Paul J. Keenan Jr. (*pro hac vice pending*)
Reginald Sainvil (*pro hac vice pending*)
Baker & McKenzie LLP
1111 Brickell Avenue, 10th Floor
Miami, FL 33130
Telephone: 305-789-8900
Facsimile: 305-789-8953
Email: paul.keenan@bakermckenzie.com
        reginald.sainvil@bakermckenzie.com

Blaire Cahn
Baker & McKenzie LLP
452 Fifth Avenue
New York, NY 10018
Telephone: 212-626-4100
Facsimile: 212-310-1600
Email: blaire.cahn@bakermckenzie.com

*Proposed Counsel for the Debtor
and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CREDIVALORES – CREDISERVICIOS S.A. | Case No. 24-10837 (DSJ) |
| Debtor. | |

_____/

### DECLARATION OF JAIME FRANCISCO BURITICÁ LEAL
### IN SUPPORT OF (I) THE CHAPTER 11 PETITION AND FIRST
### DAY PLEADINGS AND (II) PURSUANT TO LOCAL RULE 1007-2

I, Jaime Francisco Buriticá Leal, hereby declare, under penalty of perjury, as follows:

1.      I am the *Gerente General*, or Chief Executive Officer, at Credivalores – Crediservicios S.A., a company organized under the laws of Colombia ("**Credivalores**"), the above-captioned debtor and debtor in possession (the "**Debtor**," or the "**Company**"). I have served the Debtor in this role since October of 2023. Based on my service in these roles, I am generally familiar with the Debtor's day-to-day operations, business and financial affairs, and books and

1

records, and the circumstances leading to the commencement of the Debtor's above-captioned Chapter 11 case (the "**Chapter 11 Case**").

2.      I have had an extensive career in the financial sector, with expertise in investment banking, portfolio management in local and international markets, debt restructuring, and foreign trade. Prior to joining the Debtor, I was the Treasury Director for Bancóldex. I hold a professional degree in public accounting from Universidad Santo Tomás, with an MBA from Universidad de Los Andes and postgraduate studies in finance and economics from the same institution.

3.      On May 16, 2024 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in this Court seeking approval of its Prepackaged Chapter 11 Plan (as may be amended or modified, the "**Plan**") so as to permit the restructuring of the Debtor's notes issued under that certain Indenture, dated February 7, 2020, between the Debtor and the Bank of New York Mellon (the "**Old Notes**"), on the terms set forth in the Plan.

4.      On the Petition Date, the Debtor also filed a number of motions and applications (collectively, the "**First Day Motions**") in order to move towards approval and confirmation of the Plan in a manner that will allow the Debtor to operate in Chapter 11 with minimum disruption or loss of value. I am familiar with the contents of each of the First Day Motions (including the exhibits thereto), and believe that the relief sought in each of the First Day Motions is necessary to ensure a successful restructuring of the Old Notes as set forth in the Plan.

5.      I submit this declaration (the "**Declaration**") in accordance with Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**") and 28 U.S.C. § 1746 (the "**First Day Declaration**"). Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based on my personal knowledge, information supplied to me by

others at the Debtor and the Debtor's professionals, were learned from my review of relevant documents, or are my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtor. If called upon to testify, I would testify competently to the facts set forth herein.

6. To familiarize the Bankruptcy Court with the Debtor, its business, the circumstances leading to the commencement of the Chapter 11 Case, and the relief the Debtor is seeking in those certain motions and applications filed contemporaneously herewith, I have organized this Declaration as follows:

(a) <u>Part I</u> of this Declaration describes the background and business of the Debtor;

(b) <u>Part II</u> describes the Debtor's prepetition capital structure and indebtedness;

(c) <u>Part III</u> describes circumstances leading to the commencement of the Chapter 11 Case and the efforts of the Debtor to restructure the Old Notes;

(d) <u>Part IV</u> sets forth the relevant facts in support of each of the First Day Motions; and

(e) <u>Part V</u> contains statements and schedules providing additional information about the Debtor, as required by Local Rule 1007-2.

## PART I

## <u>BACKGROUND AND BUSINESS OF THE DEBTOR</u>

**A. Corporate History and Organizational Structure**

7. Crediservicios S.A. was formed in 2003 for the primary purpose of providing payroll deduction loans. Credivalores S.A. was also formed in 2003 and its primary business activities were factoring transactions and the financing of goods, services, and insurance premiums. Both companies provided their services locally in Cali, Colombia. As a result of a merger in 2008, Credivalores S.A. was fully absorbed into Crediservicios S.A. and the resulting entity changed its name to Credivalores – Crediservicios S.A.S.

8.     Over time, the Debtor grew into other geographic regions throughout Colombia, including Bogotá. In 2010, the Debtor was capitalized by two private equity funds, ACON Colombia Consumer Finance Holdings, S.L. and HSBC Capital (now Graycliff Partners), in order to strengthen its capital structure and leverage its high growth potential. In May 2014, the Debtor received a new capital injection from Gramercy, a U.S. investment manager, and as a result Gramercy became a new shareholder of the Debtor. In March 2015, Gramercy completed a new capital injection, which strengthened the Debtor's equity, promoted strong growth and improved its capitalization ratios.

9.     In June 2019, the Debtor completed a legal corporate transformation from a simplified stock corporation (*sociedad por acciones simplificadas or S.A.S*) to become a stock corporation (*sociedad anónima or S.A.*) under Colombian law and changed its name to Credivalores – Crediservicios S.A, the Debtor's current legal name.

**B.     The Debtor's Business Model**

10.     The Debtor is the largest non-bank financial institution in Colombia engaged primarily in consumer lending, focusing its offerings on a variety of flexible, specialized, and tailored credit and financing alternatives, which includes payroll deduction loans (*Tucrédito*), and insurance premium financing (*Credipóliza*), to the less-privileged segments of the Colombian population that is not served by traditional banks in small and mid-sized cities.

11.     The Debtor's main product is payroll loans, which are consumer loans whose monthly repayments/installments are deducted directly from the client's paycheck by its employer, who in turn transfers it directly to the Debtor.  The Debtor contracts directly with employers in Colombia to offer such loans to the employer's employees (each individual "**Client**" and the "**Clients**," collectively). Payroll loans are an integral financing and credit option for Colombian residents, representing approximately 35% of total consumer loans in the Colombian financial

system. Given the aforementioned collection mechanism, payroll loans typically have lower default ratios than other consumer loans. Moreover, the payroll loans are secured by an irrevocable order or authorization from the Clients to their respective employers (or to the entity that pays their salary or other financial benefits arising from their employment).

12. In addition to the Payroll Loan Business, the Debtor also offers three (3) other services, two (2) legacy services that are being wound down and/or sold, and one (1) representing only a small portion of the Debtor's overall business operations.

13. One such legacy portion of the Debtor's business operations is tailored to the provision of credit cards for Clients (the "**Credit Card Business**"). The Credit Card Business segment was initially launched as a revolving personal line of credit to finance the acquisition of specific goods, such as home appliances, or to finance home improvement projects. Eventually, this segment evolved into a Debtor-branded credit card. The credit card was offered to Clients in major retailers in Colombia and could be used at any retail merchant that accepts Visa. Collections made in connection with the Credit Card Business are done through the Client's utility bill, as well as through direct billing to the Client and through independent collections companies located in Colombia. The Debtor is currently in the process of selling and closing the Credit Card Business and no longer originates any new business from the Credit Card Business. Notwithstanding the anticipated sale and closure of the Credit Card Business, the Debtor continues to operate this segment of its operations.

14. In another legacy service, the Debtor also provided financing for insurance premiums (the "**Insurance Premium Financing Business**"). The Insurance Premium Financing Business represented only a small part of the Debtor's total business operations and was ultimately closed in 2021. Any income that the Insurance Premium Financing Business presently generates

is related solely to previously-existing clients. In other words, the Debtor is collecting on any remaining accounts, but does not originate any new business from this segment of its operations.

15.     Finally, the Debtor also offers the mandatory insurance required for the loans generated by the Payroll Loan Business, as well as other optional insurance products such as health and accident insurance ("**Optional Insurance Services**") through its alliances with insurers.  For every client that signs up for insurance services through the Debtor, the Debtor receives a fee of approximately 23.5–27% of the insurance premiums.

**PART II**

**THE DEBTOR'S PREPETITION CAPITAL STRUCTURE AND INDEBTEDNESS**

**A.     Outstanding Debt Obligations**

16.     The Debtor's largest financial indebtedness is the amount that it owes under the Old Notes. As of the Petition Date, the amount outstanding on the Old Notes was US$210,800,000, plus estimated accrued interest through February 7, 2024 of US$9,354,250.

17.     The Debtor issued the Old Notes under an Indenture, dated February 7, 2020, between the Debtor and the Bank of New York Mellon, a New York banking corporation incorporated under the laws of New York, as trustee, registrar, paying agent, and transfer agent. The Indenture provided for the issuance of 8.875% Senior Notes due February 7, 2025, in an aggregate principal amount not to exceed $300,000,000. The Old Notes arising under the Indenture are general unsecured obligations of the Debtor.

