Paul J. Keenan Jr. (*pro hac vice* pending)
Reginald Sainvil (*pro hac vice* pending)
Baker & McKenzie LLP
1111 Brickell Avenue, 10th Floor
Miami, FL 33130
Telephone: 305-789-8900
Facsimile: 305-789-8953
Email: paul.keenan@bakermckenzie.com
        reginald.sainvil@bakermckenzie.com

Blaire Cahn
Baker & McKenzie LLP
452 Fifth Avenue
New York, NY 10018
Telephone: 212-626-4100
Facsimile: 212-310-1600
Email: blaire.cahn@bakermckenzie.com

*Proposed Counsel for the Debtor*
*and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CREDIVALORES – CREDISERVICIOS S.A., | Case No. 24-10837 (DSJ) |
| Debtor. | |

**MOTION OF THE DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING (i) CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, (ii) MAINTENANCE OF EXISTING BANK ACCOUNTS, AND (iii) CONTINUED USE OF EXISTING BUSINESS FORMS, (B) AUTHORIZING CONTINUED PERFORMANCE UNDER RELATED PARTY TRANSACTIONS AND HISTORICAL PRACTICES, AND (C) WAIVING THE REQUIREMENTS OF <u>SECTION 345(B) OF THE BANKRUPTCY CODE</u>**

The above-captioned debtor and debtor-in-possession (the "**Debtor**") in the above-captioned chapter 11 case (the "**Chapter 11 Case**") hereby files this motion (this "**Motion**") for entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "**Interim Order**"), and a final order, substantially in the form attached hereto as **Exhibit B** (the "**Final**

Order," and together with the Interim Order, the "**Proposed Orders**"), granting the relief requested herein. In support of this Motion, the Debtor relies upon and incorporates by reference the *Declaration of Jaime Francisco Buriticá Leal (I) in Support of the Chapter 11 Petition and First Day Pleadings and (II) Pursuant to Local Bankruptcy Rule 1007-2* (the "**First Day Declaration**"), filed concurrently herewith. In further support of the Motion, the Debtor respectfully represent as follows:

<u>**JURISDICTION AND VENUE**</u>

1.      The United States Bankruptcy Court for the Southern District of New York (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012 (Preska, C.J.).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtor consents to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

4.      The statutory and other bases for the relief sought herein are sections 105(a), 363, 364, 553, 1107 and 1108 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004(h), Local Bankruptcy Rule 9013-1(a), and the *Amended Procedural Guidelines for Prepackaged Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of New York*, effective February 1, 2024 (the "**Guidelines**").

## BACKGROUND

5.      On the date hereof (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under the Bankruptcy Code with the Court.  The Debtor continues to operate its business and manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No creditors' committee has been appointed by the Office of the United States Trustee for the Southern District of New York (the "**U.S. Trustee**"), nor has a trustee or examiner been appointed in the Chapter 11 Case.

6.      The Debtor is a non-bank financial institution in Colombia offering a variety of flexible, specialized, and tailored credit and financing alternatives, including payroll deduction loans and insurance premium financing, to low- and middle-income segments of the Colombian population. Initially operating locally in Cali, Colombia, the Debtor steadily grew into other geographic regions throughout Colombia.

7.      The Debtor has historically funded costs and expenditures through a combination of cash generated from operations, equity issuances, and borrowings under funded indebtedness. Recently, the Debtor faced pressure with respect to its coupon payment due on February 7, 2024 on its 8.875% Senior Notes due 2025 (the "**Old Notes**") issued under that certain Indenture, dated February 7, 2020, between the Debtor and the Bank of New York Mellon.

8.      While the Debtor's business operations are strong, the Debtor has faced numerous headwinds in its efforts to raise the necessary funds in order to make the coupon payment on the Old Notes and does not anticipate being able to raise the necessary funds in order to repay the Old Note at maturity on February 7, 2025, and for those reasons, determined to improve its liquidity position through a restructuring of the Old Notes.

9.      Prior to the Petition Date, the Debtor commenced discussions with several holders of the Old Notes regarding a restructuring of the Old Notes that would extend the maturity of the

Old Notes, reduce the Debtor's overall debt and interest burden, and strengthen the Debtor's capital by significantly reducing its refinancing requirements.

10.     On March 7, 2024, the Debtor launched an exchange offer and solicited votes from all holders of the Old Notes to exchange the Old Notes (the "**Exchange Offer**") for newly issued Senior Secured Step-up Notes due 2029 (the "**New Notes**"), and on its Prepackaged Chapter 11 Plan (as may be amended, the "**Plan**") that would effectuate the financial restructuring, i.e., the exchange of the Old Notes for the New Notes, on essentially the same terms as the Exchange Offer in the event that an insufficient number of holders elected to exchange the Old Notes.

11.     The Plan consists of a plan of reorganization under Chapter 11 of the Bankruptcy Code that would result in the same transactions contemplated by the Exchange Offer, *i.e.*, the extension of the maturity of the Old Notes through the issuance of New Notes in order to reduce the Debtor's overall debt burden and interest expense burden.

12.     The voting deadline on the Plan was April 3, 2024 at 5:00 p.m. New York City time. As shown in the related declaration of the Debtor's solicitation agent, 81.25% in amount and 96.09% in number of the holders of the Old Notes that cast ballots on the Plan voted to accept the Plan.

13.     On the Petition Date, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code to effectuate the Plan, enhance liquidity, and solidify its long-term growth prospects and operating performance.  The Plan provides that all claims other than those of the holders of the Old Notes are unimpaired.

14.     A detailed factual background of the Debtor's business and operations, as well as the events precipitating the commencement of this Chapter 11 Case, is more fully set forth in the First Day Declaration, filed contemporaneously herewith and incorporated herein by reference.

## THE DEBTOR'S BANK ACCOUNTS AND CASH MANAGEMENT SYSTEM

**A.     The Cash Management System**

15.     To facilitate the efficient operation of their business, the Debtor utilizes an integrated, centralized cash management system to collect, transfer, and disburse funds generated by its operations, including the Bank Accounts and the Related Party Transactions (each as defined herein), and all other cash management and funds-processing activities and arrangements utilized by the Debtor (together, the "**Cash Management System**").

16.     The Cash Management System facilitates the Debtor's cash forecasting and reporting, monitoring of the collection and disbursement of funds, maintenance of current and accurate accounting records for all cash transactions, and administration of approximately 43 bank accounts (collectively, the "**Bank Accounts**") maintained by the Debtor prior to the Petition Date in the ordinary course of business at various financial institutions (hereinafter, the "**Banks**").  A list of the Bank Accounts is set forth in **Exhibit C** attached hereto.

17.     The Debtor's continued use of the Cash Management System is integral to monitoring and optimizing the use of cash, thereby enhancing the value of the Debtor's estate for the benefit of all of the Debtor's stakeholders. A general overview of the movement of cash through the Cash Management System is illustrated by the chart annexed as **Exhibit D**.

**i.     *The Debtor's Business Operations***

18.     As noted *supra*, the Debtor offers a variety of flexible credit and financing alternatives, including payroll deduction loans (the "**Payroll Loan Business**").