18.     Interest payments under the Old Notes are made semi-annually on February 7th and August 7th (or, if a non-Business Day, the next succeeding Business Day).

19. The equity interest of the Debtor is as follows: Lacrot Inversiones 2014 SLU, 41.9%; Crediholding S.A.S., 20.6%; Davalia Gestión de Activos S.L, 20.0%; Acon Consumer Finance Holdings II S L, 12.0%; Acon Consumer Finance Holdings S de RL, 2.5%; with the remaining 3.0% held in treasury shares.

**B. The Debtor's Secured Claims[1]**

20. The Debtor has a series of secured claims, arising in the ordinary course of business, that are classified as unimpaired and will be paid in full as such obligations come due. All such claims are collateralized with receivables from either the Debtor's payroll loans or credit cards. These secured claims total approximately US$94.7 million.[2] The Plan provides for payment in full in cash for all such claims in the ordinary course, as payments from loan portfolios are received or as loan portfolios are sold (in contexts described further below).

**C. General Unsecured Claims**

21. In the ordinary course, the Debtor routinely transacts business with a number of third-party contractors and vendors, many of which are based outside of the United States. These transactions give rise to general unsecured claims against the Debtor. The Debtor estimates that from the Petition Date until the proposed date to consider approval of the Plan, the aggregate total amount of unsecured claims, such as leases, customer refunds, financials debt, trade claims, among others, in Class C—which the Debtor will have an obligation to pay as such obligations come due pursuant to the terms or course of dealing of the Debtor and such creditors—are approximately $2.8 million. The Plan provides for reinstatement or payment in full in cash in the ordinary course of business for all such claims.

---

[1] The Plan provides that claims in Classes B (secured claims) and C (general unsecured claims) are unimpaired.
[2] Amounts reflect outstanding balance (principal and interest) as of April 30, 2024.

**C.     The Debtor's Current Financial Condition**

22.     A difficult credit environment, currency volatility, and certain operational challenges, including servicing prepetition debt, has led to tightening liquidity for the Debtor. These challenges caused the Debtor to choose to hold back the $9.4 million interest payment under the Old Notes on February 7, 2024 for the purposes of maintaining liquidity to fund ongoing operations. The consequent ratings downgrade of the Debtor's prepetition secured debt caused further tightening in the Debtor's trade terms, which has exacerbated the Debtor's ongoing liquidity issues. Given recent performance, business plan projections, and the lack of free cash flow needed to make critical investments in its business, the Debtor has determined that deleveraging its capital structure is a necessity. Accordingly, the Debtor has filed this Chapter 11 Case to implement the Plan and a comprehensive balance sheet restructuring of its Old Notes. The restructuring will enable the Debtor to deleverage its balance sheet by approximately $55 million—approximately 25.0% of its funded debt obligations—strengthening its capital structure, and positioning its businesses for stability and long-term financial sustainability and success after emergence from bankruptcy.

**PART III**

**CIRCUMSTANCES LEADING TO COMMENCEMENT OF THESE CHAPTER 11 CASE**

23.     The Debtor has historically funded costs and expenditures through a combination of cash generated from operations, equity issuances, and borrowing funded indebtedness. Although the Debtor's business remains strong, a difficult credit environment and certain operational challenges, including the servicing prepetition debt, has led to tightening liquidity for the Debtor.  Currency volatility, in particular with respect to the Colombian Peso, has also presented a headwind for the Debtor, as a substantial portion of the Debtor's debt is denominated

in U.S. dollars, while the Debtor's revenue is generated solely in Colombian Pesos. As a result of these forces, the Debtor recently experienced difficulty in raising sufficient cash to meet its obligations as they become due and has faced pressure with respect to its coupon and principal payments on its borrowings.

24. Chief among the Debtor's debt obligations in this respect are the Old Notes. Despite the Debtor's overall financial strength, the Debtor has had difficulty raising the necessary funds to repay the Old Notes for the aforementioned reasons and recently held back the coupon payment due on February 7, 2024 on the Old Notes in order to maintain liquidity to continue funding ongoing operations. Prior to holding back the coupon payment in February 2024, the Debtor announced its intention to restructure the Old Notes and replace them with new Senior Secured Step-up Notes maturing in 2029 with staggered coupons, and commenced negotiations with the holders of the Old Notes. Additionally, the Debtor negotiated the terms of, and executed, three (3) forbearance agreements: one dated March 1, 2024 with Clover Zermatt O LLC, Clover Private Credit Opportunities Origination II LP, and Gramercy Colombia Consumer Lending Holdings LLC as lenders; one dated March 7, 2024 with GCS Colombia Finance LLC, GDA Luma Special Opportunities Fund, L.P., and Acon Colombia Finance II, LLC, as lenders; and one dated April 1, 2024 with Bancolombia S.A., Banco de Bogotá, S.A., Banco de Occidente S.A., and Banco de Santander de Negocios Colombia S.A. as lenders (collectively, the "**Lenders**"). In the forbearance agreements, the Lenders acknowledged the Debtor's efforts to restructure the debt owed under the Old Notes, its negotiations with the noteholders of the Old Notes, and agreed to forbear their rights to declare default events under certain credit agreements, thereby providing the Debtor with

sufficient time to consider and implement a prepackaged restructuring of its obligations under the Old Notes to optimize its balance sheet and ensure agility and resilience moving forward.

25.     The Plan (defined below), which has the support of the majority of the holders of the Debtor's funded indebtedness, contemplates restructuring the Old Notes, the issuance of the New Notes (defined below), and the unimpaired treatment of all other claims and interests.  By restructuring the Old Notes, the Debtor will strengthen its capital structure, improve and extend its debt maturity profile and liquidity, thereby fortifying its financial position and long-term financial sustainability and operations such that it can continue offering flexible credit and financing alternatives to its more than 700,000 clients, many of whom belong to the less-privileged and financially-underserved members of Colombia's population.

A.      **The Exchange Offer**

26.     Because the Debtor, after considering the financial and operational aspects of the Debtor's business and after consultation with the Debtor's professionals and advisors, has deemed it necessary to obtain relief from its debt burden in order to remain competitive—namely, relief from the debt burden imposed under the Old Notes—it began discussion with several holders of its Old Notes regarding a restructuring of the Old Notes.  This restructuring would have the primary effect of extending the maturity of the Old Notes and thereby reducing the Debtor's overall debt and interest burden in the near term, ensuring its financial strength into the future.

27.     Accordingly, on March 7, 2024, the Debtor launched an exchange offer and solicited votes from all holders of the Old Notes to exchange the Old Notes (the "**Exchange Offer**") for newly-issued Senior Secured Step-up Notes due 2029 (the "**New Notes**") and on its Prepackaged Chapter 11 Plan (as may be amended, the "**Plan**") that would effectuate the financial

restructuring, *i.e.*, the exchange of the Old Notes for the New Notes, on essentially the same terms as the Exchange Offer.

28.     As set forth above, the outstanding principal amount of the Old Notes is US$210,800,000. The maximum aggregate principal amount of the Senior Secured Step-Up Notes would be estimated to be  US$165,120,000.

29.     To assist it in connection with the Exchange Offer, consent solicitation, and the Plan Solicitation (defined below), the Debtor retained the services of Epiq Corporate Restructuring LLC (exchange agent and information agent) ("**Epiq**") and BCP Securities, Inc. (dealer manager) ("**BCP**").

**B.      Plan Solicitation**

30.     Concurrently with the Exchange Offer, the Debtor solicited votes from all holders of the Old Notes to approve the Plan (the "**Plan Solicitation**") that would effectuate the financial restructuring, *i.e.*, the exchange of the Old Notes for the New Notes and certain cash consideration, on essentially the same terms as the Exchange Offer.

**C.      The Plan is Accepted**

31.     The deadline for voting on the Plan expired at 5:00 p.m. (New York City time) on April 3, 2024 (the "**Voting Deadline**").

32.     As of the Voting Deadline, the requisite number of eligible holders of the Old Notes tendered their votes and the Debtor determined to file and prosecute the Plan consistent with the Exchange Offer.  As set forth in the certification of Epic, 128 ballots were submitted by holders of the Old Notes (the only creditors eligible to vote on the Plan).  Of those that voted, 81.25% of the

holders of the Old Notes in number, holding 96.09% of principal amount of the Old Notes of the holders that voted, voted to accept the Plan.

33.     Contemporaneously with the filing of this First Day Declaration, the Debtor filed the Offering Memorandum and Consent Solicitation Statement Relating to the Joint Prepackaged Chapter 11 Plan of the Debtor (as modified, amended, or supplemented from time to time, the "**Disclosure Statement**") and the Joint Prepackaged Plan (again, the "**Plan**"), and a motion seeking approval of the adequacy of the Disclosure Statement, approval of the Solicitation Package and confirmation of the Plan (the "**Scheduling Motion**," and the proposed order in respect thereof, the "**Scheduling Order**").