19.     Another portion of the Debtor's business operations is tailored to the provision of credit cards for Clients (the "**Credit Card Business**").  The Credit Card Business segment was initially launched as a revolving personal line of credit to finance the acquisition of specific goods, such as home appliances, or to finance home improvement projects.  Eventually, this segment

evolved into a Debtor-branded credit card (the "**Credit Card**"). The Credit Card was offered to Clients in major retailers in Colombia and could be used at any retail merchant that accepts Visa. Collections made in connection with the Credit Card Business are done through the Client's utility bill, as well as through direct billing to the Client and through independent collections companies located in Colombia. The Debtor is currently in the process of selling and closing the Credit Card Business and no longer originates any new business from the Credit Card Business. Notwithstanding the anticipated sale and closure of the Credit Card Business, the Debtor continues to operate this segment of its operations.

20.     In addition to the Payroll Loan Business and the Credit Card Business, the Debtor also formerly provides financing for insurance premiums (the "**Insurance Premium Financing Business**").  The Insurance Premium Financing Business represented only a small part of the Debtor's total business operations and was closed in 2021.  Any income that the Insurance Premium Financing Business presently generates is related solely to previously-existing clients. In other words, the Debtor is collecting on any remaining accounts, but does not originate any new business from this segment of its operations.

21.     The Debtor also offers the mandatory insurance required for the loans generated by the Payroll Loan Business, as well as other optional insurance products such as health and accident insurance ("**Optional Insurance Services**") through its alliances with insurers.  For every client that signs up for insurance services through the Debtor, the Debtor receives a fee of approximately 23.5–27.0% of the insurance premiums.

### ii.    *Payroll Loan Originating Process*

22.     The structure of the Payroll Loan Business is further explained below.

23.     First, the Debtor signs an agreement with the employer to offer payroll loans to the employer's employees (each individual "**Client**" and the "**Clients**," collectively).  The Client then applies for credit and, if approved, the Client then issues an irrevocable payment instruction to their employer for deductions to be made from their monthly paycheck/pension receipt.  In order to be approved, the Client must have a life insurance policy, either facilitated through the Debtor or their own. The insurance policy offered through the Debtor is with Cardif Colombia Seguros Generales S.A. If the Client utilizes their own life insurance policy, such policy must meet the same conditions as the policy offered through the Debtor. (These conditions include naming the Debtor as first beneficiary, requiring the pay-out amount to be for, at a minimum, the full balance of the loan, including principal, interest and fees, as well as other conditions.)  Once these steps are taken and conditions are met, the Client receives the funds from the Debtor.

24.     Once the funds are disbursed to the Client, the Debtor sends a file to the Client's employer with the total amounts due under each Client's loan, which includes any repayments to the principal, interest, fees, and any insurance premiums (if applicable). The employer then deducts the amounts due from the payroll and remits the deducted amounts to the Debtor. If the Client obtained the insurance through the Debtor, the Debtor then remits the portion corresponding to the insurance premiums to Cardif Colombia Seguros Generales S.A. A flowchart detailing the basics of this loan transaction, as relevant to the Cash Management System, is set forth below:





25.     At present, no new loans are being originated from the Credit Card Business nor the Payroll Loan Business.  However, the Debtor is working with potential local and international investors to obtain more capital in order to begin originating new payroll loans.

### iii.     Collections and Structure of Free-Standing Trusts

26.     Generally, collections from the loans are remitted to the Debtor through trust accounts. Financing through trusts is a very commonly used structure in Colombia across public and public/private initiatives, including in the financial sector and with private companies. Indeed, the Debtor, like many of its competitors, has been raising funds through trusts since its inception. The trusts utilized are irrevocable trusts that are contractual in nature and are not separate legal entities from the grantor.

27.     For example, a trust is established by a grantor (*e.g.*, here, the Debtor) and agreed to by a trustee (a "*fiduciario*") who is bound to undertake a specific purpose for the benefit of a beneficiary (*e.g.*, here, the Debtor's financing institution(s)).  Fiduciaries must be financial services companies regulated by the local Colombian regulator responsible for overseeing financial regulation, the Superintendencia Financiera de Colombia ("SFC"). Under this structure, the Debtor becomes the grantor and constitutes the trust with either cash or a loan portfolio. The promissory notes that comprise the loan portfolio are endorsed to the trust, which in turn borrows funds from financial institutions, using the portfolio as collateral. The Debtor guarantees the obligations of the trusts and continues managing the loan portfolio throughout the life of the loans. Additionally, the Debtor is entitled to excess funds or assets owned by the trusts after the agreed collateral level has been met.

28.     The Debtor utilizes two master trusts for collection of funds: one for payroll loans, and another for credit cards.  In the case of payroll loans, all employers wire transfer the amounts deducted via payroll from Clients to a specific trust (*i.e.*, collection trust), and the Debtor in turn wire transfers the funds that correspond to the security of the financial obligation to each trust before taking the excess into the Debtor's own accounts to pay ongoing operational expenses and other financial obligations.  In the case of credit cards issued by the Debtor, the transaction is substantially the same.

### iv.     *Bank Accounts*

29.     The Cash Management System is comprised of forty three (43) Bank Accounts held by the Debtor or held by other parties where the debtor is the trustee (each, a "**Bank Account**" and collectively, the "**Bank Accounts**"), each at eight (8) financial institutions (the "**Banks**"). Of the forty three (43) Bank Accounts, fifteen (15) are under the Debtor's name, while the remaining twenty eight (28) are trust accounts.

30.     The Debtor's accounts are held primarily at seven (7) banks: Bancolombia S.A. ("**Bancolombia**"); Banco de Bogota S.A. ("**Banco de Bogota**"); Banco de Occidente S.A. ("**Banco de Occidente**"); Alianza Fiduciaria S.A. ("**Alianza Fiduciaria**"); Banco Santander S.A. ("**Banco Santander**"); Scotiabank Colpatria ("**Scotiabank**"); and Valores Bancolombia S.A. ("**Valores Bancolombia**").  Of these accounts, fourteen (14) are in Colombian Pesos (COP) and one (1) is in U.S. Dollars (USD).

31.     Those trust accounts not in the Debtor's name but part of its Cash Management System are held mainly at Bancolombia and are all in COP. A full list of the Debtor's Bank Accounts is identified on **Exhibit A** attached hereto.

32.     The Debtor's main operating Bank Accounts, although not within the UST Authorized Depository List, are accounts held at highly-rated, global financial institutions that are widely recognized as well-capitalized and financially stable. Of the 43 Bank Accounts, 41 are held at financially stable institutions that are insured by either the Federal Deposit Insurance Corporation ("**FDIC**") (up to an applicable limit per Debtor per institution) or its Colombian equivalent, the deposit insurance agencies Fondo de Garantias de Instituciones Financieras ("**FOGAFIN**"). Of the remaining two (2) Bank Accounts, one is held by the Debtor at Alianza Fiduciaria and is periodically used as a savings account to earn higher interest, and the other is a trust account with Fiduprevisora S.A. ("**Fiduprevisora**").