## PART IV
## FIRST DAY MOTIONS AND APPLICATIONS

34.     The Debtor has filed or will file a number of Motions  (the "**First Day Motions**") seeking various forms of relief designed to facilitate approval of the Plan on an expeditious basis and a successful restructuring of the Debtor.[3]

35.     I have reviewed each of the First Day Motions, including the exhibits thereto. I believe that the Debtor has satisfied the applicable standards for the relief requested, and that the Court's grant of the requested relief is in the best interests of the Debtor, its estate, as well as that of creditors and other parties in interest. Each of the First Day Motions is summarized below.

36.     **Utilities Motion.**   The Debtor seeks entry of interim and final orders: (i) authorizing it to continue paying amounts owed to its foreign utility providers (including those that do not consent to the jurisdiction of this Court) in the normal course of business, (ii) approving the Debtor's proposed adequate assurance and adequate assurance procedures for consenting

---

[3] Unless otherwise defined herein, capitalized terms in this Part IV shall have the meaning ascribed to them in the respective First Day Motion.

foreign utility providers; (iii) prohibiting consenting foreign utility providers from altering, refusing, or discontinuing utility services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtor's proposed adequate assurance; and (iv) granting related relief.

37.     In the ordinary course of business, the Debtor regularly incurs utility expenses for utility services provided by foreign utility providers. Uninterrupted utility services are essential to the Debtor's business operations.  Should any foreign utility provider refuse or discontinue service, even for a brief period, the Debtor's ability to preserve and maximize the value of its estate could be severely and irreparably harmed. I believe that any interruption of the utility services would disrupt the Debtor's ability to operate and maintain its business and would thereby negatively affect the Debtor's customer relationships, revenues, and profits. Such a result could seriously jeopardize the value of the Debtor's businesses and, ultimately, creditor recoveries.

38.     **Cash Management Motion.**  The Debtor seeks entry of an interim and final orders: (A) authorizing, but not directing, (i) the continued use of existing cash management system(s), (ii) maintenance of bank accounts, and (iii) continued use of existing business forms and checks; (B) authorizing, but not directing, continued performance under related party transactions and historical practices; and (C) waiving the requirements of section 345(B) of the Bankruptcy Code; and (D) providing any additional relief required in order to effectuate the foregoing.

39.     To facilitate the efficient operation of their business, in the ordinary course of its business, the Debtor utilizes an integrated, centralized cash management system to collect, transfer, and disburse funds generated by its operations, including the Bank Accounts, the Flow of Funds, the Related Party Transactions, and all other cash management and funds-processing activities and arrangements utilized by the Debtor (together, the "**Cash Management System**").

The Cash Management System facilitates the Debtor's cash forecasting and reporting, monitoring of the collection and disbursement of funds, maintenance of current and accurate accounting records for all cash transactions, and administration of approximately forty three (43) bank accounts held by the Debtor or held by other parties where the debtor is the trustee (each, a "**Bank Account**" and collectively, the "**Bank Accounts**") maintained by the Debtor prior to the Petition Date in the ordinary course of business at various financial institutions (hereinafter, the "**Banks**"). Of the forty three (43) Bank Accounts, fifteen (15) are under the Debtor's name, while the remaining twenty eight (28) are trust accounts.

40.     The Debtor's main operating Bank Accounts, although not within the UST Authorized Depository List, are accounts held at highly-rated, global financial institutions that are widely recognized as well-capitalized and financially stable. Of the 43 Bank Accounts, 41 are held at financially stable institutions that are insured by either the Federal Deposit Insurance Corporation ("**FDIC**") (up to an applicable limit per Debtor per institution) or its Colombian equivalent, the deposit insurance agencies Fondo de Garantias de Instituciones Financieras ("**FOGAFIN**"). Of the remaining two (2) Bank Accounts, one is held by the Debtor at Alianza Fiduciaria and is periodically used as a savings account to earn higher interest, and the other is a trust account with Fiduprevisora S.A. ("**Fiduprevisora**").

41.     The Cash Management System facilitates the Debtor's various operations. With respect to the Payroll Loan Business, funds generally flow through the Cash Management System as follows. The Debtor first signs an agreement with the employer to offer payroll loans to the employer's employees (each individual "**Client**" and the "**Clients**," collectively). The Client then applies for credit and, if approved, the Client then issues an irrevocable payment instruction to their employer for deductions to be made from their monthly paycheck/pension receipt. In order

to be approved, the Client must have a life insurance policy, either facilitated through the Debtor or their own. The insurance policy offered through the Debtor is with Cardif Colombia Seguros Generales S.A. If the Client utilizes their own life insurance policy, such policy must meet the same conditions as the policy offered through the Debtor. (These conditions include naming the Debtor as first beneficiary, requiring the pay-out amount to be for, at a minimum, the full balance of the loan, including principal, interest and fees, as well as other conditions.) Once these steps are taken and conditions are met, the Client receives the funds from the Debtor.

42.     Once the funds are disbursed to the Client, the Debtor sends a file to the Client's employer with the total amounts due under each Client's loan, which includes any repayments to the principal, interest, fees, and any insurance premiums (if applicable). The employer then deducts the amounts due from the payroll and remits the deducted amounts to the Debtor. If the Client obtained the insurance through the Debtor, the Debtor then remits the portion corresponding to the insurance premiums to Cardif Colombia Seguros Generales S.A. A flowchart detailing the basics of this loan transaction, as relevant to the Cash Management System, is set forth below:



43.     At present, no new loans are being originated from the Credit Card Business nor the Payroll Loan Business at this time. However, the Debtor is working with potential local and international investors to obtain more capital in order to begin originating new payroll loans.

44. Generally, collections from the loans are remitted to the Debtor through trust accounts. Financing through trusts is a very commonly used structure in Colombia across public and public/private initiatives, including in the financial sector and with private companies. Indeed, the Debtor, like many of its competitors, has been raising funds through trusts since its inception. The trusts utilized are irrevocable trusts that are contractual in nature and are not separate legal entities from the grantor.

45. For example, a trust is established by a grantor (*e.g.*, here, the Debtor) and agreed to by a trustee (a "*fiduciario*") who is bound to undertake a specific purpose for the benefit of a beneficiary (*e.g.*, here, the Debtor's financing institution(s)). Fiduciaries must be financial services companies regulated by the local Colombian regulator responsible for overseeing financial regulation, the Superintendencia Financiera de Colombia ("SFC"). Under this structure, the Debtor becomes the grantor and constitutes the trust with either cash or a loan portfolio. The promissory notes that comprise the loan portfolio are endorsed to the trust, which in turn borrows funds from financial institutions, using the portfolio as collateral. The Debtor guarantees the obligations of the trusts and continues managing the loan portfolio throughout the life of the loans. Additionally, the Debtor is entitled to excess funds or assets owned by the trusts after the agreed collateral level has been met.

46. The Debtor utilizes two master trusts for collection of funds: one for payroll loans, and another for credit cards. In the case of payroll loans, all employers wire transfer the amounts deducted via payroll from Clients to a specific trust (*i.e.*, collection trust), and the Debtor in turn wire transfers the funds that correspond to the security of the financial obligation to each trust before taking the excess into the Debtor's own accounts to pay ongoing operational expenses and

other financial obligations. In the case of credit cards issued by the Debtor, the transaction is substantially the same.

47.     The Debtor maintains seven (7) main types of accounts: (i) four (4) loan originating accounts; (ii) fifteen (15) collection accounts; (iii) one (1) consolidating account; (iv) nine (9) loan trust accounts; (v) one (1) excess funds account; (vi) four (4) disbursement account; and (vii) five (5) reserve accounts.

48.     Collections are continuously received on almost a daily basis. At the end of each month, the Debtor prepares the various reports to determine all of the amounts that were collected and to which portfolio they belong. Within the first week after each month's end, the transfers to the various accounts are made

49.     In the ordinary course of business, the Debtor incurs and pays, honors, or allows to be deducted from the appropriate Bank Accounts certain service charges and other related fees, costs, and expenses charged by the Banks. In particular, the Banks charge the Debtor service charges, transaction fees, taxes and other fees in connection with the maintenance of the Cash Management System ("**Bank Fees**"). Gravamen a los Movimientos Financieros ("**GMF**") is a financial transactions tax applied to most movements of money within Colombian bank accounts, such as deposits, withdrawals, and transfers among others. Currently, the rate is four Colombian pesos for every thousand Colombian pesos transacted, or 0.4% of the transaction amount. At present, the Debtor pays the Banks an aggregate of approximately US$104,493 in connection with the Bank Fees per month, which are generally due and paid on a daily basis for GMF, and on a monthly basis for all other Bank Fees. The Bank Fees related to the accounts in the Debtor's name are approximately US$27,932, while the remaining US$76,561 relate to the trust accounts. As of the Petition Date, the Debtor does not believe that it has any outstanding or unpaid Bank Fees. Out

of an abundance of caution, and to ensure continued access to the Bank Accounts and related banking services, the Debtor seeks authority to pay any pre-petition Bank Fees that may have been incurred and to continue to pay the Bank Fees in accordance with past practices.