33.     The Debtor maintains seven (7) main types of accounts: (i) four (4) loan originating accounts; (ii) fifteen (15) collection accounts; (iii) one (1) consolidating account; (iv) nine (9) loan trust accounts; (v) one (1) excess funds account; (vi) four (4) disbursement account; and (vii) five (5) reserve accounts.  These account types are detailed further here:

    a)    Loan originating accounts are used to fund the new payroll loans to clients and are in the Debtor's name.

    b)    Collection accounts are trust accounts established for the purpose of collecting payments from Clients (or customers) with respect to the payroll loans and the credit card payments.

    c)    The consolidating accounts are used to aggregate all of the collections received from payroll loans into one account.  (As noted, there is no consolidating accounts for purposes of aggregating collections received from credit card payments.)

d)    Those funds in the consolidating accounts that are trust accounts are transferred to each of the respective loan trust accounts based on the collections related to the portfolio of each "**Patrimonio Autonomo**" or "**PA**" (*i.e.*, PA Citibank, PA Sindicado, etc.).[1]

e)    Any remaining funds in the consolidating accounts are then transferred to an excess funds account, all of which are in the Debtor's name.

f)    Disbursement accounts receive transfers from the excess funds accounts to pay for the Debtor's business operations such as rent, administrative costs, payroll, utilities, expenses, other financial obligations, etc.

g)    Reserve accounts are deposits required by the Debtor's Banks. For instance, when lending against a portfolio, most Banks require approximately three (3) months of interest payments to be placed in a reserve account as part of their lending requirements. These accounts are in the Banks' name and the Debtor cannot use these funds.

34.    Collections are continuously received on almost a daily basis. At the end of each month, the Debtor prepares the various reports to determine all of the amounts that were collected and to which portfolio they belong. Within the first week after each month's end, the transfers to the various accounts are completed.

---

[1] Under Colombian law, upon a person (or entity) entering into a "Contrato de Fiducia" or "Trust Agreement," the assets associated with such trust agreement are transferred to a separate and independent "patrimony," referred as "Patrimonio Autonomo." The "Patrimonio Autónomo" is not a legal person or entity, but rather is a group of assets that is represented and managed by the trustee, which must be a financial services company, authorized to act as trustee, and which is subject to regulation and oversee from Colombia financial authorities. Trust Agreements and "Patrimonios Autónomos" are common in Colombia, especially in circumstances where funds from multiple persons are meant to be received and managed. Having a "Patrimonio Autonomo" in place gives assurances to third parties that such funds will be administrated by the trustee (which has to be a regulated financial entity subject to surveillance of the Colombian government), based on the specific instructions, terms and conditions previously established in the Trust Agreement. These structures are often used to enhance transparency in business dealings and to separate certain assets or funds from other businesses or assets of the settlor.

35.     In the ordinary course of business, the Debtor incurs and pays, honors, or allows to be deducted from the appropriate Bank Accounts certain service charges and other related fees, costs, and expenses charged by the Banks.  In particular, the Banks charge the Debtor service charges, transaction fees, taxes and other fees in connection with the maintenance of the Cash Management System ("**Bank Fees**"). Gravamen a los Movimientos Financieros ("**GMF**") is a financial transactions tax applied to most movements of money within Colombian bank accounts, such as deposits, withdrawals, and transfers among others. Currently, the rate is four Colombian pesos for every thousand Colombian pesos transacted, or 0.4% of the transaction amount. At present, the Debtor pays the Banks an aggregate of approximately US$104,493 in connection with the Bank Fees per month, which are generally due and paid on a daily basis for GMF, and on a monthly basis for all other Bank Fees.  The Bank Fees related to the accounts in the Debtor's name are approximately US$27,932, while the remaining US$76,561relate to the trust accounts.

36.     As of the Petition Date, the Debtor does not believe that it has any outstanding or unpaid Bank Fees. Out of an abundance of caution, and to ensure continued access to the Bank Accounts and related banking services, the Debtor seeks authority to pay any pre-petition Bank Fees that may have been incurred and to continue to pay the Bank Fees in accordance with past practices.

### *v.*     *Business Forms*

37.     In the ordinary course of business, the Debtor uses various business forms, such as checks, as well as electronic bank transfers/wires for payments under the Cash Management System described herein (the "**Business Forms**"). To minimize administrative expense and delay, the Debtor requests authority to continue to use their Business Forms substantially in the forms existing immediately prior to the Petition Date.

### vi.    Related Party Transactions

38.    The Debtor does not have any intercompany transfers or transactions, but does engage in transactions with three (3) related entities in the ordinary course of its business, as described in further detail below (the "**Related Party Transactions**").

39.    **Asesorias Financieras de Credito S.A.S ("Asficredito")**[2]: In June 2016 the Debtor entered into an agreement with Asficredito to provide the following services: (i) selection, hiring and training of personnel for contact service center, credit origination, commercial management and Client onboarding; (ii) documentation management, digitization and custody of all types of documents; (iii) provision of contact center services (inbound and outbound) for data updates, service evaluation, classification and stratification of databases, sale of financial services, collection of portfolio and reception and transmission of telephone calls to carry out the above activities; (iv) provision of BPO (Business Process Outsourcing) services; (v) provision of courier services including collection, protection, surveillance, transfer, custody, filing, transportation and delivery of items and documents with commercial value; and (vi) execution of operational processes for Portfolio Payments and delivery of checks to third party Clients, among others. The cost associated with these services vary on a monthly basis, but are approximately COP 500 million (approximately US$130,705) a month. The services provided by Asficredito to the Debtor are in the normal course of the Debtor's business and operations. Furthermore, there is also a receivable balance outstanding from Asficredito of US$20.1 million related to payments made by the Debtor to Asficredito for operating costs such as marketing and payroll. This receivable balance is expected to decrease as new payroll loans are originated since Asficredito charges a fee related to the origination of the loans which is offset against the receivable.

---

[2] 14.5% of the Debtor's shareholders have approximately 23% ownership in Asficredito.

40.    **Finanza Inversiones S.A.S ("Finanza Inversiones")** [3] : The Debtor is also borrower on several loans originated between 2022 and 2023 with Finanza Inversiones totaling approximately US$42.6 million (including capitalized interest at SOFR + 12.26% for four of the loans and 20% fixed for one loan). The Debtor utilized these loans to inject funds into the business to continue, and grow, the current operations. The Debtor also has an outstanding receivable loan from Finanza Inversiones for US$23.6 million from December 2022, with a net payable balance of US$19.0 million as of the Petition Date. These loans have a maturity date of November 2024 with accrued interest since the second half of 2023, resulting in outstanding interest of US$4.4 million.

41.    **Ban100 S.A. ("Ban100")**[4]: In November 2023, the Debtor sold to Ban100 some of its payroll loan portfolio and Credit Card Business. The payroll loan portfolio transfer has not been fully completed as the Debtor still receives some of the collections related to the portfolio sold to Ban100. Upon receipt of such collections, the Debtor transfers those funds to Ban100. The Debtor will continue to receive such collections—and, by extension, continue to transfer said collections to Ban100—until the employers update their records, at which point the employers will submit these collections directly to Ban100 on a monthly basis. The Debtor continues to sell some of its payroll loan portfolio to Ban100 (or any other interested party as may arise). The sales agreement with Ban100 also includes recourse against the Debtor for any overdue loans, which may result in the Debtor having to repurchase some of these loans back.

42.    Additionally, the Debtor is in the process of partially selling the Credit Card Business for COP 60 billion (approximately US$15.7 million) to Ban100 and anticipates eventually selling the entire Credit Card Business portfolio to Ban100 or any other interested party.