50.     As described in the Cash Management Motion, the Debtor does not have any intercompany transfers or transactions, but presently transacts with three (3) related entities with certain identified parties in which the Debtor's shareholders have a substantial ownership interest in the ordinary course of its business (the "**Related Party Transactions**"):

a)     In June 2016 the Debtor entered into an agreement with Asesorias Financieras de Credito S.A.S ("**Asficredito**")[4] to provide the following services: (i) selection, hiring and training of personnel for contact service center, credit origination, commercial management and Client onboarding; (ii) documentation management, digitization and custody of all types of documents; (iii) provision of contact center services (inbound and outbound) for data updates, service evaluation, classification and stratification of databases, sale of financial services, collection of portfolio and reception and transmission of telephone calls to carry out the above activities; (iv) provision of BPO (Business Process Outsourcing) services; (v) provision of courier services including collection, protection, surveillance, transfer, custody, filing, transportation and delivery of items and documents with commercial value; and (vi) execution of operational processes for Portfolio Payments and delivery of checks to third party Clients, among others.

b)     The Debtor is also borrower on several loans originated between 2022 and 2023 with Finanza Inversiones S.A.S ("**Finanza Inversiones**")[5] totaling approximately

---

[4] 14.5% of the Debtor's shareholders have approximately 23% ownership in Asficredito.
[5] 77.0% of the Debtor's shareholders have 100% ownership of Finanza Inversiones.

US$42.6 million (including capitalized interest at SOFR + 12.26% for four of the loans and 20% fixed for one loan). The Debtor utilized these loans to inject funds into the business to continue, and grow, the current operations. The Debtor also has an outstanding receivable loan from Finanza Inversiones for US$23.6 million from December 2022, with a net payable balance of US$19.0 million as of the Petition Date. These loans have a maturity date of November 2024 with accrued interest since the second half of 2023, resulting in outstanding interest of US$4.4 million.

c)  In November 2023, the Debtor sold to Ban100 S.A. ("**Ban100**")[6] some of its payroll loan portfolio and Credit Card Business. The payroll loan portfolio transfer has not been fully completed as the Debtor still receives some of the collections related to the portfolio sold to Ban100. Upon receipt of such collections, the Debtor transfers those funds to Ban100. The Debtor will continue to receive such collections—and, by extension, continue to transfer said collections to Ban100—until the employers update their records, at which point the employers will submit these collections directly to Ban100 on a monthly basis. The Debtor continues to sell some of its payroll loan portfolio to Ban100 (or any other interested party as may arise). The sales agreement with Ban100 also includes recourse against the Debtor for any overdue loans, which may result in the Debtor having to repurchase some of these loans back.

51.  These Related Party Transactions allow the Debtor, among other things, to meet the needs of their customers efficiently in a cost-effective manner through the centralization of key administrative functions, as well as ensure liquidity and cash flow.

---

[6] Finanza Inversiones owns approximately 94.5% of Ban100.

52.     I believe the Debtor's Cash Management System, as summarized above and more fully detailed in the Cash Management Motion, constitutes a customary and essential business practice that was created and implemented by the management of the Debtor in the exercise of its business judgment, and is a practical and essential mechanism that allows the Debtor to continue operations.

53.     **Taxes and Fees Motion.** The Debtor will seek entry of an order authorizing, but not directing, the Debtor, in its sole discretion to pay prepetition Taxes and Fees that arise in the ordinary course of the Debtor's business, owed to the Taxing and Regulatory Authorities, provided that the aggregate amount of such payments shall not exceed $750,000. Of this amount, the Debtor is requesting authority to pay approximately $700,000 on an interim basis prior to the final hearing on the relief requested in the Taxes and Fees Motion. In addition, in this Motion, the Debtor also seeks authorization to honor (a) all checks that remain uncashed prior to the Petition Date or that are otherwise returned by a Taxing or Regulatory Authority, as well as (b) those Taxes and Fees subsequently determined upon audit to be owed for periods prior to the Petition Date.

54.     In connection with the normal operations of its business, the Debtor withholds and incurs an assortment of income, VAT, city, municipal, withholding, and other taxes (collectively, the "**Taxes**") to various Colombian federal, municipal and local government entities, service providers or tax administrators (collectively, the "**Taxing and Regulatory Authorities**") and pay various regulatory fees (the "**Regulatory Fees**" and together with the Taxes, the "**Taxes and Fees**").

55.     It is my understanding that the Debtor's failure to pay the Taxes and Fees could adversely affect the Debtor's business operations because the Taxing and Regulatory Authorities could suspend the Debtor's operations, file liens, issue penalties, or seek to lift the automatic stay.

In addition, certain Taxing and Regulatory Authorities may take precipitous action against the Debtor's directors and officers for unpaid Taxes, which undoubtedly would distract those key personnel from their day-to-day duties as well as in connection with the restructuring. For these reasons, as described more fully in the Taxes Motion, I believe that the payment of prepetition Taxes and Fees will help the Debtor avoid serious disruption to its operations that would result from the failure to pay such Taxes and Fees.

56. **Unimpaired Claims Motion.** In the Unimpaired Claims Motion, the Debtor requests entry of an order authorizing, but not directing, the Debtor to pay the prepetition claims of creditors that are treated as unimpaired claims under the Plan as the payment obligation on those claims arise in the ordinary course of the Debtor's business. The Plan seeks to restructure just one type of claims—those arising under the Old Notes. Importantly, the Plan has classified the Debtor's other secured claims ("**Class B**") and general unsecured claims ("**Class C**") as unimpaired (collectively, the "**Unimpaired Claims**"), with the Debtor seeking to satisfy each of those claims as they come due in the ordinary course of the Debtor's business.

57. The Debtor's Class B claims relate primarily to secured claims of various financial institutions, collateralized with either receivables from payroll loans or receivables from credit cards. These secured claims total approximately $94.7 million.[78]

58. The Debtor's Class C claims consist of the Debtor's obligations to its vendors, other trade creditors that provide goods or services related to (and for the benefit of) the Debtor's operations, such as leases, customer refunds, trade claims, and other unsecured financial debt. The Debtor estimates that from the Petition Date until the proposed date to consider approval of the

---

[7] As noted in Schedule 2 to this Declaration, Citibank Colombia S.A holds a security interest in a portion of the Debtor's payroll loan portfolio. In the Debtor's ordinary course of business, proceeds related to the sale of such interest to Ban100 (or any other interested party), must be used to repay Citibank Colombia S.A.

[8] Amount reflect outstanding balance (principal and interest) as of April 30, 2024.

Plan, the aggregate total amount of unsecured claims, such as leases, customer refunds, financial debt, trade claims, among others, in Class C, which the Debtor will have an obligation to pay as such obligations come due pursuant to the terms or course of dealing of the Debtor and such creditors are approximately $2.8 million. The Debtor believes that most of those claims (a) may be entitled to statutory priority under section 503(b)(9) of the Bankruptcy Code, (b) may give rise to shippers, suppliers, or other liens against the Debtor's property if unpaid, (c) are held by vendors who are critical to the Debtor's business and who the Debtor believes must be paid to avoid any disruption to the Debtor's business, and/or (d) are foreign trade vendors who operate in Colombia and have few or no contacts with the United States. Such foreign vendors may not be willing to transact with the Debtor if it owes outstanding debts and they may seek to withhold goods or services, which would interfere with ordinary course operations of the Debtor's business.

59.     I believe that given the importance of maintaining its relationships with creditors who hold Unimpaired Claims, and that such claims will remain unimpaired under the Plan, it is necessary to avoid the risk of key vendors and service providers withholding essential services or refusing to sell goods to the Debtor.

60.     **Schedules Extension/Waiver Motion.**   In this Motion, the Debtor seeks interim and final orders: (i) extending the time by which the Debtor must file its schedules of assets and liabilities and statements of financial  affairs (collectively, the "**Schedules and Statements**") to sixty (60) days after the current deadline imposed by Bankruptcy Rule 1007 and (ii) waiving the requirement that the Debtor file the Schedules and Statements on the date of confirmation of the Plan if confirmation occurs on or before the 60 day deadline.

61.     This is a prepackaged chapter 11 plan, and the Debtor anticipates consummation of the plan during the next sixty (60) days. Given this compressed time frame, I believe that the

Debtor's resources must be focused on finalizing the documentation necessary to implement the transactions contemplated by the Plan rather than working to finalize Schedules and Statements. Therefore, I am of the understanding that the deadline to file the Schedules and Statements should be extended and the requirement waived if the Plan is confirmed.