---

[3] 77.0% of the Debtor's shareholders have 100% ownership of Finanza Inversiones.
[4] Finanza Inversiones owns approximately 94.5% of Ban100.

The Debtor has received the funds and has included the portion that is pending to be transferred as part of its accounts payable for US$8.8 million while the business is transitioning. Furthermore, the Debtor has in place an agreement with Ban100 related to commissions for the right to use the Visa brand until the Credit Card Business is fully offloaded to Ban100, as Ban100 is presently the entity with a licensing agreement with Visa to use the Visa mark. This commission is approximately US$5,000 which is due and paid on a monthly basis.

## RELIEF REQUESTED

43.     By this Motion, the Debtor seeks entry of an interim and final orders: (A) authorizing, but not directing, (i) the continued use of existing cash management system(s), (ii) maintenance of bank accounts, and (iii) continued use of existing business forms and checks; (B) authorizing, but not directing, continued performance under related party transactions and historical practices; and (C) waiving the requirements of section 345(B) of the Bankruptcy Code; and (D) providing any additional relief required in order to effectuate the foregoing.

## BASIS FOR RELIEF REQUESTED

### A.     Continued Use of the Cash Management System is Necessary and Appropriate.

44.     An integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in part and rev'd in part*, 997 F.2d 1039 (3d Cir. 1993). As a result, courts have generally concluded that the requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient." *Columbia Gas*, 997 F.2d at 1061.

45.     Continuation of the Cash Management System is permitted pursuant to section 363(c)(1) of the Bankruptcy Code, which authorizes the debtor in possession to "use property of the estate in the ordinary course without notice or a hearing." 11 U.S.C. § 363(c)(1). Section

363(c)(1) of the Bankruptcy Code also allows a debtor in possession to engage in ordinary-course transactions required to operate its business without additional oversight from its creditors or the court. *See, e.g., Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997) ("Section 363(c)(1) of the Bankruptcy Code authorizes a debtor-in-possession to enter into transactions involving property of the estate within the ordinary course of business without notice or a hearing."); *In re Enron Corp.*, No. 01-16034 (AJG), 2003 WL 1562202, at *15 (Bankr. S.D.N.Y. Mar. 21, 2003) (stating same).

46.     Further, section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title" and section 363(c)(1) of the Bankruptcy Code authorizes the debtor-in-possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. §§ 105(a), 363(c)(1). The purpose of these sections is to provide a debtor-in-possession with the flexibility to engage in the ordinary transactions required to operate its business without undue oversight by creditors or the Court.

47.     Here, the Debtor's Cash Management System constitutes a customary and essential business practice that was created and implemented by the management of the Debtor in the exercise of its business judgment. The Cash Management System is a practical and essential mechanism that allows the Debtor to continue operating its business.  Allowing the Debtor to maintain and continue utilizing its existing Cash Management System will ensure the Debtor is able to maintain its operations, making the relief requested herein appropriate under section 105(a) of the Bankruptcy Code.

**B.     The Debtor Should be Permitted to Maintain Bank Accounts.**

48.     As previously discussed, the Debtor maintains forty three (43) Bank Accounts and conducts numerous financial transactions utilizing these Bank Accounts. It would cause an

enormous amount of disruption to force the Debtor to open new bank accounts and close the existing Bank Accounts. Such disruption would provide no benefit to the Debtor's estate and would likely result in havoc for the Debtor's Cash Management System.

49.      For these reasons, the Debtor should be authorized, but not directed, to continue to fund its businesses and operations by payments made from the Bank Accounts listed on **Exhibit C** to this Motion, and should be exempt from certain of the Guidelines[5] established by the United States Trustee for the Southern District of New York.

50.      As part of the requested relief, the Debtor also seeks a waiver of the requirement to establish specific bank accounts for tax payments. The Debtor believes that tax obligations can be paid most efficiently out of the existing Bank Accounts, that the United States Trustee can adequately monitor the flow of funds into, among and out of the Bank Accounts, and that the creation of new debtor-in-possession accounts designated solely for tax obligations would be unnecessary and inefficient.

51.      The Debtor hereby requests authority to maintain the Bank Accounts and utilize them pursuant to the Cash Management System described above. The Debtor does not believe that allowing them to do so will prejudice any party-in-interest or its estate.

52.      Moreover, if the Debtor were forced to close its Bank Accounts, the Debtor expects that there would be disruption and confusion that would negatively impact its operations. For

---

[5] The Guidelines were issued in order to assist the United States Trustee in supervising the administration of Chapter 11 cases. Such Guidelines require Chapter 11 debtors to, among other things, unless the Court requires otherwise:

(a)  Close all existing bank accounts and open new accounts which must be designated debtor-in-possession bank accounts;

(b)  Establish and maintain separate debtor-in-possession accounts for the payment of taxes and separate debtor-in-possession accounts for cash collateral; and

(c)  Obtain and utilize new checks for all debtor-in-possession accounts which bear the designation "Debtor-in-Possession" and contain certain other information related to the chapter 11 case.

instance, funds may be deposited into the wrong account, misapplied, held in limbo or otherwise delayed, thus negatively affecting the Debtor's relationships with parties who are necessary to the Debtor's efforts and who already may be burdened by the filing of this Chapter 11 Case. As a result, the Debtor submits that maintenance of the existing Bank Accounts and Cash Management System is warranted.

53.     Subject to section 553 of the Bankruptcy Code, all banks that maintain the Bank Accounts should be prohibited from offsetting, affecting, freezing or otherwise impeding the Debtor's use of any funds deposited in the Bank Accounts on account of, or by reason of, any claim (as defined in section 101(5) of the Bankruptcy Code) of any such bank against the Debtor that arose before the Petition Date, absent further order of the Court.

**C.    The Debtor Should be Permitted to Continue Using Existing Business Forms.**

54.     Due to the nature and scope of the businesses in which the Debtor is engaged, it is also imperative that the Debtor be permitted to continue to use the Business Forms without alteration or change. Changing correspondence and Business Forms would be unnecessary and burdensome to the estates, as well as expensive and disruptive to the Debtor's business operations.

55.     Accordingly, the Debtor requests that this Court authorize, but not direct, it to use all correspondence and Business Forms existing immediately before the Petition Date without reference to the Debtor's status as "debtor-in-possession." As of the Petition Date, the Debtor regularly utilizes wire transfers in the ordinary course of business.  Given that this Chapter 11 Case is a prepackaged case of short duration, the time and resources that would be incurred in making such references would not be justified.

**D.   The Debtor Should be Permitted to Continue Related Party Transactions and Related Party Transactions in the Ordinary Course.**

56.   As described above, under the Cash Management System, the Debtor, in the ordinary course of its business, has entered into certain  Related Party Transactions with certain identified parties in which the Debtor's shareholders have a substantial ownership interest. These Related Party Transactions allow the Debtor, among other things, to meet the needs of their customers efficiently in a cost-effective manner through the centralization of key administrative functions (in the case of Asficredito), as well as ensure liquidity and cash flow (in the case of Finanza Inversiones and Ban100). If these Related Party Transactions are discontinued or the Debtor is prohibited from continuing to comply with its obligations under such Related Party Transactions, the Debtor's cash management process and business operations would be disrupted causing irreparable harm to the Debtor.