62.     **Insurance Motion.**   The Debtor requests that the Court authorize the Debtor to maintain existing insurance policies, pay all policy premiums arising thereunder, whether prepetition or postpetition, and renew or enter into new policies as needed. The Debtor also requests that the Court authorize the Debtor to continue paying premiums collected from borrowers of the Debtor (the "**Borrowers**") to the appropriate insurance company.

63.     The Debtor historically maintains numerous insurance policies with various insurance companies (collectively, the "**Insurance Companies**") providing coverage for, *inter alia*, officers and directors liability, general civil liability, cyber risk management, the Debtor's assets (real estate and otherwise), and coverage derived from the risk in the management of financial entities (collectively, the "**Operations Insurance Policies**").  In addition, the Borrowers are required by Colombian law to purchase a life insurance policy when acquiring a financial service, but the Debtor also offers to its Borrowers other optional upgrades or policies such as personal injuries coverage. Therefore, the Borrowers must maintain life insurance coverage with a death benefit in favor of the Borrower, whether the Borrower has a drawable loan or a credit card. The insurance coverage must be equal or greater to the principal amount of the loan acquired, *i.e.* principal, interest, interest on arrears, and collection expenses. To meet the  requirement of life insurance policies required by Colombian law, Borrowers have two options. They may either (i) accredit their own insurance policy or (ii) buy an insurance policy offered by the Debtor (the "**Borrower's Life Insurance Policies**" and together with the "**Operating Insurance Policies**",

the "**Policies**"). Borrowers are the named insured, but the Debtor is the beneficiary thereof. The monthly insurance premiums are deducted from the Borrower's payments for both mandatory and optional insurance coverage and are remitted by the Debtor to the Insurer within 60 days after collection.

64.     I believe that the continuation of the Policies, the renewal of and entry into new insurance policies in the ordinary course, and remitting payments from the Debtor's Borrowers to the Borrower's Life Insurance Policies is essential to the preservation of the value of the Debtor's properties and assets. In many cases, coverage provided by the Policies is required by the regulations, laws, and contracts governing the Debtor's commercial activities, including the requirement of the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") that a debtor maintain adequate coverage. While other alternatives exist, such alternatives likely require considerable additional cash expenditures that could thwart the Debtor's efforts to preserve and maximize the value of its estate. Accordingly, and as set forth further in the Insurance Motion, the Debtor submits that it is necessary and appropriate to permit the Debtor to honor its obligations under its current Policies.

65.     **Scheduling and Solicitation Procedures Motion.** The Debtor seeks entry of an order (i) scheduling a combined hearing (the "**Confirmation Hearing**") to consider the adequacy of the Offering Memorandum and Consent Solicitation Statement (as modified, amended, or supplemented from time to time, the "**Disclosure Statement**") and confirmation of the Plan; (ii) approving the form and manner of notice of the Confirmation Hearing; (iii) approving the solicitation procedures used in connection with the Debtor's prepetition solicitation of the Plan described herein and further discussed in the Disclosure Statement (collectively, the "**Solicitation**

**Procedures**"); (iv) directing that a meeting of creditors not be convened; and (v) granting certain related relief, all as described more fully in the Scheduling and Solicitation Procedures Motion.

66.     As set forth in the Motion, the Debtor proposes the following schedule of dates relevant to the Solicitation Procedures and the Confirmation Hearing.

| Proposed Solicitation and Confirmation Schedule | |
|---|---|
| Voting Record Date | March 7, 2024 |
| Distribution of Solicitation Package | March 7, 2024 |
| Voting Deadline | April 3, 2024 |
| Petition Date | May 16, 2024 |
| Distribution of Confirmation Hearing Notice | May 23, 2024 |
| Plan Supplement Deadline | June 7, 2024 |
| Objection Deadline | June 14, 2024, at 4:30 pm (prevailing Eastern Time) |
| Reply Deadlines | June 21,2024, at 4:30 pm (prevailing Eastern Time) |
| Confirmation Hearing | June 25, 2024 |

67.     The Debtor believes that this timeline is reasonable, particularly given the fact that the holders of the Old Notes will have known the terms of the Plan for approximately fourteen (14) weeks by the time objections are due, and were aware that, if the Exchange Offer were not consummated, the Debtor would promptly seek relief under the Bankruptcy Code.

68.     Based on my conversations with the Debtor's advisors, I respectfully submit that the relief sought in this Motion is appropriate under the circumstances presented here.

69.     **Unsecured Creditors Committee Motion.**  The Debtor seeks an entry of an order, pursuant to 11 U.S.C. § 341(e), dispensing with or delaying the formation of an official committee of unsecured creditors, or for compliance with Fed. R. Bankr. P. 2007(B).  The basis for this Motion is that there are no unsecured creditors, and no such plan or solicitation need for the same, and therefore, I understand that a meeting of creditors would serve no meaningful purpose in this Chapter 11 Case.  In addition, as further detailed in the Motion, there is little complexity in these proceedings because the Plan relates to only one set of debt instruments, and thus, I understand

that any requirement of a meeting of creditors would unduly prolong the resolutions process and cause the Debtor to incur unnecessary expenses without significant benefits to the interested parties in this Chapter 11 Case.

70. **Salaries and Wages Motion.** Here, the Debtor seeks interim and final orders: (i) authorizing it to pay prepetition amounts owed on account of Employee Related Obligations, (including Employee Compensation, Payroll Withholding Obligations, Social Fund Obligations, Employee Benefit Programs, and Termination Obligations, as further defined in the underlying Motion), (ii) authorizing it to maintain and continue paying these Employee Related Obligations post-petition in the ordinary course of business; and (iii) granting related relief.

71. The Debtor's ability to successfully operate depends on the services and dedication of the 112 men and women that make up the Debtor's workforce. These Employees have worked tirelessly to sustain the Debtor's operations and prepare them for this Chapter 11 Case. I believe it is critical that the Debtor retains its Employees to continue its operations. Thus, it is essential to assure the Employees that the Debtor will honor the prepetition Employee Related Obligations, and continue to honor those obligations post-petition in the ordinary course of business. A failure to promptly do so may create concern and discontent among the Employees and could hinder the Debtor's operations and the administration of its estate. I believe that loss of even a few key personnel in the initial days of this Chapter 11 Case could immediately and irreparably harm the Debtor's ability to maintain operations and maximize the value of its assets, all to the detriment of the Debtor and its estate.

72. **Automatic Stay Motion.** The Debtor seeks an entry of an order (1) enforcing the protections of 11 U.S.C. §§ 362, 365, 525, and 541; (2) approving the form and manner of notice; (3) granting related relief. As further detailed in the Motion, this "automatic stay" constitutes a

fundamental protection that, together with other provision of the Bankruptcy Code, would provide Debtor with a "breathing spell" that is essential to a successful reorganization.

73. **Compensation of Professionals Motion.** In this motion, the Debtor seeks an entry of an order establishing procedures for interim compensation and reimbursement of expenses for retained professionals. As further detailed in the Motion, the Debtor seeks the Court's approval of procedures for the monthly allowance and payment of compensation and reimbursement of expenses for attorneys and other professionals whose retention are approved by the Court pursuant to sections 327, or 1103 of the Bankruptcy Code and who will be required to file applications for allowance of compensation and reimbursement of expenses pursuant to sections 328, 330, and 331 of the Bankruptcy Code, on terms that satisfy the requirements of Bankruptcy Rule 2016(a) and Local Bankruptcy Rule 2016-1. I believe that the retention of these professionals is essential to the success of the Chapter 11 Case and, by extension, the long-term success of the Debtor.

74. **Application to Retain Attorneys.** The Debtor has determined that it is necessary to engage counsel with knowledge and experience in the areas of bankruptcy, reorganization, tax, corporate governance and other matters. Such counsel will enable the Debtor to carry out their duties in the Chapter 11 Case and to assist in the restructuring of the Old Notes. The Debtor, therefore, seeks to retain and employ Baker & McKenzie LLP ("**Baker McKenzie**") as their restructuring attorneys in all phases of the Chapter 11 Case.

75. I understand that Baker McKenzie is a law firm, which employs approximately 4,800 attorneys and maintains offices for the practice of law in New York, New York, as well as offices located throughout the world, including but not limited to: Washington, D.C.; Miami, Florida; Bogotá, Colombia; Mexico City, Mexico; London, United Kingdom; Paris, France; Rome, Italy; Milan, Italy; Frankfurt, Germany; Berlin, Germany; Hong Kong; Beijing, China; Buenos

Aires, Argentina; São Paulo, Brazil; Abu Dhabi, United Arab Emirates; Seoul, South Korea; Bangkok, Thailand; Tokyo, Japan; and Sydney, Australia. I also have been informed that Paul Keenan, Esq., of Baker McKenzie, the lead partner who will be engaged in the Chapter 11 Case, is a member in good standing of, among others, the Bar of the State of Florida, and is presently seeking *pro hac vice* admission to the United States District Court for the Southern District of New York, and is sponsored in such admission by Blaire Cahn, Esq., of Baker McKenzie, who is a member in good standing of the Bar of the State of New York and the United States District Court for the Southern District of New York.