57.   Accordingly, the Debtor believes that the continuation of the Related Party Transactions in the ordinary course of the Debtor's business, subject in all respects to the terms and conditions set forth herein and in the interim and final orders, is critical. The Debtor seeks authority to continue to uphold its obligations in such Related Party Transactions in the ordinary course of its business, subject in all respects to the terms and conditions set forth herein and in the interim and final orders. The Debtor maintains records of substantially all Related Party Transactions and can ascertain, trace and account for the Related Party Transactions at all times. The Debtor will continue to maintain such records postpetition.

58.   Out of an abundance of caution, the Debtor requests that this Court clarify that this relief will not limit the Debtor's ability to reconcile amounts owed between and among the Debtor and any Related Party, including netting and setting off obligations arising from Related Party Transactions, whether arising prepetition or post-petition, in the ordinary course of business.

**E.      Waiver of Requirements of Section 345(b) of the Bankruptcy Code and the United States Trustee Guidelines Regarding Authorized Depositories is Warranted.**

59.      Section 345 of the Bankruptcy Code governs a debtor's deposits of cash during a Chapter 11 case. For deposits that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code requires that the debtor obtain from the "entity with which such money is deposited or invested a bond in favor of the United States secured by the undertaking of a corporate surety, . . . unless the court for cause orders otherwise." 11 U.S.C. § 345(b). Often times, strict adherence to the requirements of section 345(b) of the Bankruptcy Code would be inconsistent with the value-maximizing purpose of Chapter 11 by unduly disrupting the debtor's cash management system and banking relationships. As a result, in 1994, to avoid "needlessly handcuff[ing] larger, more sophisticated debtors," Congress amended section 345(b) to provide that its strict requirements may be waived or modified if the court so orders "for cause." 140 Cong. Rec. H. 10,767 (Oct. 4, 1994); *see* 11 U.S.C. § 345(b).

60.      Courts consider the "totality of the circumstances" in determining whether "cause" exists to waive compliance with section 345(b) of the Bankruptcy Code, with particular regard to the following factors: (i) the sophistication of the debtor's business; (ii) the size of the debtor's business operations; (iii) the amount of investments involved; (iv) the reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case; (v) the bank ratings of the financial institutions where debtor in possession funds are held; (vi) the complexity of the case; (vii) the safeguards in place within the debtor's own business of ensuring the safety of the funds; (viii) the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions; (ix) the benefit to the debtor; and (x) the harm, if any,

to the estate. *See In re Ditech Holding Corp.*, 605 B.R. 10, 17 (Bankr. S.D.N.Y. 2019); *In re Serv. Merch. Co.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

61.     Here, cause exists to waive the requirements of section 345(b) of the Bankruptcy Code because (i) the cost associated with satisfying the requirements of section 345(b) would be needlessly burdensome to the Debtor and its estate, which costs would be borne by creditors and other stakeholders in this Chapter 11 Case; (ii) the process of satisfying such requirements would lead to significant inconvenience and inefficiencies in the management of the Debtor's business; and (iii) satisfying the requirements of section 345(b) would hamper the Debtor's transition into bankruptcy and could cause a precipitous loss of value.

62.     Moreover, obtaining a bond secured by the undertaking of a corporate surety from each Bank at which the Debtor maintains a Bank Account that is not an authorized depository would be inordinately expensive, if such a bond could even be obtained at all as most are financial institutions located in Colombia. Accordingly, the Debtor seeks a waiver of the requirements set forth in section 345(b) of the Bankruptcy Code.

## **BANKRUPTCY RULE 6003 IS SATISFIED AND REQUEST FOR WAIVER OF STAY**

63.     The Debtor submits that because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor for the reasons set forth herein and in the First Day Declaration, Bankruptcy Rule 6003 has been satisfied and the relief requested herein should be granted.  Bankruptcy Rule 6003 provides:

> Except to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, issue an order granting the following: . . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition . . . .

Fed. R. Bankr. P. 6003.

64.     Any impairment of the Debtor's Cash Management System will result in immediate and irreparable harm to the Debtor and its estate.  Accordingly, the Debtor respectfully submits that, because of the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

65.     To successfully implement the foregoing, the Debtor respectfully requests that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and that the Court waive the stay imposed by Bankruptcy Rules 6004(h) and 4001(a).  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As explained above and in the First Day Declaration, the Debtor submits that ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and granting a waiver of the stay imposed by Bankruptcy Rules 4001(a)(3) and 6004(h), to the extent such notice is required and such a stay applies.

66.     Accordingly, the relief requested herein is appropriate under the circumstances and under Bankruptcy Rules 6003 and 6004(h).

**<u>RESERVATION OF RIGHTS</u>**

67.     Nothing contained herein is intended or should be construed as or deemed to constitute an agreement or admission as to the validity of any claim against the Debtor on any grounds, a waiver or impairment of the Debtor's rights to dispute any claim on any grounds or an assumption or rejection of any agreement, contract or lease under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be, and should not be construed as, an admission as to the validity of any claim or a waiver of the Debtor's rights to dispute such claim subsequently.

## NOTICE

68.    Notice of this Motion will be provided to: (a) the U.S. Trustee; (b) the holders of the 20 largest unsecured claims against the Debtor; (c) the Internal Revenue Service; (d) the United States Attorney's Office for the Southern District of New York and any other states in which the Debtor operates; (e) the Securities and Exchange Commission; (f) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (g) any other party entitled to notice pursuant to Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York. In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary.

## NO PRIOR REQUEST

69.    No prior request for the relief sought in this Motion has been made to this or any other court.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that this Court enter interim and final orders, substantially in the forms annexed hereto as **Exhibit A** and **Exhibit B**, respectively, granting the relief requested herein and granting such other and further relief as is just and proper.

*[Signature page follows]*

Dated: May 16, 2024                    **BAKER & McKENZIE LLP**

By: */s/ Paul J. Keenan Jr.*
   Paul J. Keenan Jr. (*pro hac vice* pending)
   Reginald Sainvil (*pro hac vice* pending)
   1111 Brickell Avenue, 10th Floor
   Miami, FL 33131
   Telephone: (305) 789-8900
   Facsimile: (305) 789-8953
   Email: paul.keenan@bakermckenzie.com
          reginald.sainvil@bakermckenzie.com

   Blaire Cahn
   452 Fifth Avenue
   New York, NY 10018
   Telephone: 212-626-4100
   Facsimile: 212-310-1600
   Email: blaire.cahn@bakermckenzie.com

   *Proposed Counsel for the Debtor and Debtor-in-Possession*

**EXHIBIT A**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:                                                                    Chapter 11

CREDIVALORES – CREDISERVICIOS S.A.,                Case No. 24-10837 (DSJ)

      Debtor.