76.     Over the course of its representation of the Debtor, Baker McKenzie has become familiar with the Debtor's business and affairs, including the transactions contemplated by the Plan, as well as the legal issues that may arise in these proceedings. Baker McKenzie's present representation of the Debtors regarding the restructuring contemplated in this Chapter 11 Case began on or around October 2023. I have been informed that Baker McKenzie does not hold or represent any interest adverse to the Debtor or its estate, and that Baker McKenzie is a "disinterested person" as that phrase is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code.

77.     The Debtor believes, and I agree, that Baker McKenzie is both well-qualified and uniquely able to represent the Debtor in the Chapter 11 Case in an efficient and timely manner. Accordingly, I respectfully submit that the Baker McKenzie Application should be approved

78.     **Hedging Practices Motion.**  In this motion, the Debtor seeks entry of interim and final orders authorizing, but not directing, the Debtor to (a) continue entering into, terminating, and/or performing under the Hedging Agreements  in the ordinary course of business, (b) perform

such ancillary transactions as may be necessary to implement or terminate such Hedging Agreements, including providing credit support, and (c) granting related relief.

79.     As is customary for companies with debts denominated in other currencies, in the ordinary course of business, the Debtor has historically entered into foreign currency purchase contracts and options to manage risks associated with transactions denominated in foreign currencies (the "**Foreign Currency Hedging Agreements**" or "**Hedging Agreements**") and the activities related thereto (the "**Hedging Practices**"). In order to execute derivative trades, the Debtor enters into an International Swap and Derivatives Association, Inc. Master Agreement ("**ISDA**") with Morgan Stanley & Co ("**Morgan Stanley**"). The ISDA is a standard contract that governs all Hedging Agreements entered into between the Debtor and the respective derivative counterparty (each "**Hedging Counterparty**" or the "**Hedging Counterparties**").

80.     The Hedging Practices operate to reduce the Debtor's exposure to risks related to currency exchange rate fluctuations, providing the Debtor with cash-flow predictability to help manage its business. Through the Hedging Practices, the Debtor is able to hedge against adverse foreign exchange fluctuations, thereby protecting the economic value of its operations by preventing substantial declines in cash flows. While hedging does not eliminate risk, hedging can generally be used as an effective management tool for mitigating it. The Debtor's internal policy states that as long as the functional currency of the business is the Colombian Peso, management must implement a total hedging strategy (principal and interest) for foreign currency denominated assets and liabilities in a timely manner after acquiring those rights and obligations.

81.     As of the Petition Date, the Debtor had approximately twenty-four (24) foreign exchange call options (Hedging Agreements) with an approximate mark to market value as of May 8, 2024 of US$314,387. Foreign currency options hedge against changes in currency exchange

rates. Essentially, these options provide the right, but not the obligation, to exchange a specific amount of one currency for another at a predetermined rate (strike price) on or before a specified date (the expiry date). This flexibility allows the Debtor to mitigate its risk against foreign exchange currency fluctuations. The Debtor has implemented a call spread strategy which involves buying a call option with a lower strike price and selling another call option with a higher strike price. Both options have the same expiration date. The aim of this strategy is to reduce the net cost of entering the trade, as the premium received from selling the higher-strike call helps offset the cost of the lower-strike call.

82.     I believe that, as set forth more fully in the Hedging Practices Motion, the Debtor maintaining the prepetition Hedging Practices on a postpetition basis is essential for the Debtor to minimize its exposure to foreign currency exchange rate fluctuations so as to maintain predictable cash flows and uninterrupted operations.

**PART V**
**LOCAL RULE 1007-2 DISCLOSURES**

83.     Pursuant to Local Rule 1007-2(a)(1), a statement regarding the nature of the Debtor's business and the circumstances leading to the filing of the Chapter 11 case is set forth in Parts I through III above.

84.     The Chapter 11 case was not originally commenced under Chapter 7 or Chapter 13 of the Bankruptcy Code. Accordingly, Local Rule 1007-2(a)(2) is inapplicable.

85.     In accordance with Local Rule 1007-2(a)(4), **Schedule 1** lists the twenty (20) largest unsecured claims, excluding the claims of insiders, held against the Debtor as of the Petition Date. Schedule 1 includes a list of the names and addresses of each such creditor, and the names, addresses and telephone numbers of persons familiar with the Debtor's accounts. Where available, the amount of the claim is also included. In each case, the claim amount listed on Schedule 1

represents the Debtor's best estimate of the amount of the claim, and is therefore subject to verification. The Debtor reserves any and all rights (i) as to whether any claim is contingent, unliquidated, disputed or subject to setoff, (ii) challenge the priority, nature, amount and status of any claim or debt and (iii) to assert any remedies, defenses, counterclaims and offsets with respect to each of the foregoing.

86.     Pursuant to Local Rule 1007-2(a)(5), **Schedule 2** lists the name and address of the holders of secured claims against the Debtor as of the Petition Date. Any amount listed on Schedule 2 represents the Debtor's best estimate, and is therefore subject to verification. The Debtor reserves all rights as to the validity, enforceability and priority of each claim and lien pending approval of the Plan and reserves any and all rights to assert remedies, defenses, counterclaims and offsets with respect to such claim.

87.     Pursuant to Local Rule 1007-2(a)(6), **Schedule 3** provides a summary of the Debtor's total assets and liabilities as of March 31, 2024.

88.     Pursuant to Local Rule 1007-2(a)(7), the Debtor confirms that there is no publicly traded equity issued by the Debtor.

89.     Pursuant to Local Rule 1007-2(a)(8), the Debtor confirms that none of the Debtor's property is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity, giving the name, address and telephone number of such entity. The Debtor represents that there are no proceedings related to any of the above pending in any court.

90.     Pursuant to Local Rule 1007-2(a)(9), **Schedule 4** lists the property or premises owned, leased or held under another arrangement from which the Debtor operates.

91.     Pursuant to Local Rule 1007-2(a)(10), **Schedule 5** lists the locations of the Debtor's substantial assets, the location of its books and records, and the nature, location and value of any assets held by the Debtor outside the territorial limits of the United States.

92.     Pursuant to Local Rule 1007-2(a)(11), I hereby confirm that to the best of my knowledge, as of the Petition Date, there were no pending actions or proceedings against the Debtor, where a judgment against the Debtor or seizure of the Debtor's properties may be imminent as of the Petition Date.

93.     Pursuant to Local Rule 1007-2(a)(12), **Schedule 6** lists the Debtor's existing senior management, including their tenure with the Debtor and a brief summary of their relevant responsibilities and experience.

94.     Pursuant to Local Rule 1007-2(b)(1), the Debtor estimates that the weekly payroll for employees, exclusive of officers, directors, stockholders and partners, during the 30-day period following the Petition Date will be $79,000.

95.     Pursuant to Local Rule 1007-2(b)(2), the Debtor estimates that the amount to be paid to the Debtor's officers for the 30-day period following the Petition Date will be $24,000.

96.     Pursuant to Local Rule 1007-2(b)(3), **Schedule 7** provides the estimated consolidated cash receipts, disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid for the 30 days following the Petition Date, other than professional fees.

97.     Venue of the Chapter 11 cases in this district is proper because the Debtor maintains property in the United States, in particular, the Debtor satisfies the requirement of Section 109(a) of the Bankruptcy Code because (i) the Old Notes are governed by New York law, and (ii) Debtor

has a US$100,000 on retainer in the trust account of Baker & McKenzie LLP, in a JPMorgan Chase account in New York.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: May 16, 2024
New York, New York

*/s/ Jaime Francisco Buritica Leal*
*Gerente General* (Chief Executive Officer)
Credivalores – Crediservicios S.A.,

# SCHEDULE 1

## Twenty Largest Unsecured Claims

Pursuant to Local Rule 1007-2(a)(4), the following is a list of the twenty (20) largest unsecured claims, excluding the claims of insiders, held against the Debtor as of the Petition Date. This Schedule includes a list of the names and addresses of each such creditor, and the names, addresses and telephone numbers of persons familiar with the Debtor's accounts. Where available, the amount of the claim is also included. In each case, the claim amount listed on this Schedule represents the Debtor's best estimate of the amount of the claim, and is therefore subject to verification. The Debtor reserves any and all rights (i) as to whether any claim is contingent, unliquidated, disputed or subject to setoff, (ii) challenge the priority, nature, amount and status of any claim or debt and (iii) to assert any remedies, defenses, counterclaims and offsets with respect to each of the foregoing.