_____/

**INTERIM ORDER (A) AUTHORIZING (i) CONTINUED USE OF EXISTING CASH
MANAGEMENT SYSTEM, (ii) MAINTENANCE OF EXISTING BANK ACCOUNTS,
AND (iii) CONTINUED USE OF EXISTING BUSINESS FORMS, (B) AUTHORIZING
CONTINUED PERFORMANCE UNDER RELATED PARTY TRANSACTIONS AND
HISTORICAL PRACTICES, AND (C) WAIVING THE REQUIREMENTS OF
SECTION 345(B) OF THE BANKRUPTCY CODE**

Upon the motion, dated May 16, 2024 [Doc. No. [●]] (the "**Motion**")[1] of the above-
captioned debtor and debtor-in-possession (the "**Debtor**"), pursuant to sections 105(a), 363, 364,
553, 1107 and 1108 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004(h), Local
Bankruptcy Rule 9013-1(a), and the *Amended Procedural Guidelines for Prepackaged Chapter
11 Cases in the United States Bankruptcy Court for the Southern District of New York*, effective
February 1, 2024, to (A) authorize, but not direct, (i) the continued use of existing cash
management system(s), (ii) maintenance of bank accounts, and (iii) continued use of existing
business forms and checks; (B) authorize, but not direct, continued performance under related
party transactions and historical practices; and (C) waive the requirements of section 345(B) of the
Bankruptcy Code; and upon consideration of the *Declaration of Jaime Francisco Buritica Leal
(I) in Support of the Chapter 11 Petition and First Day Pleadings and (II) Pursuant to Local
Bankruptcy Rule 1007-2* dated May 16, 2024 [Doc. No. [●]]; and the Court having jurisdiction to
consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and
consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

§ 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and

due and proper notice of the Motion having been provided; and the Court having conducted a

hearing on the motion on [●], 2024 (the "**Hearing**"); and the Court having reviewed the Motion;

and it appearing that (a) the legal and factual bases set forth in the Motion establish just cause for

the relief granted herein, (b) the Debtor has provided due and proper notice of the Motion, and no

further notice is necessary, (c) the relief granted herein is necessary to avoid immediate and

irreparable harm to the Debtor as contemplated by Rule 6003 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**"), and (d) nothing in the Motion requests, and nothing in the

Order grants, a waiver, termination, or modification of the automatic stay; and upon all of the

proceedings had before the Court, including the record of the Hearing; and after due deliberation

and sufficient cause appearing therefore,

  **IT IS HEREBY ORDERED:**

  1. The Motion is GRANTED as set forth herein.

  2. The hearing (the "**Final Hearing**") on the Motion shall be held on **_____, 2024,**

**at _____ __.m.**, prevailing Eastern Time. Any objections or responses to the relief sought shall (i)

be in writing, (ii) conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy

Rules for the Southern District of New York, and (iii) be filed with the Bankruptcy Court

by attorneys electronically in accordance with General Order M-399 (which can be found at

www.nysb.uscourts.gov); and shall be served on (a) counsel to the Debtor, Baker & McKenzie

LLP (Attn: Blaire Cahn) 452 Fifth Avenue, New York, New York 10018,

blaire.cahn@bakermckenzie.com, and Baker & McKenzie LLP (Attn: Paul J. Keenan Jr. and

Reginald Sainvil) 1111 Brickell Avenue, Suite 1000, Miami, Florida 33131,

paul.keenan@bakermckenzie.com and reginald.sainvil@bakermckenzie.com, (b) counsel to the

Trustee for the Old Notes, Norton Rose Fulbright  (Attn: Marian Baldwin), 1301 6th Ave, New

York, New York 10019, marian.baldwin@nortonrosefulbright.com, and (c) counsel to the United

States Trustee, Alexander Hamilton Custom House, One Bowling Green, Room 534, New York,

NY 1004 (Attn: Andrew D. Velez-Rivera), In the event no objections to entry of a final order are

timely received, this Court may enter a final order without need for the Final Hearing.

3.      The Debtor is authorized, but not directed, to maintain and use its Cash

Management System, solely on the terms set forth in this Order.

4.      The Debtor is authorized, but not directed, to maintain and use the existing Bank

Accounts listed on **Exhibit C** to the Motion in the name and with the account numbers existing

immediately prior to the Petition Date.

5.      The requirement in the Guidelines that the Debtor establish a specific new bank

account for tax payments is waived. To the extent that the Debtor's Bank Accounts and Cash

Management System are inconsistent with the requirements of section 345(b) of the Bankruptcy,

such requirements are hereby waived.

6.      The Debtor is authorized, but not directed, to deposit funds in and withdraw funds

from its Bank Accounts by all usual means, subject to the same access rights and limitations

existing prior to the Petition Date, including, but not limited to, checks, wire transfers, automated

clearinghouse transfers, electronic funds transfers and other debits and to treat the Bank Accounts

for all purposes as debtor-in-possession accounts.

7.      The Debtor is authorized, but not directed, to continue to use its checks,

correspondence and Business Forms including, but not limited to, purchase orders, letterhead,

envelopes, promotional materials, and other business forms, substantially in the forms existing

immediately prior to the Petition Date, without reference to the Debtor's debtor-in-possession status.

8.      The banks listed on **Exhibit C** to the Motion and any and all other financial institutions receiving or transferring funds from the Debtor are hereby authorized and directed to continue to service and administer the Bank Accounts of the relevant Debtor as a debtor-in-possession without interruption and in the usual and ordinary course, and to receive, process, honor and pay any and all checks, drafts, wires or ACH transfers drawn on the Bank Accounts by the holders or makers thereof. In no event shall any of the banks be required to honor overdrafts or to pay any check, wire or other debit against any of the Bank Accounts that is drawn against uncollected funds.

9.      For banks at which the Debtor holds Bank Accounts that are party to a Uniform Depository Agreement with the Office of the United States Trustee for the Southern District of New York, within ten (10) days of the date of entry of this Order, the Debtor shall (a) contact each bank; (b) provide the bank with the Debtor's employer identification number; and (c) identify each of its Bank Accounts held at such banks as being held by a debtor-in-possession in a bankruptcy case.

10.     Subject to section 553 of the Bankruptcy Code, all banks that maintain the Bank Accounts are prohibited from offsetting, affecting, freezing or otherwise impeding the Debtor's use of any funds in the Bank Accounts on account of, or by reason of, any claim (as defined in section 101(5) of the Bankruptcy Code) of any such bank against the Debtor that arose before the Petition Date, absent further order of this Court.

11.     In connection with the ongoing utilization of the Cash Management System, the Debtor shall continue to maintain records with respect to all transfers of cash so that all transactions

4

(including Related Party Transactions) may be readily ascertained, traced, recorded properly and distinguished between prepetition and postpetition transactions.

12.      The Debtor is authorized, but not directed, to pay or reimburse any bank fees, claims, costs, expenses or charges associated with the Bank Accounts and arising prior to and after the Petition Date, including, without limitation, (i) service charges or fees; (ii) checks deposited with the banks which have been dishonored or returned for insufficient funds; and (iii) any reimbursement or other payment obligations, such as overdrafts, arising under the terms of any prepetition agreement existing between the Debtor and each bank (collectively, the "**Bank Account Claims**" and the banks in which the Debtor maintains the Bank Accounts, the "**Banks**"). In the course of maintaining any of the Bank Accounts for the Debtor, the Banks are authorized, without further order of this Court, to continue to deduct from the appropriate Bank Accounts, the Bank Account Claims incurred in connection with the Bank Accounts.