| | Name of Creditor | Complete Mailing Address, and Employee, Agent, or Department of Creditor Familiar with Claim | Nature of Claim | Whether Claim is Contingent, Unliquidated, Disputed, Partially Secured or Subject to Setoff | Amount of Claim (USD)[9] |
|---|---|---|---|---|---|
| 1. | THE BANK OF NEW YORK MELLON 240 GREENWICH STREET, FLOOR 7 EAST NEW YORK, NEW YORK 10286 | CONTACT: CREDIVALORES – CREDISERVICIOS TRUSTEE - JOANNE ADAMIS PHONE: (212) 815-4259 FAX: (212) 815 5875 / (212) 815 5877 JOANNE.ADAMIS@BNYMELLON.COM | TRUSTEE OF UNSECURED BONDS 2025 | N/A | $220,154,250.00 |
| 2. | FINANZA INVERSIONES S.A.S CARRERA 10 65-98 BOGOTA, CUNDINAMARCA N/A COLOMBIA | CONTACT: MARIA CRISTINA ROJAS PHONE: +57-601-4926792 FAX: N/A NOTIFICACIONES@FINANZAINVERSIONES.COM | SHAREHOLDERS LOANS (RELATED PARTIES) | | $42,600,551.78 |
| 3. | DEUTSCHE BANK WINCHESTER HOUSE GREAT WINCHESTER STREET 1 LONDON, N/A EC2N 2DB UNITED KINGDOM | CONTACT: DEBT AND AGENCY SERVICES PHONE: +44-207-547-5796 FAX: +44-0207-547-5782 TSS-GDS.ROW@DB.COM | AGENT OF UNSECURED NOTES 2028 | | $32,865,666.30 |
| 4. | FONDO NACIONAL DE GARANTIAS | CONTACT: MAYRA PEREZ PHONE: +57-601-3239000 EXT 4061 FAX: N/A | UNSECURED DEBT | | $25,471,061.42 |

---

[9] Total Prepetition Debt balance converted from COP to USD using the FX Rate from Colombia's Central Bank as of May 16, 2024 @ 3,825.42 USD/COP.

| | Name of Creditor | Complete Mailing Address, and Employee, Agent, or Department of Creditor Familiar with Claim | Nature of Claim | Whether Claim is Contingent, Unliquidated, Disputed, Partially Secured or Subject to Setoff | Amount of Claim (USD)[9] |
|---|---|---|---|---|---|
| | CALLE 26 13-97 PISO25 BOGOTA, CUNDINAMARCA N/A COLOMBIA | GARANTIABONOS@FNG.GOV.CO | | | |
| 5. | BAN100 S.A CR 7 76 35 P 9 BOGOTA, CUNDINAMARCA N/A COLOMBIA | CONTACT: RICARDO VALDES PHONE: +57-4926792 EXT. 2216 FAX: N/A RVALDES@BAN100.COM.CO | COMMISSIONS & SALE OF BUSINESS SEGMENT (RELATED PARTIES) | | $8,753,563.97 |
| 6. | BANCO DE OCCIDENTE CRA 7 NO. 71 - 52 TORRE A PISO 1 BOGOTA, CUNDINAMARCA N/A COLOMBIA | CONTACT: LEONARDO JIMENEZ PHONE: +57-601-7462060 EXT 15242 FAX: N/A LJIMENEZ@BANCODEOCCIDENTE.COM.CO | UNSECURED WORKING CAPITAL FACILITY | | $2,315,273.48 |
| 7. | BANCOLOMBIA AVENIDA 8 NORTE NO. 12 N - 43 PISO 5 CALI, VALLE DEL CAUCA N/A COLOMBIA | CONTACT: MARIA CRISTINA CADAVID VALENCIA PHONE: +57-602- 4853243 FAX: N/A MCCADAVI@BANCOLOMBIA.COM.CO | OPERATIONAL LEASES & UNSECURED WORKING CAPITAL FACILITIES | | $2,189,218.37 |
| 8. | DIRECCION DE IMPUESTOS Y INCOME TAXES ADUANAS NACIONALES (DIAN) CR 7 34 69 BOGOTA, CUNDINAMARCA N/A COLOMBIA | CONTACT: N/A PHONE: +57-601-3325100 FAX: N/A DIRECCIONGENERAL@DIAN.GOV.CO | INCOME TAXES | | $988,255.34 |
| 9. | BANCO DE BOGOTA CARRERA 3 NO. 8 - 13 PISO 8 CALI, VALLE DEL CAUCA N/A COLOMBIA | CONTACT: CARLOS DAVILA PHONE: +57-602- 8900760 EXT. 55241 FAX: N/A CDAVIL1@BANCODEBOGOTA.COM.CO | UNSECURED WORKING CAPITAL FACILITY | | $644,842.84 |
| 10. | METLIFE COLOMBIA SEGUROS DE VIDA S.A CR 7 99 53 P 17 BOGOTA, BOGOTA N/A COLOMBIA | CONTACT: GUILLERMO RODRIGUEZ PHONE: +57-601-6388240 FAX: N/A GUILLERMO.A.RODRIGUEZ@METLIFE.COM.CO | INSURANCE | | $599,721.46 |

| | Name of Creditor | Complete Mailing Address, and Employee, Agent, or Department of Creditor Familiar with Claim | Nature of Claim | Whether Claim is Contingent, Unliquidated, Disputed, Partially Secured or Subject to Setoff | Amount of Claim (USD)[9] |
|---|---|---|---|---|---|
| 11. | AMERICAS BUSINESS PROCESS SERVICES SA AV EL DORADO 85 D 55 LC 149 BOGOTA, CUNDINAMARCA N/A COLOMBIA | CONTACT: OLGA LUCIA GARZON ABRIL PHONE: +57-601-4251700 FAX: N/A OLGA.GARZON@AMERICASB PS.COM; CRISTIAN.HERNANDEZH@A MERICASBPS.COM | PROFESSIONAL SERVICES | | $236,369.50 |
| 12. | SECRETARIA DE HACIENDA BOGOTA CR 30 25 90 BOGOTA, CUNDINAMARCA N/A COLOMBIA | CONTACT: N/A PHONE: +57-601-3385000 FAX: N/A RADICACIONHACIENDABOGO TA@SHD.GOV.CO | INCOME TAXES | | $156,520.80 |
| 13. | CUATRECASAS, GONCALVES PEREIRA S.A.S CR 11 79 35 OF 701 BOGOTA, CUNDINAMARCA N/A COLOMBIA | CONTACT: MANUEL FERNANDO QUINCHE GONZALEZ PHONE: +57-606-7953030 FAX: N/A MANUEL.QUINCHE@CUATRE CASAS.COM | PROFESSIONAL SERVICES | | $143,535.48 |
| 14. | DELIMA MARSH CL 67N 6N 85 CALI, VALLE DEL CAUCA N/A COLOMBIA | CONTACT: YASNI GIOVANNETTI PHONE: +57-602-3985000 FAX: N/A YASNI.GIOVANNETTI@MARS H.COM; ALEXANDER.BOTELLO@MAR SH.COM; ANDRES.C.POVEDA@MARSH. COM | INSURANCE | | $107,921.30 |
| 15. | FINLECO B P O SAS CR 27B 68 96 BOGOTA, CUNDINAMARCA N/A COLOMBIA | CONTACT: SERGIO ERNESTO REYES OROZCO PHONE: +57-601-7449772 – +57-3208498435 FAX: N/A ERNESTO.REYES@FINLECOBP O.COM; SERGIO.REYES@FINLECOBPO .COM; CONTABILIDAD@FINLECOBP O.COM; COMERCIAL@FINLECOBPO.C OM; SERGIO.REYES@FINLECOBPO .COM | PROFESSIONAL SERVICES | | $104,209.67 |
| 16. | ECONTACT COL SAS CR 28 48 59 | CONTACT: EVARISTO CANETE DEL RIO PHONE: +57-3164544541 FAX: N/A | COLLECTION AND TECHNICAL SERVICES | | $62,490.74 |