13.      This Order shall apply to any and all Bank Accounts actually in, or linked to, the Cash Management System, even if such Bank Accounts do not appear on the list attached as **Exhibit C** to the Motion. After entry of this Order, should the Debtor identify any Bank Accounts not listed on **Exhibit C**, they shall promptly file an amended **Exhibit C** with the Court, indicating any added or deleted Bank Accounts. Any and all accounts opened by the Debtor on or after the Petition Date at any Bank shall be deemed a Bank Account (as if it had been opened prior to the Petition Date and listed on **Exhibit C**) and any and all Banks at which such accounts are opened shall similarly be subject to the rights and obligations of this Order.

14.      The Banks may rely on the representations of the Debtor with respect to whether any check, item, or other payment order drawn or issued by the Debtor prior to the Commencement Date should be honored pursuant to this or any other order of this Court, and such Banks shall not

have any liability to any party for relying on such representations by the Debtor as provided for herein.

15.     Notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

16.     Under the circumstances of the Chapter 11 Case, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

17.     The Debtor is authorized and empowered to take all actions necessary to implement the relief granted in this Order.


Dated: _____, 2024
        New York, New York


                                        _____
                                        HONORABLE DAVID S. JONES
                                        UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT B**

**Proposed Final Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| CREDIVALORES – CREDISERVICIOS S.A., | Case No. 24-10837 (DSJ) |
| Debtor. | |

_____/

### FINAL ORDER (A) AUTHORIZING (i) CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, (ii) MAINTENANCE OF EXISTING BANK ACCOUNTS, AND (iii) CONTINUED USE OF EXISTING BUSINESS FORMS, (B) AUTHORIZING CONTINUED PERFORMANCE UNDER RELATED PARTY TRANSACTIONS AND HISTORICAL PRACTICES, AND (C) WAIVING THE REQUIREMENTS OF SECTION 345(B) OF THE BANKRUPTCY CODE

Upon the motion, dated May 16, 2024 [Doc. No. [●]] (the "**Motion**")[1] of the above-captioned debtor and debtor-in-possession (the "**Debtor**"), pursuant to sections 105(a), 363, 364, 553, 1107 and 1108 of the Bankruptcy Code (the "**Bankruptcy Code**"), Bankruptcy Rules 6003 and 6004(h), Local Bankruptcy Rule 9013-1(a), and the *Amended Procedural Guidelines for Prepackaged Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of New York*, effective February 1, 2024, to (A) authorize, but not direct, (i) the continued use of existing cash management system(s), (ii) maintenance of bank accounts, and (iii) continued use of existing business forms and checks; (B) authorize, but not direct, continued performance under related party transactions and historical practices; and (C) waive the requirements of section 345(B) of the Bankruptcy Code; and upon consideration of the *Declaration of Jaime Francisco Buritica Leal (I) in Support of the Chapter 11 Petition and First Day Pleadings and (II) Pursuant to Local Bankruptcy Rule 1007-2* dated May 16, 2024 [Doc. No. [●]]; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and a hearing having been held on [●], 2024 (the "**Interim Hearing**") to consider the relief requested in the Motion on an interim basis, and the Court having entered an order granting the relief on an interim basis on May [●], 2024 [Doc. No. [●]] (the "**Interim Order**"), and a final hearing on the Motion having been held on [●], 2024 (the "**Final Hearing**"); and the Court having reviewed the Motion; and it appearing that (a) the legal and factual bases set forth in the Motion establish just cause for the relief granted herein, (b) the Debtor have provided due and proper notice of the Motion, and no further notice is necessary, and (c) nothing in the Motion requests, and nothing in the Order grants, a waiver, termination, or modification of the automatic stay; and upon all of the proceedings had before the Court, including the record of the Interim Hearing and the Final Hearing; and after due deliberation and sufficient cause appearing therefore,

     **IT IS HEREBY ORDERED:**

1. The Motion is GRANTED on a final basis as set forth herein.

2. The Debtor is authorized, but not directed, to maintain and use its Cash Management System, solely on the terms set forth in this Order.

3. The Debtor is authorized, but not directed, to maintain and use the existing Bank Accounts listed on **Exhibit C** to the Motion in the name and with the account numbers existing immediately prior to the Petition Date.

4. The requirement in the Guidelines that the Debtor establish a specific new bank account for tax payments is waived. To the extent that the Debtor's Bank Accounts and Cash

Management System are inconsistent with the requirements of section 345(b) of the Bankruptcy Code, such requirements are waived.

5.      The Debtor is authorized, but not directed, to deposit funds in and withdraw funds from its Bank Accounts by all usual means, subject to the same access rights and limitations existing prior to the Petition Date, including, but not limited to, checks, wire transfers, automated clearinghouse transfers, electronic funds transfers and other debits and to treat the Bank Accounts for all purposes as debtor-in-possession accounts.

6.      The Debtor is authorized, but not directed, to continue to use its checks, correspondence and Business Forms including, but not limited to, purchase orders, letterhead, envelopes, promotional materials, and other business forms, substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtor's debtor-in-possession status.

7.      The banks listed on **Exhibit C** to the Motion and any and all other financial institutions receiving or transferring funds from the Debtor are hereby authorized and directed to continue to service and administer the Bank Accounts of the Debtor as a debtor-in-possession without interruption and in the usual and ordinary course, and to receive, process, honor and pay any and all checks, drafts, wires or ACH transfers drawn on the Bank Accounts by the holders or makers thereof. In no event shall any of the banks be required to honor overdrafts or to pay any check, wire or other debit against any of the Bank Accounts that is drawn against uncollected funds.

8.      For banks at which the Debtor holds Bank Accounts that are party to a Uniform Depository Agreement with the Office of the United States Trustee for the Southern District of New York, within ten (10) days of the date of entry of this Order, the Debtor shall (a) contact each bank; (b) provide the bank with the Debtor's employer identification number; and (c) identify each

3

of its Bank Accounts held at such banks as being held by a debtor-in-possession in a bankruptcy case.

9.      Subject to section 553 of the Bankruptcy Code, all banks that maintain the Bank Accounts are prohibited from offsetting, affecting, freezing or otherwise impeding the Debtor's use of any funds in the Bank Accounts on account of, or by reason of, any claim (as defined in section 101(5) of the Bankruptcy Code) of any such bank against the Debtor that arose before the Petition Date, absent further order of this Court.

10.     The Debtor is authorized, but not directed, to pay or reimburse any bank fees, claims, costs, expenses or charges associated with the Bank Accounts and arising prior to and after the Petition Date, including, without limitation, (i) service charges or fees; (ii) checks deposited with the banks which have been dishonored or returned for insufficient funds; and (iii) any reimbursement or other payment obligations, such as overdrafts, arising under the terms of any prepetition agreement existing between the Debtor and each bank (collectively, the "**Bank Account Claims**" and the banks in which the Debtor maintains the Bank Accounts, the "**Banks**"). In the course of maintaining any of the Bank Accounts for the Debtor, the Banks are authorized, without further order of this Court, to continue to deduct from the appropriate Bank Accounts, the Bank Account Claims incurred in connection with the Bank Accounts.

11.     This Order shall apply to any and all Bank Accounts actually in, or linked to, the Cash Management System, even if such Bank Accounts do not appear on the list attached as **Exhibit C** to the Motion. After entry of this Order, should the Debtor identify any Bank Accounts not listed on **Exhibit C**, it shall promptly file an amended **Exhibit C** with the Court, indicating any added or deleted Bank Accounts. Any and all accounts opened by the Debtor on or after the Petition Date at any Bank shall be deemed a Bank Account (as if it had been opened prior to the

Petition Date and listed on **Exhibit C**) and any and all Banks at which such accounts are opened shall similarly be subject to the rights and obligations of this Order,.