| | Name of Creditor | Complete Mailing Address, and Employee, Agent, or Department of Creditor Familiar with Claim | Nature of Claim | Whether Claim is Contingent, Unliquidated, Disputed, Partially Secured or Subject to Setoff | Amount of Claim (USD)[9] |
|---|---|---|---|---|---|
| | MANIZALES, CALDAS N/A COLOMBIA | JHOYOS@EMERGIACC.COM; AAGUDELO@EMERGIACC.CO M | | | |
| 17. | CENTRAL DE COBRANZAS SAS CR 43 95 20 BRR EL TABOR BARRANQUILLA, ATLANTICO N/A COLOMBIA | CONTACT: MONICA PATRICIA VELEZ ANGULO PHONE: (57) 3205654955 +57-605- 3091735 FAX: N/A JHERRERA@CENTRALDECOB RANZASLTDA.COM; VELEZMONICA@CENTRALDE COBRANZASLTDA.COM | PROFESSIONAL SERVICES | | $61,164.69 |
| 18. | AMERICAN SMART SYSTEM & NETWORKS LTDA CR 49 A 91 31 BBR LA CASTELLANA BOGOTA, CUNDINAMARCA N/A COLOMBIA | CONTACT: JOSE FERNANDO RODRIGUEZ CABRERA PHONE: +57-601- 5801800 EXT 1020 FAX: N/A EARIAS@ASNETLA.COM; YTORRES@ASNETLA.COM; ASNET@ASNETLA.COM; GTORRES@ASNETLA.COM; YTORRES@ASNETLA.COM; FRODRIGUEZ@ASNETLA.CO M | TECHNICAL SERVICES & MAINTENANCE | | $59,476.12 |
| 19. | CREDIBANCO SA AK 68 75 A 50 METROPOLIS BOGOTA, CUNDINAMARCA N/A COLOMBIA | CONTACT: ANDRES MAURICIO GOMEZ DURAN PHONE: +57 (1) 3766440 FAX: N/A REPRESENTANTELEGALCREDI BANCO@CREDIBANCO.COM; ANDRESM.GOMEZ@CREDIBA NCO.COM; CARLOS.DELUQUE@CREDIBA NCO.COM | TECHNICAL SERVICES & MAINTENANCE | | $59,293.52 |
| 20. | GRUPO CONSULTOR RA SAS CL 29 BIS 6 58 OF 402 BOGOTA, CUNDINAMARCA N/A COLOMBIA | CONTACT: SANDRA ROSA ACUNA PAEZ PHONE: (57) 3208770066 FAX: N/A SANDRARAP72@HOTMAIL.C OM | PROFESSIONAL SERVICES | | $51,337.33 |

# SCHEDULE 2

## List of Holders of Secured Claims

Pursuant to Local Rule 1007-2(a)(5), the following lists the name and address of the holders of secured claims against the Debtor as of the Petition Date. Any amount listed on Schedule 2 represents the Debtor's best estimate, and is therefore subject to verification. The Debtor reserves all rights as to the validity, enforceability and priority of each claim and lien pending approval of the Plan and reserves any and all rights to assert remedies, defenses, counterclaims and offsets with respect to such claim.

| Creditor Name and Address | Amount of Claim (USD)[10] | Collateral Description | Gross Accounting Book Value of Collateral (USD) |
|---|---|---|---|
| Citibank Colombia S.A | 26,881,984 | Secured Bank Debt collateralized with receivables from payroll loans | 45,878,493 |
| Bancolombia S.A. | 26,200,709 | Secured Bank Debt collateralized with receivables from payroll loans | 36,532,068 |
| UBS Gramercy Facility | 17,547,383 | Secured Bank Debt collateralized with receivables from credit cards | 84,650,702 |
| Systemgroup S.A.S. | 8,510,350 | Secured Bank Debt collateralized with receivables from payroll loans and credit cards | 100,476,618 |
| Banco De Occidente | 7,568,282 | Secured Bank Debt collateralized with receivables from payroll loans | 10,552,505 |

---

[10] Amounts reflect outstanding balance (principal and interest) as of April 30, 2024.

# SCHEDULE 3

## Summary of the Debtor's Assets and Liabilities

Pursuant to Local Rule 1007-2(a)(6), the following are estimates of the Debtor's assets and liabilities (book value) as of *March 31, 2024*.  The information contained herein shall not constitute an admission of liability by, nor is it binding on the Debtor.

| Assets and Liabilities | Amount (USD) |
|---|---|
| Total Assets | $ 487,956,371 |
| Total Liabilities | $ 432,840,883 |

# SCHEDULE 4

## Schedule of Owned and Leased Property

Pursuant to Local Rule 1007-2(a)(9), the following lists the property or premises owned, leased or held under another arrangement from which the Debtor operates as of the Petition Date.

|  | Name of Property | Type of Leasing |
|---|---|---|
| 1. | Office in Armenia | Commercial Building - Offices |
| 2. | Edificio BCSC | Commercial Building – Offices |
| 3. | Office in Bogota | Commercial Building – Offices |
| 4. | Oficina 701 | Commercial Building – Offices |
| 5. | Edificio Gran Colombiano | Commercial Building – Offices |
| 6. | Edificio Caja Agraria | Commercial Building – Offices |
| 7. | Office in Cucuta | Commercial Building – Offices |
| 8. | Office in Ibague | Commercial Building – Offices |
| 9. | Office in Manizales | Commercial Building – Offices |
| 10. | Centro Empresarial Olaya Herrera | Commercial Building – Offices |
| 11. | Office in Santa Marta | Commercial Building – Offices |
| 12. | Office in Sincelejo | Commercial Building – Offices |
| 13. | Edificio Santa Fe | Commercial Building - Offices |

## SCHEDULE 5

### Location of the Debtor's Substantial Assets, Books and Records, and Nature and Location of Assets Outside of the United States

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtor's substantial assets, the location of its books and records, and the nature, location and value of any assets held by the Debtor outside the territorial limits of the United States as of the Petition Date.

| Debtor's Assets | Location |
|---|---|
| Debtor's Books and Records | Carrera 7 No, 76 - 35 Bogotá, Colombia |
| Debtor's Substantial Assets | Carrera 7 No, 76 - 35 Bogotá, Colombia |

# SCHEDULE 6

## Debtor's Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who constitute the Debtor's existing senior management, including their tenure with the Debtor and a brief summary of their relevant responsibilities and experience.

| Name | Title | Responsibility | Tenure |
|------|-------|----------------|--------|
| Jaime Francisco Buriticá Leal | President and Chief Executive Officer | Spearheads the organization's overall strategic direction and operational activities, guiding executive decision-making, fostering a culture of innovation, and driving sustainable growth and profitability. Leads by example, ensuring alignment with corporate values, and representing the organization to stakeholders, partners, and the public. | 7 months |
| Liliana Arango Salazar | Vice-president and Legal Counsel | Provides strategic legal advice and guidance to senior management, overseeing legal matters, contracts, and regulatory compliance to safeguard the organization's interests and ensure adherence to applicable laws and regulations | 14 years and 11 months |
| Julieth Stefanny Cadena Palencia | Compliance Officer | Ensures adherence to regulatory standards and company policies, conducting audits and implementing procedures to mitigate risks. | 3 months |
| Hernán Dario Ramírez Torres | Internal Auditor | Conducts thorough assessments of organizational processes, identifying inefficiencies and ensuring compliance with internal policies and external regulations | 4 years and 11 months |
| Maria Paola Carvajal Galeano | Treasury Manager | Oversees the organization's financial liquidity, managing cash flow, investments, and financial risk to optimize financial stability and support strategic objectives. | 5 months |
| Eliana Andrea Erazo Restrepo | Administrative Manager | Coordinates administrative functions, including office operations, personnel management, and resource allocation to facilitate smooth business operations | 18 years and 7 months |
| Zulma Consuelo Moreno | Product (Payroll Loans) Manager | Coordinates market analysis, strategy development, roadmap planning, and cross-functional collaboration to deliver innovative solutions. This role involves | 4 years and 11 months |

| Name | Title | Responsibility | Tenure |
|---|---|---|---|
| | | defining product requirements, overseeing agile development, leading product launches, and monitoring performance metrics for continuous improvement. | |
| Juan Carlos Restrepo Acuña | Distributor Manager | Develops and maintains relationships with distribution partners, manages sales channels, and implements strategies to maximize product distribution and revenue | 20 years and 7 months |
| Jennifer Paola Machado Sanchez | Collections Director | Leads the collections department, developing strategies to recover outstanding debts while maintaining positive customer relationships and compliance with regulations. | 5 years |
| Juan Carlos Estupiñan Sandoval | Director of Financial Planning | Guides financial planning initiatives, analyzing data, and developing strategies to achieve organizational financial goals and optimize resource allocation. | 8 years and 10 months |
| Carmen Elena Caro Cardenas | Accounting Director | Oversees accounting operations, including financial reporting, budgeting, and auditing, ensuring accuracy and compliance with accounting standards and regulations | 6 years |

**SCHEDULE 7**

Schedule of 30 Day Estimated Cash Receipts and Disbursements

Pursuant to Local Rule 1007-2(b)(3), the following provides the estimated consolidated cash receipts, disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid for the 30 days following the Petition Date, other than professional fees.

| Type | Amount (Estimated) |
|------|--------------------|
| Cash Receipts | US 11.6 million |
| Cash Disbursements | (US 18.1 million) |
| Net Cash Gain (Loss)[1] | (US 6.5 million) |
| Unpaid Obligations[2] | (US 427.5 million) |
| Uncollected Receivables[3] | US 422.9 million |

[1]. Although the estimated amount results in a net cash loss, the disbursements include payments to be made from collections received prior to the Petition Date which are part of the opening cash balance of US$13.6 million.

[2]. Unpaid Obligations consider obligations with financial lenders and suppliers outstanding as of March 31, 2024.

[3]. Uncollected Receivables consider accounts receivable and loan portfolio as of March 31, 2024.