12.     The Debtor is authorized to request the Banks, and the Banks are authorized to accept and honor all representations from the Debtor, as to which checks, drafts, wires or ACH transfers should be honored or dishonored whether the Banks believe the payment is or is not consistent with the order(s) of this Court and governing law, and whether such checks, drafts, wires or ACH transfers are dated or made prior to, on or subsequent to the Petition Date.

13.     Notwithstanding any provision of this Order to the contrary, the Banks will not be liable to any party on account of (a) following the Debtor's instructions or representations as to any check or other item that may be honored or as to any order of this Court, (b) the honoring of any prepetition check or item in a good faith belief that the Court has authorized such prepetition check or item to be honored, or (c) an innocent mistake made despite implementation of reasonable item handling procedures.

14.     Bankruptcy Rule 6003(b) has been satisfied because the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtor.

15.     Notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

16.     The Debtor is authorized and empowered to take all actions necessary to implement the relief granted in this Order.

17.     This Court shall retain jurisdiction with respect to all matters arising from or relating to the interpretation or implementation of this Order.

Dated: _____ ___, 2024
      New York, New York

_____
HONORABLE DAVID S. JONES
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT C**

**List of Bank Accounts**

| # | Account Owner (Legal Entity) | Country | Currency | Bank Name | Description | Acct # (last 4 digits) | Status | Collateralized? |
|---|---|---|---|---|---|---|---|---|
| 1 | Credivalores | Colombia | COP | Alianza Fiduciaria | Disbursements Account | *0989 | Active | |
| 2 | Credivalores | Colombia | COP | Banco de Bogota | Disbursements Account | *5182 | Active | |
| 3 | Credivalores | Colombia | COP | Banco de Bogota | Collections Account | *1243 | Active | |
| 4 | Credivalores | Colombia | COP | Banco de Occidente | Disbursements Account | *9434 | Active | |
| 5 | Credivalores | Colombia | COP | Banco de Occidente | Loan Originating Account | *9262 | Active | |
| 6 | Credivalores | Uruguay | USD | Banco Santander Uruguay | USD Savings Account | *7370 | Active | |
| 7 | Credivalores | Colombia | COP | Bancolombia | Collections Account | *3608 | Active | |
| 8 | Credivalores | Colombia | COP | Bancolombia | Excess Funds Account | *0065 | Active | |
| 9 | Credivalores | Colombia | COP | Bancolombia | Disbursements Account | *0645 | Active | |
| 10 | Credivalores | Colombia | COP | Bancolombia | Loan Originating Account | *4981 | Active | |
| 11 | Credivalores | Colombia | COP | Bancolombia | Loan Originating Account | *2970 | Active | |
| 12 | Credivalores | Colombia | COP | Bancolombia | Loan Originating Account | *3360 | Active | |
| 13 | Credivalores | Colombia | COP | Bancolombia | Collections Account | *0302 | Active | |
| 14 | Credivalores | Colombia | COP | Scotiabank Colpatria | Administrative savings Account | *3835 | in process of closing | |
| 15 | Credivalores | Colombia | COP | Valores Bancolombia | Administrative Trust Account | *0072 | Inactive | |
| 16 | Fidubancolombia | Colombia | COP | Banco de Bogota | Collections Account | *0945 | Active | |
| 17 | Fidubancolombia | Colombia | COP | Bancolombia | PA Loan Trust Account | *3958 | Active | Yes |
| 18 | Fidubancolombia | Colombia | COP | Bancolombia | PA Reserve account | *3643 | Active | Yes |
| 19 | Fidubancolombia | Colombia | COP | Bancolombia | Inactive savings account | *5013 | in process of closing | |
| 20 | Fidubancolombia | Colombia | COP | Bancolombia | Collections Account | *4961 | Active | |
| 21 | Fidubancolombia | Colombia | COP | Bancolombia | Collections Account | *3660 | Active | |
| 22 | Fidubancolombia | Colombia | COP | Bancolombia | Trust Consolidating Account | *0183 | Active | |
| 23 | Fidubancolombia | Colombia | COP | Bancolombia | PA Loan Trust Account | *8778 | Active | Yes |
| 24 | Fidubancolombia | Colombia | COP | Bancolombia | PA Reserve account | *4968 | Active | Yes |
| 25 | Fidubancolombia | Colombia | COP | Bancolombia | PA Loan Trust Account | *4472 | Active | Yes |
| 26 | Fidubancolombia | Colombia | COP | Bancolombia | PA Loan Trust Account | *4184 | Active | Yes |
| 27 | Fidubancolombia | Colombia | COP | Bancolombia | PA Reserve account | *4185 | Active | Yes |

| # | Account Owner (Legal Entity) | Country | Currency | Bank Name | Description | Acct # (last 4 digits) | Status | Collateralized? |
|---|---|---|---|---|---|---|---|---|
| 28 | Fidubancolombia | Colombia | COP | Bancolombia | Collections Account | *6641 | Active | |
| 29 | Fidubancolombia | Colombia | COP | Bancolombia | Collections Account | *0691 | Active | |
| 30 | Fidubancolombia | Colombia | COP | Bancolombia | Collections Account | *8692 | Active | |
| 31 | Fidubancolombia | Colombia | COP | Bancolombia | Collections Account | *8228 | Active | |
| 32 | Fidubancolombia | Colombia | COP | Bancolombia | PA Loan Trust Account | *4806 | Active | Yes |
| 33 | Fidubancolombia | Colombia | COP | Bancolombia | PA Loan Trust Account | *4821 | Active | Yes |
| 34 | Fidubancolombia | Colombia | COP | Fiduprevisora | Collections Account | *1860 | Active | |
| 35 | Fidubancolombia | Colombia | COP | Valores Bancolombia | PA Loan Trust Account | *2288 | Active | Yes |
| 36 | Fidubancolombia | Colombia | COP | Valores Bancolombia | PA Loan Trust Account | *3311 | Active | Yes |
| 37 | Fidubancolombia | Colombia | COP | Valores Bancolombia | Collections Account (Receives all the funds from account 0945) | *3579 | Active | |
| 38 | Fidubancolombia | Colombia | COP | Valores Bancolombia | PA Loan Trust Account | *4606 | Active | Yes |
| 39 | Fiducoomeva | Colombia | COP | Bancolombia | Collections Account | *4202 | Active | |
| 40 | Fiducoomeva | Colombia | COP | Bancolombia | Collections Account | *4203 | Active | |
| 41 | Fiducoomeva | Colombia | COP | Bancolombia | Collections Account | *9655 | Active | |
| 42 | Fiducoomeva | Colombia | COP | Bancolombia | PA Reserve account | *9831 | Active | Yes |
| 43 | Fiducoomeva | Colombia | COP | Bancolombia | PA Reserve account | *9832 | Active | Yes |

**EXHIBIT D**

**Cash Flow Management Chart**



Note: The chart above includes 40 bank accounts out of 43 bank accounts listed. Two bank accounts not included above are currently in the process of being closed and one bank account is currently not in use.