Paul J. Keenan Jr. (*pro hac vice*)
Reginald Sainvil (*pro hac vice*)
Baker & McKenzie LLP
1111 Brickell Avenue, 10th Floor
Miami, FL 33130
Telephone: 305-789-8900
Facsimile: 305-789-8953
Email: paul.keenan@bakermckenzie.com
          reginald.sainvil@bakermckenzie.com

Blaire Cahn
Baker & McKenzie LLP
452 Fifth Avenue
New York, NY 10018
Telephone: 212-626-4100
Facsimile: 212-310-1600
Email: blaire.cahn@bakermckenzie.com

*Proposed Counsel for the Debtor*
*and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CREDIVALORES – CREDISERVICIOS S.A., | Case No. 24-10837 (DSJ) |
| Debtor. | |

_____/

### NOTICE OF FILING OF (I) OFFERING MEMORANDUM AND CONSENT SOLICITATION STATEMENT, (II) FIRST SUPPLEMENT TO OFFERING MEMORANDUM AND CONSENT SOLICITATION STATEMENT, AND (III) SECOND SUPPLEMENT TO OFFERING MEMORANDUM AND CONSENT SOLICITATION STATEMENT

**PLEASE TAKE NOTICE** that Credivalores – Crediservicios S.A. ("Credivalores"), the above-captioned debtor and debtor in possession (the "**Debtor**") file the Offering Memorandum and Consent Solicitation Statement, attached hereto as **Exhibit A**.

Dated: May 16, 2024                                **BAKER & McKENZIE LLP**

                                        By: */s/ Paul J. Keenan Jr.*
                                        Paul J. Keenan Jr. (*pro hac vice*)
                                        Reginald Sainvil (*pro hac vice*)
                                        1111 Brickell Avenue, 10th Floor
                                        Miami, FL 33131
                                        Telephone: 305-789-8900
                                        Facsimile: 305-789-8953
                                        Email: paul.keenan@bakermckenzie.com
                                                reginald.sainvil@bakermckenzie.com

                                        Blaire Cahn
                                        452 Fifth Avenue
                                        New York, NY 10018
                                        Telephone: 212-626-4100
                                        Facsimile: 212-310-1600
                                        Email: blaire.cahn@bakermckenzie.com

                                        *Proposed Counsel for the Debtor and Debtor-in-Possession*

# Exhibit A

**Offering Memorandum and Consent Solicitation Statement**



**Credivalores – Crediservicios S.A.**

**Offer to Exchange any and all of its outstanding 8.875% Senior Notes due 2025 for its newly issued Senior Secured Step-up Notes due 2029**

**Solicitation of Consents to Proposed Amendments to Related Indenture**

**Disclosure Statement for Solicitation of Votes on a Prepackaged Plan of Reorganization**

> The exchange offer, the consent solicitation and the plan solicitation will expire at 5:00 p.m. (New York City time) on April 3, 2024 unless extended by us (such date and time, as they may be extended, the "Expiration Date"). In order to be eligible to receive the exchange consideration, holders of Old Notes (as defined below) must validly tender and must not validly withdraw their Old Notes and must submit their ballot in favor of the Plan (as defined below) prior to the Expiration Date, unless extended by us. Votes to accept or reject the Prepackaged Chapter 11 Plan in the form set forth in Annex B hereto (as same may be modified, amended or supplemented from time to time) (the "Plan") must be received no later than 5:00 p.m. (New York City time) on April 3, 2024 (the "Voting Deadline"). If the exchange offer and consent solicitation are successful, any votes to accept or reject the Plan will be of no effect.

**The Exchange Offer**

We are making an offer (the "Exchange Offer") to eligible holders (as defined below), upon the terms and subject to the conditions set forth in this offering memorandum and consent solicitation statement (this "Statement"), to exchange all of our outstanding 8.875% Senior Notes due 2025 (the "Old Notes") for our newly issued Senior Secured Step-up Notes due 2029 (the "New Notes"), for the consideration set forth in the table below.

| CUSIP / ISIN of Old Notes | Aggregate Principal Amount Outstanding of Old Notes | Title of Old Notes | Title of New Notes | Exchange Consideration per US$1,000 Principal Amount of Old Notes if Tendered on or before the Expiration Date |
|---|---|---|---|---|
| 22555L AB2 / US22555LAB27 and P32086 AR4 / USP32086AR44 | US$210,800,000 | 8.875% Senior Notes due 2025 | Senior Secured Step-up Notes due 2028 | US$750 of Senior Notes and Capitalized Interest (1) |

_____

(1) Consideration in the form of principal amount of New Notes per US$1,000 principal amount of Old Notes that are validly tendered (and not validly withdrawn), including further New Notes to capitalize the accrued and unpaid interest from (and including) the immediately preceding interest payment date to (but excluding) February 7, 2024 (such accrued and unpaid

interest subject to the same 25% reduction as the principal amount of the Old Notes), to the effect that each US$1 of accrued and unpaid interest of such Old Notes validly tendered and accepted (rounded down to the nearest US$ 1) will be exchanged for US$0.75 in principal amount of New Notes in lieu of cash (such accrued and unpaid capitalized interest, the "Capitalized Interest").

## The Consent Solicitation

In connection with the Exchange Offer, we are soliciting consents (the "Consent Solicitation"), upon the terms and subject to the conditions set forth in this Statement from all Eligible Holders of the Old Notes to the Proposed Amendments to the indenture governing the Old Notes (the "Old Notes Indenture") that would eliminate the majority of the restrictive covenants and certain events of default (the "Proposed Amendments"), as more fully described under "The Proposed Amendments." If the Proposed Amendments become operative, all holders who do not validly tender their Old Notes in the Exchange Offer will be bound by the Proposed Amendments even though they did not consent to the Proposed Amendments. By tendering Old Notes for exchange, holders will also be delivering their consent to the Proposed Amendments. Eligible Holders may not tender their Old Notes without consenting to the Proposed Amendments and may not deliver consents to the Proposed Amendments without tendering the related Old Notes. Tendering holders may not withdraw their validly tendered Old Notes without revoking their consents and may not revoke their consents without withdrawing any validly tendered Old Notes. We can provide no assurance that the conditions to the Exchange Offer will be satisfied.

## The Plan Solicitation

As described more fully in this Statement, the consummation of the Exchange Offer is conditioned upon, among other things, the valid tender, without subsequent withdrawal, of at least 95% (including any Old Notes which are owned by us or our affiliates) in aggregate principal amount of the outstanding Old Notes on or prior to the Expiration Date (the "Minimum Tender Condition"); provided however that the Proposed Amendments will only be operative if at least a majority (not including any Old Notes which are owned by us or our affiliates) in aggregate amount of the Old Notes is validly tendered and not validly withdrawn on or prior to the Expiration Date. If the Minimum Tender Condition is not satisfied on or before the Expiration Date, we intend to terminate the Exchange Offer; however, we reserve the right to waive the Minimum Tender Condition.

In the event that the Exchange Offer is terminated, but holders of the Old Notes submit votes in favor of the Plan in an amount and number that satisfy the Bankruptcy Threshold (as defined herein), we currently intend to file a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), which will commence a chapter 11 case (the "Chapter 11 Case"), and seek prompt confirmation of the Plan in order to accomplish the financial restructuring contemplated by the Exchange Offer. Concurrently with the Exchange Offer and Consent Solicitation, we are commencing the solicitation of votes to approve the Plan (the "Plan Solicitation"). Accordingly, an applicable Ballot and Master Ballot will be provided under separate cover to holders as of the record date that is applicable for voting on the Plan.

Because the Chapter 11 Case has not yet been commenced, this Statement has not been approved by the Bankruptcy Court as containing "adequate information" within the meaning of Section 1125(a) of the Bankruptcy Code. If we file the Chapter 11 Case, we will promptly seek entry of an order from the Bankruptcy Court (a) approving this Statement as having contained "adequate information," (b) approving the solicitation of votes as having been in compliance with Section 1126(b) of the Bankruptcy Code and (c) confirming the Plan. The Bankruptcy Court may order additional disclosures.

**Participating in the Exchange Offer, the Consent Solicitation or the Plan Solicitation involves risks. See "Risk Factors" beginning on page 26 and on page A-9.**

**The Exchange Offer and the Consent Solicitation are directed only to holders of the Old Notes who are Qualified Institutional Buyers ("QIBs") (within the meaning of Rule 144A under the U.S. Securities Act of 1933, as amended, (the "Securities Act")) in compliance with Rule 144A under the Securities Act or to persons other than U.S. Persons (as defined in Regulation S under the U.S. Securities Act of 1933, as amended (the "Securities Act")) outside**

the United States. Holders of Old Notes that are eligible to participate in the Exchange Offer and the Consent Solicitation pursuant to the foregoing condition are referred to in this Statement as "Eligible Holders." Only Eligible Holders are authorized to participate in the Exchange Offer and the Consent Solicitation. The New Notes have not been registered and will not be registered under the Securities Act. Accordingly, we are offering the New Notes only to Eligible Holders. For certain restrictions on transfer of the New Notes, see "Transfer Restrictions."

Neither this Statement nor the Plan have been filed with or reviewed by the Bankruptcy Court, and the securities to be issued in the Exchange Offer or, if the Exchange Offer is not consummated, on or after the Effective Date will not have been the subject of a registration statement filed with the U.S. Securities and Exchange Commission (the "SEC") under the Securities Act, or any securities regulatory authority of any state under any state securities laws. We are relying on Section 4(a)(2) and Regulation S under the Securities Act, and similar provisions of state securities laws, to exempt from registration under the Securities Act the offer of New Notes to holders of Old Notes before the filing of the Chapter 11 Case, including, without limitation, in connection with the Plan Solicitation.

In order to consummate the Plan, we will rely on Section 1145 of the Bankruptcy Code to exempt the offering, issuance and distribution of the New Notes from the registration requirements of the Securities Act and of any state securities laws. Section 1145 of the Bankruptcy Code exempts from registration the offer or sale of securities of us or a successor to us under a chapter 11 plan, if such securities are offered or sold in exchange for a claim against us, an equity interest in us, or a claim for an administrative expense in the case concerning us.

The Plan has not been approved or disapproved by the SEC or any state securities commission, and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of the information contained herein. In addition, the New Notes have not been approved or disapproved by the SEC, any state securities commission or any other regulatory authority, nor have any of the foregoing authorities passed upon or endorsed the merits of the Plan or the accuracy or adequacy of this statement. Any representation to the contrary is a criminal offense. This Statement does not constitute an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

The terms and conditions of any offer of securities will be notified to the Colombian Superintendency of Finance (Superintendencia Financiera de Colombia, or "SFC") for informational purposes only and such notice does not constitute a certification as to the investment quality of the securities, our solvency or the accuracy or completeness of this Statement. The New Notes have not been registered with the Colombian National Registry of Securities and Issuers (Registro Nacional de Valores y Emisores, or "RNVE") maintained by the SFC. The New Notes will not be listed on the Colombian Stock Exchange (Bolsa de Valores de Colombia). The New Notes may be offered to persons in Colombia in a private placement. The offering will not be subject to review or authorization by the SFC.

*Exclusive Dealer Manager*

**BCP Securities, Inc.**

**March 7, 2024**

# TABLE OF CONTENTS

**Page**

Important Information About the Exchange Offer, the Consent Solicitation and the Plan Solicitation.....................................1
Notice to Holders ................................................................................................................................................................4
Service of Process and Enforcement of Civil Liabilities ...................................................................................................6
Reasons for the Exchange Offer, Consent Solicitation and Plan Solicitation ...................................................................9
Questions and Answers About the Restructuring .............................................................................................................10
Summary of the Exchange Offer and the Consent Solicitation ........................................................................................17
Summary of the New Notes ..............................................................................................................................................20
Summary of the Plan .........................................................................................................................................................24
Risk Factors ......................................................................................................................................................................26
Description of the Exchange Offer and the Consent Solicitation .....................................................................................39
The Proposed Amendments ...............................................................................................................................................50
Description of the New Notes ...........................................................................................................................................53
Book-Entry; Delivery And Form ......................................................................................................................................98
Description of the Plan And Voting .................................................................................................................................102
Anticipated Events in a Chapter 11 Case ........................................................................................................................124
Transfer Restrictions .......................................................................................................................................................127
Taxation ...........................................................................................................................................................................131
Legal Matters ..................................................................................................................................................................140
General Information .........................................................................................................................................................141

Annex A – Information about the Company

Annex B – Chapter 11 Plan of Reorganization

**IMPORTANT INFORMATION ABOUT THE EXCHANGE OFFER, THE CONSENT SOLICITATION AND THE PLAN SOLICITATION**

**The Exchange Offer and the Consent Solicitation**

Eligible Holders that validly tender through the *"Automated Tender Offer Program ("ATOP")"* maintained by The Depository Trust Company ("DTC") and do not validly withdraw Old Notes on or before the Expiration Date will be eligible to receive the exchange consideration of US$ 750 principal amount of the New Notes for each US$1,000 principal amount of Old Notes validly tendered, not validly withdrawn and accepted.

The New Notes will be issued in minimum denominations of US$ 1,000 and integral multiples of US$ 1.00 in excess thereof. An Eligible Holder must tender Old Notes in a principal amount equal to the minimum denominations of US$200,000 and integral multiples of US$1,000 in excess thereof. Any holder that tenders less than such amount will not be able to participate in the Exchange Offer and the Consent Solicitation and their exchange will be rejected.

The amount of New Notes to be issued to any holder will be rounded down, if necessary, to the nearest US$ 1.00. No additional cash will be paid in lieu of any principal amount of New Notes not received as a result of rounding down. If the Exchange Offer and Consent Solicitation are successful, the New Notes will be allocated on a per-tender basis with rounding calculated at each "voluntary offering instruction" generated by DTC's ATOP. Alternatively, if the Exchange Offer and Consent Solicitation are not successful, the New Notes will likely be allocated on a mandatory basis with DTC treated as one holder for rounding purposes.

The acceptance date is expected to be on or promptly following the Expiration Date with respect to Old Notes that are validly tendered and are not validly withdrawn on or before the Expiration Date. The Settlement Date is expected to be within three business days of the Expiration Date.

On the Settlement Date, all Eligible Holders whose Old Notes are validly tendered and not validly withdrawn, and are accepted for exchange will also receive New Notes to capitalize the accrued and unpaid interest in respect of the Old Notes validly tendered and accepted for exchange from (and including) the immediately preceding interest payment date of the Old Notes to (but excluding) February 7, 2024, to the effect that accrued and unpaid interest on the Old Notes validly tendered and accepted for payment will also receive US$0.75 New Notes for each US$1 of accrued and unpaid interest; provided, however, that the amount of accrued and unpaid interest will be rounded down, if necessary, to the nearest US$1.00 and no additional cash will be paid in lieu of any fractional amount. The Exchange Offer is not being made to, and any offers to exchange will not be accepted from, or on behalf of, Eligible Holders of the Old Notes in any jurisdiction in which the making of such offer would not be in compliance with the laws and regulations of such jurisdiction. See "Transfer Restrictions."

**The New Notes have not been, and will not be, registered under the Securities Act. The Exchange Offer and the Consent Solicitation will only be made to QIBs (within the meaning of Rule 144A under the Securities Act) in compliance with Rule 144A under the Securities Act or to non-US persons outside the United States in offshore transactions in reliance on Regulation S under the Securities Act. Only Eligible Holders are authorized to participate in the Exchange Offer and the Consent Solicitation. The New Notes to be issued in the Exchange Offer are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and other applicable securities laws. Investors should be aware that they may be required to bear the financial risks of this investment for an indefinite period of time. See "Transfer Restrictions."**

**Withdrawal Rights**

Tenders of Old Notes may be validly withdrawn at any time prior to 5:00 p.m. (New York City time) on April 3, 2024, unless extended by us (such date and time, as it may be extended, the "Withdrawal Date"), but will thereafter be irrevocable, except in certain limited circumstances where we determine additional withdrawal rights are necessary and to the extent required by law.

**Conditions to the Exchange Offer and the Consent Solicitation**

The Exchange Offer and the Consent Solicitation are subject to certain conditions, as described under "Description of the Exchange Offer and the Consent Solicitation—Conditions to the Exchange Offer and the Consent Solicitation," which may be asserted or waived by us in full or in part in our sole discretion. For example, as more fully described herein, we will only accept Old Notes for exchange if the Minimum Tender Condition has been satisfied.

Although we have no present intention to do so, we expressly reserve the right to amend or terminate, at any time, the Exchange Offer and the Consent Solicitation and not accept for exchange any Old Notes not theretofore accepted for exchange. We may extend the Exchange Offer and the Consent Solicitation from time to time until the conditions are satisfied or waived. We will give you notice of any amendment, termination or extension if required by applicable law.

**The New Notes**

We would issue a maximum aggregate principal amount of US$ 165.12 million of New Notes in the Exchange Offer, including Capitalized Interest, if all Old Notes are tendered and we do not round down the amount to be issued to any tendering holder. We will pay interest on the New Notes on February 7 and August 7 of each year, beginning on August 7, 2024. The New Notes will mature on February 7, 2029.

We may redeem the New Notes, in whole or in part, at any time at a redemption price of 100% of their principal amount, plus accrued and unpaid interest and Additional Amounts, if any. If a change in control occurs with respect to us, unless we have exercised our option to redeem the notes, each holder of the notes will have the right to require us to repurchase all or any part of that holder's notes at 101% of the aggregate principal amount of notes repurchased, plus any additional amounts then due and accrued and unpaid interest to, but excluding, the date of repurchase.

**The Plan**

We are also soliciting from all holders of the Old Notes votes on the Plan, pursuant to which, among other things, the Old Notes would be exchanged for the New Notes. If the Exchange Offer is not consummated, but holders of the Old Notes have submitted votes in an amount and number in favor of the Plan as of the Voting Deadline that satisfy the Bankruptcy Threshold, we reserve the right to commence the Chapter 11 Case for the purpose of seeking confirmation of the Plan from the Bankruptcy Court.

Only holders of the Old Notes as of the Voting Record Date (as defined herein) will be entitled to vote to accept or reject the Plan. Votes received from persons that are not holders as of the Voting Record Date, will not be counted for purposes of determining whether the Bankruptcy Threshold has been satisfied for the class of claims consisting of the Old Notes. That is, they will not be counted as voting to accept or reject the Plan, nor will they be included in the denominator when determining the percentage in amount and fraction of holders that have voted to accept the Plan. The Old Notes *are* the only class of claims or interests impaired under the Plan and are thus the only class entitled to vote on the Plan. Importantly, the Plan provides for the satisfaction of all trade, customer and other non-funded debt claims in full in the ordinary course of business.

For the Plan to be confirmed by the Bankruptcy Court without invoking the "cram-down" provisions of the Bankruptcy Code, each class of claims or interests that is impaired must vote to accept the Plan. An impaired class of claims is presumed to accept a plan of reorganization if the holders of at least two-thirds in amount and more than one-half in number of the claims in such class who actually cast votes vote to accept the plan. We refer to the foregoing thresholds collectively as the "Bankruptcy Threshold".

If the Plan is confirmed by the Bankruptcy Court and the Effective Date (as defined in the Plan) occurs, all holders of the Old Notes (including, without limitation, those holders of the Old Notes who do not submit ballots to accept or reject the Plan) will be bound by the terms of the Plan and the transactions contemplated thereby. For a description of the Plan and

the procedures for submitting ballots (each, a "Ballot" and, collectively, the "Ballots") to vote to accept or reject the Plan, see the section titled "Description of the Plan."

For the avoidance of doubt, with regards to the Plan Solicitation, in the event of a discrepancy between this Statement and the Plan, the terms of the Plan shall control.

The statements contained in this Statement are made as of the date hereof, and neither the delivery of this Statement nor any supplement will, under any circumstance, create any implication that the information contained herein is correct at any time subsequent to the date hereof. Any estimates of claims and interests set forth in this Statement may vary from the amounts of claims or interests ultimately allowed by the Bankruptcy Court. The summaries of the Plan and the other documents contained in this Statement are qualified in their entirety by reference to the Plan itself, the exhibits thereto and all documents described herein. The information contained in this Statement, including, but not limited to, the information regarding the history, businesses and operations of the Debtor, the historical and projected financial information of the Debtor (including the projected results of operations of Reorganized Credivalores) and the liquidation analysis relating to the Debtor is included solely for purposes of soliciting acceptances of the Plan. Such information, including projected financial information and valuation of Reorganized Credivalores, is not to be construed as admissions or stipulations but rather as statements made in settlement negotiations.

# NOTICE TO HOLDERS

Credivalores – Crediservicios S.A. is a stock corporation (*sociedad anónima*) organized under the laws of the Republic of Colombia ("Colombia"). Unless otherwise indicated or except as the context otherwise may require, references in this Statement to the "Company," "Credivalores," "we," "us" or "our" are to Credivalores – Crediservicios S.A. You should read this entire Statement carefully before you decide whether to tender your Old Notes in the Exchange Offer. You should rely only on the information contained in this Statement. We have not, and the Dealer Manager has not, authorized any other person to provide you with different information. If anyone provides you with different or inconsistent information, you should not rely on it. We are not, and the Dealer Manager is not, making an offer to sell, or seeking offers to buy, the New Notes in any jurisdiction where the offer or sale is not permitted. This Statement does not constitute an offer to sell, or a solicitation of an offer to buy, any New Notes by any person in any jurisdiction in which it is unlawful for such person to make such an offer or solicitation. You should assume that the information contained in this Statement is accurate only as of the date on the front cover of this Statement. Our business, financial condition, results of operations and prospects may have changed since that date.

This Statement has been prepared by us solely for use in connection with the Exchange Offer, the Consent Solicitation and the Plan Solicitation. Its use for any other purpose is not authorized. Distribution of this Statement to any person other than Eligible Holders and any person retained to advise any Eligible Holder with respect to its participation in the Exchange Offer and Consent Solicitation is unauthorized, and any disclosure of any of its contents, without the Company's prior written consent, is prohibited. Each prospective participant in the Exchange Offer and Consent Solicitation, by accepting delivery of this Statement, agrees to the foregoing and to make no copies or reproductions of this Statement or any documents referred to herein in whole or in part (other than publicly available documents). We reserve the right to reject any tender offer for any reason.

This Statement is personal to each offeree and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire any of the New Notes. Each person receiving this Statement represents that such person's investment decision is based solely on this Statement and that such person is not relying on any other information it may have received from us except as acknowledged below. Each recipient, by accepting delivery of this Statement, agrees to the foregoing and, if the offeree is not eligible to participate in the Exchange Offer and Consent Solicitation, to return this Statement and all such documents delivered herewith to: the Exchange Agent and Information Agent and/or the Dealer Manager at the addresses set forth on the back cover of this Statement.

**Neither the SEC, any state securities commission nor any other regulatory authority, has approved or disapproved the New Notes; nor have any of the foregoing authorities passed upon or endorsed the merits of the Exchange Offer and the Consent Solicitation or the accuracy or adequacy of this Statement. Any representation to the contrary could be a criminal offense in certain jurisdictions.**

You must:

- comply with all applicable laws and regulations in force in any jurisdiction in connection with the possession or distribution of this Statement and the purchase, offer or sale of the New Notes; and

- obtain any consent, approval or permission required to be obtained by you for the purchase, offer or sale by you of the New Notes under the laws and regulations applicable to you in force in any jurisdiction to which you are subject or in which you make such purchases, offers or sales; and neither the Company nor the Dealer Manager shall have any responsibility therefor.

- If issued pursuant to the Exchange Offer, the New Notes are subject to restrictions on transfer. See "Transfer Restrictions."

You acknowledge that:

- you have been afforded an opportunity to request from us, and to review, all additional information considered by you to be necessary to verify the accuracy of, or to supplement, the information contained in this Statement;

- you have not relied on the Dealer Manager or any person affiliated with the Dealer Manager in connection with your investigation of the accuracy of such information or your investment decision; and

- no person has been authorized to give any information or to make any representation concerning us or the New Notes, other than as contained in this Statement and, if given or made, any such other information or representation should not be relied upon as having been authorized by us or the Dealer Manager.

In making an investment decision, you must rely on your own examination of us and the terms of this Exchange Offer and the Consent Solicitation, including the merits and risks involved.

We are responsible for ensuring that the information contained in this Statement is true and correct in all material respects and is not misleading in any material respect as of the date of this Statement, and that there has been no omission of information which, in the context of the Exchange Offer and the Consent Solicitation, would make any statement of material fact herein misleading in any material respect, in light of the circumstances existing as of the date of this Statement. We accept responsibility accordingly.

The Dealer Manager is not making any representation or warranty, express or implied, as to the accuracy or completeness of the information contained in this Statement. The Dealer Manager assumes no responsibility for the accuracy or completeness of any such information. You should not rely upon the information contained in this Statement, as a promise or representation, whether as to the past or the future.

None of us, the Dealer Manager, the Exchange Agent and Information Agent nor any of our and their respective representatives, is making any representation to you regarding the legality of an investment in the New Notes. You should consult with your own advisors as to legal, tax, business, financial and related aspects of an investment in the New Notes. You must comply with all laws applicable in any place in which you buy, offer or sell the New Notes or possess or distribute this Statement, and you must obtain all applicable consents and approvals. Neither the Company nor the Dealer Manager shall have any responsibility for any of the foregoing legal requirements.

## SERVICE OF PROCESS AND ENFORCEMENT OF CIVIL LIABILITIES

We are a stock corporation (*sociedad anónima*) organized under Colombian law. All or a substantial part of our assets and operations are located, and all or a substantial part of our revenues are derived from sources, outside the United States. Certain of our directors and all or substantially all of our officers named herein reside outside of the United States and all or a significant portion of the assets of these persons and of our assets are located outside the United States. As a result, it may not be possible for investors to effect service of process within the United States upon such persons or upon us, or to enforce against them or against us, judgments obtained in U.S. courts predicated upon the civil liability provisions of the U.S. federal securities laws or otherwise.

The Colombian Supreme Court will determine whether to recognize a U.S. judgment predicated on U.S. securities laws through a procedural system known under Colombian law as "exequatur." Enforcement of U.S. judgments may require a separate court procedure in Colombia.

The Colombian Supreme Court will recognize a foreign judgment, without reconsideration of the merits, only if the judgment satisfies the requirements set forth in Articles 605, 606 and 607 of the General Code of Procedure, Law 1564 of 2012 (*Código General del Proceso* or "GCP"), provided that the parties affected by the judgment were summoned in the exequatur proceeding in accordance with applicable rules.

Reciprocity may be either diplomatic (i.e., if there is a treaty with the State in which the decision was issued) or legislative or *de facto* (i.e., if no treaty is applicable, then the Court will examine whether there is a legal provision in the country where the decision was rendered that provides for the possibility of accepting and respecting decisions rendered by Colombian judges, or if the recognition of Colombian judgments emerges from standards set forth via jurisprudence). Legal reciprocity can be proved with affidavits of declarations from lawyers of the jurisdiction where the judgment was rendered. Usually, the Supreme Court will first consider whether diplomatic reciprocity exists and in the absence of such form of reciprocity, it will evaluate the existence of legal reciprocity or treaties in which the signatory parties are the states involved in the dispute. Hence, reciprocity can be demonstrated either through the existence of an applicable treaty with a foreign country or through proof that similar judgments rendered in Colombia would be enforced in said country, in accordance to its domestic laws. Once the Supreme Court has determined that reciprocity requirement is met then it will turn to analyze the requirements set forth in article 606 of the GCP. This Article provides that in order for the exequatur to be granted in Colombia, plaintiffs must provide evidence that the foreign decision at issue meets the following requirements:

- not be related to *in rem* rights over assets located in Colombia at the commencement of the proceedings in which the decision was rendered (GCP Article 606.1);

- be consistent with Colombian public policy provisions (i.e., provisions considered to be international public policy), with the exception of procedural rules (GCP Article 606.2);

- be final under the law of the country where it was issued. The copy of the judgment provided to the Colombian Supreme Court must be legalized and translated into Spanish by an authorized translator, duly registered at the Ministry of Foreign Affairs (GCP Article 606.3);

- not refer to matters subject to the exclusive jurisdiction of Colombian judges (GCP Article 606.4): this assessment must be made based on the law applicable as of the date of issuance of the foreign judgement, rather than on the law applicable as of the date of recognition of said judgement;

- not be concerned with disputes already decided by national judges, or subject to judicial proceedings in Colombia (GCP Article 606.5); and

- be the result of a proceeding duly notified to the respondent, in which the latter could answer the claim, in accordance with the law of the country of origin (GCP Article 606.6). Pursuant to GCP Article 606.6, the

fulfilment of the last requirement is presumed in light of the final character of the decision, which in turn is determined in accordance with the laws of the State where the judgment was rendered.

Failure to satisfy any of the requirements set forth above would result in the exequatur claim being dismissed without prejudice.

Proceedings for enforcement of a money judgment by attachment or execution against any assets or property located in Colombia would be within the exclusive jurisdiction of Colombian courts, under the assumption that the Colombian Supreme Court has granted exequatur upon the foreign judgment. In the course of an exequatur procedure, both the plaintiff and the defendant are afforded the opportunity to request that evidence be collected in connection with the requirements listed above. In addition, before the judgment is rendered, each party may file final allegations in support of its position. Notwithstanding, the GCP does not provide for a re-examination or re-litigating of the merits of the original action during the exequatur procedure.

The United States and Colombia do not have a bilateral treaty providing for automatic reciprocal recognition and enforcement of judgments in civil and commercial matters. However, the Colombian Supreme Court, which is the only Colombian court that can recognize foreign judgments, has accepted that legal reciprocity exists when it has been proven that laws or judicial decisions of the U.S. state where the judgment was rendered provide for recognition of foreign judgments of the same nature of the judgment under review. However, the Colombian legal system is not based on precedents and exequatur decisions are made on a case-by-case basis.

Pursuant to Article 2535 and 2536 of Colombia's Civil Code (*Código Civil*), in order for the statute of limitations to run and extinguish enforcement rights it is necessary that the party entitled to exercise an enforcement action fails to do so during a period commencing on the date in which the relevant right became enforceable and ending three, five or ten years after, depending on the relevant statute of limitations. A waiver to the statute of limitations can only be granted once the relevant statute of limitations has elapsed.

Any contractual agreement in favor of a third party, even in the absence of the right to represent such party, is revocable until such third party tacitly or expressly accepts such agreement.

Under bilateral agreements, a party will not be in default after failing to comply with its obligations, if the other party also fails to comply with or does not agree to comply with its obligations. Waiving this principle is valid if (i) it is not interpreted as a violation to the right to access to justice, (ii) it does not contravene public order or (iii) such waiver does not imply condoning or pardoning future gross negligence or willful misconduct. A provision whereby one party waives defenses that arise out of an invalid or illegal obligation may be understood as a waiver of future willful misconduct and, as such, deemed null and void by a Colombian court.

Waiving specific rights is permitted if such waiver only affects the individual interest of the waiving party and to the extent such waiver is not prohibited by any applicable law. Laws involving public order and good faith customs, however, shall not be waived by means of private agreements. Under Colombian law, any immunity from proceedings which might in the future be available cannot be validly waived in advance.

Except for constitutional actions (*tutela y acciones populares*) that exist for the protection of fundamental constitutional rights and collective rights, the specific performance of contracts and certain precautionary measures and remedies in unfair trade practices claims, there are no other equitable remedies or injunctive relief under Colombian law.

In any proceeding in Colombia, service of notice to the parties thereto will be made in accordance with the provisions of the GCP and contractual provisions regarding service of notice procedures will not be enforceable for service of process in Colombia.

With respect to court proceedings in Colombia, under Article 365 of the GCP, any legal costs incurred in connection with such court proceedings would be limited to those costs ordered by the respective court.

Notwithstanding the foregoing, we cannot assure you that a Colombian court would recognize or enforce a U.S. based judgment with respect to the notes based on U.S. securities laws. We have been advised by our Colombian counsel that there is no legal basis for original actions to be brought against us or our directors and officers in a Colombian court predicated solely upon the provisions of U.S. securities laws. In addition, certain remedies available under provisions of the U.S. securities laws may not be admitted or enforced by Colombian courts. See "Risk Factors—Risks Related to the New Notes and Our Indebtedness—You may not be able to effect service of process on us, our directors or our officers or to enforce in Colombian courts judgments obtained against us in the United States" in the first part of this Statement regarding the terms of the Exchange Offer and Consent Solicitation.

**REASONS FOR THE EXCHANGE OFFER, CONSENT SOLICITATION AND PLAN SOLICITATION**

We do not anticipate being able to raise the necessary funds in order to repay the Old Notes at maturity. We are conducting the Exchange Offer to refinance the Old Notes, and improve our liquidity position.

Through the Exchange Offer and Consent Solicitation, we intend to achieve the following goals:

- extend the maturity of the Old Notes through the issuance of the New Notes;

- reduce our overall debt burden; and

- reduce our overall interest expense burden.

# QUESTIONS AND ANSWERS ABOUT THE RESTRUCTURING

*The following are some questions and answers regarding our financial restructuring, whether accomplished through the Exchange Offer or through confirmation of the Plan by the Bankruptcy Court. It does not contain all of the information that may be important to you. You should carefully read this Statement to fully understand the terms of the restructuring, which includes the Exchange Offer and the Plan, as well as the other considerations that are important to you in making your investment decision. You should pay special attention to the "Risk Factors."*

## General

Q:      What is the purpose of the restructuring?

A:      The restructuring consists of the transactions described in the introductory section of this Statement. We believe the restructuring will provide us with a tenable long-term capital structure and sufficient liquidity to conduct our operations. The purpose of the restructuring is to extend the maturity of the Old Notes through the issuance of the New Notes, reduce our overall debt burden; and reduce our overall interest expense burden, thereby allowing us to continue operations.

The restructuring may be accomplished through either the out-of-court Exchange Offer or, in the alternative, the in-court Plan.

Q:      What is the Exchange Offer?

A:      The Exchange Offer is one of two possible methods to accomplish the restructuring. Through the Exchange Offer, the retirement of the Old Notes tendered in the Exchange Offer would be effected, with the holders of Old Notes tendering their Old Notes in exchange for New Notes upon the terms and conditions set forth herein. The closing of the Exchange Offer is conditioned upon, among other things, the Minimum Tender Condition being satisfied. If the Minimum Tender Condition is not satisfied on or before the Expiration Date, we intend to terminate the Exchange Offer; however, we reserve the right to waive the Minimum Tender Condition. In the event that the conditions to the consummation of the Exchange Offer are not satisfied and the Exchange Offer is terminated, we reserve the right to implement an in-court financial restructuring, through which we would seek to accomplish the results contemplated by the Exchange Offer through consummation of the Plan under chapter 11 of the Bankruptcy Code if the Bankruptcy Threshold is satisfied.

Q:      What is the Plan?

A:      The Plan is the second alternative for accomplishing the restructuring. We may seek confirmation of the Plan in the Chapter 11 Case in the event that the Minimum Tender Condition to the Exchange Offer is not satisfied (or waived as described above) but we receive votes in favor of the Plan from a sufficient number of holders and amounts of Old Notes to allow the Plan to satisfy the Bankruptcy Threshold. Under the Plan, we expect that the holders of the Old Notes will receive the same treatment with respect to their claims as they would in the Exchange Offer. See "Description of the Plan."

Q:      In what circumstances will we file the Plan instead of consummation the Exchange Offer?

A:      We may commence the Chapter 11 Case and seek confirmation of the Plan instead of consummating the Exchange Offer if (i) certain conditions are not satisfied or waived including, among other conditions, the Minimum Tender Condition, and (ii) the Bankruptcy Threshold is satisfied as to the class of claims consisting of holders of the Old Notes. In such circumstances, we may seek to accomplish the restructuring on substantially the same terms as the Exchange Offer, by way of the Plan.

For the Plan to be confirmed by the Bankruptcy Court without invoking the "cram-down" provisions of the Bankruptcy Code, each class of claims or interests that is impaired must vote to accept the Plan. An impaired class of claims is deemed to accept a plan of reorganization if the holders of at least two-thirds in amount and more than one-half in number of the claims in such class who actually cast Ballots vote to accept the plan. To be confirmed, at least one class of impaired claims must accept the plan, determined without including any acceptance of the plan by any insider.

The confirmation and effectiveness of the Plan are subject to certain conditions that may not be satisfied and are different from those under the Exchange Offer. We cannot assure you that all requirements for confirmation and effectiveness of the Plan will be satisfied or that the Bankruptcy Court will conclude that the requirements for confirmation and effectiveness of the Plan have been satisfied.

The effective date of the Plan will not occur until the confirmation order has been entered, no stay of such order is in effect and certain other conditions have been satisfied.

Q: What are the costs and benefits of consummating the restructuring through the Exchange Offer rather than the Plan?

A: Consummating the restructuring through the Exchange Offer provides several benefits, including the ability to effectuate the restructuring in a shorter period of time without the extra costs and potential uncertainties inherent to the process of a bankruptcy. The costs associated with a bankruptcy could be material and could include both direct costs, including fees paid to a trustee and to attorneys and professionals, and indirect costs. In addition, there can be no assurance that the Bankruptcy Court will confirm the Plan. See "Risk Factors—Risks Related to the Plan."

Q: What are the expected results of the restructuring, whether accomplished through the Exchange Offer or the Plan?

A: We expect that the restructuring, if successful, will deliver our balance sheet and improve our capital structure. Specifically, upon the completion of the restructuring, we expect our indebtedness corresponding to the principal amount of the Old Notes to be reduced from an estimated US$ 210.8 million as of September 30, 2023 to an estimated US$ 165.12 million at the consummation of the restructuring (assuming full participation in the Exchange Offer and no bankruptcy filing).

Assuming we are able to complete the restructuring, we expect that, for the foreseeable future, cash generated from operations will be sufficient to allow us to fund our operations and to increase working capital as necessary to support our long-term business plan, though there can be no assurance that such cash generated will be sufficient for such purposes.

**The Exchange Offer**

Q: Who is making the Exchange Offer?

A: The Company is making the Exchange Offer and delivering the New Notes.

Q: What amount of Old Notes are you seeking in the Exchange Offer?

A: We are seeking to exchange any and all of the Old Notes for New Notes.

Q: What will I receive in the Exchange Offer if I tender my Old Notes and they are accepted?

A: Eligible Holders that validly tender and do not validly withdraw Old Notes on or before the Expiration Date will, upon the terms and subject to the conditions set forth in this Statement, receive the exchange consideration of US$ 750 principal amount of the New Notes for each US$ 1,000 principal amount of Old Notes validly tendered, not validly withdrawn and accepted.

In addition, on the Settlement Date of the Exchange Offer, all Eligible Holders whose Old Notes are validly tendered, not validly withdrawn and accepted for exchange will also receive Capitalized Interest equal to the accrued and unpaid interest on their Old Notes validly tendered and not validly withdrawn and accepted for exchange through but excluding the Settlement Date.

Q:    Who may participate in the Exchange Offer?

A:    Any and all Eligible Holders of Old Notes may participate in the Exchange Offer. The Company reserves the right to terminate, withdraw, amend or extend the terms of the Exchange Offer and Consent Solicitation for any reason prior to the Expiration Date, subject to applicable law.

Q:    Does the success of the Exchange Offer depend on the participation of any minimum number of holders of Old Notes?

A:    Yes. The Exchange Offer and Consent Solicitation is subject to, among other things, the valid tender, without subsequent withdrawal, of at least of at least 95% (including any Old Notes which are owned by us or our affiliates) in aggregate principal amount of the outstanding Old Notes on or prior to the Expiration Date.

The Company has had discussions with several holders of Old Notes who assisted in developing the proposal and who believe that the restructuring is fair and reasonable in light of the current market environment and given the Company's circumstances. Certain bondholders holding over 40% the aggregate principal amount of the Old Notes outstanding have already indicated that they will vote in favor of the Exchange Offer.

Q:    How do I tender my Old Notes in the Exchange Offer?

A:    Please follow the procedures for tendering your Old Notes in the exchange offer described in "Description of the Exchange Offer and Consent Solicitation—Procedures for Tendering." For further information, consult your broker, dealer, commercial bank, trust company or other nominee for assistance.

Q:    How long will the Exchange Offer remain open?

A:    The Exchange Offer will expire at 5:00 p.m. (New York City time) on April 3, 2024 unless extended by us.

Subject to applicable law and the terms set forth in this Statement, we may extend the Expiration Date or amend any of the terms or conditions of the Exchange Offer. The last date on which tenders and consents will be accepted, whether on April 3, 2024, or any subsequent time or date to which the Exchange Offer may be extended, is referred to as the Expiration Date.

If we extend the Expiration Date, any extension will be followed as promptly as practicable by announcement thereof, such announcement in the case of an extension of the Exchange Offer to be issued no later than 9:00 a.m. (New York City time) on the first business day after the previously scheduled Expiration Date. Subject to applicable law, if we extend the Expiration Date, holders of Old Notes may not withdraw any notes validly tendered into the Exchange Offer or revoke any consent provided to the proposed amendments.

Q:    When will I receive New Notes if I tender my Old Notes in the Exchange Offer?

A:    Upon satisfaction or waiver of all of the conditions to the Exchange Offer, all Old Notes validly tendered by the Expiration Date will be accepted for exchange. The exchange of New Notes will be settled with respect to any and all Old Notes validly tendered within three business days of the Expiration Date for any notes validly tendered.

Q:    Who will be issuing the New Notes?

A:    Credivalores will be the issuer of the New Notes.

Q:    Can I withdraw my tender of Old Notes?

A:    Tenders of Old Notes may be validly withdrawn at any time prior to 5:00 p.m. (New York City time) on April 3, 2024, unless extended by us, but will thereafter be irrevocable, except in certain limited circumstances where we determine additional withdrawal rights are necessary and to the extent required by law.

Q:    What risks should I consider in deciding whether or not to participate in the Exchange Offer?

A:    In deciding whether to participate in the Exchange Offer, you should carefully consider the discussion of risks and uncertainties described under "Risk Factors," which do not represent the only risks that we face. Additional risks and uncertainties not currently known to us, or that we currently deem immaterial, may also affect your investment decision and/or impair our business operations. You should carefully consider the other information and data included in this Statement and information and data contained in our reports provided to the trustee and noteholders pursuant to the Old Notes Indenture for other risks that may affect you.

Q:    If the Exchange Offer is consummated, but I do not tender my Old Notes, how will my rights be affected?

A:    If the Proposed Amendments are adopted, holders of Old Notes will no longer be entitled to the benefit of substantially all of the restrictive covenants, defaults, and certain other provisions presently contained in the Old Notes Indenture. If we consummate the Exchange Offer, the applicable trading market, if any, for your outstanding Old Notes may be significantly more limited. See "The Proposed Amendments."

Q:    What happens if my Old Notes are not accepted in the Exchange Offer?

A:    During any extension and irrespective of any amendment to the Exchange Offer or Consent Solicitation, all Old Notes previously tendered and not accepted for purchase will remain subject to the Exchange Offer or Consent Solicitation and may be accepted thereafter, subject to compliance with applicable law. In addition, we may waive conditions without extending the Exchange Offer or Consent Solicitation in accordance with applicable law.

Q:    Has the board of directors adopted a position on the Exchange Offer?

A:    Our board of directors has authorized the Exchange Offer, but has not made any recommendation as to whether you should tender your Old Notes pursuant to the Exchange Offer.

Q:    Whom do I call if I have any questions about how to tender my Old Notes, deliver my Consents or any other questions relating to the Exchange Offer?

A:    Questions and requests for assistance with respect to the procedures for tendering Old Notes and delivering Consents pursuant to the Exchange Offer may be directed to the Exchange Agent and Information Agent at its address and telephone number set forth on the back cover of this Statement.

**The Plan**

Q:    Who is soliciting votes on the Plan?

A:    Credivalores is soliciting votes from all holders of the Old Notes on the Plan.

Q:    Why are we soliciting votes on the Plan if the restructuring can be accomplished through the Exchange Offer?

A:   We have prepared the Plan as an alternative to the Exchange Offer for accomplishing the restructuring, if the conditions to completion of the Exchange Offer are not satisfied or waived, but we receive acceptances from a sufficient number of holders of the Old Notes to allow the Plan to be confirmed under the Bankruptcy Code, including confirmation through the nonconsensual "cram-down" provisions of section 1129(b) of the Bankruptcy Code with respect to non-accepting impaired classes of claims or interests. The Plan consists of a plan of reorganization under chapter 11 of the Bankruptcy Code that would effect the same transactions contemplated by the Exchange Offer, including, among other things, the issuance of the New Notes in exchange for all of the Old Notes.

For the Plan to be confirmed by the Bankruptcy Court without invoking the "cram-down" provisions of the Bankruptcy Code, each class of claims or interests that is impaired must vote to accept the Plan. An impaired class of claims is deemed to accept a plan of reorganization if the holders of at least two-thirds in amount and more than one-half in number of the claims in such class who actually cast Ballots vote to accept the plan. An impaired class of interests is deemed to accept a plan of reorganization if the holders of at least two-thirds in amount of the interests in such class who actually cast Ballots vote to accept the plan. If the Plan is confirmed by the Bankruptcy Court, it will bind all holders of claims and equity interests, including all holders of Old Notes, in the Company regardless of whether they voted for, against, or did not vote at all on, the Plan.

Therefore, assuming the Plan satisfies the other requirements of the Bankruptcy Code, a significantly smaller number of claim holders can bind other claim holders to the terms of the Plan to accomplish the restructuring than is required to effect the Exchange Offer and the other transactions contemplated thereby.

The confirmation and effectiveness of the Plan are subject to certain conditions that may not be satisfied and are different from those under the Exchange Offer. We cannot assure you that all requirements for confirmation and effectiveness of the Plan will be satisfied or that the Bankruptcy Court will conclude that the requirements for confirmation and effectiveness of the Plan have been satisfied.

Q:   Who is eligible to vote for the Plan?

A:   Generally, holders of claims or interests in classes that are impaired (other than classes that receive no distribution under the Plan and are, therefore, deemed to reject the Plan) are eligible to vote on the Plan. As more fully explained in this Statement, a claim or equity interest is impaired, generally speaking, if its treatment under a plan of reorganization alters the terms of, or rights associated with, that claim or interest. The holders of the Old Notes are impaired under and consequently may vote on, the Plan.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| A | Old Notes Claims | Impaired | Entitled To Vote |
| B | Other Secured Claims | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| C | General Unsecured Claims | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| D | Interests | Unimpaired | Deemed To Accept; Not Entitled To Vote |

The holders of Class A Old Notes claims are impaired and are eligible to vote on the Plan. The holders of all other claims and interests are unimpaired and presumed to accept the Plan under section 1126(f) of the Bankruptcy Code.

Q:      What vote is needed to confirm the Plan?

A:      The Bankruptcy Code provides that only holders of claims and interests entitled to vote and who actually cast a Ballot will be counted for purposes of determining whether acceptances from a sufficient number of holders of impaired claims in an impaired class of claims have been received to allow the Plan to be confirmed under the Bankruptcy Code, including confirmation through the nonconsensual "cram-down" provisions of section 1129(b) of the Bankruptcy Code with respect to non-accepting impaired classes. Failure by a holder to deliver an original, duly completed and signed Ballot will not be counted as a vote to accept or reject the Plan.

For the Plan to be confirmed by the Bankruptcy Court without invoking the "cram-down" provisions of the Bankruptcy Code, each class of claims or interests that is impaired must vote to accept the Plan. An impaired class of claims is deemed to accept a plan of reorganization if the holders of at least two-thirds in amount and more than one-half in number of the claims in such class who actually cast ballots vote to accept the Plan. An impaired class of interests is deemed to accept a plan of reorganization if the holders of at least two-thirds in amount of the interests in such class who actually cast Ballots vote to accept the Plan. Under the Plan, holders of Old Notes claims are separately classified and constitute the only impaired class of claims. In addition, under the Plan, other classes of claims against and interests in the Company are unimpaired and conclusively presumed to accept the Plan.

The Bankruptcy Court may disagree with our classification of claims and interests and any party in interest may challenge our classification of claims and interests. If the Bankruptcy Court concludes that the classification of claims and interests under the Plan does not comply with the requirements of the Bankruptcy Code, the Plan may not be confirmed.

If the Plan is confirmed by the Bankruptcy Court, it will bind all holders of claims and interests in the Company regardless of whether they voted for, against, or did not vote at all on, the Plan. Therefore, assuming the Plan satisfies the other requirements of the Bankruptcy Code, a significantly smaller number of claim holders can bind other claim holders to the terms of the Plan than is required to effect the Exchange Offer and the other transactions contemplated by the Exchange Offer. Additionally, since claims and interests are grouped in classes for the purpose of voting on the Plan, holders of claims and interests may be bound by the decisions of other claim or interest holders in a way that they otherwise would not outside of bankruptcy.

If we do not receive acceptances from a sufficient number of holders of claims or interests in an impaired class of claims or interests to allow the Plan to be confirmed under the Bankruptcy Code, including confirmation through the nonconsensual "cram-down" provisions of section 1129(b) of the Bankruptcy Code with respect to non-accepting impaired classes, we reserve the right not to commence the Chapter 11 Case.

Q:      What are the effects of the Plan?

A:      Holders of the Old Notes will receive substantially the same treatment with respect to their claims as they would in the Exchange Offer.

**Q:** When is the deadline for submitting Ballots?

**A:** Master Ballots or pre-validated Beneficial Ballots (the "Ballots") must be received by the Balloting Agent by the Voting Deadline. If the Voting Deadline is extended, then the Ballots must be received by the Balloting Agent by any such extended Voting Deadline. In order to be counted for purposes of determining the amount of acceptances and rejections of the Plan, Ballots must be sent by mail, hand delivery or overnight courier to the Balloting Agent, so as to be actually received on or prior to the Voting Deadline. Master Ballots from nominees will also be accepted by e-mail; however, pre-validated Beneficial Ballots from beneficial owners will not be accepted. Facsimile Ballots will not be accepted.

**Q:** How do I vote on the Plan?

**A:** Please follow the procedures for voting on the Plan described in the section titled "Description of the Plan—Voting and Revocation Instructions." For further information, contact the Balloting Agent at its address and telephone number on the Ballot or consult your broker, dealer, commercial bank, trust company or other nominee for assistance.

Only the holders of Old Notes as of March 7, 2024 (the "Voting Record Date") are eligible to vote on the Plan.

**Q:** Can I change, or revoke my vote?

**A:** Any party that has previously submitted a properly completed Ballot to the Balloting Agent before the Voting Deadline may change or revoke the vote on such Ballot by submitting a revised Ballot to the Balloting Agent, before the Voting Deadline, a subsequent properly completed Ballot for acceptance or rejection of the Plan, or abstention from voting. In the event the Company does not consummate the Exchange Offer, Ballots remain binding until the Bankruptcy Court enters an order confirming the Plan.

**Q:** Whom do I call if I have any questions about how to submit Ballots or any other questions relating to the Plan?

**A:** Questions and requests for assistance with respect to the procedures for voting on the Plan, as well as requests for additional copies of this Statement and the Ballot, may be directed to the Balloting Agent at its address and telephone number set forth on the Ballot.

**Q:** What risks should I consider in deciding whether to accept or reject the Plan?

**A:** In deciding whether to vote to accept or reject the Plan, you should carefully consider the discussion of risks and uncertainties described under "Risk Factors," which do not represent the only risks that we face. Additional risks and uncertainties not currently known to us, or that we currently deem immaterial, may also affect your investment decision and/or impair our business operations. You should carefully consider the other information and data included in this Statement and information and data contained in our reports provided to the trustee and noteholders pursuant to the Old Notes Indenture for other risks that may affect you.

## SUMMARY OF THE EXCHANGE OFFER AND THE CONSENT SOLICITATION

*The following is a brief summary of some of the terms of the Exchange Offer and the Consent Solicitation. For a more complete description of the Exchange Offer and the Consent Solicitation, see "Description of the Exchange Offer and the Consent Solicitation."*

| | |
|---|---|
| **The Exchange Offer** | We are making an offer to Eligible Holders to exchange each US$ 1,000 principal amount of Old Notes for exchange consideration of US$ 750 principal amount of New Notes and the Capitalized Interest if the Old Notes are tendered and not validly withdrawn on or before the Expiration Date. |
| **The Consent Solicitation** | In connection with the Exchange Offer, we are soliciting Consents to the Proposed Amendments from Eligible Holders of Old Notes. |
| | See "Proposed Amendments." |
| | By tendering Old Notes, holders will also be delivering their Consent to the Proposed Amendments. Eligible Holders may not tender their Old Notes without consenting to the Proposed Amendments and may not deliver Consents to the Proposed Amendments without tendering the related Old Notes. Tendering holders may not withdraw their validly tendered Old Notes without revoking their Consents and may not revoke their Consents without withdrawing any validly tendered Old Notes. |
| **Total Exchange Consideration** | Eligible Holders that validly tender and do not withdraw Old Notes on or before the Expiration Date will be eligible to receive the exchange consideration of US$ 750 principal amount of New Notes for each US$ 1,000 principal amount of Old Notes validly tendered, not validly withdrawn and accepted. |
| | The New Notes will be issued in minimum denominations of US$ 1,000 and integral multiples of US$ 1.00 in excess thereof. An Eligible Holder must tender Old Notes in a principal amount sufficient to receive at least US$ 1,000 principal amount of New Notes in exchange for such Old Notes, based on the applicable exchange consideration. Any holder that tenders less than such amount will not be able to participate in the Exchange Offer and the Consent Solicitation and their exchange will be rejected. |
| | The amount of New Notes to be issued to any holder will be rounded down to the nearest US$ 1.00. No additional cash will be paid in lieu of any principal amount of New Notes not received as a result of rounding down. |
| **Capitalized Interest** | On the Settlement Date, all Eligible Holders whose Old Notes are validly tendered, not validly withdrawn and accepted will also receive additional New Notes that will be issued and delivered to capitalize the accrued and unpaid interest in respect of the Old Notes validly tendered and accepted for exchange from (and including) the immediately preceding interest payment date of the Old Notes to (but excluding) February 7, 2024, to the effect that accrued and unpaid interest on the Old Notes validly tendered and accepted for payment will also receive US$0.75 of New Notes for each US$1 of accrued and unpaid interest; provided, however, that the amount |

of accrued and unpaid interest will be rounded down, if necessary, to the nearest US$1.00 and no additional cash will be paid in lieu of any fractional amount.

**Holders Eligible to Participate in the Exchange Offer and the Consent Solicitation**

The Exchange Offer and the Consent Solicitation is directed only to holders of Old Notes who are either (i) QIBs or (ii) certain persons, other than U.S. persons (as defined in Regulation S under the Securities Act) outside the United States.

Only Eligible Holders are authorized to participate in the Exchange Offer and the Consent Solicitation.

**Additional Information**

Any questions concerning the terms of the Exchange Offer and the Consent Solicitation should be directed to the Dealer Manager, at the telephone numbers listed on the back cover page of this Statement.

**Withdrawal Date**

April 3, 2024, at 5:00 p.m. (New York City time) unless extended by us.

**Expiration Date**

April 3, 2024, at 5:00 p.m. (New York City time) unless extended by us.

**Acceptance Date**

The acceptance date is expected to be on or promptly following the Expiration Date with respect to Old Notes that are validly tendered and are not validly withdrawn on or before the Expiration Date.

**Settlement Date**

The settlement date is expected to be within three business days of the Expiration Date.

**Withdrawal Rights**

Tenders of Old Notes may be validly withdrawn at any time prior to the Withdrawal Date. Thereafter, tenders become irrevocable except in certain limited circumstances where additional withdrawal rights are required by law (as determined by us).

Tenders submitted after the Withdrawal Date will be irrevocable except in the limited circumstances referred to in the preceding sentence. See "Description of the Exchange Offer and the Consent Solicitation—Withdrawal of Tenders."

**Conditions to the Exchange Offer and the Consent Solicitation**

The Exchange Offer and the Consent Solicitation are subject to certain conditions, which we may assert or waive in full or in part in our sole discretion, including the Minimum Tender Condition; provided however that the Proposed Amendments will only be operative if at least a majority (not including any Old Notes which are owned by us or our affiliates) in aggregate amount of the Old Notes is validly tendered and not validly withdrawn on or prior to the Expiration Date.

Although we have no present intention to do so, we expressly reserve the right to amend or terminate, at any time, the Exchange Offer and the Consent Solicitation and not accept for exchange any Old Notes not theretofore accepted for exchange. We may extend the Exchange Offer and the Consent Solicitation from time to time until the conditions are satisfied or waived. We will give you notice of any amendment, termination or extension if required by applicable law. See "Description of the Exchange

Offer and the Consent Solicitation—Conditions to the Exchange Offer and the Consent Solicitation."

| | |
|---|---|
| **Procedures for Tendering** | • If you wish to participate in the Exchange Offer and the Consent Solicitation and your Old Notes are held by a custodial entity, such as a bank, broker, dealer, trust company or other nominee, you must instruct that custodial entity to tender your Old Notes on your behalf pursuant to the procedures of that custodial entity. |

• To participate in the Exchange Offer and the Consent Solicitation, you must either:

• Comply with the ATOP (defined below) procedures for book-entry transfer described below on or before the Expiration Date; or

• If you are a beneficial owner that holds Old Notes through Euroclear Bank S.A./N.V. ("Euroclear") or Clearstream Banking, société anonyme ("Clearstream") and wish to tender your Old Notes, you must contact your Euroclear or Clearstream accountholder to ascertain the procedure for tendering Old Notes and comply with such procedure, and Euroclear or Clearstream must then arrange to tender such Old Notes through ATOP; or

• Custodial entities that are participants in DTC must tender Old Notes through ATOP, by which the custodial entity and the beneficial owner on whose behalf the custodial entity is acting agree to be bound by the consent. A valid tender into ATOP will automatically be deemed an acceptance of the consent solicitation.

**Consequences of Failure to Tender**   For a description of the consequences of failing to tender your Old Notes in the Exchange Offer, see "Risk Factors" and "Description of the Exchange Offer and the Consent Solicitation—Certain Consequences to Holders of Old Notes Not Tendering in the Exchange Offer and the Consent Solicitation."

**Taxation**   For a summary of certain Colombian national and U.S. federal income tax consequences of the exchange offer and the consent solicitation, see "Taxation."

**Exchange Agent and Information**   Epiq Corporate Restructuring, LLC has been appointed as the exchange agent and information agent for the Exchange Offer and the Consent Solicitation. The address and telephone numbers of the exchange agent and information agent are listed on the back cover page of this Statement.

**Dealer Manager**   BCP Securities, Inc. is acting as exclusive dealer manager for the Exchange Offer and for the Consent Solicitation. Its address and telephone number are listed on the back cover page of this Statement.

# SUMMARY OF THE NEW NOTES

*The summary below describes the principal terms of the New Notes. Certain terms and conditions described below are subject to important limitations and exceptions. The "Description of the New Notes" section of this Statement contains a more detailed description of the terms and conditions of the New Notes.*

**Issuer** ................................................. Credivalores - Crediservicios S.A.

**Notes Offered** .................................. Up to a maximum of US$165.12 million aggregate principal amount, including Capitalized Interest, of Senior Secured Step-Up Notes due 2029.

**Maturity Date** ................................. February 7, 2029.

**Interest Rate** .................................... Interest on the New Notes will accrue from and including February 7, 2024. Interest on the New Notes will initially accrue at a rate of 4.00% per annum, with a step-up to 5.00% per annum beginning with the interest payment due on February 7, 2025 and a step-up to 11% per annum beginning with the interest payment due on August 7, 2026.

**Interest Payment Dates** .................. February 7 and August 7 of each year, commencing on August 7, 2024.

**Security** ............................................ To the extent described herein, the New Notes will be secured by the Collateral (as defined herein). Such Collateral consists of a first-priority lien on our loan portfolio (excluding Special Purpose Finance Trusts) and a second priority lien on a Special Purpose Finance Trust (*patrimonio autónomo*), as described further in the "Description of the New Notes". Initially, the Collateral will consist of at least US$165 million of first-priority liens and second priority liens.

The indenture and security documents will permit the release of the Collateral only in certain limited circumstances. To the extent the value of the loan portfolio secured by the first-priority lien and second-priority lien falls below the aggregate outstanding principal amount of the New Notes (due to repayments of the loans or other fluctuations in the value of the loan portfolio other than due to exchange rate fluctuations), the Company will be required to include additional Collateral (in the form of cash or assets in the loan portfolio having comparable creditworthiness to the average creditworthiness of the existing Collateral) in an amount such that the total Collateral is at least equal to the value of the aggregate outstanding principal amount of the New Notes. The value of the collateral will be tested on a semi-annual basis on each interest payment date using an exchange rate of Ps. 4,000 to US$1.00, and such amount will be certified on an Officers' Certificate delivered to the Trustee and the Collateral Agent within 30 days.

**Ranking** ........................................... The New Notes will:

- rank equal in right of payment with any existing and future Secured Indebtedness (as defined under "Description of the New Notes") of the issuer to the extent that the New Notes are secured by the first-priority Collateral (subject to certain obligations for which preferential treatment is given under Colombian insolvency laws) and will be effectively subordinated to all existing and future Indebtedness and other liabilities of any Special Purpose Finance Trust (as defined under "Description of the Notes") the extent of the value of the assets securing such Indebtedness;

- rank senior in right of payment to all existing and future Subordinated Indebtedness (as defined under "Description of the New Notes") of the issuer, if any; and

- be structurally subordinated to all existing and future Indebtedness and trade payables of the issuer's Subsidiaries (as defined under "Description of the New Notes"), if any, that are not Guarantors (as defined under "Description of the New Notes").

As of September 30, 2023, we had total Indebtedness excluding transaction costs of Ps.1,700,111 million (US$419 million), of which Ps. 516,564 million (US$127 million) was secured by collateral. After giving effect to the Exchange Offer," as of September 30, 2023 we would have had total Indebtedness excluding transaction costs of Ps.1,518,286 million (US$375 million), of which Ps.1,185,904 million (US$293 million) would have been secured by collateral.

**Optional Redemption**........................ We may redeem the New Notes, in whole or in part, on at least 30 days' but not more than 60 days' notice, at a redemption price equal to 100% of the principal amount of such notes, plus accrued and unpaid interest to, but excluding, the date of redemption, plus Additional Amounts, if any. See "Description of the New Notes—Optional Redemption."

**Change of Control**........................ Upon the occurrence of a Change of Control Triggering Event (as defined under "Description of the New Notes"), we will be required to make an offer to purchase the New Notes at a purchase price equal to 101% of their principal amount, plus any accrued and unpaid interest through the purchase date, plus any Additional Amounts (as defined under "Description of the New Notes") due thereon. See "Description of the New Notes — Change of Control Triggering Event."

| **Additional Amounts**............................ | Payments of interest on the New Notes (and amounts deemed interest, such as any discount on the principal amount of the New Notes) to investors that are non-residents of Colombia for tax purposes will not be subject to Colombian withholding taxes. See "Taxation—Colombian Tax Considerations." Subject to certain specified exceptions, the issuer will pay Additional amounts, if any, as may be required so that the net amount received by the holders of the New Notes in respect of principal, interest or other payments on the New Notes, after any such withholding or deduction, will not be less than the amount each holder of New Notes would have received if such withholding or deduction had not been applied. See "Description of the New Notes — Additional Amounts." |
|---|---|
| **Certain Covenants**............................ | The Indenture will limit, among other things, our ability and the ability of any of its Restricted Subsidiaries (as defined under "Description of the New Notes) to: |

- incur additional indebtedness;
- pay dividends or redeem capital stock;
- make other restricted payments;
- make certain acquisitions or investments;
- enter into certain transactions with affiliates;
- transfer or sell assets;
- secure our indebtedness and the indebtedness of our subsidiaries;
- guarantee debts; and
- sell, consolidate, merge or transfer all or substantially all of their assets.
- incur liens other than permitted liens

These covenants are subject to a number of important exceptions and qualifications. See "Description of the New Notes—Certain Covenants."

| **Events of Default**............................ | The Indenture will set forth the events of default applicable to the New Notes. See "Description of the New Notes—Events of Default." |
|---|---|
| **Further Issuances**............................ | Subject to the limitation contained in the Indenture, the issuer may from time to time and without providing notice to or obtaining the consent of the holders of the New Notes issue an unlimited principal amount of Additional Notes (as defined under "Description of the New Notes" of the same series as the New Notes initially issued in this offering, provided that unless such Additional Notes are issued under a separate CUSIP number, either such Additional Notes are part of the same "issue" for U.S. federal income tax purposes or are issued pursuant to a "qualified reopening" for U.S. federal income tax purposes. |
| **Form and Denomination; Settlement**............................ | The New Notes will be in fully registered form without interest coupons attached, only in denominations of US$1,000 and in integral multiples of US$1.00 in excess thereof. The New Notes will be issued in book-entry form through the facilities of DTC, for the accounts of the participants, including Euroclear and Clearstream, and will trade in DTC's same-day funds settlement system. Beneficial interests in New Notes held in book-entry form will not be entitled to receive physical delivery of certificated New Notes, except in certain limited circumstances. For a description of certain factors relating to clearance and settlement, see "Book-Entry; Delivery and Form." |

**Transfer Restrictions......................** The New Notes have not been registered under the Securities Act. If the New Notes are issued under the Exchange Offer, they will be subject to certain restrictions on transfer. If the New Notes are issued under the Plan instead of the exchange offer, they will be issued pursuant to section 1145(a) of the Bankruptcy Code, and therefore will not be deemed restricted securities. Accordingly, upon issuance, such New Notes issued under the Plan will be freely tradable by any holder not deemed an underwriter in the public market without restriction or further registration under the Securities Act, subject to applicable law. See "Transfer Restrictions."

**Listing................................................** We intend to apply to list the notes on the SGX-ST.

**Governing Law.................................** The Indenture and the New Notes will be governed by, and construed in accordance with, the laws of the State of New York. The Collateral Documents will be governed by the laws of Colombia.

**Taxation...........................................** For a summary of certain Colombian national and U.S. federal income tax consequences of the Exchange Offer and Consent Solicitation, see "Taxation."

**Trustee, Transfer Agent, Registrar and Paying Agent.............................** The Bank of New York Mellon

**Risk Factors......................................** Eligible Holders participating in the Exchange Offer should consider carefully all of the information included in this Statement and, in particular, the information set forth under "Risk Factors" before making an investment in the New Notes.

# SUMMARY OF THE PLAN

*This section is* intended *to only provide a summary of the key terms, structure, classification, treatment and implementation of the Plan, and is qualified in its entirety by reference to the Plan and exhibits thereto. Although this Statement includes summaries of the provisions contained in the Plan and in documents referred to therein, this Statement does not purport to be a precise or complete statement of all such terms and provisions, and should not be relied on for a comprehensive discussion of the Plan. Instead, reference is made to the Plan and all such documents should be reviewed for the full and complete statements of such terms and provisions. The Plan itself (including attachments) will control the treatment of creditors and equity holders under the Plan. To the extent there is any inconsistency between this Statement and the Plan, the Plan shall govern. For a more complete description of the Plan, see "Description of the Plan."*

| | |
|---|---|
| **Chapter 11 Plan** | We have prepared the Plan as an alternative to the Exchange Offer for accomplishing the restructuring if the conditions to complete the Exchange Offer are not satisfied, but we receive acceptances from a sufficient number of holders of claims or interests in impaired classes of claims or interests to satisfy the Bankruptcy Threshold. By relying on the provisions of the Bankruptcy Code that permit us to solicit acceptances on the Plan prior to commencing a Chapter 11 case, we believe that we can successfully manage any impact on our business from the Chapter 11 Case by permitting us to quickly enter and exit Chapter 11, as well as be able to communicate to our customers, vendors, employees and other key constituents the positive financial impact the restructuring will have on our business and operations. |
| | The Plan consists of a plan of reorganization under Chapter 11 of the Bankruptcy Code that would result in the same transactions contemplated by the Exchange Offer, including the issuance of New Notes in exchange for all of the Old Notes. If confirmed, the Plan would be binding on all of the holders of Old Notes, regardless of whether a holder voted to accept or reject the Plan. |
| | Under the Plan, we expect that the holders of the Old Notes will receive substantially the same treatment with respect to their claims as they would in the Exchange Offer. |
| | Other than the restructuring of the Old Notes, the Plan proposes to render all other claims against us unimpaired. Specifically, under the Plan, we intend to have all other claims against us ride through the Chapter 11 Case and Plan unaffected and/or satisfied in the ordinary course of business. In addition, under the Plan, all of our equity interests will be left unaltered. |
| | If we do not receive acceptances from a sufficient number of holders of impaired claims in an impaired class to satisfy the Bankruptcy Threshold, the Plan will not be confirmed or become effective, and we anticipate that we would face problems with respect to our liquidity in the near future. |
| **Voting Record Date** | The voting record date for determining the holders of claims entitled to vote on the Plan is March 7, 2024. |
| **Conditions to the Effectiveness of the Plan** | The effectiveness of the Plan is contingent upon the satisfaction or waiver of each of the following conditions: |

- the Bankruptcy Court shall have approved this Statement as containing adequate information with respect to the Plan within the meaning of Section 1125 of the Bankruptcy Code;

- the confirmation order shall have been entered and shall be a final order (as described in the Plan);

- all documents and agreements necessary to implement the Plan shall have been executed and tendered for delivery, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms thereof (or will be satisfied and waived substantially concurrently with the occurrence of the effective date of the Plan);

- all actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental authorities in accordance with applicable law; and

- all material authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and the transactions contemplated herein shall have been obtained.

The conditions to the effectiveness of the Plan may be waived by us, without any notice to parties in interest and without any further notice to or action, order or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm the Plan.

**Transfer Restrictions**

If our restructuring is accomplished through the Plan, we expect that the confirmation order of the Bankruptcy Court will provide that the issuance of the New Notes distributed under the Plan would be exempt from the registration requirements of the Securities Act in accordance with section 1145 of the Bankruptcy Code and therefore will be freely transferable by most recipients thereof.

**Governing Law**

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, instrument or agreement entered into expressly in connection with the Plan, the right and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the state of New York, without giving effect to conflict of laws principles.

# RISK FACTORS

*We have set forth below certain risk factors that are related specifically to the New Notes or the Exchange Offer and the Consent Solicitation. These factors are not the only factors that could affect us, the New Notes, the Old Notes or the Exchange Offer and Consent Solicitation. Additional risks not presently known to us or that we currently deem immaterial may also impair our business. You should carefully consider all these risk factors in addition to the business and other information presented in this statement, including, in particular, the information set forth in "Annex A—Information About the Company—Risk Factors."*

## Risks Related to the Exchange Offer, the Consent Solicitation and the Old Notes

### *No recommendation is being made concerning the Exchange Offer and Consent Solicitation.*

None of the Company, the Dealer Manager, the Exchange Agent and Information Agent or the trustee makes any recommendation to any Eligible Holder whether to tender for exchange or refrain from tendering any or all of such Eligible Holder's Old Notes, or to deliver or refrain from delivering any Consents, and neither the Company nor any such other person has authorized any person to make any such recommendation. In addition, neither our board of directors nor our management has made any determination that the consideration to be received in the Exchange Offer and Consent Solicitation represents a fair valuation of the Old Notes. The Company has not obtained a fairness opinion from any financial advisor or other person about the fairness to the Company or to you of the consideration to be received by Eligible Holders of Old Notes who validly tender, and do not validly withdraw (and whose tenders are accepted for exchange), their Old Notes in the Exchange Offer and Consent Solicitation.

Eligible Holders are urged to evaluate carefully all information in this Statement, including the expiration deadlines included herein, consult their own investment and tax advisors and make their own decisions whether to tender Old Notes and, if so, the principal amount of Old Notes to tender for exchange, and whether to deliver any Consent.

### *There may be a long period during which participating holders may be unable to effect transfers or sales of their Old Notes.*

The Exchange Offer and Consent Solicitation expire on the Expiration Date, and at or following the Withdrawal Date, withdrawal rights will only be provided as may be required by applicable law. As a result, there may be a long period of time during which participating holders may be unable to effect transfers or sales of their Old Notes.

### *The Exchange Offer may result in reduced liquidity for any Old Notes that are not exchanged.*

The trading market for Old Notes that are not exchanged could become more limited than the existing trading market for the Old Notes and could cease to exist altogether due to the reduction in the principal amount of the Old Notes outstanding upon consummation of the Exchange Offer and the Consent Solicitation. A more limited trading market might adversely affect the liquidity and market price of the Old Notes, and may result in price volatility of the Old Notes. If a market for the Old Notes that are not exchanged exists or develops, the Old Notes may trade at a discount to the price at which they were issued or would trade if the principal amount outstanding were not reduced had the Exchange Offer and Consent Solicitation not occurred. There can, however, be no assurance that an active market in the Old Notes will exist, develop or be maintained, or as to the prices and discounts at which the Old Notes may trade, after the Exchange Offer and the Consent Solicitation is consummated.

### *We cannot assure you that the credit ratings for the Old Notes will not be lowered, suspended or withdrawn by the rating agencies.*

The credit ratings of the Old Notes may change after the Proposed Amendments become operative and the New Notes are issued. Such ratings are limited in scope, and do not address all material risks relating to an investment in the notes, but rather reflect only the views of the rating agencies at the time the ratings are issued. An explanation of the significance of such ratings may be obtained from the rating agencies. We cannot assure you that such credit ratings will remain in effect for

any given period of time or that such ratings will not be lowered, suspended or withdrawn entirely by the rating agencies, if, in the judgment of such rating agencies, circumstances so warrant. Any lowering, suspension or withdrawal of such ratings may have an adverse effect on the market price and marketability of the notes.

***Your decision to tender Old Notes for New Notes exposes you to the risk of nonpayment for a longer period of time.***

The Old Notes will mature on February 7, 2025. The New Notes will mature five years after issuance. If, following the maturity date of the Old Notes but prior to the maturity date of the New Notes, we were to become subject to a bankruptcy, *proceso de reorganización* (reorganization), *liquidación* (bankruptcy), or similar proceeding, the holders of Old Notes who did not exchange their Old Notes for New Notes could have been paid in full and there would exist a risk that holders of Old Notes who exchanged their Old Notes for New Notes would not be paid in full, if at all, or would be paid after substantial time had elapsed. Your decision to tender your Old Notes should be made with the understanding that the lengthened maturity of the New Notes exposes you to the risk of nonpayment for a longer period of time.

***You may not receive New Notes in the Exchange Offer and the Consent Solicitation if you do not follow the procedure for the Exchange Offer and the Consent Solicitation.***

We will issue the New Notes in exchange for your Old Notes only if you tender your Old Notes pursuant to an agent's message before the expiration of the Exchange Offer and the Consent Solicitation. You should allow sufficient time to ensure timely delivery of the necessary documents. Furthermore, you should carefully follow the procedures for tendering the Old Notes. Neither the Exchange Agent nor we are under any duty to give notification of defects or irregularities with respect to the tenders of Old Notes for exchange. If you are the beneficial owner of Old Notes that are registered in the name of your broker, dealer, commercial bank, trust company or other nominee, and you wish to tender in the Exchange Offer and the Consent Solicitation, you should promptly contact the person in whose name your Old Notes are registered, follow the procedures specified herein and instruct that person to tender on your behalf.

In addition, Eligible Holders of Old Notes are referred to the restrictions in "Transfer Restrictions" and the agreements, acknowledgements, representations, warranties and undertakings contained therein and in the Eligibility Letter, which Eligible Holders will make on submission of an agent's message. Non-compliance with these could result in, among other things, the unwinding of trades and/or heavy penalties.

***The consummation of the Exchange Offer and the Consent Solicitation may be delayed or may not occur.***

We are not obligated to complete the Exchange Offer and the Consent Solicitation under certain circumstances and unless and until certain conditions are satisfied, as described more fully under "Description of the Exchange Offer and the Consent Solicitation—Conditions to the Exchange Offer and the Consent Solicitation." For example, we will only consummate this exchange offer if at least 95% (including any Old Notes which are owned by us or our affiliates) in aggregate principal amount of the outstanding Old Notes is validly tendered and not validly withdrawn on or prior to the Expiration Date (the "Minimum Tender Condition"), unless we waive this condition; provided however that the Proposed Amendments will only be operative if at least a majority (not including any Old Notes which are owned by us or our affiliates) in aggregate amount of the Old Notes is validly tendered and not validly withdrawn on or prior to the Expiration Date.

Even if the Exchange Offer and the Consent Solicitation is completed, it may not be completed on the schedule described in this Statement. Accordingly, holders participating in the Exchange Offer and the Consent Solicitation may have to wait longer than expected to receive their New Notes, during which time those holders of Old Notes will not be able to effect transfers of their Old Notes tendered in the Exchange Offer and the Consent Solicitation.

***The consideration to be received in the Exchange Offer and the Consent Solicitation does not reflect any valuation of the Old Notes or the New Notes.***

Neither our board of directors nor any of our principal officers have made any determination that the consideration to be received in the Exchange Offer and the Consent Solicitation represents a fair valuation of either the Old Notes or the New Notes. We have not obtained a fairness opinion from any financial advisor about the fairness to us or to you of the consideration to be received by holders of Old Notes. Accordingly, none of us, our board of directors, our principal officers, the Dealer Manager, the Exchange Agent and Information Agent, the trustee or any other person is making any recommendation regarding the Exchange Offer and the Consent Solicitation, including the consideration to be received in connection therewith, and you have to make your own decision as to whether to tender Old Notes.

***If the Proposed Amendments become operative, holders of Old Notes that are not tendered will no longer benefit from all the restrictive covenants and events of default in the Old Notes Indenture.***

If the Exchange Offer and the Consent Solicitation is consummated and the Proposed Amendments become operative as to the Old Notes Indenture, Old Notes that are not exchanged pursuant to the Exchange Offer will remain outstanding and will be subject to the terms of the Old Notes Indenture as modified by a supplement to the Old Notes Indenture (the "Supplemental Indenture") reflecting the Proposed Amendments. Holders of Old Notes that are not exchanged pursuant to the Exchange Offer for any reason will no longer be entitled to the benefits of all of the covenants and events of default of the Old Notes Indenture after such provisions have been modified with respect to the Old Notes by the Proposed Amendments. The Proposed Amendments will eliminate certain provisions, including the majority of the restrictive covenants and certain events of default under the Old Notes Indenture. The Proposed Amendments would permit us to take actions previously prohibited under the Old Notes Indenture that could increase the credit risks faced by the holders of any remaining Old Notes, adversely affect the market price and credit rating of such Old Notes or otherwise be materially adverse to the interests of the holders of such remaining Old Notes.

The Proposed Amendments, however, will not relieve us from our respective obligations to make scheduled payments of principal and interest on the Old Notes not exchanged pursuant to the Exchange Offer in accordance with the terms of the Old Notes Indenture as currently in effect.

**Risks Related to the New Notes and Our Indebtedness**

***If we were subject to Colombian bankruptcy or insolvency law, holders of the New Notes may find it difficult to collect payment on the New Notes.***

If we were to be held subject to Colombian bankruptcy or insolvency law by a Colombian authority, our obligations under the New Notes would be subject to the outcome of, and priorities recognized in, the relevant proceedings, and would be subject to certain statutory preferences including tax, social security and labor claims and claims of secured creditors. In addition, in the event of bankruptcy or insolvency, and upon the initiation of a reorganization or liquidation process before Colombian authorities, including the Colombian Superintendency of Companies (*Superintendencia de Sociedades*), our obligations may be subject to an automatic stay or compliance thereunder which may delay or affect the ability of the holders of the New Notes to collect payment on the New Notes.

***Our substantial level of debt could impair our financial condition.***

We currently have, and after the Exchange Offer and Consent Solicitation will have, a substantial amount of debt. We had total principal indebtedness of Ps. 1,700,111 million (US$ 419 million) as of September 30, 2023. Of our total indebtedness as of September 30, 2023, Ps. 334,121 million (US$ 82 million), or 19.7%, consisted of indebtedness with maturities of one year or less or indebtedness that otherwise becomes due within one year, which we classify as short-term indebtedness. The remaining Ps. 1,365,990 million (US$ 337 million), or 80.3%, of our total outstanding indebtedness

consisted of indebtedness with maturities greater than one year, which we classify as long-term indebtedness. Our significant level of debt could have important consequences to you, including:

- requiring a substantial portion of our cash flows from operations be used for the payment of interest on our debt, therefore reducing the funds available to us for the operations or other capital needs;

- limiting our flexibility in planning for, or reacting to changes in our business because our available cash flow after paying principal and interest on our debt may not be sufficient to make the capital and other expenditures necessary to address these changes;

- increasing our vulnerability to general adverse economic and industry conditions because, during periods in which we experience lower earnings and cash flow, we will be required to devote a greater percentage of our cash flow to paying principal and interest on our debt;

- limiting our ability to obtain additional financing in the future to fund working capital, capital expenditures, acquisitions and general corporate requirements;

- making it difficult for us to refinance our indebtedness or to refinance such indebtedness on favorable terms;

- restricting our ability to take advantage of opportunities that would permit us to acquire other businesses;

- placing us at a competitive disadvantage to other relatively less leveraged competitors that have more cash flow available to fund working capital, capital expenditures and general corporate requirements; and

- any borrowings we make at variable interest rates leave us vulnerable to increases in interest rates generally.

The occurrence of any of these and other risks related to our indebtedness may have a material adverse effect on our business, results of operations and financial condition.

***We may incur substantially more debt, which could further exacerbate the risks associated with our indebtedness.***

As of September 30, 2023, we had Ps. 1,700,111 million (US$ 419 million) in financial liabilities excluding transaction costs, including Ps. 516,564 million (US$127 million) of secured indebtedness under loan facilities with local financial institutions through structures with trusts and Ps. 1,183,547 million (US$292 million) of unsecured indebtedness. We may be able to incur substantial additional debt in the future. Although the agreements governing our outstanding indebtedness contain restrictions on the incurrence of additional indebtedness, these restrictions are subject to several qualifications and exceptions, and the indebtedness incurred in compliance with these restrictions could be substantial. Also, these restrictions do not prevent us from incurring obligations that do not constitute "indebtedness" as defined in the relevant documents. Adding new debt to our current indebtedness levels would increase our leverage. The related risks that we now face could intensify.

***The instruments governing our indebtedness, including the New Notes, contain cross-default provisions that may cause all of the debt issued under such instruments to become immediately due and payable as a result of a default under an unrelated debt instrument.***

The New Notes Indenture will contain numerous restrictive covenants. Instruments governing our other indebtedness also contain certain affirmative and negative covenants and require us and our subsidiaries to meet certain financial ratios and tests. Our failure to comply with the obligations contained in the New Notes Indenture or other instruments governing our indebtedness could result in an event of default under the applicable instrument, which could then result in the related debt and the debt issued under other instruments becoming immediately due and payable. In such event, we would need to raise funds from alternative sources, which may not be available to us on favorable terms, on a timely basis or at all. Alternatively, such default could require us to sell our assets and otherwise curtail operations in order to pay our creditors.

***The Old Notes Indenture contains, and the New Notes Indenture will contain, restrictions on our ability to operate our business and to pursue our business strategies. Our failure to comply with these covenants could result in an acceleration of our indebtedness.***

The Old Notes Indenture contains, and the New Notes Indenture will contain, covenants that may restrict our ability to finance future operations or capital needs, to respond to changing business and economic conditions or to engage in certain transactions or business activities that may be important to our growth strategy, necessary to remain competitive or otherwise important to us. The New Notes Indenture will restrict, among others, our ability to:

- incur additional indebtedness;

- pay dividends or redeem capital stock;

- make other restricted payments;

- make certain acquisitions or investments;

- enter into certain transactions with affiliates;

- transfer or sell assets;

- secure our indebtedness and the indebtedness of our subsidiaries;

- guarantee debts; and

- sell, consolidate, merge or transfer all or substantially all of our assets.

If we do not comply with these restrictions, we could be in default despite our ability to service our indebtedness. If there were an event of default under the Old Notes Indenture or the New Notes Indenture, holders of such Old Notes or New Notes could demand immediate payment of the aggregate principal amount and accrued interest on such Old Notes and New Notes outstanding. This could lead to our inability to pay our obligations or to our reorganization or bankruptcy for the benefit of our creditors. Any additional financings we obtain in the future would most likely contain similar or more restrictive covenants.

***There are restrictions on your ability to transfer the New Notes.***

The New Notes have not been registered under the Securities Act or any state securities laws, and we are not required to and currently do not plan on making any such registration in the immediate future. As a result, the New Notes may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable U.S. state securities laws. Prospective investors should be aware that investors may be required to bear the financial risks of this investment for an indefinite period of time. See "Transfer Restrictions" for a full explanation of such restrictions.

The New Notes have not been and will not be registered with the RNVE and the New Notes will not be listed on the Colombian Stock Exchange (*Bolsa de Valores de Colombia*). The New Notes will not be offered to persons in Colombia by means of a public offering, but may be offered in a private placement pursuant to an exemption therefrom under Colombian law and the notes will not be sold to more than 99 determined Colombian persons, nor to an undetermined number of Colombian persons. The Exchange Offer will not be subject to review or authorization by the SFC.

***An active trading market for the New Notes may not develop.***

Currently there is no market for the New Notes. An active trading market for the New Notes may not develop. We intend to apply to list the New Notes on the Singapore Stock Exchange. Even if the New Notes become listed on this

exchange, we may delist the notes. A trading market for the New Notes may not develop, or if a market for the New Notes were to develop, the New Notes may trade at a discount from their initial offering price, depending upon many factors, including prevailing interest rates, the market for similar securities, general economic conditions in the United States and Colombia and our financial condition. The Dealer Manager are under no obligation to make a market with respect to the New Notes, and we cannot assure you that trading markets will develop or be maintained. Accordingly, we cannot assure you as to the development or liquidity of any trading market for the New Notes. If an active market for the New Notes does not develop or is interrupted, the market price and liquidity of the New Notes may be adversely affected.

***The trading price of the New Notes may be volatile.***

The prices at which the New Notes may trade will depend on many factors, including, among others, prevailing interest rates, general economic conditions, our performance and financial results and markets for similar securities. Historically, the markets for debt such as the New Notes have been subject to disruptions that have caused substantial volatility in their prices. The market, if any, for the New Notes may be subject to similar disruptions, which may have an adverse effect on the price of the New Notes.

***We may not be able to make payments in U.S. Dollars.***

In the past, the Colombian economy has experienced balance of payments deficits and shortages in foreign exchange reserves. While the Colombian government does not currently restrict the ability of Colombian or foreign persons or entities to convert Colombian pesos to foreign currencies, including U.S. dollars, it has done so in the past and could do so again in the future. We cannot assure you that the Colombian government will not implement a restrictive exchange control policy in the future. Any such restrictive exchange control policy could prevent or restrict our access to U.S. dollars to meet our U.S. dollar obligations and could also have a material adverse effect on our business, financial condition and results of operations. We cannot predict the impact of any such measures on the Colombian economy.

***Payment of judgments against us in Colombia may be made in Colombian pesos, which may expose you to exchange rate risks.***

Article 86 of Resolution 1 of 2018 issued by the Colombian Central Bank provides that, in case of legal proceedings in Colombia, the conversion of foreign currency-denominated obligations of Colombian residents, such as us, would be made by using the foreign exchange rate (i.e. *tasa representativa del mercado* or "TRM") prevailing on the payment date. Accordingly, if proceedings are brought and a judgment is entered against us in Colombia, we may be required to discharge these obligations in Colombian pesos. As a result, investors may be exposed to exchange rate risks.

***We may be unable to purchase the New Notes upon change of control event, which would result in defaults under the New Notes Indenture.***

The terms of the New Notes require us to make an offer to repurchase the New Notes upon the occurrence of a specified change of control event at a purchase price equal to 101% of the principal amount of the New Notes, plus accrued interest to the date of the purchase. Any financial arrangements we may enter may require repayment of amounts outstanding upon the occurrence of a change of control event and limit our ability to fund the repurchase of your New Notes in certain circumstances. It is possible that we will not have sufficient funds at the time of any change of control to make the required repurchase of New Notes or that restrictions on our other financing arrangement will not allow the repurchase of New Notes or that restrictions in our other financing arrangements will not allow the repurchases. If we fail to repurchase the New Notes in such circumstances, we would default under the New Notes Indenture which may, in turn, trigger cross-default provisions in our other debt instruments. See "Description of the New Notes—Change of Control Triggering Event."

***You may not be able to effect service of process on us, our directors or our officers or to enforce in Colombian courts judgments obtained against us in the United States.***

We are a stock corporation (*sociedad anónima*) organized under Colombian law. Certain of our directors and all or substantially all of our officers reside outside the United States. Substantially all of the assets of such persons are located in Colombia. Substantially all of our assets are located in Colombia. As a result, it may not be possible for investors to effect service of process within the United States or in any other jurisdiction outside of Colombia upon us, our directors or officers or to enforce against us or our directors or officers in any jurisdiction outside of Colombia judgments predicated upon the laws of any such jurisdiction, including any judgment predicated upon the U.S. federal and state securities laws. In addition, you should not assume that courts in Colombia (1) would enforce judgments of U.S. courts obtained in actions against us based upon the civil liability provisions of applicable U.S. federal and state securities laws or (2) would enforce, in original actions, liabilities against us or our subsidiaries based on those laws.

There is also substantial doubt that the courts of Colombia would enter judgment in original actions brought in those courts predicated on U.S. federal or state securities laws. Moreover, certain remedies available under provisions of the U.S. securities laws may not be admitted or enforced by Colombian courts.

Colombian courts will enforce a U.S. judgment predicated on the U.S. securities laws through a procedural system known under Colombian law as *exequatur*. Colombian courts will enforce a foreign judgment, without reconsideration of the merits, only if the judgment satisfies the requirements set forth in articles 605 through 607 of the GCP, which provides that the foreign judgment will be enforced if certain conditions are met, as described in detail in "Service of Process and Enforcement of Civil Liabilities."

***The New Notes Indenture will contain periodic reporting requirements that will be different and less burdensome than would be applicable to us if we had agreed to register the New Notes following the closing of the Exchange Offer.***

We do not presently file periodic reports and other information with the SEC, and the New Notes Indenture will not require us to file such reports or other information. The New Notes Indenture will require us to provide annual and quarterly financial information, including English language translations, to the holders of New Notes and the trustee. The requirements of the New Notes Indenture, however, will be more limited in certain respects than those applicable to public companies under the U.S. Securities Exchange Act of 1934, as amended, (the "Exchange Act"). See "Description of the New Notes— Certain Covenants—Reports to Holders."

***We cannot assure you that the credit ratings for the New Notes will not be lowered, suspended or withdrawn by the rating agencies.***

The credit ratings of the New Notes may change after issuance. Such ratings are limited in scope, and do not address all material risks relating to an investment in the New Notes, but rather reflect only the views of the rating agencies at the time the ratings are issued. An explanation of the significance of such ratings may be obtained from the rating agencies. We cannot assure you that such credit ratings will remain in effect for any given period of time or that such ratings will not be lowered, suspended or withdrawn entirely by the rating agencies if, in the judgment of such rating agencies, circumstances so warrant. Any lowering, suspension or withdrawal of such ratings may have an adverse effect on the market price and marketability of the New Notes.

The ratings of the New Notes are not a recommendation to purchase hold or sell the New Notes, and the ratings do not comment on market price or suitability for a particular investor. The ratings of the New Notes are subject to change and may be lowered or withdrawn. A downgrade in or withdrawal of the ratings of the New Notes will not be an event of default under the New Notes Indenture. The assigned ratings may be raised or lowered depending, among other things, on the rating agency's assessment of our financial strength, as well as its assessment of Colombian sovereign risk generally.

***It is possible that any future note guarantees by any future subsidiaries may not be enforceable.***

Any future note guarantees would provide a basis for a direct claim against the guarantor. However, it is possible that such guarantees may not be enforceable. The laws of Colombia may in some cases prevent the guarantees from being valid, binding and enforceable against such subsidiary guarantors in accordance with their terms. In the event that such guarantor was declared bankrupt, the guarantee may be deemed to have been a fraudulent transfer and declared void if such subsidiary guarantor failed to receive fair consideration or reasonably equivalent value in exchange for such guarantee. In addition, under Colombian bankruptcy law, if any of the subsidiary guarantors are judicially declared bankrupt, each of such subsidiary guarantors' obligations under its guarantee will be subordinated to secured creditors and certain statutorily preferred creditors, such as those holding labor, tax and social security related claims, which will have preference over any other claims, including claims by any investor in respect of the notes or such guarantees.

***If we enter into a bankruptcy, insolvency, intervention, administrative takeover for management or for liquidation purposes or similar proceeding, holders of subordinated and unsubordinated debt may be given the same priority.***

In a bankruptcy, insolvency, intervention, administrative takeover for management or for liquidation purposes or restructuring proceedings under Colombian law, subordination agreements may be disregarded. In such a case, subordinated and unsubordinated creditors (including holders of the New Notes) may have the same priority. The New Notes Indenture allows us to incur subordinated debt, and to refinance, repay, redeem, repurchase or otherwise acquire or retire for value certain subordinated indebtedness. For example, we may incur an unlimited amount of subordinated debt. If we were to undergo bankruptcy, liquidation, restructuring or administrative takeover proceedings, holders of our debt that were contractually subordinated to our prior payments, including such intercompany debt, may have the same rights as holders of our unsubordinated debt under the New Notes. Therefore, we cannot assure you that you will not lose your priority over any subordinated debt.

***Our controlling shareholders may exercise their control in a manner that differs from your interests as a holder of New Notes.***

Our controlling shareholders have the ability to direct the outcome of substantially all matters submitted to a vote of our shareholders, including the election of the majority of directors and, as a result, any decisions taken by the board of directors (including those decisions affecting our future growth and strategy). These shareholders may exercise their control in a manner that differs from your interests as a noteholder. For example, they may have an interest in pursuing acquisitions, combinations, divestitures, financings or other transactions which in their judgment could enhance their equity interest, even though such transactions may involve risks to you as a holder of New Notes.

## Risks Related to the Collateral

***The proceeds from the sale of the Collateral securing the New Notes may not be sufficient to satisfy our obligations under the New Notes.***

The New Notes will be secured by a first-priority lien on our loan portfolio (excluding Special Purpose Finance Trusts) and a second-priority lien on a Special Purpose Finance Trust (patrimonio autónomo). Payment on the New Notes will be effectively subordinated to all existing and future Indebtedness and other liabilities of any Special Purpose Finance Trust (as defined under "Description of the Notes") the extent of the value of the assets securing such Indebtedness. In the event of a foreclosure (or any other enforcement mechanism available under Colombian law) on the Collateral, we would be required to pay certain fees and other amounts prior to distribution of any proceeds from foreclosure (or any other enforcement mechanism available under Colombian law) in respect of the New Notes. In the case of the second-priority lien, in the event of a foreclosure (or any other enforcement mechanism available under Colombian law) on such Collateral those proceeds would be paid first to the holders of the first-priority lien on the Special Purpose Finance Trust (patrimonio autónomo) to the extent of the value of the assets securing such Indebtedness. The execution and perfection of the second-priority lien on the Special Purpose Finance Trust (*patrimonio autónomo*) may require consent or authorization by the respective secured party. We can provide no assurance as to the amount that would be distributed in respect of the New Notes upon any foreclosure or otherwise, or that the proceeds from the sale of the Collateral would be sufficient to satisfy our obligations under the New Notes.

The value of the Collateral and any amount to be received at foreclosure (or any other enforcement mechanism available under Colombian law) will depend upon many factors including, among others, the condition of the Collateral, the ability to sell the Collateral in an orderly sale, the availability of buyers, the condition of the Colombian economy, the condition of our competitors in Colombia and exchange rates. No appraisal of any of the Collateral has been prepared by us or on our behalf in connection with this Exchange Offer and Consent Solicitation. Given the limited number of participants in the Colombian non-bank financial sector, there may not be any buyer willing and able to purchase a significant portion of our assets or the Collateral in the event of foreclosure (or any other enforcement mechanism available under Colombian law). In addition, since we are not pledging all of our assets, it may not be possible to sell our business as a going concern upon foreclosure. Each of these factors could reduce the likelihood of a foreclosure (or any other enforcement mechanism available under Colombian law) as well as reduce the amount of any proceeds in such event of foreclosure.

*Impediments exist to any foreclosure on the Collateral, which may adversely affect the proceeds of any foreclosure.*

Substantially all of the Collateral Documents (as defined in "Description of the Senior Notes—Security") are governed by the laws of Colombia, and substantially all of the Collateral is located in Colombia. Any foreclosure (or any other enforcement mechanism available under Colombian law) with respect to the Collateral (including a foreclosure initiated by holders of the New Notes) would therefore be required to comply with Colombian legal and procedural requirements, which differ substantially from procedural requirements in the United States. In particular, Colombian law does not allow for self-executing liens, foreclosure without judicial action or expedited foreclosure proceedings. Moreover, Colombian law may have limited *in persona*, *in rem*, and *in aid of foreclosure* remedies, thus limiting collection activities. Any proceeding related to the foreclosure of the Collateral in Colombia would be required to be initiated in a Colombian court and could involve significant delays. A Colombian court may require a judgment regarding the existence of an event of default under the New Notes Indenture from a U.S. court prior to any foreclosure (or any other enforcement mechanism available under Colombian law). We may also have available to us defenses under Colombian law not available under U.S. law to any foreclosure proceeding, which may result in a delay in foreclosure proceedings. In addition, any foreclosure on the Collateral may be subject to regulatory approvals. All of the foregoing factors, and other factors relating to judicial proceedings in Colombia, may result in significant delays in connection with any foreclosure of the Collateral. These delays could result in a deterioration of the Collateral and a decrease in the value that would otherwise be realizable upon foreclosure.

*Third parties' rights may affect the ability of the Collateral Agent to foreclose on the Collateral.*

Third parties may have rights and be entitled to remedies that diminish the ability of the Collateral Agent to foreclose upon the Collateral, or amounts available after foreclosure or enforcement of the Collateral for repayment. Under Colombian law, amounts owed to employees or, with some limited exceptions, to tax authorities (including social security and retirement fund liabilities), must be paid by a debtor prior to the satisfaction of any other claims, including certain secured claims. In addition, under the terms of the New Notes, certain third-party Collateral Permitted Liens may be senior to the liens securing the New Notes. See "Description of the New Notes—Certain Definitions—Collateral Permitted Liens." The rights and remedies to which these and other third-party creditors are entitled may limit the ability of foreclosure or enforcement on the Collateral or may otherwise reduce the proceeds available to satisfy our obligations under the New Notes.

*We may incur additional secured indebtedness, which would dilute the value of the Collateral securing the Senior Notes.*

Under the New Notes Indenture, we will be permitted in the future to incur specified additional obligations that may share in the liens on the Collateral securing the New Notes. If we incur any additional debt that is secured on an equal and ratable basis with the New Notes, the holders of that debt will be entitled to share ratably with the holders of the New Notes and the value of the Collateral (or the proceeds from the sale of the Collateral in a foreclosure proceeding) securing the New Notes will be diluted. Any such dilution will increase the risk of the proceeds from the sale of the Collateral not being sufficient to satisfy the amounts outstanding under the New Notes and all other obligations secured by such Collateral. If such proceeds were not sufficient to repay amounts due on the New Notes, then holders of the New Notes (to the extent the New Notes are not repaid from the proceeds of the sale of the Collateral) would have an unsecured claim against our remaining assets.

*Since not all of our assets are included in the Collateral, the ability to sell the Collateral as a going concern may be limited.*

The Collateral pledged or otherwise delivered as security for our obligations under the New Notes is limited. The Collateral consists of a significant portion, but not all, of our assets. In light of the fact that the Collateral is closely related to

assets that are not pledged or otherwise delivered as Collateral, the ability of the Collateral Agent to sell the Collateral as a going concern may be limited and may affect the attractiveness of the assets constituting the Collateral for a third-party purchaser.

### *A Colombian or U.S. bankruptcy may limit the ability to realize value from the Collateral.*

The rights of the Collateral Agent upon a foreclosure on the Collateral upon the occurrence of an event of default under the New Notes Indenture is likely to be significantly impaired by applicable bankruptcy law, including Ley 1116 de 2006 ("Insolvency Law") if a bankruptcy proceeding were to be commenced by or against us before the foreclosure on the Collateral.

Under Colombia's Insolvency Law, the foreclosure or sale of all or any part of the Collateral may not be possible prior to our liquidation. In addition, during the pendency of insolvency proceedings, Colombian law does not require a debtor to provide adequate protection or assurances to secured creditors, although the bankruptcy court could adopt precautionary measures to such effect.

Significant uncertainties are inherent in bankruptcy proceedings, including bankruptcy proceedings in Colombia, that may result in delays that could adversely impact the value of the Collateral or that may prevent foreclosure (or any other enforcement mechanism available under Colombian laws) with respect to the Collateral. There have been a limited number of final judicial decisions relating to critical bankruptcy issues such as the relative treatment and priority of debts, the role of the creditors in overseeing business operations during insolvency proceedings, criteria and voting majorities required (and how such votes are counted) for court approval of a reorganization plan and the effect of the process on subsidiaries (including the possible cancellation of bankruptcy proceedings). Secured creditors' rights in a bankruptcy proceeding are therefore not well-established in Colombia, and this may result in substantial delays beyond those contemplated by Colombia's Insolvency Law as well as the inability of the mediator to exercise the remedies and powers granted to creditors. Delays in proceedings, the inadequacy of available remedies, the limitation of remedies available and the inability of the mediator to exercise available remedies could result in a substantial deterioration of the Collateral during the pendency of any such proceeding and may affect your ability to foreclose on the Collateral and thus receive payment in respect of the New Notes.

### *Rights of holders of the New Notes to the Collateral may be adversely affected by our failure to perfect security interests in certain Collateral acquired in the future.*

The security interests in the Collateral securing the New Notes includes specified classes of assets whether now owned or acquired or arising in the future. Applicable law requires that certain property and rights acquired after the grant of a general security interest can only be perfected at the time such property and rights are acquired and identified. Neither the trustee nor the Collateral Agent will be required to monitor, and there will be no assurance that we will inform the trustee or the Collateral Agent of, the future acquisition of property and rights that constitute Collateral, and that the necessary actions will be taken to properly perfect the security interest in such after-acquired Collateral (including any amendments to the Collateral Documents that may be rendered necessary from time to time). Such failure may result in the loss of the security interest therein or the priority of the security interest in favor of the New Notes against third parties.

### *We will in most cases have control over the Collateral securing the New Notes, and the sale of particular assets by us could reduce the pool of assets securing the New Notes.*

The Collateral Documents may allow us to remain in possession of, to retain exclusive control over, to freely operate and to collect, invest and/or dispose of any income or rights derived from the Collateral securing the New Notes. To the extent we sell any assets that constitute such Collateral, when such sale is allowed under the Collateral Documents, the proceeds from such sale will be subject to the liens securing the New Notes only to the extent such proceeds would otherwise constitute Collateral securing the New Notes under the Collateral Documents. To the extent the proceeds from any such sale of Collateral do not constitute Collateral under the Collateral Documents, the pool of assets securing the New Notes would be reduced and the New Notes would not be secured by such proceeds.

**Risks Related to the Plan**

*If the Exchange Offer is not consummated, we intend to commence a case under Chapter 11 of the Bankruptcy Code and seek confirmation of the Plan.*

If the Exchange Offer is not consummated, we may not be able to meet certain financial obligations as they come due. If this occurs, holders of the Old Notes and our other creditors could commence involuntary bankruptcy proceedings against us in Colombia or in the United States.

As a result, if the Exchange Offer is not consummated, we may commence a voluntary case under Chapter 11 of the Bankruptcy Code. Such a restructuring may be protracted, contentious and disruptive to our business and could materially adversely affect our relationships with our customers and employees who may terminate their relationships with us. A restructuring would also cause us to incur significant legal, administrative and other professional expenses. Moreover, no assurances can be given that any such restructuring would be successful or that holders of our debt obligations would not have their claims significantly reduced, converted into equity or eliminated. If a restructuring is not successful, we may be forced to liquidate our business and assets.

If we receive votes in number and amount sufficient to satisfy the Bankruptcy Threshold, we may seek confirmation of the Plan. If confirmed, the Plan would be binding on all of the holders regardless of whether a holder voted to accept or reject the Plan. If the Plan does not receive the required support from holders, we may elect to seek confirmation regardless of the rejection by amending the Plan or seeking to confirm an alternative Chapter 11 plan. There can be no assurance that the terms of any such alternative Chapter 11 plan would be similar or as favorable to the holders as those proposed in the Plan.

In addition, a restructuring under Chapter 11 (other than the Plan) may result in holders of the Old Notes receiving notes with terms that may be materially less favorable than the New Notes being offered pursuant to the Exchange Offer.

*We may fail to satisfy vote requirements to confirm the Plan.*

If votes are received in number and amount sufficient satisfy the Bankruptcy Threshold, we may commence the Chapter 11 Case for the purpose of seeking confirmation of the Plan thereafter as promptly as practicable. If the Plan does not receive the required support from holders of claims, we may elect to seek confirmation regardless of the rejection, by amending the Plan or seeking to confirm an alternative Chapter 11 plan. There can be no assurance that the terms of any such alternative Chapter 11 plan would be similar or as favorable to the holders of allowed claims and allowed interests as those proposed in the Plan.

If we are not able to confirm the Plan or an alternative Chapter 11 plan, there is substantial doubt that we will be able to generate the necessary cash to continue operations. As a result, we may be required to file for liquidation in Colombia.

*We may fail to satisfy solicitation requirements.*

The solicitation of votes by the Company to accept the Plan is subject to several requirements under applicable bankruptcy law. If the Bankruptcy Court does not find that our solicitation complied with such requirements, confirmation of the Plan could be denied.

Section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) require that:

- the plan of reorganization be transmitted to substantially all creditors and other interest holders entitled to vote;

- the time prescribed for voting is not unreasonably short; and

- the solicitation of votes is in compliance with any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in such solicitation or, if no such law, rule or regulation exists, votes be solicited only after the disclosure of "adequate information". Section 1125(a)(1) of the U.S. Bankruptcy

Code describes adequate information as information of a kind and in sufficient detail as would enable a hypothetical reasonable investor typical of holders of claims and interests to make an informed judgment about the plan.

To satisfy the requirements of Section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b), we intend to deliver this Consent Solicitation to all holders of allowed notes claims as of the Voting Record Date. In that regard, we believe that the solicitation of votes to accept or reject the Plan is proper under applicable non-bankruptcy law, rules and regulations. However, we cannot be certain that the solicitation of acceptances or rejections will be approved by the Bankruptcy Court. If such approval is not obtained, confirmation of the Plan could be denied.

**The Bankruptcy Court may not confirm the Plan.**

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to satisfy the Bankruptcy Threshold, we may commence the Chapter 11 Case for the purpose of seeking confirmation of the Plan by the Bankruptcy Court. However, even if the requisite votes are received, the Bankruptcy Court is not obligated to confirm the Plan as proposed. In addition, a dissenting holder of a claim against the Company could challenge the balloting procedures as not being in compliance with the Bankruptcy Code, which could mean that the balloting results may be invalid. Even if the Bankruptcy Court determined that the balloting procedures were appropriate and the results were valid, the Bankruptcy Court could still decline to confirm the Plan, if the Bankruptcy Court found that any of the statutory requirements for confirmation had not been met. Section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a plan of reorganization, requires, among other things, a finding by the Bankruptcy Court that the plan of reorganization is "feasible," that all claims and interests have been classified in compliance with the provisions of section 1122 of the Bankruptcy Code and that, under the plan of reorganization, each holder of a claim or interest within each impaired class either accepts the plan of reorganization or receives or retains cash or property of a value, as of the date the plan of reorganization becomes effective, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. There can be no assurance that the Bankruptcy Court will conclude that the feasibility test and other requirements of sections 1122, 1123, 1129 and the other applicable provisions of the Bankruptcy Code have been met with respect to the Plan. In addition, the Bankruptcy Court may decline to accept the Company's petition based on jurisdictional or venue grounds, which would also result in the Company not being able to obtain confirmation of the Plan.

If the Plan is not confirmed by the Bankruptcy Court, (a) we may not be able to reorganize our businesses, (b) the distributions that holders of claims ultimately would receive, if any, with respect to their claims is uncertain, (c) there is no assurance that we will be able to successfully develop, prosecute, confirm and consummate an alternative plan that will be acceptable to the Bankruptcy Court and the holders of claims, (d) there can be no assurance that the Chapter 11 Case would continue rather than be converted into liquidation cases under chapter 7 of the Bankruptcy Code and (e) we may be required to liquidate our entire operations through a liquidation process in Colombia. It is also possible that third parties may seek and obtain approval from the Bankruptcy Court to terminate or shorten the exclusivity period during which only we may propose and confirm a plan of reorganization. If a liquidation or protracted reorganization of our estate were to occur, there is a substantial risk that our going concern value would be substantially eroded to the detriment of all stakeholders.

**Commencing the Chapter 11 Case may have a material adverse effect on our operations.**

The Plan Solicitation or any subsequent commencement of the Chapter 11 Case could adversely affect the relationships between us and our customers, employees, vendors, lenders, partners and others. There is a risk, due to uncertainty about our future, that:

- customers could seek alternate service providers;

- the commencement of the Chapter 11 Case could erode our customers' confidence in our ability to provide our services and, as a result, there could be a significant and precipitous decline in our revenues, profitability and cash flow;

- employees could seek other career opportunities;

- it may be more difficult to attract or replace key employees; and

- our suppliers, vendors, and service providers, many of whom may not be subject to the jurisdiction of the Bankruptcy Court, could seek to terminate their relationships with us or require financial assurances or enhanced performance.

***We may not be successful in obtaining first day orders to permit us to pay our key customers, vendors and employees in the ordinary course of business.***

In the event that we commence the Chapter 11 Case, it is our intention to seek authorization from the Bankruptcy Court on an emergency basis to pay our accounts payable to key parties in interest in the ordinary course of business and in the case of those key vendors that have agreed to continue to extend normal business terms to us during the Chapter 11 Case. However, there can be no guarantee that we would be successful in obtaining the necessary approvals of the Bankruptcy Court for such arrangements or for every party in interest we may seek to treat in this matter, and as a result, our business might suffer.

***We cannot predict the amount of time the Chapter 11 Case will take to complete for purposes of implementing the Plan, and a lengthy Chapter 11 Case could disrupt our business.***

While we intend to seek confirmation of the Plan in 30 to 45 days from the commencement of the Chapter 11 Case, we cannot be certain that this will be the case. Although the Plan and the Plan Solicitation are both designed to minimize the length of time that we may need to spend in Chapter 11, it is impossible to predict with certainty the exact amount of time that it may take to obtain confirmation of the Plan.

# DESCRIPTION OF THE EXCHANGE OFFER AND THE CONSENT SOLICITATION

**The Exchange Offer**

We are making an offer to Eligible Holders, upon the terms and subject to the conditions set forth in this Statement, to exchange each US$ 1,000 principal amount of the Old Notes for the exchange consideration of US$ 750 principal amount of New Notes and Capitalized Interest if the Old Notes are tendered and not validly withdrawn on or before the Expiration Date.

The New Notes will be issued in minimum denominations of US$ 1,000 and integral multiples of US$ 1.00 in excess thereof. An Eligible Holder must tender Old Notes in a principal amount equal to the minimum denominations of US$200,000 and integral multiples of US$1,000 in excess thereof. Any holder that tenders less than such amount will not be able to participate in the Exchange Offer and the Consent Solicitation and their exchange will be rejected.

The amount of New Notes to be issued to any holder will be rounded down to the nearest US$ 1.00. No additional cash will be paid in lieu of any principal amount of the New Notes not received as a result of rounding down.

On the Settlement Date, all Eligible Holders whose Old Notes are validly tendered and not validly withdrawn and accepted for exchange will also receive Capitalized Interest equal to the applicable accrued and unpaid interest on their Old Notes validly tendered and not validly withdrawn and accepted for exchange through but excluding February 7, 2024 (such accrued and unpaid interest subject to the same 25% reduction as the principal amount of the Old Notes).

On the Settlement Date, the Old Notes validly tendered and not validly withdrawn and accepted for exchange will be cancelled.

Tenders of Old Notes may be validly withdrawn at any time prior to 5:00 p.m. (New York City time) on April 3, 2024, but will thereafter be irrevocable, except in certain limited circumstances where we determine additional withdrawal rights are necessary and to the extent required by law.

**Any Eligible Holder who exchanges Old Notes for New Notes pursuant to the Exchange Offer must also deliver its Consent to the Proposed Amendments. Eligible Holders may not deliver Consents in the Consent Solicitation without exchanging their Old Notes for the New Notes in the Exchange Offer.**

**The Consent Solicitation**

In connection with the Exchange Offer, we are soliciting Consents to the Proposed Amendments with respect to the Old Notes Indenture, upon the terms and subject to the conditions set forth in this Statement. If the Proposed Amendments to the Old Notes Indenture become operative, certain provisions, including the majority of the restrictive covenants and certain events of default will be eliminated. See "The Proposed Amendments." Any corresponding provisions of the Old Notes will also be amended in conformity with the Proposed Amendments to the Old Notes Indenture. If the Proposed Amendments become operative, only a failure to comply with the restrictive covenants as modified by the Supplemental Indenture reflecting the Proposed Amendments would be a default or an event of default under the Old Notes Indenture.

If we receive Consents from at least a majority of the outstanding aggregate principal amount of the Old Notes (not including any Old Notes which are owned by us or our affiliates), we and the trustee will enter into the Supplemental Indenture. Except as set forth in this Statement, the Old Notes Indenture will not be supplemented or amended in connection with the Proposed Amendments, and all other provisions of the Old Notes Indenture will remain in full force and effect. The Supplemental Indenture may be executed and delivered prior to the Expiration Date. If the Requisite Consents are received and the Supplemental Indenture has become operative, the Proposed Amendments will be binding on all holders of such Old Notes. Accordingly, consummation of the Exchange Offer and the adoption of the Proposed Amendments may have adverse consequences for holders who elect not to tender Old Notes affected thereby in the Exchange Offer. See "—Proposed Amendments."

**Expiration Date; Extensions; Amendments; Termination**

The Expiration Date of the Exchange Offer and the Consent Solicitation will be 5:00 p.m. (New York City time) on April 3, 2024 subject to our right to extend that time and date in our absolute discretion, in which case the Expiration Date means the latest time and date to which the Exchange Offer and the Consent Solicitation is extended.

We reserve the right, in our absolute discretion, by giving oral or written notice to the exchange agent, to:

- extend the Exchange Offer and the Consent Solicitation;

- terminate the Exchange Offer and the Consent Solicitation if a condition to our obligation to exchange Old Notes for New Notes is not satisfied or waived on or before the Expiration Date;

- amend the Exchange Offer and the Consent Solicitation; and

- terminate and withdraw the Exchange Offer and Consent Solicitation.

If the Exchange Offer and the Consent Solicitation is amended in a manner that we determine constitutes a material change, we will extend the Exchange Offer and the Consent Solicitation for a period of two to 10 business days, depending upon the significance of the amendment and the manner of disclosure to the Eligible Holders, if the Exchange Offer and the Consent Solicitation would otherwise have expired during that two to 10 business day period. Any change in the consideration offered to holders of Old Notes pursuant to the Exchange Offer and the Consent Solicitation will be paid to all holders whose Old Notes have been previously tendered and not validly withdrawn.

Although we have no present plans or arrangements to do so, we reserve the right to amend, at any time, the terms and conditions of the Exchange Offer and the Consent Solicitation. We will promptly announce any extension, amendment or termination of the Exchange Offer and the Consent Solicitation by issuing a press release. We will announce any extension of the Expiration Date no later than 9:00 a.m. (New York City time) on the first business day after the previously scheduled Expiration Date.

**Settlement Date**

We will deliver the New Notes on the Settlement Date. We will not be obligated to deliver New Notes unless the Exchange Offer and the Consent Solicitation is consummated.

**Conditions to the Exchange Offer and the Consent Solicitation**

The Exchange Offer and the Consent Solicitation are subject to certain conditions, which we may assert or waive in full or in part in our sole discretion. We may extend the Exchange Offer and the Consent Solicitation from time to time until the conditions are satisfied or waived. Although we have no present intention to do so, we reserve the right to amend, at any time, the terms and conditions of the Exchange Offer and the Consent Solicitation. We will give you notice of any amendment or extension if required by applicable law.

Notwithstanding any other provisions of the Exchange Offer and the Consent Solicitation or any extension of the Exchange Offer and the Consent Solicitation, we will not be required to issue New Notes, and we may terminate the Exchange Offer and the Consent Solicitation or, at our option, modify, extend or otherwise amend the Exchange Offer and the Consent Solicitation, if any of the following events occur or exist on or before the Expiration Date:

(1) any action or event shall have occurred or been threatened, or action shall have been taken, or any statute, rule, regulation, judgment, order, stay, decree or injunction shall have been promulgated, enacted, entered, enforced or deemed to be applicable to the Exchange Offer and the Consent Solicitation or the exchange of Old

Notes for New Notes in the Exchange Offer by or before any court or governmental regulatory or administrative agency, authority or tribunal, including, without limitation, taxing authorities, that either:

    (a)    challenges the making of the Exchange Offer and the Consent Solicitation or the exchange of Old Notes for New Notes in the Exchange Offer or might, directly or indirectly, prohibit, prevent, restrict or delay consummation of, or might otherwise adversely affect in any material manner, the Exchange Offer and the Consent Solicitation or the exchange of Old Notes for New Notes in the Exchange Offer and the Consent Solicitation; or

    (b)    in our reasonable judgment, could materially adversely affect our business, condition (financial or otherwise), income, operations, properties, assets, liabilities or prospects or materially impair the contemplated benefits to us of the Exchange Offer and the Consent Solicitation or the exchange of Old Notes for New Notes in the Exchange Offer;

    (2)    there shall have occurred (a) any general suspension of or material limitation on trading in securities on the New York Stock Exchange, the NASDAQ Stock Market, the Colombian Stock Exchange (*Bolsa de Valores de Colombia*) or any other exchange or over-the-counter market in the United States or Colombia or any establishment of minimum prices on any of such exchanges or such market by such exchange or by any regulatory body having jurisdiction over such exchange or market; (b) any suspension of trading of any securities issued or guaranteed by us on any exchange or the over-the-counter market in the United States or Colombia; (c) a declaration of a general moratorium on commercial banking activities by U.S. federal or New York state authorities or by Colombian authorities; (d) any outbreak or escalation of national or international hostilities or any change in financial markets or any calamity or crisis; (e) any material adverse change or development involving a prospective material adverse change in taxation, exchange controls or other applicable law or regulation in the United States or Colombia directly affecting the New Notes or the imposition of restrictions on repatriation of remittances or interest payments or dividends from Colombia; or (f) a material adverse change in Colombian, U.S. or international monetary, general economic, political or financial conditions; or

    (3)    the trustee with respect to the Old Notes Indenture shall have objected in any respect to, or taken any action that could, in our reasonable judgment, adversely affect the consummation of the Exchange Offer and the Consent Solicitation or the exchange of Old Notes for New Notes in the Exchange Offer, or the trustee shall have taken any action that challenges the validity or effectiveness of the procedures used by us in making the Exchange Offer and the Consent Solicitation or the exchange of Old Notes for New Notes in the Exchange Offer.

In addition, the Exchange Offer and Consent Solicitation are subject to the valid tender, without subsequent withdrawal, of at least 95% (including any Old Notes which are owned by us or our affiliates) in aggregate principal amount of the outstanding Old Notes on or prior to the Expiration Date (the "Minimum Tender Condition"); provided however that the Proposed Amendments will only be operative if at least a majority (not including any Old Notes which are owned by us or our affiliates) in aggregate amount of the Old Notes is validly tendered and not validly withdrawn on or prior to the Expiration Date.

The foregoing conditions are for our sole benefit and may be waived by us, in whole or in part, at our absolute discretion. Any determination made by us concerning an event, development or circumstance described or referred to above will be conclusive and binding. Our failure at any time to exercise any of our rights will not be deemed a waiver of any other right, and each right will be deemed an ongoing right which may be asserted at any time and from time to time.

If any of the foregoing conditions are not satisfied, we may, at any time on or before the Expiration Date:

•    terminate the Exchange Offer and the Consent Solicitation and return all tendered Old Notes to the respective tendering holders;

- modify, extend or otherwise amend the Exchange Offer and the Consent Solicitation and retain all tendered Old Notes until the Expiration Date, as extended, subject, however, to the withdrawal rights of holders;

- waive the unsatisfied conditions with respect to the Exchange Offer and the Consent Solicitation and accept all Old Notes tendered and not previously validly withdrawn; or

- terminate and withdraw the Exchange Offer and Consent Solicitation.

## Purchases of Old Notes by Us

We reserve the right, in our absolute discretion, to purchase or make offers to purchase any Old Notes that remain outstanding subsequent to the Expiration Date and, to the extent permitted by applicable law, to purchase Old Notes in the open market, in privately negotiated transactions, tender offers, exchange offers, redemptions or otherwise. The terms of any such purchases or offers could differ from the terms of the Exchange Offer and the Consent Solicitation. Any purchase or offer to purchase will not be made except in accordance with applicable law.

## Certain Consequences to Holders of Old Notes Not Tendering in the Exchange Offer and the Consent Solicitation

Consummation of the Exchange Offer and the Consent Solicitation may have adverse consequences to holders of Old Notes who elect not to tender their Old Notes in the Exchange Offer. In particular, the trading market for Old Notes that are not exchanged could become more limited than the existing trading market for the Old Notes and could cease to exist altogether due to the reduction in the amount of the Old Notes outstanding upon consummation of the Exchange Offer and the Consent Solicitation. A more limited trading market might adversely affect the liquidity, market price and price volatility of the Old Notes. Furthermore, we cannot assure you that ratings on the Old Notes will be maintained. See "Risk Factors—Risks Related to the Exchange Offer, the Consent Solicitation and the Old Notes."

## Effect of Tender

Any tender of Old Notes by a holder, and our subsequent acceptance of that tender, will constitute a binding agreement between that holder and us upon the terms and subject to the conditions of the Exchange Offer and the Consent Solicitation described in this Statement. The acceptance of the Exchange Offer and the Consent Solicitation by a tendering holder of Old Notes will constitute the agreement by that holder to deliver to us good and marketable title to the tendered Old Notes, free and clear of any and all liens, restrictions, charges, pledges, security interests, encumbrances or rights of any kind of third parties.

## Eligibility to Participate in the Exchange Offer

You may not copy or distribute this Statement in whole or in part to anyone without our prior consent. This Statement is a confidential document that is being provided for informational use solely in connection with the consideration of the Exchange Offer and Consent Solicitation and an investment in the New Notes to Eligible Holders. Only Eligible Holders who have returned a duly completed Eligibility Letter certifying that they are (a) "qualified institutional buyers" (as defined in Rule 144A under the Securities Act), and (b) persons other than "U.S. persons" as defined in Regulation S under the Securities Act, who are not acquiring New Notes for the account or benefit of a U.S. person, in offshore transactions in compliance with Regulation S under the Securities Act, are authorized to receive and review this Statement and participate in the Exchange Offer. If you are not an Eligible Holder, you should dispose of this Statement. Each Eligible Holder that tenders its outstanding Old Notes and/or delivers its Consents in this Exchange Offer and Consent Solicitation will be agreeing with and making the representations, warranties and agreements as set forth under "—Representations, Warranties and Covenants of Holders of Old Notes" and "Transfer Restrictions."

## Representations, Warranties and Covenants of Holders of Old Notes

Pursuant to an agent's message (as defined below under "—Book-Entry Delivery Procedures for Tendering Old Notes Held with DTC"), a holder, or the beneficial owner of Old Notes on behalf of which the holder has tendered, will,

subject to that holder's ability to withdraw its tender, and subject to the terms and conditions of the Exchange Offer and the Consent Solicitation generally, be deemed, among other things, to:

(1) irrevocably sell, assign and transfer to us all right, title and interest in and to, and any and all claims in respect of or arising or having arisen as a result of the holder's status as a holder of, all Old Notes tendered thereby, such that thereafter the holder shall have no contractual or other rights or claims in law or equity against us or any fiduciary, trustee, agent or other person connected with the Old Notes arising under, from or in connection with those Old Notes;

(2) waive any and all rights with respect to the Old Notes tendered thereby, including, without limitation, any existing or past defaults and their consequences in respect of those Old Notes; and

(3) conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge us and the trustee for the Old Notes from any and all claims that the holder may have, now or in the future, arising from, under, out of or in any way related to the Old Notes tendered thereby, including, without limitation, any claims that the holder is entitled to receive additional principal or interest payments with respect to the Old Notes tendered thereby, other than accrued and unpaid interest on the Old Notes or as otherwise expressly provided in this statement, or to participate in any redemption or defeasance of the Old Notes tendered thereby.

In addition, each holder of Old Notes will be deemed to represent, warrant and agree that:

(4) it has received and reviewed this Statement;

(5) it is the beneficial owner of, or a duly authorized representative of one or more beneficial owners of, the Old Notes tendered thereby, and it has full power and authority to consent;

(6) the Old Notes being tendered thereby were owned as of the date of tender, free and clear of any liens, charges, claims, encumbrances, interests and restrictions of any kind, and we will acquire good, indefeasible and unencumbered title to those Old Notes, free and clear of all liens, charges, claims, encumbrances, interests and restrictions of any kind, when we accept the same;

(7) it will not sell, pledge, hypothecate or otherwise encumber or transfer any Old Notes tendered thereby from the date of the consent, and any purported sale, pledge, hypothecation or other encumbrance or transfer will be void and of no effect;

(8) it is, or, in the event that it is acting on behalf of a beneficial owner of the Old Notes tendered thereby, it has received a written certification from that beneficial owner, dated as of a specific date on or since the close of that beneficial owner's most recent fiscal year, to the effect that such beneficial owner is (a) a Qualified Institutional Buyer within the meaning of Rule 144A under the Securities Act or (b) not a U.S. person or acquiring for the account or benefit of one or more U.S. persons (other than as a distributor) and is acquiring New Notes outside the United States in accordance with Regulation S under the Securities Act;

(9) in evaluating the Exchange Offer and the Consent Solicitation and in making its decision whether to participate in the Exchange Offer and the Consent Solicitation by tendering its Old Notes, it has made its own independent appraisal of the matters referred to in this Statement in any related communications and it is not relying on any statement, representation or warranty, express or implied, made to it by us, the Exchange Agent and Information Agent, the trustee or the Dealer Manager, other than those contained in this Statement, as amended or supplemented through the Expiration Date;

(10) the execution and delivery of the Consent shall constitute an undertaking to execute any further documents and give any further assurances that may be required in connection with any of the foregoing, in each case on and subject to the terms and conditions described or referred to in this Statement;

(11)    the submission of the Consent to the Exchange Agent and Information Agent shall, subject to a holder's ability to withdraw its tender prior to the Withdrawal Date, and subject to the terms and conditions of the Exchange Offer and the Consent Solicitation, constitute the irrevocable appointment of the Exchange Agent and Information Agent as its attorney and agent and an irrevocable instruction to that attorney and agent to complete and execute all or any forms of transfer and other documents at the discretion of that attorney and agent in relation to the Old Notes tendered thereby in favor of us and to deliver those forms of transfer and other documents in the attorney's and agent's discretion and the certificates and other documents of title relating to the registration of Old Notes and to execute all other documents and to do all other acts and things as may be in the opinion of that attorney or agent necessary or expedient for the purpose of, or in connection with, the acceptance of the Exchange Offer and the Consent Solicitation, and to vest in us those Old Notes;

(12)    if the Old Notes are assets of (i) an "employee benefit plan" as defined in the U.S. Employee Retirement Income Security Act of 1974, as amended, ("ERISA") that is subject to Title I of ERISA; (ii) a "plan" as defined in Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "Code"); (iii) a "governmental plan" as defined in Section 3(32) of ERISA or any other plan that is subject to a law substantially similar to Title I of ERISA or Section 4975 of the Code; or (iv) an entity deemed to hold plan assets of any of the foregoing, the exchange of the Old Notes and the acquisition, holding and disposition of the New Notes will not result in a non-exempt prohibited transaction under ERISA, Section 4975 of the Code or any substantially similar applicable law;

(13)    the terms and conditions of the Exchange Offer and the Consent Solicitation shall be deemed to be incorporated in, and form a part of, the Consent, which shall be read and construed accordingly;

(14)    it is not located or resident in the United Kingdom or, if it is located or resident in the United Kingdom, it is:

(a)    a person (i) falling within the definition of investment professionals (as defined in Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (the "Financial Promotion Order")), (ii) falling within Article 43 of the Financial Promotion Order (non-real time communication by or on behalf of a body corporate to creditors of that body corporate), or (iii) to whom this Statement and any other documents or materials relating to the Exchange Offer may otherwise lawfully be communicated in accordance with the Financial Promotion Order; and

(b)    a qualified investor as defined in the Prospectus Regulation as it forms part of domestic law by virtue of the European Union (Withdrawal) Act 2018 ("EUWA"), and not a retail investor (as defined below under "Transfer Restrictions" in relation to the United Kingdom).

(15)    it is not an investor resident in a Member State of the EEA, or, if it is resident in a Member State of the EEA, it is a qualified investor (within the meaning of the Prospectus Regulation) and not a retail investor (as defined in the "PRIIPs Regulation");

(16)    it is not an investor resident in Colombia, or, if it is located in Colombia:

(a)    it is a qualified investor (*Inversionista Profesional*) within the meaning of Articles 7.2.1.1.2 and 7.2.1.1.3 of Decree 2555 of 2010 of Colombian securities laws ("Decree 2555");

(b)    it is not a retail investor (*Cliente Inversionista*) in Colombia. For these purposes, a retail investor (*Cliente Inversionista*) means a person who is one (or more) of: (i) a retail client (*Cliente Inversionista*) as defined in Article 7.2.1.1.4 of the Decree 2555; or (ii) a customer (*Cliente*) within the meaning of Article 7.2.1.1.1 of Decree 2555; or (iii) not a

qualified investor (*Inversionista Profesional*) as defined in Articles 7.2.1.1.2 and 7.2.1.1.3 of Decree 2555; and

(c) it acknowledges that no key information required by Decree 2555 or its complementary rules for offering or selling the New Notes or otherwise making them available to retail investors (*Clientes Inversionistas*) in Colombia has been prepared, and therefore, offering or selling the New Notes or otherwise making them available to any retail investor (*Cliente Inversionista*) in Colombia may be unlawful under Decree 2555;

(17) it and the person receiving New Notes have observed the laws of all relevant jurisdictions, obtained all requisite governmental, exchange control or other required consents, complied with all requisite formalities and paid any issue, transfer or other taxes or requisite payments due from any of them in each respect in connection with any offer or acceptance in any jurisdiction, and that it and such person or persons have not taken or omitted to take any action in breach of the terms of the Exchange Offer and Consent Solicitation or which will or may result in the Company or any other person acting in breach of the legal or regulatory requirements of any such jurisdiction in connection with the Exchange Offer and Consent Solicitation, the tender of Old Notes or delivery of Consents in connection therewith;

(18) it is otherwise a person to whom it is lawful to make available this Statement or to make the Exchange Offer and Consent Solicitation in accordance with applicable laws (including the transfer restrictions set out in this Statement);

(19) it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of acquiring the New Notes and that it and any accounts for which it is acting are each able to bear the economic risks of its or their investment;

(20) it is not acquiring the New Notes with a view toward any distribution thereof in a transaction that would violate the Securities Act or the securities laws of any state of the United States or any other applicable jurisdiction; provided that the disposition of its property and the property of any accounts for which it is acting as fiduciary will remain at all times within its control;

(21) it acknowledges that the Company, the Dealer Manager and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and agreements and agrees that if any of the acknowledgements, representations and warranties made by its submission of a tender in accordance with the procedures set forth herein, are, at any time prior to the consummation of the Exchange Offer and Consent Solicitation, no longer accurate, it shall promptly notify the Company and the Dealer Manager. If it is tendering the Old Notes and/or delivering Consents as a fiduciary or agent for one or more investor accounts, it represents that it has sole investment discretion with respect to each such account and it has full power to make the foregoing acknowledgements, representations and agreements on behalf of such account; and

(22) neither it nor the person receiving New Notes is acting on behalf of any person who could not truthfully make the foregoing representations, warranties and undertakings.

Each holder of Old Notes that submits a consent, or agrees to the terms of a consent pursuant to an agent's message, will also be deemed to represent, warrant and agree to the terms described under "Transfer Restrictions."

The representations, warranties and agreements of a holder tendering Old Notes will be deemed to be repeated and reconfirmed on and as of the Expiration Date and the Settlement Date. For purposes of this Statement, the "beneficial owner" of any Old Notes means any holder that exercises investment discretion with respect to those Old Notes.

**Absence of Dissenters' Rights**

Holders of the Old Notes do not have any appraisal or dissenters' rights in connection with the Exchange Offer and the Consent Solicitation.

**Acceptance of Old Notes for Exchange and Delivery of New Notes**

On the Settlement Date, New Notes to be issued in partial or full exchange for Old Notes in the Exchange Offer and the Consent Solicitation, if consummated, will be delivered in book-entry form, and transmitted to tendering holders by DTC.

We will be deemed to accept validly tendered Old Notes that have not been validly withdrawn as provided in this Statement when, and if, we give oral or written notice of acceptance to the Exchange Agent and Information Agent. Subject to the terms and conditions of the Exchange Offer and the Consent Solicitation, delivery of the New Notes will be made at the direction of the Exchange Agent and Information Agent on the Settlement Date upon receipt of that notice. If any tendered Old Notes are not accepted for any reason described in the terms and conditions of the Exchange Offer and the Consent Solicitation, such unaccepted Old Notes will be returned without expense to the tendering holders as promptly as practicable after the expiration or termination of the Exchange Offer and the Consent Solicitation.

**Procedures for Tendering**

**In order to meet the deadlines set forth in this Statement, custodians and clearing systems may require you to act on a date prior to the Expiration Date. Additionally, they may require further information in order to process all requests to tender. Holders are urged to contact their custodians and clearing systems as soon as possible to ensure compliance with their procedures and deadlines.**

If you wish to participate in the Exchange Offer and the Consent Solicitation and your Old Notes are held by a custodial entity such as a bank, broker, dealer, trust company or other nominee, you must instruct that custodial entity to tender your Old Notes on your behalf pursuant to the procedures of that custodial entity.

To participate in the Exchange Offer and the Consent Solicitation, you must either:

- comply with the ATOP procedures for book-entry transfer described below on or before the Expiration Date; or

- if you are a beneficial owner that holds Old Notes through Euroclear or Clearstream and wish to tender your Old Notes, you must contact your Euroclear or Clearstream accountholder to ascertain the procedure for tendering Old Notes and comply with such procedure, and Euroclear or Clearstream must then arrange to tender such Old Notes through ATOP;

The procedures by which you may tender or cause to be tendered Old Notes will depend upon the manner in which the Old Notes are held, as described below.

The Exchange Agent anticipates that the Exchange Offer and the Consent Solicitation will be eligible for ATOP with respect to book-entry Old Notes held through DTC. An agent's message in lieu of a Consent, and any other required documents, must be transmitted to and received by the Exchange Agent on or before the Expiration Date. Old Notes will not be deemed to have been tendered until the agent's message, is received by the Exchange Agent.

If you are a beneficial owner which holds Old Notes through Euroclear or Clearstream and wish to tender your Old Notes, you must instruct Euroclear or Clearstream, as the case may be, to block the account in respect of the tendered Old Notes in accordance with the procedures established by Euroclear or Clearstream. You are encouraged to contact your Euroclear or Clearstream accountholder directly to ascertain the procedures for tendering Old Notes.

No guaranteed delivery procedures are provided in order to tender your Old Notes in the Exchange Offer and the Consent Solicitation. To validly tender your Old Notes, an agent's message must be received by the Exchange Agent on or before the Expiration Date.

**Book-Entry Delivery Procedures for Tendering Old Notes Held with DTC**

If you wish to tender Old Notes held on your behalf by a nominee with DTC, you must:

- inform your nominee of your interest in tendering your Old Notes pursuant to the Exchange Offer and the Consent Solicitation; and

- instruct your nominee to tender all Old Notes you wish to be tendered in the Exchange Offer and the Consent Solicitation into the Exchange Agent's account at DTC prior to the Expiration Date.

Any financial institution that is a *participant* in DTC must tender Old Notes that are held through DTC by effecting a book-entry transfer of Old Notes to be tendered in the Exchange Offer and the Consent Solicitation into the account of the Exchange Agent at DTC by electronically transmitting its acceptance of the Exchange Offer and the Consent Solicitation through the ATOP procedures for transfer. DTC will then verify the acceptance, execute a book-entry delivery to the exchange agent's account at DTC and send an agent's message to the Exchange Agent. An "agent's message" is a message, transmitted by DTC to, and received by, the Exchange Agent and forming part of a book-entry confirmation, which states that DTC has received an express acknowledgement from an organization that participates in DTC, which we refer to as a "participant," tendering Old Notes that the participant has received and agrees to be bound by the terms of the Consent and that we may enforce the agreement against the participant. Consents will automatically be delivered with any submission through ATOP.

All questions as to the validity, form, eligibility, including time of receipt, and acceptance and withdrawal of tendered Old Notes will be determined by us in our absolute discretion, which determination will be final and binding. We reserve the absolute right to reject any and all tendered Old Notes determined by us not to be in proper form or not to be tendered properly or any tendered Old Notes our acceptance of which would, in the opinion of our counsel, be unlawful. We also reserve the right to waive, in our absolute discretion, any defects, irregularities or conditions of tender as to particular Old Notes, whether or not waived in the case of other Old Notes. Our interpretation of the terms and conditions of the Exchange Offer and the Consent Solicitation, including the terms and instructions in the consent, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with tenders of Old Notes must be cured within the time we determine. Although we intend to notify holders of defects or irregularities with respect to tenders of Old Notes, none of us, the Exchange Agent, the Dealer Manager or any other person will be under any duty to give that notification or shall incur any liability for failure to give that notification. Tenders of Old Notes will not be deemed to have been made until any defects or irregularities therein have been cured or waived.

Any holder whose Old Notes have been mutilated, lost, stolen or destroyed will be responsible for obtaining replacement securities or for arranging for indemnification with the trustee for the Old Notes. Holders may contact the Exchange Agent for assistance with these matters.

**Withdrawal of Tenders and Revocation of Consents**

Tenders of Old Notes may be validly withdrawn at any time prior to 5:00 p.m. (New York City time) on the Withdrawal Date, but thereafter are irrevocable, except in certain limited circumstances where additional withdrawal rights are required by law (as determined by us).

To be effective, the withdrawal of a tender and revocation of the related Consent or a properly transmitted "Request Message" through DTC's ATOP system for a withdrawal of a tender (and the related revocation of the Consent) must be received by the Exchange Agent and Information Agent prior to the applicable Withdrawal Deadline.

A withdrawal of Existing Notes and the revocation of Consents can only be accomplished in accordance with the foregoing procedures.

If the Old Notes to be withdrawn are held through the clearing systems, you must contact your custodian to arrange for the withdrawal of previously tendered Old Notes. No such withdrawal will be effective unless the Request Message described above is received through DTC's ATOP system. The clearing systems may impose additional deadlines in order to process these withdrawal instructions to ATOP.

Withdrawal of tenders of Old Notes may not be rescinded, and any Old Notes validly withdrawn will thereafter be deemed not to have been validly tendered for purposes of the Exchange Offer and the Consent Solicitation. Tendering holders may not withdraw their validly tendered Old Notes without revoking their Consents and may not revoke their Consents without withdrawing any validly tendered Old Notes. Validly withdrawn Old Notes may, however, be tendered again by following one of the procedures described under "—Procedures for Tendering" on or before the Expiration Date.

**Information Related to the Agents**

*Exchange Agent and Information Agent*

Epiq Corporate Restructuring, LLC has been appointed as the Exchange Agent and Information Agent for the Exchange Offer and the Consent Solicitation. Questions concerning tender procedures and requests for additional copies of this Statement should be directed to the Exchange Agent and Information Agent at the address and telephone numbers listed on the back cover page of this Statement. Holders of Old Notes should contact their commercial bank, broker, dealer, trust company or other nominee for assistance in tendering its Old Notes in the Exchange Offer and the Consent Solicitation. We will pay the Exchange Agent and Information Agent reasonable and customary fees for its services and will reimburse it for its reasonable out-of-pocket expenses in connection with the Exchange Offer and the Consent Solicitation.

*Dealer Manager*

We have retained BCP Securities, Inc. to act as exclusive Dealer Manager for the Exchange Offer and for the Consent Solicitation. We will pay a fee to the Dealer Manager for soliciting acceptances of the Exchange Offer and the Consent Solicitation. We will also reimburse the Dealer Manager for certain of its reasonable out-of-pocket expenses. The obligations of the Dealer Manager to perform its functions are subject to various conditions. We have agreed to indemnify the Dealer Manager against various liabilities, including various liabilities under the federal securities laws. Questions regarding the terms of the Exchange Offer may be directed to the Dealer Manager at the address and telephone numbers listed on the back cover page of this Statement.

The Dealer Manager and its affiliates may in the future provide investment banking and other commercial services in the ordinary course of business to us and our affiliates, for which they will receive, customary fees and commissions.

At any given time and in compliance with applicable laws and regulations, the Dealer Manager or its affiliates may trade the Old Notes, the New Notes or our other securities for their respective accounts or for the accounts of their respective customers and, accordingly, may hold a long or short position in the Old Notes or the New Notes.

**Announcements**

We may make any announcement required pursuant to the terms of this Statement or required or permitted by the U.S. Securities Exchange Act of 1934, as amended, (the "Exchange Act") or the rules promulgated thereunder through a reasonable press release or other public announcement in our sole discretion.

**Other Fees and Expenses**

We will pay brokerage houses and other custodians, nominees and fiduciaries the reasonable out-of-pocket expenses incurred by them in forwarding copies of this Statement and related documents to the beneficial owners of Old Notes, and in

handling or tendering for their customers. We will not make any payment to brokers, dealers or others soliciting acceptances of the Exchange Offer and the Consent Solicitation other than the Dealer Manager, as described above.

Tendering holders of Old Notes will not be required to pay any fee or commission to the Dealer Manager. If, however, a tendering holder handles the transaction through its broker, dealer, commercial bank, trust company or other institution, that holder may be required to pay brokerage fees or commissions.

## THE PROPOSED AMENDMENTS

The Old Notes were issued pursuant to the indenture, dated as of February 7, 2020, among the Company and The Bank of New York Mellon, as trustee (the "Old Notes Indenture").

The following summarizes the Proposed Amendments to the Old Notes Indenture for which consents are being sought pursuant to the Consent Solicitation. The summary set forth below of the provisions of the Old Notes Indenture that are affected by the Proposed Amendments is qualified in its entirety by reference to the full and complete terms in the Old Notes Indenture, copies of which are available upon request without charge from the Exchange Agent and Information Agent. The Proposed Amendments, if adopted by the holders, would, among other things, eliminate substantially all of the restrictive covenants and certain events of default and related provisions contained in the Old Notes Indenture.

Pursuant to the terms of the Old Notes Indenture, the Proposed Amendments set forth below require the Requisite Consents. The Proposed Amendments constitute a single proposal, and a tendering and consenting Eligible Holder must consent to the Proposed Amendments as an entirety and may not consent selectively with respect to certain of the Proposed Amendments. If the Proposed Amendments become effective, the holders of any Old Notes that are not tendered and accepted for purchase pursuant to the Exchange Offer will be bound by the Proposed Amendments.

The valid tender of Old Notes by an Eligible Holder pursuant to the Exchange Offer and Consent Solicitation will be deemed to constitute a consent by such Eligible Holder to the Proposed Amendments. We are not soliciting and will not accept consents from Eligible Holders who are not tendering their Old Notes pursuant to the Exchange Offer and Consent Solicitation.

*Amendments to Restrictive Covenants in the Old Notes Indenture.* The Proposed Amendments would, in substance, eliminate the following sections and subsections from the Old Notes Indenture:

- Section 3.04 — Payment of Taxes.

- Section 3.05 — Further Instruments and Acts.

- Section 3.06 —Waiver of Stay, Extension or Usury Laws.

- Section 3.07— Change of Control Triggering Event.

- Section 3.08 — Limitation on Incurrence of Additional Indebtedness.

- Section 3.09 — Limitation on Guarantees.

- Section 3.10 — Limitation on Restricted Payments.

- Section 3.11—Limitation on Asset Sales and Sales of Subsidiary Stock.

- Section 3.12 — Limitation on Securitization and Loan Receivables Backed Financing.

- Section 3.13 — Limitation on Designation of Unrestricted Subsidiaries.

- Section 3.14 — Limitation on Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries.

- Section 3.15 — Limitation on Layered Indebtedness.

- Section 3.16 — Limitation on Liens.

- Section 3.17 — Limitation on Transactions with Affiliates.

- Section 3.18 — Conduct of Business.

- Section 3.19 — Report to Holders.

- Section 3.20 — Listing.

- Section 3.22 — Guarantees.

- Section 3.23 — Suspension of Covenants.

- Section 4.01 — Merger, Consolidation and Sale of Assets.

*Amendments to Events of Default in the Old Notes Indenture.* The Proposed Amendments also would eliminate the following Events of Default by deleting each clause referenced below in its entirety:

- Section 6.01(a)(iii) — Failure to perform or comply with any of the provisions described under Section 4.01

- Section 6.01(a)(v) — Failure to pay any indebtedness, or acceleration of any indebtedness in excess of US$10.0 million

- Section 6.01(a)(vi) — Judgments in excess of US$10.0 million that are not paid or discharged within 60 days of being entered

*Amendments to Redemption Provisions in the Old Notes Indenture.* The Proposed Amendments also would:

- Amend Section 5.03(a) of the Old Notes Indenture so that the Company shall give or cause the trustee to give notice of redemption to the holders at least six business days prior to the redemption date.

- Amend Section 5.03(b) of the Old Notes Indenture so that the Company shall deliver the notice of redemption to the trustee at least nine business days prior to the redemption date.

*Amendments to Legal Defeasance and Covenant Defeasance in the Old Notes Indenture.* The Proposed Amendments would eliminate the following provisions of Section 8.02 contained in the Old Notes Indenture governing legal defeasance and covenant defeasance by deleting each provision referenced below in its entirety:

| Section Reference | Provision |
|---|---|
| **8.02(b)** | The Company must deliver an opinion of counsel to the trustee to the effect that holders will not recognize income, gain or loss for U.S. federal income tax purposes as a result of legal defeasance and will be subject to U.S. federal income tax in the same manner had such legal defeasance not occurred. |
| **8.02(c)** | The Company must deliver an opinion of counsel to the trustee to the effect that holders will not recognize income, gain or loss for U.S. federal income tax purposes as a result of covenant defeasance and will be subject to U.S. federal income tax in the same manner had such covenant defeasance not occurred. |
| **8.02(d)** | No default or event of default shall have occurred and be continuing on the date of the deposit required in connection with such defeasance. |
| **8.02(e)** | The Company must deliver an officers' certificate that such defeasance will not result in a breach or violation or constitute a default under the Indenture or any material agreement or instrument of the Company or any of its subsidiaries. |
| **8.02(f)** | The Company must deliver an officers' certificate stating that such deposit was not made with the intent of preferring holders of the old notes to other creditors or with the intent of defeating, hindering, delaying or defrauding any creditors of the Company. |
| **8.02(g)** | The Company must deliver an officers' certificate and opinion of counsel stating that all conditions precedent relating to such defeasance have been complied with. |
| **8.02(h)** | The Company must deliver an opinion of counsel to the effect that the trust funds will not be subject to the effect of any bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights, generally. |

The Proposed Amendments to the Old Notes Indenture would eliminate any references in the Old Notes Indenture and the Old Notes to the deleted sections or subsections and any defined terms in the Old Notes Indenture that are used solely in those deleted sections or subsections. We expect to execute with the trustee an Old Notes Supplemental Indenture to the Old Notes Indenture, providing for the Proposed Amendments, promptly after receipt of the Requisite Consents. The Old Notes Supplemental Indenture will be effective immediately upon execution thereof, but the provisions thereof will not be operative until the Settlement Date.

The foregoing is qualified in its entirety by reference to the Old Notes Indenture and the form of Old Notes Supplemental Indenture, copies of which are available upon request without charge from the Exchange Agent and Information Agent.

In addition to the foregoing, execution and delivery of the Consent will constitute an express waiver by a consenting holder of the Old Notes with respect to all claims against us of any breach, default or event of default that may have arisen under the Old Notes Indenture.

In order to be adopted, the Proposed Amendments must be consented to by the holders of at least a majority of the outstanding aggregate principal amount of the Old Notes (not including any Old Notes which are owned by us or our affiliates) (the "Requisite Consents"). The supplemental indenture reflecting the Proposed Amendments (the "Old Notes Supplemental Indenture") may be executed promptly following the date on which the Requisite Consents to the Proposed Amendments are received, which may be prior to the Expiration Date. The Old Notes Supplemental Indenture will become effective immediately upon its execution and delivery by the parties thereto; however, the Proposed Amendments contained therein will not become operative until the acceptance for exchange of Old Notes upon the terms and subject to the conditions set forth in this Statement.

The Proposed Amendments constitute a single proposal for the Consent Solicitation, and a consenting holder must consent to the Proposed Amendments applicable to all Old Notes tendered by that holder as an entirety and may not consent selectively with respect to certain of the Proposed Amendments. If the Proposed Amendments become operative, all holders who do not validly tender and not withdraw their Old Notes in the Exchange Offer and the Consent Solicitation will be bound by the Proposed Amendments even though they did not consent to the Proposed Amendments. Any Eligible Holder who exchanges Old Notes for New Notes pursuant to the Exchange Offer and the Consent Solicitation must also deliver its consent to the Proposed Amendments with respect to the Old Notes tendered. Eligible Holders may not deliver consents in the Consent Solicitation without exchanging their Old Notes for the New Notes in the Exchange Offer and the Consent Solicitation.

# DESCRIPTION OF THE NEW NOTES

We will issue the notes under an indenture (the "Indenture"), to be dated the Issue Date, between us and The Bank of New York Mellon, as trustee (the "Trustee"), registrar (the "Registrar"), paying agent (the "Paying Agent") and transfer agent. We summarize below certain provisions of the Indenture, but do not restate the Indenture in its entirety. We urge you to read the Indenture because it, and not this description, defines your rights. You can obtain a copy of the Indenture in the manner described under "Available Information."

You can find the definition of capitalized terms used in this section under "—Certain Definitions." When we refer to:

- the "Company" in this section, we mean Credivalores - Crediservicios S.A., and not any of its subsidiaries; and

- the "notes" in this section, we mean the notes originally issued on the Issue Date and Additional Notes, if any.

If the notes are issued in the Exchange Offer, they will be issued in a private transaction that is not subject to the registration requirements of the Securities Act and will be subject to certain restrictions on transfer. If the notes are issued under the Plan instead of the Exchange Offer, they will be issued pursuant to section 1145(a) of the Bankruptcy Code, and therefore will not be deemed restricted securities. Accordingly, upon issuance, such notes issued under the Plan will be freely tradable by any holder not deemed an underwriter in the public market without restriction or further registration under the Securities Act, subject to applicable law. See "Transfer Restrictions."

## General

The notes will:

- rank equal in right of payment with any existing and future Secured Indebtedness of the Company to the extent that the New Notes are secured by the first-priority Collateral (subject to certain obligations for which preferential treatment is given under Colombian insolvency laws) and will be effectively subordinated to all existing and future Indebtedness and other liabilities of any Special Purpose Finance Trust (as defined under "Description of the Notes") the extent of the value of the assets securing such Indebtedness;

- rank senior in right of payment to all existing and future Subordinated Indebtedness of the Company, if any; and

- be structurally subordinated to all existing and future Indebtedness and trade payables of the Company's Subsidiaries, if any, that are not Guarantors.

As of September 30, 2023, we had total Indebtedness excluding transaction costs of Ps.1,700,111 million (US$419 million), of which Ps.516,564 million (US$127 million) was secured by collateral. After giving effect to the Exchange Offer," as of September 30, 2023 we would have had total Indebtedness excluding transaction costs of Ps.1,518,286 million (US$375 million), of which Ps.1,185,904 million (US$293 million) would have been secured by collateral.

## Additional Notes

Subject to the limitations set forth under "—Certain Covenants—Limitation on Incurrence of Additional Indebtedness," the Company and its Subsidiaries may incur additional Indebtedness. At the Company's option, this additional Indebtedness may consist of additional notes ("Additional Notes") issued by the Company in one or more transactions, which have identical terms (other than issue date and issue price) as the notes issued on the Issue Date; *provided* that such Additional Notes will either be (i) fungible with the original notes for U.S. federal income tax purposes or (ii) issued under a separate CUSIP number. Holders of Additional Notes will have the right to vote together with holders of notes issued on the Issue Date as one class.

## Principal, Maturity and Interest

For every US$ 1,000 of its Old Notes, the Company will issue US$750 in aggregate principal amount of notes, plus Capitalized Interest (such accrued and unpaid interest subject to the same 25% reduction as the principal amount of the Old Notes), for a maximum of up to US$165.12 million. The notes and any additional notes subsequently issued under the

Indenture will be treated as a single class for all purposes under the Indenture, including, without limitation, waivers, amendments, redemptions and offers to purchase the notes. (See "—Additional Notes".)

The Company will issue notes in denominations of US$1,000 and integral multiples of US$1.00 in excess thereof. The notes will mature on February 7, 2029, at which time the principal amount of the notes outstanding on such date will become due and payable. The redemption price of the notes outstanding on such date will be 100.0%, plus accrued and unpaid interest; however, the Company may redeem the notes, at its option, in whole or in part prior to such date. See "—Optional Redemption" below. The notes will not be entitled to the benefit of any mandatory sinking fund.

Interest on the New Notes will accrue from and including February 7, 2024. If the notes are issued through the Exchange Offer or the Plan, interest on the notes will accrue from February 7, 2024 at the rate of 4.00% per annum, with a step-up to 5.00% per annum beginning with the interest payment due on February 7, 2025 and a step-up to 11.00% per annum beginning with the interest payment due on August 7, 2026, and will be payable semi-annually in arrears on each February 7 and August 7, commencing on August 7, 2024. Payments will be made to the persons who are registered holders at the close of business on January 23 and July 23, respectively, immediately preceding the applicable interest payment date. The final payment on any registered note, however, will be made only upon presentation and surrender of such note at the office of any Paying Agent.

Interest on the notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from and including February 7, 2024. Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months. The redemption of notes with unpaid and accrued interest to the date of redemption will not affect the right of holders of record on a record date to receive interest due on an interest payment date.

Initially, the Trustee will act as Paying Agent and Registrar for the notes. The Company may change the Paying Agent and Registrar without notice to holders. Payments on the notes will be made at the office or agency of the Paying Agent and Registrar in New York City.

Subject to any applicable abandoned property law, the Trustee and the Paying Agent shall pay to the Company upon written request any money held by them for the payment of principal of or interest on the notes that remains unclaimed for two years, and, thereafter, holders entitled to any such money must look to the Company for payment as general creditors.

## Security

### *General*

The New Notes will be secured by (i) a first-priority Lien (subject to Collateral Permitted Liens) on the Company's loan portfolio (excluding Special Purpose Finance Trusts) and (ii) a second-priority Lien (subject to Collateral Permitted Liens) on a Special Purpose Finance Trust (patrimonio autónomo) (collectively, the "Collateral"), in each case pursuant to a pledge agreement or a security trust agreement (*contrato de fiducia en garantía*) (collectively, the "Collateral Documents") to be entered into from time to time by the Company and any Guarantors (collectively, the "Grantors"), a trust company in Colombia, a collateral agent in Colombia, and other collateral agents that may be appointed from time to time under the Indenture (collectively, the "Collateral Agent"), for the benefit of the Holders of the New Notes.

Initially, the Collateral will consist of at least US$165 million of first-priority Liens and second priority Liens.

The indenture and security documents will permit the release of the Collateral only in certain limited circumstances. To the extent the value of the loan portfolio secured by the first-priority lien and second-priority lien falls below the aggregate outstanding principal amount of the New Notes (due to repayments of the loans or other fluctuations in the value of the loan portfolio other than due to exchange rate fluctuations), the Company will be required to include additional Collateral (in the form of cash or assets in the loan portfolio having comparable creditworthiness to the average creditworthiness of the existing Collateral) in an amount such that the total Collateral is at least equal to the value of the aggregate outstanding principal amount of the New Notes. The value of the collateral will be tested on a semi-annual basis on each interest payment date using an exchange rate of Ps. 4,000 to US$1.00, and such amount will be certified on an Officers' Certificate delivered to the Trustee and the Collateral Agent within 30 days.

Within 90 days of the Issue Date, Liens will be created and perfected on the Collateral. If the Company does not

create the required Liens by the applicable date there would be a potential Event of Default. See clause (9) under "—Events of Default."

The Liens created will be governed by Colombian law and remedies including foreclosure will be subject to Colombian law. In order to be perfected and enforceable against third parties, Liens on the Collateral will require registration in the national centralized registry for security over movable assets (*Registro de Garantías Mobiliarias*) created by Law 1676 of 2013.

There are certain risks related to the Collateral and the ability of the Collateral Agent to foreclose on the Collateral. See "Risk Factors—Risks Related to the Collateral."

### Use of the Collateral

Subject to the terms and conditions of the Indenture and the Collateral Documents, the Company may retain possession and use and have the right to partially exploit the Collateral (to the extent necessary to service the respective loan portfolio or to comply with any other obligation under such Collateral Documents), including proceeds in respect thereof, in the ordinary course of its business, in each case unless and until the Collateral Agent, upon the occurrence and during the continuance of an Event of Default, instructs otherwise or takes other enforcement action in accordance with the terms of the Collateral Documents. See "Enforcement and Disposition of Collateral" below. In addition, the Collateral Documents will provide that, upon the occurrence and during the continuance of an Event of Default, all rights of each Grantor to receive cash proceeds from the Collateral will automatically cease and the Collateral Agent shall thereupon be authorized and empowered to collect and receive all cash proceeds of the Collateral.

Upon the full and final payment and performance by the Company of the Obligations under the New Notes, the Indenture and the Collateral Documents will terminate and the Liens on all of the Collateral will be released.

### Enforcement and Disposition of Collateral

For so long as an Event of Default has occurred and is continuing, and subject to certain limitations, the Collateral Agent may be directed in writing by the holders of the New Notes, directly or through the trustee for the New Notes, to take (or to refrain from taking) such action or exercise such power only upon the written instruction of the holders of at least 25% in aggregate principal amount of the New Notes then outstanding and if such holders have offered to the Collateral Agent indemnity or security satisfactory to it against any loss, liability or expense, and provided always that if the Collateral Agent receives conflicting instructions, those supported by holders representing a greater aggregate principal amount will prevail.

The cash proceeds of sales of, or collections on, any Collateral received upon the exercise of remedies, including pursuant to a bankruptcy proceeding (to the extent permitted by Insolvency Law), will be applied pursuant to the Collateral Documents in the following order of priority:

- *first*, to the payment of all unpaid fees, expenses, reimbursements, indemnifications and advancements of the Collateral Agent and its agents and counsel under the Collateral Documents, to the unpaid fees, expenses, reimbursements and indemnifications of the Collateral Agent, and to the payment of all unpaid fees, expenses, reimbursements, indemnifications and advancements of the trustee and its agents and counsel, to the extent relating to their activities in connection with the Collateral Documents or the New Notes;

- *second*, to the payment of principal under the New Notes, excluding any premium, interest, penalty or other amounts in respect thereof, on a pro rata basis;

- *third*, to the payment of accrued and unpaid interest under the New Notes;

- *fourth*, to the payment of any other obligations under the New Notes; and

- *fifth*, to the Company and its Restricted Subsidiaries or to whomever else may lawfully be entitled to receive such proceeds or as a court of competent jurisdiction may direct.

No appraisal of any of the Collateral has been prepared by or on behalf of the Company in connection with the issuance and sale of the New Notes or otherwise. There can be no assurance that the proceeds from the sale of the Collateral in whole

or in part pursuant to the Collateral Documents would be sufficient to satisfy payments due in respect of the New Notes. By its nature, some or all of the Collateral will be illiquid and may have no readily ascertainable market value. The exercise of remedies may be restricted or limited with respect to some or all of the Collateral. In addition, certain of the Collateral may be subject to additional legal or other restrictions that may inhibit or significantly delay its disposition. Accordingly, there can be no assurance that the Collateral can be disposed of in a short period of time, or at all.

### Release of Liens in Respect of New Notes

The Collateral Agent's priority Liens upon the Collateral will no longer secure the New Notes outstanding under the Indenture or any other Obligations under the Indenture, and the right of the holders of the New Notes and such Obligations to the benefits and proceeds of the Collateral Agent's priority Liens on the Collateral will terminate and be discharged, in which case the Collateral Agent shall execute and allow the Company to file all required documents provided to it, at the Company's sole cost and expense, to effectuate the release of the Collateral Agent's Liens upon the Collateral, upon the receipt by the Collateral Agent from the Trustee of written notice as to any of the following:

(1)     satisfaction and discharge in accordance with the Indenture;

(2)     a Legal Defeasance or Covenant Defeasance of the New Notes in accordance with the Indenture;

(3)     payment in full and discharge of all New Notes outstanding under the Indenture and all Obligations that are outstanding, due and payable under the Indenture at the time the New Notes are paid in full and discharged (other than any obligations for taxes, costs, indemnifications, reimbursements, damages and other liabilities in respect of which no claim or demand for payment has been made at such time); or

(4)     such termination or discharge, in whole or in part, with the consent of the holders of the requisite percentage of New Notes in accordance with the Indenture.

### Guarantees

If after the date of the Indenture the Company or any of its future Restricted Subsidiaries acquires or creates a Restricted Subsidiary that is or becomes an Eligible Subsidiary, the Company must cause such Eligible Subsidiary to provide a guarantee of the notes (a "Note Guarantee").

Each Note Guarantee will be limited to the maximum amount that would not render the Guarantor's obligations subject to avoidance under applicable fraudulent conveyance provisions. By virtue of this limitation, a Guarantor's obligation under its Note Guarantee could be significantly less than amounts payable with respect to the notes, or a Guarantor may have effectively no obligation under its Note Guarantee.

The Note Guarantee of a Guarantor will terminate upon:

(1)     a sale or other disposition (including by way of consolidation or merger) of the Guarantor or the sale or disposition of all or substantially all the assets of the Guarantor (other than to the Company or a Restricted Subsidiary) otherwise permitted by the Indenture,

(2)     if the Note Guarantee was required pursuant to the terms of the Indenture, the cessation of the circumstances requiring the Note Guarantee,

(3)     the designation in accordance with the Indenture of the Guarantor as an Unrestricted Subsidiary, or

(4)     defeasance or discharge of the notes, as provided in "—Legal Defeasance and Covenant Defeasance" and "—Satisfaction and Discharge."

Not all of our Restricted Subsidiaries will guarantee the notes. Only Eligible Subsidiaries will guarantee the notes. In the event of a bankruptcy, liquidation or reorganization of non-guarantor Subsidiaries, these non-guarantor Subsidiaries will pay the holders of their debt and their trade creditors before they will be able to distribute any of their assets to us. In addition, holders of minority equity interests in Subsidiaries may receive distributions prior to or *pro rata* with the Company depending on the terms of the equity interests. See "Risk Factors—Risks Related to the New Notes and our Indebtedness—

Payments on the New Notes will be effectively junior to any of our secured indebtedness and structurally junior to debt obligations of our subsidiaries."

As of the Issue Date, the Company does not have any Subsidiaries.

**Additional Amounts**

The Company, and the Guarantors, if any, will pay to holders of the notes all present or future taxes, duties, assessments or other governmental charges, including interest or penalties ("Taxes"), imposed with respect to that payment by a Colombian taxing authority or any other jurisdiction in which the Company is organized or resident for tax purposes or through which the Company, or the Guarantors, if any make a payment on the notes or the Note Guarantees (a "Relevant Jurisdiction"), or any political subdivision or taxing authority thereof or therein ("Additional Amounts") that may be necessary so that every net payment of interest, any premium paid upon redemption of the notes or principal to holders of the notes will not be less than the amount provided for in the notes.

Our obligation to pay Additional Amounts is subject to several important exceptions, however. The Company, and the Guarantors, if any, will not pay Additional Amounts to any holder for or solely on account of any of the following:

- any Taxes imposed on, or withheld or deducted from, any payments made to the holder or beneficial owner of a note solely because at any time there is or was a connection between the holder or beneficial owner of the note and the Relevant Jurisdiction (or any political subdivision or taxing authority thereof or therein), including such holder or beneficial owner (i) being or having been a citizen or resident thereof for tax purposes, (ii) maintaining or having maintained an office, permanent establishment, or branch, in all cases subject to taxation therein, or (iii) being or having been present or engaged in a trade or business therein (other than the receipt of payments or the ownership or holding of a note);

- any estate, inheritance, gift, transfer, use, excise, personal property or similar Tax, assessment or other governmental charge imposed with respect to the notes;

- any Taxes imposed on, or withheld or deducted from, any payments made to the holder or beneficial owner of a note, solely because the holder or any other person having a beneficial interest in the notes fails to comply with any certification, information, documentation or other reporting requirement concerning the nationality, residence for tax purposes or identity of the holder or any beneficial owner of the note, if compliance is required by statute, rule, regulation, officially published administrative practice of the taxing jurisdiction or by an applicable income tax treaty which is in effect and to which Colombia or any other Relevant Jurisdiction is a party, as a precondition to exemption from, or reduction in the rate of, the tax or other governmental charge and we (or the relevant Guarantor, if applicable) have given the holders at least 60 days' notice that holders will be required to provide any such certification, information, documentation or reporting requirement;

- any Taxes payable otherwise than by deduction or withholding from payments on the notes;

- any Taxes with respect to such note presented for payment more than 30 days after the date on which the payment became due and payable or the date on which payment thereof is duly provided for and notice thereof given to holders, whichever occurs later, except to the extent that the holders of such note would have been entitled to such Additional Amounts on presenting such note for payment on any date during such 30 day period;

- any payment on the note to a holder that is a fiduciary or partnership or a person other than the sole beneficial owner of any such payment, to the extent that a beneficiary or settlor with respect to such fiduciary, a member of such partnership or the beneficial owner of the payment would not have been entitled to the Additional Amounts had the beneficiary, settlor, member or beneficial owner been the holder of the note;

- any Taxes imposed under Sections 1471 through 1474 of the U.S. Internal Revenue Code of 1986, as amended (the "Code"), as of the Issue Date and any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreement between a non-U.S. jurisdiction and the United States with respect to the foregoing or any law, regulation or practice adopted pursuant to any such intergovernmental agreement (collectively, "FATCA"), or any similar law enacted in any jurisdiction to implement an intergovernmental tax information sharing regime similar to FATCA; or

- any combination of the above.

The third bullet point above does not require, and should not be construed as requiring, that any person, including any non-Colombian pension fund, retirement fund or financial institution, of any nature, register with the Colombian authorities to establish eligibility for an exemption from, or a reduction of, Colombian withholding tax.

Upon written request, the Company and the Guarantors, if any, will provide the Trustee with documentation satisfactory to the Trustee evidencing the payment of Colombian taxes in respect of which we have paid any Additional Amount. We will make copies of such documentation available to the holders of the notes or the paying agent upon written request.

Any reference in this section, the Indenture, or the notes to principal, premium, interest or any other amount payable in respect of the notes by us will be deemed also to refer to any Additional Amount that may be payable with respect to that amount under the obligations referred to in this subsection.

In the event that Additional Amounts actually paid with respect to the notes pursuant to the preceding paragraphs are based on rates of deduction or withholding of withholding taxes in excess of the appropriate rate applicable to the holder of such notes, and as a result thereof such holder is entitled to make a claim for a refund or credit of such excess from the withholding agent imposing such withholding tax, then such holder shall, by accepting such notes, be deemed to have assigned and transferred all right, title and interest to any such claim for a refund or credit of such excess to us. However, by making such assignment, the holder makes no representation or warranty that we will be entitled to receive such claim for a refund or credit and incurs no other obligation with respect thereto, including taking any action for such refund to be repaid.

In the event of any merger or other transaction described and permitted under "—Certain Covenants—Limitation on Merger, Consolidation and Sale of Assets," then all references to Colombia, Colombian law or regulations, and Colombian taxing authorities under this section "—Additional Amounts" (other than the third paragraph above) and under "—Optional Redemption—Optional Redemption for Changes in Withholding Taxes" shall be deemed to also include the relevant Qualified Merger Jurisdiction, the law or regulations of the relevant Qualified Merger Jurisdiction, and any taxing authority of the relevant Qualified Merger Jurisdiction, respectively.

## Optional Redemption

At any time and from time to time, the Company may, at its option, redeem any of the notes, in whole or in part, on at least 30 days' but not more than 60 days' notice, at a redemption price equal to 100.0% of the principal amount of such notes, plus accrued and unpaid interest to, but excluding, the date of redemption, plus Additional Amounts, if any (subject to the right of holders on the relevant record date to receive interest due on the relevant interest payment date).

### *Optional Redemption Procedures*

In the event that less than all of the notes are to be redeemed at any time, selection of notes for redemption will be made by the Trustee on a pro rata basis, by lot or by any other method as may be required by DTC in accordance with its applicable procedures. No notes of a principal amount of US$1,000 or less may be redeemed in part and notes of a principal amount in excess of US$1,000 may be redeemed in multiples of US$1.00 only.

Notice of any redemption will be delivered at least 30 but not more than 60 days before the redemption date to each holder of notes to be redeemed at its registered address. If notes are to be redeemed in part only, the notice of redemption will state the portion of the principal amount thereof to be redeemed. We will give notice of any redemption to the Trustee no later than 15 days (unless a shorter period is acceptable to the Trustee) prior to the date such notice is given to the holders of the notes. A new note in a principal amount equal to the unredeemed portion thereof (if any) will be issued in the name of the holder thereof and delivered to such holder upon cancellation of the original note (or appropriate adjustments to the amount and beneficial interests in a Global Note will be made, as appropriate).

The Company will pay the redemption price for any note together with accrued and unpaid interest thereon to, but excluding, the date of redemption. On and after the redemption date, interest will cease to accrue on notes or portions thereof called for redemption as long as the Company has deposited with the Paying Agent funds in satisfaction of the applicable redemption price pursuant to the Indenture. Upon redemption of any notes by the Company, such redeemed notes will be cancelled.

Notwithstanding the foregoing provisions of this "—Optional Redemption" section, the Company and its Subsidiaries are not prohibited from acquiring the notes by means other than a redemption, whether pursuant to a tender offer, open market purchase or otherwise.

**Change of Control Triggering Event**

Upon the occurrence of a Change of Control (a "Change of Control Triggering Event"), each holder will have the right to require that the Company purchase all or a portion (in minimum principal amounts of US$1,000 and integral multiples of US$1.00 in excess thereof) of the holder's notes at a purchase price equal to 101% of the principal amount thereof, plus accrued and unpaid interest thereon and any Additional Amounts, if any, to, but excluding, the date of purchase (the "Change of Control Triggering Event Payment").

Within 30 days following the date upon which the Change of Control Triggering Event occurred, the Company must deliver a notice to each holder, with a copy to the Trustee, offering to purchase the notes as described above (a "Change of Control Triggering Event Offer"). The Change of Control Triggering Event Offer shall state, among other things, the purchase date, which must be no earlier than 30 days nor later than 60 days from the date the notice is delivered, other than as may be required by law (the "Change of Control Triggering Event Payment Date").

On the Change of Control Triggering Event Payment Date, the Company will, to the extent lawful:

(1)  accept for payment all notes or portions thereof properly tendered and not withdrawn pursuant to the Change of Control Triggering Event Offer;

(2)  deposit with the Paying Agent funds in an amount equal to the Change of Control Triggering Event Payment in respect of all notes or portions thereof so tendered; and

(3)  deliver or cause to be delivered to the Trustee the notes so accepted together with an Officers' Certificate stating the aggregate principal amount of notes or portions thereof being purchased by the Company.

If only a portion of a note is purchased pursuant to a Change of Control Triggering Event Offer, a new note in a principal amount equal to the portion thereof not purchased will be issued in the name of the holder thereof upon cancellation of the original note (or appropriate adjustments to the amount and beneficial interests in a Global Note will be made, as appropriate).

The Company will not be required to make a Change of Control Triggering Event Offer upon a Change of Control Triggering Event if (l) a third party makes the Change of Control Triggering Event Offer in the manner, at the times and otherwise in compliance with the requirements set forth in the Indenture applicable to a Change of Control Triggering Event Offer made by the Company and purchases all notes properly tendered and not withdrawn under the Change of Control Triggering Event Offer, or (2) notice of redemption has been given pursuant to the Indenture as described above under the caption "—Optional Redemption," unless and until there is a default in payment of the applicable redemption price.

A Change of Control Triggering Event Offer may be made in advance of a Change of Control Triggering Event, and conditioned upon the occurrence of such Change of Control Triggering Event, if a definitive agreement is in place for the Change of Control at the time of making the Change of Control Triggering Event Offer. Notes repurchased by the Company pursuant to a Change of Control Triggering Event Offer will have the status of notes issued but not outstanding or will be retired and canceled, at the option of the Company. Notes purchased by a third party pursuant to the preceding paragraph will have the status of notes issued and outstanding.

In the event that holders of not less than 95% of the aggregate principal amount of the outstanding notes accept a Change of Control Triggering Event Offer and the Company or a third party purchases all of the notes held by such holders, the Company will have the right, on not less than 30 nor more than 60 days' prior notice, given not more than 30 days following the purchase pursuant to the Change of Control Triggering Event Offer described above, to redeem all of the notes that remain outstanding following such purchase at a purchase price equal to the Change of Control Triggering Event Payment plus, to the extent not included in the Change of Control Triggering Event Payment, accrued and unpaid interest, if any, on the notes that remain outstanding, to, but excluding, the date of redemption (subject to the right of holders on the relevant record date to receive interest due on the relevant interest payment date).

Other existing and future Indebtedness of the Company may contain prohibitions on the occurrence of events that would constitute a Change of Control or require that Indebtedness to be repurchased upon a Change of Control. Moreover, the exercise by the holders of their right to require the Company to repurchase the notes upon a Change of Control Triggering Event would cause a default under such Indebtedness even if the Change of Control itself does not.

If a Change of Control Triggering Event Offer occurs, there can be no assurance that the Company will have available funds sufficient to make the Change of Control Triggering Event Payment for all the notes that might be delivered by holders seeking to accept the Change of Control Triggering Event Offer. In the event the Company is required to purchase outstanding notes pursuant to a Change of Control Triggering Event Offer, the Company expects that it would seek third-party financing to the extent it does not have available funds to meet its purchase obligations and any other obligations in respect of Senior Indebtedness. However, there can be no assurance that the Company would be able to obtain necessary financing.

The Company will comply with the requirements of Rule 14e-1 under the Exchange Act and any other applicable securities laws and regulations in connection with the purchase of notes in connection with a Change of Control Triggering Event Offer. To the extent that the provisions of any securities laws or regulations conflict with the "Change of Control Triggering Event" provisions of the Indenture, the Company will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under the Indenture by doing so.

The definition of Change of Control includes a phrase relating to the direct or indirect sale, lease, transfer, conveyance or other disposition of "all or substantially all" of the properties or assets of the Company and its Subsidiaries taken as a whole. Although there is a limited body of case law interpreting the phrase "substantially all," there is no precise established definition of the phrase under applicable law. Accordingly, the ability of a holder to require the Company to repurchase its notes as a result of a sale, lease, transfer, conveyance or other disposition of less than all of the assets of the Company and its Subsidiaries taken as a whole to another Person or group may be uncertain.

## Certain Covenants

### *Suspension of Covenants*

During any period of time that (i) the notes have Investment Grade Ratings from at least two Rating Agencies and (ii) no Default or Event of Default has occurred and is continuing (the occurrence of the events described in the foregoing clauses (i) and (ii) being collectively referred to as a "Covenant Suspension Event", and the date on which such Covenant Suspension Event occurs being referred to as a "Suspension Date"), the Company and its Restricted Subsidiaries will not be subject to the provisions of the Indenture described under:

- "—Limitation on Incurrence of Additional Indebtedness";

- "—Limitation on Guarantees";

- "—Limitation on Restricted Payments";

- "—Limitation on Asset Sales and Sales of Subsidiary Stock";

- "—Limitation on Securitization and Loan Receivables Backed Financings";

- "—Limitation on Designation of Unrestricted Subsidiaries";

- "—Limitation on Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries";

- "—Limitation on Layered Indebtedness";

- clause (b) of "—Limitation on Merger, Consolidation or Sale of Assets";

- "—Limitation on Transactions with Affiliates"; and

- "—Conduct of Business" (collectively, the "Suspended Covenants").

In the event that the Company and its Restricted Subsidiaries are not subject to the Suspended Covenants for any period of time as a result of the foregoing, and on any subsequent date (the "Reversion Date") one of the Rating Agencies withdraws its Investment Grade Rating or downgrades its rating assigned to the notes below an Investment Grade Rating, then the Company and its Restricted Subsidiaries will thereafter again be subject to the Suspended Covenants. The period of time between the Suspension Date and the Reversion Date is referred to as the "Suspension Period." Notwithstanding that the Suspended Covenants may be reinstated, no Default or Event of Default will be deemed to have occurred as a result of a failure to comply with the Suspended Covenants during the Suspension Period (or upon termination of the Suspension Period or after that time based solely on events that occurred during the Suspension Period).

On the Reversion Date, all Indebtedness incurred during the Suspension Period will be classified as having been incurred pursuant to clause (1) of "—Limitation on Incurrence of Additional Indebtedness" below or one of the clauses set forth in clause (2) of "—Limitation on Incurrence of Additional Indebtedness" below (to the extent such Indebtedness would be permitted to be incurred thereunder as of the Reversion Date and after giving effect to Indebtedness incurred prior to the Suspension Period and outstanding on the Reversion Date). To the extent such Indebtedness would not be so permitted to be incurred pursuant to the first or second clauses of "—Limitation on Incurrence of Additional Indebtedness," such Indebtedness will be deemed to have been outstanding on the Issue Date, so that it is classified as permitted under clause 2(m) of "—Limitation on Incurrence of Additional Indebtedness." Calculations made after the Reversion Date of the amount available to be made as Restricted Payments under "—Limitation on Restricted Payments" will be made as though the covenant described under "—Limitation on Restricted Payments" had been in effect since the Issue Date and throughout the Suspension Period. The Company will notify the Trustee of the occurrence of any Suspension Date or Reversion Date within 10 business days of its occurrence. After any such notice of the occurrence of a Reversion Date, the Trustee shall assume the Suspended Covenants apply and are in full force and effect.

***Limitation on Incurrence of Additional Indebtedness***

(1)  The Company will not, and will not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, Incur any Indebtedness, including Acquired Indebtedness, except that the Company may Incur Indebtedness, including Acquired Indebtedness, if, at the time of and immediately after giving *pro forma* effect to the Incurrence thereof and the application of the proceeds therefrom the Capitalization Ratio of the Company is greater than 13.5%.

(2)  Notwithstanding clause (1) above, the Company and its Restricted Subsidiaries, as applicable, may Incur the following Indebtedness ("Permitted Indebtedness"):

(1)  Indebtedness in respect of the notes, excluding Additional Notes or Guarantees thereof;

(2)  Guarantees by any Restricted Subsidiary of Indebtedness of the Company Incurred in accordance with this covenant, which Guarantee is permitted under "—Limitation on Guarantees" below; *provided* that (i) if such Guarantee is of Subordinated Indebtedness then the Note Guarantee of such Guarantor shall be senior to such Guarantor's Guarantee of Subordinated Indebtedness and (ii) if such Restricted Subsidiary is not a Guarantor it shall simultaneously provide a Note Guarantee and become a Guarantor;

(3)  Hedging Obligations entered into by the Company and its Restricted Subsidiaries in the ordinary course of business and not for speculative purposes (as determined conclusively by the senior management of the Company acting in good faith), including, without limitation, Hedging Obligations in respect of the notes;

(4)  intercompany Indebtedness between the Company and any Restricted Subsidiary or between any Restricted Subsidiaries; *provided* that:

(1)  if the Company or any Guarantor is the obligor on any such Indebtedness owed to a Restricted Subsidiary that is not a Guarantor, such Indebtedness must be expressly subordinated to the prior payment in full of all obligations under the notes and the Indenture, in the case of the Company, or such Guarantor's Note Guarantee, in the case of any such Guarantor; *provided* that the Company, its parent companies (if any) and any Guarantor shall agree to vote such Indebtedness, or provide their consents in connection with such Indebtedness, in any Colombian Restructuring, in a manner that is consistent with the vote of, or the consents provided by, the holders of the notes and other unaffiliated creditors of the same class as the notes, and

(2)  in the event that at any time any such Indebtedness ceases to be held by the Company or a Restricted Subsidiary, such Indebtedness shall be deemed to be Incurred and not permitted by this clause (d) at the time such event occurs;

(5) Indebtedness of the Company or any of its Restricted Subsidiaries arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (including daylight overdrafts paid in full by the close of business on the day such overdraft was Incurred) drawn against insufficient funds in the ordinary course of business; *provided* that such Indebtedness is extinguished within five business days of Incurrence;

(6) Indebtedness of the Company or any of its Restricted Subsidiaries represented by letters of credit for the account of the Company or any Restricted Subsidiary, as the case may be, in order to provide for judicial deposits required in connection with any judicial or administrative proceeding, provide security for workers' compensation claims, payment obligations in connection with self-insurance, health, disability or other employee benefits or similar requirements in the ordinary course of business;

(7) Indebtedness in respect of bid, performance, surety bonds or *fianzas* in the ordinary course of business for the account of the Company or any of its Restricted Subsidiaries, including Guarantees or obligations of the Company or any Restricted Subsidiary with respect to letters of credit and/or *fianzas* supporting such bid, performance or surety obligations (in each case other than for the payment of borrowed money);

(8) Refinancing Indebtedness in respect of:

    (1) Indebtedness (other than Indebtedness owed to the Company or any Subsidiary of the Company) Incurred pursuant to clause (1) of this covenant (it being understood that no Indebtedness outstanding on the Issue Date is Incurred pursuant to such clause (1)), or

    (2) Indebtedness Incurred pursuant to this clause (2)(h) and clauses 2(a), 2(j) and 2(m) of this covenant;

(9) Capitalized Lease Obligations and Purchase Money Indebtedness of the Company or any Restricted Subsidiary in an aggregate principal amount not to exceed US$5.0 million (or the equivalent in other currencies) at any one time outstanding;

(10) Permitted Acquisition Indebtedness;

(11) Capital Securities;

(12) indemnification, adjustment of purchase price, earn-out or similar obligations, in each case, incurred or assumed in connection with the acquisition or disposition of any business or assets of the Company or any Restricted Subsidiary or Capital Stock of a Restricted Subsidiary, other than guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business, assets or equity interests for the purposes of financing or in contemplation of any such acquisition; *provided that* (i) any amount of such obligations included on the face of the balance sheet of the Company or any Restricted Subsidiary shall not be permitted under this clause (l) and (ii) in the case of a disposition, the maximum aggregate liability in respect of all such obligations outstanding under this clause (l) shall at no time exceed the gross proceeds actually received by the Company and the Restricted Subsidiaries in connection with such disposition;

(13) other Indebtedness of the Company outstanding on the Issue Date;

(14) Indebtedness of the Company or any of its Restricted Subsidiaries to the extent the net proceeds thereof are promptly used to redeem the notes in part or in full or deposited to defease or discharge the notes, in each case in accordance with the Indenture; and

(15) additional Indebtedness of the Company or any Restricted Subsidiary in an aggregate principal amount not to exceed the greater of (x) US$10 million and (y) 10.0% of Consolidated Net Worth of the Company and its Restricted Subsidiaries at any time outstanding.

(4) For purposes of determining compliance with, and the outstanding principal amount of, any particular Indebtedness Incurred pursuant to and in compliance with this covenant, (i) the outstanding principal amount of any item of Indebtedness will be counted only once, (ii) the amount of Indebtedness issued at a price that is less than the principal amount thereof will be equal to the amount of the liability in respect thereof determined in accordance with Applicable GAAP, and (iii) Guarantees of, or obligations in respect of letters of credit or similar instruments relating to, Indebtedness which is otherwise included in the determination of any particular amount of Indebtedness will not be included. Accrual of interest, the accretion or amortization of original issue discount, the payment of regularly scheduled interest in the form of additional Indebtedness of the same instrument or the payment of regularly scheduled dividends on Disqualified Capital Stock in the form of additional Disqualified Capital Stock with the same terms will not be deemed to be an Incurrence of Indebtedness for purposes of this covenant; *provided* that any such outstanding additional Indebtedness or Disqualified Capital Stock paid in respect of Indebtedness Incurred pursuant to any provision of clause (2) of this covenant will be counted as Indebtedness outstanding

thereunder for purposes of any future Incurrence under such provision. For purposes of determining compliance with this "—Limitation on Incurrence of Additional Indebtedness" covenant, in the event that an item of proposed Indebtedness meets the criteria of more than one of the categories of Permitted Indebtedness described in clauses (2)(a) through (2)(o) above, or is entitled to be incurred pursuant to clause (1) of this covenant, the Company will be permitted to classify such item of Indebtedness on the date of its incurrence and will only be required to include the amount and type of such Indebtedness in one of the above clauses, although the Company may divide and classify an item of Indebtedness in one or more of the types of Indebtedness and may later re-divide or reclassify all or a portion of such item of Indebtedness in any manner that complies with this covenant. Notwithstanding any other provision of this covenant, the maximum amount of Indebtedness that the Company or any Restricted Subsidiary may incur pursuant to this covenant shall not be deemed to be exceeded as a result solely of fluctuations in exchange rates or currency values.

(5)     For purposes of determining compliance with any U.S. dollar denominated restriction on the Incurrence of Indebtedness where the Indebtedness Incurred is denominated in a different currency, the amount of such Indebtedness will be the U.S. Dollar Equivalent determined on the date of the Incurrence of such Indebtedness or, in the case of revolving credit Indebtedness, first committed; *provided, however*, that if any such Indebtedness denominated in a different currency is subject to a Currency Agreement with respect to U.S. dollars covering all principal, premium, if any, and interest payable on such Indebtedness, the amount of such Indebtedness expressed in U.S. dollars will be that provided in such Currency Agreement. The principal amount of any Refinancing Indebtedness Incurred in the same currency as the Indebtedness being Refinanced will be the U.S. Dollar Equivalent of the Indebtedness Refinanced, except to the extent that (x) such U.S. Dollar Equivalent was determined based on a Currency Agreement, in which case the Refinancing Indebtedness will be determined in accordance with the preceding sentence, and (y) the principal amount of the Refinancing Indebtedness exceeds the principal amount of the Indebtedness being Refinanced, in which case the U.S. Dollar Equivalent of such excess will be determined on the date such Refinancing Indebtedness is Incurred.

### Limitation on Guarantees

Except to the extent that the limitations set forth below expressly contravene, or result in a violation of, Colombian law, the Company will not permit any Restricted Subsidiary of the Company to Guarantee any Indebtedness of the Company or to secure any Indebtedness of the Company with a Lien on the assets of such Restricted Subsidiary, unless contemporaneously therewith (or prior thereto) effective provision is made to Guarantee or secure the notes on an equal and ratable basis with such Guarantee or Lien for so long as such Guarantee or Lien remains effective, and in an amount equal to the amount of Indebtedness so Guaranteed or secured. Any Guarantee by any such Restricted Subsidiary of Subordinated Indebtedness of the Company will be subordinated and junior in right of payment to the contemporaneous Guarantee of the notes by such Restricted Subsidiary.

In the event that any Restricted Subsidiary is required to Guarantee the notes in accordance with the preceding paragraph, such Restricted Subsidiary will be released and relieved of its obligations under such Guarantee in the event:

(1) there is a Legal Defeasance or a Covenant Defeasance of the notes;
(2) there is a sale or other disposition of Capital Stock of such Restricted Subsidiary following which such Restricted Subsidiary is no longer a direct or indirect Subsidiary of the Company; or
(3) such Restricted Subsidiary is designated as an Unrestricted Subsidiary;

*provided* that, in each case, such transactions are carried out pursuant to and in accordance with all applicable covenants and provisions of the Indenture.

### Limitation on Restricted Payments

The Company will not, and will not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, take any of the following actions (each, a "Restricted Payment"):

(a) declare or pay any dividend or return of capital or make any distribution on or in respect of shares of Capital Stock of the Company or any Restricted Subsidiary to holders of such Capital Stock, other than:

- dividends or distributions payable in Qualified Capital Stock of the Company,

- dividends or distributions payable to the Company and/or a Restricted Subsidiary, or

- dividends, distributions or returns of capital made on a *pro rata* basis to the Company and its Restricted Subsidiaries, on the one hand, and minority holders of Capital Stock of a Restricted Subsidiary, on the other hand (or on a less than *pro rata* basis to any minority holder);

(b) purchase, redeem or otherwise acquire or retire for value:

- any Capital Stock of the Company, or

- any Capital Stock of any Restricted Subsidiary held by an Affiliate of the Company (other than a Restricted Subsidiary) or any Preferred Stock of a Restricted Subsidiary, except for Capital Stock held by the Company or a Restricted Subsidiary or purchases, redemptions, acquisitions or retirements for value of Capital Stock on a pro rata basis from the Company and/or any Restricted Subsidiaries, on the one hand, and minority holders of Capital Stock of a Restricted Subsidiary, on the other hand, according to their respective percentage ownership of the Capital Stock of such Restricted Subsidiary;

(c) make any principal payment on, purchase, defease, redeem, prepay, decrease or otherwise acquire or retire for value, prior to any scheduled final maturity, scheduled repayment or scheduled sinking fund payment, as the case may be, any Subordinated Indebtedness or any Capital Securities (excluding (x) any intercompany Indebtedness owed to the Company and/or any Guarantor, (y) any intercompany Indebtedness between Restricted Subsidiaries that are not Guarantors, or (z) the purchase, repurchase or other acquisition of Indebtedness that is contractually subordinate or otherwise junior in right of payment to the notes, purchased in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case within one year of such date of purchase, repurchase or acquisition); or

(d) make any Investment (other than Permitted Investments);

if at the time of the Restricted Payment and immediately after giving effect thereto:

(a) a Default or an Event of Default shall have occurred and be continuing;

(b) the Company is not able to Incur at least US$1.00 of additional Indebtedness pursuant to clause (1) of "— Limitation on Incurrence of Additional Indebtedness"; or

(c) the aggregate amount (the amount expended for these purposes, if other than in cash, being the Fair Market Value of the relevant property) of the proposed Restricted Payment and all other Restricted Payments made subsequent to the Issue Date up to the date thereof, shall exceed the sum of:

(A) 50.0% of cumulative Consolidated Net Income of the Company or, if such cumulative Consolidated Net Income of the Company is a loss, minus 100.0% of the loss, accrued during the period, treated as one accounting period, beginning on the first day of the fiscal quarter during which the Issue Date occurs to the end of the most recent fiscal quarter for which consolidated financial information of the Company is available; *plus*

(B) 100.0% of the aggregate net proceeds, including cash and the Fair Market Value of property used in a Permitted Business (other than cash and securities), received by the Company from any Person from any:

- contribution to the equity capital of the Company not representing an interest in Disqualified Capital Stock or issuance and sale of Qualified Capital Stock of the Company, in each case, subsequent to the Issue Date,

- issuance and sale subsequent to the Issue Date (and, in the case of Indebtedness of a Restricted Subsidiary, at such time as it was a Restricted Subsidiary) of any Indebtedness of the Company or any Restricted Subsidiary that has been converted into or exchanged for Qualified Capital Stock of the Company, or

- issuance and sale subsequent to the Issue Date of any Capital Securities,

excluding, in each case, any net proceeds:

(x) received from a Restricted Subsidiary of the Company; or

(y) applied in accordance with clause (2) or (3) of the second paragraph of this covenant below; *plus*

(C) any Investment Return; *plus*

(D) US$3.0 million.

Notwithstanding the preceding paragraph, this covenant does not prohibit:

(1)  the payment of any dividend or distribution or the consummation of any irrevocable redemption of Subordinated Indebtedness within 60 days after the date of declaration of such dividend or distribution or giving of the redemption notice, as the case may be, if the dividend, distribution or redemption would have been permitted on the date of declaration or notice pursuant to the preceding paragraph; *provided* that such redemption shall be included (without duplication for the declaration) in the calculation of the amount of Restricted Payments;

(2)  the making of any Restricted Payment,

(x)  in the form of Qualified Capital Stock of the Company,

(y)  through the application of the net proceeds received by the Company from a substantially concurrent sale of Qualified Capital Stock of the Company or a contribution to the equity capital of the Company not representing an interest in Disqualified Capital Stock, in each case not received from a Subsidiary of the Company, or

(z)  through the application of the net proceeds received by the Company from a substantially concurrent issuance or sale of Capital Securities;

*provided* that the value of any such Qualified Capital Stock or Capital Securities used or the net proceeds of which are used to make a Restricted Payment pursuant to this clause (2) shall be excluded from clause (3)(B) of the first paragraph of this covenant;

(3)  the voluntary prepayment, purchase, defeasance, redemption or other acquisition or retirement for value of any Subordinated Indebtedness solely in exchange for, or through the application of net proceeds of a substantially concurrent sale, other than to a Subsidiary of the Company, of Refinancing Indebtedness for such Subordinated Indebtedness;

(4)  repurchases by the Company of Common Stock of the Company or options, warrants or other securities exercisable or convertible into Common Stock of the Company from any current or former employees, officers, directors or consultants of the Company or any of its Subsidiaries or their authorized representatives upon the death, disability or termination of employment or directorship of such employees, officers or directors, or the termination of retention of any such consultants, in an amount not to exceed US$0.5 million in any calendar year (with unused amounts in any calendar year being permitted to be carried over into succeeding calendar years up to a maximum of US$0.5 million) plus the cash proceeds of key man life insurance policies received by the Company and its Restricted Subsidiaries;

(5)  the repurchase of Capital Stock deemed to occur upon the exercise of stock options or warrants to the extent such Capital Stock represents a portion of the exercise price of those stock options or warrants;

(6)  if no Default or Event of Default shall have occurred and be continuing, the declaration and payment of regularly scheduled or accrued dividends or distributions to holders of any class or series of Disqualified Capital Stock of the Company or any Restricted Subsidiary issued on or after the Issue Date in accordance with the covenant "—Limitation on Incurrence of Additional Indebtedness";

(7) the repurchase, redemption or other acquisition or retirement for value of any Subordinated Indebtedness of the Company pursuant to and in accordance with the terms of a "change of control" covenant set forth in the indenture or other agreement pursuant to which such Subordinated Indebtedness is issued and such "change of control" covenant is substantially similar to the Change of Control Triggering Event provision included in the Indenture; provided that the Company (or another Person) has repurchased all notes required to be repurchased by the Company under the caption "Change of Control Triggering Event" prior to the purchase, redemption or other acquisition or retirement for value of such Subordinated Indebtedness pursuant to the applicable "change of control" covenant;

(8) if no Default or Event of Default shall have occurred and be continuing, the purchase by the Company of fractional shares arising out of stock dividends, splits or combinations or business combinations; *provided* that such purchases are not made for the purposes of circumventing the provisions of this covenant; and

(9) if no Default or Event of Default shall have occurred and be continuing, other Restricted Payments in an aggregate amount not to exceed US$2.0 million per annum.

In determining the aggregate amount of Restricted Payments made subsequent to the Issue Date, amounts expended pursuant to clauses (1) (without duplication for the declaration of the relevant dividend), (4), (6) and (8) above shall be included in such calculation and amounts expended pursuant to clauses (2), (3), (5), (7) and (9) above shall not be included in such calculation.

### *Limitation on Asset Sales and Sales of Subsidiary Stock*

The Company will not, and will not permit any of its Restricted Subsidiaries to, consummate an Asset Sale unless:

(a) the Company or the applicable Restricted Subsidiary, as the case may be, receives consideration at the time of such Asset Sale at least equal to the Fair Market Value of the assets or Capital Stock sold or otherwise disposed of, and

(b) at least 75% of the consideration received for the assets or Capital Stock sold by the Company or the Restricted Subsidiary, as the case may be, in such Asset Sale shall be in the form of cash or Cash Equivalents received at the time of such Asset Sale.

For purposes of the immediately preceding clause (b), each of the following will be deemed to be cash:

(a) any liabilities that are included on the balance sheet of the Company or any Restricted Subsidiary (other than contingent liabilities and liabilities that are by their terms subordinated to the notes) that are assumed by the transferee of any such assets and as a result of which the Company or such Restricted Subsidiary, as the case may be, are fully and unconditionally released from any further liability in connection therewith;

(b) any securities, notes or other obligations or assets received by the Company or any such Restricted Subsidiary from such transferee that are converted by the Company or such Restricted Subsidiary into cash or Cash Equivalents within 180 days of the receipt thereof (subject to ordinary settlement periods), to the extent of the cash or Cash Equivalents received in that conversion;

(c) the Fair Market Value of any Capital Stock of a Person engaged in a Permitted Business that will become, upon purchase, a Restricted Subsidiary or assets (other than current assets as determined in accordance with Applicable GAAP or Capital Stock) to be used by the Company or any Restricted Subsidiary in a Permitted Business; and

(d) any Designated Non-cash Consideration received by the Company or any of its Restricted Subsidiaries in such Asset Sale; *provided* that the aggregate Fair Market Value of such Designated Non-cash Consideration, taken together with the Fair Market Value at the time of receipt of all other Designated Non-cash Consideration received pursuant to this clause (4) less the amount of Net Proceeds previously realized in cash or Cash Equivalents from the sale of prior Designated Non-cash Consideration is less than the greater of (x) 2.5% of Consolidated Tangible Assets at the time of the receipt of such Designated Non-cash Consideration and

(y) US$10.0 million, in each case with the Fair Market Value of each item of Designated Non-cash Consideration being measured at the time received and without giving effect to subsequent changes in value;

*provided that,* amounts received pursuant to clauses (1), (3) and (4) shall not be deemed to constitute Net Cash Proceeds for purposes of making an Asset Sale Offer.

The Company or such Restricted Subsidiary, as the case may be, may apply the Net Cash Proceeds of any such Asset Sale within 365 days thereof to:

(a) repay any Senior Indebtedness of the Company, any Indebtedness secured by the assets subject to such Asset Sale or Indebtedness of any Restricted Subsidiary (in each case owing to a Person other than the Company or any Restricted Subsidiary and including, in each case without limitation, Capitalized Lease Obligations),

(b) make capital expenditures or use it for working capital purposes in a Permitted Business, and/or

(c) purchase

(a) assets (other than current assets as determined in accordance with Applicable GAAP or Capital Stock) to be used by the Company or any Guarantor in a Permitted Business,

(b) all or substantially all of the assets of, or any Capital Stock of, a Person engaged in a Permitted Business if, after giving effect to any such acquisition, such Person is or becomes or such assets are contributed to a Guarantor, or

(c) enter into a binding commitment with a Person, other than the Company or any of its Restricted Subsidiaries, to apply such Net Cash Proceeds pursuant to clause (b) and/or (c) above, *provided* that such binding commitment shall be subject only to customary conditions and the applicable purchase shall be consummated within 180 days following the expiration of the aforementioned 365-day period.

To the extent all or a portion of the Net Cash Proceeds of any Asset Sale are not applied within the 365 days of the Asset Sale as described in clause (a), (b) and/or (c) of the immediately preceding paragraph, the Company will make an offer to purchase notes (the "Asset Sale Offer"), at a purchase price equal to 100.0% of the principal amount of the notes to be purchased, plus accrued and unpaid interest thereon, to, but excluding, the date of purchase (the "Asset Sale Offer Amount"). The Company will purchase pursuant to an Asset Sale Offer from all tendering holders on a *pro rata* basis, and, at the Company's option, on a *pro rata* basis with the holders of any other Senior Indebtedness with similar provisions requiring the Company to offer to purchase the other Senior Indebtedness with the proceeds of Asset Sales, that principal amount (or accreted value in the case of Indebtedness issued with original issue discount) of notes and the other Senior Indebtedness to be purchased equal to such unapplied Net Cash Proceeds. The Company may satisfy its obligations under this covenant with respect to the Net Cash Proceeds of an Asset Sale by making an Asset Sale Offer prior to the expiration of the relevant 365-day period.

The purchase of notes pursuant to an Asset Sale Offer will occur not less than 20 business days following the date thereof, or any longer period as may be required by law, nor more than 45 days following the 365th day following the Asset Sale (except in the case of clause (c)(3) in which case such period shall be extended for 180 days). The Company may, however, defer an Asset Sale Offer until there is an aggregate amount of unapplied Net Cash Proceeds from one or more Asset Sales equal to or in excess of US$15.0 million. At that time, the entire amount of unapplied Net Cash Proceeds, and not just the amount in excess of US$15.0 million, will be applied as required pursuant to this covenant. Pending application in accordance with this covenant, Net Cash Proceeds may be applied to temporarily reduce revolving credit borrowings or Invested in Cash Equivalents.

Each notice of an Asset Sale Offer will be delivered to the record holders as shown on the register of holders within 20 days following such 365th day, with a copy to the Trustee offering to purchase the notes as described above. Each notice of an Asset Sale Offer will state, among other things, the purchase date, which must be no earlier than 30 days nor later than 60 days from the date the notice is delivered, other than as may be required by law (the "Asset Sale Offer Payment Date"). Upon receiving notice of an Asset Sale Offer, holders may elect to tender their notes in whole or in part in minimum principal amounts of US$1,000 and integral multiples of US$1.00 in excess thereof in exchange for cash.

On the Asset Sale Offer Payment Date, the Company will, to the extent lawful:

(a) accept for payment all notes or portions thereof properly tendered pursuant to the Asset Sale Offer;

(b) deposit with the Paying Agent funds in an amount equal to the Asset Sale Offer Amount in respect of all notes or portions thereof so tendered; and

(c) deliver or cause to be delivered to the Trustee the notes so accepted together with an Officers' Certificate stating the aggregate principal amount of notes or portions thereof being purchased by the Company.

To the extent holders of notes and holders of other Senior Indebtedness, if any, which are the subject of an Asset Sale Offer properly tender and do not withdraw notes or the other Senior Indebtedness in an aggregate amount exceeding the amount of unapplied Net Cash Proceeds, the Company will purchase the notes and the other Senior Indebtedness on a *pro rata* basis (based on amounts tendered). If only a portion of a note is purchased pursuant to an Asset Sale Offer, a new note in a principal amount equal to the portion thereof not purchased will be issued in the name of the holder thereof upon cancellation of the original note (or appropriate adjustments to the amount and beneficial interests in a global note will be made, as appropriate). Notes (or portions thereof) purchased pursuant to an Asset Sale Offer will be cancelled and cannot be reissued.

The Company will comply with the requirements of Rule 14e-1 under the Exchange Act and any other applicable securities laws in connection with the purchase of notes pursuant to an Asset Sale Offer. To the extent that the provisions of any applicable securities laws or regulations conflict with the "Asset Sale" provisions of the Indenture, the Company will comply with those laws and regulations and will not be deemed to have breached its obligations under the "Asset Sale" provisions of the Indenture by doing so.

Upon completion of an Asset Sale Offer, the amount of Net Cash Proceeds will be reset at zero. Accordingly, to the extent that the aggregate amount of notes and other Indebtedness tendered pursuant to an Asset Sale Offer is less than the aggregate amount of unapplied Net Cash Proceeds, the Company and its Restricted Subsidiaries may use any remaining Net Cash Proceeds for any purpose not otherwise prohibited by the Indenture.

### *Limitation on Securitization and Loan Receivables Backed Financing*

The Company and its Restricted Subsidiaries may sell, transfer or otherwise dispose of accounts receivable to a Securitization Vehicle or a Special Purpose Finance Trust; *provided* that:

(1) the sale, transfer or other disposition is in connection with a Loan-Related Securitization or Loan Receivables Backed Financing, as the case may be; and

(2) the aggregate consideration received in each such sale, transfer or other disposition is at least equal to the Fair Market Value of the receivables sold or transferred.

### *Limitation on Designation of Unrestricted Subsidiaries*

Except to the extent that the limitations set forth below expressly contravene, or result in a violation of, Colombian law, the Company may designate after the Issue Date any Subsidiary of the Company as an "Unrestricted Subsidiary" under the Indenture (a "Designation") only if:

(1) no Default or Event of Default shall have occurred and be continuing at the time of or immediately after giving effect to such Designation and any transactions between the Company or any of its Restricted Subsidiaries and such Unrestricted Subsidiary are in compliance with "— Limitation on Transactions with Affiliates";

(2) at the time of and after giving effect to such Designation, the Company could Incur US$1.00 of additional Indebtedness pursuant to clause (1) of "—Limitation on Incurrence of Additional Indebtedness";

(3) the Company would be permitted to make an Investment at the time of Designation (assuming the effectiveness of such Designation and treating such Designation as an Investment at the time of Designation) as a Restricted Payment pursuant to the first paragraph of "— Limitation on Restricted Payments" or as a Permitted Investment in an amount (the "Designation Amount") equal to the amount of the Company's Investment in such Subsidiary on such date; and

(4)   at the time of such Designation, neither the Company nor any Restricted Subsidiary will:

    (a)   provide credit support for, subject any of its property or assets (other than the Capital Stock of any Unrestricted Subsidiary) to the satisfaction of, or Guarantee, any Indebtedness of such Subsidiary (including any undertaking, agreement or instrument evidencing such Indebtedness);

    (b)   be directly or indirectly liable for any Indebtedness of such Subsidiary; or

    (c)   be directly or indirectly liable for any Indebtedness which provides that the holder thereof may (upon notice, lapse of time or both) declare a default thereon or cause the payment thereof to be accelerated or payable prior to its final scheduled maturity upon the occurrence of a default with respect to any Indebtedness of such Subsidiary, except for any non-recourse Guarantee given solely to support the pledge by the Company or any Restricted Subsidiary of the Capital Stock of such Subsidiary.

The Company may revoke any Designation of a Subsidiary as an Unrestricted Subsidiary (a "Revocation") only if:

(1)   no Default or Event of Default shall have occurred and be continuing at the time of and after giving effect to such Revocation; and

(2)   all Liens and Indebtedness of such Unrestricted Subsidiary outstanding immediately following such Revocation would, if Incurred at such time, have been permitted to be Incurred for all purposes of the Indenture.

The Designation of a Subsidiary of the Company as an Unrestricted Subsidiary shall be deemed to include the Designation of all of the Subsidiaries of such Subsidiary. All Designations and Revocations must be evidenced by a certificate of the Chief Financial Officer of the Company, delivered to the Trustee certifying compliance with the preceding provisions.

### *Limitation on Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries*

    (a)   Except as provided in paragraph (b) below, the Company will not, and will not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, create or otherwise cause or permit to exist or become effective any encumbrance or restriction on the ability of any Restricted Subsidiary to:

    (a)   pay dividends or make any other distributions on or in respect of its Capital Stock to the Company or any other Restricted Subsidiary or pay any Indebtedness owed to the Company or any other Restricted Subsidiary;

    (b)   make loans or advances to, or Guarantee any Indebtedness or other obligations of, or make any Investment in, the Company or any other Restricted Subsidiary; or

    (c)   transfer any of its property or assets to the Company or any other Restricted Subsidiary.

    (b)   Paragraph (a) above will not apply to encumbrances or restrictions existing under or by reason of:

    (d)   applicable law, rule, regulation or order;

    (e)   the Indenture or the notes;

    (f)   the terms of any Indebtedness outstanding on the Issue Date, and any amendment, modification, restatement, renewal, restructuring, replacement or refinancing thereof; provided that any amendment, modification, restatement, renewal, restructuring, replacement or refinancing is not materially more restrictive, taken as a whole, with respect to such encumbrances or restrictions than those in existence on the Issue Date;

    (g)   customary non-assignment provisions of any contract and customary provisions restricting assignment or subletting in any lease governing a leasehold interest of any Restricted Subsidiary, or any customary restriction on the ability of a Restricted Subsidiary to dividend, distribute or otherwise transfer any asset which secures Indebtedness secured by a Lien, in each case permitted to be Incurred under the Indenture;

(h) any instrument governing Acquired Indebtedness not Incurred in connection with, or in anticipation or contemplation of, the relevant acquisition, merger or consolidation, which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person or the properties or assets of the Person so acquired;

(i) customary restrictions with respect to a Restricted Subsidiary of the Company imposed pursuant to a binding agreement which has been entered into for the sale or disposition of Capital Stock or assets of such Restricted Subsidiary; provided that such restrictions apply solely to the Capital Stock or assets of such Restricted Subsidiary being sold;

(j) customary restrictions imposed on the transfer of copyrighted or patented materials;

(k) an agreement governing Indebtedness of the Company or any Restricted Subsidiaries permitted to be Incurred subsequent to the date of the Indenture in accordance with the covenant described above under the caption "— Limitation on Incurrence of Additional Indebtedness"; *provided* that the provisions relating to such encumbrance or restriction contained in such agreement are no more restrictive, taken as a whole, than those contained in the agreement referred to in clause (3) of this paragraph;

(l) purchase money obligations for property (including Capital Stock) acquired in the ordinary course of business and Capitalized Lease Obligations that impose restrictions on the property purchased or leased of the nature described in paragraph (a)(3) of this covenant;

(m) Liens permitted to be incurred under the provisions of the covenant described below under the caption "— Limitation on Liens" that limits the right of the debtor to dispose of the assets securing such Indebtedness;

(n) provisions limiting the payment of dividends or the disposition or distribution of assets or property or transfer of Capital Stock in joint venture agreements, sale-leaseback agreements, limited liability company organizational documents and other similar agreements entered into in accordance with the terms of the Indenture and (a) in the ordinary course of business consistent with past practice or (b) with the approval of the Company's Board of Directors, which limitation is applicable only to the assets, property or Capital Stock that are the subject of such agreements;

(o) restrictions on cash, Cash Equivalents, Marketable Securities or other deposits or net worth imposed by customers or lessors under contracts or leases entered into in the ordinary course of business consistent with past practice to secure trade payable obligations; and

(p) restrictions customarily granted in connection with any Loan-Related Securitizations or Loan Receivables Backed Financing.

### Limitation on Layered Indebtedness

The Company will not, and will not permit any Guarantor to, directly or indirectly, Incur any Indebtedness that is subordinate in right of payment to any other Senior Indebtedness, unless such Indebtedness is expressly subordinate in right of payment to the notes, or the Note Guarantee, as the case may be, to the same extent and on the same terms as such Indebtedness is subordinate to such other Senior Indebtedness; *provided* that the foregoing limitation shall not apply to distinctions between categories of Senior Indebtedness that exist by reason of any Liens arising or created in respect of some but not all such Senior Indebtedness.

### Limitation on Liens

The Company will not, and will not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, Incur any Liens of any kind (except for Permitted Liens) against or upon any of their respective properties or assets, whether owned on the Issue Date or acquired after the Issue Date, or any proceeds therefrom, to secure any Indebtedness or trade payables unless contemporaneously therewith effective provision is made to secure the notes and all other amounts due under the Indenture, equally and ratably with such Indebtedness or other obligation (or, in the event that such Indebtedness is subordinated in right of payment to the notes, prior to such Indebtedness or other obligation) with a Lien on the same

properties and assets securing such Indebtedness or other obligation for so long as such Indebtedness or other obligation is secured by such Lien.

### Limitation on Merger, Consolidation and Sale of Assets

The Company will not, in a single transaction or series of related transactions, consolidate or merge with or into any Person (whether or not the Company is the surviving or continuing Person), or sell, assign, transfer, lease, convey or otherwise dispose of (or cause or permit any Restricted Subsidiary to sell, assign, transfer, lease, convey or otherwise dispose of) all or substantially all of the Company's properties and assets (determined on a consolidated basis for the Company and its Restricted Subsidiaries), to any Person unless:

either:

(a) the Company shall be the surviving or continuing Person, or

    (1) the Person (if other than the Company) formed by such consolidation or into which the Company is merged or the Person which acquires by sale, assignment, transfer, lease, conveyance or other disposition the properties and assets of the Company and of the Company's Restricted Subsidiaries substantially as an entirety (the "Surviving Entity"):

    (2) shall be a Person organized or formed and validly existing under the laws of Colombia or a Qualified Merger Jurisdiction, and

    (3) shall expressly assume, by supplemental indenture (in form and substance satisfactory to the Trustee), executed and delivered to the Trustee, the due and punctual payment of the principal of, and premium, if any, and interest on all of the notes and the performance and observance of every covenant of the notes and the Indenture on the part of the Company to be performed or observed and shall cause each Guarantor (including Persons that become Guarantors as a result of the transaction) to confirm by supplemental indenture that its Note Guarantee will apply for the Obligations of the Surviving Entity in respect of the Indenture and the notes;

(b) immediately after giving effect to such transaction and the assumption contemplated by clause (a)(2)(B) above (including giving effect on a *pro forma* basis to any Indebtedness, including any Acquired Indebtedness, Incurred in connection with or in respect of such transaction), the Company or such Surviving Entity, as the case may be:

    (1) will be able to Incur at least US$1.00 of additional Indebtedness pursuant to clause (1) of "— Limitation on Incurrence of Additional Indebtedness," or

    (2) will have a Capitalization Ratio of not less than the Capitalization Ratio of the Company and its Restricted Subsidiaries immediately prior to such transaction;

(c) immediately before and immediately after giving effect to such transaction and the assumption contemplated by clause (a)(2)(B) above (including, without limitation, giving effect on a *pro forma* basis to any Indebtedness, including any Acquired Indebtedness, Incurred and any Lien granted in connection with or in respect of the transaction), no Default or Event of Default shall have occurred or be continuing;

(d) if the Company is organized under Colombian law and merges with a corporation, or the Surviving Entity is, organized under the laws of a Qualified Merger Jurisdiction or the Company is organized under the laws of a Qualified Merger Jurisdiction and merges with a Person, or the Surviving Entity is, organized under the laws of Colombia, the Company or the Surviving Entity will have delivered to the Trustee an Opinion of Counsel from each of Colombia and the relevant Qualified Merger Jurisdiction to the effect that, as applicable:

    (i) the holders of the notes will not recognize income, gain or loss for income tax purposes under the laws of the relevant Qualified Merger Jurisdiction or Colombia as a result of the transaction and will be taxed in the holder's home jurisdiction in the same manner and on the same amounts

(assuming solely for this purpose that no Additional Amounts are regarded to be paid on the notes) and at the same times as would have been the case if the transaction had not occurred,

(ii) any payment of interest or principal under or relating to the notes will be paid in compliance with any requirements under the section "—Additional Amounts," and

(iii) no other taxes on income, including capital gains, will be payable by holders of the notes under the laws of Colombia or the relevant Qualified Merger Jurisdiction relating to the acquisition, ownership or disposition of the notes, including the receipt of interest or principal thereon; *provided* that the holder does not use or hold, and is not deemed to use or hold the notes in carrying on a business in Colombia or the relevant Qualified Merger Jurisdiction, and

(e) the Company or the Surviving Entity has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that the consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition and, if required in connection with such transaction, the supplemental indenture, comply with the applicable provisions of the Indenture and that all conditions precedent in the Indenture relating to the transaction have been satisfied.

For purposes of this covenant, the transfer (by lease, assignment, sale or otherwise, in a single transaction or series of transactions) of all or substantially all of the properties or assets of one or more Restricted Subsidiaries of the Company, the Capital Stock of which constitutes all or substantially all of the properties and assets of the Company (determined on a consolidated basis for the Company and its Restricted Subsidiaries), will be deemed to be the transfer of all or substantially all of the properties and assets of the Company.

The provisions of clause (b) above will not apply to:

(1) any transfer of the properties or assets of a Restricted Subsidiary to the Company or to another Restricted Subsidiary;

(2) any merger of a Restricted Subsidiary into the Company or another Restricted Subsidiary; or

(3) any merger of the Company into a Wholly-Owned Subsidiary of the Company created for the purpose of holding the Capital Stock of the Company.

Upon any consolidation, combination or merger or any transfer of all or substantially all of the properties and assets of the Company and its Restricted Subsidiaries in accordance with this covenant, in which the Company is not the continuing corporation, the Surviving Entity formed by such consolidation or into which the Company is merged or to which such conveyance, lease or transfer is made will succeed to, and be substituted for, and may exercise every right and power of, the Company under the Indenture and the notes with the same effect as if such Surviving Entity had been named as such. For the avoidance of doubt, compliance with this covenant will not affect the obligations of the Company (including a Surviving Entity, if applicable) under "—Change of Control Triggering Event," if applicable.

Each Guarantor will not, and the Company will not cause or permit any Guarantor to, consolidate with or merge into, or sell or dispose of all or substantially all of its assets to, any Person (other than the Company) that is not a Guarantor unless:

(a) such Person (if such Person is the surviving entity) assumes all of the obligations of such Guarantor in respect of its Note Guarantee by executing a supplemental indenture and providing the Trustee with an Officers' Certificate and Opinion of Counsel, and such transaction is otherwise in compliance with the Indenture;

(b) such Note Guarantee is to be released as provided under "—Note Guarantees"; or

(c) such sale or other disposition of substantially all of such Guarantor's assets is made in accordance with "—Limitation on Asset Sales and Sales of Subsidiary Stock."

### *Limitation on Transactions with Affiliates*

(1) The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, enter into any transaction or series of related transactions (including, without limitation, the purchase, sale, lease or exchange of any

property or the rendering of any service) with, or for the benefit of, any of its Affiliates (each an "Affiliate Transaction"), unless:

(a) the terms of such Affiliate Transaction are not materially less favorable than those that could reasonably be expected to be obtained in a comparable transaction at such time on an arm's-length basis from a Person that is not an Affiliate of the Company; and

(b) in the event that such Affiliate Transaction involves aggregate payments, or transfers of property or services with a Fair Market Value in excess of US$5.0 million (or the equivalent in other currencies), the terms of such Affiliate Transaction will be set forth in an Officers' Certificate delivered to the Trustee stating that such transaction complies with clause (a) above; and

(c) in the event that such Affiliate Transaction involves aggregate payments, or transfers of property or services with a Fair Market Value in excess of US$10.0 million (or the equivalent in other currencies), the terms of such Affiliate Transaction will be approved by a majority of the members of the Board of Directors of the Company (including a majority of the disinterested members thereof), the approval to be evidenced by a Board Resolution stating that the Board of Directors has determined that such transaction complies with clause (a) above; and

(d) in the event that such Affiliate Transaction involves aggregate payments, or transfers of property or services with a Fair Market Value in excess of US$20.0 million (or the equivalent in other currencies), the Company must in addition obtain and deliver to the Trustee a favorable written opinion from an internationally recognized investment banking or accounting firm as to the fairness of the transaction to the Company and its Restricted Subsidiaries from a financial point of view.

(2) Paragraph (1) above will not apply to:

(a) Affiliate Transactions with or among the Company and any Restricted Subsidiary or between or among Restricted Subsidiaries;

(b) reasonable fees and compensation paid to, and any indemnity provided on behalf of, officers, directors, employees, consultants or agents of the Company or any Restricted Subsidiary as determined in good faith by the Company's Board of Directors or senior management of the Company;

(c) Affiliate Transactions undertaken pursuant to any contractual obligations or rights in existence on the Issue Date and any amendment, modification or replacement of such agreement (so long as such amendment, modification or replacement is not materially more disadvantageous to the Company and its Restricted Subsidiaries or the holders of the notes, taken as a whole, than the original agreement as in effect on the Issue Date);

(d) any Restricted Payments made in compliance with "— Limitation on Restricted Payments" or any Permitted Investments;

(e) loans and advances to officers, directors and employees of the Company or any Restricted Subsidiary for travel, entertainment, moving and other relocation expenses, in each case made in the ordinary course of business and not exceeding US$1.5 million outstanding at any one time;

(f) any employment agreement, employee benefit plan, officer or director indemnification agreement or any similar arrangement entered into by the Company or any of its Restricted Subsidiaries in the ordinary course of business or consistent with past practice and payments pursuant thereto;

(g) any issuance of Capital Stock (other than Disqualified Stock) of the Company to Affiliates of the Company or to any director, officer, employee or consultant of the Company, and the granting and performance of registration rights;

(h) transactions between the Company or any of its Restricted Subsidiaries and any Securitization Vehicle or Special Purpose Finance Trust in the ordinary course of business in connection with Loan-Related Securitizations or Loan Receivables Backed Financings, as the case may be; and

(i) transactions with customers, clients, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of the Indenture, which are fair to the Company or its Restricted Subsidiaries (as applicable), or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party.

### Conduct of Business

The Company and its Restricted Subsidiaries will not engage in any business other than a Permitted Business.

### Reports to Holders

So long as any notes are outstanding, the Company will furnish to the Trustee:

(a) Within 120 days following the end of each of the Company's fiscal years:

(i) the audited consolidated financial statements of the Company and its subsidiaries (containing income statements, balance sheets, statements of shareholders equity, cash flow statements and any other statements required under Applicable GAAP) and the related notes thereto for the Company's two most recent fiscal years prepared in accordance with Applicable GAAP, which need not, however, contain any reconciliation to U.S. GAAP or otherwise comply with Regulation S-X of the U.S. Securities and Exchange Commission, together with an audit report thereon by the Company's independent auditors; and

(ii) information (presented in the English language) including the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" with scope and content similar to the corresponding section in Annex A to this offering memorandum and consent solicitation statement (after taking into consideration any changes to the business and operations of the Company after the Issue Date).

(b) Within 75 days following the end of each of the three fiscal quarters ended on March 31, June 30 and September 30 in each of the Company's fiscal years (beginning with the fiscal quarter ended March 31, 2024):

(i) quarterly unaudited consolidated financial statements of the Company and its subsidiaries (containing balance sheets, statements of income, statements of shareholders equity, statements of cash flows and any other statements required under Applicable GAAP) and the related notes thereto for the Company, in each case for the quarterly period then ended and the corresponding quarterly period in the prior fiscal year and prepared in accordance with Applicable GAAP, which need not, however, contain any reconciliation to U.S. GAAP or otherwise comply with Regulation S-X of the U.S. Securities and Exchange Commission; and

(ii) information (presented in the English language) including the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" for such quarterly period.

To the extent that the Company is not required under Colombian law or Applicable GAAP to prepare and make available consolidated financial statements, all references to "consolidated financial statements," "consolidated balance sheet" or "consolidated financial information" of the Company, or similar terms in this "Description of the New Notes" section and in the Indenture, shall be deemed to refer to the unconsolidated financial statements, unconsolidated balance sheet or unconsolidated financial information of the Company prepared in accordance with Applicable GAAP.

None of the information provided pursuant to the preceding paragraph shall be required to comply with Regulation S-K as promulgated by the U.S. Securities and Exchange Commission. In addition, the Company shall furnish to the holders of the notes and to prospective investors, upon the requests of such holders, any information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act so long as the notes are not freely transferable under the Exchange Act by Persons who are not "affiliates" under the Securities Act.

Delivery of such reports, information and documents to the Trustee is for informational purposes only and the Trustee's receipt thereof shall not constitute constructive notice of any information contained therein or determinable for information contained therein, including the Company's compliance with any of the covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officers' Certificates).

## Listing

The Company intends to apply to list the notes on the SGX-ST and to trade the notes on the Official List of the SGX-ST in a minimum board lot size of US$1,000. The Company will use commercially reasonable efforts to obtain and maintain listing of the notes on the SGX-ST; however, the notes are not yet listed, and the Company cannot assure the holders of the notes that they will be accepted for listing or that the listing will be maintained.

If the Company is unable to list the notes on the SGX-ST and/or the notes do not trade on the Official List of the SGX-ST, or if the Company is unable to maintain such listing and trading, or if as a result regulations adopted or enforced by authorities governing the SGX-ST continued listing on such exchange becomes impractical or materially more burdensome, the Company may delist the notes from such exchange and will, prior to the delisting of such notes, use its commercially reasonable efforts to list and maintain a listing of the notes on another internationally recognized stock exchange.

## Notices

As long as the Company issues notes in global form, notices to be given to holders will be given to DTC, in accordance with its applicable policies as in effect from time to time. If the Company issues notes in certificated form, notices, including upon the occurrence of a Change of Control Triggering Event, to be given to holders will be sent by mail to the respective addresses of the holders as they appear in the Trustee's records, and will be deemed given when mailed.

## Events of Default

The following are "Events of Default":

(1)  default in the payment when due of the principal of or premium, if any, on any notes, including the failure to make a required payment to purchase notes tendered pursuant to an optional redemption, Change of Control Triggering Event Offer or an Asset Sale Offer;

(2)  default for 30 days or more in the payment when due of interest or Additional Amounts, if any, on any notes;

(3)  the failure to perform or comply with any of the provisions described under "—Certain Covenants—Merger, Consolidation and Sale of Assets;"

(4)  the failure by the Company or any Restricted Subsidiary to comply with any other covenant or agreement contained in the Indenture or in the notes for 30 days or more after written notice to the Company from the Trustee or the holders of at least 25% in aggregate principal amount of the outstanding notes;

(5)  default by the Company or any Restricted Subsidiary that is a Significant Subsidiary under any Indebtedness which

   (a)  is caused by a failure to pay principal or premium, if any, or interest on such Indebtedness prior to the expiration of any applicable grace period provided in the instrument governing such Indebtedness on the date of such default; or
   (b)  results in the acceleration of such Indebtedness prior to its stated maturity;

and, in each case, the principal or accreted amount of Indebtedness at the relevant time, in the aggregate is equal or more than US$10.0 million;

(6)  failure by the Company or any Restricted Subsidiary that is a Significant Subsidiary to pay one or more final judgments against any of them, aggregating US$10.0 million or more, which judgment(s) are not paid, discharged or stayed for a period of 60 days or more;

(7)  certain events of bankruptcy affecting the Company or any of its Restricted Subsidiaries that are Significant Subsidiaries, including the declaration of their *concurso mercantil*;

(8)  any Note Guarantee ceases to be in full force and effect, other than in accordance the terms of the Indenture, or a Guarantor denies or disaffirms its obligations under its Note Guarantee; or

(9) any (A) breach by the Company or any Subsidiary party thereto of any representation or warranty set forth in the Collateral Documents, (B) default by the Company or any Subsidiary party thereto in the performance of any covenant set forth in the Collateral Documents, or (C) repudiation by the Company or any Subsidiary party thereto of its obligations under the Collateral Documents or the unenforceability of any of the Collateral Documents against the Company or any Subsidiary party thereto for any reason, including the failure to enter into or execute any of the Collateral Documents within the allotted time period; provided, that any or all of the occurrences set forth in (A) through (C) taken together, relate to Collateral the aggregate value of which is in excess of $10.0 million ($5.0 million with respect to breaches and defaults specified in (A) or (B) that relate to the enforceability, perfection or priority of any security interest in Collateral or the existence of a Lien on Collateral other than a Collateral Permitted Lien or any repudiation specified in (C)); provided further, that solely in the case of (A) or (B) with respect to any breach or default that does not relate to the enforceability, perfection or priority of the security interest granted in Collateral or the existence of an Lien on Collateral other than a Collateral Permitted Lien, such breach or default remains uncured for a period of 30 days after notice is provided thereof by the Trustee or a holder of the Notes.

If an Event of Default (other than an Event of Default specified in clause (7) above with respect to the Company) shall occur and be continuing, the Trustee or the holders of at least 25% in principal amount of outstanding notes may declare the unpaid principal of (and premium, if any) and accrued and unpaid interest on all the notes to be immediately due and payable by notice in writing to the Company and the Trustee specifying the Event of Default and that it is a "notice of acceleration." If an Event of Default specified in clause (7) above occurs with respect to the Company, then the unpaid principal of (and premium, if any) and accrued and unpaid interest on all the notes will become immediately due and payable without any declaration or other act on the part of the Trustee or any holder. The Trustee shall not be deemed to have any notice of any Default or Event of Default unless written notice of such Default or Event of Default is received by a responsible officer of the Trustee at the corporate trust office of the Trustee, and such notice references the notes and the Indenture.

At any time after a declaration of acceleration with respect to the notes as described in the preceding paragraph, the holders of a majority in principal amount of the notes may rescind and cancel such declaration and its consequences:

(1) if the rescission would not conflict with any judgment or decree;

(2) if all existing Events of Default have been cured or waived, except nonpayment of principal or interest that has become due solely because of the acceleration;

(3) to the extent the payment of such interest is lawful, interest on overdue installments of interest and overdue principal, which has become due otherwise than by such declaration of acceleration, has been paid; and

(4) if the Company has paid the Trustee its reasonable compensation and reimbursed the Trustee for its reasonable expenses (including the fees and expenses of its counsel), disbursements and advances.

No rescission will affect any subsequent Default or impair any rights relating thereto.

The holders of a majority in principal amount of the notes may waive any existing Default or Event of Default under the Indenture, and its consequences, except a default in the payment of the principal of, premium, if any, or interest on any notes.

In the event of any Event of Default specified in clause (5) of the first paragraph above, such Event of Default and all consequences thereof (excluding, however, any resulting payment default) will be annulled, waived and rescinded, automatically and without any action by the Trustee or the holders, if within 30 days after such Event of Default arose the Company delivers an Officers' Certificate to the Trustee stating that (x) the Indebtedness or Guarantee that is the basis for such Event of Default has been discharged, or (y) the holders thereof have rescinded or waived the acceleration, notice or action (as the case may be) giving rise to such Event of Default, or (z) the default that is the basis for such Event of Default has been cured, it being understood that in no event shall an acceleration of the principal amount of the notes as described above be annulled, waived or rescinded upon the happening of any such events.

Subject to the provisions of the Indenture relating to the duties of the Trustee, the Trustee is under no obligation to exercise any of its rights or powers under the Indenture at the request, order or direction of any of the holders, unless such holders have offered to the Trustee satisfactory indemnity. Subject to all provisions of the Indenture and applicable law, the holders of a majority in aggregate principal amount of the then outstanding notes have the right to direct the time, method and

place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee.

No holder of any notes will have any right to institute any proceeding with respect to the Indenture or for any remedy thereunder, unless:

(1) such holder gives to the Trustee written notice of a continuing Event of Default;

(2) holders of at least 25% in principal amount of the then outstanding notes make a written request to pursue the remedy;

(3) such holders of the notes provide to the Trustee satisfactory indemnity;

(4) the Trustee does not comply within 60 days; and

(5) during such 60 day period the holders of a majority in principal amount of the outstanding notes do not give the Trustee a written direction which, in the opinion of the Trustee, is inconsistent with the request;

*provided* that a holder of a note may institute suit for enforcement of payment of the principal of and premium, if any, or interest on such note on or after the respective due dates expressed in such note.

Upon becoming aware of any Default or Event of Default, the Company is required to deliver to the Trustee written notice of events which would constitute such Defaults or Events of Default, their status and what action the Company is taking or proposes to take in respect thereof. In addition, the Company is required to deliver to the Trustee, within 120 days after the end of each fiscal year, an Officers' Certificate indicating whether the signers thereof know of any Default or Event of Default that occurred during the previous fiscal year. The Indenture provides that if a Default or Event of Default occurs, is continuing and written notice of such Default or Event of Default has been delivered to a responsible officer of the Trustee, the Trustee must deliver to each holder notice of the Default or Event of Default within 90 days after the occurrence thereof. Except in the case of a Default or Event of Default in the payment of principal of, premium, if any, or interest on any note, the Trustee may withhold notice if and so long as its trust officer in good faith determines that withholding notice is in the interests of the holders.

**Legal Defeasance and Covenant Defeasance**

The Company may, at its option and at any time, elect to have its obligations with respect to outstanding notes discharged ("Legal Defeasance"). Such Legal Defeasance means that the Company will be deemed to have paid and discharged the entire indebtedness represented by the outstanding notes after the deposit specified in clause (1) of the second following paragraph, except for:

(1) the rights of holders to receive payments in respect of the principal of, premium, if any, and interest on the notes when such payments are due;

(2) the Company's obligations with respect to the notes concerning issuing temporary notes, registration of notes, mutilated, destroyed, lost or stolen notes and the maintenance of an office or agency for payments;

(3) the rights, powers, trust, duties and immunities of the Trustee and the Company's obligations in connection therewith; and

(4) the Legal Defeasance provisions of the Indenture.

In addition, the Company may, at its option and at any time, elect to have its obligations released with respect to certain covenants (including, without limitation, obligations to make Change of Control Triggering Event Offers, Asset Sale Offers, the obligations described under "—Certain Covenants" and the cross-acceleration provisions and judgment default provisions described under "Events of Default") that are described in the Indenture ("Covenant Defeasance") and thereafter any omission to comply with such obligations will not constitute a Default or Event of Default with respect to the notes. In the event Covenant Defeasance occurs, certain events (not including non- payment, bankruptcy, receivership, reorganization and insolvency events) described under "Events of Default" will no longer constitute an Event of Default with respect to the notes.

In order to exercise either Legal Defeasance or Covenant Defeasance:

(5) the Company must irrevocably deposit with the Trustee, in trust for the benefit of the holders, cash in U.S. dollars, certain direct non-callable obligations of, or guaranteed by, the United States, or a combination thereof, in such amounts as will be sufficient without reinvestment, in the opinion of a nationally recognized investment bank, appraisal firm or firm of independent public accountants, to pay the principal of, premium, if any, and interest (including Additional Amounts) on the notes on the stated date for payment thereof or on the applicable redemption date, as the case may be;

(6) in the case of Legal Defeasance, the Company has delivered to the Trustee an Opinion of Counsel from counsel in the United States reasonably acceptable to the Trustee (subject to customary exceptions and exclusions) and independent of the Company to the effect that:

(a) the Company has received from, or there has been published by, the Internal Revenue Service a ruling; or

(b) since the Issue Date, there has been a change in the applicable U.S. federal income tax law, in either case to the effect that, and based thereon such Opinion of Counsel shall state that, the beneficial owners will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Legal Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(7) in the case of Covenant Defeasance, the Company has delivered to the Trustee an Opinion of Counsel in the United States reasonably acceptable to the Trustee (subject to customary exceptions and exclusions) to the effect that the beneficial owners will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Covenant Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(8) no Default or Event of Default shall have occurred and be continuing on the date of the deposit pursuant to clause (1) of this paragraph (except any Default or Event of Default resulting from the failure to comply with "— Certain Covenants—Limitation on Incurrence of Additional Indebtedness" as a result of the borrowing of the funds required to effect such deposit);

(9) the Trustee has received an Officers' Certificate stating that such Legal Defeasance or Covenant Defeasance shall not result in a breach or violation of, or constitute a default under the Indenture or any other material agreement or instrument to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound;

(10) the Company has delivered to the Trustee an Officers' Certificate stating that the deposit was not made by the Company with the intent of preferring the holders over any other creditors of the Company or any Subsidiary of the Company or with the intent of defeating, hindering, delaying or defrauding any other creditors of the Company or others;

(11) the Company has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel from counsel reasonably acceptable to the Trustee (subject to customary exceptions and exclusions) and independent of the Company, each stating that all conditions precedent provided for or relating to the Legal Defeasance or the Covenant Defeasance have been complied with; and

(12) the Company has delivered to the Trustee an Opinion of Counsel from counsel reasonably acceptable to the Trustee and independent of the Company to the effect that the trust funds will not be subject to the effect of any applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally.

## Satisfaction and Discharge

The Indenture will be discharged and will cease to be of further effect (except as to surviving rights or registration of transfer or exchange of the notes, as expressly provided for in the Indenture) as to all outstanding notes when:

(1) either:

(a) all the notes theretofore authenticated and delivered (except lost, stolen or destroyed notes which have been replaced or paid and notes for whose payment money has theretofore been deposited in trust or segregated

and held in trust by the Company and thereafter repaid to the Company or discharged from such trust) have been delivered to the Trustee for cancellation; or

(b) all notes not theretofore delivered to the Trustee for cancellation have become due and payable, and the Company has irrevocably deposited or caused to be deposited with the Trustee funds or certain direct, non-callable obligations of, or guaranteed by, the United States sufficient without reinvestment to pay and discharge the entire Indebtedness on the notes not theretofore delivered to the Trustee for cancellation, for principal of, premium, if any, and interest on the notes to the date of deposit, together with irrevocable instructions from the Company directing the Trustee to apply such funds to the payment of such notes;

(2) the Company has paid all other sums payable under the Indenture and the notes by it; and

(3) the Company has delivered to the Trustee an Officers' Certificate stating that all conditions precedent under the Indenture relating to the satisfaction and discharge of the Indenture have been complied with.

## Modification of the Indenture

From time to time, the Company and the Trustee, without the consent of the holders, may amend the Indenture or the notes for certain specified purposes, including curing ambiguities, omissions, defects or inconsistencies, to provide for uncertificated notes in addition to or in place of certificated notes; to provide for the assumption of the Company's obligations to holders of notes in the case of a merger or consolidation or sale of all or substantially all of the Company's assets, as applicable; to make any change that would provide any additional rights or benefits to the holders or that does not adversely affect the legal rights under the Indenture of any such holder; to comply with applicable requirements of the U.S. Securities and Exchange Commission; to conform the text of the Indenture or the notes to any provision of this Description of the New Notes to the extent that such provision in this Description of the New Notes was intended to be a verbatim recitation of a provision of the Indenture or the notes; to comply with the requirements of any applicable securities depositary; to provide for a successor Trustee in accordance with the terms of the Indenture; to otherwise comply with any requirement of the Indenture; to issue Additional Notes; and to make any other changes which do not adversely affect the rights of any of the holders in any material respect. In formulating its opinion on such matters, the Trustee will be entitled to rely on such evidence as it deems appropriate, including solely on an Opinion of Counsel and Officers' Certificate, and shall have no liability whatsoever in reliance upon the foregoing.

Other modifications and amendments of the Indenture or the notes may be made with the consent of the holders of a majority in principal amount of the then outstanding notes issued under the Indenture, except that, without the consent of each holder affected thereby, no amendment may (with respect to any notes held by a non-consenting holder):

(1) reduce the principal amount of notes whose holders must consent to an amendment, supplement or waiver;

(2) reduce the rate of or change or have the effect of changing the time for payment of interest, including defaulted interest, on any notes;

(3) reduce the principal of or change or have the effect of changing the fixed maturity of any notes, or change the date on which any notes may be subject to redemption, or reduce the redemption price therefor;

(4) make any notes payable in a currency other than that stated in the notes;

(5) make any change in provisions of the Indenture entitling each holder to receive payment of principal of, premium, if any, and interest on such note on or after the due date thereof or amend the contractual right to bring suit to enforce such payment, or permitting holders of a majority in principal amount of notes to waive Defaults or Events of Default;

(6) amend, change or modify in any material respect any obligation of the Company to make and consummate a Change of Control Triggering Event Offer in respect of a Change of Control Triggering Event that has occurred, or make and consummate an Asset Sale Offer with respect to any Asset Sale that has been consummated;

(7) make any change in the provisions of the Indenture described under "—Additional Amounts" that adversely affects the rights of any holder or amend the terms of the notes in a way that would result in a loss of exemption from Taxes;

(8) make any change to the provisions of the Indenture or the notes that adversely affects the ranking of the notes; and

(9)  eliminate or modify in any manner a Guarantor's obligation with respect to its Note Guarantee which adversely affects the holders of the notes in any material respect, except as contemplated in the Indenture.

## Governing Law; Jurisdiction

The Indenture and the notes will be governed by, and construed in accordance with, the law of the State of New York. The Company consents to the jurisdiction of the Federal and State courts located in the City of New York, Borough of Manhattan and has appointed an agent for service of process with respect to any actions brought in these courts arising out of or based on the Indenture or the notes.

## The Trustee

Except during the continuance of an Event of Default, the Trustee will perform only such duties as are specifically set forth in the Indenture. During the existence of an Event of Default, the Trustee will exercise such rights and powers vested in it by the Indenture, and use the same degree of care and skill in its exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

The Indenture contains certain limitations on the rights of the Trustee, should it become a creditor of the Company, to obtain payments of claims in certain cases or to realize on certain property received in respect of any such claim as security or otherwise. Subject to the terms of the indenture, the Trustee will be permitted to engage in other transactions; *provided* that if the Trustee acquires any conflicting interest as described in the indenture, it must eliminate such conflict or resign.

## No Personal Liability

An incorporator, director, officer, employee, stockholder or controlling person, as such, of the Company shall not have any liability for any obligations of the Company under the notes or the Indenture or for any claims based on, in respect of or by reason of such obligations or their creation. By accepting a note, each holder waives and releases all such liability.

## Currency Indemnity

The Company and the Guarantors will pay all sums payable under the Indenture or the notes solely in U.S. dollars. Any amount that a holder receives or recovers in a currency other than U.S. dollars in respect of any sum expressed to be due to such holder from the Company or any Guarantors will only constitute a discharge to us, to the greatest extent permitted under applicable law, to the extent of the U.S. dollar amount which such holder is able to purchase with the amount received or recovered in that other currency on the date of the receipt or recovery or, if it is not practicable to make the purchase on that date, on the first date on which such holder is able to do so. If the U.S. dollar amount is less than the U.S. dollar amount expressed to be due to such holder under any note, to the greatest extent permitted under applicable law, the Company and the Guarantors will indemnify such holder against any loss such holder may sustain as a result. In any event, the Company and the Guarantors will indemnify any such holder against the cost of making any purchase of U.S. dollars. For the purposes of this paragraph, it will be sufficient for such holder to certify in a satisfactory manner that such holder would have suffered a loss had an actual purchase of U.S. dollars been made with the amount received in that other currency on the date of receipt or recovery or, if it was not practicable to make the purchase on that date, on the first date on which such holder was able to do so. In addition, any such holder will also be required to certify in a satisfactory manner the need for a change of the purchase date.

The indemnities described above:

- constitute a separate and independent obligation from the other obligations of the Company and the Guarantors;

- will give rise to a separate and independent cause of action;

- will apply irrespective of any indulgence granted by any holder; and

- will continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any note.

## Certain Definitions

Set forth below is a summary of certain of the defined terms used in the Indenture. Reference is made to the Indenture for a full definition of all such terms, as well as any other terms used herein for which no definition is provided.

*"Acquired Indebtedness"* means Indebtedness of a Person or any of its Subsidiaries existing at the time such Person becomes a Restricted Subsidiary or at the time it merges, consolidates or amalgamates with the Company or any of its Restricted Subsidiaries or is assumed in connection with the acquisition of assets from such Person; *provided* that such Indebtedness is not incurred in connection with, or in anticipation or contemplation of such merger, consolidation, amalgamation or acquisition. Such Indebtedness will be deemed to have been Incurred at the time such Person becomes a Restricted Subsidiary or at the time it merges, consolidates or amalgamates with the Company or a Restricted Subsidiary or at the time such Indebtedness is assumed in connection with the acquisition of assets from such Person.

*"Additional Amounts"* has the meaning set forth under "—Additional Amounts" above.

*"Additional Notes"* has the meaning set forth under "—Payment of Additional Notes" above.

*"Affiliate"* means, with respect to any specified Person, any other Person who directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such specified Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. For purposes of this definition, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.

*"Affiliate Transaction"* has the meaning set forth under "—Certain Covenants—Limitation on Transactions with Affiliates" above.

*"Applicable GAAP"* means either (i) financial reporting and accounting standards (*Normas de Información Financiera*) accepted in Colombia, as provided by Law 1314 of 2009 (as amended), which are based on International Financial Reporting Standards, together with their corresponding interpretations as issued by the International Accounting Standards Board, or (ii) International Financial Reporting Standards as issued by the International Accounting Standards Board, in each case as in effect from time to time.

*"Asset Acquisition"* means:

(1) an Investment by the Company or any Restricted Subsidiary in any other Person pursuant to which such Person will become a Restricted Subsidiary, or will be merged with or into the Company or any Restricted Subsidiary;

(2) the acquisition by the Company or any Restricted Subsidiary of the assets of any Person (other than a Subsidiary of the Company) which constitute all or substantially all of the assets of such Person or comprises any division or line of business of such Person or any other properties or assets of such Person other than in the ordinary course of business; or

(3) any Revocation with respect to an Unrestricted Subsidiary.

*"Asset Sale"* means any direct or indirect sale, disposition, issuance, conveyance, transfer, lease, assignment or other transfer, including a Sale and Leaseback Transaction (each, a "disposition") by the Company or any Restricted Subsidiary of:

(a) any Capital Stock of any Restricted Subsidiary (but not Capital Stock of the Company); or

(b) any property or assets (other than cash or Cash Equivalents or Capital Stock of the Company) of the Company or any Restricted Subsidiary.

Notwithstanding the preceding, the following items will not be deemed to be Asset Sales:

(1) the disposition of all or substantially all of the assets of the Company and its Restricted Subsidiaries as permitted under "—Certain Covenants—Merger, Consolidation and Sale of Assets;"

(2) for purposes of "—Certain Covenants—Limitation on Asset Sales and Sales of Subsidiary Stock" only, the making of a Restricted Payment permitted under "—Certain Covenants—Limitation on Restricted Payments" or any Permitted Investment;

(3) a disposition to the Company or a Guarantor, including a Person that is or will become a Guarantor immediately after the disposition;

(4) transactions that involve assets or Capital Stock of a Restricted Subsidiary having a Fair Market Value of less than US$3.0 million (or the equivalent in other currencies) during the life of the notes;

(5) a transfer of assets between or among the Company and any Guarantor;

(6) an issuance or sale of Capital Stock by a Restricted Subsidiary of the Company to the Company or any Restricted Subsidiary;

(7) the disposition of accounts receivable and Loan Receivables as permitted under "—Certain Covenants—Limitations on Securitizations and Loan Receivables Backed Financings";

(8) the sale of delinquent loans to unaffiliated third parties;

(9) any sale or other disposition of damaged, worn-out, obsolete or no longer useful assets or properties in the ordinary course of business;

(10) the sale of assets received by the Company or any of its Restricted Subsidiaries upon the foreclosure of a Lien in the ordinary course of business;

(11) the granting of Liens permitted under "Certain Covenants—Limitation on Liens";

(12) the good faith surrender or waiver of contract rights or settlement, release or surrender of contract, tort or other claims or statutory rights in connection with a settlement in the ordinary course of business consistent with past practice; and

(13) a disposition to a Restricted Subsidiary that is not a Guarantor from another Restricted Subsidiary that is not a Guarantor.

*"Asset Sale Offer"* has the meaning set forth under "—Certain Covenants—Limitation on Asset Sales and Sales of Subsidiary Stock."

*"Asset Sale Transaction"* means any Asset Sale and, whether or not constituting an Asset Sale, (1) any sale or other disposition of Capital Stock, (2) any Designation with respect to an Unrestricted Subsidiary and (3) any sale or other disposition of property or assets excluded from the definition of Asset Sale by clause (4) of that definition.

*"Board of Directors"* means, as to any Person, the board of directors, management committee or similar governing body of such Person or any duly authorized committee thereof.

*"Board Resolution"* means, with respect to any Person, a copy of a resolution certified by the Secretary or an Assistant Secretary of such Person to have been duly adopted by the Board of Directors of such Person and to be in full force and effect on the date of such certification, and delivered to the Trustee.

*"Capitalization Ratio"* means, for any Person as of any date of determination, the result (expressed as a percentage) obtained by dividing (x) Consolidated Net Worth of such Person (calculated as of the end of the last completed fiscal quarter ending on or prior to the date of the transaction giving rise to the need to calculate Consolidated Net Worth) by (y) Net Loan Portfolio as of such date of determination.

*"Capital Securities"* means, with respect to the Company, any bonds, debentures, notes or other similar instruments of the Company (i) which are expressly subordinated in right of payment and in insolvency to the prior payment in full of any note and any other Senior Indebtedness, (ii) which have a scheduled maturity date of at least 10 years after the Issue Date, (iii) the first principal payment in respect of which (pursuant to any redemption provision, amortization schedule or

otherwise) may not occur until at least 12 months after the last scheduled principal payment of any note and any other Senior Indebtedness, (iv) the principal of which may not be accelerated so long as any note remains outstanding (except pursuant to a customary bankruptcy event of default with respect to the Company), (v) are senior only to Capital Stock of the Company, (vi) in respect of which interest may be deferred and cancelled, and (vii) which, prior to their issuance, are provided equity-like treatment by at least two Rating Agencies pursuant to their respective rating criteria.

*"Capital Stock"* means:

(1) with respect to any Person that is a corporation, any and all shares, interests, participations or other equivalents (however designated and whether or not voting) of corporate stock, including each class of Common Stock and Preferred Stock of such Person;

(2) with respect to any Person that is not a corporation, any and all partnership or other equity or ownership interests of such Person; and

(3) any warrants, rights or options to purchase any of the instruments or interests referred to in clause (1) or (2) above.

*"Capitalized Lease Obligations"* means, as to any Person, the obligations of such Person under a lease that are required to be classified and accounted for as capital lease obligations under Applicable GAAP. For purposes of this definition, the amount of such obligations at any date will be the capitalized amount of such obligations at such date, determined in accordance with Applicable GAAP.

*"Cash Equivalents"* means:

(1) marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition thereof;

(2) marketable direct obligations issued by the government of Colombia and maturing not later than one year after the acquisition thereof;

(3) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either S&P or Fitch or any successor thereto;

(4) commercial paper maturing no more than one year from the date of creation thereof and, at the time of acquisition, having a rating of at least A-2 from S&P or at least F-1 from Fitch;

(5) demand deposits, certificates of deposit, time deposits or bankers' acceptances maturing within one year from the date of acquisition thereof issued by (a) any bank organized under the laws of the United States of America or any state thereof or the District of Columbia, (b) any U.S. branch of a non-U.S. bank having at the date of acquisition thereof combined capital and surplus of not less than US$500.0 million, or (c) in the case of Colombian peso deposits, any institution regulated by or subject to the supervision of the Colombian Superintendency of Finance (*Superintendencia Financiera de Colombia*);

(6) repurchase obligations with a term of not more than seven days for underlying securities of the types described in clause (1) above entered into with any bank meeting the qualifications specified in clause (5) above;

(7) any other debt instruments (i) having a rating of at least A-1 or AAA from S&P or F1 or AAA from Fitch or (ii) issued by any institution regulated by or subject to the supervision of the Colombian Superintendency of Finance (*Superintendencia Financiera de Colombia*), in each case, with maturities of one year or less from the date of acquisition; and

(8) investments in money market funds, which invest substantially all of their assets in securities of the types described in clauses (1) through (7) above.

*"Change of Control"* means the occurrence of one or more of the following events:

(1)  the Permitted Holders cease to be the beneficial owners, directly or indirectly, in the aggregate of at least 30.0% of the total voting power of the Voting Stock of the Company (or its successor by merger, consolidation or purchase of all or substantially all of its assets); or

(2)  if any "person" or "group" (as defined below) (other than a Permitted Holder) becomes the beneficial owner, directly or indirectly, of a greater amount of the total voting power of the Voting Stock of the Company than the total voting power of the Voting Stock of the Company held by the Permitted Holders in the aggregate; or

(3)  the Company consolidates with, or merges with or into, another Person, or the Company sells, conveys, assigns, transfers, leases or otherwise disposes of all or substantially all of the assets of the Company, determined on a consolidated basis, to any Person, other than a transaction where the Person or Persons that, immediately prior to such transaction "beneficially owned" the outstanding Voting Stock of the Company are, by virtue of such prior ownership, or Permitted Holders are, the "beneficial owners" in the aggregate of a majority of the total voting power of the then outstanding Voting Stock of the surviving or transferee person (or if such surviving or transferee Person is a direct or indirect wholly-owned subsidiary of another Person, such Person who is the ultimate parent entity), in each case whether or not such transaction is otherwise in compliance with the Indenture.

For purposes of this definition:

(a)  "beneficial owner" will have the meaning specified in Rules 13d-3 and 13d-5 under the Exchange Act, except that any Person or Group will be deemed to have "beneficial ownership" of all securities that such Person or Group has the right to acquire, whether such right is exercisable immediately, only after the passage of time or, except in the case of the Permitted Holders, upon the occurrence of a subsequent condition.

(b)  "Person" and "Group" will have the meanings for "person" and "group" as used in Sections 13(d) and 14(d) of the Exchange Act; and

(c)  the Permitted Holders will be deemed to beneficially own any Voting Stock of a corporation held by any other corporation (the "parent corporation") so long as the Permitted Holders beneficially own, directly or indirectly, in the aggregate at least 50.0% of the voting power of the Voting Stock of the parent corporation and no other Person or Group beneficially owns an equal or greater amount of the Voting Stock of the parent corporation.

*"Change of Control Triggering Event"* has the meaning set forth under "—Change of Control Triggering Event."

*"Change of Control Triggering Event Offer"* has the meaning set forth under "—Change of Control Triggering Event."

*"Change of Control Triggering Event Payment"* has the meaning set forth under "—Change of Control Triggering Event."

*"Change of Control Triggering Event Payment Date"* has the meaning set forth under "—Change of Control Triggering Event."

"*Collateral Permitted Liens*" means any of the following:

(1)  statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, suppliers, materialmen, repairmen and other Liens imposed by law incurred in the ordinary course of business for sums not yet delinquent or being contested in good faith, if such reserve or other appropriate provision, if any, as shall be required by IFRS has been made in respect thereof;

(2)  Liens for taxes, assessments or governmental charges or levies on the property of the Company or any Restricted Subsidiary if the same shall not at the time be delinquent or thereafter can be paid without penalty, or are being contested in good faith and by appropriate proceedings promptly instituted and diligently concluded; provided that any reserve or other appropriate provision that shall be required in conformity with IFRS shall have been made therefor;

(3)     Liens Incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, including any Lien securing letters of credit issued in the ordinary course of business consistent with past practice in connection therewith, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(4)     Liens upon specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(5)     Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual, or warranty requirements of the Company or a Restricted Subsidiary, including rights of offset and set-off;

(6)     Liens existing on the Issue Date;

(7)     zoning restrictions, licenses, easements, servitudes, rights of way, title defects, covenants running with the land and other similar charges or encumbrances or restrictions not interfering in any material respect with the ordinary operation of any Collateral or materially and adversely affecting the value of the Collateral; and

(8)     Liens created pursuant to the Collateral Documents securing the New Notes or any note guarantees.

"*Colombian Restructuring*" means any case or other proceeding against the Company or any Subsidiary with respect to it or its debts under bankruptcy, *reorganización empresarial*, *liquidación judicial*, insolvency or other similar law now or hereafter in effect or seeking the appointment of a *promotor*, *liquidador*, custodian or other similar official of it or any substantial part of its properties.

"*Common Stock*" of any Person means any and all shares, interests or other participations in, and other equivalents (however designated and whether voting or non-voting) of such Person's common equity interests, whether outstanding on the Issue Date or issued after the Issue Date, and includes, without limitation, all series and classes of such common equity interests.

"*Consolidated Net Income*" means, with respect to any Person for any period, the aggregate net income (or loss) of such Person and its Subsidiaries (after deducting (or adding) the portion of such net income (or loss) attributable to minority interests in Subsidiaries of such Person) for such period on a consolidated basis, determined in accordance with Applicable GAAP; *provided* that there shall be excluded therefrom to the extent reflected in such aggregate net income (loss):

(1)  net after-tax gains or losses from Asset Sale Transactions or abandonments or reserves relating thereto;

(2)  net after-tax items classified as extraordinary gains or losses;

(3)  the net income (but not loss) of any Person, other than such Person and any Subsidiary of such Person (Restricted Subsidiary in the case of the Company); except that, solely for purposes of calculating Consolidated Net Income pursuant to clause (3) of the first paragraph of "Certain Covenants—Limitation on Restricted Payments" only, Consolidated Net Income of the Company will include the Company's proportionate share of the net income of:

(a)  any Person acquired in a "pooling of interests" transaction accrued prior to the date it becomes a Restricted Subsidiary or is merged or consolidated with the Company or any Restricted Subsidiary; or

(b)  a Surviving Entity prior to assuming the Company's obligations under the Indenture and the notes pursuant to "Certain Covenants—Limitation on Merger, Consolidation and Sales of Assets";

(4)  the net income (but not loss) of any Subsidiary of such Person (Restricted Subsidiary in the case of the Company) to the extent that (and only so long as) a corresponding amount could not be distributed to such Person at the date of determination as a result of any restriction pursuant to the constituent documents of such Subsidiary (Restricted Subsidiary in the case of the Company) or any law, regulation, agreement or judgment applicable to any such distribution;

(5)     any increase (but not decrease) in net income attributable to minority interests in any Subsidiary (Restricted Subsidiary in the case of the Company);

(6)     any gain (or loss) from foreign exchange translation or change in net monetary position;

(7)     any gains or losses (less all fees and expenses or charges relating thereto) attributable to the early extinguishment of Indebtedness and Hedging Obligations; and

(8)     the cumulative effect of changes in accounting principles.

*"Consolidated Net Worth"* means, for any Person at any time, the consolidated stockholders' equity of such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Company) as set forth on the consolidated balance sheet as of the most recent fiscal quarter of such Person, prepared in accordance with Applicable GAAP, less (without duplication) amounts attributable to Disqualified Capital Stock of such Person.

*"Consolidated Tangible Assets"* means, for any Person at any time, the total consolidated assets of such Person and its Subsidiaries (Restricted Subsidiaries in the case of the Company) as set forth on the consolidated balance sheet as of the most recent fiscal quarter of such Person, prepared in accordance with Applicable GAAP, *less* Intangible Assets.

*"Covenant Defeasance"* has the meaning set forth under "—Legal Defeasance and Covenant Defeasance."

*"Currency Agreement"* means, in respect of any Person, any foreign exchange contract, currency swap agreement or other similar agreement as to which such Person is a party designed to hedge foreign currency risk of such Person.

*"Default"* means an event or condition the occurrence of which is, or with the lapse of time or the giving of notice or both would be, an Event of Default.

*"Designated Non-cash Consideration"* means the Fair Market Value of non-cash consideration used in a Permitted Business (other than securities) received by the Company or any of its Restricted Subsidiaries in connection with an Asset Sale that is so designated as Designated Non-cash Consideration pursuant to an officers' certificate, setting forth the basis of such valuation, executed by the Chief Executive Officer or the Chief Financial Officer of the Company and delivered to the Trustee, less the amount of cash or Cash Equivalents received in connection with a sale of such Designated Non-cash Consideration.

*"Designation"* and *"Designation Amount"* have the meanings set forth under "—Certain Covenants—Limitation on Designation of Unrestricted Subsidiaries" above.

*"Disqualified Capital Stock"* means that portion of any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the sole option of the holder thereof, in any case, on or prior to the final maturity date of the notes; *provided, however*, that any Capital Stock that would not constitute Disqualified Stock but for provisions thereof giving holders thereof the right to require such Person to purchase or redeem such Capital Stock upon the occurrence of an "asset sale" or "change of control" occurring prior to the final maturity of the notes shall not constitute Disqualified Stock if:

(1)     the "asset sale" or "change of control" provisions applicable to such Capital Stock are not materially more favorable to the holders of such Capital Stock than the terms applicable to the notes and described under "—Certain Covenants—Limitation on Sales of Assets and Subsidiary Stock" and "—Certain Covenants—Change of Control Triggering Event;" and

(2)     any such requirement only becomes operative after compliance with such terms applicable to the notes, including the purchase of any notes tendered pursuant thereto.

The amount of any Disqualified Capital Stock shall be equal to the greater of its voluntary or involuntary liquidation preference and its maximum fixed repurchase price, but excluding accrued dividends, if any. The amount of any Disqualified Stock that does not have a fixed redemption, repayment or repurchase price will be calculated in accordance with the terms of such Disqualified Stock as if such Disqualified Stock were redeemed, repaid or repurchased on any date on which the amount of such Disqualified Stock is to be determined pursuant to the Indenture; *provided, however*, that if such Disqualified Stock

could not be required to be redeemed, repaid or repurchased at the time of such determination, the redemption, repayment or repurchase price will be the book value of such Disqualified Stock as reflected in the most recent consolidated financial statements of such Person.

"*Eligible Subsidiary*" means a Restricted Subsidiary that is a Wholly-Owned Subsidiary of the Company or of a Guarantor but excluding (1) any Subsidiary the net assets of which are less than US$3.0 million and (2) for the avoidance of doubt, any Special Purpose Finance Trust.

"*ECP Program*" means the Company's euro commercial paper program established or otherwise contemplated by the Program Agreement dated as of August 12, 2014, by and among the Company and the dealers named therein, as such document may be amended or supplemented from time to time, under which the Company may issue and have outstanding at any time notes up to an aggregate principal amount of US$150.0 million.

"*Equity Sales*" has the meaning set forth under "—Optional Redemption upon Equity Sales."

"*Event of Default*" has the meaning set forth under "Events of Default."

"*Exchange Act*" means the U.S. Securities Exchange Act of 1934, as amended, or any successor statute or statutes thereto.

"*Fair Market Value*" means, with respect to any asset (including, without limitation, accounts receivable), the price (after deducting any liabilities relating to such assets) which could be negotiated in an arm's-length free market transaction, for cash, between a willing seller and a willing and able buyer, neither of which is under any compulsion to complete the transaction; *provided* that the Fair Market Value of any such asset (including, without limitation, accounts receivable) will be determined conclusively by the senior management of the Company acting in good faith.

"*Fitch*" means Fitch, Inc. and its successors and assigns.

"*Guarantee*" means any obligation, contingent or otherwise, including an *aval*, of any Person directly or indirectly guaranteeing any Indebtedness of any other Person:

(1)  to purchase or pay, or advance or supply funds for the purchase or payment of, such Indebtedness of such other Person, whether arising by virtue of partnership arrangements, or by agreement to keep well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise, or

(2)  entered into for purposes of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof, in whole or in part,

*provided* that "Guarantee" will not include endorsements for collection or deposit in the ordinary course of business. "Guarantee" used as a verb has a corresponding meaning.

"*Guarantor*" means any Eligible Subsidiary that provides a Note Guarantee pursuant to the Indenture unless and until such Guarantor is released from its Note Guarantee pursuant to the Indenture.

"*Hedging Obligations*" means the obligations of any Person pursuant to any Interest Rate Agreement or Currency Agreement.

"*Impairment of Financial Assets and FGA Reserve*" means, as of any date of determination, the sum of (i) impairment of financial assets of the Company and its Restricted Subsidiaries as set forth on the consolidated financial statements and related notes thereto as of and for the most recent fiscal quarter of the Company, prepared in accordance with Applicable GAAP and (ii) the amount of the guarantee disclosed on the notes to the consolidated financial statements of the Company with respect to Loan Receivables guaranteed by the *Fondo de Garantías de Antioquia* pursuant to that certain agreement between the Company and the *Fondo de Garantías de Antioquia*, dated as of August 9, 2011, as amended from time to time.

"*Incur*" means, with respect to any Indebtedness or other obligation of any Person, to create, issue, incur (including by conversion, exchange or otherwise), assume, Guarantee or otherwise become liable in respect of such Indebtedness or other obligation on the balance sheet of such Person (and "Incurrence," "Incurred" and "Incurring" will have meanings correlative to the preceding).

*"Indebtedness"* means with respect to any Person, without duplication:

(1) the principal amount (or, if less, the accreted value) of all obligations of such Person for borrowed money;

(2) the principal amount (or, if less, the accreted value) of all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(3) all Capitalized Lease Obligations of such Person;

(4) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations and all obligations under any title retention agreement (but excluding trade accounts payable and other accrued liabilities arising in the ordinary course of business that are not overdue by 180 days or more or are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted);

(5) all letters of credit, banker's acceptances or similar credit transactions, including reimbursement obligations in respect thereof;

(6) Guarantees and other contingent obligations of such Person in respect of Indebtedness referred to in clauses (1) through (5) above and clauses (8) through (11) below;

(7) all Indebtedness of any other Person of the type referred to in clauses (1) through (6) which is secured by any Lien on any property or asset of such Person, the amount of such Indebtedness being deemed to be the lesser of the Fair Market Value of such property or asset or the amount of the Indebtedness so secured;

(8) all Net Obligations under Hedging Obligations of such Person;

(9) all Indebtedness Incurred by a Special Purpose Finance Trust;

(10) to the extent not otherwise included in this definition, all liabilities required to be recorded on the consolidated financial statements and notes thereto of such Person in accordance with Applicable GAAP in connection with a sale or other disposition of securitized receivables, Loan Receivables or other accounts receivables and related assets, including, without limitation, in connection with any Loan-Related Securitization or Loan Receivables Backed Financing; and

(11) all Disqualified Capital Stock issued by such Person.

*"Intangible Assets"* means with respect to any Person all unamortized debt discount and expense, unamortized net deferred charges, goodwill, patents, trademarks, service marks, trade names, copyrights and all other items which would be treated as intangibles on the consolidated balance sheet of such Person prepared in accordance with Applicable GAAP.

*"Interest Rate Agreement"* of any Person means any interest rate protection agreement (including, without limitation, interest rate swaps, caps, floors, collars, derivative instruments and similar agreements) and/or other types of hedging agreements designed to hedge interest rate risk of such Person.

*"Investment"* means, with respect to any Person, any:

(1) direct or indirect loan, advance or other extension of credit (including, without limitation, a Guarantee) to any other Person,

(2) capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others) any other Person, or

(3) any purchase or acquisition by such Person of any Capital Stock, bonds, notes, debentures or other securities or evidences of Indebtedness issued by, any other Person.

*"Investment"* will exclude accounts receivable or deposits arising in the ordinary course of business. "Invest," "Investing" and "Invested" will have corresponding meanings.

For purposes of the "Limitation on Restricted Payments" covenant, the Company will be deemed to have made an "Investment" in an Unrestricted Subsidiary at the time of its Designation, which will be valued at the Fair Market Value of the sum of the net assets of such Unrestricted Subsidiary at the time of its Designation and the amount of any Indebtedness of such Unrestricted Subsidiary or owed to the Company or any Restricted Subsidiary immediately following such Designation. Any property transferred to or from an Unrestricted Subsidiary will be valued at its Fair Market Value at the time of such transfer. If the Company or any Restricted Subsidiary sells or otherwise disposes of any Capital Stock of a Restricted Subsidiary (including any issuance and sale of Capital Stock by a Restricted Subsidiary) such that, after giving effect to any such sale or disposition, such Restricted Subsidiary would cease to be a Subsidiary of the Company, the Company will be deemed to have made an Investment on the date of any such sale or disposition equal to sum of the Fair Market Value of the Capital Stock of such former Restricted Subsidiary held by the Company or any Restricted Subsidiary immediately following such sale or other disposition and the amount of any Indebtedness of such former Restricted Subsidiary Guaranteed by the Company or any Restricted Subsidiary or owed to the Company or any other Restricted Subsidiary immediately following such sale or other disposition.

*"Investment Grade Rating"* means a rating equal to or higher than BBB- (or the equivalent) by Fitch, S&P or Moody's or, if any such entity ceases to rate the notes for reasons outside of the control of the Company, the equivalent investment grade credit rating from any other Rating Agency.

*"Investment Return"* means, in respect of any Investment (other than a Permitted Investment) made after the Issue Date by the Company or any Restricted Subsidiary:

(1) (x) the proceeds in cash and the Fair Market Value of property other than cash received by the Company or any Restricted Subsidiary upon the sale, liquidation or repayment of such Investment or, in the case of a Guarantee, the amount of the Guarantee upon the unconditional release of the Company and its Restricted Subsidiaries in full, less any payments previously made by the Company or any Restricted Subsidiary in respect of such Guarantee and (y) any dividends or distributions received by the Company or any Restricted Subsidiary from an Unrestricted Subsidiary, to the extent such amounts were not otherwise included in Consolidated Net Income;

(2) in the case of the Revocation of the Designation of an Unrestricted Subsidiary, an amount equal to the lesser of:

(a) the Company's Investment in such Unrestricted Subsidiary at the time of such Revocation;

(b) that portion of the Fair Market Value of the net assets of such Unrestricted Subsidiary at the time of Revocation that is proportionate to the Company's equity interest in such Unrestricted Subsidiary at the time of Revocation; and

(c) the Designation Amount with respect to such Unrestricted Subsidiary upon its Designation which was treated as a Restricted Payment; and

(3) in the event the Company or any Restricted Subsidiary makes any Investment in a Person that, as a result of or in connection with such Investment, becomes a Restricted Subsidiary, the Fair Market Value of the Investment of the Company and its Restricted Subsidiaries in such Person, in the case of each of (1), (2) and (3), up to the amount of such Investment that was treated as a Restricted Payment under "Certain Covenants — Limitation on Restricted Payments" less the amount of any previous Investment Return in respect of such Investment.

*"Issue Date"* means the date on which the notes are first issued.

*"Legal Defeasance"* has the meaning set forth under "Legal Defeasance and Covenant Defeasance."

*"Lien"* means any lien, mortgage, deed of trust, pledge, security interest, charge or encumbrance of any kind (including any conditional sale, assignment or transfer, or other title retention agreement, any lease in the nature thereof and any agreement to give any security interest); *provided* that (i) the lessee in respect of a Capitalized Lease Obligation or Sale and Leaseback Transaction will be deemed to have Incurred a Lien on the property leased thereunder and (ii) the grantor in respect of a Loan Receivables Backed Financing will be deemed to have Incurred a Lien on the Loan Receivables assigned or transferred thereunder.

*"Loan Receivables"* means loans and other loan-related receivables purchased or originated by the Company or any Restricted Subsidiary; *provided, however*, that for purposes of determining the amount of a Loan Receivable at any time,

such amount shall be determined in accordance with Applicable GAAP, consistently applied, as of the most recent practicable date.

*"Loan Receivables Backed Financing"* means any financing transaction or series of transactions entered into by the Company or any of its Restricted Subsidiaries pursuant to which such Person directly or indirectly assigns or transfers a pool of specified Loan Receivables or related assets of the Company or any Restricted Subsidiary to a Special Purpose Finance Trust on terms that senior management has concluded are customary and market terms fair to the Company and its Restricted Subsidiaries and the proceeds of which are used to repay any Senior Indebtedness of the Company, make capital expenditures in a Permitted Business, and/or purchase assets to be used by the Company or any Restricted Subsidiary in a Permitted Business.

*"Loan-Related Securitization"* means any securitization, factoring, discounting or similar financing transaction or series of transactions entered into by the Company or any of its Restricted Subsidiaries pursuant to which the Company or any of its Restricted Subsidiaries directly or indirectly through a Securitization Vehicle securitizes a pool of specified Loan Receivables, Residual Interests, net interest margin securities or similar or related assets of the Company or any Restricted Subsidiary on terms that the Board of Directors has concluded are customary and market terms fair to the Company and its Restricted Subsidiaries and the proceeds of which are used to repay any Senior Indebtedness of the Company, make capital expenditures in a Permitted Business, and/or purchase assets to be used by the Company or any Restricted Subsidiary in a Permitted Business.

*"Marketable Securities"* has the meaning ascribed to such term under Applicable GAAP.

"*Moody's*" means Moody's Investors Service, Inc.

*"Net Cash Proceeds"* means, with respect to any Asset Sale, the proceeds in the form of cash or Cash Equivalents, including payments in respect of deferred payment obligations when received in the form of cash or Cash Equivalents received by the Company or any of its Restricted Subsidiaries from such Asset Sale, net of:

(1)  reasonable out-of-pocket expenses and fees relating to such Asset Sale (including, without limitation, legal, accounting and investment banking fees and sales commissions);

(2)  taxes paid or payable in respect of such Asset Sale after taking into account any reduction in consolidated tax liability due to available tax credits or deductions and any tax sharing arrangements;

(3)  repayment of Indebtedness secured by a Lien permitted under the Indenture that is required to be repaid in connection with such Asset Sale; and

(4)  appropriate amounts to be provided by the Company or any Restricted Subsidiary, as the case may be, as a reserve, in accordance with Applicable GAAP, against any liabilities associated with such Asset Sale and retained by the Company or any Restricted Subsidiary, as the case may be, after such Asset Sale, including, without limitation, pension and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale, but excluding any reserves with respect to Indebtedness.

*"Net Loan Portfolio"* means, as of any date of determination, the principal amount of the total Loan Receivables of the Company and its Restricted Subsidiaries *less* Impairment of Financial Assets and FGA Provision of the Company and its Restricted Subsidiaries, in each case, as set forth on the consolidated financial statements and notes thereto as of the most recent fiscal quarter of the Company, prepared in accordance with Applicable GAAP.

"*Net Obligations*" means, at any date of determination, the net amount, exclusive of any commissions or administrative fees that a Person would be obligated to pay upon the termination of any Hedging Obligations.

*"Obligations"* means, with respect to any Indebtedness, any principal, interest (including, without limitation, Post-Petition Interest), penalties, fees, indemnifications, reimbursements, damages, and other liabilities payable under the documentation governing such Indebtedness, including in the case of the notes, the Indenture.

"*Officer*" means, when used in connection with any action to be taken by the Company, the Chairman of the Board, the Chief Executive Officer, the President, the Chief Financial Officer, any Vice President, the Treasurer, the General Counsel, the Controller or the Secretary of the Company.

"*Officers' Certificate*" means, when used in connection with any action to be taken by the Company, a certificate signed by two Officers or by an Officer and either the Chief Accountant or an Assistant Secretary of the Company and delivered to the Trustee.

"*Opinion of Counsel*" means a written opinion of counsel, who may be an employee of or counsel for the Company (except as otherwise provided in the Indenture) and which opinion shall be reasonably acceptable to the Trustee.

"*Permitted Acquisition Indebtedness*" means Indebtedness of the Company to the extent such Indebtedness was (i) Indebtedness of a Subsidiary prior to the date on which such Subsidiary became a Restricted Subsidiary, (ii) Indebtedness of a Person that was merged, consolidated or amalgamated into the Company or (iii) assumed in connection with the acquisition of assets from a Person; *provided* that on the date such Subsidiary became a Restricted Subsidiary or the date such Person was merged, consolidated or amalgamated into the Company or assumed in connection with an Asset Acquisition, as applicable, after giving *pro forma* effect thereto, (a) the Company would be permitted to incur at least US$1.00 of additional Indebtedness pursuant to clause (1) under "—Certain Covenants—Limitation on Incurrence of Additional Indebtedness," or (b) the Capitalization Ratio of the Company and its Restricted Subsidiaries would be equal to or greater than the Capitalization Ratio of the Company and its Restricted Subsidiaries immediately prior to such transaction.

"*Permitted Business*" means the business or businesses conducted by the Company as of the Issue Date, and any business related, ancillary or complementary thereto or otherwise arising out of those activities, including, without limitation, any activities relating to consumer lending, credit card loans, payroll loan financing, durable goods lending, auto loans, loans to small and medium enterprises (SMEs) and independent professionals, the extension of group loans and other consumer goods and receivables financing services.

"*Permitted Holders*" means:

(1) (i) David Seinjet, (ii) a parent, brother or sister of David Seinjet, (iii) the spouse or a former spouse of any individual referenced in clause (i) or (ii), (iv) the lineal descendants of any person referenced in clauses (i) through (iii) and the spouse or a former spouse of any such lineal descendant, (v) the estate, heir or any guardian, custodian or other legal representative of any individual referenced in clauses (i) through (iv), (vi) any trust or other investment vehicle established principally for the benefit of any one or more of the individuals (or their respective heirs) referenced in clauses (i) through (v), and (vii) any Person in which a majority of the equity interests are owned, directly or indirectly, by any one or more of the Persons referenced in clauses (i) through (vi);

(2) Gramercy Funds Managements LLC;

(3) ACON Investments, L.L.C.; and

(4) GDA Luma Capital Management, L.P.

"*Permitted Indebtedness*" has the meaning set forth under clause (2) of "Certain Covenants—Limitation on Incurrence of Additional Indebtedness."

"*Permitted Investments*" means:

(5) Investments by the Company or any Restricted Subsidiary in any Person that is, or that result in any Person becoming, immediately after such Investment, a Restricted Subsidiary or constituting a merger or consolidation of such Person into the Company or with or into a Restricted Subsidiary, except for a Guarantee of Indebtedness of a Restricted Subsidiary;

(6) Investments by the Company, or any Restricted Subsidiary, in the Company;

(7) Investments in cash and Cash Equivalents;

(8)  Investments existing as of the Issue Date and any extension, modification or renewal of any Investments existing as of the Issue Date (but not Investments involving additional advances, contributions or other investments of cash or property or other increases thereof, other than as a result of the accrual or accretion of interest or original issue discount or payment-in-kind pursuant to the terms of such Investment as of the Issue Date);

(9)  Investments permitted pursuant to clause (2)(b), (c) or (e) of "Certain Covenants—Limitation on Transactions with Affiliates;"

(10) Investments received as a result of the bankruptcy or reorganization of any Person, or taken in settlement of or other resolution of claims or disputes, and, in each case, extensions, modifications and renewals thereof;

(11) Investments made by the Company or its Restricted Subsidiaries as a result of non-cash consideration permitted to be received in connection with an Asset Sale made in compliance with the covenant described under "Certain Covenants—Limitation on Asset Sales and Sales of Subsidiary Stock;"

(12) Investments in the form of Hedging Obligations permitted under clause 2(c) of "Certain Covenants—Limitation on Incurrence of Additional Indebtedness;"

(13) Investments in a Person engaged in a Permitted Business, provided that any such Investment, taken together with all Investments made in reliance on this clause (9) since the Issue Date, shall not exceed (a) 2.5% of the Consolidated Tangible Assets of the Company *plus* (b) US$10.0 million, *plus* (c) returns received from Investments made under this clause (9), *provided, however*, that these returns (i) are not included in the Consolidated Net Income of the Company, (ii) are in the form of cash and (iii) do not exceed the amount of Investments in such Person made after the Issue Date in reliance on this clause (9). For the avoidance of doubt, Investments in Restricted Subsidiaries shall not be affected by this clause (9);

(14) receivables owing to the Company or any Restricted Subsidiary if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms;

(15) payroll, travel, entertainment, relocation and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(16) loans or advances to employees in the ordinary course of business consistent with past practices of the Company or such Restricted Subsidiary;

(17) Investments in any Person to the extent such Investments consist of prepaid expenses, negotiable instruments held for collection and lease, utility and workers' compensation, performance and other similar deposits made in the ordinary course of business by the Company or any Restricted Subsidiary;

(18) credit card loans, payroll loans, durable goods loans, small business loans, group loans, car loans and other loans (including loan portfolios) made or acquired by the Company in the ordinary course of business, including, without limitation, the acquisition of loans or loan portfolios from third parties; and

(19) Investments in any Person in connection with a Loan-Related Securitization or in any Special Purpose Finance Trust in connection with a Loan Receivables Backed Financing; *provided* that such Investment in any such Person or Special Purpose Finance Trust is in the form of a receivables financing facility, net interest margin securities or similar or related assets of the Company or any Restricted Subsidiary and transferred to such Person or Special Purpose Finance Trust in connection with a Loan-Related Securitization (including by way of transfers of receivables to a Securitization Vehicle) or Loan Receivables Backed Financing;

*provided, however*, that with respect to any Investment, the Company may, in its sole discretion, allocate all or any portion of any Investment and later re-allocate all or any portion of any Investment to, one or more of the above clauses (1) through (15) so that the entire Investment would be a Permitted Investment.

*"Permitted Liens"* means any of the following:

(1)  statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, suppliers, materialmen, repairmen and other Liens imposed by law incurred in the ordinary course of business for sums not yet delinquent or being contested in good faith;

(2) Liens Incurred or deposits made in the ordinary course of business (x) in connection with workers' compensation, unemployment insurance and other types of social security, including any Lien securing letters of credit issued in the ordinary course of business consistent with past practice in connection therewith, or (y) to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(3) Liens securing reimbursement obligations with respect to commercial letters of credit which encumber documents and other property relating to such letters of credit and products and proceeds thereof;

(4) Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual, or warranty requirements of the Company or a Restricted Subsidiary, including rights of offset and set-off;

(5) Liens securing Hedging Obligations that relate to Indebtedness that is Incurred in accordance with "—Certain Covenants—Limitation on Incurrence of Additional Indebtedness" and that are secured by the same assets as secure such Hedging Obligations;

(6) Liens existing on the Issue Date and Liens to secure any Refinancing Indebtedness which is Incurred to Refinance any Indebtedness which has been secured by a Lien permitted under the covenant described under "—Certain Covenants—Limitation on Liens" not incurred pursuant to clauses (8) and (9) of this definition of "Permitted Liens" and which Indebtedness has been Incurred in accordance with "—Certain Covenants—Limitation on Incurrence of Additional Indebtedness;" *provided* that such new Liens:

> are no less favorable to the holders of notes and are not more favorable to the lienholders with respect to such Liens than the Liens in respect of the Indebtedness being Refinanced, and

> do not extend to any property or assets other than the property or assets securing the Indebtedness Refinanced by such Refinancing Indebtedness;

(7) Liens securing Acquired Indebtedness Incurred in accordance with "—Certain Covenants—Limitation on Incurrence of Additional Indebtedness" not incurred in connection with, or in anticipation or contemplation of, the relevant acquisition, merger or consolidation; *provided* that

> such Liens secured such Acquired Indebtedness at the time of and prior to the Incurrence of such Acquired Indebtedness by the Company or a Restricted Subsidiary and were not granted in connection with, or in anticipation of the Incurrence of such Acquired Indebtedness by the Company or a Restricted Subsidiary, and

> such Liens do not extend to or cover any property of the Company or any Restricted Subsidiary other than the property that secured the Acquired Indebtedness prior to the time such Indebtedness became Acquired Indebtedness of the Company or a Restricted Subsidiary and are no more favorable to the lienholders than the Liens securing the Acquired Indebtedness prior to the Incurrence of such Acquired Indebtedness by the Company or a Restricted Subsidiary;

(8) purchase money Liens securing Purchase Money Indebtedness or Capitalized Lease Obligations Incurred to finance the acquisition or leasing of property of the Company or a Restricted Subsidiary used in a Permitted Business; *provided* that:

> the related Purchase Money Indebtedness does not exceed the cost of such property and shall not be secured by any property of the Company or any Restricted Subsidiary other than the property so acquired, and

> the Lien securing such Indebtedness will be created within 365 days of such acquisition;

(9) any pledge or deposit of cash or property in conjunction with obtaining surety and performance bonds and letters of credit required to engage in constructing on-site and off-site improvements required by municipalities or other governmental authorities in the ordinary course of business;

(10) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(11) Liens encumbering customary initial deposits and margin deposits, and other Liens that are customary in the industry and incurred in the ordinary course of business securing Indebtedness under Hedging Obligations and forward contracts, options, futures contracts, futures options or similar agreements or arrangements designed to protect the Company and its Restricted Subsidiaries from fluctuations in interest rates;

(12) Liens for taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded; *provided* that any reserve or other appropriate provision as is required in conformity with Applicable GAAP has been made therefor;

(13) licenses of intellectual property in the ordinary course of business;

(14) Liens to secure a defeasance trust to the extent such defeasance is otherwise permitted pursuant to the terms of the Indenture;

(15) easements, rights-of-way, zoning and similar restrictions, reservations, restrictions or encumbrances in respect of real property or title defects that were not incurred in connection with Indebtedness and that do not in the aggregate materially adversely affect the value of said properties (as such properties are used by the Company or its Restricted Subsidiaries) or materially impair their use in the operation of the business of the Company and its Restricted Subsidiaries;

(16) judgment Liens not giving rise to an Event of Default so long as any appropriate legal proceedings that may have been duly initiated for the review of such judgment shall not have been finally terminated or the period within which such legal proceedings may be initiated shall not have expired;

(17) Liens on Capital Stock of an Unrestricted Subsidiary that secure Indebtedness or other obligations of such Unrestricted Subsidiary; or

(18) Collateral Permitted Liens.

*"Person"* means an individual, partnership, limited partnership, corporation, company, limited liability company, unincorporated organization, trust or joint venture, or a governmental agency or political subdivision thereof.

*"Post-Petition Interest"* means all interest accrued or accruing after the commencement of any insolvency or liquidation proceeding (and interest that would accrue but for the commencement of any insolvency or liquidation proceeding) in accordance with and at the contract rate (including, without limitation, any rate applicable upon default) specified in the agreement or instrument creating, evidencing or governing any Indebtedness, whether or not, pursuant to applicable law or otherwise, the claim for such interest is allowed as a claim in such insolvency or liquidation proceeding.

*"Preferred Stock"* of any Person means any Capital Stock of such Person that has preferential rights over any other Capital Stock of such Person with respect to dividends, distributions or redemptions or upon liquidation.

*"Purchase Money Indebtedness"* means Indebtedness Incurred for the purpose of financing all or any part of the purchase price, or other cost of construction or improvement of any property; *provided* that the aggregate principal amount of such Indebtedness does not exceed the lesser of the Fair Market Value of such property or such purchase price or cost, including any Refinancing of such Indebtedness that does not increase the aggregate principal amount (or accreted amount, if less) thereof as of the date of Refinancing.

*"Qualified Capital Stock"* means any Capital Stock that is not Disqualified Capital Stock and any warrants, rights or options to purchase or acquire Capital Stock that is not Disqualified Capital Stock that are not convertible into or exchangeable into Disqualified Capital Stock.

*"Qualified Merger Jurisdiction"* means (i) the United States, any State thereof or the District of Columbia; (ii) any member state of the European Union; or (iii) any other nation that has a sovereign debt rating from two Rating Agencies that is equal to or higher than the sovereign debt rating assigned to Colombia by such Rating Agencies.

*"Rating Agencies"* means (i) S&P, (ii) Fitch, (iii) Moody's or (iv) if S&P, Fitch or Moody's or all of them shall not make a rating of the notes publicly available, a nationally recognized United States securities rating agency or agencies, as the case may be, selected by the Company, which shall be substituted for S&P, Fitch or Moody's or all of them, as the case may be.

*"Rating Date"* means the earlier of the date of public notice of the occurrence of a Change of Control or of the entry into a definitive agreement contemplating a Change of Control.

*"Refinance"* means, in respect of any Indebtedness, to issue any Indebtedness in exchange for or to refinance, replace, defease or refund such Indebtedness in whole or in part. "Refinanced" and "Refinancing" will have correlative meanings; *provided* that, with respect to Indebtedness Incurred by the Company under its ECP Program (and solely with respect to such Indebtedness), the term "Refinance" shall include the replacement of any Indebtedness Incurred thereunder through the repayment of such Indebtedness on its stated maturity date and the issuance shortly thereafter (and in any event no later than fifteen (15) business days thereafter) of new Indebtedness under the ECP Program to be acquired by the same dealer who originally acquired the Indebtedness being replaced.

*"Refinancing Indebtedness"* means Indebtedness of the Company or any Restricted Subsidiary issued to Refinance any other Indebtedness of the Company or a Restricted Subsidiary so long as:

(1)  the aggregate principal amount (or initial accreted value, if applicable) of such new Indebtedness as of the date of such proposed Refinancing does not exceed the aggregate principal amount (or initial accreted value, if applicable) of the Indebtedness being Refinanced (plus the amount of any premium required to be paid under the terms of the instrument governing such Indebtedness and the amount of reasonable expenses incurred by the Company in connection with such Refinancing);

(2)  such new Indebtedness has:

a Weighted Average Life to Maturity that is equal to or greater than the Weighted Average Life to Maturity of the Indebtedness being Refinanced, and

a final maturity that is equal to or later than the final maturity of the Indebtedness being Refinanced; and

(3)  if the Indebtedness being Refinanced is:

Indebtedness of the Company, then such Refinancing Indebtedness will be Indebtedness of the Company,

Indebtedness of a Guarantor, then such Refinancing Indebtedness will be Indebtedness of the Company and/or such Guarantor, and

Subordinated Indebtedness, then such Refinancing Indebtedness shall be subordinate to the notes, at least to the same extent and in the same manner as the Indebtedness being Refinanced.

*"Residual Interests"* means (i) any residual interests in Loan-Related Securitizations, Securitization Securities or any other interests in Securitization Vehicles or (ii) the residual value of any assets that are financed through Indebtedness Incurred in connection with a Loan-Related Securitization, regardless of whether required to appear on the face of the consolidated financial statements of such Person and its Subsidiaries in accordance with Applicable GAAP.

*"Restricted Payment"* has the meaning set forth under "Certain Covenants—Limitation on Restricted Payments."

*"Restricted Subsidiary"* means any Subsidiary of the Company, which at the time of determination is not an Unrestricted Subsidiary.

*"Revocation"* has the meaning set forth under "—Certain Covenants—Limitation on Designation of Unrestricted Subsidiaries."

*"S&P"* means Standard & Poor's Ratings Services and its successors and assigns.

*"Sale and Leaseback Transaction"* means any direct or indirect arrangement with any Person or to which any such Person is a party providing for the leasing to the Company or a Restricted Subsidiary of any property, whether owned by the Company or any Restricted Subsidiary at the Issue Date or later acquired, which has been or is to be sold or transferred by the Company or such Restricted Subsidiary to such Person or to any other Person by whom funds have been or are to be advanced on the security of such Property.

*"Secured Indebtedness"* means any Indebtedness secured by a Lien upon the property or assets of the Company and/or its Restricted Subsidiaries; *provided* that Indebtedness Incurred by a Special Purpose Finance Trust shall be deemed Secured Indebtedness of the grantor thereof.

*"Securitization Securities"* has the meaning set forth in the definition of "Securitization Vehicle."

*"Securitization Vehicle"* means (i) any Person (whether or not a Restricted Subsidiary of the Company) established for the purpose of issuing asset-backed securities of any kind or issuing any other Indebtedness (whether or not in the form of securities) backed by Loan Receivables or Residual Interests ("Securitization Securities"), and (ii) any special purpose, bankruptcy remote Restricted Subsidiary of the Company or any of its Restricted Subsidiaries established in connection with the issuance of Securitization Securities and any other entity (or several entities) that serves as an intermediate entity between a Restricted Subsidiary, as the case may be, that initially purchases or originates Loan Receivables or Residual Interests and an entity referred to in clause (i) regardless of whether such Restricted Subsidiary is an issuer of Securitization Securities; *provided* that in each case, such entity is an entity:

(1)   that does not engage in, and whose charter prohibits it from engaging in, any activities other than Loan- Related Securitizations and any activity necessary, incidental or related thereto,

(2)   no portion of the Debt or any other obligation, contingent or otherwise, of which: (i) is Guaranteed by the Company or any Restricted Subsidiary of the Company, (ii) is recourse to or obligates the Company or any Restricted Subsidiary of the Company in any way, or (iii) subjects any property or asset of the Company or any Restricted Subsidiary of the Company, directly or indirectly, contingently or otherwise, to the satisfaction thereof;

(3)   with respect to which neither the Company nor any Restricted Subsidiary of the Company (other than an Unrestricted Subsidiary) has any obligation to maintain or preserve its financial condition or cause it to achieve certain levels of operating results other than, in respect of clauses (2) and (3), (x) pursuant to customary representations, warranties, covenants and indemnities entered into in connection with a Loan-Related Securitization, and (y) any Guarantees by the Company or a Restricted Subsidiary of any Indebtedness of a Securitization Vehicle that would constitute Permitted Indebtedness or which would be permitted under "—Limitation on Incurrence of Additional Indebtedness."

*"Senior Indebtedness"* means the notes (and any Note Guarantee thereof) and any other Indebtedness of the Company or a Guarantor that is not, pursuant to the instrument evidencing such Indebtedness, expressly subordinated in right of payment to the notes, or the relevant Note Guarantee.

*"Significant Subsidiary"* means a Subsidiary of the Company constituting a "Significant Subsidiary" of the Company in accordance with Rule 1-02(w) of Regulation S-X under the Securities Act in effect on the date hereof.

*"Special Purpose Finance Trust"* means any trust (*patrimonio autónomo*) established by the Company pursuant to a commercial trust agreement (*contrato de fideicomiso mercantil*) for the purpose of, directly or indirectly, Incurring Indebtedness backed by Loan Receivables; *provided* that in each case:

(1)   such Special Purpose Finance Trust is an entity that does not engage in, and whose charter prohibits it from engaging in, any activities other than Loan Receivables Backed Financing and any activity necessary, incidental or related thereto;

(2)   the grantor and beneficiary of such Special Purpose Finance Trust is the Company;

(3)   such Special Purpose Finance Trust is accounted for as a pass-through entity under Applicable GAAP and its related assets and liabilities appear on the balance sheet of the Company;

(4)   any Indebtedness Incurred by such Special Purpose Finance Trust would constitute Permitted Indebtedness of the Company or would be permitted under "—Limitation on Incurrence of Additional Indebtedness"; and

(5)   any Liens Incurred by the grantor of the Special Purpose Finance Trust would constitute Permitted Liens of the Company or would be permitted under "—Limitation on Liens."

*"Subordinated Indebtedness"* means, with respect to the Company or a Guarantor, any Indebtedness of the Company or a Guarantor that is, pursuant to the instrument evidencing such Indebtedness, expressly subordinated in right of payment to the notes, the relevant Note Guarantee or any other Senior Indebtedness, as the case may be.

*"Subsidiary"* means, with respect to any Person, any other Person of which such Person owns, directly or indirectly, more than 50.0% of the voting power of the other Person's outstanding Voting Stock.

*"Surviving Entity"* has the meaning set forth under "—Certain Covenants—Limitation on Merger, Consolidation and Sale of Assets."

*"U.S. Dollar Equivalent"* means with respect to any monetary amount in a currency other than U.S. dollars, at any time for determination thereof, the amount of U.S. dollars obtained by converting such foreign currency involved in such computation into U.S. dollars at the spot rate for the purchase of U.S. dollars with the applicable foreign currency as published in *The Wall Street Journal* in the "Exchange Rates" column under the heading "Currency Trading" on the date two business days prior to such determination.

Except as described under "—Certain Covenants—Limitation on Incurrence of Additional Indebtedness," whenever it is necessary to determine whether the Company has complied with any covenant in the Indenture or a Default has occurred and an amount is expressed in a currency other than U.S. dollars, such amount will be treated as the U.S. Dollar Equivalent determined as of the date such amount is initially determined in such currency.

*"Unrestricted Subsidiary"* means any Subsidiary of the Company Designated as an Unrestricted Subsidiary pursuant to "Certain Covenants—Limitation on Designation of Unrestricted Subsidiaries." Any such Designation may be revoked by a certificate of the Chief Financial Officer of the Company, subject to the provisions of such covenant.

*"Voting Stock"* with respect to any Person, means securities of any class of Capital Stock of such Person entitling the holders thereof (whether at all times or only so long as no senior class of stock has voting power by reason of any contingency) to vote in the election of members of the Board of Directors (or equivalent governing body) of such Person.

*"Weighted Average Life to Maturity"* means, when applied to any Indebtedness at any date, the number of years (calculated to the nearest one-twelfth) obtained by dividing:

(1) the then outstanding aggregate principal amount or liquidation preference, as the case may be, of such Indebtedness into

(2) the sum of the products obtained by multiplying:

the amount of each then remaining installment, sinking fund, serial maturity or other required payment of principal or liquidation preference, as the case may be, including payment at final maturity, in respect thereof, by

the number of years (calculated to the nearest one-twelfth) which will elapse between such date and the making of such payment.

*"Wholly-Owned Subsidiary"* means, for any Person, any Subsidiary (Restricted Subsidiary in the case of the Company) of which all the outstanding Capital Stock (other than, in the case of a Subsidiary not organized in the United States, directors' qualifying shares or an immaterial amount of shares required to be owned by other Persons pursuant to applicable law) is owned by such Person and/or one or more Persons that satisfy this definition in respect of such Person (or a combination thereof).

# BOOK-ENTRY; DELIVERY AND FORM

The New Notes will be issued in the form of fully registered global notes which will be deposited with, or on behalf of, The Depository Trust Company ("DTC") and registered in the name of Cede & Co., which is DTC's nominee. The New Notes are expected to be accepted for clearance by DTC. Beneficial interests in the global notes will be shown on, and transfers thereof will be effected only through, book-entry accounts of financial institutions acting on behalf of beneficial owners as direct and indirect participants in DTC. Investors may elect to hold interests in the global notes through either DTC in the United States, or Clearstream Banking, S.A. ("Clearstream") or the Euroclear System ("Euroclear"), if they are participants in those systems, or, indirectly, through organizations that are participants in those systems. Owners of beneficial interests in the notes will receive all payments relating to their notes in U.S. Dollars. One or more fully registered global notes, representing the aggregate principal amount of notes issued, will be issued and will be deposited with DTC and will bear a legend regarding the restrictions on exchanges and registration of transfer referred to below.

The laws of some jurisdictions may require that some purchasers of securities take physical delivery of securities in definitive form. These laws may impair the ability to transfer beneficial interests in the New Notes, so long as the New Notes are represented by global notes.

If the New Notes are issued in the Exchange Offer, they will be issued to QIBs (within the meaning of Rule 144A under the Securities Act) in compliance with Rule 144A under the Securities Act or to non-US persons outside the United States in offshore transactions in reliance on Regulation S under the Securities Act. Through and including the 40th day after the closing of the Exchange Offer (such period through and including such 40th day, the "Restricted Period"), beneficial interests in the Regulation S Global Notes may be held only through Euroclear and Clearstream (as indirect participants in DTC), unless transferred to a person that takes delivery through a Rule 144A Global Note in accordance with the certification requirements described below. Beneficial interests in the Rule 144A Global Notes may not be exchanged for beneficial interests in the Regulation S Global Notes at any time except in the limited circumstances described below. See "—Exchanges between Regulation S Global Notes and Rule 144A Global Notes." Regulation S Global Notes will be subject to certain restrictions on transfer and will bear a restrictive legend as described under "Transfer Restrictions."

If the New Notes are issued under the Plan instead of the Exchange Offer, they will be issued pursuant to pursuant to section 1145(a) of the Bankruptcy Code, and therefore will not be deemed restricted securities. Accordingly, upon issuance, such New Notes issued under the Plan will be freely tradable by any holder not deemed an underwriter in the public market without restriction or further registration under the Securities Act, subject to applicable law. See Annex B – Chapter 11 Plan of Reorganization.

DTC is a limited-purpose trust company organized under the New York Banking Law, a banking organization within the meaning of the New York Banking Law, a member of the Federal Reserve System, a clearing corporation within the meaning of the New York Uniform Commercial Code, and a clearing agency registered pursuant to the provisions of Section 17A of the Exchange Act. DTC holds and provides asset servicing for issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments that DTC's direct participants deposit with DTC. DTC also facilitates the post-trade settlement among direct participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between direct participants' accounts. This eliminates the need for physical movement of securities certificates. Direct participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations.

DTC is a wholly owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others, who we refer to as indirect participants, such as U.S. and non-U.S. securities brokers and dealers, banks, trust companies and clearing corporations that clear through or maintain a direct or indirect custodial relationship with a direct participant. The rules applicable to DTC and its participants are on file with the SEC.

Purchases of the New Notes under the DTC system must be made by or through direct participants, who will receive a credit for the New Notes on DTC's records. The ownership interest of each actual purchaser of New Notes, (a "beneficial

owner") is in turn to be recorded on the direct or indirect participants' records. Beneficial owners will not receive written confirmation from DTC of their purchase. Beneficial owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the direct or indirect participant through which the beneficial owner entered into the transaction. Transfers of ownership interests in the New Notes are to be accomplished by entries made on the books of direct and indirect participants acting on behalf of beneficial owners. Beneficial owners will not receive certificates representing their ownership interests in New Notes, except as described below. Under a book-entry format, holders may experience some delay in their receipt of payments, as such payments will be forwarded by the trustee to Cede & Co., as nominee for DTC. DTC will forward the payments to its participants, who will then forward them to indirect participants or holders. Beneficial owners of the New Notes other than DTC or its nominees will not be recognized by the registrar and transfer agent as registered holders of the New Notes entitled to the rights of holders thereof. Beneficial owners that are not participants will be permitted to exercise their rights only indirectly through and according to the procedures of participants and, if applicable, indirect participants.

To facilitate subsequent transfers, all notes deposited by direct participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of notes with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual beneficial owners of the notes; DTC's records reflect only the identity of the direct participants to whose accounts the notes are credited, which may or may not be the beneficial owners. The direct and indirect participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to direct participants, by direct participants to indirect participants, and by direct and indirect participants to beneficial owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Redemption notices will be sent to DTC. If less than all of the New Notes are being redeemed, DTC's practice is to determine by lot the amount of the interest of each direct participant in the New Notes to be redeemed.

The global notes are exchangeable for certificated securities in definitive, fully registered form without interest coupons only in the following limited circumstances:

- DTC notifies us that it is unwilling or unable to continue as depositary for the global notes or DTC ceases to be a clearing agency registered under the Exchange Act, at a time when DTC is required to be so registered in order to act as depositary, and in each case the issuer fails to appoint a successor depositary within 90 days of such notice;

- the issuer notifies the trustee in writing that the global notes will be so exchangeable; or

- if an Event of Default with respect to the New Notes has occurred and is continuing.

In all cases, certificated securities delivered in exchange for any global note or beneficial interests therein will be registered in the names, and issued in any approved denominations, requested by or on behalf of DTC (in accordance with its customary procedures) and will bear the applicable restrictive legend referred to in "Transfer Restrictions" unless we determine otherwise in accordance with the Indenture and in compliance with applicable law.

As long as DTC or its nominee is the registered owner of the global notes, DTC or its nominee, as the case may be, will be considered the sole owner and holder of the global notes and all New Notes represented by the global notes for all purposes under the Indenture. Except in the limited circumstances referred to above, owners of beneficial interests in global notes:

- will not be entitled to have such global notes or the New Notes represented by the global notes registered in their names;

- will not receive or be entitled to receive delivery of physical certificates in exchange for beneficial interests in global notes; and

- will not be considered to be owners or holders of the global notes or the New Notes represented by the global

notes for any purpose under the Indenture.

Payments with respect to the New represented by the global notes and all transfers and deliveries of the New Notes will be made to DTC or its nominee, as the case may be, as the registered holder of the New Notes. DTC's practice is to credit direct participants' accounts upon DTC's receipt of funds and corresponding detail information from us or our agent, on the payable date in accordance with their respective holdings shown on DTC's records. Payments by participants to beneficial owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of that participant and not of us, any of our agents, DTC or the trustee, subject to any statutory or regulatory requirements as may be in effect from time to time. Payments to Cede & Co. or such other nominee as may be requested by an authorized representative of DTC are the responsibility of us or our agent, disbursement of such payments to direct participants will be the responsibility of DTC, and disbursement of such payments to the beneficial owners will be the responsibility of direct and indirect participants.

Ownership of beneficial interests in the global notes will be limited to participants or persons that may hold beneficial interests through institutions that have accounts with DTC or its nominee. Ownership of beneficial interests in global notes will be shown only on, and the transfer of those ownership interests will be effected only through, records maintained by DTC or its nominee, with respect to participants' interests, or any participant, with respect to interests of persons held by the participant on their behalf. Payments, transfers, deliveries, exchanges, and other matters relating to beneficial interests in global notes may be subject to various policies and procedures adopted by DTC from time to time. Neither we nor any of our agents will have any responsibility or liability for any aspect of DTC's or any direct or indirect participant's records relating to, or for payments made on account of, beneficial interests in global notes, or for maintaining, supervising or reviewing any of DTC's records or any direct or indirect participant's records relating to these beneficial ownership interests.

Although DTC has agreed to the foregoing procedures in order to facilitate transfer of interests in the global notes among participants, DTC is under no obligation to perform or continue to perform these procedures, and these procedures may be discontinued at any time. We will not have any responsibility for the performance by DTC or its direct or indirect participants under the rules and procedures governing DTC.

Because DTC can act only on behalf of direct participants, who in turn act only on behalf of direct or indirect participants, and certain banks, trust companies and other persons approved by it, the ability of a beneficial owner of notes to pledge the notes to persons or entities that do not participate in the DTC system may be limited due to the unavailability of physical certificates for the notes.

DTC has advised us that it will take any action permitted to be taken by a registered holder of any New Notes under the Indenture only at the direction of one or more participants to whose accounts with DTC the notes are credited.

Clearstream and Euroclear will hold interests on behalf of their participants through customers' securities accounts in Clearstream's and Euroclear's names on the books of their respective depositaries, which in turn will hold interests in customers' securities accounts in the depositaries' names on the books of DTC.

Clearstream holds securities for its participating organizations, ("Clearstream Participants") and facilitates the clearance and settlement of securities transactions between Clearstream Participants through electronic book-entry changes in accounts of Clearstream Participants, thereby eliminating the need for physical movement of certificates. Clearstream provides to Clearstream Participants, among other things, services for safekeeping, administration, clearance and settlement of internationally traded securities and securities lending and borrowing. Clearstream interfaces with domestic markets in several countries.

Clearstream is registered as a bank in Luxembourg, and as such is subject to regulation by the Commission de Surveillance du Secteur Financier and the Banque Centrale du Luxembourg, which supervise and oversee the activities of Luxembourg banks. Clearstream Participants are world-wide financial institutions including underwriters, securities brokers and dealers, banks, trust companies and clearing corporations, and may include the initial purchasers or their affiliates. Indirect access to Clearstream is available to other institutions that clear through or maintain a custodial relationship with a Clearstream Participant. Clearstream has established an electronic bridge with Euroclear as the operator of the Euroclear System (the "Euroclear Operator") in Brussels to facilitate settlement of trades between Clearstream and the Euroclear Operator.

Euroclear holds securities and book-entry interests in securities for participating organizations, (the "Euroclear Participants") and facilitates the clearance and settlement of securities transactions between Euroclear Participants, and between Euroclear Participants and participants of certain other securities intermediaries through electronic book-entry changes in accounts of such participants or other securities intermediaries. Euroclear provides Euroclear Participants, among other things, with safekeeping, administration, clearance and settlement, securities lending and borrowing and related services. Euroclear Participants are investment banks, securities brokers and dealers, banks, central banks, supranationals, custodians, investment managers, corporations, trust companies and certain other organizations, and may include the initial purchasers or their affiliates. Non-participants in Euroclear may hold and transfer beneficial interests in a global note through accounts with a Euroclear Participant or any other securities intermediary that holds a book-entry interest in a global note through one or more securities intermediaries standing between such other securities intermediary and Euroclear.

Securities clearance accounts and cash accounts with the Euroclear Operator are governed by the Terms and Conditions Governing Use of Euroclear and the related Operating Procedures of the Euroclear System, and applicable Belgian law, which we collectively refer to as the "Terms and Conditions." The Terms and Conditions govern transfers of securities and cash within Euroclear, withdrawals of securities and cash from Euroclear and receipts of payments with respect to securities in Euroclear. All securities in Euroclear are held on a fungible basis without attribution of specific certificates to specific securities clearance accounts. The Euroclear Operator acts under the Terms and Conditions only on behalf of Euroclear Participants, and has no record of or relationship with persons holding through Euroclear Participants.

Distributions with respect to New Notes held beneficially through Clearstream or Euroclear will be credited to the cash accounts of Clearstream Participants or Euroclear Participants, as the case may be, in accordance with their respective procedures, to the extent received by the U.S. depositary for Clearstream or Euroclear, as the case may be. Transfers between Euroclear Participants and Clearstream Participants will be effected in the ordinary way in accordance with their respective rules and operating procedures.

Cross-market transfers between DTC's participating organizations ("DTC Participants"), on the one hand, and Euroclear Participants or Clearstream Participants, on the other hand, will be effected through DTC in accordance with DTC's rules on behalf of Euroclear or Clearstream, as the case may be, by its U.S. depositary; however, such cross-market transactions will require delivery of instructions to Euroclear or Clearstream, as the case may be, by the counterparty in such system in accordance with the rules and procedures and within the established deadlines of such system. Euroclear or Clearstream, as the case may be, will, if the transaction meets its settlement requirements, deliver instructions to its U.S. depositary to take action to effect final settlement on its behalf by delivering or receiving interests in the global note in DTC, and making or receiving payment in accordance with normal procedures for same-day fund settlement applicable to DTC. Euroclear Participants and Clearstream Participants may not deliver instructions directly to their respective U.S. depositaries. Due to time zone differences, the securities accounts of a Euroclear Participant or Clearstream Participant purchasing an interest in a global note from a DTC Participant in DTC will be credited, and any such crediting will be reported to the relevant Euroclear Participant or Clearstream Participant, during the securities settlement processing day, which must be a business day for Euroclear or Clearstream, immediately following the settlement date of DTC. Cash received in Euroclear or Clearstream as a result of sales of interests in a global note by or through a Euroclear Participant or Clearstream Participant to a DTC Participant will be received with value on the settlement date of DTC but will be available in the relevant Euroclear or Clearstream cash account only as of the business day for Euroclear or Clearstream following DTC's settlement date.

Although DTC, Clearstream, Luxembourg and Euroclear have agreed to the foregoing procedures in order to facilitate transfers of securities among participants of DTC, Clearstream, Luxembourg and Euroclear, they are under no obligation to perform or continue to perform such procedures and they may discontinue the procedures at any time. None of us, any of the initial purchasers or the trustee will have any responsibility for the performance by Clearstream or Euroclear or their respective participants of their respective obligations under the rules and procedures governing their operations. In addition, the information in this section concerning DTC and its book-entry system has been obtained from sources that we believe to be accurate, but we assume no responsibility for the accuracy thereof.

# DESCRIPTION OF THE PLAN AND VOTING

*Terms not otherwise defined herein shall have the meanings set forth in the Prepackaged Chapter 11 Plan of Credivalores – Crediservicios S.A. attached as Annex B hereto.*

**WE HAVE NOT COMMENCED A CHAPTER 11 CASE UNDER THE BANKRUPTCY CODE AND HAVE NOT FILED THE PLAN AT THIS TIME. THIS OFFERING MEMORANDUM AND CONSENT SOLICITATION STATEMENT SOLICITS ADVANCE ACCEPTANCE OF THE PLAN IN THE EVENT THAT WE DETERMINE TO COMMENCE THE CHAPTER 11 CASE AND THE PLAN IS FILED WITH THE BANKRUPTCY COURT, AND CONTAINS INFORMATION RELEVANT TO A DECISION TO ACCEPT OR REJECT THE PLAN.**

The following is a summary of the material terms and provisions of the Plan. While we believe this summary covers the material terms and provisions of the Plan, it may not contain all of the information that is important to you. To the extent there is any inconsistency between this Statement and the Plan regarding the terms of the Plan, the Plan shall control.

The Plan and this Statement should be read and studied in their entirety before voting on the Plan. See "Risk Factors—Risks Related to the Plan of Reorganization" in this Statement for a discussion of risks associated with the Plan and the transactions contemplated thereunder. You are urged to consult your counsel about the Plan and its effect on your legal rights before voting.

To allow us to effect a Chapter 11 reorganization in the quickest and most cost efficient manner possible, we are soliciting acceptances of the Plan from holders of Impaired Claims entitled to vote under the Plan. Under the Plan, we expect that the holders of the Old Notes will receive the same treatment with respect to their Old Notes Claims as they would in the Exchange Offer. We may seek confirmation of the Plan by commencing the Chapter 11 Case in the event that the conditions to the out-of-court Restructuring are not satisfied, but we receive acceptances on the Plan from a sufficient amount and number of holders of the Old Notes so as to satisfy the Bankruptcy Threshold. The debtor in the Chapter 11 Case would be the Company (the "Debtor"). We refer to the Debtor, or any successor thereto by merger, consolidation or otherwise after the Effective Date of the Plan as "Reorganized Credivalores."

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT, IT WILL BIND ALL HOLDERS OF OUR OLD NOTES, REGARDLESS OF WHETHER THEY VOTED TO ACCEPT OR REJECT THE PLAN, OR DID NOT VOTE AT ALL.

## Solicitations of Acceptances on the Plan

Usually, a plan of reorganization and disclosure statement are filed after the bankruptcy case is commenced, and votes to accept or reject the plan are solicited following bankruptcy court approval of the disclosure statement. A debtor may, however, solicit votes before the commencement of a reorganization case in accordance with section 1126(b) of the Bankruptcy Code and Rule 3018(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). In accordance with such provisions, we are soliciting acceptances only from holders of the Old Notes for purposes of seeking confirmation of the Plan in the Chapter 11 Case.

Bankruptcy Rule 3018(b) requires that:

- the plan of reorganization be transmitted to substantially all creditors and interest holders entitled to vote on the plan;

- the time prescribed for voting to reject or accept such plan not be unreasonably short; and

- the solicitation of votes be in compliance with any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in such solicitation or, if no such law, rule or regulation exists, votes be solicited only after the disclosure of adequate information.

Section 1125(a)(1) of the Bankruptcy Code describes "adequate information" as information of a kind and in sufficient detail as would enable a hypothetical reasonable investor typical of holders of Claims and Interests to make an informed judgment about the plan. With regard to a solicitation of votes before the commencement of a reorganization case, Bankruptcy Rule 3018(b) specifically provides that acceptances or rejections of the plan by holders of Claims and Interests before the commencement of a reorganization case will not be deemed acceptances or rejections of the plan if the Bankruptcy Court determines, after notice and a hearing, that the plan was not transmitted to substantially all creditors and equity security holders entitled to vote on the plan, that an unreasonably short time was prescribed for such creditors and equity security holders to vote on the plan, or that the solicitation was not otherwise in compliance with section 1126(b) of the Bankruptcy Code. If, however, the aforementioned conditions of the Bankruptcy Code and Bankruptcy Rules are met, all acceptances and rejections received before the commencement of the reorganization case and within the prescribed solicitation period will be deemed to be acceptances and rejections of the plan for purposes of confirmation under the Bankruptcy Code.

As further described herein, in the event that the conditions to the Exchange Offer are not satisfied or waived by the date on which acceptances are due and we receive from a sufficient number of holders of the Old Notes holding a sufficient amount of the Old Notes necessary to satisfy the Bankruptcy Threshold, we may:

- commence a Chapter 11 case in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") and file the Plan;

- file certain first day motions and seek to obtain entry of the orders approving such motions and schedule a hearing in the Bankruptcy Court on the earliest date possible to contemporaneously consider confirmation of the Plan and to approve this Statement;

- send notices to all persons to whom such notices are required to be sent under the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of the United States Bankruptcy Court for the Southern District of New York (the "Local Rules") and to such other persons as ordered by the Bankruptcy Court, as soon as practicable after the commencement of the Plan proceeding;

- use our reasonable best efforts to obtain confirmation of the Plan by the Bankruptcy Court;

- use our reasonable best efforts to obtain the dismissal of any and all appeals and motions for reconsideration filed with respect to the Plan; and

- cause the Plan to become effective and the distributions provided for under the Plan to be commenced as promptly as possible on or following the day on which conditions to effectiveness set forth in the Plan have been satisfied or waived.

There can be no assurance, however, that the Bankruptcy Court will conclude that the requirements of section 1129 of the Bankruptcy Code for confirmation of the Plan have been met. The Bankruptcy Court may find that the Plan Solicitation did not comply with all of the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules (including the requirement under section 1126(b) of the Bankruptcy Code that the Plan Solicitation comply with any applicable nonbankruptcy law, rule or regulation governing the adequacy of disclosure or that the Plan Solicitation is made after disclosure of adequate information). In such an event, we may be required to resolicit votes on the Plan before seeking confirmation of the Plan, in which case the confirmation of the Plan could be delayed and possibly jeopardized.

Bankruptcy Rule 3016(b) provides that either a disclosure statement under section 1125 of the Bankruptcy Code or evidence showing compliance with section 1126(b) of the Bankruptcy Code must be filed with the Plan or within the time fixed by the court. This Statement is presented to holders of our Old Notes to satisfy the requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3016(b) and 3018(b). We believe that this Statement and the solicitation process we undertake will meet these requirements.

The Plan Solicitation is being conducted at this time to obtain the acceptance of our Old Notes, the only class of Claims entitled to vote on the Plan. If we commence the Chapter 11 Case, we will promptly seek to obtain an order of the Bankruptcy Court finding that the Plan solicitation was in compliance with section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) and that the acceptance of the class consisting of the Old Notes can be used for purposes of confirmation of the Plan under Chapter 11 of the Bankruptcy Code. We reserve the right to use the acceptances to seek confirmation of any permitted amendment or modification of the Plan, provided that we may not make any amendment or modification to the Plan prohibited by the Plan.

As more fully described below, we are soliciting acceptances of the Plan only from holders of Old Notes Claims in Class A (the "Voting Class").

| Letter | Class |
| --- | --- |
| Class A | Class A consists of the Old Notes Claims. |
| Class B | Class B consists of all Other Secured Claims. |
| Class C | Class C consists of all General Unsecured Claims. |
| Class D | Class D consists of all Interests. |

To the extent a Class contains Allowed Claims or Allowed Interests with respect to the Debtor, the treatment provided to each Class for distribution purposes is specified below:

| Class | Claim or Interest | Treatment |
| --- | --- | --- |
| A | Old Notes Claims | In full and final satisfaction, settlement, release, and discharge of and exchange for each Allowed Old Notes Claim, each Holder of an Allowed Old Notes Claim shall receive its Pro Rata share of the (i) New Notes and (ii) Capitalized Interest. |
| B | Other Secured Claims | Each Holder of an Allowed Other Secured Claim shall, at the election of Reorganized Credivalores, (i) have the legal, equitable and contractual rights of such Holder Reinstated, or (ii) receive, at the option of the Debtor, (A) Cash in an amount equal to such Allowed Other Secured Claim or (B) such other treatment as renders its Allowed Other Secured Claim Unimpaired. |
| C | General Unsecured Claims | Each Holder of an Allowed Unsecured Claim shall, at the election of Reorganized Credivalores, (i) have the legal, equitable and contractual rights of such Holder Reinstated, or (ii) receive, at the option of the Debtor, (A) Cash in an amount equal to such Allowed |

| | | | |
|---|---|---|---|
| | | | Unsecured Claim or (B) such other treatment as renders its Allowed Unsecured Claim Unimpaired. |
| D | Interests | | On the Effective Date, the Allowed Interests in the Debtor shall all be Reinstated. |

Note: This table is only a summary of the classification and treatment of claims and interests under the Plan. Reference should be made to the Plan attached to this statement as Annex B for a complete description of the classification and treatment of claims and interests.

**Treatment of Unclassified Claims**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in ARTICLE III of the Plan.

**(i)    Administrative Claims**

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtor or Reorganized Credivalores, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either: (a) on the Effective Date, or as soon as reasonably practicable thereafter; (b) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (c) if the Allowed Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of its business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claims.

**(ii)    Professional Claims**

a.    Final Fee Applications and Payment of Professional Claims

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code. Reorganized Credivalores shall pay Professional Claims in Cash in the amount the Bankruptcy Court allows. From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and Reorganized Credivalores may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

b.    Professional Fee Escrow Account

On or before the Effective Date, the Debtor shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Except as otherwise expressly set forth in the last sentence of this paragraph, such funds shall not be considered property of the Estate of the Debtor or the Reorganized Credivalores. The amount of Allowed Professional Claims shall be paid in Cash to the Professionals by the Reorganized Credivalores from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Claims are Allowed. When such Allowed Professional Claims have been paid in full, any

remaining amount held in the Professional Fee Escrow Account shall promptly revert to the Reorganized Credivalores without any further action or order of the Bankruptcy Court.

### c. Professional Fee Amount

Professionals shall reasonably estimate their unpaid Professional Claims and other unpaid fees and expenses incurred in rendering services to the Debtor before and as of the Effective Date, and shall deliver such estimate to the Debtor no later than five (5) Business Days before the anticipated Effective Date; provided that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Case. If a Professional does not provide an estimate, the Debtor or Reorganized Credivalores may estimate the unpaid and unbilled fees and expenses of such Professional.

### d. Post-Confirmation Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtor shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtor. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtor may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### e. Substantial Contribution Compensation and Expenses

Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Case pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code must file an application and serve such application on counsel for the Debtor or Reorganized Credivalores, as applicable, and as required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules on or before three (3) Business Days after the Confirmation Date.

### (iii) Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Priority Tax Claim: (a) the treatment provided by section 1129(a)(9)(C) of the Bankruptcy Code; (b) a Cash payment on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, equal to the amount of such Allowed Priority Tax Claim; or (c) such other less favorable treatment as may be agreed upon between the Holder of such Allowed Priority Tax Claim and the Debtor. If payment is made in accordance with section 1129(a)(9)(C), installment payments shall be made quarterly and interest shall accrue in accordance with 26 U.S.C. § 6621. On the Effective Date, Liens securing such Allowed Secured Tax Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim may be paid in full in Cash in accordance with the terms of any agreement between the Debtor and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business.

### (iv) Other Priority Claims

Each Holder of an Allowed Other Priority Claim due and payable on or before the Effective Date shall receive in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Other Priority Claim: (a) the treatment provided by section 1129(a)(9) of the Bankruptcy Code; (b) a Cash payment on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Other Priority Claim becomes an Allowed Other

Priority Claim, equal to the amount of such Allowed Other Priority Claim; or (c) such other less favorable treatment as may be agreed upon between the Holder of such Allowed Priority Tax Claim and the Debtor.

**(v)**      **Trustee Fees**

On the Effective Date, the Reorganized Credivalores shall pay all reasonable, documented, and unpaid fees, expenses and out-of-pocket costs (including the reasonable and documented fees and expenses of counsel to the Trustee and/or the trustee for the Old Notes) incurred by the Trustee and/or trustee of the Old Notes, as applicable, through the Effective Date, except any such fees, costs and expenses as may be attributable to the gross negligence or willful misconduct of the Trustee or the trustee for the Old Notes. Following the Effective Date, the Reorganized Credivalores shall pay all reasonable, documented, and unpaid fees, expenses and out-of-pocket costs (including the reasonable and documented fees and expenses of counsel to the Trustee) in accordance with the New Notes Indenture.

**(vi)**      **United States Trustee Fees**

The Debtor and Reorganized Credivalores, as applicable, will pay fees payable pursuant to 28 U.S.C § 1930(a), including fees and expenses payable to the United States Trustee, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, for each quarter (including any fraction thereof) until the Chapter 11 Case are converted, dismissed, or closed, whichever occurs first.

**Means for Implementation of the Plan**

A.      *General Settlement of Claims*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests. Distributions made to Holders of Allowed Claims in any Class are intended to be final.

B.      *Subordination*

The allowance, classification, and treatment of all Claims and Interests under the Plan shall conform to and with the respective contractual, legal, and equitable subordination rights of such Claims and Interests, and the Plan shall recognize and implement any such rights. Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the Debtor reserves the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto. For the avoidance of doubt, no Claim in Class A shall be subject to subordination.

C.      *Sources of Cash for Plan Distributions*

All Cash consideration necessary for the Reorganized Credivalores to make payments or distributions pursuant to this Plan shall be obtained from Cash of the Debtor or Reorganized Credivalores.

D.      *Issuance of New Notes*

On Effective Date, the Reorganized Credivalores is authorized to issue, execute, or otherwise bring into effect, as the case may be, to or for the benefit of the Holders of Allowed Old Notes Claims, the New Notes and any other instruments, certificates, and other documents or agreements required to be issued, executed or delivered pursuant to the Plan, and take any other necessary actions in connection with the foregoing, in each case without need for further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity. The issuance of the New Notes, which shall be delivered on or as soon as practicable following the Effective Date, shall be exempt from registration under section 1145 of the Bankruptcy Code and, to the extent applicable, under applicable securities laws. All documents, agreements and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of this Plan shall become effective and binding in accordance with their

respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity (other than as expressly required by such applicable agreement).

E.    *Discharge from Old Notes, Instruments, Certificates, and Other Documents*

On the Effective Date, except as otherwise provided in this Plan: (1) the Old Notes Indenture and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtor giving rise to any Claim or Interest (except such certificates, mortgages, notes, or other instruments or documents evidencing indebtedness or obligations of or ownership interest in the Debtor that are specifically Reinstated or otherwise not Impaired under the Plan) shall be deemed cancelled, discharged, released and extinguished, and the Debtor shall not have any continuing obligations thereunder; and (2) the obligations of the Debtor pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtor (except such agreements, certificates, mortgages, notes, or other instruments evidencing indebtedness or obligations of or ownership interests in the Debtor that are specifically Reinstated or otherwise not Impaired under the Plan) shall be released and discharged; provided, however, notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of enabling Holders of Allowed Claims to receive distributions under the Plan as provided herein; provided further, however, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Credivalores, except to the extent set forth in or provided for under this Plan. Notwithstanding the foregoing and solely for the purpose set forth in this sentence, the following rights of the Trustee shall remain in effect after the Effective Date: (1) rights to payment of fees, expenses and indemnification obligations, including from property distributed hereunder to the Trustee, whether pursuant to the exercise of a charging lien or otherwise, (2) rights relating to distributions made to Holders of Allowed Old Notes Claims by the Trustee from any source, including distributions hereunder, (3) rights relating to representation of the interests of the Holders of Old Notes Claims by the Trustee in the Chapter 11 Case to the extent not discharged or released hereunder or any order of the Bankruptcy Court, and (4) rights relating to participation by the Trustee in any proceedings related to the Plan. On and after the Effective Date, all duties and responsibilities of the Trustee shall be discharged unless otherwise specifically set forth in or provided for under the Plan.

F.    *Restructuring Transactions*

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Credivalores may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law; and (4) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

G.     *Corporate Action*

The Debtor or the Reorganized Credivalores, as applicable, are authorized to take all further corporate actions necessary to effectuate the Plan and authorize each of the matters provided for by the Plan involving the corporate structure of the Debtor or corporate or related actions to be taken by or required of the Reorganized Credivalores, whether taken prior to or as of the Effective Date.

H.     *New Corporate Governance Documents*

Solely to the extent required by applicable non-bankruptcy law, on or immediately before the Effective Date, Reorganized Credivalores will file its New Corporate Governance Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation. The New Corporate Governance Documents will be consistent with the provisions of the Plan and the Bankruptcy Code. After the Effective Date, Reorganized Credivalores may amend and restate its New Corporate Governance Documents as permitted by the laws of its respective jurisdiction of formation and its respective New Corporate Governance Documents.

I.     *Effectuating Documents; Further Transactions*

On and after the Effective Date, Reorganized Credivalores, and the officers and/or members of the board of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

J.     *Section 1146(a) Exemption*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

K.     *Managers, Directors and Officers*

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, and except as may otherwise be disclosed in the Disclosure Statement, as of the Effective Date, the directors and officers who are identified in the Plan Supplement shall serve as the initial board of directors and officers of Reorganized Credivalores. Pursuant to section 1129(a)(5), the Debtor will disclose in the Plan Supplement, on or prior to the Confirmation Date, the identity and affiliations of any Person proposed to serve on Reorganized Credivalores' board of directors and, to the extent such Person is an Insider, the nature of any compensation for such Person. After the Effective Date, the corporate governance and management of Reorganized Credivalores shall be determined by the applicable board of managers or board of directors in accordance with the laws of the applicable state or county of organization.

L.     *Preservation of Rights of Action*

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, Reorganized Credivalores shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and Reorganized Credivalores' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. **No Entity may rely on the absence of a specific reference in the Plan, the Plan**

**Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtor or Reorganized Credivalores will not pursue any and all available Causes of Action against them. The Debtor and Reorganized Credivalores expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, Reorganized Credivalores expressly reserves all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel, judicial, equitable, or otherwise, or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. From and after the Effective Date, the Debtor or Reorganized Credivalores, as applicable, shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any Cause of Action and to decline to do any of the foregoing without further notice to or action, order or approval of the Bankruptcy Court.

Notwithstanding any provision in the Plan or any Order entered in the Chapter 11 Case, the Debtor and Reorganized Credivalores forever waive, relinquish, and release any and all Causes of Action the Debtor and its estate had, have, or may have that arise under sections 544, 547, 548 and 549 of the Bankruptcy Code against any Entity that is being rendered Unimpaired under the Plan and any Entity, including Professionals, with whom the Debtor is conducting and will continue to conduct business on and after the Effective Date.

M.      *Directors and Officers Insurance Policies*

Notwithstanding anything in the Plan to the contrary, Reorganized Credivalores shall be deemed to have assumed all of the Debtor's D&O Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of Reorganized Credivalores' foregoing assumption of each of the unexpired D&O Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtor under the Plan as to which no Proof of Claim need be filed. In addition, after the Effective Date, Reorganized Credivalores shall not terminate or otherwise reduce the coverage under any D&O Insurance Policy (including any "tail policy") in effect on the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtor who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.

N.      *Indemnification Provisions in Organizational Documents*

On and from the Effective Date, and except as prohibited by applicable non-bankruptcy law, Reorganized Credivalores shall assume or reinstate, as applicable, all indemnification obligations in place as of the Effective Date (whether in by- laws, certificates of incorporation, board resolutions, contracts, or otherwise) for the current and former directors, members, officers, managers, employees, attorneys, other professionals and agents of the Debtor; provided, however, such indemnification obligations shall not apply with respect to any act or omission constituting gross negligence, willful misconduct, fraud, or criminal conduct as determined by a Final Order entered by a court of competent jurisdiction, except to the extent of available insurance.

O.      *Reinstatement of Equity Interests*

On the Effective Date, all equity interests in each Debtor, including Intercompany Interests, shall be deemed reinstated without any additional act on the part of the Debtor or Reorganized Credivalores.

P.       *Exemption from Registration Requirements*

The offering, issuance, and distribution of any Securities, including the New Notes pursuant to the Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act pursuant to section 1145 of the Bankruptcy Code, Regulation S of the Securities Act, or any other available exemption from registration under the Securities Act, as applicable. To the extent that the issuance of the New Notes is covered by section 1145 of the Bankruptcy Code, except as otherwise provided in the Plan or the governing certificates or instruments, the New Notes issued under the Plan will be freely tradable under the Securities Act by the recipients thereof, subject to: (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any applicable state or foreign securities laws, if any, and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities or instruments, including any such restrictions any agreement governing the New Notes; (b) the restrictions, if any, on the transferability of such securities and instruments; and (c) any other applicable regulatory approval.

## Treatment of Executory Contracts and Unexpired Leases

A.       *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein or in any contract, instrument, release, indenture, or other agreement entered into in connection with the Plan, Executory Contracts and Unexpired Leases shall be deemed assumed as of the Effective Date, unless such Executory Contract or Unexpired Lease (1) was assumed or rejected previously by the Debtor, (2) previously expired or terminated pursuant to its own terms; or (3) is the subject of a motion to reject filed on or before the Effective Date, if any. Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumption of such Executory Contracts or Unexpired Leases as set forth in the Plan, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, assumptions of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by a Bankruptcy Court order shall re-vest in and be fully enforceable by the applicable contracting Reorganized Credivalores in accordance with its terms notwithstanding any provision in such assumed Executory Contract or Unexpired Lease that prohibits, restricts or conditions such assumption, assignment or transfer. Any provision in the assumed Executory Contracts and Unexpired Leases that purports to declare a breach or default based in whole or in part on the commencement or continuance of the Chapter 11 Case or any successor case is hereby deemed unenforceable.

B.       *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Claims arising from the rejection of any Executory Contract or Unexpired Lease shall be classified as a General Unsecured Claim and shall be treated in accordance with Article III of the Plan, as applicable.

C.       *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed*

Claims or defaults arising or becoming due under any assumed Executory Contract or Unexpired Lease after the effective date of assumption of the applicable assumed Executory Contract or Unexpired Lease are to be paid in full in the ordinary course by the applicable Debtor or Reorganized Credivalores, as applicable, subject to the rights of the Debtor or Reorganized Credivalores, as applicable, to assert or apply, as applicable, any defenses, setoffs, credits, or discounts available under the applicable assumed Executory Contract or Unexpired Lease or under applicable non-bankruptcy law, and, for the avoidance of doubt, such Claims or defaults shall not be released, expunged, discharged, or enjoined by the Plan or the Confirmation Order and there shall be no need or requirement for the counterparty to such Executory Contract or Unexpired Lease to file an Administrative Claim for such Claim or default. Nothing in the Plan releases or discharges the applicable Debtor or Reorganized Credivalores from (1) obligations to fully satisfy Cure Claims on the Effective Date, or to the extent a dispute exists regarding the Cure Claim, upon entry of a Final Order resolving the dispute or upon mutual agreement between the applicable Debtor or Reorganized Credivalores and the applicable counterparty, or (2) Claims, defaults or obligations arising or becoming due under any assumed Executory Contract or Unexpired Lease after the effective date of such assumption of the applicable assumed Executory Contract or Unexpired Lease pursuant to the terms thereof.

In the event of a dispute regarding (1) the amount of any payment to cure such a default, (2) the ability of the applicable Reorganized Credivalores to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payment, if any, required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.

The assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date the applicable Debtor or Reorganized Credivalores assume such Executory Contract or Unexpired Lease. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court..

D. *Insurance Policies*

All of the Debtor's insurance policies and any agreements, documents, or instruments relating thereto, including the D&O Insurance Policies, shall be treated as and deemed to be Executory Contracts under the Plan. As of the Effective Date, the Debtor shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto.

E. *Indemnification Provisions*

As of the Effective Date, the Debtor and Reorganized Credivalores, as applicable, shall be deemed to have assumed all of the Indemnification Provisions in place on or before the Effective Date for Claims related to or in connection with any actions, omissions, or transactions occurring before the Effective Date. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtor's foregoing assumption of each of the Indemnification Provisions. Notwithstanding anything to the contrary contained herein, (1) Confirmation shall not discharge, impair, or otherwise modify any obligations assumed by the foregoing assumption of the Indemnification Provisions, (2) each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtor under the Plan and as to which no Proof of Claim need be filed, and (3) as of the Effective Date, the Indemnification Provisions shall be binding and enforceable against the Reorganized Credivalores.

F. *Benefit Programs*

As of the Effective Date, all employee compensation and benefit programs of the Debtor, including programs subject to section 1114 and 1129(a)(13) of the Bankruptcy Code, if any, entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, Executory Contracts that are assumed under the ARTICLE VI, but only to the extent that rights under such programs are held by the Debtor or Persons who are employees of the Debtor as of the Confirmation Date; provided, however, that nothing herein shall extend or otherwise modify the duration of any such program or prohibit the Debtor or the Reorganized Credivalores from modifying the terms and conditions of any such program or benefits as otherwise permitted by such program and applicable nonbankrutpcy law.

G. *Modifications, Amendments, Supplements, Restatements or Other Agreements*

Unless otherwise provided for in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

H. *Reservation of Rights*

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of such assumption or rejection, the Debtor or Reorganized Credivalores, as applicable, shall have twenty-eight (28) calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by assuming or rejecting such contract or lease.

I. *Nonoccurrence of the Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

J. *Contracts and Leases Entered into After the Petition Date*

Contracts and leases entered into after the Petition Date by the Debtor will be performed by the Debtor or Reorganized Credivalores liable thereunder in the ordinary course of the Debtor's business. Accordingly, such contracts and leases will survive and remain unaffected by entry of the Confirmation Order.

**Release, Injunction, and Related Provisions**

A. **Releases by the Debtor**

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise expressly provided for in the Plan, for good and valuable consideration, as of the Effective Date, to the extent permitted by applicable laws, the Released Parties are conclusively, absolutely, unconditionally, irrevocably, and forever deemed released and discharged by the Debtor, Reorganized Credivalores, and the Estate from any and all actions, Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether for tort, contract, violations of federal or state securities laws and Avoidance Actions, including any derivative Claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, asserted or that could possibly have been asserted on behalf of the Debtor, that the Debtor, Reorganized Credivalores, or the Estate, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in, or under, in whole or in part, the Debtor, the Chapter 11 Case, the Old Notes, the Old Notes Indenture, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor or Reorganized Credivalores, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any of the following: (a) the Debtor; (b) the Trustee; (c) the trustee of the Old Notes, (d) the Holders of Interests; and (e) with respect to each of the foregoing Entities in clauses (a) through (d), such Entity's successors and assigns, and current and former Affiliates, subsidiaries, officers, directors, members, stockholders, partners, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, solely in their respective capacities as such (each a "Released Party"), the restructuring of Claims and Interests prior to or in the Chapter 11 Case, the negotiation, formulation, solicitation, or preparation of the Disclosure Statement, the Plan, the Plan Supplement, or related agreements, instruments or other documents, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided, however, that the foregoing provisions of <u>Section 8.3</u> of the Plan shall have no effect on the liability of any of the Released Parties for gross negligence, willful misconduct, fraud, or criminal conduct as determined by a Final Order entered by a court of competent jurisdiction; provided further that nothing in <u>Section 8.3</u> of the Plan shall release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed to implement, or otherwise given effect under, the Plan, including the New Notes and any other agreement or document related thereto or entered into in connection therewith, as applicable.**

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in Section 8.3 of the Plan, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the Claims released by Section 8.3 of the Plan; (c) in the best interests of the Debtor and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to the Debtor asserting any Claim or Cause of Action released by Section 8.3 of the Plan.

**B.** *Releases by the Releasing Parties*

As of the Effective Date, to the extent permitted by applicable law, each of the following: (a) the Holders of Impaired Claims or Interests that (i) affirmatively vote to accept the Plan or (ii) abstain from voting on the Plan; (b) to the fullest extent permissible under applicable law, the Holders of Unimpaired Claims or Interests; (c) the Trustee; and (d) with respect to each of the foregoing Entities in clauses (a) through (c), such Entity's successors and assigns, and current and former Affiliates, subsidiaries, officers, directors, members, stockholders, partners, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, solely in their respective capacities as such (each a "Releasing Party"), shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtor, Reorganized Credivalores, the Estate, the Released Parties and each such Entity's successors and assigns, current and former affiliates, subsidiaries, officers, directors, members, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, solely in their respective capacities as such, and only if such Persons occupied any such positions at any time on or after the Petition Date, from any and all Claims, Interests, obligations, rights, liabilities, actions, causes of action, choses in action, suits, debts, demands, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including all claims and actions against any Entities under the Bankruptcy Code) whatsoever, whether for tort, contract, violations of federal or state securities laws and Avoidance Actions, including any derivative Claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity asserted or that could possibly have been asserted, or would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in, or under, in whole or in part, the Debtor, the Chapter 11 Case, the Old Notes, the Old Notes Indenture, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor or Reorganized Credivalores, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Releasing Party, the restructuring of Claims and Interests prior to or during the Chapter 11 Case, the negotiation, formulation, solicitation, or preparation of the Disclosure Statement, the Plan, the Plan Supplement, or related agreements, instruments or other documents, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided, however, that the foregoing provisions of Section 8.4 of the Plan shall have no effect on the liability of any of the Released Parties for gross negligence, willful misconduct, fraud, or criminal conduct as determined by a Final Order entered by a court of competent jurisdiction; provided further that nothing in Section 8.4 of the Plan shall release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed to implement, or otherwise given effect under, the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in Section 8.4 of the Plan, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) important to the Plan; (b) in exchange for the good and valuable consideration provided by the Debtor, Reorganized Credivalores, the Estate and the Released Parties; (c) a good faith settlement and compromise of the Claims released by Section 8.4; (d) in the best interests of the Debtor and all Holders of Claims and Interests; (e) fair, equitable, and

reasonable; (f) given and made after due notice and opportunity for hearing; and (g) a bar to any Entity granting a release under Section 8.4 of the Plan from asserting any Claim or Cause of Action released by Section 8.4 of the Plan.

C.     *Exculpation*

No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim or any obligation, Cause of Action, or liability for any Exculpated Claim; provided, however, that the foregoing "exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted fraud, gross negligence, or willful misconduct; provided, further, that in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to, or in connection with, the Plan. The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of acceptances and rejections of the Plan and the making of distributions pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable, law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

D.     *Injunction*

Except as otherwise provided herein or for obligations issued pursuant hereto, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to Section 8.3 or Section 8.4, discharged pursuant to Section 8.2, or are subject to exculpation pursuant to Section 8.5 are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtor, the Reorganized Credivalores, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estate of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estate of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, exculpated, or settled pursuant to the Plan.

**The Solicitation Package**

The following materials constitute the solicitation package (collectively, the "Solicitation Package"):

- the appropriate Ballots and applicable voting instructions;

- a pre-addressed, postage pre-paid return envelope; and

- the Statement with all exhibits, including the Plan and any other supplements or amendments to these documents.

The Voting Class shall be sent copies of the appropriate Ballots and applicable voting instructions and paper copies or flash drives containing the Statement with all exhibits, including the Plan. Any party who receives a flash drive and desires paper copies of these documents may request copies by writing to the Balloting Agent at Credivalores, c/o Epiq Corporate Restructuring, 10300 SW Allen Blvd, Beaverton, OR 97005. Our website and the information contained on our website are not part of this Statement. All parties entitled to vote to accept or reject the Plan shall receive voting instructions and/or a paper copy of the Ballot.

The plan supplement (the "Plan Supplement") will be filed with the Bankruptcy Court no later than five business days before the hearing to consider confirmation of the Plan or such other date as may be approved by the Bankruptcy Court. The Plan Supplement means the compilation of documents and forms of documents, schedules, and exhibits to be filed on the Plan Supplement Filing Date, as amended, modified or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules, including the following documents: (a) the New Corporate Governance Documents; (b) a list of retained Causes of Action; (c) to the extent known, the identity of the members of the New Board; and (d) any and all other documentation necessary to effectuate the transactions contemplated by the Plan. The Company may subsequently amend, modify or supplement the Plan Supplement in accordance with the terms of the Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

**Voting Deadline**

The period during which Ballots with respect to the Plan will be accepted by the Ballot Agent will terminate on the Voting Deadline, which is 5:00 p.m. (New York City time) on April 3, 2024, unless the Company extends the date until which Ballots will be accepted. Except to the extent the Company so determines or as permitted by the Bankruptcy Court, Ballots that are received after the Voting Deadline will not be counted or otherwise used by the Company in connection with the Company's request for confirmation of the Plan (or any permitted modification thereof).

The Company reserves the absolute right, at any time or from time to time, to extend the period of time (on a daily basis, if necessary) during which Ballots will be accepted for any reason, including determining whether or not the requisite number of acceptances have been received. The Company will give notice of any such extension in a manner deemed reasonable to the Company in its discretion. As of the date of the Exchange Offer, we have no intention of extending such date.

**Solicitation Package Distribution and Tabulation**

Only the Voting Class is entitled to vote to accept or reject the Plan, and they may do so by following the instructions below and the voting instructions provided with the Ballot. The failure of a Holder of a Claim in the Voting Class to deliver a duly executed Ballot on or before the Voting Deadline will be deemed to constitute an abstention by such Holder with respect to voting on the Plan, and such abstentions will not be counted as votes for or against the Plan.

The Claim amounts of Old Notes for voting purposes only will be established by reference to (a) the Company's applicable books and records and (b) the list of record holders maintained by the trustee for the Old Notes and/or reflected in the securities position report(s) from DTC or other applicable depository firm, dated as of the Voting Record Date, which shall be provided by the trustee of the Old Note, or the Company, to the Balloting Agent no later than three (3) Business Days following the Voting Record Date.

The following additional rules will apply with respect to the distribution of Beneficial Ballots and Master Ballots cast by Nominees for Beneficial owners of Old Notes Claims:

The Balloting Agent shall distribute or cause to be distributed through a nominee or its agent the appropriate number of copies of Ballots to each Beneficial owner (a "Beneficial Ballot") of an Old Notes Claim as of the Voting Record Date;

If you are a beneficial owner holding securities through a broker, dealer, commercial bank, trust company or other nominee, or your "nominee," you can vote on the Plan in one of the two following ways:

- *If your Beneficial Ballot has already been signed (or "prevalidated") by your nominee (as described below),* you can vote on the Plan by completing the information requested on the Ballot, indicating your vote on the Ballot, and returning the completed original Ballot in the enclosed, pre-addressed, postage-paid envelope so that it is actually received by the Balloting Agent before the Voting Deadline.

- *If your Beneficial Ballot has not been signed (or "prevalidated") by your nominee,* you can vote on the Plan by completing the information requested on the Ballot, indicating your vote on the Beneficial Ballot, and

returning the completed original Beneficial Ballot to your nominee in sufficient time for your nominee then to process the Ballot, incorporate your vote on a master Ballot, and return the master Ballot to the Balloting Agent so that the master Ballot is actually received by the Balloting Agent before the Voting Deadline. If no self-addressed, postage pre-paid envelope was enclosed for this purpose, the nominee must be contacted for instructions.

If you are a broker, dealer, commercial bank, trust company or other nominee that is the registered holder of securities, please forward a copy of this Statement, the appropriate Ballot, and any other enclosed materials to each beneficial owner as of the Voting Record Date and arrange for beneficial owners to vote in accordance with the voting procedures described herein and:

- *You may "pre-validate"* a Ballot by: (1) signing the Ballot; (2) including your DTC participant number; indicating the account number of the Beneficial owner and the principal amount of Old Note Claims held by the nominee for such Beneficial owner, accompanied by a medallion guarantee stamp certifying the Beneficial owner's position as of the Voting Record Date; and then forwarding the Beneficial Ballot together with the Solicitation Package to the Beneficial owner, together with a postage pre-paid envelope addressed to the Balloting Agent, and instructions for the Beneficial owner to complete the Ballot and submit directly to the Balloting Agent, so that it is actually received by the Balloting Agent before the Voting Deadline. A list of the beneficial owners to whom "pre-validated" Ballots were delivered should be maintained by the nominee for inspection for at least one year from the Voting Deadline.

*Or*

- You, as nominee, may obtain the votes of beneficial owners by forwarding to the beneficial owners the unsigned Ballots, together with this Statement, a return envelope provided by, and addressed to, the nominee, and other materials requested to be forwarded.[1] Each such beneficial owner may vote on the Plan by completing the information requested on the Ballot, indicating its vote on the Ballot, and returning the completed original Ballot to you, as nominee. After collecting the Ballots, you, as nominee, should, in turn, complete a master Ballot compiling the votes and other information from the Ballot, execute the master Ballot, and deliver the master Ballot to the Balloting Agent so that it is actually received by the Balloting Agent before the Voting Deadline. All Ballots returned by beneficial owners should be retained by nominees for at least one year from the Voting Deadline.

Each nominee should advise its beneficial owners to return their Ballots to the nominee by a date calculated by the nominee to allow it to prepare and return the master Ballot to Balloting Agent so that it is actually received by Balloting Agent before the Voting Deadline.

Any Ballot returned to a nominee by a beneficial owner shall not be counted for purposes of accepting or rejecting the Plan until such nominee properly completes and delivers to the Balloting Agent a master Ballot that reflects the vote of such beneficial owner on or before the Voting Deadline or otherwise validates the Beneficial Ballot in a manner acceptable to the Balloting Agent.

If a beneficial owner holds an Old Notes Claim through more than one nominee or through multiple accounts, such beneficial owner may receive more than one Ballot and each such beneficial owner should execute a separate Ballots for each block of Old Notes Claims that it holds through any nominee and must return each such Ballot to the appropriate nominee.

---

[1] Solicitation Packages may be sent in paper format or via electronic transmission in accordance with the customary requirements of each nominee. Each nominee will then distribute the Solicitation Packages, as appropriate, in accordance with their customary practices and obtain votes to accept or to reject the Plan also in accordance with their customary practices. If it is the nominee's customary and accepted practice to submit a "voting instruction form" to the Beneficial owners for the purpose of recording the Beneficial owner's vote, the nominee will be authorized to send the voting instruction form in lieu of, or in addition to, a Beneficial Ballot.

For the purposes of tabulating votes, each beneficial owner shall be deemed (regardless of whether such owner includes interest in the amount counted on its Ballot) to have voted only the principal amount of its position in the applicable Old Notes Claims.

Votes cast by beneficial owners through a Master Ballot submitted by a nominee (or its agent) will be applied against the positions held by such nominee in the securities as of the Voting Record Date, as evidenced by the record and depository listings. Votes submitted by a nominee (or its agent) will not be counted in excess of the record amount of such securities held by such nominee; provided that the Balloting Agent may adjust such record amount to reflect the corresponding claim amount.

If conflicting votes or "over-votes" are submitted by a nominee, the Balloting Agent will use reasonable efforts to reconcile discrepancies with the nominee;

If over-votes on a master Ballot are not reconciled prior to the preparation of the Voting Report, the Balloting Agent shall apply the votes to accept and to reject the Plan in the same proportion as the votes to accept and to reject the Plan submitted on the master Ballot that contained the over-vote, but only to the extent of the nominee's position, as of the Voting Record Date, of Old Notes Claims;

Any Ballot that is properly executed by the holder of a Claim, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, shall not be counted at all.

Each holder of a Claim in the Voting Class must vote all of their Claims either to accept or reject the Plan and may not split their votes.

Ballots are accompanied by a pre-addressed, postage pre-paid envelope and/or voting instructions. It is important to follow the specific instructions provided with each Ballot.

Any Holder of a Claim in the Voting Class that has not received a Ballot should contact its nominee or the Balloting Agent at its address and telephone number on the back cover of this Statement.

We have engaged the Balloting Agent as the noticing, claims and balloting agent to assist in the balloting and tabulation process. The Balloting Agent will process and tabulate Ballots for the Voting Classes and will file a voting report as soon as practicable on or after the Petition Date.

Acceptances or rejections may be withdrawn or revoked at any time before the Voting Deadline by the beneficial owner on the Voting Record Date who completed the original master Ballot or Ballot, or by the nominee who completed the master Ballot in such beneficial owner's name, as the case may be. However, after commencement of a reorganization case in connection with the Plan, withdrawal or revocation of votes accepting or rejecting the Plan may be effected only with the approval of the Bankruptcy Court.

Acceptances or rejections in regard to the Plan may be withdrawn or revoked before commencement of a reorganization case in connection with the Plan by complying with the following procedures: (a) a holder of a Claim in the Voting Class should deliver a written notice of withdrawal or revocation to the record holder for endorsement and delivery to the Balloting Agent and (b) a record holder of a Claim in the Voting Class who voted securities held for their own account should deliver a written notice of withdrawal or revocation to the Balloting Agent.

To be effective, a notice of revocation and withdrawal must:

- be timely received by the Balloting Agent at its address specified on the back cover of this Statement;

- specify the name and/or customer account number of the beneficial owner or otherwise identify the Ballot with the vote on the Plan of reorganization that is being withdrawn or revoked; and; and

- be signed by the beneficial owner of the Claim who executed the Ballot reflecting the vote being withdrawn or revoked, or by the nominee who executed the master Ballot reflecting the vote being withdrawn or

revoked, as applicable, in each case in the same manner as the original signature on the Ballot or master Ballot, as the case may be.

After the commencement of a reorganization case in connection the Plan, a notice of withdrawal of a previously furnished Ballot or master Ballot will not be effective without the approval of the Bankruptcy Court.

## Note to Holders of Claims in the Voting Class

By signing and returning a Ballot, each Holder of a Claim in the Voting Classes will be certifying to the Bankruptcy Court and us that, among other things:

- the holder has received and reviewed a copy of the Statement and Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

- the holder has cast the same vote with respect to all Claims, as applicable, in the same respective class; and

- no other Ballots with respect to the same Claim have been cast, or, if any other Ballots have been cast with respect to such Claims, then any such Ballots are thereby revoked.

## Voting Tabulation

The Ballot does not constitute, and shall not be deemed to be, a proof of claim or an assertion or admission of a claim. Only Holders of Claims in the Voting Class shall be entitled to vote with regard to such Claims.

Unless the Company decides otherwise, Ballots received after the Voting Deadline may not be counted. The method of delivery of the Ballots to be sent to the Balloting Agent is at the election and risk of each Holder of a Claim in the Voting Class. Except as otherwise provided herein, or if you have been provided a pre-validated Beneficial Ballot, a pre-validated Ballot will be deemed delivered only when the Balloting Agent actually receives the original executed Ballot. No Ballot should be sent to us or any of our agents (other than the Balloting Agent), or to our financial or legal advisors.

We reserve the right to use the acceptances to seek confirmation of any permitted amendment or modification of the Plan, provided that we may not make any amendment or modification to the Plan prohibited by the Plan.

The Bankruptcy Code may require the Company to disseminate additional solicitation materials if the Company makes material changes to the terms of the Plan or if the Company waives a material condition to confirmation of the Plan. In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

If multiple Ballots are received from the same Holder with respect to the same Claim in the respective Voting Class, the last Ballot timely dated Ballot will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot. Holders of a Claim in the Voting Class must vote all of their Claims, as applicable, either to accept or reject the Plan and may not split their vote. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted. Further, to the extent there are multiple Claims in the same Voting Class, we may, in our discretion, and to the extent possible, aggregate the respective Claims of any particular Holder within the particular class for the purpose of counting votes.

In the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

To the extent that we commence the Chapter 11 Case, we will file with the Bankruptcy Court, on the Petition Date, or as soon as practicable thereafter, the voting report prepared by the Balloting Agent. We are accepting the Master Ballot via E-mail. The voting report shall, among other things, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity, including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, received via facsimile or damaged. The voting report also shall indicate our intentions with regard to such irregular Ballots. Neither we nor any other person or entity will be

under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the voting report, nor will any of them incur any liability for failure to provide such notification.

**Confirmation of the Plan**

If we commence the Chapter 11 Case, we will promptly request that the Bankruptcy Court hold a hearing to consider confirmation of the Plan (the "Confirmation Hearing"), including a determination that the Plan Solicitation was in compliance with any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure or, if there is not any such law, rule or regulation, was made after disclosure of adequate information as defined in the Bankruptcy Code, upon such notice to parties in interest as is required by the Bankruptcy Code and the Bankruptcy Court. Bankruptcy Rule 2002(b) requires no less than 28 days' notice by mail of the time for filing objections to confirmation of the Plan and of the time and place of the confirmation hearing, unless the Bankruptcy Court shortens or lengthens this period. Parties in interest, including all Holders of the Old Notes, will be provided notice by mail, or by publication if required by the Bankruptcy Court, of the date and time fixed by the Bankruptcy Court for the Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan. The Bankruptcy Court will also establish procedures for the filing and service of objections to confirmation of the Plan. Such procedures will be described to parties in interest in the notice informing them of the time for filing objections to confirmation of the Plan.

**ANY OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED WITH THE BANKRUPTCY COURT IN ACCORDANCE WITH APPLICABLE BANKRUPTCY RULES AND ANY PROCEDURES ESTABLISHED BY THE BANKRUPTCY COURT.**

In order for the Plan to be confirmed, and regardless of whether all impaired classes of Claims and Interests vote to accept the Plan, the Bankruptcy Code requires that the Bankruptcy Court determine that the Plan complies with the requirements of section 1129 of the Bankruptcy Code. Section 1129 of the Bankruptcy Code sets forth certain requirements that must be met in order for a plan of reorganization to be confirmed including, among other things, that:

- except to the extent the Plan meets the "nonconsensual confirmation" standards, the Plan be accepted by each impaired class of Claims and Interests by the requisite votes of Holders of Claims and Interests in such impaired classes;

- the Plan is feasible (that is, there is a reasonable probability that we will be able to perform our obligations under the Plan and continue to operate our business without the need for further financial reorganization) (see "Feasibility of the Plan" below); and

- the Plan meets the requirements of section 1129(a)(7) of the Bankruptcy Code, which requires that, with respect to each impaired class, each Holder of a Claim or Interest in such class either hypothetically (1) accepts the Plan or (2) receives at least as much pursuant to the Plan as such Holder would receive in a liquidation under chapter 7 of the Bankruptcy Code (see "Best Interests Test" below).

In addition, we must demonstrate in accordance with section 1129 of the Bankruptcy Code that:

- the Plan is proposed in good faith;

- the Plan complies with the Bankruptcy Code;

- payments for services or costs and expenses in or in connection with the case, or in connection with the Plan, have been approved by or are subject to the approval of the Bankruptcy Court;

- the individuals to serve as our officers and directors have been disclosed and their appointment or continuance in such office is consistent with the interests of creditors and interest holders;

- the identity of any insider that will be employed or retained by us is disclosed, as well as any compensation to be paid to such insider;

- all statutory fees have been or will be paid; and

- the Plan provides for the continued maintenance of retiree benefits, if any, at a certain level.

## Acceptance of the Plan

As a condition to confirmation, the Bankruptcy Code requires that each impaired class of claims or interests accept a plan of reorganization, unless the "cram-down" requirements of section 1129(b) of the Bankruptcy Code are met. Classes of claims or interests that are not "impaired" under a plan are conclusively presumed to have accepted the plan and are not entitled to vote.

## Feasibility of the Plan

As a condition to plan confirmation, the Bankruptcy Code requires, among other things, the Bankruptcy Court to find that Confirmation is not likely to be followed by either a liquidation or the need to further reorganize the debtor. In connection with developing the Plan, and for purposes of determining whether the Plan satisfies feasibility standards, our management believes that Reorganized Credivalores will possess the ability to meet its obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct their businesses.

Thus, we believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of Reorganized Credivalores. In general, as will be illustrated by certain financial projections developed by our management team and which will be filed with the Bankruptcy Court on or before the date for filing the Plan Supplement (the "Projections") illustrated by the Projections, we believe that with a significantly de-leveraged capital structure, Reorganized Credivalores will be viable. We also believe that Reorganized Credivalores will have sufficient liquidity to fund obligations as they arise, thereby maintaining value. Accordingly, we believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code. We, together with our advisors, prepared the Projections in good faith, based upon estimates and assumptions developed by our management team.

## Best Interests Test

As will be further described in the Liquidation Analysis that will be filed with the Bankruptcy Court on or prior to the date for filing the Plan Supplement, even if the Plan is accepted by each impaired class of Claims and Interests, section 1129(a)(7) of the Bankruptcy Code requires that in order to confirm the Plan, the Bankruptcy Court must determine that either (i) each member of an impaired class of Claims or Interests has accepted the Plan or (ii) the Plan will provide each *non-accepting* member of an impaired class of Claims or Interests a recovery that has a value at least equal to the value of the distribution that such member would receive if we were liquidated under chapter 7 of the Bankruptcy Code. If all members of an impaired class of Claims or Interests accept the Plan, the best interests test does not apply with respect to that class.

The first step in meeting the best interests test is to determine the dollar amount that would be generated from the liquidation of our assets and properties in the context of a chapter 7 liquidation case. The total amount available would be the sum of the proceeds from the disposition of our assets and the cash held by us at the time of the commencement of the chapter 7 case. The next step is to reduce that total by the amount of any claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of our business and the use of chapter 7 for the purposes of liquidation. Finally, the present value of that amount (taking into account the time necessary to accomplish the liquidation) is allocated to creditors and stockholders in the strict order of priority in accordance with section 726 of the Bankruptcy Code, which requires that no junior creditor receive any distribution until all senior creditors are paid in full, and then compared to the value of the property that is proposed to be distributed under the Plan on the date the Plan becomes effective.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a chapter 11 case, including:

- the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee;

- the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail; and

- substantial increases in claims that would be satisfied on a priority basis or on a parity with creditors in a chapter 11 case.

As will be detailed in the Liquidation Analysis that will be attached to the Plan Supplement, we believe that the distributions to be made to Holders of Old Notes under the Plan will provide each such Holder with a recovery that is not less than it would receive pursuant to our hypothetical liquidation under chapter 7 of the Bankruptcy Code.

**Conditions to the Effective Date**

All standard conditions to the Plan becoming effective, including without limitation that the Confirmation Order become a final and non-appealable order, are conditions to the Effective Date.

# ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives include:

## Liquidation Under Chapter 7

If no plan is confirmed, the Debtor may choose to file a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected to liquidate the Debtor's assets for distribution in accordance with the priorities established by chapter 7 of the Bankruptcy Code. However, there is substantial doubt as to whether the local government or creditors not subject to the jurisdiction of the Bankruptcy Court would choose to respect such a liquidation.

## Alternative Plan(s) of Reorganization

The Debtor believes that failure to confirm the Plan will likely lead to an expensive and protracted Chapter 11 Case. In formulating and developing the Plan, the Debtor has explored numerous other alternatives and engaged in an extensive negotiating process. The Debtor believes that not only does the Plan fairly adjust the rights of various Classes of Holders of Claims and Interests, and enable each to maximize their returns, but also that rejection of the Plan in favor of some alternative method of reconciling the Claims and Interests will require, at the very least, an extensive and time consuming process (including the possibility of protracted and costly litigation) and will not result in a better recovery for any Class.

## Dismissal of the Debtor's Chapter 11 Case

Dismissal of the Debtor's Chapter 11 Case would have the effect of restoring (or attempting to restore) all parties to the status quo ante. Upon dismissal of the Debtor's Chapter 11 Case, the Debtor would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time-consuming process of negotiation with creditors, and possibly resulting in costly and protracted litigation in various jurisdictions. Dismissal will also permit unpaid secured and unsecured creditors to obtain and enforce judgments against the Debtor. The Debtor believes that these actions would seriously undermine its ability to continue operations. Therefore, the Debtor believes that dismissal of the Chapter 11 Case is not a viable reorganizational alternative to the Plan.

## ANTICIPATED EVENTS IN A CHAPTER 11 CASE

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Pursuant to Chapter 11, a debtor may remain in possession of its assets, continue to manage its business and attempt to reorganize its business for the benefit of the debtor, its creditors and other parties in interest. The commencement of a Chapter 11 case creates an estate comprising all the legal and equitable interests of a debtor in its property as of the date the petition is filed. Sections 1107 and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession," unless the Bankruptcy Court orders the appointment of a trustee. The commencement of a Chapter 11 case also triggers the automatic stay provisions of the Bankruptcy Code. Section 362 of the Bankruptcy Code provides, among other things, for an automatic stay of all attempts to collect prepetition claims from the debtor or otherwise interfere with its property or business. Except as otherwise ordered by the Bankruptcy Court, the automatic stay generally remains in full force and effect until confirmation of a plan of reorganization.

Consummating a plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

A "prepackaged" plan of reorganization is one in which a debtor seeks approval of a plan of reorganization from affected creditors before filing for bankruptcy. Because solicitation of acceptances begins before the bankruptcy filing, the amount of time required for the bankruptcy case is often less than in non-prepackaged bankruptcy cases. Increased certainty of results and reduced costs are other benefits generally associated with prepackaged bankruptcy cases.

Pursuant to section 1102 of the Bankruptcy Code, upon the commencement of a Chapter 11 case, the Office of the United States Trustee (the "U.S. Trustee") is required to appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors or of equity security holders as the U.S. Trustee deems appropriate. However, it is not uncommon for the U.S. Trustee to not appoint a creditors' committee in cases where solicitation of a Plan has been conducted before the Petition Date and the Plan is supported by the impaired class or classes of creditors under the Plan. Should we commence the Chapter 11 Case, we will seek a waiver of this requirement.

Pursuant to section 1103 of the Bankruptcy Code, a committee appointed under section 1102 of the Bankruptcy Code may:

- consult with the trustee or debtor in possession concerning the administration of the Chapter 11 case;

- investigate the acts, conduct, assets, liabilities and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business and any other matter relevant to the case or to the formulation of a plan;

- participate in the formulation of a plan, advise those represented by such committee of such committee's determinations as to any plan formulated and collect and file with the court acceptances or rejections of a plan;

- request the appointment of a trustee or examiner under section 1104 of the Bankruptcy Code; and

- perform such other services as are in the interest of those represented by the committee.

Furthermore, pursuant to section 1109(b) of the Bankruptcy Code, upon the commencement of the Chapter 11 case, any party in interest, including the debtor, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder or any indenture trustee may raise and may appear and be heard on any issue in the Chapter 11 case.

The formulation and confirmation of a plan of reorganization is the principal objective of a Chapter 11 case. The plan sets forth the means for satisfying the claims against and interests in the debtor. The Plan we propose will pay all administrative and priority claims in full, provide the consideration to holders of the Old Notes set forth in this Statement and leave all other claims and interests unaltered by the Plan.

In order to facilitate the Chapter 11 Case and minimize disruption to our business and maximize the probability of a successful restructuring, we will seek certain relief, including but not limited to, the relief summarized below. The relief sought will facilitate the administration of the Chapter 11 Case; however, there is no guarantee that the Bankruptcy Court will grant any or all of the requested relief.

**Voluntary Petition**

We will file a chapter 11 bankruptcy petition on the Petition Date, which will commence the Chapter 11 Case.

**Expected Timetable of the Chapter 11 Case**

We expect the Chapter 11 Case to proceed quickly, and believe that since the Plan seeks to confirm a prepackaged plan of reorganization where no class of claims or interests is proposed to be crammed down, that we should be able to proceed with confirmation of the Plan quickly.

We cannot assure you, however, that the Bankruptcy Court will approve the Plan on the timetable we will propose. On the Petition Date, we will promptly request the Bankruptcy Court to set a hearing date to approve the Disclosure Statement and to confirm the Plan approximately 30 to 45 days after the Petition Date or even more quickly as the Bankruptcy Court may permit. If the Plan is confirmed, the Effective Date of the Plan is projected to be as soon as practicable after the date the Bankruptcy Court enters the Confirmation Order and the Confirmation Order becomes a Final Order and the other conditions to Consummation of the Plan are satisfied or waived.

**First Day Relief**

In addition to the motion to set a hearing on approval of the Disclosure Statement and the Plan, we intend to file certain motions that we believe will permit the Chapter 11 Case to proceed on an efficient and expedited basis so as to permit us to obtain confirmation of the Plan, including (i) a motion seeking an extension and potential waiver of the requirement to file schedules, (ii) a motion asking the United States Trustee's office to dispense with the requirement of convening a 341 creditors meeting and formation of an unsecured creditors committee (see following paragraph) and (iii) certain procedural and administrative motions, including applications to retain the various Professionals who will be assisting us in the Chapter 11 Case.

Pursuant to section 1102 of the Bankruptcy Code, upon the commencement of a Chapter 11 case, the U.S. Trustee is required to appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors or of equity security holders as the U.S. Trustee deems appropriate. However, it is not uncommon for the U.S. Trustee to not appoint a creditors' committee in cases where solicitation of a Plan has been conducted before the Petition Date and the Plan is supported by the impaired class of creditors under the Plan.

**Holders of Claims or Interests may object to, and the Bankruptcy Court may disagree with, the Plan's classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtor believes that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.

However, a Holder of a Claim or Interest could challenge the Debtor's classification. In such an event, the cost of the Chapter 11 Cases and the time needed to confirm the Plan may increase and there can be no assurance that the Bankruptcy Court will agree with the Debtor's classification. If the Bankruptcy Court agrees with the objection to the Plan's classification of Claims and Interests, the Debtor may be required to modify the Plan, which could require re-solicitation of votes on the Plan and/or amending the Plan. In addition, the Plan may not be confirmed if the Bankruptcy Court determines that the Debtor's classification of Claims and Interests is not appropriate.

**The Bankruptcy Court may not confirm the Plan.**

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtor intends to seek Confirmation of the Plan by the Bankruptcy Court. However, even if the requisite votes are received, the Bankruptcy Court is not obligated to confirm the Plan as proposed. In addition, a dissenting Holder of a Claim against the Debtor could challenge the balloting procedures as not being in compliance with the Bankruptcy Code, which could mean that the balloting results may be invalid. Even if the Bankruptcy Court determined that the balloting procedures were appropriate and the results were valid, the Bankruptcy Court could still decline to confirm the Plan, if the Bankruptcy Court found that any of the statutory requirements for confirmation had not been met.

Section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a plan of reorganization, requires, among other things, a finding by the Bankruptcy Court that the plan of reorganization is "feasible," that all claims and interests have been classified in compliance with the provisions of section 1122 of the Bankruptcy Code and that, under the plan of reorganization, each holder of a claim or interest within each impaired class either accepts the plan of reorganization or receives or retains cash or property of a value, as of the date the plan of reorganization becomes effective, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. There can be no assurance that the Bankruptcy Court will conclude that the feasibility test and other requirements of sections 1122, 1123, 1129 and the other applicable provisions of the Bankruptcy Code have been met with respect to the Plan. In addition, the Bankruptcy Court may decline to accept the Debtor's petition based on jurisdictional or venue grounds, which would also result in the Debtor not being able to obtain Confirmation of the Plan.

**The Debtor may seek to amend, waive, modify or withdraw the Plan at any time prior to Confirmation.**

The Debtor reserves the right, prior to the Confirmation of the Plan or substantial Consummation thereof, subject to the provisions of section 1127 of the Bankruptcy Code and applicable law, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. Holders of Claims and Interests will receive notice of such amendments or waivers as required by applicable law and the Bankruptcy Court. If, after receiving sufficient acceptances, but prior to Confirmation of the Plan, the Debtor seek to modify the Plan, the previously solicited acceptances will be valid only if (a) all Classes of adversely affected Holders of Claims and Interests accept the modification in writing, or (b) the Bankruptcy Court determines, after notice to designated parties, that such modification was de minimis or purely technical or otherwise did not adversely change the treatment of Holders of accepting Claims and Interests or is otherwise permitted by the Bankruptcy Code

**The effects of a U.S. bankruptcy on agreements between the Debtor and third parties upon commencement of the Chapter 11 Cases is uncertain.**

Certain of the agreements between the Debtor and various third parties permit the termination of such agreements if the Debtor becomes the subject of a judicial declaration of bankruptcy or insolvency. Although such so-called *ipso facto* provisions are generally unenforceable under section 365(b)(2) of the Bankruptcy Code when a debtor is in chapter 11, no assurance can be given that local courts would prohibit a third party from terminating a contract pursuant to such *ipso facto* clauses in other countries. Therefore, the Debtor can give no assurance that some of the Debtor's agreements would not be terminated as a result of the commencement of the Chapter 11 Cases.

# TRANSFER RESTRICTIONS

*The following description of transfer restrictions is only applicable to the Exchange Offer. See "Description of the Plan" for transferability of New Notes issued under the Plan.*

The New Notes have not been registered, and will not be registered, under the Securities Act or any state securities laws, and the New Notes may not be offered or sold except pursuant to an effective registration statement or pursuant to transactions exempt from, or not subject to, registration under the Securities Act. Accordingly, the New Notes be issued in the Exchange Offer are being offered and issued only (a) to "qualified institutional buyers" (as defined in Rule 144A under the Securities Act), or QIBs, in compliance with Rule 144A under the Securities Act or (b) outside of the United States, to certain persons, other than U.S. persons, in offshore transactions meeting the requirements of Rule 903 of Regulation S under the Securities Act. As used herein, the terms "offshore transactions," "United States" and "U.S. person" have the respective meanings given to them in Regulation S, and who are not acquiring New Notes for the account or benefit of a U.S. person. Only holders who have returned a duly completed Eligibility Letter certifying that they are (a) a QIB, and is aware that the sale is being made in reliance on Rule 144A under the Securities Act or (b) a non-U.S. person that is outside the United States.

## Purchasers' Representations and Restrictions on Resale and Transfer

By exchanging its Old Notes for New Notes, each recipient of New Notes will be deemed to have represented and agreed as follows:

(1)     it is obtaining the New Notes for its own account or an account with respect to which it exercises sole investment discretion and it and any such account is (a) a QIB, and is aware that the sale to it is being made in reliance on Rule 144A under the Securities Act or (b) a non-U.S. person that is outside the United States;

(2)     it acknowledges that the New Notes have not been registered under the Securities Act or with any securities regulatory authority of any state and may not be offered or sold within the United States;

(3)     it understands and agrees that the New Notes will be represented by a global note;

(4)     it will not resell or otherwise transfer any of such New Notes prior to (i) the date which is one year (or such other period of time as permitted by Rule 144(d) under the Securities Act or any successor provision thereunder) after the later of the date of original issuance of the New Notes and (ii) such later date, if any, as may be required by applicable laws, except (a) to us or any of our subsidiaries, (b) within the United States to a qualified institutional buyer in a transaction complying with Rule 144A under the Securities Act, (c) outside the United States to non-U.S. purchasers in offshore transactions in compliance with Rule 903 or 904 under the Securities Act, (d) pursuant to an exemption from registration under the Securities Act (if available) or (e) pursuant to an effective registration statement under the Securities Act;

(5)     it agrees that it will give to each person to whom it transfers the New Notes notice of any restrictions on transfer of such New Notes;

(6)     it acknowledges that prior to any proposed transfer of New Notes (other than pursuant to an effective registration statement or in respect of New Notes sold or transferred either pursuant to (a) Rule 144A or (b) Regulation S) the holder of such New Notes may be required to provide certifications relating to the manner of such transfer as provided in the New Notes Indenture;

(7)     it acknowledges that the trustee, registrar or transfer agent for the New Notes may not be required to accept for registration or transfer of any New Notes acquired by it, except upon presentation of evidence satisfactory to us that the restrictions set forth herein have been complied with;

(8)        it acknowledges that we, the Dealer Manager and other persons will rely upon the truth and accuracy of the foregoing acknowledgements, representations and agreements and agrees that if any of the acknowledgements, representations and agreements deemed to have been made by its exchange of the New Notes are no longer accurate, it will promptly notify us and the Dealer Manager;

(9)        if it is acquiring the New Notes as a fiduciary or agent for one or more investor accounts, it represents that it has sole investment discretion with respect to each such account and it has full power to make the foregoing acknowledgements, representations and agreements on behalf of each account; and

(10)       the Exchange Offer is not being made to, and any offers to exchange will not be accepted from, or on behalf of, Eligible Holders of the Old Notes in any jurisdiction in which the making of such offer would not be in compliance with the laws and regulations of such jurisdiction.

## Legends

The following is the form of restrictive legend which will appear on the face of the global notes and which will be used to notify transferees of the foregoing restrictions on transfer. This legend will only be removed with our consent. If we so consent, it will be deemed to be removed.

THE SECURITIES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE OR OTHER SECURITIES LAWS, AND MAY NOT BE OFFERED, SOLD, PLEDGED, OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE HOLDER OF THIS SECURITY BY ITS ACCEPTANCE HEREOF (1) REPRESENTS THAT IT, AND ANY ACCOUNT FOR WHICH IT IS ACTING, (A) IS A "QUALIFIED INSTITUTIONAL BUYER" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT) OR (B) IS NOT A U.S. PERSON AND IS ACQUIRING THIS SECURITY IN AN "OFFSHORE TRANSACTION" PURSUANT TO RULE 903 OR 904 OF REGULATION S AND, WITH RESPECT TO (A) AND (B), EXERCISES SOLE INVESTMENT DISCRETION WITH RESPECT TO SUCH ACCOUNT, (2) AGREES FOR THE BENEFIT OF THE COMPANY THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS SECURITY OR ANY BENEFICIAL INTEREST HEREIN, EXCEPT (A) (I) TO THE COMPANY OR ANY SUBSIDIARY THEREOF, (II) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT, (III) TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, (IV) IN AN OFFSHORE TRANSACTION COMPLYING WITH THE REQUIREMENTS OF RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, OR (V) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT (IF AVAILABLE), AND (B) IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF THE STATES OF THE UNITED STATES AND OTHER JURISDICTIONS, AND (3) AGREES THAT IT WILL GIVE TO EACH PERSON TO WHOM THIS SECURITY IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION," "UNITED STATES" AND "U.S. PERSON" HAVE THE RESPECTIVE MEANINGS GIVEN TO THEM BY REGULATION S UNDER THE SECURITIES ACT. PRIOR TO EXPIRATION OF THE 40-DAY DISTRIBUTION COMPLIANCE PERIOD (AS DEFINED IN REGULATION S ("REGULATION S") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT")), THIS SECURITY MAY NOT BE REOFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES (AS DEFINED IN REGULATION S) OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, A U.S. PERSON (AS DEFINED IN REGULATION S), EXCEPT TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT IN A TRANSACTION MEETING THE REQUIREMENTS OF THE INDENTURE REFERRED TO HEREIN.

Prior to the registration of any transfer in accordance with clause (2)(A)(V) of the global note legend, we reserve the right to require the delivery of such legal opinions, certifications, or other evidence as may reasonably be required in order to determine that the proposed transfer is being made in compliance with the Securities Act and applicable state securities laws. No representation is made as to the availability of any exemption from the registration requirements of the Securities Act.

The applicable Resale Restriction Period may be extended in our discretion, in the event of one or more issuances of additional notes, as described under "Description of the New Notes—Additional Notes."

## European Economic Area

The New Notes are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the European Economic Area ("EEA"). For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client as defined in point (11) of Article 4(1) of Directive 2014/65/EU (as amended, "MiFID II"); or (ii) a customer within the meaning of Directive (EU) 2016/97 (as amended, the "Insurance Distribution Directive"), where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II, or (iii) not a qualified investor as defined in Regulation (EU) 2017/1129 (as amended the "Prospectus Regulation"). Consequently, no key information document required by Regulation (EU) No 1286/2014 (as amended, the "PRIIPs Regulation") for offering or selling the New Notes or otherwise making them available to retail investors in the EEA, has been prepared and therefore offering the New Notes or otherwise making them available to any retail investor in the EEA may be unlawful under the PRIIPs Regulation.

We have not authorized the making of any offer (other than permitted public offers) of New Notes in circumstances in which an obligation arises for us to publish a prospectus for such offer.

## United Kingdom

The New Notes are not intended to be offered, sold or otherwise made available to, and should not be offered, sold or otherwise made available to, any retail investor in the United Kingdom ("UK"). For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client, as defined in point (8) of Article 2 of Regulation (EU) No 2017/565 as it forms part of domestic law by virtue of the European Union (Withdrawal) Act 2018 ("EUWA"); or (ii) a customer within the meaning of the provisions of the Financial Services and Markets Act 2000 (as amended, the "FSMA") and any rules or regulations made under the FSMA to implement the Insurance Distribution Directive (EU), where that customer would not qualify as a professional client, as defined in point (8) of Article 2(1) of Regulation (EU) No 600/2014 as it forms part of domestic law by virtue of the EUWA, or (iii) not a qualified investor as defined in Article 2 of Regulation (EU) No 2017/1129 as it forms part of domestic law by virtue of the EUWA (the "UK Prospectus Regulation"). Consequently, no key information document required by Regulation (EU) No 1286/2014 as it forms part of domestic law by virtue of the EUWA (the "UK PRIIPs Regulation") for offering or selling the New Notes or otherwise making them available to retail investors in the United Kingdom has been prepared and therefore offering or selling the New Notes or otherwise making them available to any retail investor in the United Kingdom may be unlawful under the UK PRIIPs Regulation.

In the United Kingdom, this communication is only addressed to and is only directed at qualified investors within the meaning of the UK Prospectus Regulation.

This Statement has been prepared on the basis that any offer of New Notes in the United Kingdom ("UK") will be made pursuant to an exemption under the UK Prospectus Regulation and the Financial Services and Markets Act 2000 (as amended, the "FSMA") from the requirement to publish a prospectus for offers of New Notes. Accordingly any person making or intending to make an offer in the UK of New Notes which are the subject of the offering contemplated in this Exchange Offer Statement may only do so to legal entities which are qualified investors as defined in the UK Prospectus Regulation, provided that no such offer of New Notes shall require PEMEX or the Dealer Manager to publish a prospectus pursuant to Article 3 of the UK Prospectus Regulation or section 85 of the FSMA in relation to such offer.

In the United Kingdom, this Statement is for distribution only to persons who (i) have professional experience in matters relating to investments falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (as amended, the "Order"), (ii) are persons falling within Article 49(2)(a) to (d) ("high net worth companies, unincorporated associations etc.") of the Order or (iii) are persons to whom an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the FSMA) in connection with the issue or sale of any New Notes may otherwise lawfully be communicated or caused to be communicated (all such persons together being referred to as "relevant persons"). This Statement is directed only at relevant persons and must not be acted on or relied on by persons who are not relevant persons. Any investment or investment activity to which this Statement relates is available only to and will be

engaged in only with relevant persons. Any person who is not a relevant person should not act or rely on this Statement or any of its contents.

**Colombia**

The New Notes are not intended to be offered, sold or otherwise made available to, and should not be offered, sold or otherwise made available to any retail investor (*Cliente Inversionista*) in Colombia. For these purposes, a retail investor (*Cliente Inversionista*) means a person who is one (or more) of: (i) a retail client (*Cliente Inversionista*) as defined in Article 7.2.1.1.4 of Decree 2555; or (ii) a customer (*Cliente*) within the meaning of Article 7.2.1.1.1 of Decree 2555; or (iii) not a qualified investor (*Inversionista Profesional*) as defined in Articles 7.2.1.1.2 and 7.2.1.1.3 of Decree 2555. Consequently, no key information required by Decree 2555 or its complementary rules for offering or selling the New Notes, or otherwise making them available to retail investors (*Clientes Inversionistas*) in Colombia, has been prepared and therefore offering or selling the New Notes or otherwise making them available to any retail investor (*Cliente Inversionista*) in Colombia may be unlawful under Decree 2555.

This Statement has been prepared on the basis that no offer of New Notes will be conducted in Colombia or, if any such offer is made in Colombia, it will be directed to qualified investors (*Inversionistas Profesionales*) under a private placement, pursuant to Article 6.1.1.1.1 of Decree 2555, and/or as a foreing issuance in accordance with Article 2.15.6.1.13 of Decree 2555, thus exempting the offering of any requirement to publish or file a prospectus (or equivalent document) for offers of New Notes before the SFC.

**TAXATION**

The following is a general summary of certain Colombian national and U.S. federal income tax consequences related to participation in the Exchange Offer as well as the ownership and disposition of New Notes, but it does not purport to be a comprehensive description of all the tax considerations that may be relevant to a decision to exchange Old Notes for New Notes in the Exchange Offer or to hold or dispose of the New Notes. This summary does not describe any tax consequences arising under the laws of any state, locality, municipality or taxing jurisdiction other than the federal income tax laws of the United States and the Colombian National Income Tax Law (*Decreto Ley 624 de 1989, as amended or amended and restated from time to time*, or the "Colombian Income Tax Law").

This summary is for general information only and is based on the national tax laws of Colombia and federal income tax laws of the United States as in effect on the date of this statement, as well as rules and regulations of Colombia and regulations, rulings and decisions of the United States available on or before this date and now in effect. All of the foregoing are subject to change, possibly with retroactive effect, which could affect the continued validity of this summary.

Holders of Old Notes should consult their own tax advisors as to the Colombian, U.S. or other tax consequences (including tax consequences under any law of Colombia or the United States or under any applicable double taxation treaty which is in effect) of participation in the exchange offer and of the ownership or disposition of the New Notes, including the particular tax consequences to them in light of their particular investment circumstances.

**Certain Colombian Income Tax Considerations**

*The following is a summary of certain Colombian tax considerations that may be relevant to you if you exchange Old Notes for New Notes. This summary is based on laws, regulations, and rulings currently in force in Colombia. All the foregoing is subject to change, amendments and/or modification, which could affect the continued validity of this summary.*

Under the Colombian Income Tax Law, non-Colombian tax residents (including both individuals and corporations) are subject to the Colombian Income Tax only on their Colombian-source income.

*Consequences of Tendering Old Notes for New Notes - Colombian source income*

Colombian-source income is generally defined as revenue derived from: (i) services rendered within the Colombian territory, (ii) tangible and intangible assets located or possessed in Colombia, (iii) the sale or exchange of tangible or intangible assets located or possessed in Colombia, and (iv) interest paid by Colombian tax residents (including both individuals and corporations) acting as borrowers in debt transactions with foreign creditors, unless statutory exceptions under the Colombian Income Tax Law apply (as explained below).

Therefore, as a general rule, interest paid by Colombian tax residents (individuals or corporations that are domiciled in Colombia or formed under Colombian law or foreign entities with their effective place of management in Colombia) to a foreign non-Colombian tax resident creditor are subject to a 15% withholding income tax rate, provided that the term of the loan is at least one year. If the term of the loan is less than one year, the withholding income tax rate will increase by up to 20%.

Notwithstanding the aforementioned, interest paid and derived from notes, bonds and other debt securities issued by Colombian tax residents but traded abroad (outside Colombia) by non-Colombian tax residents are deemed to be foreign source income (non-Colombian-source income) subject to a special tax treatment outlined in Section 266(6) of the Colombian Income Tax Law ("Section 266 (6)"). Section 266 (6) establishes that notes, bonds or other debt securities issued by Colombian tax residents that are traded outside Colombia are treated as loans deemed to be possessed outside Colombia and therefore, interest paid by the Colombian issuer (or borrower) are not subject to withholding income tax in Colombia.

On November 25, 2016, the Colombian tax authority issued tax ruling number 32227 of 2016 stating that income of any kind (including interest or any capital gain derived from the exchange) from notes, bonds or debt securities issued by

Colombian issuers but traded outside Colombia by non-Colombian tax residents (*e.g.*, those subject to the abovementioned rule) are not subject to the Colombian income tax.

Therefore, in accordance with Section 266(6) and tax ruling number 32227 of 2016, interest payments related to notes, bonds, or other debt securities that are (i) issued by Colombian tax residents but (ii) offered or traded outside Colombia by non-Colombian tax residents are not subject to Colombian income tax nor withholding income tax in Colombia.

*Exchange of Old Notes for New Notes*

Pursuant to section 266(6) and Tax Ruling number 32227 of 2016, the transfer or exchange of notes and bonds traded outside Colombia is a non-taxable event in Colombia, provided that the holder is a non-Colombian tax resident. Thus, non-Colombian tax residents that transfer or exchange the Old Notes for New Notes traded outside Colombia are not subject to income and capital gains tax obligations in Colombia.

If the Note holders are not Colombian tax residents, no transfer taxes would apply in Colombia derived from the exchange of Notes. There would be no inheritance, gift, or capital gains tax in the event of a transfer of notes traded outside Colombia by non-Colombian tax residents.

*Tax residency for Colombian Income Tax Laws*

A corporation or legal entity will be deemed to be a domestic entity for Colombian income tax purposes if it (i) is incorporated under the laws of Colombia, (ii) has its legal domicile in Colombia; or (iii) has its effective place of management in Colombia.

Pursuant to the Colombian Income Tax Law, a foreign individual will become a tax resident in Colombia, if they satisfy the "substantial presence test". The substantial presence test is a relatively simple test intended to identify foreign individuals who spend substantial periods of time within Colombian territory. The test will be satisfied if the foreign individual was present in Colombia (continuously or not) for an aggregate period of 183 days within a period of 365 consecutive calendar days. In case that the 365 days period is satisfied within two taxable years, the individual will be considered Colombian tax resident for the second taxable year. Please be advised that in Colombia the fiscal year starts on January 1st and ends on December 31st.

Colombian nationals domiciled outside Colombia could become Colombian tax residents, if they satisfy any of the following conditions:

- has a spouse, legal partner, underage children who is a tax resident in Colombia;

- 50% or more of their income is Colombian-source income;

- 50% or more of their assets are managed in Colombia;

- 50% or more of such person's assets are located or possessed in Colombia;

- they cannot provide a certificate of tax residence in another jurisdiction.

- they are a tax resident in a jurisdiction that is listed as a low or no-tax jurisdiction under the Colombian Income Tax Law.

Statutory exceptions set forth in section 10 of the Colombian Income Tax Law could apply to Colombian nationals only.

Additional changes in tax laws and regulations, as well as their interpretations, can impact tax burdens. This may involve increases in tax rates and fees, the introduction of new taxes, restrictions on tax deductions, and the elimination of

tax-based incentives and non-taxed income. Furthermore, tax authorities or courts may interpret tax regulations differently than we do, potentially leading to tax litigation and associated costs and penalties.

**Certain U.S. Federal Income Taxation Considerations**

The following is a summary of certain U.S. federal income tax consequences of the Exchange Offer and Consent Solicitation and the ownership and disposition of the New Notes that may be relevant to U.S. holders (as defined below).

This discussion assumes that the Old Notes are held, and the New Notes will be held, as capital assets within the meaning of Section 1221 of the Internal Revenue Code of 1986, as amended (the "Code"). In addition, this discussion addresses the U.S. federal income tax consequences of owning and disposing of the New Notes only in the case of U.S. holders that acquired their New Notes in exchange for Old Notes in the Exchange Offer.

As used in this statement, a "U.S. holder" means a beneficial owner of an Old Note or a New Note, as applicable, that is, for U.S. federal income tax purposes:

- a citizen or individual resident of the United States;

- a corporation (or entity treated as a corporation for such purposes) created or organized in or under the laws of the United States, or any State thereof or the District of Columbia;

- an estate the income of which is includible in its gross income for U.S. federal income tax purposes without regard to its source; or

- a trust, if either (x) it is subject to the primary supervision of a court within the United States and one or more "United States persons" has the authority to control all substantial decisions of the trust or (y) it has a valid election in effect under applicable U.S. Treasury regulations to be treated as a "United States person."

This summary does not discuss considerations or consequences relevant to persons subject to special provisions of U.S. federal income tax law, such as:

- entities that are tax-exempt for U.S. federal income tax purposes and retirement plans, individual retirement accounts and tax-deferred accounts;

- pass-through entities (including partnerships and entities and arrangements classified as partnerships for U.S. federal income tax purposes) and beneficial owners of pass-through entities;

- real estate investment trusts and regulated investment companies;

- certain U.S. expatriates;

- persons that are subject to the alternative minimum tax;

- banks, financial institutions, insurance companies, and dealers or traders in securities or currencies;

- persons having a "functional currency" other than the U.S. dollar; and

- persons that hold the Old Notes or that will hold the New Notes as part of a constructive sale, wash sale, conversion transaction or other integrated transaction or a straddle, hedge or synthetic security.

If a partnership (or an entity or arrangement classified as a partnership for U.S. federal income tax purposes) holds Old Notes or New Notes, the U.S. federal income tax treatment of a partner in the partnership generally will depend on the status of the partner and the activities of the partnership. If a U.S. holder is a partner in a partnership holding Old Notes, such U.S. holder should consult their own tax advisors regarding the U.S. federal income tax consequences of participation in the Exchange Offer and of owning and disposing of New Notes.

U.S. holders that use an accrual method of accounting for tax purposes ("accrual method holders") generally are required to include certain amounts in income no later than the time such amounts are reflected on certain financial statements (the "book/tax conformity rule"). The application of the book/tax conformity rule thus may require the accrual of income earlier than would be the case under the general tax rules described below. Accrual method holders should consult with their tax advisors regarding the potential applicability of the book/tax conformity rule to their particular situation.

Finally, this summary does not address the effect of any U.S. state or local tax law or any tax (other than income tax) under U.S. federal law on a beneficial owner of Old Notes or New Notes (including consequences arising under the alternative minimum tax, special timing rules prescribed under section 451(b) of the Code or the Medicare contribution tax on net investment income). This discussion assumes that each beneficial owner of Old Notes and New Notes will comply with the certification procedures described in "Description of the New Notes—Additional Amounts" as may be necessary to obtain a reduced rate of withholding tax under Colombian law.

No ruling from the U.S. Treasury Department ("Treasury") or U.S. Internal Revenue Service ("IRS") has been or will be sought with respect to any of the U.S. federal income tax considerations discussed below, and no assurance can be given that the IRS will not take a position contrary to the discussion below or that any contrary position would not be sustained in court. Each beneficial owner of Old Notes or New Notes should consult a tax advisor as to the particular tax consequences to it of participation in the exchange offer and of owning and disposing of such notes, including the applicability and effect of any state, local or foreign tax laws.

### Consequences of Tendering Old Notes for New Notes

*General Consequences*. The exchange of Old Notes for New Notes will be treated as a disposition of such Old Notes for U.S. federal income tax purposes. If a U.S. holder validly tenders Old Notes for New Notes pursuant to the Exchange Offer, the tax treatment of this exchange by a U.S. holder will depend to a significant extent on whether the exchange constitutes a recapitalization for U.S. federal income tax purposes or is a taxable exchange.

The qualification of the exchange by a U.S. holder as a "recapitalization" for U.S. federal income tax purposes depends upon whether both the Old Notes and the New Notes constitute "securities" for purposes of Section 354 of the Code. The term "security" for such purposes is not defined in the Code or the U.S. Treasury regulations. While judicial decisions have held that the determination of whether a particular debt instrument constitutes a "security" depends on all the facts and circumstances and involves an overall evaluation of the nature of the debt instrument, the term of the debt instrument is generally regarded as one of the most significant factors. Debt instruments with a term of ten years or more generally have qualified as securities, debt instruments with a term of between five and ten years often qualify as securities and debt instruments with a term of less than five years often do not qualify as securities. In this regard, the Old Notes and the New Notes should both be treated as issued with maturities of five years or more.

Each U.S. holder is urged to consult its own tax advisor with respect to the U.S. federal income tax consequences of participation in the exchange offer. The U.S. federal income tax consequences of recapitalization and non-recapitalization treatment to U.S. holders are discussed below.

*Recapitalization Treatment*. If the exchange qualifies as a recapitalization, a U.S. holder who elects to exchange Old Notes for New Notes and other applicable consideration will generally (i) not recognize gain realized (determined as described below under "—Non-Recapitalization Treatment") on the exchange, if any (excluding for this purpose, any amounts received in respect of accrued interest on the Old Notes, including any New Notes received in exchange for Capitalized Interest, which will generally be treated and taxed separately as such, as discussed below under "—Accrued Interest"), and will not recognize loss realized, if any, on the exchange, (ii) have a holding period in the New Notes received that includes the holding period of the Old Notes exchanged therefor, and (iii) have an initial tax basis in the New Notes equal to the adjusted tax basis in the Old Notes tendered in exchange for the New Notes. This discussion does not consider the consequences of receiving cash in exchange for the Old Notes.

*Non-Recapitalization Treatment*. If the exchange does not qualify as a recapitalization, a U.S. holder will recognize gain or loss in an amount equal to the difference, if any, between (i) the issue price of the New Notes (as discussed below under "—Ownership and Disposition of the New Notes—Issue Price") and (ii) such U.S. holder's adjusted tax basis in the Old Notes tendered in exchange therefor. Any amounts received in the exchange with respect to accrued but unpaid interest on the Old Notes will generally be treated and taxed separately as such, as discussed below under "—Accrued Interest." A U.S. holder's adjusted tax basis in its Old Notes will generally equal the amount paid therefor, increased by any "market discount," as described below, previously taken into account as income by the U.S. holder and reduced by the amount of payments on the Old Notes that were not qualified stated interest payments and any amortizable bond premium previously amortized by the U.S. holder. Any such gain or loss recognized on the exchange will be capital gain (except to the extent of any accrued market discount on the Old Notes not previously included in income by the U.S. holder, which will be treated as ordinary income) or loss, and will be long-term capital gain or loss if the Old Notes have been held for more than one year at the time of the exchange. In addition, the use of capital losses may be subject to limitations. A U.S. holder will be considered to have purchased its Old Notes at a market discount for U.S. federal income tax purposes if such holder's initial tax basis in its Old Notes was less than the stated principal amount of such Old Notes by more than a specified *de minimis* amount. The U.S. holder's holding period for the New Notes will begin on the day after the exchange, and such holder's initial tax basis in the New Notes generally will equal the issue price of the New Notes. This discussion does not consider the consequences of receiving cash in exchange for the Old Notes.

*Accrued Interest*. Amounts received by a U.S. holder of Old Notes exchanging such Old Notes for New Notes that are attributable to accrued but unpaid interest on the Old Notes, including any New Notes received in exchange for Capitalized Interest, will not be considered part of the amount realized in the exchange and instead will be includible in gross income by the U.S. holder as interest income if such accrued interest has not been included previously in the U.S. holder's gross income for U.S. federal income tax purposes.

*Foreign Tax Credits*. Any gain or loss recognized by a U.S. holder on the exchange (if the exchange does not qualify as a recapitalization) generally should be treated as US-source income or loss for U.S. foreign tax credit purposes (as discussed below under "Ownership and Disposition of the New Notes - Sale, Exchange, or Other Taxable Disposition"). Accrued interest income with respect to the Old Notes that is treated as paid as a result of the exchange (including any Capitalized Interest or accrued market discount, not previously included in income by the U.S. holder) will constitute income from sources outside the United States and generally will constitute "passive category income" for U.S. foreign tax credit purposes. The rules governing U.S. foreign tax credits are complex, and a U.S. holder is urged to consult its tax advisor regarding the application of the rules to your particular circumstances.

*U.S. Holders that Do Not Participate in the Exchange Offer or Consent Solicitation*. The U.S. federal income tax consequences to U.S. holders that do not participate in the Exchange Offer or Consent Solicitation will depend on whether the adoption of the Proposed Amendments results in a deemed exchange of such Old Notes for U.S. federal income tax purposes. A deemed exchange may occur if the modifications that are effected by the Proposed Amendments are "significant" within the meaning of applicable U.S. Treasury regulations. Under applicable U.S. Treasury regulations, the modification of a debt instrument generally is a "significant" modification if, based on all the facts and circumstances (aside from certain modifications covered by specific rules), the legal rights or obligations that are altered and the degree to which they are altered is "economically significant." The applicable U.S. Treasury regulations specifically provide that a modification that adds, deletes or alters customary accounting or financial covenants is not a significant modification.

If the adoption of the Proposed Amendments does not constitute a "significant modification," a U.S. holder that does not participate in the Exchange Offer or Consent Solicitation should not recognize gain or loss in respect of Old Notes not tendered pursuant to the Exchange Offer, and such U.S. holder's adjusted tax basis and holding period in the Old Notes not tendered should remain unchanged.

There can be no assurance that the IRS will not successfully challenge this position. If the IRS successfully asserted that the adoption of the Proposed Amendments resulted in a significant modification of the Old Notes for U.S. federal income tax purposes, U.S. holders of the Old Notes that do not participate in the Exchange Offer or Consent Solicitation would be

deemed to have exchanged their Old Notes for notes bearing the modified note terms, such deemed exchange would be treated as a fully taxable exchange as discussed above (except to the extent any recognized loss may be deferred under the "wash sale" rules of Section 1091 of the Code), unless the deemed exchange qualifies as a "recapitalization" under the Code (as discussed above). Regardless of whether the deemed exchange qualifies as a recapitalization, any accrued and unpaid interest, including any Capitalized Interest, would be taxable as ordinary income at the time of the deemed exchange (to the extent not previously so taxed). U.S. holders should consult their own tax advisors regarding the U.S. federal income tax consequences of not participating in the Exchange Offer or Consent Solicitation.

### Ownership and Disposition of the New Notes

*Effect of Certain Contingencies.*

Certain debt instruments that provide for one or more contingent payments may be subject to U.S. Treasury regulations governing contingent payment debt instruments. A payment is not treated as a contingent payment under these U.S. Treasury regulations if, as of the issue date of the debt instrument, the likelihood that such payment will be made is remote and/or the payments are incidental. In certain circumstances as set forth in the "Description of the New Notes," we may redeem the New Notes in advance of their stated maturity, in which case we may pay amounts on the New Notes that are in excess of the stated interest or principal of the New Notes. We intend to take the position that the possibility that any such payment will be made is remote and/or the payments are incidental and therefore the New Notes are not subject to the rules governing contingent debt instruments.

Our determination that these contingencies are remote and/or incidental is binding on a U.S. holder unless it discloses its contrary position to the IRS in the manner that is required by applicable U.S. Treasury regulations. Our determination is not, however, binding on the IRS. It is possible that the IRS might take a different position from that described above, in which case the timing, character and amount of taxable income in respect of the New Notes may differ adversely from that described herein. The remainder of this discussion assumes that the New Notes will not be treated as contingent payment debt instruments.

*Stated Interest.* A U.S. holder generally must include in the U.S. holder's gross income all qualified stated interest with respect to the New Notes, and Additional Amounts thereon, if any, on account of non-U.S. withholding taxes (in each case, without reduction for any such taxes withheld), at the time they are paid or accrued in accordance with the U.S. holder's usual method of accounting for U.S. federal income tax purposes. Because a U.S. holder's stated interest income will not be reduced by the non-U.S. taxes withheld, a U.S. holder may be required to include more interest (or OID) in the U.S. holder's gross income than the U.S. holder actually receives in cash.

However, a U.S. holder may, subject to certain limitations, be eligible to claim non-U.S. income taxes withheld as a credit or deduction for purposes of computing its U.S. federal income tax liability, even though the payment of these taxes will be remitted by us. Interest and Additional Amounts paid on the New Notes will constitute income from sources without the United States for U.S. foreign tax credit purposes. This foreign source income generally will constitute "passive category income" for U.S. foreign tax credit purposes. One common limitation is that a U.S. Holder have sufficient taxable income in such category to claim a credit for foreign taxes corresponding to such category of income. The rules relating to the calculation and timing of foreign tax credits and, in the case of a U.S. holder that elects to deduct foreign taxes, the availability of deductions, involves the application of complex rules that depend upon a U.S. holder's particular circumstances. U.S. holders should consult with their own tax advisors with regard to the availability of a credit or deduction in respect of foreign taxes and, in particular, the application of the foreign tax credit rules to their particular situations.

*Issue Price.* The issue price of the New Notes will depend on whether the Old Notes or the New Notes are considered, for U.S. federal income tax purposes, to be traded on an established market. Debt instruments are considered to be traded on an established market if, at any time during the 31-day period ending 15 days after their issue date, there is a sales price for the debt instrument or there are one or more firm or indicative quotes for the debt instrument. If the New Notes are considered to be traded on an established market, the issue price of the New Notes would be the fair market value of the New Notes on the date of the exchange. If the New Notes are not considered to be traded on an established market but the

Old Notes are considered to be traded on an established market, the issue price of the New Notes would be the fair market value of the Old Notes on the date of the exchange. If neither the New Notes nor the Old Notes are considered to be traded on an established market, the issue price of the New Notes would be their stated principal amount. Although not free from doubt, we believe that it is likely that both the New Notes and the Old Notes will be considered to be traded on an established market at the time of the exchange, and, therefore, the issue price of the New Notes will be the fair market value of such notes on the date of the exchange. Our determination of whether the Old Notes or New Notes are considered to be traded on an established market and, if so, the issue price of the New Notes is binding on each U.S. holder unless it explicitly discloses to the IRS, on its timely filed U.S. federal income tax return for the taxable year that includes the date of the exchange, that its determination is different from ours, the reason for its different determination, and, if appropriate, how it determined the issue price.

*Original Issue Discount.* A New Note will have OID to the extent the issue price of such New Note (determined as described above under "—Issue Price") is less than its "stated redemption price at maturity," subject to a statutory de minimis exception. The stated redemption price at maturity of a New Note will equal the sum of all payments required under the New Note other than payments of qualified stated interest. A U.S. holder (whether a cash or accrual method taxpayer) generally will be required to include in gross income (as ordinary income) any OID as the OID accrues (on a constant yield to maturity basis), before the holder's receipt of cash payments attributable to such OID (and notwithstanding the book/tax conformity rule described above).

The amount of OID includible in a U.S. holder's gross income for a taxable year with respect to a New Note will be the sum of the "daily portions" of OID with respect to such New Note for each day during such taxable year on which such holder held such New Note. The daily portion is determined by allocating to each day in any accrual period other than an initial short accrual period and the final accrual period a pro rata portion of the amount equal to the excess, if any, of: (i) the product of a New Note's adjusted issue price at the beginning of such accrual period and its yield to maturity (determined on the basis of compounding at the close of each accrual period and properly adjusted for the length of the accrual period) over (ii) the sum of the amounts payable as qualified stated interest on such New Note in respect of such accrual period.

The accrual period for a New Note may be of any length and may vary in length over the term of such New Note provided that each accrual period is no longer than one year and each scheduled payment of principal or stated interest occurs on the first day or the final day of any accrual period. The amount of OID allocable to the final accrual period is the difference between the amount payable at maturity (other than a payment of qualified stated interest) and the adjusted issue price of the New Note at the beginning of the final accrual period. The amount of OID allocable to any initial short accrual period may be computed under any reasonable method. The adjusted issue price of the New Note at the start of any accrual period is equal to its issue price increased by the accrued OID for each prior accrual period and reduced by any prior payments with respect to such New Note (other than payments of qualified stated interest).

The "yield to maturity" is the discount rate that, when applied to all interest and principal payments to be made under a New Note, results in a present value (as of the issue date) equal to the issue price of such New Note. If a U.S. holder has "acquisition premium" with respect to the New Notes (i.e., if such holder's adjusted tax basis immediately after the exchange is greater than the New Notes' issue price, but less than the New Notes "stated redemption price at maturity", the amount of OID that such holder would include in gross income would be reduced to reflect the acquisition premium.)

The rules regarding OID are complex. A U.S. holder should consult their own tax advisors regarding the consequences of OID, including the amount of OID that such holder would include in gross income for a taxable year.

*Amortizable Bond Premium.* If a U.S. holder has an adjusted tax basis in its New Notes immediately after the exchange which exceeds the stated principal amount of its New Notes, the U.S. holder would be considered to have amortizable bond premium equal to such excess, and such U.S. Holder would not be required to include any OID in gross income in respect of the New Notes. In addition, a U.S. holder may elect to amortize this premium using a constant yield method over the term of the New Notes. Special rules may apply in the case of notes, like the New Notes, that are subject to optional redemption. A U.S. holder who elects to amortize bond premium may offset each interest payment on such New

Notes by the portion of the bond premium allocable to the payment and must reduce its tax basis in the New Notes by the amount of the premium so amortized. If a U.S. holder does not elect to amortize any bond premium and holds the New Notes to maturity, then, in general, such U.S. holder will recognize a capital loss equal to the amount of such premium when the New Notes mature (or, if such U.S. holder disposes of the New Note prior to maturity, the amount of the premium will decrease the gain or increase the loss otherwise recognized on the disposition of the New Note). If a U.S. holder makes the election, it generally will apply to all debt instruments that it holds at the time of the election, as well as any debt instruments that such U.S. holder subsequently acquires. In addition, a U.S. holder may not revoke the election without the consent of the IRS. U.S. holders should consult their own tax advisor regarding the availability of an election to amortize bond premium for U.S. federal income tax purposes.

*Market Discount.* In general, a New Note will be treated as having been acquired with market discount if the excess of the issue price of the New Note over the U.S. holder's initial tax basis therein equals or exceeds a statutorily defined *de minimis* amount. Upon any disposition (other than certain non-recognition transactions) of New Notes treated as acquired with market discount, any gain recognized will be recharacterized as ordinary income to the extent such gain does not exceed the amount of any market discount that accrued from the date that the New Notes were issued through the date of disposition, plus any unrecognized accrued market discount carried over from the Old Notes.

*Sale, Exchange or Other Taxable Disposition*. Unless a non-recognition provision applies and subject to the discussion herein with respect to market discount, upon the sale, exchange or other taxable disposition of its New Notes, a U.S. holder will generally recognize taxable gain or loss equal to the difference between the amount realized on the disposition (except amounts attributable to accrued but unpaid interest on New Notes, which amounts will be treated as ordinary interest income to the extent not previously included in the U.S. holder's income) and the U.S. holder's adjusted tax basis in the New Notes immediately before the disposition. The adjusted tax basis of the New Notes generally will equal the U.S. holder's initial tax basis in the New Notes, calculated as described above, increased by any market discount and OID includible in income by the U.S. holder with respect to the New Notes, and reduced by the amount of any payments previously received on the New Notes that are not qualified stated interest payments and any premium amortized by such holder with respect to the New Notes. Except to the extent of any accrued market discount on the New Notes not previously included in income by the U.S. holder, with respect to which any gain will be treated as ordinary income, gain or loss realized on the sale, exchange or other taxable disposition of a New Note will generally be capital gain or loss and will be long-term capital gain or loss if at the time of the sale, exchange or other taxable disposition the New Note has been held by the holder for more than one year. Certain non-corporate U.S. holders (including individuals) are eligible for reduced rates of taxation on long-term capital gains under current law. There are limitations on the deductibility of capital losses.

If any foreign income tax is withheld on the sale, exchange or other taxable disposition of a New Note, the amount realized by a U.S. holder will include the gross amount of the proceeds of that sale, exchange or other taxable disposition before withholding or deduction of such tax. Capital gain or loss, if any, realized by a U.S. holder on the sale, exchange or other taxable disposition of a New Note generally will be treated as U.S. source gain or loss for U.S. foreign tax credit purposes (except that accrued interest income with respect to the New Notes that is treated as paid as a result of the disposition (including accrued market discount not previously included in income by the U.S. holder) will constitute income from sources outside the United States and generally will constitute "passive category income" for U.S. foreign tax credit purposes). Consequently, in the case of a gain from the sale, exchange or other taxable disposition of a New Note that is subject to foreign income tax, the U.S. holder may not be able to benefit from the foreign tax credit for the tax unless the U.S. holder can apply the credit against U.S. federal income tax payable on other income from foreign sources. Alternatively, the U.S. holder may take a deduction for the foreign income tax if the U.S. holder elects to deduct (rather than credit) all foreign income taxes paid or accrued during the taxable year. The rules governing foreign tax credits are complex and, therefore, U.S. holders should consult their tax advisors regarding the availability of foreign tax credits in their particular circumstances.

### *Information Reporting and Backup Withholding*

In general, information reporting requirements will apply to payments received in the exchange of Old Notes for New Notes, payments of interest on the New Notes and payments of the proceeds of the sale or other disposition of the New Notes (including a redemption or retirement), unless the U.S. holder is an exempt recipient (such as a corporation).

In general, backup withholding will also apply to such payments if the U.S. holder:

- fails to furnish its social security or other taxpayer identification number ("TIN") within a reasonable time after a request for such information;

- furnishes an incorrect TIN;

- fails to report interest or dividends properly; or

- fails, under certain circumstances, to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that the U.S. holder is not subject to backup withholding.

Backup withholding is not an additional tax. Any amount withheld from a payment to a U.S. holder under the backup withholding rules is generally allowable as a credit against such U.S. holder's U.S. federal income tax liability, and may entitle such holder to a refund, provided that the required information is timely furnished to the IRS. U.S. holders of New Notes should consult their tax advisors as to their qualification for exemption from backup withholding and the procedure for obtaining such exemption.

## LEGAL MATTERS

Certain legal matters in connection with the Exchange Offer and Consent Solicitation are being passed upon for us by Baker & McKenzie LLP, our special U.S. counsel. Certain matters relating to the validity of the New Notes will be passed upon by Muñoz Aya S.A.S., our special Colombian counsel.

## GENERAL INFORMATION

**Authorization**

We have obtained all necessary consents, approvals and authorizations in connection with the issuance and performance of the New Notes.

**No Material Adverse Change**

Except as disclosed in this statement, there has been no material adverse change in the financial position or prospects of us and our subsidiaries taken as a whole since September 30, 2023.

**Litigation**

We are not involved in any legal or arbitration proceedings (including any such proceedings which are pending or to our knowledge threatened) relating to claims or amounts which may have or have had during the 12 months prior to the date of this statement a material adverse effect on the financial position of us and our subsidiaries taken as a whole.

**INFORMATION ABOUT THE COMPANY**

# INFORMATION ABOUT THE COMPANY

## TABLE OF CONTENTS

**Page**

Available Information ...................................................................................................................................... 1
Cautionary Statement Regarding Forward-Looking Statements ..................................................................... 2
Presentation of Financial and Other Information ........................................................................................... 4
Recent Developments ..................................................................................................................................... 7
Risk Factors ................................................................................................................................................... 9
Exchange Rates and Foreign Exchange Controls ......................................................................................... 22
Capitalization ............................................................................................................................................... 25
Selected Financial Information ..................................................................................................................... 26
Management's Discussion and Analysis of Financial Condition and Results of Operations ....................... 31
Business ........................................................................................................................................................ 64
Management .................................................................................................................................................. 85
Principal Shareholders .................................................................................................................................. 88
Related Party Transactions ........................................................................................................................... 91
Independent Accountants .............................................................................................................................. 92

# AVAILABLE INFORMATION

We are not subject to the information requirements of the U.S. Securities Exchange Act of 1934, as amended (the "Exchange Act"). To permit compliance with Rule 144A in connection with resales of New Notes, we will be required under the indenture under which the New Notes are issued (the "New Notes Indenture"), upon the request of a holder of Rule 144A notes or Regulation S notes (during the restricted period, as defined in the legend included under "Transfer Restrictions"), to furnish to such holder and any prospective purchaser designated by such holder the information required to be delivered under Rule 144A(d)(4) under the U.S. Securities Act of 1933, as amended (the "Securities Act"), unless we either furnish information to the U.S. Securities and Exchange Commission (the "SEC") in accordance with Rule 12g3-2(b) under the Exchange Act or furnish information to the SEC pursuant to Section 13 or 15(d) of the Exchange Act. Any such request may be made to us in writing at our main office located at Carrera 7 #76-35, 7th Floor, Bogotá, Colombia.

The New Notes Indenture will further require that we furnish to the trustee (as defined herein) all notices of meetings of the holders of New Notes and other reports and communications that are generally made available to holders of the New Notes. At our request, the trustee will be required under the New Notes Indenture to mail these notices, reports and communications received by it from us to all record holders of the notes promptly upon receipt. See "Description of the New Notes."

We intend to apply to have the New Notes listed and quoted on the Singapore Exchange Securities Trading Limited (the "SGX-ST"). We will be required to comply with any undertakings given by us from time to time to the SGX-ST in connection with the New Notes, and to furnish to them all such information as the rules of the SGX-ST may require in connection with the listing of the New Notes.

# CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS

This Statement contains a number of estimates and forward-looking statements. Words such as "may," "might," "will," "would," "shall," "should," "can," "could," "believe," "anticipate," "continue," "expect," "estimate," "plan," "intend," "foresee," "seeks," "predict," "project," "potential," or the negative of these terms, and other similar terms are used in this Statement to identify such forward-looking statements. Our estimates and forward-looking statements are mainly based on our current expectations and estimates on projections of future events and trends, which affect or may affect our businesses and results of operations. Although we believe that these estimates and forward-looking statements are based upon reasonable assumptions, they are subject to several risks and uncertainties and are made in light of information currently available to us. We make no representation or warranty as to the accuracy or completeness of such estimates or forward-looking statements. Our estimates and forward-looking statements may be influenced by a number of following factors, including, but not limited to:

- changes in Colombian, regional and international business and economic, political or other conditions;

- developments affecting Colombian and international capital and financial markets;

- changes to accounting principles, laws, regulations, taxation and governmental policies related to our activities, including, but not limited to, interest rate regulations and consumer protection laws;

- movements in exchange rates;

- increases in inflation rates;

- competition in the Colombian markets for consumer loans, credit card services, and related industries;

- our ability to freely determine the interest rates we charge to our clients;

- our ability to implement our operating strategy and business plan;

- our level of capitalization and reserves;

- increases in defaults by our clients, as well as any increase in our allowance for loan losses;

- our clients' ability to pay their loans and the stability of their sources of income;

- availability of funds and related funding costs;

- offer and demand for our products and services;

- adverse legal or regulatory disputes or proceedings;

- increases in provisions for contingent liabilities;

- natural disasters and internal security issues affecting countries where we operate;

- loss of any key member of our senior management; and

- other potential risk factors presented under "Risk Factors" in this Statement.

Estimates and forward-looking statements speak only at the date they were made, and we undertake no obligation to update or to review any estimate and/or forward-looking statement because of new information, future events or other factors. Estimates and forward-looking statements involve risks and uncertainties and are not guarantees of future performance. In light of the risks and uncertainties described above, the estimates and forward-looking statements discussed in this Statement might not occur and our future results and our performance may differ materially from those expressed in these forward-looking statements due to the factors mentioned above, among others. Because of these uncertainties, you should not make

any investment decision based on these estimates and forward-looking statements. The estimates and/or forward-looking statements shall be deemed to be modified in their entirety by any written or oral that we may make in the future

## PRESENTATION OF FINANCIAL AND OTHER INFORMATION

All references herein to "Colombian pesos," "pesos" or "Ps." refer to the lawful currency of Colombia. All references to "U.S. dollars," "dollars" or "US$ " are to United States dollars. See "Exchange Rates and Foreign Exchange Controls" for information regarding exchange rates for the Colombian currency. Our functional currency is the Colombian peso.

This Statement translates certain Colombian peso amounts into U.S. dollars at specified rates solely for the convenience of the reader. The conversion of amounts expressed in Colombian pesos as of a specified date at the then prevailing exchange rate may result in the presentation of U.S. dollar amounts that differ from U.S. dollar amounts that would have been obtained by converting Colombian pesos as of another specified date. Unless otherwise noted in this Statement, all such Colombian peso amounts have been translated into U.S. dollars at the rate of Ps. 4,053.76 to US$ 1.00, which was the representative market rate calculated on September 30, 2023. The representative market rate is computed and certified by the SFC on a daily basis and represents the weighted average of the buy/sell foreign exchange rates negotiated on the previous day by certain financial institutions authorized to engage in foreign exchange transactions. Such conversion should not be construed as a representation that the Colombian peso amounts presented herein correspond to, or have been or could be converted into, U.S. dollars at that rate or any other rate.

### Financial Statements

This Statement includes:

- our interim unaudited condensed financial statements as of September 30, 2023 and for the nine months ended September 30, 2023 and 2022, together with the notes thereto (the "Interim Financial Statements"); and

- our annual audited financial statements as of and for the years ended December 31, 2022 and 2021 and annual audited financial statements as of and for the years ended December 31, 2021, 2020, in each case together with the notes thereto (together, the "Annual Financial Statements," and, together with our Interim Financial Statements, the "Financial Statements").

Our Annual Financial Statements have been audited by PwC Contadores y Auditores S.A.S., independent auditors, as stated in their audit report appearing therein. Our historical results are not necessarily indicative of results to be expected for future periods.

### Accounting Principles

The financial statements of Credivalores-Crediservicios S.A. have been prepared under the accounting and financial reporting standards accepted in Colombia, based on International Financial Reporting Standards (IFRS), together with their interpretations, conceptual framework, the conclusion rationale, and the application guides authorized and issued by the International Accounting Standards Board (IASB), which until 2018 were published in Spanish excluding IFRS 17 on Insurance Contracts; and other legal provisions defined by government surveillance entities that may differ in some aspects from those established by other State control bodies, established in Law 1314 of 2009, regulated by Single Regulatory Decree 2420 of 2015 modified by Decree 2496 of 2015. They have been prepared based on historical cost.

Law 1314 of July 13, 2009, regulated the financial reporting, accounting, and data security standards and principles accepted in Colombia and identified competent authorities, established the procedure for issuing the standards, and determined the entities responsible for monitoring compliance. This law was regulated through the following decrees:

a) 2784 of December 28, 2012

b) 1851 of August 29, 2013

c) 3023 of December 27, 2013

d) 2267 of November 11, 2014.

Decree 2615 dated December 17, 2014, came into effect on January 1, 2016. Decree 2615 contains the international accounting and financial reporting standards in force as of December 31, 2013, and their corresponding amendments issued by the International Accounting Standards Board IASB in force today. With this, the regulatory technical framework contained in the annex to Decree 2784 dated December 28, 2012, and Decree 3023 dated December 27, 2013, was revoked.

Credivalores reports comparative information from the immediately previous period for all values included in the current period's financial statements and includes comparative explanations, when necessary.

The Interim Financial Statements have been prepared in accordance with International Accounting Standard IAS 34 Interim Financial Reporting. These Interim Financial Statements do not include all information required for a complete set of FRAS-IFRS financial statements and should be read in conjunction with the Company's last annual consolidated financial statements as of and for the year ended December 31, 2022.

**Non-IFRS Financial Measures**

We include certain ratios in this Statement which we believe provide investors with important information regarding our operations, such as return on equity ("ROE"), return on assets ("ROA"), net interest margin, and operational efficiency and asset quality indicators, among others. These measures should not be construed as an alternative to IFRS measures and should also not be compared to similarly titled measures reported by other companies, which may evaluate such measures differently from how we do. Some of these ratios are also used in this Statement to compare us to our principal competitors.

**Certain Portfolio and Other Operating Data**

We have included in this Statement certain financial and operating data relating to the breakdown of our loan portfolio, our non-performing loan portfolio, our products and our clients which are not derived from our financial statements. None of such financial and operating data contained in this Statement have been audited or reviewed by PwC Contadores y Auditores S.A.S. The updating of the variables of the impairment calculation of IFRS 9 are updated annually and the last update was on December 31, 2022.

**Market Share and Other Information**

We obtained the market and competitive position data, including market forecasts, presented throughout this Statement from market research, publicly available information and industry publications. We have presented this data on the basis of information from third-party sources that we believe are reliable, including, among others, the International Monetary Fund ("IMF"), the SFC, the Colombian Stock Exchange, the Colombian National Bureau of Statistics (*Departamento Administrativo Nacional de Estadística*, or "DANE"), and the World Bank. Industry and government publications, including those referenced herein, generally state that the information presented has been obtained from sources believed to be reliable, but that the accuracy and completeness of such information is not guaranteed. Unless otherwise indicated, gross domestic product ("GDP") figures with respect to Colombia in this Statement are based on the 2015 base year data series published by DANE. Although we have no reason to believe that any of this information or these reports is inaccurate in any material respect, we have not independently verified the competitive position, market share, market size, market growth or other data provided by third parties or by industry or other publications. Neither we nor the Dealer Manager make any representation or warranty as to the accuracy of such information.

We are a company that participates mainly in the consumer loans market. Our payroll loan market share is determined by comparing us and similar entities to the payroll loans segment of banks that report their results to the SFC. In the payroll loans business, we consider our principal competitors in Colombia to be certain banks and, to a lesser extent, non-bank financial institutions.

**Other Conventions**

Certain figures included in this Statement have been subject to rounding adjustments. Accordingly, figures shown as totals in certain tables may not be an arithmetic summation of the figures that precede them. References to "billion" in this Statement are to 1,000,000,000 and to "trillion" are to 1,000,000,000,000.

# RECENT DEVELOPMENTS

### *Preliminary Results for the Three Months and Year Ended December 31, 2023*

As of the date of this Statement we have not finalized our results for the three-month period and year ended December 31, 2023 and financial position as of December 31, 2023. The following unaudited preliminary financial information estimates, and is not intended to be a comprehensive statement of, our financial or operational results for the three-month period or year ended December 31, 2023 and our financial position as of December 31, 2023.

The preliminary financial results for the year and for the three months ended December 31, 2023 and financial position as of December 31, 2023 presented below have not been audited or reviewed by our independent auditors, nor have any procedures been performed by our independent auditors with respect thereto. Such information has been derived from management accounts rather than our consolidated financial statements, is preliminary and is subject to our financial closing procedures, which have not yet been completed. We expect to complete our financial closing procedures and release our figures by March 2024. Our expectations with respect to our preliminary results discussed below are based upon management estimates and are the responsibility of management. While we believe this preliminary financial information reasonably estimates our financial or operational results and financial position, our actual results and financial position could vary from these estimates and such differences could be material. As such, you should not place undue reliance on the preliminary financial information set forth below and these preliminary financial results may not be indicative of our performance in any future period or financial positions as of any future date. See "Cautionary Statement Regarding Forward-Looking Statements" and "Risk Factors" for a more complete discussion of certain of the factors that could affect our future performance, results of operation and financial position.

### *Interest Income*

We estimate interest income for the three months ended December 31, 2023, was between Ps. 50,000 million (US$ 12.3 million) and Ps.60,000 million (US$ 14.8 million), an increase of 28% at the midpoint of the range as compared to Ps.43,105 million (US$ 10.6 million) for the three months ended December 31, 2022.

We estimate interest income for the year ended December 31, 2023, was between Ps.260,000 million (US$ 64.1 million) and Ps.270,000 million (US$ 66.6 million), a 2% increase at the midpoint of the range compared to Ps. 260,323 million (US$ 64.2 million) for the year ended December 31, 2022.

### *Financial Margin*

We estimate financial margin for the three months ended December 31, 2023 was between Ps.70,000 million (U.S.$17.3 million) and Ps. 72,500 million (U.S.$18.5 million), an increase of 128% at the midpoint of the range as compared to Ps.(257,441) million (US$ (63.5) million) for the three months ended December 31, 2022.

We estimate financial margin for the year ended December 31, 2023, was between Ps.230,000 million (US$56.7 million) and Ps.240,000 million (US$ 59.2 million), a 210% increase at the midpoint of the range compared to Ps. (257,441) million (US$ (63.5) million) for the year ended December 31, 2022.

### *Allowance for Loan Losses*

We estimate allowance for loan losses for the three months ended December 31, 2023 was between Ps.40,000 million (US$9.9 million) and Ps.45,000 million (US$ 11.1 million), an increase of 45.6% at the midpoint of the range as compared to Ps.29,189 million (US$ 7.2 million) for the three months ended December 31, 2022.

We estimate allowance for loan losses for the year ended December 31, 2023 was between Ps.120,000 million (US$ 29.6 million) and Ps.125,000 million (US$30.8 million), an increase of 46.3% at the midpoint of the range compared to Ps. 83,738 million (U.S.$20.7 million) for the year ended December 31, 2022.

*Selling, General and Administrative Expenses (SG&A)*

We estimate Selling, General and Administrative Expenses (SG&A) for the three months ended December 31, 2023, was between Ps. 20,000 million (US $4.9 million) and Ps.30,000 million (US$ 7.4 million), a 33% contraction at the midpoint of the range as compared to Ps. (37,447) million (US$ (9.2) million) for the three months ended December 31, 2022.

We estimate Selling, General and Administrative Expenses (SG&A) for the year ended December 31, 2023 was between Ps.100,000 million (US$ 24.7 million) and Ps.105,000 million (US$ 25.9 million), an 8.1% contraction at the midpoint of the range compared to Ps. 111,516 million (US$ 27.5 million) for the year ended December 31, 2022.

*Net income*

We estimate net income for the three months ended December 31, 2023 was between Ps.1,000 million (US$ 247.7 thousand) and Ps.1,500 million (US$ 370 thousand), comparing favorably with the Ps. (235,682) million loss (US$ (58.1) million) for the three months ended December 31, 2022.

We estimate net income for the year ended December 31, 2023 was between Ps.6,000 million (US$ 1.5 million) and Ps.7,000 million (US$ 1.7 million), a 100% increase at the midpoint of the range compared to Ps. (302,459) million (US$ (74.6) million) for the year ended December 31, 2022.

*Total Loan Portfolio*

As of December 31, 2023, we estimate our total loan portfolio reached between Ps.1,800,000 million (US$444 million) and Ps.1,900,000 million (US$ 469 million), a decrease of 8% at the midpoint of the range as compared to Ps. 2,005,440 million (U.S.$495 million) as of December 31, 2022.

*Cash & Cash Equivalents*

As of December 31, 2023, we estimate our cash and cash equivalents was between Ps.58,000 million (US$ 14 million) and Ps.60,000 million (US$ 15 million), a decrease of 78% at the midpoint of the range as compared to Ps. 273,052 million (US$ 67 million) as of December 31, 2022.

# RISK FACTORS

*Investing in the New Notes involves risk. You should consider carefully the following factors, among others, as well as all other information in this Statement, before making a decision whether to participate in the Exchange Offer and the Consent Solicitation. The risk factors below describe certain potential risks and uncertainties related to our business and an investment in the New Notes. The risks described below are not the only risks we face. Additional risks and uncertainties not currently known to us that we currently deem to be immaterial may also materially adversely affect us, which could also result in the loss of all or part of your investment in the New Notes. Realization of these risks could materially adversely affect our business, financial condition and results of operations.*

*This Statement also contains forward-looking statements that involve risks and uncertainties. Our actual results could differ materially from those anticipated in these forward-looking statements as a result of certain factors, including the risks faced by us described below and elsewhere in this Statement. See the "Risk Factors" section in the first part of this Statement for a discussion of other risks related to the New Notes.*

## Risks Relating to Our Business and Industry

Changes in economic conditions could materially and adversely affect consumer demand and thus demand for loan products.

Our primary business is the origination and servicing of consumer loans. Demand for our products depends on economic conditions in Colombia, including gross domestic product ("GDP"), growth rates, inflation, value-added tax ("VAT"), unemployment, the cost of energy and other utilities, the availability of consumer credit, interest rates, consumer confidence, debt levels, retail trends and foreign currency exchange rates. These economic conditions are beyond our control. If there is a downturn in economic conditions, demand for consumer goods will likely decline. A decline in demand for consumer goods would likely reduce demand for payroll loans. Our ability to receive payments on our loans in full and on time is also dependent on the financial condition of our clients, which is in turn heavily dependent on economic conditions of the country. The occurrence of any of these events may materially and adversely affect our revenues, and we may not be able to generate sufficient demand to originate payroll deduction loans in an amount sufficient to satisfy any amounts payable under the New Notes.

***Colombian insolvency laws may limit our ability to collect on monetary obligations and enforce rights against collateral or under guarantees.***

Colombian insolvency laws provide that creditors of an insolvent debtor are prohibited from initiating collection proceedings outside the bankruptcy, reorganization or liquidation process of such debtor. In addition, all collection proceedings outstanding at the beginning of the bankruptcy or reorganization process must be suspended and any creditors are prevented from enforcing their rights against the assets of the insolvent debtor, unless the respective collection proceeding is initiated for the enforcement of a security interest created over any particular asset, and such security interest was perfected and registered in accordance with Law 1676 of 2013 (*Ley de Garantías Mobiliarias*).

Once a non-merchant individual has ceased paying his or her debts, according to the GCP, that individual can initiate a voluntary insolvency proceeding before a notary public or mediator to reach an out-of-court agreement with creditors. The terms of any agreement reached with a group (two or more) of creditors that represent more than 50% of the total amount of the claims will be mandatorily applicable to all relevant creditors. The Colombian insolvency law also provides for increased debtor protections, including an automatic stay for a maximum of 90 days. A perception that loans to individuals may be difficult to recover could cause us to enhance credit requirements and result in decreased lending to individuals by making access to credit more expensive or more onerous. Furthermore, increased difficulties in enforcing debt and other monetary obligations due to Colombian insolvency laws could have an adverse effect on our results of operations and financial condition.

***Our revenues depend significantly on our existing collaboration agreements with employers and the agreements we have with low-amount collection agencies and non-bank correspondents.***

If we are not capable of maintaining our existing collaboration agreements with employers and of leveraging our sales force to enhance the penetration rate among the employees of the companies and government agencies for granting payroll loans and having optimal operational efficiencies with them, our ability to originate new payroll loans may be diminished and our timely performance of our payment obligations under the New Notes could be materially adversely affected. However, according to the Colombian Payroll Loan Law (*Ley 1527 de 2012,* or the "Colombian Payroll Loan Law") each employee has the right to select the entity providing a payroll loan and its employer is required to enter into an agreement with such entity in order to disburse and collect the loan.

If we are unable to maintain the agreements with low-amount collection agencies and non-bank correspondents, which operations allow us collect payroll loans nationwide, our ability to originate and collect loans may be diminished and our timely performance of our payment obligations under the New Notes could be materially adversely affected.

***We and our sales force may be subject to penalties or sanctions due to our advertising or lending practices.***

As an entity engaged in consumer lending and financial marketing, we have been and may be subject to sanctions by the Superintendency of Industry and Commerce (*Superintendencia de Industria y Comercio*) for consumer lending practices, unfair competition or non-compliance with data protection regulation. Pursuant to applicable law, we may be subject to penalties imposed by the Superintendency of Industry and Commerce if we offer information that is incorrect, false, incomplete or susceptible to confusion with regard to our products, or if we engage in advertising that offers our products or services to customers that have expressly requested not to receive such advertising. The advertising carried out by our sales force in order to originate loans could be deemed unclear under applicable law, including with respect to our role as the ultimate creditor, specific interest rates and the terms of loans. We may also be sanctioned for the breach of any of our obligations under the Law 1328 of 2009, the Law 1581 of 2012 and Decree 1377 of 2013, which regulate and govern privacy and data protection in Colombia. Any of the above could affect our public perception, result in penalties or sanctions or have an adverse effect on our business, financial condition and results of operations.

***We may be subject to penalties or sanctions by the Colombian Superintendency of Companies***

In accordance with Colombian corporate laws (Article 2.2.2.1.1.1 of Decree 1074 of 2015), we are an entity supervised by the Colombian Superintendence of Companies (*Superintendencia de Sociedades*) due to the amount of revenues that we generated in previous years. As such, the Colombian Superintendency of Companies currently supervises our business activity, and may impose sanctions and penalties to us. Any such sanction or penalty may have a material adverse effect on our business, financial condition and results of operations.

***In the ordinary course of our business, we may be subject to litigation from time to time.***

In the ordinary course of our business, we may be subject to litigation and administrative proceedings, including proceedings initiated by the Colombian customer protection authority (*Superintendencia de Industria y Comercio*). Any such litigation or proceedings may continue without resolution for long periods of time and may consume substantial amounts of our senior management's time and attention, and that time and the devotion of these resources to litigation may, at times, be disproportionate to the amounts at stake in the litigation. The commencement of any such litigation or proceedings, or an adverse result in any litigation or proceedings that may be pending, could have a material adverse effect on our business, results of operations and financial condition.

***Past performance may not be indicative of our future results.***

We have included information in this Statement relating to our past financial performance. In considering this information, you should bear in mind that past performance is not necessarily indicative of future results, and that there can be no assurance that we will achieve comparable results. Future conditions may require actions that differ from those

contemplated at this time. See "Business." There may be differences between investors' expectations and actual results because events and circumstances frequently do not occur as expected, and those differences may be material and adverse. In addition, general economic conditions, which are not predictable, can also have a material adverse impact on the reliability of management's projections.

***We may not be able to timely collect payroll loans from borrowers upon a borrower's termination of employment.***

Our ability to timely collect payroll loans depends heavily upon irrevocable payment instructions given by individual borrowers to their employers prior to disbursement. The termination of the borrower's employment for any reason (including the borrower's retirement), may result in salaries not being paid to a borrower and, thus, the inability of such borrower to repay a loan. After the occurrence of a borrower's termination of employment, we can still collect payments directly from the borrower or through its new employer, because payroll loans are personal obligations of the borrower. Colombia has a stable regulatory framework applicable to payroll loans. According to the Colombian Payroll Loan Law, the deduction of borrower's salary "follows" or "attaches" to the borrower even in the case of a change of employer. In the event a borrower changes employers, the new employer is required to continue deducting the amounts due to the lender, otherwise the employer becomes jointly liable.

However, if a borrower terminates its employment, we may be unable to obtain timely repayment of the applicable payroll loan which may have a material adverse effect on our business, results of operations, prospects and financial condition. Our inability to timely collect from borrowers may affect our ability to timely satisfy our obligations and, if such defaults were to become frequent, as a result of economic or social conditions or otherwise, it could have a material adverse impact on our financial condition and results of operations, including our ability to timely meet our obligations under the New Notes.

***Our business is subject to operational risks.***

Our business depends on our ability to process large numbers of transactions efficiently and accurately. While we review the truthfulness and accuracy of the information provided by credit applicants as part of our origination process, operational risks and losses could result from fraud, employee error, failure to properly document transactions or to obtain proper internal authorization, breaches of conduct of business policies, equipment failures, natural disasters or the failure of external systems, among others, and could lead to the loss of the principal amount disbursed, in whole or in part. Although we have implemented operational risk processes and systems based on the best practices and standards of the financial industry, those may be ineffective, which could have a material adverse impact on our financial condition and results of operations, including our ability to meet our obligations under the New Notes.

***Our revenues depend heavily on our human resources, infrastructure, technology and data collection, processing and storage systems, the failure of any of which could materially and adversely affect our risk management and internal control system.***

Our business is highly dependent on our ability to timely collect and process a large amount of information related to our existing customer base, including transaction processes that may increase in complexity with increasing volume of business. The proper functioning of financial controls, accounting or other data collection and processing systems is critical to our business and to our ability to compete effectively. A partial or complete failure of any of these primary systems could materially and adversely affect our decision-making process, our risk management and internal control systems, as well as our ability to respond on a timely basis to changing market conditions.

Although we continuously invest in our IT systems, we may experience difficulties in upgrading, developing and expanding our IT systems on a timely and cost-effective basis to accommodate our growing customer base. If we cannot maintain an effective data collection and management system, or if we cannot upgrade that system as necessary to meet the changing circumstances of our business, then our business, financial condition and results of operations could be materially adversely affected, which may have a material adverse effect on our ability to meet our obligations under the New Notes.

***Interruption or failure in our IT systems may adversely affect our operations.***

Our success is heavily dependent on the efficient and uninterrupted operation of our computer and communications hardware systems. Our computer and communications systems and operations could be damaged or interrupted by fire, flood, power loss, telecommunications failure, computer viruses, physical or electronic break-ins, cyber-security breaches or other similar events or disruptions. Any of these events could cause system interruptions, delays and losses of critical data and could prevent us from operating at optimal levels or at all. Furthermore, our disaster recovery planning may not be sufficient for all eventualities, and we may have inadequate insurance coverage or insurance limitations that could prevent us from being fully compensated for losses from a major interruption or other damage to our systems. If any of these events were to occur, we could incur substantial expenses and our operations, as well as our business, results of operations, prospects and financial condition could be materially adversely affected.

***Our inability to maintain, improve or upgrade our information technology infrastructure and credit risk management systems in a timely manner could adversely affect our competitiveness, financial position and results of operations.***

Our ability to operate and remain competitive depends on, among other factors, our ability to maintain and upgrade our information technology infrastructure in a timely and cost-effective manner. We must continually make investments and improvements to our information technology infrastructure in order to remain competitive. The information available to our management through our existing information systems may not be timely or sufficient to manage risks or to plan for, and respond to, future changes in market conditions and other developments in our operations. We may experience difficulties in upgrading, developing and expanding such systems quickly enough to accommodate our growing customer base and range of products and services. Any failure to maintain, improve or upgrade our information technology infrastructure and management information systems in a timely manner, or the inappropriate manipulation of the data in our systems, could materially and adversely affect our competitiveness, financial position and results of operations. We have not conducted a recent and independent analysis of our systems confirming that there is no risk that the data stored in these systems cannot be manipulated inappropriately.

***If we do not control our financial risks, we may be unable to profitably manage our business.***

Our success in providing financial services depends on our ability to manage and control our financial risks, which include liquidity, market and credit risk. If we fail to manage and adequately control these risks, we may incur losses that could have a material adverse effect on our results of operations and financial condition and, ultimately, our ability to meet our obligations under the New Notes.

We have market risk exposure as a result of changes in interest rates, foreign currency rates, asset prices or other financial instruments. Our financial margin and the market value of certain of our assets and liabilities are subject to variations due to interest rate volatility. Changes in interest rates affect our interest income, the volume of loans we generate and our interest expense. For example, when interest rates rise, we must pay higher interest on our borrowings while interest earned on our loans does not rise as quickly, causing our financial margin, which comprises the majority of our revenue, to temporarily decrease. Fluctuations in interest rates and prevailing market prices may have a material adverse effect on our business, results of operations, prospects and financial condition.

***We are subject to fluctuations in interest rates. Imbalances in the interest rates and maturity between our loan portfolio and our sources of funds could adversely affect us and our capacity to expand our business.***

We are exposed to interest rate and maturity mismatches between our loans and sources of funding. Out of our total loan portfolio, 28.4% consists mainly of loans bearing floating interest rates under payroll loans and the remaining 71.6% are loans at fixed interest rates. Our net interest income from our loans depends mainly on the spread between our cost of funding and the interest rates we charge to our customers. An increase in interest rates, or general uncertainty about changes in interest rates, could affect demand for credit, and thus affect demand for our loan products.

Any mismatch between the maturity of our loan portfolio and our sources of funds could magnify the effect of any imbalance in interest rates and could present a liquidity risk if we fail to obtain funding on an ongoing basis. An increase in our total cost of funds could result in an increase in the interest rates on our loans, which could, as a result, affect our ability to attract new customers and could limit the expansion of our business. A decrease in the growth of our loan portfolio could materially and adversely affect our ability to pay our liabilities, which in turn could have a material adverse effect on our business, financial condition and results of operations.

The board of directors of the Colombian Central Bank has authority to raise or lower interest rates, in order to intervene in the Colombian economy. Although interest rates in Colombia have remained stable recently, we cannot assure you that interest rates will remain stable. Any change in the interest rates could negatively affect our business and financial condition.

***We are subject to credit risk, and if we are unable to effectively control the level of non-performing loans in the future, our business, results of operations, prospects and financial condition may be adversely affected.***

Although we have rigorous and standardized credit processes in place and collection channels that mitigate risk of nonpayment, some of our payroll loans and credit card receivables could be partially or totally impaired as a result of the borrowers' default on their obligations. We use an internally designed credit risk management system that estimates the probability of default for every loan based on a borrower profile based on demographic and economic variables. However, this process involves subjective and complex judgments, including projections of economic conditions and assumptions on the ability of our borrowers to repay their loans. This process is also subject to human error as our employees may not always be able to assign an accurate credit rating to a client, which may result in exposure to higher credit risk than indicated by our risk rating system. We may not be able to timely detect these risks before they occur, or due to limited resources or available infrastructure, our employees may not be able to effectively implement our credit risk management system, which may increase our exposure to credit risk.

Non-performing loans can negatively impact our results of operations and financial condition. We cannot assure you that we will be able to effectively control the level of these loans in our loan portfolio. Although the amount of our non-performing loans is lower than that of the Colombian financial industry, we cannot assure you that this amount will not increase in the future. If the quality of our total loan portfolio deteriorates, we may be required to increase our impairments, which could materially adversely affect our business, results of operations, prospects and financial condition.

***Our current business model relies heavily on our ability to originate new loans.***

Currently our income is materially dependent on our ability to originate new loans on terms attractive to us. If we are unable to originate new loans on favorable terms, our results of operations and financial position may be adversely affected, since we do not engage in full banking activities that could compensate for a decrease of the income derived from our loan origination business.

***We could fail to fully or timely detect money laundering, terrorism financing and other illegal or inappropriate activities that could result in incurring additional liability and could harm our business and reputation.***

We are subject to and must comply with all applicable laws against money laundering, terrorism financing and other regulations in Colombia. These laws and regulations require, among other things, that we adopt and implement policies and procedures which involve "know-your-client" requirements and reporting suspicious and material transactions to the applicable regulatory authorities. While we have adopted policies and procedures intended to detect and prevent the use of our network for money laundering activities and by terrorists, and the size of the loans granted by us are relatively small for money laundering activities, these policies and procedures may fail to fully eliminate the risk that we have been or are currently being used by other parties, without our knowledge, to engage in activities related to money laundering or other illegal or inappropriate activities. To the extent we have not detected or do not detect such illegal activities, the relevant Colombian governmental agencies to which we report, such as the Financial Information and Analysis Unit (*Unidad de Información y Análisis Financiero*, or UIAF) of the Colombian Ministry of Finance (*Ministerio de Hacienda y Crédito*

*Público*), have the power and authority to impose fines and other penalties and sanctions on us. In addition, our business and reputation could be materially adversely affected if our clients use us for money laundering activities or illegal or inappropriate purposes.

We cannot ensure that our "best practices" and ethics policy for hiring and operations, and the internal control and practices derived from such policy will always be effective in preventing corrupt business practices by our employees and/or distributors in relation to their activities carried out during their dealings with public or private agencies. This could adversely affect our reputation, business, financial condition and results of operations.

### *Loans to low-income individuals pose unique risks not generally associated with other forms of lending.*

Our customers are typically low and low-middle income individuals who have limited access to traditional sources of credit. Loans to these borrowers may pose risks not generally associated with other forms of lending in Colombia. Our low-income customers typically have limited credit history or none at all, posing a higher degree of risk than borrowers with established credit history. We use strong collection channels and other relevant information (*i.e.*, from utilities companies) to determine the clients risk profile and mitigate the lack of credit history. In the future we may experience higher levels of non-performing loans and may be required to record higher impairments, which may materially and adversely affect our results of operations and financial position. There can be no assurance that the levels of non-performing loans and subsequent charge-offs will not be materially higher in the future, which could have a material adverse effect on our business, financial condition and results of operations.

### *A contraction in the credit markets could affect our capacity to fund our operations.*

A contraction in the credit markets could affect our capacity to fund our operations and adversely affect our business, financial condition and results of operations. Although 87.3% of our managed loan portfolio is placed among pensioners and public sector employees that have a stable job history and a secure source of income, increased unemployment caused by a contraction of credit markets could negatively impact the financial situation of our current clients which could, in turn, cause an increase in delinquent loans, reducing the profitability of our loan portfolios and the solvency of our clients, adversely affect our loan approval rate and, in turn, may have a material adverse effect on our results of operations and financial condition and, ultimately, on our ability to meet our obligations under the New Notes.

### *Reductions in our credit ratings could increase our cost of borrowing funds and impair our ability to raise new funds and renew maturing debt.*

Our credit ratings are an important component of our liquidity profile. Among other factors, our credit ratings are based on the financial strength, credit quality and low concentrations of our investment portfolio, the level and volatility of our earnings, our capitalization, the quality of our management, the liquidity of our balance sheet and our ability to access a broad array of funding sources. Our lenders may be sensitive to the risk of a downgrade in our credit ratings. We cannot assure you that our ratings will remain for any given period of time or that such ratings will not be lowered or withdrawn. The assigned ratings may be raised or lowered depending, among other factors, on the rating agencies' respective assessment of our financial strength, as well as their assessment of Colombian sovereign risk generally.

Adverse changes in our credit ratings could increase the cost of refinancing existing obligations, raising funds in the capital markets and borrowing funds from private lenders, which may result in a material adverse effect on our business, results of operations and financial condition, and, ultimately, may impair our ability to meet our obligations under the New Notes.

### *Servicing our indebtedness, including the New Notes, will require a significant amount of cash.*

Our ability to make payments on our indebtedness, including the New Notes, will depend on our ability to generate cash in the future. This, to a certain extent, is subject to general economic, financial, competitive and other factors that are beyond our control. Our business may not be able to generate sufficient cash flow from operations and future borrowings

may not be available to us in an amount sufficient to enable us to pay our indebtedness or to fund our other liquidity needs. We may need to refinance all or a portion of our indebtedness at or before maturity, and may not be able to complete such refinancing on commercially reasonable terms or at all. We may not have sufficient resources to repay our indebtedness as it becomes due or sufficient time to finance the repayment thereof. We are required to use a portion of our cash flow from operations to pay interest on our current and future indebtedness, which may require us to reduce funds available for other purposes, including new loan origination. If we are unable to generate cash to service, repay or refinance our indebtedness, our business, financial condition or results of operations may be materially and adversely affected.

***Competition from financial institutions and Fintechs may adversely affect our profitability and position.***

We face competition from existing and new lenders that target our existing and prospective payroll loan customers. Existing competitor financial institutions include banks and cooperatives as well as commercial entities and informal loan providers. New competitors include Fintechs dedicated mainly to payroll loan and credit card origination within our target market. We expect competition to continue to increase as we continue expanding our operations in Colombia. Some of our existing competitors may have more resources and name recognition than us and have access to lower-cost sources of funding. The lower cost of funding of such competitors may allow them to offer payroll loans with lower interest rates or to engage in predatory practices such as lending below costs. Pricing (as reflected primarily in the applicable interest rate and to a lesser extent in related transaction fees) is an important competitive feature in the lending business. New lenders such as Fintechs, may develop more flexible and user friendly underwriting processes to originate payroll loans and credit cards among our target market with lower origination costs. Stronger price competition in the future could cause the rate of voluntary prepayments in our portfolio to increase and to exceed the rate at which payroll loans have been prepaid in the past, if the difference in interest rates exceeds the costs of refinancing with other lenders. Competition in our market may result in a material adverse effect on our business, financial condition and results of operations and in turn ultimately have a material adverse effect on our ability to meet our obligations under the New Notes.

***We depend on our principal officers and key employees.***

The loss of any of our experienced principal officers, key employees and senior managers could negatively affect our ability to execute our business strategy. In addition, in line with our planned expansion, our future success also depends on our continuing ability to identify, hire, train and retain other qualified sales, marketing, collections and managerial personnel. Competition for such qualified personnel is intense and we may be unable to attract, integrate or retain qualified personnel at levels of experience or compensation that are necessary to maintain our quality and reputation or to sustain or expand our operations. For example, we have experienced and continue to experience high rates of turnover among our sales force, which may in turn impact our productivity. Our business, results of operations, prospects and financial condition could therefore be adversely affected if we cannot continue to attract and retain these necessary personnel.

***We are not currently subject to significant regulation as a bank or other financial institution in Colombia. Changes to Colombian governmental regulations, could adversely affect our business, results of operations, prospects and financial condition.***

There may be significant future changes in the regulatory system or in the enforcement of the laws and regulations that could adversely affect us. Financial services and banking laws regulations are subject to ongoing review and revision, including changes in response to global regulatory trends. As a result, governments have been actively considering new banking laws and regulations, and reviewing and revising existing laws and regulations, particularly in relation to the regulation of non-bank financial institutions, interest rate regulations, capital adequacy and accounting standards. The adoption of new laws or regulations or changes in the interpretations or enforcement of existing laws or regulations may have an adverse effect on our business, results of operations and financial condition.

Any legislative or regulatory actions (including any amendment to the Colombian Payroll Loan Law) and any required changes to our business operations resulting from such legislation and regulations could result in significant loss of revenue, limit our ability to pursue certain business opportunities, increase the level of reserves we are required to maintain or capital adequacy requirements, affect the value of assets that we hold, require us to increase our prices and, therefore, reduce

demand for our products, impose additional costs on us or otherwise adversely affect our businesses. Accordingly, there can be no assurance that future changes in regulations or in their interpretation or application will not adversely affect us. Changes in regulations may also cause us to face increased compliance costs and limitations on our ability to pursue certain business opportunities and provide certain products and services.

***If we are not able to access sources of funding, our business, financial condition and results of operations may be adversely affected.***

We rely significantly on several sources of funding. Therefore, we are constantly looking for alternative sources of funding to finance our operations, including bank credit lines, publicly or privately issued debt or equity securities, among others. Adverse financial conditions, including the existence of a liquidity crisis, could limit our access to new or sustained funding. Any decrease in the availability of one or more of our funding sources, could have an adverse effect on our business, financial condition and results of operations.

We may also require additional capital in the future in order to grow our loan portfolio, remain competitive or enter into new businesses. In addition, we may need to raise additional capital to increase our equity base in the event that we experience large, unexpected losses in our loan portfolio. Our ability to obtain additional capital in the future is subject to a variety of uncertainties, including:

• our future financial condition, results of operations and cash flows;

• general market conditions for capital-raising activities by financial institutions; and

• economic, political and other conditions in Colombia and elsewhere.

We may not be able to obtain additional capital in a timely manner, on acceptable terms or at all, which could have a material adverse effect on our business, financial condition and results of operations.

***Future acquisitions or significant investments may not be successfully implemented or could disrupt our operations.***

As we plan to continue growing our businesses, we may consider other strategic acquisitions or investments (including investments in regulated businesses) from time to time in Colombia and abroad. We face a variety of uncertainties and challenges relating to acquisitions and investments, including achieving expected synergies, retaining key employees, integrating operational and financial systems, maintaining levels of revenue and profitability, securing governmental approvals and minimizing exposure to potential liabilities. These risks, and the possibility that integration of any acquired business could require a significant amount of the time and resources of our management and employees, could disrupt our ongoing business and could have a material adverse effect on our business, financial condition and results of operations.

***If we are unable to bring an enforcement action on the collateral securing our financial contracts or if the value of collateral under certain of our financing contracts is inadequate, our results of operations and financial condition could be adversely affected.***

If we are unable to bring an enforcement action on collateral on a timely basis or at all, or if proceedings related thereto are delayed or insufficient, our results of operations and financial condition may be adversely affected. Additionally, the value of such collateral may be adversely affected by a number of conditions such as damage, loss, deterioration, devaluation, oversupply or reduced demand for such asset. There can be no assurance that the value of such collateral will not decline. There can also be no assurance that the assumptions relied on by appraisers assessing the value of such collateral are accurate measures of the market and thus the value of such collateral may be evaluated inaccurately. Consequently, the price at which we are able to sell any collateral in the event of an attachment or foreclosure, or any other enforcement mechanism available under applicable laws, may be lower than the valuation of such collateral and this may have a material adverse effect on our financial condition and results of operations.

***Any failure to protect our registered trademarks and intellectual property may materially adversely affect us.***

We believe that our commercial advertisements, trademarks and other intellectual property are fundamental to our name recognition and the continued success of our business. Any infringement of our intellectual or industrial property rights or any failure to register or maintain these rights in the jurisdictions in which we operate may result in: (i) litigation, requiring that we dedicate substantial time and resources to defend our intellectual and industrial property; and/or (ii) the potential loss of our ability to use our trademarks. The success of our business depends in part upon our continued ability to use our trademarks to increase brand awareness and further develop our brand in our markets. We cannot assure you that all of the steps that we have taken to protect our trademarks in Colombia and other countries will be adequate to prevent the infringement of our trademarks by others. The unauthorized reproduction of our trademarks could diminish the value of our brand and our market recognition, our competitive advantages or our goodwill, which could adversely affect our business, results of operations, prospects and financial condition.

***Risks not contemplated in our insurance policies may affect our business.***

Although we take actions to ensure that our insurance policies cover most of the risks related to our business, it is possible that the terms and conditions of the insurance policies we have will not cover a specific event or incident. If any uninsured events occur with respect to a significant portion of our assets or business, such lack of coverage could have a material adverse effect on our financial condition and results of operations.

**Risks Relating to Colombia**

***Adverse economic and political conditions in Colombia may have an adverse effect on our results of operations and financial condition.***

We are a Colombian company and most of our operations, properties and clients are located in Colombia. As a consequence, our results of operations and financial condition are materially affected by economic and political conditions in Colombia. The quality of our assets, financial condition and results of operations significantly depend on macroeconomic and political conditions prevailing in Colombia.

Colombia is subject to economic, political and other uncertainties, including changes in monetary, exchange control and trade policies that could affect the overall business environment in Colombia, which would, in turn, affect our results of operations and financial condition. For example, changes in monetary, exchange, and trade policies could affect the overall business environment in Colombia, which could impact our financial condition and results of operations and, ultimately, our ability to meet our obligations under the New Notes.

Decreases in the growth rate of the Colombian economy, periods of negative growth, material increases in inflation or interest rates or significant fluctuations in the exchange rate could result in lower demand for, or affect the pricing of, our services and products. Because a large percentage of our costs and expenses are fixed, we may not be able to reduce costs and expenses upon the occurrence of any of these events, in which case our profitability could be affected.

***An outbreak of disease or similar public health threat could have a material adverse impact on us.***

An outbreak of disease or similar public health threat, such as a pandemic and its detrimental impact on the worldwide economy, could have a material adverse impact on our business, results of operations and financial condition. Future events regarding any pandemic, which are unpredictable and beyond our control, may impact our business and results of operations, our clients' ability to continue to pay us in a timely manner or at all, our workforce and our performance under our contracts. Additionally, we cannot assure you that Colombian government authorities will not force our branches or other sales locations to close in the future due to any pandemic. To the extent any of these risks and uncertainties adversely impact us, they may also have the effect of heightening many of the other risks described in this "Risk Factors" section.

In addition, we cannot assure you of the impact, if any, further regulations issued by the Colombian government for purposes of mitigating the impacts of any contagious disease outbreak will have on our business and results of operations.

***The Colombian economy remains vulnerable to external shocks, including any global economic crisis and those that could be caused by future significant economic difficulties of its major regional trading partners or by more general "contagion" effects.***

A significant decline in economic growth of any of Colombia's major trading partners—in particular, the United States, China and Ecuador—could have a material adverse effect on each country's balance of trade and economic growth. Lower economic growth than expected may result in asset quality deterioration and could negatively affect our business.

The United States is Colombia's largest export market. A decline in the United States' demand for imports could negatively affect Colombian exports and Colombia's economic growth, which could have a material adverse effect on our business, results of operations and financial condition.

In addition, because international investors' reactions to the events occurring in one emerging market country sometimes have demonstrated a "contagion" effect with respect to other emerging market countries, in which an entire region or class of investment is disfavored by international investors, Colombia could be affected by negative economic or financial developments in other emerging market countries.

There can be no assurance that any global financial crisis or similar events in emerging market countries will not adversely affect investor confidence in emerging markets or the economies of the principal countries of Latin America, including Colombia. There can be no assurance that these events will not adversely affect Colombia's economy and in turn have a material adverse effect on our business, results of operations and financial condition.

Colombia's long-term public external indebtedness is currently rated BB+ by S&P, BB+ by Fitch and Baa2 by Moody's.

The investment and security climate in Colombia continues to be tied to the results and performance of the government's economic, security and social policies and the perception of such policies by foreign investors. In 2019, Colombia's annual GDP increased by 3.2%. For 2020, prior to the COVID-19 outbreak, *Departamento Administrativo Nacional de Estadística* - DANE estimated GDP growth at 3.62%. During 2020, Colombia's economic growth went down to -7.04%, a significant deterioration compared to annual GDP growth of 3.2% in 2019 and 2.6% in 2018. The economic slowdown in 2020 was primarily due to the disruptions in the economic activity due to the restrictions imposed by the COVID-19 pandemic which affected mainly the construction, mining and oil production sectors and commercial activities. In 2021, Colombia's annual GDP increased by 10.7%, mainly driven by a recovery in the retail sector and wholesale commercial activity, the manufacturing sector and government investment. During 2022, Colombia's GDP increased 7.5% compared to 2021, mainly driven by changes in the retail sector and wholesale commercial activity, repair of motor vehicles and motorcycles, transportation and storage, and accommodation and food services activities. As September 2023, Colombia´s GDP decreased 0.3% compared to the same period in 2022 mainly driven by the decrease in manufacturing industry which decreased 6.2% and contributes with (0.8) percentage points to the annual variation of the added value. In spite of this economic recovery, the political and economic climate in Latin America, including countries facing political unrest such as Venezuela, Bolivia, Chile, Ecuador and Argentina, may negatively affect international investor perception of the region. A reversal of the rate of growth of the Colombian economy, a slowdown in the growth in customer demand, an increase in market competition, or changes in governmental regulations, could adversely affect the rate of growth of our loan portfolio and our risk index and, accordingly, increase our required allowances for loan losses. All of these conditions could lead to a general decrease in demand for borrowings.

In addition, the effect on consumer confidence of any actual or perceived deterioration of household incomes in the Colombian economy may have a material adverse effect on our results of operations and financial condition.

***Colombia has experienced and continues to experience internal security issues that have had or could have a negative effect on the Colombian economy.***

Colombia has experienced and continues to experience, in a lesser degree, internal security issues, primarily due to the activities of guerrilla groups such as the dissident groups of the former Revolutionary Armed Forces of Colombia (*Fuerzas Armadas Revolucionarias de Colombia*) ("FARC") and the National Liberation Army (*Ejército de Liberación Nacional*) ("ELN"), paramilitary groups and drug cartels. In remote regions of the country with minimal governmental presence, these groups have exerted influence over the local population and funded their activities by protecting, and rendering services to drug traffickers. The Colombian government commenced peace talks with the FARC in August 2012, and peace negotiations with ELN began in November 2016. The Colombian Government has suspended the negotiations with ELN after a series of rebel attacks. The Colombian government and the FARC signed a peace agreement on September 26, 2016, which was amended by the Colombian Congress on November 30, 2016 and is in the process of being implemented after four years of negotiation. Pursuant to the peace agreements, the FARC now occupies five seats in the Colombian Senate and four seats in the Colombian House of Representatives. Most recently, Law 418 of 2022 was enacted for the Colombian Government to conduct peace talks with illegal armed groups in Colombia. Such law sets forth the delimitation of geographical areas in the country for such peace talks to be conducted *(regiones de paz)*. The Colombian government and armed forces will continue making presence in such geographical areas while peace talks take place. Moreover, despite the enactment of a cease fire decree with some paramilitary groups (i.e., Decree 016 of 2024), the remote regions affected in Colombia by such paramilitary groups and drug cartels remain subject to some security concerns.

We cannot predict what policies will be adopted by the Colombian government and whether these policies would have a negative impact on the Colombian economy or our business, financial condition and results of operations. During the transition process, Colombia may experience internal security issues, and drug-related crime and guerilla and paramilitary activities, which may have a negative impact on the Colombian economy. Our business or financial condition could be adversely affected by rapidly changing economic or social conditions, including the Colombian government's response to the post conflict if any, which may result in legislation that increases the tax burden of Colombian companies.

***Government policies and actions as well as judicial decisions in Colombia could significantly affect the local economy and, as a result, our results of operations and financial condition.***

Our results of operations and financial condition may be adversely affected by changes in Colombian governmental policies and actions, and judicial decisions, involving a broad range of matters, including interest rates, exchange rates, exchange controls, inflation rates, taxation, banking and pension fund regulations and other political or economic developments affecting Colombia. The Colombian government has historically exercised substantial influence over the economy, and its policies are likely to continue to have a significant effect on Colombian companies, including us. The president of Colombia has considerable power to determine governmental policies and actions relating to the economy, and may adopt policies that could negatively affect us. Future governmental policies and actions, or judicial decisions, could adversely affect our results of operations or financial condition. The current government has been very active in the preparation of bills aimed at introducing changes in the pension, education, labor, health, and tax regimes. Although such reforms have been subject to high scrutiny before the Colombian Congress, and they have not yet been approved, they could adversely affect our results of operations or financial condition.

***New or higher taxes resulting from changes in tax regulations or the interpretation thereof in Colombia could adversely affect our results of operations and financial condition.***

New tax laws and regulations, and uncertainties with respect to future tax policies, could adversely affect our results of operations and financial condition. In recent years, the Colombian Congress has approved the inclusion of additional taxes in a variety of areas, such as taxes on financial transactions and taxes to fund Colombia's fight against terrorism, the peace negotiations with guerilla forces and, recently, to address the Covid-19 outbreak. Changes in tax-related laws and regulations, and interpretations thereof, can affect tax burdens by increasing tax rates and fees, creating new taxes, limiting tax deductions, and eliminating tax-based incentives and non-taxed income. In addition, tax authorities or courts may interpret

tax regulations differently than we do, which could result in tax litigation and associated costs and penalties. Any change in tax regulations or the interpretation thereof could have a material adverse effect on our results of operations and financial condition.

On April 15, 2021, the Colombian government presented to Congress a new tax reform bill intended to restore government revenues and cover the spending associated with the COVID-19 pandemic. This bill was withdrawn by the government on May 2, 2021 due to the discontent of the citizens that resulted in a series of protests nationwide. On July 20, 2021, the Colombian government presented a new tax reform bill which was partially approved by the Congress in December 2021.

On December 13, 2022, the Colombian Congress passed Law No. 2277 of 2022, the new tax reform filed by the government of Gustavo Petro. Such reform amended current rules or introduced new rules on, among others, the corporate income tax taxable base assessment and income tax rates on dividends paid to residents (both individuals and entities) and to foreign non-resident persons, as explained below. Rules on income tax withholding rates and the general regime on payments from Colombia to foreign non-resident entities were not amended.

Under this tax reform, the corporate income tax rate remained at 35%. Surtaxes are applicable to financial entities and oil & gas taxpayers. Per the new regulations, local companies are not allowed to determine an income tax below 15% on the financial profit determined as set-forth by law. In addition, the capital gains tax rate was increased from 10% to 15%.

Dividend distributions to foreign non-residents persons (individuals and entities) are subject to tax at a rate of 20%. The dividends tax rate on distributions to resident individuals is 15%, with 1.090 Tax Units (2024: Ps. 47,065.00) of exempt income.

Income tax rate on dividends paid to local companies was increased from 7.5% to 10%, applicable on the first distribution, with a credit for the tax passed onto the ultimate shareholder (resident individual or non-resident entity or individual). The 10% withholding is not applicable when the distribution is made between registered economic group members.

Changes in tax treatment implemented by a new law could have a material adverse effect on our results of operations and financial condition.

***Exchange rate fluctuations could adversely affect the Colombian economy, and therefore, our results of operations and financial condition.***

The Colombian peso has been subject to significant devaluations and appreciations in the past and may be subject to similar fluctuations in the future. As of December 31, 2020, 2021 and 2022, and September 30, 2023, the exchange rate of the Colombian peso against the U.S. dollar was Ps. 3,432.5 per US$ 1.00, Ps. 3,981.16 per US$ 1.00, Ps. 4,810.2 per US$ 1.00 and 4,053.76 per US$ 1.00, respectively. Substantially all of our revenues are denominated in Colombian pesos. As of September 30, 2023, 58% of our outstanding debt was denominated in U.S. dollars, so a significant decrease in the value of the Colombian peso as compared to the U.S. dollar will increase our debt service costs. We cannot assure you that we will maintain our current hedge positions in the future or that our hedging policy will successfully mitigate the effects of fluctuations in the exchange rate of the Colombian peso against the U.S. dollar.

A devaluation of the Colombian peso relative to the U.S. dollar could create inflationary pressures in Colombia and result in the adoption by the Colombian government of measures such as increasing interest rates. Restrictive macroeconomic policies could adversely affect the stability of the Colombian economy, as well as adversely impact our results of operations and profitability. A significant devaluation or appreciation of the Colombian peso in relation to the U.S. dollar could adversely affect the Colombian economy, which could have a material adverse effect on our results of operations and financial condition.

***Natural disasters, acts of war or terrorism, or other external events could disrupt our businesses and affect our results of operations and financial condition.***

Colombia is exposed to natural disasters, such as earthquakes, volcanic eruptions, tornadoes, tropical storms and hurricanes. Heavy rains or abnormally low rainfall in Colombia, attributable in part to the *La Niña* and *El Niño* weather patterns, have resulted in severe flooding and mudslides, and prolonged droughts in the past and may continue to contribute to flooding, mudslides, droughts or other natural disasters on an equal or greater scale in the future. In addition to severe weather and natural disasters, acts of war or terrorism and other adverse external events could have a significant impact on our ability to conduct business and may, among other things, impair the ability of our clients to repay outstanding loans, impair the value of collateral securing loans, cause significant property damage, cause us to incur additional expenses and/or result in loss of revenue. In the event of such circumstances, our disaster recovery plans may prove to be ineffective, which could have a material adverse effect on our ability to conduct our businesses, particularly if such an occurrence affects computer-based data processing, transmission, storage and retrieval systems or destroys customer or other data. In addition, if a significant number of our employees and senior managers were unavailable because of a natural disaster, our ability to conduct our businesses could be compromised. Natural disasters, acts of war or similar events could also result in substantial volatility in our results of operations for any fiscal quarter or year.

***The Colombian Central Bank may impose requirements on the ability of Colombian residents (including us) to obtain loans in foreign currency.***

Under Colombian exchange control operations, the Colombian Central Bank is allowed to require a mandatory deposit in connection with loans denominated in a foreign currency obtained by Colombian residents, including us. Although there is not currently a mandatory deposit requirement in effect, a mandatory deposit requirement was set at 40.0% in 2008 after the Colombian peso appreciated against foreign currencies. We cannot predict or control future actions by the Colombian Central Bank, which may involve the establishment of a different mandatory deposit percentage. The use of such measures by the Colombian Central Bank may be a disincentive for us and our clients to obtain loans in foreign currency. We cannot predict the effects that such policies will have on the Colombian economy. In addition, we cannot assure you that the Colombian peso will not depreciate or appreciate relative to other currencies in the future.

# EXCHANGE RATES AND FOREIGN EXCHANGE CONTROLS

## Exchange Rates

The Colombian foreign exchange system allows the purchase and sale of foreign currency and the international transfer of Colombian pesos by any person or legal entity, regardless of the amount, subject to certain regulatory procedures. The SFC calculates the representative market rate based on the weighted averages of the buy/sell foreign exchange rates quoted daily by certain financial institutions, including certain of our financial subsidiaries, for the purchase and sale of U.S. dollars. On September 30, 2023 the representative market rate was Ps. 4,053.76 per US$ 1.00, and on December 31, 2022 the representative market rate was Ps. 4,810.2 per US$ 1.00. The Federal Reserve Bank of New York does not report a noon buying rate for Colombian pesos/U.S. dollars.

The following table presents, for the periods indicated, the low, high and period-end exchange rates published by the SFC, all expressed in nominal Colombian pesos per U.S. dollar.

| Month | High | Low | Period End |
|---|---|---|---|
| August 2023 | 4,144.79 | 3,898.48 | 4,085.33 |
| September 2023 | 4,099.20 | 3,902.54 | 4,053.76 |
| October 2023 | 4,386.66 | 4,053.76 | 4,060.83 |
| November 2023 | 4,117.71 | 3,957.77 | 3,980.67 |
| December 2023 | 4,045.22 | 3,822.05 | 3,822.05 |
| January 2024 | 3,969.50 | 3,822.05 | 3,925.6 |
| February 2024 (through February 9) | 3,975.74 | 3,889.05 | 3,954.68 |

The following table presents the average Colombian pesos/U.S. dollar representative market rate for each of the five most recent years, calculated by using the average of the exchange rates on the last day of each month during the period, and the representative year-end market rate for each of the five most recent years, as published by the SFC, all expressed in nominal Colombian pesos per U.S. dollar.

| Month | High | Low | Period End |
|---|---|---|---|
| 2019 | 3,522.48 | 3,072.01 | 3,277.14 |
| 2020 | 4,153.91 | 3,253.89 | 3,432.50 |
| 2021 | 4,023.68 | 3,420.78 | 3,981.16 |
| 2022 | 5,061.21 | 3,706.95 | 4,810.20 |
| 2023 | 4,989.58 | 3,822.05 | 3,822.05 |

This Statement contains translations of certain Colombian peso amounts into U.S. dollars at specified rates solely for the convenience of the reader. The convenience translations should not be construed as a representation that the Colombian peso amounts actually represent such U.S. dollar amounts or that they could be converted into U.S. dollars at the specified rate or at all. See "Presentation of Financial and Other Information."

## Foreign Exchange Controls

In 1990, the Colombian government initiated a policy of gradual currency liberalization. Foreign currency holdings abroad were permitted and, in a series of decrees, control of the exchange rate was shifted from the Colombian Central Bank to the spot foreign exchange market conducted by certain authorized financial institutions.

The general legal principles of Colombia's foreign exchange and international investments regulations ("Foreign Regulations") were established by Law 9 of 1991. Pursuant to this law, the Board of Directors of the Colombian Central Bank enacted Resolution 1 of 2018 as amended or amended and restated ("Resolution 1"), which is considered the main legal framework governing Colombia's FX Regulations.

Resolution 1 establishes two types of markets for foreign currency exchange: (i) the free market, which consists of all foreign currencies originated in sales of services, donations, remittances and all other inflows or outflows that do not have to be channeled through the FX Market (as defined in (ii) below) (the "Free Market"). The Free Market also includes assets and investments abroad, including its profits, owned by Colombian residents prior to September 1, 1990; and (ii) the controlled market (the "FX Market"), which consists of: (a) all foreign currencies originated in operations considered to be controlled operations and, therefore, which may only be transacted through foreign exchange intermediaries, or through registered compensation accounts, or (b) foreign currencies originated in operations which although not required to be transacted through the FX Market, are voluntarily channeled through such market. This market is made up of the following foreign exchange operations, which must be channeled through the FX market: (1) import and export of goods, (2) foreign investments in Colombia, (3) foreign indebtedness agreements entered into by Colombian residents, as well as the financial costs associated with such indebtedness, (4) direct investments abroad by Colombian residents, (5) derivatives transactions, (6) guaranties granted in foreign currency and (7) financial investments in foreign securities or assets abroad and their yield, unless such investments are made in foreign currency originated in operations in the Free Market.

Under Colombian FX Regulations, foreign exchange intermediaries ("FX Intermediaries") are authorized to enter into foreign exchange transactions ("FX Transactions") to convert Colombian pesos into foreign currencies or foreign currencies into Colombian pesos. According to Article 7 of Resolution 1 the following institutions are considered FX Intermediaries, when they have been duly approved to act as such: (i) commercial banks, (ii) mortgage banks, (iii) financial corporations, (iv) commercial finance companies, (v) Financiera de Desarrollo Nacional or FDN, (vi) Banco de Comercio Exterior de Colombia S.A. or BANCOLDEX, (vii) financial cooperatives, (viii) local stock brokerage firms, (ix) exchange intermediation and special financial services companies, (x) companies specialized in electronic deposits and payments (SEDPES), (xi) Financiera de Desarrollo Territorial or FINDETER, (xii) Fondo para el Financiamiento del Sector Agropecuario or FINAGRO, (xiii) Instituto Colombiano de Crédito Educativo y Estudios Técnicos en el Exterior or ICETEX, and (xiv) Fondo Nacional de Ahorro or FNA. These institutions are considered authorized intermediaries and, therefore, are allowed to buy and sell foreign currency originated in foreign exchange transactions, according to the parameters and limits set forth by Article 8 of Resolution 1. Exchange intermediation companies are also considered authorized intermediaries; however, these companies have a limited regime and are not authorized to buy and sell foreign currency for controlled operations.

Compensation accounts are accounts opened abroad by Colombian residents (individuals and legal entities), which are registered with the Colombian Central Bank to channel foreign currency originated in either controlled operations on the FX Market or the Free Market. Colombian law allows the Colombian Government and the Colombian Central Bank to intervene in the foreign exchange market if the value of the Colombian peso is subject to significant volatility. The Colombian Government and the Colombian Central Bank may also limit the remittance of dividends and/or investments of foreign currency received by Colombian residents whenever the international reserves fall below an amount equal to three months of imports. See "Risk Factors—Risks Relating to Colombia— Government policies and actions as well as judicial decisions in Colombia could significantly affect the local economy and, as a result, our results of operations and financial condition."

In addition to its past interventions in the FX Market, the Colombian Central Bank regulations establish a deposit requirement on all foreign loans granted to Colombian residents, as an instrument to control the fluctuation of the Colombian peso against the U.S. dollar. To this end, the Colombian Central Bank has on some occasions required that a certain percentage of the debt incurred (depending on the maturity of the debt) to be deposited in Colombian pesos or foreign currency with the Colombian Central Bank in a non-interest-bearing account for a fixed period of time (*depósito por operaciones de endeudamiento externo*). A debtor of foreign loans can early prepay or redeem the certificate given by the Colombian Central Bank evidencing the deposit, but said prepayment or early redemption will imply a discount. The discount

is reduced as the term for maturity is reduced. Even though the deposit requirement is currently equal to zero of the disbursements made under the loan, which means that there is currently no deposit that has to be made with the Colombian Central Bank by the debtor of foreign loans, the same may be modified by the Colombian Central Bank at any time.

**Fluctuation of Colombian Peso against U.S. dollar and Measures Adopted by the Colombian Government**

The Colombian government has considerable power to determine governmental policies and actions that relate to the Colombian economy and, consequently, to affect the operations and financial performance of businesses. The Colombian government and the Colombian Central Bank may seek to implement measures aimed at controlling further fluctuation of the Colombian peso and promoting domestic price stability. A prediction cannot be made on the policies that may be adopted by the Colombian government and whether those policies may negatively affect the Colombian economy or our business or financial performance. Furthermore, we cannot assure you that the Colombian peso will not depreciate or appreciate relative to the U.S. dollar and to other currencies in the future.

# CAPITALIZATION

The following table sets forth certain financial information for us as of September 30, 2023, including our cash and cash equivalents, commercial paper, short-term and long-term indebtedness, shareholders' equity and total capitalization. The table also sets forth such information as adjusted to reflect (i) the consummation of our ECP Program exchange offer completed on December 20, 2023 (the "ECP Exchange Offer") and (ii) the consummation of the Exchange Offer and the Consent Solicitation, assuming that all Old Notes are tendered prior to or on the Expiration Date and we do not round down the amount to be issued to any tendering holder. This table should be read together with the Interim Financial Statements and notes thereto included elsewhere in this Statement. There has been no material change in our capitalization since September 30, 2023.

| | As of September 30 2023 (unaudited) | | | |
| --- | --- | --- | --- | --- |
| | Actual | As Adjusted[1] | Actual | As adjusted[1] |
| | (Ps. millions). | | (US $ millions)[2] | |
| Cash and cash equivalents | 95,629 | 95,629 | 24 | 24 |
| Short-term debt: | 334,121 | 205,973 | 82 | 51 |
| Bank loans and borrowings from other entities | 205,973 | 205,973 | 51 | 51 |
| ECP Program (notes in US$ ) | 128,148 | 0 | 32 | 0 |
| Long-term debt: | 1,365,990 | 1,312,313 | 337 | 324 |
| ECP Program (notes in US$ )[3] | | 131,517 | | 32 |
| Bank loans and borrowings from other entities | 511,457 | 511,457 | 126 | 126 |
| 8.875% Notes due 2025[4] | 854,533 | 669,340 | 211 | 165 |
| Notes issued hereby | | | | |
| Interest | 17,855 | 6,479 | 4 | 2 |
| Transaction costs | -43,143 | (39,032) | (11) | (10) |
| **Total financial obligations**[5] | **1,674,823** | **1,485,734** | **413** | **367** |
| Total shareholders' equity | 274,582 | 433,343 | 68 | 107 |
| **Total capitalization**[6] | **1,949,405** | **1,919,077** | **481** | **473** |

(1)   As adjusted to give effect to (i) the consummation of the ECP Exchange Offer and (ii) the consummation of the Exchange Offer and Consent Solicitation, assuming that all Old Notes are tendered prior to or on the Expiration Date and we do not round down the amount to be issued to any tendering holder.

(2)   Solely for the convenience of the reader, Colombian peso amounts have been translated into U.S. dollars at the market rate as of September 30, 2023 of Ps. 4,053.76 to US$ 1.00. See "Exchange Rates and Foreign Exchange Controls" for information on recent fluctuations in exchange rates.

(3)   The as adjusted column reflects the consummation of the ECP Exchange Offer and includes capitalized interest of Ps. 131,517 million (US$32 million).

(4)   The as adjusted column assume that all Old Notes are tendered prior to or on the Expiration Date and we do not round down the amount to be issued to any tendering holder.

(5)   Net of transaction costs.

(6)   Total debt plus shareholders' equity.

# SELECTED FINANCIAL INFORMATION

The following tables present certain selected financial information as of the dates and for each of the periods indicated. The results included below and elsewhere in this Statement are not necessarily indicative of our future performance. This data is qualified in its entirety by reference to, and should be read together with "Presentation of Financial and Other Information," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our financial statements and related notes included elsewhere in this Statement. Certain amounts and percentages included in this Statement have been subject to rounding adjustments. Accordingly, figures shown for the same category presented in different contexts may vary slightly and figures in certain other contexts may not be an exact arithmetic result of the figures shown herein.

Our balance sheet data as of September 30, 2023 and the income statement data for the nine months ended September 30, 2023 and 2022 are derived from our Interim Financial Statements included elsewhere in this Statement. Our balance sheet data as of December 31, 2022 and 2021 and the income statement data for the years ended December 31, 2022, 2021 and 2020 are derived from our Annual Financial Statements included elsewhere in this Statement.

We have prepared our Annual Financial Statements included elsewhere in this Statement in accordance with FRAS-IFRS for non-financial entities.

| | For the Nine Months Ended September 30, | | | For the Year Ended December 31 | | | |
|---|---|---|---|---|---|---|---|
| | 2023 | 2023 | 2022 | 2022 | 2022 | 2021 | 2020 |
| | | (unaudited) | | | | | |
| | (in millions of US$ ) (1) | (in millions of Ps.) | | (in millions of US$ ) (1) | (in millions of Ps.) | | |
| **Income statement data:** | | | | | | | |
| Interest income and similar **(2)** | 67 | 270,653 | 339,808 | 99 | 399,894 | 436,626 | 376,530 |
| Financial costs (interest) | (86) | (348,279) | (256,907) | (121) | (491,269) | (235,607) | (186,988) |
| Exchange rate differences | 61 | 245,363 | (38,590) | (30) | (121,755) | 844 | 4,093 |
| **Net interest** | **41** | **167,737** | **44,311** | **-53** | **-213,130** | **201,863** | 193,635 |
| | | | | | | | |
| Impairment of financial assets loan portfolio | (20) | (81,703) | (54,549) | (21) | (83,739) | (81,822) | (101,444) |
| Expense on accounts receivable provisions | (2) | (9,788) | (8,072) | (3) | (11,298) | (13,860) | (174) |
| **Gross financial margin** | **19** | **76,246** | **(18,310)** | **(76)** | **(308,167)** | **106,181** | **92,017** |
| | | | | | | | |
| **SG&A** | | | | | | | |
| Employee benefits | (2) | (9,707) | (10,835) | (4) | (14,358) | (13,409) | (13,839) |
| Depreciation and amortization expense | (1) | (4,685) | (4,649) | (2) | (6,222) | (6,185) | (5,915) |
| Depreciation of right of use assets | (1) | (2,048) | (1,543) | (1) | (2,056) | (2,156) | (1,954) |
| Other(3) | (15) | (59,850) | (57,042) | (22) | (88,880) | (80,004) | (68,878) |
| **Total other expenses** | **(19)** | **(76,290)** | **(74,069)** | **(28)** | **(111,516)** | **(101,754)** | **(90,586)** |
| | | | | | | | |
| **Net operating income** | **(0)** | **(44)** | **(92,379)** | **(104)** | **(419,683)** | **4,427** | **1,431** |
| | | | | | | | |
| Other income | 0 | 1,302 | 2,260 | 1 | 2,122 | 940 | 2,678 |
| Financial income | 2 | 6,134 | 4,747 | 2 | 7,566 | 937 | 3,535 |
| **Financial income** | **2** | **7,436** | **7,007** | **2** | **9,688** | **1,877** | **6,213** |

| | 2023 | 2023 | 2023 | 2022 | 2022 | 2022 | 2021 |
|---|---|---|---|---|---|---|---|
| Derivative instrument valuation | (0) | (3) | (9) | (0) | (9) | (44) | (101) |
| **Financial expense** | **(0)** | **(3)** | **(9)** | **(0)** | **(9)** | **(44)** | **(101)** |
| **Net financial income (expense)** | **2** | **7,433** | **6,998** | **2** | **9,679** | **1,833** | **6,112** |
| **Net income before income tax** | **2** | **7,389** | **(85,381)** | **(101)** | **(410,004)** | **6,260** | **7,543** |
| Income tax | -0 | (1,557) | 18,604 | 27 | 107,545 | (324) | (2,319) |
| **Net income for the period** | **1** | **5,832** | **(66,777)** | **(75)** | **(302,459)** | **5,936** | **5,224** |

(1) Solely for the convenience of the reader, Colombian peso amounts have been translated into U.S. dollars at the market rate as of September 30, 2023, of Ps. 4,053.76 to US$ 1.00. See "Exchange Rates and Foreign Exchange Controls" for information on recent fluctuations in exchange rates.

(2) Includes interest income plus interest income from trusts plus commissions and fees from contracts with clients.

(3) Includes commissions and fees from legal, financial, and other advisory services.

| | As of September 30, | | As of December 31, | | |
|---|---|---|---|---|---|
| | **2023** | **2023** | **2022** | **2022** | **2021** |
| | (unaudited) | | | | |
| | (in millions of US$) (1) | (in millions of Ps.) | (in millions of US$ ) (1) | (in millions of Ps.) | |
| **Balance sheet data:** | | | | | |
| **Assets:** | | | | | |
| **Cash and cash equivalents** | **24** | **95,629** | **67** | **273,052** | **148,514** |
| Financial assets at fair value through profit or lost | | | | | |
| Equity instruments | 1 | 5,205 | 1 | 5,698 | 6,115 |
| Derivatives instruments | 5 | 18,641 | 24 | 98,861 | 355,167 |
| Loan portfolio | - | - | 0 | 381 | 16,683 |
| **Total financial assets at fair value** | **6** | **23,846** | **26** | **104,940** | **377,965** |
| **Financial assets at amortized cost** | | | | | |
| Consumer loans | 475 | 1,926,824 | 495 | 2,005,440 | 2,034,298 |
| Impairment | -107 | -432,092 | -92 | -372,608 | -318,427 |
| **Total Loan portfolio, net** | **369** | **1,494,732** | **403** | **1,632,832** | **1,715,871** |
| Accounts receivable, net | 69 | 281,052 | 79 | 320,129 | 436,872 |
| **Total financial assets at amortized cost** | **438** | **1,775,784** | **482** | **1,952,961** | **2,152,743** |
| Investments in associates and affiliates | 3 | 12,616 | 4 | 14,945 | 12,369 |
| Current tax assets | 9 | 37,972 | 8 | 32,012 | 22,245 |
| Deferred tax assets, net | 32 | 127,795 | 39 | 157,736 | 43,409 |
| Property, plant and equipment, net | 0 | 153 | 0 | 173 | 229 |
| Right of use assets | 0 | 1,232 | 0 | 2,021 | 4,298 |
| Intangible assets other than goodwill, net | 9 | 36,828 | 10 | 39,852 | 44,111 |
| **Total assets** | **521** | **2,111,855** | **636** | **2,577,692** | **2,805,883** |

**Liabilities and equity**

**Liabilities:**

Financial liabilities at fair value:

| | | | | | |
|---|---|---|---|---|---|
| Derivative instruments | | - | | | 316 |
| **Total financial liabilities at fair value** | | **-** | | | **316** |
| Financial liabilities at amortized cost | | | | | |
| Financial obligations | 413 | 1,674,823 | 625 | 2,534,228 | 2,417,239 |
| Lease liabilities | 0 | 1,468 | 1 | 2,179 | 4,770 |
| **Total financial liabilities at amortized cost** | **414** | **1,676,291** | **626** | **2,536,407** | **2,422,009** |
| Employee benefits provisions | 0 | 1,159 | 0 | 1,053 | 995 |
| Other provisions | 1 | 2,483 | 1 | 3,028 | 918 |
| Accounts payable | 30 | 122,636 | 13 | 51,892 | 79,065 |
| Current tax liabilities | 0 | 1,554 | 0 | 1,698 | 1,969 |
| Other liabilities | 8 | 33,150 | 10 | 40,057 | 42,000 |
| **Total liabilities** | **453** | **1,837,273** | **650** | **2,634,135** | **2,547,272** |

**Equity:**

| | | | | | |
|---|---|---|---|---|---|
| Share capital | 56 | 225,323 | 33 | 135,194 | 135,194 |
| Treasury Shares | -3 | -12,837 | -3 | -12,837 | -12,837 |
| Reserve Treasury Shares | 3 | 12,837 | 3 | 12,837 | 12,837 |
| Reserves | 3 | 11,038 | 3 | 11,038 | 11,038 |
| Additional paid-in capital | 63 | 255,020 | 18 | 71,169 | 71,169 |
| Other comprehensive income (OCI) | 0 | 1,743 | -12 | -49,470 | -36,874 |
| Retained earnings | -50 | -202,464 | 25 | 99,995 | 94,058 |
| IFRS Convergence Results | -5 | -21,910 | -5 | -21,910 | -21,910 |
| Earnings for the period | 1 | 5,832 | -75 | -302,459 | 5,936 |
| **Total equity** | **68** | **274,582** | **-14** | **-56,443** | **258,611** |
| **Total liabilities and equity** | **521** | **2,111,855** | **636** | **2,577,692** | **2,805,883** |

(1) Solely for the convenience of the reader, Colombian peso amounts have been translated into U.S. dollars at the market rate as of September 30, 2023 of Ps. 4,053.74 to US$ 1.00. See "Exchange Rates and Foreign Exchange Controls" for information on recent fluctuations in exchange rates.

The following tables show our debt maturities, excluding lease agreements, as of September 30, 2023 (unaudited):

| | Secured Debt | Unsecured Debt | Bonds | ECP Program | Total |
|---|---|---|---|---|---|
| | | | (in millions of Ps.) | | |
| 2023 | 28,823 | 90,221 | - | 60,806 | 179,850 |
| 2024 | 93,899 | 110,095 | - | 67,342 | 271,336 |
| 2025 | 245,385 | 550 | 854,533 | - | 1,100,467 |
| 2026 | 49,528 | - | - | - | 49,528 |
| 2027 | 98,930 | - | - | - | 98,930 |
| **Total** | **516,564** | **200,866** | **854,533** | **128,148** | **1,700,111** |

| | Secured Debt | Unsecured Debt | Bonds | ECP Program | Total |
|---|---|---|---|---|---|
| | | | (in millions of US$) | | |
| 2023 | 7 | 22 | - | 15 | 44 |
| 2024 | 23 | 27 | - | 17 | 67 |
| 2025 | 61 | 0 | 211 | - | 271 |
| 2026 | 12 | - | - | - | 12 |
| 2027 | 24 | - | - | - | 24 |
| **Total** | **127** | **50** | **211** | **32** | **419** |

| | As of and for the Nine Months Ended September 30, 2023 (unaudited) | | As of and for the Year Ended December 31, | | | |
|---|---|---|---|---|---|---|
| | | | 2022 | 2022 | 2021 | 2020 |
| | (in millions of US$ ) (1) | (in millions of Ps.) | (in millions of US$ ) (1) | (in millions of Ps.) | | |
| **Other financial data:** | | | | | | |
| Owned loan portfolio (principal only) (2) | 386 | 1,564,220 | 416 | 1,685,538 | 1,749,149 | 1.518.871 |
| FGA reserve (3) | - | 1,720 | - | - | 8,475 | 9,811 |
| Impairment of financial assets | 107 | 432,092 | 92 | 372,608 | 318,427 | 266,972 |
| Total unencumbered assets (4) | 256 | 1,039,262 | 327 | 1,326,908 | 2,360,266 | 2,198,539 |
| Interest income and similar (5) | 67 | 270,653 | 99 | 399,894 | 436,626 | 376,530 |
| Net interest and similar | 41 | 167,737 | -53 | -213,130 | 201,863 | 186,563 |
| LTM net income | 2 | 9.398 | **-75** | **-302,459** | **5,936** | **5,224** |
| Commissions and fees | 13 | 53,860 | 28 | 113,128 | 115,452 | 85,552 |

(1) Solely for the convenience of the reader, Colombian peso amounts have been translated into U.S. dollars at the market rate as of September 30, 2023 of Ps. 4,053.76 to US$ 1.00. See "Exchange Rates and Foreign Exchange Controls" for information on recent fluctuations in exchange rates.

(2) Owned loan portfolio includes our on-balance sheet collateralized and uncollateralized loan portfolio, as reflected in our Financial Statements. Derived from our Financial Statements included elsewhere in this Statement.

(3) Fondo de Garantias de Antioquia (FGA) is an entity owned by the Chamber of Commerce of Medellin, the Medellin Mayor's Office, the National Fund of Guarantees and the National Federation of Merchants (Fenalco) among others, which acts as a guarantor of all payroll loans we originate and of some of our credit card clients. FGA assumes risk up to a set limit and is responsible of recording the corresponding guarantees and indemnities and paying out on claims received. We are responsible for managing the risk, processing the loans, allocating guarantees, administering the collection of loans and collateral, processing indemnities and invoicing on behalf of FGA. Once a loan enters default, we can claim a reimbursement from FGA for the outstanding balance of the loan. As a result, we receive monetary compensation and record it as revenue under the income for guarantees item in our income statement.

(4) Total consolidated assets (excluding Intangible Assets, any net deferred tax assets and any other assets securing other Indebtedness of the Company loan portfolio held through our free-standing trusts) not securing any portion of our secured indebtedness.

(5) Includes interest income from own portfolio, commissions and fees, revenues from portfolio sales and indemnities.

| | As of and for the Nine Months Ended September 30, 2023 (unaudited) | | As of and for the Year Ended December 31, | | | |
|---|---|---|---|---|---|---|
| | | | 2022 | 2022 | 2021 | 2020 |
| | (in millions of US$ ) (1) | (in millions of Ps.) | (in millions of US$ ) (1) | (in millions of Ps.) | | |
| **Net interest margin (NIM):** | | | | | | |
| Interest income, excluding transaction costs and fair value | 60 | 242,050 | 88 | 356,581 | 358,611 | 315,454 |
| Financial costs (interest) | (86) | (348,279) | (121) | (491,269) | (235,607) | (186,988) |
| Exchange Rate Differences | 61 | 245,363 | (30) | (121,755) | 844 | 4,093 |
| Net interest margin (NIM) | (26) | (106,229) | (63) | (256,443) | 123,848 | 132,559 |

(1) Solely for the convenience of the reader, Colombian peso amounts have been translated into U.S. dollars at the market rate as of September 30, 2023 of Ps. 4,053.76 to US$ 1.00. See "Exchange Rates and Foreign Exchange Controls" for information on recent fluctuations in exchange rates.

| | As of and for the Nine Months Ended September 30, 2023 (unaudited) | As of and for the Year Ended December 31, | | |
| --- | --- | --- | --- | --- |
| | | 2022 | 2021 | 2020 |
| **Ratios:** | | | | |
| Efficiency ratio (1) | 55.3% | -64.6% | 61.7% | 58.2% |
| ROA (2) | 0.4% | -11.7% | 0.2% | 0.2% |
| ROE (3) | 2.8% | 535.9% | 2.3% | 1.7% |
| Equity / assets (end of period) | 13.0% | -2.2% | 9.2% | 12.1% |
| Capitalization ratio (4) | 24.3% | -4.3% | 18.2% | 24.8% |
| NPLs / total managed loans (5) | 10.4% | 6.0% | 5.2% | 4.2% |
| Reserves / NPLs (6) | 250.7% | 346.2% | 330.6% | 378.4% |

(1) Calculated as other expenses plus employee benefits, divided by net interest and similar.

(2) Calculated as net income for the last twelve months divided by the total assets at the end of the period.

(3) Calculated as net income for the last twelve months divided by the shareholders' equity at the end of the period.

(4) Calculated as total shareholder's equity divided by net loan portfolio (defined as owned loan portfolio less impairment of financial assets and FGA reserve) (as defined under "Description of the Notes").

(5) Calculated as NPLs of our managed loan portfolio over total managed loan portfolio. Our non-performing loans include principal only and include managed loans past due for over 60 days adjusted for operational nature of business. For comparative purposes, loans due for over 360 days are not considered in the calculation, given that we do not perform recurrent write-offs of loans.

(6) Calculated as reserves (including impairments as stated in the Financial Statements and FGA reserves) over NPLs of managed loan portfolio.

# MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The following discussion should be read in conjunction with our Financial Statements, included elsewhere in this Statement. Our Annual Financial Statements have been prepared in accordance with FRAS-IFRS for non-financial entities. The Interim Financial Statements have been prepared in accordance with International Accounting Standard IAS 34 Interim Financial Reporting. See "Presentation of Financial and Other Information."*

## Factors Affecting our Results of Operations

### Interest Income and Similar

Our revenues are mainly comprised of:

- *Interest income*: corresponds to interest income generated by our on-balance payroll loan portfolio, credit card portfolio and insurance financing, claims for reimbursement from FGA for defaulted loans whose provision was administered by FGA, interest from recovered loans and the net margin between the interest income of the payroll loan portfolios transferred and the financial cost of the funding received in a funding structure in place with a mutual fund administered by local trusts in the Colombian capital markets. We transfer payroll loan portfolios to this mutual fund and in turn we receive the funding to originate additional loans and an equity stake in the fund, which is subordinated to the rest of the investors in the fund.

- *Revenues from contracts with customers*: corresponds to credit card monthly fees and commissions charged to clients with an outstanding balance in credit cards issued by us and revenues resulting from sales of insurance products (i.e., life insurance and voluntary insurance) through our network and brokerage fees received from the FGA agreement in connection with their serving as guarantor of the payroll loans we originate.

### Net Interest Margin (NIM) Analysis

The calculation of interest income includes: interest income from our own portfolio and from the portfolio held through trusts and the valuation of financial instruments, net of transaction costs. Financial costs (interest) or interest expense includes our own interest expense and those from our trusts and exchange rate differences.

### Loan Portfolio Performance

The performance of our loan portfolio depends on our ability to collect each expected installment payment on a timely basis, which in turn depends, in part, on the strength of our origination and credit approval processes. Since our incorporation in 2003, we have developed and improved our proprietary underwriting standards and credit review system and have built an infrastructure to support the implementation of our credit review process for each of our loan portfolios. Our proprietary credit review process has, in part, enabled us to maintain low NPL ratios in our loan portfolio. Our NPL (Non - performing loans under >60 days and <360 days) ratios for our total managed loan portfolio were 5.2% and 6.0% as of December 31, 2021 and 2022, respectively, and 10.4% as of September 30, 2023.

On September 30, 2023, 0.3% of our managed payroll loan portfolio and about 7.5% of our credit card portfolio was restructured. Restructuring is formalized with each customer by changing the amounts of credit installments, the dates for partial payments of credit and the loan repayment periods, to ensure the customer is able to make consistent payments over the course of the loan term. When we restructure loans for our customers, we analyze the customer's current payment capacity and willingness to pay and calculate the probability of success of the new payment arrangement.

### Interest Rate Fluctuations

Interest rate fluctuations in Colombia have a significant effect on our business, financial condition and results of operations. While our interest-earning assets bear fixed and floating interest rates; all of our interest-bearing liabilities

currently carry fixed and floating interest rates equal to the DTF rate plus a spread, and are subject to frequent re-pricing. The DTF rate is the benchmark interbank interest rate applicable to borrowing from and lending to the Colombian Central Bank in transactions denominated in pesos and is updated weekly by the Colombian Central Bank.

The following table presents the high, low and average DTF rate during each of the periods indicated.

| | DTF Rate | | | |
| | High | Low | Average | End of Period |
|---|---|---|---|---|
| 2017 | 7.12% | 5.21% | 6.03% | 5.21% |
| 2018 | 5.29% | 4.35% | 4.72% | 4.51% |
| 2019 | 4.64% | 4.32% | 4.49% | 4.46% |
| 2020 | 4.66% | 1.94% | 3.46% | 1.94% |
| 2021 | 3.04% | 1.70% | 2.02% | 3.04% |
| 2022 | 13.70% | 3.21% | 8.17% | 13.70% |
| 2023 (January-September) | 11.15% | 3.21% | 6.83% | 10.90% |

Source: Colombian Central Bank

The Colombian Central Bank decreased its interest rate to 1.75% in 2020, increased it to 3% in 2021 and increased it to 12% in 2022. The overnight lending rate was 13.26% as of September 30, 2023.



Source: Colombian Central Bank

A portion of our assets are linked to the DTF rate; accordingly, changes in the DTF (which is highly correlated to Central Bank's target rate), affect our net interest income.

The average DTF rate was 3.46% during 2020, 2.02% during 2021, 8.17% during 2022 and 6.83% during the nine months ended September 30, 2023. Economic growth expectations from the Central Bank were revised to 0.9% from 1%,. However, on November 15, 2023, the National Department of Statistics revealed that the GDP growth in the third quarter of 2023 was -0.3%, in line with the market consensus. This decrease was driven mainly by manufacturing industries, commerce, construction, professional activities and information and communications, which decreased at rates of 0.8%, 0.7%, 0.4%, 0.1% and 0.03% year over year, respectively. With the inflation rate at 10.99% as of October 7, 2023, the Colombian Central Bank may consider reducing the intervention rate in line with the decline in inflation over the last six months.

### *Seasonality*

On a general basis, the second half of the year exhibits higher disbursements from our three products due to an increasing demand to purchase consumer goods after pensioners and public sector employees receive additional pensions and

wages benefits in June according to law and the anticipation of expenditure related to the year-end holiday season. In turn, the first quarter of the year is usually slow in disbursements and demand for new credit as the vacation season extends during the first months of the year.

**Critical Accounting Estimates**

Preparing financial statements in accordance with FRAS-IFRS requires our management to make certain estimates and assumptions that affect the amount of assets, liabilities, income and expenses reported during the period.

We will disclose the nature and amounts of changes in accounting estimates that are significant and that affect the current period or that are expected to any impact in future periods. Information about the effect on future periods will not be disclosed if estimating the effect is impractical.

Critical judgments and the significant accounting estimates made for the required accounting policies include (See Note 3 to our Annual Financial S):

*Financial Assets Business Model*

Our business model is based on granting consumer loan products in a quick and innovative manner to middle or low-income segments that are not served by the traditional financial system.

We developed a diversified platform with collection channels designed to minimize the risk of default and optimize the quality of our loan portfolio (minimize NPL), including: payroll deduction loans (discounted from payroll payments), credit card (collecting via public utilities bills), and financing for insurance policy premiums (revocable insurance where the insurer returns the portion of the premium that was not used in case of default).

The business model focuses on building alliances and agreements for origination and distribution of each one of our products, and access to data that enriches the underwriting process, thus promoting growth. We have 273 active operating agreements with employers and alliances with third parties and insurers for the origination of the *Credipóliza* product. During 2023, the Company decided to focus its origination on payrolls, as it is the Company's core business since its inception and in the Company's view, it is a product with a lower collection risk.

We apply meaningful judgments in managing financial assets and to evaluate if our financial assets comply with the conditions established in our business model so they can be classified at fair value or at amortized cost. Some of our financial assets have been classified as investments at fair value and others at amortized cost. According to our business model, the financial assets at amortized cost can be sold only in limited circumstances, such as when there are infrequent transactions, adjustments are made to the maturity structure of our assets and liabilities, when it is necessary to finance significant capital disbursements and when there are seasonal liquidity needs.

*Allowance for Loan Losses*

The Company has advanced its development of quantitative and qualitative criteria used to identify the significant increase in the credit risk of an instrument (the "SIRC"). Although quantitative criterion is used as the main principle to evaluate the SIRC, qualitative criteria have also been developed in case it is not possible to apply the quantitative criterion or in case such criterion cannot be used for specific financial assets.

Impairment-related requirements are applied to financial assets measured at amortized cost and fair value with changes in other comprehensive income (FVOCI) whose business model remains to collect contractual cash flows and sell such contractual cash flows.

The expected credit loss (ECL) model considers the prospective nature of loss tolerances for instruments, based on expectations of future behavior.

For the calculation of the ECL of payroll and credit card products, Credivalores uses the Granular Amortization approach, which considers the following:

- Exposure and corresponding risk parameters are calculated individually for each period.

- Exposure and corresponding risk parameters are intended to be constant within each period but may vary between periods.

- The calculation of the ECL is individual by period.

- 12-month ECL and lifetime ECL are calculated by adding the individual ECLs for each respective risk horizon (one-year, whole life).

- The frequency of payment is fixed according to its depreciation: monthly, quarterly, semi-annual, and annual, among others.

- The granular depreciation approach captures the dynamic behaviors of risk parameters at high granularity (more detailed).

**Main sources of calculation**

The central concept of impairment under the new IFRS 9 impairment model is based on a dual measurement approach of a financial instrument that considers the current level of expected impairment of each loan, compared to initial recognition, and requires recognition of impairment over the difference between expected credit losses in 12 months if no significant changes in risk have occurred since initial recognition; otherwise, a credit loss amount is recognized over the expected life of the financial instrument.

This model is complemented by stress analysis and scenarios with inputs that are not controlled by the Company, such as macroeconomic factors. To this end, the Company has developed a statistical model for the projection of ECLs through neural networks in a univariate way:

1. **Search for possible associations with macroeconomic variables:** Using the collection of information on macroeconomic variables that were considered, we went through the Principal Components Analysis (PCA) method and the Stepwise method (STW) to find the possible associations of macroeconomic variables with each of the ECL of the products which were considered explanatory variables.

2. **Univariate projections:** We project the ECL and the macroeconomic variables associated in a univariate way through neural networks. In some macroeconomic variables we use traditional methods such as ARIMA models. The method used to select the appropriate model to make the projections of a specific series is the lowest value found with the root of the mean square error both in training and the validation set (test). The models that are ultimately selected are those where there is coherence in the projections. The projected ECL is considered the ECL of our BASE scenario, and this is precisely the target variable in multivariate scenarios. The fundamental reason that the ECL is projected in a univariate way is that by doing so, the Company is only using the information that the series keeps. Although we acknowledge that a series is the reflection of other variables, in principle we look for the information that only the series presents, and later observe how it is affected by macroeconomic variables.

3. **Generation of scenarios:** For forward-looking models, we must generate two scenarios in our projections of macroeconomic variables, one optimistic and one pessimistic. To achieve this, we rely on descriptive measures of each of the series. By doing so, the projected scenarios are given by the standard deviations that are needed to reach quartiles 25% and 75% of each of the macroeconomic series, understanding these points as critical values for both an optimistic and pessimistic scenario.

4. **Multivariate adjustment:** With the macroeconomic variables projected in the BASE scenario, a multivariate neural network is adjusted, understanding that the variables associated with each of the products are the explanatory variables and the response variable, that is, the ECL is our explanatory variable. The best fit that is determined by the smallest root of the mean square error is our chosen neural network model. With this model and with the optimistic and pessimistic projections of the macroeconomic variables associated, we forecast each of the scenarios, optimistic and pessimistic, in a multivariate way.

We recognize loss allowances for ECL on the following financial instruments that are not measured at Fair Value Though Profit or Loss (FVTPL):

- Loans and lease receivables and other accounts receivable.

- No credit impairment loss is recognized on equity investments.

## *Deferred Income Tax*

We evaluate the time over which income tax assets will be realized. The deferred tax assets represent income taxes that are recoverable through future deductions to taxable income and are registered in the statement of financial position. The deferred tax assets are recoverable as long as it is probable that related tax revenue will be realized. Future tax revenue and the amount of tax benefits that are probable in the future are based on medium term plans prepared by the management. The business plan is based on management's expectations, which are considered reasonable under the circumstances.

## *Estimates for Contingencies*

We estimate and register an estimate for contingencies to cover possible losses due to labor cases, civil proceedings, fiscal claims and others according to the circumstances that, based on the opinion of external legal advisors and/or internal attorneys, are considered probable losses and can be reasonably estimated. Given the nature of the claims, cases, and/or proceedings it is not possible to make an accurate prediction or reasonably quantify an amount of loss sometimes. For this reason, the actual amount of the disbursements made due to claims, cases, and/or proceedings is generally different than the estimated amounts that were initially provisioned. Said differences are recognized in the year they are incurred. See Note 18 to our Annual Financial Statements.

## New Accounting Standards Implemented

Below is a summary of the standards that have been implemented by the Company for annual periods starting on or after January 1, 2017. See Note 3 to our Annual Financial Statements.

## *IFRS 9 Financial Instruments and associated amendments to various other standards*

IFRS 9 replaces the multiple classification and measurement models in IAS 39 Financial instruments: Recognition and measurement with a single model that has initially only two classification categories: amortized cost and fair value. IFRS 9 became effective for annual periods beginning on or after January 1, 2018.

## *IFRS 15 Revenue from Contracts with Customers*

In May 2014, IFRS 15 was issued which establishes a single comprehensive model for entities to use in accounting for revenue arising from contracts with customers. IFRS 15 became effective for annual periods beginning on or after January 1, 2018.

IFRS 15 only covers revenue arising from contracts with customers. Under IFRS 15, a customer of an entity is a party that has contracted with the entity to obtain goods or services that are an output of the entity's ordinary activities in exchange for consideration. Unlike the se of IAS 18, the recognition and measurement of interest income and dividend income from debt and equity investments are no longer within the se of IFRS 15. Instead, they are within the set of Financial Instruments: Recognition and Measurement IFRS 9 Financial Instruments.

As mentioned above, the new revenue standard has a single model to deal with revenue from contracts with customers. Its core principle is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. For more information, see Note 3 to our Annual Financial Statements.

### IFRS 16 Leases

IFRS 16 provides a comprehensive model for the identification of lease arrangements and their treatment in the financial statements of both lessees and lessors. IFRS 16 was effective for annual periods beginning on or after January 1, 2019.

### IFRIC 23 Uncertainty regarding the Treatment of Income Taxes

IFRIC 23 was issued in May 2017, and clarifies how to apply the recognition and measurement requirements of IAS 12 when there is uncertainty regarding the treatment of income tax. In this circumstance, an entity recognizes and measures its asset or liability for deferred or current taxes by applying the requirements of IAS 12 based on taxable profit (tax loss), tax bases, unused fiscal losses, unused tax credits and tax rates determined by applying this Interpretation.

The Company evaluates the potential impacts of this interpretation on its financial statements but has not yet identified any situations that may require changes in the financial statements.

## Results of Operations for the Nine Months Ended September 30, 2023 Compared to the Nine Months Ended September 30, 2022

The comparative financial statements as September 30, 2023, and September 30, 2022, are unaudited.

### Interest Income and Similar

For the nine months ended September 30, 2023, our revenues were comprised of interest income (80%) and revenue from contracts with customers, which includes commissions from sales of insurance products and fees from credit cards (20%).

The following chart summarizes our interest income for the periods described therein:

| | For the Nine Months Ended September 30, | | | |
| --- | --- | --- | --- | --- |
| | **2023** | **2023** | **2022** | **Percent Change** |
| | | **(unaudited)** | | |
| | **(in thousands of US$)[1]** | **(in millions of Ps.)** | | |
| Interest income | 53,479 | 216,793 | 248,599 | (13)% |
| Commissions and fees | 13,286 | 53,860 | 91,209 | (41)% |
| **Interest income and similar** | 66,766 | 270,653 | 339,808 | **(20)%** |

(1) Solely for the convenience of the reader, Colombian peso amounts have been translated into U.S. dollars at the market rate as of September 30, 2023 of Ps. 4,053.76 to US$ 1.00. See "Exchange Rates and Foreign Exchange Controls" for information on recent fluctuations in exchange rates.

For the nine months ended September 30, 2023, interest income decreased 13% and revenue from contracts with customers, including commissions and fees, decreased 41%. Interest income decreased as a result of a decrease in disbursements due to the narrowing of funds in the capital markets and a the general perception of nonbank financial

instututions ("NBFIs") by financial markets as a result of the bankruptcy of certain NBFIs in the region in recent years and high interest rates worldwide that affect consumers' decisions on credits. Similarly, the sale of our credit card business unit was carried out in 2023, which resulted in lower interest and commission income.

Under IFRS, results from trusts are accounted in each line item of our statement of income. Therefore, their interest income and expenses are part of the total interest income and of the financial costs (interest).

*Financial Costs (Interest)*

For the nine months ended September 30, 2023, financial costs (interest) increased 36%, from Ps. 256,907 million (US$ 63 million) for the nine months ended September 30, 2022 to Ps. 348,279 million (US$ 86 million) for the same period in 2023 as a result of an accelerated increase in interest rates in the second half of 2022, which is fully reflected in 2023, due to the growth of the IBR rate, which was 7.2% on average in 2022 and 13.0% on average in 2023, a repricing effect on the cost of funding of more than 480 bps.

*Net Interest Margin (NIM)*

We analyze our net interest margin (NIM) as follows:

| | For the nine months ended September 30, | | | |
| --- | --- | --- | --- | --- |
| | 2023 | 2023 | 2022 | Percent Change |
| | | (unaudited) | | |
| | (in thousands of US$ ) (1) | (in millions of Ps.) | | |
| Interest income, excluding transaction costs and fair value | 59,710 | 242,050 | 278,057 | (13)% |
| Financial costs (interest) | (85,915) | (348,279) | (256,907) | 36% |
| Exchange Rate Differences | 60,527 | 245,363 | (38,590) | 736% |
| **Net interest margin, excluding transaction costs and fair value (NIM)** | **34,322** | **139,134** | **(17,440)** | **898%** |

(1)    Solely for the convenience of the reader, Colombian peso amounts have been translated into U.S. dollars at the market rate as of September 30, 2023 of Ps. 4,053.76 to US$ 1.00. See "Exchange Rates and Foreign Exchange Controls" for information on recent fluctuations in exchange rates.

Net interest margin, excluding transaction costs and fair value (NIM) increased 898% during the nine months ended September 30, 2023 as compared to the same period in 2022 due to the reduction of financial obligations as a result of the proceeds from the capitalization from a new shareholder carried out in the first half of 2023 and the changes in the exchange rate during the period.

*Impairment of Financial Assets Loan Portfolio*

Impairment expense of financial assets loan portfolio increased 50% from Ps. 54,549 million (US$ 13 million) for the nine months ended September 30, 2022 to Ps. 81,703 million (US$ 20 million) for the same period in 2023, due to high interest rates worldwide and macroeconomic conditions in Colombia that led to the generation of a greater volume of provisions as the customers' ability to pay was reduced mainly in the credit card business.

*Gross Financial Margin*

Gross financial margin increased 516%, from Ps. (18,310) million (US$ (5) million) for the nine months ended September 30, 2022 to Ps. 76,246 million (US$ 19 million) for the same period in 2023, primarily due to the positive impact in the exchange rate differences.

The following chart summarizes our gains from operating activities for the periods described therein:

| | For the Nine Months Ended September 30, | | | |
| | 2023 | 2023 | 2022 | Percent Change |
| | (unaudited) | | | |
| | (in thousands of US$)[1] | (in millions of Ps.) | | |
|---|---|---|---|---|
| Interest income and similar (2) | 66,766 | 270,653 | 339,808 | (20)% |
| Financial costs (interest) | (85,915) | (348,279) | (256,907) | 36% |
| Exchange rate differences | 60,527 | 245,363 | (38,590) | 736% |
| **Net interest and similar** | 41,378 | 167,737 | 44,311 | 279% |
| Impairment of financial assets loan portfolio | (20,155) | (81,703) | (54,549) | 50% |
| Impairment of other accounts receivable | (2,415) | (9,788) | (8,072) | 21% |
| **Gross financial margin** | 18,809 | 76,246 | (18,310) | 516% |

(1) Solely for the convenience of the reader, Colombian peso amounts have been translated into U.S. dollars at the market rate as of September 30, 2023 of Ps. 4,053.76 to US$ 1.00. See "Exchange Rates and Foreign Exchange Controls" for information on recent fluctuations in exchange rates.

(2) Includes revenue from contracts with customers.

### *Selling, General and Administrative Expenses (SG&A)*

SG&A expenses are comprised of employee benefits, depreciation and amortization and other expenses. Other expenses are comprised mainly of commissions, technical assistance consultancy fees for the implementation of software (core and loan administration) and cost control initiatives consulting services, other expenses of the free-standing trusts (tax on financial transactions and commissions), taxes, fees, insurance, and advertising.

Employee benefits decreased by 10% for the nine months ended September 30, 2023 due to a reduction in the number of employees of the Company, due to the implementation of a digital innovation model in May 2019 and the automation in operational processes. Expenses for depreciation and amortization increased 1% in the same period and expenses for depreciation of right of use assets resulting from the amortization of intangible assets were Ps. 2,048 million (US$ 1 million)] which have historically increased annually due to the credit card business model. Furthermore, other expenses increased 5% from Ps. 57,042 million (US$ 14 million) to Ps. 59,050 million (US$ 15 million) due to the increase in expenses related to fees and taxes resulting from the capitalization in the first half of 2023 and other financing structures.

| | For the Nine Months Ended September 30, | | | |
| | 2023 | 2023 | 2022 | Percent Change |
| | (unaudited) | | | |
| | (in thousands of US$ ) (1) | (in millions of Ps.) | | |
|---|---|---|---|---|
| SG&A | | | | |
| Employee benefits | (2,395) | (9,707) | (10,835) | (10)% |
| Expense for depreciation and amortization | (1,156) | (4,685) | (4,649) | 1% |
| Depreciation for right of use assets | (505) | (2,048) | (1,543) | 33% |
| Other | (14,764) | (59,850) | (57,042) | 5% |
| **Total Other expenses** | **(18,820)** | **(76,290)** | **(74,069)** | 3% |

(1) Solely for the convenience of the reader, Colombian peso amounts have been translated into U.S. dollars at the market rate as of September 30, 2023 of Ps. 4,053.76 to US$ 1.00. See "Exchange Rates and Foreign Exchange Controls" for information on recent fluctuations in exchange rates.

### Net Operating Income

As a result of the above, net operating income increased 99.9% from Ps. (92,379) million (US$ (23) million) for the nine months ended September 30, 2022 to Ps. (44) million (US$ 11 thousand) for the same period in 2023.

### Net Financial Income or Financial Expenses

Net financial income or financial expenses include: (i) financial income from the investment of our available cash and (ii) other income which includes collection charges from payroll loans and interest from recovered loans from previous periods.

Financial income increased 6%, from Ps. 7,007 million (US$ 2 million) for the nine months ended September 30, 2022 to Ps. 7,436 million (US$ 2 million) for the same period in 2023, primarily due to the improvement in interest rates of the banking accounts to manage the company´s liquidity. Financial expenses decreased 67% from Ps. 9 million (US$ 2 thousand) for the nine months ended September 30, 2023 to Ps. 3 million (US$ 1 thousand) for the same period in 2023, mainly due to the impact of the derivatives valuation.

Consequently, the net financial result changed from a net financial income of Ps. 6,998 million (US$ 2 million) in the nine months ended September 30, 2022 to a net financial expense of Ps. 7,433 million (US$ 2 million) in the nine months ended September 30, 2023.

| | For the Nine Months Ended September 30, | | | |
| --- | --- | --- | --- | --- |
| | 2023 | 2023 | 2022 | Percent Change |
| | (unaudited) | | | |
| | (in thousands of US$) [1] | (in millions of Ps.) | | |
| **Net Operating Income** | (11) | (44) | (92,379) | |
| Other income | 321 | 1,302 | 2,260 | (42)% |
| Financial Income | 1,513 | 6,134 | 4,747 | 29% |
| **Financial income** | 1,834 | **7,436** | 7,007 | **6%** |
| Financial expenses | | | | |
| Derivative instruments valuation | (1) | (3) | (9) | -67% |
| **Financial expenses** | (1) | **(3)** | **(9)** | **-67%** |
| **Net financial Income (expense)** | **1,834** | **7,433** | **6,998** | **6%** |

(1) Solely for the convenience of the reader, Colombian peso amounts have been translated into U.S. dollars at the market rate as of September 30, 2023 of Ps. 4,053.76 to US$ 1.00. See "Exchange Rates and Foreign Exchange Controls" for information on recent fluctuations in exchange rates.

### Taxes

Income tax increased 108.4% from Ps. (18,604) million (US$ 5 million) to Ps. 1,557 million (US$ 384 thousand) between September 2022 and September 2023, mainly due to the impact of the valuation of financial instruments in the deferred taxes balance and the exchange rate differences.

*Net Income*

Net income for the nine months ended September 30, 2023 was Ps. 5,832 million (US$ 1,439 thousand), an increase of 109% compared to the same period in 2022, mainly driven by the changes described above.

**Results of Operations for the Year Ended December 31, 2022 Compared to the Year Ended December 31, 2021**

*Interest Income and Similar*

For the year ended December 31, 2022, our interest income and similar was comprised of (i) interest income (72%) and (ii) revenue from contracts with customers, which includes commissions and fees (28%).

| | For the Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2022 | 2022 | 2021 | Percent Change |
| | (in thousands of US$) [1] | (in millions of Ps.) | | |
| Interest income | 70,741 | 286,766 | 321,174 | (11)% |
| Commissions and fees | 27,907 | 113,128 | 115,452 | (2)% |
| **Interest income and similar** | **98,648** | **399,894** | **436,626** | **(8)%** |

(1) Solely for the convenience of the reader, Colombian peso amounts have been translated into U.S. dollars at the market rate as of September 30, 2023 of Ps. 4,053.76 to US$ 1.00. See "Exchange Rates and Foreign Exchange Controls" for information on recent fluctuations in exchange rates.

Interest income and similar decreased 8% due to lower commissions and fees and interest income as follows:

*Interest income*: For the year ended December 31, 2022, our interest income decreased by 11% from Ps. 321,174 million (US$ 79 million) in 2021 to Ps. 286,766 million (US$ 71 million) in 2022 due to a the decrease in disbursements resulting from the decrease in funding sources in the capital markets as an effect of the general perception of NBFIs in the region resulting from the bankruptcy of certain NBFIs in the region in recent years, and due to the liquidity strategy carried out in 2022 for the contractual payments of the bonds due in 2022. Figures as of December 31, 2022 include transaction costs for loan origination and fair value of loan portfolio for Ps. 69,815 million (US$ 17 million).

*Revenue from contracts with customers (Commissions and fees):* Commissions and fees correspond mainly to fees related to the sale of mandatory insurance products through our network (debtor life insurance, voluntary insurance products, etc.), collection fees and administration fees. Administration fees are monthly fees charged in our credit card business to those clients with an active credit card with outstanding balance, therefore it is a recurring income that changes based on the number of credit cards issued. During 2022, commissions and fees decreased by 2%, to Ps. 113,128 million (US$ 28 million), mainly due to the decrease in credit card disbursements, which have a direct impact on commissions in both the handling fee and advance commissions. Similarly, the lower disbursement made in payroll generated lower FGA commissions.

*Financial Costs (Interest)*

Financial costs (interest) reached Ps. 491,269 million (US$ 121 million) for the year ended December 31, 2022, due to the increase in the interest rates of the Central Bank, since 36% of the financing is at a floating rate, with the IBR being the reference for these obligations. The IBR increased from 2.9% in 2021 to 11.9% in 2022, which had a direct impact on the financial costs.

*Net Interest Margin (NIM)*

We analyze our net interest margin (NIM) as follows:

| For the Year Ended December 31, |
|---|

| | 2022 | 2022 | 2021 | Percent Change |
|---|---|---|---|---|
| | (in millions of US$) (1) | (in millions of Ps.) | | |
| Interest income, excluding of transaction costs and fair value | 87,963 | 356,581 | 358,611 | (1)% |
| Financial costs (interest) | (121,188) | (491,269) | (235,607) | 109% |
| Exchange Rate Differences | (30,035) | (121,755) | 844 | (14,526)% |
| Net interest margin, excluding transaction costs and fair value (NIM) | (63,261) | (256,443) | 123,848 | (307)% |

(1) Solely for the convenience of the reader, Colombian peso amounts have been translated into U.S. dollars at the market rate as of September 30, 2023 of Ps. 4,053.76 to US$ 1.00. See "Exchange Rates and Foreign Exchange Controls" for information on recent fluctuations in exchange rates.

Net interest margin (excluding transaction costs and fair value) (NIM) decreased by 307% compared to December 31, 2021. The NIM was affected by the exchange difference due to the strategy adopted by the Company in relation to liquidity. The Company prioritized the payment of obligations to obtain greater liquidity.

### *Impairment of Financial Assets Loan Portfolio*

During 2022, impairment of financial assets loan portfolio increased 2% from Ps. 81,822 million (US$ 20 million) in 2021 to Ps. 83,739 million (US$ 21 million) due to the macroeconomic factors worldwide as well as in Colombia, where the credit card portfolio had a higher level of NPL compared to 2021.

### *Gross Financial Margin*

Gross financial margin decreased by 390%, from Ps. 106,181 million (US$ 26 million) in 2021 to Ps. (308,167) million (US$(76) million) in 2022, primarily due to a large increase in financial cost and exchange differences, as explained above.

The following chart summarizes our gains from operating activities for the periods described therein:

| | For the Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2022 | 2022 | 2021 | Percent Change |
| | (in thousands of US$) (1) | (in millions of Ps.) | | |
| Interest income and similar (2) | 98,648 | 399,894 | 436,626 | (8)% |
| Financial costs (interest) | (121,188) | (491,269) | (235,607) | 109% |
| Exchange rate differences | (30,035) | (121,755) | 844 | (14526)% |
| Net interest and similar | (52,576) | (213,130) | 201,863 | (206)% |
| Impairment of financial assets loan portfolio | (20,657) | (83,739) | (81,822) | 2% |
| Impairment of other accounts receivable | (2,787) | (11,298) | (13,860) | (18)% |
| Gross financial margin | (76,020) | (308,167) | 106,181 | (390)% |

(1) Solely for the convenience of the reader, Colombian peso amounts have been translated into U.S. dollars at the market rate as of September 30, 2023 of Ps. 4,053.76 to US$ 1.00. See "Exchange Rates and Foreign Exchange Controls" for information on recent fluctuations in exchange rates.

(2) Includes revenue from contracts with customers.

### Selling, General and Administrative Expenses (SG&A)

SG&A expenses are comprised of employee benefits, depreciation and amortization and other expenses. Other expenses are comprised mainly of commissions, technical assistance consultancy fees for the implementation of software (core and loan administration) and cost control initiatives consulting services, other expenses of the free-standing trusts (tax on financial transactions and commissions), taxes, fees, insurance, and advertising.

Employee benefits increased 7% due to the 10% increase in the minimum wage presented in 2022.

Total other expenses increased from Ps. 80,004 million (US$ 20 million) in 2021 to Ps. 88,880 million (US$ 22 million) in 2022, mainly due to an increase in fees and leases.

| | For the Year Ended December 31, | | | Percent Change |
|---|---|---|---|---|
| | 2022 | 2022 | 2021 | |
| | (in thousands of US$) [(1)] | (in millions of Ps.) | | |
| SG&A | | | | |
| Employee benefits | (3,542) | (14,358) | (13,409) | 7% |
| Expense for depreciation and amortization | (1,535) | (6,222) | (6,185) | 1% |
| Expense for depreciation of right of use assets | (507) | (2,056) | (2,156) | (5)% |
| Other | (21,925) | (88,880) | (80,004) | 11% |
| **Total Other expenses** | **(27,509)** | **(111,516)** | **(101,754)** | **10%** |

(1) Solely for the convenience of the reader, Colombian peso amounts have been translated into U.S. dollars at the market rate as of September 30, 2023 of Ps. 4,053.76 to US$ 1.00. See "Exchange Rates and Foreign Exchange Controls" for information on recent fluctuations in exchange rates.

### Net Operating Income

Net operating income decreased 9,580% from Ps. 4,427 million (US$ 1 million) in 2021 to Ps. (419,683) million (US$ (104) million) in 2022, as a result of the factors described above.

### Net Financial Income or Financial Expenses

Net financial income or financial expenses include: (i) financial income from the investment of our available cash and (ii) other income which includes collection charges from payroll loans and interest from recovered loans from previous periods.

Net Financial income increased 428%, from an income of Ps. 1,833 million (US$ 452 thousand) in 2021 to an income of Ps. 9,679 million (US$ 2 million) in 2022, mainly as a result of excess liquidity that was optimized with banks with higher returns.

| | For the Year Ended December 31, | | | Percent Change |
|---|---|---|---|---|
| | 2022 | 2022 | 2021 | |
| | (in thousand of US$) [(1)] | (in millions of Ps.) | | |
| Financial income: | | | | |
| Other Income | 523 | 2,122 | 940 | 126% |
| Financial income | 1,866 | 7,566 | 937 | 707% |
| **Total financial income** | **2,390** | **9,688** | **1,877** | **416%** |

| Financial expenses | | | | |
|---|---|---|---|---|
| Derivative instruments valuation | (2) | (9) | (44) | (80)% |
| **Total financial expenses** | (2) | (9) | (44) | -80% |
| | - | | | |
| **Net financial income (expense)** | **2,388** | **9,679** | **1,833** | **428%** |

_____

(1) Solely for the convenience of the reader, Colombian peso amounts have been translated into U.S. dollars at the market rate as of September 30, 2023 of Ps. 4,053.76 to US$ 1.00. See "Exchange Rates and Foreign Exchange Controls" for information on recent fluctuations in exchange rates.

## *Taxes*

Income tax decreased from Ps. 324 million (US$ 80 thousand) in 2021 to Ps. (107,545) million (US$ 75 million) in 2022 mainly due to.the deferred tax in favor originated in the loss presented in the given period that allowed the company to offset the losses.

## *Net Income*

Net income decreased by 5,195% from Ps. 5,936 million (US$ 1 million) in 2021 to Ps. (302,459) million (US$ (75) million) in 2022. The decrease was driven primarily by the changes described above.

## **Results of Operations for the Year Ended December 31, 2021 Compared to the Year Ended December 31, 2020**

The annual audited financial statements as of and for the years ended December 31, 2021 and 2020 include certain reclassifications between the financial cost and derivative instrument valuation line items that were made to conform the information presented in 2020 and 2019.

## *Interest Income and Similar*

For the year ended December 31, 2021, our interest income and similar was comprised of (i) interest income (74%) and (ii) commissions and fees (26%).

| | For the Year Ended December 31, | | | |
|---|---|---|---|---|
| | **2021** | **2021** | **2020** | **Percent Change** |
| | **(in thousands of US$)** [(1)] | **(in millions of Ps.)** | | |
| Interest income | 79,229 | 321,174 | 290,980 | 10% |
| Commissions and fees | 28,480 | 115,452 | 85,550 | 35% |
| **Interest income and similar** | 107,709 | **436,626** | **376,530** | **16%** |

_____

(1) Solely for the convenience of the reader, Colombian peso amounts have been translated into U.S. dollars at the market rate as of September 30, 2023 of Ps. 4,053.76 to US$ 1.00. See "Exchange Rates and Foreign Exchange Controls" for information on recent fluctuations in exchange rates.

Interest income and similar increased 16% due to higher commissions and fees and interest income as follows:

*Interest income*: For the year ended December 31, 2021, our interest increased by 10% from Ps. 290,980 million (US$ 72 million) to Ps. 321,174 million (US$ 79 million) as the result of an increasing pricing power among our niche market in different regions amidst a low interest rate environment. As a result, the yield of our loan portfolio increased to 24% in 2021. Figures as of December 31, 2021 include transaction costs for loan origination and fair value of loan portfolio of Ps. 24,472 million (US$ 6 million).

*Revenue from contracts with customers (Commissions and fees):* Commissions and fees correspond mainly to fees related to the sale of mandatory insurance products through our network (debtor life insurance, voluntary insurance products, etc.), collection fees and administration fees. Administration fees are monthly fees charged in our credit card business to

those clients with an active credit card with outstanding balance, therefore it is fluctuating income that changes based on the number of credit cards issued. During 2021, commissions and fees increased by 35%, to Ps. 115,452 million (US$ 21 million), mostly due to reactivation of the credit card business, which resulted in a greater volume of disbursements with a growth of 61%, increasing from Ps. 391,499 million in 2020 to Ps. 631,422 in 2021, which is reflected in higher management fees, advance commissions and commissions.

### Financial Costs (Interest)

Financial costs (interest) reached Ps. 235,607 million (US$ 48 million) for the year ended December 31, 2021, due to new funding sources for the on-balance sheet portfolio which had a year over year growth of 15.2%.

### Net Interest Margin (NIM)

We analyze our net interest margin (NIM) as follows:

| | For the Year Ended December 31, | | | Percent Change |
|---|---|---|---|---|
| | 2021 | 2021 | 2020 | |
| | (in thousands of US$) (1) | (in millions of Ps.) | | |
| Interest income, excluding of transaction costs and fair value | 88,464 | 358,611 | 315,454 | 14% |
| Financial costs (interest) | (58,121) | (235,607) | (186,988) | 26% |
| Exchange Rate Differences | 208 | 844 | 4,0934,041 | (79)% |
| Net interest margin, excluding transaction costs and fair value (NIM) | 30,551 | 123,848 | 132,559 | -7% |

(1) Solely for the convenience of the reader, Colombian peso amounts have been translated into U.S. dollars at the market rate as of September 30, 2023 of Ps. 4,053.76 to US$ 1.00. See "Exchange Rates and Foreign Exchange Controls" for information on recent fluctuations in exchange rates.

Net interest margin (excluding transaction costs and fair value) (NIM) decreased by 7% as compared to December 31, 2020 due to a 21% increase in financial costs due to a 19% increase in the liabilities to leverage the growth of the portfolio and higher interest expense related to the Old Notes (in 2020 accrued interest on the bond was 11 months, and in 2021 was 12 months), offset by a 15.2% increase in the owned portfolio that increased income from interest.

### Impairment of Financial Assets Loan Portfolio

During 2021, impairment of financial assets loan portfolio decreased 19% from Ps. 101,444 million (US$ 25 million) in 2020 to Ps. 81,822 million (US$ 20 million) due to the Company's implementation of collection strategies through the government-sponsored relief program that could be offered to clients due to the COVID-19 pandemic, which led to payment agreements with clients that adjusted to the client's cash flow.

Impairment of other accounts receivable was Ps. 13,860 million (US$ 3 million) for the year ended December 31, 2021.

### Gross Financial Margin

Gross financial margin increased by 15%, from Ps. 92,017 million (US$ 23 million) in 2020 to Ps. 106,181 million (US$ 26 million) in 2021, primarily due to an increase in net interest and similar and the decrease in the impairment expenses for loans, as explained above.

The following chart summarizes our gains from operating activities for the periods described therein:

| | For the Year Ended December 31, | | | |
|---|---|---|---|---|
| | **2021** | **2021** | **2020** | **Percent Change** |
| | (in thousands of US$ ) [1] | (in millions of Ps.) | | |
| Interest income and similar | 107,709 | 436,626 | 376,530 | 16% |
| Financial costs (interest) | (58,121) | (235,607) | (186,988) | 26% |
| Exchange rate differences | 208 | 844 | 4,093 | (79)% |
| **Net interest and similar** | **49,796** | **201,863** | **193,635** | **4%** |
| | | | | |
| Impairment of financial assets loan portfolio | (20,184) | (81,822) | (101,444) | (19)% |
| Impairment of other accounts receivable | (3,419) | (13,860) | (174) | 7,866% |
| **Gross financial margin** | **26,193** | **106,181** | **92,017** | **15%** |

(1) Solely for the convenience of the reader, Colombian peso amounts have been translated into U.S. dollars at the market rate as of September 30, 2023 of Ps. 4,053.76 to US$ 1.00. See "Exchange Rates and Foreign Exchange Controls" for information on recent fluctuations in exchange rates.

## *Selling, General and Administrative Expenses (SG&A)*

SG&A expenses are comprised of employee benefits, depreciation and amortization and other expenses. Other expenses are comprised mainly of commissions, technical assistance consultancy fees for the implementation of software (core and loan administration) and cost control initiatives consulting services, other expenses of the free-standing trusts (tax on financial transactions and commissions), taxes, fees, insurance, and advertising.

Employee benefits decreased 3% and depreciation and amortization increased 5%. Depreciation and amortization expenses increased resulting from investments in digital process for payroll and credit card origination.

Total other expenses increased 16% from Ps. (68,878) million (US$ 20 million) in 2020 to Ps. (80,004) million (US$ 22 million) in 2021, mainly due to an increase in fees, technical assistance expenses and taxes.

| | For the Year Ended December 31, | | | |
|---|---|---|---|---|
| | **2021** | **2021** | **2020** | **Percent Change** |
| | (in thousands of US$ ) [1] | (in millions of Ps.) | | |
| SG&A | | | | |
| Employee benefits | (3,308) | (13,409) | (13,839) | (3)% |
| Expense for depreciation and amortization | (1,526) | (6,185) | (5,915) | 5% |
| Depreciation of right of use assets | (532) | (2,156) | (1,954) | 10% |
| Other | **(19,736)** | (80,004) | (68,878) | 16% |
| **Total other expenses** | (25,101) | **(101,754)** | (90,586) | **12%** |

(1) Solely for the convenience of the reader, Colombian peso amounts have been translated into U.S. dollars at the market rate as of September 30, 2023 of Ps. 4,053.76 to US$ 1.00. See "Exchange Rates and Foreign Exchange Controls" for information on recent fluctuations in exchange rates.

## *Net Operating Income*

Net operating income increased 178% from Ps. (5,641) million (US$ (1) million) in 2020 to Ps. 4,427 million (US$ 1 million) in 2021, as a result of the factors described above.

## *Net Financial Income or Financial Expenses*

Net financial income or financial expenses include: (i) the effect of valuation and exchange rate differences resulting from financial derivatives used to hedge our financial liabilities in foreign currency, (ii) financial income from the investment of our available cash and (iii) other income which includes collection charges from payroll loans and interest from recovered loans from previous periods.

Financial income decreased 70%, from Ps. 6,213 million (US$ 2 million) in 2020 to Ps. 1,877 million (US$ 436 thousand) in 2021, mainly as a result of derivates instrument valuation, and less excess cash that decreased financial returns for 2021.

Financial expenses decreased 56% from Ps. 101 million (US$ 25 thousand) in 2020 to Ps. (44) million (US$11 thousand) in 2021.

| | For the Year Ended December 31 | | | |
| --- | --- | --- | --- | --- |
| | 2021 | 2021 | 2020 | Percent Change |
| | (in thousands of US$ )(1) | (in millions of Ps.) | | |
| Financial income: | | | | |
| Other income | 232 | 940 | 2,678 | (65)% |
| Financial income | 231 | 937 | 3,535 | (73)% |
| **Total financial income** | 463 | **1,877** | **6,213** | **(70)%** |
| Financial expenses | | | | |
| Derivatives instrument valuation | (11) | (44) | (101) | 56% |
| **Total financial expenses** | (11) | **(44)** | **(101)** | 56% |
| **Net financial income (expense)** | 452 | **1,833** | **6,112** | **(70)%** |

(1)   Solely for the convenience of the reader, Colombian peso amounts have been translated into U.S. dollars at the market rate as of September 30, 2023 of Ps. 4,053.76 to US$ 1.00. See "Exchange Rates and Foreign Exchange Controls" for information on recent fluctuations in exchange rates.

## *Taxes*

Income tax decreased from Ps. (2,319) million (US$ (1) million) in 2020 to Ps. (324) million (US$ 80 thousand) in 2021 mainly due to exchange rate differences that were deducible in the fiscal taxes report.

## *Net Income*

Net income increased by 14% from Ps. 5,224 million (US$ 1 million) in 2020 to Ps. 5,936 million (US$ 1 million) in 2021. The increase was driven primarily by the changes described above.

## **Analysis of Cash Flows**

The following table summarizes our generation and use of cash for the periods presented:

| For the Nine Months Ended September 30, | | For the Year Ended December 31 | | |
| --- | --- | --- | --- | --- |
| 2023 | 2022 | 2022 | 2021 | 2020 |
| (unaudited) | | | | |
| (in millions of Ps.) | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Net cash provided by (used in) operating activities | 389,410 | 171,532 | 430,273 | 288,828 | (200,317) |
| Net cash provided by (used in) investing activities | 414 | 211 | 233 | 10,413 | (33,668) |
| Net cash provided by (used in) financing activities | (567,247) | (106,859) | (305,968) | (415,027) | 334,432 |
| Net cash inflow/outflow | (177,423) | 64,884 | 124,538 | (115,786) | 100,448 |

## Cash Flows for the Nine Months Ended September 30, 2023 Compared to the Nine Months Ended September 30, 2022

Taking into account our cash flows from operations, cash flows from financing activities and cash flows from investing activities, we had a net cash outflow of Ps. 177,423 million (US$ 44 million) for the nine months ended September 30, 2023, compared to a net cash inflow of Ps. 64,884 million (US$ 16 million) for the nine months ended September 30, 2022.

*Operating Activities.* Our net cash provided in operating activities increased to Ps. 389,410 million (US$ 96 million) for the nine months ended September 30, 2023 from Ps. 171,532 million (US$ 42 million) for the same period in 2022. This change was primarily due to lower disbursements of loans in payrolls and credit cards, and strategies in collection to improve NPL´s and excess cash.

*Investing Activities.* Our net cash used in investing activities decreased for the nine months ended September 30, 2023 to Ps. 414 million (US$ 102 thousand) as a result of the decrease of investments in mutual funds.

*Financing Activities.* Our net cash used in financing activities increased for the nine months ended September 30, 2023 to Ps. 567,247 million (US$ 140 million) from Ps. 106,859 million (US$ 26 million) for the same period in 2022. This change was primarily due to an increase in the need for additional prepayment financing in collateral facilities, and the partial cancellation of the Old Notes (as defined herein) in 2023 with resources provided by the capitalization made by a new shareholder for Ps. 273.980 million (US$ 68 million), and payment upon maturity of derivatives.

## Cash Flows for the Year Ended December 31, 2022 Compared to the Year Ended December 31, 2021

Taking into account our cash flows from operations, cash flows from financing activities and cash flows from investing activities, we had a net cash inflow of Ps. 124,538 million (US$ 31 million) for the year ended December 31, 2022, compared to a net cash outflow of Ps. 115,786 million (US$ 29 million) for the year ended December 31, 2021.

*Operating Activities.* Our net cash provided by operating activities increased to Ps. 430,273 million (US$ 106 million) for the year ended December 31, 2022, from Ps. 288,828 million (US$ 71 million) for the year ended December 31, 2021. This change was primarily due to an increase in accrued interest from our portfolio and an increase in collections.

*Investing Activities.* Our net cash used in investing activities decreased to Ps. 10,413 million (US$ 3 million) for the year ended December 31, 2021, to an inflow from investment activities in an amount of Ps. 233 million (US$ 57 thousand) for the year ended December 31, 2022. This change was primarily due to the decrease of investments in mutual funds.

*Financing Activities.* Our net cash used in financing activities decreased for the year ended December 31, 2022 to Ps. 305,968 million (US$ 75 million) from Ps. 415,027 million (US$ 102 million) for the year ended December 31, 2021. This decrease was primarily due to liquidation of the derivatives related to the 2022 bond that generated cash for the Company.

**Cash Flows for the Year Ended December 31, 2021 Compared to the Year Ended December 31, 2020**

Taking into account our cash flows from operations, cash flows from financing activities and cash flows from investing activities, we had a net cash outflow of Ps. 115,786 million (US$ 29 million) for the year ended December 31, 2021, compared to a net cash inflow of Ps. 100,448 million (US$ 25 million) for the year ended December 31, 2020.

*Operating Activities.* Our net cash provided by operating activities increased to Ps. 288,828 million (US$ 71 million) for the year ended December 31, 2021 from an outflow of Ps. 200,317 million (US$ 49 million) for the year ended December 31, 2020. This change was primarily due to an increase in accrued interest from our portfolio.

*Investing Activities.* Our net cash provided by investing activities increased for the year ended December 31, 2021 to Ps. 10,413 million (US$ 3 million) from an outflow of Ps. 33,668 million (US$ 8 million) for the year ended December 31, 2020. This change was primarily due to a decrease in our investments in mutual funds.

*Financing Activities.* Our net cash used in financing activities increased for the year ended December 31, 2021 to Ps. 415,027 million (US$ 102 million) from an inflow of Ps. 334,432 million (US$ 82 million) for the year ended December 31, 2020. This was primarily due to payment of interest of financial liabilities and the liquidation of financial derivatives.

**Liquidity and Capital Resources**

Since our formation, we have consistently sought to diversify our funding sources. We are constantly looking for alternative forms to raise funds to finance our operations, including bank credit lines, publicly and privately issued debt and equity securities and private equity investments, among other sources of capital. We also strategically evaluate transactions from time to time to strengthen our capital structure.

The economic situation in Colombia during the second half of 2022 and 2023, combined with the general perception of NBFIs by financial markets resulting from the bankruptcy of certain NBFIs in the region in recent years, affected the availability of funding for Credivalores from our usual sources of financing locally and internationally. However, during 2023, the Company complied with the payment of its financial obligations and had shareholder support through the capital injection from a new shareholder and loans. The table below presents our projected cash flow related to outstanding loans in our loan portfolio (Collections) as well as to the outstanding financial liabilities as of September 30, 2023, including interest and principal at maturity (Obligations), during the fourth quarter of 2023 and the first, second and third quarters of 2024, on a quarterly basis and in the aggregate over those periods. As set forth in the table, assuming no material change in the default rate of our loan portfolio, our collections are expected to exceed our financial obligations for each quarter.

| | 2023 | 2024 | | | |
| | Fourth Quarter | First Quarter | Second Quarter | Third Quarter | Aggregate |
|---|---|---|---|---|---|
| | | | (in millions of Ps.) | | |
| Collections | 144,634 | 245,029 | 84,544 | 91,302 | 565,511 |
| Obligations | 121,840 | 233,529 | 67,835 | 214,192 | 637,396 |

As of September 30, 2023, our weighted debt maturity was 1.5 years. Our weighted debt maturity was 2.33 years as of December 31, 2022, and 2.13 years as of December 31, 2021.

As of September 30, 2023, Ps. 516,564 million (US$ 127.4 million), or 30.4%, of our outstanding indebtedness (excluding accrued interest) was secured by collateral.

As of September 30, 2023, we had an aggregate principal amount of Ps. 982,681 million (US$ 242.4 million) of contractual obligations denominated in U.S. dollars.

**International Funding**

*ECP Program*

As of September 30, 2023, we had a total aggregate principal amount of US$ 31.6 million outstanding under our ECP Program. In December 2023 we issued US$ 32.4 million aggregate principal amount of 10% notes due 2028 under our ECP Program in exchange for our US$ 15 million 12.50% Notes due 2023 and our US$ 15.5 million 13.0% Notes due 2024, plus capitalized interest.

*International Bonds*

In February 2020, we issued an aggregate principal amount of US$ 300 million of 8.875% Senior Notes due 2025 (the "Old Notes"). The Old Notes bear interest at a fixed rate of 8.875% per annum, which is payable on February 7 and August 7 of each year. The Old Notes mature on February 7, 2025. The outstanding principal amount of the Old Notes as of September 30, 2023, was US$ 210.8 million as a result of the capitalization in kind made by a new shareholder. The Old Notes contain certain restrictive covenants which, among other things, limit our ability to (i) incur additional debt; (ii) make certain dividend payments, redeem capital stock and make certain investments; (iii) transfer and sell assets; (iv) enter into any agreements that would limit the ability of subsidiaries to pay dividends or make distributions; (v) create liens on assets; (vi) effect a consolidation, merger or sale of assets; and (vii) enter into transactions with affiliates. The indenture governing the Old Notes (the "Old Notes Indenture") contains customary events of default. We have the right, at our option, to redeem any of the Old Notes, in whole or in part, at any time on or after February 7, 2023, at the redemption prices set forth in the Old Notes Indenture. Prior to February 7, 2023, we have the right, at our option, to redeem the Old Notes, in whole but not in part, at a redemption price equal to the greater of (i) 100% of the principal amount of such notes and (ii) the sum of the present value at such redemption date of (a) the redemption price of the Old Notes at February 7, 2023 plus (b) all required interest payments on the notes through February 7, 2023 (excluding accrued but unpaid interest to the date of redemption), discounted to the redemption date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate plus 50 basis points, plus in each case any accrued interest on the principal amount of the Old Notes to, but excluding, the date of redemption.

*Finanza Inversiones Credit Agreement*

We are a guarantor under a credit agreement entered into by Finanza Inversiones with certain of our shareholders as lenders dated as of October 25, 2022, as amended on February 3, 2023 and as further amended on March 15, 2023 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Finanza Inversiones Credit Agreement") in the amount of US$38.2 million. As of September 30, 2023, US$38.2 million was outstanding under this facility.

The Finanza Inversiones Credit Agreement contains maintenance covenants that require us to comply with certain financial ratios The Finanza Inversiones Credit Agreement also contains certain restrictive covenants applicable to us as guarantor under the facility which, among other things, limit our ability to create liens on our assets, incur additional debt and make restrictive payments.

The Finanza Inversiones Credit Agreement matured on November 15, 2023, however the outstanding loan has not been repaid. We entered into an Amended and Restated Forbearance and Waiver Agreement dated March 7, 2024 in which the lenders under the Finanza Inversiones Credit Agreement agreed to waive certain existing defaults, including the non-payment of amounts due under the facility. In addition, the lenders agreed, subject to certain termination events (i) to waive the cross default provision that will be triggered after the expiration of the applicable grace period due to the non-payment of the February 7, 2024 interest payment on the Old Notes and waive the insolvency event of default that will be triggered by a Chapter 11 filing, in order to allow the Company to proceed with the Exchange Offer and Chapter 11 Prepackaged Plan and

(ii) in the event that the Company proceeds with an exchange offer or Prepackaged Chapter 11 Plan and issues the New Notes, to waive compliance with the requirements of the lien covenant, allowing us to secure the New Notes with the Collateral.

***UBS Credit Agreement***

We are a guarantor under a credit agreement entered into by Patrimonio Autónomo PA Credivalores UBS Gramercy, represented by Fiduciaria Bancolombia S.A. Sociedad Fiduciaria, as Trustee with affiliates of certain of our shareholders as lenders dated as of dated as of May 13, 2022, as amended on July 8, 2022 and as further amended on October 13, 2022 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "UBS Credit Agreement") in the amount of US$47.7 million.  As of September 30, 2023, US$42.0 million was outstanding under this facility.  The UBS Credit Agreement matures on May 12, 2025.

The UBS Credit Agreement contains maintenance covenants that require us to comply with certain financial ratios The UBS Credit Agreement also contains certain restrictive covenants applicable to us as guarantor under the facility which, among other things, limit our ability to create liens on our assets, incur additional debt and make restrictive payments.

We entered into an Amended and Restated Forbearance and Waiver Agreement dated March 1, 2024 in which the lenders under the Finanza Inversiones Credit Agreement agreed, subject to certain termination events (i) to waive the cross default provision that will be triggered after the expiration of the applicable grace period due to the non-payment of the February 7, 2024 interest payment on the Old Notes and waive the insolvency event of default that will be triggered by a Chapter 11 filing, in order to allow the Company to proceed with the Exchange Offer and Chapter 11 Prepackaged Plan and (ii) in the event that the Company proceeds with an exchange offer or Prepackaged Chapter 11 Plan and issues the New Notes, to waive compliance with the requirements of the lien covenant, allowing us to secure the New Notes with the Collateral.

**Local Funding**

In September 2015, we closed a Ps. 270,000 million (US$ 78 million) syndicated secured loan for *TuCrédito* with six local financial institutions. This facility was completely prepaid in September 2017 with the proceeds of the issuance of the International Bonds. However, we decided to preserve the legal and operative structure of this facility, whose availability period extended until August 2018. During the first half of 2018, we disbursed this facility to fund payroll loan portfolio origination, taking advantage of lower funding costs and extended maturities of this facility compared to other alternatives denominated in U.S. dollars. Then, in November 2018 we renewed this facility with local financial institutions for an amount of Ps. 223,000 million (US$ 64.4 million). As of September 30, 2023, the outstanding balance under this facility was Ps.190,341 million (US$ 47 million).  We are currently negotiating with the bank syndicate in order to (i) amend the facility to extend the maturity date by five years, (ii) modify certain financial ratios and other covenants; and (iii) waive the cross default provision that will be triggered after the expiration of the applicable grace period due to the non-payment of the February 7, 2024 interest payment on the Old Notes, in order to allow the Company to proceed with the Exchange Offer and Chapter 11 Prepackaged Plan.

On August 26, 2021, we issued the first tranche of our inaugural domestic bond issuance of ordinary bonds with a partial guarantee from the FNG in the Colombian debt capital market. The total amount of the issuance, authorized by the Financial Superintendence of Colombia in September 2021, is Ps.160,000 million (US$ 40 million), and in August 2021 the Company issued the first tranche of bonds for an amount of Ps. 52,900 million (US$ 13 million) with a 3-year term and 9.10% coupon. Subsequently, on September 23, 2022, Credivalores issued the second tranche of the ordinary bonds with a partial guarantee of the FNG for an amount of Ps. 43,440 million (US$ 11 million) maintaining the same maturity date and coupon of the issuance of the first tranche. As of September 30, 2023, the total aggregate principal amount of ordinary bonds with a partial guarantee of the FNG outstanding was 95,940 million (US$24 million). During 2022, we also structured funding sources through secured loans with local trusts, which represents Ps. 516,564 million (US$127 million) as of September 30,2023.

## Contractual Obligations

The table below sets forth information regarding our contractual obligations (excluding accrued interest and leases) as of September 30, 2023:

|  | Total | 2023 | 2024 | 2025 | 2026 and Thereafter |
|---|---|---|---|---|---|
|  | | | (in millions of Ps.) | | |
| Debt (excluding accrued interest and mark-to-market): | | | | | |
| Short-term debt | 334,121 | 155,972 | 177,598 | 550 | - |
| Long-term debt | 1,365,990 | 23,878 | 93,737 | 1,099,917 | 148,458 |
| **Total contractual obligations (excluding accrued interest and mark-to-market)** | **1,700,111** | 179,850 | 271,336 | 1,100,467 | **148,458|** |

## Balance Sheet

We use part of our loan portfolio to secure financing structures as shown in the chart below.

### Assets

|  | As of September 30, | | As of December 31, | | Percentage Change September 2023 / December 2022 |
|---|---|---|---|---|---|
|  | 2023 | 2023 | 2022 | 2021 | |
|  | (unaudited) | | | | |
|  | (in millions of Ps.) | (in thousands of US$ ) [1] | (in millions of Ps.) | | |
| Cash and cash equivalents | 95,629 | 23,590 | 273,052 | 148,514 | -65% |
| Total financial assets at fair value | 23,846 | 5,882 | 104,940 | 377,965 | (77)% |
| Total loan portfolio, net | 1,494,732 | 368,727 | 1,632,832 | 1,715,871 | (8)% |
| Accounts receivable, net | 281,052 | 69,331 | 320,129 | 436,872 | (12)% |
| Total financial assets at amortized cost | 1,775,784 | 438,058 | 1,952,961 | 2,152,743 | (9)% |
| Investments in associates and affiliates | 12,616 | 3,112 | 14,945 | 12,369 | (16)% |
| Current tax assets | 37,972 | 9,367 | 32,012 | 22,245 | 19% |
| Deferred tax assets, net | 127,795 | 31,525 | 157,736 | 43,409 | (19)% |
| Property and equipment, net | 153 | 38 | 173 | 229 | (12)% |

| | As of September 30, | | As of December 31, | | Percentage Change |
|---|---|---|---|---|---|
| | 1,232 | 304 | 2,021 | 4,298 | (39)% |
| Assets of right of use | 1,232 | 304 | 2,021 | 4,298 | (39)% |
| Intangible assets other than goodwill, net | 36,828 | 9,085 | 39,852 | 44,111 | (8)% |
| **Total assets** | **2,111,855** | 520,962 | **2,577,692** | 2,805,883 | **(18)%** |

(1)     Solely for the convenience of the reader, Colombian peso amounts have been translated into U.S. dollars at the market rate as of September 30, 2023 of Ps. 4,053.76 to US$ 1.00. See "Exchange Rates and Foreign Exchange Controls" for information on recent fluctuations in exchange rates.

## Cash and Cash Equivalents

Cash and cash equivalents, valued at fair value under FRAS-IFRS include our liquidity and short-term investments of our trusts, which are held on investment funds.

As of September 30, 2023, cash and cash equivalents amounted to Ps. 95,629 million (US$ 24 million), and represent 5% of our total assets.

| | As of September 30, | | As of December 31, | | Percentage Change |
|---|---|---|---|---|---|
| | **2023** | **2023** | **2022** | **2021** | **Sep. 2023 / Dec. 2022** |
| | (unaudited) | | | | |
| | (in thousands of US$ ) [(1)] | (in millions of Ps.) | (in millions of Ps.) | (in millions of Ps.) | |
| Cash in hand | 0 | 2 | 2 | 2 | 0 |
| Banks | 18,609 | 75,435 | 245,087 | 121,520 | (69)% |
| Mutual funds | 1,982 | 8,035 | 15,701 | 4,623 | (49)% |
| Certificates of deposit | 2,999 | 12,157 | 12,021 | 22,202 | 1% |
| Time deposits | 0 | 0 | 241 | 167 | (100)% |
| **Total cash and equivalents** | **23,590** | **95,629** | **273,052** | **148,514]** | **(65)%** |

(1)     Solely for the convenience of the reader, Colombian peso amounts have been translated into U.S. dollars at the market rate as of September 30, 2023 of Ps. 4,053.76 to US$ 1.00. See "Exchange Rates and Foreign Exchange Controls" for information on recent fluctuations in exchange rates.

## Total Financial Assets at Amortized Cost (Net Accounts receivable and Loan Portfolio)

Our loan portfolio (payroll loans, credit cards and insurance premium financing) and other accounts receivable are classified as total financial assets at amortized cost.

Total financial assets valued at amortized cost, decreased by 9% from Ps. 1,952,961 million (US$ 482 million) as of December 31, 2022 to Ps. 1,775,784 million (US$ 438 million) as of September 30, 2023, mainly due to a decrease in the consumer loans portfolio. As valued under FRAS-IFRS, the net loan portfolio decreased by 5%, from Ps. 1,715,871 million (US$ 423 million) for the year ended December 31, 2021, to Ps. 1,632,832 million (US$ 403 million) for the year ended December 31, 2022. The decrease was principally driven by the decline of the payroll and credit card loan portfolio.

As of September 30, 2023, total financial assets at amortized cost comprised 84% of total assets, and decreased 9% compared to December 31, 2022, which was explained by the decrease in our loan portfolio, the increase in impairment and the decrease in accounts receivable.

The table below sets forth information regarding our total financial assets at amortized cost:

| | As of September 30, | | As of December 31, | | Percentage Change |
|---|---|---|---|---|---|
| | 2023 | 2023 | 2022 | 2021 | Sep. 2023 / Dec. 2022 |
| | | (unaudited) | | | |
| | (in millions of US$) [1] | (in millions of Ps.) | (in millions of Ps.) | | |
| **Assets** | | | | | |
| Financial assets at amortized cost | | | | | |
| Loan portfolio, net | | | | | |
| Consumer loans | 475 | 1,926,823 | 2,005,440 | 2,034,298 | (4)% |
| Impairment | (107) | (432,091) | (372,608) | (318,427) | **16%** |
| **Total loan portfolio, net** | **369** | **1,494,732** | **1,632,832** | **1,715,871** | **(8)%** |
| **Accounts receivable, net** | **69** | **281,052** | **320,129** | **436,872** | **(12)%** |
| **Total financial assets at amortized cost** | **438** | **1,775,784** | **1,952,961** | **2,152,743** | **(9)%** |

---

(1)     Solely for the convenience of the reader, Colombian peso amounts have been translated into U.S. dollars at the market rate as of September 30, 2023 of Ps. 4,053.76 to US$ 1.00. See "Exchange Rates and Foreign Exchange Controls" for information on recent fluctuations in exchange rates.

The balance for accounts receivable, net decreased 27% from Ps. 436,872 (US$ 108 million) as of December 31, 2021 to Ps. 320,129 million (US$ 79 million) as of December 31, 2022, and decreased 12% to Ps. 281,052 million (US$ 69 million) as of September 30, 2023. The balance for accounts receivable, net includes loan collection balances (principal, interest, fees and commissions) due to the free-standing trusts and public service companies pending transfer to Credivalores, warranty claims to FGA and administrative collection fees of Ps. 136,351 million (US$ 34 million) as of September 30, 2023, Ps. 168,909 million (US$ 42 million) as of December 31, 2022 and Ps. 250,244 million (US$ 62 million) as of December 31, 2021. In addition, accounts receivable include receivables from Asficrédito, a collections company and the outsourcing company that manages our sales force for Ps. 74,593 million (US$ 18 million) as of September 30, 2023, Ps. 78,156 million (US$ 19 million) as of December 31, 2022 and Ps. 81,455 million (US$ 20 million) as of December 31, 2021.

Impairment of financial assets changed 16%, from Ps. 372,608 million (US$ 92 million) on December 31, 2022, to Ps. 432,091 million (US$ 107 million) on September 30, 2023. For the evaluation of impairment, we use statistical models that include historical trends of probability of default and probability of recovery.

**Non-performing Loan Portfolio**

Our loan portfolio is classified as non-performing when loans are 60 days or more past due, and is recognized as non-performing up to the amount of the capital and interest due at that date. Our non-performing loans and calculations

related thereto do not take into account loans over 360 days past due (as described below) nor do they include past due interest.

Overdue balances of borrowers are recorded in the non-performing portfolio in the event of non-compliance with payment terms in which a loan installment or payment is past-due for specified periods. Loans are generally recorded as non-performing after 60 days of billing periods reporting non-compliance.

As of September 30, 2023, the NPL ratio for our total managed loan portfolio was 10.4%, an increase as compared to the 6% level of December 31, 2022. This increase was primarily due to the high interest rates worldwide that also occurred in Colombia, which led to the generation of a greater volume of NPLs mainly in the credit card product affected also by the closing of the business unit that reduces the amount available of credit to clients. As of December 31, 2022, the NPL ratio for our total managed loan portfolio was 6%, an increase as compared to 5.2% as of December 31, 2021. This increase was primarily due to an increase in NPLs under our credit card and insurance premium financing products, resulting from stronger signs of deterioration in the credit risk of our credit card business and operating difficulties at certain insurance companies which caused delays in payments under revoked policies. The NPL ratio for the credit card product increased from 7.1% as of December 31, 2021 to 8.2% in December 31, 2022 and the NPLs from the insurance premium financing product decreased from 1.5% as of December 31, 2021 to 0.8% as of December 31, 2022.

Between 2021 and 2022, the managed loan portfolio decreased 6%. The number of clients we served (including those with insurance products offered through our network and the alliance with Metlife) for the same period of time decreased 3.1%, as a result of a decrease in the number of clients from payroll loans and credit cards in spite of self-imposed measures to better control NPLs and management decisions to accumulate cash to pay obligations.

The following tables set forth an analysis of our non-performing managed loan portfolio by product as of September 30, 2023 and December 31, 2022 and 2021:

**September 30, 2023:**

(in millions of Ps.)

(unaudited)

| Days Overdue | Payroll Loans | Credit Card | Insurance Premium | Total Managed Loan Portfolio | On Balance Sheet Portfolio |
|---|---|---|---|---|---|
| Performing | 559,450 | 511,576 | 26,575 | 1,097,601 | 1,007,254 |
| 1-30 | 8,878 | 42,650 | 39 | 51,567 | 51,071 |
| 31-60 | 4,056 | 13,152 | 12 | 17,220 | 16,943 |
| 61-90 | 3,293 | 29,548 | 8 | 32,849 | 32,750 |
| 91-180 | 8,223 | 53,736 | 5 | 61,964 | 61,857 |
| 181-360 | 20,284 | 57,820 | 114 | 78,218 | 78,088 |
| >360 | 121,221 | 190,072 | 7,624 | 318,917 | 316,256 |
| **Total** | **725,405** | **898,554** | **34,377** | **1,658,336** | **1,564,220** |
| | | | | | |
| **NPLs > 60 days** | | | | **491,948** | **488,952** |

| | | | | | |
|---|---|---|---|---|---|
| **NPLs > 60 and < 360** | | | | $173,032 | $172,696 |
| **NPL Index (>60 days, excl. > 360 days) / Total Loan Portfolio (excl. > 360 days)** | | | | 10.4% | 11% |

## December 31, 2022:

**(in millions of Ps.)**

| Days Overdue | Payroll Loans | Credit Card | Insurance Premium | Total Managed Loan Portfolio | On Balance Sheet Portfolio |
|---|---|---|---|---|---|
| Performing | 659,312 | 629,513 | 26,759 | 1,315,585 | 1,206,606 |
| 1-30 | 11,797 | 45,830 | 20 | 57,646 | 56,690 |
| 31-60 | 7,505 | 22,421 | 32 | 29,958 | 29,121 |
| 61-90 | 4,316 | 16,432 | 11 | 20,759 | 20,732 |
| 91-180 | 10,046 | 24,682 | 13 | 34,741 | 34,684 |
| 181-360 | 15,495 | 36,379 | 251 | 52,124 | 51,802 |
| >360 | 105,962 | 174,624 | 7,732 | 288,318 | 285,903 |
| **Total** | **814,433** | **949,881** | **34,818** | **1,799,132** | **1,685,538** |

| | | | | | |
|---|---|---|---|---|---|
| **NPLs > 60 days** | | | | **107,218** | **107,625** |
| **NPLs > 60 and < 360** | | | | **285,903** | **288,319** |
| **NPL Index (>60 days, excl. > 360 days) / Total Loan Portfolio (excl. > 360 days)** | | | | **6%** | **6.4%** |

## December 31, 2021:

| Days Overdue | Payroll Loans | Credit Card | Insurance Premium | Total Managed Loan Portfolio | On Balance Sheet Portfolio |
|---|---|---|---|---|---|
| Performing | 785,767 | 719,444 | 27,762 | 1,532,973 | 1,373,758 |
| 1-30 | 13,742 | 23,864 | 606 | 38,212 | 36,535 |
| 31-60 | 6.774 | 27,364 | 473 | 34,611 | 33,053 |
| 61-90 | 5,320 | 8,591 | 108 | 14,019 | 12,946 |

| | | | | | |
|---|---|---|---|---|---|
| 91-180 | 10,482 | 25,571 | 78 | 36,131 | 36,023 |
| 181-360 | 14,670 | 33,696 | 366 | 48,732 | 48,491 |
| >360 | 85,380 | 117,470 | 7,658 | 210,508 | 208,343 |
| **Total** | **922,135** | **956,000** | **37,051** | **1,915,186** | **1,749,149** |

| | | |
|---|---|---|
| **NPLs > 60 days** | **98,882** | **97,461** |
| **NPLs > 60 and < 360** | **210,508** | **208,343** |
| **NPL Index (>60 days, excl. > 360 days) / Total Loan Portfolio (excl. > 360 days)** | **5.2%** | **5.6%** |

## Other Assets

Other assets include investments in associates and affiliates and tax assets. As of September 30, 2023, Credivalores maintained a 25% stake in Inverefectivas S.A. equivalent to Ps. 12,616 million (US$ 3 million).

## Long Term Assets

Long-term assets decreased between December 31, 2022 and September 30, 2023, showing a 17% decrease from Ps. 197,761 million (US$ 49 million) as of December 31, 2022, to Ps. 164,776 million (US$ 41 million) as of September 30, 2023.

| | As of September 30, | | As of December 31, | | Percentage Change |
|---|---|---|---|---|---|
| | **2023** | **2023** | **2022** | **2021** | **Sep. 2023 / Dec. 2022** |
| | **(unaudited)** | | | | |
| | **(in thousands of US$) [1]** | **(in millions of Ps.)** | **(in millions of Ps.)** | | |
| **Long Term Assets** | | | | | |
| Deferred tax assets, net | 31,525 | 127,795 | 157,735 | 43,409 | -19% |
| Property and equipment, net | 38 | 153 | 173 | 229 | -12% |
| Intangible assets other than goodwill, net | 9,085 | 36,828 | 39,852 | 44,111 | -8% |
| **Long term assets** | **40,648** | **164,776** | **197,761** | **87,749** | **-17%** |

---

(1)     Solely for the convenience of the reader, Colombian peso amounts have been translated into U.S. dollars at the market rate as of September 30, 2023 of Ps. 4,053.76 to US$ 1.00. See "Exchange Rates and Foreign Exchange Controls" for information on recent fluctuations in exchange rates.

## Liabilities

Our sources of funding are working capital credit lines with local financial institutions, note issuances in the international capital markets including the Old Notes and notes under our ECP Program, collateralized loans incurred through our free-standing trusts (*patrimonios autónomos*), and portfolio sales under certain investment structures.

We continue to evaluate other financing sources to diversify our funding, such as issuance of debt securities and international credit lines.

As of September 30, 2023, liabilities were mainly comprised of financial obligations, which accounted for 91% of our total liabilities. Total liabilities decreased 30%, from Ps. 2,634,135 million (US$ 650 million) as of December 31, 2022, to Ps. 1,837,273 million (US$ 453 million) as of September 30, 2023, and increased 3% between December 31, 2021 and December 31, 2022. As of December 31, 2022, our ratio of unencumbered assets to unsecured debt was under 110% and the capitalization ratio was under 13.5%. As of September 30, 2023, our ratio of unencumbered assets to unsecured debt was under 110% but capitalization ratio was over 13.5%.

| | As of September 30, | | As of December 31, | | Percentage Change |
|---|---|---|---|---|---|
| | 2023 | 2023 | 2022 | 2021 | Sep. 2023 / Dec. 2022 |
| | (unaudited) | | | | |
| | (in thousands of US$) [(1)] | (in millions of Ps.) | (in millions of Ps.) | | |
| **Liabilities** | | | | | |
| Total financial liabilities at amortized cost | 413,515 | 1,676,291 | 2,536,407 | 2,422,009 | -34% |
| Total financial obligations | 413,153 | 1,674,823 | 2,534,228 | 2,417,239 | -33% |
| Lease liabilities | 362 | 1,468 | 2,179 | 4,770 | -34% |
| Employee benefits | 286 | 1,159 | 1,053 | 995 | 10% |
| Other provisions | 613 | 2,483 | 3,028 | 918 | (18)% |
| Accounts payable | 30,252 | 122,636 | 51,892 | 79,065 | 136% |
| Current tax liabilities | 383 | 1,554 | 1,698 | 1,969 | (8)% |
| Other liabilities | **8,178** | 33,150 | 40,057 | 42,000 | (17)% |
| **Total liabilities** | **453,227** | **1,837,273** | **2,634,135** | **2,547,272** | (30)% |

_____

(1)     Solely for the convenience of the reader, Colombian peso amounts have been translated into U.S. dollars at the market rate as of September 30, 2023 of Ps. 4,053.76 to US$ 1.00. See "Exchange Rates and Foreign Exchange Controls" for information on recent fluctuations in exchange rates.

**Financial Debt**

We classify our financial indebtedness under financial obligations. Interest bearing loans and obligations are carried at amortized cost.

| | As of September 30, | | As of December 31, | | Percentage Change | |
|---|---|---|---|---|---|---|
| | **2023** | **2023** | **2022** | **2021** | **Sep. 2023 / Dec. 2022** | **Dec. 2022 / Dec. 2021** |
| | (unaudited) | | | | | |
| | (in thousands of US$) [1] | (in millions of Ps.) | (in millions of Ps.) | (in millions of Ps.) | | |
| Issuance of Bonds | 210,800 | 854,533 | 1,289,134 | 1,720,458 | (34)% | (250% |
| Financial obligations in Free-Standing Trusts | 127,428 | 516,564 | 901,280 | 252,296 | (43)% | 257% |
| ECP Program Notes | 31,612 | 128,148 | 192,408 | 298,587 | (33)% | (36)% |
| Local Bonds | **23,667** | 95,940 | 95,940 | 52,900 | 0% | 81% |
| Promissory Notes- Local Banks | 25,884 | 104,926 | 48,919 | 82,721 | 114% | (41)% |
| Finance Lease Agreements | 362 | 1,468 | 2,179 | 4,770 | (33)% | (54)% |
| Other Financial Obligations (Interest) | 4,405 | 17,855 | 60,503 | 72,069 | (70)% | (16)% |
| Transactions Costs | **(10,643)** | (43,143) | (53,924) | (61,792) | (20)% | (13)% |
| **Total financial obligations** | **413,515** | **1,676,291** | **2,536,439** | **2,422,009** | **(34)%** | **5%** |

---

(1)    Solely for the convenience of the reader, Colombian peso amounts have been translated into U.S. dollars at the market rate as of September 30, 2023 of Ps. 4,053.76 to US$ 1.00. See "Exchange Rates and Foreign Exchange Controls" for information on recent fluctuations in exchange rates.

Financial obligations including accrued interest and transaction costs increased 5%, from Ps. 2,422,009 million (US$ 597 million) for the year ended December 31, 2021, to Ps. 2,536,439 million (US$ 626 million) for the year ended December 31, 2022. For the year ended December 31, 2022, 50% of our total financial obligations was comprised of the Old Notes for Ps. 1,289,134 (US$ 318 million), 35% of financial obligations were trusts (*patrimonios autónomos*) equivalent to Ps. 901,280 (US$ 222 million), our ECP Program equivalent to Ps. 192,408 million (US$ 47 million), local bonds equivalent to Ps.95,940 million (US$ 24 million) and credits with local banks equivalent to Ps.48,919 million (US$ 12 million).

Between December 31, 2022 and September 30, 2023, financial obligations (excluding accrued interest and transaction costs) decreased by 33% and reached Ps. 1,700,111 million (US$ 419 million), of which 50% was comprised of the Old Notes equivalent to Ps. 854,533 million (US$ 210.8 million), 30%, financial obligations in Free-Standing Trusts equivalent to Ps. 516,564 million (US$ 127 million), 8% notes issued under the ECP Program equivalent to Ps. 128,148 million (US$ 32 million), 6% of financial obligations with local bonds equivalent to Ps. 95,940 million (US$ 24 million) and local financial obligations equivalent to Ps. 104,926 (US$26 million).

As of September 30, 2023, the debt in foreign currency was comprised of Ps. 982,681 million (US$ 243 million), Ps. 128,148 million (US$ 32 million) of notes issued under the ECP Program, and Ps. 854,533 million (US$ 211 million) of the Old Notes.

## Equity

Our equity has increased due to capital injections from shareholders.

From December 31, 2021 to December 31, 2022, our total equity decreased 122%, mainly due to the net income for the period affected mainly by the results in exchange rate differences.

Total equity increased 586%, from Ps. (56,443) million (US$ (14) million) on December 31, 2022, to Ps. 274,582 million (US$ 68 million) on September 30, 2023. This was mainly explained by the capitalization from shareholders completed in May 2023 in the amount of Ps. 273,980 million (US$ 68 million).

| | As of September 30, | | As of December 31, | | Percentage Change |
|---|---|---|---|---|---|
| | 2023 | 2023 | 2022 | 2021 | Sep. 2023 / Dec. 2022 |
| | (unaudited) | | | | |
| | (in millions of US$) [1] | (in millions of Ps.) | (in millions of Ps.) | | |
| **Equity** | | | | | |
| Share capital | 56 | 225,323 | 135,194 | 135,194 | 67% |
| Treasury shares | (3) | (12,837) | (12,837) | (12,837) | 0% |
| Reserves Treasury Shares | 3 | 12,837 | 12,837 | 12,837 | 0% |
| Reserves | 3 | 11,038 | 11,038 | 11,038 | 0% |
| Additional paid-in capital | 63 | 255,020 | 71,169 | 71,169 | 258% |
| Other Comprehensive income (OCI) | 0 | 1,743 | (49,470) | (36,874) | 104% |
| Accumulated earnings | (50) | (202,464) | 99,995 | 94,058 | (302)% |
| IFRS Convergence Results | (5) | (21,910) | (21,910) | (21,910) | 0% |
| Earnings for the period | 1 | 5,832 | (302,459) | 5,936 | 102% |
| **Total Equity** | **68** | **274,582** | **(56,443)** | **258,611** | **586%** |

(1) Solely for the convenience of the reader, Colombian peso amounts have been translated into U.S. dollars at the market rate as of September 30, 2023 of Ps. 4,053.76 to US$ 1.00. See "Exchange Rates and Foreign Exchange Controls" for information on recent fluctuations in exchange rates.

## Shareholders' Equity to Total Assets Ratio

The chart below shows our shareholders' equity to total assets between 2020 and September 30, 2023. As of September 30, 2023, our shareholders' equity was Ps. 274,582 million (US$ 68 million).



**Equity/Total Assets**

| 2020 | 2021 | 2022 | Sep-23 |
|------|------|------|--------|
| 12.1% | 9.2% | (2.2%) | 13.0% |

**Off Balance Sheet Arrangements**

As of September 30, 2023, we had Ps. 90,329 million (US$ 22 million) in loan portfolio sales to third parties, which are included under our managed loan portfolio. We continue to perform the collection and the servicing of the loans, but Ps. 3,625 million (US$ 1 million) of these portfolios have been sold without any recourse to the Company and are therefore accounted as off-balance sheet transactions. The remainder of the sold portfolio reported as part of the managed portfolio results from portfolio transfers to mutual funds that involves a collateral amount for the deterioration of the loan portfolio transferred that is gradually formed from the returns on the equity stake that the Company holds in the fund.

**Capital Expenditures**

As of September 30, 2023, we did not expect to have any material capital expenditures for the year ended December 31, 2023.

**Quantitative and Qualitative Disclosures about Market Risk**

We are exposed to various market risks associated with our assets, liabilities and operations, including risks related to interest rates, credit, inflation and exchange rates. We continually assess our exposure to market risk that arises in connection with our operations and financial activities.

**Credit Risk**

Our Credit Risk Management System considers the nature of each portfolio product, adjusting its methodologies, processes and policies to these characteristics to achieve the target risk set for each product.

The credit risk management model is based on four stages:

- *Identification and Measurement*: for adequate risk measurement and identification, we use statistical models to identify risk factors, accurately profile our current and potential clients and determine the level of risk to which we are exposed.

- *Policies and Processes*: based on the characteristics of each product and the risk profile identified for each client risk management devises distinct processes and policies that adapt to each level of risk seeking to mitigate exposure to the potential risk in a precise manner.

- *Control and Monitoring*: this process aims to ensure compliance with the policies and processes established, as well as to monitor the progress of the portfolio risk indicators so as to take timely actions in response to any deviation from the expected indicators.

- *Estimation of Provisions*: risk management includes determination of risk coverage to allow absorption of the losses which may arise due to non-compliance with the credit obligations. Estimations of our provisions are based on statistical models of expected losses for our main products, payroll deduction loans and credit cards. For financing insurance policies, we use transition matrices.

These processes are documented in the Credit Risk Management System Manual which also defines the target market, credit assessment criteria, collateral, collection management, organizational structure and information management.

In order to prevent excessive concentrations of credit risk at an individual, economic group, cities or economic sectors level, we maintain updated indices to limit concentration of risk to an individual level or to an economic sector. The exposure limit to an individual client or economic group depends on the risk profile of the client, the nature of the risk of the debtor.

As of September 30, 2023 the following characteristics of our managed loan portfolio allow us to mitigate the credit risks:

- The 25 largest debtors accounted for 0.65% of the payroll loan portfolio, and the largest single client represented 0.06%.

- About 88.2% of the total managed loan portfolio was comprised of public-sector employees and pensioners, with high job stability as these payments are included in the annual national budget.

- The average loan size (portfolio/total clients) was Ps. 2.3 million (US$ 579 thousand).

- Highly diversified geographical location in small and middle size cities located in different regions in Colombia. Bogota accounts for 31.2% of the total portfolio, followed by Cesar with 8.1% and Antioquia with 7.4%.

To identify the level of credit risk, we have ad hoc scoring models for each product and by region for some products. The models include information from credit bureaus, internal information on behavior and external information yielded by our partnerships. This external information includes access to databases with information on public-utility payment behavior; this privileged information enables the development of granting models that are more precise than those of the market, as well as the identification of clients without bank accounts for whom there is no financial information allowing access to a larger market than that traditionally covered by the banking industry.

The payroll loan credit approval model consists of a proprietary risk scoring model and underwriting policies that help measure and control operational and credit risk according to the risk appetite defined by the board. During 2023, the policies and scoring model were reviewed and updated when necessary. For the credit card product, we developed a proprietary scoring model in 2019 that included multiple scorecards combining bureau, demographic and utilities information. We also have a statistical model to estimate payment capacity based on levels of utility consumption, economic strata level, and risk profile. Our risk department is responsible for controlling all stages of the credit approval process, ensuring that the verification and analysis processes comply with the quality standards and policies defined by our Risk Committee. Our origination process is supported by IT tools that automate and control the entire credit flow, providing process quality, greater efficiency and online monitoring of each stage of the process. For payroll deduction loans, we use Bizagi and for credit cards we use Credisoft. In addition, the originator allows:

- remote access for on-site client profiling;

- online consultation of the status of each loan application;

- management of pre-approved campaigns;

- digitization of all applications (document manager);

- parametrization by agreement of document requirements and business rules;

- parametrization of process flows by profile and agreement type;

- specialized modules for each process: location, verification, guarantees, ratification, and supervision;

- integration with external processes: insurer, identity validation, georeference, credit bureau;

- control of productivity and response-time alerts for each role in the process; and

- access control and information security.

## Market Risks

We have been able to meet our liquidity needs acquiring working capital and lines of credit from local, foreign and multilateral entities. Given the exposition to variable interest rates we constantly monitor the behavior of variable interest rates (financial obligations indexed to local and/or foreign variable rates such as: DTF, IBR, UVR, SOFOR, PRIME, etc.), and to exchange-rate fluctuations due to devaluation or revaluation in the local currency (US$, EUR, etc.).

Market risk arises from the open positions of our investment portfolios in debt securities, derivatives and equity instruments recorded at fair value, due to adverse changes in risk factors such as interest rates and exchange rates of foreign currencies.

For analysis purposes, market risk has been broken down into price risk and/or interest and exchange-rate risk of financial obligations in the periods over which payments on capital are amortized, the point at which the risk materialized.

As of September 30, 2023, December 31, 2022 and December 31, 2021, we had had the following financial assets and liabilities at fair price subject to trade risk:

| Financial assets and liabilities at fair value exposed to trading risk held: | September 30, 2023 (unaudited) (in millions of Ps.) | December 31, 2022 (in millions of Ps.) | December 31, 2021 (in millions of Ps.) |
|---|---|---|---|
| Equity securities | 5,205 | 5,698 | 6,115 |
| Derivative instruments | 4,555 | 98,861 | 355,167 |
| Loan portfolio | 14,086 | 381 | 16,683 |
| **Total** | **23,846** | **104,940** | **377,956** |
| Derivative Financial Instruments | - | - | (316) |
| **Total** | **23,846** | **104,940** | **(316)** |
| **Net position** | **23,846** | **104,940** | **377,649** |

## Interest Rate Risk

Out of our total managed loan portfolio, 66.3% consists mainly of loans bearing floating interest rates under payroll loans and the remaining 33.7% are credit cards and insurance premium financing loans at fixed interest rates. However, the credit cards interest rate is adjusted on a monthly basis according to changes in the cap rate, thus the interest rate risk is contained in this product.

Our financial obligations are exposed to the interest rate risk when financing is acquired at variable indexed rates that may be subject to volatilities affecting our financial margin. We conducted a sensitivity analysis on our interest expenses of a 20 basis points movement in the variable indexed rates of financial obligations until maturity with the following results:

| Scenarios | Interest (million Ps.) |
|---|---|
| Effect of 20 bps decrease in variable rate | 1,338,946 |
| Effect of 20 bps increase in variable rate | 1,330,247 |
| **Combined Effect on Interest Expense** | **(8,699)** |

## Exchange Rate Risk

In addition, our financial obligations are also exposed to exchange rate risk due to appreciation or depreciation of the peso against the currency in which the financial obligation is denominated. Our risk management policy, approved by the board of directors, mandates that we hedge all foreign currency positions (assets or liabilities) to pesos through different instruments that require a dynamic management of financial risks.

Taking into account our exposure to changes in the exchange rate, below is a sensitivity analysis of the impact on financial obligations resulting from possible changes in the exchange rate in 2023, using the following methodology:

- Two scenarios were evaluated, adjusting the spot exchange rate by 0.6% of daily volatility, resulting in appreciation or depreciation of the currency based on the TRM applicable as of September 30, 2023.

- The amortization of principal and interests on financial obligations were included in these scenarios, considering their payment periods and maturity.

- The accrual of interest payments was evaluated using equivalent rates.

- The present value of the monthly interest payment was calculated, using the twelve-month IBR rate as a reference as of September 30, 2023 (12.751%).

- Finally, we compared the results of each scenario to the base scenario, which was based on the expected cash flow payments for interest and principal using the reference rates as of September 30, 2023.

The results are set out below:

| Item | Total Debt (in millions of Ps.) |
|---|---|
| Initial scenario (Balance as of September 30, 2023) | 374,818 |
| Scenario 1 (Appreciation effect of the currency) | 373,876 |
| Scenario 2 (Appreciation effect of the currency) | 375,798 |
| **Difference (Scenario 1 vs. Initial)** | **(982)** |
| **Difference (Scenario 2 vs. Initial)** | **980** |

# BUSINESS

## Overview

We are a leading non-bank financial institution in Colombia focused on providing under-banked segments of the population access to consumer credit and micro-insurance through loan products designed to minimize loan losses. We have a successful track record of over 20 years in consumer lending, serving low- and middle- income households. As of September 30, 2023, our managed loan portfolio was Ps. 1,658,336 million (US$ 409 million), with over 711,723 clients (which we calculate by product). We define our "managed loan portfolio" as our on-balance sheet collateralized and uncollateralized loans and off-balance sheet loans that we have originated and sold but remain under our servicing and management. In addition, as a result of our strong origination capacity, since our inception through September 30, 2023, we have generated an aggregate originated loan portfolio of Ps.$12.17 trillion (US$ 3 billion), which includes the managed loan portfolio and additional loan portfolio sales not serviced and managed by us.

We focus on consumer lending through a diversified platform comprised of three main products/lines of business:

- *Tucrédito*: payroll loans, mainly to public service employees and pensioners, which represented 44% of our total managed loan portfolio as of September 30, 2023;

- *Crediuno*: a branded credit card business which represented 54% of our total managed loan portfolio as of September 30, 2023; and

- *Credipóliza*: insurance premium financing, which represented 2% of our total managed loan portfolio as of September 30, 2023.

Our products have been designed with collection channels that mitigate the risk of non-payment in order to allow us to grow while maintaining healthy portfolio quality ratios.

We originate almost 100% of our loan portfolio directly and, accordingly, our growth has been almost 100% organic. We have established strategic alliances for the origination and collection of each of our loan products that give us access to a potential client base of approximately 13 million potential clients. For *Tucrédito*, our payroll loan product, we have operating agreements with approximately 273 employers and pension funds, including public and private sector entities, that give us access to over 2.7 million potential clients. We are in the process of selling and closing our credit card business unit, *Crediuno*, as we focus our strategic efforts on payroll, which has a better risk profile.

Our strategy of digital transformation and data analytics development, has driven the redesign and digitalization of our origination processes, allowing us to achieve greater efficiency and flexibility for our clients. It has also created a differentiated underwriting process based on a more robust data base for our scoring models on some of our products and greatly enhanced our time to market. In May 2019, we first implemented a 100% digital origination process for our credit card business through our commercial channels, increasing the number of applications submitted to the loan underwriting process from our sales representatives. Currently 100% of our origination process is digital. We equipped our sales force with tablets to facilitate the profiling of our clients at retailers and points of sale. In this way, we are able to obtain instant feasibility confirmation and we are able to collect data from our clients with georeferencing and automatic validations of information.

We have extensive geographic coverage in Colombia, with an emphasis on small and mid-sized towns and cities with high growth potential and where our target market is underserved by the financial industry. We have loans disbursed in 626 of the 1,123 cities in Colombia.

### History and Development

Crediservicios S.A. was formed in 2003 for the primary purpose of providing payroll deduction loans. Credivalores S.A. was also formed in 2003 and its primary business activities were factoring transactions and the financing of goods,

services and insurance premiums. Both companies provided their services locally in Cali, Colombia. As a result of a merger in 2008, Credivalores S.A. was fully absorbed into Crediservicios S.A. and the resulting entity changed its name to Credivalores – Crediservicios S.A.S.

Over time, the business has grown into other geographic regions throughout Colombia, including Bogotá. In 2010, the company was capitalized by two private equity funds, ACON Colombia Consumer Finance Holdings, S.L. and HSBC Capital (now Graycliff Partners), in order to strengthen its capital structure and leverage its high growth potential. In May 2014, the company received a new capital injection from Gramercy, a U.S. investment manager, and as a result Gramercy became a new shareholder. In March 2015, Gramercy completed a new capital injection, which has strengthened our equity, promoted strong growth and improved our capitalization ratios. In October 2016, Gramercy granted us a convertible loan facility in the amount of Ps. 60,014 million (US$ 20.4 million) due in April 2017. In March 2017, we decided to exercise our option to capitalize Ps. 53,510 million (US$ 15.5 million) of this facility into equity. In September 2018, Gramercy injected an additional Ps. 3,023 million (US$ 0.9 million) of capital into the Company, and in June 2019, the three shareholders ACON, Gramercy and Crediholding, injected a total of Ps. 12,000 million (US$ 3.5 million) of capital into the Company on a pro rata basis. In December 2021, the Company received an additional capital injection from three of its shareholders (including ACON and Gramercy) totaling Ps.12,000 million (US$ 3.01 million) a pro rata basis. In 2023 a new shareholder, GDA Luma, provided a capital injection of US$ 58 million. The participation of our shareholders has strengthened our capital structure, promoted strong growth and improved our total shareholders' equity to total assets ratio.

In June 2019, we completed a legal corporate transformation from a simplified stock corporation (*sociedad por acciones simplificadas*) to become a stock corporation (*sociedad anónima*) under Colombian law and changed our name to Credivalores – Crediservicios S.A. This transformation will grant us access to the domestic capital markets allowing the company to registry bonds and securities before the National Registry of Securities and Issuers from the SFC.

Our growth has been supported by a business model with more than 20 years of proven track record and success. This model is based on its niche market strategy and specialized financial products targeting the underserved low- and middle- income brackets of the Colombian population.

**Our Target Market**

We target consumers in social segments 1, 2 and 3 of the Colombian population, which corresponds to middle- and low-income socio-economic segments. Our target market includes approximately 80% of the population of Colombia.

Our typical client has limited access to financing from banks and other traditional credit providers, partly because traditional credit lenders and banks find it costly to serve clients interested in only one credit product and/or clients with small financing needs. Furthermore, in some cases, the low-income population is apprehensive of going to a bank's branch or a bank-related financial institution due to cultural reasons, such as an unfavorable perception of the financial industry among that segment of the population, and/or cumbersome and slow approval processes for opening accounts. In contrast, we rely on our sales force to approach our clients, and we are able to offer them agile and tailor-made credit solutions, compared to banks and other financial institutions. Our key parameters for credit evaluation include socio-economic and demographic information, as well as information on credit bureaus; however, the parameters vary by product. For payroll loans, we need to determine our clients' level of indebtedness, and the main parameters we use for the credit evaluation process also include employment history, time at the current employment, type of employer and position. The lack of widespread access to financing alternatives has created a set of common factors among our clients that includes:

- *Good repayment habits*. There is a very limited number of financial alternatives for the target market, which results in timely repayment to avoid forfeiting the right to access the limited financing available.

- *Net worth versus cash flow*. Our clients have stable cash flows and continue to exhibit this stability over time.

- *Rate versus installment amount.* Our clients are not generally concerned about the interest rate on the loan; rather, they care about the monthly installment amount that they will need to pay.

- *Urgency and need.* A loan is usually needed as soon as possible, and we have the ability to process and disburse the funds in less than 24 hours of the request, which is a key success factor. Also, traditional banks want to sell the client a suite of products, whereas the client may want just one product, a straightforward loan.

- *Brand loyalty.* In many cases, the loans we provide are the clients' first formally obtained loans and their first departure from the informal financing community.

- *Renewal of current loans.* Ability to renew a loan continuously, provided it has been current and had no past due balances over its entire term.

**Products and Services**

Our business model consists of offering to the low- and middle- income segments of the population and to individuals that require immediate liquidity a range of flexible, specialized, and tailored credit and financing alternatives, which includes payroll deduction loans (*Tucrédito*), and insurance premium financing (*Credipóliza*). We have created origination, underwriting, monitoring and collection tools and policies in line with the risk profiles of our potential borrowers. The Company decided to focus its efforts and strategy in payroll deduction loans in line with its credit risk profile, and is in the process of selling and closing its credit card business unit.

As of September 30, 2023, our client base is comprised of 711,723 active clients, of which 706,048 have credit products and 5,675 have insurance products distributed through our network. As of September 30, 2023, we had 50,660 payroll loan clients (*Tucrédito*), which represented Ps. $725,405 million (US$ 179 million), or 43.7% of our managed loan portfolio; 637,915 credit card clients (*Crediuno*), which represented Ps. 898,554 million (US$ 222 million), or 54.2% of our total loan portfolio; 5,675 insurance premium financing clients (*Credipóliza*), which represented Ps. $34,377 million (US$ 8 million), or 2.1% of our total loan portfolio. The table below summarizes our loan portfolio by product.



| Product | Description | Managed Loan Portfolio | % of total loans |
|---------|-------------|------------------------|------------------|
| **Tucrédito** | Payroll deduction loans | Ps. 725,577 million | 43.7% |
| **Crediuno** | Credit cards | Ps. 898,554 million | 54.2% |
| **Credipóliza** | Insurance premium financing | Ps. 34,377 million | 2.1% |

We define our "managed loan portfolio" as our on-balance sheet collateralized and uncollateralized loans and off-balance sheet loans that we have originated and sold but remain under our servicing and management. Between 2021 and 2022, the managed loan portfolio decreased 6%. The number of clients we served (including those with insurance products offered through our network and the alliance with Metlife) for the same period of time decreased 3%, as a result of self-imposed measures to better control NPLs in the credit card business and management decisions to operate only payroll loans as part of our business strategy.

The chart below sets forth the historical growth of our managed and owned loan portfolio:



This decrease is a result of reduced access to new sources of funding in the local and international markets. All credit products have been designed with collection mechanisms that prioritize secured repayments, such as direct deduction from paychecks and collection through public utility bills. As of September 30, 2023, NPLs, defined as managed loans overdue by 60 days or more adjusted by operational nature of the business but excluding loans overdue by more than 360 days, totaled 9.5% of our total managed loan portfolio, above the industry average for consumer loans of 7.5% according to SFC. As of September 30, 2023, our NPL ratio was 10.4%. This metric is used by us to make it comparable to the financial industry.



Source: SFC and Credivalores

Payments on payroll loans are collected directly from employers before any wages are paid to clients, pursuant to clients' irrevocable instructions. In addition, the majority of the portfolio is comprised of public sector employees and pensioners, who have low turnover rates and steady revenues, thus mitigating collection and non-payment risk.

Payments on credit cards were collected through public utility companies, as payments due are invoiced as part of the client's public utility bill in accordance with the exclusivity agreement signed with the utility company, which creates a sense of priority for payment over any other consumer loan. However, the Company is closing the credit card business unit and collections are made through small amount collection companies.

To maintain low delinquency rates and identify growth opportunities with controlled risks, we constantly monitor our portfolio through statistical analysis and vintage analysis. Our risk department, consisting of a majority of mathematicians and statistics graduates, uses powerful data-mining techniques such as decision tree methodology to identify risk variables in portfolio, allowing for accurate adjustments in our underwriting policies and procedures. Vintage analysis is also a tool that allows for performance comparisons between portfolio segments. Data is grouped into segments based on the origination month (a vintage) and can be formatted in a triangular fashion with vintage and age (months on books) as the two axes. In this type of analysis, a portfolio is completely deconstructed into separate vintages, which allow a clear look at all the independent parts of the macro portfolio, including the application of different credit policies and controls over time. The right-most data point for each vintage aggregate up to the current macro portfolio. This isolates the segments to show behavioral aspects and financial performance for the individual vintages.

Breaking down a portfolio into these separate vintages can help identify trends and point to reasons for shifts in macro portfolio performance such as changes in the risk profile of clients or deficiencies in the policy's processes and controls. The vintage analysis allows for adjustments to the origination process on a timely manner without having to wait until complete maturity of the portfolio. Any change in the diagonal of the vintage analysis send signals of the deterioration of the maintaining processes of the portfolio, due to operations, collections or worsening of credit profiles of clients of certain economic sectors.

In addition, on an annual basis we recover 12.7 % of the past due payroll loans over 90 days, 10.7% of the past due loans under the credit card product and 3% of the insurance premium financing product. We are able to achieve this high ratio of recoveries due to our internal collection processes and to the collection channels of our products.

*Treatment of the Loan Portfolio*

We originate almost 100% of our own loan portfolio through our dedicated sales force. We define our "managed loan portfolio" as our on-balance sheet collateralized and uncollateralized loans and off-balance sheet loans that we have originated and sold but remain under our servicing and management. As of September 30, 20123, our total managed loan portfolio amounted to Ps. 1,658,336 million (US$ 409 million). Our portfolio has three different products:

- *Sold portfolio.* Corresponds to loan portfolio comprised of payroll deduction loans that were originated by us and used to be sold on to financial institutions until mid-2016. This portfolio was sold based on the present value of the expected cash flows. Revenues from portfolio sales were recorded as a one-off payment from the sale of the loan. In 2018 and 2019 we started registering portfolio transfers under a funding structure we have in mutual funds administered by trusts in the Colombian capital markets. We transfer loan portfolios to these mutual funds and in turn we receive the funding to originate additional loans and an equity stake at the fund, which is subordinated to the rest of the investors in the fund. This funding structure differs from the previous portfolio sales completed before 2016 since instead of an upfront premium, we receive recurrent revenue resulting from the net margin between the interest income of the portfolio transferred and the financial cost of the funding received, and an equity return from the fund. We record the net margin and the equity return in our financial statements on a monthly basis. Portfolios transferred under these structures, involve a collateral amount for the deterioration of the loan portfolio of more than 90 days, which is gradually formed from the returns on the equity stake that the Company holds in the fund. We have included into our provisions the historical amount of loans repurchased. As of September 30, 2023, sold portfolio (which we continue to service and manage) amounted to (excluding sales without any recourse to the Company) Ps. 94,116 million (US$ 23 million), or 5.7% of our total managed loan portfolio.

- *Collateralized portfolio.* Corresponds to loan portfolio that is originated by us and assigned irrevocably to a free-standing trust or *fiducia* (*patrimonio autónomo*), which is used for funding. We use these trusts to match portfolio types and portfolio maturity with the corresponding debt from funding sources. That is, for each loan product (payroll loans, credit cards or insurance financing) there is a separate trust with a separate financing in place, which generally matches the duration of the underlying portfolio used for the repayment of the debt. As of September 30, 2023, Ps. 982,556 million (US$ 242 million) of our loan portfolio was held through our free-standing trusts.

- *Uncollateralized portfolio.* Corresponds to loan portfolio that is originated by us and is maintained on our balance sheet. As of September 30, 2023, our uncollateralized loan portfolio amounted to Ps. 675,780 million (US$ 167 million), or 41% of our total managed loan portfolio.

Our objective is to increase the portion of the uncollateralized portfolio that is assigned for funding.

*Diversified Loan Portfolio*

We believe one of our competitive strengths is the diversification of our loan portfolio. Our portfolio has limited concentration by geography, economic segment, amount, and number of clients, as follows:

- *Geography*: Our growth strategy is based on small and medium sized cities, with only 31.2% of the portfolio in the capital (Bogotá).

The following chart set forth our geographic diversification though out the Colombian territory as of September 30, 2023:



- *Economic segment*: Our payroll loan portfolio is focused on pensioners and government employees; nonetheless the portfolio is diversified by economic activity; of the total payroll loans: 56% are loans to pensioners, 11.8% to private companies, 9.8% to government related agencies, 10.4% to teachers, and 12% to police and military.

- *Number of clients*: We have many clients with small amounts per loan. The average loan calculated as total portfolio over total number of clients is Ps. 2.3 million (US$ 579 thousand). Overall, our top 25 clients contribute to less than 0.65% of the total payroll loan portfolio.

### Customer Demographics

Our target market is the low- and middle- income segments of the population including portions of "bottom of the socio-economic pyramid," focused on tiers 1 to 3 and the segment of the population that has achieved pension requirements.

We target Colombia's growing low middle class that requires greater financial inclusion and banking penetration – precisely the target market that also is the focus of Government policy.

### Payroll Loans - Tucrédito

*Overview*

Our main product is payroll loans, which are consumer loans whose monthly repayments/installments are deducted directly from the client's paycheck by its employer, who in turn transfers it directly to us. The payroll loans segment represents approximately 35% of total consumer loans in the Colombian financial system. Given this collection mechanism, payroll loans typically have lower default ratios than other consumer loans.

The payroll loans are secured by an irrevocable order or authorization from the clients to their respective employers or to the entity that pays their salary or other financial benefits arising from their employment. Given our target market, wages and pensions are typically the client's primary source of income.

We currently have agreements to provide payroll loans with over 273 employers and pension funds including a wide range of businesses and government entities, which together comprise a substantial portion of our portfolio. As of September 30,

2023, approximately 88% of our payroll deduction loan portfolio was comprised of public sector employees and pensioners, which we believe have low turnover rates and stable income.

Approximately 56% of our *Tucrédito* payroll loans portfolio is comprised of loans to pensioners. In the case of the pensioners we serve, pensions are paid by Colpensiones, the state-owned pension administrator, and their loans, like the rest of our loan portfolio, have life insurance coverage. In the case of public sector employees, we focus on employees that have long tenure at their position ("*carrera administrativa*"), as opposed to temporary employees whose jobs may depend heavily on changes of the administration.

In terms of loan size, the portfolio is highly diversified, as the average loan size is Ps.9.3 million (US$ 2 thousand).

The historical growth of our owned and managed payroll loan portfolio is described in the charts below:

*(In thousand millions of Ps.)*



The historical number of our payroll clients is described in the chart below:

*In thousands*



*Structure*

The structure of the payroll loan business is explained in the diagram below:



1. We sign an agreement with the employer to offer payroll loans to its employees.

2. The employee applies for credit with us.

3. If approved, the employee issues an irrevocable payment instruction to his employer for deductions to be made from his monthly paycheck/pension receipt. Deductions include the monthly premium of the life insurance that covers the loan.

4. We disburse funds to the employee.

5. We send a file to the employer with the amounts due under each client's loan.

6. Employer deducts amounts due from the client's payroll.

7. Employer remits the funds to us (through a separate trust used specifically for collection).

8. We remit the portion corresponding to the insurance premium to the insurance company.

To ensure that the employer is able to accurately make payroll deductions to repay the loans on a monthly basis, we provide them electronically with a list of employees who have loans outstanding, showing the individual installment amounts to be deducted and the total amount to be paid to us. During our more than 20 years of operations, we have developed the know-how to operate with multiple employers in an efficient manner.

As of September 30, 2023, the average payroll deduction loan granted was Ps.9.5 million (US$ 2 thousand). The payroll loan portfolio has life insurance coverage, to which we are the first beneficiary.

***Credit Cards - Crediuno***

*Overview*

In June 2011, we launched Crediuno, a branded credit card that utilizes the client's public utility bill for invoicing and collections. The product was initially launched in 2005 as a revolving personal line of credit to finance the acquisition of

specific goods, such as home appliances, or to finance home improvements, and later evolved into a branded credit card. As of September 30, 2023, this product represented approximately 54.2% of our total managed loan portfolio.

Our credit card was offered to clients in major retailers and, until the third quarter of 2015, it could only be used for purchases at selected retailers in Colombia. In August 2015, we entered into an alliance with VISA, whereby our credit card could be used at any retail merchant that accepts the VISA franchise, widening the universe of retailers in which our clients can use our credit card. We are the first non-bank financial institution issuing VISA credit cards in Colombia for the low- and middle- income segments of the population.

Since their origin, credit card repayments have been collected through the client's public utility bill. However, in May 2019, we launched client-focus digitalization initiatives to improve agility in our origination process. Since then, credit card repayments have also been collected through direct billing to the client.

As part of our business strategy, we are in the process of closing the sale of our credit card business unit (*Crediuno*), as we focus our strategic efforts on payroll, which has a better risk profile.

**Funding**

Since our formation, we have consistently sought to diversify our funding sources. In order to maintain adequate levels of availability, we have developed funding facilities with an approach to match the duration of assets and liabilities and to reduce our average cost of financing. Currently, we receive funding from multiple local and international sources, including top-class committed shareholders, local bank debt, local bonds, our euro commercial paper program ("ECP Program") and the issuance in 2020 of 8.875% Senior Notes due 2025 in 2020 (the "Old Notes"). We have relationships with local financial institutions and have begun to develop relationships with international private equity funds.

The following chart sets forth the evolution of our funding sources:



***Capitalization by Shareholders***

We have a strong capital structure hinged on our shareholders' commitment. In 2010, we received a Ps. 28,993 million (US$ 8.4 million) equity injections from ACON Colombia Consumer Finance Holdings, S.L. In 2011, our shareholders at the time injected an additional Ps. 19,480 million (US$ 5.6 million). More recently, in May 2014, we received a Ps. 42,841 million (US$ 12.4 million) capital injection from Gramercy Funds Management LLC. In connection with the

2014 capitalization, we entered into an option agreement with certain of our shareholders to receive a new capital infusion for up to Ps. 9,300 million (US$ 2.7 million). In March 2015, the option was exercised, and we received a new equity injection of Ps. 9,300 million. Furthermore, in October 2016 Gramercy granted us a convertible loan facility in the amount of Ps. 60,014 million (US$ 17.3 million) due in April 2017. In March 2017, we decided to exercise our option to capitalize Ps. 53,510 million (US$ 15.5 million) of this facility into equity. The capitalization was recorded in our financial statements as of April 30, 2017. In August 2017, this loan was fully repaid. In September 2018, Gramercy injected an additional Ps. 3,023 million (US$ 0.9 million) of capital into the Company and in June 2019 the three shareholders ACON, Gramercy and Crediholding injected a total of Ps. 12,000 million (US$ 3.5 million) of capital into the Company on a pro rata basis. . In 2023, a new shareholder, GDA Luma, made a capital injection of Ps. 273,980 million (US$ 58 million). The participation of our shareholders has strengthened our capital structure, promoted strong growth and improved our total shareholders' equity to total assets ratio.

Following these capital injections, as of September 30, 2023, our shareholders' equity was Ps. 274,582 million (US$ 68 million).

In the past ten years, we have not distributed dividends to our shareholders, allowing us to strengthen our balance sheet, which serves as proof of our shareholders' commitment and belief in the business model.

The following chart sets forth the evolution of our shareholders' equity:



Thousand million COP$

| 2020 | 2021 | 2022 | Sep-22 | Sep-23 |
| 308 | 259 | -56 | 180 | 275 |

+586%  +52%

*Sales and Transfers of Originated Portfolio*

To fund growth, we may sell a portion of our originated payroll loan portfolio. Our entire portfolio sales are made to entities supervised by the SFC and not to individuals (retail). Purchasers of loans have included: Banco GNB, Banco Agrario and Ban100, among others.

Our portfolio sales and transfers may include recourse to the Company for those loans overdue. We estimate the probability of repurchasing those loans and include a provision into the calculation of its impairment.

From an accounting perspective, this is registered in the financial statements as the derecognizing of assets due to sales or transfers of the loan portfolio. A financial asset (or, if applicable, a portion of a financial asset or group of similar financial assets) is derecognized when:

- the contractual rights to the cash flows produced by the financial asset expire;

- the contractual rights to the cash flows from the asset are transferred or an obligation is incurred to pay a third party all of these cash flows without significant delay, by means of a transfer agreement;

- a substantial portion of the risks and benefits of owning the financial asset are transferred; and,

- a substantial portion of all the risks and benefit of owning the asset is retained, but control over such has been transferred.

Based on the business and the variables established by IFRS for recording derecognized assets, upon a sale of loans from our portfolio, a substantial portion of all risks inherent to the financial asset in question is transferred to the purchaser. Therefore, loans sold are not included into the loan portfolio accounts in the financial statements.

As of December 31, 2021 and 2022, our sold but managed portfolio (principal only) was Ps. 217,000 million (US$ 54 million) and Ps. 116,000 million (US$ 29 million), respectively, and as of September 30, 2023, our sold but managed portfolio (principal only) was Ps. 94,116 million (US$ 23 million).

### Collateralized Funding – Patrimonios Autónomos

As of September 30, 2023, our managed loan portfolio amounted to Ps. $1,658,336 million (US$ 409 million), of which Ps. 982,556 million (US$ 242 million) was held through our free-standing trusts (*patrimonios autónomos*). We use collateralized funding structures through free-standing trusts (*patrimonios autónomos*) to support our growth. These structures allowed us to access financing from financial institutions with tenors longer than on a stand-alone basis, while minimizing any maturity gap between the financing and the underlying asset. Today, the collateralized funding is granted via loans with local financial institutions, which given our structure track record, have decreased their collateral requirements.

*Structure*

The structure of our free-standing trusts is explained in the diagram below:



1. We endorse/assign the loan portfolio promissory notes (P-Notes in the chart above) to the Borrower/Trust ("*endoso en propiedad a un Patrimonio Autónomo – PA en Garantía*")

2. The independent custodian and auditor certify the P-Notes and its amounts that will secure the loan.

3.      Upon receiving certification of conditions precedent being met, the financial institutions disburse the loan granted to the Borrower/Trust.

4.      Borrower/Trust reimburses us.

5.      We disburse the loan to the client.

6.      Employer or pension funds applies the payroll deduction, including interest, fees and commissions.

7.      Master Collection Trust collects interest, fees and commissions from the loan portfolio wired directly by the employers: isolation of the source of payment from us and additional flow of funds into the Borrower/Trust.

8.      Master Collection Trust with irrevocable instruction to transfer to the Borrower/Trust all amounts collected from P-Notes endorsed to the Borrower Trust.

9.      Borrower/ Trust pays all amounts collected from P-Notes to the lender/banks.

Financing through trusts is a very commonly used structure in Colombia across public and public/private initiatives, financial sector and private companies. We, like many of our competitors, have been raising funds through trusts since our inception. These are irrevocable trusts that are contractual in nature and are not separate legal entities from the grantor. Trusts are established by a grantor (*i.e.*, Credivalores) and agreed to by a trustee (*fiduciario*) who is bound to undertake a specific purpose for the benefit of a beneficiary (*i.e.*, financing institutions). *Fiduciarias* are financial services companies regulated by the local regulator, the SFC.

Under this structure, we become the grantor and constitute the trust with either cash or a loan portfolio. The promissory notes that comprise the loan portfolio are endorsed to the trust, which in turn borrows funds from financial institutions, using the portfolio as collateral. One of our objectives is that the duration of the loan matches the average duration of the loan portfolio.

We guarantee the obligations of the trusts and continue managing the loan portfolio throughout the life of the loans. Additionally, we are entitled to excess funds or assets owned by the trusts after the agreed collateral level has been met.

We use two master trusts for collection of funds, one for Tucrédito and another one for Crediuno (*i.e.*, in the case of *Tucrédito*, all employers wire transfer the amounts deducted via payroll loans from clients to one specific trust (collection master trust), that in turn wire transfer the funds that corresponds to the security of the financial obligation to each trust).

*Uncollateralized Funding – Credit Lines*

Since inception, we have had access to unsecured funding with local banks. As of September 30, 2023, we had uncollateralized credit under our ECP Program, of which US$ 31 million were outstanding as of September 30, 2023. Moreover, we have accessed international capital markets through the issuance of the Old Notes in February 2020 for an amount of US$ 300 million, of which US$210.8 million was outstanding as of September 30, 2023. Issuances under our ECP Program have average coupons of 12.7% as of September 30, 2023.

*Hedging of Debt in Foreign Currency*

We are exposed to FX risk, mainly because of our ECP Program and the Old Notes denominated in U.S. dollars. The following are the main considerations of the hedging policy that was in place until 2022:

- As long as the functional currency of the Company is the Colombian peso, the management must implement a total hedging strategy (principal and interest) for foreign currency denominated assets and liabilities in a timely manner after acquiring those rights or obligations.

- The limitations to execute the hedging operations should be related only to market depth and availability of counterparties. The Board of Directors approves all counterparties for hedging transactions.

- The policy considers the following instruments to mitigate FX risk: natural hedging, commercial operations, operations with financial derivatives of the same economic nature and treasury operations.

- The company can manage the exposure to FX risk through temporary transactions (e.g. forwards) in the short-term while more complex transactions are structured for the long-term. Once the long-term solutions are executed, the temporary transactions should be liquidated.

- All hedging transactions must be registered at execution and they should be treated preferable under hedging accounting principles following applicable accounting principles, which results in a mitigation of the impact of foreign currency volatility in our income statement, since hedge accounting allows us to offset the exchange rate differences from financial obligations denominated in foreign currency with valuation of hedging instruments in the foreign currency component within the income statement. The objective of hedge accounting is to represent, in the financial statements, the effect of risk management activities that use financial instruments to manage exposures arising from particular risks that could affect profit or loss or other comprehensive income (OCI). Hedge accounting is a technique that modifies the normal basis for recognizing gains and losses (or revenues and expenses) on associated hedging instruments and hedged items, so that both are recognized in profit or loss (or OCI) in the same accounting period. This is a matching concept that eliminates or reduces the volatility in the statement of comprehensive income that otherwise would arise if the hedged item and the hedging instrument were accounted for separately under IFRS. The valuation of hedging instruments due to interest rates is registered under the other comprehensive income account in the shareholders' equity.

Amounts outstanding under our ECP Program and the Old Notes are currently not hedged. We intend to hedge the foreign currency exposure related to the New Notes.

### *Funding Cost Evolution*

We carefully monitor the cost of funds from our various funding sources. We order and access each batch of funding on a least cost basis. The evolution of the cost of funding has increased due to the increase in the DTF, the weekly deposit rate. This increase has been partly offset by a lower spread charged by the local banks. The chart below sets out our effective average interest rate, including working capital and capital markets notes as of the dates shown:

| Date | Effective Average Interest Rate |
|---|---|
| December 31, 2020 | 9.10% |
| December 31, 2021 | 9.01% |
| December 31, 2022 | 10.68% |
| September 30, 2023 | 12.77% |

The evolution of the DTF is shown below:

| | DTF Rate | | | |
|---|---|---|---|---|
| | **High** | **Low** | **Average** | **End of Period** |
| 2017 | 7.12% | 5.31% | 6.10% | 5.21% |
| 2018 | 5.29% | 4.35% | 4.72% | 4.54% |
| 2019 | 4.64% | 4.32% | 4.49% | 4.46% |
| 2020 | 4.66% | 1.94% | 3.46% | 1.94% |
| 2021 | 3.04% | 1.70% | 2.02% | 3.04% |
| 2022 | 13.70% | 3.21% | 8.17% | 13.70% |
| 2023 (January to September) | 11.15% | 3.21% | 6.83% | 10.90% |

## Distribution Network

We have business offices in 14 cities and towns in Colombia, with loan disbursements in 626 of Colombia's 1,123 provinces (municipios). We focus on small and intermediate cities, which we believe are underserved by the financial industry and have significant growth potential. We serve our target market through:

- *Mobile units*. Vehicles offering financing products, which are fully equipped and connected to our central system, with capabilities to approve credit immediately.

- *Main customer service offices*. business offices in 14 cities and towns throughout Colombia managing approximately 217 operating agreements with employers.

- *External sales force.* We also offer our products through an external sales force.

## Information Technology

We use information technology systems used by the financial industry but tailored to the specific needs of our products and target market. Main systems include a loan originator for *Credipóliza* and *Tucrédito*, a loan originator specific for credit cards, software for loan administration, customer service software, ERP software for financial, accounting and management control, and a call center for client management and a call center for client management (inbound and outbound). These systems allow us to effectively manage and serve a large number of loan applications and track the performance of our portfolio.

The loan originator for *Tucrédito* was updated in 2019 to develop the 100% digital platform for the renewal process of selected payroll loans under a self-service model for mobile devices, which represent approximately 100% of the total renewals per month. We expect to decrease origination costs and retain more clients with our digital platform, as this new channel will allow us to present new offers and financing alternatives to our current clients who have additional indebtedness capacity.

In the past year we have worked on initiatives for digital innovation in our business model. We started by redesigning and digitalizing our origination processes to achieve higher efficiency and agility for our clients.

In order to strengthen the operation, the integrity of information and as a part of our strategic objectives, we finalized the implementation of ERP (Apoteosys), updated Bizagi–our software for origination of payroll–and began operations of our data warehousing project.

The following projects were undertaken during the period from 2020 through September 30, 2023:

- Management of 59 productive changes for the different products (Bill Payment and Credit Card), plus improvements in the core and non-core transversal platforms.

- Implementation of the latest version of Bizagi BPM (version 11.8).

- Development of technological platforms to optimize the collection processes of the billing product, achieving a positive impact on the preparation times of information to be transmitted to the payment offices.

- MVP implementation of Azure DevOps platform for project management and technology requirements.

- Implementation of the transmission of support documents for acquisitions according to the DIAN (Colombian tax office) request.

- Improvement of the experience of the digital payment placement platform, anticipating the identity validation process.

- Implementation of documents, certificates, among others, through virtual channels, thereby achieving self-management by clients.

Our back office is located at our headquarters in Bogotá, providing support to our customer service centers. Our back office **uses** a technology platform that allows efficient processing based on what it believes to be highly timely and reliable information. This platform helps us to achieve prompt and effective decision-making and to successfully meet client needs. We devote significant efforts to maintaining our valuable human resources as well as providing continuous training and development programs that promote better growth dynamics and improved skills among employees.

**Credit Risk**

Throughout our 20 years of experience, we have developed and refined our proprietary underwriting standards and scoring methodology designed specifically by us for our target market. We believe that our access to key information about our clients, such as their payment history of utility bills, improves the precision of our risk models compared to other financial institutions and thereby allows us to manage and control risk more efficiently.

We follow the best practices of the Colombian financial industry (management of credit risk, operational risk, anti-money laundering risk and liquidity and market risk) and international guidelines (Basel III), and we have a local rating as a loan originator and servicer of "ori BB+ " by BRC Standard and Poor's.

**Credit Risk Cycle**

We implement a five-step process to address our credit risk:

1. *Product characterization.* In this stage, we define the payment profile of the client, based on payment history from the utility companies or on the collection channel that will be utilized; we also analyze the client's capacity of payment, based on the maximum discount allowed by law for payroll loans or in the maximum installment allowed by the credit card's risk model. Finally, we analyze the need for any collateral.

Payroll loans are characterized as low risk, as collection is done at the employers' level; also it is highly atomized, diversifying our portfolio. Credit card collection risk is mitigated by analyzing the information on the customer that the public utility companies provide.

2. *Risk identification.* In terms of credit scoring for payroll loans, potential clients are ranked in terms of preferred, low, medium, high risk and rejects. This is based on credit scoring in credit bureaus, demographics and variables associated with each payroll loans agreement. For each client rank, there are specific policies, processes and associated terms and conditions.

In terms of credit scoring for credit cards, potential clients are ranked in terms of preferred, low, medium, high risk and rejects. This is based on credit scoring cross referencing two models: rating agencies against historical payments for each client's utility bill. There are also regional skews. For each client rank the credit card limit is calculated as a function of: economic activity, socio-economic segments, level of consumption of the public utility, salary and profile.

3. *Approval process.* The approval process is differentiated for each level of risk; each one has separate policies, processes and terms and conditions. The approval will determine the maximum amount available, the need for guarantee, the interest rate and tenor, among others.

Current policies are the result of our more than 20 years of experience in the Colombian market. Scoring models have been developed in-house and with specialized companies, industry leaders.

Furthermore, we have proper controls to mitigate fraud in credit applications, specifically: documentation provided by the client, including fingerprints and signatures, is verified by experts that guarantee the identity of the applicant and cross referencing of information provided is done by phone.

4. *Recovery*. In accordance with the days past due and individual scoring, there is a recovery process: (i) welcome, (ii) preventive collection, (iii) commercial collection for the first 30 days, (iv) administrative collection from day 31 to day 180 and (v) recovery after 180 days. The recovery strategy has three levels: (a) strategic in line with client segmentation, (b) operational and (c) administrative.

5. *Follow up and evaluation.* Between the Credit/Risk area and the Risk Committee there is constant follow up of applied policy, vintage analysis, and credit/risk analysis to identify negative patterns early and take corrective actions and adjust policies and models.

### Provisions

Our Risk Department is responsible for calculating the minimum level of provisions that should be on the balance sheet based on a model of Expected Loss, similar to the process used by the financial institutions; these models are applied to all of our loan portfolio products.

### Impairment Model

Under the guidelines of the accounting standard IFRS 9, Credivalores changed its model of impairment loss incurred to expected loss, which is set based on a classification of operations in three stages:

- Stage 1- assets without significant deterioration or in normal situation.

- Stage 2 - assets with a significant increase.

- Stage 3 - assets with objective evidence of impairment.

The fundamental concept of the new model is based on an approach of dual measurement, depending on the stage of the financial instrument classification. Stage 1 impairment is equal to the expected credit losses (ECL) over 12 months, and

for stages 2 and 3 the impairment is equal to the credit losses over the expected lifetime. The following are the criteria of the standard:

- For the losses over the lifetime of the asset we use the same methodology that would apply for credit losses expected over a year, but instead of covering only the first year, we calculate the impairment on the expected life of the contract, including extension of the instrument options.

- A financial asset is classified as low-credit risk if the issuer has an investment grade credit rating. The 12-month ECL are the portion of ECL that result from default events on a financial instrument within the 12-month period after the reporting date.

For the calculation of the ECL of payroll loans and credit cards, we have decided to use the granular depreciation approach, considering the following aspects:

- The exposure and the corresponding risk parameters are calculated individually for each period.

- The exposure and the corresponding risk parameters are consistent within each period but may vary between periods.

- The estimate of the ECL is individual per period.

- 12-months ECL and lifetime ECL calculations, are made by adding the individual ECL for each respective risk horizon (one year, lifetime).

- The ECL will be fixed, according to the payment frequency: monthly, quarterly, semi-annual, annual, among others.

- The granular amortization approach captures the dynamic behavior of the risk parameters with more detail.

In addition to the provisions on the balance sheet, we disclose in the notes to our financial statements certain guarantees that we have from the FGA. FGA acts as guarantor to certain clients with higher risk profiles; amounts charged under the guarantees are held on a trust to cover any past due loans. FGA assumes risk up to a set limit and is responsible of recording the corresponding guarantees and indemnities and paying out on claims received. We are responsible for managing the risk, processing the loans, allocating guarantees, administering the collection of loans and collateral, processing indemnities and invoicing on behalf of FGA.

The amount of the provisions recognized for this trust fund is contained in a reserve that we have set up to protect our portfolio. The amounts held in FGA due to provisions were Ps. 8,475 million (US$ 2 million) as of December 31,2021. As of December 31, 2022 we didn´t hold reserves, and as of September 30, 2023, the amount of provisions held at the FGA was Ps. 1,720 million (US$ 424 thousand)].

### Data Warehousing

We have a centralized information system that consolidates in a secure manner multiple sources of information, to produce reports which allows for efficient and timely decision-making process, for risk, operations, collection, marketing and management.

Our data warehousing reporting systems are connected into the CORE and BIZAGI loan origination systems, which allow us to generate origination reports available in near real time, showing the status of each product request online, approval and disbursement.

The data warehousing project has reduced timing of operational processes by using one database that prevents files to be manually manipulated and consolidating data from 2016 to date; it generates follow-up reports through information cubes, daily reports and dashboards via web or mobile applications, allowing the user to make comparisons against previous

months and years, and analyzing information from different perspectives, as opposed to monthly manual and statics reports. On the other hand, the analytics team uses these data repositories and data mining tools to perform analysis for credit risk and commercial strategies.

Most importantly, strategic reports which were previously developed monthly for the management team are now produced more quickly with internet access reducing the processing time from several hours to five minutes.

Additionally, our team is working on data governance implementation, which will allow the efficient management of data and information of the company, quality and data availability policies definition, strengthen information security.

**Operational Risk**

We implemented our Operating Risk Management System to proactively handle this risk and minimize potential losses, in accordance with international standards (Basel II and AS/NS4360), ISO 31000, and Technical Quality Standard 5254, similar to the requirements for financial institutions supervised by the SFC.

This system enables risk to be managed in a systematic, organized and comprehensive manner, with all the elements required for properly identifying, measuring, controlling and monitoring this type of exposure, as listed below:

- *Organizational structure*: policies, manuals and procedures;

- *Technology platform*: documentation, operating risk event logging;

- *Governing bodies*: disseminating information; and,

- *Training*: Company officers.

Subsequently, in 2023 the operational risk matrices were updated in accordance with the following defined phases: identification, measurement and control of operational risk. Furthermore, we continued strengthening our operational risk culture at every level of the organization by launching a new e-learning course for operational risk and through collection and recording of all of the operational risk events.

The operational risk function has been focused on the following activities:

- Update of all of the policies, procedures and Operational risk methodologies;

- Determine Operational Risk phases: Phase I, CORE processes and action plans, Phase II, Commercial processes and support, identification, measurement and control, and Phase III, support processes, identification, measurement and control; and

- Training and event register.

We have mapped out all of the inherent and residual risks, risk factors and mitigants for all of the operational risk phases identified above. Also, after finalizing each phase, the risk maps are discussed to define action plans.

**AML/TF Risk**

We have implemented our own self-regulating system with respect to managing our anti-money laundering risk, based on our operations, risk exposure and size, in accordance with best practices adopted by the financial industry supervised by the SFC.

During 2023, we were fully compliant with the requirement to submit AML reports to the Financial Information and Analysis Unit of the Ministry of Finance (*Unidad de Información y Análisis Financiero*), through the SIREL application and with the monitoring of the entire client base through the VIGIA application. As of September 2023, there were no hits in

restrictive lists with regards to all our suppliers, personnel, board members, local and international shareholders or clients. Restrictive lists screenings are done on a monthly basis.

The VIGIA application we use include its own restrictive lists (*i.e.*, Fraud List, which is administered by the Credit/Risk department, Past Due List (which is administered by the Collections department and not part of the AML/TF effort).

AML/TF training is done through e-learning applications for new employees. As of September 30, 2023, 97% of our employees have received AML/TF training.

**Corporate Structure**

The following chart shows our corporate structure as of September 30, 2023. We also hold 3.01% of our shares in treasury.



As of the date of this Statement, we have no subsidiaries.

We also hold investments with no significant influence in Inverefectivas (25%), a Panamanian investment company, equivalent to Ps. 12,616 million (US$ 3 million).

**Property and Leases**

Our executive offices in Bogotá, as well as all of our service offices and branches throughout Colombia, are located on leased premises. Our main fixed assets consist of computers and other office furniture and equipment.

**Intellectual Property**

In addition to other intellectual property such as copyrights and licenses, we own the following trademarks: *Crediyá, Credivalores, Credipóliza, Crediservicios, Credipóliza, Su Dinero Siempre, Credi1uno, Creditrade, CV Credit, Tu Aliado Experto en Libranza, Crediseguro CV, Credicasa, Credipuntos, Crediuno Avances, Credimanía, Tutaxi CV, Tuvehículo Tu Taxi CV, Credilibranza CV, Libranza Premier, La Felicidad de Ahorrar, Tuseguro CV,* all of which are registered with the Superintendency of Industry and Commerce.

**Litigation**

We are from time to time involved in certain legal proceedings that are incidental to the normal conduct of our business. We do not believe that the outcome of any such proceedings, if decided adversely to our interests, will have a material adverse effect on our business, financial condition, cash flows or results of operations.

# MANAGEMENT

**Board of Directors**

Our management team is comprised of experienced professionals with deep knowledge of their areas, who we believe have been responsible for the development and growth of our business.

The combined knowledge, experience and commitment of our management team and our shareholders have been crucial in determining our strategy and building new initiatives.

Pursuant to our bylaws, our board of directors must be composed of seven principal members with their alternates. Each member of the board holds office for a term of one year and may be reelected for subsequent terms. The current members of the board of directors were appointed at shareholders' meetings held on June 6, 2023. The following table presents the members of our board of directors as of September 30, 2023.

| Name | Position | Age |
| --- | --- | --- |
| Gustavo Adrián Ferraro | Principal Member | 62 |
| Luis María Blaquier | Principal Member | 28 |
| José Miguel Knoell Ferrada | Principal Member | 55 |
| Carlos Eduardo Meza Guarnizo | Principal Member | 45 |
| Juan Manuel Trujillo Sánchez | Principal Member | 45 |
| Vacancy | Principal Member | |
| Vacancy | Principal Member | |

Biographical information of the principal members of our board of directors is set forth below. Ages displayed in the chart above are as of September 30, 2023.

*Gustavo Ferraro.* Mr. Ferraro was appointed as an alternate member of our board of directors in May 2014, and as a principal member in August 2015. He is currently the Head of Latin American Markets at Gramercy Funds Management LLC. Previously, Mr. Ferraro served as a Managing Director with Barclays Capital, where he led a Capital Markets team that covered the firm's largest Latin American corporate and sovereign clients focusing on debt capital markets and liability management. He played a key role in Argentina's 2010 reverse inquiry debt restructuring, as well as the country's previous debt restructuring in 2005. From 2000 through 2003, Mr. Ferraro worked in Salomon Smith Barney's Investment Bank where he was head of TMT (Technology, Media & Telecom) for Latin America. From 1994 through 2000, he was the head of the Debt Capital Markets desk for Latin America for Lehman Brothers in New York and he covered Argentina and Chile for Lehman Brothers Investment Banking as the head of their office in Buenos Aires. From 1987 through 1994, he spent time at Citibank in São Paulo, Brazil and in New York, where he was responsible for asset trading and for the coverage of Brazilian and multinational clients and later on became responsible for the debt syndicate desk for emerging markets. Mr. Ferraro received an MBA in Finance from Claremont Graduate School and a degree in Economy from Universidad Católica Argentina in Buenos Aires.

*Luis María Blaquier.* Mr. Blaquier was appointed as a principal member of our board of directors in July 2023. Mr. Blaquier has served on the Board of Directors of Ban100 and Alpha Group. Mr. Blaquier started his professional career in June 2016 as Analyst in Fiorito Factoring, from 2018 to 2020 worked as portfolio manager in Galileo-Copérnico, a hedge fund of US1 billion portfolio, from 2021 to 2022 was Associate Professor in Columbia Business School. Currently Mr. Blaquier is Vice President at GDA Luma. Mr. Blaquier is MBA from Columbia Business School.

*José Miguel Knoell Ferrada.* Mr. Knoell was appointed as a principal member of our board of directors in May 2016. Mr. Knoell serves on the Board of Directors of the following ACON fund/investment vehicle portfolio companies: AMFORA Packaging, Credifinanciera, CryoHoldco de Latinoamerica, Grupo Sala and Vetra. Mr. Knoell is also an observer on the board of NetUno. Mr. Knoell also serves on the board of Fundación Carulla, one of Colombia's most successful early childhood development and education non-profits for underprivileged children. Foundation Carulla was funded with a portion of the proceeds from the sale of Carulla Vivero, a prior ACON fund portfolio company. Mr. Knoell previously served on the board of Carulla Vivero, Fybeca and SAE Towers, among other ACON fund/investment vehicle portfolio companies. Prior to joining ACON in 1998, Mr. Knoell was a Vice President with the Blackstone Group from 1994 to 1998, where he was responsible for the firm's investment and advisory business in Latin America. Prior to joining Blackstone, he was an associate and founder of GBS Finanzas, a privately owned investment banking boutique based in Madrid, Spain. Mr. Knoell started his professional career as an Analyst in the mergers and acquisitions group of S.G. Warburg in Madrid, Spain. Mr. Knoell received a B.A. with honors in Economics from Harvard University.

*Carlos Eduardo Meza Guarniz.* Lawyer from the Javeriana University with a Master's Degree in Law from Columbia Law School in New York and specialization in Tax Law from the Universidad del Rosario, he also has a Professional Certificate in Financial Analysis from the University of New York. He has more than 20 years of experience, an expert in financial transactions, corporate finance and solving complex legal problems. He has participated in the closing of financial transactions for more than US$15 billion and in the design and implementation of high-impact public policies, such as subsidies to more than 3 million families and guaranteed loans for more than US$10 billion. He currently works as Legal Vice President at the National Guarantee Fund.

*Juan Manuel Trujillo Sánchez.* Lawyer from the Javeriana University with a Master's Degree in Economic Law from the same University. He also has a Master's Degree in Law and Corporate Finance from ESADE Barcelona and studied in the Executive Program in Administration at INALDE. He has more than 20 years of experience in commercial, financial, corporate, pension and corporate finance matters. Strengths in negotiation, structuring, contracting and management of financial products through extensive experience in financial regulation, the securities market and the general pension system. He currently serves as Legal Vice President and General Secretary at Colfondos S.A.

**Committees**

*Audit Committee*

We have established an audit committee which will be responsible for presenting proposals to our board of directors on structure, procedures and methodology regarding internal control, evaluating the internal control structure in place and reports from internal auditors and other control entities, presenting programs and controls to prevent fraud and other violations, overviewing the responsibilities and duties of the internal control department, monitoring our risk exposure and our mitigation procedures at least every six months, and presenting a report to our board of directors including a description of the most relevant activities of the committee and the deficiencies detected and recommendations that could affect the financial statements and annual reports.

Set forth below are the names of the main members of our audit committee as of September 30, 2023:

| Name | Position | Independent |
| --- | --- | --- |
| José Miguel Knoell Ferrada | Board Member | No |
| Juan Manuel Trujillo Sánchez | Board Member | Yes |
| Carlos Eduardo Mesa Guarnizo | Board Member | Yes |

***Other Committees***

Our board of directors has established several committees, including the Risk Committee, which consists of: President, Credit Manager, Collections Manager, Credit Approvals Manager, Operations Manager and the Commercial Directors.

**Principal Officer**

In October 2023, Jaime Francisco Buriticá Leal joined Credivalores as Chief Executive Officer of the Company. Mr. Buriticá has more than 20 years of experience in the banking and financial sector in Colombia as Treasurer and Commercial. Mr. Buriticá holds an MBA and postgraduate studies in Economics and a Finance from Los Andes University. Mr. Buriticá leads a team of highly qualified professionals in various business areas at the Company.

**Employees and Labor Relations**

As of September 30, 2023, we had a total 128 employees, of which 5 were officers and 8 were managers. We have no unions.

# PRINCIPAL SHAREHOLDERS

## Share Ownership

The following table sets forth certain information about the ownership of our capital structure as of September 30, 2023:

| Shareholders | Common Shares | Series A Preferred Shares | Series B Preferred Shares | Series C Preferred Shares | Series D Preferred Shares | Treasury Stock | Total | % of Total |
|---|---|---|---|---|---|---|---|---|
| Crediholding S.A.S. | 1,642,120 | - | - | | | | 1,642,121 | 20.59% |
| Lacrot Inversiones 2014 S.L.U. | 260,325 | - | 923,665 | 563,119 | 1,594,984 | | 3,342,093 | 41.91% |
| ACON Consumer Finance Holdings, S. de R.L. | 118,363 | 835,834 | - | | | | 954,197 | 11.96% |
| ACON Consumer Finance Holdings II, S.L. | 17,720 | - | 184,167 | | | | 201,887 | 2.53% |
| Treasury stock | | - | - | | | 239,640 | 239,640 | 3.01% |
| Davalia Gestión de Activos S.L | | | | | 1,594,985 | | | 20% |
| **Total** | **2,038,529** | **835,834** | **1,107,832** | **563,119** | **3,189,969** | **239,640** | **7,974,923** | **100.00%** |

Our main shareholders include international private equity firms with ample experience investing in companies in the financial sector or in middle-market companies in emerging markets. Their philosophy is to be an active investor and form partnerships with the management teams providing support and therefore maximizing growth potential.

The combined knowledge, experience and commitment of our management team and our shareholders have been crucial in determining our strategy and building new initiatives.

## Shareholders

### Crediholding S.A.S. – Seinjet Family

The Seinjet family owns 100% of the shares of Crediholding S.A.S. The Seinjet family has been in the sugar business since 1944 through Ingenio La Cabaña, with approximately 25,000 hectares belonging to the same family and 4,000 employees. La Cabaña currently produces approximately 250,000 tons of sugar per year of which 60% are exported. In 1998,

La Cabaña began cogeneration from cane bagasse with an installed capacity of 45 MW, most of which is being sold on the national interconnected grid.

*Gramercy / Lacrot Inversiones*

Lacrot Inversiones 2014 S.L.U. is an investment fund managed by Gramercy Funds Managements LLC, a US$ 5.6 billion private equity firm, dedicated to emerging markets investment manager based in Greenwich, CT with offices in London, Hong Kong, Singapore and Mexico City, with a presence in Lima and Buenos Aires. The firm was founded in 1998, and it seeks to provide investors with superior risk-adjusted returns through a comprehensive approach to emerging markets supported by a transparent and robust institutional platform. Gramercy offers both, alternative and long-only strategies across all asset classes (U.S. dollar-denominated debt, local currency-denominated debt, high yield corporate debt, distressed debt, equity, private equity and special situations).

The investment professionals at Gramercy have dedicated their careers to emerging markets. Its investment team has an extensive distressed credit core competency. Due to the hands-on nature of distressed investing, Gramercy has promoted local market relationships that are not easily replicated. For nearly three decades, its investment team has cultivated these deep-rooted, unique local relationships. It believes that the combination of its pan-emerging markets expertise and local market relationships give Gramercy a distinct advantage in emerging markets.

*ACON*

ACON Colombia Consumer Finance Holdings, S.L. and ACON Consumer Finance Holdings II, S.L.U. are investment funds managed by ACON Investments, L.L.C., a middle-market private equity investment firm led by a team that has been investing together for nearly 20 years. ACON partners with management teams to create value through separate funds for its investors across a wide range of industries in the United States and in Latin America. ACON was founded in 1996 and is responsible for managing approximately US$ 5.4 billion of assets with a diverse portfolio of companies spanning over 65 investments.

ACON has professionals in Washington, D.C., Los Angeles, and internationally, in Mexico City, São Paulo and Bogotá. Among its success stories in Colombia are Vivero-Carulla, Vetra Energy, AMFORA Packaging in Colombia and Peru, Grupo Sala, a waste management company in North West Colombia and, more recently, it has invested in us.

*GDA Luma*

GDA Luma is an American investment fund, specializing in supporting companies and working collaboratively with stakeholders to carry out disciplined recapitalizations and operational transformations. The GDA Luma team has experience in investments of more than US$6 billion in North America, Europe and Latin America. The GDA Luma team has proven industry expertise to drive successful operational transformations and grow strategic partnerships and has a long-standing association with Gramercy.

**Shareholding Structure**

We have four types of shares: common shares, series A preferred shares, Series B preferred shares, Series C preferred shares and Series D preferred shares. Each share of Series A, Series B and Series C preferred shares entitles its holders to the same number of votes per share as the common shares.

The Series A preferred shares are (i) subordinated to our existing and future indebtedness and (ii) senior only in right of payment and upon a liquidation, bankruptcy, reorganization, dissolution or winding up of the company or a sale or distribution of all or substantially all of our assets in connection therewith, a "liquidating event", to the common shares, and will be junior to the Series B preferred shares and the Series C preferred shares. Upon the occurrence of a liquidating event, the holders of the Series A preferred shares will be entitled to receive a liquidation preference over the holders of common shares, but will be junior to the payment of a specified liquidation preference to which the holders of Series B preferred shares and of Series C preferred shares are entitled.

The Series B preferred shares are (i) subordinated to our existing and future indebtedness and (ii) senior only in right of payment and upon a liquidating event, to the common shares and Series A preferred shares, and will be junior to the Series C preferred shares. Upon the occurrence of any liquidating event, the holders of the Series B preferred shares will be entitled to receive a liquidation preference over the holders of common shares and holders of Series A preferred shares, but will be junior to the payment of a specified liquidation preference to which the holders of Series C preferred shares are entitled.

The Series C preferred shares are (i) subordinated to our existing and future indebtedness and (ii) senior only in right of payment and upon a liquidating event, to all other equity securities we have, including Series A preferred shares and Series B preferred shares. Upon the occurrence of any liquidating event, the holders of the Series C preferred shares will be entitled to receive, in preference to the holders of common shares, holders of Series A preferred shares and holders of Series B preferred shares, a specified liquidation preference.

The Series D preferred shares are (i) subordinated to our existing and future indebtedness and (ii) Upon the occurrence of any liquidating event, the holders of the Series D preferred shares will be entitled to receive 40% of the correspondent amount in such event.

# RELATED PARTY TRANSACTIONS

The following table summarizes our related party transactions from December 31, 2022 until September 30, 2023:

| | As of September 2023 (in millions of Ps.) | | | |
| | Shareholders | Other Parties | Investments | Members of the Board of Directors (a) |
| --- | --- | --- | --- | --- |
| Accounts receivable | 1,815 | 87,428 | 17,266 | - |
| Accounts payable | | 148,272 | | 120 |
| Operating expenses | | | | 160 |

| | As of December 2022 (in millions of Ps.) | | | |
| | Shareholders | Other Parties | Investments | Members of the Board of Directors (a) |
| --- | --- | --- | --- | --- |
| Accounts receivable | 1,815 | 83,195 | 19,655 | - |
| Accounts payable | 57 | 148,272 | | 112 |
| Operating expenses | | | | 206 |

These transactions reflect certain disbursements that we make from time to time for the account of our shareholders, such as travel expenses to assist to shareholders or board meetings and other legal expenses, which are reimbursed to us in the short term. The table above summarizes both disbursements and reimbursements. Additional information on related party transactions is available in Note 29 to our Interim Financial Statements.

## INDEPENDENT ACCOUNTANTS

The Annual Audited Financial Statements included in this statement have been audited by PwC Contadores y Auditores S.A.S., independent accountants, as stated in their report appearing herein.

# INDEX TO FINANCIAL STATEMENTS

**Page**

**Interim Unaudited Financial Statements**

Statements of Financial Position as of September 30, 2023 (Unaudited) and December 31, 2022 (Audited) ... F-3

Statements of Income for the nine months ended September 30, 2023 and 2022 ............................................. F-4

Statements of Other Comprehensive Income for the nine months ended September 30, 2023 and 2022 .......... F-5

Statements of Changes in Equity for the nine months ended September 30, 2023 and 2022 ........................... F-6

Statements of Cash Flow for the nine months ended September, 2023 and 2022 ............................................ F-7

Notes to the Interim Unaudited Financial Statements ..................................................................................... F-8

**Annual Audited Financial Statements**

Independent Auditors' Report ......................................................................................................................... F-60

Statements of Financial Position as of December 31, 2022 and 2021 ............................................................. F-66

Statements of Income for the years ended December 31, 2022 and 2021 ........................................................ F-67

Statements of Other Comprehensive Income for the years ended December 31, 2022 and 2021 ..................... F-68

Statements of Changes in Equity for the years ended December 31, 2022 and 2021 ....................................... F-69

Statements of Cash Flow for the years ended December 31, 2022 and 2021 ................................................... F-70

Notes to the Annual Audited Financial Statements ......................................................................................... F-71

**Annual Audited Financial Statements**

Independent Auditors' Report ......................................................................................................................... F-145

Statements of Financial Position as of December 31, 2020 and 2019 ............................................................. F-146

Statements of Income for the years ended December 31, 2020 and 2019 ........................................................ F-147

Statements of Other Comprehensive Income for the years ended December 31, 2020 and 2019 ..................... F-150

Statements of Changes in Equity for the years ended December 31, 2020 and 2019 ....................................... F-151

Statements of Cash Flow for the years ended December 31, 2020 and 2019 ................................................... F-152

Notes to the Annual Audited Financial Statements ......................................................................................... F-153

***Credivalores-Crediservicios S. A.***
*Financial Statements*

*For the periods ended September 30, 2023, and December 31, 2022*

**CREDIVALORES -CREDISERVICIOS S. A.**
**STATEMENT OF FINANCIAL POSITION**
**ENDED SEPTEMBER 30, 2023, AND DECEMBER 31, 2022**
(Stated in millions of Colombian pesos)

| | Notes | September 30, 2023 | December 31, 2022 |
|---|---|---|---|
| **Assets** | | | |
| Cash and cash equivalents | 6 | 95.629 | 273.052 |
| Financial Assets at fair value measure profit or lost | | | |
| Equity Instruments | 7 | 5.205 | 5.698 |
| Derivatives Instruments | 15 | 18.641 | 98.861 |
| Loan portfolio | 9 | - | 381 |
| **Total financial assets at fair value** | | **23.846** | **104.940** |
| | | | |
| **Financial Assets at amortized cost** | | | |
| Consumer loans | 9 | 1.926.824 | 2.005.440 |
| Impairment | 9 | (432.092) | (372.608) |
| **Total Loan portfolio, net** | 9 | 1.494.732 | **1.632.832** |
| Accounts receivable, net | 10 | 281.052 | 320.129 |
| **Total Financial Assets at amortized cost** | | **1.775.784** | **1.952.961** |
| | | | |
| Investments in Associates and Affiliates | 8 | 12.616 | 14.945 |
| Current tax assets | 20 | 37.972 | 32.012 |
| Deferred tax assets, net | 20 | 127.795 | 157.736 |
| Property and equipment net | 11 | 153 | 173 |
| Assets for right of use | 12 | 1.232 | 2.021 |
| Intangible assets other than goodwill, net | 13 | 36.828 | 39.852 |
| **Total assets** | | **2.111.855** | **2.577.692** |
| | | | |
| **Liabilities and equity** | | | |
| **Liabilities:** | | | |
| Financial Liabilities At amortized cost | | | |
| Financial obligations | 16 | 1.674.823 | 2.534.228 |
| Other Lease Liabilities | 12 | 1.468 | 2.179 |
| **Total Financial Liabilities At amortized cost** | | **1.676.291** | **2.536.407** |
| Employee benefits provisions | 17 | 1.159 | 1.053 |
| Other provisions | 18 | 2.483 | 3.028 |
| Accounts payable | 19 | 122.636 | 51.892 |
| Current tax liabilities | 20 | 1.554 | 1.698 |
| Other liabilities | 21 | 33.150 | 40.057 |
| **Total liabilities** | | **1.837.273** | **2.634.135** |
| | | | |
| **Equity:** | 22 | | |
| Share capital | | 225.323 | 135.194 |
| Treasury shares | 22 | (12.837) | (12.837) |
| Reserves treasury shares | 22 | 12.837 | 12.837 |
| Reserves | 22 | 11.038 | 11.038 |
| Additional paid-in capital | | 255.020 | 71.169 |
| Other Comprehensive Income (OCI) | 23 | 1.743 | (49.470) |
| Retained earnings | | (202.464) | 99.995 |
| IFRS convergence result | | (21.910) | (21.910) |
| Net loss income for the period | | 5.832 | (302.459) |
| **Total equity** | | **274.582** | **(56.443)** |
| **Total liabilities and equity** | | **2.111.855** | **2.577.692** |

The accompanying notes are an integral part of the financial statements.

**CREDIVALORES -CREDISERVICIOS S. A.**
**STATEMENT OF INCOME**
**PERIODS ENDED SEPTEMBER 30, 2023, AND SEPTEMBER 30, 2022**

(Stated in millions of Colombian pesos)

| | Notes | For the quarter: | | For the period of nine months: | |
|---|---|---|---|---|---|
| | | July 01, 2023 to September 30, 2023 | July 01, 2022 to September 30, 2022 | January 01, 2023 to September 30, 2023 | January 01, 2022 to September 30, 2022 |
| Interest Income and similar | 24.1 | **66.552** | **69.100** | **216.793** | **248.599** |
| Financial costs interest | 16 | (71.619) | (98.445) | (348.279) | (256.907) |
| Exchange rate differences | 16 | 43.878 | (40.117) | 245.363 | (38.590) |
| Revenue from contracts and other services with customers | 24.2 | **14.304** | **34.718** | **53.860** | **91.209** |
| **Net Interest** | | **53.115** | **(34.744)** | **167.737** | **44.311** |
| | | | | | |
| Impairment of financial and condonation assets loan portfolio | 9 | (28.284) | (23.203) | (81.703) | (54.549) |
| Expense on accounts receivable provisions | 10.4.1 | (3.182) | (2.595) | (9.788) | (8.072) |
| **Gross Financial Margin** | | **21.649** | **(60.542)** | **76.246** | **(18.310)** |
| | | | | | |
| **Other Expenses** | | | | | |
| Employee Benefits | | (2.765) | (3.729) | (9.707) | (10.835) |
| Depreciation and amortization expense | 11 – 13 | (1.544) | (1.552) | (4.685) | (4.649) |
| Depreciation right of use assets | 12.1 | (981) | (514) | (2.048) | (1.543) |
| Other | 26 | (17.849) | (20.459) | (59.850) | (57.042) |
| **Total Other expenses** | | **(23.139)** | **(26.254)** | **(76.290)** | **(74.069)** |
| | | | | | |
| **Net operating Income** | | **(1.490)** | **(86.796)** | **(44)** | **(92.379)** |
| | | | | | |
| Other Income | 25 | 541 | 192 | 1.302 | 2.260 |
| Financial income | | 1.816 | 2.460 | 6.134 | 4.747 |
| **Financial Income** | | **2.357** | **2.652** | **7.436** | **7.007** |
| | | | | | |
| Investment valuation al fair value | 27 | - | - | (3) | (9) |
| **Financial expense** | | **-** | **-** | **(3)** | **(9)** |
| **Net financial income (expense)** | | **2.357** | **2.652** | **7.433** | **6.998** |
| | | | | | |
| **Net Income before income tax** | | **867** | **(84.144)** | **7.389** | **(85.381)** |
| Income tax | 20 | (112) | 18.125 | (1.557) | 18.604 |
| **Net income for the period** | | **755** | **(66.019)** | **5.832** | **(66.777)** |
| Net earnings per share | | 107 | (14.389) | 842 | (13.956) |

**CREDIVALORES -CREDISERVICIOS S. A.**
**STATEMENT OF OTHER COMPREHENSIVE INCOME**
**PERIODS ENDED SEPTEMBER 30, 2023, AND SEPTEMBER 30, 2022**
**(Stated in millions of Colombian pesos)**

| | For the quarter ended September 30 | | For the period ending September 30 | |
|---|---|---|---|---|
| | **2023** | **2022** | **2023** | **2022** |
| Net income for the period | 755 | (66.019) | 5.832 | (66.777) |
| **Other comprehensive income** | | | | |
| **Items that may be or are reclassified to profit or loss** | | | | |
| Shares | (2.354) | - | (2.388) | - |
| Unrealized gains (losses) from cash flow hedges: | | | | |
| Valuation of financial derivatives Forwards | - | (567) | 161 | (214) |
| Valuation of financial derivatives Cross Currency Swaps | - | 4.572 | 17.074 | (66.146) |
| Valuation of financial derivatives Options | (1.296) | 1.330 | 64.751 | 47.438 |
| Income tax | 760 | (1.867) | (28.384) | 6.623 |
| **Total other comprehensive income for the period** | **(2.889)** | **3.467** | **51.214** | **(12.299)** |
| **Total other comprehensive income** | **(2.134)** | **(62.552)** | **57.046** | **(79.076)** |

The accompanying notes are an integral part of the financial statements.

**CREDIVALORES- CREDISERVICIOS S. A.**
**STATEMENT OF CHANGES IN EQUITY**
**PERIODS ENDED SEPTEMBER 30, 2023, AND DECEMBER 31, 2022**
(Stated in millions of Colombian pesos)

| | Share capital | Additional paid-in capital | Treasury Shares | Reserves | Other Comprehensive Income (OCI) | IFRS convergence result | Retained earnings | Earnings for the period | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Balance as of December 31, 2021** | **135.194** | **71.169** | **(12.837)** | **23.875** | **(36.874)** | **(54.848)** | **126.996** | **5.936** | **258.611** |
| Appropriation of earnings | - | - | - | - | - | - | 5.936 | (5.936) | - |
| Increases (decrease) in other comprehensive income | - | - | - | - | (12.299) | - | - | - | (12.299) |
| Net income for the period | - | - | - | - | - | - | - | (66.777) | (66.777) |
| **Balance as of September 30, 2022** | **135.194** | **71.169** | **(12.837)** | **23.875** | **(49.173)** | **(54.848)** | **132.932** | **(66.777)** | **179.536** |
| **Balance as of December 31, 2022** | **135.194** | **71.169** | **(12.837)** | **23.875** | **(49.470)** | **(54.848)** | **132.932** | **(302.459)** | **(56.444)** |
| Appropriation of earnings | - | - | - | - | - | - | (302.459) | 302.459 | - |
| Capitalization | 90.129 | 183.850 | - | - | - | - | - | - | 273.979 |
| Increases (decrease) in other comprehensive income | - | - | - | - | 51.214 | - | - | - | 51.214 |
| Net income for the period | - | - | - | - | - | - | - | 5.832 | 5.832 |
| **Balance as of September 30, 2023** | **225.323** | **255.019** | **(12.837)** | **23.875** | **1.744** | **(54.848)** | **(169.527)** | **5.832** | **274.582** |

The accompanying notes are an integral part of the financial statements.

**CREDIVALORES -CREDISERVICIOS S. A.**
**STATEMENT OF CASH FLOWS**
**PERIODS ENDED SEPTEMBER 30, 2023, AND SEPTEMBER 30, 2022**
(Stated in millions of Colombian pesos)

| | Notes | September 30, 2023 | September 30, 2022 |
|---|---|---|---|
| **Cash flows from operating activities** | | | |
| (Loss) Profit after income tax | | 5.832 | (66.777) |
| | | | |
| **Reconciliation of (loss) profit after income tax:** | | | |
| Depreciation of tangible assets | 11 | 65 | 212 |
| Depreciation of assets by right of use | | 2.048 | 1.543 |
| Amortization of Intangible Assets | 13 | 4.620 | 4.447 |
| Amortization of expenses paid in advance | | 2.688 | 4.403 |
| Call Premium Amortization | | 41.188 | - |
| Increase in Impairment for Credit Portfolio | | 75.058 | 48.141 |
| Amortization of Transaction Costs Liabilities | 29 | 40.582 | 23.782 |
| Increase in forgiveness | | 6.645 | 6.408 |
| Impairment Accounts Receivable | | 9.788 | 8.072 |
| Valuation of Derivative Financial Instruments | | 107.347 | - |
| Portfolio valuation measured at fair value | | 381 | - |
| Exchange adjustment in investments in associates | 8 | (25) | (1.894) |
| Interest causation of financial obligations | | 197.030 | 196.635 |
| Exchange Difference Financial Instruments | | 244.067 | 39.830 |
| Income tax | | 1.557 | (18.604) |
| | | | |
| **Cash generated by operations** | | | |
| | | | |
| **Net change in operating assets and liabilities:** | | | |
| Increase in the portfolio of capital and interest loans | | 57.973 | 12.387 |
| Increase in Accounts Receivable | | 27.651 | (79.216) |
| Acquisition of Intangible Assets | | (1.607) | (1.927) |
| Increase in prepaid expenses | | (2.632) | (4.319) |
| Loss of intangible assets | | (40) | 146 |
| Increase (Decrease) of Accounts Payable | | 70.775 | (29.294) |
| Employee Benefits Increase | | 106 | 179 |
| Income tax paid | | (6.103) | (3.096) |
| Increased Provisions | 18 | (545) | 7.335 |
| Increase in Other Liabilities | | (6.905) | 23.139 |
| **Net cash provided by operating activities** | | **389.410** | **171.532** |
| | | | |
| **Net change in investment assets:** | | | |
| Increase in investments in FIC'S financial instruments | | 459 | 385 |
| Acquisition of property and equipment | | (45) | (174) |
| **Net cash provided for investment activities** | | **(414** | **211** |
| | | | |
| **Net change in operating activities** | | | |
| Acquisition of financial obligations | | 173.145 | 733.212 |
| Derivatives maturity payment | | 35.450 | 291.768 |
| Payment of financial obligations | | (774.338) | (888.158) |
| Interest payment financial obligations | | (225.287) | 241.935 |
| Premium payment option Call | | (48.227) | - |
| Capitalization | | 273.980 | - |
| Payment of financial leases | | (1.970) | (1.746) |
| **Net cash used for financing activities** | | **(567.247)** | **(106.859)** |
| | | | |
| **Increase (decrease) in cash and cash equivalents** | | **(177.423)** | **64.884** |
| Cash and cash equivalents at the beginning of the period | | 273.052 | 148.513 |
| **Cash and cash equivalents at the end of the period** | | **95.629** | **213.397** |

The accompanying notes are an integral part of the financial statements.

**CREDIVALORES- CREDISERVICIOS S. A.**
**DISCLOSURES TO THE FINANCIAL STATEMENTS**
**ENDED SEPTEMBER 30, 2023, AND DECEMBER 31, 2022**
(Stated in millions of Colombian pesos)

## NOTE 1. REPORTING COMPANY

Credivalores-Crediservicios S.A., (hereinafter "Credivalores", the "Company" or "CVCS"), is a stock company registered for business in Bogotá - Colombia, located at Carrera. 7 No. 76-35 P 7, and a website at www.credivalores.com.co. The Company was incorporated through Public Deed No. 420 dated February 4, 2003, drawn up before the Public Notary No.1 of the Circuit of Cali. The term of duration of the Company is twenty years as of the date of the aforementioned deed.

The merger of Crediservicios S.A. and Credivalores S.A. was registered through Public Deed No. 4532 of December 12, 2008. The merger was unanimously approved by the General Meeting of Shareholders of both companies on July 31, 2008, whereby it was determined that Crediservicios S.A. (the surviving company), would continue to legally exist after taking over Credivalores S.A. which would cease to exist (being dissolved but not liquidated). In addition, the equity of Credivalores S.A. was merged with that of Crediservicios S.A. by acquiring the assets and assuming the liabilities of both companies, as agreed on by both company's legal representatives.

This merger agreement was reported to the Colombian Superintendence of Industry and Commerce, which did not report any objections to the aforementioned process. Credivalores S.A. (the acquired company) was incorporated through Public Deed No. 1906 dated May 13, 2003, drawn up before the Public Notary No. 1 of the Circuit of Cali, and duly registered with the Chamber of Commerce of Cali on May 21, 2003, under Registry Number 3501 Book IX. Subsequently, the Company changed its name from Crediservicios S.A. to Credivalores-Crediservicios S.A.S, becoming a simplified stock corporation, by means of the Public Deed No. 529 dated February 27, 2009, drawn up before the Public Notary No. 1 of the Circuit of Cali.

Through Minutes No. 16 dated February 23, 2010, of the General Meeting of Shareholders, duly registered before the Chamber of Commerce on March 19, 2010; the Company became a simplified joint stock company with the name of Credivalores-Crediservicios S.A.S. under Registration Number 3074 of Book IX.

By public deed No. 3175 of notary No. 73 of Bogota D.C. as of June 28th, 2019, registered July 9th, 2019 under Number 02484244 Book IX, the company changed its name from CREDIVALORES - CREDISERVICIOS S. A. S. to CREDIVALORES - CREDISERVICIOS S. A. under the figure of a stock corporation.

The Company's business purpose is to originate consumer loans, including payroll deduction loans, to private individuals or legal entities, using both its funds and other sources of funding permitted by law. In carrying out these activities, the Company may:

a) Perform risk assessments,
b) Service and manage loans or lines of credit, including but not limiting the collection and registration of these obligations,
c) Purchase and sell loans, securities, and loan portfolios,
d) Borrow funds and enter into transactions allowing the Company to obtain the funds required to perform its corporate purpose,
e) Act as co-signer, guarantor, surety, or collateral provider to raise funds to finance its activities that may be undertaken, structured, or implemented through trust arrangements, and

Perform any other activities that are required as part of the Company's normal course of business, such as: (i) acquiring, encumbering, limiting the domain or disposing of fixed assets (ii) acquiring and using trade names, logos, trademarks, and other industrial property rights; (iii) investing in existing companies, or creating new ones, providing that these companies have the same or similar business activities as the Company or that should relate in any way to its corporate purpose; (iv) entering into partnerships or contracts with third parties to carry out its corporate purpose; (v) guaranteeing its own and third-party obligations.

The funds used by the Company for carrying out its business activities shall be lawfully sourced and therefore the Company shall be prohibited from raising money employing large-scale or regular deposits from individuals, under current legislation. The Company is not under the supervision of the Colombian Superintendence of Finance (Superintendencia Financiera de Colombia) since it is not considered to be a financial institution under Colombian legislation, nor is it allowed to carry out brokerage of instruments registered with the Colombian National Registry of Securities and Issuers (RNVE).

The Company is prohibited from raising money through large-scale and regular deposits from individuals, complying with the stipulations in the financial and exchange regulations.

At the end of September 30, 2023, Credivalores has agencies nationwide, as follows: Bogotá, Armenia, Barranquilla, Bucaramanga, Cali, Cartagena, Cúcuta, Florencia, Ibagué, Manizales, Medellín, Monteria, Neiva, Pereira, Riohacha, Santa Marta, Sincelejo, Tunja, Valledupar and Villavicencio.

**CREDIVALORES- CREDISERVICIOS S. A.**
**DISCLOSURES TO THE FINANCIAL STATEMENTS**
**ENDED SEPTEMBER 30, 2023, AND DECEMBER 31, 2022**
(Stated in millions of Colombian pesos)

**Ongoing Business**

Under the provisions of Articles 218 and 457 of the Commercial Code, such as Law 2069 of 2020 in its Article 4 paragraph 1 and Decree 854 of 2021 issued by the Ministry of Industry and Commerce, Credivalores has evaluated from the following perspectives the performance of the Company in recent months:

• Economic environment.
• Payment of obligations with third parties: payroll, suppliers, and tax national, district, and municipal entities, financial liabilities.
• Financial Forecasts.
• Ability to continue offering business model products.

As stated in the conceptual framework, in paragraph 3.9 ongoing business hypothesis, financial statements are normally prepared under the assumption that a reporting entity is in operation and will continue its activity for the foreseeable future. Therefore, it is assumed that the entity does not intend or need to liquidate or cease its business. If such an intention or need would exist, financial statements may have to be prepared on a different basis. If so, the financial statements describe the basis used.

**Economic overview**

2023 began with a marked expectation of a global economic slowdown, where signs of recession, accompanied by persistent inflation were perceived. However, during the first half of 2023 we have seen how the inflationary cycle at the global level has subsided because of the actions implemented by the different Central Banks and economic growth has been higher than expected. So far this year, different adverse situations have been avoided, such as the failures of some banks in the USA and Europe, together with the measures adopted by central banks to deal with inflation, a situation that has had a significant impact on the purchasing power and consumption of households. To date, it could be considered that the global economy has overcome the worst possible circumstances expected for this year but without a doubt, 2023 will be a year of economic slowdown.

In line with this behavior, the Bank of the Republic has been emphatic about the need to control inflation, systematically increasing the intervention rate to 13.5%. As in other latitudes, inflation has begun to ease while the dynamics of economic growth and household consumption slowdown, which is leading us to a new equally challenging situation for the remainder of 2023 and expectations for 2024. Likewise, within the new estimates for the end of 2023, inflation is expected to close at levels close to 11.5%, an event that will allow the Bank of the Republic to start with the de-escalation of the intervention rate, at lower levels than initially expected, but with expectations that at the end of December it will approach 11.5%.

Colombia PIB growth expectations have also been reconsidered, understanding that the growth-generating sectors will be represented by public spending and service activities, where the slowdown will make its mark on the labor market and will require greater support from public finances to weigh the effect on the most vulnerable population. Likewise, the impact associated with the increase in fuel prices and the possible effects of the El Niño phenomenon will mean that inflation is not controlled at the speed previously expected, situations that may cause inflation presented in some areas to persist and remain for the remainder of 2023 and 2024.

Additionally, the measures adopted by the FED and in general the global context will determine the exchange rate levels that Colombia will reach, to the extent that the Colombian peso continues to revalue against the dollar will allow the external debt to decrease and the government can allocate more resources for the social agenda defined in the national development plan.

**Payment of obligations with third parties: payroll, suppliers, and fiscal entities of national, district, and municipal order, financial obligations.**

Credivalores has been complying with the payment of the different obligations resulting from the operation and business in progress such as payroll, suppliers, national, district, and municipal tax obligations, and financial obligations.

On the other hand, the company has agreed hedges for a part of its obligations in foreign currency and is managing alternatives and strategies through international intermediaries since the local market does not have the capacity to close these positions or exchange rate exposures.

**Ability to continue offering business model products.**

Credivalores structured additional collateralized lines for the payroll portfolio that allow the company to develop its operational activity in the remainder of 2023.

Additionally, Credivalores has an authorized amount to issue bonds in dollars and available credit lines.

## NOTE 2. BASIS FOR PREPARATION OF THE FINANCIAL STATEMENTS

### 2.1 Basis of Presentation

The financial statements of the company Credivalores Crediservicios S.A., have been prepared in under the accounting and financial reporting standards accepted in Colombia, based on International Financial Reporting Standards (IFRS), together with their interpretations, conceptual framework, the conclusion rationale, and the application guides authorized and issued by the International Accounting Standards Board (IASB) published in Spanish until 2018), excluding IFRS 17 on Insurance Contracts; and other legal provisions defined by government surveillance entities that may differ in some aspects from those established by other State control bodies), established in Law 1314 of 2009, regulated by Single Regulatory Decree 2420 of 2015 modified by Decree 2496 of 2015. They have been prepared based on historical cost.

Law 1314 of July 13, 2009, regulated the financial reporting, accounting, and data security standards and principles accepted in Colombia and identified competent authorities, established the procedure for issuing the standards, and determined the entities responsible for monitoring compliance. This law was regulated through the following decrees:

a) 2784 of December 28, 2012
b) 1851 of August 29, 2013
c) 3023 of December 27, 2013
d) 2267 of November 11, 2014

Decree 2615 dated December 17, 2014, came into effect on January 1, 2016. Decree 2615 contains the international accounting and financial reporting standards in force as of December 31, 2013, and their corresponding amendments issued by the International Accounting Standards Board IASB in force today. With this, the regulatory technical framework contained in the annex to Decree 2784 dated December 28, 2012, and Decree 3023 dated December 27, 2013, was revoked.

Credivalores reports comparative information from the immediately previous period for all values included in the current period's financial statements and includes comparative explanations, when necessary, to ensure the current period's financial statements are understandable.

## NOTE 3. JUDGMENTS AND CRITICAL ACCOUNTING ESTIMATES IN THE APPLICATION OF ACCOUNTING POLICIES

The preparation of the financial statements requires management to make judgments, estimates, and assumptions that affect the implementation of accounting policies and reported amounts of assets and liabilities, and income and expenses.

Credivalores S.A. will disclose the nature and amounts of changes in accounting estimates that are significant and affect the current period or are expected to affect any impact in future periods. Information on the effect in future periods will not be disclosed if the estimate of the effect is not practical.

The financial statements, the significant judgments made by the administration in the application of the accounting policies of Credivalores, and the main sources of estimation were the same as those applied to the financial statements for the year ended September 30, 2023.

### 3.1 IFRS 9 – FINANCIAL INSTRUMENTS

Credivalores applies IFRS 9 - Financial instruments as of January 1, 2018, according to the following models.

### 3.1.1 IMPAIRMENT MODEL

IFRS 9 – financial instruments, pose significant changes in the assessment of the impairment of financial instruments and, therefore, its associated risk. In particular, the standard proposes a new approach that pursues the identification of the significant increase of the risk of credit (SIRC) in an instrument before the identification of objective evidence of impairment (OEI).

From the above, the company has advanced in the construction of quantitative and qualitative criteria to identify the significant increase in the credit risk of an instrument. Although a quantitative criterion as the main principle is used to evaluate the (SIRC), qualitative criteria have also been developed in case it is not possible to apply the quantitative criterion or it cannot be used for specific financial assets.

Impairment-related requirements are applied to financial assets measured at amortized cost and fair value with changes in other comprehensive income (FVOCI) whose business model remains to collect (contractual cash flows) and sell.

The expected credit loss model considers the prospective nature of loss tolerances for instruments, based on expectations of future behavior.

For the calculation of the expected loss of payroll and Credit Card products, Credivalores has decided to use the Granular Amortization approach, considering the following aspects:

- Exposure and corresponding risk parameters are calculated individually for each period.
- Exposure and corresponding risk parameters are intended to be constant within each period but may vary between periods.
- The calculation of the EP is individual by period.
- Calculations of PE12m and PE in life are performed by adding the individual PEs for each respective risk horizon (one-year, whole life).
- The frequency of payment is fixed according to its depreciation: monthly, quarterly, semi-annual, and annual, among others.
- The granular depreciation approach captures the dynamic behaviors of risk parameters at high granularity (more detailed).

**Main sources of calculation**

The central concept of impairment under the new IFRS 9 impairment model is based on a dual measurement approach that takes into consideration the current level of expected impairment of each loan, compared to initial recognition, and requires recognition of impairment over the difference between expected credit losses in 12 months if no significant changes in risk have occurred since initial recognition; otherwise, a credit loss amount is recognized over the expected life of the financial instrument.

This model is complemented by stress analysis and scenarios with inputs that are not controlled by the Company, such as macroeconomic factors. To this end, the Company has developed a statistical model for the projection of PDs through neural networks in a univariate way.:

**1. Search for possible associations with macroeconomic variables:** From the collection of information on macroeconomic variables that were considered, we went through the Principal Components Analysis (PCA) method and the Stepwise method (STW) to find the possible associations of macroeconomic variables with each of the PD of the products, these were considered our explanatory variables.

**2. Univariate projections:** We project the PD and the macroeconomic variables associated, we do this in a univariate way through neural networks, in some macroeconomic variables we use classic methods such as ARIMA models. The argument of selection of the best model to make the projections of each series is the lowest value found with the root of the mean square error both in training and the validation set (test), it is also important to highlight that the models chosen are those where there is coherence in the projections.
The projected PD is considered the PD of our BASE scenario, and this is precisely the target variable in multivariate scenarios. The fundamental argument for the PD to be projected in a univariate way is that by doing so we are doing it only with the information that the series keeps, that is, although we know that a series is the reflection of other variables, in principle we look for the information that only it gives us, to later observe how it is affected by macroeconomic variables.

**3. Generation of scenarios:** For Forward-looking models, we must generate two scenarios in our projections of macroeconomic variables, one optimistic and one pessimistic. To achieve this, we rely on descriptive measures of each of the series, in this case, the projected scenarios are given by the standard deviations that are needed to reach quartiles 25% and 75% of each of the macroeconomic series, understanding these points as critical values for both an optimistic and pessimistic scenario.

**4. Multivariate adjustment:** With the macroeconomic variables projected in the BASE scenario, a multivariate neural network is adjusted, understanding that the variables associated with each of the products are the explanatory variables and the response variable, that is, the PD is our explained variable. The best fit that is determined by the smallest root of the mean square error is our chosen neural network model. With this model and with the optimistic and pessimistic projections of the

associated macroeconomic variables, we proceed to project each of the optimistic and pessimistic scenarios in a multivariate way.

The selected variables that determine the adjustment factor for each product are listed in the following tables:

- Variables Crediuno

| Label | Variable Description |
|---|---|
| IPC_LAG3 | Consumer price index to 3 lags |
| PIB_LAG3 | Gross Domestic Product to 3 lags |
| PIB_TCA | Gross Domestic Product. Annual Growth Rate |
| TU | Maximum Rate Allowed |
| IPP | Producer price index |
| ITCR_USA | Real exchange rate index according producer price index - US bilateral |
| IPEXP | Exports price index, according to foreign trade |
| IPIMPORTO_LAG3 | Imports price index, according to foreign trade |
| ICCP_LAG1 | Heavy construction price index to 1 lag |

Table 8: Selected Variables CrediUno

- Variables Tucredito

| Label | Variable Description |
|---|---|
| ICCP | Heavy construction price index |
| IPC | Consumer price index |
| IPC_INF_ACT | Consumer price index. YTD Inflation |
| IPIMPORT_LAG3 | Imports price index to 3 lags |
| ISE | Economic monitor index |
| ISE_EST | Economic monitor index, data affected by seasonal effect |
| ISE_EST_TC_AC | Economic monitor index, data affected by seasonal effect YTD |
| ITCR_USA | Real exchange rate index according producer price index - US bilateral |
| PIB_LAG1 | Gross Domestic Product to 1 lag |
| PIB_TCA | Gross Domestic Product. Annual Growth Rate |
| TD | Unemployment rate |
| TRM_LAG1 | Foreign exchange rate (COP/USD) to 1 lag |
| TU_LAG3 | Maximum Rate Allowed to 3 lags |
| TU_VAR_LAG3 | Maximum Rate Allowed Change to 3 lags |

Table 9: Selected Variables Payroll (Tu Crédito)

**3.2 Financial Assets Business Model**

Credivalores assess the objective of a business model in which an asset is held at a portfolio level because this best reflects the way the business is managed, and information is provided to management. The information considered includes:

- The expected policies and objectives for the portfolio and the actual application of them In particular whether management's strategy focuses on earning contractual interest revenue, maintaining a particular interest rate profile, matching the duration of the financial assets to the duration of the liabilities that are funding those assets or realizing cash flows through the sale of the assets;
- How the performance of the portfolio is evaluated and reported to Credivalores management;
- The risks that affect the performance of the business model (and the financial assets held within that business model) and how those risks are managed; and
- The frequency, volume, and timing of sales of financial assets in prior periods, the reasons for such sales, and its expectations about future sale activity. However, information about sales activity is not considered in isolation, but as part of an overall assessment of how Credivalores stated objective for managing the financial assets is achieved and how cash flows are realized.

Credivalores Crediservicios S. A. seeks to maintain various sources of financing locally and internationally from the banking and capital markets.

The assessment of whether contractual cash flows are solely payments of principal and interest (SPPI).

For this assessment, 'principal' is defined as the fair value of the financial asset on initial recognition. 'Interest' is defined as consideration for the time value of money and for the credit risk associated with the principal amount outstanding during a particular period and for other basic lending risks and costs (e.g. liquidity risk and administrative costs), as well as profit margin.

In assessing whether the contractual cash flows are solely payments of principal and interest, Credivalores considers the contractual terms of the instrument. This includes assessing whether the financial asset contains a contractual term that could change the timing or amount of contractual cash flows such that it would not meet this condition.

Credivalores Crediservicios S.A.S.'s business model is based on granting consumer loans quickly through innovative products to middle- or low-income segments that are not served by the traditional financial system.

The Company has developed a diversified platform with collection channels designed to minimize the risk of default and optimize the quality of its loan portfolio (minimize NPL), including payroll deduction loans (discounted from payroll payments), credit cards (collecting via public utility bills), and financing for insurance policy premiums (revocable insurance where the insurer returns the portion of the premium that was not used in case of default).

The business model focuses on building alliances and agreements for the origination and distribution of each one of our products, thus guaranteeing growth. The company has more than 720 agreements with employers that can issue payroll loans, exclusive agreements with public utility companies for invoicing and collecting via credit card, and alliances with third parties and insurers for the origination. The risk management systems are similar to those implemented by other Colombian financial entities and consider characteristics of the target market. These systems have been adjusted according to the experience and knowledge acquired over more than 14 years in the market.

This business model produces a portfolio of diversified products with limited geographic concentration and by loan amount.

The entity applies meaningful judgments to determine its business model to manage financial assets and to evaluate if the financial assets comply with the conditions established in the business model so they can be classified at fair value or at amortized cost. According to the aforementioned, some financial assets have been classified as investments at fair value and others at amortized cost. According to the business model, the financial assets at amortized cost can be sold only in limited circumstances, such as when there are infrequent transactions, adjustments are made to the maturity structure of its assets and liabilities, when it is necessary to finance significant capital disbursements and when there are seasonal liquidity needs.

Investments in equity instruments at fair value have been classified with adjustments through profit or loss, considering that they are strategic investments for the company and, are expected to be sold soon.

Financial Assets at fair value

According to its business model, the Company has determined that TuCrédito payroll deduction loans will be measured at fair value when they meet the following conditions:

1. Maximum term of 90 days as of the date of origination.
2. Highest rating based on its compliance score.

Financial Assets at amortized cost

The loan portfolio is classified at amortized cost when:

The loan portfolio is classified at amortized cost when it meets the following criteria: Credivalores Crediservicios S.A.S.'s business model is to hold these assets to collect their cash flows on specified dates, as per their contractual terms, and the contractual terms of the financial asset give rise on specified dates, to cash flows that consist of payments of principal and interest on the outstanding amount owed.

**3.3 Leases**

Leases are recognized as a right-of-use asset and a corresponding liability at the date at which the leased asset is available for use by the company. Each lease payment is allocated between the liability and finance cost. The finance cost is charged to profit or loss over the lease period to produce a constant periodic rate of interest on the remaining balance of the liability for each period. The right-of-use asset is depreciated over the shorter of the asset's useful life and the lease term on a straight-line basis.

**Variable lease payments**

Some property leases contain variable payment terms that are linked to the profit generated from a specific office. For individual offices, up to 100% of lease payments are based on variable payment terms. Variable payment terms are used for a variety of reasons, including minimizing the fixed costs base for newly established offices. Variable lease payments that depend on profits are recognized in profit or loss in the period in which the condition that triggers those payments occurs.

**Lease terms**

In determining the lease term, management considers all facts and circumstances that create an economic incentive to exercise an extension option, or not exercise a termination option. Extension options (or periods after termination options) are only included in the lease term if the lease is reasonably certain to be extended (or not terminated). The evaluation is reviewed if a significant event or a significant change in the circumstances affecting this evaluation occurs.

**3.4 Seasonal nature of income and expenses.**

The nature of the most important operations of Credivalores Crediservicios S. A is mainly related to traditional activities that are not significantly affected by seasonal factors.

**3.5  Income tax**

The Company evaluates the recognition of liabilities due to discrepancies that may arise with the tax authorities based on additional tax estimates that must be canceled. The amounts provided for the payment of income tax are estimated by the administration based on its interpretation of current tax regulations and the possibility of payment.

Actual liabilities may differ from the amounts provisioned resulting in a negative effect on the Company's results and net position. When the final tax result of these situations is different from the amounts that were initially recorded, the differences impact the current income tax and deferred assets and liabilities in the period in which this fact is determined.

The Company evaluates the recoverability of deferred tax assets based on estimates of future tax results and the ability to generate sufficient results during periods in which such deferred taxes are deductible. Deferred tax liabilities are recorded according to estimates made of net assets that will not be tax-deductible in the future.

**NOTE 4 - ESTIMATIONS OF FAIR VALUE**

The Company may employ internally developed models for financial instruments that do not have active markets. Said models are mostly based on generally standardized valuation methods and techniques. Valuation models are primarily used to assess equity instruments not listed on the stock exchange, derivatives, debt securities, and other debt instruments for which markets were or have been inactive during the financial period. Some components of these models may not be observable in the market and are estimated from assumptions.

The output of a model is always an estimate or approximate value that cannot be determined accurately, and valuation techniques used may not fully reflect all the factors relative to Credivalores positions, therefore the valuations are adjusted if necessary to include additional factors, such as country risk, liquidity risks, and counterparty risks.

Fair value hierarchy has the following levels:

- Level 1 entries are unadjusted prices quoted in active markets for assets or liabilities identical to those the entity can access on the measurement date.
- Level 2 entries are entries other than the quoted prices included in Level 1 that are observable for the asset or liability, either directly or indirectly.
- Level 3 entries cannot be observed for the asset or liability.

The fair value hierarchy in which the fair value measurement is fully classified is determined from the lowest level entry that is significant for fully measuring the fair value. For that, an entry's importance is evaluated regarding the fair value measurement in its totality. Financial instruments quoted in markets considered inactive but valued per quoted market prices, quotes from price providers, or alternative price sources supported by observable entries, are classified in Level 2. A fair value measurement that uses observable entries requiring significant adjustments based on unobservable entries is a Level 3 measurement. The evaluation of a particular entry's importance in measuring the fair value in its totality requires an opinion, considering specific factors of the asset or liability.

The determination of what constitutes "observable" requires a significant opinion from Credivalores. The Company considers observable data that market data that is already available, distributed, or updated regularly by the price provider, is reliable and verifiable, has no property rights, and is provided by independent sources that participate actively in the reference market.

**4.1 Fair Value Measurement on a Recurring Basis**

Level 2 input data elements include the prices quoted for similar assets or liabilities at active markets; the quoted prices for assets or liabilities that are identical or similar in markets that are not active; input data other than quoted prices that are observable for the asset or liability and input data corroborated by the market. According to the above, Credivalores values derivative financial instruments with input data from fair value level 2.

The following table analyzes assets and liabilities (by class) within the fair value hierarchy, measured at fair value as of September 30, 2023, and December 31, 2022, regularly.

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| **ASSETS** | Level 2 | Level 2 |
| Investments in equity instruments | 5.205 | 5.698 |
| **Hedging derivatives** | | |
| Currency forward | - | 5.120 |
| Options | 18.641 | 103.887 |
| Cross Currency Swap | - | (10.146) |
| **Consumer** | | |
| Payroll deduction loans | - | 381 |
| **Total fair value recurring assets** | **23.846** | **104.940** |

**4.2 Fair value determination**

The methodology applicable to instruments for Credivalores is:

4.2.1   **Forward valuation:** The derivative's fair value comes from an internal model. This model takes the exchange rate on the day after the valuation date and forecasts it to a future value using the devaluation curve through the maturity date. After this the new forward market rate is compared to the agreed forward rate and the difference is expressed in present value using the IBR curve to calculate the derivative's fair value.

4.2.2   **Swap Valuation:** the reasonable value of the derivative comes from an internal model. The valuations of the Interest Rate Swaps (IRS) and the Cross-Currency Swaps (CCS) are performed assuming a long and a short position on a bond; including in each case the principal of the operation. For the projection and discount of the cash flows, we use current rates, to calculate the reasonable value of the derivative financial instrument.

4.2.3   **Option Valuation:** The reasonable value of the derivative comes from an internal model. The valuation of an option on its expiry date is the maximum between the premium and the difference between the exercise price and the spot price. For the projection and discount of the cash flows, we use the current rates, to calculate the reasonable value of the derivative financial instrument.

4.2.4   **Loan portfolio valuations:** Because these instruments do not have an active market, the Company has developed methodologies that employ market information for certain cases of unobservable data. The methodology seeks to maximize the use of observable data to arrive at the closest approximation of an initial price for assets and liabilities without an ample market.

The Company has implemented the following methodology to determine its loan portfolio´s Fair Value:

I.   Discount Rate: Determined by product considering the market´s appetite for such product, as well as the default risk involved.

II.   The model was built based on the following factors:

    a. Projected cash flows according to weighted average life for each product, using: Current Balance the Average term to maturity, the weighted average rate.

    b. Calculate the present value of cash flows projected as per described in a) discounted at the discount rate previously described.

    c. Present value determined as per described in b) represents the loan portfolio´s fair value.

**4.2.5 Equity instruments:** Credivalores has equity investments in Agrocañas, representing less than 20% of the company equity and that in mutual funds. In general, the company is not listed on any public securities market, and therefore its fair value is determined using the adjusted net asset value method. For mutual funds fair value is determined through the valuation of investment portfolios managed by the Trust, which are subject to an active securities market.

Credivalores defined Level 3 financial instruments as those not traded in an active market, the following table provides information about valuation techniques and significant unobservable inputs when measuring assets and liabilities at recurrent fair value.

| | Valuation technique | Significant inputs (1) |
|---|---|---|
| **ASSETS** | | - Current Balance |
| | | - Average term to maturity |
| | Adjusted net asset | - Weighted average Rate |
| **Equity Instruments** | value | - Unit value |

#### 4.2.6 Derivative financial instruments

Derivative financial instruments and hedge accounting:

A derivative is a financial instrument in which value changes respond to changes in one or more variables denominated as an "underlying" (a specific interest rate, the price of a financial instrument, a listed commodity, a foreign currency exchange rate, etc.), that has an initial net investment smaller than would be required for other instruments that have a similar response to the mentioned variable and that is settled in a future date.

Credivalores trades in financial markets, forward contracts, future contracts, swaps, and options that fulfill the definition of a derivative.

Financial assets and liabilities from transactions with derivatives are generally not offset in the statement of financial position. However, when there is a legal and exercisable right to offset the recognized values and Credivalores intends to settle them on a net basis or to realize the assets and settle the liability simultaneously, derivatives are presented as net values in the statement of financial position.

Derivative transactions are initially recognized at fair value. Subsequent changes in the fair value are recognized in profit or loss, unless the derivative instrument is designated as a hedging instrument and, in this case, the accounting criteria will depend on the nature of the hedged item, as described below.

At the beginning of the hedging transaction, Credivalores formally documents the relationship existing between the hedging instrument and the hedged item, including the risk management objective and strategy in undertaking the hedging relationship. It also documents its assessment, both initially as well as regularly, of whether the hedging relationship is highly effective in offsetting the changes in fair value or cash flows of the hedged items.

For a fair value hedge of assets or liabilities and firm commitments, changes in the fair value of the derivative instrument are recognized in profit or loss, as well as any other change in the fair value of the asset, liability, or firm commitment attributable to the hedged risk.

For a cash flow hedge of a particular risk associated with a recognized asset or liability or a projected highly probable transaction, the effective portion of changes in the fair value of the derivative is recognized in other comprehensive income. The gain or loss relating to the portion that is not effective for hedging or that does not relate to the hedged risk is immediately recognized in profit or loss.

The values accumulated in other comprehensive income are transferred to profit or loss in the same period in which the hedged item is recognized in profit or loss.

Hedging of net investments in a foreign operation is recognized similarly to cash flow hedging: the effective portion of changes in fair value of the hedging instrument is recognized in other comprehensive income, and the ineffective portion of the changes in fair value of the derivative is recognized in profit or loss. The hedging instrument's gains or losses accumulated in equity will be recognized in profit or loss when the net investment in foreign operations is sold in whole or proportionally if partially disposed of.

Credivalores defined Level 2 financial instruments as those not traded in an active market, the following table provides information about valuation techniques and significant unobservable inputs when measuring derivative assets and liabilities at recurrent fair value.

| | Valuation technique | Significant inputs (1) |
|---|---|---|
| **ASSETS** **Trading Derivatives** Currency Forward Debt securities Forward | Discounted cash flow | - Underlying asset price Currency curve by the underlying asset - Forward exchange rates curve of the operation's currency - Implicit curves of exchange rates forwards - Implicit volatilities matrixes and curves |
| **LIABILITIES** **Derivatives held for trading** Currency Forward Debt securities Forward | Discounted cash flow | - Underlying asset price - Currency curve by the underlying asset - Forward exchange rates curve of the operation's currency - Implicit curves of exchange rates forwards - Implicit volatilities matrixes and curves |

**4.3 Determination of fair value of financial assets and liabilities recorded at amortized cost.**

Below are the Company's assets and liabilities at fair value and their book value:

| | September 30, 2023 | | December 31, 2022 | |
|---|---|---|---|---|
| Fair value | Book Value | Fair Value Estimate | Book Value | Fair Value Estimate |
| **Assets** | | | | |
| Loan Portfolio (Gross) | | | | |
| Consumer | 1.926.824 | 1.870.150 | 2.005.440 | 1.727.703 |
| **Total** | **1.926.824** | **1.870.150** | **2.005.440** | **1.727.703** |
| | | | | |
| **Liability** | | | | |
| Financial obligations | 1.674.823 | 1.700.111 | 2.534.228 | 2.527.648 |
| **Total** | **1.674.823** | **1.700.111** | **2.534.228** | **2.527.648** |

The book value corresponds to the value at amortized cost. The fair value estimate does not include transaction costs.

**4.4 Financial Instruments**

**Financial Assets**

The Company classifies its financial assets into equity instruments, trading instruments, amortized cost investment instruments, credit instruments, and accounts receivable.

At the time of initial recognition, a financial instrument is measured at fair value plus any directly attributable transaction costs, which are not included if the instrument is classified at fair value through changes in profit or loss. Typically, the fair value at the initial time of recognition is the price of the transaction itself, that is, the amount to be paid or received.

Credivalores recognizes loans and accounts receivable, trading and investment securities, and other assets or liabilities on their effective dates.

Purchases and sales of financial assets that are regularly carried out are recognized on the transaction date or on the date on which the Company is required to purchase or sell the asset.

Subsequently, the Company measures its financial instruments at fair value or amortized cost based on the established business model and the contractual terms of the corresponding financial asset or liability.

**i.      Amortized cost**

Amortized cost is the cost of acquiring a financial asset or a liability plus or minus any capital repayments, cumulative amortizations (calculated using the effective interest rate method) regarding any difference between the initial amount and the value repaid at maturity and minus any reduction for impairment.

**ii.     Fair value**

Fair value is the amount to be received should the asset be sold or the amount to be paid for transferring a liability as part of a transaction between market participants on the date on which the measurement is made. The most
objective and commonplace definition of fair value is the price that would be paid in an active, deep, and transparent market ("listed price" or "market price").

When such values are available CVCS determines the fair value of an instrument using the prices listed on an active market for that specific instrument. A market is considered active if listed prices are readily and regularly available and represent real transactions that are performed regularly on a stand-alone basis.

Should no active market exist for a specific financial instrument CVCS determines its fair value using valuation techniques. These valuation techniques include using recent market transactions between knowledgeable, willing parties carried out on an arm's length basis, should these exist, as well as the fair values of other financial instruments that are substantially the same, discounted cash flows, and pricing models.

The valuation technique chosen makes use, to the maximum extent possible, of information obtained directly from the market, using the least amount of data estimated by CVCS, incorporating all those factors that would normally be considered by market participants for setting the price of such financial instruments and is consistent with generally accepted pricing methodologies.

Fair value estimates obtained from financial models are adjusted to consider other factors such as uncertainty on its risk or the liquidity model. Adjustments are included when CVCS believes that another market player uses these same estimates when determining the price of a transaction.

The Company´s business model includes payroll loans at fair value with changes in profit and losses, whereby the loans originated within the 90 days before the date of the financial statements are valued at fair value. To estimate the fair value of these loans, which could be sold to financial institutions at a market price, the Company evaluates the lending rate of these loans within the reference market to evaluate the rate at which other financial institutions are considered peers and comparable to the Company will be willing to invest their resources and hold the payroll loans within their balance sheet.

Considering the results from the evaluation of the rates, the Company evaluates four variables to obtain the value of the adjusted rate applicable to the transactions to sell loan portfolio, according to internal criteria:

> **i)**      The multiplier, which compares the Company's rate to the market rate.
> **ii)**     The value of the premium paid in these businesses, which results from discounting the future values of a loan originated at Credivalores' lending rate using the market rate.
> **iii)**    The rate is adjusted by the transaction cost associated with the loan portfolio.
> **iv)**     The cash flows associated with the insurance policies applicable to the loan are also valued.

The methodology followed by the Company uses the last three months' reports from the Financial Superintendence as the source of information to determine the interest rate to discount the cash flows and complete the valuation of the final selling price of the loan portfolio.

The Company has determined that the fair value of the loan portfolio registered in its financial statements is type 3 since most of the criteria are internal.

**4.4.1 Loans and receivables portfolio**

The Company classifies its financial assets into the following measurement categories, based on their corresponding business model:

| Classification of Financial Assets: | | | |
|---|---|---|---|
| Measurement | Terms | Features | Valuation |
| Fair value | 0-90 days from origination | Current and best-rated loans | Market price Tucredito |
| Amortized cost | 0 days from origination onwards | Current and past-due portfolio | Incurred loss model (equivalent indexed rate) |

**4.4.1.1 Financial Assets at Fair Value**

Credivalores Crediservicios S. A. S., in line with its business model, classifies its products according to the risk inherent in its portfolio. In general, its line of credit Tucredito (payroll deduction loans) is measured at fair value, given that its market niche is focused on placing "top-rated" loans.

| Classification of "Tucredito" line of credit, based on the corresponding business model | | | |
|---|---|---|---|
| Item | Tucredito portfolio segment | Measurement | Valuation |
| 1 | Performing loans subject to sale | Fair value | Market price. |
| 2 | Best-rated loans with terms of less than a year (originated loans less than 90 days prior) | Amortized cost | (Indexed rate equivalent to amortized cost). |
| 3 | Performing loans with terms of more than one year (originated loans with terms of more than 90 days) | Amortized cost | (Indexed rate equivalent to amortized cost). |
| 4 | Past due loans | Amortized cost | Incurred loss model based on the expected loss. |

The policy established by the Company for measuring its loan portfolio, per the business model classification, is:

In line with its business model the Company has decided to measure the loans comprising the "Tucredito" line of credit at fair value based on the historical trading average since its loans are not impaired (and which, from their origination, are the best-rated 0 - 90 day loans) and since the Company has the possibility of selling them in the short term because of their excellent rating.

Unsold lines of credit, which were initially measured at fair value but which after 90 days of origination were impaired, will later be measured based on an indexed rate, which converts the amortized cost rate into an amount equivalent to their fair value.

**4.4.1.2 Financial Assets at amortized cost**

Financial assets are classified at amortized cost only if the asset is kept within a business model whose objective is to maintain it to collect contractual cash flows and the contractual terms of the value give rise at specific dates to cash flows that are only payments of cash capital and interest on the outstanding principal capital; Interest income is recognized using the effective interest rate method.

The effective interest method is a method used to calculate the amortized cost of an asset and allocate the income or cost in interest during the relevant period. The effective interest rate is the discount rate at which the present value of estimated future cash payments or those received over the expected life of the financial instrument, or, as appropriate, in a shorter period, is equal to the net book value in the beginning.

To calculate the effective interest rate, the Company estimates the cash flows considering all the contractual terms of the financial instrument, including the transaction costs and the premiums granted minus the commissions and discounts, but without considering the future credit losses.

**NOTE 5. RISK MANAGEMENT**

Credivalores manages risk under the applicable regulations in the country and Credivalores' internal policies.

**Objective and general guidelines**

Credivalores' objective is to maximize returns for its investors, through proper risk management. The guiding principles of risk management of Credivalores are as follows:

a)   Make risk management a part of every institutional process.
b)   Specialization in consumer product niches.
c)   Extensive use of continuously updated scoring models to ensure quality growth of consumer loans.

**5.1 Governance structure**

**Board**

It is up to the Board of Directors of Credivalores Crediservicios S.A.:

- Establish and oversee the Company's risk management structure.
- Approve the policies, processes, and methodologies of granting, monitoring, and recovery of the company's credits, to identify, measure and control the risks faced by the Company.
- Approve exposures and limits to different types of risks.
- Point out the responsibilities and powers assigned to the positions and areas responsible for managing the different types of risk, to develop an environment of culture and risk control.
- Evaluate proposals for recommendations and correctives on management processes.
- Approve the internal control system, as well as evaluate the reports and management of the area responsible for such control.
- Request management, when deemed necessary, and for evaluation, reports on the credit portfolio.

**Risk Committee**

The responsibilities of the Risk Committee are:

- Standardize the periodic monitoring of the company's main risk indicators and anticipate risky situations that have the potential to lose the value of CVCS' assets.
- Regularly review risk management policies and systems to reflect changes in market conditions and CVCS activities.
- Proposes to the Board changes or adjustments to existing policies and methodologies to mitigate and control the level of target risk.
- The comity of risk meets monthly and is made up of members invited, within which they are:

- President
- Head of Risks
- Collections Manager
- Director of Financial Planning
- Director of Analytics Models and Strategy
- Director of Operations and Technology
- Commercial Managers

The committee not only has the permanent participation of CV Managers, but experts and external specialists who advise the decisions made by this body.

**Risk Headquarters**

- Periodically present to committed risks the evolution of the different risk indicators and perform the necessary analyses for understanding and taking actions that mitigate and control the levels of risk.
- Manage and control compliance with approved policies and processes for risk management.
- Regularly review risk management policies and systems to reflect changes in market conditions and CVCS activities.
Propose to the risk committee methodologies and adjustments to risk management policies.
- Develop methodologies and models that allow the identification, measurement, control, and monitoring of risks.

**Internal Audit**

1. Check the development of risk management under the comprehensive risk management manual
2. Report to the audit committee and issue recommendations on the findings of the risk management process

**Financial Risk Management**

The Company is exposed to the following risks related to the use of financial instruments:

- Credit Risk

- Market Risk
- Liquidity Risk
- Operating Risk

The financial statements do not include all financial risk management information and disclosures required in the annual financial statements; these financial statements should be read in conjunction with Credivalores annual financial statements as of September 30, 2023. There have been no changes to the risk management department or any risk management policies since September 30, 2023. There are no significant changes related to risk objectives, the corporate structure of the risk function, and risk strategies in general compared to what was revealed in the last set of financial statements as of September 30, 2023.

**5.2 Credit Risk**

Credit risk is the risk of financial loss faced by Credivalores Crediservicios S.A. if a client or counterparty in a financial instrument does not meet its contractual obligations and originates mainly from the receivables to customers and the Company's investment instruments. The business model of Credivalores Crediservicios S.A. in its portfolio of credits, differs from the rating of its products according to the inherent risk of its portfolio. During the three and nine-month period that ended September 30, 2023, there were no significant changes in policies and how Credivalores handles credit risk.

The maximum exposure to the credit risk of Credivalores, according to IFRS 7, is reflected in the book value of financial assets in the statement of financial position of Credivalores as of September 30, 2023, and December 31, 2022, as follows:

|  | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Cash and cash equivalents | 95.629 | 273.052 |
| Financial instruments, net | 23.846 | 104.559 |
| **Loan portfolios** |  |  |
| Consumer loans | 1.926.824 | 2.005.440 |
| Payroll loans at fair value | - | 381 |
| Accounts receivable, net | 281.052 | 320.129 |
| **Total financial assets with credit risk** | **2.327.351** | **2.703.561** |
| Off-balance-sheet credit risk at nominal value |  |  |
| Unpaid approved credits | 774.053 | 530.529 |
| **Total exposure to off-balance-sheet credit risk** | **774.053** | **530.529** |
| **Total maximum exposure to credit risk** | **3.101.404** | **3.234.090** |

**Credit Risk Model: Loans**

    **I.    Transitions between stages**

A financial asset is classified as a low credit risk asset based on the debtor's payment habits.

The first step in the methodology consists in evaluating a significant increase in credit risk by comparing the current status against a previous status of stage recognition of the loan.

If the financial asset loses its low credit risk condition or if changes in the external environment result in a review of the condition, then this probably shows a significant increase in credit risk. Consequently, the financial asset will be analyzed to determine if there is a significant increase in credit risk (stage 2) or if the asset should be classified as stage 3.

**Significant Increase in Credit Risk**

When determining whether the credit risk (i.e. risk of default) of a financial instrument has increased significantly since initial recognition, Credivalores considers reasonable, and supportable information that is relevant and available without undue cost or effort, including both quantitative and qualitative information and analysis based on Credivalores historical experience, expert credit assessment, and forward-looking information.

The following criteria are used to determine if a significant increase in credit risk has occurred:

- Comparison of the remaining lifetime probability of default (PD) at the reporting date with the lifetime PD at initial recognition of the exposure.
- Qualitative aspects such as the rebuttable presumption of the norm and restructuring agreements are also considered.
- Qualitative criteria from analysts are also considered based on expert and supportable information.

Credivalores has established a framework that incorporates both quantitative and qualitative information to determine whether the credit risk of a particular financial instrument has increased significantly since initial recognition. The framework is aligned with Credivalores' internal credit risk management process.

The criteria for determining whether credit risk has increased significantly will vary by portfolio and will include a backstop based on delinquency.

In certain instances, using its expert credit judgment and, where possible relevant historical experience, Credivalores may determine that an exposure has undergone a significant increase in credit risk if particular qualitative factors indicate so and those indicators may not be fully captured by its quantitative analysis on a timely basis. As a backstop, and as required by IFRS 9, Credivalores will presumptively consider that a significant increase in credit risk occurs no later than when an asset is more than 60 days past due.

Credivalores will monitor the effectiveness of the criteria used in identifying significant increases in credit risk through regular reviews to confirm that:

- The criteria are useful in identifying significant increases in credit risk before an exposure is in default;
- The criteria do not align with the point in time when an asset becomes over 60 days past due;
- The average time between the identification of a significant increase in credit risk and default appears reasonable;
- Exposures are not generally transferred directly from 12-month ECL measurement to credit-impaired, and there is no unwarranted volatility in loss impairment from transfers between 12-month ECL and lifetime ECL measurements.

**II.      PI – Probability of noncompliance**

**Term structure of PI**

Credit risk grades are the primary input in the determination of the term structure of PD for exposures. Credivalores collects performance and default information about its credit risk exposures analyzed by type of product and borrower and by credit risk grade. For some portfolios, information purchased from external credit reference agencies may also be used.

Credivalores employs statistical models to analyze the data collected and generate estimates of the remaining lifetime PD of exposures and how these are expected to change because of the passage of time. This analysis includes the identification and calibration of the relation between changes in default rates as well as an in-depth analysis of the impact of certain other factors on the risk of default.

For stage 1 the PD estimates the probability that the credit will default in the next 12 months, while the PD in stage 2 is the result of the probabilities for the remaining life of the credit. The probability in Stage 3 is defined as 100%.

To determine the PD the company used statistical models to analyze and select the variables significant in predicting whether clients would reach default during a known period that is determined by the stage of the loan. For stage 1 the PD is evaluated for the next 12 months, loans in later stages are evaluated for the remainder of the loan lifetime. To estimate lifetime probability Credivalores calculates the 12-month PD and for each successive year for the loan lifetime, the model estimates the PD conditioned to not having defaulted during previous years.

Credivalores approach to incorporating forward-looking information into this assessment is discussed below.

**Forward-Looking Information**

Credivalores incorporates forward-looking information into its measurement of ECLs. Credivalores formulates a 'base case' view of the future direction of relevant economic variables and a representative range of other possible forecast scenarios based on forecasts provided by economic experts and considering a forecast of multiple variables. This process involves developing two or more additional economic scenarios and considering the relative probabilities of each outcome.

The base case represents the most-likely outcome. It is aligned with information used by Credivalores for other purposes, such as strategic planning and budgeting. The other scenarios for Colombia represent more optimistic and more pessimistic outcomes. Credivalores has identified and documented key drivers of credit risk and credit losses for each portfolio of financial instruments and, using an analysis of historical data, has estimated relationships between macroeconomic variables and credit risk and credit losses.

The economic scenarios used as of September 30, 2023, include the following key indicators (among others) for Colombia for the periods ending on September 30, 2023 and December 31, 2022:

| | 2023 | | |
|---|---|---|---|
| | **Scenario A** | **Scenario B** | **Scenario C** |
| Consumer Price Index | 120,64 | 115,96 | 125,33 |
| Consumer Price Index Full-Year Variation | 6,75 | 5,46 | 8,05 |
| Import Price Index | 129,59 | 125,76 | 133,41 |
| Economic performance Index | 111,06 | 116,45 | 105,66 |
| Economic performance Index, data affected by seasonal effect | 120,84 | 124,46 | 117,22 |
| Economic performance Index, data affected by seasonal effect Full Year Variation | 5,25 | 6,21 | 4,29 |
| Real Exchange Rate Index (ITCR), according to PPI - Bilateral with the United States | 179,28 | 168,70 | 189,87 |
| Gross domestic product* | COP279.479,81 | COP288.362,79 | COP270.596,82 |
| Gross Domestic Product Annual Growth Rate | -0,24 | 0,73 | -1,22 |
| Unemployment rate | 9,63 | 7,94 | 11,31 |
| Foreign Exchange rate (COP/USD) | 4.488,82 | 4.097,26 | 4.880,38 |
| Usury rate | 31% | 29% | 33% |
| Variation of the usury rate | 0,87 | 0,56 | 1,18 |
| Consumer Price Index | 120,01 | 116,17 | 123,84 |
| Gross domestic product* | COP268.958,06 | COP275.997,44 | COP261.918,67 |
| Usury rate (Maximum interest rate) | 31% | 27% | 35% |
| Producer Price Index | 185,92 | 185,84 | 186,00 |
| Export price index, according to foreign trade | 192,66 | 192,77 | 192,55 |
| Heavy Construction Price Index | 106,53 | 106,49 | 106,56 |

- Values expressed in millions of pesos

**Credit Risk Rating**

Credivalores allocates each exposure to a credit risk grade based on a variety of data intended to be predictive of the probability of default and applying experienced credit judgment. Credivalores uses these grades to identify significant increases in credit risk. Credit risk grades are defined using qualitative and quantitative factors that are indicative of the risk of default. These factors may vary depending on the nature of the exposure and the type of borrower and product.

Each exposure is assigned to a degree of credit risk at initial recognition based on available information about the borrower. Exposures are subject to continuous monitoring, which can result in an exposure being transferred to a different degree of credit risk.

Credivalores uses behavioral demographic and origination variables to estimate PD modeling them with a logistic regression that is periodically monitored to ensure its predictive capabilities and its stability. This monitoring for payroll loans and credit card models showed adequate predictive capabilities as well as stability regarding its inputs distributions (PSI). There was also a test run on average observed PD by rating of the last 2 years that ensure the actual events that are being predicted have not varied its behavior significantly and therefore concluding the models provide an adequate and reasonable prediction of DDs by rating.

**Loan Portfolio**

| **Payroll and Credit card loans** |
|---|
| - Information collected internally about the behavior of customers. |
| - Demographic information of customers. |
| - Origination information of credits/customer. |

**III.     PDI – Loss due to non-compliance**

LGD is a measure of the potential loss if a default scenario occurs. To establish the LGD, the Credivalores methodology uses historical information to measure the recoveries of loans that reach the default stage at present value. This allows Credivalores to have an adequate estimate of the losses it will incur when credits reach the default stage. These calculations are done separately for payroll loans and credit cards to better reflect the fundamental differences in this product and therefore its LGD.

IV.    **ED – Exposure at Default**

EAD represents the amount owed from a counterparty at the time of a possible default. For stage 2 Credivalores incorporates in the analysis of the exposure at default the probability of payments and increase or decrease in exposure during the lifetime of the credit.

These probabilities are estimated using the historical information collected by the company and are grouped by type of product. The probabilities are constantly reviewed to accurately estimate them and calibrate them.

For payroll loans, EAD will correspond to the full valuation of the assets at amortized cost. For credit cards, EAD will take into account the unused credit line when available as well as the expected amortization, which allows Credivalores to have a reliable estimate of the credit exposition at default.

V.    **Simplified Model**

Credivalores uses a simplified roll rate model to estimate the ECL of remnants of portfolio loans that represent less than 5% of balance sheet loans and that are consistently lowering their portfolio share.

I.    Roll Rate Methodology

A method that uses a transition matrix to obtain the customer moratorium. This helps forecast future risk from defaults in a given time. By using this matrix, the behavior is reflected to determine in what period the accounts will be taken. These statements are determined by the number of overdue payments as defined.

For this model, first of all, the portfolio divided into two bands is evaluated.:

Credit Portfolio other products:

  ✓  Portfolio less than 90 days in arrears.
  ✓  Portfolio greater than 90 days of default.

As part of this evaluation, the Company's Management has designated as a deteriorated portfolio the one with a default greater than 90 days since it is recurrent that in the company's business, there are delays, but these are regularized before 90 days for credit portfolio.

Then the monthly average of the portfolio is determined by age and the average values are weighted according to the rate of loss greater than 90 days in each case.
To calculate the PE of the impaired portfolio, the balance of the portfolio of each tranche is multiplied by the percentage of expected loss (Migration to greater than 360) determined in the previous step.

I.    **ED – Exposure at default**

ED represents the amount owed from a counterparty at the time of a possible default.

For payroll loans, ED will correspond to the full valuation of the assets at amortized cost. For credit cards, ED will take into account the unused credit line when available as well as the expected amortization, which allows to have a reliable estimate of the credit exposition at default.

**Credit Risk Model: Other accounts receivable**

Credivalores uses the simplified approach where Credivalores uses an impairment matrix to measure the ECLs of trade receivables from individual customers, which comprise a very large number of small amounts.

Loss rates are calculated using a 'roll rate' method based on the probability of a receivable progressing through successive stages of delinquency to write-off. Roll rates are calculated separately for exposures in different segments based on the following common credit risk characteristics like the type of product purchased.

**CREDIVALORES- CREDISERVICIOS S. A.**
**DISCLOSURES TO THE FINANCIAL STATEMENTS**
**ENDED SEPTEMBER 30, 2023, AND DECEMBER 31, 2022**
(Stated in millions of Colombian pesos)

**Loss impairment**

The table below shows the loss impairment balances as of September 30, 2023:

| Loan portfolio | | Stage 1<br>12-month<br>ECL | Stage 2<br>Lifetime<br>ECL not<br>credit-<br>impaired | Stage 3<br>Lifetime<br>ECL<br>credit-<br>impaired | Total |
|---|---|---|---|---|---|
| Loan consumer portfolio | | 31.055 | 15.477 | 385.560 | 432.092 |
| Total loan portfolio | Ps. | 31.055 | 15.477 | 385.560 | 432.092 |
| Total loss impairment financial assets at amortized cost | Ps. | 31.055 | 15.477 | 385.560 | 432.092 |
| **Total loss impairment** | **Ps.** | **31.055** | **15.477** | **385.560** | **432.092** |

The following table shows the balances of loss allowances as of December 31, 2022:

(1)　Credivalores has initially adopted IFRS 15 and IFRS 9 as of 1 January 2018. According to the chosen transition methods, comparative information is not re-established.

| Loan portfolio | | Stage 1<br>12-month<br>ECL | Stage 2<br>Lifetime<br>ECL not<br>credit-<br>impaired | Stage 3<br>Lifetime<br>ECL not<br>credit-<br>impaired | Total |
|---|---|---|---|---|---|
| Loan consumer portfolio | | 33.101 | 17.023 | 322.484 | 372.608 |
| Total loan portfolio | Ps. | **33.101** | **17.023** | **322.484** | **372.608** |
| Total loss impairment financial assets at amortized cost | Ps. | 33.101 | 17.023 | 322.484 | 372.608 |
| **Total loss impairment** | **Ps.** | **33.101** | **17.023** | **322.484** | **372.608** |

The table below shows for loans stage 3 individually assessed for ECL the gross amount and loss impairment balances as of September 30, 2023.

| | Gross Amount Registered | | Impairment Recognized | |
|---|---|---|---|---|
| With recognized provision | | | | |
| Consumer | Ps. | 633.363 | Ps. | 385.560 |
| Total | Ps. | 633.363 | Ps. | 385.560 |

**5.2.1 Monitoring and Control Process**

The Company has an information system in place that provides daily indicators of the loan portfolio status to allow proper monitoring and timely decision-making.

The credit approval processes are connected to an engine managed by the risk area, which allows real-time adjustments to policy parameters to take immediate action where required in loan origination.

Each month the Risk Committee meets to evaluate the development of each product portfolio, analyzing the performance of each yield and applying corrective measures to credit processes or policies where necessary.

**As of September 30, 2023**

| Status | Tu Crédito | CrediUno | CrediPóliza | Total managed portfolio | On balance sheet Portfolio |
|---|---|---|---|---|---|
| CURRENT | 559.450 | 511.576 | 26.575 | 1.097.601 | 1.007.254 |
| 1-30 | 8.878 | 42.650 | 39 | 51.567 | 51.071 |
| 31-60 | 4.056 | 13.152 | 12 | 17.220 | 16.943 |
| 61-90 | 3.293 | 29.548 | 8 | 32.849 | 32.750 |
| 91 - 180 | 8.223 | 53.736 | 5 | 61.964 | 61.857 |
| 181 - 360 | 20.284 | 57.820 | 114 | 78.218 | 78.088 |
| > 360 | 121.221 | 190.072 | 7.624 | 318.917 | 316.256 |
| **Total** | **725.405** | **898.554** | **34.377** | **1.658.336** | **1.564.220** |

**As of December 31, 2022**

| Status | Tu Crédito | CrediUno | CrediPóliza | Total managed portfolio | On balance sheet Portfolio |
|---|---|---|---|---|---|
| CURRENT | 659.312 | 629.513 | 26.759 | 1.315.585 | 1.206.606 |
| 1-30 | 11.797 | 45.830 | 20 | 57.646 | 56.690 |
| 31-60 | 7.505 | 22.421 | 32 | 29.958 | 29.121 |
| 61-90 | 4.316 | 16.432 | 11 | 20.759 | 20.732 |
| 91 - 180 | 10.046 | 24.682 | 13 | 34.741 | 34.684 |
| 181 - 360 | 15.495 | 36.379 | 251 | 52.124 | 51.802 |
| > 360 | 105.962 | 174.624 | 7.732 | 288.319 | 285.903 |
| **Total** | **814.433** | **949.881** | **34.818** | **1.799.132** | **1.685.538** |

The following detail is due to compliance with paragraph 5 requested by the FNG, which indicates the balance of the committed and uncommitted portfolio classified by the height of arrears:

**As of September 30, 2023**

| Status | Encumbered Loan Portfolio | Unencumbered Loan Portfolio | Total |
|---|---|---|---|
| CURRENT | 718.017 | 379.584 | 1.097.601 |
| 1-30 | 14.745 | 36.822 | 51.567 |
| 31-60 | 9.617 | 7.603 | 17.220 |
| 61-90 | 23.676 | 9.173 | 32.849 |
| 91 - 180 | 39.911 | 22.053 | 61.964 |
| 181 - 360 | 52.378 | 25.840 | 78.218 |
| > 360 | 124.212 | 194.705 | 318.917 |
| **Total** | **982.556** | **675.780** | **1.658.336** |

**As of December 31, 2022**

| Status | Encumbered Loan Portfolio | Unencumbered Loan Portfolio | Total |
|---|---|---|---|
| CURRENT | 977.143 | 338.442 | 1.315.585 |
| 1-30 | 17.335 | 40.311 | 57.646 |
| 31-60 | 8.581 | 21.377 | 29.958 |
| 61-90 | 4.536 | 16.223 | 20.759 |
| 91 - 180 | 10.924 | 23.817 | 34.741 |
| 181 - 360 | 14.735 | 37.389 | 52.124 |
| > 360 | 113.642 | 174.677 | 288.319 |
| **Total** | **1.146.896** | **652.236** | **1.799.132** |

**5.3 Creditworthiness**

The following is a breakdown of banks and other financial institutions that hold our savings and checking account deposits.

| Entity | Type of Account | September 30, 2023 | December 31, 2022 |
|---|---|---|---|
| Banco de Bogotá | Savings/Checking | 36 | 62 |
| Bancolombia | Savings/Checking | 8.989 | 9.151 |
| Banco BBVA | Checking | - | - |
| Banco De Occidente | Savings/Checking | 128 | 94 |
| JP Morgan | Checking | 7 | 7 |
| Banco Santander | Checking | 270 | 490 |
| Disponible Patrimonios Autónomos | Savings/Checking | 65.960 | 234.793 |
| JP Morgan | Deposit | 2 | 11 |
| Banco Santander | Checking | 43 | 479 |
| | | **75.435** | **245.087** |

The following is a breakdown of creditworthiness as determined by independent credit rating agencies of all those major financial institutions in which the Company holds cash.

Long-term debt ratings are based on the following scale:

| Item | Financial Institution | Short-term Rating | Rating Entity |
|---|---|---|---|
| 1 | Banco BBVA | AAA | Fitch Ratings |
| 2 | Banco de Bogotá | BB+ | Fitch Ratings |
| 3 | Banco Colpatria | AAA Y F1+ | Fitch Ratings |
| 4 | Banco de Occidente | AAA Y F1+ | Fitch Ratings |
| 5 | Bancolombia | AAA Y F1+ | Fitch Ratings |
| 6 | Banco Santander | AAA Y F1+ | Fitch Ratings |
| 7 | Banco JP Morgan | AAA Y F1+ | Fitch Ratings |

Cash and cash equivalents are held with banks and financial institutions through free-standing trust funds, which have ratings between AA- and AAA BCR + 1 from BRC Standard and Poor's.

The Company considers the credit ratings awarded to financial institutions with which it conducts treasury operations in the form of fiduciary assignments such as deposits or investments at sight which classify as cash equivalents. To establish a minimum margin risk exposure and ensure optimal resource management through periodic evaluations and measurements of the Company's exposure.

**5.4 Market Risk**

The Company has been able to meet its liquidity needs acquiring working capital and lines of credit from local, foreign and multilateral entities This implies the need for follow-up when exposed to variable interest rates (financial obligations indexed to local and/or foreign variable rates such as: DTF, IBR, UVR, LIBOR, PRIME, etc.), and to exchange-rate fluctuations due to devaluation or revaluation in the local currency (USD, EUR, etc.).

Credivalores participates actively in the money, foreign exchange and capital markets, seeking to meet the needs of its clients in accordance with the policies and risk levels established. As such, it manages different financial-asset portfolios within the permitted risk levels and limits.

Market risk arises from the open positions of Credivalores investment portfolios in debt securities, derivatives and equity instruments recorded at fair value, due to adverse changes in risk factors such as interest rates and exchange rates of foreign currencies.

For analysis purposes, market risk has been broken down into price risk and/or interest and exchange-rate risk of financial obligations in the periods of capital-payment amortization, the point at which the risk materialized.

As of September 30, 2023 and December 31, 2022, Credivalores had the following financial assets and liabilities at fair value subject to trading risk:

**Financial assets and liabilities at fair value exposed to trading risk held:**

|  | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Equity Instruments | 5.205 | 5.698 |
| Derivatives instruments | 4.555 | 98.861 |
| Loan Portfolio | 14.086 | 381 |
| **Total** | **23.846** | **104.940** |

**The methodology used to measure risk**

Market risks are quantified through value-at-risk standard models.

The company uses the standard model for the measurement, control, and management of market risk of interest rates and exchange rates at which the entity is exposed.

There are two scenarios under which Credivalores is exposed to market risks:

**Interest rates**

Credivalores financial obligations are exposed to this risk when financing is acquired at variable indexed rates that are subject to volatilities and may affect the Company's financial margin.

**Sensitivity Analysis**

Taking into account Credivalores exposure to changes in the reference interest rate, a sensitivity analysis of the impact on financial obligations is included given the possible effect on the variable indexed interest rates in the third quarter of 2022. The following methodology was defined for the analysis:

1. Two scenarios were evaluated whereby indexed rates are affected by 20 BPS (increasing and decreasing indexed rates), which affect the future flows of Credivalores financial obligations indexed to the variable rate. Debt repayment is implicit in these scenarios, given their contractual frequency, taking them to maturity.

2. The flows corresponding to interest payment (accrual) were evaluated using equivalent rates.

3. The present value of the monthly interest payment was calculated, using as a reference the 6-month IBR rate on an annual basis as of September 30, 2023 (12.751%).

4. Finally, each scenario's results were compared to the base scenario, which corresponds to the projections of interest flows using the rates as of September 30, 2023, as reference.

The results are set out below:

| Scenarios | Interests |
|---|---|
| Effect of 20 BPS decrease in variable rate | 1.338.946 |
| Effect of 20 BPS increase in variable rate | 1.330.247 |
| **Total Scenarios** | **(8.699)** |

**Interest Rate and Exchange Rate**

| Rate and devaluation effect scenario (variable rate and foreign currency obligations) | Interests |
|---|---|
| Effect of revaluation and decrease, 15 BPS, variable rate | 1.338.946 |
| Effect of devaluation and increase, 15 BPS, variable rate | 1.347.645 |
| **Total Scenarios** | **8.699** |

**Exchange rate**

Credivalores' financial obligations are exposed to exchange rate risk when the present value of the liability positions present volatilities due to the devaluation or revaluation of the funding acquired in another currency. This risk materializes at the moment when the payment corresponding to the amortization of principal and interest is made, due to trading in the currencies to be paid and recognition of the exchange rate difference.

**Sensitivity Analysis**

Considering Credivalores exposure to changes in the USD/ exchange rate, a sensitivity analysis of the impact on financial obligations is included given the possible effects of changes in the exchange rate in the period of 2023. The following methodology was used for the analysis:

1.  Two scenarios were evaluated in which the exchange spot rate is adjusted by 0.60% daily volatility (spot prices projected using Bloomberg's curve), generating a revaluation and devaluation effect on the TRM as of September 30, 2023.
2.  The amortization of principal and payment of interest on financial obligations are implicit in these scenarios, given their contractual periodicity and taking them to maturity.
3.  The flows corresponding to interest payment (accrual) were evaluated using equivalent rates.
    a.  The present value of the monthly interest payment was calculated, using as a reference the 6-month IBR rate on an annual basis as of September 30, 2023 (12.751%).
4.  Finally, we compared the results of each scenario with the base scenario, which corresponds to the projected flows for payment of capital and interest using as reference the rates as of September 30, 2023.

The results are set out below:

| Item | Total Debt |
|---|---|
| Initial Scenario (Balance as of September 30st, 2023) | 374.818 |
| Scenario 1 (Effect of revaluation) | 373.836 |
| Scenario 2 (Effect of revaluation) | 375.798 |
| **Difference Scenario 1 vs. Initial Scenario** | **(982)** |
| **Difference Scenario 2 vs. Initial Scenario** | **980** |

(1) Volatility obtained from the daily average for the previous three years, including 2023.

**5.5 Liquidity Risk**

The liquidity Risk is represented by the potential event of being unable to meet the expected outgoing cash flows in a timely and efficient manner, without affecting the normal course of business or the company´s financial position. Liquidity risk is related to having insufficient liquid assets and therefore having to incur unusual or extra funding costs.

The company funding is based on short- and medium-term bank loans as well as bonds and commercial notes issued in the international capital markets. These funds are mainly used to leverage new loan origination according to Credivalores' business model. On the other hand, the Company's capacity to create positions regarding financial instruments available for sale (liquidity or loans) could be affected either by a lack of market liquidity or because of sudden changes in interest rates and asset prices.

According to the Company´s funding model the liquidity risk includes among others, the ability to get short, medium- and long-term lines of credit, to keep low liquidity assets (such as loan portfolio), and to face short-term unexpected stress situations.

To deploy a correct asset and liability management and assure the liquidity needed to operate the business, the Company has set the following guidelines to control the liquidity risk: i) In the short-term, cash flows associated with loan portfolio and liquid assets, short-term financial liabilities, and off-balance financial positions in different time frames, allowing permanent monitoring of the liquidity gap, ii) for the long-term assets and liabilities, the Company analyses its funding sources as well as the breakdown by type of source and those that are specifically associated with specific products.

Credivalores keeps at least 1.5x its operating expenses in liquid assets. The liquidity in the statement of financial position has the following components:

*   Inflows: Incoming flows associated with loan portfolio, and interest income associated with liquid assets.

*   Outflows: Outgoing flows related to i) operating expenses, ii) new loan origination, and iii) ´ principal and interest from financial liabilities.

*   Liquidity GAP: Difference between inflows and outflows according to:

- o   Monthly cash flows associated with assets (liquid assets, loan portfolio).
- o   Monthly projected cash flows related to financial liabilities and operating expenses

The Company determines its liquidity gap based on the above-mentioned variables and makes permanent follow up, as well as making any necessary adjustments according to the following ranges:

- ✓   1 to 3 months
- ✓   3 to 6 months
- ✓   6 to 12 months
- ✓   12 months +

**Liquidity Risk Management**

The company identifies its exposure to liquidity risk according to the markets where it operates, and the products and services offered to its customers. For such purpose, the Company has analyzed the processes associated with treasury to design controls and strategies to reduce the impact.

**Liquidity position**

Determine the minimum amount of liquid assets (cash and cash equivalents, short-term liquid investments), to avoid any lacks that may affect the capacity of the outflows. The Financial Committee calculates and monitors the liquidity position every week, considering cash flow projections for 7 and 15 days:

- a)   Green: liquid assets / outflows >= 105%
- b)   Yellow: liquid assets / outflows between 100 and 104%
- c)   Red: liquid assets / outflows <100%

In case there are any yellow or green situations, the Financial Committee defines any actions to be taken to assure the sufficient procurement of cash to operate on a normal basis.

The liquidity level results as of September 30, 2023, are set out below:

| Item | Liquidity level September 2023 |
|------|--------------------------------|
| 7 Days | 766% |
| 15 Days | 397% |
| 30 Days | 205% |

As of September 30, 2023, the liquidity level in the 7 and 15 days bands is above the upper limit defined in the Company's liquidity manual, constituting a green flag scenario and indicating that Credivalores has sufficient resources to operate normally.

Also, as is good practice, a third band is monitored, which allows for controlling the liquidity level projected to 30 days. As of September 30, 2023, a green band scenario is recorded, indicating that Credivalores has ample liquidity to support its needs for normal operation.

**Exposure to liquidity Risk**

The Company monitors its liquidity position to determine how likely a liquidity stress can happen.

The following is a breakdown by time range for the Liquid Assets and the LRI (Liquidity Risk Indicator) for September 30, 2023, and December 31, 2022.

**CREDIVALORES- CREDISERVICIOS S. A.**
**DISCLOSURES TO THE FINANCIAL STATEMENTS**
**ENDED SEPTEMBER 30, 2023, AND DECEMBER 31, 2022**
(Stated in millions of Colombian pesos)

| | September 30, 2023 | | | | |
|---|---|---|---|---|---|
| | Subsequent Net Balances Available | | | | |
| Description | Liquid Assets Available at the End of the Period (1) | From 1 to 7 days (2) | From 8 to 15 subsequent days (2) | From 16 to 30 subsequent days (2) | From 31 to 90 subsequent days (2) |
| Cash | 2 | 2 | - | | |
| Banco de Bogotá | 36 | 36 | - | - | - |
| Bancolombia S. A. | 8.989 | 8.989 | - | - | - |
| Banco de Occidente | 128 | 128 | | - | - |
| Banco Santander | 270 | 270 | - | - | - |
| Banco Santander Uruguay | 45 | 45 | - | - | - |
| Alianza Fiduciaria | 4.520 | 4.520 | | - | - |
| BanCien | 12.157 | - | - | 12.157 | - |
| Cash at Free-Standing Trusts | 66.224 | 66.224 | - | - | - |
| Collective Investment Funds | 555 | 555 | - | - | - |
| Agrocaña | 4.650 | - | - | - | 4.650 |
| JP Morgan | 7 | 7 | | - | - |
| Fiducolombia Free-Standing Trusts | 3.251 | 3.251 | - | - | - |
| Inverefectivas | 12.616 | - | - | - | 12.616 |
| **Total liquid assets** | **113.450** | **84.027** | **-** | **12.157** | **17.266** |

| | December 31, 2022 | | | | |
|---|---|---|---|---|---|
| | Subsequent Net Balances Available | | | | |
| Description | Liquid Assets Available at the End of the Period (1) | From 1 to 7 days (2) | From 8 to 15 subsequent days (2) | From 16 to 30 subsequent days (2) | From 31 to 90 subsequent days (2) |
| Cash | 2 | 2 | - | - | - |
| Banco de Bogotá | 62 | 62 | - | - | - |
| Bancolombia S. A. | 9.151 | 9.151 | - | - | - |
| Banco De Occidente | 105 | 105 | - | - | - |
| Bancomeva | - | - | | - | - |
| Banco Santander | 490 | 490 | - | - | - |
| Banco Santander Uruguay | 490 | 490 | - | - | - |
| Alianza Fiduciaria | 5.161 | 5.161 | | - | - |
| Credifinanciera | 12.021 | - | - | 12.021 | - |
| Cash at Free-Standing Trusts | 234.793 | 234.793 | - | - | - |
| Collective Investment Funds | 988 | 988 | - | - | - |
| Agrocaña | 4.710 | - | - | - | 4.710 |
| Mutual Funds – Fiduciaria and Valores Bancolombia | 6 | 6 | - | - | - |
| JP Morgan | 7 | 7 | | - | - |
| TIDIS | 241 | - | | 241 | - |
| Fiducolombia Free-Standing Trusts | 10.523 | 10.523 | - | - | - |
| Inverefectivas | 14.945 | - | - | - | 14.945 |
| **Total liquid assets** | **293.695** | **261.778** | **-** | **12.262** | **19.655** |

(1) Liquid assets correspond to the sum of existing assets at the close of each period, which can be quickly converted to cash. In calculating liquid assets, all the listed investments, without exception, are computed at their fair exchange value on the date of the valuation (fair value).

(2) The balance corresponds to the residual value of the Company's liquid assets on days after closing the specific period. This balance is calculated as the difference between liquid assets and liquidity requirements. In turn, the liquidity requirement is the difference between the contractual revenue flows and contractual and non-contractual outflows under the Liquidity Risk Indicator (LRI) methodology.

**Measurement of exposure to liquidity risk**

**CREDIVALORES- CREDISERVICIOS S. A.**
**DISCLOSURES TO THE FINANCIAL STATEMENTS**
**ENDED SEPTEMBER 30, 2023, AND DECEMBER 31, 2022**
(Stated in millions of Colombian pesos)

Measuring the likelihood of the Company running out of liquid resources for its normal operation under normal market conditions requires the use of the tools described above: balance sheet liquidity, liquidity gap, and cash flow projection, to thereby quantify the degree of stress that the company's cash flow can bear to fulfill its normal operations without having to acquire additional resources.

**Limit of liquidity risk exposure**

Maximum exposure to liquidity risk is identified as the average time taken by the Company to carry out the liquidity financial operations (Guaranteed Loans, Portfolio Sales, Working Capital Loans, etc.) and generate the cash available for new loan origination.

The maximum exposure to liquidity risk is calculated weekly by the financial committee, considering projections for bands of 7 days, and 15 to 30 days.

In addition, to analyze the short- and medium-term liquidity requirements, the following indicators are considered:

1) Net Liquidity/Credivalores + Free-standing Trust, where Net Liquidity is the sum of available cash and investments less long-term investments.

**Lower limit: 5%**; cannot be below the lower limit more than three times in a year.

| Exposure Limit Indicator 1 Sept-23 | |
|---|---|
| Net Liquidity | 95,629 |
| Assets (Credivalores + Free-standing Trust) (Portfolio) | 1,494,732 |
| **Indicator 1** | **6,4%** |

2) Net Liquidity/Liabilities (Free-standing Trust + Credivalores)

**Lower limit: 5%**; cannot be below the lower limit more than three times in a year.

| Exposure Limit Indicator 1 Sept-23 | |
|---|---|
| Net Liquidity | 95,629 |
| Liabilities (Credivalores + Free-standing Trust) | 1,656,215 |
| **Indicator 2** | **5,8%** |

In the three-month period ending September 30, 2023, there were no significant changes in liquidity risk or in the way CVCS manages this risk. However, the second indicator is less than 5%, because CV will use all the cash to disburse and grow the portfolio. We expect it to increase above 5% in the first quarter.

Credivalores has performed an analysis of the consolidated maturities of financial assets and liabilities both derivatives and non-derivatives, showing the following remaining contractual maturities.

**September 30, 2023**

| Assets | Less than one month | From one to six months | From six to twelve months | More than one year | Total |
|---|---|---|---|---|---|
| Cash due from banks and equivalents | 95.630 | - | - | - | 95.630 |
| Equity Instruments at fair value | 555 | - | - | 4.650 | 5.205 |
| Investments in Associates and Affiliates | - | - | - | 12.616 | 12.616 |
| Financial Assets at amortized cost (*) | 81.729 | 416.688 | 519.647 | 1.213.285 | 2.231.349 |
| **Total assets** | **177.914** | **416.688** | **519.647** | **1.230.551** | **2.344.800** |

| Liabilities | Less than one month | From one to six months | From six to twelve months | More than one year | Total |
|---|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| Financial Liabilities at amortized cost (*) | 111.566 | 375.496 | 261.091 | 1.213.371 | 1.961.524 |
| **Total Liabilities** | 111.566 | 375.496 | 261.091 | 1.213.371 | 1.961.524 |

(*) This disclosure includes the calculation of projected interest.

**December 31, 2022**

| Assets | Less than one month | From one to six months | From six to twelve months | More than one year | Total |
|---|---|---|---|---|---|
| Cash due from banks and equivalents | 273.052 | - | - | - | 273.052 |
| Equity Instruments at fair value | 988 | - | - | 4.710 | 5.698 |
| Investments in Associates and Affiliates | - | - | - | 14.945 | 14.945 |
| Financial Assets at amortized cost (*) | 78.674 | 395.468 | 479.663 | 1.396.714 | 2.350.519 |
| **Total assets** | **352.714** | **395.468** | **479.663** | **1.416.369** | **2.644.214** |

| Liabilities | Less than one month | From one to six months | From six to twelve months | More than one year | Total |
|---|---|---|---|---|---|
| Financial Liabilities at amortized cost (*) | 52.301 | 381.775 | 341.562 | 2.356.437 | 3.132.075 |
| **Total Liabilities** | **52.301** | **381.775** | **341.562** | **2.356.437** | **3.132.075** |

(*) This disclosure includes the calculation of projected interest.

**NOTE 6. CASH AND CASH EQUIVALENTS**

Cash and cash equivalents include cash balances and demand deposits with original maturities of 90 days or less from the date of acquisition, which are subject to an insignificant risk of changes to their fair value and that are used by the Credivalores to handle short-term commitments.

Cash and cash equivalent balances encompass the following as of September 30, 2023, and December 31, 2022:

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Cash | 2 | 2 |
| Banks | 75.435 | 245.087 |
| Mutual funds (6.1) | 8.035 | 15.701 |
| Term Deposit (6.2) | 12.157 | 12.021 |
| TIDIS | - | 241 |
| | **95.629** | **273.052** |

The difference, on the other hand, due to the restatement of bank accounts in foreign currency as of September 30, 2023, and 2022, is $1,296 and $1,240, respectively.

As of September 30, 2023, and December 31, 2022, there were no restrictions on bank accounts.

**6.1 Following is a breakdown of positions in money market funds (trust rights) by Credivalores and the Free-Standing Trust:**

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Fiduciaria Bancolombia – Renta Liquidez | - | 6 |
| Alianza Fiduciaria – Collective Investment Fund | 4.520 | 5.161 |
| Fiduciaria Banco de occidente | - | 11 |
| **Sub-Total** | **4.520** | **5.178** |

The average profitability ending September 30, 2023, is 25.26% and for December 31, 2022, it was 16.07%.

The following is the credit rating of the fund managers of Free Standing Trusts:

| Manager | Sept-23 | Dec-22 | Rating Agency |
|---|---|---|---|
| Fiduciaria Bancolombia | AAA Y F1+ | AAA | Fitch Ratings |
| Fiduciaria la Previsora | AAA | AAA | BRC Investor Services S. A. SCV |
| Fiduciaria la Occidente | AAA | AAA | BRC Investor Services S. A. SCV |

Cash equivalents correspond to mutual and money market funds where the Company and the Free-Standing Trust have direct ownership of shares and rights. These funds invest in short-term paper and offer a slightly higher yield than a savings account and are classified as cash equivalents since the company can withdraw and deposit funds at any time, as funds are at sight.

**6.2 Certificates of Deposit (CDs)**

As of September 30, 2023, Credivalores had Certificates of Full Deposit at Banco Santander, as detailed below:

| Institution | Initial Date | Maturity Date | Term (months) | Nominal value | Annual effective interest rate | Total Balance |
|---|---|---|---|---|---|---|
| Santander Bank | 23/08/2023 | 23/11/2023 | 3 | 6.500 | 12.80% | 6.585 |
| Santander Bank | 23/08/2023 | 23/11/2023 | 3 | 5.500 | 12.80% | 5.572 |
| Total | | | | 12.000 | | 12.157 |

The long-term rating for Santander Bank is AAA.

**NOTE 7. FINANCIAL INSTRUMENTS**

The balance of investments measured at fair value is comprised of:

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Collective Investment Funds (7.1) | 555 | 988 |
| Equity instruments (7.2) | 4.650 | 4.710 |
| | **5.205** | **5.698** |

**7.1 At fair value with changes in results**

Investments at fair value correspond to equity participations in money market funds that offer easy access to resources at low risk, held in trusts which are rated from AA- to AAA by local rating agencies BRC Standard and Poor's and/or Fitch Ratings Colombia

| Issuer | Type of Fund | Minimum Investment | Minimum Balance | Annual Return September 2023 | Annual Return 2022 | As of September 30, 2023 | As of December 31, 2022 |
|---|---|---|---|---|---|---|---|
| BTG Pactual I Z Class | Closed | 5.000.000 | 2.000.000 | 90,49007% | 40,5056% | 528 | 903 |
| BTG Pactual II Z Class | Closed | 5.000.000 | 2.000.000 | 0,00000% | - | - | - |
| Investment Fund | At sight | 200.000 | 200.000 | 0,00000% | 14,039% | 22 | 21 |
| Credicorp Capital | Collective portfolio | - | - | - | - | 5 | - |
| Open Portfolio BTG | Open | - | - | 0,00000% | 16,1680% | - | 64 |
| TOTAL | | | | | | 555 | 988 |

**7.2 Equity instruments**

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Agrocaña Shares | 4.650 | 4.710 |
| | **4.650** | **4.710** |

The Company owns 5.03% of Agrocañas S.A.'s share capital, with 3,300 outstanding shares as of September 30, 2023. These are not listed on the stock exchange and are therefore measured at fair value with changes to equity.

## NOTE 8. INVESTMENTS IN ASSOCIATES

The detail of the investments in associates is as follows:

|  | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Inverefectivas S.A (a) | 12.616 | 14.945 |
|  | **12.616** | **14.945** |

**(a)** Credivalores holds a 25% ownership in Inverefectivas S.A. This Company was incorporated under the legislation of Panama and has 4,000 shares issued, of which Credivalores owns 1,000 shares with an intrinsic value of FIX 3.106,97 expressed using the TRM of 4.053,76 as of October 01, 2023.

|  | September 30, 2023 | | December 31, 2022 | |
|---|---|---|---|---|
|  | Share of ownership interest | Book value | Share of ownership interest | Book Value |
| **Associates** |  |  |  |  |
| Inverefectivas S.A. | 25% | 12.616 | 25% | 14.945 |
|  |  | **12.616** |  | **14.945** |

The movement of investments in the associates' account is shown below for period ended September 30, 2023, and December 31, 2022:

| Associate | September 30, 2023 | December 31, 2022 |
|---|---|---|
| **Balance at the beginning of the period** | **14.945** | **12.369** |
| Adjustments for exchange rate differences | (2.354) | 2.377 |
| Adjustment for valuation method of participation | 25 | 199 |
| **Period-end balance** | **12.616** | **14.945** |

## NOTE 9. LOAN PORTFOLIO, NET

Financial assets at amortized cost on the statement of financial position are classified as consumer portfolio and microcredit. Following is a description of the portfolio of Credivalores as of September 30, 2023, and December 31, 2022:

|  | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Consumer | 1.926.824 | 2.005.440 |
| Impairment | (432.092) | (372.608) |
| **Total financial assets at amortized cost** | **1.494.732** | **1.632.832** |
|  |  |  |
| TuCredito payroll deduction loans at fair value | - | 381 |
| **Total financial assets at fair value** | **-** | **381** |
| **Total loan portfolio, net** | **1.494.732** | **1.633.213** |

The Financial Position Statement includes a net portfolio held in Free-standing trusts totaling 907.970 as of September 30, 2023, and 1.053.196 as of December 31, 2022. Credivalores classified portfolio by-products by the days of default.

The movement of the provision for the impairment of financial assets by loan portfolio is provided below for the period ended September 30, 2023, and December 31, 2022.

|  | September 30, 2023 | September 30, 2022 |
|---|---|---|
| **Initial Balance** | 372.608 | 318.427 |
| Impairment of the period charged against profit or loss | 75.058 | 48.141 |
| Write-offs | (15.574) | (16.980) |
| **Closing balance** | **432.092** | **349.588** |

Expenditure on provisions and write-offs of the loan portfolio

|  | September 30, 2023 | September 30, 2022 |
|---|---|---|
| Expenditure for the provisions period | 75.058 | 48.141 |
| Forgiveness | 6.645 | 6.408 |
| **Total** | **81.703** | **54.549** |

Below we present a breakdown of the loan portfolio in the balance sheet with all components:

**As of September 30, 2023**

| Type | Principal | Transaction costs | Accrued Interest | Commissions | Impairment | Total |
|---|---|---|---|---|---|---|
| Consumer loans | 1.564.220 | 81.716 | 267.073 | 13.814 | (432.091) | 1.494.732 |
| **Total financial assets at amortized cost** | **1.564.220** | **81.716** | **267.073** | **13.814** | **(432.091)** | **1.494.732** |

**As of December 31, 2022**

| Type | Principal | Transaction costs | Accrued Interest | Commissions | Impairment | Total |
|---|---|---|---|---|---|---|
| Consumer loans | 1.685.538 | 100.528 | 205.775 | 13.599 | (372.608) | 1.632.832 |
| **Total financial assets at amortized cost** | **1.685.538** | **100.528** | **205.775** | **13.599** | **(372.608)** | **1.632.832** |

The distribution of maturities of Credivalores gross loan portfolio is the following:

**September 30, 2023**

|  | Up to 1 year | Between 1 and 3 years | Between 3 and 5 years | More than 5 years | Total |
|---|---|---|---|---|---|
| Consumer | 161.906 | 682.361 | 314.276 | 768.281 | 1.926.824 |
| **Total Gross Loan Portfolio** | **161.906** | **682.361** | **314.276** | **768.281** | **1.926.824** |

**December 31, 2022**

|  | Up to 1 year | Between 1 and 3 years | Between 3 and 5 years | More than 5 years | Total |
|---|---|---|---|---|---|
| Consumer | 262.821 | 674.343 | 326.079 | 742.197 | 2.005.440 |
| **Total Gross Loan Portfolio** | **262.821** | **674.343** | **326.079** | **742.197** | **2.005.440** |

The distribution of maturities of Credivalores principal only loan portfolio is the following:

**September 30, 2023**

|  | Up to 1 year | Between 1 and 3 years | Between 3 and 5 years | More than 5 years | Total |
|---|---|---|---|---|---|
| Consumer | 107.223 | 567.430 | 263.109 | 626.458 | 1.564.220 |
| **Total Principal-Only Loan Portfolio** | **107.223** | **567.430** | **263.109** | **626.458** | **1.564.220** |

**December 31, 2022**

| | Up to 1 year | Between 1 and 3 years | Between 3 and 5 years | More than 5 years | Total |
|---|---|---|---|---|---|
| Consumer | 206.685 | 571.451 | 289.703 | 617.699 | 1.685.538 |
| **Total Principal-Only Loan Portfolio** | **206.685** | **571.451** | **289.703** | **617.699** | **1.685.538** |

Below is the breakdown of Credivalores managed loan portfolio, which includes the loan portfolio on balance and the portfolio sold but still managed by the Company:

| | As of September 30, 2023 | | |
|---|---|---|---|
| **Type** | **Principal Loan** | **Sold** | **Total** |
| Consumer | 1.564.220 | 94.116 | 1.658.336 |
| **Total Financial Assets at amortized cost** | **1.564.220** | **94.116** | **1.658.336** |

| | As of December 31, 2022 | | |
|---|---|---|---|
| **Type** | **Principal Loan** | **Sold** | **Total** |
| Consumer | 1.685.538 | 113.594 | 1.799.132 |
| **Total Financial Assets at amortized cost** | **1.685.538** | **113.594** | **1.799.132** |

**Overdue but not impaired**

As of September 30, 2023, and December 31, 2022, a summary of the overdue portfolio by days past due is as follows:

| | Consumer | Total | Consumer | Total |
|---|---|---|---|---|
| Performing loans | 1.007.254 | 1.007.254 | 1.206.606 | 1.206.606 |
| Overdue but not impaired | 68.014 | 68.014 | 85.811 | 85.811 |
| Non-performing loans under 360 days | 172.696 | 172.696 | 107.218 | 107.218 |
| Non-performing loans over 360 days | 316.256 | 316.256 | 285.903 | 285.903 |
| | **1.564.220** | **1.564.220** | **1.685.538** | **1.685.538** |

**NOTE 10. ACCOUNTS RECEIVABLE, NET**

The detailed information of accounts receivables as of September 30, 2023, and December 31, 2022, is as follows:

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Debtors (10.1) | 136.351 | 168.909 |
| Economically Related Parties (10.2) | 18.601 | 43.662 |
| Asficredito | 74.593 | 78.156 |
| Payments on behalf of clients (10.3) | 25.043 | 22.559 |
| Deposits | - | 9.445 |
| Prepayments and Advances | - | 1 |
| Others accounts receivable | 33.050 | 3.793 |
| Shareholders | 1.815 | 1.815 |
| Impairments for doubtful accounts (10.4) | (8.401) | (8.211) |
| | **281.052** | **320.129** |

**10.1** The balance of the debtors account that as of September 30, 2023 amounts to 136.351 and as of December 31, 2022 amounts to 168.909, mainly corresponds to outstanding portfolio collection balances from the free-standing trusts and utilities and claims of guarantees to FGA.

**10.2** The following is the detail with economically related parties:

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Activar Valores S.A.S | - | 15.777 |
| Ban100 S.A | 1 | - |
| Ingenio la cabaña S.A. | 2.313 | 2.000 |
| Finanza inversiones S.A.S | 5.801 | - |
| Inversiones Mad capital S.A.S | 10.486 | 9.736 |
| Brestol S.A.S | - | 16.149 |

|  | | |
|---|---|---|
|  | **18.601** | **43.662** |

The effective interest rates on interest-generating receivables were as follows:

|  | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Finanza Inversión | DTF + 9.41% | DTF + 9.41% |
| Mad Capital | DTF + 5.00% | DTF + 5.00% |
| Ingenio la cabaña S.A. | IBR + 8.00% | - |

**10.3** The following is a breakdown of payments by client account:

|  | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Life Insurance Payroll deduction loans | 11.682 | 9.928 |
| Crediuno Insurance | 6.522 | 5.976 |
| Tigo Insurance | 258 | 374 |
| Credipoliza Insurance | 580 | 582 |
| SG Portfolio Insurance | 6.001 | 5.699 |
|  | **25.043** | **22.559** |

**10.4** The movement in the provision for impairment of other accounts receivable is provided below:

|  | September 30, 2023 | December 31, 2022 |
|---|---|---|
| **Balance at the beginning of the period** | (8.211) | (7.910) |
| Deterioration (1) | (9.788) | (11.298) |
| Write-off | 9.598 | 10.997 |
| **Balance at the end of the period** | **(8.401)** | **(8.211)** |

(1)   The impairment analysis of other receivables is performed annually as of December 31 of each year.

**10.4.1. Detail Impairment**

As of September 30, 2023, the amount of the impairment provision for accounts receivable amounts to $8.401. Changes in the impairment provision of accounts receivable are described in the following table:

| Third-Party | Impairment | % |
|---|---|---|
| Asficredito | 7.587 | 10.2% |
| Staggered Collective Portfolio | 814 | 1.4% |
| **Total** | **8.401** | |

Increases in impairment provision of receivables have been included in the "other expenses" line of the income analysis. Amounts charged to the provision account are usually written off when there is no expectation of receiving additional cash.

The Company does not maintain any guarantee as collection insurance.

**NOTE 11. PROPERTY AND EQUIPMENT**

The Company's property, plant, and equipment as of September 30, 2023, and December 31, 2022, respectively, are as follows:

|  | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Transportation equipment | 117 | 117 |
| Office equipment and accessories | 1.788 | 1.771 |
| Computer equipment | 388 | 388 |
| Network and communication equipment | 1.784 | 1.761 |
| Assets in financial lease | 4.355 | 4.354 |

| | | |
|---|---|---|
| **Subtotal** | **8.432** | **8.391** |
| Accumulated depreciation | (8.279) | (8.218) |
| **Total** | **153** | **173** |

The breakdown for equipment movement is shown below:

| | December 31, 2022 | Purchases | Write-offs | September 30, 2023 |
|---|---|---|---|---|
| Transportation equipment | 117 | - | - | 117 |
| Office equipment and accessories | 1.771 | 22 | (5) | 1.788 |
| Electronic equipment | 388 | - | - | 388 |
| Network and communication equipment | 1.761 | 23 | - | 1.784 |
| Assets in financial lease | 4.354 | - | - | 4.355 |
| | 8.391 | 45 | (5) | 8.432 |

| | December 31, 2021 | Purchases | Write-offs | September 30, 2022 | Purchases | Write-offs | December 31, 2022 |
|---|---|---|---|---|---|---|---|
| Transportation Equipment | 117 | - | - | 117 | - | - | 117 |
| Office equipment and accessories | 1.614 | 153 | - | 1.767 | 4 | - | 1.771 |
| Electronic equipment | 393 | - | (5) | 388 | - | - | 388 |
| Network and communication equipment | 1.990 | 21 | (255) | 1.756 | - | (5) | 1.761 |
| Assets in financial lease | 4.384 | - | (30) | 4.355 | - | - | 4.355 |
| | 8.498 | 174 | (290) | 8.382 | 4 | (5) | 8.391 |

The following is the depreciation movement as of September 30, 2023, and December 31, 2022, respectively:

| | December 31, 2022 | Depreciation | Write-offs | September 30, 2023 |
|---|---|---|---|---|
| Transport equipment | 117 | - | - | 117 |
| Office equipment and accessories | 1.643 | 44 | (5) | 1.682 |
| Electronic equipment | 1.279 | 10 | - | 1.289 |
| Telecommunications equipment | 826 | 11 | - | 837 |
| Assets in financial lease | 4.353 | - | - | 4.353 |
| | 8.218 | 65 | (5) | 8.279 |

| | December 31, 2021 | Depreciation | Write-offs | December 31, 2022 |
|---|---|---|---|---|
| Transport equipment | 117 | - | - | 117 |
| Office equipment and accessories | 1.578 | 65 | - | 1.643 |
| Electronic equipment | 1.374 | 163 | (258) | 1.279 |
| Telecommunications equipment | 816 | 12 | (2) | 826 |
| Assets in financial lease | 4.384 | - | (31) | 4.353 |
| | 8.269 | 240 | (291) | 8.218 |

All equipment of Credivalores is duly protected with current insurance policies. To protect its property and equipment, the Company took out insurance policies with Beckley International Insurance Colombia and Chubb de Colombia as of September 30, 2023, and December 31, 2022, which cover the risks of theft, fire, lightning strikes, explosions, earthquakes, strikes, revolts, etc.

Property and equipment include the values of furniture, computer equipment, and improvements to rented property, which are used in the Company's normal course of business.

The Company's property and equipment as listed above, are not in any way encumbered nor have they been delivered as collateral to guarantee any kind of obligation. The Company has also taken out insurance policies to protect these assets.

**NOTE 12. PROPERTIES BY RIGHT OF USE**

Below are the plant and equipment properties that the Company has as of September 30, 2023, and December 31, 2022, respectively:

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| **Assets** | | |
| Properties, Plant, and Equipment (Right of Use) | 1.232 | 2.021 |
| Deferred tax asset | 83 | 55 |
| **Liabilities** | | |
| Other financial liabilities - lease of use | | |
| Currents | (604) | (934) |
| Non-current | (806) | (1.245) |
| **Net** | **(95)** | **(103)** |

Properties and equipment include rights to use leases, in which the Company is the tenant, whose values are shown below:

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| **As of December 31, 2021** | | |
| Cost | 9.696 | 9.296 |
| Accumulated Depreciation | (5.398) | (3.276) |
| Net cost | **4.298** | **6.020** |
| | | |
| **As of December 31, 2022** | | |
| Balance at the beginning of the year | 4.298 | 6.020 |
| Aditions | | 434 |
| Retreats | (221) | - |
| Depreciation charge | (2.056) | (2.156) |
| Balance at the end of the year | **2.021** | **4.298** |
| | | |
| **As of December 31, 2022** | | |
| Cost | 9.251 | 9.696 |
| Accumulated Depreciation | (7.230) | (5.398) |
| Net cost | **2.021** | **4.298** |
| | | |
| **As of September 30, 2023** | | |
| Balance at the beginning of the year | 2.021 | 4.298 |
| Additions | 1.965 | - |
| Retreats | (707) | (221) |
| Depreciation charge | (2.048) | (2.056) |
| Balance at the end of the year | **1.231** | **2.021** |
| | | |
| **As of September 30, 2023** | | |
| Cost | 9.518 | 9.251 |
| Accumulated Depreciation | (8.287) | (7.230) |
| Net cost | **1.231** | **2.021** |

The maturities of financial leases range from 3 to 5 years.

Concerning the rights of use recorded in the property, plant, and equipment accounts, financial leasing liabilities have been recorded which are included in other financial liabilities and which as of September 30, 2023, have the following balances:

| Lease liabilities | September 30, 2023 | December 31, 2022 |
|---|---|---|
| **As of December 31, 2022** | **2.179** | **4.770** |
| Additions | 1.965 | - |
| Payments | (1.969) | (2.370) |
| Withdraws | (707) | (221) |

| | | |
|---|---|---|
| **As of September 30, 2023\*** | **1.468** | **2.179** |

- The net variation for the year corresponds to 711.

**a. Statement of Results**

| | September 30, 2023 |
|---|---|
| Depreciation fee - usage asset | 2.048 |
| Interest expense on lease liabilities | 711 |
| Variable lease expenses | 612 |
| | **3.371** |

Total cash outings for leases as of September 30, 2023, were 2.695.

**Variable Leases**

Credivalores determined variable leases, based on the landlord's preponderance in the disposal and use of the asset, in this classification are the points of sale located in the chain warehouses.

**NOTE 13. INTANGIBLE ASSETS**

Below we present the company's other intangible assets as of September 30, 2023 and December 31, 2022, respectively:

**September 30, 2023**

| | Initial Balance | Additions | Amortization | Closing Balance |
|---|---|---|---|---|
| Software Licenses | 1.441 | 1.607 | 1.707 | 1.341 |
| Acquired Trademarks | 7.140 | - | 1.785 | 5.355 |
| Database | 17.409 | - | 568 | 16.841 |
| Contracts | 13.054 | - | 560 | 12.494 |
| Other | 484 | 2.632 | 2.688 | 428 |
| **Total** | **39.528** | **4.239** | **7.308** | **36.459** |

**December 31, 2022**

| | Initial Balance | Additions | Amortization | Closing Balance |
|---|---|---|---|---|
| Software Licenses | 1.334 | 2.225 | 2.118 | 1.441 |
| Acquired Trademarks | 9.520 | - | 2.380 | 7.140 |
| Database | 18.166 | - | 757 | 17.409 |
| Contracts | 13.781 | - | 727 | 13.054 |
| Other | 866 | 4.995 | 5.377 | 484 |
| **Total** | **43.667** | **7.220** | **11.359** | **39.528** |

Disputed rights, the variation corresponds to the collection of the portfolio included in this item:

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Disputed rights | 365 | 324 |
| **Total** | **365** | **324** |

The movement of amortization expenses for the period was as follows:

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Depreciation of brands | 1.785 | 2.380 |
| Amortization of exclusivity contracts, databases, and licenses | 2.729 | 3.602 |
| **Subtotal** | **4.514** | **5.982** |
| Consultancies, free-standing trusts commissions, contributions | 131 | 1.277 |
| Investors | 1.988 | 3.307 |
| Fees | 118 | 375 |
| Insurance | 557 | 418 |

| | | |
|---|---|---|
| **Total** | **2.794** | **5.377** |

Based on the end of 2018 and 10-year projections adjusted to the performance of the business unit up to that date, the intangibles were prepared in the evaluation and valuation of intangibles through the construction of discounted cash flow projections.

By obtaining the value of the discounted projections, the flow was evaluated in an aggregate manner, and then the tangible assets on the balance sheet were deducted from the total business value, to identify the residual value against the estimated market value of the business. The difference that was obtained in the values, according to the economic and accounting literature, gave rise to the residual value of the intangibles. It was concluded that the updated projections for the base year 2022 remain within the range initially estimated in 2018 of the Base Scenario, considering results obtained at the end of 2018 to 2021 and the future commercial expectations of placement and collection, and following the dynamics of growth, margin contribution and efficiency in expenses.

Therefore, the conclusion of the Appraiser should not generate an adjustment in the initially estimated valuation, nor should an adjustment for impairment in the registered value of CREDIUNO's intangibles be included, since it is evident that the estimated results in 2018 remained in the lower range of projection even with the effects of the pandemic, and it is expected that by meeting the economic reactivation due to the cash needs of customers in the short and medium term, it would bring rewards in terms of projected profits of the operation within the estimated and initially projected range, considering the new growth curves and efficiency in commission income along with the reduction in expenses, thus preserving the operating margins initially estimated for valuation.

**NOTE 14. CREDIT QUALITY OF FINANCIAL ASSETS**

The credit quality of financial assets that have not yet expired and have also not suffered impairment losses is assessed based on ratings given by external bodies or if they do not exist based on internal categorizations defined based on counterpart characteristics:

| | September 30, | |
|---|---|---|
| | **2023** | **2022** |
| **Cash and cash equivalents** | | |
| AAA | 75.432 | 185.604 |
| AA | 3 | 8 |
| **Total cash and cash equivalents** | **75.435** | **185.612** |

| | September 30, | |
|---|---|---|
| | **2023** | **2022** |
| **Equity instruments (shares)** | | |
| Fair value financial assets through the other comprehensive results | | |
| Financial sector | 5.205 | 5.730 |
| **Total equity instruments** | **5.205** | **5.730** |

| | September 30, | |
|---|---|---|
| | **2023** | **2022** |
| **Debt instruments** | | |
| Financial assets at fair value through the statement of return | | |
| AAA | 12.157 | 12.033 |
| **Total debt instruments** | **12.157** | **12.033** |

**NOTE 15. DERIVATIVE FINANCIAL INSTRUMENTS AND HEDGE ACCOUNTING**

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| **ASSETS** | | |

| | | |
|---|---|---|
| Prima Call | 14.086 | 7.051 |
| Hedge forward contracts (15.1) | - | 5.120 |
| Hedge Swaps (15.2) | - | (10.146) |
| Hedge Options (15.3) | 4.555 | 96.836 |
| **Total** | **18.641** | **98.861** |

Movements for hedge accounting and investments in derivatives are provided below:

Credivalores holds derivative financial instruments to hedge foreign currency risk exposure.

### *Hedging Operations*

Credivalores activities are exposed to financial risks including liquidity risk, foreign currency risk, and interest rate risks. Therefore, the administration and the Board of Directors have approved and implemented a financial risk management policy to mitigate the negative effects of financial market uncertainty and volatility on the company's financial performance. The financial risk management policy establishes the use of a wide variety of financial derivatives to cover the risks inherent in exchange rate fluctuations and the interest rate of financial obligations in currencies other than Colombian Pesos.

Credivalores has developed a hedging policy against financial risks to mitigate the effects that these risks may have on the income statement. In the development of this policy, the main objective is to minimize the effects of the exchange rate on the liabilities in foreign currency that the company currently has. To achieve this objective CVCS has contracted different types of derivatives such as Exchange Rate Forward, Cross Currency Swap, Cupon Only Swap, and Options. The Management constantly monitors the results of this strategy and its effectiveness to adopt timely actions and corrective measures in favor of results. Effectiveness is measured retrospectively using the hypothetical derivative method. Equally, the methodologies for valuation at market prices have been adopted following the practices used by the Colombian financial system and international practices, with sources of information from price providers accepted by national regulators.

### 15.1 Forward Contracts for Hedging

The portfolio of derivative transactions presents assets valued according to the policy implemented and the fair value and cash flow valuation.

- **Fair-value hedge accounting**

| | Fair value | | | |
|---|---|---|---|---|
| | September 30, 2023 | | December 31, 2022 | |
| **ASSETS** | Nominal Amount USD | Fair Value COP | Nominal Amount USD | Fair Value COP |
| **Forward Contracts for Hedging** | | | | |
| Purchase of foreign currency | - | - | 7 | 5.120 |
| **Total forward contracts for hedging – assets** | **-** | **-** | **7** | **5.120** |

*Stated in USD expressed in million*

### 15.2 Derivate Financial Instruments Options

The activities carried out by Credivalores generated significant positions in the derivatives portfolio, performing transactions for hedging purposes where the underlying assets are exchange rates and interest rates. Options are contracts between two parties, one of them has the right but not the obligation, to carry out an operation of purchase or sale according to previously agreed terms.

The company closed operations with options as derivative financial instruments to manage and mitigate the fluctuations in the fair value of the debt in the P&L. The options are measured through cash flow coverage.

The detail of derivative with options financial instruments and their accounting is as follows:

| | Fair value | | | |
|---|---|---|---|---|
| | September 30, 2023 | | December 31, 2022 | |
| **ASSETS** | Nominal Amount USD | Fair Value COP | Nominal Amount USD | Fair Value COP |
| Call spread premium option | 1 | 4.555 | 20 | 96.836 |
| **Total forward contracts for hedging – assets** | **1** | **4.555** | **20** | **96.836** |

**Options Contracts for Hedging**

Transactions in derivative instruments with options cover the debt position of the disbursements of the PA Credivalores O'Connor and Gramercy credit for an aggregate face value of US 46.888.476.

These financial instruments are valued under the methodology and market value provided by the counterparties, the type of measurement is cash flow.

The Company will hold derivative financial instruments to hedge foreign currency risk exposure to maturity, which corresponds to the maturity of the loans with UBS OCONNOR that are being hedged under this instrument. The objective and strategy of the administration is to analyze and evaluate the appropriate method for the valuation of financial instruments, according to the type of operation and negotiation that is carried out.

By the guidelines of that policy, the following is the list of derivative instruments implemented and in force as of September 2023 to hedge foreign currency risks and interest rate risks of financial obligations denominated in foreign currency:

| Type of instrument | Credivalores Position | Type of Option | Amount Covered in USD | Effective date | Expiration date | Strike Price COP | Compliance |
|---|---|---|---|---|---|---|---|
| Call Option | Seller | European | 3.907.372,96 | 15/07/2024 | 11/07/2024 | $4.585 | Non-Delivery |
| Call Option | Buyer | European | 3.907.373,00 | 15/07/2024 | 11/07/2024 | $5.085 | Non-Delivery |
| Call Option | Seller | European | 3.907.373,00 | 15/08/2024 | 13/08/2024 | $4.585 | Non-Delivery |
| Call Option | Buyer | European | 3.907.373,00 | 15/08/2024 | 13/08/2024 | $5.085 | Non-Delivery |
| Call Option | Seller | European | 3.907.373,00 | 16/09/2024 | 12/09/2024 | $4.585 | Non-Delivery |
| Call Option | Buyer | European | 3.907.373,00 | 16/09/2024 | 12/09/2024 | $5.085 | Non-Delivery |
| Call Option | Seller | European | 3.907.373,00 | 15/10/2024 | 10/10/2024 | $4.585 | Non-Delivery |
| Call Option | Buyer | European | 3.907.373,00 | 15/10/2024 | 10/10/2024 | $5.085 | Non-Delivery |
| Call Option | Seller | European | 3.907.373,00 | 15/11/2024 | 13/11/2024 | $4.585 | Non-Delivery |
| Call Option | Buyer | European | 3.907.373,00 | 15/11/2024 | 13/11/2024 | $5.085 | Non-Delivery |
| Call Option | Seller | European | 3.907.373,00 | 16/12/2024 | 12/12/2024 | $4.585 | Non-Delivery |
| Call Option | Buyer | European | 3.907.373,00 | 16/12/2024 | 12/12/2024 | $5.085 | Non-Delivery |
| Call Option | Seller | European | 3.907.373,00 | 15/01/2025 | 13/01/2025 | $4.585 | Non-Delivery |
| Call Option | Buyer | European | 3.907.373,00 | 15/01/2025 | 13/01/2025 | $5.085 | Non-Delivery |
| Call Option | Seller | European | 3.907.373,00 | 18/02/2025 | 13/02/2025 | $4.585 | Non-Delivery |
| Call Option | Buyer | European | 3.907.373,00 | 18/02/2025 | 13/02/2025 | $5.085 | Non-Delivery |
| Call Option | Seller | European | 3.907.373,00 | 17/03/2025 | 13/03/2025 | $4.585 | Non-Delivery |
| Call Option | Buyer | European | 3.907.373,00 | 17/03/2025 | 13/03/2025 | $5.085 | Non-Delivery |
| Call Option | Seller | European | 3.907.373,00 | 15/04/2025 | 11/04/2025 | $4.585 | Non-Delivery |
| Call Option | Buyer | European | 3.907.373,00 | 15/04/2025 | 11/04/2025 | $5.085 | Non-Delivery |
| Call Option | Seller | European | 3.907.373,00 | 15/05/2025 | 13/05/2025 | $4.585 | Non-Delivery |
| Call Option | Buyer | European | 3.907.373,00 | 15/05/2025 | 13/05/2025 | $5.085 | Non-Delivery |
| Call Option | Seller | European | 3.907.373,00 | 16/06/2025 | 12/06/2025 | $4.585 | Non-Delivery |
| Call Option | Buyer | European | 3.907.373,00 | 16/06/2025 | 12/06/2025 | $5.085 | Non-Delivery |

**15.3 Derivate Financial Instruments Cross Currency Swap**

Credivalores closed operations with financial derivative instruments to manage and mitigate fluctuations in the fair value of the debt position in the profit and loss statement. The portion of cross-currency swaps that hedges exchange rate risk is measured at market value (Fair Value Hedge) and the portion that hedges interest rate risk is measured as cash flow hedge. In the second half of 2022 and the first quarter of 2023, Credivalores carried out Unwind with these operations.

Derivative financial instruments through cross-currency swaps and their hedge accounting are the following:

| ASSETS | Fair value | | | |
|---|---|---|---|---|
| | September 30, 2023 | | December 31, 2022 | |
| | Nominal Amount USD | Fair Value COP | Nominal Amount USD | Fair Value COP |
| Hedging Contracts Coupon Only Swap (b) | - | - | (2) | (10.146) |
| **Total forward contracts for hedging – assets** | **-** | **-** | **(2)** | **(10.146)** |

    **a.  Coupon-only swaps hedging contracts.**

The coupon-only swaps that cover interest until the maturity of the disbursements of the PA Credivalores loan UBS O'Connor and Gramercy were canceled in February and March 2023 by the realization of an UNWIND.

**NOTE 16. FINANCIAL OBLIGATIONS**

Below, we present the balances of financial obligations as of September 30, 2023 and December 31, 2022

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| 144 A / Reg S Bonds | 854.533 | 1.289.134 |
| ECP Program Notes | 128.148 | 192.408 |
| Ordinary Local Bonds- FNG Partial Guarantee | 95.940 | 95.940 |
| Financial obligations in autonomous assets | 516.564 | 901.280 |
| Promissory notes national banks | 104.926 | 48.919 |
| Transaction costs | (43.143) | (53.924) |
| | **1.656.968** | **2.473.757** |

The balances of Credivalores' financial obligations and the Autonomous Assets of which he is trusting ending September 30, 2023, and December 31, 2022, correspond to obligations incurred with financial institutions in the country and obligations in the foreign capital market and financial leasing. Short-term credit obligations were canceled between December 2022 and September 2023 and credits that have a maturity after December 2023, respectively:

a)    Short-term financial obligations.

| Entity | September 30, 2023 | Interest rate | Maturity | December 31, 2022 | Interest rate | Maturity |
|---|---|---|---|---|---|---|
| Banco de Bogotá | 4.676 | IBR+5.8% | 2023 | 5.512 | IBR+4.15% | 2023 |
| Banco de Occidente | 9.556 | IBR+8,00% | 2023-2024 | 10.309 | IBR+2.86% | 2022-2023 |
| Bancolombia | 2.522 | IBR+7.95% | 2024 | 6.831 | IBR+9.79% | 2023 |
| Coltefinanciera | - | - | | 1.065 | 14.68%EA | 2023 |
| Finanza Inversión | 69.756 | SORF+10% | 2023 | - | | |
| Finanza Inversión | 6.265 | 20% E.A. | 2023 | - | | |
| Fiduciaria Coomeva S.A. | 3.232 | 18,5% E.A. | 2023 | - | | |
| **Total National Entities** | **96.007** | | | **23.717** | | |
| ECP Program Notes | 128.148 | 13.00% E.A. | 2023-2024 | 192.408 | 10.63%NA | 2023 |
| **Total ECP Program Notes** | **128.148** | | | **192.408** | | |

| Entity | September 30, 2023 | Maturity | Expiration | December 31, 2022 | Interest rate | Maturity |
|---|---|---|---|---|---|---|
| Free-standing Trust Crediuno IFC | - | | | 6.956 | DTF + 5.5% | 2023 |
| Free-standing Trust Crediuno IFC | 14.026 | IBR+5,5% | 2023 al 2024 | - | | |
| **TotalFree-standing Trusts** | **14.026** | | | **6.956** | | |
| **Bond Issuance** | | | | | | |
| FNG Partial Guaranteed Local Ordinary Bonds | 95.940 | 9,10% EA | 2024 | | | |
| **Total Bond Issuance** | **95.940** | | | | | |
| **Total short-term obligations** | **334.121** | | | **223.081** | | |

Credivalores has short-term financial obligations, during the periods ended September 30, 2023, and December 31, 2022 for a value of 334.121 and 223.081, respectively. The measurement of liabilities financial instruments of financial obligations is valued at low amortized cost as established by IFRS 9.

**b)    Long-term obligations**

The Company had long-term financial obligations during the periods ended September 30, 2023, and December 31, 2022, totaling 1.581.707 and 2.304.567, respectively. Associated costs incurred in the acquisition of loans are classified as transaction costs pending IFP amortization for the periods ended September 30, 2023, and December 31, 2022, valued at 43.143 and 53.924, respectively. The measurement of financial liability instruments for financial obligations are valued at amortized cost, as per IFRS 9.

The total balance of financial obligations for the periods ended September 30, 2023, and December 31, 2022 is 1.656.968 and 2.473.724 respectively, will be cancelled in accordance with the agreed conditions.

| Entity | September 30, 2023 | Interest rate | Maturity | December 31, 2022 | Interest rate | Maturity |
|---|---|---|---|---|---|---|
| Bancolombia | 12.151 | IBR+11.80% | 2024 | 26.267 | IBR+10.50% | 2024 |
| **Total National Entity** | **12.151** | | | **26.267** | | |

| Entity | September 30, 2023 | Interest rate | Maturity | December 31, 2022 | Interest rate | Maturity |
|---|---|---|---|---|---|---|
| Free-standing Trust Syndicated Loan TuCrédito | 176.315 | IBR + 5.5% | 2024 al 2027 | 253.004 | IBR + 5.5% | 2024al2027 |
| Free-standing Trust Syndicated Loan Payroll | 114.847 | IBR+8% | 2026-2027 | 169.939 | IBR+8% | 2027 |
| Free-standing Trust UBS O'Connor | 170.234 | SOFR+9,5% | 2025 | 421.920 | SOFR+9,5% | 2025 |
| Free-standing Trust Systemgroup | 37.910 | 18,14% EA | 2025 | 48.363 | 15% EA | 2025 |
| **Total Trusts** | **499.306** | | | **893.226** | | |

| Entity | September 30, 2023 | Interest rate | Maturity | December 31, 2022 | Interest rate | Maturity |
|---|---|---|---|---|---|---|
| 8.875% Bonds due February 2025 (144 A/Reg. S Bonds) | 854.533 | 8,875% NS | 2025 | 1.289.134 | 8,875% NS | 2025 |
| Domestic Bonds Guaranteed by the FNG | - | | | 95.940 | 9,1% NS | 2024 |
| **Total Bonds** | **854.533** | | | **1.385.074** | | |
| **Total long-term obligations** | **1.365.990** | | | **2.304.566** | | |
| Transaction costs | (43.143) | | | (53.924) | | |
| **Total financial obligations** | **1.656.968** | | | **2.473.724** | | |

- The item for rights of use for the periods ended December 30, 2022 and December 31, 2022 correspond to 1.468 and 2.179 respectively.

On August 26, 2021, CV issued the first tranche of its inaugural domestic bond issuance of ordinary bonds with a partial guarantee from the FNG in the Colombian debt capital market.

The total amount of the issuance, authorized by the Financial Superintendence of Colombia in September 2021, is $160,000 millions pesos, and in August 2021 the Company placed the first tranche of bonds for an amount of $52,900 billion pesos with a 3-year term of 9.10% coupon.

Subsequently, on September 23, 2022, Credivalores placed the second batch of the issuance of ordinary bonds with a partial guarantee of the FNG for an amount of 43,040 million pesos maintaining the same maturity date and coupon of the issuance of the first lot. Therefore, at the end of September 2023, the total balance of ordinary bonds with a partial guarantee of the FNG issued by Credivalores was 95,940 million.

The issuance of ordinary bonds of Credivalores has an irrevocable partial guarantee from the FNG that covers 70% of the capital and interest and was rated 'A(col)' by Fitch Ratings Colombia in May 2023.

**Obligations are stated in foreign currency.**

| Entity | Nominal Value as of September 30, 2023 | | Nominal as of Value December 31, 2022 | |
|---|---|---|---|---|
| ECP Program Notes (a) | 32 | 128.148 | 40 | 192.408 |
| 144 A/ Reg S Bonds (b) | 211 | 854.533 | 268 | 1.289.134 |
| **Total** | **USD 243** | **COP 982.681** | **USD 308** | **COP 1.481.542** |

- Interests

Listed below:

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Bank interests | 130 | 199 |
| Bank Interests Free-standing Trust | 1.485 | 2.114 |
| Foreign currency interest foreign currency interest | 1.921 | 4.513 |
| Bonus coupon | 10.955 | 45.327 |
| Coupon ordinary bonds issued locally | 819 | 2.952 |
| Interest banks another Free-standing Trust | 513 | 559 |
| Foreign currency interest Free-standing Trust | 2.032 | 4.839 |
| | **17.855** | **60.503** |

**(a)  Euro Commercial Paper Program Notes**

The Euro Commercial Paper Program (ECP Program) has a US$150,000,000 maximum outstanding amount.

In March 2023, a new note was issued under the ECP Program maturing on March 14, 2024, for an amount of US$16,612,232 and a 13% coupon with quarterly payments.

The resources of this line of financing are destined for the growth of the loan portfolio and to general uses of the company.

**(b)  Notas 144A / Reg S**

CVCS decided to make an issue of ordinary Notes under the 144A / Reg S format in the international capital market with a maturity date of February 7, 2025, for an amount of US300,000,000 with a coupon of 8.875% and a yield of 9%. These Notes pay interest due semi-annually on February 7 and August 7 of each year, beginning August 7, 2020. The proceeds of this issuance were used to repurchase the Notes under the repurchase offer of a previous issue, to refinance existing debt under the ECP Program, and to the company's general-purpose surplus.

Below are the payments of the coupons of the issuance of 144A/Reg S notes with coupons 8.875% and maturity in 2025 since its issuance:

| Principal | Coupon | First Coupon Payment - 07/08/2020 | Second Coupon Payment - 07/02/2021 | Third Coupon Payment - 07/08/2021 | Fourth Coupon Payment - 27/02/2022 | Fifth Coupon Payment - 27/08/2022 |
|---|---|---|---|---|---|---|
| | | | | 11.892.500 | | |
| 268.000.000 | 8,875% | 11.892.500 | 11.892.500 | | 11.892.500 | 11.892.500 |
| | **Total in USD** | **11.892.500** | **11.892.500** | **11.892.500** | **11.892.500** | **11.892.500** |
| | **FX Rate** | 3.775,95 | 3.543,28 | 3.949,33 | 3.962,68 | 4.337,28 |
| | **Total in Million Pesos** | **44.905.485.375** | **42.138.457.400** | **46.967.407.025** | **47.126.171.900** | **51.581.102.400** |

| Principal | Coupon | Sixth Coupon Payment - 07/02/2023 |
|---|---|---|
| 268.000.000 | | 11.892.500 |
| | 8,875% | |
| | **Total in USD** | **11.892.500** |
| | **FX Rate** | 4.669,74 |
| | **Total in Million Pesos** | **55.534.882.950** |

| Principal | Coupon | Seventh Coupon Payment - 07/08/2023 |
|---|---|---|
| 210.800.000 | | 9.354.250 |
| | 8,875% | |
| | **Total in USD** | **9.354.250** |
| | **FX Rate** | 4.144,79 |
| | **Total in Million Pesos** | **38.771.401.858** |

Under the "Description of the notes" due in 2025 and "Offering memorandum", the Company may redeem the Notes, in whole or in part, at any time from February 7, 2023, at the redemption prices stipulated in the Offering Memorandum, plus any additional amounts due and accrued and unpaid interest, until the redemption date. It is also possible to redeem notes before February 7, 2023, in whole or in part, at a price equal to 100% of their principal amount plus a make-all premium, in addition to any additional amounts then due plus accrued and unpaid interests, until the redemption date.

In addition, at any time through February 7, 2023, CVCS may redeem up to 35% of the Notes using proceeds from stock sales or equity offerings at a redemption price of 108.875% of its principal amount, plus any additional amounts then due plus accrued and unpaid interest, until the redemption date. In addition, in the event of certain changes in the tax treatment of withholding tax in Colombia in connection with interest payments on the Notes, CVCS may redeem them, in whole, but not in part, at a price of 100% of their principal amount, in addition to any additional amounts then due plus accrued and unpaid interest, until the redemption date. In the event of a change of control in the entity, unless the Company has elected to redeem the Notes, each holder thereof shall have the right to demand that the entity repurchase all or any part of such holder's Notes at 101% of the total principal amount of the repurchased Notes, in addition to any amounts then due plus accrued and unpaid interest, up to the date of repurchase.

Notes due 2025 will be forward-looking and unsecured obligations and (i) will have the same priority in terms of the right to payment as all other existing and future debt obligations of the Company (subject to certain obligations whereby they are given preferential treatment under Colombia's insolvency laws); (ii) have a higher payment priority than the Company's existing and future subordinated debt obligations, if any; (iii) be subordinated, as to the right to payment, to all existing and future unsecured debt obligations of the Company, to the extent of the value of the assets securing such indebtedness, including any debts, liabilities, and Equity; and (iv) be structurally subordinate to all existing and future payment obligations and commercial accounts payable of any of our non-guarantor subsidiaries. The notes shall not be entitled to any redemption funds.

During April and May 2020, Credivalores carried out repurchase operations of Notes 144 A / Reg S maturing in 2025 and a coupon of 8.875% in the secondary market through a broker for a total amount of US32,000,000 of principal. The entire amount repurchased from these Notes in April and May was canceled at the end of September 2020. Likewise, in May 2023 Credivalores received and canceled notes worth US57,200,000, as a result, as of September 30, 2023, the new current amount of Notes 144 A / Reg S maturing in 2025 and coupon of 8.875% is US210,800,000.

**Covenants**

The Notes 144A/Reg S due 2025 prospect contains certain restrictive covenants, which among other things, limit our ability to (i) take additional debt, (ii) make dividend payments, redeem capital, and make certain investments, (iii) transfer and sell assets, (iv) enter into any type of agreement that could limit the ability of subsidiaries to pay dividends or make capital distributions, (v) create collateral or pledge assets, (vi) consolidate, merge or sell assets and (vii) transact with affiliates. The "Indenture" contract governing the Notes contains traditional default events.

At the end of September 2023, the Company did not take on additional debt because of the financial ratios that must be measured to indicate whether or not the Company may incur additional debt.

- **IFP Financial Cost**

The funds received from loans acquired from financial institutions are used for portfolio origination and to handle various lines of working capital, which helps to maintain a degree of liquidity for the Company. The loans are represented by promissory notes wherein both parties establish the payment conditions, including maximum amount, amount, interest rate, and duration.

The financial cost includes the value of the difference in exchange for restatement during the periods ended September 30, 2023 and 2022:

| | September 30, 2023 | September 30, 2022 |
|---|---|---|
| Free-standing trusts | 86.807 | 48.824 |
| Local banks | 6.493 | 7.143 |
| Foreign currency obligation | 30.535 | 19.763 |
| Financial cost Derivatives | (134.876) | 74.798 |
| Issuance of bonds | 66.793 | 116.426 |
| Issuance of Local Bonds FNG Guarantee | 6.406 | 4.482 |
| Amortization Transaction costs | 40.582 | 23.782 |
| Interest for liabilities for lease and finance lease agreements | 176 | 279 |
| **Total** | **102.916** | **295.497** |

Exchange rate differences included:

| | September 30, 2023 | September 30, 2022 |
|---|---|---|
| Difference instead | 245.363 | (38.590) |
| **Total** | **245.363** | **(38.590)** |

The financial obligations and Free-standing Trusts of Credivalores that are recognized in local and foreign currencies will be recognized at the beginning of the transaction at their amortized value, net of costs incurred in the transaction which are attributable at the time of issuance. The difference between funds received (net of transaction costs) and the redemption value is recognized in the Income Statement for the corresponding period, using the effective interest method.

**NOTE 17. EMPLOYEE BENEFITS**

Under Colombian labor law and based on labor conventions employees are entitled to short-term benefits such as wages, holidays, statutory bonuses, severance payment, and interest on severance pay.

Below is a breakdown of employee benefit payments as of September 30, 2023, and December 31, 2022:

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Interest on severance pay | 24 | 40 |
| Pension funds | 98 | - |
| Salaries | 56 | - |
| legal premium | 95 | - |
| Severance pay | 273 | 354 |
| Holidays | 613 | 659 |
| Total | **1.159** | **1.053** |

The current component of employee benefits must be paid within the twelve months following the reporting period.

The company within its compensation policies has no post-employment benefits.

## NOTE 18. OTHER PROVISIONS

Credivalores provisions as of September 30, 2023, and December 31, 2022, respectively are provided below.

|  | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Litigations subject to executive proceedings | 1.040 | 801 |
| Other provisions (a) | 1.443 | 2.227 |
|  | 2.483 | 3.028 |

a) The third-party balance of other provisions is detailed below:

|  | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Villamizar Mario | 6 | - |
| Inversiones Roa | 5 | - |
| Amautas | 2 | - |
| Econtact col S. A. S. | - | 192 |
| Experian colombia sa | 217 | 146 |
| Activar valores S. A. S. | 1.213 | 1.213 |
| Rangel Chema Clemencia del Carmen | - | 1 |
| Colombiana de comercio S. A. | - | 2 |
| Pwc contadores y auditores | - | 32 |
| Recuperadora y normalizadora integral de | - | 106 |
| Americas business process services S. A. | - | 260 |
| Atento colombia S. A. | - | 275 |
| Villamizar Mario | 1.443 | 2.227 |

The movement of legal and other provisions are provided below for the periods ended September 30, 2023, and December 31, 2022:

|  | Legal provisions | Other provisions | Total Provisions |
|---|---|---|---|
| **Balance held on December 31, 2022** | **801** | **2.226** | **3.027** |
| Increase in provisions during the period | 238 | 1.170 | 1.408 |
| Utilization | - | (1.952) | (1.952) |
| **Balance held on September 30, 2023** | **1.039** | **1.444** | **2.483** |

|  | Legal provisions | Other provisions | Total provisions |
|---|---|---|---|
| **Balance held as of December 31, 2021** | **705** | **213** | **918** |
| Recovered provisions | 96 | 2.013 | 2.109 |
| **Balance held as of December 31, 2022** | **801** | **2.226** | **3.027** |
| Recovered provisions | 238 | (782) | (545) |
| **Balance held as of September 30, 2023** | **1.039** | **1.444** | **2.483** |

Provisions correspond mainly to labor, civil and administrative processes filed by third parties against Credivalores, on which provisions were recognized as of September 30, 2023, in an amount of 1.039 and 2022, 801 it is not possible to determine a disbursement schedule for these provisions due to the diversity of processes in different instances. However, Credivalores does not expect significant changes to the amount provisions because of the outflows applicable to each proceeding. The expected time of resolution is uncertain since each proceeding is taking place in different instances.

## NOTE 19. ACCOUNTS PAYABLE

Below, we detail the balance of accounts payable that Credivalores has on September 30, 2023, and December 31, 2022, respectively:

**CREDIVALORES- CREDISERVICIOS S. A.**
**DISCLOSURES TO THE FINANCIAL STATEMENTS**
**ENDED SEPTEMBER 30, 2023, AND DECEMBER 31, 2022**
(Stated in millions of Colombian pesos)

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Leases | 340 | 3 |
| Suppliers | 42 | 25 |
| Commission and fees | 7.602 | 523 |
| Withholdings and labor contributions | 594 | 1.013 |
| Other accounts payable (19.2) | 103.130 | 32.946 |
| Costs and expenses payable (19.1) | 10.928 | 17.351 |
| | 122.636 | 51.860 |

**19.1 Costs and expenses payable**

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Services | 9.538 | 178 |
| Others (19.1.1) | 1.390 | 17.173 |
| | 10.928 | 17.351 |

**19.1.1 Other**

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Call option premiums | - | 3.050 |
| Representation and public relations expenses | 2 | 8 |
| Maintenance | 58 | - |
| Fiduciary services | 287 | 2.980 |
| Technical service providers | 1.043 | 11.136 |
| | 1.390 | 17.174 |

**19.2 Other accounts payable**

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Payroll Loan Disbursement CDS | 1 | 2.223 |
| Account payable free standing trusts | - | 1.596 |
| MC Pending collection to apply | 20 | 9 |
| Crediuno Disbursements | 27 | 46 |
| Against Visa vrol positions | 18 | 116 |
| Different | 45.932 | 122 |
| Accounts payable Book Buybacks | 946 | - |
| TIGO Withdrawal | - | 1.440 |
| Credipoliza Withdrawals | 1.696 | 1.644 |
| Crediuno Refunds | 3.357 | 2.855 |
| Collection in favor of third parties | 13.852 | 9.408 |
| Payroll Loan CDS Refund | 14.602 | 13.470 |
| Visa C1 disbursement agreement | 22.675 | 17 |
| | 103.130 | 32.946 |

**NOTE 20. CURRENT AND DEFERRED TAX LIABILITIES**

Current and deferred income tax expenses shall be recognized in each interim accounting period on the best estimate of the tax rate expected for the annual accounting period.

For the second quarter ended September 30, 2023, Credivalores did not record an expense for current income tax, since tax losses from previous years are presented and in accordance with article 188 of the National Tax Statute, as of taxable year 2021 the percentage of presumptive income is zero (0%) of the net assets of the last day of the immediately preceding taxable year. When calculating the effective tax rate for the cut-off periods between September 30, 2023 and September 30, 2022, it was 21% and 22% respectively, presenting a decrease of 1% mainly due to non-deductible expenses.

**NOTE 21. OTHER LIABILITIES**

Below is the detail of other liabilities:

|  | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Commission commercial force | - | 7 |
| Checks pending collection | 9 | 18 |
| Collection to be applied SG | 464 | 103 |
| Portfolio collection in participation | 6.842 | - |
| Collections of managed loan portfolios | 3.534 | 5.963 |
| Collections pending application | 7.677 | 13.252 |
| Values received for third parties (21.1) | 14.624 | 20.714 |
|  | **33.150** | **40.057** |

**21.1 Values received for third parties**

Below is the detail of other Values received from third parties

|  | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Voluntary and mandatory insurance collections | 298 | 499 |
| FGA's guarantees collections | 1.987 | 3.327 |
| Free-standing trusts collections | 12.339 | 16.888 |
|  | **14.624** | **20.715** |

**NOTE 22. EQUITY**

**Capital**

Credivalores' objective is to safeguard its capacity to continue as a business enterprise and maintain a financial structure that optimizes the cost of capital and maximizes returns for shareholders. The Company's capital structure encompasses and includes the subscribed capital, retained earnings, and reserves.

Capital management objectives are met by managing the portfolio as authorized by law and maintaining a consistent pace of generating profits from its structural revenue (portfolio interests and returns on investments) which results in institutional strengthening and provides the Company an opportunity to maintain its dividend distribution policy among its shareholders.

As of June 30, 2023, the company carried out a capitalization process of COP$273,980 million (US$58.6 million) that allows the Entity's equity for the reported period to increase by COP$333,160, thus registering positive equity of COP$276,716 million at the end of the semester.

**Authorized, and Paid in Capital**

As of September 30, 2023, and December 31, 2022 Credivalores authorized and paid in capital is **225.323** and **135.194** represented in **7.974.923** and **4.784.954** shares, each of a nominal value of 28.254; respectively.

| Credivalores-Crediservicios S.A. | | | | |
|---|---|---|---|---|
| **Shareholder** | **September 30, 2023 Number of shares** | **%** | **December 31, 2022 Number of shares** | **%** |
| Acon Consumer Finance Holdings S de RL | 954.197 | 11.96% | 954.197 | 19.94% |
| Crediholding S.A.S. | 1.642.121 | 20.59% | 1.642.120 | 34.32% |
| Lacrot Inversiones 2014 SLU | 3.342.093 | 41.91% | 1.747.109 | 36.51% |
| Acon Consumer Finance Holdings II S L | 201.887 | 2.53% | 201.887 | 4.22% |
| Direcciones de Negocio S.A.S. | - | 0.00% | 1 | 0.00% |
| Davalia gestión de Activos S.L | 1.594.985 | 20.00% | - | - |
| Treasury shares | 239.640 | 3.01% | 239.640 | 5.01% |
| **Total** | **7.974.923** | **100%** | **4.784.954** | **100%** |

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Number of authorized shares | 7.974.923 | 6.469.661 |
| Subscribed and paid shares | 7.974.923 | 4.784.954 |
| Nominal value | 28.254 | 28.254 |
| Subscribed and paid capital (nominal value) | 225.323 | 135.194 |
| Paid-in capital | 255.020 | 71.170 |
| **Total capital plus premium** | **480.343** | **206.364** |

According to minutes 71 held on May 24, 2023, capitalization is made by 273.980 shares for a total value of $85.888 per share, of which $28,254 corresponds to the nominal value and $57.634 to the premium in the placement of shares.

The following is a breakdown of the basic earnings per share:

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Ordinary shares (a) | 2.278.169 | 2.278.169 |
| Preferred shares (a) | 5.696.754 | 2.506.785 |
| Repurchased treasury shares | 239.640 | 239.640 |
| **Total earnings per share** | **842** | **(63.211)** |

(a) The value of the shares as of September 30, 2023, and 2022 correspond to the total number of outstanding shares held by Credivalores, 7.974.923 and 4.784.954.

As per the Company's bylaws, both common and preferred stock have the same decision power and rights, and the preference of those shares is given by its hierarchy in the payment of dividends when declared by the Assembly and by the preferred right in the reimbursement in case of liquidation.

**September 30, 2023**

| Share capital | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Name of Entity | Preference shares A | Preference shares B | Preference shares C | Preference shares D | Treasury Shares | Common Shares | Total | % |
| Acon Consumer Finance Holdings S de R.L. | 835.834 | - | - | - | - | 118.363 | 954.197 | 11,96% |
| Crediholding S.A.S | - | - | - | - | - | 1.642.121 | 1.642.121 | 20,59% |
| Lacrot Inversiones 2014 S.L.U. | - | 923.665 | 563.119 | 1.594.984 | - | 260.325 | 3.342.093 | 41,91% |
| Treasury Shares | - | - | - | - | 239.640 | - | 239.640 | 3,01% |
| Acon Consumer Finance Holdings II, S.L. | - | 184.167 | - | - | - | 17.720 | 201.887 | 2,53% |
| Davalia Gestión de Activos S.L | - | - | - | 1.594.985 | - | - | 1.594.985 | 20,00% |
| **Total** | **835.834** | **1.107.832** | **563.119** | **3.189.969** | **239.640** | **2.038.529** | **7.974.923** | **100,00%** |

**December 31, 2022**

| Share capital | | | | | | | |
|---|---|---|---|---|---|---|---|
| Name of Entity | Preference shares A | Preference shares B | Preference shares C | Treasury Shares | Common Shares | Total | % |
| Acon Consumer Finance Holdings S de R.L. | 835.834 | - | - | - | 118.363 | 954.197 | 19.94% |
| Crediholding S.A.S | - | - | - | - | 1.642.120 | 1.642.120 | 34.32% |
| Lacrot Inversiones 2014 S.L.U. | - | 923.665 | 563.119 | - | 260.325 | 1.747.109 | 36.51% |
| Treasury Shares | - | - | - | 239.640 | - | 239.640 | 5.01% |
| Acon Consumer Finance Holdings II, S.L. | - | 184.167 | - | - | 17.720 | 201.887 | 4.22% |
| Direcciones de Negocio S.A.S. | | | | | 1 | 1 | 0.00% |
| **Total** | **835.834** | **1.107.832** | **563.119** | **239.640** | **2.038.529** | **4.784.954** | **100.00%** |

**Treasury shares**

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Treasury Shares Reserve | 12.837 | 12.837 |
| (Treasury Shares) | (12.837) | (12.837) |
| **Total** | - | - |

The CVCS General Shareholders' Meeting on July 2 of 2014, decided to establish a special reserve in the amount of 12,837 for the reacquisition of 239,640 shares. This reserve is under Articles 396 and 417 of the Commercial Code.

**Reserves**

Equity reserves as of September 30, 2023, and December 31, 2022 were comprised of the following:

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Legal reserve | 11.017 | 11.017 |
| Reserve to repurchased treasury shares | 12.837 | 12.837 |
| Occasional reserves | 21 | 21 |
| **Total Reserves** | **23.875** | **23.875** |

**Legal reserve**

The Company is obliged to appropriate as a legal reserve 10% of its annual net profits until the balance of the reserve is equivalent to 50% of the subscribed capital.  The reserve is not distributable before the liquidation of the Company but may be used to absorb or reduce losses.  Appropriations made by more than 50% are freely available by the general assembly.

**Other reservations**

The other appropriate reserves directly from the accumulated profits can be considered as reserves of free availability by the General Meeting of Shareholders.

**NOTE 23. OTHER COMPREHENSIVE INCOME (OCI)**

We present the detail below:

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| **Tax** | (1.379) | 27.004 |
| Income tax OCI | **(1.379)** | **27.004** |
| | | |
| **Other comprehensive income** | **3.123** | **(76.475)** |
| Shares | (1.432) | 955 |
| **Financial instruments** | **4.555** | **(77.430)** |
| Financial instruments Forward | - | (161) |
| Financial instruments Options | 4.555 | (60.195) |
| Financial instruments Coupon Only swap | - | (17.074) |
| **Total** | **1.744** | **(49.471)** |

**NOTE 24. REVENUE**

Below, is a detail of revenue for the three and nine-months ended September 30, 2023, and 2022:

| | For the quarter ended at September 30 | | For the period ended at September 30 | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| Interests | 66.552 | 69.129 | 216.793 | 248.662 |
| Interest expense | - | (29) | - | (63) |
| **Subtotal Interests (24.1)** | **66.552** | **69.100** | **216.793** | **248.599** |

| | | | | |
|---|---|---|---|---|
| Revenue from customer contracts (24.2) | 14.304 | 34.718 | 53.860 | 91.209 |
| | **80.856** | **103.818** | **270.653** | **339.808** |

**24.1 Interest**

| | For the quarter ended at September 30 | | For the period ended at September 30 | |
|---|---|---|---|---|
| | **2023** | **2022** | **2023** | **2022** |
| CrediUno interest | 4.736 | 7.603 | 14.625 | 69.025 |
| CrediPóliza interest | 0 | 2 | 1 | 23 |
| TuCrédito loan interest | 2.978 | 4.360 | 11.957 | 23.355 |
| Tigo loan interest | 515 | 1.410 | 2.410 | 5.437 |
| SG Free-standing Trusts loan interest | 825 | - | 2.670 | - |
| TuCrédito transaction costs | (5.481) | (11.830) | (14.212) | (19.318) |
| CrediPóliza transaction costs | - | (1) | (1) | (4) |
| CrediUno transaction costs | (4.167) | (3.104) | (10.663) | (10.136) |
| Fair value TuCrédito | - | - | (381) | - |
| **Sub-total Consumer loans** | **(596)** | **(1.560)** | **6.406** | **68.382** |
| CrediPóliza late payment interest | 14 | 32 | 53 | 118 |
| TuCrédito late payment interest | 216 | 293 | 739 | 1.073 |
| SG Free-standing Trusts late payment interest | 180 | - | 567 | - |
| **Consumer loan defaults** | **410** | **325** | **1.359** | **1.191** |
| Joint operation interest | - | 355 | 18 | 1.187 |
| **Subtotal Joint operation interest** | **-** | **355** | **18** | **1.187** |
| Financial returns | 1.469 | 1.157 | 4.332 | 2.882 |
| BTG Pactual Financial returns | (3.069) | 566 | (4.138) | 6.212 |
| Current interests, Free-standing Trust | 40.312 | 43.144 | 128.578 | 79.667 |
| Income from FGA Alliance | 266 | 421 | 1.559 | 14.171 |
| Other income, Free-standing Trust | 1.782 | 1.988 | 7.865 | 2.062 |
| Current interests left off-balance | 22.550 | 17.785 | 64.248 | 41.994 |
| Premium for portfolio sale | 3.428 | 4.919 | 6.566 | 30.851 |
| Other | **66.738** | **69.980** | **209.010** | **177.839** |
| **Total Interests** | **66.552** | **69.100** | **216.793** | **248.599** |

**24.2 Revenue from customer contracts**

| | For the quarter ended at September 30 | | For the period ended at September 30 | |
|---|---|---|---|---|
| | **2023** | **2022** | **2023** | **2022** |
| Internal commission | 4 | 5 | 25 | 187 |
| Returned commission | 9 | 74 | 62 | 239 |
| Administration fee - life insurance plus | 245 | 481 | 900 | 1.498 |
| Shared financial consultancy fees | 329 | 667 | 1.196 | 1.826 |
| Financial Consultancy – Returns from Debtor life insurance | 250 | 1.034 | 929 | 3.619 |
| Brokerage Commission | 1.864 | 2.043 | 5.925 | 6.308 |
| Financial Consultancy - Returns Voluntary insurance policies | 686 | 10.373 | 7.028 | 11.186 |
| Collection fees | 4.239 | 5.678 | 11.490 | 13.824 |
| Administration fee – credit card | 6.678 | 14.363 | 26.305 | 52.522 |
| | **14.304** | **34.718** | **53.860** | **91.209** |

**NOTE 25. OTHER INCOME**

At the end of each period, movements corresponded to:

| | For the quarter ended at September 30 | | For the period ended at September 30 | |
|---|---|---|---|---|
| | **2023** | **2022** | **2023** | **2022** |
| Recoveries from Loan portfolio | 146 | 168 | 335 | 1.601 |
| Recoveries from previous exercises | 157 | - | 715 | 593 |
| Sickness Leave | 26 | 20 | 29 | 52 |
| Other | 159 | 4 | 164 | 13 |
| Profit on sale of assets | 53 | - | 53 | - |

| | | | | |
|---|---|---|---|---|
| Tax refund | - | - | 6 | 1 |
| **Total** | **541** | **192** | **1.302** | **2.260** |

## NOTE 26. OTHER EXPENSES

At the end of each period, movements corresponded to:

| | For the quarter ended at September 30 | | For the period ended at September 30 | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| Fees | 5.000 | 6.680 | 14.820 | 17.535 |
| Tax | 4.209 | 3.285 | 12.207 | 9.597 |
| Commissions | 1.206 | 1.823 | 6.201 | 3.513 |
| Technical assistance | 462 | 876 | 4.181 | 2.552 |
| Electronic data processing | 1.947 | 2.393 | 4.980 | 7.456 |
| Yields Invertors | 1.004 | 1.004 | 3.013 | 3.013 |
| Public services | 892 | 1.086 | 2.788 | 2.938 |
| Transport | 426 | 723 | 2.124 | 1.820 |
| Leases | 630 | 773 | 2.094 | 2.058 |
| Legal expense | 3 | 17 | 1.365 | 125 |
| Other | 770 | 627 | 1.725 | 1.872 |
| Check risk central | 159 | 53 | 744 | 364 |
| Janitorial and Secutiry services | 190 | 231 | 688 | 680 |
| Fines, penalties and awards | 333 | 2 | 817 | 25 |
| Insurance | 192 | 182 | 671 | 641 |
| Publicity and advertising | 100 | 342 | 393 | 1.527 |
| maintenance and repairs | 210 | 102 | 484 | 335 |
| Office supplies | 91 | 112 | 312 | 390 |
| Travel expenses | 30 | 63 | 144 | 241 |
| Cost of representation | (25) | 70 | 65 | 221 |
| Adaptation and installation | 18 | 9 | 27 | 54 |
| Publicity and advertising | - | - | 5 | 5 |
| Temporary Services | - | 7 | 2 | 80 |
| **Total** | **17.849** | **20.459** | **59.850** | **57.042** |

## NOTE 27. NET FINANCIAL INCOME

Below is the detail of financial (net) costs, for the periods ended September 30, 2023, and 2022:

| | September 30, 2023 | September 30, 2022 |
|---|---|---|
| Financial performances (27.1) | 6.134 | 4.747 |
| Financial income (27.2) | 1.302 | 2.260 |
| **Total Financial Income** | **7.436** | **7.007** |
| | | |
| Forwards valuation (27.3) | (3) | (9) |
| **Total Financial Expense** | **(3)** | **(9)** |
| **Net Financial Income (expense)** | **7.433** | **6.998** |

27.1 Corresponds to the returns generated by investments in financial institutions in which Credivalores has invested its resources.

27.2 Mainly corresponds to the recovery of expenses of previous years and the recovery of provisioned portfolio.

27.3 Corresponds to the valuation of fixed-rate investments at fair value.

**NOTE 28. CONTINGENT ASSETS AND CONTINGENT LIABILITIES**

**a. Commitments**

**Credit commitments**

During ordinary business, Credivalores provides loan portfolio as guarantees to its funding sources, in which it irrevocably agrees to pay them in the event the client is unable to meet its obligations, with the same credit risk for loan portfolios.

Loan extension commitments represent unused portions of authorizations to extend credits as loans. Concernig the credit risk on commitments to extend lines of credit, Credivalores is potentially exposed to losses in an amount equal to the total unused commitments, if the unused amount were to be withdrawn in its totality; However, the amount of the loss is less than the total amount of the unused commitments because the majority of loan extension commitments are contingent once the client can maintain specific credit rating standards. Credivalores monitors the maturity dates of those credit limit commitments because long-term commitments have a higher credit risk than short-term commitments.

The following is a breakdown of unused lines of credit commitments and guarantees on September 30, 2023, and December 31, 2022:

|  | September 30, 2023 | December 31, 2022 |
|---|---|---|
| Unpaid approved credits | 774.053 | 530.529 |

**NOTE 29. RELATED PARTIES**

The Company's Board of Directors and Senior Management, in their role as governing bodies, are fully aware of the responsibility related to managing the various risks to which the Company is exposed; likewise, they are fully aware of the Company's processes and business structure to be able to provide support and adequate monitoring and follow-up.

The Company's related parties are as follows:

1. Shareholders with interests, a controlling stake or a joint stake of the Company, or significant influence over Credivalores.
2. Members of the Board of Directors: Members of the Board of Directors (principals and alternates, along with their related parts).
3. Key management personnel includes the Company's CEO and other C-level Officers, who are those who participate in the planning, direction, and control of the Company.
4. Affiliates: Companies in which Credivalores has significant influence, which is generally considered to be a share between 30% and 50% of their capital.

The most representative balances as of September 30, 2023, and December 31, 2022, with related parties are included in the following charts, with headings for definitions of the related parties recorded in the previous sections.

|  | Members of the Board of Directors (a) September 2023 | Members of the Board of Directors (a) December 2022 |
|---|---|---|
| Accounts payable | 120 | 112 |
| Operating expenses | 160 | 206 |

|  | September 2023 | | December 2022 | |
|---|---|---|---|---|
|  | Accounts receivable | Accounts Payable | Accounts receivable | Accounts Payable |
| **Shareholders** |  |  |  |  |
| Lacrot Inversiones 2014 S.L.U. | - | - | - | 57 |
| Crediholding S. A. S. | 1.815 | - | 1.815 | - |
| **Accounts Receivable and Other Transactions** |  |  |  |  |
| Ingenio la Cabaña S. A. | 3.219 | - | 2.393 | - |
| Inversiones Mad Capital S. A. | 10.486 | - | 9.736 | - |
| Finanza Inversiones S. A. S. | 6.531 | 76.021 | - | 2.325 |
| Banco Credifinanciera | 187 | 72.251 | 497 | 6.825 |
| Asficrédito | 67.005 | - | 70.569 | - |

| **Stock Investments** | | | | |
|---|---|---|---|---|
| Agrocañas | 4.650 | - | 4.710 | - |
| Inverefectivas S. | 12.616 | - | 14.945 | - |
| **Total** | **106.509** | **148.272** | **104.665** | **9.207** |

The Compensation received by key management personnel is comprised of the following:

| | September 30, | |
|---|---|---|
| **Item** | **2023** | **2022** |
| Salaries | 2.810 | 2.791 |
| Short-term Employee benefits | 47 | 70 |
| **Total** | **2.857** | **2.861** |

a.  Members of the Board of Directors (principals and alternates, along with their related parts) as of September 30, 2023:

**Directors**

| No. | Director | Alternate |
|---|---|---|
| 1 | Jose Miguel Knoell Ferrada | Vacante |
| 2 | Vacante | Vacante |
| 3 | Gustavo Adrián Ferraro | Vacante |
| 4 | Luis Maria Blaquier | Maite Alba De Gandiga |
| 5 | Juan Manuel Trujillo | Vacante |
| 6 | Carlos Eduardo Meza | Vacante |
| 7 | Jose Miguel Knoell Ferrada | Vacante |

**Legal Representatives**

| No. | Representative |
|---|---|
| Manager | Jaime Francisco Buritica Leal |
| Alternate | Liliana Arango Salazar |

## NOTE 30. SUBSEQUENT EVENTS

As of the date of issuance of the current Financial Statements, there have been no situations or events that date after the closing of the financial statements that could affect the figures or information included in the disclosures.

## NOTE 31. CLARIFYING NOTE

In the statement of cash flows as of September 2022, some figures were reclassified compared to those of September 2023 to improve the presentation and provide greater clarity to users of the financial statements.

***Credivalores-Crediservicios S. A.***
*Financial Statements*

*For the periods ended December 31, 2022 and 2021*



# Statutory Auditor's Report on the Financial Statements
**(Free translation from the Original in Spanish)**

To the Members of the General Shareholders' Meeting of
Credivalores Crediservicios S. A.

**Opinion**

I have audited the accompanying financial statements of Credivalores Crediservicios S. A., which comprise the statement of financial position as of December 31, 2022, and the statements of income, other comprehensive income, changes in equity and cash flows for the year then ended, and notes to the financial statements, including a summary of significant accounting policies.

In my opinion, the accompanying  financial statements, truly taken from the books of account, present fairly, in all material respects, the financial position of Credivalores Crediservicios S. A. as of December 31, 2022, and the results of its operations and its cash flows for the year then ended in accordance with Accounting and Financial Reporting Standards accepted in Colombia.

**Basis for Opinion**

I conducted my audit in accordance with Auditing Standards on Financial Reporting accepted in Colombia. My responsibilities under those standards are further described in the *Statutory Auditor's Responsibilities for the Audit of the Financial Statements* section of my report.

I am independent of Credivalores Crediservicios S. A. in accordance with the Code of Ethics for Professional Accountants of the International Ethics Standards Board for Accountants (IESBA) together with the ethical requirements applicable to my audit of the financial statements in Colombia, and I have fulfilled my other ethical responsibilities in accordance with these requirements and the IESBA Code of Ethics. I believe that the audit evidence I have obtained is sufficient and appropriate to provide a basis for my audit opinion.

**Emphasis of Matter**

The accompanying financial statements have been prepared assuming that the Entity will continue as a going concern. As stated in the financial statements as of December 31, 2022, the Company has suffered significant losses during the year and has a net equity deficiency for COP 46,692 million, which raises substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are described in Note 1 – Reporting Entity.  The financial statements do not include any adjustments that might result from the outcome of this uncertainty. My opinion is not modified in respect of this matter.

PwC Contadores y Auditores S.A.S., Calle 100 No. 11A-35, Piso 5, Bogotá, Colombia.
Tel: (60-1) 7431111, www.pwc.com/co

© 2024 PricewaterhouseCoopers. PwC se refiere a las Firmas colombianas que hacen parte de la red global de PricewaterhouseCoopers International Limited, cada una de las cuales es una entidad legal separada e independiente. Todos los derechos reservados.



**To the Members of the Shareholders' Meeting of Credivalores Crediservicios S. A.**

**Key Audit Matters**

Key audit matters are those matters that, in my professional judgement, were of most significance in my audit of the financial statements of the year. These matters were addressed in the context of my audit of the financial statements as a whole, and in forming my opinion thereon, and I do not provide a separate opinion on these matters.

| Key Audit Matter | How the Matter Was Addressed in the Audit |
|---|---|
| Provision for loan portfolio impairment losses:<br><br>As described in Notes 2, 7.2 and 11 to the financial statements, the Entity's provision for loan impairment losses represent management's most significant estimate of expected credit losses on loan portfolio, which consists primarily of consumer loans. As of December 31, 2022, the provision for loan portfolio impairment losses was COP 372,608 million for the total loan portfolio for COP 2,005,440 million.<br><br>This provision is determined for each of the loan portfolios, using an estimate with statistical models for expected credit loss on collectively evaluated loans.<br><br>The collective models include parameters for 12-month probability of default, probability of default over the life of the obligations, loss given default and exposure at default, with the inclusion of the prospective impact on the expected impact on the recoverability of the loan portfolio that includes assumptions about future macroeconomic conditions under plausible scenarios. | My work on the provision for loan portfolio impairment losses consisted in performing substantive audit tests, as well as evaluating audit evidence related to the formation of my opinion on the financial statements.<br><br>The aforementioned procedures also included the evaluation of the relevance of the models and methodologies used to generate the statistical estimates of credit loss for the loan portfolios and the evaluation of the key inputs and the assumptions and judgements applied for the statistical estimation of credit loss.<br><br>In evaluating the scenarios that management applied to estimate the credit loss, we assessed the reasonableness of the impact of external factors and economic events that have already occurred and may occur, but are not yet reflected in the credit loss estimate. |



**To the Members of the Shareholders' Meeting of**
**Credivalores Crediservicios S. A.**

| Key Audit Matter | How the Matter Was Addressed by the Audit |
|---|---|
| Management applies its judgment in evaluating statistical estimates of credit losses, considering different scenarios, external factors and economic events that have occurred and may occur, but are not yet reflected in the loss factors.<br><br>The main premises for considering the provision for loan portfolio impairment as a key audit matter are: (i) the need for a significant level of judgment by management to determine the modeling techniques used in its statistical estimates of credit loss, which in turn entails a high level of subjectivity for the auditor, (ii) the subjectivity in the evaluation of audit evidence regarding the relevance of the different evaluated scenarios, (iii) the involvement of specialized resources to support the evaluation of such audit evidence. | I relied on staff with specialized skills to assist me in evaluating the appropriateness of the models and certain inputs to the credit loss statistical estimates. |

**Responsibilities of Management and Those Charged with Governance for the Financial Statements**

Management is responsible for the appropriate preparation and fair presentation of the financial statements in accordance with Accounting and Financial Reporting Standards accepted in Colombia, and for such internal control as management determines is necessary to enable the preparation of financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the financial statements, management is responsible for assessing the Entity's ability to continue as a going concern, disclosing, as appropriate, matters related to the going concern principle and using the going concern basis of accounting unless management either intends to liquidate the Entity or to cease operations, or has no realistic alternative but to do so.

Those charged with governance are responsible for overseeing the Entity's financial reporting process.



**To the Members of the General Shareholders' Meeting of
Credivalores Crediservicios S. A.**

**Statutory Auditor's Responsibilities for the Audit of the Financial Statements**

My objective is to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue a statutory auditor's report that includes my opinion. Reasonable assurance is a high level of assurance but is not a guarantee that an audit conducted in accordance with Auditing Standards on Financial Reporting accepted in Colombia will always detect a material misstatement when it exists. Misstatements can arise from fraud or error and are considered material if, individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of these financial statements.

As part of an audit in accordance with Auditing Standards on Financial Reporting accepted in Colombia, I exercise professional judgment and maintain professional skepticism throughout the audit. I also:

- Identify and assess the risks of material misstatement of the financial statements, whether due to fraud or error, design and perform audit procedures responsive to those risks, and obtain audit evidence that is sufficient and appropriate to provide a basis for my opinion. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control.

- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances.

- Evaluate the appropriateness of accounting policies used and the reasonableness of accounting estimates and related disclosures made by management.

- Conclude on the appropriateness of management's use of the going concern basis of accounting and, based on the audit evidence obtained, whether a material uncertainty exists related to events or conditions that may cast significant doubt on the Entity's ability to continue as a going concern. If I conclude that a material uncertainty exists, I am required to draw attention in my statutory auditor's report to the related disclosures in the financial statements or, if such disclosures are inadequate, to modify my opinion. My conclusions are based on the audit evidence obtained up to the date of my statutory auditor's report. However, future events or conditions may cause the Entity to cease to continue as a going concern.

- Evaluate the overall presentation, structure, and content of the financial statements, including the disclosures, and whether the financial statements represent the underlying transactions and events in a manner that achieves fair presentation.

I communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit and significant audit findings, including any significant deficiencies in internal control that I identify during my audit.



**To the Members of the General Shareholders' Meeting of
Credivalores Crediservicios S. A.**

From the matters communicated with those charged with governance, I have determined those matters that were of most significance in the audit of the financial statements of the current period and are therefore the key audit matters. I have described these matters in my auditor's report unless law or regulations precludes public disclosure about the matter or when, in extremely rare circumstance, I determine that a matter should not be communicated in my report because the adverse consequences of doing so would reasonably be expected to outweigh the public interest benefits of such communication.

**Report on Other Legal and Regulatory Requirements**

Management is also responsible for compliance with regulatory aspects in Colombia related to accounting document management, the preparation of management reports, and the timely and appropriate payment of contributions to the Colombian Comprehensive Social Security System, the implementation of the transparency and business ethics program and ensure proper compliance with the framework for *Libranza* (payroll deduction loan) or direct deduction in accordance with Law 1527 of 2012, as amended by Law 1902 of 2018, regulated by Chapter 54 of Decree 1074 of 2015, as amended by Decree 1008.

My responsibility as Statutory Auditor for those matters is to perform review procedures to issue a conclusion on their appropriate fulfilment.

Accordingly, I conclude that:

a)   The Entity's accounting records during the year ended December 31, 2022, have been kept in conformity with legal regulations and accounting technique, and transactions recorded conform to the Company's bylaws and the decisions made by the General Shareholders' Meeting and the Board of Directors.

b)   The correspondence, account vouchers and minute book, and share registers are duly kept and safeguarded.

c)   There is consistency between the accompanying financial statements and the report prepared by management.  Management stated in such a report that it did not hinder the free circulation of invoices issued by vendors or suppliers.

d)   Information contained in self-assessment returns of contributions to the Colombian Comprehensive Social Security System, in particular that related to affiliates and their income base for calculation, has been taken from the accounting records and supports. As of December 31, 2022, the Entity is not in arrears for contributions to the Colombian Comprehensive Social Security System.

e)   The Entity did not implement the transparency and business ethics program within the term set forth by the External Circular Letter 100-000011 of 2021 issued by the Colombian Superintendency of Companies. The program is in the process of implementation.



**To the Members of the General Shareholders' Meeting of
Credivalores Crediservicios S. A.**

f)    In accordance with Article 2.2.2.54.8, Chapter 54 of Decree 1074 of 2015 as amended by
Article 2  of Decree 1008 of 2020, the financial risk department do exist and operated
adequately in the Company and the risk management and administration mechanisms were
adequate, to ensure proper compliance with the regulations for the protection of the
purchasers of equity rights of credit content derived from *Libranza* (payroll deduction loans)
operations, to entities not oversight by the Colombian Superintendency of Finance referred to
in Article 18 of Law 1527 of 2012, added by Article 7 of Law 1902 of 2018, regulated by
Chapter 54 of Decree 1074 of 2015, as amended by Decree 1008 of 2020.

In compliance with the Statutory Auditor's responsibilities contained in Article 209 (1) and (3) of the
Colombian Commercial Code, related to the assessment on whether the acts of Credivalores
Crediservicios S. A.'s  management conform to the Company's bylaws and the orders and instructions of
the General Shareholders' Meeting and on whether there are in place appropriate internal control and
custody and safekeeping measures of the Company's assets or those of third parties in its possession, I
issued a separate report dated March 10, 2023.


**Other Matters**

The Entity's financial statements for the year ended December 31, 2021, were audited by another
Statutory Auditor, also a member of PwC Contadores y Auditores S. A. S., whose report dated March 22,
2022, expressed an unqualified opinion on those statements.



(Original in Spanish duly signed by:)

Yurany Marcela Ordoñez Cifuentes
Statutory Auditor
Colombian CPA Registration No. 234389-T
Appointed by PwC Contadores y Auditores S. A. S.
March 10, 2023

**CREDIVALORES -CREDISERVICIOS S. A.**
**STATEMENT OF FINANCIAL POSITION**
**ENDED DECEMBER 31, 2022 AND 2021**

(Stated in million of Colombian pesos)

| | Notes | December 31, 2022 | December 31, 2021 |
|---|---|---|---|
| **Assets** | | | |
| Cash and cash equivalents | 8 | 273.052 | 148.514 |
| Financial Assets at fair value measure profit or lost | | | |
| Equity Instruments | 9 | 5.698 | 6.115 |
| Derivatives Instruments | 17 | 98.861 | 355.167 |
| Loan portfolio | 11 | 381 | 16.683 |
| **Total financial assets at fair value** | | **104.940** | **377.965** |
| | | | |
| **Financial Assets at amortized cost** | | | |
| Consumer loans | 11 | 2.005.440 | 2.034.298 |
| Impairment | 11 | (372.608) | (318.427) |
| **Total Loan portfolio, net** | 11 | **1.632.832** | **1.715.871** |
| Accounts receivable, net | 12 | 320.129 | 436.872 |
| **Total Financial Assets at amortized cost** | | **1.952.961** | **2.152.743** |
| | | | |
| Investments in Associates and Affiliates | 10 | 14.945 | 12.369 |
| Current tax assets | 22 | 32.012 | 22.245 |
| Deferred tax assets, net | 22 | 157.736 | 43.409 |
| Property and equipment net | 13 | 173 | 229 |
| Assets for right of use | 14 | 2.021 | 4.298 |
| Intangible assets other than goodwill, net | 15 | 39.852 | 44.111 |
| **Total assets** | | **2.577.692** | **2.805.883** |
| | | | |
| **Liabilities and equity** | | | |
| **Liabilities:** | | | |
| Financial Liabilities at fair value | | | |
| Derivative instruments | 17 | - | 316 |
| **Total Financial Liabilities at fair value** | | **-** | **316** |
| Financial Liabilities At amortized cost | | | |
| Financial obligations | 18 | 2.534.228 | 2.417.239 |
| Other Lease Liabilities | 14 | 2.179 | 4.770 |
| **Total Financial Liabilities At amortized cost** | | **2.536.407** | **2.422.009** |
| Employee benefits provisions | 19 | 1.053 | 995 |
| Other provisions | 20 | 3.028 | 918 |
| Accounts payable | 21 | 51.892 | 79.065 |
| Current tax liabilities | 22 | 1.698 | 1.969 |
| Other liabilities | 23 | 40.057 | 42.000 |
| **Total liabilities** | | **2.634.135** | **2.547.272** |
| | | | |
| **Equity:** | 24 | | |
| Share capital | | 135.194 | 135.194 |
| Treasury shares | 24 | (12.837) | (12.837) |
| Reserves treasury shares | 24 | 12.837 | 12.837 |
| Reserves | 24 | 11.038 | 11.038 |
| Additional paid-in capital | | 71.169 | 71.169 |
| Other Comprehensive Income (OCI) | 25 | (49.470) | (36.874) |
| Retained earnings | | 99.995 | 94.058 |
| IFRS convergence result | | (21.910) | (21.910) |
| Net loss income for the period | | (302.459) | 5.936 |
| **Total equity** | | **(56.443)** | **258.611** |
| **Total liabilities and equity** | | **2.577.692** | **2.805.883** |

The accompanying notes are an integral part of the financial statements.

**CREDIVALORES -CREDISERVICIOS S. A.**
**STATEMENT OF INCOME**
**PERIODS ENDED DECEMBER 31, 2022 AND 2021**

(Stated in million of Colombian pesos)

| | Notes | December 31, 2022 | December 31, 2021 |
|---|---|---|---|
| Interest Income and similar | 26.1 | **286.766** | **321.174** |
| Financial costs interest | 18 | (491.269) | (235.759) |
| Exchange rate differences | 18 | (121.755) | 996 |
| Revenue from contracts and other services with customers | 26.2 | **113.128** | **115.452** |
| **Net Interest** | | **(213.130)** | **201.863** |
| | | | |
| Impairment of financial and condonation assets loan portfolio | 11 | (83.739) | (81.822) |
| Expense on accounts receivable provisions | | (11.298) | (13.860) |
| **Gross Financial Margin** | | **(308.167)** | **106.181** |
| | | | |
| **Other Expenses** | | | |
| Employee Benefits | | (14.358) | (13.409) |
| Depreciation and amortization expense | 13 – 15 | (6.222) | (6.185) |
| Depreciation right of use assets | 14.1 | (2.056) | (2.156) |
| Other | 28 | (88.880) | (80.004) |
| **Total Other expenses** | | **(111.516)** | **(101.754)** |
| | | | |
| **Net operating Income** | | **(419.683)** | **4.427** |
| | | | |
| Other Income | 27 | 2.122 | 940 |
| Financial income | | 7.566 | 937 |
| **Financial Income** | | **9.688** | **1.877** |
| | | | |
| Investment valuation at fair value | 29 | (9) | (44) |
| **Financial expense** | | **(9)** | **(44)** |
| **Net financial income (expense)** | | **9.679** | **1.833** |
| | | | |
| **Net Income before income tax** | | **(410.004)** | **6.260** |
| Income tax | 22 | 107.545 | (324) |
| **Net income for the period** | | **(302.459)** | **5.936** |
| Net earnings per share | | **(63.211)** | **1.241** |

**CREDIVALORES -CREDISERVICIOS S. A.**
**STATEMENT OF OTHER COMPREHENSIVE INCOME**
**PERIODS ENDED DECEMBER 31, 2022 AND 2021**
**(Stated in million of Colombian pesos)**

|  | December 31, | |
| --- | ---: | ---: |
|  | **2022** | **2021** |
| **Net income for the period** | **(302.459)** | **5.936** |
| **Other comprehensive income** | | |
| **Items that may be or are reclassified to profit or loss** | | |
| | | |
| Shares | - | (345) |
| | | |
| Unrealized gains (losses) from cash flow hedges: | | |
| Valuation of financial derivatives Forwards | 300 | 3.585 |
| Valuation of financial derivatives Cross Currency Swaps | (40.869) | (54.322) |
| Valuation of financial derivatives Options | 21.190 | (54.186) |
| Income tax | 6.782 | 34.414 |
| **Total other comprehensive income for the period** | **(12.597)** | **(70.854)** |
| **Total other comprehensive income** | **(315.056)** | **(64.919)** |

The accompanying notes are an integral part of the financial statements.

**CREDIVALORES- CREDISERVICIOS S. A.**
**STATEMENT OF CHANGES IN EQUITY**
**PERIODS ENDED DECEMBER 31, 2022 AND 2021**
(Stated in million of Colombian pesos)

| | Share capital | Additional paid-in capital | Treasury Shares | Reserves | Other Comprehensive Income (OCI) | IFRS convergence result | Retained earnings | Earnings for the period | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Balance as of January 01, 2020** | **129.638** | **64.725** | **(12.837)** | **18.651** | **33.980** | **(54.848)** | **123.638** | **5.224** | **308.171** |
| Appropriation of earnings | - | - | - | 5.224 | - | - | - | (5.224) | - |
| Capitalization | 5.556 | 6.444 | | | | - | - | | 12.000 |
| Increases (decrease) in other comprehensive income | - | - | - | - | (70.854) | - | - | - | (70.854) |
| Deferred tax application IFRS 9 first time | - | - | - | - | - | - | 3.358 | - | 3.358 |
| Net income for the period | - | - | - | - | - | - | - | 5.936 | 5.936 |
| **Balance as of December 31, 2021** | **135.194** | **71.169** | **(12.837)** | **23.875** | **(36.874)** | **(54.848)** | **126.996** | **5.936** | **258.611** |
| Appropriation of earnings | - | - | - | - | - | - | 5.936 | (5.936) | - |
| Capitalization | - | - | - | - | | | | | - |
| Increases (decrease) in other comprehensive income | - | - | - | - | (12.596) | - | - | - | (12.596) |
| Net income for the period | - | - | - | - | - | - | - | (302.459) | (302.459) |
| **Balance as of December 31, 2022** | **135.194** | **71.169** | **(12.837)** | **23.875** | **(49.470)** | **(54.848)** | **132.932** | **(302.459)** | **(56.443)** |

The accompanying notes are an integral part of the financial statements.

**CREDIVALORES -CREDISERVICIOS S. A.**
**STATEMENT OF CASH FLOWS**
**PERIODS ENDED DECEMBER 31, 2022 AND 2021**

(Stated in million of Colombian pesos)

| | Notes | December 31, 2022 | December 31, 2021 |
|---|---|---|---|
| **Cash flows from operating activities** | | | |
| (Loss) Profit after income tax | | (302.459) | 5.936 |
| | | | |
| **Reconciliation of (loss) profit after income tax:** | | | |
| Depreciation of tangible assets | 13 | 240 | 405 |
| Depreciation of assets by right of use | | 2.056 | 2.156 |
| Amortization of Intangible Assets | 15 | 5.982 | 5.780 |
| Amortization of expenses paid in advance | | 5.377 | 11.117 |
| Increase in Impairment for Credit Portfolio | 11 | 75.368 | 67.500 |
| Amortization of Transaction Costs Liabilities | | 31.875 | 28.308 |
| Increase in forgiveness | | 8.370 | 14.322 |
| Impairment Accounts Receivable | | 11.298 | 13.860 |
| Portfolio valuation measured at fair value | 12 | 16.302 | 3.332 |
| Change in investments in associates | 10 | (2.576) | (1.403) |
| Interest causation of financial obligations | | 271.783 | 208.477 |
| Difference in Exchange Financial Instruments | | 360.623 | 303.443 |
| Income tax | | (107.545) | 324 |
| | | | |
| **Cash generated by operations** | | | |
| | | | |
| **Net change in operating assets and liabilities:** | | | |
| Increase in the portfolio of capital and interest loans | | (7.808) | (312.981) |
| Increase in Accounts Receivable | | 112.554 | (20.312) |
| Acquisition of Intangible Assets | | (2.226) | (2.596) |
| Increase in prepaid expenses | | (12.046) | (3.015) |
| Loss of intangible assets | | 121 | 55 |
| Increase (Decrease) of Accounts Payable | | (27.202) | (14.416) |
| Employee Benefits Increase | | 58 | 12 |
| Income tax paid | | (10.040) | (7.461) |
| Increased Provisions | 20 | 2.110 | (6.452) |
| Increase in Other Liabilities | | (1.942) | (7.568) |
| **Net cash provided by operating activities** | | **430.273** | **288.828** |
| | | | |
| **Net change in investment assets:** | | | |
| Increase in investments in FIC'S financial instruments | | 417 | 10.478 |
| Acquisition of property and equipment | | (184) | (65) |
| **Net cash provided for investment activities** | | **233** | **10.413** |
| | | | |
| **Net change in operating activities** | | | |
| Acquisition of financial obligations | | 895.631 | 437.638 |
| Result in the maturity settlement of derivatives | | 292.211 | (262.085) |
| Payment of financial obligations | | (1.208.090) | (404.229) |
| Interest payment financial obligations | | (283.350) | (196.258) |
| Capitalization | | - | 12.000 |
| Payment of financial leases | | (2.370) | (2.093) |
| **Net cash used for financing activities** | | **(305.968)** | **(415.027)** |
| | | | |
| **Increase (decrease) in cash and cash equivalents** | | **124.538** | **(115.786)** |
| Cash and cash equivalents at the beginning of the period | | 148.514 | 264.300 |
| **Cash and cash equivalents at the end of the period** | | **273.052** | **148.514** |

The accompanying notes are an integral part of the financial statements.

## NOTE 1. REPORTING COMPANY

Credivalores-Crediservicios S.A., (hereinafter "Credivalores", the "Company" or "CVCS"), is a stock company registered for business in Bogotá - Colombia, located at Carrera. 7 No. 76-35 P 7, and a website at www.credivalores.com.co. The Company was incorporated by means of Public Deed No. 420 dated February 4, 2003 drawn up before the Public Notary No.1 of the Circuit of Cali. The term of duration of the Company is twenty years as of the date of the aforementioned deed.

The merger of two companies, Crediservicios S.A. and Credivalores S.A. was registered by means of Public Deed No. 4532 of December 12, 2008.

The merger was unanimously approved by the General Meeting of Shareholders of both companies on July 31, 2008, whereby it was determined that Crediservicios S.A. (the surviving company), would continue to legally exist after taking over Credivalores S.A. which would cease to exist (being dissolved but not liquidated). In addition, the equity of Credivalores S.A. was merged with that of Crediservicios S.A. by means of acquiring the assets and assuming the liabilities of both companies, as agreed on by both company's legal representatives,

This merger agreement was reported to the Colombian Superintendence of Industry and Commerce, which did not report any objections to the aforementioned process. Credivalores S.A. (the acquired company) was incorporated by means of Public Deed No. 1906 dated May 13, 2003, drawn up before the Public Notary No. 1 of the Circuit of Cali, and duly registered with the Chamber of Commerce of Cali on May 21, 2003, under Registry Number 3501 Book IX. Subsequently, the Company changed its name from Crediservicios S.A. to Credivalores-Crediservicios S.A.S, becoming a simplified stock corporation, by means of the Public Deed No. 529 dated February 27, 2009 drawn up before the Public Notary No. 1 of the Circuit of Cali.

By means of Minutes No. 16 dated February 23, 2010 of the General Meeting of Shareholders, duly registered before the Chamber of Commerce on March 19, 2010; the Company became a simplified joint stock company with the name of Credivalores-Crediservicios S.A.S. under Registration Number 3074 of Book IX.

By public deed No. 3175 of notary No. 73 of Bogota D.C. as of September 28th, 2019, registered July 9th, 2019 under Number 02484244 Book IX, the company changed its name from CREDIVALORES - CREDISERVICIOS S. A. S. to CREDIVALORES - CREDISERVICIOS S. A. under the figure of a stock corporation.

The Company's business purpose is to originate consumer loans, including payroll deduction loans, to private individuals or legal entities, using both its own funds and other sources of funding permitted by law. In carrying out these activities, the Company may:

a)  Perform risk assessments,
b)  Service and manage loans or lines of credit, including but not limiting the collection and registration of these obligations,
c)  Purchase and sell loans, securities, and loan portfolios,
d)  Borrow funds and enter into transactions allowing the Company to obtain the funds required to perform its corporate purpose,
e)  Act as co-signer, guarantor, surety or collateral provider to raise funds in order to finance its activities that may be undertaken, structured or implemented through trust arrangements, and

Perform any other activities that are required as part of the Company's normal course of business, such as: (i) acquiring, encumbering, limiting the domain or disposing of fixed assets (ii) acquiring and using trade names, logos, trademarks and other industrial property rights; (iii) investing in existing companies, or creating new ones, providing that these companies have the same or similar business activities as the Company or that should relate
in any way to its own corporate purpose; (iv) entering into partnerships or contracts with third parties to carry out its corporate purpose; (v) guaranteeing its own and third-party obligations.

The funds used by the Company for carrying out its business activities shall be lawfully sourced and therefore the Company shall be prohibited from raising money by means of large scale or regular deposits from individuals, pursuant to current legislation. The Company is not under the supervision of the Colombian Superintendence of Finance (Superintendencia Financiera de Colombia) since it is not considered to be a financial institution in accordance with Colombian legislation, nor is it allowed to carry out brokerage of instruments registered with the Colombian National Registry of Securities and Issuers (RNVE).

The Company is prohibited from raising money through large-scale and regular deposits from individuals, complying with the stipulations in the financial and exchange regulations.

Credivalores has the following branches nationwide: Aguachica, Armenia, Barrancabermeja, Barranquilla, Bucaramanga, Cali, Cartagena, Cartago, Ciénaga, Cúcuta, El Paso, Florencia, Girardot, Ibagué, La Dorada, La Jagua de Ibirico, Lomas, Magangué, Manizales, Medellín, Mocoa, Montería, Neiva, Palmira, Pasto, Pereira, Popayán, Riohacha, Sahagún, San Andrés, Santa Marta, Sincelejo, Tunja, Valledupar, Villavicencio, and Yopal.

In December 2021 the Company received 12,000 million of capital injection. The ownership of the Company after these capitalizations is as follows:

| Shareholders | Ownership |
|---|---|
| Crediholding S.A.S. | 34,24% |
| Lacrot Inversiones 2014, S.L.U | 36,43% |
| Acon Colombia Consumer Finance Holdings, S.L. | 19,90% |
| Acon Consumer Finance Holdings II, S.L. | 4,21% |
| Direcciones de Negocio S.A.S. | 0,0% |
| Treasury Shares | 5,22% |
| **Total** | **100,00%** |

The authorized capital of the company will be as follows:

| Authorized capital | Number of Shares | Nominal value |
|---|---|---|
| 182.793.801.894 | 6.469.661 | 28.254 |

Ongoing Business

Article 218 of the Commercial Code sets the causes for dissolution of the Company:

The commercial company shall be dissolved for the following reasons:

1) The expiration of the term provided in the contract for its duration, if it is not validly extended before its expiration.
2) The impossility of developing the social enterprise, for the termination of the same or for the extinction of the thing or things whose exploitation constitutes its object.
3) By reducing the number of associates to less than required by law for their constitution or operation, or by increasing them, exceeding the maximum limit set in the same law.
4) The declaration of bankruptcy of the company.
5) The causes that are specifically and clearly stipulated in the contract.
6) By decision of the associates, adopted in accordance with the laws and the social contract.
7) By decision of the competent authority in the cases expressly provided by law,
8) For other reasons established in the laws, in relation to all or some of the forms of society regulated by this Code.

Article 457 of the Commercial Code indicates the causes for dissolution in the corporation:

The public limited company shall be dissolved:

1) For the reasons indicated in article 218.
1. Repealed by art. 4 of Law 2069 of 2020
2) When ninety-five percent or more of the subscribed shares are owned by a single shareholder.

Likewise, Article 4 of Law 2069 of 2020 establishes:

ARTICLE 4. CAUSE OF DISSOLUTION FOR NON-COMPLIANCE WITH THE ONGOING BUSINESS HYPOTHESIS. Will be cause for the commercial company dissolution the non-compliance with the ongoing business hypothesis at the end of the year, in accordance with the provisions of current regulations.

(…)

PARAGRAPH 1. The references made in any rule relating to the cause of dissolution for losses shall be understood in reference to the present cause. The obligations established in this rule shall also be enforceable to branches of a foreign company.

Finally, the National Government through Act 854 of 2021 issued by the Ministry of Industry and Commerce indicated the financial ratios or criteria to establish patrimonial impairments and insolvency risks.

(…) however, administrators will use at least the following indicators as a baseline:

| INDICATOR | DIMENSION | FORMULA |
|---|---|---|
| Negative equity position | Patrimonial detriment | Total Equity < 0 |
| Consecutive losses in two closing periods or in several monthly periods according to the business model | Patrimonial detriment | (Profit for the financial year < 0) and (profit for the previous year < 0) |
| Net working capital on short-term debts (<0.5) | Insolvency Risk | (Commercial accounts receivable customers + current inventory -Commercial accounts payable) / Current Liabilities |
| EBIT / Total assets < Liabilities | Insolvency Risk | (Earnings before interest and taxes / Total Assets) < Total Liabilities |

Credivalores has evaluated the following items according to the behavior in recent months:

• Economic environment.
• Payment of obligations with third parties: payroll, suppliers, and tax national, district and municipal entities, financial liabilities.
• Financial Forecasts.
• Ability to continue offering business model products.
• Shareholders commitment.

As stated in the conceptual framework, in paragraph 3.9 ongoing business hypothesis, financial statements are normally prepared under the assumption that a reporting entity is in operation and will continue its activity for the foreseeable future. Therefore, it is assumed that the entity does not intend or need to liquidate or cease its business. If such an intention or need would exist, financial statements may have to be prepared on a different basis. If so, the financial statements describe the basis used.

**Economic overview**

In 2022, different global and local events were presented that had important effects on economic performance. Situations such as the war between Russia and Ukraine impacted the costs of oil and its derivatives, generating cost overruns in energy generation and production globally, due to the increase in the price of raw materials. Likewise, the measures implemented by China to control COVID-19 infections, together with the high uncertainty of investors due to the electoral contests in Colombia, Brazil and other political events in the region, triggered an accelerated escalation in the exchange rates of a large part of the emerging economies.

Additionally, the global economic reactivation generated greater inflationary pressures that had to be tackled by the different central banks through a restrictive monetary policy, where countries such as Colombia suffered significant increases in interest rates, which decreased liquid funds in the economy.

With this global outlook, the economic performance in Colombia was favorable within the region despite having one of the most devalued currencies during 2022, which on average was close to 20%. However, the economy is estimated to have grown close to 9% and the unemployment rate fell to 10.9% in December according to DANE´s[1] statistics, approaching pre-pandemic levels again.

In terms of portfolio performance, this year we witnessed the total reactivation of the economy, which allowed portfolio origination volumes to be brought to pre-pandemic levels. However, the portfolio of the banking sector grew 3.5% in real terms, mainly in consumption mode (5.4%), growing below the level presented in 2021. According to Asobancaria, for 2023 a slowdown in the real growth of the portfolio of 2.1% is expected (consumption growing at 2.3%) due to a slowing down on the country's economic activity, lower household consumption due to high inflation, and new increase in the unemployment and interest rates in the placement of loans.

The financial´s market volatility suffered during the year led to an accelerated increase in interest rates, where the need to contain inflation led the Bank of the Republic to raise reference rates from 3% to 11% during 2022. Likewise, the situation caused the capital market´s activity in new local issues to be diminished.

---

[1] Colombian Department of Statistics

The rise in funding rates is expected to continue during the first half of 2023, a situation that will limit the possibility for a large part of the population to obtain both consumer and housing loans due to the transfer of this extra cost to placement rates and lower liquidity in the financial sector, forcing financial institutions to be more selective and moderate their credit risk appetite.

The local panorama still shows a high uncertainty facing a year of economic slowdown, where the mining sector has been protagonist by the permanent declarations of the government about the non-granting of new licenses for exploration and exploitation of hydrocarbons, the gradual dismantling of the subsidy to gasoline and the possibility that the capital destined for investment is compromised and limited by the energy transformation policy of the actual government.

The increase in the minimum wage of 16% will allow the growth of the loan portfolio due to the increase in the capacity of payment / indebtedness, where the payroll will have a fundamental role in the entire financial sector due to its growth in a natural way in the lower risk portfolios of. However, 2023 increases in a possible scenario of economic recession leaves a challenging outlook for the productive sector, which will seek to compensate for the effects of the increase in minimum wage, inflation and new tax reform through optimization and efficiency in its operational processes that will allow them to overcome the difficulties that lie ahead in the short term.

Finally, we see that the financial sector will continue to be one of the sectors that will mark the growth of the country's total GDP, which is projected between 0.7% and 1% by 2023, being a strategic ally for the government in the control and collection of taxes, as well as a natural facilitator in the dispersion of resources associated with government social programs that will operate during de year aimed at vulnerable population.

**Payment of obligations with third parties: payroll, suppliers, and fiscal entities of national, district and municipal order, financial obligations.**

Credivalores, has been complying with the payment of the different obligations resulting from the operation and business in progress such as: payroll, suppliers, national, district and municipal tax obligations and financial obligations.

In several scenarios that we have consulted from other entities economic research , the normal scenario they contemplate for this year is a Foreign Exchange Rate of COP4,850 per USD1, this being the value that the company currently assumed and that was reflected in the result of its Financial Statements as of December 2022. On the other hand, the company is managing alternatives and hedging strategies through international intermediaries given that the local market does not have the capacity to close these positions or exchange rate exposures.

**Ability to continue offering business model products.**

Credivalores structured two additional collateralized lines for a payroll portfolio closing COP350.000 million: i) with Coomeva for COP50,000 million and ii) Alianza for COP300,000 million, which will start operating in the first half of 2023.

**Shareholder commitment**

During 2022, arrangements were made to add a new shareholder to the company, as well as the negotiation of all contractual terms and documentation. Once this documentation is signed, it is estimated that the shareholder is making the capitalization at the beginning of 2023.

There are important uncertainties related to events and conditions that may generate significant doubts about the ability of Credivalores to continue as an ongoing business, such as the behavior of the Exchange Rate, however, the Management and Shareholders based on the related information conclude that the ongoing business hypothesis continues to be appropriate. Therefore, Credivalores will prepare the financial statements and other reports as stipulated by regulation. Likewise, it will maintain monitoring and reporting to the market any changes that may affect its situation and may lead to a non performing situation.

Additionally, Credivalores has an authorized amount to issue bonds in dollars and available credit lines.

**NOTE 2. BASIS FOR PREPARATION OF THE FINANCIAL STATEMENTS**

**2.1 Basis of Presentation**

The financial statements of the company Credivalores Crediservicios S.A., have been prepared in accordance with the accounting and financial reporting standards accepted in Colombia, based on International Financial Reporting Standards (IFRS), together with their interpretations, conceptual framework, the conclusion rationale and the application guides authorized and issued by the International Accounting Standards Board (IASB) published in Spanish until 2018), excluding IFRS 17 on Insurance Contracts; and other legal provisions defined by government surveillance entities that may differ in some aspects from those

established by other State control bodies), established in Law 1314 of 2009, regulated by Single Regulatory Decree 2420 of 2015 modified by Decree 2496 of 2015. They have been prepared based on historical cost.

Law 1314 of July 13, 2009 regulated the financial reporting, accounting and data security standards and principles accepted in Colombia and identified competent authorities, established the procedure for issuing the standards and determined the entities responsible for monitoring compliance. This law was regulated by means of the following decrees:

a) 2784 of December 28, 2012
b) 1851 of August 29, 2013
c) 3023 of December 27, 2013
d) 2267 of November 11, 2014

Decree 2615 dated December 17, 2014 came into effect on January 1, 2016. Decree 2615 contains the international accounting and financial reporting standards in force as of December 31, 2013 and their corresponding amendments issued by the International Accounting Standards Board IASB in force today. With this, the regulatory technical framework contained in the annex to Decree 2784 dated December 28, 2012 and Decree 3023 dated December 27, 2013 was revoked.

Credivalores reports comparative information from the immediately previous period for all values included in the current period's financial statements and includes comparative explanations, when necessary, to ensure the current period's financial statements are understandable.

The financial statements were authorized for issuance by the Board of Directors in accordance with minute 251 on February 28, 2023. They can be modified and must be approved by the Shareholders.

## NOTE 3. JUDGMENTS AND CRITICAL ACCOUNTING ESTIMATES IN THE APPLICATION OF ACCOUNTING POLICIES

The preparation of the financial statements requires management to make judgments, estimates and assumptions that affect the implementation of accounting policies and reported amounts of assets and liabilities, and income and expenses.

Credivalores S.A. will disclose the nature and amounts of changes in accounting estimates that are significant and affect the current period or are expected to affect any impact in future periods. Information on the effect in future periods will not be disclosed if the estimate of the effect is not practical.

The financial statements, the significant judgments made by the administration in the application of the accounting policies of Credivalores and the main sources of estimation were the same as those applied to the financial statements for the year ended December 31, 2022.

### 3.1 IFRS 9 – FINANCIAL INSTRUMENTS

Credivalores applies IFRS 9 - Financial instruments as of January 1, 2018, according to the following models.

### 3.1.1 IMPAIRMENT MODEL

IFRS 9 – financial instruments, pose significant changes in the assessment of the impairment of financial instruments and, therefore, its associated risk. In particular, the standard proposes a new approach that pursues the identification of the significant increase of the risk of credit (SIRC) in an instrument before the identification of objective evidence of impairment (OEI).

From the above, the company has advanced in the construction of quantitative and qualitative criteria to identify the significant increase in the credit risk of an instrument. Although a quantitative criterion as the main principle is used to evaluate the (SIRC), qualitative criteria have also been developed in case that it is not possible to apply the quantitative criterion or that it cannot be used for specific financial assets.

Impairment related requirements are applied to financial assets measured at amortized cost and fair value with changes in other comprehensive income (FVOCI) whose business model remains to collect (contractual cash flows) and sell.

The expected credit loss model considers the prospective nature of loss tolerances for instruments, based on expectations of future behavior.

For the calculation of the expected loss of payroll and Credit Card products Credivalores has decided to use the Granular Amortization approach, considering the following aspects:

- Exposure and corresponding risk parameters are calculated individually for each period.
- Exposure and corresponding risk parameters are intended to be constant within each period, but may vary between periods of time.
- The calculation of the EP is individual by period.
- Calculations of PE12m and PE in life are performed by adding the individual PEs for each respective risk horizon (one-year, whole life).
- Frequency of payment fixed according to its depreciation: monthly, quarterly, semi-annual, annual, among others.
- The granular depreciation approach captures the dynamic behaviors of risk parameters at high granularity (more detailed).

**Main sources of calculation**

The central concept of impairment under the new IFRS 9 impairment model is based on a dual measurement approach that takes into consideration the current level of expected impairment of each loan, compared to initial recognition, and requires recognition of impairment over the difference between expected credit losses in 12 months, if no significant changes in risk have occurred since initial recognition; otherwise, a credit loss amount is recognized over the expected life of the financial instrument.

This model is complemented with stress analysis and scenarios with inputs that are not controlled by the Company, such as macroeconomic factors. To this end, the Company has developed a statistical model for the projection of PDs through neural networks in a univariate way.:

**1. Search for possible associations with macroeconomic variables:** From the collection of information on macroeconomic variables that were considered, we went through the Principal Components Analysis (PCA) method and the Stepwise method (STW) to find the possible associations of macroeconomic variables with each of the PD of the products, these were considered our explanatory variables.

**2. Univariate projections:** We project the PD and the macroeconomic variables associated, we do this in a univariate way through neural networks, in some macroeconomic variables we use classic methods such as ARIMA models. The argument of selection of the best model to make the projections of each series is the lowest value found with the root of the mean square error both in training and in the validation set (test), it is also important to highlight that models chosen are those where there is coherence in the projections .

The projected PD is considered as the PD of our BASE scenario, and this is precisely the target variable in multivariate scenarios. The fundamental argument for the PD to be projected in a univariate way is that by doing so we are doing it only with the information that the series keeps, that is, although we know that a series is the reflection of other variables, in principle we look for the information that only it gives us, to later observe how it is affected by macroeconomic variables.

**3. Generation of scenarios:** For Forward Looking models we must generate two scenarios in our projections of macroeconomic variables, one optimistic and one pessimistic. To achieve this, we rely on descriptive measures of each of the series, in this case the projected scenarios are given by the standard deviations that are needed to reach quartiles 25% and 75% of each of the macroeconomic series, understanding these points as critical values for both an optimistic and pessimistic scenario.

**4. Multivariate adjustment:** With the macroeconomic variables projected in the BASE scenario, a multivariate neural network is adjusted, understanding that the variables associated with each of the products are the explanatory variables and the response variable, that is, the PD is our explained variable. The best fit that is determined by the smallest root of the mean square error is our chosen neural network model. With this model and with the optimistic and pessimistic projections of the associated macroeconomic variables, we proceed to project each of the optimistic and pessimistic scenarios in a multivariate way.

**3.2 Financial Assets Business Model**

Credivalores makes an assessment of the objective of a business model in which an asset is held at a portfolio level because this best reflects the way the business is managed, and information is provided to management. The information considered includes:

- The expected policies and objectives for the portfolio and the actual application of them In particular whether management's strategy focuses on earning contractual interest revenue, maintaining a particular interest rate profile,

matching the duration of the financial assets to the duration of the liabilities that are funding those assets or realizing cash flows through the sale of the assets;

- How the performance of the portfolio is evaluated and reported to Credivalores management;

- The risks that affect the performance of the business model (and the financial assets held within that business model) and how those risks are managed; and

- The frequency, volume and timing of sales of financial assets in prior periods, the reasons for such sales and its expectations about future sale activity. However, information about sales activity is not considered in isolation, but as part of an overall assessment of how Credivalores stated objective for managing the financial assets is achieved and how cash flows are realized.

Credivalores Crediservicios S. A. seeks to maintain various sources of financing locally and internationally from the banking and capital markets.

Assessment whether contractual cash flows are solely payments of principal and interest (SPPI).

For the purposes of this assessment, 'principal' is defined as the fair value of the financial asset on initial recognition. 'Interest' is defined as consideration for the time value of money and for the credit risk associated with the principal amount outstanding during a particular period and for other basic lending risks and costs (e.g. liquidity risk and administrative costs), as well as profit margin.

In assessing whether the contractual cash flows are solely payments of principal and interest, Credivalores considers the contractual terms of the instrument. This includes assessing whether the financial asset contains a contractual term that could change the timing or amount of contractual cash flows such that it would not meet this condition.

Credivalores Crediservicios S.A.S. business model is based on granting consumer loans quickly through innovative products to middle- or low-income segments that are not served by the traditional financial system.

The Company has developed a diversified platform with collection channels designed to minimize the risk of default and optimize the quality of its loan portfolio (minimize NPL), including: payroll deduction loans (discounted from payroll payments), credit card (collecting via public utilities bills), and financing for insurance policy premiums (revocable insurance where the insurer returns the portion of the premium that was not used in case of default).

The business model focuses on building alliances and agreements for origination and distribution of each one of our products, thus guaranteeing growth. The company has more than 720 agreements with employers that can issue payroll loans, exclusive agreements with public utility companies for invoicing and collecting via credit card, and alliances with third parties and insurers for the origination of the Credipoliza product. The risk management systems are similar to those implemented by other Colombian financial entities and they take characteristics of the target market into consideration. These systems have been adjusted according to the experience and knowledge acquired over more than 14 years in the market.

This business model produces a portfolio of diversified products with limited geographic concentration and by loan amount.

The entity applies meaningful judgements to determine its business model to manage financial assets and to evaluate if the financial assets comply with the conditions established in the business model so they can be classified at fair value or at amortized cost. According to the aforementioned, some financial assets have been classified in investments at fair value and others at amortized cost. According to the business model the financial assets at amortized cost can be sold only in limited circumstances, such as when there are infrequent transactions, adjustments are made to the maturity structure of its assets and liabilities, when it is necessary to finance significant capital disbursements and when there are seasonal liquidity needs.

Investments in equity instruments at fair value have been classified with adjustments through profit or loss, considering that they are strategic investments for the company and, are expected to be sold in the near future.

<u>Financial Assets at fair value</u>

According to its business model the Company has determined that TuCrédito payroll deduction loans will be measured at fair value when they meet the following conditions:

1. Maximum term of 90 days as of the date of origination.
2. Highest rating based on its compliance score.

Financial Assets at amortized cost

The loan portfolio is classified at amortized cost when:

The loan portfolio is classified at amortized cost when it meets the following criteria: Credivalores Crediservicios S.A.S. business model is to hold these assets with the purpose of collecting their cash flows on specified dates, as per their contractual terms, and the contractual terms of the financial asset give rise on specified dates, to cash flows that consist of payments of principal and interest on the outstanding amount owed.

**3.3 Leases**

Leases are recognized as a right-of-use asset and a corresponding liability at the date at which the leased asset is available for use by the company. Each lease payment is allocated between the liability and finance cost. The finance cost is charged to profit or loss over the lease period so as to produce a constant periodic rate of interest on the remaining balance of the liability for each period. The right-of-use asset is depreciated over the shorter of the asset's useful life and the lease term on a straight-line basis.

**Variable lease payments**

Some property leases contain variable payment terms that are linked to profit generated from a specific office. For individual offices, up to 100% of lease payments are based on variable payment terms. Variable payment terms are used for a variety of reasons, including minimizing the fixed costs base for newly established offices. Variable lease payments that depend on profits are recognized in profit or loss in the period in which the condition that triggers those payments occurs.

**Lease terms**

In determining the lease term, management considers all facts and circumstances that create an economic incentive to exercise an extension option, or not exercise a termination option. Extension options (or periods after termination options) are only included in the lease term if the lease is reasonably certain to be extended (or not terminated). The evaluation is reviewed if a significant event or a significant change in the circumstances affecting this evaluation occurs.

**3.4 Seasonal nature of income and expenses.**

The nature of the most important operations of Credivalores Crediservicios S. A is mainly related to traditional activities that are not significantly affected by seasonal factors.

**3.5  Income tax**

The Company evaluates the recognition of liabilities due to discrepancies that may arise with the tax authorities on the basis of additional tax estimates that must be cancelled. The amounts provided for the payment of income tax are estimated by the administration based on its interpretation of current tax regulations and the possibility of payment.

Actual liabilities may differ from the amounts provisioned resulting in a negative effect on the Company's results and net position. When the final tax result of these situations is different from the amounts that were initially recorded, the differences impact the current income tax and deferred assets and liabilities in the period in which this fact is determined.

The Company evaluates the recoverability of deferred tax assets based on estimates of future tax results and the ability to generate sufficient results during periods in which such deferred taxes are deductible. Deferred tax liabilities are recorded according to estimates made of net assets that will not be tax-deductible in the future.

**NOTE 4. SUMMARY OF THE MAIN ACCOUNTING POLICIES**

The following are the significant accounting policies applied by Credivalores in the preparation of these financial statements.

**4.1 Materiality**

The economic facts are presented in accordance with their relative importance or materiality.

For disclosure purposes, a transaction, event or operation is material when, because of its amount or nature, or knowledge or lack of knowledge thereof, and considering the circumstances surrounding it, it affects the decisions that may be made or the assessments that users can carry out in regards of the accounting information.

Upon preparing and presenting these financial statements, the materiality of the amounts recorded is determined in terms of total assets, current and non-current assets, total liabilities, current and non-current liabilities, equity or income for the year as appropriate.

As per the assessment of materiality, Management considers as material any entry, transaction or event for which the value is equal to or greater than the percentage that results from the application of the following table and any others deemed necessary because of their nature:

| Item | Percentage of fair value |
|---|---|
| Asset | 0.5% |
| Liability | 0.5% |
| Equity | 0.5% |
| Revenue | 0.5% |
| Expenses | 0.5% |

### 4.2.1 Functional and reporting currency

These financial statements are presented in Colombian pesos, which is the functional and reporting currency of Credivalores.

Items included in the Company's financial statements are stated in the currency of the primary economic environment in which the Company operates (Colombian pesos). All figures are stated in millions of Colombian Pesos and have been rounded to the nearest unit.

### 4.2.2 Transactions and Balances in Foreign Currency

Foreign currency transactions are recorded at the Company's functional currency at the exchange rate prevailing on the transaction date. Monetary assets and liabilities in foreign currency are translated into the functional currency using the prevailing exchange rate at the reporting date of the statement of financial position. Non-monetary assets and liabilities denominated in foreign currencies in terms of historical costs are measured using the exchange rate at the transaction date. Financial instruments measured at fair value are translated using the exchange rate from the date the fair value was determined.

As of December 31, 2022, and 2021, the (COP/USD) exchange rates certified by the Superintendence of Finance were 4.810,20 and 3.981,16 per U.S. $1 respectively.

### 4.3 Cash and cash equivalents

Represent the Company's high liquidity assets such as: bank account balances, remittances in transit and Time Deposits. Moreover, cash is recorded for petty-cash purposes.

Credit balances in transactions with a particular entity constitute obligations to that entity and, as such, must be reflected as a liability under bank loans and other financial obligations and/or checking account overdrafts. However, they are part of the Company's liquidity management. In the above-mentioned circumstances, such overdrafts are included as a component of cash and cash equivalents.

Investments in money market funds with positions in short term liquid assets, with maturity shorter than three months will also be classified as cash and cash equivalents. In this case, the risk of price changes is insignificant, and positions are held support short-term cash requirements rather than for investment or similar purposes.

Bank expenses and financial interests are recorded at the value reported in the corresponding bank statements. Daily financial returns are reported at the rate negotiated with the respective financial entity with adjustments made in relation to the nominal value reported in the statement at the close of each month.

### 4.4 Financial Instruments

**Financial instruments**

A financial instrument is a contract that results in a financial asset of one entity and a financial liability or equity instrument of another entity.

**Date of recognition of financial instruments**

Financial assets and liabilities are recognized in the financial statement when the Company becomes part of the contractual provisions of the instrument.

**4.4.1 Financial Assets**

The Company classifies its financial assets into equity instruments, trading instruments, amortized cost investment instruments, credit instruments and accounts receivable.

At the time of initial recognition, a financial instrument is measured at fair value plus any direct attributable transaction costs, which are not included if the instrument is classified at fair value through changes in profit or loss. Typically, the fair value at the initial time of recognition is the price of the transaction itself, that is, the amount to be paid or received.

Credivalores recognizes loans and accounts receivable, trading and investment securities and other assets or liabilities on their effective dates.

Purchases and sales of financial assets that are regularly carried out are recognized on the transaction date or on the date on which the Company is required to purchase or sell the asset.

Subsequently, the Company measures its financial instruments at fair value or amortized cost based on the established business model and the contractual terms of the corresponding financial asset or liability.

**i.     Amortized cost**

Amortized cost is the cost of acquiring a financial asset or a liability plus or minus any capital repayments, cumulative amortizations (calculated using the effective interest rate method) about any difference between the initial amount and the value repaid at maturity and minus any reduction for impairment.

Effective rate

The effective interest rate is a method that allows calculating the amortized cost of financial assets over the financing period.

This method consists of discounting the future value of the financial asset with the reference market rate for accounts receivable of similar characteristics (amount, term), at the date of commencement of the operation.

Additionally, interest must be recognized as a higher value of the obligation.

**ii.    Fair value**

Fair value is the amount to be received should the asset be sold or the amount to be paid for transferring a liability as part of a transaction between market participants on the date on which the measurement is made. The most objective and commonplace definition of fair value is the price that would be paid in an active, deep and transparent market ("listed price" or "market price").

When such values are available CVCS determines the fair value of an instrument using the prices listed on an active market for that specific instrument. A market is considered active if listed prices are readily and regularly available and represent real transactions that are performed regularly on a stand-alone basis.

Should no active market exist for a specific financial instrument CVCS determines its fair value using valuation techniques. These valuation techniques include using recent market transactions between knowledgeable, willing parties carried out on an arm's length basis, should these exist, as well as the fair values of other financial instruments that are substantially the same, discounted cash flows and pricing models.

The valuation technique chosen makes use, to the maximum extent possible, of information obtained directly from the market, using the least amount of data estimated by CVCS, incorporating all those factors that would normally be considered by market participants for setting the price of such financial instruments and is consistent with generally accepted pricing methodologies.

Fair value estimates obtained from financial models are adjusted to consider other factors such as uncertainty on its risk or the liquidity model. Adjustments are included when CVCS believes that another market player uses these same estimates when determining the price of a transaction (See note 6).

The Company´s business model includes payroll loans at fair value with changes in profit and losses, whereby the loans originated within the 90 days prior to the date of the financial statements are valued at fair value. In order to estimate the fair value of these loans, which could be sold to financial institutions at a market price, the Company evaluates the lending rate of these loans within the reference market to evaluate the rate at which other financial institutions considered as peers and comparable to the Company will be willing to invest their resources and hold the payroll loans within their balance sheet.

Considering the results from the evaluation of the rates, the Company evaluates four variables to obtain the value of the adjusted rate applicable to the transactions to sell loan portfolio, according to internal criteria:

i)      The multiplier, which compares the Company's rate to the market rate.
ii)     The value of the premium paid in these businesses, which results from discounting the future values of a loan originated at Credivalores' lending rate using the market rate.
iii)    The rate is adjusted by the transaction cost associated to the loan portfolio.
iv)     The cash flows associated to the insurance policies applicable to the loan are also valued.

The methodology followed by the Company, uses the last three months reports from the Financial Superintendence as the source of information to determine the interest rate to discount the cash flows and complete the valuation of the final selling price of the loan portfolio.

The Company has determined that the fair value of the loan portfolio registered in its financial statements is type 3, since most of the criteria is internal.

### 4.4.2 Initial measurement of financial instruments

Financial assets and liabilities are initially measured at fair value, transaction costs that are directly attributable to the acquisition or issuance of financial assets and liabilities are aggregated or deducted from the fair value of them. For financial assets and liabilities measured at fair value with changes in results (FVPL), transaction costs directly attributable to the acquisition are immediately recognized in results.

Debt instruments held within a business model aimed at receiving contractual cash flows, whose cash flows are only capital and interest payments on the outstanding principal amount (SPPI), are subsequently measured at the amortized cost; debt instruments that are maintained within a business model whose objective is both to receive contractual cash flows and to sell debt instruments and which have contractual cash flows that are SPPI, are subsequently measured at fair value through another comprehensive result (FVOCI); all other debt instruments (e.g. debt instruments administered on a fair value basis, or held for sale) and capital investments are subsequently measured in FVPL.

### 4.4.2.1 Financial Assets at Fair Value

Credivalores Crediservicios S. A. S., in line with its business model, classifies its products according to the risk inherent in its portfolio. In general, its line of credit Tucredito (payroll deduction loans) is measured at fair value, given that its market niche is focused on placing "top-rated" loans.

| Classification of "Tucredito" line of credit, based on the corresponding business model | | | |
|---|---|---|---|
| Item | Tucredito portfolio segment | Measurement | Valuation |
| 1 | Performing loans subject to sale | Fair value | Market price. |
| 2 | Best rated loans with terms of less than a year (originated loans less than 90 days prior) | Amortized cost | (Indexed rate equivalent to amortized cost). |
| 3 | Performing loans with terms of more than one year (originated loans with terms of more than 90 days) | Amortized cost | (Indexed rate equivalent to amortized cost). |

| 4 | Past due loans | Amortized cost | Incurred loss model based on the expected loss. |

In line with its business model the Company has decided to measure the loans comprising the "Tucredito" line of credit at fair value based on the historical trading average since its loans are not impaired (and which, from their origination, are the best-rated 0 - 90 day loans) and since the Company has the possibility of selling them in the short term because of their excellent rating.

Unsold lines of credit, which were initially measured at fair value but which after 90 days of origination were impaired, will later be measured based on an indexed rate, which converts the amortized cost rate into an amount equivalent to their fair value.

**4.4.2.2 Financial assets at amortized cost**

Financial assets are classified at amortized cost only if the asset is kept within a business model whose objective is to maintain it to collect contractual cash flows and the contractual terms of the value give rise at specific dates to cash flows that are only payments of cash. capital and interest on the outstanding principal capital; Interest income is recognized using the effective interest rate method.

The effective interest method is a method used to calculate the amortized cost of an asset and allocate the income or cost in interest during the relevant period. The effective interest rate is the discount rate at which the present value of estimated future cash payments or those received over the expected life of the financial instrument, or, as appropriate, in a shorter period of time, is equal to the net book value in the beginning. To calculate the effective interest rate, the Company estimates the cash flows taking into account all the contractual terms of the financial instrument, including the transaction costs and the premiums granted minus the commissions and discounts, but without considering the future credit losses.

The Company classifies the following financial instruments at amortized cost:

| Credivalores Crediservicios S.A. Business Model | | | | | |
|---|---|---|---|---|---|
| **Product** | **Measurement** | **Terms** | **Valuation** | **Features** | **Estimated % of Sales** |
| Tucredito | Fair value | 0-90 days as of date of disbursement | Market price | Current and best rated payroll loans | 56,40% |
| | Amortized cost | > 91 days subsequent to date of disbursement | Equivalent indexed rate | Current and past-due payroll loan portfolio | |
| Credipoliza | Amortized cost | Portfolio | Equivalent indexed rate | Financing for insurance policies | 7,10% |
| Crediuno | Amortized cost | Portfolio | Equivalent indexed rate | Credit card | 36,49% |

**4.4.3 Impairment**

Under the guidelines of IFRS 9, in 2019 Credivalores adjusted its impairment model of loss incurred to expected loss, in line with said standard, which is established based on a classification of operations in three stages.:

- Stage 1-assets without significant deterioration or in normal situation.
- Stage 2-assets with a significant increase.
- Stage 3-assets with objective evidence of impairment.

The fundamental concept of the new model is based on an approach of dual measurement, depending on the Stage of the financial instrument classification: for Stage 1 damage is equal to the credit losses expected at 12 months, to stage 2 and 3 is equal to the credit losses expected lifetime. The following figure outlines the criteria of the standard.

For loss lifetime of the asset is used the same methodology of credit loss expected for a year, but instead of covering only the first year, calculated on the expected life of the contract including extension of the instrument options.

For the calculation of the expected loss of clearance and credit card products Credivalores has decided to use the depreciation Granular approach, considering the following aspects:

- The exhibition and the corresponding risk parameters are calculated individually for each period.
- Intended that the exhibition and the corresponding risk parameters are consistent within each period but may vary between periods.
- The estimate of the EL is individual per period.
- 12 months EL and EL calculations in life, are made by adding the individual EL for each respective risk horizon (one year, lifetime).
- Fixed according to its amortization payment frequency: monthly, quarterly, semi-annual, annual, among others.
- The amortization approach granular capture the dynamic behavior of the parameters of risk in a high granularity (more detailed).

### 4.4.4 Impairment of non-financial assets

At each presentation date, Credivalores Crediservicios S.A.S. it reviews the carrying amounts of its property, plants and equipment and its intangible assets, in order to determine if there are indications of impairment and if there are any, the recoverable amount of the assets is estimated (whichever is greater between fair value and cost less the costs of disposal and the value of use). If the carrying amount exceeds the recoverable value, an adjustment is made so that the carrying amount decreases to the recoverable value, modifying the future depreciation charges in accordance with the remaining useful life.

### 4.5 Equity Instruments

Investments that do not represent control or a significant influence over the investee.

All equity instruments are measured at fair value. Equity instruments held for sale are measured at fair value through profit and loss.

### 4.5.1 Investment in associate and affiliates

Investments in companies in which the Company does not have control, but has significant influence are called "Investments in Associates". Investments in Associates are accounted for under the equity method.

The Company exercises significant influence over another entity if it owns, directly or indirectly, 20% or more of the voting power of the investee, unless it is clearly evidenced that such influence does not exist. They are initially recognized at cost, including costs directly related to the transaction. Subsequently to initial recognition, the consolidated financial statements include the company share of the net assets, net income or loss after income tax, and other comprehensive income of the investee, if the significant influence continues.

Investments in Associates are those in which the Company has direct or indirect control; that is, when all the following conditions are met:

- The Company has control over the entity; mainly, rights granting the Company the means of directing relevant activities that significantly affect the associate returns.
- The Company obtains or is entitled to variable returns from the interests held in the associate.
- The Company can use its power over the associate to influence the amount of income obtained by the former.

The Equity Method is an accounting method in which the investment is recorded initially at cost and then adjusted based on subsequent changes to the acquisition on the part of the investor in the net assets of the investee. Following this method Credivalores recognizes its equity in the associate through other comprehensive income and profit or loss for the period.

**Investments available for sale**

Available-for-sale investments are securities and, in general, any type of investment that is not classified as negotiable investments or as investments to hold until maturity, with respect to which there is a serious purpose and the legal, contractual, financial and operational capacity to hold them for at least one (1) year from the day they were classified in that category.

### 4.6 Accounts Receivable

Credivalores recognizes accounts receivable such as interest, commissions other than premiums from loan portfolio purchases, insurance, and taxes.

For the initial measurement Credivalores will recognize an account receivable at fair value. Transaction costs directly attributable to the transaction will be directly recognized in the income accounts.

In the case of long-term (greater than one year) financial assets without explicit financing (contractually defined) the initially recognized value will be the future value discounted at the reference market rate for similar accounts receivable (amount, term) at the transaction date. Subsequently, long-term (greater than one year) financial assets without explicit financing (contractually defined) will be measured at amortized cost using the effective interest rate method. Short-term financial assets will not be subject to discounting.

In addition, interest must be recognized at a higher value in the account receivable.

The effective interest rate will be the rate corresponding to the market rate (where applicable) at the time the financing begins. If there is no market rate with similar characteristics the average internal lending rate will be used.

**4.6.1     Impairment of accounts receivable**

Accounts receivable other than credit portfolios are classified and impairment losses are periodically assessed in accordance with the simplified approach set out in IFRS 9.

**4.7 Leases**

**4.7.1 Assets acquired under leases**

In their initial recognition, assets acquired under leases are classified as capital or operating leases.

Lease contracts classified as capital leases appear in the statement of financial position as property, plant and equipment for the Company's own use or as investment properties, as applicable. These are initially recorded as an asset and or a liability simultaneously at the lesser of the fair value of the asset leased or the present value of the minimum lease payments. The present value of the minimum lease payments is determined using the interest rate implicit in the lease contract or, in its absence, an average interest rate used by the Company on the market. Any direct costs associated with taking the lease are added to the amount recognized as an asset.

Subsequent to the initial recognition, these are recorded in the same way as the property, plant and equipment for the Company's own use or investment properties account where they were initially recorded. The amount recorded as a liability is included in the financial liabilities account and is recorded in the same way.

Payments made under operating lease agreements are recognized in the income accounts on a straight-line basis during the term of lease. The lease incentives received are recognized as an integral component of the total lease expense over its term.

**4.8 Property and Equipment**

Property and equipment for the Company's own use include the assets, whether property or under finance lease agreements, held by the Company for its current or future use and which are expected to be used for more than one reporting period.

They are recorded in the statement of financial position at cost of acquisition plus the costs incurred in preparing these for use, less accumulated depreciation and, if applicable, estimated impairment losses resulting from comparing the net book value of each item with their corresponding recoverable amounts.

They are subsequently measured at cost less accumulated depreciation and impairment. Depreciation is calculated on a straight-line basis for the estimated useful life of the asset. The annual depreciation rates for each asset category are:

| Type of asset | Total useful life | Residual value | Depreciation method |
|---|---|---|---|
| Furniture | 3 to 10 years | Zero | Straight line |
| Vehicles | Between 5 and 10 years of age | Up to 10% | Straight line |
| Office equipment | 3 to 10 years | Zero | Straight line |
| Computer and communication equipment | 3 to 7 years | Zero | Straight line |

*Leasehold Improvements*

Leasehold improvements are those made to rented property by means of a leasing agreement, as structured and designed to accommodate the entity's normal course of business and are recognized as property and equipment.

**4.9. Intangible assets**

Credivalores intangible assets correspond primarily to computer software, licenses, trademarks and insurance. Intangible assets are initially measured at cost of acquisition and subsequently at cost less any depreciation accumulated over their estimated useful life or any accumulated impairment loss. The Company analyzes whether there are external or internal signs of impairment to an intangible asset; any impairment losses or subsequent reversals are recognized in the income accounts for the period.

The following table shows the residual values, useful lives and depreciation methods for each type of asset:

| Type of asset | Useful life | Residual value | Depreciation method |
|---|---|---|---|
| Software | 1 to 3 years | Zero | Straight line |
| Licenses | 1 to 3 years | Zero | Straight line |
| Trademarks | 1 to 10 years | Zero | Straight line |
| Exclusive contracts | 1 to 15 years | Zero | Gradient according to Income Associated with contracts |
| Databases | 30 years | Zero | Straight line |

**4.10. Income taxes**

Income tax expense includes current and deferred taxes. Tax expenses are recognized in the profit or loss, except for items recognized in "Other Comprehensive Income" OCI or directly in equity.

Deferred taxes are recognized based on temporary differences arising between the tax bases of assets and liabilities and the carrying amounts in the financial statements that result in amounts that are either deductible or taxable upon determining tax profits or losses corresponding to future periods when the carrying amount of the asset is recovered or liabilities are paid or settled. However, deferred tax liabilities are not recognized if they derive from the initial recognition of goodwill; nor are deferred taxes recorded if the initial recognition of an asset or liability occurs in a transaction that is not a business combination and that affects either accounting nor taxable profit or loss. Deferred tax is determined using enacted or substantively enacted tax rates at the reporting date.

Current income tax is calculated based on the Colombian prevailing Tax laws. Management periodically assesses positions taken in its tax returns about situations in which the applicable tax regulations are subject to interpretations and establish provisions when appropriate based on amounts expected to be paid to the tax authorities.

Deferred tax assets are only recognized to the extent that it is probable that future taxable income is expected to be available to offset temporary differences.

Deferred tax liabilities arise from taxable temporary differences.

Deferred tax assets and liabilities are offset when there is a legal right to offset current deferred taxes against current tax liabilities, and when deferred tax assets and liabilities are related to taxes levied by the same tax authority on a single entity or different entities when there is an intention to offset the balances on a net basis.

Due to the enactment of Law 2155 of 2021, resulting from the estimation of the future reversal of the deferred tax as of January 1, 2022, an increase in the income tax rate from 30% to 35% was identified, as mentioned in note 22. The Company adjusted the corresponding tax-deferred balances expected to reverse beginning in 2022, using the 35% income tax rate. In line with Decree 1311 of October 20, 2021, which authorizes an alternative accounting treatment for this impact on the item of retained earnings in equity. The Company opted for this alternative and recognized COP3 billions of the tax deferred adjustments for changes in the income tax rate directly on equity against retained earnings.

With Law 2277 of December 13, 2022, a tax reform was adopted, this provision introduces some modifications in terms of income tax, however, for the general income rate it is maintained at 35% for national companies and their assimilated, permanent establishments of foreign entities and foreign legal entities with or without residence in the country obliged to file the annual tax return on the Income and complementary, taking for the year 2022 this rate for the calculation of the deferred tax.

### 4.11 Financial liabilities

A financial liability is any contractual obligation of the Company to deliver cash or another financial asset to another entity or person, to exchange financial assets or liabilities under conditions that are potentially unfavorable to the Company or a contract that will or may be settled using the Company's own equity instruments. Financial liabilities are initially recorded at their transaction value, which, unless otherwise determined is similar to their fair value less transaction costs directly attributable to issuance. Subsequently, these financial liabilities are measured at amortized cost and their returns are recognized applying the effective interest rate method determined initially and charged to the income accounts as financial expenses.

Financial liabilities are only released from the statement of financial position when the obligations they generated or acquired are extinguished through either cancellation or renewed placement.

### 4.12 Derivative financial instruments and hedge accounting

Beginning January 2016, Credivalores adopted Hedge Accounting, and thus the impact in the Company's financial statements of derivatives used for hedging purposes will be aligned to their accounting treatment in derivatives items (that is, payment of principal and interest of debt in foreign currency).

Credivalores mitigates foreign exchange risk of its indebtedness in foreign currency –mostly from the Notes issued under its Euro Commercial Paper Program– using financial instruments like non-delivery and delivery forwards with local financial institutions rated "AA-" or higher.

The Company aims to hedge the next interest payment due together with the principal of the Notes until their maturity, in tranches during the four weeks following the closing of the Note. Subject to a joint decision of the treasury and international funding areas, a portion of the principal may be left unhedged, but this should be hedged in a timely manner.

### 4.12.1 Fair-value hedge accounting

Fair value hedging: hedging exposure to changes in the fair value of recognized assets, liabilities, or firm commitments, or of an identified portion of such assets, liabilities or firm commitments which may be attributed to a particular risk and may affect the income for the period.

The exchange difference in the right valued in USD of the derivative financial instruments, forward, cross currency swap, coupon only swap and CALL options is offset by the difference in exchange of the hedged items, these are the bonds issued and notes in USD re denominated with the TCRM (Representative Market Exchange Rate) at the end of each month.

The variation in the valuation curves is recorded as another comprehensive result (ORI) in equity until the maturity of the derivative, that is, the fair value will have two effects; one to the results and the other to the ORI. Hedging effectiveness is measured retrospectively using the hypothetical derivative method.

### 4.12.2 Cash-flow hedge accounting

Cash-flow hedging: hedging of exposure to changes in cash flows that: (i) are attributed to a particular risk associated with an asset or liability (such as all or some of the future interest payments of a variable-rate loan), or to a highly probable forecast transaction, and; (ii) may affect the income for the period.

The net effect of market-value changes on coupon transactions will be recorded in Other Comprehensive Income (OCI); when the forward matures it will be recorded in the income accounts on the date when the coupon hedged is paid off.

### 4.13 Employee Benefits

Benefits for Company employees are short-term and include elements like the following, if they are to be paid in full before twelve months after the end of the annual reporting period in which employees provide related services:

(a)   wages, salaries and social security contributions.
(b)   paid leave and paid sick leave.
(c)   non-monetary benefits to current employees (such as medical care and per diem).

The Company will not need to reclassify an employee benefit to short term if the Company's expectations about the settlement calendar change temporarily. However, if the benefit characteristics change (such as a change from non-cumulative to cumulative benefit), or if a change to the settlement calendar expectations is not temporary, then the Company must determine whether the benefit still meets the definition of short term employee benefits.

When an employee has provided services to the Company during the accounting period the amount (not discounted) of the short-term benefits to be paid for such services will be recognized:

(a)   as a liability after deducting any amount already paid. If the amount already paid exceeds the amount not discounting benefits, the Company will recognize this excess as an asset (prepayment of an expense), inasmuch as the prepayment results in a reduction of future payments or a cash reimbursement.

(b)   as an expense.

### 4.13.1 Short term paid leave

The Company will recognize the expected cost of short-term employee benefits as paid leave as follows:

a)   in the case of paid leave whose rights are accumulating as the employees provide the services that increase their right to paid leave in the future.
b)   in the case of non-cumulative paid leave when the leave occurs.

Short term paid leave includes:

(a)   Vacation.
(b)   Temporary illness or disability.
(c)   Maternity or paternity leave.
(d)   Jury duty.
(e)   Other short-term leave.

### 4.14 Provisions and contingent liabilities

Lawsuit provisions are recognized when the Company has a current obligation (legal or assumed) derived from past events. A cash outflow is likely to be needed to settle the obligation and the amount has been estimated reliably. Restructuring provisions include lease cancellation payments and employee termination payments.

Where there are a number of similar obligations the likelihood that a cash outflow will be required is determined by considering the class of obligations as a whole. A provision is recognized even if the probability of a cash outlay with regard to any item included in the same class of obligations is immaterial.

Provisions are calculated at the present value of the disbursement expected to be needed to settle the obligation using a pre-tax discount rate that reflects current market measurements of the value of money over time and the specific risks attached to the obligation. An increase in the provision due to the passing of time is recognized as a financial expense.

### 4.14.1 Contingent Assets

The Company will not recognize any contingent asset.

Contingent assets are not recognized in financial statements since this may result in the recognition of income that may never be realized. However, when the income is virtually certain to be realized then the related asset is not a contingent asset and should be recognized.

Contingent assets are assessed continually to ensure that developments are appropriately reflected in the financial statements. If it has become virtually certain that an inflow of economic benefits will arise the asset and the related income are recognized in the financial statements of the period when the change occurs.

### 4.14.2 Contingent Liabilities

The Company will not recognize any contingent liability.

Contingent liabilities shall be continually assessed to determine if a cash outflow is likely to include future economic benefits. If it is expected that an outflow of future economic resources will be probable for an item previously dealt with as a contingent liability the corresponding provision is recognized in the financial statements of the period when the change in probability occurs (except in the extremely rare circumstances where no reliable estimate can be made of said amount).

**4.15 Revenues**

The income recognized under IFRS 9, from ordinary activities, among which are interest, commissions, portfolio sale are the increases in economic benefits during the period, which are generated in the performance of ordinary activities and / or other income of Credivalores that increase the equity.

Revenue will be recognized:

- To the extent that the services are provided and/or risks and benefits associated with the goods sold are transferred. When the service is provided during the same period, the degree of progress must not be recorded and instead 100% of the income will be recognized in that period.
- When the generation of economic benefits associated with the activity is likely.
- When it is possible to reliably determine the value of the same.
- The value of income is normally determined, by agreement between the Company and the third party. They will be measured at the fair value of the counterparty, received or to be received, taking into account the amount of any discount, bonus or rebate that the Company may grant.

Under IFRS 15, Credivalores uses the following approach to determine the classification, recognition and measurement of income from ordinary activities:

1. Identify contracts with customers.
2. Identifies performance obligations associated with contracts.
3. Determine the transaction price.
4. Assigns the transaction price to each identified performance obligation.
5. Recognizes revenue to the extent that Credivalores satisfies performance obligations by transferring control of the goods to the customer or providing to the satisfaction of the services promised.

According to the previous Credivalores applies IFRS 9 for all income from ordinary activities.

**4.15.1 Revenues from interest and commissions**

**Interest income, portfolio sales, guarantees:**

Interest income and items assimilated to it are recognized in the accounts based on their accrual period, by application of the effective rate method.

The effective interest rate is the rate that accurately discounts estimated future cash payments or those received over the expected life of the financial instrument or a shorter period, in the net carrying value of the financial asset or financial liability. The calculation takes into account all contractual conditions of the financial instrument (for example, prepaid options) and includes incremental fees or costs that are directly attributable to the instrument and are an integral part of the IRR, but not future credit losses.

Credit card fees or deposits, including credit card exchange fees and quarterly handling fees are recognized when the performance obligations associated with the customer contract are met.
Income from collateral and portfolio sales is recognized when the stages for the recognition of operating income are met, that is, when performance obligations related to the transfer of assets are satisfied. The following tables describe the different activities that the Company develops and the commission income it generates.

| Type of transaction | Description | IFRS standard |
|---|---|---|
| **Commissions** | | |
| Financial consultancy fees | Credit study fees | IFRS 15 |
| Insurance returns | Insurance sales commissions upon placing loans. | |
| Chain store commissions | Brokerage and channel (chain store) commissions. | |
| Collection and handling fees | Fees for collections processes through legal proceedings. | |
| Internal commission | Internal commission generated by intermediation channels. | |
| SME commission | Deferred commission on placement of loans under the Micro-Credit line | |
| FEE | Fee for handling the credit card, advance payments and offsetting through the channels of the Crediuno credit line. | |
| Brokerage fee | It is the brokerage fee charged in the contract signed with FGA. | IFRS 15 |
| **Management fees** | | |
| Crediuno | Management and handling fees for the Crediuno line. | IFRS 15 |
| Payroll deduction loans | Management fees and disbursement fees for the payroll credit line. | |
| Credipoliza | Administration and handling fees for the Credipoliza line. | |
| Plus life insurance | Management fee on the Plus life insurance policy of the Crediuno line. | |

**4.15.2 Revenues from ordinary activities**

Revenue from ordinary activities shall be measured at the fair value of the consideration received or to be received, and represent amounts to be collected for goods delivered, net of discounts and returns.

The Company recognizes revenues when the amount can be measured reliably, when future economic benefits will probably flow to the Company, and when specific criteria have been met for each activity, as described below:

**4.15.2.1 Dividends**

Credivalores recognizes dividends when the Company establishes the right to receive them.

When the right to receive them is established investments at fair value are credited to income accounts. For investments in associates, these are recognized using the equity method, deducting the investment amount.

**4.16 Net earnings per share**

To determine net earnings per share the Company divides the net income from the period attributable to shareholders, or controlling interest, between the weighted average common and preferred shares. Diluted net

earnings per share is determined in the same way over net earnings, but the weighted average of outstanding shares is adjusted considering the potential diluting effect of stock options.

**NOTE 5 - NEW FINANCIAL REPORTING STANDARDS AND INTERPRETATIONS**

**5.1. New standards, amendments and interpretations included in the accepted accounting principles in Colombia.**

In accordance with what is indicated in Decree 938 of 2021, the rules issued applicable as of January 1, 2023 are listed below. The impact of these amendments and interpretations is in the process of being evaluated by the administration of Credivalores; however, they are not expected to have a significant impact on the Financial Statements.

Modling of the Technical Annex of Financial Information for Group 1. Amend International Accounting Standards 1, 16, 37, 39 Y41, and International Financial Reporting Standards 1,3,4,7,9 and 16 of the Technical Annex to the Financial Reporting Standards for Group 1, provided for in the "Compilatory and Updated Technical Annex 1 - 2019, of the Financial Reporting Standards, Group 1" of Decree 2270 of 2019, compiled in the Single Regulatory Decree on Accounting, Financial Reporting and Information Assurance Standards, Decree 2420 of 2015, with the annex called "Technical Annex 2021, of the financial reporting standards, group 1", which is an integral part of the Decree.

IAS 1. Classifications of Liabilities as Current or Non-Current. Paragraphs 72A, 75A, 76A, 768 and 139U are incorporated; paragraph 1390 is deleted and paragraphs 69, 73, 74 and 76 are amended. The requirement to classify a liability as current is modified, by establishing that a liability is classified as current when it does not have the right at the end of the reporting period to postpone the liquidation of the liability for at least twelve months following the date of the reporting period

IFRS 9, IFRS 7 and Accounting IAS 39. Reform of the Reference Interest Rate. Paragraphs 6.8.1 to 6.8.12 of IFRS 9 are added with respect to temporary exceptions to the application of specific hedge accounting requirements. Paragraphs 1 02A to 1 02N and 108G are incorporated, with respect to the temporary exceptions to the application of the specific requirements of IAS39 coverage accounting. Paragraphs 24H on uncertainty arising from the reform of the reference interest rate, 44DE and 44DF of IFRS 7 are incorporated.

IFRS 3. Reference to the Conceptual Framework. Modifications are made to the references to align them with the conceptual framework issued by IASB in 2018 and incorporated into Colombian legislation, in this sense the identifiable assets acquired and the liabilities assumed in a business combination, on the date of transaction, will correspond to those that meet the definition of assets and liabilities described in the conceptual framework. Paragraphs 21 A, 21 B and 21 C are incorporated with respect to exceptions to the principle of recognition for contingent liabilities and liabilities within the scope of IAS 37 and IFRIC 21. Paragraph 23A is incorporated to define a contingent asset, and to clarify that the acquirer in a business combination will not recognize a contingent asset on the date of acquisition.

Reform of the reference interest rate Phase 2, IFRS 9. Paragraphs 5.4.5 to 5.49 Changes in the basis for the determination of contractual cash flows as a result of the reform of the reference interest rate (measurement of amortized cost) are added, 6.8.13 Completion of the application of the temporary exception in hedge accounting, 6.9.1 to 6.9.13 Additional temporary exceptions arising from the reform of the reference interest rate, 7.1.10 Effective Date, and 7.2.43 to 7.2.46 Transition for Reference Interest Rate Reform Phase 2 of IFRS 9.

IAS 39: Paragraph 102M Completion of the application of the temporary exception in hedge accounting, paragraphs 1020 to 102Z3 Additional temporary exceptions arising from the reform of the reference interest rate and 108H to 1 08K are added Effective date and transition, and new headings are added. Amendment to IFRS 7: Add paragraphs 241, 24J Additional disclosure information related to the reform of the reference interest rate, 44GG and 44HH Effective date and transition, and add new headings, Amendment to IFRS 4: Add paragraphs 20R and 20S Changes in the basis for the determination of contractual cash flows as a result of the reform of the reference, and paragraphs 50 and 51 Effective date and transition, and new headings are added. Amendment to IFRS 16: Paragraphs 104 to 106 Temporary exception arising from the reform of the reference interest rate are amended, and paragraphs C20C and C20D Reform of the reference interest rate phase 2 are added

IFRIC 23 Uncertainty regarding the Treatment of Income Taxes

IFRIC 23 was issued in May 2017, this Interpretation clarifies how to apply the recognition and measurement requirements of IAS 12 when there is uncertainty regarding the treatment of income tax. In this circumstance, an entity recognizes and measures its asset or liability for deferred or current taxes by applying the requirements of IAS 12 based on taxable profit (tax loss), tax bases, unused fiscal losses, unused tax credits and tax rates determined by applying this Interpretation.

The Company will evaluate the potential impacts of this interpretation in its financial statements, without having identified situations that may require changes in the financial statements.

Amendment to IAS 37 Provisions, Contingent Liabilities and Contingent Assets - Cost of Fulfilling a Contract

The purpose of this amendment was published in May 2020, specifying the costs that an entity includes in determining the "cost of performance" of a contract for the purpose of assessing whether a contract is onerous; clarifies that direct contract fulfillment costs include both the incremental costs of fulfilling a contract and an allocation of other costs that relate directly to contract compliance. Before recognizing a provision separated by an onerous contract, for an onerous contract, the entity must recognize impairment losses on the assets used to fulfill the contract.

The Company does not expect significant impacts from this modification, in any case it is evaluating the impact that these could have on the financial statements.

Reform of the benchmark interest rate

After the financial crisis, reform and replacement of benchmark interest rates, such as LIBOR GBP and other interbank rates (IBOR), has become a priority for global regulators. There is now uncertainty about the timing and precise nature of these changes. In order to transition existing contracts and agreements that refer to LIBOR, adjustments to time differences and credit differences may be necessary to allow the two benchmark rates to be economically equivalent in the transition

Changes made to IFRS 9 Financial Instruments, IAS 39 Financial Instruments: Recognition and Measurement and IFRS 7 Financial Instruments: Disclosures provide certain alternatives in relation to the reform of the benchmark interest rate. Alternatives relate to hedging accounting and have the effect that reforms generally should not cause hedge accounting to end. However, any coverage ineffability must continue to be recorded in the results state. Given the widespread nature of hedges involving interbank fee-based contracts (IBRs), alternatives will affect companies in all industries.

Accounting policies related to hedging accounting should be updated to reflect alternatives. Fair value disclosures may also be affected by transfers between levels of fair value hierarchy as markets become more or less liquid.

The Company does not expect significant impacts from this modification, in any case it is evaluating the impact that these could have on the financial statements.

Annual improvements to IFRS Standards cycle 2018–2020

The following improvements were completed in May 2020:

- IFRS 9 Financial instruments: clarifies which commissions should be included in the 10% test for de-payments in financial liability accounts.
- IFRS 16 Leases: Amends illustrative example 13 of the standard to remove the illustration of landlord payments related to improvements in leased property, to eliminate any confusion about the treatment of lease incentives.

The Company does not expect significant impacts from this modification, in any case it is evaluating the impact that these could have on the financial statements.

Conceptual Framework

The IASB has issued a revised Conceptual Framework to be used in decisions to establish rules with immediate effect. Key changes include:

- Increase the importance of management in the purpose of financial information
- Restoring prudence as a component of neutrality
- Define an entity that reports, which can be a legal entity or a part of an entity
- Review the definitions of an asset and a liability
- Eliminate the probability threshold for recognition and add guides on account de-down
- Add guides on different measurement bases
- Indicate that profit or loss is the main performance indicator and that, in principle, income and expenditure on other comprehensive income should be recycled when this improves the relevance or faithful representation of financial statements.

No changes will be made to any of the current accounting rules. However, entities that rely on the Framework to determine their accounting policies for transactions, events or conditions that are not otherwise covered by accounting rules should apply the revised Framework as of January 1, 2020. These entities should consider whether their accounting policies remain appropriate under the revised Framework.

## NOTE 6 - ESTIMATIONS OF FAIR VALUE

The Company may employ internally developed models for financial instruments that do not have active markets. Said models are mostly based on generally standardized valuation methods and techniques. Valuation models are primarily used to assess equity instruments not listed on the stock exchange, derivatives, debt securities and other debt instruments for which markets were or have been inactive during the financial period. Some components of these models may not be observable in the market and are estimated from assumptions.

The output of a model is always an estimate or approximate value that cannot be determined accurately, and valuation techniques used may not fully reflect all the factors relative to Credivalores positions, therefore the valuations are adjusted if necessary to include additional factors, such as country risk, liquidity risks and counterparty risks.

Fair value hierarchy has the following levels:

- Level 1 entries are unadjusted prices quoted in active markets for assets or liabilities identical to those the entity can access on the measurement date.
- Level 2 entries are entries other than the quoted prices included in Level 1 that are observable for the asset or liability, either directly or indirectly.
- Level 3 entries cannot be observed for the asset or liability.

The fair value hierarchy in which the fair value measurement is fully classified is determined from the lowest level entry that is significant for fully measuring the fair value. For that, an entry's importance is evaluated with regard to the fair value measurement in its totality. Financial instruments quoted in markets considered inactive but valued in accordance with quoted market prices, quotes from price providers or alternative price sources supported by observable entries, are classified in Level 2. A fair value measurement that uses observable entries requiring significant adjustments based on unobservable entries is a Level 3 measurement. The evaluation of a particular entry's importance in measuring the fair value in its totality requires an opinion, considering specific factors of the asset or liability.

The determination of what constitutes "observable" requires a significant opinion from Credivalores. The Company considers observable data that market data that is already available, distributed or updated regularly by the price provider, is reliable and verifiable, has no property rights, and is provided by independent sources that participate actively in the reference market.

**6.1 Fair Value Measurement on a Recurring Basis**

Level 2 input data elements include: the prices quoted for similar assets or liabilities at active markets; the quoted prices for assets or liabilities that are identical or similar in markets which are not active; input data other than quoted prices that are observable for the asset or liability and input data corroborated by the market. According to the above, Credivalores values derivative financial instruments with input data from fair value level 2.

The following table analyzes assets and liabilities (by class) within the fair value hierarchy, measured at fair value as of December 31, 2022 and December 31, 2021, on a recurring basis.

|  | December 31, 2022 | December 31, 2021 |
|---|---|---|
| **ASSETS** | Level 2 | Level 2 |
| Investments in equity instruments | 5.698 | 6.115 |
| **Hedging derivatives** | | |
| Currency forward | 5.120 | 8.013 |
| Options | 96.836 | 138.380 |
| Cross Currency Swap | (10.146) | 208.774 |
| Prima Call | 7.051 | |
| **Consumer** | | |
| Payroll deduction loans | 381 | 16.683 |
| **Total fair value recurring assets** | **104.940** | **377.965** |
| | | |
| **LIABILITIES** | | |
| **Derivative of speculation** | | |
| Forward | - | 316 |
| **Total fair value recurring liabilities** | **-** | **316** |

**6.2 Fair value determination**

The methodology applicable to instruments for Credivalores is:

**6.2.1**  **Forward valuation:** The derivative's fair value comes from an internal model. This model takes the exchange rate on the day after the valuation date and forecasts it to a future value using the devaluation curve through maturity date. After this the new forward market rate is compared to the agreed forward rate and the difference is expressed in present value using the IBR curve to calculate the derivative's fair value.

**6.2.2**  **Swap Valuation:** the reasonable value of the derivative comes from an internal model. The valuations of the Interest Rate Swaps (IRS) and the Cross-Currency Swaps (CCS) are performed assuming a long and a short position on a

bond; including in each case the principal of the operation. For the projection and discount of the cash flows we use current rates, to calculate the reasonable value of the derivative financial instrument.

6.2.3    **Option Valuation:** The reasonable value of the derivative comes from an internal model. The valuation of an option on its expiry date is the maximum between the premium and the difference between the exercise price and the spot price. For the projection and discount of the cash flows we use the current rates, to calculate the reasonable value of the derivative financial instrument.

6.2.4    **Loan portfolio valuations:** Because these instruments do not have an active market, the Company has developed methodologies that employ market information for certain cases of unobservable data. The methodology seeks to maximize the use of observable data to arrive at the closest approximation of an initial price for assets and liabilities without an ample market.

The Company has implemented the following methodology to determine its loan portfolio´s Fair Value:

I.     Discount Rate: Determined by product considering market´s appetite for such product, as well as the default risk involved

II.    The model was built based on the following factors:

   a.   Projected cash flows according to weighted average life for each product, using: Current Balance Average term to maturity, weighted average rate

   b.   Calculate present value of cash flows projected as per described in a) discounted at the discount rate previously described.

   c.   Present value determined as per described in b) represents the loan portfolio´s fair value.

**6.2.5 Equity instruments:** Credivalores has equity investments in Agrocañas, representing less than 20% of the company equity and that in mutual funds. In general, the company is not listed on any public securities market, and therefore its fair value is determined using the adjusted net asset value method. For mutual funds fair value is determined through valuation of investment portfolios managed by the Trust, which are subject to an active securities market.

Credivalores defined Level 3 financial instruments as those not traded in an active market, the following table provides information about valuation techniques and significant unobservable inputs when measuring assets and liabilities at recurrent fair value.

| | **Valuation technique** | **Significant inputs (1)** |
|---|---|---|
| **ASSETS** | | |
| **Equity Instruments** | Adjusted net asset value | - Current Balance<br>- Average term to maturity<br>- Weighted average Rate<br>- Unit value |

**6.2.6 Derivative financial instruments**

Derivative financial instruments and hedge accounting:

A derivative is a financial instrument in which value changes respond to changes in one or more variables denominated as an "underlying" (a specific interest rate, the price of a financial instrument, a listed commodity, a foreign currency exchange rate, etc.), that has an initial net investment smaller than would be required for other instruments that have a similar response to the mentioned variable and that is settled in a future date.

Credivalores trades in financial markets, forward contracts, future contracts, swaps and options that fulfil the definition of a derivative.

Financial assets and liabilities from transactions with derivatives are generally not offset in the statement of financial position. However, when there is a legal and exercisable right to offset the recognized values and Credivalores intends to be settle them on a net basis or to realize the assets and settle the liability simultaneously, derivatives are presented as net values in the statement of financial position.

Derivative transactions are initially recognized at fair value. Subsequent changes in the fair value are recognized in profit or loss, unless the derivative instrument is designated as a hedging instrument and, in this case, the accounting criteria will depend on the nature of the hedged item, as described below.

At the beginning of the hedging transaction, Credivalores formally documents the relationship existing between the hedging instrument and the hedged item, including the risk management objective and strategy in undertaking the hedging relationship. It also documents its assessment, both initially as well as on a recurring basis, of whether the hedging relationship is highly effective in offsetting the changes in fair value or cash flows of the hedged items.

For fair value hedge of assets or liabilities and firm commitments, changes in the fair value of the derivative instrument are recognized in profit or loss, as well as any other change in the fair value of the asset, liability or firm commitment attributable to the hedge risk.

For cash flow hedge of a particular risk associated with a recognized asset or liability or a projected highly probable transaction, the effective portion of changes in the fair value of the derivative is recognized in other comprehensive income. The gain or loss relating to the portion that is not effective for hedging or that does not relate to the hedged risk is immediately recognized in profit or loss.

The values accumulated in other comprehensive income are transferred to profit or loss in the same period in which the hedged item is recognized in profit or loss.

Hedging of net investments in a foreign operation is recognized similarly to cash flow hedging: the effective portion of changes in fair value of the hedging instrument is recognized in other comprehensive income, and the ineffective portion of the changes in fair value of the derivative is recognized in profit or loss. The hedging instrument's gains or losses accumulated in equity will be recognized in profit or loss when the net investment in foreign operations is sold in whole or proportionally, if partially disposed of.

Credivalores defined Level 2 financial instruments as those not traded in an active market, the following table provides information about valuation techniques and significant unobservable inputs when measuring derivative assets and liabilities at recurrent fair value.

| | Valuation technique | Significant inputs (1) |
|---|---|---|
| **ASSETS** **Trading Derivatives** Currency Forward Debt securities Forward | Discounted cash flow | - Underlying asset price Currency curve by underlying asset - Forward exchange rates curve of the operation's currency - Implicit curves of exchange rates forwards - Implicit volatilities matrixes and curves |
| **LIABILITIES** **Derivatives held for trading** Currency Forward Debt securities Forward | Discounted cash flow | - Underlying asset price - Currency curve by underlying asset - Forward exchange rates curve of the operation's currency - Implicit curves of exchange rates forwards - Implicit volatilities matrixes and curves |

**6.3 Determination of fair value of financial assets and liabilities recorded at amortized cost.**

Below are the Company's assets and liabilities at fair value and their book value:

| Fair value | December 31, 2022 | | December 31, 2021 | |
|---|---|---|---|---|
| | Book Value | Fair Value Estimate | Book Value | Fair Value Estimate |
| **Assets** | | | | |
| Loan Portfolio (Gross) | | | | |
| Consumer | 2.005.440 | 1.727.703 | 2.034.298 | 2.028.584 |
| **Total** | **2.005.440** | **1.727.703** | **2.034.298** | **2.028.584** |

| Liability | | | | |
|---|---|---|---|---|
| Financial obligations | 2.534.228 | 2.527.648 | 2.417.239 | 2.406.962 |
| **Total** | **2.534.228** | **2.527.648** | **2.417.239** | **2.406.962** |

The book value corresponds to the value at amortized cost. The fair value estimate does not include transaction costs.

**6.4 Financial Instruments**

**Financial Assets**

The Company classifies its financial assets into equity instruments, trading instruments, amortized cost investment instruments, credit instruments and accounts receivable.

At the time of initial recognition a financial instrument is measured at fair value plus any direct attributable transaction costs, which are not included if the instrument is classified at fair value through changes in profit or loss. Typically, the fair value at the initial time of recognition is the price of the transaction itself, that is, the amount to be paid or received.

Credivalores recognizes loans and accounts receivable, trading and investment securities and other assets or liabilities on their effective dates.

Purchases and sales of financial assets that are regularly carried out are recognized on the transaction date or on the date on which the Company is required to purchase or sell the asset.

Subsequently, the Company measures its financial instruments at fair value or amortized cost based on the established business model and the contractual terms of the corresponding financial asset or liability.

**iii.   Amortized cost**

Amortized cost is the cost of acquiring a financial asset or a liability plus or minus any capital repayments, cumulative amortizations (calculated using the effective interest rate method) with regard to any difference between the initial amount and the value repaid at maturity and minus any reduction for impairment.

**iv.   Fair value**

Fair value is the amount to be received should the asset be sold or the amount to be paid for transferring a liability as part of a transaction between market participants on the date on which the measurement is made. The most

objective and commonplace definition of fair value is the price that would be paid in an active, deep and transparent market ("listed price" or "market price").

When such values are available CVCS determines the fair value of an instrument using the prices listed on an active market for that specific instrument. A market is considered active if listed prices are readily and regularly available and represent real transactions that are performed regularly on a stand-alone basis.

Should no active market exist for a specific financial instrument CVCS determines its fair value using valuation techniques. These valuation techniques include using recent market transactions between knowledgeable, willing parties carried out on an arm's length basis, should these exist, as well as the fair values of other financial instruments that are substantially the same, discounted cash flows and pricing models.
The valuation technique chosen makes use, to the maximum extent possible, of information obtained directly from the market, using the least amount of data estimated by CVCS, incorporating all those factors that would normally be considered by market participants for setting the price of such financial instruments and is consistent with generally accepted pricing methodologies.

Fair value estimates obtained from financial models are adjusted to consider other factors such as uncertainty on its risk or the liquidity model. Adjustments are included when CVCS believes that another market player uses these same estimates when determining the price of a transaction.

The Company´s business model includes payroll loans at fair value with changes in profit and losses, whereby the loans originated within the 90 days prior to the date of the financial statements are valued at fair value. In order to estimate the fair value of these loans, which could be sold to financial institutions at a market price, the Company evaluates the lending rate of

these loans within the reference market to evaluate the rate at which other financial institutions considered as peers and comparable to the Company will be willing to invest their resources and hold the payroll loans within their balance sheet.

Considering the results from the evaluation of the rates, the Company evaluates four variables to obtain the value of the adjusted rate applicable to the transactions to sell loan portfolio, according to internal criteria:

i)     The multiplier, which compares the Company's rate to the market rate.
ii)    The value of the premium paid in these businesses, which results from discounting the future values of a loan originated at Credivalores' lending rate using the market rate.
iii)   The rate is adjusted by the transaction cost associated to the loan portfolio.
iv)    The cash flows associated to the insurance policies applicable to the loan are also valued.

The methodology followed by the Company, uses the last three months reports from the Financial Superintendence as the source of information to determine the interest rate to discount the cash flows and complete the valuation of the final selling price of the loan portfolio.

The Company has determined that the fair value of the loan portfolio registered in its financial statements is type 3, since most of the criteria is internal.

**6.4.1 Loans and receivables portfolio**

The Company classifies its financial assets into the following measurement categories, based on their corresponding business model:

| Classification of Financial Assets: | | | |
|---|---|---|---|
| **Measurement** | **Terms** | **Features** | **Valuation** |
| Fair value | 0-90 days from origination | Current and best rated loans | Market price Tucredito |
| Amortized cost | 0 days from origination onwards | Current and past-due portfolio | Incurred loss model (equivalent indexed rate) |

**6.4.1.1 Financial Assets at Fair Value**

Credivalores Crediservicios S. A. S., in line with its business model, classifies its products according to the risk inherent in its portfolio. In general, its line of credit Tucredito (payroll deduction loans) is measured at fair value, given that its market niche is focused on placing "top-rated" loans.

| Classification of "Tucredito" line of credit, based on the corresponding business model | | | |
|---|---|---|---|
| **Item** | **Tucredito portfolio segment** | **Measurement** | **Valuation** |
| 1 | Performing loans subject to sale | Fair value | Market price. |
| 2 | Best rated loans with terms of less than a year (originated loans less than 90 days prior) | Amortized cost | (Indexed rate equivalent to amortized cost). |
| 3 | Performing loans with terms of more than one year (originated loans with terms of more than 90 days) | Amortized cost | (Indexed rate equivalent to amortized cost). |
| 4 | Past due loans | Amortized cost | Incurred loss model based on the expected loss. |

The policy established by the Company for measuring its loan portfolio, per the business model classification, is:

In line with its business model the Company has decided to measure the loans comprising the "Tucredito" line of credit at fair value based on the historical trading average since its loans are not impaired (and which, from their origination, are the best-rated 0 - 90 day loans) and since the Company has the possibility of selling them in the short term because of their excellent rating.

Unsold lines of credit, which were initially measured at fair value but which after 90 days of origination were impaired, will later be measured based on an indexed rate, which converts the amortized cost rate into an amount equivalent to their fair value.

### 6.4.1.2 Financial assets at amortized cost

Financial assets are classified at amortized cost only if the asset is kept within a business model whose objective is to maintain it to collect contractual cash flows and the contractual terms of the value give rise at specific dates to cash flows that are only payments of cash capital and interest on the outstanding principal capital; Interest income is recognized using the effective interest rate method.

The effective interest method is a method used to calculate the amortized cost of an asset and allocate the income or cost in interest during the relevant period. The effective interest rate is the discount rate at which the present value of estimated future cash payments or those received over the expected life of the financial instrument, or, as appropriate, in a shorter period, is equal to the net book value in the beginning.

To calculate the effective interest rate, the Company estimates the cash flows considering all the contractual terms of the financial instrument, including the transaction costs and the premiums granted minus the commissions and discounts, but without considering the future credit losses.

## NOTE 7. RISK MANAGEMENT

Credivalores manages risk pursuant to the applicable regulations in the country and Credivalores internal policies.

**Objective and general guidelines**

Credivalores objective is to maximize returns for its investors, through proper risk management. The guiding principles of risk management of Credivalores are as follows:

a)    Make risk management a part of every institutional process.
b)    Specialization in consumer product niches.
c)    Extensive use of continuously updated scoring models to ensure quality growth of consumer loans

### 7.1 Governance structure

**Board**

It is up to the Board of Directors of Credivalores Crediservicios S.A.:

1. Establish and oversee the Company's risk management structure
1. Approve the policies, processes and methodologies of granting, monitoring and recovery of the company's credits, in order to identify, measure and control the risks faced by the Company
• Approve exposures and limits to different types of risks.
• Point out the responsibilities and powers assigned to the positions and areas responsible for managing the different types of risk, in order to develop an environment of culture and risk control.
• Evaluate proposals for recommendations and correctives on management processes.
• Approve the internal control system, as well as evaluate the reports and management of the area responsible for such control.
• Request management, when deemed necessary and for evaluation, reports on the credit portfolio.

**Risk Committee**

The responsibilities of the Risk Committee are:

• Standardize the periodic monitoring of the company's main risk indicators and anticipate risky situations that have the potential to lose the value of CVCS' assets.
• Regularly review risk management policies and systems to reflect changes in market conditions and CVCS activities.
• Proposes to the Board changes or adjustments to existing policies and methodologies to mitigate and control the level of target risk.
• The comity of risk meets monthly and is made up of members invited, within which they are:

-    President
-    Head of Risks

- Collections Manager
- Director of Financial Planning
- Director of Analytics Models and Strategy
- Director of Operations and Technology
- Commercial Managers

The commit not only has the permanent participation of CV Managers, but experts and external specialists who advise the decisions made by this body.

**Risk Headquarters**

- Periodically present to committed risks the evolution of the different risk indicators and perform the necessary analyses for understanding and taking actions that mitigate and control the levels of risk.
- Manage and control compliance with approved policies and processes for risk management.
- Regularly review risk management policies and systems to reflect changes in market conditions and CVCS activities. Propose to the risk committee methodologies and adjustments to risk management policies
- Develop methodologies and models that allow the identification, measurement, control and monitoring of risks.

**Internal Audit**

1. Check the development of risk management in accordance with the comprehensive risk management manual
2. Report to the audit committee and issue recommendations on the findings of the risk management process

**Financial Risk Management**

The Company is exposed to the following risks related to the use of financial instruments:

- Credit Risk
- Market Risk
- Liquidity Risk
- Operating Risk

The financial statements do not include all financial risk management information and disclosures required in the annual financial statements; these financial statements should be read in conjunction with Credivalores annual financial statements as of December 31, 2022. There have been no changes to the risk management department or any risk management policies since December 31, 2022. There are no significant changes related to risk objectives, the corporate structure of the risk function and risk strategies in general compared to what was revealed in the last set of financial statements as of December 31, 2022.

**7.2 Credit Risk**

Credit risk is the risk of financial loss faced by Credivalores Crediservicios S.A., if a client or counterparty in a financial instrument does not meet its contractual obligations and originates mainly from the receivables to customers and the Company's investment instruments. The business model of Credivalores Crediservicios S.A, in its portfolio of credits differs from the rating of its products according to the inherent risk of its portfolio. During the three and six-month period ended December 31, 2022, there were no significant changes in policies and how Credivalores handles credit risk.

The maximum exposure to credit risk of Credivalores, according to IFRS 7, is reflected in the book value of financial assets in the statement of financial position of Credivalores as of December 31, 2022 and December 31, 2021 as follows:

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Cash and cash equivalents | 273.052 | 148.514 |
| Financial instruments net | 104.559 | 361.282 |
| **Loan portfolios** | | |
| Consumer loans | 2.005.440 | 2.034.298 |
| Payroll loans at fair value | 381 | 16.683 |
| Accounts receivable, net | 320.129 | 436.872 |
| **Total financial assets with credit risk** | **2.703.561** | **2.997.649** |
| **Off-balance-sheet credit risk at nominal value** | | |
| Unpaid approved credits | 530.529 | 291.322 |
| **Total exposure to off-balance-sheet credit risk** | **530.529** | **291.322** |
| **Total maximum exposure to credit risk** | **3.234.090** | **3.288.971** |

**CREDIVALORES- CREDISERVICIOS S. A.**
**DISCLOSURES TO THE FINANCIAL STATEMENTS**
**ENDED DECEMBER 31, 2022 AND 2021**
(Stated in million of Colombian pesos)

**Credit Risk Model: Loans**

### I. Transitions between stages

A financial asset is classified as a low credit risk asset based on the debtor's payment habits.

The first step in the methodology consist in evaluating a significant increase in credit risk by comparing the current status against a previous status of stage recognition of the loan.

If the financial asset loses its low credit risk condition or if changes in external environment results in a review of the condition, then this probably shows a significant increase in credit risk. Consequently, the financial asset will be analyzed to determine if there is a significant increase of credit risk (stage 2) or if the asset should be classified as stage 3.

**Significant Increase in Credit Risk**

When determining whether the credit risk (i.e. risk of default) of a financial instrument has increased significantly since initial recognition, Credivalores considers reasonable and supportable information that is relevant and available without undue cost or effort, including both quantitative and qualitative information and analysis based on Credivalores historical experience, expert credit assessment and forward-looking information.

The following criteria is used to determine if a significant increase in credit risk has occurred:

- Comparison of the remaining lifetime probability of default (PD) at the reporting date with the lifetime PD at initial recognition of the exposure.
- Qualitative aspects such as the rebuttable presumption of the norm and restructuring agreements are also considered.
- Qualitative criteria from analysts is also considered based on expert and supportable information.

Credivalores has established a framework that incorporates both quantitative and qualitative information to determine whether the credit risk of a particular financial instrument has increased significantly since initial recognition. The framework is aligned with Credivalores internal credit risk management process.

The criteria for determining whether credit risk has increased significantly will vary by portfolio and will include a backstop based on delinquency.

In certain instances, using its expert credit judgement and, where possible relevant historical experience, Credivalores may determine that an exposure has undergone a significant increase in credit risk if particular qualitative factors indicate so and those indicators may not be fully captured by its quantitative analysis on a timely basis. As a backstop, and as required by IFRS 9, Credivalores will presumptively consider that a significant increase in credit risk occurs no later than when an asset is more than 60 days past due.

Credivalores will monitor the effectiveness of the criteria used in identifying significant increases in credit risk through regular reviews to confirm that:

- The criteria are useful in identifying significant increases in credit risk before an exposure is in default;
- The criteria do not align with the point in time when an asset becomes over 60 days past due;
- The average time between the identification of a significant increase in credit risk and default appears reasonable;
- Exposures are not generally transferred directly from 12-month ECL measurement to credit-impaired; and there is no unwarranted volatility in loss impairment from transfers between 12 month ECL and lifetime ECL measurements.

### II. PI – Probability of noncompliance

**Term structure of PI**

Credit risk grades are the primary input in the determination of the term structure of PD for exposures. Credivalores collects performance and default information about its credit risk exposures analyzed by type of product and borrower, and by credit risk grade. For some portfolios, information purchased from external credit reference agencies may also be used.

Credivalores employs statistical models to analyze the data collected and generate estimates of the remaining lifetime PD of exposures and how these are expected to change because of the passage of time. This analysis includes the identification and

calibration of the relation between changes in default rates as well as an in-depth analysis of the impact of certain other factors on the risk of default.

For stage 1 the PD estimates the probability that the credit will default in the next 12 months, while the PD in stage 2 is the result of the probabilities for the remaining life of the credit. The probability in Stage 3 is defined as 100%.

To determine the PD the company used statistical models to analyze and select the variables significant in predicting whether clients would reach default during a known period of time that is determined by the stage of the loan. For stage 1 the PD are evaluated for the next 12 months, loans on later stages are evaluated for the remainder of the loan lifetime. To estimate lifetime probability Credivalores calculates the 12-month PD and for each successive year for the loan lifetime the model estimates the PD conditioned to not having defaulted during previous years.

Credivalores approach to incorporating forward-looking information into this assessment is discussed below.

**Forward-Looking Information**

Credivalores incorporates forward-looking information into its measurement of ECLs. Credivalores formulates a 'base case' view of the future direction of relevant economic variables and a representative range of other possible forecast scenarios based on forecasts provided by economic experts and considering a forecast of multiple variables. This process involves developing two or more additional economic scenarios and considering the relative probabilities of each outcome.

The base case represents a most-likely outcome. It is aligned with information used by Credivalores for other purposes, such as strategic planning and budgeting. The other scenarios for Colombia represent more optimistic and more pessimistic outcomes. Credivalores has identified and documented key drivers of credit risk and credit losses for each portfolio of financial instruments and, using an analysis of historical data, has estimated relationships between macro-economic variables and credit risk and credit losses.

The economic scenarios used as of December 31, 2022 include the following key indicators (among others) for Colombia for the years ending 31 December 2022 and December, 2021[2]:

| | 2022 | | |
|---|---|---|---|
| | **Scenario A** | **Scenario B** | **Scenario C** |
| Consumer Price Index | 116,77 | 112,08 | 121,45 |
| Consumer Price Index Full Year Variation | 6,66 | 5,37 | 7,96 |
| Import Price Index | 127,83 | 124,01 | 131,66 |
| Economic performance Index | 114,85 | 120,24 | 109,46 |
| Economic performance Index, data affected by seasonal effect | 121,10 | 124,72 | 117,47 |
| Economic performance Index, data affected by seasonal effect Full Year Variation | 8,66 | 9,62 | 7,71 |
| Real Exchange Rate Index (ITCR), according to PPI - Bilateral with the United States | 173,15 | 162,57 | 183,74 |
| Gross domestic product | 243558,25 | 252441,24 | 234675,27 |
| Gross Domestic Product Annual Growth Rate | 6,46 | 7,43 | 5,48 |
| Unemployment rate | 9,81 | 8,13 | 11,50 |
| Foreign Exchange rate (COP/USD) | 4258,73 | 3867,18 | 4650,29 |
| Usury rate | 32% | 31% | 34% |
| Variation of the usury rate | 3,17 | 2,86 | 3,48 |
| Consumer Price Index | 116,12 | 112,29 | 119,96 |
| Gross domestic product | 241270,98 | 248310,36 | 234231,59 |
| Usury rate (Maximum interest rate) | 33% | 29% | 37% |
| Producer Price Index | 182,96 | 182,88 | 183,04 |
| Export price index, according to foreign trade | 221,01 | 221,12 | 220,90 |
| Heavy Construction Price Index | 103,47 | 103,44 | 103,50 |

**Credit Risk Rating**

Credivalores allocates each exposure to a credit risk grade based on a variety of data intended to be predictive of the probability of default and applying experienced credit judgment. Credivalores uses these grades with the purpose identifying significant increases in credit risk. Credit risk grades are defined using qualitative and quantitative factors that are indicative of the risk of default. These factors may vary depending on the nature of the exposure and the type of borrower and product.

---

[2] Projections made internally by the planning area.

Credivalores uses behavioral demographic and origination variables to estimate PD modeling them with a logistic regression that is periodically monitored to ensure its predictive capabilities and its stability. This monitoring for payroll loans and credit card models showed adequate predictive capabilities as well as stability regarding its inputs distributions (PSI). There was also a test run on average observed PD by rating of the last 2 years that ensure the actual events that are being predicted have not vary its behavior significantly and therefore concluding the models provide an adequate and reasonable prediction of PDs by rating.

**Loan Portfolio**

|  |
| --- |
| **Payroll and Credit card loans** |
| - Information collected internally about the behavior of customers. |
| - Demographic information of customers. |
| - Origination information of credits/customer. |

### III. PDI – Loss due to non-compliance

LGD is a measure of the potential loss if a default scenario occurs. To establish the LGD, Credivalores methodology uses historical information to measure the recoveries of loans that reach the default stage at present value. This allows Credivalores to have an adequate estimate of the losses it will incur when credits reach default stage. These calculations are done separately for payroll loans and credit cards to better reflect the fundamental differences in this product and therefore on its LGD.

### IV. ED – Exposure at Default

EAD represents the amount owed from a counterparty at the time of a possible default. For stage 2 Credivalores incorporates in the analysis of the exposure at default the probability of payments and increase or decrease in exposure during the lifetime of the credit.

These probabilities are estimated using the historical information collected by the company and are grouped by type of product. The probabilities are constantly reviewed in order to accurately estimate them and calibrate them.

For payroll loans EAD will correspond to the full valuation of the assets at amortized cost. For credit cards, EAD will take into account the unused credit line when available as well the expected amortization, which allows to have a reliable estimate of the credit exposition at default.

### V. Simplified Model

Credivalores uses a simplified roll rate model to estimate ECL of remnants of portfolio loans that represent less than 5% of balance sheet loans and that are consistently lowering its portfolio share.

I. Roll Rate Methodology

A method that uses a transition matrix to obtain the customer moratorium. This helps forecast future risk from defaults in a given time. By using this matrix, the behavior is reflected in order to determine in what period of time the accounts will be taken. These statements are determined by the number of overdue payments as defined.

For this model, first of all, the portfolio divided into two bands is evaluated.:

Credit Portfolio other products:

- ✓ Portfolio less than 90 days in arrears.
- ✓ Portfolio greater than 90 days of default.

As part of this evaluation, the Company's Management has designated as a deteriorated portfolio the one with a default greater than 90 days since it is recurrent that in the company's business there are delays, but that these are regularized before 90 days for credit portfolio.

Then the monthly average of the portfolio is determined by age and the average values are weighted according to the rate of loss greater than 90 days in each case.

To calculate the PE of the impaired portfolio, the balance of the portfolio of each tranche is multiplied by the percentage of expected loss (Migration to greater than 360) determined in the previous step

**I.      ED – Exposure at default**

ED represents the amount owed from a counterparty at the time of a possible default.

For payroll loans ED will correspond to the full valuation of the assets at amortized cost. For credit cards, ED will take into account the unused credit line when available as well the expected amortization, which allows to have a reliable estimate of the credit exposition at default.

**Credit Risk Model: Other accounts receivable**

Credivalores uses the simplified approach where Credivalores uses an impairment matrix to measure the ECLs of trade receivables from individual customers, which comprise a very large number of small amounts.

Loss rates are calculated using a 'roll rate' method based on the probability of a receivable progressing through successive stages of delinquency to write-off. Roll rates are calculated separately for exposures in different segments based on the following common credit risk characteristics like type of product purchased.

**Loss impairment**

The table below shows the loss impairment balances as of December 31, 2022:

| Loan portfolio | | Stage 1<br>12-month<br>ECL | Stage 2<br>Lifetime<br>ECL not<br>credit-<br>impaired | Stage 3<br>Lifetime<br>ECL<br>credit-<br>impaired | Total |
|---|---|---|---|---|---|
| Loan consumer portfolio | | 33.101 | 17.023 | 322.485 | 372.609 |
| Total loan portfolio | Ps. | **33.101** | **17.023** | **322.485** | **372.609** |
| Total loss impairment financial assets at amortized cost | Ps. | 33.101 | 17.023 | 322.485 | 372.609 |
| **Total loss impairment** | **Ps.** | **33.101** | **17.023** | **322.485** | **372.609** |

The following table shows the balances of loss allowances as of December 31, 2021:

(1)    Credivalores has initially adopted IFRS 15 and IFRS 9 as of 1 January 2018. According to the chosen transition methods, comparative information is not re-established.

| Loan portfolio | | Stage 1<br>12-month<br>ECL | Stage 2<br>Lifetime<br>ECL not<br>credit-<br>impaired | Stage 3<br>Lifetime<br>ECL not<br>credit-<br>impaired | Total |
|---|---|---|---|---|---|
| Loan consumer portfolio | | 56.987 | 24.604 | 236.837 | 318.428 |
| Total loan portfolio | Ps. | **56.987** | **24.604** | **236.837** | **318.428** |
| Total loss impairment financial assets at amortized cost | Ps. | 56.987 | 24.604 | 236.837 | 318.428 |
| **Total loss impairment** | **Ps.** | **56.987** | **24.604** | **236.837** | **318.428** |

The table below shows for loans stage 3 individually assessed for ECL the gross amount and loss impairment balances as of December 31, 2022.

| | Gross Amount Registered | | Impairment Recognized | |
|---|---|---|---|---|
| With recognized provision | | | | |
| Consummer | Ps. | 530.628 | Ps. | 322.485 |
| Total | Ps. | **530.628** | Ps. | **322.485** |

**7.2.1 Monitoring and Control Process**

The Company has an information system in place that provides daily indicators on the loan portfolio status to allow proper monitoring and timely decision-making.

The credit approval processes are connected to an engine managed by the risk area, which allows real-time adjustments to policy parameters to take immediate action where required in loan origination.

Each month the Risk Committee meets to evaluate the development of each product portfolio, analyzing the performance of each yield and applying corrective measures to credit processes or policies where necessary.

**As of December 31, 2022**

| Status | Tu Crédito | CrediUno | CrediPóliza | Total managed portfolio | On balance sheet Portfolio |
|---|---|---|---|---|---|
| CURRENT | 659.312 | 629.513 | 26.759 | 1.315.585 | 1.206.606 |
| 1-30 | 11.797 | 45.830 | 20 | 57.646 | 56.690 |
| 31-60 | 7.505 | 22.421 | 32 | 29.958 | 29.121 |
| 61-90 | 4.316 | 16.432 | 11 | 20.759 | 20.732 |
| 91 - 180 | 10.046 | 24.682 | 13 | 34.741 | 34.684 |
| 181 - 360 | 15.495 | 36.379 | 251 | 52.124 | 51.802 |
| > 360 | 105.962 | 174.624 | 7.732 | 288.319 | 285.903 |
| **Total** | **814.433** | **949.881** | **34.818** | **1.799.132** | **1.685.538** |

**As of December 31, 2021**

| Status | Tu Crédito | CrediUno | CrediPóliza | Total managed portfolio | On balance sheet Portfolio |
|---|---|---|---|---|---|
| CURRENT | 785.767 | 719.444 | 27.762 | 1.532.973 | 1.373.758 |
| 1-30 | 13.742 | 23.864 | 606 | 38.212 | 36.535 |
| 31-60 | 6.774 | 27.364 | 473 | 34.611 | 33.053 |
| 61-90 | 5.320 | 8.591 | 108 | 14.019 | 12.946 |
| 91 - 180 | 10.482 | 25.571 | 78 | 36.131 | 36.023 |
| 181 - 360 | 14.670 | 33.696 | 366 | 48.732 | 48.491 |
| > 360 | 85.380 | 117.470 | 7.658 | 210.508 | 208.343 |
| **Total** | **922.135** | **956.000** | **37.051** | **1.915.186** | **1.749.149** |

The following detail is due to compliance with paragraph 5 requested by the FNG, which indicates the balance of the committed and uncommitted portfolio classified by height of arrears:

**As of December 31, 2022**

| Status | Encumbered Loan Portfolio | Unencumbered Loan Portfolio | Total |
|---|---|---|---|
| CURRENT | 977.143 | 338.442 | 1.315.585 |
| 1-30 | 17.335 | 40.311 | 57.646 |
| 31-60 | 8.581 | 21.377 | 29.958 |
| 61-90 | 4.536 | 16.223 | 20.759 |
| 91 - 180 | 10.924 | 23.817 | 34.741 |
| 181 - 360 | 14.735 | 37.389 | 52.124 |
| > 360 | 113.642 | 174.677 | 288.319 |
| **Total** | **1.146.896** | **652.236** | **1.799.132** |

**As of December 31, 2021**

| Status | Encumbered Loan Portfolio | Unencumbered Loan Portfolio | Total |
|---|---|---|---|
| CURRENT | 509.654 | 1.023.319 | 1.532.973 |
| 1-30 | 9.336 | 28.877 | 38.212 |
| 31-60 | 1.558 | 33.053 | 34.611 |
| 61-90 | 1.073 | 12.946 | 14.019 |
| 91 - 180 | 109 | 36.023 | 36.131 |
| 181 - 360 | 240 | 48.491 | 48.732 |
| > 360 | 2.165 | 208.343 | 210.508 |
| **Total** | **524.135** | **1.391.052** | **1.915.186** |

**7.3 Credit worthiness**

The following is a breakdown of banks and other financial institutions that hold our savings and checking account deposits.

| Entity | Type of Account | December 31, 2022 | December 31, 2021 |
|---|---|---|---|
| Banco de Bogotá | Savings/Checking | 62 | 183 |
| Bancolombia | Savings/Checking | 9.151 | 5.794 |
| Red Multibanca Colpatria | Savings | - | 28 |
| Banco BBVA | Checking | - | 299 |
| Banco De Occidente | Savings/Checking | 94 | 108 |
| Banco Santander | Checking | 490 | 20 |
| JP Morgan | Checking | 7 | 790 |
| Available in Free-standing Trusts | Savings/Checking | 234.793 | 85.957 |
| JP Morgan USD | Deposit | 11 | 3.204 |
| Banco Santander USD | Checking | 479 | 25.137 |
| | | **245.087** | **121.520** |

The following is a breakdown of creditworthiness as determined by independent credit rating agencies of all those major financial institutions in which the Company holds cash.

Long-term debt ratings are based on the following scale:

| Item | Financial Institution | Short-term Rating | Rating Entity |
|---|---|---|---|
| 1 | Banco BBVA | AAA | Fitch Ratings |
| 2 | Banco de Bogotá | BB+ | Fitch Ratings |
| 3 | Banco Colpatria | AAA Y F1+ | Fitch Ratings |
| 4 | Banco de Occidente | AAA Y F1+ | Fitch Ratings |
| 5 | Bancolombia | AAA Y F1+ | Fitch Ratings |
| 6 | Banco Santander | AAA y de BRC 1+ | BRC Investor Services S. A. SCV |
| 7 | Banco JP Morgan | AAA and F1+ | Fitch Ratings |

Cash and cash equivalents are held with banks and financial institutions through free-standing trust funds, which have ratings between AA- and AAA BCR + 1 from BRC Standard and Poor's.

The Company considers the credit ratings awarded to financial institutions with which it conducts treasury operations in the form of fiduciary assignments such as deposits or investments at sight which classify as cash equivalents. In order to establish a minimum margin risk exposure and ensure optimal resource management through periodic evaluations and measurements of the Company's exposure.

**7.4 Market Risk**

The Company has been able to meet its liquidity needs acquiring working capital and lines of credit from local, foreign and multilateral entities This implies the need for follow-up when exposed to variable interest rates (financial obligations indexed to local and/or foreign variable rates such as: DTF, IBR, UVR, LIBOR, PRIME, etc.), and to exchange-rate fluctuations due to devaluation or revaluation in the local currency (USD, EUR, etc.).

Credivalores participates actively in the money, foreign exchange and capital markets, seeking to meet the needs of its clients in accordance with the policies and risk levels established. As such, it manages different financial-asset portfolios within the permitted risk levels and limits.

Market risk arises from the open positions of Credivalores investment portfolios in debt securities, derivatives and equity instruments recorded at fair value, due to adverse changes in risk factors such as interest rates and exchange rates of foreign currencies.

For analysis purposes, market risk has been broken down into price risk and/or interest and exchange-rate risk of financial obligations in the periods of capital-payment amortization, the point at which the risk materialized.

As of December 31, 2022 and December 31, 2021, Credivalores had the following financial assets and liabilities at fair value subject to trading risk:

| Financial assets and liabilities at fair value exposed to trading risk held: | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Equity Instruments | 5.698 | 6.115 |
| Derivatives instruments | 98.861 | 355.167 |
| Loan Portfolio | 381 | 16.683 |
| **Total** | **104.940** | **377.965** |
| Financial liabilities | - | (316) |
| **Total** | **-** | **(316)** |
| **Net Position** | **104.940** | **377.649** |

**Methodology used to measure risk**

Market risks are quantified through value at risk standard models.

The company uses the standard model for the measurement, control and management of market risk of interest rates and exchange rates at which the entity is exposed.

There are two scenarios under which Credivalores is exposed to market risks:

**Interest rates**

Credivalores financial obligations are exposed to this risk when financing is acquired at variable indexed rates that may be subject to volatilities and may affect the Company's financial margin.

**Sensitivity Analysis**

Taking into account Credivalores exposure to changes in the reference interest rate, a sensitivity analysis of the impact on financial obligations is included given the possible effect on the variable indexed interest rates in the third quarter of 2022. The following methodology was defined for the analysis:

1. Two scenarios were evaluated whereby indexed rates are affected by 20 BPS (increasing and decreasing indexed rates), which affect the future flows of Credivalores financial obligations indexed to the variable rate. Debt repayment is implicit in these scenarios, given their contractual frequency, taking them to maturity.

2. The flows corresponding to interest payment (accrual) were evaluated using equivalent rates.

3. The present value of the monthly interest payment was calculated, using as reference the 6-month IBR rate on an annual basis as of December 31, 2022 (12.565%).

4. Finally, the results of each scenario were compared to the base scenario, which corresponds to the projections of interest flows using the rates as of December 31, 2022 as reference .

The results are set out below:

| Scenarios | Interests |
|---|---|
| Effect of 20 BPS decrease in variable rate | 1.835.128 |
| Effect of 20 BPS increase in variable rate | 1.823.399 |
| **Total Scenarios** | **(11.729)** |

**Interest Rate and Exchange Rate**

| Rate and devaluation effect scenario (variable rate and foreign currency obligations) | Interests |
|---|---|
| Effect of revaluation and decrease, 15 BPS, variable rate | 1.835.128 |
| Effect of devaluation and increase, 15 BPS, variable rate | 1.846.857 |
| **Total Scenarios** | **11.729** |

**Exchange rate**

Credivalores financial obligations are exposed to exchange rate risk when the present value of the liability positions presents volatilities due to the devaluation or revaluation of the funding acquired in another currency. This risk materializes at the moment when the payment corresponding to the amortization of principal and interest is made, due to trading in the currencies to be paid and recognition of the exchange rate difference.

**Sensitivity Analysis**

Considering Credivalores exposure to changes in the USD/ exchange rate, a sensitivity analysis of the impact on financial obligations is included given the possible effects of changes in the exchange rate in the third quarter of 2022. The following methodology was used for the analysis:

1.  Two scenarios were evaluated in which the exchange spot rate is adjusted by 0.60% daily volatility (spots prices projected using Bloomberg's curve), generating revaluation and devaluation effect on the TRM as of December 31, 2022.
2.  The amortization of principal and payment of interest on financial obligations are implicit in these scenarios, given their contractual periodicity and taking them to maturity.
3.  The flows corresponding to interest payment (accrual) were evaluated using equivalent rates.
4.  The present value of the monthly interest payment was calculated, using as reference the 6-month IBR rate on an annual basis as of December 31, 2022 (12.565%).
5.  Finally, we compared the results of each scenario with the base scenario, which corresponds to the projected flows for payment of capital and interest using as reference the rates as of December 31, 2022.

The results are set out below:

| Item | Total Debt |
|---|---|
| Initial Scenario (Balance as of December 31st, 2022) | 521.526 |
| Scenario 1 (Effect of revaluation) | 520.272 |
| Scenario 2 (Effect of revaluation) | 522.777 |
| **Difference Scenario 1 vs. Initial Scenario** | **(1.253)** |
| **Difference Scenario 2 vs. Initial Scenario** | **1.251** |

(1)  Volatility obtained from the daily average for the previous three years, including 2021.

**7.5 Liquidity Risk**

The liquidity Risk is represented by the potential event of being unable to meet the expected outgoing cash flows on a timely and efficient manner, without affecting the normal course of business or the company´s financial position. Liquidity risk is related with having insufficient liquid assets and therefore having to incur in unusual or extra funding costs.

The company funding is based on short- and medium-term bank loans as well as bonds and commercial notes issued in the international capital markets. These funds are mainly used to leverage new loan origination according to Credivalores' business model. On the other hand, the Company's capacity to create positions regarding financial instruments available for sale (liquidity or loans) could be affected either by lack of market liquidity or because of sudden changes in interest rates and asset prices.

According to the Company´s funding model the liquidity risk includes among others, the ability to get short, medium- and long-term lines of credit, to keep low liquidity assets (such as loan portfolio) and face short-term unexpected stress situations.

In order to deploy a correct asset and liability management and assure the liquidity needed to operate the business, the Company has set the following guidelines to control the liquidity risk: i) In the short -term, cash flows associated to loan portfolio and liquid assets, short -term financial liabilities, and off balance financial positions in different time frames, allowing a permanent monitoring of the liquidity gap, ii) for the long-term assets and liabilities, the Company analyses its funding sources as well as the breakdown by type of source and those that are specifically associated to specific products.

Credivalores keeps at least 1.5x its operating expenses in liquid assets. The liquidity in the statement of financial position has the following components:

- Inflows: Incoming flows associated to loan portfolio, and interest income associated to liquid assets.

- Outflows: Outgoing flows related to i) operating expenses, ii) new loan origination, and iii) ´ principal and interest from financial liabilities.

- Liquidity GAP: Difference between inflows and outflows according to:

  o  Monthly cash flows associated to assets (liquid assets, loan portfolio).
  o  Monthly projected cash flows related to financial liabilities and operating expenses

The Company determines its liquidity gap based on to the above-mentioned variables, and makes permanent follow up, as well as making any necessary adjustments according to the following ranges:

- ✓  1 to 3 months
- ✓  3 to 6 months
- ✓  6 to 12 months
- ✓  12 months +

**Liquidity Risk Management**

The company identifies its exposure to liquidity risk according to the markets where it operates, and the products and services offered to its customers. For such purpose the Company has analyzed the processes associated to treasury in order to design controls and strategies to reduce the impact.

**Liquidity position**

Determine the minimum amount of liquid assets (cash and cash equivalents, short-term liquid investments), in order to avoid any lacks that may affect the capacity to the outflows. The Financial Committee calculates and monitors the liquidity position on a weekly basis, considering cash flow projections for 7 and 15 days:

a)  Green: liquid assets / outflows >= 105%
b)  Yellow: liquid assets / outflows between 100 and 104%
c)  Red: liquid assets / outflows <100%
In case there are any yellow or green situations, the Financial Committee defines any actions to be taken in order to assure the sufficient procurement of cash to operate on a normal basis.

The liquidity level results as of December 31, 2022 are set out below:

| Item | Liquidity level December, 2022 |
|---|---|
| 7 Days | 3.248% |
| 15 Days | 1.690% |
| 30 Days | 637% |

As of December 31, 2022, the liquidity level in the 7 and 15 day bands is above the upper limit defined in the Company's liquidity manual, constituting a green flag scenario and indicating that Credivalores has sufficient resources to operate normally.

Also, as is good practice, a third band is monitored, which allows for controlling of the liquidity level projected to 30 days. As of December 31, 2022, a green band scenario is recorded, indicating that Credivalores has ample liquidity to support its needs for normal operation.

**Exposure to liquidity Risk**

The Company monitors its liquidity position in order to determine how likely a liquidity stress can happen.

The following is a breakdown by time range for the Liquid Assets and the LRI (Liquidity Risk Indicator) for December 31, 2022 and December 31, 2021.

| Description | December 31, 2022 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Subsequent Net Balances Available | | | | |
| | Liquid Assets Available at the End of the Period (1) | From 1 to 7 days (2) | From 8 to 15 subsequent days (2) | From 16 to 30 subsequent days (2) | From 31 to 90 subsequent days (2) |
| Cash | 2 | 2 | - | - | - |
| Banco de Bogotá | 62 | 62 | - | - | - |
| Bancolombia S. A. | 9.151 | 9.151 | - | - | - |
| Banco De Occidente | 105 | 105 | - | - | - |
| Bancomeva | - | - | | - | - |
| Banco Santander | 490 | 490 | - | - | - |
| Banco Santander Uruguay | 490 | 490 | - | - | - |
| Alianza Fiduciaria | 5.161 | 5.161 | | - | - |
| Credifinanciera | 12.021 | - | - | 12.021 | - |
| Cash at Free-Standing Trusts | 234.793 | 234.793 | - | - | - |
| Collective Investment Funds | 988 | 988 | - | - | - |
| Agrocaña | 4.710 | - | - | - | 4.710 |
| Mutual Funds – Fiduciaria and Valores Bancolombia | 6 | 6 | - | - | - |
| JP Morgan | 7 | 7 | - | - | - |
| TIDIS | 241 | - | | 241 | - |
| Fiducolombia Free-Standing Trusts | 10.523 | 10.523 | - | - | - |
| Inverefectivas | 14.945 | - | - | - | 14.945 |
| **Total liquid assets** | **293.695** | **261.778** | **-** | **12.262** | **19.655** |

|  | December 31, 2021 | | | | |
|---|---|---|---|---|---|
|  | Subsequent Net Balances Available | | | | |
| Description | Liquid Assets Available at the End of the Period (1) | From 1 to 7 days (2) | From 8 to 15 subsequent days (2) | From 16 to 30 subsequent days (2) | From 31 to 90 subsequent days (2) |
| Cash | 2 | 2 | - | - | - |
| Banco de Bogotá | 183 | 183 | - | - | - |
| Bancolombia S. A. | 5.794 | 5.794 | - | - | - |
| BBVA Colombia | 299 | 299 | - | - | - |
| Red Multibanca Colpatria S. A. | 28 | 28 | - | - | - |
| Banco De Occidente | 108 | 108 | - | - | - |
| Banco Santander | 20 | 20 | - | - | - |
| Banco Santander Uruguay | 28.341 | 28.341 | - | - | - |
| Alianza Fiduciaria | 4.398 | 4.398 | | - | - |
| Credifinanciera | 22.202 | - | - | 22.202 | - |
| Cash at Free-Standing Trusts | 85.984 | 85.984 | - | - | - |
| Collective Investment Funds | 1.406 | 1.406 | - | - | - |
| Agrocaña | 4.710 | - | - | - | 4.710 |
| Mutual Funds – Fiduciaria and Valores Bancolombia | 190 | 190 | - | - | |
| JP Morgan | 790 | 790 | | | |
| TIDIS | 167 | - | | 167 | - |
| Fiducolombia Free-Standing Trusts | 8 | 8 | - | - | - |
| Inverefectivas | 12.369 | - | - | - | 12.369 |
| **Total liquid assets** | **166.998** | **127.551** | **-** | **22.369** | **17.079** |

(1) Liquid assets correspond to the sum of existing assets at the close of each period, which can be quickly converted to cash. In calculating liquid assets, all the listed investments, without exception, are computed at their fair exchange value on the date of the valuation (fair value).

(2) The balance corresponds to the residual value of the Company's liquid assets on days after closing the specific period. This balance is calculated as the difference between liquid assets and liquidity requirements. In turn, the liquidity requirement is the difference between the contractual revenue flows and contractual and non-contractual outflows in accordance with the Liquidity Risk Indicator (LRI) methodology.

**Measurement of exposure to liquidity risk**

Measuring the likelihood of the Company running out of liquid resources for its normal operation under normal market conditions requires the use of the tools described above: balance sheet liquidity, liquidity gap, and cash flow projection, to thereby quantify the degree of stress that the company's cash flow can bear to fulfill its normal operations without having to acquire additional resources.

**Limit of liquidity risk exposure**

Maximum exposure to liquidity risk is identified as the average time taken by the Company to carry out the liquidity financial operations (Guaranteed Loans, Portfolio Sales, Working Capital Loans, etc.) and generate the cash available for new loan origination.

The maximum exposure to liquidity risk is calculated weekly by the financial committee, considering projections for bands of 7 days, and 15 to 30 days.

In addition, to analyze the short- and medium-term liquidity requirements, the following indicators are considered:

1) Net Liquidity/Credivalores + Free-standing Trust, where Net Liquidity is the sum of available cash and investments less long-term investments.

**Lower limit: 5%**; cannot be below the lower limit more than three times in a year

| | Exposure Limit Indicator 1 Dec-22 |
|---|---|
| Net Liquidity | 273,052 |
| Assets (Credivalores + Free-standing Trust) (Portfolio) | 1,632,832 |
| **Indicator 1** | **16,7%** |

2) Net Liquidity/Liabilities (Free-standing Trust + Credivalores)

**Lower limit: 5%**; cannot be below the lower limit more than three times in a year

| | Exposure Limit Indicator 1 Dec-22 |
|---|---|
| Net Liquidity | 273,052 |
| Liabilities (Credivalores + Free-standing Trust) | 2,359,861 |
| **Indicator 2** | **11,6%** |

In the three-month period ended December 31, 2022, there were no significant changes in liquidity risk or in the way CVCS manages this risk. However, the second indicator is less than 5%, because CV will use all the cash to disburse and grow the portfolio. We expect it to increase above 5% in the first quarter.

Credivalores has performed an analysis of the consolidated maturities of financial assets and liabilities both derivatives and non-derivatives, showing the following remaining contractual maturities.

**December 31, 2022**

| Assets | Less than one month | From one to six months | From six to twelve months | More than one year | Total |
|---|---|---|---|---|---|
| Cash due from banks and equivalents | 273.052 | - | - | - | 273.052 |
| Equity Instruments at fair value | 988 | - | - | 4.710 | 5.698 |
| Investments in Associates and Affiliates | - | - | - | 14.945 | 14.945 |
| Financial Assets at amortized cost (*) | 78.674 | 395.468 | 479.663 | 1.396.714 | 2.350.519 |
| **Total assets** | **352.714** | **395.468** | **479.663** | **1.416.369** | **2.644.214** |

| Liabilities | Less than one month | From one to six months | From six to twelve months | More than one year | Total |
|---|---|---|---|---|---|
| Financial Liabilities at amortized cost (*) | 52.301 | 381.775 | 341.562 | 2.356.437 | 3.132.075 |
| **Total Liabilities** | **52.301** | **381.775** | **341.562** | **2.356.437** | **3.132.075** |

(*) This disclosure includes the calculation of projected interest.

**December 31, 2021**

| Assets | Less than one month | From one to six months | From six to twelve months | More than one year | Total |
|---|---|---|---|---|---|
| Cash due from banks and equivalents | 148.514 | - | - | - | 148.514 |
| Equity Instruments at fair value | 1.405 | - | - | 4.710 | 6.115 |
| Investments in Associates and Affiliates | - | - | - | 12.369 | 12.369 |
| Financial Assets at amortized cost (*) | 81.731 | 410.091 | 495.635 | 1.386.610 | 2.374.066 |
| **Total assets** | **231.650** | **410.091** | **495.635** | **1.403.689** | **2.541.065** |

| Liabilities | Less than one month | From one to six months | From six to twelve months | More than one year | Total |
|---|---|---|---|---|---|
| Financial Liabilities at amortized cost (*) | 34.584 | 221.166 | 996.751 | 1.464.172 | 2.716.673 |
| Financial Liabilities at fair value Derivatives instruments | - | - | 133 | 183 | 316 |
| **Total Liabilities** | **34.584** | **221.166** | **996.884** | **1.464.355** | **2.716.989** |

(*) This disclosure includes the calculation of projected interest.

## NOTE 8. CASH AND CASH EQUIVALENTS

Cash and cash equivalents include cash balances and demand deposits with original maturities of 90 days or less from the date of acquisition, which are subject to an insignificant risk of changes to their fair value and that are used by the Credivalores to handle short-term commitments.

Cash and cash equivalent balances encompass the following as of December 31, 2022 and December 31, 2021:

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Cash | 2 | 2 |
| Banks | 245.087 | 121.520 |
| Mutual funds (8.1) | 15.701 | 4.623 |
| Term Deposit (8.2) | 12.021 | 22.202 |
| TIDIS | 241 | 167 |
| | **273.052** | **148.514** |

As of December 31, 2022, and December 31, 2021, there were no restrictions on bank accounts.

**8.1 Following is a breakdown of positions in money market funds (trust rights) by Credivalores and the Free-Standing Trust:**

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Fiduciaria Bancolombia – Renta Liquidez | 6 | 190 |
| Alianza Fiduciaria – Collective Investment Fund | 5.161 | 4.399 |
| Fiduciaria Bancolombia - Progression | - | 27 |
| Fiduciaria Banco de occidente | 11 | - |
| **Sub-Total** | **5.178** | **4.616** |

The average profitability with cut to December 2022 is 16.07% and for 2021 it was 4.35%.

The following is the credit rating of the fund managers of Free Standing Trusts:

| Manager | Dec-21 | Dec-20 | Rating Agency |
|---|---|---|---|
| Fiduciaria Bancolombia | AAA | AAA | Fitch Ratings |
| Fiduciaria la Previsora | AAA | AAA | BRC Investor Services S. A. SCV |
| Fiduciaria la Occidente | AAA | AAA | BRC Investor Services S. A. SCV |

Cash equivalents correspond to mutual and money market funds where the Company and the Free-Standing Trust have a direct ownership of shares and rights. These funds invest in short term paper and offer a slightly higher yield than a savings account and are classified as cash equivalents since the company can withdraw and deposit funds at any time, as funds are at sight.

**8.2 Certificates of Deposit (CDs)**

As of December 31, 2022, Credivalores had Certificates of Full Deposit at Banco Santander, as detailed below:

| Institution | Initial Date | Maturity Date | Term (months) | Nominal value | Annual effective interest rate | Nominal rate | Total Balance |
|---|---|---|---|---|---|---|---|
| Santander Bank | 23/08/2022 | 23/02/2023 | 6 | 6.500 | 14.61% | 13.71% | 6.517 |
| Santander Bank | 23/08/2022 | 23/02/2023 | 6 | 5.500 | 14.61% | 13.71% | 5.504 |
| Total | | | | 12.000 | | | 12.021 |

The long-term rating for Santander Bank is AAA.

**NOTE 9. FINANCIAL INSTRUMENTS**

The balance of investments measured at fair value is comprised of:

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Collective Investment Funds (9.1) | 988 | 1.405 |
| Equity instruments (9.2) | 4.710 | 4.710 |
| | **5.698** | **6.115** |

**9.1 At fair value with changes in results**

Investments at fair value correspond to equity participations in money market funds that offer easy access to resources at low risk, held in trusts which are rated from AA- to AAA by local rating agencies BRC Standard and Poor's and/or Fitch Ratings Colombia

| Issuer | Type of Fund | Minimum Investment | Minimum Balance | Annual Return 2022 | Annual Return 2021 | As of December 31, 2022 | As of December 31, 2021 |
|---|---|---|---|---|---|---|---|
| BTG Pactual I Z Class | Closed | 5.000.000 | 2.000.000 | 40,5056% | 71.255% | 903 | 1.085 |
| BTG Pactual II Z Class | Closed | 5.000.000 | 2.000.000 | 0,00000% | 32.995% | - | 244 |
| Fiduciaria Popular | At sight | 200.000 | 200.000 | 14,039% | 3.158% | 21 | 16 |
| Open Portfolio BTG | Open | - | - | 16,1680% | 3.158% | 64 | 60 |
| TOTAL | | | | | | 988 | 1.405 |

**9.2 Equity instruments**

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Agrocaña Shares | 4.710 | 4.710 |
| | **4.710** | **4.710** |

The Company owns 5.03% of Agrocañas S.A. share capital, with 3,300 outstanding shares as of December 31, 2022. These are not listed on the stock exchange and are therefore measured at fair value with changes to equity.

**NOTE 10. INVESTMENTS IN ASSOCIATES**

The detail of the investments in associates is as follows:

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Inverefectivas S.A (a) | 14.945 | 12.369 |
| | **14.945** | **12.369** |

**(a)** Credivalores holds a 25% ownership in Inverefectivas S.A. This Company was incorporated in accordance with the legislation of Panama, and has 4,000 shares issued, of which Credivalores owns 1,000 shares with an intrinsic value of FIX 3. 106,97 expressed using the TRM of 4.810,20 as of January 01, 2023.

| | December 31, 2022 | | December 31, 2021 | |
| --- | --- | --- | --- | --- |
| | **Share of ownership interest** | **Book value** | **Share of ownership interest** | **Book Value** |
| **Associates** | | | | |
| Inverefectivas S.A. | 25% | 14.945 | 25% | 12.369 |
| | | **14.945** | | **12.369** |

The movement of investments in the associates account is shown below for the nine months ended December 31, 2022 and December 31, 2021:

| | December 31 | |
| --- | --- | --- |
| **Associate** | **2022** | **2021** |
| **Balance at the beginning of the period** | **12.369** | **10.966** |
| Adjustments for exchange rate differences | 2.377 | 1.573 |
| Adjustment for valuation method of participation | 199 | (170) |
| **Period-end balance** | **14.945** | **12.369** |

## NOTE 11. LOAN PORTFOLIO, NET

Financial assets at amortized cost on the statement of financial position are classified as consumer portfolio and microcredit. Following is a description of the portfolio of Credivalores as of December 31, 2022 and December 31, 2021:

| | **December 31, 2022** | **December 31, 2021** |
| --- | --- | --- |
| Consumer | 2.005.440 | 2.034.298 |
| Impairment | (372.608) | (318.427) |
| **Total financial assets at amortized cost** | **1.632.832** | **1.715.871** |
| | | |
| TuCredito payroll deduction loans at fair value | 381 | 16.683 |
| **Total financial assets at fair value** | **381** | **16.683** |
| **Total loan portfolio, net** | **1.633.213** | **1.732.554** |

The Financial Position Statement includes a net portfolio held in Free-standing trusts totaling 1.053.196 as of December 31, 2022 and 358.097 as of December 31, 2021. Credivalores classified portfolio by product in accordance with the days of default.

The movement of the provision for the impairment of financial assets by loan portfolio is provided below for the nine months ended December 31, 2022 and December 31, 2021.

| | December 31, | |
| --- | --- | --- |
| | **2022** | **2021** |
| **Initial Balance** | 318.427 | 266.972 |
| Impairment of the period charged against to profit or loss | 75.368 | 67.500 |
| Write-offs | (21.187) | (16.045) |
| **Closing balance** | **372.608** | **318.427** |

Expenditure on provisions and write-offs of loan portfolio

| | **December 31, 2022** | **December 31, 2021** |
| --- | --- | --- |
| Expenditure for the provisions period | 75.369 | 67.500 |
| Forgiveness | 8.370 | 14.322 |
| **Total** | **83.739** | **81.822** |

Below we present a breakdown of the loan portfolio in the balance sheet with all components:

**As of December 31, 2022**

| Type | Principal | Transaction costs | Accrued Interest | Commissions | Impairment | Total |
|---|---|---|---|---|---|---|
| Consumer loans | 1.685.538 | 100.528 | 205.775 | 13.599 | (372.608) | 1.632.832 |
| **Total financial assets at amortized cost** | **1.685.538** | **100.528** | **205.775** | **13.599** | **(372.608)** | **1.632.832** |

**At December 31, 2021**

| Type | Principal | Transaction costs | Accrued Interest | Commissions | Impairment | Total |
|---|---|---|---|---|---|---|
| Consumer loans | 1.749.149 | 129.621 | 145.298 | 10.230 | (318.427) | 1.715.871 |
| **Total financial assets at amortized cost** | **1.749.149** | **129.621** | **145.298** | **10.230** | **(318.427)** | **1.715.871** |

The distribution of maturities of Credivalores gross loan portfolio is the following:

**December 31, 2022**

| | Up to 1 year | Between 1 and 3 years | Between 3 and 5 years | More than 5 years | Total |
|---|---|---|---|---|---|
| Consumer | 262.821 | 674.343 | 326.079 | 742.197 | 2.005.440 |
| **Total Gross Loan Portfolio** | **262.821** | **674.343** | **326.079** | **742.197** | **2.005.440** |

**December 31, 2021**

| | Up to 1 year | Between 1 and 3 years | Between 3 and 5 years | More than 5 years | Total |
|---|---|---|---|---|---|
| Consumer | 290.753 | 704.337 | 245.326 | 793.882 | 2.034.298 |
| **Total Gross Loan Portfolio** | **290.753** | **704.337** | **245.326** | **793.882** | **2.034.298** |

The distribution of maturities of Credivalores principal only loan portfolio is the following:

**December 31, 2022**

| | Up to 1 year | Between 1 and 3 years | Between 3 and 5 years | More than 5 years | Total |
|---|---|---|---|---|---|
| Consumer | 206.685 | 571.451 | 289.703 | 617.699 | 1.685.538 |
| **Total Principal Only Loan Portfolio** | **206.685** | **571.451** | **289.703** | **617.699** | **1.685.538** |

**December 31, 2021**

| | Up to 1 year | Between 1 and 3 years | Between 3 and 5 years | More than 5 years | Total |
|---|---|---|---|---|---|
| Consumer | 223.620 | 612.807 | 219.836 | 692.886 | 1.749.149 |
| **Total Principal Only Loan Portfolio** | **223.620** | **612.807** | **219.836** | **692.886** | **1.749.149** |

Below is the breakdown of Credivalores managed loan portfolio, which includes the loan portfolio on balance and the portfolio sold but still managed by the Company:

| | As of December 31, 2022 | | |
|---|---|---|---|
| Type | Principal Loan | Sold | Total |
| Consumer | 1.685.538 | 113.594 | 1.799.132 |
| **Total Financial Assets at amortized cost** | **1.685.538** | **113.594** | **1.799.132** |

| Type | As of December 31, 2022 | | |
|---|---|---|---|
| | Principal Loan | Sold | Total |
| Consumer | 1.749.149 | 166.038 | 1.915.187 |
| **Total Financial Assets at amortized cost** | **1.749.149** | **166.038** | **1.915.187** |

**Overdue but not impaired**

As of December 31, 2022 and December 31, 2021, a summary of the overdue portfolio by days past due is as follows:

| | Consumer | Total | Consumer | Total |
|---|---|---|---|---|
| Performing loans | 1.206.606 | 1.206.606 | 1.373.758 | 1.373.758 |
| Overdue but not impaired | 85.811 | 85.811 | 69.589 | 69.589 |
| Non-performing loans under 360 days | 107.218 | 107.218 | 97.461 | 97.461 |
| Non-performing loans over 360 days | 285.903 | 285.903 | 208.341 | 208.341 |
| | **1.685.538** | **1.685.538** | **1.749.149** | **1.749.149** |

**NOTE 12. ACCOUNTS RECEIVABLE, NET**

The detailed information of accounts receivables as of December 31, 2022 and December 31, 2021 is as follows:

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Debtors (12.1) | 168.909 | 250.244 |
| Economically Related Parties (12.2) | 43.662 | 92.121 |
| Asficredito | 78.156 | 81.455 |
| Payments on behalf of clients (12.3) | 22.559 | 15.794 |
| Deposits | 9.445 | - |
| Prepayments and Advances | 1 | 977 |
| Others accounts receivable | 3.793 | 1.815 |
| Shareholders | 1.815 | 2.373 |
| Employees | - | 3 |
| Impairments for doubtful accounts | (8.211) | (7.910) |
| | **320.129** | **436.872** |

**12.1** The balance of the debtors account that as of December 31, 2022 amounts to 168.909 and as of December 31, 2021 amounts to 250.244, mainly corresponds to outstanding portfolio collection balances from the free-standing trusts and utilities and claims of guarantees to FGA.

**12.2** The following is the detail with economically related parties:

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Banco Credifinanciera | - | 1 |
| Finanza inversiones S.A.S | - | 44.156 |
| Ingenio la cabaña S.A. | 2.000 | - |
| Inversiones Mad capital S.A.S | 9.736 | 8.894 |
| Activar Valores S.A.S | 15.777 | 22.321 |
| Brestol S.A.S | 16.149 | 16.749 |
| | **43.662** | **92.121** |

The effective interest rates on interest-generating receivables were as follows:

| | December 31, | |
|---|---|---|
| | 2022 | 2021 |
| Loans | DTF + 9.41% and IBR + 8% | DTF + 9.41% |

**12.3** The following is a breakdown of payments by client account:

|  | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Life Insurance Payroll deduction loans | 9.928 | 9.936 |
| Crediuno Insurance | 5.976 | 5.075 |
| Tigo Insurance | 374 | 186 |
| Credipoliza Insurance | 582 | 597 |
| SG Portfolio Insurance | 5.699 | - |
|  | **22.559** | **15.794** |

**12.4** The movement in the provision for impairment of other accounts receivable is provided below:

|  | December 31, 2022 | December 31, 2021 |
|---|---|---|
| **Balance at start of period** | (7.910) | (14.629) |
| Deterioration (1) | (11.298) | (13.860) |
| Write-off | 10.997 | 20.579 |
| **Balance at end of period** | **(8.211)** | **(7.910)** |

   (1)  The impairment analysis of other receivables is performed annually as of December 31 of each year.

**12.4.1. Detail Impairment**

As of December 31, 2022, the amount of the impairment provision for accounts receivable amounts to $8.211. Changes in the impairment provision of accounts receivable are described in the following table:

| Third Party | Impairment | % |
|---|---|---|
| Asficredito | 7.587 | 9.7% |
| Staggered Collective Portfolio | 624 | 1% |
| **Total** | **8.211** | |

Increases in impairment provision of receivables have been included in the "other expenses" line of the income analysis. Amounts charged to the provision account are usually written off when there is no expectation of receiving additional cash.

The Company does not maintain any guarantee as collection insurance.

**NOTE 13. PROPERTY AND EQUIPMENT**

The Company's property, plant and equipment as of December 31, 2022 and December 31, 2021, respectively, are as follows:

|  | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Transportation equipment | 117 | 117 |
| Office equipment and accessories | 1.771 | 1.614 |
| Computer equipment | 388 | 393 |
| Network and communication equipment | 1.761 | 1.990 |
| Assets in financial lease | 4.354 | 4.384 |
| **Subtotal** | **8.391** | **8.498** |
| Accumulated depreciation | (8.218) | (8.269) |
| **Total** | **173** | **229** |

The breakdown for equipment movement is shown below:

| | December 31, 2021 | Purchases | Write-offs | December 31, 2022 |
|---|---|---|---|---|
| Transportation equipment | 117 | - | - | 117 |
| Office equipment and accessories | 1.614 | 157 | - | 1.771 |
| Electronic equipment | 393 | 3 | (8) | 388 |
| Network and communication equipment | 1.990 | 24 | (253) | 1.761 |
| Assets in financial lease | 4.384 | - | (30) | 4.354 |
| | **8.498** | **184** | **(291)** | **8.391** |

| | December 31, 2020 | Purchases | Write-offs | December 31, 2021 |
|---|---|---|---|---|
| Transportation Equipment | 117 | - | - | 117 |
| Office equipment and accessories | 1.781 | 28 | (195) | 1.614 |
| Electronic equipment | 399 | 31 | (37) | 393 |
| Network and communication equipment | 2.204 | 6 | (220) | 1.990 |
| Machinery, plant and equipment in assembly | 49 | - | (49) | - |
| Assets in financial lease | 4.865 | - | (481) | 4.384 |
| | **9.415** | **65** | **(982)** | **8.498** |

The following is the depreciation movement as of December 31, 2022 and December 31, 2021, respectively:

| | December 31, 2021 | Depreciation | Write-offs | December 31, 2022 |
|---|---|---|---|---|
| Transport equipment | 117 | - | - | 117 |
| Office equipment and accessories | 1.578 | 65 | - | 1.643 |
| Electronic equipment | 1.374 | 163 | (258) | 1.279 |
| Telecommunications equipment | 816 | 12 | (2) | 826 |
| Assets in financial lease | 4.384 | - | (31) | 4.353 |
| | **8.269** | **240** | **(291)** | **8.218** |

| | December 31, 2020 | Depreciation | Write-offs | December 31, 2021 |
|---|---|---|---|---|
| Transport equipment | 117 | - | - | 117 |
| Office equipment and accessories | 1.720 | 54 | (196) | 1.578 |
| Electronic equipment | 1.227 | 299 | (152) | 1.374 |
| Telecommunications equipment | 912 | 52 | (148) | 816 |
| Assets in financial lease | 4.865 | - | (481) | 4.384 |
| | **8.841** | **405** | **(977)** | **8.269** |

All equipment of Credivalores is duly protected with current insurance policies. To protect its property and equipment, the Company took out insurance policies with Beckley International Insurance Colombia and Chubb de Colombia as of December 31, 2022 and December 31, 2021, which cover the risks of theft, fire, lightning strikes, explosions, earthquakes, strikes, revolts, etc.

Property and equipment include the values of furniture, computer equipment and improvements to rented property, which are used in the Company's normal course of business.

The Company's own property and equipment as listed above, are not in any way encumbered neither have they been delivered as collateral to guarantee any kind of obligation. The Company has also taken out insurance policies to protect these assets.

**NOTE 14. PROPERTIES BY RIGHT OF USE**

Below is the plant and equipment properties that the Company has as of December 31,2022 and December 31, 2021, respectively:

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| **Assets** | | |
| Properties, Plant and Equipment (Right of Use) | 2.021 | 4.298 |
| Deferred tax asset | 55 | 166 |
| **Liabilities** | | |
| Other financial liabilities - lease of use | | |
| Currents | (934) | (2.044) |
| Non-current | (1.245) | (2.726) |
| **Net** | **(103)** | **(306)** |

Properties and equipment include rights to use leases, in which the Company is the tenant, whose values are shown below:

| | Rights of use Premises and Offices | Total |
|---|---|---|
| **As of December 31, 2020** | | |
| Cost | 9.296 | 9.296 |
| Accumulated Depreciation | (3.276) | (3.276) |
| Net cost | **6.020** | **6.020** |
| | | |
| **As of December 31, 2021** | | |
| Balance at the beginning of the year | 6.020 | 6.020 |
| Additions | 434 | 434 |
| Retreats | - | - |
| Transfers | - | - |
| Depreciation charge | (2.156) | (2.156) |
| Balance at the end of the year | **4.298** | **4.298** |
| | | |
| **As of December 31, 2021** | | |
| Cost | 9.696 | 9.696 |
| Accumulated Depreciation | (5.398) | (5.398) |
| Net cost | **4.298** | **4.298** |
| | | |
| **As of December 31, 2022** | | |
| Balance at the beginning of the year | 4.298 | 4.298 |
| Additions | - | - |
| Retreats | (221) | (221) |
| Transfers | - | - |
| Depreciation charge | (2.056) | (2.056) |
| Balance at the end of the year | **2.021** | **2.021** |
| | | |
| **As of December 31, 2022** | | |
| Cost | 9.251 | 9.251 |
| Accumulated Depreciation | (7.229) | (7.229) |
| Net cost | **2.021** | **2.021** |

The maturities of financial leases range from 3 to 5 years.

In relation to the rights of use recorded in the property, plant and equipment accounts, financial leasing liabilities have been recorded which are included in other financial liabilities and which as of December 31, 2022, have the following balances:

| Lease liabilities | December 31, 2022 | December 31, 2021 |
|---|---|---|
| **As December 31, 2021** | **4.770** | **6.429** |
| Additions | - | 434 |
| Payments | (2.370) | (2.093) |
| Withdraws | (221) | - |
| **As December 31, 2022*** | **2.179** | **4.770** |

- The net variation for 2021 corresponds to 566.

**14.1 Statement of Results**

| | December 31, 2022 |
|---|---|
| Depreciation fee - usage asset | 2.056 |
| Interest expense on lease liabilities | 221 |
| Variable lease expenses | 858 |
| | **3.135** |

Total cash outings for leases as of December 31, 2022 were 3.491

**Variable Leases**

Credivalores determined variable leases, based on the landlord's preponderance in the disposal and use of the asset, in this classification are the points of sale located in the chain warehouses.

**NOTE 15. INTANGIBLE ASSETS**

Below we present the company's other intangible assets as of December 31, 2022 and December 31, 2021, respectively:

**December 31, 2022**

| | Initial Balance | Additions | Amortization | Closing Balance |
|---|---|---|---|---|
| Software Licenses | 1.334 | 2.225 | 2.118 | 1.441 |
| Acquired Trademarks | 9.520 | - | 2.380 | 7.140 |
| Database | 18.166 | - | 757 | 17.409 |
| Contracts | 13.781 | - | 727 | 13.054 |
| Other | 866 | 4.995 | 5.377 | 484 |
| **Total** | **43.667** | **7.220** | **11.359** | **39.528** |

**December 31, 2021**

| | Initial Balance | Additions | Amortization | Closing Balance |
|---|---|---|---|---|
| Software Licenses | 1.261 | 2.098 | 2.025 | 1.334 |
| Acquired Trademarks | 11.900 | - | 2.380 | 9.520 |
| Database | 18.923 | - | 757 | 18.166 |
| Contracts | 14.399 | - | 618 | 13.781 |
| Other | 8.469 | 3.514 | 11.117 | 866 |
| **Total** | **54.952** | **5.612** | **16.897** | **43.667** |

Disputed rights, the variation corresponds to the collection of the portfolio included in this item:

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Disputed rights | 324 | 444 |
| **Total** | **324** | **444** |

The movement of amortization expenses for the period was as follows:

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Depreciation of brands | 2.380 | 2.380 |
| Amortization of exclusivity contracts, databases and licenses | 3.602 | 3.400 |
| **Subtotal** | **5.982** | **5.780** |
| Consultancies, free-standing trusts commissions, contributions | 1.277 | 1.443 |

| | | |
|---|---|---|
| Investors | 3.307 | 1.825 |
| Fees | 375 | 1.347 |
| Insurance | 418 | 6.502 |
| **Total** | **5.377** | **11.117** |

Based on the end of 2018 and 10-year projections adjusted to the performance of the business unit up to that date, the intangibles were prepared in the evaluation and valuation of intangibles through the construction of discounted cash flow projections.

By obtaining the value of the discounted projections, the flow was evaluated in an aggregate manner, and then the tangible assets on the balance sheet were deducted from the total business value, to identify the residual value against the estimated market value of the business. The difference that was obtained in the values, according to the economic and accounting literature, gave rise to the residual value of the intangibles. It was concluded that the updated projections for the base year 2022 remain within the range initially estimated in 2018 of the Base Scenario, considering results obtained at the end of 2018 to 2021 and the future commercial expectations of placement and collection, and in accordance with the dynamics of growth, margin contribution and efficiency in expenses.

Therefore, the conclusion of the Appraiser should not generate an adjustment in the initially estimated valuation, nor should an adjustment for impairment in the registered value of CREDIUNO's intangibles be included, since it is evident that the estimated results in 2018 remained in the lower range of projection even with the effects of the pandemic, and it is expected that by meeting the economic reactivation due to the cash needs of customers in the short and medium term, it would bring rewards in terms of projected profits of the operation within the estimated and initially projected range, considering the new growth curves and efficiency in commission income along with the reduction in expenses, thus preserving the operating margins initially estimated for valuation.

**NOTE 16. CREDIT QUALITY OF FINANCIAL ASSETS**

The credit quality of financial assets that have not yet expired and have also not suffered impairment losses is assessed on the basis of ratings given by external bodies or if they do not exist on the basis of internal categorizations defined on the basis of counterpart characteristics:

| | December 31, | |
|---|---|---|
| | **2022** | **2021** |
| **Cash and cash equivalents** | | |
| AAA | 245.087 | 121.492 |
| AA | - | 28 |
| **Total cash and cash equivalents** | **245.087** | **121.520** |

| | December 31, | |
|---|---|---|
| | **2022** | **2021** |
| **Equity instruments (shares)** | | |
| Fair value financial assets through the other comprehensive results | | |
| Financial sector | 5.698 | 6.115 |
| **Total equity instruments** | **5.698** | **6.115** |

| | December 31, | |
|---|---|---|
| | **2022** | **2021** |
| **Debt instruments** | | |
| Financial assets at fair value through the statement of return | | |
| AAA | 12.021 | 22.202 |
| **Total debt instruments** | **12.021** | **22.202** |

**NOTE 17. DERIVATIVE FINANCIAL INSTRUMENTS AND HEDGE ACCOUNTING**

Movements for hedge accounting and investments in derivatives are provided below:

|  | December 31, 2022 | December 31, 2021 |
|---|---|---|
| **ASSETS** | | |
| Prima Call | 7.051 | - |
| Hedge forward contracts (17.1) | 5.120 | 8.013 |
| Hedge Options (17.2) | (10.146) | 138.380 |
| Hedge Swaps (17.3) | 96.836 | 208.774 |
| **Total** | **98.861** | **355.167** |
| | | |
| **LIABILITY** | | |
| Forward speculation | - | 316 |
| **Total** | **-** | **316** |

Credivalores holds derivative financial instruments to hedge foreign currency risk exposure.

***Hedging Operations***

Credivalores activities are exposed to financial risks including liquidity risk, foreign currency risk and interest rate risks. Therefore, the administration and the Board of Directors have approved and implemented a financial risk management policy to mitigate the negative effects of financial market uncertainty and volatility on the company's financial performance. The financial risk management policy establishes the use of a wide variety of financial derivatives to cover the risks inherent in exchange rate fluctuations and the interest rate of financial obligations in currencies other than Colombian Pesos.

Credivalores has developed a hedging policy against financial risks to mitigate the effects that these risks may have on the income statement. In development of this policy, the main objective to minimize the effects of the exchange rate on the liabilities in foreign currency that the company currently has. To achieve this objective CVCS has contracted different types of derivatives such as: Exchange Rate Forward, Cross Currency Swap, Cupon Only Swap and Options. The Management constantly monitors the results of this strategy and its effectiveness to adopt timely actions and corrective measures in favor of results. Effectiveness is measured retrospectively using the hypothetical derivative method. Equally, the methodologies for valuation at market prices have been adopted in accordance with the practices used by the Colombian financial system and international practices, with sources of information from price providers accepted by national regulators.

In accordance with the guidelines of this policy, the following is the list of derivative instruments implemented and in force as of September 2022 to hedge foreign currency risks and interest rate risks of financial obligations denominated in foreign currency (Notes due 2025 and credits):

**Cross Currency Swaps**

| Theoretical Hedging | | | | Annual Interest Rate | | | |
|---|---|---|---|---|---|---|---|
| **Credivalores pays** | **Credivalores receives USD** | **Credivalores pays COP** | **Delivery** | **Effective Date** | **Maturity Date** | **Credivalores receivers** | **Credivalores pays** |
| Coupon Only Swap | 100.000.000 | 341.600.000.000 | Non-Delivery | 7/02/2020 | 7/02/2025 | 8,88% | IBR+ 8,54% |
| Coupon Only Swap | 50.000.000 | 170.750.000.000 | Non-Delivery | 7/02/2020 | 7/02/2025 | 8,88% | IBR+ 3,32% |
| Coupon Only Swap | 50.000.000 | 170.750.000.000 | Non-Delivery | 7/02/2020 | 7/02/2025 | 8,88% | IBR+ 4,995% |
| Coupon Only Swap | 40.000.000 | 160.660.000.000 | Non-Delivery | 1/06/2022 | 31/05/2025 | 9.5% + SOFR | IBR + 4.56% |
| Coupon Only Swap | 29.388.476 | 135.993.995.022 | Non-Delivery | 7/07/2022 | 31/05/2025 | 9.5% + SOFR | IBR + 3.9% |
| Coupon Only Swap | 18.325.152 | 78.706.527.453 | Non-Delivery | 18/07/2022 | 31/05/2025 | 9.5% + SOFR | IBR + 3.69% |

**Operaciones de Cobertura Vigentes**

| Type of instrument | Position of Credivalores | Type of Option | Amount covered in USD | Effective date | Due date | Strike Price COP | Compliance |
|---|---|---|---|---|---|---|---|
| Call Option | Seller | European | 50.000.000 | 7-feb-25 | 7-feb-25 | 4.000,00 | Non-Delivery |
| Call Option | Buyer | European | 50.000.000 | 7-feb-25 | 7-feb-25 | 3.415,00 | Non-Delivery |
| Call Option | Seller | European | 100.000.000 | 7-feb-25 | 7-feb-25 | 4.000,00 | Non-Delivery |
| Call Option | Buyer | European | 100.000.000 | 7-feb-25 | 7-feb-25 | 3.415,00 | Non-Delivery |
| Call Option | Seller | European | 18.000.000 | 7-feb-25 | 7-feb-25 | 4.000,00 | Non-Delivery |
| Call Option | Buyer | European | 18.000.000 | 7-feb-25 | 7-feb-25 | 3.415,00 | Non-Delivery |
| Call Option | Seller | European | 3.333.333 | 11-jul-24 | 11-jul-24 | 4.516,50 | Non-Delivery |
| Call Option | Buyer | European | 3.333.333 | 11-jul-24 | 11-jul-24 | 4.016,50 | Non-Delivery |
| Call Option | Seller | European | 3.333.333 | 13-ago-24 | 13-ago-24 | 4.516,50 | Non-Delivery |
| Call Option | Buyer | European | 3.333.333 | 13-ago-24 | 13-ago-24 | 4.016,50 | Non-Delivery |
| Call Option | Seller | European | 3.333.333 | 12-sep-24 | 12-sep-24 | 4.516,50 | Non-Delivery |
| Call Option | Buyer | European | 3.333.333 | 12-sep-24 | 12-sep-24 | 4.016,50 | Non-Delivery |
| Call Option | Seller | European | 3.333.333 | 10-oct-24 | 10-oct-24 | 4.516,50 | Non-Delivery |
| Call Option | Buyer | European | 3.333.333 | 10-oct-24 | 10-oct-24 | 4.016,50 | Non-Delivery |
| Call Option | Seller | European | 3.333.333 | 13-nov-24 | 13-nov-24 | 4.516,50 | Non-Delivery |
| Call Option | Buyer | European | 3.333.333 | 13-nov-24 | 13-nov-24 | 4.016,50 | Non-Delivery |
| Call Option | Seller | European | 3.333.333 | 12-dic-24 | 12-dic-24 | 4.516,50 | Non-Delivery |
| Call Option | Buyer | European | 3.333.333 | 12-dic-24 | 12-dic-24 | 4.016,50 | Non-Delivery |
| Call Option | Seller | European | 3.333.333 | 13-ene-25 | 13-ene-25 | 4.516,50 | Non-Delivery |
| Call Option | Buyer | European | 3.333.333 | 13-ene-25 | 13-ene-25 | 4.016,50 | Non-Delivery |
| Call Option | Seller | European | 3.333.333 | 13-feb-25 | 13-feb-25 | 4.516,50 | Non-Delivery |
| Call Option | Buyer | European | 3.333.333 | 13-feb-25 | 13-feb-25 | 4.016,50 | Non-Delivery |
| Call Option | Seller | European | 3.333.333 | 13-mar-25 | 13-mar-25 | 4.516,50 | Non-Delivery |
| Call Option | Buyer | European | 3.333.333 | 13-mar-25 | 13-mar-25 | 4.016,50 | Non-Delivery |
| Call Option | Seller | European | 3.333.333 | 11-abr-25 | 11-abr-25 | 4.516,50 | Non-Delivery |
| Call Option | Buyer | European | 3.333.333 | 11-abr-25 | 11-abr-25 | 4.016,50 | Non-Delivery |
| Call Option | Seller | European | 3.333.333 | 13-may-25 | 13-may-25 | 4.516,50 | Non-Delivery |
| Call Option | Buyer | European | 3.333.333 | 13-may-25 | 13-may-25 | 4.016,50 | Non-Delivery |
| Call Option | Seller | European | 3.333.333 | 12-jun-25 | 12-jun-25 | 4.516,50 | Non-Delivery |
| Call Option | Buyer | European | 3.333.333 | 12-jun-25 | 12-jun-25 | 4.016,50 | Non-Delivery |
| Call Option | Seller | European | 2.449.040 | 11-jul-24 | 11-jul-24 | 5.127,46 | Non-Delivery |
| Call Option | Buyer | European | 2.449.040 | 11-jul-24 | 11-jul-24 | 4.627,46 | Non-Delivery |
| Call Option | Seller | European | 2.449.040 | 13-ago-24 | 13-ago-24 | 5.127,46 | Non-Delivery |
| Call Option | Buyer | European | 2.449.040 | 13-ago-24 | 13-ago-24 | 4.627,46 | Non-Delivery |
| Call Option | Seller | European | 2.449.040 | 12-sep-24 | 12-sep-24 | 5.127,46 | Non-Delivery |
| Call Option | Buyer | European | 2.449.040 | 12-sep-24 | 12-sep-24 | 4.627,46 | Non-Delivery |
| Call Option | Seller | European | 2.449.040 | 10-oct-24 | 10-oct-24 | 5.127,46 | Non-Delivery |
| Call Option | Buyer | European | 2.449.040 | 10-oct-24 | 10-oct-24 | 4.627,46 | Non-Delivery |
| Call Option | Seller | European | 2.449.040 | 13-nov-24 | 13-nov-24 | 5.127,46 | Non-Delivery |
| Call Option | Buyer | European | 2.449.040 | 13-nov-24 | 13-nov-24 | 4.627,46 | Non-Delivery |
| Call Option | Seller | European | 2.449.040 | 12-dic-24 | 12-dic-24 | 5.127,46 | Non-Delivery |
| Call Option | Buyer | European | 2.449.040 | 12-dic-24 | 12-dic-24 | 4.627,46 | Non-Delivery |
| Call Option | Seller | European | 2.449.040 | 13-ene-25 | 13-ene-25 | 5.127,46 | Non-Delivery |
| Call Option | Buyer | European | 2.449.040 | 13-ene-25 | 13-ene-25 | 4.627,46 | Non-Delivery |
| Call Option | Seller | European | 2.449.040 | 13-feb-25 | 13-feb-25 | 5.127,46 | Non-Delivery |
| Call Option | Buyer | European | 2.449.040 | 13-feb-25 | 13-feb-25 | 4.627,46 | Non-Delivery |
| Call Option | Seller | European | 2.449.040 | 13-mar-25 | 13-mar-25 | 5.127,46 | Non-Delivery |
| Call Option | Buyer | European | 2.449.040 | 13-mar-25 | 13-mar-25 | 4.627,46 | Non-Delivery |
| Call Option | Seller | European | 2.449.040 | 11-abr-25 | 11-abr-25 | 5.127,46 | Non-Delivery |
| Call Option | Buyer | European | 2.449.040 | 11-abr-25 | 11-abr-25 | 4.627,46 | Non-Delivery |
| Call Option | Seller | European | 2.449.040 | 13-may-25 | 13-may-25 | 5.127,46 | Non-Delivery |
| Call Option | Buyer | European | 2.449.040 | 13-may-25 | 13-may-25 | 4.627,46 | Non-Delivery |
| Call Option | Seller | European | 2.449.040 | 12-jun-25 | 12-jun-25 | 5.127,46 | Non-Delivery |
| Call Option | Buyer | European | 2.449.040 | 12-jun-25 | 12-jun-25 | 4.627,46 | Non-Delivery |
| Call Option | Seller | European | 1.527.096 | 11-jul-24 | 11-jul-24 | 4.795,00 | Non-Delivery |
| Call Option | Buyer | European | 1.527.096 | 11-jul-24 | 11-jul-24 | 4.295,00 | Non-Delivery |
| Call Option | Seller | European | 1.527.096 | 13-ago-24 | 13-ago-24 | 4.795,00 | Non-Delivery |
| Call Option | Buyer | European | 1.527.096 | 13-ago-24 | 13-ago-24 | 4.295,00 | Non-Delivery |
| Call Option | Seller | European | 1.527.096 | 12-sep-24 | 12-sep-24 | 4.795,00 | Non-Delivery |
| Call Option | Buyer | European | 1.527.096 | 12-sep-24 | 12-sep-24 | 4.295,00 | Non-Delivery |
| Call Option | Seller | European | 1.527.096 | 10-oct-24 | 10-oct-24 | 4.795,00 | Non-Delivery |
| Call Option | Buyer | European | 1.527.096 | 10-oct-24 | 10-oct-24 | 4.295,00 | Non-Delivery |
| Call Option | Seller | European | 1.527.096 | 13-nov-24 | 13-nov-24 | 4.795,00 | Non-Delivery |
| Call Option | Buyer | European | 1.527.096 | 13-nov-24 | 13-nov-24 | 4.295,00 | Non-Delivery |
| Call Option | Seller | European | 1.527.096 | 12-dic-24 | 12-dic-24 | 4.795,00 | Non-Delivery |
| Call Option | Buyer | European | 1.527.096 | 12-dic-24 | 12-dic-24 | 4.295,00 | Non-Delivery |
| Call Option | Seller | European | 1.527.096 | 13-ene-25 | 13-ene-25 | 4.795,00 | Non-Delivery |
| Call Option | Buyer | European | 1.527.096 | 13-ene-25 | 13-ene-25 | 4.295,00 | Non-Delivery |
| Call Option | Seller | European | 1.527.096 | 13-feb-25 | 13-feb-25 | 4.795,00 | Non-Delivery |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Call Option | Buyer | European | 1.527.096 | 13-feb-25 | 13-feb-25 | 4.295,00 | Non-Delivery |
| Call Option | Seller | European | 1.527.096 | 13-mar-25 | 13-mar-25 | 4.795,00 | Non-Delivery |
| Call Option | Buyer | European | 1.527.096 | 13-mar-25 | 13-mar-25 | 4.295,00 | Non-Delivery |
| Call Option | Seller | European | 1.527.096 | 11-abr-25 | 11-abr-25 | 4.795,00 | Non-Delivery |
| Call Option | Buyer | European | 1.527.096 | 11-abr-25 | 11-abr-25 | 4.295,00 | Non-Delivery |
| Call Option | Seller | European | 1.527.096 | 13-may-25 | 13-may-25 | 4.795,00 | Non-Delivery |
| Call Option | Buyer | European | 1.527.096 | 13-may-25 | 13-may-25 | 4.295,00 | Non-Delivery |
| Call Option | Seller | European | 1.527.096 | 12-jun-25 | 12-jun-25 | 4.795,00 | Non-Delivery |
| Call Option | Buyer | European | 1.527.096 | 12-jun-25 | 12-jun-25 | 4.295,00 | Non-Delivery |

**17.1 Forward Contracts for Hedging**

The portfolio of derivative transactions presents assets valued according to the policy implemented and the fair value and cash flow valuation.

- **Fair-value hedge accounting**

| | **Fair value** | | | |
|---|---|---|---|---|
| | **December 31, 2022** | | **December 31, 2021** | |
| **ASSETS** | **Nominal Amount USD** | **Fair Value** | **Nominal Amount USD** | **Fair Value** |
| **Forward Contracts for Hedging** | | | | |
| Purchase of foreign currency | 7 | 5.120 | 59 | 8.013 |
| **Total forward contracts for hedging – assets** | **7** | **5.120** | **59** | **8.013** |

*Stated in USD expressed in million*

**17.2 Derivate Financial Instruments Options**

The activities carried out by Credivalores generated significant positions in the derivatives portfolio, performing transactions for hedging purposes where the underlying assets are exchange rates and interest rates. Options are contracts between two parties, one of them has the right but not the obligation, to carry out an operation of purchase or sale according to previously agreed terms.

The company closed operations with options as derivative financial instruments to manage and mitigate the fluctuations in the fair value of the debt in the P&L. The options are measured through cash flow coverage.

Detail of derivative with options financial instruments and their accounting is as follows:

| | **Fair value** | | | |
|---|---|---|---|---|
| | **December 31, 2022** | | **December 31, 2021** | |
| **ASSETS** | **Nominal Amount USD** | **Fair Value** | **Nominal Amount USD** | **Fair Value** |
| Call spread premium option | 23 | 96.836 | 35 | 138.380 |
| **Total forward contracts for hedging – assets** | **23** | **96.836** | **35** | **138.380** |

**Options Contracts for Hedging**

Transactions in derivative instruments with options cover the debt position (equity only) of the disbursements of the PA Credivalores O'Connor and Gramercy credit for an aggregate face value of US 87,713,627.

These financial instruments are valued under the methodology and market value provided by the counterparties, the type of measurement is cash flow.

The Company will maintain derivative financial instruments, to cover the foreign currency risk exposure until maturity, which corresponds to the expiration of the Notes that are being covered by this instrument. The objective and strategy of the administration is to analyze and evaluate the appropriate method for the valuation of financial instruments, depending on the type of operation and negotiation carried out.

**17.3 Derivate Financial Instruments Cross Currency Swap**

Credivalores, executed operations with derivative financial instruments to manage and mitigate the fluctuations in the fair value of the debt position in the P&L. The cross-currency swaps in place hedge the exposure to the risk of exchange rate, which is measured at market (fair value hedging) value, which is measured as a cash flow hedge.

Derivative financial instruments through cross currency swaps and its hedge accounting is the following:

| | Fair value | | | |
|---|---|---|---|---|
| | December 31, 2022 | | December 31, 2021 | |
| **ASSETS** | Nominal Amount USD | Fair Value | Nominal Amount USD | Fair Value |
| Hedging Contracts Cross Currency Swaps (a) | - | - | 48 | 191.802 |
| Hedging Contracts Coupon Only Swap (b) | (2) | (10.146) | 4 | 16.972 |
| **Total forward contracts for hedging – assets** | **(2)** | **(10.146)** | **52** | **208.774** |

    **a.  Cross currency swap hedging contracts**

In 2022, coverage with CCS was cancelled.

    **b.  Coupon only swaps hedging contracts**

The derivative trading through a coupon only swaps cover interest payments on Notes 144 A/Reg S due 2025 issued on February 7, 2020, with a coupon of 8.875% for an original face value of US$200,000,000. With respect to Notes 144 A / Reg S maturing in 2025 and coupon of 8.875%, in June 2020 the number of coupons covered at maturity with coupon only swaps was adjusted after completing a repurchase operation in the secondary market of these Notes for US32,000,000 principal.

In addition, coupon only swaps cover interest until maturity of PA Credivalores UBS O'Connor and Gramercy credit disbursements with a nominal value of US 87,713,627.

The balance of the account registers negative balance because the valuation of this derivative financial instrument is showing a loss at the end of 2022.

**NOTE 18. FINANCIAL OBLIGATIONS**

Below, we present the balances of financial obligations as of December 31, 2022 and December 31, 2021

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| 144 A / Reg S Bonds | 1.289.134 | 1.720.458 |
| ECP Program Notes | 192.408 | 298.587 |
| Ordinary Local Bonds- FNG Partial Guarantee | 95.940 | 52.900 |
| Financial obligations in autonomous assets | 901.280 | 252.296 |
| Promissory notes national banks | 48.919 | 82.721 |
| Transaction costs | (53.924) | (61.792) |
| | **2.473.757** | **2.345.170** |

The balances of Credivalores' financial obligations and the Autonomous Assets of which he is trusting at court December 31, 2022 and December 31, 2021, correspond to obligations incurred with financial institutions in the country and obligations in the foreign capital market and financial leasing. Short-term credit obligations are cancelled between December 2022 and 2021 and credits that have a maturity after December 2022, respectively, are considered long-term:

a)  Short-term financial obligations.

| Entity | December 31, 2022 | Interest rate | Maturity | December 31, 2021 | Interest rate | Maturity |
|---|---|---|---|---|---|---|
| Banco de Bogotá | 5.512 | IBR+4.15% | 2023 | 271 | IBR+1.25% | 2022 |
| Banco de Occidente | 10.309 | IBR+2.86% | 2022-2023 | 10.271 | IBR+2.5% | 2022 |
| Bancolombia | 6.831 | IBR+9.79% | 2023 | 9.995 | IBR+7.95% | 2022 |
| JP Morgan Colombia | - | | | 36.500 | 10%EA | 2022 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Coltefinanciera | 1.065 | 14.68%EA | 2023 | - | | |
| **Total National Entities** | **23.717** | | | **57.037** | | |
| ECP Program Notes | 192.408 | 10.63%NA | 2023 | 199.058 | 8,5%EA | 2022 |
| **Total ECP Program Notes** | **192.408** | | | **199.058** | | |

| Entity | December 31, 2022 | Interest rate | Maturity | December 31, 2021 | Interest rate | Maturity |
|---|---|---|---|---|---|---|
| 9.75% Bonds due July 2022 (144 A/Reg. S Bonds) | - | | | 379.464 | 9.75%EA | 2022 |
| Reopening of 9.75% Bonds due July 2022 (144 A/Reg. S) | - | | | 274.043 | 9.75%EA | 2022 |
| **Total International Bonds** | **-** | | | **653.507** | | |

| Entity | December 31, 2022 | Maturity | Expiration | December 31, 2021 | Interest rate | Maturity |
|---|---|---|---|---|---|---|
| Free-standing Trust Crediuno IFC | 6.956 | DTF + 5.5% | 2023 | - | | |
| **TotalFree-standing Trusts** | **6.956** | | | **-** | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Total short-term obligations** | **223.081** | | | **909.602** | | |

Credivalores has short-term financial obligations, during the periods ended December 31, 2022 and December 31, 2021 for a value of 223,081 and 909,602, respectively. The measurement of liabilities financial instruments of financial obligations are valued at low amortized cost as established by IFRS 9.

**b)    Long-term obligations**

The Company had long-term financial obligations during the periods ended December 31, 2022 and December 31 2020 totaling 2.304.567  and 1.497.360, respectively. Associated costs incurred in the acquisition of loans are classified as transaction costs pending IFP amortization for the periods ended December 31, 2022 and December 31, 2021, valued at 53.924 and 61.792, respectively. The measurement of financial liability instruments for financial obligations is valued at amortized cost, as per IFRS 9.

The total balance of financial obligations for the periods ended December 31, 2022 and December 31, 2021 is 2.473.724 and 2.345.170 respectively, which will be paid off as described above.

| Entity | December 31, 2022 | Interest rate | Maturity | December 31, 2021 | Interest rate | Maturity |
|---|---|---|---|---|---|---|
| Banco de Bogotá | - | | | 5.210 | IBR+5.5% | 2023 |
| Bancolombia | 26.267 | IBR+10.50% | 2024 | 20.475 | IBR+7.65% | 2023 |
| **Total National Entity** | **26.267** | | | **25.685** | | |
| ECP Program Notes | - | | | 99.529 | 8,75%EA | 2023 |
| **Total ECP Program Notes** | **-** | | | **99.529** | | |

| Entity | December 31, 2022 | Interest rate | Maturity | December 31, 2021 | Interest rate | Maturity |
|---|---|---|---|---|---|---|
| Free-standing Trust Syndicated Loan TuCrédito | 253.004 | IBR + 5.5% | 2024al2027 | 252.296 | DTF-IBR+5.5% | 2023 to 2025 |
| Free-standing Trust Syndicated Loan Payroll | 169.939 | IBR+8% | 2027 | - | | |
| Free-standing Trust UBS O'Connor | 421.920 | SOFR+9,5% | 2025 | - | | |
| Free-standing Trust Systemgroup | 48.363 | 15% EA | 2025 | - | | |
| **Total Trusts** | **893.226** | | | **252.296** | | |

| Entity | December 31, 2022 | Interest rate | Maturity | December 31, 2021 | Interest rate | Maturity |
|---|---|---|---|---|---|---|
| 8.875% Bonds due February 2025 (144 A/Reg. S Bonds) | 1.289.134 | 8,875% NS | 2025 | 1.066.951 | 8,875% EA | 2025 |
| Domestic Bonds Guaranteed by the FNG | 95.940 | 9,1% NS | 2024 | 52.900 | 9,1%EA | 2024 |

| | | | | | |
|---|---|---|---|---|---|
| **Total Bonds** | 1.385.074 | | 1.119.851 | | |
| **Total long-term obligations** | 2.304.566 | | 1.497.361 | | |
| Transaction costs | (53.924) | | (61.793) | | |
| **Total financial obligations** | 2.473.724 | | 2.345.170 | | |

- The item for rights of use for the periods ended December 30, 2022 and December 31, 2021 correspond to 2,179 and 4,770 respectively

On August 26, 2021, CV issued the first tranche of its inaugural domestic bond issuance of ordinary bonds with a partial guarantee from the FNG in the Colombian debt capital market.

The total amount of the issuance, authorized by the Financial Superintendence of Colombia in September 2021, is $160,000 million pesos and in August 2021 the Company placed the first tranche of bonds for an amount of $52,900 billion pesos with a 3-year term an a 9.10% coupon.

The placement of the first tranch had an over-demand of 1.51 for the amount initially offered, which was 35,000 million pesos. Subsequently, on September 23, 2022, Credivalores placed the second tranch of the issuance of ordinary bonds with partial guarantee of the FNG for an amount of 43,040 million pesos maintaining the same maturity date and coupon of the issuance of the first lot. Therefore, at the end of September 2022, the total balance of ordinary bonds with partial guarantee of the FNG issued by Credivalores was 95.940 million.

The issuance of ordinary bonds of Credivalores has an irrevocable partial guarantee from the FNG that covers 70% of the principal and interest and was rated 'AA (col)' by Fitch Ratings Colombia.

The resources from the placement of the first and second tranches of Credivalores ordinary bond issuance allowed the company to support the growth of its operation in Colombia by financing the disbursements of the payroll and credit card loans.

For the last quarter of 2022, the company constituted a trust with Systemgroup for 48,363 million for the maintenance of its operation and in turn to meet the expiration of the October 2022 note.

On January 31, 2022, Credivalores closed a credit line committed to Citibank Colombia for an amount of 290,000 million pesos, which was structured through a trust without recourse to Credivalores. This line is backed by a payroll portfolio, with an initial revolving period of 24 months and subsequent amortization of the capital depending on the portfolio, to achieve a half-life of the facility of around 5.6 years. At the end of December 2022, 169,939,000 million pesos of the total committed amount of this facility had been disbursed.

The resources of this loan were used to finance the growth of the portfolio and to meet the maturity of the bonds in dollars with a coupon of 9.75% in July 2022.

**Obligations stated in foreign currency.**

| Entity | Nominal Value as of December 31, 2022 | | Nominal as of Value December 31, 2021 | |
|---|---|---|---|---|
| ECP Program Notes (a) | 75 | 192.408 | 75 | 298.587 |
| 144 A/ Reg S Bonds (b) | 268 | 1.289.134 | 432 | 1.720.458 |
| **Total** | **USD 343** | **COP 1.481.542** | **USD 507** | **COP 2.019.045** |

- Interests

Listed below:

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Bank interests | 199 | 1.382 |
| Bank Interests Free-standing Trust | 2.114 | 722 |
| Foreign currency interest foreign currency interest | 4.513 | 3.253 |
| Bonus coupon | 45.327 | 65.104 |
| Coupon ordinary bonds issued locally | 2.952 | 1.608 |
| Interest banks another Free-standing Trust | 559 | - |
| Foreign currency interest Free-standing Trust | 4.839 | - |
| | **60.502** | **72.069** |

**(a) Euro Commercial Paper Program Notes**

The Euro Commercial Paper Program (ECP Program) has a US$150,000,000 maximum outstanding amount.

In April 2021 CV issued a new note under the ECP Program due October 28, 2022 for an amount of US$50,000,000 and a coupon of 8.50% with quarterly interest payments. In that same month, a US$40,000,000 note with a coupon of 8.25% issued in April 2018 matured. In September 2021 CV issued a new US$25,000,000 note with a maturity in March 2023 and a coupon of 8.75%. In that same month, a US$20,000,000 note issued in June 2020 with a coupon of 8.50% matured. The resources of the last issue made in October 2022 were allocated to the growth of the company's loan portfolio and general uses.

As a result of amortization principal and issuance of new notes under the ECP Program, the total outstanding balance as of December 31, 2022, is US$40,000,000.

(b) **Notas 144A / Reg S**

On July 27, 2017, Credivalores issued its inaugural senior unsecured 144A / Reg S notes (the "Notes") due July 27, 2022 for US$250,000,000 with a coupon of 9.75% and a yield of 10.0%. The Notes are payable semi-annually in arrears on January 27 and July 27 of each year, beginning on January 27, 2018. The proceeds from this issuance were used to refinance existing indebtedness, including mostly secured debt, and the remainder, if any, for general corporate purposes.

In addition, on February 14th, 2018, Credivalores reopened these Notes for an additional amount of US$75,000,000, bringing the total issued to US$325,000,000, taking into account the original issue. The Notes were reopened with a yield of 8.625% and a price of 104.079%. The proceeds of the reopening were used to refinance existing uncollateralized debt and the surpluses were used for the company's general purposes.

Subsequently, on January 17, 2020, CVCS launched a Tender Offer and a Consent Solicitation for all or a portion of the principal of the 144A/Reg S Notes due July 2022 and coupon of 9.75%. The repurchase offer would be contingent on the condition of a new bond issue in the international market that would allow obtaining the resources to carry out the repurchase and the request for the elimination of covenants would materialize if more than 51% of the principal of the current Notes were repurchased. The repurchase offer was launched at a price of US$1,055 per US$1,000 of principal of these Notes applicable during the Early Tender Time extending through January 31, 2020 and at a price of US$1,005 per US$1,000 principal of the Notes applicable in the final maturity period of the repurchase offer which ran through February 14, 2020. During the early participation period , US$154,035,000 of the principal of the Notes maturing in 2022 was repurchased and then in the final maturity period, an additional US$650,000 of the principal of these notes was received. The principal repurchases of the Notes maturing 2022 in the repurchase offer corresponded to 47.6% of the US325,000,000 current as of December 31, 2019.

Once the early repurchase period concluded, CVCS decided to conduct a new issuance of ordinary notes under the 144A/Reg S format in the international capital market with a maturity date on February 7th, 2025, for an amount of US300,000,000 with a coupon of 8.875% and yield of 9%. The new Notes pay interest due semi-annually on February 7 and August 7 of each year, beginning August 7, 2020. The proceeds from this issue were used to repurchase the Notes under the repurchase offer referred to above, to refinance existing debt under the ECP Program and the surplus to company's general-purpose. Once the fulfillment of this debt management operation was carried out on February 7, 2020, the new current principal of the Notes with a coupon of 9.75% and maturity in 2022 is US164,150,000.

After the repurchase operations in the secondary market carried out in 2020 and 2022, the amount of outstanding principal of the Notes with a coupon of 9.75% and maturity in 2022 was US$155,952,000, which was paid in full on July 27, 2022 to investors along with the corresponding interest.

Below are the payments of the coupons of the issuance of 144A/Reg S notes with coupon 9.75% and 8.875% and maturity in 2022 and 2025 since its issuance:

| Principal | Coupon | First Coupon Payment – 27/01/2018 | Second Coupon | Third Coupon Payment - 27/01/2019 | Fourth Coupon Payment - 27/07/2019 | Fifth Coupon Payment - 27/01/2020 |
|---|---|---|---|---|---|---|

| | | Payment - 27/07/2018 | | | | |
|---|---|---|---|---|---|---|
| 250.000.000 | 9,75% | 12.187.500 | 12.187.500 | 12.187.500 | 12.187.500 | 12.187.500 |
| 75.000.000 | 9,75% | - | 3.656.250 | 3.656.250 | 3.656.250 | 3.656.250 |
| **Total in USD** | | **12.187.500** | **15.843.750** | **15.843.750** | **15.843.750** | **15.843.750** |
| **FX Rate** | | 2.805,40 | 2.882,84 | 3.160,52 | 3.213,09 | 3.353,76 |
| **Total in Million Pesos** | | **34.190.812.500** | **45.674.996.250** | **50.074.488.750** | **50.907.394.688** | **53.136.135.000** |

| Principal | Coupon | Sixth Coupon Payment - 27/07/2020 | Seven Coupon Payment - 27/01/2021 | Eight Coupon Payment – 27/07/2021 | Nineth Coupon Payment – 27/01/2022 |
|---|---|---|---|---|---|
| 95.315.000 | 9,75% | 4.646.606 | 4.646.606 | 4.646.606 | 4.646.606 |
| 75.000.000 | 9,75% | 3.656.250 | - | - | - |
| 68.835.000 | 9,75% | - | 3.355.706 | 3.355.706 | 3.355.706 |
| **Total in USD** | | **8.302.856** | **8.002.313** | **8.002.313** | **8.002.213** |
| **FX Rate** | | 3.660,15 | 3.591,48 | 3.904,17 | 3.947,83 |
| **Total in Million Pesos** | | **30.389.698.303** | **28.740.147.093** | **31.242.390.345** | **31.591.376.548** |

| Principal | Coupon | First Coupon Payment - 07/08/2020 | Second Coupon Payment - 07/02/2021 | Third Coupon Payment - 07/08/2021 | Fourth Coupon Payment - 27/02/2022 |
|---|---|---|---|---|---|
| 268.000.000 | 8,875% | 11.892.500 | 11.892.500 | 11.892.500 | 11.892.500 |
| **Total in USD** | | **11.892.500** | **11.892.500** | **11.892.500** | **11.892.500** |
| **FX Rate** | | 3.775,95 | 3.543,28 | 3.949,33 | 3.962,68 |
| **Total in Million Pesos** | | **44.905.485.375** | **42.138.457.400** | **46.967.407.025** | **47.126.171.900** |

In accordance with the "Description of the notes" due in 2025 and "Offering memorandum", the Company may redeem the Notes, in whole or in part, at any time from February 7, 2023, at the redemption prices stipulated in the Offering Memorandum, plus any additional amounts due and accrued and unpaid interest, until the redemption date. It is also possible to redeem notes before February 7, 2023, in whole or in part, at a price equal to 100% of their principal amount plus a make-all premium, in addition to any additional amounts then due plus accrued and unpaid interests, until the redemption date.

In addition, at any time through February 7, 2023, CVCS may redeem up to 35% of the Notes using proceeds from stock sales or equity offerings at a redemption price of 108.875% of its principal amount, plus any additional amounts then due plus accrued and unpaid interest, until the redemption date. In addition, in the event of certain changes in the tax treatment of withholding tax in Colombia in connection with interest payments on the Notes, CVCS may redeem them, in full, but not in part, at a price of 100% of their principal amount, in addition to any additional amounts then due plus accrued and unpaid interest, until the redemption date. In the event of a change of control in the entity, unless the Company has elected to redeem the Notes, each holder thereof shall have the right to demand that the entity repurchase all or any part of such holder's Notes at 101% of the total principal amount of the repurchased Notes, in addition to any amounts then due plus accrued and unpaid interest, up to the date of repurchase.

Notes due 2025 will be forward-looking and unsecured obligations and (i) will have the same priority in terms of right to payment as all other existing and future debt obligations of the Company (subject to certain obligations whereby they are given preferential treatment under Colombia's insolvency laws); (ii) have a higher payment priority than the Company's existing and future subordinated debt obligations, if any; (iii) be subordinated, as to the right to payment, to all existing and future unsecured debt obligations of the Company, to the extent of the value of the assets securing such indebtedness, including any debts, liabilities and Equity; and (iv) be structurally subordinate to all existing and future payment obligations and commercial accounts payable of any of our non-guarantor subsidiaries. The notes shall not be entitled to any redemption funds.

The principal and coupons of the Notes maturing in February 2025 were hedged to pesos using cross currency swaps and call spreads at maturity of the instrument.

During April and May 2020, Credivalores carried out repurchase operations of Notes 144 A / Reg S maturing in 2025 and coupon of 8.875% in the secondary market through a broker for a total amount of US32,000,000 of principal. The entire amount repurchased from these Notes in April and May was cancelled at the end of September 2020. As a result, as of December 31, 2022, the new current number of Notes 144 A/Reg S due in 2025 and coupon of 8.875% is US$268,000,000.

**Covenants**

The Notes 144A/Reg S due 2025 prospect contains certain restrictive covenants, which among other things, limit our ability to (i) take additional debt, (ii) make dividend payments, redeem capital and make certain investments, (iii) transfer and sell assets, (iv) enter into any type of agreement that could limit the ability of subsidiaries to pay dividends or make capital distributions, (v) create collateral or pledge assets, (vi) consolidate, merge or sell assets and (vii) transact with affiliates. The "Indenture" contract governing the Notes contains traditional default events.

At the end of December 2022, there was an incompliance in the financial covenants related to Notes 144 A / Reg S maturing in 2025, however, they are expected to be corrected during the first half of 2023.

**(a)    Free-standing Trust Credivalores O'Connor y Gramercy**

On May 13, 2022, Credivalores signed a new credit line committed for US$100 million with two international funds (O'Connor UBS and Gramercy), structured through a trust, which will be backed by the credit card product portfolio as credit collateral. The line has a term of 36 months with an availability period of 12 months from its signature and amortization of capital from month 24 from signature, to achieve an average life of the facility of around 2.54 years. Each of the disbursements of this credit will be covered in Colombian pesos through operations with derivative financial instruments at maturity. At the end of December 2022, US$87,713,627 million of this facility had been disbursed, which were covered in Colombian pesos through derivative financial instruments.

All the resources obtained through this loan will be used to meet the maturity of the bonds in dollars with a coupon of 9.75% in July 2022.

- **IFP Financial Cost**

The funds received from loans acquired from financial institutions are used for portfolio origination and to handle various lines of working capital, which helps to maintain a degree of liquidity for the Company. The loans are represented by promissory notes wherein both parties establish the payment conditions, including maximum amount, amount, interest rate and duration. The financial cost of financial obligations for the periods ended December 31, 2022, and December 31, 2021:

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Free-standing trusts | 82.431 | 20.318 |
| Local banks | 8.901 | 5.387 |
| Finance Leasing | 27.048 | 23.443 |
| Foreign currency obligation | 189.681 | (1.432) |
| Financial cost Derivatives | 144.315 | 157.554 |
| Issuance of bonds | 6.670 | 1.608 |
| Amortization Transaction costs | 31.875 | 28.307 |
| Interest for liabilities for lease and finance lease agreements | 348 | 574 |
| **Total** | **491.269** | **235.759** |

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Difference instead | 121.755 | (996) |
| **Total** | **121.755** | **(996)** |

The financial obligations and Free-standing Trusts of Credivalores that are recognized in local and foreign currencies will be recognized at the beginning of the transaction at their amortized value, net of costs incurred in the transaction which are attributable at the time of issuance. The difference between funds received (net of transaction costs) and the redemption value is recognized in the Income Statement for the corresponding period, using the effective interest method.

**NOTE 19. EMPLOYEE BENEFITS**

Under Colombian labor law and based on labor conventions employees are entitled to short-term benefits such as: wages, holidays, statutory bonuses, severance payment, and interest on severance pay.

Below is a breakdown of employee benefit payments as of December 31, 2022, and December 31, 2021:

|  | December 31, | |
|---|---|---|
|  | **2022** | **2021** |
| Interest on severance pay | 40 | 42 |
| Severance pays | 354 | 367 |
| Holidays | 659 | 586 |

The current component of employee benefits must be paid within the twelve months following the reporting period.

The company within its compensation policies has no post-employment benefits.

**NOTE 20. OTHER PROVISIONS**

Credivalores provisions as of December 31, 2022, and December 31, 2021, respectively are provided below.

|  | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Litigations subject to executive proceedings | 801 | 705 |
| Other provisions (a) | 2.227 | 213 |
|  | **3.028** | **918** |

a) The third-party balance of other provisions is detailed below:

|  | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Axesnet S. A. S. | - | 29 |
| Sertisoft S. A. S. | - | 12 |
| Bancolombia | - | 1 |
| Emergia customer care colombia S. A. S. | - | 171 |
| Rangel Chema Clemencia del Carmen | 1 | - |
| Colombiana de comercio S. A. | 2 | - |
| Pwc contadores y auditors | 32 | - |
| Recuperadora y normalizadora integral | 106 | - |
| Experian colombia sa | 146 | - |
| Econtact col S. A. S. | 192 | - |
| Americas business process services S. A. | 260 | - |
| Atento colombia S. A. | 276 | - |
| Activar valores S. A. S. | 1.213 | - |
|  | **2.227** | **213** |

The movement of legal and other provisions are provided below for the periods ended December 31, 2022, and December 31, 2021:

|  | Legal provisions | Other provisions | Total Provisions |
|---|---|---|---|
| **Balance held on December 31, 2021** | **705** | **213** | **918** |
| Increase in provisions during the period | 96 | 2.013 | 2.109 |
| Utilization | - | - | - |
| **Balance held on December 31, 2022** | **801** | **2.226** | **3.027** |

|  | Legal provisions | Other provisions | Total provisions |
|---|---|---|---|
| **Balance held as of December 31, 2020** | **199** | **7.171** | **7.370** |
| Recovered provisions | 506 | (6.957) | (6.452) |
| **Balance held as of December 31, 2021** | **705** | **213** | **918** |
| Recovered provisions | 96 | 2.013 | 2.109 |

| | | | |
|---|---|---|---|
| **Balance held as of December 31, 2022** | **801** | **2.226** | **3.027** |

Provisions correspond mainly to labor, civil and administrative processes filed by third parties against Credivalores, on which provisions were recognized as of December 31, 2022, in an amount of 801 and 2021, 705 it is not possible to determine a disbursement schedule for these provisions due to the diversity of processes in different instances. However, Credivalores does not expect significant changes to the amount provisions because of the outflows applicable to each proceeding. The expected time of resolution is uncertain since each proceeding is taking place in different instances.

**NOTE 21. ACCOUNTS PAYABLE**

Below, we detail the balance of accounts payable has Credivalores December 31, 2022, and December 31, 2021, respectively:

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Leases | 3 | 2 |
| Suppliers | 25 | 23 |
| Commission and fees | 523 | 5.204 |
| Withholdings and labor contributions | 1.013 | 1.282 |
| Other accounts payable (21.2) | 32.946 | 27.612 |
| Costs and expenses payable (21.1) | 17.350 | 44.943 |
| | **51.860** | **79.065** |

**21.1 Costs and expenses payable**

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Services | 177 | 2.153 |
| Others (21.1.1) | 17.173 | 42.787 |
| Financial expenses | - | 3 |
| | **17.350** | **44.943** |

**21.1.1 Other**

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Technical service providers | 11.135 | 7.763 |
| Call option premiums | 3.050 | 34.941 |
| Fiduciary services | 2.980 | 83 |
| Representation and public relations expenses | 8 | - |
| | **17.173** | **42.787** |

**21.2 Other accounts payable**

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Third party administrative payments | - | 49 |
| MC Pending collection to apply | 9 | - |
| Visa C1 disbursement agreement | 17 | - |
| Crediuno Disbursements | 46 | 158 |
| Against Visa vrol positions | 116 | 4 |
| Different | 122 | 232 |
| TIGO Withdrawal | 1.440 | 1.184 |
| Account payable free-standing trusts | 1.596 | 2.263 |
| Credipoliza Withdrawals | 1.644 | 1.979 |
| Payroll Loan Disbursement CDS | 2.223 | 4.584 |
| Crediuno Refunds | 2.855 | 2.378 |
| Collection in favor of third parties | 9.408 | 4.932 |
| Payroll Loan CDS Refund | 13.470 | 9.849 |
| | **32.946** | **27.612** |

**NOTE 22. CURRENT AND DEFERRED TAX LIABILITIES**

**22.1 Components of current tax asset:**

Current tax assets for the years ended December 31, 2022, and December 31, 2021 is as follows:

|  | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Income tax advance | 32.000 | 22.224 |
| Industry and Commerce Tax | 12 | 21 |
| **Total current tax assets** | **32.012** | **22.245** |

**22.2 Components of current tax liabilities**

Current tax liabilities for the years ended December 31, 2022, and December 31, 2021 is as follows:

|  | December 31, | |
|---|---|---|
|  | **2022** | **2021** |
| Industry and Commerce Tax | 1.322 | 1.812 |
| VAT | 376 | 157 |
|  | **1.698** | **1.969** |

**22.3 Components of income tax expense**

Income tax expense for the years ended December 31, 2022, and December 31, 2021 is as follows:

|  | December 31, | |
|---|---|---|
|  | **2022** | **2021** |
| Income Tax | - | - |
| **Subtotal - taxes from the current period** | **-** | **-** |
| Net deferred tax from the period | (107.545) | 324 |

In accordance with the IAS 12, current and deferred taxes are recognized as income or expense in the income statement, except to the extent that they arise from a transaction or event recognized outside profit or loss in other comprehensive income (OCI), in equity. Therefore, in the periods ended December 31, 2022, and December 31, 2021, other comprehensive income was recognized in equity.

**22.4 Reconciliation of the nominal income tax rate and the effective tax rate in Colombia:**

The tax provisions in force in Colombia for income and ancillary taxes applicable in 2022 and 2021, respectively, among others, are as follows:

- With the Social Investment Law, enacted on September 14, law 2155 of 2021; which establish the income tax was increased by 35% beginning on 2022. In this way, the gradual reduction of the tariff, which is contemplated in art. 240 of the Tax Statute.

- The income tax rate for the year 2021 was 31%, law 2010 of 2019.

- Excess presumptive income can be offset in the following 5 fiscal periods and tax losses may be offset with ordinary net income obtained in the following 12 fiscal periods.

- In accordance with article 188 of the National Tax Statute, as of fiscal year 2021, the percentage of presumptive income is zero (0%) of the liquid assets of the last day of the immediately preceding taxable year.

- As of the fiscal year 2022, 100% of the industry and commerce tax and notices and boards cannot be taken as a tax discount on income tax, that is, it continues to apply the discount of 50% of the industry and commerce tax actually paid.

- With Law 2277 of December 13, 2022, a tax reform was adopted, this provision introduces some modifications in terms of income tax, however, for the general income rate it is maintained at 35% for national companies and their assimilated, permanent establishments of foreign entities and foreign legal entities with or without residence in the country obliged to file the annual tax return on the Rent and complementary.

- A minimum tax is established for residents in Colombia, setting an additional tax in case the adjusted income tax with some adjustments is less than 15% of the accounting profit before taxes with certain adjustments. Thus, taxpayers must: - Determine the clear tax account of the Colombian taxpayer, or the group´s clear tax account in case it is part of a business group.

- Determine the clear profit of the Colombian taxpayer or group as a part of a business group, and, -Determine the adjusted tax rate of Colombian taxpayer or group as a part of a business group. If the effective rate (Deputy/purified profit tax) is less than 15%, the tax to be added by the taxpayer or group must be calculated in case it is part of a business group.

- Continues as a deductible 100% of taxes, fees and contributions actually paid in the taxable year, which are causally related to the generation of income (except income tax); 50% of the tax on financial movements (GMF) will be deductible, regardless of whether or not it has a causal relationship with the income-generating activity.

The Company performed the conciliation of the effective rate in accordance with IAS 12, the following is the detail between the total Company's income tax expense calculated at the current tax rates and the tax expense (income) recorded in the results of the period for the year 2022 with a rate of 26% and for 2021 of 5%, as detailed below:

| | 2022 | 2021 |
|---|---|---|
| Earnings (loss) before tax | (410.004) | 6.261 |
| **Income Tax rate** | **35%** | **31%** |
| Income Tax | (143.501) | 1.941 |
| **More (less) tax impact on:** | | |
| Non-deductible expense | 7.471 | 5.269 |
| Exchange rate differences | 28.462 | (6.907) |
| Non-deductible tax | 3 | 10 |
| Presumptive interest | 20 | 11 |
| **Total income tax provisions charged to income** | **(107.545)** | **324** |
| **Effective rate** | **26%** | **5%** |

**22.5 Deferred Tax**

Differences between the book value of assets and liabilities and their tax bases result in temporary differences in deferred, calculated and recorded taxes in the periods ended December 31, 2022, and December 31, 2021, based on the tax rates in force for the years in which such temporary differences will be reversed.

In the determination of the calculation will be made with the rate of 35% of income tax and complementary, according to the measurement of expenses for deferred tax, taking into account Decree 1311 of 2021 the difference in the equity is recognized the value of the deferred tax derived from the change of the rate corresponding to 5%, only this effect for the taxable year 2021.

| | December 31, | |
|---|---|---|
| | **2022** | **2021** |
| Assets deferred taxes | 162.450 | 53.324 |
| Liabilities deferred taxes | (4.714) | (9.915) |
| **Deferred taxes assets (liabilities), net** | **157.736** | **43.409** |

The net movement of deferred taxes during the period is as follows:

| | December 31, | |
|---|---|---|
| | **2022** | **2021** |
| Balances as of January 1 | **43.409** | **5.961** |
| Charge (credit) to the statement of results | 107.544 | (324) |
| Charge (credit) to the other comprehensive results | 6.783 | 34.413 |
| Position (credit) to utilities the accumulated surplus | - | 3.359 |
| **Balance as of December 31** | **157.736** | **43.409** |

(Stated in million of Colombian pesos)

The movements of deferred taxes assets and liabilities during the period, without regard to the compensation of balances referred to the same tax authority, have been as follows:

| | Portfolio Provision | IFRS 9 Adoption | IFRS 16 Adoption | Depreciation Fixed Assets | Provision Expenses | Valuation of Financial Instruments | Financial Instruments | Tax Loss | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Deferred taxes assets** | | | | | | | | | |
| Balance as of January 1, 2021 | 13.839 | 14.117 | 127 | 245 | 33 | - | - | - | 28.361 |
| Charge (credit) to income statement | (1.561) | - | 15 | (58) | 30 | - | 95 | 1.409 | (70) |
| Charge (credit) to other comprehensive results | - | - | - | - | - | 20.318 | - | - | 20.318 |
| Charge (credit) to utilities or accumulated surpluses | 2.047 | 2.352 | 24 | 31 | 11 | - | 16 | 234 | 4.715 |
| **Balance as of December 31, 2021** | **14.325** | **16.469** | **166** | **218** | **74** | **20.318** | **111** | **1.643** | **53.324** |
| Charge (credit) to income statement | (9.884) | | (111) | (83) | 138 | | (111) | 112.394 | 102.343 |
| Charge (credit) to other comprehensive results | - | - | - | - | - | 6.783 | - | - | 6.783 |
| Charge (credit) to utilities or accumulated surpluses | - | - | - | - | - | - | - | - | - |
| **Balance as of December 31, 2022** | **4.441** | **16.469** | **55** | **135** | **212** | **27.101** | **-** | **114.037** | **162.450** |

| | Valuation of Financial Instruments | Intangibles | Impairment Financial Instruments | Shares | Available in Foreign Currency | Total |
|---|---|---|---|---|---|---|
| **Deferred taxes liabilities** | | | | | | |
| Balance as of January 1, 2021 | 14.062 | 1.859 | 6.205 | 274 | - | 22.400 |
| Charge (credit) to income statement | | 750 | (1.199) | 175 | 529 | 255 |
| Charge (credit) to other comprehensive results | (14.062) | - | - | (34) | - | (14.096) |
| Charge (credit) to utilities or accumulated surpluses | - | 435 | 833 | | 88 | 1.356 |
| Balance as of December 31, 2021 | - | 3.044 | 5.839 | 415 | 617 | 9.915 |
| Charge (credit) to income statement | | 837 | (5.706) | 259 | (591) | (5.202) |
| Charge (credit) to other comprehensive results | - | - | - | - | - | - |
| Charge (credit) to utilities or accumulated surpluses | - | - | - | - | - | - |
| **Balance as of December 31, 2022** | **-** | **3.881** | **133** | **674** | **26** | **4.714** |

(Stated in million of Colombian pesos)

Deferred tax assets outstanding assets are recognized to the extent that the corresponding tax benefit is likely to be made through future tax benefits. The Company has recognized all deferred tax assets and liabilities.

**22.6 Effect of current and deferred taxes in each component of other comprehensive income in equity:**

The effects of current and deferred taxes in each component of other comprehensive income in equity are as follows:

| | December 2022 | | | December 2021 | | |
|---|---|---|---|---|---|---|
| | Amount before tax | Deferred tax income (expense) | Net | Amount before tax | Deferred tax income (expense) | Net |
| **Items that may be subsequently reclassified to income** | | | | | | |
| Effect of changes in fair value on the valuation of derivative financial instruments | (19.379) | 6.782 | (12.597) | (104.924) | 34.380 | (70.544) |
| Shares | - | - | - | (344) | 34 | (310) |
| | **(19.379)** | **6.782** | **(12.597)** | **(105.268)** | **34.414** | **(70.854)** |

**22.7 Tax uncertainties**

Income tax and supplementary returns that are open for review by the Tax Authorities are as follows:

| Period | Declaration | Date presentation | Amount | Observations |
|---|---|---|---|---|
| 2019 | Rent | | | No oversight by the DIAN. |
| 2020 | Rent | | | No oversight by the DIAN . |
| 2021 | Rent | | | No oversight by the DIAN . |

Of the above statements, the Tax Authority has not initiated review processes for the taxable years 2019, 2020 and 2021.

No comments and/or adjustments are expected from the process of reviewing income tax and supplementary returns by the tax authorities.

**Performing deferred taxes assets**

In future periods, it is expected to continue generating taxable net income against which to recover the values recognized as deferred taxes assets. Estimation of future fiscal results is based primarily on tax projections.

**22.8    Annual Statement of Assets Held Abroad**

Law 1739 of 2014 created an annual declaration of assets held abroad to be submitted by all those paying Income and Ancillary Taxes who are **obliged** to pay tax on (i) their global income; (ii) their equity held both at home and abroad; and (iii) assets held abroad.

The information required in order to identify the taxpayer as stipulated by the corresponding tax regulations is as follows:

✓    Discrimination of assets held by the Company abroad on January 1, the value of which shall exceed 3,580 TVA (Tax Value Units), the value of the taxpayer's equity, the jurisdiction in which the assets are located and the nature and type of asset.

✓    Discrimination of assets held by the Company abroad at January 1, the value of which shall not exceed 3,580 TVA (Tax Value Units) in order to declare these in their aggregate along with the jurisdiction in which the assets are located and the nature and type of asset.

**NOTE 23. OTHER LIABILITIES**

Below the detail of other liabilities:

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Credit card guarantee | - | 912 |
| Commission commercial force | 7 | 16 |
| Checks pending collection | 18 | 754 |
| Collection to be applied SG | 103 | - |
| Collections of managed loan portfolios | 5.963 | 6.973 |
| Collections pending application | 13.251 | 18.243 |
| Values received for third parties (23.1) | 20.715 | 15.102 |
| | **40.057** | **42.000** |

**23.1 Values received for third parties**

Below the detail of other Values received for third parties

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Retailers collections | - | 22 |
| Voluntary and mandatory insurance collections | 499 | 2.584 |
| FGA guarantees' collections | 3.327 | 12.496 |
| Free-standing trusts collections | 16.889 | - |
| | **20.715** | **15.102** |

**NOTE 24. EQUITY**

**Capital**

Credivalores objective is to safeguard its capacity to continue as a business enterprise and maintain a financial structure that optimizes the cost of capital and maximizes returns for shareholders. The Company's capital structure encompasses and includes the subscribed capital, retained earnings and reserves.

Capital management objectives are met by managing the portfolio as authorized by law and maintaining a consistent pace of generating profits from its structural revenue (portfolio interests and returns on investments) which results in institutional strengthening and provides the Company an opportunity to maintain its dividend distribution policy among its shareholders.

For the reporting periods, Credivalores indeed complied with the required minimum capital in the relation of solvency required by legal provisions and mandatory investments.

**Authorized, and Paid in Capital**

As of December 31, 2022, and December 31, 2021 Credivalores authorized and paid in capital is **135.194** represented in **4.784.954** shares, each of a nominal value of 28.254; respectively.

**Credivalores-Crediservicios S.A.**

| Shareholder | December 31, 2022 Number of shares | % | December 31, 2021 Number of shares | % |
|---|---|---|---|---|
| Acon Consumer Finance Holdings S de RL | 954.197 | 19.94% | 954.197 | 19.94% |
| Crediholding S.A.S. | 1.642.120 | 34.32% | 1.642.120 | 34.32% |
| Lacrot Inversiones 2014 SLU | 1.747.109 | 36.51% | 1.747.109 | 36.51% |
| Acon Consumer Finance Holdings II S L | 201.887 | 4.22% | 201.887 | 4.22% |
| Direcciones de Negocio S.A.S. | 1 | 0.00% | 1 | 0.00% |
| Treasury shares | 239.640 | 5.01% | 239.640 | 5.01% |
| **Total** | **4.784.954** | **100%** | **4.784.954** | **100%** |

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Number of authorized shares | 6.469.661 | 6.469.661 |
| Subscribed and paid shares | 4.784.954 | 4.784.954 |
| Nominal value | 28.254 | 28.254 |
| Subscribed and paid capital (nominal value) | 135.194 | 135.194 |
| Paid-in capital | 71.170 | 71.170 |
| **Total capital plus premium** | **206.364** | **206.364** |

According to minutes 64 held on December 13, 2021, capitalization is made by 196,654 shares for a total value of $61,021 per share, of which $28,254 corresponds to the nominal value and $32,767 to the premium in placement of shares.

The following is a breakdown of the basic earnings per share:

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Ordinary shares (a) | 2.278.169 | 2.278.169 |
| Preferred shares (a) | 2.506.785 | 2.506.785 |
| Repurchased treasury shares | 239.640 | 239.640 |
| **Total earnings per share** | **(63.211)** | **1.241** |

    (a)  The value of the shares as of December 31, 2022, and December 2020 correspond to the total number of outstanding shares held by Credivalores, 4.784.954.

As per the Company´s bylaws, both common and preferred stock have the same decision power and rights, and the preference of those shares is given by its hierarchy in the payment of dividends when declared by the Assembly and by the preferred right in the reimbursement in case of liquidation.

**December 31, 2022**

| Share capital | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Name of Entity** | **Preference shares A** | **Preference shares B** | **Preference shares C** | **Treasury Shares** | **Common Shares** | **Total** | **%** |
| Acon Consumer Finance Holdings S de R.L. | 835.834 | - | - | - | 77.079 | 954.197 | 19.94% |
| Crediholding S.A.S | - | - | - | - | 1.571.073 | 1.642.120 | 34.32% |
| Lacrot Inversiones 2014 S.L.U. | - | 923.665 | 563.119 | - | 184.736 | 1.747.109 | 36.51% |
| Treasury Shares | - | - | - | 239.640 | - | 239.640 | 5.01% |
| Acon Consumer Finance Holdings II, S.L. | - | 184.167 | - | - | 8.986 | 201.887 | 4.22% |
| Direcciones de Negocio S.A.S. | | | | | 1 | 1 | 0.00% |
| **Total** | **835.834** | **1.107.832** | **563.119** | **239.640** | **1.841.875** | **4.784.954** | **100.00%** |

**December 31, 2021**

| Share capital | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Name of Entity** | **Preference shares A** | **Preference shares B** | **Preference shares C** | **Treasury Shares** | **Common Shares** | **Total** | **%** |
| Acon Consumer Finance Holdings S de R.L. | 835.834 | - | - | - | 77.079 | 954.197 | 19.94% |
| Crediholding S.A.S | - | - | - | - | 1.571.073 | 1.642.120 | 34.32% |
| Lacrot Inversiones 2014 S.L.U. | - | 923.665 | 563.119 | - | 184.736 | 1.747.109 | 36.51% |
| Treasury Shares | - | - | - | 239.640 | - | 239.640 | 5.01% |
| Acon Consumer Finance Holdings II, S.L. | - | 184.167 | - | - | 8.986 | 201.887 | 4.22% |
| Direcciones de Negocio S.A.S. | | | | | 1 | 1 | 0.00% |
| **Total** | **835.834** | **1.107.832** | **563.119** | **239.640** | **1.841.875** | **4.784.954** | **100.00%** |

**Treasury shares**

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Treasury Shares Reserve | 12.837 | 12.837 |
| (Treasury Shares) | (12.837) | (12.837) |

| | | |
|---|---|---|
| **Total** | - | - |

The CVCS General Shareholders' Meeting on April 2 of 2014, decided to establish a special reserve in the amount of 12,837 for the reacquisition of 239,640 shares. This reserve is in accordance with Articles 396 and 417 of the Commercial Code.

**Reserves**

Equity reserves as of December 31, 2022, and December 31, 2021 were comprised of the following:

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Legal reserve | 11.017 | 11.017 |
| Reserve to repurchased treasury shares | 12.837 | 12.837 |
| Occasional reserves | 21 | 21 |
| **Total Reserves** | **23.875** | **23.875** |

**Legal reserve**

The Company is obliged to appropriate as a legal reserve 10% of its annual net profits, until the balance of the reserve is equivalent to 50% of the subscribed capital. The reserve is not distributable prior to the liquidation of the Company but may be used to absorb or reduce losses. Appropriations made more than the 50% are freely available by the general assembly.

In accordance with the decision taken at the general assembly, held on April 20, 2021, it was decreed that the profits of the year 2020 will be used to increase the reserve by $5,224.

**Other reservations**

The other appropriate reserves directly from the accumulated profits can be considered as reserves of free availability by the General Meeting of Shareholders.

**NOTE 25. OTHER COMPREHENSIVE INCOME (OCI)**

We present the detail below:

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| **Tax** | 27.004 | 20.223 |
| Income tax OCI | **27.004** | **20.223** |
| | | |
| **Other comprehensive income** | **(76.475)** | **(57.097)** |
| Shares | 955 | 955 |
| **Financial instruments** | **(77.430)** | **(58.052)** |
| Financial instruments Forward | (161) | (461) |
| Financial instruments Cross Currency Swap | - | 18.902 |
| Financial instruments Options | (60.195) | (81.386) |
| Financial instruments Coupon Only swap | (17.074) | 4.893 |
| **Total** | **(49.471)** | **(36.874)** |

**NOTE 26. REVENUE**

Below, is a detail of revenue for the three and nine-months ended December 31, 2022, and 2021:

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Interests | 286.838 | 321.286 |
| Interest expense | (72) | (112) |
| **Subtotal Interests (26.1)** | **286.766** | **321.174** |
| Revenue from customer contracts (26.2) | 113.128 | 115.452 |
| | **399.894** | **436.626** |

**26.1 Interest**

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| CrediUno interest | 74.894 | 107.929 |
| CrediPóliza interest | 24 | 1.576 |
| TuCrédito loan interest | 26.407 | 43.709 |
| Tigo loan interest | 6.446 | 10.803 |
| SG Free-standing Trusts loan interest | 343 | - |
| TuCrédito transaction costs | (39.715) | (21.926) |
| CrediPóliza transaction costs | (4) | (83) |
| CrediUno transaction costs | (13.794) | (12.096) |
| Fair value TuCrédito | (16.302) | (3.332) |
| **Sub-total Consumer loans** | **38.299** | **126.580** |
| CrediPóliza late payment interest | 153 | 355 |
| TuCrédito late payment interest | 1.307 | 1.293 |
| SG Free-standing Trusts late payment interest | 139 | - |
| **Consumer loan defaults** | **1.599** | **1.648** |
| Joint operation interest | 1.386 | - |
| **Subtotal Joint operation interest** | **1.386** | **-** |
| Financial returns | 4.432 | 3.691 |
| BTG Pactual Financial returns | 9.831 | 22.993 |
| Current interests, Free-standing Trust | 124.501 | 53.002 |
| Income from FGA Alliance | 14.520 | 33.170 |
| Other income, Free-standing Trust | 5.044 | 360 |
| Current interests left off-balance | 61.232 | 21.732 |
| Premium for portfolio sale | 25.922 | 57.998 |
| Sub-total Other | **245.482** | **192.946** |
| **Total Interests** | **286.766** | **321.174** |

**26.2 Revenue from customer contracts**

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Department store income and credit card channels income | - | 2 |
| Internal commission | 195 | 377 |
| Returned commission | 287 | 286 |
| Administration fee - life insurance plus | 1.889 | 2.048 |
| Shared financial consultancy fees | 2.381 | 1.667 |
| Financial Consultancy – Returns from Debtor life insurance | 4.236 | 4.122 |
| Brokerage Commission | 8.208 | 7.813 |
| Financial Consultancy- Returns Voluntary insurance policies | 11.523 | 1.497 |
| Collection fees | 18.995 | 14.289 |
| Administration fee – credit card | 65.414 | 83.351 |
| | **113.128** | **115.452** |

**NOTE 27. OTHER INCOME**

At the end of each period, movements corresponded to:

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Recoveries from Loan portfolio | 1.461 | 649 |
| Recoveries from previous exercises | 593 | 223 |
| Sickness Leave | 54 | 10 |
| Other | 13 | 23 |
| Tax refund | 1 | 5 |
| Other income recoveries | - | 19 |
| Refund insurance | - | 11 |
| | **2.122** | **940** |

## NOTE 28. OTHER EXPENSES

At the end of each period, movements corresponded to:

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Fees | 27.524 | 27.223 |
| Tax | 16.919 | 12.194 |
| Electronic data processing | 9.884 | 10.149 |
| Commissions | 7.978 | 3.269 |
| Technical assistance | 4.049 | 4.990 |
| Yields Invertors | 4.018 | 3.158 |
| Public services | 3.959 | 3.645 |
| Leases | 2.840 | 2.424 |
| Other | 2.483 | 3.529 |
| Transport | 2.279 | 2.159 |
| Publicity and advertising | 1.918 | 1.215 |
| Janitorial and Security services | 904 | 839 |
| Fines, penalties and awards | 815 | 659 |
| Insurance | 763 | 1.466 |
| Check risk central | 552 | 803 |
| Office supplies | 495 | 402 |
| maintenance and repairs | 480 | 1.148 |
| Travel expenses | 434 | 180 |
| Cost of representation | 271 | 112 |
| Legal expense | 158 | 241 |
| Temporary Services | 82 | 161 |
| Adaptation and installation | 70 | 17 |
| Publicity and advertising | 4 | 6 |
| Donations | - | 15 |
| | 88.880 | 80.004 |

## NOTE 29. NET FINANCIAL INCOME

Below is the detail of financial (net) costs, for the periods for three and nine months ended December 31, 2022, and 2021:

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Financial performances (29.1) | 7.566 | 937 |
| Financial income (29.2) | 2.122 | 940 |
| **Total Financial Income** | **9.688** | **1.877** |
| | | |
| Forwards valuation (29.3) | (9) | (44) |
| **Total Financial Expense** | **(9)** | **(44)** |
| **Net Financial Income (expense)** | **9.679** | **1.833** |

29.1 Corresponds to the returns generated by investments in financial institutions in which Credivalores has invested its resources.
29.2 Mainly corresponds to recovery of expenses of previous years and recovery of punished portfolio.
29.3 Corresponds to the valuation of fixed-rate investments at fair value.

## NOTE 30. CONTINGENT ASSETS AND CONTINGENT LIABILITIES

**a. Commitments**

**Credit commitments**

During ordinary business, Credivalores provides loan portfolio as guarantees to its funding sources, in which it irrevocably agrees to pay them in the event the client is unable to meet its obligations, with the same credit risk for loan portfolios.

Loan extension commitments represent unused portions of authorizations to extend credits as loans. With regard to the credit risk on commitments to extend lines of credit, Credivalores is potentially exposed to losses in an amount equal to the total

unused commitments, if the unused amount were to be withdrawn in its totality; However, the amount of the loss is less than the total amount of the unused commitments because the majority of loan extension commitments are contingent once the client can maintain specific credit rating standards. Credivalores monitors the maturity dates of those credit limit commitments because long-term commitments have a higher credit risk than short-term commitments.

The following is a breakdown of unused lines of credit commitments and guarantees on December 31, 2022 and December 31, 2021:

|  | December 31, 2022 | December 31, 2021 |
|---|---|---|
| Unpaid approved credits | 530.529 | 291.322 |

## NOTE 31. RELATED PARTIES

The Company's Board of Directors and Senior Management, in their role as governing bodies, are fully aware of the responsibility related to managing the various risks to which the Company is exposed; likewise, they are fully aware of the Company's processes and business structure so as to be able to provide support and adequate monitoring and follow-up.

The Company's related parties are as follows:

1. Shareholders with interests, a controlling stake or a joint stake of the Company, or significant influence over Credivalores.
2. Members of the Board of Directors: Members of the Board of Directors (principals and alternates, along with their related parts).
3. Key management personnel include the Company CEO and other C-level Officers, who are those who participate in the planning, direction and control of the Company.
4. Affiliates: Companies in which Credivalores has significant influence, which is generally considered to be a share between 30% and 50% of their capital.

The most representative balances as of December 31, 2022, and December 31, 2021 with related parties are included in the following charts, with headings for definitions of the related parties recorded in the previous sections.

|  | Members of the Board of Directors (a) December 2022 | Members of the Board of Directors (a) December 2021 |
|---|---|---|
| Accounts payable | 112 | 39 |
| Operating expenses | 206 | 202 |

|  | December 2022 | | December 2021 | |
|---|---|---|---|---|
|  | Accounts receivable | Accounts Payable | Accounts receivable | Accounts Payable |
| **Shareholders** |  |  |  |  |
| Lacrot Inversiones 2014 S.L.U. | - | 57 | - | 57 |
| Crediholding S. A. S. | 1.815 | - | 1.815 | - |
| **Accounts Receivable and Other Transactions** |  |  |  |  |
| Ingenio la Cabaña S. A. | 2.393 | - | - | - |
| Inversiones Mad Capital S. A. | 9.736 | - | 9.001 | - |
| Finanza Inversiones S. A. S. | - | 2.325 | 71.890 | - |
| Banco Credifinanciera | 497 | 6.825 | 11.436 | 6.942 |
| Asficrédito | 70.569 | - | 73.546 | - |
| **Stock Investments** |  |  |  |  |
| Agrocañas | 4.710 | - | 4.710 | - |
| Inverefectivas S. | 14.945 | - | 14.945 | - |
| **Total** | **104.665** | **9.208** | **187.343** | **6.999** |

Compensation received by key management personnel is comprised of the following:

|  | December 31, | |
| --- | --- | --- |
| **Item** | **2022** | **2021** |
| Salaries | 3.798 | 3.507 |
| Short-term employee benefits | 344 | 222 |
| **Total** | **4.142** | **3.729** |

a.   Members of the Board of Directors (principals and alternates, along with their related parts) as of December 31, 2022:

**Directors**

| No. | Director | Alternate |
| --- | --- | --- |
| 1 | Jose Miguel Knoell Ferrada | Cristiano Mathias Boccia |
| 2 | Maria Patricia Moreno Moyano | Liliana Arango Salazar |
| 3 | Vacant | Marcelo Jimenez |
| 4 | Rony Doron Seinjet | Vacant |
| 5 | Vacant | Vacant |
| 6 | Gustavo Adrián Ferraro | Carlos Manuel Ramon |
| 7 | Juan Camilo Ocampo | Vacant |

**Legal Representatives**

| No. | Representative |
| --- | --- |
| Manager | Eliana Andrea Erazo Restrepo |
| Alternate | Liliana Arango Salazar |

### 32.  SUBJECT MATTER THAT QUALIFIES INTERNAL CONTROL

In accordance with the company´s statutes , the audit committee must be held quarterly and due to the resignation of two (2) members of this, it was not carried out in the last quarter of the year of 2022.

The administration will constantly maintain offers to interest parties to reduce times in case of unexpected resignations and to fill the vacancies in less time.

### 33.  SUBSEQUENT EVENTS

At the date of approval of the report, there are no known economic situations or events that may affect the figures and information presented here.

***Credivalores Crediservicios S. A.***
*Financial Statements*

*For the periods ended December 31, 2020 and 2019*

**Report of the Auditor on the financial statements**

To the Members of the Shareholders' Assembly of
Credivalores Crediservicios S. A.

**Opinion**

I have audited the attached financial statements of Credivalores Crediservicios S.A., which include the statement of financial position as of December 31, 2020 and the statements of income, comprehensive income, changes in equity and cash flows for the year ended that date, and the notes to the financial statements that include a summary of significant accounting policies.

In my opinion, the accompanying financial statements, faithfully taken from the books, present fairly, in all material respects, the financial position of Credivalores Crediservicios S.A. as of December 31, 2020 and the results of its operations and its cash flows for the year ended on that date, in accordance with the Accounting and Financial Reporting Standards Accepted in Colombia.

**Basis for the opinion**

I carried out my audit in accordance with the Financial Information Auditing Standards Accepted in Colombia. My responsibilities under those standards are described below in the Responsibilities of the Auditor in relation to the audit of the financial statements section of this report.

I am independent of Credivalores Crediservicios S.A. in accordance with the Code of Ethics for Professional Accountants of the International Ethics Standards Board for Accountants (IESBA) together with the ethical requirements that are applicable to my audit of the financial statements in Colombia and have complied the other ethical responsibilities in accordance with these requirements and with the IESBA Code of Ethics.

I believe that the audit evidence I obtained is sufficient and appropriate to provide a basis for my audit opinion.

**Responsibilities of the administration and those in charge of managing the Entity regarding the financial statements**

Management is responsible for the adequate preparation and fair presentation of the attached financial statements, in accordance with the Accounting and Financial Reporting Standards Accepted in Colombia, and for the internal control that management considers necessary for the preparation of these financial statements. is free from material misstatement due to fraud or error.

In preparing the financial statements, management is responsible for evaluating the Entity's ability to continue as a going concern, disclosing, as appropriate, matters related to the going concern basis and using the going concern basis of accounting. ongoing, unless the administration intends to liquidate the Entity or cease its operations, or there is no other more realistic alternative to doing so.

Those in charge of managing the Entity are responsible for supervising the Entity's financial information reporting process.

**Responsibilities of the Auditor in relation to the audit of the financial statements**

My objective is to obtain reasonable assurance about whether the financial statements as a whole are free of material misstatement, whether due to fraud or error, and to issue an audit report containing my opinion. Reasonable assurance is a high degree of assurance, but it does not guarantee that an audit conducted in accordance with the Financial Reporting Auditing Standards Accepted in Colombia will always detect a material error when it exists. Misstatements may arise from fraud or error and are considered material if, individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users made on the basis of the financial statements.

As part of an audit in accordance with the Financial Reporting Auditing Standards Accepted in Colombia, I apply my professional judgment and maintain an attitude of professional skepticism throughout the audit. Also:

- I identify and assess the risks of material misstatement in the financial statements, due to fraud or error; I design and apply audit procedures to respond to said risks; and obtain sufficient appropriate audit evidence to provide a basis for my opinion. The risk of not detecting a material misstatement due to fraud is higher than that of a material misstatement due to error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control.

- I obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances.

- I evaluate the suitability of the accounting policies applied and the reasonableness of the accounting estimates and the corresponding disclosures made by management.

- Conclude on the appropriateness of management's use of the going concern accounting principle and, based on the audit evidence obtained, conclude on whether or not a material uncertainty exists related to events or conditions that may cast significant doubt on the the Entity's ability to continue as a going concern. If I conclude that a material uncertainty exists, I am required to draw attention in my audit report to the relevant disclosures in the financial statements or, if such disclosures are inadequate, to express a modified opinion. My conclusions are based on the audit evidence obtained up to the date of my audit report. However, future events or conditions may cause the Entity to cease to be a going concern.

- I evaluate the overall presentation, structure and content of the financial statements, including the information disclosed, and whether the financial statements represent the underlying transactions and events in a manner that achieves fair presentation.

I communicate to those charged with management of the Entity, among other matters, the planned scope and timing of the audit and the significant findings of the audit, as well as any significant deficiencies in internal control that I identify during the course of the audit.

**Report on other legal and regulatory requirements**

The administration is also responsible for compliance with regulatory aspects in Colombia related to accounting document management, the preparation of management reports, the timely and adequate payment of contributions to the Comprehensive Social Security System. My

responsibility as Auditor in these matters is to carry out review procedures to issue a conclusion on their adequate compliance.

Based on the above, I conclude that:

a) The accounting of the Entity during the year ended December 31, 2020 has been carried out in accordance with legal standards and accounting techniques and the recorded operations comply with the statutes and the decisions of the Shareholders' Assembly and the Board of Directors.

b) Correspondence, account receipts, minutes and Share register books are properly maintained and preserved.

c) There is agreement between the accompanying financial statements and the management report prepared by the administrators. The administrators in the management report write down that they did not obstruct the free circulation of invoices issued by sellers or suppliers.

d) The information contained in the self-assessment declarations of contributions to the Comprehensive Social Security System, particularly that relating to the affiliates and their contribution base income, has been taken from the records and accounting supports. As of December 31, 2020, the Entity is not in arrears for contributions to the Comprehensive Social Security System.

In compliance with the responsibilities of the auditor contained in Sections 1 and 3 of the Article 209 of the Commercial Code, related to the evaluation of whether the acts of the administrators of Credivalores Crediservicios S.A. conform to the statutes and the orders and the instructions of the Shareholders' Assembly and whether there are and are adequate internal control measures, conservation and custody of the assets of the Company or of third parties that are in its possession, I issued a separate report dated April 2, 2021.

Andrés Leonardo Nova Martínez
Auditor
Professional Card No. 133.670-T
Designated by PwC Contadores y Auditores S.A.S.
2 de abril de 2021

(Stated in millions of Colombian pesos)

| | Notes | December 31, 2020 | December 31, 2019 |
|---|---|---|---|
| **Assets** | | | |
| Cash and cash equivalents | 8 | 264.299 | 163.851 |
| Financial Assets at fair value through profit or lost | | | |
| Equity Instruments | 9 | 16.938 | 8.715 |
| Derivatives Instruments | 17 | 243.444 | 210.830 |
| Loan portfolio | 11 | 20.015 | 19.324 |
| **Total financial assets at fair value** | | **280.397** | **238.869** |
| | | | |
| **Financial Assets at amortized cost** | | | |
| Consumer loans | | 1.747.353 | 1.424.958 |
| Microcredit loans | | 5.772 | 5.863 |
| Impairment | 11 | (266.972) | (192.847) |
| **Total Loan portfolio, net** | 11 | **1.486.153** | **1.237.974** |
| Accounts receivable, net | 12 | 428.978 | 386.189 |
| **Total Financial Assets at amortized cost** | | **1.915.131** | **1.624.163** |
| | | | |
| Investments in Associates and Affiliates | 10 | 10.966 | 10.963 |
| Current tax assets | | 14.858 | 13.542 |
| Deferred tax assets, net | | 5.961 | 11.053 |
| Property, plant and equipment | 13 | 575 | 1.159 |
| Assets for right of use | 14 | 6.020 | 5.902 |
| Intangible assets other than goodwill, net | 15 | 55.452 | 53.892 |
| **Total assets** | | **2.553.659** | **2.123.394** |
| | | | |
| **Liabilities and equity** | | | |
| **Liabilities:** | | | |
| Financial Liabilities at fair value | | | |
| Derivative instruments | 17 | 16.791 | 32.188 |
| **Total Financial Liabilities at fair value** | | **16.791** | **32.188** |
| Financial Liabilities At amortized cost | | | |
| Financial obligations | 18 | 2.008.973 | 1.637.320 |
| Other Lease Liabilities | 18 | 6.429 | 6.258 |
| **Total Financial Liabilities At amortized cost** | | **2.015.402** | **1.643.578** |
| Employee benefits provisions | 19 | 983 | 1.105 |
| Other provisions | 20 | 7.370 | 476 |
| Accounts payable | 21 | 153.330 | 100.273 |
| Current tax liabilities | 22.2 | 2.043 | 1.244 |
| Other liabilities | 23 | 49.568 | 61.833 |
| **Total liabilities** | | **2.245.487** | **1.840.697** |
| | | | |
| **Equity:** | 24 | | |
| Share capital | | 129.638 | 129.638 |
| Treasury shares | 24 | (12.837) | (12.837) |
| Reserves treasury shares | 24 | 12.837 | 12.837 |
| Reserves | 24 | 5.814 | 5.814 |
| Additional paid-in capital | | 64.726 | 64.726 |
| Other Comprehensive Income (OCI) | 25 | 33.980 | 13.727 |
| Retained earnings | | 90.700 | 85.650 |
| IFRS convergence result | | (21.910) | (21.910) |
| Net Income for the period | | 5.224 | 5.052 |
| **Total equity** | | **308.172** | **282.697** |
| **Total liabilities and equity** | | **2.553.659** | **2.123.394** |

The accompanying notes are an integral part of the financial statements.

**CREDIVALORES CREDISERVICIOS S. A.**
**STATEMENT OF INCOME**
**PERIODS ENDED DECEMBER 31, 2020 AND 2019**

(Stated in millions of Colombian pesos)

| | Notes | December 31, 2020 | December 31, 2019 |
|---|---|---|---|
| Interest Income and similar | 26.1 | **290.980** | **275.186** |
| Financial costs interest | 18 | (194.008) | (191.824) |
| Revenue from contracts with customers | 26.2 | 85.550 | 97.003 |
| **Net Interest** | | **182.522** | **180.365** |
| | | | |
| Impairment of financial assets loan portfolio | 12 | (101.444) | (63.321) |
| Expense on accounts receivable provisions | | (174) | (6.495) |
| **Gross Financial Margin** | | **80.904** | **110.549** |
| | | | |
| **Other Expenses** | | | |
| Employee Benefits | | (13.839) | (15.953) |
| Depreciation and amortization expense | 13 – 15 | (5.915) | (6.774) |
| Depreciation right of use assets | 14.1 | (1.954) | (1.694) |
| Other | 28 | (68.878) | (76.871) |
| **Total Other expenses** | | **(90.586)** | **(101.292)** |
| | | | |
| **Net operating Income** | | **(9.682)** | **9.257** |
| | | | |
| Other Income | 27 | 2.678 | 2.357 |
| Financial income | | 3.535 | 478 |
| Exchange rate differences | 29 | 4.041 | 412 |
| **Financial Income** | | **10.254** | **3.247** |
| | | | |
| Derivative instrument valuation | 29 | 6.971 | (4.240) |
| **Financial expense** | | **6.971** | **(4.240)** |
| **Net financial income (expense)** | | **17.225** | **(993)** |
| | | | |
| **Net Income before income tax** | | **7.543** | **8.264** |
| Income tax | 22.3 | (2.319) | (3.212) |
| **Net income for the period** | | **5.224** | **5.052** |
| Net earnings per share | | **1.139** | **1.101** |

**CREDIVALORES CREDISERVICIOS S. A.**
**TATEMENT OF OTHER COMPREHENSIVE INCOME**
**PERIODS ENDED DECEMBER 31, 2020 AND 2019**
**(Stated in millions of Colombian pesos)**

|  | December 31, | |
| --- | --- | --- |
|  | **2020** | **2019** |
| **Net income for the period** | **5.224** | **5.052** |
| **Other comprehensive income** | | |
| **Items that may be or are reclassified to profit or loss** | | |
|  | | |
| Shares | (499) | 526 |
|  | | |
| Unrealized gains (losses) from cash flow hedges: | | |
| Valuation of financial derivatives Forwards | 5.480 | 2.817 |
| Valuation of financial derivatives Cross Currency Swaps | 56.306 | 9.996 |
| Valuation of financial derivatives Options | (32.214) | 8.392 |
|  | | |
| Income tax | (8.822) | (5.763) |
| **Total other comprehensive income for the period** | **20.251** | **15.968** |
| **Total other comprehensive income** | **25.475** | **21.020** |

The accompanying notes are an integral part of the financial statements.

**CREDIVALORES CREDISERVICIOS S. A.**
**STATEMENT OF CHANGES IN EQUITY**
**PERIODS ENDED DECEMBER 31, 2020 AND 2019**
(Stated in millions of Colombian pesos)

| | Share capital | Additional paid-in capital | Treasury Shares | Reserves | Other Comprehensive Income (OCI) | IFRS convergence result | Retained earnings | Earnings for the period | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Balance as of January 01, 2018** | 120.899 | 58.442 | (12.837) | 18.651 | (20.165) | (21.910) | 78.298 | 809 | 254.317 |
| Appropriation of earnings | - | - | - | - | - | - | 7.352 | (7.352) | - |
| Capitalization | 5.716 | 6.284 | - | - | - | - | - | - | 12.000 |
| Increases (decrease) in other comprehensive income | - | - | - | - | 15.968 | | | | 15.968 |
| Net income for the period | - | - | - | - | - | | - | 5.052 | 5.052 |
| **Balance as of December 31, 2019** | 129.638 | 64.726 | (12.837) | 18.651 | 13.727 | (21.910) | 85.650 | 5.052 | 282.697 |
| Appropriation of earnings | - | - | - | - | - | - | 5.050 | (5.050) | - |
| Capitalization | - | - | - | - | - | - | - | - | - |
| Increases (decrease) in other comprehensive income | - | - | - | - | 21.180 | - | - | - | 21.180 |
| Net income for the period | - | - | - | - | - | | - | 5.224 | 5.224 |
| **Balance as of December 31, 2020** | 129.638 | 64.726 | (12.837) | 18.651 | 34.907 | (21.910) | 90.700 | 5.226 | 309.101 |

The accompanying notes are an integral part of the financial statements.

**CREDIVALORES CREDISERVICIOS S. A.**
**STATEMENT OF CASH FLOWS**
**PERIODS ENDED DECEMBER 31, 2020 AND 2019**

(Stated in millions of Colombian pesos)

| | Notes | December 31, 2020 | December 31, 2019 |
|---|---|---|---|
| **Cash flows from operating activities** | | | |
| Net income before taxes | | 5.224 | 5.052 |
| | | | |
| **Reconciliation of net income before taxes and net cash provided by (used in) operating activities:** | | | |
| Depreciation of tangible assets | 13 | 618 | 647 |
| Depreciation of assets for rights of use | | 1.954 | 1.694 |
| Amortization of intangible assets | 15 | 23.349 | 11.652 |
| Amortization of Call premium options | 17.2 | 16.883 | 5.502 |
| Allowance for impairment of loan portfolio | 12 | 80.581 | 45.301 |
| Impairment Accounts Receivable | | 174 | 6.495 |
| Portfolio valuation measured at fair value | 12 | (691) | (987) |
| Fair value adjustments to financial assets | 10 | (3) | (597) |
| Income tax | | (2.319) | (3.212) |
| **Cash generated by trades** | | | |
| Income tax paid | | (1.928) | (1.607) |
| | | | |
| **Changes in operating assets and liabilities:** | | | |
| Increase (decrease) in loans | | (328.760) | (140.750) |
| Decrease (increase) in accounts receivables | | (42.962) | (62.034) |
| Increase (decrease) in accounts payable | | 53.054 | 4.377 |
| Decrease (increase) in employee benefit | | (122) | 9 |
| Decrease in provisions | 20 | 6.894 | 133 |
| Increase (decrease) in other liabilities | | (12.265) | 15.534 |
| **Net cash provided by (used in) operating activities** | | **(200.317)** | **(112.791)** |
| | | | |
| **Cash flows from investing activities:** | | | |
| Net flow of investments in financial instruments | | (8.722) | 11.844 |
| Net flow of property, plant and equipment | | (36) | (1.019) |
| Acquisition of intangible assets | | (24.910) | (10.286) |
| **Net cash used in investing activities** | | **(33.668)** | **539** |
| | | | |
| **Cash flows from financing activities:** | | | |
| Acquisition of financial obligations | | 1.940.403 | 597.156 |
| Payment due on derivatives | | (36.434) | 11.584 |
| Payment of financial obligations | | (1.498.478) | (538.354) |
| Payment premium call options | | (69.158) | - |
| Capitalization | | - | 12.000 |
| Pay financial leases | | (1.900) | (1.339) |
| **Net cash provided by financing activities** | | **334.432** | **81.046** |
| | | | |
| **(Decrease) Increase in cash and cash equivalents** | | **100.448** | **(31.206)** |
| Cash and cash equivalents at beginning of year | | 163.851 | 195.057 |
| **Cash and cash equivalents at end of year** | | **264.299** | **163.851** |

The accompanying notes are an integral part of the financial statements.

## NOTE 1. REPORTING COMPANY

Credivalores Crediservicios S.A., (hereinafter "Credivalores", the "Company" or "CVCS"), is a stock company registered for business in Bogotá - Colombia, located at Carrera. 7 No. 76-35 P 7, and a website at www.credivalores.com.co. The Company was incorporated by means of Public Deed No. 420 dated February 4, 2003 drawn up before the Public Notary No.1 of the Circuit of Cali. The term of duration of the Company is twenty years as of the date of the aforementioned deed.

The merger of two companies, Crediservicios S.A. and Credivalores S.A. was registered by means of Public Deed No. 4532 of December 12, 2008.

The merger was unanimously approved by the General Meeting of Shareholders of both companies on July 31, 2008, whereby it was determined that Crediservicios S.A. (the surviving company), would continue to legally exist after taking over Credivalores S.A. which would cease to exist (being dissolved but not liquidated). In addition, the equity of Credivalores S.A. was merged with that of Crediservicios S.A. by means of acquiring the assets and assuming the liabilities of both companies, as agreed on by both company's legal representatives,

This merger agreement was reported to the Colombian Superintendence of Industry and Commerce, which did not report any objections to the aforementioned process. Credivalores S.A. (the acquired company) was incorporated by means of Public Deed No. 1906 dated May 13, 2003, drawn up before the Public Notary No. 1 of the Circuit of Cali, and duly registered with the Chamber of Commerce of Cali on May 21, 2003, under Registry Number 3501 Book IX. Subsequently, the Company changed its name from Crediservicios S.A. to Credivalores-Crediservicios S.A.S, becoming a simplified stock corporation, by means of the Public Deed No. 529 dated February 27, 2009 drawn up before the Public Notary No. 1 of the Circuit of Cali.

By means of Minutes No. 16 dated February 23, 2010 of the General Meeting of Shareholders, duly registered before the Chamber of Commerce on March 19, 2010; the Company became a simplified joint stock company with the name of Credivalores-Crediservicios S.A.S. under Registration Number 3074 of Book IX.

By public deed No. 3175 of notary No. 73 of Bogota D.C. as of September 28th, 2019, registered July 9th, 2019 under Number 02484244 Book IX, the company changed its name from CREDIVALORES - CREDISERVICIOS S. A. S. to CREDIVALORES - CREDISERVICIOS S. A. and its social reason to Sociedad Anonima.

The Company's business purpose is to originate consumer loans, including payroll deduction loans, to private individuals or legal entities, using both its own funds and other sources of funding permitted by law. In carrying out these activities, the Company may:

a) Perform risk assessments,

b) Service and manage loans or lines of credit, including but not limiting the collection and registration of these obligations,

c) Purchase and sell loans, securities, and loan portfolios,

d) Borrow funds and enter into transactions allowing the Company to obtain the funds required to perform its corporate purpose,

e) Act as co-signer, guarantor, surety or collateral provider to raise funds in order to finance its activities that may be undertaken, structured or implemented through trust arrangements, and

Perform any other activities that are required as part of the Company's normal course of business, such as: (i) acquiring, encumbering, limiting the domain or disposing of fixed assets (ii) acquiring and using trade names,

logos, trademarks and other industrial property rights; (iii) investing in existing companies, or creating new ones, providing that these companies have the same or similar business activities as the Company or that should relate

in any way to its own corporate purpose; (iv) entering into partnerships or contracts with third parties to carry out its corporate purpose; (v) guaranteeing its own and third-party obligations.

The funds used by the Company for carrying out its business activities shall be lawfully sourced and therefore the Company shall be prohibited from raising money by means of large scale or regular deposits from individuals, pursuant to current legislation. The Company is not under the supervision of the Colombian Superintendence of Finance (Superintendencia Financiera de Colombia) since it is not considered to be a financial institution in accordance with Colombian legislation, nor is

it allowed to carry out brokerage of instruments registered with the Colombian National Registry of Securities and Issuers (RNVE).

The Company is prohibited from raising money through large-scale and regular deposits from individuals, complying with the stipulations in the financial and exchange regulations.

Credivalores has the following branches nationwide: Aguachica, Armenia, Barrancabermeja, Barranquilla, Bucaramanga, Cali, Cartagena, Cartago, Ciénaga, Cúcuta, El Paso, Florencia, Girardot, Ibagué, La Dorada, La Jagua de Ibirico, Lomas, Magangué, Manizales, Medellín, Mocoa, Montería, Neiva, Palmira, Pasto, Pereira, Popayán, Riohacha, Sahagún, San Andrés, Santa Marta, Sincelejo, Tunja, Valledupar, Villavicencio, and Yopal.

In June 2019, a 12,000 million capitalization was completed. The ownership of the Company after this capitalization is as follows:

| Shareholders | Ownership |
|---|---|
| Crediholding S.A.S. | 34,24% |
| Lacrot Inversiones 2014, S.L.U | 36,43% |
| Acon Colombia Consumer Finance Holdings, S.L. | 19,90% |
| Acon Consumer Finance Holdings II, S.L. | 4,21% |
| Direcciones de Negocio S.A.S. | 0,01% |
| Treasury Shares | 5,21% |
| **Total** | **100,00%** |

Covid-19 impacts

Since the first months of 2020, Coronavirus (COVID-19) has spread around the world, leading to the closure of production and supply chains and disrupting international trade, which could lead to a global economic slowdown and adversely affect various industries. Global authorities including Colombian authorities have had to take, among other measures, the temporary closure of establishments and the quarantine of persons in various areas, implying that employees, suppliers, and customers are unable to carry out their activities for an indefinite period of time. This situation could have adverse material effects on the results of the Company's operations, financial situation and liquidity, which are being evaluated daily by the administration to take all appropriate measures to minimize the negative impacts that may arise from this situation. The impacts that have been generated by this situation have been recognized in the financial statements.

The main impacts observed on the Company's financial situation and operations are described below.

*Impairment of financial instruments*

Financial instruments within the scope of IFRS 9's expected credit loss model (PCE) (loans, trading accounts and other receivables, unmeasured debt instruments at fair value with changes in results, contractual assets, lease

receivables, financial guarantees and loan commitments) have been assessed considering COVID-19 impacts on the PCE.

Impacts have been generated mainly by the following two aspects:

• The PCE's own estimate that it considers to be:

  Credit risk (risk of non-compliance), which has increased in relation to debtors' businesses, has been adversely affected and which has increased THE PCE's percentages by 36.2%;

  The amount at risk (default exposure), taking into account that affected debtors have resorted to unused credit quotas for approximately $323,608, and a two (2) months increase

In addition, in considering forward-looking information (including macroeconomic information) there has been a significant increase in the credit risk considered in the credit loss estimation; and additional negative scenarios have been included to the scenarios previously had in the entity's expected credit loss model.

This led to an increase in impairment provisions of financial assets measured at the amortized cost of $80.58 3as of December 31,2020.

*Fair values - Financial Instruments*

Market price volatility as a result of the spread of COVID-19 affected the fair values of assets and liabilities that are measured for accounting purposes at fair value at the date of submission of financial information.  However, the entity measures its principal assets and liabilities at amortized cost with hedging strategies that mitigated much of these effects.

*Fair values - Non-financial assets*

The fair value of properties, plant and equipment measured by revalued cost and investment properties is determined by external and independent property appraisers, who have recognized professional qualifications and recent experience in the location and category of the property being valued.

During 2020, losses in investment properties worth$517 were recognized in the statement of comprehensive income.

*Measuring financial instruments - Leases*

Landlords and tenants have conducted renegotiation processes of the terms of their lease agreements, a result of which landlords have granted tenants concessions of some kind in connection with lease payments. The entity has considered in the role of tenant the posting of these concessions as if they were not modifications which has involved the recognition of profits in the income statement worth$278.

*Other issues*

Results worth$6 were charged in connection with the depreciation of properties, plant and equipment and intangibles that are determined based on straight-line methods despite not being being used for a few months. The establishment of passive provisions was assessed as of December 31, 2020 without decisions involving the emergence of present obligations that have a high likelihood of exit of resources.

Business on the move

The outbreak of the COVID-19 pandemic and the measures taken by the Colombian government to mitigate the spread of the pandemic have significantly impacted the economy. These measures forced the Company to curb its activities in several locations for periods of three to six months during the year. This has negatively impacted the Company's

financial performance over the run of the year, however, its liquidity situation was positive thanks to the US$300 issue, before starting pandemic.

There is still great uncertainty about how the outbreak will affect the Company's business and customer demand for its products in future periods. Therefore, management has modeled scenarios considering a period of 12 months from the date of authorization of these financial statements. The assumptions modeled are based on the estimated potential impact of COVID-19 restrictions and regulations and the responses proposed by management. The base case scenario includes the benefits of actions already taken by management to mitigate the impacts caused by COVID-19. It is assumed that there may be new business closures for additional weeks. In this base scenario, the Company is expected to continue to have sufficient leeway with the support of available funding.

The most severe downstage, which is considered prudent but plausible, would have a significant adverse impact on the Company's businesses, including its cash flows. In response, management has the ability to take the following mitigation actions to reduce costs, optimize cash flow, and preserve liquidity:

- Reduce, defer or cancel discretionary spending; And
- Freezing non-essential hires.

Based on the Company's liquidity position at the date of authorization of these financial statements, and in light of the uncertainty surrounding the future development of the outbreak, management continues to have a reasonable expectation that it will have adequate resources to continue in operation for at least the next 12 months and that the operating company's accounting base remains adequate.

These financial statements have been prepared on a running business basis and do not include any adjustment to book values and classification of reported assets, liabilities and expenses that might otherwise be required if the on-going business base were not appropriate.

## NOTE 2. BASIS FOR PREPARATION OF THE FINANCIAL STATEMENTS AND SUMMARY OF THE MAIN ACCOUNTING POLICIES

### 2.1 Basis of Presentation

The financial statements as of December 31, 2020 and December 31, 2019 were prepared in accordance with the International Financial Reporting Standards (IFRS) issued by the International Accounting Standards Council (IASB).

These financial statements were authorized by the Company's Management on March 31, 2021.

The Financial Statements of Credivalores have been prepared in line with the Financial Reporting and Accounting Standards accepted in Colombia FRAS - IFRS established by Law 1314 of 2009, regulated by Regulatory Decree 2420 of 2015, modified by Decree 2496 of 2015. These Financial Reporting and Accounting Standards correspond to the International Financial Reporting Standards (IFRS), officially translated and authorized by the International Accounting Standards Board (IASB) on December 31, 2016.

Law 1314 of July 13, 2009 regulated the financial reporting, accounting and data security standards and principles accepted in Colombia and identified competent authorities, established the procedure for issuing the standards and determined the entities responsible for monitoring compliance. This law was regulated by means of the following decrees:

a) 2784 of December 28, 2012
b) 1851 of August 29, 2013
c) 3023 of December 27, 2013
d) 2267 of November 11, 2014

Decree 2615 dated December 17, 2014 came into effect on January 1, 2016. Decree 2615 contains the international accounting and financial reporting standards in force as of December 31, 2013 and their corresponding amendments issued by the International Accounting Standards Board IASB in force today. With

this, the regulatory technical framework contained in the annex to Decree 2784 dated December 28, 2012 and Decree 3023 dated December 27, 2013 was revoked.

Credivalores reports comparative information from the immediately previous period for all values included in the current period's financial statements and includes comparative explanations, when necessary, to ensure the current period's financial statements are understandable.

**Leases**

Assets and liabilities arising from a lease are initially measured on a present value basis. Lease liabilities include the net present value of the following lease payments:

- Fixed payments (including substantial fixed payments), minus any lease incentives receivable
- Variable lease payment based on an index or rate
- Amounts that the tenant is expected to pay under residual value guarantees
- The exercise price of a purchase option if the tenant is reasonably sure to exercise that option, and
- Payments of fines for terminating the lease, if the condition of the lease reflects that the tenant exercised that option.

Lease payments are deducted using the implied interest rate on the lease, if such rate can be determined, or the incremental indebtedness rate.

Right of Use Assets are cost-measured and include the following:

- The amount of the initial measurement of the lease liability
- Any lease payments made on or before the start date
- Any direct initial costs, and
- Restoration costs

Payments associated with short-term leases and low-value asset leases are recognized under the linear method as an expense in the income statement. Short term leases have a term of 12 months or less. Low-value assets include computer equipment and small items in office furniture.

**2.2 Changes in accounting policies**

**LEASINGS- IFRS 16**

In accordance with the provisions of the standard, the leases shall apply paragraph 46, whereas the modifications of the contracts, are contemplated by IFRS 16 so that the company assesses the practical solution. For the application of this:



The impact from the effects of the COVID -19 pandemic and the application of the practical resource are presented as of December 31, 2020:

- Adjustment by valuation: 383
- Depreciation adjustment: 191
- Adjustment by financial cost: (54)

## NOTE 3. JUDGMENTS AND CRITICAL ACCOUNTING ESTIMATES IN THE APPLICATION OF ACCOUNTING POLICIES

The preparation of the financial statements requires management to make judgments, estimates and assumptions that affect the implementation of accounting policies and reported amounts of assets and liabilities, and income and expenses.

Credivalores S.A. will disclose the nature and amounts of changes in accounting estimates that are significant and affect the current period or are expected to affect any impact in future periods. Information on the effect in future periods will not be disclosed if the estimate of the effect is not practical.

The financial statements, the significant judgments made by the administration in the application of the accounting policies of Credivalores and the main sources of uncertainty estimation were the same as those applied to the financial statements for the year ended December 31, 2019.

## 3.1 IFRS 9 – FINANCIAL INSTRUMENTS

IFRS 9 - financial instruments in lieu of the IAS 39 - financial instruments: recognition and measurement for the annual periods subsequent to January 1, 2018.

The company did not restate comparative information for 2017 for those financial instruments under the scope of IFRS 9. Therefore, comparative information for 2017 is reported according to IAS 39 and is not comparable to the information presented for 2018. The differences arising from the adoption of IFRS 9 – financial instruments have been recognized directly in earnings accumulated to 1 January 2018.

### 3.1.1 IMPAIRMENT MODEL

IFRS 9 – financial instruments, pose significant changes in the assessment of the impairment of financial instruments and, therefore, its associated risk. In particular, the standard proposes a new approach that pursues the identification of the significant increase of the risk of credit (SIRC) in an instrument before the identification of objective evidence of impairment (OEI).

From the above, the company has advanced in the construction of quantitative and qualitative criteria to identify the significant increase in the credit risk of an instrument. Although a quantitative criterion as the main principle is used to evaluate the (SIRC), qualitative criteria have also been developed in case that it is not possible to apply the quantitative criterion or that it cannot be used for specific financial assets.

Impairment related requirements are applied to financial assets measured at amortized cost and fair value with changes in other comprehensive income (FVOCI) whose business model remains to collect (contractual cash flows) and sell.

The expected credit loss model considers the prospective nature of loss tolerances for instruments, based on expectations of future behavior.

For the calculation of the expected loss of payroll and Credit Card products Credivalores has decided to use the Granular Amortization approach, considering the following aspects:

- Exposure and corresponding risk parameters are calculated individually for each period.
- Exposure and corresponding risk parameters are intended to be constant within each period, but may vary between periods of time.
- The calculation of the EP is individual by period.
- Calculations of PE12m and PE in life are performed by adding the individual PEs for each respective risk horizon (one-year, whole life).
- Frequency of payment fixed according to its depreciation: monthly, quarterly, semi-annual, annual, among others.
- The granular depreciation approach captures the dynamic behaviors of risk parameters at high granularity (more detailed).

**Main sources of uncertainty**

The central concept of impairment under the new IFRS 9 impairment model is based on a dual measurement approach that takes into consideration the current level of expected impairment of each loan, compared to initial recognition, and requires recognition of impairment over the difference between expected credit losses in 12

months, if no significant changes in risk have occurred since initial recognition; otherwise, a credit loss amount is recognized over the expected life of the financial instrument.

This model is complemented with stress analysis and scenarios with variables that are not controlled by the Company, such as macroeconomic factors. To this end, the Company has developed a non-lineal statistical model (log–log model) that associates the level of overdue payments of the loan portfolio of Credivalores products with a set of available macroeconomic variables. The model indicates that the macroeconomic variables most closely correlated with performance of the Credivalores portfolio are the unemployment rate, the maximum allowable interest rate, the change in the CPI and the change in GDP.

The resulting model enables us to incorporate forecasts on the expected future behavior of these macroeconomic variables in order to calculate expected loan portfolio losses. Such effect has been quantified and included in the provisions recorded by the Company. It also enables performing sensitivity analysis on the performance of these variables, in face of uncertainty, on the performance of our portfolio. This information is presented below:

Sensitivity analysis under two assumed scenarios:

- Pessimistic scenario: All the macroeconomic variables that are correlated with the portfolio move in a negative direction by one standard deviation.
- Optimistic scenario: All the macroeconomic variables that are correlated with the portfolio move in a positive direction by one standard deviation.

## 3.2 Financial Assets Business Model

Credivalores makes an assessment of the objective of a business model in which an asset is held at a portfolio level because this best reflects the way the business is managed, and information is provided to management. The information considered includes:

- The expected policies and objectives for the portfolio and the actual application of them In particular whether management's strategy focuses on earning contractual interest revenue, maintaining a particular

  interest rate profile, matching the duration of the financial assets to the duration of the liabilities that are funding those assets or realizing cash flows through the sale of the assets;

- How the performance of the portfolio is evaluated and reported to Credivalores management;

- The risks that affect the performance of the business model (and the financial assets held within that business model) and how those risks are managed; and

- The frequency, volume and timing of sales of financial assets in prior periods, the reasons for such sales and its expectations about future sale activity. However, information about sales activity is not considered in isolation, but as part of an overall assessment of how Credivalores stated objective for managing the financial assets is achieved and how cash flows are realized.

Assessment whether contractual cash flows are solely payments of principal and interest (SPPI).
For the purposes of this assessment, 'principal' is defined as the fair value of the financial asset on initial recognition. 'Interest' is defined as consideration for the time value of money and for the credit risk associated with the principal amount outstanding during a particular period and for other basic lending risks and costs (e.g. liquidity risk and administrative costs), as well as profit margin.

In assessing whether the contractual cash flows are solely payments of principal and interest, Credivalores considers the contractual terms of the instrument. This includes assessing whether the financial asset contains a contractual term that could change the timing or amount of contractual cash flows such that it would not meet this condition.

Credivalores Crediservicios S.A.S. business model is based on granting consumer loans quickly through innovative products to middle- or low-income segments that are not served by the traditional financial system.

The Company has developed a diversified platform with collection channels designed to minimize the risk of default and optimize the quality of its loan portfolio (minimize NPL), including: payroll deduction loans (discounted from payroll payments), credit card (collecting via public utilities bills), and financing for insurance policy premiums (revocable insurance where the insurer returns the portion of the premium that was not used in case of default).

The business model focuses on building alliances and agreements for origination and distribution of each one of our products, thus guaranteeing growth. The company has more than 720 agreements with employers that can issue payroll loans, exclusive agreements with public utility companies for invoicing and collecting via credit card, and alliances with third parties and insurers for the origination of the Credipoliza product.

The risk management systems are similar to those implemented by other Colombian financial entities and they take characteristics of the target market into consideration. These systems have been adjusted according to the experience and knowledge acquired over more than 14 years in the market.

Credivalores Crediservicios S.A.S. seeks to maintain various sources of funding on the local and international level from banking and capital markets.

This business model produces a portfolio of diversified products with limited geographic concentration and by loan amount.

The entity applies meaningful judgements to determine its business model to manage financial assets and to evaluate if the financial assets comply with the conditions established in the business model so they can be classified at fair value or at amortized cost. According to the aforementioned, some financial assets have been classified in investments at fair value and others at amortized cost. According to the business model the financial assets at amortized cost can be sold only in limited circumstances, such as when there are infrequent transactions, adjustments are made to the maturity structure of its assets and liabilities, when it is necessary to finance significant capital disbursements and when there are seasonal liquidity needs.

Investments in equity instruments at fair value have been classified with adjustments through profit or loss, considering that they are strategic investments for the company and, are expected to be sold in the near future.

Financial Assets at fair value

According to its business model the Company has determined that Tu credito payroll deduction loans will be measured at fair value when they meet the following conditions:

1.   Maximum term of 90 days as of the date of origination.

2.   Highest rating based on its compliance score.

Financial Assets at amortized cost (*)

The loan portfolio is classified at amortized cost when it meets the following criteria: Credivalores Crediservicios S.A.S. business model is to hold these assets with the purpose of collecting their cash flows on specified dates, as per their contractual terms, and the contractual terms of the financial asset give rise on specified dates, to cash flows that consist of payments of principal and interest on the outstanding amount owed.

**3.3 Leases**

Leases are recognized as a right-of-use asset and a corresponding liability at the date at which the leased asset is available for use by the company. Each lease payment is allocated between the liability and finance cost. The finance cost is charged to profit or loss over the lease period so as to produce a constant periodic rate of interest

on the remaining balance of the liability for each period. The right-of-use asset is depreciated over the shorter of the asset's useful life and the lease term on a straight-line basis.

**Variable lease payments**

Some property leases contain variable payment terms that are linked to profit generated from a specific office. For individual offices, up to 100% of lease payments are on the basis of variable payment terms. Variable payment terms are used for a variety of reasons, including minimizing the fixed costs base for newly established offices. Variable lease payments that depend on profits are recognized in profit or loss in the period in which the condition that triggers those payments occurs.

**Lease terms**

In determining the lease term, management considers all facts and circumstances that create an economic incentive to exercise an extension option, or not exercise a termination option. Extension options (or periods after termination options) are only included in the lease term if the lease is reasonably certain to be extended (or not terminated). The evaluation is reviewed if a significant event or a significant change in the circumstances affecting this evaluation occurs.

**3.4 Seasonal nature of income and expenses.**

The nature of the most important operations of Credivalores Crediservicios S. A is mainly related to traditional activities that are not significantly affected by seasonal factors.

**NOTE 4. SUMMARY OF THE MAIN ACCOUNTING POLICIES**

The following are the significant accounting policies applied by Credivalores in the preparation of these financial statements.

**4.1 Materiality**

The economic facts are presented in accordance with their relative importance or materiality.

For disclosure purposes, a transaction, event or operation is material when, because of its amount or nature, or knowledge or lack of knowledge thereof, and considering the circumstances surrounding it, it affects the decisions that may be made or the assessments that users can carry out in regards of the accounting information.

Upon preparing and presenting these financial statements, the materiality of the amounts recorded is determined in terms of total assets, current and non-current assets, total liabilities, current and non-current liabilities, equity or income for the year as appropriate.

As per the assessment of materiality, Management considers as material any entry, transaction or event for which the value is equal to or greater than the percentage that results from the application of the following table and any others deemed necessary because of their nature:

| Item | Percentage of fair value |
|---|---|
| Asset | 0.5% |
| Liability | 0.5% |
| Equity | 0.5% |
| Revenue | 0.5% |
| Expenses | 0.5% |

**4.2.1 Functional and reporting currency**

These financial statements are presented in Colombian pesos, which is the functional and reporting currency of Credivalores.

Items included in the Company's financial statements are stated in the currency of the primary economic environment in which the Company operates (Colombian pesos). All figures are stated in millions of Colombian Pesos and have been rounded to the nearest unit.

**4.2.2 Transactions and Balances in Foreign Currency**

Foreign currency transactions are recorded at the Company's functional currency at the exchange rate prevailing on the transaction date. Monetary assets and liabilities in foreign currency are translated into the functional currency using the prevailing exchange rate at the reporting date of the statement of financial position. Non-monetary assets and liabilities denominated in foreign currencies in terms of historical costs are measured using the exchange rate at the transaction date. Financial instruments measured at fair value are translated using the exchange rate from the date the fair value was determined.

As of December 31, 2020, and 2019, the (COP/USD) exchange rates certified by the Superintendence of Finance were 3,432.50 and 3,277.14 per U.S. $1 respectively.

**4.3 Cash and cash equivalents**

Represent the Company's high liquidity assets such as: bank account balances, remittances in transit and Time Deposits. Moreover, cash is recorded for petty-cash purposes.

Credit balances in transactions with a particular entity constitute obligations to that entity and, as such, must be reflected as a liability under bank loans and other financial obligations and/or checking account overdrafts. However, they are part of the Company's liquidity management. In the above-mentioned circumstances, such overdrafts are included as a component of cash and cash equivalents.

Investments in money market funds with positions in short term liquid assets, with maturity shorter than three months will also be classified as cash and cash equivalents. In this case, the risk of price changes is insignificant and positions are held support short-term cash requirements rather than for investment or similar purposes.

Bank expenses and financial interests are recorded at the value reported in the corresponding bank statements. Daily financial returns are reported at the rate negotiated with the respective financial entity with adjustments made in relation to the nominal value reported in the statement at the close of each month.

**4.4 Financial Instruments**

**Financial instruments**

A financial instrument is a contract that results in a financial asset of one entity and a financial liability or equity instrument of another entity.

**Date of recognition of financial instruments**

Financial assets and liabilities are recognized in the financial statement when the Company becomes part of the contractual provisions of the instrument.

**4.4.1 Financial Assets**

The Company classifies its financial assets into equity instruments, trading instruments, amortized cost investment instruments, credit instruments and accounts receivable.

At the time of initial recognition, a financial instrument is measured at fair value plus any direct attributable transaction costs, which are not included if the instrument is classified at fair value through changes in profit or loss. Typically, the fair value at the initial time of recognition is the price of the transaction itself, that is, the amount to be paid or received.

Credivalores recognizes loans and accounts receivable, trading and investment securities and other assets or liabilities on their effective dates.

Purchases and sales of financial assets that are regularly carried out are recognized on the transaction date or on the date on which the Company is required to purchase or sell the asset.

Subsequently, the Company measures its financial instruments at fair value or amortized cost based on the established business model and the contractual terms of the corresponding financial asset or liability.

**i.    Amortized cost**

Amortized cost is the cost of acquiring a financial asset or a liability plus or minus any capital repayments, cumulative amortizations (calculated using the effective interest rate method) with regard to any difference between the initial amount and the value repaid at maturity and minus any reduction for impairment.

**ii.    Fair value**

Fair value is the amount to be received should the asset be sold or the amount to be paid for transferring a liability as part of a transaction between market participants on the date on which the measurement is made. The most objective and commonplace definition of fair value is the price that would be paid in an active, deep and transparent market ("listed price" or "market price").

When such values are available CVCS determines the fair value of an instrument using the prices listed on an active market for that specific instrument. A market is considered active if listed prices are readily and regularly available and represent real transactions that are performed regularly on a stand-alone basis.

Should no active market exist for a specific financial instrument CVCS determines its fair value using valuation techniques.  These valuation techniques include using recent market transactions between knowledgeable, willing parties carried out on an arm's length basis, should these exist, as well as the fair values of other financial instruments that are substantially the same, discounted cash flows and pricing models.
The valuation technique chosen makes use, to the maximum extent possible, of information obtained directly from the market, using the least amount of data estimated by CVCS, incorporating all those factors that would normally be considered by market participants for setting the price of such financial instruments and is consistent with generally accepted pricing methodologies.

Fair value estimates obtained from financial models are adjusted to consider other factors such as uncertainty on its risk or the liquidity model. Adjustments are included when CVCS believes that another market player uses these same estimates when determining the price of a transaction (See note 6).

The Company´s business model includes payroll loans at fair value with changes in profit and losses, whereby the loans originated within the 90 days prior to the date of the financial statements are valued at fair value. In order to estimate the fair value of these loans, which could be sold to financial institutions at a market price, the Company evaluates the lending rate of these loans within the reference market to evaluate the rate at which

other financial institutions considered as peers and comparable to the Company will be willing to invest their resources and hold the payroll loans within their balance sheet.

Considering the results from the evaluation of the rates, the Company evaluates four variables to obtain the value of the adjusted rate applicable to the transactions to sell loan portfolio, according to internal criteria:

i)     The multiplier, which compares the Company's rate to the market rate.
ii)    The value of the premium paid in these businesses, which results from discounting the future values of a loan originated at Credivalores' lending rate using the market rate.
iii)   The rate is adjusted by the transaction cost associated to the loan portfolio.
iv)    The cash flows associated to the insurance policies applicable to the loan are also valued.

The methodology followed by the Company, uses the last three months reports from the Financial Superintendence as the source of information to determine the interest rate to discount the cash flows and complete the valuation of the final selling price of the loan portfolio.

The Company has determined that the fair value of the loan portfolio registered in its financial statements is type 3, since most of the criteria is internal.

### 4.4.2 Initial measurement of financial instruments

Financial assets and liabilities are initially measured at fair value, transaction costs that are directly attributable to the acquisition or issuance of financial assets and liabilities are aggregated or deducted from the fair value of them. For financial assets and liabilities measured at fair value with changes in results (FVPL), transaction costs directly attributable to the acquisition are immediately recognized in results.

Debt instruments held within a business model aimed at receiving contractual cash flows, whose cash flows are only capital and interest payments on the outstanding principal amount (SPPI), are subsequently measured at the amortized cost; debt instruments that are maintained within a business model whose objective is both to receive

contractual cash flows and to sell debt instruments and which have contractual cash flows that are SPPI, are subsequently measured at fair value through another comprehensive result (FVOCI); all other debt instruments (e.g. debt instruments administered on a fair value basis, or held for sale) and capital investments are subsequently measured in FVPL.

### 4.4.2.1 Financial Assets at Fair Value

Credivalores Crediservicios S. A. S., in line with its business model, classifies its products according to the risk inherent in its portfolio. In general, its line of credit Tucredito (payroll deduction loans) is measured at fair value, given that its market niche is focused on placing "top-rated" loans.

| Classification of "Tucredito" line of credit, based on the corresponding business model | | | |
|---|---|---|---|
| **Item** | **Tucredito portfolio segment** | **Measurement** | **Valuation** |
| 1 | Performing loans subject to sale | Fair value | Market price. |
| 2 | Best rated loans with terms of less than a year (originated loans less than 90 days prior) | Amortized cost | (Indexed rate equivalent to amortized cost). |
| 3 | Performing loans with terms of more than one year (originated loans with terms of more than 90 days) | Amortized cost | (Indexed rate equivalent to amortized cost). |

| 4 | Past due loans | Amortized cost | Incurred loss model based on the expected loss. |
|---|---|---|---|

The policy established by the Company for measuring its loan portfolio, per the business model classification, is:

In line with its business model the Company has decided to measure the loans comprising the "Tucredito" line of credit at fair value based on the historical trading average since its loans are not impaired (and which, from their origination, are the best-rated 0 - 90 day loans) and since the Company has the possibility of selling them in the short term because of their excellent rating.

Unsold lines of credit, which were initially measured at fair value but which after 90 days of origination were impaired, will later be measured based on an indexed rate, which converts the amortized cost rate into an amount equivalent to their fair value.

**4.4.2.2 Financial assets at amortized cost**

Financial assets are classified at amortized cost only if the asset is kept within a business model whose objective is to maintain it to collect contractual cash flows and the contractual terms of the value give rise at specific dates to cash flows that are only payments of cash. capital and interest on the outstanding principal capital; Interest income is recognized using the effective interest rate method.

The effective interest method is a method used to calculate the amortized cost of an asset and allocate the income or cost in interest during the relevant period. The effective interest rate is the discount rate at which the present value of estimated future cash payments or those received over the expected life of the financial instrument, or, as appropriate, in a shorter period of time, is equal to the net book value in the beginning. To calculate the effective interest rate, the Company estimates the cash flows taking into account all the contractual terms of the financial instrument, including the transaction costs and the premiums granted minus the commissions and discounts, but without considering the future credit losses.

The Company classifies the following financial instruments at amortized cost:

| Credivalores Crediservicios S.A. business model | | | | | |
|---|---|---|---|---|---|
| **Product** | **Measurement** | **Terms** | **Valuation** | **Features** | **Estimated % of Sales** |
| Tucredito | Fair value | 0-90 days as of date of disbursement | Market price | Current and best rated payroll loans | 56,40% |
| | Amortized cost | > 91 days subsequent to date of disbursement | Equivalent indexed rate | Current and past-due payroll loan portfolio | |
| Credipoliza | Amortized cost | Portfolio | Equivalent indexed rate | Financing for insurance policies | 7,10% |
| Crediuno | Amortized cost | Portfolio | Equivalent indexed rate | Credit card | 36,49% |

**4.4.3 Impairment**

Under the guidelines of the accounting standard IFRS 9, Credivalores was changing its model of impairment loss incurred to expected loss, which is set based on a classification of operations in three stages:

- Stage 1-assets without significant deterioration or in normal situation.
- Stage 2-assets with a significant increase.

- Stage 3-assets with objective evidence of impairment.

The fundamental concept of the new model is based on an approach of dual measurement, depending on the Stage of the financial instrument classification: for Stage 1 damage is equal to the credit losses expected at 12 months, to stage 2 and 3 is equal to the credit losses expected lifetime. The following figure outlines the criteria of the standard.

For loss lifetime of the asset is used the same methodology of credit loss expected for a year, but instead of covering only the first year, calculated on the expected life of the contract including extension of the instrument options.

For the calculation of the expected loss of clearance and credit card products Credivalores has decided to use the depreciation Granular approach, considering the following aspects:

- The exhibition and the corresponding risk parameters are calculated individually for each period.
- Intended that the exhibition and the corresponding risk parameters are consistent within each period but may vary between periods.
- The estimate of the EL is individual per period.
- 12 months EL and EL calculations in life, are made by adding the individual EL for each respective risk horizon (one year, lifetime).
- Fixed according to its amortization payment frequency: monthly, quarterly, semi-annual, annual, among others.
- The amortization approach granular capture the dynamic behavior of the parameters of risk in a high granularity (more detailed).

**4.4.4 Impairment of non-financial assets**

At each presentation date, Credivalores Crediservicios S.A.S. it reviews the carrying amounts of its property, plants and equipment and its intangible assets, in order to determine if there are indications of impairment and if there are any, the recoverable amount of the assets is estimated (whichever is greater between fair value and cost less the costs of disposal and the value of use). If the carrying amount exceeds the recoverable value, an adjustment is made so that the carrying amount decreases to the recoverable value, modifying the future depreciation charges in accordance with the remaining useful life

**4.5 Equity Instruments**

*Investments that do not represent control or a significant influence over the investee.*

All equity instruments are measured at fair value. Equity instruments held for sale are measured at fair value through profit and loss.

**4.5.1 Investment in associate and affiliates**

Investments in companies in which the Company does not have control, but has significant influence are called "Investments in Associates". Investments in Associates are accounted for under the equity method.

The Company exercises significant influence over another entity if it owns, directly or indirectly, 20% or more of the voting power of the investee, unless it is clearly evidenced that such influence does not exist. They are initially recognized at cost, including costs directly related to the transaction. Subsequently to initial recognition, the consolidated financial statements include the company share of the net assets, net income or loss after income tax, and other comprehensive income of the investee, as long as the significant influence continues.

Investments in Associates are those in which the Company has direct or indirect control; that is, when all of the following conditions are met:

- The Company has control over the entity; mainly, rights granting the Company the means of directing relevant activities that significantly affect the associate returns.
- The Company obtains or is entitled to variable returns from the interests held in the associate.
- The Company can use its power over the associate to influence the amount of income obtained by the former.

The Equity Method is an accounting method in which the investment is recorded initially at cost and then adjusted based on subsequent changes to the acquisition on the part of the investor in the net assets of the investee. Following this method Credivalores recognizes its equity in the associate through other comprehensive income and profit or loss for the period.

## 4.6 Accounts Receivable

Credivalores recognizes accounts receivable such as interest, commissions other than premiums from loan portfolio purchases, insurance and taxes.

For the initial measurement Credivalores will recognize an account receivable at fair value. Transaction costs directly attributable to the transaction will be directly recognized in the income accounts.

In the case of long-term (greater than one year) financial assets without explicit financing (contractually defined) the initially recognized value will be the future value discounted at the reference market rate for similar accounts receivable (amount, term) at the transaction date. Subsequently, long-term (greater than one year) financial assets without explicit financing (contractually defined) will be measured at amortized cost using the effective interest rate method. Short-term financial assets will not be subject to discounting.

In addition, interest must be recognized at a higher value in the account receivable.
The effective interest rate will be the rate corresponding to the market rate (where applicable) at the time the financing begins. If there is no market rate with similar characteristics the average internal lending rate will be used.

## 4.7 Leases

### 4.7.1 Assets acquired under leases

In their initial recognition, assets acquired under leases are classified as capital or operating leases.

Lease contracts classified as capital leases appear in the statement of financial position as property, plant and equipment for the Company's own use or as investment properties, as applicable. These are initially recorded as an asset and or a liability simultaneously at the lesser of the fair value of the asset leased or the present value of the minimum lease payments. The present value of the minimum lease payments is determined using the interest rate implicit in the lease contract or, in its absence, an average interest rate used by the Company on the market. Any direct costs associated with taking the lease are added to the amount recognized as an asset.

Subsequent to the initial recognition, these are recorded in the same way as the property, plant and equipment for the Company's own use or investment properties account where they were initially recorded. The amount recorded as a liability is included in the financial liabilities account and is recorded in the same way.

Payments made under operating lease agreements are recognized in the income accounts on a straight-line basis during the term of lease. The lease incentives received are recognized as an integral component of the total lease expense over its term.

## 4.8 Property and Equipment

Property, plant and equipment for the Company's own use include the assets, whether property or under finance lease agreements, held by the Company for its current or future use and which are expected to be used for more than one reporting period.

They are recorded in the statement of financial position at cost of acquisition plus the costs incurred in preparing these for use, less accumulated depreciation and, if applicable, estimated impairment losses resulting from comparing the net book value of each item with their corresponding recoverable amounts.

They are subsequently measured at cost less accumulated depreciation and impairment. Depreciation is calculated on a straight-line basis for the estimated useful life of the asset. The annual depreciation rates for each asset category are:

| Type of asset | Total useful life | Residual value | Depreciation method |
|---|---|---|---|
| Furniture | 3 to 10 years | Zero | Straight line |
| Vehicles | Between 5 and 10 years of age | Up to 10% | Straight line |
| Office equipment | 3 to 10 years | Zero | Straight line |
| Computer and communication equipment | 3 to 7 years | Zero | Straight line |

*Leasehold Improvements*

Leasehold improvements are those made to rented property by means of a leasing agreement, as structured and designed to accommodate the entity's normal course of business and are recognized as property and equipment.

### 4.9. Intangible assets

Credivalores intangible assets correspond primarily to computer software, licenses, trademarks and insurance. Intangible assets are initially measured at cost of acquisition and subsequently at cost less any depreciation accumulated over their estimated useful life or any accumulated impairment loss. The Company analyzes whether there are external or internal signs of impairment to an intangible asset; any impairment losses or subsequent reversals are recognized in the income accounts for the period.

The following table shows the residual values, useful lives and depreciation methods for each type of asset:

| Type of asset | Useful life | Residual value | Depreciation method |
|---|---|---|---|
| Software | 1 to 3 years | Zero | Straight line |
| Licenses | 1 to 3 years | Zero | Straight line |
| Trademarks | 1 to 10 years | Zero | Straight line |
| Exclusive contracts | 1 to 15 years | Zero | Gradient according to Income Associated with contracts |
| Databases | 30 years | Zero | Straight line |

### 4.10. Income taxes

Income tax expense includes current and deferred taxes. Tax expenses are recognized in the profit or loss, except for items recognized in "Other Comprehensive Income" OCI or directly in equity.

Deferred taxes are recognized based on temporary differences arising between the tax bases of assets and liabilities and the carrying amounts in the financial statements that result in amounts that are either deductible or taxable upon determining tax profits or losses corresponding to future periods when the carrying amount of the asset is recovered or liabilities are paid or settled. However, deferred tax liabilities are not recognized if they derive from the initial recognition of goodwill; nor are deferred taxes recorded if the initial recognition of an asset or liability occurs in a transaction that is not a business combination and that affects either accounting nor taxable profit or loss. Deferred tax is determined using enacted or substantively enacted tax rates at the reporting date.

Current income tax is calculated on the basis of the Colombian prevailing Tax laws. Management periodically assesses positions taken in its tax returns with regard to situations in which the applicable tax regulations are subject to interpretations and establish provisions when appropriate on the basis of amounts expected to be paid to the tax authorities.
Deferred tax assets are only recognized to the extent that it is probable that future taxable income is expected to be available to offset temporary differences.

Deferred tax liabilities arise from taxable temporary differences.

Deferred tax assets and liabilities are offset when there is a legal right to offset current deferred taxes against current tax liabilities, and when deferred tax assets and liabilities are related to taxes levied by the same tax authority on a single entity or different entities when there is an intention to offset the balances on a net basis.

## 4.11 Financial liabilities

A financial liability is any contractual obligation of the Company to deliver cash or another financial asset to another entity or person, to exchange financial assets or liabilities under conditions that are potentially unfavorable to the Company or a contract that will or may be settled using the Company's own equity instruments. Financial liabilities

are initially recorded at their transaction value, which, unless otherwise determined is similar to their fair value less transaction costs directly attributable to issuance. Subsequently, these financial liabilities are measured at amortized cost and their returns are recognized applying the effective interest rate method determined initially and charged to the income accounts as financial expenses.

Financial liabilities are only released from the statement of financial position when the obligations they generated or acquired are extinguished through either cancellation or renewed placement.

## 4.12 Derivative financial instruments and hedge accounting

Beginning January 2016, Credivalores adopted Hedge Accounting, and thus the impact in the Company's financial statements of derivatives used for hedging purposes will be aligned to their accounting treatment in derivatives items (that is, payment of principal and interest of debt in foreign currency).

Credivalores mitigates foreign exchange risk of its indebtedness in foreign currency –mostly from the Notes issued under its Euro Commercial Paper Program– using financial instruments like non-delivery and delivery forwards with local financial institutions rated "AA-" or higher.

The Company aims to hedge the next interest payment due together with the principal of the Notes until their maturity, in tranches during the four weeks following the closing of the Note. Subject to a joint decision of the treasury and international funding areas, a portion of the principal may be left unhedged, but this should be hedged in a timely manner.

### 4.12.1 Fair-value hedge accounting

Fair value hedging: hedging exposure to changes in the fair value of recognized assets, liabilities, or firm commitments, or of an identified portion of such assets, liabilities or firm commitments which may be attributed to a particular risk and may affect the income for the period.

Changes in the forward contract debt due to exchange-rate differences are offset by changes in the forward contract price associated with the change in the market rate (TRM). The forward points will be recorded in Other Comprehensive Income (OCI) until the maturity date. That is, the fair value will have an effect on both income accounts and on OCI.

### 4.12.2 Cash-flow hedge accounting

Cash-flow hedging: hedging of exposure to changes in cash flows that: (i) are attributed to a particular risk associated with an asset or liability (such as all or some of the future interest payments of a variable-rate loan), or to a highly probable forecast transaction, and; (ii) may affect the income for the period.

The net effect of market-value changes on coupon transactions will be recorded in Other Comprehensive Income (OCI); when the forward matures it will be recorded in the income accounts on the date when the coupon hedged is paid off.

## 4.13 Employee Benefits

Benefits for Company employees are short-term and include elements like the following, if they are to be paid in full before twelve months after the end of the annual reporting period in which employees provide related services:

(a)   wages, salaries and social security contributions.
(b)   paid leave and paid sick leave;
(c)   non-monetary benefits to current employees (such as medical care and per diem).

The Company will not need to reclassify an employee benefit to short term if the Company's expectations about the settlement calendar change temporarily. However, if the benefit characteristics change (such as a change from non-cumulative to cumulative benefit), or if a change to the settlement calendar expectations is not temporary, then the Company must determine whether the benefit still meets the definition of short term employee benefits.

When an employee has provided services to the Company during the accounting period the amount (not discounted) of the short-term benefits to be paid for such services will be recognized:

(a)   as a liability after deducting any amount already paid. If the amount already paid exceeds the amount not discounting benefits, the Company will recognize this excess as an asset (prepayment of an expense), inasmuch as the prepayment results in a reduction of future payments or a cash reimbursement.
(b)   as an expense.

## 4.13.1 Short term paid leave

The Company will recognize the expected cost of short-term employee benefits as paid leave as follows:

a)   in the case of paid leave whose rights are accumulating as the employees provide the services that increase their right to paid leave in the future.

b)   in the case of non-cumulative paid leave when the leave occurs.

Short term paid leave includes:

(a)   Vacation.
(b)   Temporary illness or disability.
(c)   Maternity or paternity leave.
(d)   Jury duty.
(e)   Other short-term leave.

## 4.14 Provisions and contingent liabilities

Lawsuit provisions are recognized when the Company has a current obligation (legal or assumed) derived from past events. A cash outflow is likely to be needed to settle the obligation and the amount has been estimated reliably. Restructuring provisions include lease cancellation payments and employee termination payments.

Where there are a number of similar obligations the likelihood that a cash outflow will be required is determined by considering the class of obligations as a whole. A provision is recognized even if the probability of a cash outlay with regard to any item included in the same class of obligations is immaterial.

Provisions are calculated at the present value of the disbursement expected to be needed to settle the obligation using a pre-tax discount rate that reflects current market measurements of the value of money over time and the specific risks attached to the obligation. An increase in the provision due to the passing of time is recognized as a financial expense.

### 4.14.1 Contingent Assets

The Company will not recognize any contingent asset. Contingent assets are not recognized in financial statements since this may result in the recognition of income that may never be realized. However, when the income is virtually certain to be realized then the related asset is not a contingent asset and should be recognized.

Contingent assets are assessed continually to ensure that developments are appropriately reflected in the financial statements. If it has become virtually certain that an inflow of economic benefits will arise the asset and the related income are recognized in the financial statements of the period when the change occurs.

### 4.14.2 Contingent Liabilities

The Company will not recognize any contingent liability. Contingent liabilities shall be continually assessed to determine if a cash outflow is likely to include future economic benefits. If it is expected that an outflow of future economic resources will be probable for an item previously dealt with as a contingent liability the corresponding provision is recognized in the financial statements of the period when the change in probability occurs (except in the extremely rare circumstances where no reliable estimate can be made of said amount).

### 4.15 Revenues

### 4.15.1 Revenues from interest and commissions

Revenues from ordinary activities are increases in economic benefits during a period that are generated through performance of ordinary activities and/or other revenues of Credivalores that increase equity.

Revenues are recognized:

- When services have been provided and/or when the risks and benefits associated with the sold goods have been transferred.  When the service is provided within the same reporting period, it is not necessary to record the level of progress, and instead 100% of the revenues are recorded in the same period.
- When it is probable that economic benefits associated with the activity will be received.
- When it is possible to reliably establish their amount.
- The value of revenues is normally determined by means of an agreement between the Company and a third party. They are measured at the fair value of the consideration received or receivable, taking into account any discount, bonus or rebate provided by the Company.

Revenue from contracts with customers (other than interest income) policy applicable from January 1, 2018 IFRS 15 establishes a comprehensive framework to determine how much and when income is recognized, it replaced IAS 18, IAS 11 and other policies related to its interpretations, IFRIC 13, IFRIC 18 and SIC 31

- **Contract assets**

A contract asset is Credivalores right to consideration in exchange for goods or services that Credivalores has transferred to a customer when that right is conditional on something other than the passage of time (for example, invoicing or delivery of other elements of the contracts).

Contract costs eligible for capitalization as incremental costs of obtaining a contract are recognized as a contract asset. Contract costs are capitalized when are incurred if Credivalores expects to recover those costs. Contract contracts are amortized on a systematic basis that is consistent with the transfer to the customer of the services when the related revenues are recognized. Contract costs capitalized are impaired if the customer is retired or if the asset's carrying amount exceeds projected discounted cash flows relating to the contract.

•        **Contract liabilities**

Contract liabilities comprise Credivalores obligation to transfer goods or services to a customer for which Credivalores has received consideration from the end customer or the amount is due.  Additionally, it includes deferred income relating to goods or services that will be delivered in the future, which are charged to a customer in advance but not yet due.

As set forth in IFRS 15, Credivalores uses the following approach to establish the classification, recognition and measurement of revenues from ordinary activities:

1. Identify the contracts with customers.
2. Identify the performance obligations associated with the contracts.
3. Establish the transaction price.
4. Assign the transaction price to each performance obligation identified.
5. Recognize revenues when Credivalores satisfies the performance obligations by means of transfer to the client of control over the goods and the services or the supply to satisfaction of the promised services.

Credivalores satisfies a performance obligation and recognizes revenue over time, if one of the following criteria is met:

a)        Credivalores performance does not create an asset with an alternate use to Credivalores, and Credivalores has as an enforceable right to payment for performance completed to date.

b)        Credivalores performance creates or enhances an asset that the customer controls as the asset is created or enhanced.

c)        The customer simultaneously receives and realizes the benefits provided by Credivalores.

For performance obligations where one of the above conditions are not met, revenue is recognized at the point in time at which the performance obligation is satisfied.

When Credivalores satisfies a performance obligation by delivering the promised goods or services it creates a contract asset on the amount of consideration earned by the performance. Where the amount of consideration received from a customer exceeds the amount of revenue recognized this gives rise to a contract liability.

Revenue is measured based on consideration specified in a contract with a customer and excludes amounts collected on behalf of third parties. Credivalores recognizes revenue when it transfers control over a good or service to a customer. Revenue is presented net of value added tax (VAT), rebates and discounts and after eliminating intra-group sales.

The following tables show the different activities that the Company carries out:

| Type of transaction | Description | IFRS standard |
|---|---|---|
| **Commissions** | | |
| Financial consultancy fees | Credit study fees | IFRS 15 |
| Insurance returns | Insurance sales commissions upon placing loans. | |
| Chain store commissions | Brokerage and channel (chain store) commissions. | |
| Collection and handling fees | Fees for collections processes through legal proceedings. | |
| Internal commission | Internal commission generated by intermediation channels. | |
| SME commission | Deferred commission on placement of loans under the Micro-Credit line | |
| FEE | Fee for handling the credit card, advance payments and offsetting through the channels of the Crediuno credit line. | |
| Brokerage fee | It is the brokerage fee charged in the contract signed with FGA. | IFRS 15 |
| **Management fees** | | |
| Crediuno | Management and handling fees for the Crediuno line. | IFRS 15 |
| Payroll deduction loans | Management fees and disbursement fees for the Payroll credit line. | |
| Credipoliza | Administration and handling fees for the Credipoliza line. | |
| Plus life insurance | Management fee on the Plus life insurance policy of the Crediuno line. | |

Credivalores often enter into contracts that cover a number of different services. Such contracts might contain components within, and components outside, the scope of IFRS 15. Therefore, Credivalores only applies the guidance in IFRS 15 where it has contracts that are all or partly outside the scope of IFRS 9.

Main revenue streams earned by the Company from contracts with customers are the following:

- *Credit cards: Interchange fees, Annual-quarterly-monthly fees*

There are contracts that create enforceable rights and obligations between Credivalores and the cardholders or merchants under which the Credivalores will provide services, sometimes in exchange for annual and other fees. The following are some of the services that might exist in a contract with a cardholder:

- Payment processing service;
- Insurance where Credivalores is not the insurer;
- Fraud protection; and
- Processing of certain transactions, such as purchases in a foreign currency and cash withdrawals.

The transaction price is allocated to each performance obligation based on the relative stand-alone selling prices of the goods or services being provided to the customer. The allocation of the transaction price to each of the separate performance obligations will not necessarily be required where there is more than one performance obligation, but the performance obligations are all satisfied at the same time or evenly over the period.

Performance obligations are fulfilled over time, taking into account that customers receive benefits as time goes on. Because the entity's efforts or resources are expended evenly throughout the performance period, income is

recognized on a linear basis during the period defined under the credit card conditions. The costs of plastic or security elements are capitalized as contract signing costs.

- **Commissions:**

Credivalores receive insurance commissions for introducing new clients to third party insurers, where the Credivalores does not underwrite the insurance policy itself. These commissions are usually paid periodically (for example, monthly) to Credivalores based on the volume of new policies (and/or renewal of existing policies) originating from clients introduced by the Credivalores. The transaction price might include an element of consideration that is variable or contingent on the outcome of future events, such as policy cancellations, which is estimated and included in the transaction price based on the most likely amount and it is included in the transaction price only when it is highly probable that the resolution of the uncertainty will not result in a significant reversal of revenue.

Performance obligations are fulfilled over time, taking into account that customers (insurers) receive benefits as time goes on. Where the commission calculation is made on a monthly basis or in a lower period, the total amount of the commission is recognized in the results when its determination is made. If the settlement of commissions is defined in periods higher than a monthly basis, the expected income to recognize revenues is estimated as time goes on.

Loan commitment fees are within the scope of IFRS 15 where it is unlikely that a specific lending arrangement will be entered into and the loan commitment is not measured at FVTPL. Loan syndication fees received by a Credivalores that arranges a loan and retains no part of the loan package for itself (or retains a part at the same Effective Interest Rate "EIR" for comparable risk as other participants) are within the scope of IFRS 15.

Income from performance obligations to provide such services, which are met at a point in time, are recognized when the particular event defined in the contracts occurs (e.g., approval of the syndicated loan). The obligations met over time are recognized during the period of the commitment; if they are received in advance, they are deferred for their periodic amortization; or if they are received upon expiration, they are estimated periodically.

**4.15.2 Revenues from ordinary activities**

Revenue from ordinary activities shall be measured at the fair value of the consideration received or to be received, and represent amounts to be collected for goods delivered, net of discounts and returns.

The Company recognizes revenues when the amount can be measured reliably, when future economic benefits will probably flow to the Company, and when specific criteria have been met for each activity, as described below:

**4.15.2.1 Dividends**

Credivalores recognizes dividends when the Company establishes the right to receive them.

When the right to receive them is established investments at fair value are credited to income accounts. For investments in associates, these are recognized using the equity method, deducting the investment amount.

**4.16 Net earnings per share**

To determine net earnings per share the Company divides the net income from the period attributable to shareholders, or controlling interest, between the weighted average common and preferred shares. Diluted net

earnings per share is determined in the same way over net earnings, but the weighted average of outstanding shares is adjusted considering the potential diluting effect of stock options.

## NOTE 5 - NEW FINANCIAL REPORTING STANDARDS AND INTERPRETATIONS

**5.1. New standards, amendments and interpretations included in the accepted accounting principles in Colombia**

IFRIC 23 Uncertainty regarding the Treatment of Income Taxes

IFRIC 23 was issued in May 2017, this Interpretation clarifies how to apply the recognition and measurement requirements of IAS 12 when there is uncertainty regarding the treatment of income tax. In this circumstance, an entity recognizes and measures its asset or liability for deferred or current taxes by applying the requirements of IAS 12 based on taxable profit (tax loss), tax bases, unused fiscal losses, unused tax credits and tax rates determined by applying this Interpretation.

The Company will evaluate the potential impacts of this interpretation in its financial statements, without having identified situations that may require changes in the financial statements.

Amendment to IAS 37 Provisions, Contingent Liabilities and Contingent Assets - Cost of Fulfilling a Contract

The purpose of this amendment was published in May 2020, specifying the costs that an entity includes in determining the "cost of performance" of a contract for the purpose of assessing whether a contract is onerous; clarifies that direct contract fulfillment costs include both the incremental costs of fulfilling a contract and an allocation of other costs that relate directly to contract compliance. Before recognizing a provision separated by a onerous contract, for a onerous contract, the entity must recognize impairment losses on the assets used to fulfill the contract.

The Company does not expect significant impacts from this modification, in any case it is evaluating the impact that these could have on the financial statements.

Reform of the benchmark interest rate

After the financial crisis, reform and replacement of benchmark interest rates, such as LIBOR GBP and other interbank rates (IBOR), has become a priority for global regulators. There is now uncertainty about the timing and precise nature of these changes. In order to transition existing contracts and agreements that refer to LIBOR, adjustments to time differences and credit differences may be necessary to allow the two benchmark rates to be economically equivalent in the transition

Changes made to IFRS 9 Financial Instruments, IAS 39 Financial Instruments: Recognition and Measurement and IFRS 7 Financial Instruments: Disclosures provide certain alternatives in relation to the reform of the benchmark interest rate. Alternatives relate to hedging accounting and have the effect that reforms generally should not cause hedge accounting to end. However, any coverage ineffability must continue to be recorded in the results state. Given the widespread nature of hedges involving interbank fee-based contracts (IBRs), alternatives will affect companies in all industries.

Accounting policies related to hedging accounting should be updated to reflect alternatives. Fair value disclosures may also be affected by transfers between levels of fair value hierarchy as markets become more or less liquid.

The Company does not expect significant impacts from this modification, in any case it is evaluating the impact that these could have on the financial statements.

Annual improvements to IFRS Standards cycle 2018–2020

The following improvements were completed in May 2020:

- IFRS 9 Financial instruments: clarifies which commissions should be included in the 10% test for de-payments in financial liability accounts.

- IFRS 16 Leases: Amends illustrative example 13 of the standard to remove the illustration of landlord payments related to improvements in leased property, to eliminate any confusion about the treatment of lease incentives.

The Company does not expect significant impacts from this modification, in any case it is evaluating the impact that these could have on the financial statements.

Conceptual Framework

The IASB has issued a revised Conceptual Framework to be used in decisions to establish rules with immediate effect. Key changes include:

- Increase the importance of management in the purpose of financial information
- Restoring prudence as a component of neutrality
- Define an entity that reports, which can be a legal entity or a part of an entity
- Review the definitions of an asset and a liability
- Eliminate the probability threshold for recognition and add guides on account de-down
- Add guides on different measurement bases
- Indicate that profit or loss is the main performance indicator and that, in principle, income and expenditure on other comprehensive income should be recycled when this improves the relevance or faithful representation of financial statements.

No changes will be made to any of the current accounting rules. However, entities that rely on the Framework to determine their accounting policies for transactions, events or conditions that are not otherwise covered by accounting rules should apply the revised Framework as of January 1, 2020. These entities should consider whether their accounting policies remain appropriate under the revised Framework.

## NOTE 6 - ESTIMATIONS OF FAIR VALUE

The Company may employ internally developed models for financial instruments that do not have active markets. Said models are mostly based on generally standardized valuation methods and techniques. Valuation models are primarily used to assess equity instruments not listed on the stock exchange, derivatives, debt securities and other debt instruments for which markets were or have been inactive during the financial period. Some components of these models may not be observable in the market and are estimated from assumptions.

The output of a model is always an estimate or approximate value that cannot be determined accurately, and valuation techniques used may not fully reflect all the factors relative to Credivalores positions, therefore the valuations are adjusted if necessary to include additional factors, such as country risk, liquidity risks and counterparty risks.

Fair value hierarchy has the following levels:

- Level 1 entries are unadjusted prices quoted in active markets for assets or liabilities identical to those the entity can access on the measurement date.

- Level 2 entries are entries other than the quoted prices included in Level 1 that are observable for the asset or liability, either directly or indirectly.

- Level 3 entries cannot be observed for the asset or liability.

The fair value hierarchy in which the fair value measurement is fully classified is determined from the lowest level entry that is significant for fully measuring the fair value. For that, an entry's importance is evaluated with regard

to the fair value measurement in its totality. Financial instruments quoted in markets considered inactive but valued in accordance with quoted market prices, quotes from price providers or alternative price sources supported by observable entries, are classified in Level 2.

A fair value measurement that uses observable entries requiring significant adjustments based on unobservable entries is a Level 3 measurement. The evaluation of a particular entry's importance in measuring the fair value in its totality requires an opinion, considering specific factors of the asset or liability.

The determination of what constitutes "observable" requires a significant opinion from Credivalores. The Company considers observable data that market data that is already available, distributed or updated regularly by the price provider, is reliable and verifiable, has no property rights, and is provided by independent sources that participate actively in the reference market.

## 6.1 Fair Value Measurement on a Recurring Basis

Level 2 input data elements include: the prices quoted for similar assets or liabilities at active markets; the quoted prices for assets or liabilities that are identical or similar in markets which are not active; input data other than quoted prices that are observable for the asset or liability and input data corroborated by the market. According to the above, Credivalores values derivative financial instruments with input data from fair value level 2.

The following table analyzes assets and liabilities (by class) within the fair value hierarchy, measured at fair value as of December 31, 2020 and December 31, 2019, on a recurring basis.

|  | December 31, 2020 | December 31, 2019 |
|---|---|---|
| **ASSETS** | **Level 2** | **Level 2** |
| Investments in equity instruments | 16.938 | 8.715 |
| **Hedging derivatives** | | |
| Currency forward | 7.108 | 10.771 |
| Options | 87.470 | 85.426 |
| Cross Currency Swap | 148.866 | 114.633 |
| **Consumer** | | |
| Payroll deduction loans | 20.015 | 19.324 |
| **Total fair value recurring assets** | **280.397** | **238.869** |
| | | |
| **LIABILITIES** | | |
| **Hedging derivatives** | | |
| Forward | 16.791 | 103 |
| Options | - | 32.085 |
| **Total fair value recurring liabilities** | **16.791** | **32.188** |

## 6.2 Fair value determination

The methodology applicable to instruments for Credivalores is:

**6.2.1** **Forward valuation:** The derivative's fair value comes from an internal model. This model takes the exchange rate on the day after the valuation date and forecasts it to a future value using the devaluation curve through maturity date. After this the new forward market rate is compared to the agreed forward rate and the difference is expressed in present value using the IBR curve to calculate the derivative's fair value.

**6.2.2** **Swap Valuation:** the reasonable value of the derivative comes from an internal model. The valuations of the Interest Rate Swaps (IRS) and the Cross-Currency Swaps (CCS) are performed assuming a long and a short position on a bond; including in each case the principal of the operation. For the projection and discount of the cash flows we use current rates, to calculate the reasonable value of the derivative financial instrument.

**6.2.3** **Option Valuation:** The reasonable value of the derivative comes from an internal model. The valuation of an option on its expiry date is the maximum between the premium and the difference between the exercise

price and the spot price. For the projection and discount of the cash flows we use the current rates, to calculate the reasonable value of the derivative financial instrument.

**6.2.4   Loan portfolio valuations:** Because these instruments do not have an active market, the Company has developed methodologies that employ market information for certain cases of unobservable data. The methodology seeks to maximize the use of observable data to arrive at the closest approximation of an initial price for assets and liabilities without an ample market.

The Company has implemented the following methodology to determine its loan portfolio´s Fair Value:

I.   Discount Rate: Determined by product considering market´s appetite for such product, as well as the default risk involved

II.   The model was built based on the following factors:

   a.   Projected cash flows according to weighted average life for each product, using: Current Balance Average term to maturity, weighted average Rate

   b.   Calculate present value of cash flows projected as per described in a) discounted at the discount rate previously described.

   c.   Present value determined as per described in b) represents the loan portfolio´s fair value.

**6.2.5 Equity instruments:** Credivalores has equity investments in Agrocañas, representing less than 20% of the company equity and that in mutual funds. In general, the company is not listed on any public securities market, and therefore its fair value is determined using the adjusted net asset value method. For mutual funds fair value is determined through valuation of investment portfolios managed by the Trust, which are subject to an active securities market.

Credivalores defined Level 3 financial instruments as those not traded in an active market, the following table provides information about valuation techniques and significant unobservable inputs when measuring assets and liabilities at recurrent fair value.

|  | **Valuation technique** | **Significant inputs (1)** |
|---|---|---|
| **ASSETS** | | |
| **Equity Instruments** | Adjusted net asset value | - Current Balance<br>- Average term to maturity<br>- Weighted average Rate<br>- Unit value |

**6.2.6 Derivative financial instruments**

Derivative financial instruments and hedge accounting:

A derivative is a financial instrument in which value changes respond to changes in one or more variables denominated as an "underlying" (a specific interest rate, the price of a financial instrument, a listed commodity, a foreign currency exchange rate, etc.), that has an initial net investment smaller than would be required for other instruments that have a similar response to the mentioned variable and that is settled in a future date.

Credivalores trades in financial markets, forward contracts, future contracts, swaps and options that fulfil the definition of a derivative.

Financial assets and liabilities from transactions with derivatives are generally not offset in the statement of financial position. However, when there is a legal and exercisable right to offset the recognized values and Credivalores intends to be settle them on a net basis or to realize the assets and settle the liability simultaneously, derivatives are presented as net values in the statement of financial position.

Derivative transactions are initially recognized at fair value. Subsequent changes in the fair value are recognized in profit or loss, unless the derivative instrument is designated as a hedging instrument and, in this case, the accounting criteria will depend on the nature of the hedged item, as described below.

At the beginning of the hedging transaction, Credivalores formally documents the relationship existing between the hedging instrument and the hedged item, including the risk management objective and strategy in undertaking the hedging relationship. It also documents its assessment, both initially as well as on a recurring basis, of whether the hedging relationship is highly effective in offsetting the changes in fair value or cash flows of the hedged items.

For fair value hedge of assets or liabilities and firm commitments, changes in the fair value of the derivative instrument are recognized in profit or loss, as well as any other change in the fair value of the asset, liability or firm commitment attributable to the hedge risk.

For cash flow hedge of a particular risk associated with a recognized asset or liability or a projected highly probable transaction, the effective portion of changes in the fair value of the derivative is recognized in other comprehensive income. The gain or loss relating to the portion that is not effective for hedging or that does not relate to the hedged risk is immediately recognized in profit or loss.

The values accumulated in other comprehensive income are transferred to profit or loss in the same period in which the hedged item is recognized in profit or loss.

Hedging of net investments in a foreign operation is recognized similarly to cash flow hedging: the effective portion of changes in fair value of the hedging instrument is recognized in other comprehensive income, and the ineffective portion of the changes in fair value of the derivative is recognized in profit or loss. The hedging instrument's gains or losses accumulated in equity will be recognized in profit or loss when the net investment in foreign operations is sold in whole or proportionally, if partially disposed of.

Credivalores defined Level 2 financial instruments as those not traded in an active market, the following table provides information about valuation techniques and significant unobservable inputs when measuring derivative assets and liabilities at recurrent fair value.

| | Valuation technique | Significant inputs (1) |
|---|---|---|
| **ASSETS**<br>**Trading Derivatives**<br>  Currency Forward<br>  Debt securities Forward | Discounted cash flow | - Underlying asset price Currency curve by underlying asset<br>- Forward exchange rates curve of the operation's currency<br>- Implicit curves of exchange rates forwards<br>- Implicit volatilities matrixes and curves |
| **LIABILITIES**<br>**Derivatives held for trading**<br>  Currency Forward<br>  Debt securities Forward | Discounted cash flow | - Underlying asset price<br>- Currency curve by underlying asset |

| | Valuation technique | Significant inputs (1) |
|---|---|---|
| | | - Forward exchange rates curve of the operation's currency |
| | | - Implicit curves of exchange rates forwards |
| | | - Implicit volatilities matrixes and curves |

**6.3 Determination of fair value of financial assets and liabilities recorded at amortized cost.**

Below are the Company's assets and liabilities at fair value and their book value:

| Fair value | December 31, 2020 | | December 31, 2019 | |
|---|---|---|---|---|
| | Book Value | Fair Value Estimate | Book Value | Fair Value Estimate |
| **Assets** | | | | |
| Loan Portfolio (Gross) | | | | |
| Consumer | 1.747.353 | 1.795.341 | 1.424.958 | 1.433.358 |
| Microcredit | 5.772 | 5.964 | 5.863 | 6.053 |
| **Total** | **1.753.125** | **1.801.305** | **1.430.821** | **1.439.411** |
| | | | | |
| **Liability** | | | | |
| Financial obligations | 2.015.402 | 2.092.655 | 1.643.578 | 1.689.025 |
| **Total** | **2.015.402** | **2.092.655** | **1.643.578** | **1.689.025** |

The book value corresponds to the value at amortized cost. The fair value estimate does not include transaction costs.

**6.4 Financial Instruments**

**Financial Assets**

The Company classifies its financial assets into equity instruments, trading instruments, amortized cost investment instruments, credit instruments and accounts receivable.

At the time of initial recognition a financial instrument is measured at fair value plus any direct attributable transaction costs, which are not included if the instrument is classified at fair value through changes in profit or loss. Typically, the fair value at the initial time of recognition is the price of the transaction itself, that is, the amount to be paid or received.

Credivalores recognizes loans and accounts receivable, trading and investment securities and other assets or liabilities on their effective dates.

Purchases and sales of financial assets that are regularly carried out are recognized on the transaction date or on the date on which the Company is required to purchase or sell the asset.

Subsequently, the Company measures its financial instruments at fair value or amortized cost based on the established business model and the contractual terms of the corresponding financial asset or liability.

**iii.  Amortized cost**

Amortized cost is the cost of acquiring a financial asset or a liability plus or minus any capital repayments, cumulative amortizations (calculated using the effective interest rate method) with regard to any difference between the initial amount and the value repaid at maturity and minus any reduction for impairment.

**iv.  Fair value**

Fair value is the amount to be received should the asset be sold or the amount to be paid for transferring a liability as part of a transaction between market participants on the date on which the measurement is made. The most

objective and commonplace definition of fair value is the price that would be paid in an active, deep and transparent market ("listed price" or "market price").

When such values are available CVCS determines the fair value of an instrument using the prices listed on an active market for that specific instrument. A market is considered active if listed prices are readily and regularly available and represent real transactions that are performed regularly on a stand-alone basis.

Should no active market exist for a specific financial instrument CVCS determines its fair value using valuation techniques.  These valuation techniques include using recent market transactions between knowledgeable, willing parties carried out on an arm's length basis, should these exist, as well as the fair values of other financial instruments that are substantially the same, discounted cash flows and pricing models.
The valuation technique chosen makes use, to the maximum extent possible, of information obtained directly from the market, using the least amount of data estimated by CVCS, incorporating all those factors that would normally be considered by market participants for setting the price of such financial instruments and is consistent with generally accepted pricing methodologies.

Fair value estimates obtained from financial models are adjusted to consider other factors such as uncertainty on its risk or the liquidity model. Adjustments are included when CVCS believes that another market player uses these same estimates when determining the price of a transaction.

The Company´s business model includes payroll loans at fair value with changes in profit and losses, whereby the loans originated within the 90 days prior to the date of the financial statements are valued at fair value. In order to estimate the fair value of these loans, which could be sold to financial institutions at a market price, the Company evaluates the lending rate of these loans within the reference market to evaluate the rate at which other financial institutions considered as peers and comparable to the Company will be willing to invest their resources and hold the payroll loans within their balance sheet.

Considering the results from the evaluation of the rates, the Company evaluates four variables to obtain the value of the adjusted rate applicable to the transactions to sell loan portfolio, according to internal criteria:

i)      The multiplier, which compares the Company's rate to the market rate.
ii)     The value of the premium paid in these businesses, which results from discounting the future values of a loan originated at Credivalores' lending rate using the market rate.
iii)    The rate is adjusted by the transaction cost associated to the loan portfolio.
iv)     The cash flows associated to the insurance policies applicable to the loan are also valued.

The methodology followed by the Company, uses the last three months reports from the Financial Superintendence as the source of information to determine the interest rate to discount the cash flows and complete the valuation of the final selling price of the loan portfolio.

The Company has determined that the fair value of the loan portfolio registered in its financial statements is type 3, since most of the criteria is internal.


**6.4.1 Loans and receivables portfolio**

The Company classifies its financial assets into the following measurement categories, based on their corresponding business model:

| Classification of Financial Assets: | | | |
|---|---|---|---|
| **Measurement** | **Terms** | **Features** | **Valuation** |
| Fair value | 0-90 days from origination | Current and best rated loans | Market price Tucredito |
| Amortized cost | 0 days from origination onwards | Current and past-due portfolio | Incurred loss model (equivalent indexed rate) |

### 6.4.1.1 Financial Assets at Fair Value

Credivalores Crediservicios S. A. S., in line with its business model, classifies its products according to the risk inherent in its portfolio. In general, its line of credit Tu credito (payroll deduction loans) is measured at fair value, given that its market niche is focused on placing "top-rated" loans.

| Classification of "Tu credito" line of credit, based on the corresponding business model | | | |
|---|---|---|---|
| **Item** | **Tu credito portfolio segment** | **Measurement** | **Valuation** |
| 1 | Performing loans subject to sale | Fair value | Market price. |
| 2 | Best rated loans with terms of less than a year (originated loans less than 90 days prior) | Amortized cost | (Indexed rate equivalent to amortized cost). |
| 3 | Performing loans with terms of more than one year (originated loans with terms of more than 90 days) | Amortized cost | (Indexed rate equivalent to amortized cost). |
| 4 | Past due loans | Amortized cost | Incurred loss model based on the expected loss. |

The policy established by the Company for measuring its loan portfolio, per the business model classification, is:

In line with its business model the Company has decided to measure the loans comprising the "Tu credito" line of credit at fair value based on the historical trading average since its loans are not impaired (and which, from their origination, are the best-rated 0 - 90 day loans) and since the Company has the possibility of selling them in the short term because of their excellent rating.

Unsold lines of credit, which were initially measured at fair value but which after 90 days of origination were impaired, will later be measured based on an indexed rate, which converts the amortized cost rate into an amount equivalent to their fair value.

### 6.4.1.2 Financial assets at amortized cost

Financial assets are classified at amortized cost only if the asset is kept within a business model whose objective is to maintain it to collect contractual cash flows and the contractual terms of the value give rise at specific dates to cash flows that are only payments of cash capital and interest on the outstanding principal capital; Interest income is recognized using the effective interest rate method.

The effective interest method is a method used to calculate the amortized cost of an asset and allocate the income or cost in interest during the relevant period. The effective interest rate is the discount rate at which the present value of estimated future cash payments or those received over the expected life of the financial instrument, or, as appropriate, in a shorter period, is equal to the net book value in the beginning. To calculate the effective interest rate, the Company estimates the cash flows considering all the contractual terms of the financial instrument,

including the transaction costs and the premiums granted minus the commissions and discounts, but without considering the future credit losses.

## NOTE 7. RISK MANAGEMENT

Credivalores manages risk pursuant to the applicable regulations in the country and Credivalores internal policies.

**Objective and general guidelines**

Credivalores objective is to maximize returns for its investors, through proper risk management. The guiding principles of risk management of Credivalores are as follows:

a) Make risk management a part of every institutional process.
b) Specialization in consumer product niches.
c) Extensive use of continuously updated scoring models to ensure quality growth of consumer loans

### 7.1 Governance structure

**Board**

It is up to the Board of Directors of Credivalores Crediservicios S.A.:

1. Establish and oversee the Company's risk management structure
1. Approve the policies, processes and methodologies of granting, monitoring and recovery of the company's credits, in order to identify, measure and control the risks faced by the Company
- Approve exposures and limits to different types of risks.
- Point out the responsibilities and powers assigned to the positions and areas responsible for managing the different types of risk, in order to develop an environment of culture and risk control.
- Evaluate proposals for recommendations and correctives on management processes.
- Approve the internal control system, as well as evaluate the reports and management of the area responsible for such control.
- Request management, when deemed necessary and for evaluation, reports on the credit portfolio.

**Risk Committee**

The responsibilities of the Risk Committee are:

- Standardize the periodic monitoring of the company's main risk indicators and anticipate risky situations that have the potential to lose the value of CVCS' assets.
- Regularly review risk management policies and systems to reflect changes in market conditions and CVCS activities.
- Proposes to the Board changes or adjustments to existing policies and methodologies to mitigate and control the level of target risk.
- The comity of risk meets monthly and is made up of members invited, within which they are:

- President
- Head of Risks
- Collections Manager
- Director of Financial Planning
- Director of Analytics Models and Strategy
- Director of Operations and Technology
- Commercial Managers

The commit not only has the permanent participation of CV Managers, but experts and external specialists who advise the decisions made by this body.

**Risk Headquarters**

- Periodically present to committed risks the evolution of the different risk indicators and perform the necessary analyses for understanding and taking actions that mitigate and control the levels of risk.
- Manage and control compliance with approved policies and processes for risk management.
- Regularly review risk management policies and systems to reflect changes in market conditions and CVCS activities.

Propose to the risk committee methodologies and adjustments to risk management policies

- Develop methodologies and models that allow the identification, measurement, control and monitoring of risks.

**Internal Audit**

1. Check the development of risk management in accordance with the comprehensive risk management manual
2. Report to the audit committee and issue recommendations on the findings of the risk management process

**Financial Risk Management**

The Company is exposed to the following risks related to the use of financial instruments:

- Credit Risk
- Market Risk
- Liquidity Risk
- Operating Risk

The financial statements do not include all financial risk management information and disclosures required in the annual financial statements; these financial statements should be read in conjunction with Credivalores annual financial statements as of December 31, 2019. There have been no changes to the risk management department or any risk management policies since December 31, 2019. There are no significant changes related to risk objectives, the corporate structure of the risk function and risk strategies in general compared to what was revealed in the last set of financial statements as of December 31, 2019.

**7.2 Credit Risk**

Credit risk is the risk of financial loss faced by Credivalores Crediservicios S.A., if a client or counterparty in a financial instrument does not meet its contractual obligations and originates mainly from the receivables to customers and the Company's investment instruments.

The business model of Credivalores Crediservicios S.A, in its portfolio of credits differs from the rating of its products according to the inherent risk of its portfolio.

During the three and six-month period ended December 31, 2020, there were no significant changes in policies and how Credivalores handles credit risk.

The maximum exposure to credit risk of Credivalores, according to IFRS 7, is reflected in the book value of financial assets in the statement of financial position of Credivalores as of December 31, 2020 and December 31, 2019 as follows:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Cash and cash equivalents | 264.299 | 163.851 |
| Financial instruments net | 260.382 | 219.545 |
| **Loan portfolios** | | |
| Consumer loans | 1.747.353 | 1.424.958 |
| Microcredit portfolio | 5.772 | 5.863 |
| Payroll loans at fair value | 20.015 | 19.324 |
| Accounts receivable, net | 428.978 | 386.189 |
| **Total financial assets with credit risk** | **2.726.799** | **2.219.730** |
| **Off-balance-sheet credit risk at nominal value** | | |
| Unpaid approved credits | 385.960 | 495.551 |
| **Total exposure to off-balance-sheet credit risk** | **385.960** | **495.551** |
| **Total maximum exposure to credit risk** | **3.112.759** | **2.715.281** |

**Credit Risk Model: Loans**

**I.      Transitions between stages**

A financial asset is classified as a low credit risk asset based on the debtor's payment habits.

The first step in the methodology consist in evaluating a significant increase in credit risk by comparing the current status against a previous status of stage recognition of the loan.

If the financial asset loses its low credit risk condition or if changes in external environment results in a review of the condition, then this probably shows a significant increase in credit risk. Consequently, the financial asset will be analyzed to determine if there is a significant increase of credit risk (stage 2) or if the asset should be classified as stage 3.

**Significant Increase in Credit Risk**

When determining whether the credit risk (i.e. risk of default) of a financial instrument has increased significantly since initial recognition, Credivalores considers reasonable and supportable information that is relevant and available without undue cost or effort, including both quantitative and qualitative information and analysis based on Credivalores historical experience, expert credit assessment and forward-looking information.

The following criteria is used to determine if a significant increase in credit risk has occurred:

• Comparison of the remaining lifetime probability of default (PD) at the reporting date with the lifetime PD at initial recognition of the exposure.

• Qualitative aspects such as the rebuttable presumption of the norm and restructuring agreements are also considered.

• Qualitative criteria from analysts is also considered based on expert and supportable information.

Credivalores has established a framework that incorporates both quantitative and qualitative information to determine whether the credit risk of a particular financial instrument has increased significantly since initial recognition. The framework is aligned with Credivalores internal credit risk management process.

The criteria for determining whether credit risk has increased significantly will vary by portfolio and will include a backstop based on delinquency.

In certain instances, using its expert credit judgement and, where possible relevant historical experience, Credivalores may determine that an exposure has undergone a significant increase in credit risk if particular qualitative factors indicate so and those indicators may not be fully captured by its quantitative analysis on a timely basis. As a backstop, and as required by IFRS 9, Credivalores will presumptively consider that a significant increase in credit risk occurs no later than when an asset is more than 60 days past due.

Credivalores will monitor the effectiveness of the criteria used in identifying significant increases in credit risk through regular reviews to confirm that:

- The criteria are useful in identifying significant increases in credit risk before an exposure is in default;
- The criteria do not align with the point in time when an asset becomes over 60 days past due;
- The average time between the identification of a significant increase in credit risk and default appears reasonable;
- Exposures are not generally transferred directly from 12-month ECL measurement to credit-impaired; and there is no unwarranted volatility in loss impairment from transfers between 12 month ECL and lifetime ECL measurements.
- 

## II.    PD – Probability of Default

**Term structure of PD**

Credit risk grades are the primary input in the determination of the term structure of PD for exposures. Credivalores collects performance and default information about its credit risk exposures analyzed by type of product and borrower, and by credit risk grade. For some portfolios, information purchased from external credit reference agencies may also be used.

Credivalores employs statistical models to analyze the data collected and generate estimates of the remaining lifetime PD of exposures and how these are expected to change as a result of the passage of time.

This analysis includes the identification and calibration of the relation between changes in default rates as well as an in-depth analysis of the impact of certain other factors on the risk of default.

For stage 1 the PD estimates the probability that the credit will default in the next 12 months, while the PD in stage 2 is the result of the probabilities for the remaining life of the credit. The probability in Stage 3 is defined as 100%.

To determine the PD the company used statistical models to analyze and select the variables significant in predicting whether clients would reach default during a known period of time that is determined by the stage of the loan. For stage 1 the PD are evaluated for the next 12 months, loans on later stages are evaluated for the remainder of the loan lifetime.
To estimate lifetime probability Credivalores calculates the 12-month PD and for each successive year for the loan lifetime the model estimates the PD conditioned to not having defaulted during previous years.

Credivalores uses behavioral demographic and origination variables to estimate PD modeling them with a logistic regression that is periodically monitored to ensure its predictive capabilities and its stability. This monitoring for payroll loans and credit card models showed adequate predictive capabilities as well as stability regarding its inputs distributions (PSI). There was also a test run on average observed PD by rating of the last 2 years that ensure the actual events that are being predicted have not vary its behavior significantly and therefore concluding the models provide an adequate and reasonable prediction of PDs by rating.

Credivalores approach to incorporating forward-looking information into this assessment is discussed below.

**Forward-Looking Information**

Credivalores incorporates forward-looking information into its measurement of ECLs. Credivalores formulates a 'base case' view of the future direction of relevant economic variables and a representative range of other possible forecast scenarios based on forecasts provided by economic experts and considering a forecast of multiple variables. This process involves developing two or more additional economic scenarios and considering the relative probabilities of each outcome.

The base case represents a most-likely outcome. It is aligned with information used by Credivalores for other purposes, such as strategic planning and budgeting. The other scenarios for Colombia represent more optimistic and more pessimistic outcomes.

Credivalores has identified and documented key drivers of credit risk and credit losses for each portfolio of financial instruments and, using an analysis of historical data, has estimated relationships between macro-economic variables and credit risk and credit losses.

The economic scenarios used as of December 31, 2020 include the following key indicators (among others) for Colombia for the years ending 31 December 2020 and December, 2019[1]:

| | 2019-2020 | | |
|---|---|---|---|
| | Scenario A | Scenario B | Scenario C |
| Usury rate | 28,0% | 27,7% | 27,1% |
| Economic Tracking Indicator | 112,83 | 110,70 | 108,57 |
| CPI Variation | 40% | 39% | 38% |

**Credit Risk Rating**

Credivalores allocates each exposure to a credit risk grade based on a variety of data intended to be predictive of the probability of default and applying experienced credit judgment. Credivalores uses these grades with the purpose identifying significant increases in credit risk. Credit risk grades are defined using qualitative and quantitative factors that are indicative of the risk of default. These factors may vary depending on the nature of the exposure and the type of borrower and product.

Each exposure is allocated to a credit risk grade at initial recognition based on available information about the borrower. Exposures are subject to ongoing monitoring, which may result in an exposure being moved to a different credit risk grade.

**Loan Portfolio**

**Payroll and Credit card loans**
- Information collected internally about the behavior of customers.
- Demographic information of customers.
- Origination information of credits/customer.

**III.    LGD – Loss Given Default**

LGD is a measure of the potential loss if a default scenario occurs. To establish the LGD, Credivalores methodology uses historical information to measure the recoveries of loans that reach the default stage at present

---

[1] Projections made internally by the planning area.

value. This allows Credivalores to have an adequate estimate of the losses it will incur when credits reach default stage. These calculations is done separately for payroll loans and credit cards to better reflect the fundamental differences in this product and therefore on its LGD.

### IV.      EAD – Exposure at Default

EAD represents the amount owed from a counterparty at the time of a possible default. For stage 2 Credivalores incorporates in the analysis of the exposure at default the probability of payments and increase or decrease in exposure during the lifetime of the credit.

These probabilities are estimated using the historical information collected by the company and are grouped by type of product. The probabilities are constantly reviewed in order to accurately estimate them and calibrate them.

For payroll loans EAD will correspond to the full valuation of the assets at amortized cost. For credit cards, EAD will take into account the unused credit line when available as well the expected amortization, which allows to have a reliable estimate of the credit exposition at default.

### V.      Simplified Model

Credivalores uses a simplified roll rate model to estimate ECL of remnants of portfolio loans that represent less than 5% of balance sheet loans and that are consistently lowering its portfolio share.

### I.      Transition between stages

A financial asset is classified as a low credit risk asset based on the debtors payment habits.

The first step in the methodology consist in evaluating a significant increase in credit risk by comparing the current status against a previous status of stage recognition of the loan.

If the financial asset loses its low credit risk condition or if changes in external environment results in a review of the condition, then this probably shows a significant increase in credit risk. Consequently, the financial asset will be analyzed to determine if there is a significant increase of credit risk (stage 2) or if the asset should be classified as stage 3.

### II.      PD – Probability of default

To determine the PD the company used statistical models to analyze and select the variables significant in predicting whether clients would reach default during a known period of time that is determined by the stage of the loan. For stage 1 the PD are evaluated for the next 12 months, loans on later stages are evaluated for the remainder of the loan lifetime.
To estimate lifetime probability Credivalores calculates the 12-month PD and for each successive year for the loan lifetime the model estimates the PD conditioned to not having defaulted during previous years.

Credivalores uses behavioral demographic and origination variables to estimate PD modeling them with a logistic regression that is periodically monitored to ensure its predictive capabilities and its stability. This monitoring for payroll loans and credit card models showed adequate predictive capabilities as well as stability regarding its inputs distributions (PSI). There was also a test run on average observed PD by rating of the last 2 years that ensure the actual events that are being predicted have not vary its behavior significantly and therefore concluding the models provide an adequate and reasonable prediction of PDs by rating.

PD depends of the external credit rating of the issuance, issuer or counterparty. Credit rating information is published by international credit rating corporations, such as Standard & Poor's, Moody's and Fitch Ratings, or

national credit rating corporations, such as Fitch Ratings Colombia S.A. or BRC. In any case, international ratings have priority over national ratings.

Credit ratings from S&P have priority over other rating corporations. If the issuance, issuer or counterparty is not rated by S&P, credit ratings from Moody's or Fitch Ratings can be used but they must be translated to the S&P rating scale. The order of priority in credit rating corporations is as follows: S&P in first place, Moody's in second place and Fitch Ratings in the third one.

The reason for choosing this hierarchy is to avoid discretion at the time of assigning a rating. National credit rating corporations can be used only if international credit ratings are not available, and the translation condition to the S&P rating scale must be followed as well.

For financial assets classified as stage 1, PD correspond to the probability of default for the next 12 months established in accordance to "Cumulative Default Rates by Rating Modifiers" for both sovereign and corporate issuers, expressed at an annual basis. In order to avoid an empty value of impairment as a consequence of a PD equal to zero, methodology allows PD increase from 0% to 0.01%. If the remaining life of the assets is less than 12 months, the resulting PD will correspond to the weighted 12 months-PD with the remaining life of the financial asset.

For financial assets classified as stage 2, lifetime PD must be used and computed using the "Cumulative Default Rates by Rating Modifiers" for both sovereign and corporate issuers, expressed at an annual basis and according to the term of each flow.

For financial assets classified as stage 3, lifetime PD will equal 100% for any issuance, issuer or counterparty.

**Forward-Looking Information**

Credivalores incorporates forward-looking information into its assessment of whether the credit risk of an instrument has increased significantly since initial recognition and its measurement of ECL. This information will directly affect the PD and the stage classification.

### III. LGD – Loss given default

LGD is a measure of the potential loss if a default scenario occurs. To establish the LGD, Credivalores methodology uses historical information to measure the recoveries of loans that reach the default stage at present value. This allows Credivalores to have an adequate estimate of the losses it will incur when credits reach default stage. This calculation is done separately for payroll loans and credit cards to better reflect the fundamental differences in this product and therefore on its LGD.

### IV. EAD – Exposure at default

EAD represents the amount owed from a counterparty at the time of a possible default.

For payroll loans EAD will correspond to the full valuation of the assets at amortized cost. For credit cards, EAD will take into account the unused credit line when available as well the expected amortization, which allows to have a reliable estimate of the credit exposition at default.

**Credit Risk Model: Other accounts receivable**

Credivalores uses the simplified approach where Credivalores uses an impairment matrix to measure the ECLs of trade receivables from individual customers, which comprise a very large number of small amounts.

Loss rates are calculated using a 'roll rate' method based on the probability of a receivable progressing through successive stages of delinquency to write-off. Roll rates are calculated separately for exposures in different segments based on the following common credit risk characteristics like type of product purchased.

**Loss impairment**

The table below shows the loss impairment balances as of December 31, 2020:

| | | Stage 1 | Stage 2 Lifetime ECL not credit-impaired | Stage 3 Lifetime ECL credit-impaired | Total |
|---|---|---|---|---|---|
| | | 12-month ECL | | | |
| Loan portfolio | | | | | |
| Loan consumer portfolio | | 56,459 | 15,323 | 189,353 | 261,135 |
| Loan microcredit portfolio | | - | - | 5,837 | 5,837 |
| Total loan portfolio | Ps. | 56,459 | 15,323 | 195,190 | 266,972 |
| Total loss impairment financial assets at amortized cost | Ps. | 56,459 | 15,323 | 195,190 | 266,972 |
| **Total loss impairment** | **Ps.** | **56,459** | **15,323** | **195,190** | **266,972** |

(1) Credivalores has initially adopted IFRS 15 and IFRS 9 as of January 1, 2018. According to the transition methods chosen, comparative information is not restated. See Note 2.

The table below shows for loans stage 3 individually assessed for ECL the gross amount and loss impairment balances as of December 31, 2020.

| | | December 31, 2020 | | |
|---|---|---|---|---|
| | | **Gross Amount Registered** | | **Impairment Recognized** |
| With recognized provision | | | | |
| Consummer | Ps. | 312,015 | Ps. | 189,353 |
| Microcredit | | 5,837 | | 5,837 |
| Total | **Ps.** | **317,852** | **Ps.** | **195,190** |

**7.2.1 Monitoring and Control Process**

The Company has an information system in place that provides daily indicators on the loan portfolio status to allow proper monitoring and timely decision-making.

The credit approval processes are connected to an engine managed by the risk area, which allows real-time adjustments to policy parameters to take immediate action where required in loan origination.

Each month the Risk Committee meets to evaluate the development of each product portfolio, analyzing the performance of each yield and applying corrective measures to credit processes or policies where necessary.

**As of December 31, 2020**

| Status | Tu Crédito | CrediUno | CrediPóliza | Microcredito | Total managed portfolio | On balance sheet Portfolio |
|---|---|---|---|---|---|---|
| CURRENT | 807.326 | 572.052 | 49.344 | - | 1.428.721 | 1.224.357 |
| 1-30 | 7.145 | 34.922 | 4.843 | - | 46.910 | 45.289 |
| 31-60 | 8.399 | 17.518 | 1.204 | - | 27.120 | 25.989 |
| 61-90 | 4.032 | 25.397 | 187 | - | 29.616 | 29.423 |
| 91 - 180 | 13.341 | 12.957 | 539 | - | 26.837 | 26.578 |
| 181 - 360 | 9.806 | 6.369 | 496 | 13 | 16.685 | 16.120 |
| > 360 | 74.888 | 76.510 | 7.223 | 4.163 | 162.785 | 151.115 |
| **Totals** | **924.937** | **745.725** | **63.836** | **4.176** | **1.738.674** | **1.518.871** |

**As of December 31, 2019**

| Status | Tu Crédito | CrediUno | CrediPóliza | Microcredito | Total managed portfolio | On balance sheet Portfolio |
|---|---|---|---|---|---|---|
| CURRENT | 844.030 | 470.313 | 54.888 | 28 | 1.369.260 | 1.050.198 |
| 1-30 | 13.443 | 12.238 | 5.376 | 13 | 31.070 | 28.737 |
| 31-60 | 4.389 | 9.601 | 1.071 | 10 | 15.070 | 13.608 |
| 61-90 | 5.747 | 8.302 | 343 | 4 | 14.397 | 12.906 |
| 91 - 180 | 12.002 | 14.629 | 999 | 20 | 27.649 | 25.939 |
| 181- 360 | 9.640 | 15.996 | 2.173 | 15 | 27.823 | 26.697 |
| > 360 | 48.573 | 46.305 | 4.829 | 4.176 | 103.883 | 93.759 |
| **Totals** | **937.824** | **577.384** | **69.679** | **4.266** | **1.589.152** | **1.251.844** |

**7.3 Credit worthiness**

The following is a breakdown of banks and other financial institutions that hold our savings and checking account deposits.

| Entity | Type of Account | December 31, 2020 | December 31, 2019 |
|---|---|---|---|
| Banco de Bogotá | Checking | 1.211 | 517 |
| Bancolombia | Checking | 8.660 | 12.182 |
| Red Multibanca Colpatria | Savings | 104 | 87 |
| Banco BBVA | Checking | 211 | 303 |
| Banco De Occidente | Checking | 138 | 102 |
| Bancomeva | Checking | - | 8 |
| Banco Santander | Checking | 384 | 30.614 |
| Available in Free-standing Trusts | Savings/Checking | 6.032 | 9.689 |
| JP Morgan | Deposit | 2.771 | 458 |
| | | **19.511** | **53.960** |

The following is a breakdown of creditworthiness as determined by independent credit rating agencies of all those major financial institutions in which the Company holds cash.

Long-term debt ratings are based on the following scale:

| Item | Financial Institution | Long-term Rating | Short-term Rating | Description |
|---|---|---|---|---|
| 1 | Banco BBVA | AAA | AAA (col) y F1+(col) | AAA is the highest rating awarded, indicating that the entity has an extremely |
| 2 | Banco de Bogotá | AAA | AAA | |
| 3 | Banco Colpatria | AA | AAA y AA+ | |

| | | | | |
|---|---|---|---|---|
| 4 | Banco de Occidente | AAA | AAA y de BRC 1+ | robust capacity to safeguard its capital and limit its exposure to the risk of loss due to credit-related factors. |
| 5 | Banco Corpbanca | AAA | | |
| 6 | Bancolombia | AAA | AAA y de BRC 1+ | |
| 7 | Banco Santander | AAA | AAA y de BRC 1+ | |
| 8 | GNB Sudameris | AA+ | AA+ | An AA rating indicates that the capacity of either the issuer or issue to meet its financial obligations is very strong. However, issuers or issues that are awarded this rating may be more vulnerable to adverse events compared to those rated in the highest category. |

Cash and cash equivalents are held with banks and financial institutions through free-standing trust funds, which have ratings between AA- and AAA BCR + 1 from BRC Standard and Poor's.

The Company considers the credit ratings awarded to financial institutions with which it conducts treasury operations in the form of fiduciary assignments such as deposits or investments at sight which classify as cash equivalents. In order to establish a minimum margin risk exposure and ensure optimal resource management through periodic evaluations and measurements of the Company's exposure.

**7.4 Market Risk**

The Company has been able to meet its liquidity needs acquiring working capital and lines of credit from local, foreign and multilateral entities This implies the need for follow-up when exposed to variable interest rates (financial obligations indexed to local and/or foreign variable rates such as: DTF, IBR, UVR, LIBOR, PRIME, etc.), and to exchange-rate fluctuations due to devaluation or revaluation in the local currency (USD, EUR, etc.).

Credivalores participates actively in the money, foreign exchange and capital markets, seeking to meet the needs of its clients in accordance with the policies and risk levels established. As such, it manages different financial-asset portfolios within the permitted risk levels and limits.

Market risk arises from the open positions of Credivalores's investment portfolios in debt securities, derivatives and equity instruments recorded at fair value, due to adverse changes in risk factors such as interest rates and exchange rates of foreign currencies.

For analysis purposes, market risk has been broken down into price risk and/or interest and exchange-rate risk of financial obligations in the periods of capital-payment amortization, the point at which the risk materialized.

As of December 31, 2020 and December 31, 2019, Credivalores had the following financial assets and liabilities at fair value subject to trading risk:

| Financial assets and liabilities at fair value exposed to trading risk held: | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Equity Instruments | 16.938 | 8.715 |
| Derivatives instruments | 243.444 | 210.830 |
| Loan Portfolio | 20.015 | 19.324 |
| **Total** | **280.397** | **238.869** |
| Financial liabilities | (16.791) | (32.188) |
| **Total** | **(16.791)** | **(32.188)** |
| **Net Position** | **263.606** | **206.681** |

**Methodology used to measure risk**

Market risks are quantified through value at risk standard models.

The company uses the standard model for the measurement, control and management of market risk of interest rates and exchange rates at which the entity is exposed.

There are two scenarios under which Credivalores is exposed to market risks:

**Interest rates**

Credivalores financial obligations are exposed to this risk when financing is acquired at variable indexed rates that may be subject to volatilities and may affect the Company's financial margin.

**Sensitivity Analysis**

Taking into account Credivalores exposure to changes in the reference interest rate, a sensitivity analysis of the impact on financial obligations is included given the possible effect on the variable indexed interest rates in the third quarter of 2019. The following methodology was defined for the analysis:

1. Two scenarios were evaluated whereby indexed rates are affected by 20 BPS (increasing and decreasing indexed rates), which affect the future flows of Credivalores financial obligations indexed to the variable rate. Debt repayment is implicit in these scenarios, given their contractual frequency, taking them to maturity.

2. The flows corresponding to interest payment (accrual) were evaluated using equivalent rates.

3. The present value of the monthly interest payment was calculated, using as reference the 6-month IBR rate on an annual basis as of December 31, 2020 (1.711%).

4. Finally, the results of each scenario were compared to the base scenario, which corresponds to the projections of interest flows using the rates as of December 31, 2020 as reference .

The results are set out below:

| Scenarios | Interests |
|---|---|
| Effect of 20 BPS decrease in variable rate | (356.522) |
| Effect of 20 BPS increase in variable rate | 355.888 |
| **Total Scenarios** | **(634)** |

**Interest Rate and Exchange Rate**

| Rate and devaluation effect scenario (variable rate and foreign currency obligations) | Interests |
|---|---|
| Effect of revaluation and decrease, 15 BPS, variable rate | (356.522) |
| Effect of devaluation and increase, 15 BPS, variable rate | 357.155 |
| **Total Scenarios** | **633** |

**Exchange rate**

Credivalores financial obligations are exposed to exchange rate risk when the present value of the liability positions presents volatilities due to the devaluation or revaluation of the funding acquired in another currency. This risk materializes at the moment when the payment corresponding to the amortization of principal and interest is made, due to trading in the currencies to be paid and recognition of the exchange rate difference.

**Sensitivity Analysis**

Considering Credivalores exposure to changes in the USD/ exchange rate, a sensitivity analysis of the impact on financial obligations is included given the possible effects of changes in the exchange rate in the third quarter of 2019. The following methodology was used for the analysis:

1.  Two scenarios were evaluated in which the exchange spot rate is adjusted by 0.60% daily volatility (spots prices projected using Bloomberg's curve), generating revaluation and devaluation effect on the TRM as of December 31, 2020.

2.  The amortization of principal and payment of interest on financial obligations are implicit in these scenarios, given their contractual periodicity and taking them to maturity.

3.  The flows corresponding to interest payment (accrual) were evaluated using equivalent rates.

4.  The present value of the monthly interest payment was calculated, using as reference the 6-month IBR rate on an annual basis as of December 31, 2020 (1.711%).

5.  Finally, we compared the results of each scenario with the base scenario, which corresponds to the projected flows for payment of capital and interest using as reference the rates as of December 31, 2020.

The results are set out below:

| Item | Total Debt |
|---|---|
| Initial Scenario (Balance as of December 31st, 2020) | 1.213.142 |
| Scenario 1 (Effect of revaluation) | 1.205.650 |
| Scenario 2 (Effect of revaluation) | 1.220.635 |
| **Difference Scenario 1 vs. Initial Scenario** | **(7.493)** |
| **Difference Scenario 2 vs. Initial Scenario** | **7.493** |

(1) Volatility obtained from the daily average for the previous three years, including the first nine months of 2020.

**7.5 Liquidity Risk**

The liquidity Risk is represented by the potential event of being unable to meet the expected outgoing cash flows on a timely and efficient manner, without affecting the normal course of business or the

company´s financial position. Liquidity risk is related with having insufficient liquid assets and therefore having to incur in unusual or extra funding costs.

The company funding is based on short- and medium-term bank loans as well as bonds and commercial notes issued in the international capital markets. These funds are mainly used to leverage new loan origination according to Credivalores' business model. On the other hand, the Company's capacity to create

positions regarding financial instruments available for sale (liquidity or loans) could be affected either by lack of market liquidity or because of sudden changes in interest rates and asset prices

According to the Company´s funding model the liquidity risk includes among others, the ability to get short, medium- and long-term lines of credit, to keep low liquidity assets (such as loan portfolio) and face short-term unexpected stress situations.

In order to deploy a correct asset and liability management and assure the liquidity needed to operate the business, the Company has set the following guidelines to control the liquidity risk: i) In the short -term, cash flows associated to loan portfolio and liquid assets, short -term financial liabilities, and off balance financial positions in different time frames, allowing a permanent monitoring of the liquidity gap, ii) for the long-term assets and liabilities, the Company analyses its funding sources as well as the breakdown by type of source and those that are specifically associated to specific products.

Credivalores keeps at least 1.5x its operating expenses in liquid assets. The liquidity in the statement of financial position has the following components:

- Inflows: Incoming flows associated to loan portfolio, and interest income associated to liquid assets.

- Outflows: Outgoing flows related to i) operating expenses, ii) new loan origination, and iii) ´ principal and interest from financial liabilities.

- Liquidity GAP: Difference between inflows and outflows according to:

  o Monthly cash flows associated to assets (liquid assets, loan portfolio).
  o Monthly projected cash flows related to financial liabilities and operating expenses

The Company determines its liquidity gap based on to the above-mentioned variables, and makes permanent follow up, as well as making any necessary adjustments according to the following ranges:

  ✓ 1 to 3 months
  ✓ 3 to 6 months
  ✓ 6 to 12 months
  ✓ 12 months +

**Liquidity Risk Management**

The company identifies its exposure to liquidity risk according to the markets where it operates, and the products and services offered to its customers. For such purpose the Company has analyzed the processes associated to treasury in order to design controls and strategies to reduce the impact.

**Liquidity position**

Determine the minimum amount of liquid assets (cash and cash equivalents, short-term liquid investments), in order to avoid any lacks that may affect the capacity to the outflows. The Financial Committee calculates and monitors the liquidity position on a weekly basis, considering cash flow projections for 7 and 15 days:

a) Green: liquid assets / outflows >= 105%
b) Yellow: liquid assets / outflows between 100 and 104%
c) Red: liquid assets / outflows <100%

In case there are any yellow or green situations, the Financial Committee defines any actions to be taken in order to assure the sufficient procurement of cash to operate on a normal basis.

The liquidity level results as of December 31, 2020 are set out below:

| Item | Liquidity level December, 2020 |
|------|-------------------------------|
| 7 Days | 1.154% |
| 15 Days | 585% |
| 30 Days | 259% |

As of December 31, 2020, the liquidity level in the 7 and 15 day bands is above the upper limit defined in the Company's liquidity manual, constituting a green flag scenario and indicating that Credivalores has sufficient resources to operate normally.

Also, as is good practice, a third band is monitored, which allows for controlling of the liquidity level projected to 30 days. As of December 31, 2020, a green band scenario is recorded, indicating that Credivalores has ample liquidity to support its needs for normal operation.

**Exposure to liquidity Risk**

The Company monitors its liquidity position in order to determine how likely a liquidity stress can happen.

The following is a breakdown by time range for the Liquid Assets and the LRI (Liquidity Risk Indicator) for December 31, 2020 and December 31, 2019.

| Description | December 31, 2020 | | | | |
|---|---|---|---|---|---|
| | Subsequent Net Balances Available | | | | |
| | Liquid Assets Available at the End of the Period (1) | From 1 to 7 days (2) | From 8 to 15 subsequent days (2) | From 16 to 30 subsequent days (2) | From 31 to 90 subsequent days (2) |
| Cash | 18 | 18 | - | - | - |
| Banco de Bogotá | 1.211 | 1.211 | - | - | - |
| Bancolombia S. A. | 8.660 | 8.660 | - | - | - |
| Banco GNB Sudameris Colombia | - | - | - | - | - |
| BBVA Colombia | 211 | 211 | - | - | - |
| Red Multibanca Colpatria S. A. | 104 | 104 | - | - | - |
| Banco De Occidente | 138 | 138 | - | - | - |
| Bancoomeva | - | - | - | - | - |

**CREDIVALORES CREDISERVICIOS S. A.**
**DISCLOSURES TO THE FINANCIAL STATEMENTS**
**ENDED DECEMBER 31, 2020 AND 2019**
(Stated in millions of Colombian pesos)

| Description | Liquid Assets Available at the End of the Period (1) | From 1 to 7 days (2) | From 8 to 15 subsequent days (2) | From 16 to 30 subsequent days (2) | From 31 to 90 subsequent days (2) |
|---|---|---|---|---|---|
| Banco Santander | 72 | 72 | - | - | - |
| Banco Santander Uruguay | 3.082 | 3.082 | - | - | - |
| Alianza Fiduciaria | 95.956 | 95.956 | | | |
| Credifinanciera | 32.564 | | - | 32.564 | - |
| Cash at Free-Standing Trusts | 7.171 | 7.171 | - | - | - |
| Collective Investment Funds | 12.232 | 12.232 | - | - | - |
| Agrocaña | 4.705 | - | - | - | 4.075 |
| Asficredito | - | - | | - | |
| Mutual Funds – Fiduciaria and Valores Bancolombia | 3.534 | 3.534 | - | - | - |
| Scotiabank | - | - | | | |
| TIDIS | 124 | - | | 124 | - |
| Fiducolombia Free-Standing Trusts | 111.455 | 111.455 | | - | |
| Inverefectivas | 10.966 | - | - | - | 10.966 |
| **Total liquid assets** | **292.203** | **243.844** | **-** | **32.688** | **15.671** |

| | December 31, 2019 | | | | |
|---|---|---|---|---|---|
| | Subsequent Net Balances Available | | | | |
| Description | Liquid Assets Available at the End of the Period (1) | From 1 to 7 days (2) | From 8 to 15 subsequent days (2) | From 16 to 30 subsequent days (2) | From 31 to 90 subsequent days (2) |
| Cash | 18 | 18 | - | - | - |
| Banco de Bogotá | 517 | 517 | - | - | - |
| Bancolombia S.A. | 13.657 | 13.657 | - | - | - |
| Banco GNB Sudameris Colombia | - | - | - | - | - |
| BBVA Colombia | 303 | 303 | - | - | - |
| Red Multibanca Colpatria S.A. | 87 | 87 | - | - | - |
| Banco De Occidente | 102 | 102 | - | - | - |
| Bancoomeva | 9 | 9 | - | - | - |
| Banco Santander | 75 | 75 | - | - | - |
| Alianza Fiduciaria | 30.997 | 30.997 | - | - | - |
| Credifinanciera | 8.546 | 8.546 | | | |
| Cash at Free-standing Trusts | 12.066 | - | - | 12.066 | - |
| Collective Investment Funds | 10.832 | 10.832 | - | - | - |
| Agrocaña | 4.028 | 4.028 | - | - | - |
| Valores Bancolombia | 4.686 | - | - | - | 4.686 |
| Scotiabank | 1.837 | 1.837 | - | - | - |
| Fiducolombia Free-standing | 84.807 | 84.807 | - | - | - |
| Inverefectivas | 10.963 | - | - | - | 10.963 |
| **Total liquid assets** | **183.530** | **155.815** | **-** | **12.066** | **15.649** |

(1) Liquid assets correspond to the sum of existing assets at the close of each period, which can be quickly converted to cash. In calculating liquid assets, all the listed investments, without exception, are computed at their fair exchange value on the date of the valuation (fair value).

(2) The balance corresponds to the residual value of the Company's liquid assets on days after closing the specific period. This balance is calculated as the difference between liquid assets and liquidity requirements. In turn, the liquidity requirement is the difference between the contractual revenue flows and contractual and non-contractual outflows in accordance with the Liquidity Risk Indicator (LRI) methodology.

**Measurement of exposure to liquidity risk**

Measuring the likelihood of the Company running out of liquid resources for its normal operation under normal market conditions requires the use of the tools described above: balance sheet liquidity, liquidity gap, and cash

flow projection, to thereby quantify the degree of stress that the company's cash flow can bear to fulfill its normal operations without having to acquire additional resources.

**Limit of liquidity risk exposure**

Maximum exposure to liquidity risk is identified as the average time taken by the Company to carry out the liquidity financial operations (Guaranteed Loans, Portfolio Sales, Working Capital Loans, etc.) and generate the cash available for new loan origination.

The maximum exposure to liquidity risk is calculated weekly by the financial committee, taking into account projections for bands of 7 days, and 15 to 30 days.

In addition, to analyze the short- and medium-term liquidity requirements, the following indicators are taken into account:

1) Net Liquidity/Credivalores + Free-standing Trust, where Net Liquidity is the sum of available cash and investments less long-term investments.

**Lower limit: 8%**; cannot be below the lower limit more than three times in a year

| Exposure Limit Indicator 1 Dec-20 | |
|---|---|
| Net Liquidity | 264.299 |
| Assets (Credivalores + Free-standing Trust) (Portfolio) | 1.753.125 |
| **Indicator 1** | **15,1%** |

2) Net Liquidity/Liabilities (Free-standing Trust + Credivalores)

**Lower limit: 10%**; cannot be below the lower limit more than three times in a year

| Exposure Limit Indicator 1 Dec-20 | |
|---|---|
| Net Liquidity | 264.299 |
| Liabilities (Credivalores + Free-standing Trust) | 1.785.363 |
| **Indicator 2** | **14,8%** |

In the three-month period ended December 31, 2020 there were no significant changes in the liquidity risk or in the manner in which Credivalores manages this risk.

Credivalores has performed an analysis of the consolidated maturities of financial assets and liabilities both derivatives and non-derivatives, showing the following remaining contractual maturities.

**December 31, 2020**

| Assets | Less than one month | From one to six months | From six to twelve months | More than one year | Total |
|---|---|---|---|---|---|
| Cash due from banks and equivalents | 259.594 | - | - | - | 259.594 |
| Equity Instruments at fair value | 16.938 | - | - | 4.705 | 21.643 |
| Investments in Associates and Affiliates | - | - | - | 10.966 | 10.963 |
| Financial Assets at amortized cost (*) | 68.717 | 345.265 | 418.373 | 1.242.029 | 2.074.384 |
| **Total assets** | **345.249** | **345.265** | **418.373** | **1.257.700** | **2.366.587** |

| Liabilities | Less than one month | From one to six months | From six to twelve months | More than one year | Total |
|---|---|---|---|---|---|
| Financial Liabilities at amortized cost (*) | 37.336 | 374.928 | 257.189 | 1.884.033 | 2.553.486 |
| Financial Liabilities at fair value Derivatives instruments | - | 1.821 | 662 | 14.308 | 16.791 |
| **Total Liabilities** | **37.336** | **376.749** | **257.851** | **1.898.341** | **2.570.277** |

(*) This disclosure includes the calculation of projected interest.

**December 31, 2019**

| Assets | Less than one month | From one to six months | From six to twelve months | More than one year | Total |
|---|---|---|---|---|---|
| Cash due from banks and equivalents | 163.851 | - | - | - | 163.851 |
| Equity Instruments at fair value | 4.028 | - | - | 4.686 | 8.714 |
| Investments in Associates and Affiliates | - | - | - | 10.963 | 10.366 |
| Financial Assets at amortized cost (*) | 60.434 | 301.163 | 356.477 | 1.068.680 | 1.786.754 |
| **Total assets** | **228.313** | **301.163** | **356.477** | **1.084.329** | **1.970.282** |

| Liabilities | Less than one month | From one to six months | From six to twelve months | More than one year | Total |
|---|---|---|---|---|---|
| Financial Liabilities At amortized cost (*) | 33.013 | 278.940 | 165.414 | 1.532.572 | 2.009.939 |
| Financial Liabilities at fair value - Derivatives instruments | - | 2.715 | - | 29.473 | 32.188 |
| **Total Liabilities** | **33.013** | **281.655** | **165.414** | **1.562.045** | **2.042.127** |

(*) This disclosure includes the calculation of projected interest.

**NOTE 8. CASH AND CASH EQUIVALENTS**

Cash and cash equivalents include cash balances and demand deposits with original maturities of 90 days or less from the date of acquisition, which are subject to an insignificant risk of changes to their fair value and that are used by the Credivalores to handle short-term commitments.

Cash and cash equivalent balances encompass the following as of December 31, 2020 and December 31, 2019:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Cash | 18 | 18 |
| Banks | 19.511 | 53.960 |
| Mutual funds (8.1) | 212.082 | 97.807 |
| Term Deposit (8.2) | 32.688 | 12.066 |
| | **264.299** | **163.851** |

As of December 31, 2020, and December 31, 2019, there were no restrictions on bank accounts.

**8.1 Following is a breakdown of positions in money market funds (trust rights) by Credivalores and the Free-Standing Trust:**

|  | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Fiduciaria Bancolombia – Renta Liquidez | 3.526 | 1.837 |
| Alianza Fiduciaria - FIC | 95.956 | 8.546 |
| Fiduciaria Bancolombia - Credinvest | 1.119 | 1.119 |
| Fiduciaria Bancolombia - Factoring | - | 15.207 |
| Fiduciaria Bancolombia - Economic rights | - | 14 |
| Fiduciaria Bancolombia - Progression | 20 | 9 |
| Ownership | 7 | - |
| **Sub-Total** | **100.628** | **26.732** |

| Entity | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Fiduciaria Bancolombia - Collective Investment Funds Participation | 111.454 | 71.075 |
| **Sub-Total** | **111.454** | **71.075** |
| **Collective investment funds** | **212.082** | **97.807** |

The following is the credit rating of the fund managers of Free Standing Trusts:

| Manager | Dec-20 | Dec-19 | Rating Agency |
|---|---|---|---|
| Fiduciaria Bancolombia | AAA/F1 +(col) | S1/AAA(col) | Fitch Ratings Colombia S. A. S. |
| Fiduciaria GNB Sudameris_Servitrusts | F-AAA | F-AAA | Value and Risk Rating S.AS Credivalores (2016 - 2017) BRC Standard & Poor´s (2015) |
| Fiduciaria la Previsora | AAA | S1/AAA(col) | Fitch Ratings Colombia S. A. S. CVCS |
| Fiduciaria Popular | AAA | FAAA/2 | Value and Risk Rating S.A. Sociedad Calificadora de Valores |

Cash equivalents correspond to mutual and money market funds where the Company and the Free Standing Trust have a direct ownership of shares and rights. These funds invest in short term paper and offer a slightly higher yield than a savings account, and are classified as cash equivalents since the company can withdraw and deposit funds at any time, as funds are at sight.

**8.2 CDT deposit certificates**

As of December 31, 2020, Credivalores had Certificates of Full Deposit (CDT) at Banco Santander and Banco Credifinanciera. Which are detailed below:

| Number ID | Date | Payment date | Term | Nominal value | Annual effective interest rate | Nominal rate | Total Balance Dec, 2020 |
|---|---|---|---|---|---|---|---|
| Credifinanciera Bank | 13/04/2020 | 13/01/2021 | 6 | 10.149 | 5,35% | 5,22% | 10.350 |
| Credifinanciera Bank | 7/04/2020 | 04/02/2021 | 6 | 10.000 | 4,89% | 4,78% | 10.149 |
| Santander Bank | 22/08/2019 | 22/08/2021 | 24 | 6.500 | 5,30% | 5,18% | 6.536 |
| Santander Bank | 23/08/2019 | 23/08/2021 | 24 | 5.500 | 5,30% | 5,18% | 5.529 |
| **Total** | | | | **32.149** | | | **32.564** |

**NOTE 9. FINANCIAL INSTRUMENTS**

The balance of investments measured at fair value is comprised of:

|  | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Equity instruments (9.1) | 12.234 | 4.028 |
| Shares instruments (9.2) | 4.704 | 4.686 |
|  | **16.938** | **8.715** |

**9.1 At fair value with changes in results**

Investments at fair value correspond to equity participations in money market funds that offer easy access to resources at low risk, held in trusts which are rated from AA- to AAA by local rating agencies BRC Standard and Poor's and/or Fitch Ratings Colombia

| Issuer | Type of Fund | Minimum Investment | Minimum Balance | Annual Return 2020 | Annual Return 2019 | As of December 31, 2020 | As of December 31, 2019 |
|---|---|---|---|---|---|---|---|
| BTG Pactual I Z Class | Closed | 5.000.000 | 2.000.000 | 0,500% | 58.21% | 1.519 | 1.792 |
| BTG Pactual II Z Class | Closed | 5.000.000 | 2.000.000 | 0.500% | 96.81% | 561 | 763 |
| Fiduciaria Popular | At sight | 200.000 | 200.000 | 0.750% | 3.98% | 17 | 649 |
| Open Portfolio BTG | Abierto | - | - | 1.80% | 5.01% | 10.137 | 824 |
| TOTAL | | | | | | 12.234 | 4.028 |

**9.2 Equity instruments**

|  | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Agrocaña Shares | 4.704 | 4.686 |
|  | **4.704** | **4.686** |

The Company owns 5.03% of Agrocañas S.A. share capital, with 3,300 outstanding shares as of December 31, 2020. These are not listed on the stock exchange and are therefore measured at fair value with changes to equity.

**NOTE 10. INVESTMENTS IN ASSOCIATES**

The detail of the investments in associates is as follows:

|  | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Inverefectivas S.A (a) | 10.966 | 10.963 |
|  | **10.966** | **10.963** |

**(a)** Credivalores holds a 25% ownership in Inverefectivas S.A. This Company was incorporated in accordance with the legislation of Panama, and has 4,000 shares issued, of which Credivalores owns 1,000 shares with an intrinsic value of FIX 3.345,21 expressed using the TRM of 3.277,14 as of January 01, 2021.

| | December 31, 2020 | | December 31, 2019 | |
|---|---|---|---|---|
| | **Share of ownership interest** | **Book value** | **Share of ownership interest** | **Book Value** |
| **Associates** | | | | |
| Inverefectivas S.A. | 25% | 10.966 | 25% | 10.963 |
| | | **10.966** | | **10.963** |

The movement of investments in the associates account is shown below for the nine months ended December 31, 2020 and December 31, 2019:

| | December 31 | |
|---|---|---|
| **Associate** | **2020** | **2019** |
| **Balance at the beginning of the period** | **10.963** | **10.366** |
| Adjustments for exchange rate differences | 3 | 597 |
| **Period-end balance** | **10.966** | **10.963** |

## NOTE 11. LOAN PORTFOLIO, NET

Financial assets at amortized cost on the statement of financial position are classified as consumer portfolio and microcredit. Following is a description of the portfolio of Credivalores as of December 31, 2020 and December 31, 2019:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Consumer | 1.747.353 | 1.424.958 |
| Microcredit | 5.772 | 5.863 |
| Impairment | (266.972) | (192.847) |
| **Total financial assets at amortized cost** | **1.486.153** | **1.237.974** |
| | | |
| TuCrédito payroll deduction loans at fair value | 20.015 | 19.324 |
| | **20.015** | **19.324** |
| **Total loan portfolio, net** | **1.506.168** | **1.257.298** |

The Financial Position Statement includes a net portfolio held in Free-standing trusts totaling 293.707 as of December 31, 2020 and 251.165 as of December 31, 2019. Credivalores classified portfolio by product in accordance with the days of default.

The movement of the provision for the impairment of financial assets by loan portfolio is provided below for the nine months ended December 31, 2020 and December 31, 2019.

| | December 31, | |
|---|---|---|
| | **2020** | **2019** |
| **Initial Balance** | 192.847 | 163.413 |
| Impairment of the period charged against to profit or loss | 80.582 | 45.299 |
| Write-offs | (6.457) | (15.865) |
| **Closing balance** | **266.972** | **192.847** |

Below we present a breakdown of the loan portfolio in the balance sheet with all components:

**As of December 31, 2020**

| Type | Principal | Transaction costs | Accrued Interest | Commissions | Impairment | Total |
|---|---|---|---|---|---|---|
| Consumer loans | 1.514.693 | 108.675 | 115.850 | 8.070 | (261.136) | 1.486.152 |
| Microcredit | 4.178 | - | 1.594 | 65 | (5.836) | 1 |
| **Total financial assets at amortized cost** | **1.518.871** | **108.675** | **117.444** | **8.135** | **(266.972)** | **1.486.153** |

**At December 31, 2019**

| Type | Principal | Transaction costs | Accrued Interest | Commissions | Impairment | Total |
|---|---|---|---|---|---|---|
| Consumer loans | 1.247.579 | 78.331 | 91.021 | 7.960 | (186.909) | 1.237.982 |
| Microcredit | 4.266 | 2 | 1.597 | 65 | (5.938) | (8) |
| **Total financial assets at amortized cost** | **1.251.845** | **78.333** | **92.618** | **8.025** | **(192.847)** | **1.237.974** |

The distribution of maturities of Credivalores gross loan portfolio is the following:

**December 31, 2020**

| | Up to 1 year | Between 1 and 3 years | Between 3 and 5 years | More than 5 years | Total |
|---|---|---|---|---|---|
| Consumer | 254.992 | 579.171 | 218.030 | 646.458 | 1.698.651 |
| Microcredit | 5.829 | 8 | - | - | 5.837 |
| **Total Gross Loan Portfolio** | **260.821** | **579.179** | **218.030** | **646.458** | **1.704.488** |

**December 31, 2019**

| | Up to 1 year | Between 1 and 3 years | Between 3 and 5 years | More than 5 years | Total |
|---|---|---|---|---|---|
| Consumer | 240.207 | 421.879 | 240.925 | 521.947 | 1.424.958 |
| Microcredit | 5.827 | 36 | - | - | 5.863 |
| **Total Gross Loan Portfolio** | **246.034** | **421.915** | **240.925** | **521.947** | **1.430.821** |

The distribution of maturities of Credivalores principal only loan portfolio is the following:

**December 31, 2020**

| | Up to 1 year | Between 1 and 3 years | Between 3 and 5 years | More than 5 years | Total |
|---|---|---|---|---|---|
| Consumer | 212.410 | 513.280 | 197.302 | 591.701 | 1.514.693 |
| Microcredit | 4.171 | 7 | - | - | 4.178 |
| **Total Principal Only Loan Portfolio** | **216.581** | **513.287** | **197.302** | **591.701** | **1.518.871** |

**December 31, 2019**

| | Up to 1 year | Between 1 and 3 years | Between 3 and 5 years | More than 5 years | Total |
|---|---|---|---|---|---|
| Consumer | 201.546 | 360.115 | 210.334 | 210.334 | 1.247.579 |

| | | | | | |
|---|---|---|---|---|---|
| Microcredit | 4.231 | 35 | - | - | 4.266 |
| **Total Principal Only Loan Portfolio** | **205.777** | **360.150** | **210.334** | **210.334** | **1.251.845** |

Below is the breakdown of Credivalores managed loan portfolio, which includes the loan portfolio on balance and the portfolio sold but still managed by the Company:

| | As of December 31, 2020 | | |
|---|---|---|---|
| **Type** | **Principal Loan** | **Sold** | **Total** |
| Consumer | 1.514.693 | 219.802 | 1.734.495 |
| Microcredit | 4.178 | - | 4.178 |
| **Total Financial Assets at amortized cost** | **1.518.871** | **219.802** | **1.738.673** |

| | As of December 31, 2019 | | |
|---|---|---|---|
| **Type** | **Principal Loan** | **Sold** | **Total** |
| Consumer | 1.247.579 | 337.309 | 1.584.888 |
| Microcredit | 4.266 | - | 4.266 |
| **Total Financial Assets at amortized cost** | **1.251.845** | **337.309** | **1.589.154** |

**Overdue but not impaired**

As of December 31, 2020 and December 31, 2019, a summary of the overdue portfolio by days past due is as follows:

| | As of December 31, 2020 | | | As of December 31, 2019 | | |
|---|---|---|---|---|---|---|
| | **Consumer** | **Microcredit** | **Total** | **Consumer** | **Microcredit** | **Total** |
| Performing loans | 1.224.357 | - | 1.224.357 | 1.050.170 | 28 | 1.050.198 |
| Overdue but not impaired | 71.278 | - | 71.278 | 42.322 | 23 | 42.345 |
| Non-performing loans under 360 days | 72.107 | 14 | 72.121 | 65.503 | 39 | 65.542 |
| Non-performing loans over 360 days | 146.951 | 4.164 | 151.115 | 89.584 | 4.176 | 93.760 |
| | **1.514.693** | **4.178** | **1.518.871** | **1.247.579** | **4.266** | **1.251.845** |

**NOTE 12. ACCOUNTS RECEIVABLE, NET**

The detailed information of accounts receivables as of December 31, 2020 and December 31, 2019 is as follows:

| | December 31, 2019 | December 31, 2018 |
|---|---|---|
| Debtors (12.1) | 240.574 | 250.145 |
| Asficredito | 82.755 | 70.513 |
| Economically Related Parties (12.2) | 100.725 | 66.650 |
| Shareholders | 1.815 | 1.815 |
| Prepayments and Advances | 3.071 | 968 |
| Payments on behalf of clients (12.3) | 13.214 | 9.411 |
| Employees | 2 | 51 |
| Others accounts receivable | 1.451 | 1.427 |
| Impairments for doubtful accounts (12.4) | (14.629) | (14.791) |

| | | |
|---|--:|--:|
| | **428.978** | **386.189** |

**12.1** The balance of the debtors account that as of December 31, 2020 amounts to 240.574 and as of December 31, 2019 amounts to 250.145, mainly corresponds to outstanding portfolio collection balances from the free-standing trusts to Credivalores.

**12.2** The following is the detail with economically related parties:

| | December 31, 2020 | December 31, 2019 |
|---|--:|--:|
| Asficor S.A.S | - | 243 |
| Inversiones Dana S.A. | 73 | 146 |
| Agro el arado S. A | 146 | 147 |
| Mad Capital S.A. | 221 | 221 |
| Ingenio la Cabaña S.A. | 2.000 | - |
| Agroindustriales del Cauca | 8.600 | 8.600 |
| Inversiones Mad capital S.A.S | 8.601 | 8.122 |
| Brestol S.A.S | 18.771 | 21.462 |
| Finanza inversiones S.A.S | 30.575 | 27.709 |
| Activar Valores S.A.S | 31.738 | - |
| | **100.725** | **66.650** |

The effective interest rates on interest-generating receivables were as follows

| | December 31, | |
|---|:--:|:--:|
| | **2020** | **2019** |
| Loans | DTF + 9.41% | DTF + 9.41% |

**12.3** The following is a breakdown of payments by client account:

| | December 31, 2020 | December 31, 2019 |
|---|--:|--:|
| Life Insurance Payroll deduction loans | 9.182 | 6.643 |
| Crediuno Insurance | 3.387 | 2.335 |
| Tigo Insurance | 184 | 152 |
| Credipoliza Insurance | 461 | 281 |
| | **13.214** | **9.411** |

**12.4** The movement in the provision for impairment of other accounts receivable is provided below:

| | December 31, 2020 | December 31, 2019 |
|---|--:|--:|
| **Balance at start of period** | (14.454) | (8.295) |
| Provision charged to income statement (1) | (175) | (6.496) |
| **Balance at end of period** | **(14.629)** | **(14.791)** |

(1) The impairment analysis of other receivables is performed annually as of December 31 of each year.

**12.4.1. Detail Impairment**

Below is a breakdown of the provisioned items applying the simplified approach under IFRS 9 as of December 31, 2020:

| Third Party | Impairment | % |
|---|---|---|
| Mad Capital S.A. | 221 | 100,0% |
| Agrointegrales del Cauca | 8.600 | 100,0% |
| Asficredito | 5.808 | 7,02% |
| **Total** | **14.629** | |

| | | | |
|---|---|---|---|
| **Gross amount of accounts receivable** | **334.891** | **2.831** | **337.722** |
| | | | |
| **Impairment provision** | | | |
| Balance as of January 1, 2019 | (6.612) | (2.831) | (9.443) |
| Movements from the statement of results | | (6.496) | (6.496) |
| Transfers between states | (6.496) | 6.496 | - |
| New accounts receivable | 52.829 | | 52.829 |
| | **374.612** | **-** | **374.612** |
| | | | |
| Movements with no effect on the state of results | | | |
| | | | |
| Transfers between states | 1.148 | - | 1.148 |
| **Balance as of December 31, 2019** | **375.759** | **-** | **375.759** |
| | | | |
| **Gross amount of accounts receivable** | **381.223** | **9.327** | **390.550** |
| **Impairment provision balance 2019** | **(5.464)** | **(9.327)** | **(14.791)** |
| Movements from the statement of results | | (101) | (101) |
| Transfers between states | (101) | 101 | - |
| New accounts receivable | 36.771 | | 36.771 |
| | **412.429** | **-** | **412.429** |
| | | | |
| Movements with no effect on the state of results | | | |
| | | | |
| Transfers between states | 263 | - | 263 |
| **Balance as of December 31, 2020** | **412.692** | **-** | **412.692** |

Increases in impairment provision of receivables have been included in the "other expenses" line of the income analysis. Amounts charged to the provision account are usually written off when there is no expectation of receiving additional cash.

The Company does not maintain any guarantee as collection insurance.

**NOTE 13. PROPERTY AND EQUIPMENT**

The Company's property, plant and equipment as of December 31, 2020 and December 31, 2019, respectively, are as follows:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Transportation equipment | 117 | 117 |
| Office equipment and accessories | 1.782 | 1.861 |
| Computer equipment | 399 | 405 |
| Network and communication equipment | 2.205 | 2.262 |
| Machinery, plant and equipment in assembly | 49 | 49 |
| Goods received on finance lease agreements | 4.865 | 4.966 |
| **Subtotal** | **9.417** | **9.660** |
| Accumulated depreciation | (8.842) | (8.501) |
| **Total** | **575** | **1.159** |

The breakdown for equipment movement is shown below:

| | December 31, 2019 | Additions | Lows | December 31, 2020 |
|---|---|---|---|---|
| Transportation equipment | 117 | - | - | 117 |
| Office equipment and accessories | 1.861 | 5 | (84) | 1.782 |
| Electronic equipment | 405 | 3 | (9) | 399 |
| Network and communication equipment | 2.262 | 28 | (85) | 2.205 |
| Machinery, plant and equipment in assembly | 49 | - | - | 49 |
| Goods received on finance lease agreements | 4.966 | - | (101) | 4.865 |
| | **9.660** | **36** | **(279)** | **9.417** |

| | December 31, 2018 | Purchases | Adjustment (*) | December 31, 2019 |
|---|---|---|---|---|
| Transportation Equipment | 117 | - | - | 117 |
| Office equipment and accessories | 1.740 | 123 | (2) | 1.861 |
| Electronic equipment | 316 | 91 | (2) | 405 |
| Network and communication equipment | 1.679 | 804 | (221) | 2.262 |
| Machinery, plant and equipment in assembly | 49 | - | - | 49 |
| Goods received on finance lease agreements | 4.966 | - | - | 4.966 |
| | **8.867** | **1.018** | **(225)** | **9.660** |

(*) The adjustments correspond to the unification of useful life of assets according to the established policy.
The following is the depreciation movement as of December 31, 2020 and December 31, 2019, respectively:

| | December 31, 2019 | Depreciación | Bajas | December 31, 2020 |
|---|---|---|---|---|
| Transport equipment | 117 | - | - | 117 |
| Office equipment and accessories | 1.755 | 50 | (84) | 1.721 |
| Electronic equipment | 945 | 289 | (9) | 1.227 |
| Telecommunications equipment | 727 | 270 | (85) | 912 |
| Assets in financial lease | 4.957 | 9 | (101) | 4.865 |
| | **8.501** | **618** | **(279)** | **8.842** |

All equipment of Credivalores is duly protected with current insurance policies. To protect its property and equipment, the Company took out insurance policies with Beckley International Insurance Colombia and Chubb de Colombia as of December 31, 2020 and December 31, 2019, which cover the risks of theft, fire, lightning strikes, explosions, earthquakes, strikes, revolts, etc.

Property and equipment include the values of furniture, computer equipment and improvements to rented property, which are used in the Company's normal course of business.

The Company's own property and equipment as listed above, are not in any way encumbered neither have they been delivered as collateral to guarantee any kind of obligation. The Company has also taken out insurance policies to protect these assets.

## NOTE 14. PROPERTIES BY RIGHT OF USE

Below is the plant and equipment properties that the Company has as of December 31, 2020 and December 31, 2019, respectively:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| **Assets** | | |
| Properties, Plant and Equipment (Right of Use) | 6.020 | 5.902 |
| Deferred tax asset | - | 114 |
| **Liabilities** | | |
| Other financial liabilities - lease of use | | |
| Currents | (2.143) | (757) |
| Non-current | (4.286) | (5.501) |
| **Net** | **(409)** | **(242)** |

Properties and equipment include rights to use leases, in which the Company is the tenant, whose values are shown below:

| | Rights of use Premises and Offices | Total |
|---|---|---|
| **As of December 31, 2019** | | |
| Balance at the beginning of the year | - | - |
| Additions | 7.597 | 7.597 |
| Retreats | - | - |
| Transfers | - | - |
| Depreciation charge | (1.694) | (1.694) |
| Balance at the end of the year | 5.903 | 5.903 |
| | | |
| **As of December 31, 2019** | | |
| Cost | 7.597 | 7.597 |
| Accumulated Depreciation | (1.694) | (1.694) |
| Net cost | 5.903 | 5.903 |
| | | |
| **As of December 31, 2020** | | |
| Balance at the beginning of the year | 5.903 | 5.903 |
| Additions | 3.958 | 3.958 |
| Retreats | (1.887) | (1.887) |
| Transfers | - | - |
| Depreciation charge | (1.954) | (1.954) |
| Balance at the end of the year | 6.020 | 6.020 |
| | | |
| **As of December 31, 2020** | | |
| Cost | 9.296 | 9.296 |
| Accumulated Depreciation | (3.276) | (3.276) |
| Net cost | **6.020** | **6.020** |

The maturities of financial leases range from 3 to 5 years.

In relation to the rights of use recorded in the property, plant and equipment accounts, financial leasing liabilities have been recorded which are included in other financial liabilities and which as of December 31, 2020 have the following balances:

| Lease liabilities | December 31, 2020 | December 31, 2019 |
|---|---|---|
| **As December 31** | **6.258** | **-** |
| Currents | 3.958 | 7.597 |
| Pay | (1.900) | (1.339) |
| Non-current | (1.887) | - |
| **As December 31*** | **6.429** | **6.258** |

- The net variation for 2020 corresponds to 171.

**14.1 Statement of Results**

|  | December 31, 2020 |
|---|---|
| Depreciation fee - usage asset | 1.954 |
| Interest expense on lease liabilities | 660 |
| Short-term lease expenses | 10 |
| Low-value lease expenses | 177 |
| Variable lease expenses | 697 |
|  | **3.498** |

Total cash outings for leases as of December 31, 2020 were 4.465

**Incorporation of Assets**

According to paragraph 53(f) below, the incorporation of assets for rights of use is detailed:

- Contract with Fiduciaria Corficolombiana S.A with NIT 800.140.887, with monthly lease fee 92 million per month including VAT.

**Variable Leases**

Credivalores determined variable leases, based on the landlord's preponderance in the disposal and use of the asset, in this classification are the points of sale located in the chain warehouses.

**Low Value Assets**

The company considers as low-value assets leases whose underlying assets have a value equal to or less than 0.5% of the value of the Company's Property, Plant and Equipment excluding assets that are under lease.

By 2020 the calculation of materiality on assets is carried out with the following information:

- The total value of fixed assets 4,550 multiplied by 0.5%, the materiality for the year 2020 is 23.

According to the analysis carried out on each of the contracts the low value applies to 20 leases of premises and offices.

**Health Emergency Impact - COVID 19**

In accordance with regulatory decree 1432 of November 5, 2020, amending IFRS 16 contained in the technical and compilation annex in 2019, of the Single Regulatory Decree on Financial Reporting and Information Assurance Standards, Decree 2420 of 2015, Leases: Reductions in Rent related to COVID 19, where:

1. The technical annex covered by Article 1 above, which is an integral part of the decree, shall apply to general purpose financial statements, where voluntary application is allowed in a comprehensive and advance manner for financial statements covering periods initiated from 1 January 2020.

According to the above, COVID-19-related rent reductions apply to tenants:

"C20A: A tenant will apply COVID-19-related rent reductions (see paragraph C1A) retroactively, recognizing the cumulative effect of the initial application of that modification as an adjustment to the initial balance of accumulated earnings (or other component of equity, as appropriate) at the beginning of the annual period reported in the tenant to apply the modification for the first time."

Credivalores in 2020 had 64 leases of which 38 are recognized under IFRS 16; with the impact of COVID -19, the company was forced to close the following offices:

The Health Emergency presented in Credivalores below details the offices where discounts were presented:

| CITY | DIRECTION | LEASE VALUE | OBSERVATION |
|------|-----------|-------------|-------------|
| BOGOTÁ | CL 28 No. 13 - 22 LC 32 | 9 | Property Delivery on August 30 |
| BOGOTÁ | CL 44 No. 59 - 52 | 6 | Property Delivery on May 30 |
| BOGOTÁ | CRA14 # 27A - 30 | 0 | Property Delivery on April 30 |
| MEDELLIN | CR 49 No. 52-17 LC 107 | 3 | Property Delivery on May 30 |
| BARRANQUILLA | CL 45 No.39 - 63 LC 8 | 2 | Property Delivery on July |
| CARTAGENA | SHOPING CENTER CL71 #29-236 | 7 | Property Delivery on July 15 |
| CIENAGA | CALLE 8A No.10B-21 LC 2 | 1 | Property Delivery on May 30 |
| SANTA MARTA | CARRERA 3 No. 17 - 27 LC 6 | 2 | Property Delivery on July 30 |
| MEDELLIN | COOPENESSA | 3 | Property Delivery on May 30 |
| **TOTAL** | | **33** | |

*Figures in millions of pesos*

The following contracts submitted amendments to the lease fee through OTHER – YES:

| NAME | SIGNING DATE | CITY |
|------|-------------|------|
| MORA MORALES JOSE SANTOS | 18/05/2020 | VILLAVICENCIO |
| PATERNINA VILLAREAL ROGER AUGUTO | 2/04/2020 | SINCELEJO |
| INMOBILIARIA ESTTEBAN RIOS LIMITADA | 9/06/2020 | BUCARAMANGA |
| INMOBILIARIA TONCHALA LIMITADA | 30/06/2020 | CUCUTA |
| ARQUITECTURA & DISEÑOS SIN LIMITES S.A.S | 5/06/2020 | MONTARIA |
| GOMEZ GOMEZ RICARDO LEON | 5/06/2020 | CARTAGENA |
| INMOBILIARIA INGENIERIA ARANA &CIA | 30/04/2020 | BARRANQUILLA |
| VIVE DE LUJO VALLEDUPAR SAS | 1/05/2020 | VALLEDUPAR |
| CUERVO GOMEZ DANIEL GUSTAVO | 27/05/2020 | NEIVA |

## NOTE 15. OTHER INTANGIBLE ASSETS

Below is the company's other intangible assets as of December 31, 2020 and December 31, 2019, respectively:

| | MARKS | DATABASES | CONTRACTS | LICENSES | PROJECTS | OTHER | TOTAL |
|---|-------|-----------|-----------|----------|----------|-------|-------|
| **As of January 1, 2019** | | | | | | | |
| Cost | 23.800 | 22.707 | 16.044 | 1.992 | 3.021 | 7.387 | 74.951 |
| Accumulated depreciation | (7.135) | (2.271) | (733) | (660) | (983) | (3.135) | (14.917) |
| Net cost | **16.665** | **20.436** | **15.311** | **1.332** | **2.038** | **4.252** | **60.034** |
| | | | | | | | |
| **Year ended December 31, 2019** | | | | | | | |
| Balance at the beginning of the year | 16.665 | 20.436 | 15.311 | 1.332 | 2.038 | 4.252 | 60.034 |
| Additions | - | - | - | 3.276 | 1.563 | 8.230 | 13.070 |
| Retreats | - | - | - | - | - | - | - |
| Transfers | - | - | - | - | - | - | - |
| Depreciation fee | (2.385) | (760) | (406) | (3.596) | (2.678) | (9.594) | (19.419) |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Balance at the end of the year** | **14.280** | **19.676** | **14.905** | **1.011** | **924** | **2.888** | **53.685** |
| | | | | | | | |
| **As of December 31, 2019** | | | | | | | |
| Cost | 23.800 | 22.707 | 16.044 | 5.268 | 4.584 | 15.617 | 88.021 |
| Depreciation fee | (9.520) | (3.031) | (1.139) | (4.257) | (3.661) | (12.729) | (34.336) |
| Net cost | **14.280** | **19.676** | **14.905** | **1.011** | **924** | **2.888** | **53.685** |
| | | | | | | | |
| **Year ended December 31, 2020** | | | | | | | |
| Balance at the beginning of the year | **14.280** | **19.676** | **14.905** | **1.011** | **924** | **2.888** | **53.685** |
| Additions | - | - | - | 1.974 | 5.917 | 17.088 | 24.979 |
| Retreats | - | - | - | - | - | - | - |
| Transfers | - | - | - | - | - | - | - |
| Depreciation fee | (2.380) | (757) | (506) | (1.723) | (713) | (17.633) | (23.712) |
| **Balance at the end of the year** | **11.900** | **18.919** | **14.399** | **1.261** | **6.127** | **2.344** | **54.951** |
| | | | | | | | |
| **As of December 31, 2020** | | | | | | | |
| Cost | 23.800 | 22.707 | 16.044 | 7.242 | 10.501 | 32.706 | 113.000 |
| Depreciation fee | (11.900) | (3.788) | (1.645) | (5.980) | (4.374) | (30.362) | (58.048) |
| Net cost | **11.900** | **18.919** | **14.399** | **1.261** | **6.127** | **2.344** | **54.951** |
| **Litigation rights** | **-** | **-** | **-** | **-** | **-** | **501** | **501** |
| **Total** | **-** | **-** | **-** | **-** | **-** | **2.845** | **55.452** |

## NOTE 16. CREDIT QUALITY OF FINANCIAL ASSETS

The credit quality of financial assets that have not yet expired and have also not suffered impairment losses is assessed on the basis of ratings given by external bodies or if they do not exist on the basis of internal categorizations defined on the basis of counterpart characteristics:

| | December 31, | |
|---|---|---|
| | **2020** | **2019** |
| **Cash and cash equivalents** | | |
| AAA | 19.407 | 53.873 |
| AA | 104 | 87 |
| **Total cash and cash equivalents** | **19.511** | **53.960** |

| | December 31, | |
|---|---|---|
| | **2020** | **2019** |
| **Equity instruments (shares)** | | |
| Fair value financial assets through the other comprehensive results | | |
| Financial sector | 16.938 | 8.715 |
| **Total equity instruments** | **16.938** | **8.715** |

| | December 31, | |
|---|---|---|
| | **2020** | **2019** |
| **Debt instruments** | | |
| Financial assets at fair value through the statement of return | | |
| AAA | 12.065 | 12.066 |
| A | 20.499 | - |
| **Total debt instruments** | **32.564** | **12.066** |

**NOTE 17. DERIVATIVE FINANCIAL INSTRUMENTS AND HEDGE ACCOUNTING**

Movements for hedge accounting and investments in derivatives are provided below:

|  | December 31, 2020 | December 31, 2019 |
|---|---|---|
| **ASSETS** | | |
| Hedge forward contracts (17.1) | 7.108 | 10.771 |
| Hedge Options (17.2) | 87.470 | 68.543 |
| Hedge Swaps (17.3) | 148.866 | 114.633 |
| **Sub-Total** | **243.444** | **193.947** |
| Call Premium | - | 16.883 |
| **Total** | **243.444** | **210.830** |
| | | |
| **LIABILITY** | | |
| Forward Coverage (17.1) | 16.791 | |
| Hedge Negotiation (17.1) | - | 32.188 |
| **Sub-Total** | **16.791** | **32.188** |

Credivalores maintains the derivative financial instrument to cover exposure to risk in foreign currency.

***Hedging Operations***

Credivalores activities are exposed to financial risks including liquidity risk, foreign currency risk and interest rate risks. Therefore, the administration and the Board of Directors have approved and implemented a financial risk management policy to mitigate the negative effects of financial market uncertainty and volatility on the company's financial performance. The financial risk management policy establishes the use of a wide variety of financial derivatives to cover the risks inherent in exchange rate fluctuations and the interest rate of financial obligations in currencies other than Colombian Pesos in the company's financial statements.

Credivalores used a Cross Currency Swap on principal and interest payments from the 9.75% Coupon Notes issued in July 2017 maturing in 2022 in the amount of $250,000,000 and a Coupon Only Swap and a Call Spread, which corresponds to a combination of options positions, to cover interest payments and the principal of the reopening of the Notes for US$75,000,000 held in February 2018. Subsequently, the Company executed several hedging operations to hedge the FX risk on the 8.875% Notes issued on February 7, 2020 and due in 2025, including a Cross Currency Swap on the principal and interests at maturity on US$100,000,000, a coupon only swap for US$200,000,000 to hedge interest payments at maturity and a call spread on the principal for US$200,000,000. Options are derivatives contracts through which the buyer acquires the right to buy or sell a financial asset or an underlying asset at a set strike price, at a specific date and periods. Under the option contract, the buyer pays the premium by acquiring a right to exercise the option and the seller receives the premium, acquiring an obligation to the buyer of the option.

In accordance with the guidelines of this policy, the following is the list of derivative instruments implemented and outstanding as of September 2020 to hedge the foreign currency and interest rate risks on the Notes maturing in 2022 and 2025:

### Cross Currency Swaps

| Theoretical Hedging | | | | Annual Interest Rate | | | |
|---|---|---|---|---|---|---|---|
| Credivalores pays | Credivalores receives USD | Credivalores pays COP | Delivery | Effective Date | Maturity Date | Credivalores receivers | Credivalores pays |
| Principal and Coupon | 95.315.000 | 265.274.035.950 | Non-Delivery | 27/01/2018 | 27/07/2022 | 9,75% | IBR+ 8,89% |
| Coupon | 75.000.000 | 213.675.750.000 | Non-Delivery | 27/01/2018 | 27/07/2022 | 9,75% | IBR+ 5,12% |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Principal and Coupon | 100.000.000 | 341.600.000.000 | Non-Delivery | 7/02/2020 | 7/02/2025 | 8,875% | IBR+ 8,54% |
| Coupon | 68.000.000 | 232.288.000.000 | Non-Delivery | 7/02/2020 | 7/02/2025 | 8,875% | IBR+ 5,10% |
| Coupon | 50.000.000 | 170.750.000.000 | Non-Delivery | 7/02/2020 | 7/02/2025 | 8,875% | IBR+ 5,15% |
| Coupon | 50.000.000 | 170.750.000.000 | Non-Delivery | 7/02/2020 | 7/02/2025 | 8,875% | IBR+ 4,995% |

| Type of Instrument | Credivalores' Position | Type of Option | Hedged amount USD | Effective Date | Maturity Date | Strike Price COP | Delivery |
|---|---|---|---|---|---|---|---|
| Call Option | Buyer | European | 37.500.000 | 22-mar-18 | 25-jul-22 | $ 2.849,01 | Non - Delivery |
| Call Option | Buyer | European | 37.500.000 | 22-mar-18 | 25-jul-22 | $ 2.849,01 | Non - Delivery |
| Call Option | Seller | European | 37.500.000 | 22-mar-18 | 25-jul-22 | $ 3.500,01 | Non - Delivery |
| Call Option | Seller | European | 37.500.000 | 22-mar-18 | 25-jul-22 | $ 3.500,01 | Non - Delivery |
| Call Option | Buyer | European | 75.000.000 | 13-sep-19 | 25-jul-22 | $ 3.500,00 | Non - Delivery |
| Call Option | Seller | European | 75.000.000 | 13-sep-19 | 25-jul-22 | $ 3.750,00 | Non - Delivery |
| Call Option | Buyer | European | 75.000.000 | 31-mar-20 | 25-jul-22 | $ 3.750,00 | Non - Delivery |
| Call Option | Seller | European | 75.000.000 | 31-mar-20 | 25-jul-22 | $ 4.300,0 | Non - Delivery |
| Call Option | Buyer | European | 18.000.000 | 7-feb-20 | 7-feb-25 | $ 3.415,000 | Non - Delivery |
| Call Option | Seller | European | 18.000.000 | 7-feb-20 | 7-feb-25 | $ 4.000,00 | Non - Delivery |
| Call Option | Buyer | European | 50.000.000 | 7-feb-20 | 7-feb-25 | $ 3.415,000 | Non - Delivery |
| Call Option | Seller | European | 50.000.000 | 7-feb-20 | 7-feb-25 | $ 4.000,00 | Non - Delivery |
| Call Option | Buyer | European | 100.000.000 | 7-feb-20 | 7-feb-25 | $ 3.415,000 | Non - Delivery |
| Call Option | Seller | European | 100.000.000 | 7-feb-20 | 7-feb-25 | $ 4.000,00 | Non - Delivery |
| Call Option | Buyer | European | 168.000.000 | 27-mar-20 | 7-feb-25 | $ 4.000,00 | Non - Delivery |
| Call Option | Seller | European | 168.000.000 | 27-mar-20 | 7-feb-25 | $ 4.500,00 | Non - Delivery |

## 17.1 Forward Contracts for Hedging

The portfolio of derivative transactions presents assets valued according to the policy implemented and the fair value and cash flow valuation.

- **Fair-value hedge accounting**

| | Fair value | | | |
|---|---|---|---|---|
| | December 31, 2020 | | December 31, 2019 | |
| **ASSETS** | Nominal Amount USD | Fair Value | Nominal Amount USD | Fair Value |
| **Forward Contracts for Hedging** | | | | |
| Purchase of foreign currency | 21 | 7.108 | 75 | 10.771 |
| **Total forward contracts for hedging – assets** | **21** | **7.108** | **75** | **10.771** |

*Stated in USD expressed in millions*

| | December 31, 2020 | | December 31, 2019 | |
|---|---|---|---|---|
| **Liabilities** | **Nominal Amount USD** | **Fair Value** | **Nominal Amount USD** | **Fair Value** |
| **Forward coverage contracts** | | | | |
| Buying foreign currency | 47 | 16.791 | 6 | 103 |
| **Total forward derivatives of passive hedging** | **47** | **16.791** | **6** | **103** |

**17.2 Derivate Financial Instruments Options**

The activities carried out by Credivalores generated significant positions in the derivatives portfolio, performing transactions for hedging purposes where the underlying assets are exchange rates and interest rates. Options are contracts between two parties, one of them has the right but not the obligation, to carry out an operation of purchase or sale according to previously agreed terms.

The company closed operations with options as derivative financial instruments to manage and mitigate the fluctuations in the fair value of the debt in the P&L. The options are measured through cash flow coverage.

Detail of derivative with options financial instruments and their accounting is as follows:

| | Fair value | | | |
|---|---|---|---|---|
| | December 31, 2020 | | December 31, 2019 | |
| **ASSETS** | **Nominal Amount USD** | **Fair Value** | **Nominal Amount USD** | **Fair Value** |
| Call spread premium option | 243 | 87.470 | 75 | 68.543 |
| **Total forward contracts for hedging – assets** | **243** | **87.470** | **75** | **68.543** |

| | Fair value | | | |
|---|---|---|---|---|
| | December 31, 2020 | | December 31, 2019 | |
| **LIABILITIES** | **Nominal Amount USD** | **Fair Value** | **Nominal Amount USD** | **Fair Value** |
| Call spread premium option | - | - | 75 | 32.188 |
| **Total forward contracts for hedging – Liabilities** | **-** | **-** | **75** | **32.188** |

**Options Contracts for Hedging**

Trading derivative instruments with options covers the debt (capital only) position of the 144 A/Reg S ratio with a coupon of 9.75% and 8.875% with maturity in 2022 and 20 25 and issued on February 14, 2018 and February 07, 2020 for a face value of US$ 75,000,000 and US$ 168,000,000. These financial instruments are valued under the methodology and market value provided by counterparties, the type of measurement is cash flow.

The Company will maintain derivative financial instruments, to cover the foreign currency risk exposure until maturity, which corresponds to the expiration of the Notes that are being covered by this instrument. The objective and strategy of the administration is to analyze and evaluate the appropriate method for the valuation of financial instruments, depending on the type of operation and negotiation carried out.

**Call Premium**

The premium Call option is the payment to lock the right to the option contract at the beginning of the operation with the counterparties Nomura and JP Morgan. Premium Calls have the same expiration dates as bond flows and the amortization is registered in the company's results at the end of each period.

Below call premium movement:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Balance at start of period | 16.883 | 17.886 |
| Agreed Premium | - | 4.499 |
| Call premium amortization | (16.883) | (5.502) |
| **Total** | **-** | **16.883** |

**17.3 Derivate Financial Instruments Cross Currency Swap**

Credivalores, executed operations with derivative financial instruments to manage and mitigate the fluctuations in the fair value of the debt position in the P&L. The cross currency swaps in place hedge the exposure to the risk of exchange rate, which is measured at market (fair value hedging) value, which is measured as a cash flow hedge.

Derivative financial instruments through cross currency swaps and its hedge accounting is the following:

| | Fair value | | | |
|---|---|---|---|---|
| | December 31, 2020 | | December 31, 2019 | |
| **ASSETS** | Nominal Amount USD | Fair Value | Nominal Amount USD | Fair Value |
| Hedging Contracts Cross Currency Swaps (a) | 195 | 92.808 | 250 | 103.071 |
| Hedging Contracts Coupon Only Swap (b) | 243 | 56.058 | 75 | 11.562 |
| **Total forward contracts for hedging – assets** | **438** | **148.866** | **325** | **114.633** |

Credivalores will keep the cross currency swaps, to hedge the exposure to foreign currency and interest rate risk until maturity, in line with the maturity of the Notes hedged.

a. **Cross currency swap hedging contracts**

Trading derivative instruments through cross currency swaps covers the debt (capital and interest) position of Notes 144 A/Reg S issued on July 27, 2018 due in 2022 for a face value of US$ 250,000,000 with a coupon rate of 9.75% and Notes 144 A/Reg S issued on February 7, 2020 due in 2025 for a face value of US$100,000,000 with a coupon rate of 8,875%. With respect to Notes 144 A/Reg S due in 2022 and coupon of 9.75%, in February 2020 the amount of principal and coupons covered at maturity with coupon only swaps was adjusted after a repurchase transaction ("Tender Offer") of these Notes was completed for US$154,685,000 principal.

b. **Coupon only swaps hedging contracts**

The derivatives transaction through a coupon only swaps covers interest payments from the reopening of Notes 144 A/ Reg S due in 2022 made on February 14, 2018 with coupon of 9.75% for a face value US$75.000,000 and Notes 144 A /Reg S due in 2025 made on February 7, 2020 with coupon of 8,875% for a face value of US$200,000,000. With respect to Notes 144 A/Reg S due in 2025 and coupon of 8.875%, in June 2020 the amount of coupons covered at maturity with coupon only swaps was adjusted after a repurchase trade on the secondary market of these Notes was completed for US$32,000,000 principal.

**NOTE 18. FINANCIAL OBLIGATIONS**

Below, we present the balances of financial obligations as of December 31, 2020 and December 31, 2019

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Issuance of bonds | 1.483.355 | 1.065.071 |
| Foreign banks | 257.438 | 294.943 |
| Financial obligations in free standing trusts | 294.674 | 230.678 |
| Promissory notes – Local banks | 50.760 | 92.278 |
| Finance lease agreements | - | 12 |
| Other financial obligations | - | 6 |
| Transaction cost | 6.429 | 6.258 |
| Other Lease Liabilities | (77.254) | (45.668) |
| | 2.015.402 | 1.643.578 |

The balances of Credivalores' financial obligations and the Autonomous Assets of which he is trusting at court December 31, 2020 and December 31, 2019, correspond to obligations incurred with financial institutions in the country and obligations in the foreign capital market and financial leasing. Short-term credit obligations are considered to be cancelled between December 2020 and 2021 and credits that have a maturity after January 2022, respectively, are considered long-term:

a)    Short-term financial obligations.

| Entity | December 31, 2020 | Interest rate | Expiration | December 31, 2019 | Interest rate | Expiration |
|---|---|---|---|---|---|---|
| Banco de Bogotá | 1.969 | IBR + 4.3% | 2021 | 2.938 | IBR + 5.3% | 2020 |
| Banco Colpatria | - | | | 25.417 | 9.8% EA | 2020 |
| Banco de Occidente | 10.000 | IBR + 3.7% | 2021 | 9.950 | IBR + 4.3% | 2020 |
| Bancolombia | 10.000 | IBR + 7.9% | 2021 | 16.125 | DTF + 7.4% | 2020 |
| Banco Santander | 2.875 | IBR + 6% | 2021 | | | |
| **Total National Entity** | **24.844** | | | **54.430** | | |
| Notas Internacionales (Programa ECP) | 257.438 | 8.4% EA | 2021 | 114.700 | 8.3% EA | 2020 |
| **Total Foreign Entity** | **257.438** | | | **114.700** | | |
| **Total Own obligations** | **282.282** | | | **169.130** | | |

| Entity | December 31, 2020 | Interest rate | Expiration | December 31, 2019 | Interest rate | Expiration |
|---|---|---|---|---|---|---|
| Leasing Bancolombia | - | | | 12 | 8.4% EA | 2020 |
| **Total Leasing Financial** | **-** | | | **12** | | |
| Overdraft | - | | | 6 | | |
| **Total Overdraft** | **-** | | | **6** | | |
| **Total Leasing y Overdraft** | **-** | | | **18** | | |

| Entity | December 31, 2020 | Interest rate | Expiration | December 31, 2019 | Interest rate | Expiration |
|---|---|---|---|---|---|---|
| PA Crediuno IFC | 2.329 | 12.4% EA | 2021 | 6.222 | 11.11% EA | 2020 |
| **Total PA** | **2.329** | | | **6.222** | | |

| Entidad | December 31, 2020 | Interest rate | Expiration | December 31, 2019 | Interest rate | Expiration |
|---|---|---|---|---|---|---|
| Leases | 2.143 | 10.6% EA | 2021 | 757 | 10.6% EA | 2020 |
| **Total Leases** | **2.143** | | | **757** | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Total short-term obligations** | **286.754** | | | **176.127** | | |

Credivalores had short-term financial obligations during the periods ended December 31, 2020 and December 31, 2019 totaling 286.754 and 176.127, respectively. The measurement of financial liability instruments for financial obligations is valued at amortized cost, as per IFRS 9.

**b)  Long-term obligations**

The Company had long-term financial obligations during the periods ended December 31, 2020 and December 31 2018 totaling 1.827.063 and 1.513.119, respectively. Associated costs incurred in the acquisition of loans are classified as transaction costs pending IFP amortization for the periods ended December 31, 2020 and December 31, 2019, valued at 77.253 and 45.668, respectively. The measurement of financial liability instruments for financial obligations is valued at amortized cost, as per NIIF 9.

The total balance of financial obligations for the periods ended December 31, 2020 and December 31, 2019 is 2.036.564 and 1.643.577 respectively, which will be paid off as described above.

| Entity | December 31, 2020 | Interest rate | Expiration | December 31, 2019 | Interest rate | Expiration |
|---|---|---|---|---|---|---|
| Banco de Bogotá | 5.148 | IBR+6.3 % | 2022 | 9.391 | IBR+6.3 % | 2021 |
| Bancolombia | 20.767 | IBR + 7.7% | 2022 | 18.682 | IBR + 6.9% | 2021 y 2022 |
| Banco Santander | - | | | 9.775 | IBR + 6% | 2021 |
| **Total National Entity** | **25.915** | | | **37.848** | | |
| Notas Internacionales (Programa ECP) | - | | | 180.243 | 8.4% EA | 2021 |
| **Total Foreign Entity** | **-** | | | **180.243** | | |
| **Total National and Foreign Entity** | **25.915** | | | **218.091** | | |

| Entity | December 31, 2020 | Interest rate | Expiration | December 31, 2019 | Interest rate | Expiration |
|---|---|---|---|---|---|---|
| PA CrediUno IFC | - | | | 11.646 | 12.2% EA | 2021 |
| PA TuCrédito Sindicado | 292.345 | DTF - IBR + 5.5% | 2023 y 2025 | 212.810 | DTF + 5.5% | 2023 y 2024 |
| **Total PA** | **292.345** | | | **224.456** | | |

| Entity | December 31, 2020 | Interest rate | Expiration | December 31, 2019 | Interest rate | Expiration |
|---|---|---|---|---|---|---|
| Other leases liabilities | 4.286 | 10.06% EA | 2023 | 5.501 | 10.06% EA | 2023 |
| **Total Leasing y other leases** | **4.286** | | | **5.501** | | |

| Entity | December 31, 2020 | Interest rate | Expiration | December 31, 2019 | Interest rate | Expiration |
|---|---|---|---|---|---|---|
| Notas internacionales 144 A/Reg. S | 327.168 | 9,75% EA | 2022 | 819.285 | 9,75% EA | 2022 |
| Notas internacionales 144 A/Reg. S Retap | 257.438 | 9.75% EA | 2022 | 245.786 | 9,75% EA | 2022 |
| Notas 144 A/Reg. S con 8.875% con vencimiento en 2025 | 919.910 | 8.875% EA | 2025 | - | | |
| **Total international bonds issued** | **1.504.516** | | | **1.065.071** | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Total obligaciones a largo plazo** | **1.827.066** | | | **1.513.876** | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Costo de Transacción por Amortizar IFP | (77.253) | | | (45.668) | | |
| **Total financial obligations** | **2.036.563** | | | **1.643.578** | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Total Fair Value financial obligations** | **2.113.816** | | | **1.689.245** | | |

**Obligations stated in foreign currency**

| Entity | Nominal Value as of December 31, 2019 | | Nominal as of Value December 31, 2018 | |
|---|---|---|---|---|
| ECP Program Notes (a) | 75 | 257.438 | 90 | 294.943 |
| International Finance Corporation (IFC) | 1 | 2.329 | 6 | 17.868 |
| Issuance of bonds 144 A/ Reg S (b) | 438 | 1.483.355 | 325 | 1.065.071 |
| **Total** | **USD 514** | **COP 1.743.122** | **USD 421** | **COP 1.377.882** |

### (a) Euro Commercial Paper Program Notes

Pursuant to Item 8 of the Pricing Term Sheet dated March 17, 2017, in connection with Tranche X issued under our US$150,000,000 Euro Commercial Paper Program ("ECP Program"), Credivalores decided to exercise the right of optional redemption at par of US$55,000,000 of principal of these notes on March 22, 2018 using the proceeds of the reopening of the 9.75% Notes due July 2022.

Later, on April 19, 2018 Credivalores issued a new note under the ECP Program for US$40,000,000 due on April 19, 2021 with a coupon rate of 8.25%.

In addition, Credivalores decided to exercise the right of optional redemption at par of US$12,000,000 outstanding of Tranche X on September 22, 2018 using additional resources from the reopening of the 9.75% Notes due July 2022.

In December 2019, CVCS issued a new note under the ECP Program due June 13, 2021 for $15,000,000 and a 8.50% coupon with quarterly payments. The resources of this issue will be dedicated to the growth of the credit portfolio and general uses of the company.

In June 2020, CVCS issued a new note under the ECP Program due September 5, 2021 for $20,000,000 and a 8.50% coupon with quarterly payments. The resources of this issue will be dedicated to the growth of the credit portfolio and general uses of the company.

As a result of early redemptions, capital maturities and new issues under the ECP Program, the total balance under the ECP Program as of December 31, 2020 is US$75,000,000.

### (b) Issuance of bonds

On July 27, 2017 Credivalores issued its inaugural senior unsecured 144A / Reg S notes (the "Notes") due July 27, 2022 for US$250,000,000 with a coupon of 9.75% and a yield of 10.0%. The Notes are payable semi-annually in arrears on January 27 and July 27 of each year, beginning on January 27, 2018. The proceeds from this issuance were used to refinance existing indebtedness, including mostly secured debt, and the remainder, if any, for general corporate purposes.

According to the "Description of the Notes" of the Offering Memorandum, the Company may redeem the Notes, in whole or in part, at any time on or after July 27, 2020, at the applicable redemption prices set forth in the Offering Memorandum, plus any additional amounts then due and accrued and unpaid interest to, but excluding, the date of redemption. Prior to July 27, 2020, we may also redeem the notes, in whole or in part, at a redemption price equal to 100% of their principal amount plus a "make-whole" premium, plus any additional amounts then due and accrued and unpaid interest to, but excluding, the date of redemption. In addition, at any time on or prior to July 27, 2020, Credivalores may redeem up to 35% of the Notes using the proceeds of certain equity offerings at a redemption price equal to 109.750% of their principal amount, plus any additional amounts then due and accrued and unpaid interest to, but excluding, the date of redemption. In addition, in the event of certain changes in the

Colombian withholding tax treatment relating to payments of interest on the Notes, Credivalores may redeem the Notes, in whole but not in part, at 100% of their principal amount, plus any additional amounts then due and accrued and unpaid interest to, but excluding, the date of redemption. If a change in control occurs with respect to us, unless the Company has exercised the option to redeem the Notes, each holder of the Notes will have the right to require us to repurchase all or any part of that holder's Notes at 101% of the aggregate principal amount of Notes repurchased, plus any additional amounts then due and accrued and unpaid interest to, but excluding, the date of repurchase.

The Notes will be senior unsecured general obligations and will (i) rank equally in right of payment with all of the Company's other existing and future senior indebtedness (subject to certain obligations for which preferential treatment is given under Colombian insolvency laws); (ii) rank senior in right of payment to the Company's existing and future subordinated indebtedness, if any; (iii) be effectively subordinated in right of payment to all of the Company's existing and future secured indebtedness to the extent of the value of the assets securing such indebtedness, including all indebtedness and other liabilities of any free-standing trusts (patrimonies autonomous); and (iv) be structurally subordinated to all existing and future indebtedness and trade payables of any of our subsidiaries that are not guarantors. The notes will not be entitled to any sinking fund.

No public market currently exists for the Notes. The Notes have been registered in Singapore Exchange Securities Trading Limited (the "SGX-ST").
The Notes were not and will not be registered in the Colombian National Register of Securities and Issuers (or the "RNVE"), therefore, they will not be offered to the public in the Republic of Colombia ("Colombia"). Notes will not be listed on the Colombian Stock Exchange. The Notes may be offered to persons in Colombia through private placement. The offer is not subject to review or authorization by the Financial Superintendency of Colombia.

In addition, on February 14, 2018 Credivalores reopened these Notes for an additional amount of US$75,000,000, bringing the total issued to US$ 325,000,000, taking into account the original issue. The Notes were reopened with a yield of 8.625% and a price of 104.079%. Reopening resources were used to refinance existing non-collateralized indebtedness and surpluses were used for the company's general purposes.

Following we present past coupons payments of the 144A / Reg S notes, since its issuance:

| Principal | Coupon | First Coupon Payment – 27/01/2018 | Second Coupon Payment - 27/07/2018 | Third Coupon Payment - 27/01/2019 | Fourth Coupon Payment - 27/07/2019 | Fiveth Coupon Payment - 27/01/2020 |
|---|---|---|---|---|---|---|
| 250.000.000 | 9,75% | 12.187.500 | 12.187.500 | 12.187.500 | 12.187.500 | 12.187.500 |
| 75.000.000 | 9,75% | | 3.656.250 | 3.656.250 | 3.656.250 | 3.656.250 |
| | Total in USD | 12.187.500 | 15.843.750 | 15.843.750 | 15.843.750 | 15.843.750 |
| | FX Rate | 2.805,40 | 2.882,84 | 3.160,52 | 3.213,09 | 3.213,09 |
| | Total in Millions Pesos | 34.190.812.500 | 45.674.996.250 | 50.074.488.750 | 50.907.394.688 | 50.907.394.688 |

| Principal | Coupon | Sixth Coupon Payment – 27/07/2020 |
|---|---|---|
| 250.000.000 | 9,75% | 4.646.606 |
| 75.000.000 | 9,75% | 3.656.250 |
| | Total in USD | 8.302.856 |
| | FX Rate | 3.660,15 |
| | Total in Millions Pesos | 30.389.699.303 |

| Principal | Coupon | First Coupon Payment - 07/08/2020 |
|---|---|---|
| 280.000.000 | 8,875% | 11.892.500 |
| | Total in USD | 11.892.500 |

| | |
|---|---|
| **FX Rate** | 3.775,95 |
| **Total in Millions Pesos** | 44.905.485.375 |

On January 17, 2020, CVCS launched a repurchase offer (Tender Offer) and a request to remove covenants ("Consent Solicitation") for all or a portion of the principal of the 9.75% 144A / Reg S Notes due in July 2022. The repurchase offer was contingent on the fulfilment of the condition of a new issuance of bonds in the international capital market. The elimination of covenants would materialize if more than 51% of the principal of the outstanding Notes were tendered. The repurchase offer was launched with an initial price of $1,055 for every $1,000 principal of the 9.75% Notes due 2022 applicable during the early period of participation ("Early Tender Time") that ran until January 31, 2020 and then the price would fall to $1,005 for every $1,000 principal of the Notes during the late tender period that lasted until February 14, 2020. During the early tender period a total of US$154,035,000 of

principal were tendered and repurchased and then during the late tender period an additional US$650,000 were tendered and repurchased. The principal amount repurchased on the 9.75% Notes due 2022 Notes accounted for 47.6% of the US$325,000,000 outstanding as of the end of September 30, 2019. Therefore, the covenants applicable under the Description of the Notes ("Description of the Notes") of the Offering Memorandum of the 9.75% Notes due 2022 remain in effect without modification.

Once the early tender period concluded, CVCS launched a new 144A / Reg S Note in the international capital market for a total amount of US$300,000,000, a coupon of 8.875% and yield of 9% and a final maturity on February 7th, 2025. The 8.875% Notes pay interests on a semiannual basis on February 7 and August 7 of each year, starting August 7, 2020. The use of proceeds from this issuance was to repurchase the 9.75% Notes due 2022 tendered under the repurchase offer referred to above, to refinance existing debt under the ECP Program and for general corporate purposes. Once this liability management transaction was completed on February 7, 2020, the new outstanding principal of the 9.75% Notes due 2022 is US$170,315,000.

In accordance with the "Description of the Notes" of the Offering Memorandum of the 8.875% Notes due 2025, the Company may redeem the Notes, in whole or in part, at any time from February 7, 2023, at the redemption prices stipulated in the Offering Memorandum, plus any additional amounts then owed and interest accrued and unpaid, until the date of redemption. It is also possible to redeem the notes before February 7, 2023, in whole or in part, at a price equal to 100% of your capital amount plus a make-whole premium, in addition to any additional amount then owed plus accrued and unpaid interest, up to the date of redemption. In addition, at any time until February 7, 2023, CVCS may redeem up to 35% of the Notes using resources from stock sales or equity offers at a redemption price of 108.875% of its capital amount, plus any additional amount then owed plus accrued and unpaid interest, up to the date of redemption. Moreover, in the event of certain changes in the tax treatment of withholding tax in Colombia in relation to interest payments on the Notes, CVCS may redeem them, in full, but not in part, at a price of 100% of their capital amount, in addition to any additional amount then owed plus interest accrued and unpaid, until the date of redemption. In the event of a change of control in the entity, unless the Company has chosen to redeem the Notes, each holder of the Notes will have the right to require that the Company purchase all or a portion (in minimum principal amounts of US$200,000 and integral multiples of US$1,000 in excess thereof) of the holder's notes at a purchase price equal to 101% of the principal amount thereof, plus accrued and unpaid interest thereon and any Additional Amounts, if any, to, but excluding, the date of purchase.

The Notes due in 2025 will be future and unsecured obligations and (i) will have the same priority as to the right of payment as all other existing and future debt obligations of the Company (subject to certain obligations under which they are given preferential treatment in accordance with Colombia's insolvency laws); (ii) shall have a higher payment priority than the Company's existing and future subordinated debt obligations, if any; (iii) shall be subject, as regards the right of payment, to all existing and future indebtedness obligations, without guarantee, of the Company, to the extent of the value of the assets guaranteeing such indebtedness, including any debt, liabilities and autonomous assets; and (iv) shall be structurally subordinate to all existing and future payment obligations and to the commercial payable accounts of any of our non-guarantor subsidiaries. Notes shall not be entitled to any depreciation fund.

The principal and coupons of the 8.875% Notes due in February 2025 were hedged by using cross currency swaps and call spreads at maturity.

During April and May 2020, Credivalores engaged in Open Market Repurchases ("OMR")of the 8.875% Notes due 2025 through a broker. The total principal amount of the 8.875% Notes due 2025 repurchased through OMRs reached US$32,000,000 and the Notes repurchased were cancelled on September 30th, 2020. Consequently, as of September 30, 2020 the new outstanding amount of the 8.875% Notes due 2025 was US$268.000.000.

**Covenants**

The package leaflet for Notes 144A / Reg S contains certain restrictive covenants, which within other things, limit our ability to (i) incur additional debt, (ii) make dividend payments, redeem capital and make some investments, (iii) transfer and sell assets, (iv) sign any type of agreement that could limit the ability of subsidiaries to pay dividends or make capital distributions, (v) create collateral or pledge assets, (vi) conduct consolidation, merger or sale of assets, and (vii) transact with affiliates. The "Indenture" contract governing the Notes contains traditional default events.

These same Indenture covenants and conditions were reflected in the documentation in Notes 144 A/Reg S due in 2025 for US$300,000,000.

Additionally, in December 2012 the company signed a peso indexed credit with the IFC amounting to US$25,000,000, which was amended in May 2015 to increase the amount to US$45,000,000. This facility includes several covenants within which the most relevant are: a risk-weighted solvency ratio (not less than 12%) for 2019 of 14% and 13.5% by December 2020, an equity ratio (not less than 12%) for 2019 of 13% and 12.07% by December 2020, an economic group exposure ratio (not more than 7%) for 2019 of 0.3% and 0.3% by December 2020, a ratio of exposure to related parties (no more than 12%) for 2019 of 0.64% and 0.59% by December 2020, fixed assets on equity (no more than 35%) for 2019 of 0.41% and 0.19% by December 2020, an aggregate exchange rate risk ratio (not more than 25%) by 2019 of 3.70% and 3.73% by December 2020, an aggregate interest rate risk ratio (not less than -10% and not more than 10%) 2019 of -1.50% and -1.84% by December 2020 and a liquidity ratio (not less than 8%) 8.99% for 2019 and 11.87% by December 2020.

During 2019 and as of December 31, 2020 Credivalores complied with the covenants set forth above.

- **IFP Financial Cost**

The funds received from loans acquired from financial institutions are used for portfolio origination and to handle various lines of working capital, which helps to maintain a degree of liquidity for the Company. The loans are represented by promissory notes wherein both parties establish the payment conditions, including maximum amount, amount, interest rate and duration. The financial cost of financial obligations for the periods ended December 31, 2020 and December 31, 2019:

|  | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Free-standing trusts | 17.477 | 21.115 |
| Local banks | 7.025 | 11.194 |
| Finance Leasing | - | 17 |
| Foreign currency obligation | 24.766 | 20.557 |
| Financial cost Derivatives | 19.230 | 21.114 |
| Issuance of bonds | 92.544 | 101.607 |
| Amortization Transaction costs | 32.299 | 15.5707 |
| Interest for liabilities for lease and finance lease agreements | 660 | 650 |
| **Total** | **194.001** | **191.824** |

The financial obligations and Free-standing Trusts of Credivalores that are recognized in local and foreign currencies will be recognized at the beginning of the transaction at their amortized value, net of costs incurred in

the transaction which are attributable at the time of issuance. The difference between funds received (net of transaction costs) and the redemption value is recognized in the Income Statement for the corresponding period, using the effective interest method.

## NOTE 19. EMPLOYEE BENEFITS

Under Colombian labor law and based on labor conventions employees are entitled to short-term benefits such as: wages, holidays, statutory bonuses, severance payment, and interest on severance pay.

Below is a breakdown of employee benefit payments as of December 31, 2020 and December 31, 2019:

|  | December 31, | |
| --- | --- | --- |
|  | **2020** | **2019** |
| Interest on severance pay | 48 | 51 |
| Severance pay | 407 | 451 |
| Holidays | 528 | 603 |
|  | **983** | **1.105** |

The current component of employee benefits must be paid within the twelve months following the reporting period.

The company within its compensation policies has no post-employment benefits.

## NOTE 120. OTHER PROVISIONS

Credivalores provisions at December 31, 2020 and December 31, 2019, respectively are provided below.

|  | December 31, 2020 | December 31, 2019 |
| --- | --- | --- |
| Litigations subject to executive proceedings | 199 | 226 |
| Other provisions | 7.171 | 250 |
|  | **7.370** | **476** |

The movement of legal and other provisions are provided below for the periods ended December 31, 2020 and December 31, 2019:

|  | Legal provisions | Other provisions | Total provisions |
| --- | --- | --- | --- |
| **Balance held at December 31, 2019** | **226** | **250** | **476** |
| Increase in provisions during the period | (27) | 6.921 | 6.894 |
| **Balance held at December 31, 2020** | **199** | **(*) 7.171** | **7.370** |

|  | Legal provisions | Other provisions | Total provisions |
| --- | --- | --- | --- |
| **Balance held at December 31, 2018** | **108** | **235** | **343** |
| Recovered provisions | 118 | 15 | 133 |
| **Balance held at December 31, 2019** | **226** | **250** | **476** |
| Recovered provisions | (27) | 6.921 | 6.894 |
| **Balance held at December 31, 2020** | **199** | **7.171** | **7.370** |

(*) As of December 31, 2020, other provisions are made up of the following:

|  | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Fees | 199 | 87 |
| Others | 7.171 | 3.832 |
|  | **7.370** | **3.919** |

Provisions correspond mainly to labor, civil and administrative processes filed by third parties against Credivalores, on which provisions were recognized as of December 31, 2019 in an amount of 64 it is not possible to determine a disbursement schedule for these provisions due to the diversity of processes in different instances.

However, Credivalores does not expect significant changes to the amounts provisions as a consequence of the outflows applicable to each proceeding. The expected time of resolution is uncertain since each proceeding is taking place in different instances.

## NOTE 21. ACCOUNTS PAYABLE

Below, we detail the balance of accounts payable has Credivalores December 31, 2020 and December 31, 2019, respectively:

|  | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Leases | 4 | 5 |
| Suppliers | 32 | 95 |
| Withholdings and labor contributions | 1.813 | 733 |
| Commissions and fees | 5.623 | 3.998 |
| Other accounts payable (21.2) | 28.410 | 19.771 |
| Costs and expenses payable (21.1) | 117.448 | 75.671 |
|  | **153.330** | **100.273** |

### 21.1 Costs and expenses payable

|  | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Services | 1.708 | 6.407 |
| Others | 55.890 | 19.272 |
| Financial expenses | 59.850 | 49.992 |
|  | **117.448** | **75.671** |

### 21.2 Other accounts payable

|  | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Third-party administrative payments | 69 | - |
| CXP Pound Portfolio Buybacks | 72 | - |
| Tigo disbursements | 112 | - |
| Different | 121 | 62 |
| Wallet your credit | 143 | 143 |
| VISA C1 disbursements convention | 379 | 1.722 |
| TIGO withdrawal | 1.083 | 843 |
| Credipoliza withdrawals | 1.645 | 1.256 |
| Crediuno withdrawals | 1.741 | 937 |
| Account payable (trusts) | 2.177 | 1.840 |
| Third Parties | 3.217 | 2.806 |

| | | |
|---|---|---|
| Credipoliza disbursements | 3.817 | 3.940 |
| Payroll loans CDs | 5.715 | 1.989 |
| Payroll Loans CDs disbursement | 8.119 | 4.233 |
| | **28.410** | **19.770** |

## NOTE 22. CURRENT AND DEFERRED TAX LIABILITIES

### 22.1 Components of current tax asset:

Current tax assets for the years ended December 31, 2020 and December 31, 2019 is as follows:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Income tax advance | 14.841 | 13.537 |
| Sales tax withheld | 1 | - |
| Advance other taxes | 16 | 5 |
| **Total current tax assets** | **14.858** | **13.542** |

### 22.2 Components of current tax liabilities

Current tax liabilities for the years ended December 31, 2020 and December 31, 2019 is as follows:

| | December 31, | |
|---|---|---|
| | **2020** | **2019** |
| Tax on industry and Commerce | 1.725 | 1.189 |
| Sales tax | 318 | 55 |
| | **2.043** | **1.244** |

### 22.3 Components of income tax expense

Income tax expense for the years ended December 31, 2020 and December 31, 2019 is as follows:

| | December 31, | |
|---|---|---|
| | **2020** | **2019** |
| Income Tax | 6.049 | 5.596 |
| **Subtotal - taxes from the current period** | **6.049** | **5.596** |
| Net deferred tax from the period | (3.730) | (2.384) |
| **Total** | **2.319** | **3.212** |

In accordance with the IAS 12, current and deferred taxes are recognized as income or expense in the income statement, except to the extent that they arise from a transaction or event recognized outside profit or loss in other

comprehensive income (OCI), in equity. Therefore, in the periods ended December 31, 2020 and December 31, 2019, other comprehensive income was recognized in equity.

### 22.4 Reconciliation of the nominal income tax rate and the effective tax rate in Colombia:

The tax provisions in force in Colombia for income and ancillary taxes applicable in 2020 and 2019, respectively, among others, are as follows:

- The income tax rate for 2020 is 32%.
- With the Economic Growth Act 2010 of 2019, the income tax rate for the years 2020, 2021, 2022 and following is 32%, 31% and 30%, respectively.

- Economic Growth Act 2010 of 2019 reduces presumptive income to 0.5% of liquid assets on the last day of the taxable year immediately before 2020, and to 0% from 2021 and following.
- The Economic Growth Act 2010 of 2019 maintains the possibility of taking as a tax discount on income tax 50% of the industry tax and trade notices and boards actually paid in the taxable year or period, which from 2022 will be 100%. By 2020 this tax has the treatment of deduction in income tax.
- The occasional gain tax is taxed at the 10% rate.
- Excess presumptive income may be offset in the following 5 taxable periods.

The Company reconciled the total effective rate without deferred tax, which was 31% for 2020 and 31% for 2019, as detailed below:

|  | 2020 | 2019 |
|---|---|---|
| Earnings (loss) before tax | 7.544 | 8.264 |
| **Income Tax rate** | **32%** | 33% |
| Income Tax | 2.414 | **2.727** |
| **More (less) tax impact on:** | | |
| Non-deductible expense | 1.040 | 777 |
| Exchange rate differences | (1.163) | (323) |
| Non-deductible tax | 3 | 4 |
| Presumptive interest | 26 | 27 |
| **Total income tax provisions charged to income** | **2.320** | **3.212** |
| **Effective rate** | **31%** | **39%** |

## 22.5 Deferred Tax

Differences between the book value of assets and liabilities and their tax bases result in temporary differences in deferred, calculated and recorded taxes in the periods ended December 31, 2020 and December 31, 2019, based on the tax rates in force for the years in which such temporary differences will be reversed.

|  | December 31, | |
|---|---|---|
|  | 2020 | 2019 |
| Assets deferred taxes | 28.361 | 23.775 |
| Liabilities deferred taxes | (22.400) | (12.722) |
| **Deferred taxes assets (passive), net** | **5.961** | **11.053** |

The net movement of deferred taxes during the period is as follows:

|  | December 31, | |
|---|---|---|
|  | 2020 | 2019 |
| Balances as of January 1 | **11.053** | **14.432** |
| Charge (credit) to the statement of results | 3.730 | 2.384 |
| Charge (credit) to the other comprehensive results | (8.822) | (5.763) |
| **Balance as of December 31** | **5.961** | **11.053** |

The movements of deferred taxes active and passive during the period, without regard to the compensation of balances referred to the same tax authority, have been as follows:

| | Expenses paid in advance | Portfolio Provision | IFRS Adoption 9 | IFRS Adoption 16 | Depreciation Fixed Assets | Provision of Expenses | Total |
|---|---|---|---|---|---|---|---|
| **Assets deferred taxes** | | | | | | | |
| **Balance as of January 1, 2019** | 1.988 | 4.582 | 14.117 | - | 218 | - | 20.905 |
| Charge (credit) to the statement of results | - 1.988 | 4.725 | | 114 | 19 | | 2.870 |
| Charge (credit) to the other comprehensive results | - | - | - | - | - | - | - |
| **Balance as of December 31, 2019** | - | 9.307 | 14.117 | 114 | 237 | - | 23.775 |
| Charge (credit) to the statement of results | - | 4.532 | | 13 | 8 | 33 | 4.586 |
| Charge (credit) to the other comprehensive results | - | - | | | | | - |
| **Balance as of December 31, 2020** | - | 13.839 | 14.117 | 127 | 245 | 33 | 28.361 |

| | Valuation Financial Instruments | Intangibles | Impairment Financial Instruments | Shares | Total |
|---|---|---|---|---|---|
| **Liabilities deferred taxes** | | | | | |
| **Balance as of January 1, 2019** | - | - | 6.052 | 421 | 6.473 |
| Charge (credit) to the statement of results | - | 1.075 | 132 | (721) | 486 |
| Charge (credit) to the other comprehensive results | 5.190 | - | - | 573 | 5.763 |
| **Balance as of December 31, 2019** | 5.190 | 1.075 | 6.184 | 273 | 12.722 |
| Charge (credit) to the statement of results | - | 784 | 21 | 51 | 856 |
| Charge (credit) to the other comprehensive results | 8.872 | - | - | (50) | 8.822 |
| **Balance as of December 31, 2020** | 14.062 | 1.859 | 6.205 | 274 | 22.400 |

Deferred tax assets outstanding assets are recognized to the extent that the corresponding tax benefit is likely to be made through future tax benefits. The Company has recognized all deferred tax assets and liabilities.

**22.6 Effect of current and deferred taxes in each component of other comprehensive income in equity:**

The effects of current and deferred taxes in each component of other comprehensive income in equity are as follows:

| | December 2020 | | | December 2019 | | |
|---|---|---|---|---|---|---|
| | **Amount before tax** | **Deferred tax income (expense)** | **Net** | **Amount before tax** | **Deferred tax income (expense)** | **Net** |
| **Items that may be subsequently reclassified to income** | | | | | | |
| Effect of changes in fair value on the valuation of derivative financial instruments | 29.572 | (8.872) | 20.700 | 21.206 | (5.190) | 16.016 |
| Shares | (499) | 50 | (449) | 525 | (573) | (48) |
| | **29.073** | **(8.822)** | **20.251** | **21.731** | **(5.763)** | **15.968** |

**22.7 Tax uncertainties**

Income tax and supplementary returns that are open for review by the Tax Authorities are as follows:

| Period | Declaration | Date presentation | Amount | Observations |
|---|---|---|---|---|
| 2017 | Rent | | | Balance in Favor offset by income statement taxable year 2018. |
| 2018 | Rent | | | Balance in Favor offset by income statement taxable year 2019. |
| 2019 | Rent | | | No DIAN audit. |

Of the above statements, the Tax Authority has not initiated review processes for the taxable years 2017, 2018 and 2019.

No comments and/or adjustments are expected from the process of reviewing income tax and supplementary returns by the tax authorities.

**22.8    Annual Statement of Assets Held Abroad**

Law 1739 of 2014 created an annual declaration of assets held abroad to be submitted by all those paying Income and Ancillary Taxes who are **obliged** to pay tax on (i) their global income; (ii) their equity held both at home and abroad; and (iii) assets held abroad.

The information required in order to identify the taxpayer as stipulated by the corresponding tax regulations is as follows:

✓   Discrimination of assets held by the Company abroad at January 1, 2019, the value of which shall exceed 3,580 TVA (Tax Value Units), the value of the taxpayer's equity, the jurisdiction in which the assets are located and the nature and type of asset.

✓   Discrimination of assets held by the Company abroad at January 1, 2019, the value of which shall not exceed 3,580 TVA (Tax Value Units) in order to declare these in their aggregate along with the jurisdiction in which the assets are located and the nature and type of asset.

**NOTE 23. OTHER LIABILITIES**

Below the detail of other liabilities:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Collections pending application | - | 5.141 |
| Values received for third parties (23.1) | 171 | 119 |
| Bond premium at issuance | 1.210 | 416 |
| Collection of managed loan portfolios | 7.201 | 8.252 |
| Checks pending collection | 18.382 | 19.620 |
| Credit card guarantee | 22.604 | 28.285 |
| **Total** | **49.568** | **61.833** |

### 23.1 Values received for third parties

Below the detail of other Values received for third parties

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Retailers collections | 21 | 19 |
| Free-standing trusts collections | 1.628 | 2.172 |
| Voluntary and mandatory insurance collections | 3.026 | 1.388 |
| FGA guarantees' collections (a) | 13.707 | 16.041 |
| **Total Values received for third parties** | **18.382** | **19.620** |

(a) This value corresponds to the security claim pending payment to the FGA and to compensate with claims.

### NOTE 24. EQUITY

**Capital**

Credivalores objective is to safeguard its capacity to continue as a business enterprise and maintain a financial structure that optimizes the cost of capital and maximizes returns for shareholders. The Company's capital structure encompasses and includes the subscribed capital, retained earnings and reserves.

Capital management objectives are met by managing the portfolio as authorized by law and maintaining a consistent pace of generating profits from its structural revenue (portfolio interests and returns on investments) which results in institutional strengthening and provides the Company an opportunity to maintain its dividend distribution policy among its shareholders.

For the reporting periods, Credivalores indeed complied with the required minimum capital in the relation of solvency required by legal provisions and mandatory investments.

**Authorized, and Paid in Capital**

As of December 31, 2020 and December 31, 2019 Credivalores authorized and paid in capital is **129.638** and **123.992** represented in **4.588.300** and **4.385.998** shares, each of a nominal value of 28.254; respectively.

**CREDIVALORES CREDISERVICIOS S. A.**
**DISCLOSURES TO THE FINANCIAL STATEMENTS**
**ENDED DECEMBER 31, 2020 AND 2019**
(Stated in millions of Colombian pesos)

| Credivalores Crediservicios S.A. | | | | |
|---|---|---|---|---|
| Shareholder | December 31, 2020 Number of shares | % | December 31, 2019 Number of shares | % |
| Acon Consumer Finance Holdings S de RL | 912.913 | 19.89% | 912.913 | 19.89% |
| Crediholding S.A.S. | 1.571.073 | 34.24% | 1.571.073 | 34.24% |
| Lacrot Inversiones 2014 SLU | 1.671.520 | 36.43% | 1.671.520 | 36.43% |
| Acon Consumer Finance Holdings II S L | 193.153 | 4.21% | 193.153 | 4.21% |
| Direcciones de Negocio S.A.S. | 1 | 0.00% | 1 | 0.00% |
| Treasury shares | 239.640 | 5.22% | 239.640 | 5.22% |
| **Total** | **4.588.300** | **100%** | **4.588.300** | **100%** |

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Number of authorized shares | 4.700.000 | 4.700.000 |
| Subscribed and paid shares | 4.588.300 | 4.588.300 |
| Nominal value | 28.254 | 28.254 |
| Subscribed and paid capital (nominal value) | 129.638 | 129.638 |
| Paid-in capital | 64.727 | 64.727 |
| **Total capital plus premium** | **194.365** | **194.365** |

The following is a breakdown of the basic earnings per share:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Ordinary shares (a) | 2.081.515 | 1.532.597 |
| Preferred shares (a) | 2.506.785 | 2.506.785 |
| Repurchased treasury shares | 239.640 | 239.640 |
| **Total earnings per share** | **1.139** | **1.101** |

(a) The value of the shares as of December 31, 2020 and December 2019 correspond to the total number of outstanding shares held by Credivalores, 4.588.300.

As per the Company´s bylaws, both common and preferred stock have the same decision power and rights, and the preference of those shares is given by its hierarchy in the payment of dividends when declared by the Assembly and by the preferred right in the reimbursement in case of liquidation.

**December 31, 2020**

| Share capital | | | | | | | |
|---|---|---|---|---|---|---|---|
| Name of Entity | Preference shares A | Preference shares B | Preference shares C | Treasury Shares | Common Shares | Total | % |
| Acon Consumer Finance Holdings S de R.L. | 835.834 | - | - | - | 77.079 | 912.913 | 19.90% |
| Crediholding S.A.S | - | - | - | - | 1.571.073 | 1.571.073 | 34.24% |
| Lacrot Inversiones 2014 S.L.U. | - | 923.665 | 563.119 | - | 184.736 | 1.671.520 | 36.43% |
| Treasury Shares | - | - | - | 239.640 | - | 239.640 | 5.22% |
| Acon Consumer Finance Holdings II, S.L. | - | 184.167 | - | - | 8.986 | 193.153 | 4.21% |
| Direcciones de Negocio S.A.S. | | | | | 1 | 1 | 0.00% |
| **Total** | **835.834** | **1.107.832** | **563.119** | **239.640** | **1.841.875** | **4.588.300** | **100.00%** |

**December 31, 2019**

| Share capital | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Name of Entity** | **Preference shares A** | **Preference shares B** | **Preference shares C** | **Treasury Shares** | **Common Shares** | **Total** | **%** |
| Acon Consumer Finance Holdings S de R.L. | 835.834 | - | - | - | 77.079 | 912.913 | 19.90% |
| Crediholding S.A.S | - | - | - | - | 1.571.073 | 1.571.073 | 34.24% |
| Lacrot Inversiones 2014 S.L.U. | - | 923.665 | 563.119 | - | 184.736 | 1.671.520 | 36.43% |
| Treasury Shares | - | - | - | 239.640 | - | 239.640 | 5.22% |
| Acon Consumer Finance Holdings II, S.L. | - | 184.167 | - | - | 8.986 | 193.153 | 4.21% |
| Direcciones de Negocio S.A.S. | | | | | 1 | 1 | 0.00% |
| **Total** | **835.834** | **1.107.832** | **563.119** | **239.640** | **1.841.875** | **4.588.300** | **100.00%** |

**Treasury shares**

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Treasury Shares Reserve | 12.837 | 12.837 |
| (Treasury Shares) | (12.837) | (12.837) |
| **Total** | **-** | **-** |

The CVCS General Shareholders' Meeting on April 2 of 2014, decided to establish a special reserve in the amount of 12,837 for the reacquisition of 239,640 shares. This reserve is in accordance with Articles 396 and 417 of the Commercial Code.

**Reserves**

Equity reserves as of December 31, 2020 and December 31, 2019 were comprised of the following:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Legal reserve | 5.793 | 5.793 |
| Reserve to repurchased treasury shares | 12.837 | 12.837 |
| Occasional reserves: | 21 | 21 |
| **Total Reserves** | **18.651** | **18.651** |

**NOTE 25. OTHER COMPREHENSIVE INCOME (OCI)**

We present the detail below:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| **Tax** | (14.191) | (5.370) |
| Income tax OCI | **(14.191)** | **(5.370)** |
| | | |
| **Other comprehensive income** | **48.171** | **19.096** |
| Shares | 1.300 | 1.798 |
| **Financial instruments** | **46.871** | **17.298** |
| Financial instruments Forward | (4.046) | (9.526) |
| Financial instruments Cross Currency Swap | 30.523 | 11.971 |
| Financial instruments Options | (27.200) | 5.013 |
| Financial instruments Coupon Only swap | 47.594 | 9.840 |
| **Total** | **33.980** | **13.726** |

**NOTE 26. REVENUE**

Below, is a detail of revenue for the three and nine-months ended December 31, 2020 and 2019:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Interests | 291.203 | 275.415 |
| Interest expense | (223) | (229) |
| **Subtotal Interests (26.1)** | **290.980** | **275.186** |
| Revenue from customer contracts (26.2) | 85.550 | 97.003 |
| | **376.530** | **372.189** |

**26.1 Interest**

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| CrediUno interest | 71.546 | 48.898 |
| CrediPóliza interest | 6.161 | 10.417 |
| TuCrédito interest | 52.948 | 53.962 |
| Tigo interest | 12.744 | 9.571 |
| TuCrédito transaction costs | (15.964) | (8.574) |
| CrediPóliza transaction costs | (304) | (324) |
| CrediUno transaction costs | (8.895) | (5.818) |
| TuCrédito fair value | 691 | 987 |
| **Sub-total Consumer loans** | **118.927** | **109.119** |
| Microcredit interest | 12 | 58 |
| Microcredit loans transaction costs | (2) | (35) |
| **Sub-total Microcredit** | **10** | **23** |
| Factoring | 35 | 278 |
| **Subtotal Factoring** | **35** | **278** |
| CrediUno late payment interest | - | 849 |
| CrediPóliza late payment interest | 581 | 669 |
| TuCrédito late payment interest | 653 | 480 |
| Tigo late payment interest | - | 345 |
| **Consumer loan defaults** | **1.234** | **2.343** |
| CrediYa late payment interest | - | 92 |
| **Microcredit loan defaults** | **-** | **92** |
| Financial returns | 4.026 | 5.071 |
| BTG Pactual financial returns | 30.428 | 43.971 |
| Current interests, Free-standing Trust | 48.957 | 46.039 |
| Income from FGA Alliance | 23.713 | 20.640 |
| Other income, Free-standing Trust | 1.411 | 3.435 |
| Write – off | 24.642 | 18.168 |
| Other loan interest | 37.597 | 26.008 |
| **Other** | **170.774** | **163.332** |
| **Total Interests** | **290.980** | **275.186** |

**26.2 Revenue from customer contracts**

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Administration fee – credit card | 59.190 | 56.221 |
| Collection fees | 9.766 | 15.497 |
| Brokerage Commission | 6.402 | 6.738 |

| | | |
|---|---:|---:|
| Financial Consultancy – Returns from Debtor life insurance | 3.517 | 3.965 |
| Financial Consultancy- Returns Voluntary insurance policies | 2.823 | 3.142 |
| Shared financial consultancy fees | 1.909 | 2.365 |
| Internal commission | 1.330 | 1.464 |
| Certifications | 394 | 676 |
| Returned commission | 215 | 446 |
| Department store income and credit card channels income | 4 | 8 |
| Administration fee - life insurance plus | - | 6.480 |
| Microcredit SME's loan fees | - | 1 |
| | **85.550** | **97.003** |

## NOTE 27. OTHER INCOME

At the end of each period, movements corresponded to:

| | December 31, 2020 | December 31, 2019 |
|---|---:|---:|
| Other | 1.961 | 697 |
| Recovery of portfolio written-off | 537 | 705 |
| Recoveries from previous exercises | 67 | 632 |
| Sickness Leave | 48 | 161 |
| Reimbursement of expenses from previous years | 43 | 6 |
| Refund insurance | 17 | 19 |
| Tax refund | 5 | 5 |
| Other income recoveries | - | 132 |
| | **2.678** | **2.357** |

## NOTE 28. OTHER EXPENSES

At the end of each period, movements corresponded to:

| | December 31, 2020 | December 31, 2019 |
|---|---:|---:|
| Fees | 19.680 | 25.350 |
| Taxes | 11.157 | 9.654 |
| Temporary Services | 9.195 | 3.754 |
| Operating leases | 3.943 | 4.464 |
| Technical assistance | 3.815 | 8.640 |
| Electronic data processing | 3.430 | 2.168 |
| Commissions | 2.991 | 2.677 |
| Publicity and advertising | 2.751 | 2.499 |
| Transport | 2.565 | 2.000 |
| Public services | 1.998 | 4.537 |
| Returns to investors | 1.537 | 1.590 |
| Consultation with Credit Bureau | 1.303 | 2.235 |
| Cost of representation | 961 | 1.604 |
| Travel expenses | 910 | 820 |
| Remodeling of facilities | 832 | 727 |
| Publications and subscriptions | 485 | 514 |

| | | |
|---|---|---|
| Office supplies | 451 | 802 |
| Concierge and security services | 324 | 880 |
| Fines, penalties and awards | 196 | 565 |
| Maintenance | 126 | 453 |
| Insurance | 120 | 590 |
| Legal expense | 89 | 295 |
| Donations | 12 | 32 |
| Other | 7 | 22 |
| | **68.878** | **76.872** |

**NOTE 29. NET FINANCIAL INCOME**

Below is the detail of financial (net) costs, for the periods for three and nine months ended December 31, 2020 and 2019:

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Financial performances | 3.535 | 478 |
| Financial income | 2.678 | 2.357 |
| Exchange rate differences | 4.041 | 412 |
| **Total Financial Income** | **10.254** | **3.247** |
| | | |
| Forwards valuation | 6.971 | (4.240) |
| **Total Financial Expense** | **6.971** | **(4.240)** |
| **Net Financial Income (expense)** | **17.225** | **(993)** |

29.1 During the first months of 2020 due to the issuance of the 8.875% Bonds due 2025, there was a high liquidity balance that was invested in financial institutions to obtain a return.

29.2 It mainly corresponds to charges for the Bizagi platform administration of $1,753, and portfolio recovery written off $537.

29.3 Corresponds to the change in the exchange rate of derivative financial instruments and re-expression of balance sheet accounts in USD, such as bank accounts, investments and accounts payable.

29.4 Corresponds to the net result generated by the liquidation of derivative financial instruments as a result of repurchases of the 8.875% Bonds due 2025.

**NOTE 30. CONTINGENT ASSETS AND CONTINGENT LIABILITIES**

**a. Commitments**

**Credit commitments**

In the course of ordinary business, Credivalores provides loan portfolio as guarantees to its funding sources, in which it irrevocably agrees to pay them in the event the client is unable to meet its obligations, with the same credit risk for loan portfolios.

Loan extension commitments represent unused portions of authorizations to extend credits as loans. With regard to the credit risk on commitments to extend lines of credit, Credivalores is potentially exposed to losses in an amount equal to the total unused commitments, if the unused amount were to be withdrawn in its totality; However, the amount of the loss is less than the total amount of the unused commitments because the majority of loan

extension commitments are contingent once the client can maintain specific credit rating standards. Credivalores monitors the maturity dates of those credit limit commitments because long-term commitments have a higher credit risk than short-term commitments.

The following is a breakdown of unused lines of credit commitments and guarantees at December 31, 2020 and December 31, 2019:

|  | December 31, 2020 | December 31, 2018 |
|---|---|---|
| Unpaid approved credits | 385.960 | 495.551 |

## NOTE 31. RELATED PARTIES

The Company's Board of Directors and Senior Management, in their role as governing bodies, are fully aware of the responsibility related to managing the various risks to which the Company is exposed; likewise, they are fully aware of the Company's processes and business structure so as to be able to provide support and adequate monitoring and follow-up.

The Company's related parties are as follows:

1. Shareholders with interests, a controlling stake or a joint stake of the Company, or significant influence over Credivalores.

2. Members of the Board of Directors: Members of the Board of Directors (principals and alternates, along with their related parts).

3. Key management personnel includes the Company CEO and other C-level Officers, who are those who participate in the planning, direction and control of the Company.

4. Affiliates: Companies in which Credivalores has significant influence, which is generally considered to be a share between 20% and 50% of their capital.

The most representative balances as of December 31, 2020 and December 31, 2019 with related parties are included in the following charts, with headings for definitions of the related parties recorded in the previous sections.

|  | December 31, 2020 | | December 31, 2019 | |
|---|---|---|---|---|
|  | Shareholders | Members of the Board of Directors (a) | Shareholders | Members of the Board of Directors (a) |
| Accounts receivable | 1.815 | - | 1.815 | - |
| Accounts payable | - | 93 | - | 78 |
| Operating expenses | - | 286 | - | 186 |

Compensation received by key management personnel is comprised of the following:

|  | December 31, | |
|---|---|---|
| **Item** | **2020** | **2019** |
| Salaries | 2.977 | 3.870 |
| Short-term employee benefits | 947 | 957 |
| **Total** | **3.924** | **4.827** |

a.  Members of the Board of Directors (principals and alternates, along with their related parts) as of December 31, 2020:

**Directors**

| No. | Director | Alternate |
|-----|----------|-----------|
| 1 | José Miguel Knoell Ferrada | Mathias Boccia Cristiano |
| 2 | Juan Carlos Restrepo Acuña | Liliana Arango Salazar |
| 3 | Lorena Margarita Cárdenas Costas | Diana Esperanza Montero |
| 4 | Rony Doron Seinjet | Andrea Cañón Rincon |
| 5 | Maria Marcela Caicedo Pachón | Vacant |
| 6 | Adrián Gustavo Ferrado | Carlos Manuel Ramón |
| 7 | Juan Camilo Ocampo Lalinde | Maria Patricia Moreno |

**Legal Representatives**

| No. | Representative |
|-----|----------------|
| Manager | Eliana Andrea Erazo Restrepo |
| Alternate | Liliana Arango Salazar |

**NOTE 32. SUBSECUENT EVENTS**

There are no subsequent facts that occurred after December 31, 2020 and after the filing of these financial statements that could significantly affect the Company's results and assets.

The financial statements were approved by the shareholder's general assembly on March 31, 2021.

**PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CREDIVALORES – CREDISERVICIOS S.A.[1] | ) Case No. 24-[___] ([___]) |
| | ) |
| | ) |
| | ) |
| Debtor. | ) |

## PREPACKAGED CHAPTER 11 PLAN OF CREDIVALORES – CREDISERVICIOS S.A.

---

**THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE**
**BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION**

---

**BAKER & MCKENZIE LLP**
452 5th Avenue
New York, New York 10018
Telephone: (212) 626-4100
Facsimile: (212) 310-1600

    -and-

1111 Brickell Avenue, 10th Floor
Miami, Florida 33131
Telephone: (305) 789-8900
Facsimile: (305) 789-8953

*Proposed Counsel to the Debtor and Debtor-in-Possession*

Dated: March 7, 2024

---

[1] The address for Credivalores – Crediservicios S.A. is Carrera 7 #76-35, 7th Floor, Bogotá, Colombia.

**TABLE OF CONTENTS**

Page

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME,
GOVERNING LAW, AND OTHER REFERENCES ........................................................................ 2

1.1   **Defined Terms** ................................................................................................ 2

1.2   **Rules of Interpretation** ................................................................................ 8

1.3   **Computation of Time** .................................................................................... 8

1.4   **Governing Law** ............................................................................................... 8

1.5   **Reference to Monetary Figures** .................................................................. 8

ARTICLE II ADMINISTRATIVE AND PRIORITY CLAIMS ............................................................. 8

2.1   **Administrative Claims** .................................................................................. 8

2.2   **Professional Claims** ....................................................................................... 9

2.3   **Priority Tax Claims** ..................................................................................... 10

2.4   **Other Priority Claims** ................................................................................ 10

2.5   **Payment of Statutory Fees** ....................................................................... 10

2.6   **Trustee Expenses** .......................................................... **Error! Bookmark not defined.**

ARTICLE III CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS ............. 11

3.1   **Classification of Claims and Interests** ..................................................... 11

3.2   **Treatment of Classes of Claims and Interests** ....................................... 11

3.3   **Special Provision Governing Unimpaired Claims** ................................. 13

3.4   **Elimination of Vacant Classes** ................................................................. 13

ARTICLE IV PROVISIONS FOR IMPLEMENTATION OF THE PLAN .............................................. 13

4.1   **General Settlement of Claims** ................................................................... 13

4.2   **Subordination** .............................................................................................. 13

4.3   **Sources of Cash for Plan Distributions** .................................................. 13

4.4   **Issuance of the New Notes** ......................................................................... 13

4.5   **Vesting of Assets in the Reorganized Debtor** ......................................... 14

4.6   **Discharge from Old Notes, Instruments, Certificates, and Other Documents** ......................... 14

4.7   **Restructuring Transactions** ...................................................................... 15

4.8    **Corporate Action** ......................................................................................................15

4.9    **New Corporate Governance Documents** ...............................................................15

4.10   **Effectuating Documents; Further Transactions** ..................................................15

4.11   **Section 1146(a) Exemption** .....................................................................................15

4.12   **Managers, Directors and Officers** ........................................................................15

4.13   **Preservation of Rights of Action** ..........................................................................16

4.14   **Directors and Officers Insurance Policies** ...........................................................16

4.15   **Indemnification Provisions in Organizational Documents** ................................17

4.16   **Reinstatement of Equity Interests** .......................................................................17

4.17   **Exemption from Registration Requirements** ......................................................17

ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......................17

5.1    **Assumption and Rejection of Executory Contracts and Unexpired Leases** ...........17

5.2    **Claims Based on Rejection of Executory Contracts or Unexpired Leases** ..............18

5.3    **Cure of Defaults for Executory Contracts and Unexpired Leases Assumed.** .........18

5.4    **Insurance Policies** ...................................................................................................18

5.5    **Indemnification Provisions** ....................................................................................18

5.6    **Benefit Programs** ....................................................................................................19

5.7    **Modifications, Amendments, Supplements, Restatements or Other Agreements** ....19

5.8    **Reservation of Rights** .............................................................................................19

5.9    **Nonoccurrence of the Effective Date** ....................................................................19

5.10   **Contracts and Leases Entered into After the Petition Date** ...............................19

ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS ....................................................19

6.1    **Distributions on Account of Claims Allowed as of the Effective Date** ...................19

6.2    **Special Rules for Distributions to Holders of Disputed Claims** .............................20

6.3    **Disbursing Agent** ...................................................................................................20

6.4    **Distributions on Account of Old Notes Claims** ....................................................20

6.5    **Delivery of Distributions and Undeliverable or Unclaimed Distributions** .............21

6.6    **Setoffs** .....................................................................................................................22

6.7    **Allocation Between Principal and Accrued Interest** .............................................23

ARTICLE VII PROCEDURES FOR RESOLVING DISPUTED CLAIMS ....................................23

    7.1   **Disputed Claims**...................................................................................................23

    7.2   **Resolution of Disputed Claims**............................................................................23

    7.3   **Estimation of Claims** ...........................................................................................24

    7.4   **No Interest**...........................................................................................................24

    7.5   **No Distributions Pending Allowance** ....................................................................24

    7.6   **Disallowance of Claims and Interests** ..................................................................24

ARTICLE VIII EFFECT OF CONFIRMATION OF THE PLAN ..........................................25

    8.1   **Compromise and Settlement of Claims, Interests, and Controversies** ....................25

    8.2   **Discharge of Claims and Termination of Interests** ...............................................25

    8.3   **Releases by the Debtor**..........................................................................................25

    8.4   **Releases by the Releasing Parties**.........................................................................26

    8.5   **Exculpation** ........................................................................................................27

    8.6   **Injunction**...........................................................................................................27

    8.7   **Protection Against Discriminatory Treatment** ......................................................27

    8.8   **Recoupment**........................................................................................................28

    8.9   **Release of Liens** ..................................................................................................28

    8.10  **Reimbursement or Contribution** .........................................................................28

ARTICLE IX CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ...........................28

    9.1   **Conditions Precedent to the Effective Date**...........................................................28

    9.2   **Waiver of Conditions Precedent** ..........................................................................29

    9.3   **Effect of Non-Occurrence of Conditions to Consummation**....................................29

ARTICLE X MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN.............29

    10.1  **Modification of Plan**............................................................................................29

    10.2  **Revocation or Withdrawal of Plan**.......................................................................29

ARTICLE XI RETENTION OF JURISDICTION ...............................................................30

    11.1  **Jurisdiction**.........................................................................................................30

ARTICLE XII MISCELLANEOUS PROVISIONS ..............................................................31

    12.1  **Additional Documents** .........................................................................................31

12.2 **Reservation of Rights** .................................................................................................31

12.3 **Successors and Assigns** ..............................................................................................31

12.4 **Service of Documents** .................................................................................................32

12.5 **Term of Injunctions or Stays** .....................................................................................32

12.6 **Entire Agreement** .......................................................................................................32

12.7 **Plan Supplement Exhibits** .........................................................................................32

12.8 **Non-Severability** .........................................................................................................32

# INTRODUCTION

Credivalores – Crediservicios S.A. ("Credivalores") as debtor and debtor-in-possession (the "Debtor") proposes this plan of reorganization (the "Plan"). Reference is made to the Disclosure Statement for a discussion of the history, businesses, properties and operations, projections and risk factors related to the Debtor, as well as a summary and analysis of this Plan and certain related matters. Capitalized terms used herein shall have the meanings set forth in Section 1.1 below.

# ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

## 1.1    **Defined Terms**

1.      "*Administrative Claim*" means any Claim for costs and expenses of administration during the Chapter 11 Case pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estate and operating the businesses of the Debtor; (b) Allowed Professional Claims; and (c) all fees and charges assessed against the Estate pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

2.      "*Affiliate*" means affiliate as such term is defined in section 101(2) of the Bankruptcy Code.

3.      "*Allowed*" means, with reference to any Claim or Interest, or any portion thereof, that is (a) specifically allowed under this Plan, (b) allowed under the Bankruptcy Code, or (c) allowed by a Final Order.

4.      "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of the Debtor or its Estate or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

5.      "*Ballot*" means the form or forms distributed to certain Holders of Claims that are entitled to vote on the Plan by which such parties may indicate acceptance or rejection of the Plan and includes both the form distributed for use by the actual beneficial owners of the Old Notes and the form distributed for use by the bank, broker, or other financial institution that holds the Old Notes in "street name" on behalf of one or more beneficial owners.

6.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as may be amended from time to time.

7.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York or such other court having jurisdiction over the Chapter 11 Case.

8.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Case and the general, local, and chambers rules of the Bankruptcy Court.

9.      "*Business Day*" means any day, other than (a) a Saturday, Sunday, or a "legal holiday" (as defined in Bankruptcy Rule 9006(a)(6)), or (b) any other day on which banks are legally permitted to be closed in New York or Colombia.

10.     "*Capitalized Interest*" means further New Notes to capitalize the accrued and unpaid interest from (and including) the immediately preceding interest payment date to (but excluding) February 7, 2024, to the effect

that each US$1 of accrued and unpaid interest on Old Notes validly accepted and tendered (rounded down to the nearest US$1) will be exchanged for US$1 in principal amount of New Notes in lieu of cash.

11. "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

12. "*Causes of Action*" means any and all claims, actions, causes of action, choses in action, suits, debts, demands, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including all claims and any avoidance, recovery, subordination, or other actions against Insiders and/or any other Entities under the Bankruptcy Code, including Avoidance Actions) of the Debtor, the debtor in possession, and/or the Estate, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, that are or may be pending on the Effective Date or commenced by the Reorganized Debtor after the Effective Date against any Entity, based in law or equity, including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order.

13. "*Chapter 11 Case*" means the case pending for the Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

14. "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

15. "*Claims and Solicitation Agent*" means the claims, noticing, and/or solicitation agent the Debtor will retain in the Chapter 11 Case pursuant to an order of the Bankruptcy Court.

16. "*Class*" means a category of Holders of Claims or Interests under section 1122(a) of the Bankruptcy Code.

17. "*Colombia*" means the Republic of Colombia.

18. "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Case.

19. "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case within the meaning of Bankruptcy Rules 5003 and 9021.

20. "*Confirmation Hearing*" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtor seek entry of the Confirmation Order.

21. "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code and approving the Disclosure Statement.

22. "*Consummation*" means the occurrence of the Effective Date.

23. "*Creditor*" has the meaning set forth in section 101(10) of the Bankruptcy Code.

24. "*Cure Claim*" means a Claim based on the Debtor's defaults on an Executory Contract or Unexpired Lease at the time such Executory Contract or Unexpired Lease is assumed by the Debtor pursuant to sections 365 or 1123 of the Bankruptcy Code.

25. "*D&O Insurance Policies*" means all insurance policies of the Debtor for directors', managers', and officers' liability existing as of the Petition Date.

26. "*Debtor*" has the meaning set forth in the introductory paragraph of this Plan.

27. "*Description of New Notes*" means the Description of the New Notes set forth in the Disclosure Statement.

28. "*Disbursing Agent*" means the Reorganized Debtor or any Entity selected by the Debtor or Reorganized Debtor and identified in the Plan Supplement, as applicable, to make or facilitate distributions contemplated under the Plan.

29. "*Disclosure Statement*" means that certain Offering Memorandum and Consent Solicitation Statement dated as of March 7, 2024, as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto, to be approved by the Bankruptcy Court.

30. "*Disputed*" means, with respect to a Claim or Interest (or portion thereof), (a) that an objection to such Claim or Interest (or portion thereof) has been filed on or before the Effective Date or (b) for which a proof of such Claim or Interest is filed; provided that in no event shall a Claim or Interest (or portion thereof) that is deemed Allowed pursuant to the Plan be a Disputed Claim or Interest.

31. "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtor, on or after the Effective Date, upon which the Reorganized Debtor or the Disbursing Agent shall make distributions to Holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

32. "*Distribution Record Date*" means for purposes of making distributions under the Plan on account of Allowed Claims, the Confirmation Date. Notwithstanding the foregoing, the Distribution Record Date shall not apply to publicly held securities, the holders of which shall receive their distribution in accordance with the Plan and the applicable procedures of DTC in exchange for such securities.

33. "*DTC*" means The Depository Trust Company.

34. "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent to the occurrence of the Effective Date set forth in Section 9.1 have been satisfied or waived in accordance with Section 9.2.

35. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

36. "*Estate*" means the bankruptcy estate of the Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

37. "*Exchange Offer*" means the out-of-court process conducted by Debtor for the exchange of the Old Notes for the New Notes.

38. "*Exculpated Claim*" means any Claim related to any act or omission in connection with, relating to, or arising out of the Debtor's in-court or out-of-court efforts to negotiate, enter into or implement the Chapter 11 Case, the formulation, preparation, solicitation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with or pursuant to the Disclosure Statement or the Plan, the filing of the Chapter 11 Case, the pursuit of Confirmation, the administration and implementation of the Plan, or the distribution of property under the Plan.

39. "*Exculpated Party*" means each of the following in its capacity as such: (a) the Debtor; (b) the Reorganized Debtor; (c) the Trustee; (d) the Holders of Interests; and (e) with respect to each of the foregoing Entities in clauses (a) through (d) such Entity's predecessors, successors and assigns and current and former Affiliates, subsidiaries, officers, directors, members, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals.

40.     "*Executory Contract*" means a contract or lease to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

41.     "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

42.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction entered on the docket of such court that has not been reversed, vacated, stayed, modified, or amended, and as to which the time to appeal, petition for certiorari, seek to review or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or review or other proceedings for reargument or rehearing shall then be pending, or as to which any right to appeal, petition for certiorari or review, reargue or rehear shall have been waived in writing in form and substance satisfactory to the Debtor or the Reorganized Debtor, or, in the event that an appeal, writ of certiorari or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari or review, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari or review or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not preclude such order from being a Final Order.

43.     "*General Unsecured Claim*" means any Claim against the Debtor other than an Administrative Claim, a Professional Claim, an Other Secured Claim, a Priority Tax Claim or an Other Priority Claim.

44.     "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

45.     "*Holder*" means an Entity holding a Claim or Interest.

46.     "*Impaired*" means a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

47.     "*Indemnification Provisions*" means each of the Debtor's indemnification provisions currently in place, whether in the Debtor's bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment contracts, for the Debtor's current and former directors, officers, managers, employees, attorneys, other professionals, and agents and such current and former directors, officers, and managers' respective Affiliates.

48.     "*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

49.     "*Interest*" means any membership, stock or other equity ownership interest in the Debtor and all dividends and distributions with respect to such membership, stock or other equity ownership interest and all rights, options, warrants (regardless of when exercised), other rights to acquire any membership, stock or other equity ownership interest in the Debtor existing immediately prior to the Effective Date.

50.     "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

51.     "*New Corporate Governance Documents*" means the form of the articles of incorporation and bylaws, or other similar organizational and constituent documents, as may be required under applicable law, for the Reorganized Debtor, and which forms shall be included in the Plan Supplement.

52.     "*New Notes*" means the senior secured step-up notes due 2029 that the Reorganized Debtor will issue as part of the New Notes Distribution in full satisfaction of the Old Notes Claims on the terms set forth in the Description of New Notes in an aggregate principal amount of US$750 per US$1,000 of Old Notes.

53.     "*New Notes Distribution*" means the New Notes and Capitalized Interest.

54. "*New Notes Indenture*" means the indenture governing the New Notes, which shall be consistent with the Description of New Notes in the Disclosure Statement in all respects.

55. "*Old Notes*" means those certain outstanding 8.875% senior notes due 2025, issued by the Debtor pursuant to the Old Notes Indenture.

56. "*Old Notes Claim*" means any and all Claims of an Old Notes Creditor against the Debtor arising under or in connection with the Old Notes Indenture, the Old Notes and all other financing and related documents executed in furtherance of the issuance of the Old Notes, including for the avoidance of doubt, Capitalized Interest.

57. "*Old Notes Creditors*" means Holders of the Old Notes.

58. "*Old Notes Indenture*" means that certain Indenture, by and among the Debtor, as issuer, and The Bank of New York Mellon, as trustee.

59. "*Other Priority Claim*" means any Claim against the Debtor other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

60. "*Other Secured Claim*" means any Secured Claim against the Debtor.

61. "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

62. "*Petition Date*" means the date on which the Debtor filed its petition for relief commencing the Chapter 11 Case.

63. "*Plan*" means this chapter 11 plan, as it may be altered, amended, modified, or supplemented from time to time, including the Plan Supplement and all exhibits, supplements, appendices, and schedules.

64. "*Plan Supplement*" means any compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, which shall be filed by the Debtor no later than five (5) Business Days prior to the date first scheduled for the Confirmation Hearing, or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.

65. "*Priority Tax Claim*" means any Claim of a Governmental Unit against the Debtor of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code, including a Secured Tax Claim.

66. "*Professional*" means an Entity: (a) employed in the Chapter 11 Case pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to sections 327, 328, 329, 330, and 331 of the Bankruptcy Code or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

67. "*Professional Claim*" means any Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional on or after the Petition Date through and including the Confirmation Date under sections 328, 330, 331, 503(b)(2), 503(b)(4), or 503(b)(5) of the Bankruptcy Code (including transaction and success fees) to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.

68. "*Professional Fee Amount*" means the aggregate amount of Professional Claims and other unpaid fees and expenses that Professionals estimate they have incurred or will incur in rendering services to the Debtor during the course of the Chapter 11 Case.

69. "*Professional Fee Escrow Account*" means an escrow account funded by the Debtor with Cash on or before the Effective Date in an amount equal to the Professional Fee Amount.

70. "*Proof of Claim*" means a proof of Claim filed against the Debtor in the Chapter 11 Case.

71. "*Pro Rata*" means the proportion of an Allowed Claim in a particular Class bears to the aggregate amount of all Allowed Claims in that Class.

72. "*Reinstated*" means, with respect to Claims and Interests, treated in accordance with section 1124(2)(B) of the Bankruptcy Code.

73. "*Released Party*" means each of the following: (a) the Debtor; (b) the Trustee; (c) the Holders of Interests; and (d) with respect to each of the foregoing Entities in clauses (a) through (c), such Entity's successors and assigns, and current and former Affiliates, subsidiaries, officers, directors, members, stockholders, partners, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, solely in their respective capacities as such.

74. "*Releasing Party*" means each of the following: (a) the Holders of Impaired Claims or Interests that (i) affirmatively vote to accept the Plan or (ii) abstain from voting on the Plan; (b) to the fullest extent permissible under applicable law, the Holders of Unimpaired Claims or Interests; (c) the Trustee; and (d) with respect to each of the foregoing Entities in clauses (a) through (c), such Entity's successors and assigns, and current and former Affiliates, subsidiaries, officers, directors, members, stockholders, partners, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, solely in their respective capacities as such.

75. "*Reorganized Debtor*" means Credivalores, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date, it being understood that, as of the Effective Date, Reorganized Debtor shall be a corporation organized under the laws of Colombia.

76. "*SEC*" means the U.S. Securities and Exchange Commission.

77. "*Secured Claim*" means a Claim against the Debtor: (a) secured by a Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

78. "*Secured Tax Claim*" means any Secured Claim which, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code.

79. "*Securities*" means any instruments that qualify under section 2(a)(1) of the Securities Act.

80. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, or any similar federal, state or local law.

81. "*Trustee*" means The Bank of New York Mellon, in its capacity as trustee under the Old Notes Indenture.

82. "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Interest to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtor of an intent to accept a particular distribution; (c) responded to the Debtor's or Reorganized Debtor's requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

83. "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

84.     "*Unimpaired*" means, with respect to a Claim, Interest or Class of Claims or Interests, a Claim, Interest or Class of Claims or Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

85.     "*United States Trustee*" means the United States Trustee for the Southern District of New York.

86.     "*Voting Record Date*" means for purposes of casting Ballots on the Plan, March 7, 2024.

## 1.2    **Rules of Interpretation**

For purposes of the Plan: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

## 1.3    **Computation of Time**

Bankruptcy Rule 9006(a) applies in computing any period of time prescribed or allowed herein.

## 1.4    **Governing Law**

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles.

## 1.5    **Reference to Monetary Figures**

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

**ARTICLE II**
**ADMINISTRATIVE AND PRIORITY CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in <u>ARTICLE III</u>.

## 2.1    **Administrative Claims**

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtor or Reorganized Debtor, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal

to the amount of such Allowed Administrative Claim either: (a) on the Effective Date, or as soon as reasonably practicable thereafter; (b) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (c) if the Allowed Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of its business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claims.

## 2.2 **Professional Claims**

### (a) Final Fee Applications and Payment of Professional Claims

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code. The Reorganized Debtor shall pay Professional Claims in Cash in the amount the Bankruptcy Court allows. From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### (b) Professional Fee Escrow Account

On or before the Effective Date, the Debtor shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Except as otherwise expressly set forth in the last sentence of this paragraph, such funds shall not be considered property of the Estate of the Debtor or the Reorganized Debtor. The amount of Allowed Professional Claims shall be paid in Cash to the Professionals by the Reorganized Debtor from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Claims are Allowed. When such Allowed Professional Claims have been paid in full, any remaining amount held in the Professional Fee Escrow Account shall promptly revert to the Reorganized Debtor without any further action or order of the Bankruptcy Court.

### (c) Professional Fee Amount

Professionals shall reasonably estimate their unpaid Professional Claims and other unpaid fees and expenses incurred in rendering services to the Debtor before and as of the Effective Date, and shall deliver such estimate to the Debtor no later than five (5) Business Days before the anticipated Effective Date; provided that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Case. If a Professional does not provide an estimate, the Debtor or Reorganized Debtor may estimate the unpaid and unbilled fees and expenses of such Professional.

### (d) Post-Confirmation Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtor shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtor. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtor may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

(e)     <u>Substantial Contribution Compensation and Expenses</u>

Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Case pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code must file an application and serve such application on counsel for the Debtor or Reorganized Debtor, as applicable, and as required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules on or before three (3) Business Days after the Confirmation Date.

## 2.3   **Priority Tax Claims**

Each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Priority Tax Claim: (a) the treatment provided by section 1129(a)(9)(C) of the Bankruptcy Code; (b) a Cash payment on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, equal to the amount of such Allowed Priority Tax Claim; or (c) such other less favorable treatment as may be agreed upon between the Holder of such Allowed Priority Tax Claim and the Debtor. If payment is made in accordance with section 1129(a)(9)(C), installment payments shall be made quarterly and interest shall accrue in accordance with 26 U.S.C. § 6621. On the Effective Date, Liens securing such Allowed Secured Tax Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim may be paid in full in Cash in accordance with the terms of any agreement between the Debtor and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business.

## 2.4   **Other Priority Claims**

Each Holder of an Allowed Other Priority Claim due and payable on or before the Effective Date shall receive in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Other Priority Claim: (a) the treatment provided by section 1129(a)(9) of the Bankruptcy Code; (b) a Cash payment on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, equal to the amount of such Allowed Other Priority Claim; or (c) such other less favorable treatment as may be agreed upon between the Holder of such Allowed Priority Tax Claim and the Debtor.

## 2.5   **Trustee Fees**

On the Effective Date, the Reorganized Debtor shall pay all reasonable, documented, and unpaid fees, expenses and out-of-pocket costs (including the reasonable and documented fees and expenses of counsel to the Trustee and/or the trustee for the Old Notes) incurred by the Trustee and/or trustee of the Old Notes, as applicable, through the Effective Date, except any such fees, costs and expenses as may be attributable to the gross negligence or willful misconduct of the Trustee or the trustee for the Old Notes.  Following the Effective Date, the Reorganized Debtor shall pay all reasonable, documented, and unpaid fees, expenses and out-of-pocket costs (including the reasonable and documented fees and expenses of counsel to the Trustee) in accordance with the New Notes Indenture.

## 2.6   **United States Trustee Statutory Fees**

The Debtor and Reorganized Debtor, as applicable, will pay fees payable pursuant to 28 U.S.C § 1930(a), including fees and expenses payable to the United States Trustee, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, for each quarter (including any fraction thereof) until the Chapter 11 Case are converted, dismissed, or closed, whichever occurs first.

# ARTICLE III
## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

Except for the Claims addressed in ARTICLE II, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. For the avoidance of doubt, Secured Tax Claims are being addressed under Section 2.3 of the Plan.

3.1  **Classification of Claims and Interests**

Claims against and Interests in the Debtor are divided into the following lettered Classes:

| Letter | Class |
| --- | --- |
| Class A | Class A consists of the Old Notes Claims. |
| Class B | Class B consists of all Other Secured Claims. |
| Class C | Class C consists of all General Unsecured Claims. |
| Class D | Class D consists of all Interests. |

3.2  **Treatment of Classes of Claims and Interests**

The following chart designates the Class of Claims against and Interests in the Debtor and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) deemed to accept or reject the Plan. The Debtor may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Section 3.4 of the Plan.

| Class | Claim or Interest | Status | Voting Rights |
| --- | --- | --- | --- |
| A | Old Notes Claims | Impaired | Entitled To Vote |
| B | Other Secured Claims | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| C | General Unsecured Claims | Unimpaired | Deemed to Accept; Not Entitled to Vote |

| D | Interests | Unimpaired | Deemed To Accept; Not Entitled To Vote |

Except to the extent that a Holder of an Allowed Claim against or Interest in the Debtor as applicable, agrees to a less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Interest. Unless otherwise indicated, the Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date, or as soon as reasonably practicable thereafter:

## Class A (Old Notes Claims)

*(1)* *Classification*: Class A consists of the Old Notes Claims against the Debtor.

*(2)* *Allowance*: On the Effective Date, the Old Notes Claims shall be Allowed in the principal amount of US$750 plus Capitalized Interest, and shall not be subject to avoidance, subordination, setoff, offset, deduction, objection, challenge, recharacterization, surcharge under section 506(c) of the Bankruptcy Code or any other claim or defense.

*(3)* *Treatment*: In full and final satisfaction, settlement, release, and discharge of and exchange for each

*(4)* Allowed Old Notes Claim, each Holder of an Allowed Old Notes Claim shall receive its Pro Rata share of the (i) New Notes and (ii) Capitalized Interest.

*(5)* *Voting*: Class A is Impaired. Holders of Old Notes Claims are entitled to vote to accept or reject the Plan.

## Class B (Other Secured Claims)

*(1)* *Classification*: Class B consists of all Allowed Other Secured Claims against the Debtor.

*(2)* *Treatment*: Each Holder of an Allowed Other Secured Claim shall, at the election of the Reorganized Debtor, (i) have the legal, equitable and contractual rights of such Holder Reinstated, or (ii) receive, at the option of the Debtor, (A) Cash in an amount equal to such Allowed Other Secured Claim or (B) such other treatment as renders its Allowed Other Secured Claim Unimpaired.

*(3)* *Voting*: Class B is Unimpaired. Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

## Class C (General Unsecured Claims)

*(1)* *Classification*: Class C consists of all Allowed General Unsecured Claims against the Debtor.

*(2)* *Treatment*: Each Holder of an Allowed Unsecured Claim shall, at the election of the Reorganized Debtor, (i) have the legal, equitable and contractual rights of such Holder Reinstated, or (ii) receive, at the option of the Debtor, (A) Cash in an amount equal to such Allowed Unsecured Claim or (B) such other treatment as renders its Allowed Unsecured Claim Unimpaired.

*(3)* *Voting*: Class C is Unimpaired. Holders of Allowed General Unsecured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed General Unsecured Claims are not entitled to vote to accept or reject the Plan.

**Class D (Interests)**

*(1)*      *Classification*: Class D consists of all Allowed Interests in the Debtor.

*(2)*      *Treatment*: On the Effective Date, the Allowed Interests in the Debtor shall all be Reinstated.

*(3)*      *Voting*: Class D is Unimpaired. Holders of Allowed Interests in the Debtor are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Interests are not entitled to vote to accept or reject the Plan.

### 3.3    Special Provision Governing Unimpaired Claims

Nothing under the Plan shall affect the Debtor's rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

### 3.4    Elimination of Vacant Classes

Any Class of Claims or Interests that (a) does not have a Holder of an Allowed Claim or a Claim temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing or (b) is entitled to vote on the Plan but with respect to which no Ballots are cast or no Ballots are deemed to be cast, shall be deemed eliminated from the Plan for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**ARTICLE IV**
**PROVISIONS FOR IMPLEMENTATION OF THE PLAN**

### 4.1    General Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests. Distributions made to Holders of Allowed Claims in any Class are intended to be final. Distributions made to Holders of Allowed Claims in any Class are intended to be final. Distributions made to Holders of Allowed Claims in any Class are intended to be final. Distributions made to Holders of Allowed Claims in any Class are intended to be final. Distributions made to Holders of Allowed Claims in any Class are intended to be final. Distributions made to Holders of Allowed Claims in any Class are intended to be final. Distributions made to Holders of Allowed Claims in any Class are intended to be final. Distributions made to Holders of Allowed Claims in any Class are intended to be final. Distributions made to Holders of Allowed Claims in any Class are intended to be final.

### 4.2    Subordination

The allowance, classification, and treatment of all Claims and Interests under the Plan shall conform to and with the respective contractual, legal, and equitable subordination rights of such Claims and Interests, and the Plan shall recognize and implement any such rights. Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the Debtor reserves the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto. For the avoidance of doubt, no Claim in Class A shall be subject to subordination.

### 4.3    Sources of Cash for Plan Distributions

All Cash consideration necessary for the Reorganized Debtor to make payments or distributions pursuant to this Plan shall be obtained from Cash of the Debtor or Reorganized Debtor.

### 4.4    Issuance of the New Notes

On Effective Date, the Reorganized Debtor is authorized to issue, execute, or otherwise bring into effect, as the case may be, to or for the benefit of the Holders of Allowed Old Notes Claims, the New Notes and any other instruments, certificates, and other documents or agreements required to be issued, executed or delivered pursuant to the Plan, and take any other necessary actions in connection with the foregoing, in each case without need for further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity. The issuance of the New Notes, which shall be delivered on or as soon as practicable following the Effective Date, shall be exempt from registration under section 1145 of the Bankruptcy Code and, to the extent applicable, under applicable securities laws. All documents, agreements and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of this Plan shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity (other than as expressly required by such applicable agreement).

## 4.5 <u>Vesting of Assets in the Reorganized Debtor</u>

Except as otherwise provided herein, or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in the Estate and all Causes of Action, shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan or any other agreement or document related thereto or entered into in connection therewith, the Reorganized Debtor may operate its businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

## 4.6 <u>Discharge from Old Notes, Instruments, Certificates, and Other Documents</u>

On the Effective Date, except as otherwise provided in this Plan: (1) the Old Notes Indenture and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtor giving rise to any Claim or Interest (except such certificates, mortgages, notes, or other instruments or documents evidencing indebtedness or obligations of or ownership interest in the Debtor that are specifically Reinstated or otherwise not Impaired under the Plan) shall be deemed cancelled, discharged, released and extinguished, and the Debtor shall not have any continuing obligations thereunder; and (2) the obligations of the Debtor pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtor (except such agreements, certificates, mortgages, notes, or other instruments evidencing indebtedness or obligations of or ownership interests in the Debtor that are specifically Reinstated or otherwise not Impaired under the Plan) shall be released and discharged; <u>provided</u>, <u>however</u>, notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of enabling Holders of Allowed Claims to receive distributions under the Plan as provided herein; <u>provided further</u>, <u>however</u>, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtor, except to the extent set forth in or provided for under this Plan. Notwithstanding the foregoing and solely for the purpose set forth in this sentence, the following rights of the Trustee shall remain in effect after the Effective Date: (1) rights to payment of fees, expenses and indemnification obligations, including from property distributed hereunder to the Trustee, whether pursuant to the exercise of a charging lien or otherwise, (2) rights relating to distributions made to Holders of Allowed Old Notes Claims by the Trustee from any source, including distributions hereunder, (3) rights relating to representation of the interests of the Holders of Old Notes Claims by the Trustee in the Chapter 11 Case to the extent not discharged or released hereunder or any order of the Bankruptcy Court, and (4) rights relating to participation by the Trustee in any

proceedings related to the Plan. On and after the Effective Date, all duties and responsibilities of the Trustee shall be discharged unless otherwise specifically set forth in or provided for under the Plan.

## 4.7    Restructuring Transactions

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtor may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law; and (4) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

## 4.8    Corporate Action

The Debtor or the Reorganized Debtor, as applicable, are authorized to take all further corporate actions necessary to effectuate the Plan and authorize each of the matters provided for by the Plan involving the corporate structure of the Debtor or corporate or related actions to be taken by or required of the Reorganized Debtor, whether taken prior to or as of the Effective Date.

## 4.9    New Corporate Governance Documents

Solely to the extent required by applicable non-bankruptcy law, on or immediately before the Effective Date, the Reorganized Debtor will file its New Corporate Governance Documents with the applicable Secretaries of State and/or other applicable authorities in the states, provinces, or countries of its incorporation in accordance with the corporate laws of the states, provinces, or countries of its incorporation. The New Corporate Governance Documents will be consistent with the provisions of the Plan and the Bankruptcy Code. After the Effective Date, the Reorganized Debtor may amend and restate its New Corporate Governance Documents as permitted by the laws of its jurisdiction of formation and its New Corporate Governance Documents.

## 4.10    Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtor, and the officers and/or members of the board of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

## 4.11    Section 1146(a) Exemption

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

## 4.12    Managers, Directors and Officers

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, and except as may otherwise be disclosed in the Disclosure Statement, as of the Effective Date, the directors and officers who are identified in the Plan Supplement shall serve as the initial board of directors and officers of the Reorganized Debtor. Pursuant to section 1129(a)(5), the Debtor will disclose in the Plan Supplement, on or prior to the Confirmation Date, the identity and affiliations of any Person proposed to serve on the Reorganized Debtor's boards of directors and, to the extent such Person is an Insider, the nature of any compensation for such Person. After the Effective Date, the corporate governance and management of the Reorganized Debtor shall be determined by the applicable board of managers or board of directors in accordance with the laws of the applicable state or county of organization.

## 4.13 <u>Preservation of Rights of Action</u>

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtor's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtor or the Reorganized Debtor will not pursue any and all available Causes of Action against them. The Debtor and the Reorganized Debtor expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtor expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel, judicial, equitable, or otherwise, or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. From and after the Effective Date, the Debtor or the Reorganized Debtor, as applicable, shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any Cause of Action and to decline to do any of the foregoing without further notice to or action, order or approval of the Bankruptcy Court.

Notwithstanding any provision in the Plan or any Order entered in the Chapter 11 Case, the Debtor and Reorganized Debtor forever waive, relinquish, and release any and all Avoidance Actions the Debtor and its estate had, have, or may have against any Entity that is being rendered Unimpaired under the Plan and any Entity, including Professionals, with whom the Debtor is conducting and will continue to conduct business on and after the Effective Date.

## 4.14 <u>Directors and Officers Insurance Policies</u>

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtor shall be deemed to have assumed all of its D&O Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtor's foregoing assumption of each of the unexpired D&O Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtor under the Plan as to which no Proof of Claim need be filed. In addition, after the Effective Date, the Reorganized Debtor shall not terminate or otherwise reduce the coverage under any D&O Insurance Policy (including any "tail policy") in effect on the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtor who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits

of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.

### 4.15    **Indemnification Provisions in Organizational Documents**

On and from the Effective Date, and except as prohibited by applicable non-bankruptcy law, the Reorganized Debtor shall assume or reinstate, as applicable, all indemnification obligations in place as of the Effective Date (whether in by- laws, certificates of incorporation, board resolutions, contracts, or otherwise) for the current and former directors, members, officers, managers, employees, attorneys, other professionals and agents of the Debtor; provided, however, such indemnification obligations shall not apply with respect to any act or omission constituting gross negligence, willful misconduct, fraud, or criminal conduct as determined by a Final Order entered by a court of competent jurisdiction, except to the extent of available insurance.

### 4.16    **Reinstatement of Equity Interests**

On the Effective Date, all equity interests in the Debtor shall be deemed reinstated without any additional act on the part of the Debtor or Reorganized Debtor.

### 4.17    **Exemption from Registration Requirements**

The offering, issuance, and distribution of any Securities, including the New Notes pursuant to the Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act pursuant to section 1145 of the Bankruptcy Code, Regulation S of the Securities Act, or any other available exemption from registration under the Securities Act, as applicable. To the extent that the issuance of the New Notes is covered by section 1145 of the Bankruptcy Code, except as otherwise provided in the Plan or the governing certificates or instruments, the New Notes issued under the Plan will be freely tradable under the Securities Act by the recipients thereof, subject to: (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any applicable state or foreign securities laws, if any, and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities or instruments, including any such restrictions any agreement governing the New Notes; (b) the restrictions, if any, on the transferability of such securities and instruments; and (c) any other applicable regulatory approval.

## ARTICLE V
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 5.1    **Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except as otherwise provided herein or in any contract, instrument, release, indenture, or other agreement entered into in connection with the Plan, Executory Contracts and Unexpired Leases shall be deemed assumed as of the Effective Date, unless such Executory Contract or Unexpired Lease (1) was assumed or rejected previously by the Debtor, (2) previously expired or terminated pursuant to its own terms, or (3) is the subject of a motion to reject filed on or before the Effective Date, if any. Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumption of such Executory Contracts or Unexpired Leases as set forth in the Plan, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, assumptions of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by a Bankruptcy Court order shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms notwithstanding any provision in such assumed Executory Contract or Unexpired Lease that prohibits, restricts or conditions such assumption, assignment or transfer. Any provision in the assumed Executory Contracts and Unexpired Leases that purports to declare a breach or default based in whole or in part on the commencement or continuance of the Chapter 11 Case or any successor case is hereby deemed unenforceable.

## 5.2   Claims Based on Rejection of Executory Contracts or Unexpired Leases

Claims arising from the rejection of any Executory Contract or Unexpired Lease shall be classified as a General Unsecured Claim and shall be treated in accordance with ARTICLE III, as applicable.

## 5.3   Cure of Defaults for Executory Contracts and Unexpired Leases Assumed

Claims or defaults arising or becoming due under any assumed Executory Contract or Unexpired Lease after the effective date of assumption of the applicable assumed Executory Contract or Unexpired Lease are to be paid in full in the ordinary course by the applicable Debtor or Reorganized Debtor, as applicable, subject to the rights of the Debtor or Reorganized Debtor, as applicable, to assert or apply, as applicable, any defenses, setoffs, credits, or discounts available under the applicable assumed Executory Contract or Unexpired Lease or under applicable non-bankruptcy law, and, for the avoidance of doubt, such Claims or defaults shall not be released, expunged, discharged, or enjoined by the Plan or the Confirmation Order and there shall be no need or requirement for the counterparty to such Executory Contract or Unexpired Lease to file an Administrative Claim for such Claim or default. Nothing in the Plan releases or discharges the applicable Debtor or Reorganized Debtor from (1) obligations to fully satisfy Cure Claims on the Effective Date, or to the extent a dispute exists regarding the Cure Claim, upon entry of a Final Order resolving the dispute or upon mutual agreement between the applicable Debtor or Reorganized Debtor and the applicable counterparty, or (2) Claims, defaults or obligations arising or becoming due under any assumed Executory Contract or Unexpired Lease after the effective date of such assumption of the applicable assumed Executory Contract or Unexpired Lease pursuant to the terms thereof.

In the event of a dispute regarding (1) the amount of any payment to cure such a default, (2) the ability of the applicable Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payment, if any, required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.

The assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date the applicable Debtor or Reorganized Debtor assume such Executory Contract or Unexpired Lease. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

## 5.4   Insurance Policies

All of the Debtor's insurance policies and any agreements, documents, or instruments relating thereto, including the D&O Insurance Policies, shall be treated as and deemed to be Executory Contracts under the Plan. As of the Effective Date, the Debtor shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto.

## 5.5   Indemnification Provisions

As of the Effective Date, the Debtor and Reorganized Debtor, as applicable, shall be deemed to have assumed all of the Indemnification Provisions in place on or before the Effective Date for Claims related to or in connection with any actions, omissions, or transactions occurring before the Effective Date. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtor's foregoing assumption of each of the Indemnification Provisions. Notwithstanding anything to the contrary contained herein, (1) Confirmation shall not discharge, impair, or otherwise modify any obligations assumed by the foregoing assumption of the

Indemnification Provisions, (2) each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtor under the Plan and as to which no Proof of Claim need be filed, and (3) as of the Effective Date, the Indemnification Provisions shall be binding and enforceable against the Reorganized Debtor.

## 5.6 **Benefit Programs**

As of the Effective Date, all employee compensation and benefit programs of the Debtor, including programs subject to section 1114 and 1129(a)(13) of the Bankruptcy Code, if any, entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, Executory Contracts that are assumed under the ARTICLE VI, but only to the extent that rights under such programs are held by the Debtor or Persons who are employees of the Debtor as of the Confirmation Date; provided, however, that nothing herein shall extend or otherwise modify the duration of any such program or prohibit the Debtor or the Reorganized Debtor from modifying the terms and conditions of any such program or benefits as otherwise permitted by such program and applicable nonbankrutpcy law.

## 5.7 **Modifications, Amendments, Supplements, Restatements or Other Agreements**

Unless otherwise provided for in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

## 5.8 **Reservation of Rights**

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of such assumption or rejection, the Debtor or Reorganized Debtor, as applicable, shall have twenty-eight (28) calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by assuming or rejecting such contract or lease.

## 5.9 **Nonoccurrence of the Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## 5.10 **Contracts and Leases Entered into After the Petition Date**

Contracts and leases entered into after the Petition Date by the Debtor will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of the Debtor's business. Accordingly, such contracts and leases will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI
## PROVISIONS GOVERNING DISTRIBUTIONS

## 6.1 **Distributions on Account of Claims Allowed as of the Effective Date**

Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the Debtor or the Reorganized Debtor (as the case may be) and the Holder of the applicable Allowed Claim, on the Distribution Date, the Reorganized Debtor shall make initial distributions under the Plan on account of Claims Allowed on or before the Effective Date, subject to the Debtor's and Reorganized Debtor's right to object to Claims; provided, however,

that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 Case prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (2) Allowed Priority Tax Claims shall be paid in accordance with <u>Section 2.3</u>. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim may be paid in full in Cash in accordance with the terms of any agreement between the particular Debtor or the Reorganized Debtor (as the case may be) and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

## 6.2  **Special Rules for Distributions to Holders of Disputed Claims**

Notwithstanding any provision to the contrary in the Plan and except as otherwise agreed by the relevant parties: (1) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (2) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Claim has been Allowed or expunged. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall be paid also, in the applicable amounts, to any Holder of a Disputed Claim, as applicable, in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

## 6.3  **Disbursing Agent**

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Disbursing Agent on or as soon as practicable after the Effective Date. To the extent the Disbursing Agent are the Reorganized Debtor, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement, the provisions hereof.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent may be paid in Cash by the Reorganized Debtor.

## 6.4  **Distributions on Account of Old Notes Claims**

On or as soon as is reasonably practicable after the Effective Date, the Reorganized Debtor or the Disbursing Agent shall distribute the New Notes Distribution in accordance with the terms of this <u>ARTICLE VI</u> and the Plan Supplement. Holders of Old Notes will receive their pro rata share of the New Notes Distribution in exchange for the Old Notes. The method for issuance of the New Notes will be described in greater detail in the Plan Supplement.

Holders of Old Notes who do not fulfill the requirements noted above and, if applicable, in the Plan Supplement for the receipt of their pro rata share of the New Notes Distribution within one hundred and eighty (180) days after the Effective Date shall forfeit their entitlement to a distribution under the Plan, shall not participate in any distribution under the Plan, and shall have their Claims on account of the Old Notes discharged. Any property in respect of such forfeited Old Notes Claims would revert to the Reorganized Debtor.

6.5    **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

(a)    Delivery of Distributions

Except as otherwise provided in the Plan (including in Section 6.4 above), distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Reorganized Debtor or the Disbursing Agent, as appropriate: (a) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtor or the applicable Disbursing Agent, as appropriate or (b) on any counsel that has appeared in the Chapter 11 Case on the Holder's behalf. The Debtor shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date; provided, however, that distributions on account of the Old Notes Claims shall be made in accordance with Section 6.4 above. Subject to this ARTICLE VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtor, the Reorganized Debtor, and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for fraud, gross negligence, or willful misconduct.

(b)    Minimum; *De Minimis* Distributions.

Notwithstanding anything to the contrary contained in the Plan, the Disbursing Agent shall not be required to distribute Cash or other property to the Holder of any Allowed Claim or Allowed Interest if the amount of Cash or other property to be distributed on account of such Allowed Claim or Allowed Interest is less than US$100. Any Holder of an Allowed Claim or Allowed Interest on account of which the amount of Cash or other property to be distributed is less than such amount shall have such Claim or Interest, as applicable, discharged and shall be forever barred from asserting such Claim or Interest against the Debtor, the Reorganized Debtor, or their respective property. Any Cash or other property not distributed pursuant to this provision shall be the property of the Reorganized Debtor.

(c)    Fractional New Notes or Amounts Less than Integral Multiples

The New Notes will be issued in minimum denominations of US$1,000 and integral multiples of US$1.00 in excess thereof. Notwithstanding any other provision in the Plan to the contrary, no fractional amounts of New Notes shall be issued or distributed pursuant to the Plan. Whenever any distribution under the Plan would yield a distribution of New Notes below the integral requirement, the actual distribution shall reflect a rounding of such amount down to the nearest US$1.00. Upon the allocation of all of the whole New Notes authorized under the Plan, all remaining portions of the entitlements shall be canceled and shall be of no further force and effect. For distribution and rounding purposes, DTC will be considered a single holder.

(d)    Compliance Matters

In connection with the Plan, to the extent applicable, the Reorganized Debtor or the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtor or the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtor reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances. All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of this Plan to the contrary, (a) each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any

Governmental Unit, including income, withholding and other tax obligations, on account of such distribution, and (b) no distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Reorganized Debtor for the payment and satisfaction of such tax obligations.

        (e)      Cash Payments

Except as otherwise set forth in this <u>Section 6.5(e)</u>, distributions of Cash under the Plan shall be made by the Reorganized Debtor or the Disbursing Agent on behalf of the Debtor in U.S. dollars. At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements. Cash payments to creditors outside of the United States of America may be made, at the option of the Reorganized Debtor or the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

        (f)      Undeliverable and Unclaimed Distributions

        (1)      *Undeliverable Distributions.* If any distribution to a Holder of an Allowed Claim is returned to the Reorganized Debtor or the Disbursing Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Reorganized Debtor or the Disbursing Agent are notified in writing of such Holder's then-current address or other necessary information for delivery. Subject to the succeeding sentence, the Reorganized Debtor or their duly appointed disbursing agent shall retain undeliverable distributions until such time as a distribution becomes deliverable. Each Holder of an Allowed Claim whose distribution remains (i) undeliverable for one hundred and eighty (180) days after the distribution is returned as undeliverable or (ii) otherwise has not been deposited, endorsed or negotiated within one hundred and eighty (180) days of the date of issuance shall have no claim to or interest in such distribution and shall be forever barred from receiving any distribution under the Plan. Nothing contained in this Plan shall require the Debtor, the Reorganized Debtor or the Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

        (2)      *Reversion.* Any distribution under the Plan that is an Unclaimed Distribution for a period of one hundred and eighty (180) days after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the Reorganized Debtor. Upon such revesting, the Claim or Interest of any Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

6.6    <u>**Setoffs**</u>

Except as otherwise expressly provided herein, the Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that the Debtor or Reorganized Debtor, as applicable, may hold against

the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Reorganized Debtor of any such Claims, rights, and Causes of Action that the Reorganized Debtor may possess against such Holder. In no event shall any Holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtor or Reorganized Debtor, as applicable, unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise. For the avoidance of doubt, no Claim in Class A shall be subject to setoff.

6.7    **Allocation Between Principal and Accrued Interest**

Except as otherwise provided in the Plan and to the extent permitted by applicable law, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan for income tax purposes as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest accrued through and including the Effective Date.

6.8    **No Postpetition or Default Interest on Claims**

Unless otherwise specifically provided for in the Plan or the Confirmation Order and notwithstanding any documents that govern the Debtor's prepetition indebtedness to the contrary, (1) postpetition and/or default interest shall not accrue or be paid on any Claims, and (2) no Holder of a Claim shall be entitled to (a) interest accruing on or after the Petition Date on any such Claim or (b) interest at the contract default rate, each as applicable.

**ARTICLE VII**
**PROCEDURES FOR RESOLVING DISPUTED CLAIMS**

7.1    **Disputed Claims**

In the event that the Debtor disputes a Claim, such Claim shall be Disputed unless Allowed or disallowed by a Final Order or as otherwise set forth in this ARTICLE VII. Except as otherwise provided herein, all Proofs of Claim filed after the Effective Date shall be expunged without the need for any objection by the Reorganized Debtor or any further notice to or action, order, or approval of the Bankruptcy Court. On and after the Effective Date, the Reorganized Debtor may settle any Claims for which a Proof of Claim has been filed or for which a Proof of Claim has not been filed, without further notice to or approval of the Bankruptcy Court, the Claims and Solicitation Agent, or any other party.

7.2    **Resolution of Disputed Claims**

Except insofar as a Claim is Allowed under the Plan, the Debtor or the Reorganized Debtor, as applicable, shall be entitled to object to the Claim. Any objections to Claims shall be served and filed on or before the 120th day after the Effective Date or by such later date as ordered by the Bankruptcy Court. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder thereof if service is effected in any of the following manners: (a) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; or (b) by first class mail, postage prepaid, on any counsel that has appeared on the Holder's behalf in the Chapter 11 Case. The Debtor and the Reorganized Debtor shall be authorized to, and shall resolve all Disputed Claims or Interests by withdrawing or settling such objections thereto, or by litigating to Final Order in the Bankruptcy Court the validity, nature and/or amount thereof. All Claims not objected to by the end of such 120-day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, the Reorganized Debtor shall have and retain any and all rights and defenses the Debtor had immediately

prior to the Effective Date with respect to any Disputed Claim, including the Causes of Action retained pursuant to Section 4.13.

7.3    **Estimation of Claims**

The Debtor or the Reorganized Debtor, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated in accordance with section 502(c) of the Bankruptcy Code for any reason, regardless of whether any Entity previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection. If the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, the estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

7.4    **No Interest**

Unless otherwise expressly provided in the Plan or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

7.5    **No Distributions Pending Allowance**

Notwithstanding any other provision of this Plan to the contrary, no payments or distributions of any kind or nature shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order and the Disputed Claim has become an Allowed Claim. Distributions on account of Disputed Claims that become Allowed Claims shall be made pursuant to Section 6.2.

7.6    **Disallowance of Claims and Interests**

All Claims of any Entity from which property is sought by the Debtor under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtor or the Reorganized Debtor allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtor or the Reorganized Debtor, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

7.7    **Adjustment to Claims Without Objection**

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged by the Reorganized Debtor without the Reorganized Debtor having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest, and without any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE VIII
## EFFECT OF CONFIRMATION OF THE PLAN

8.1    **Compromise and Settlement of Claims, Interests, and Controversies**

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made on account of such Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its Estate, and Holders of Claims and Interests, and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtor may compromise and settle Claims against them and Causes of Action against other Entities.

8.2    **Discharge of Claims and Termination of Interests**

**Except as otherwise provided for herein and effective as of the Effective Date: (a) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtor or any of their assets, property, or Estate; (b) the Plan shall bind all Holders of Claims and Interests, notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtor's liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtor, the Debtor's Estate, the Reorganized Debtor, their successors and assigns, and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.**

8.3    **Releases by the Debtor**

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise expressly provided herein, for good and valuable consideration, as of the Effective Date, to the extent permitted by applicable laws, the Released Parties are conclusively, absolutely, unconditionally, irrevocably, and forever deemed released and discharged by the Debtor, the Reorganized Debtor, and the Debtor's Estate from any and all actions, Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether for tort, contract, violations of federal or state securities laws and Avoidance Actions, including any derivative Claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, asserted or that could possibly have been asserted on behalf of the Debtor, that the Debtor, Reorganized Debtor, or Debtor's Estate, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in, or under, in whole or in part, the Debtor, the Chapter 11 Case, the Old Notes, the Old Notes Indenture, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims and Interests prior to or during the Chapter 11 Case, the negotiation, formulation, solicitation, or preparation of the Disclosure Statement, the Plan, the Plan Supplement, or related agreements,**

instruments or other documents, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided, however, that the foregoing provisions of this Section 8.3 shall have no effect on the liability of any of the Released Parties for gross negligence, willful misconduct, fraud, or criminal conduct as determined by a Final Order entered by a court of competent jurisdiction; provided further that nothing in this Section 8.3 shall release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed to implement, or otherwise given effect under, the Plan, including the New Notes and any other agreement or document related thereto or entered into in connection therewith, as applicable.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in this Section 8.3, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the Claims released by this Section 8.3; (c) in the best interests of the Debtor and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to the Debtor asserting any Claim or Cause of Action released by this Section 8.3.

8.4    Releases by the Releasing Parties

As of the Effective Date, to the extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtor, the Reorganized Debtor, the Estate, the Released Parties and each such Entity's successors and assigns, current and former affiliates, subsidiaries, officers, directors, members, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, solely in their respective capacities as such, and only if such Persons occupied any such positions at any time on or after the Petition Date, from any and all Claims, Interests, obligations, rights, liabilities, actions, causes of action, choses in action, suits, debts, demands, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including all claims and actions against any Entities under the Bankruptcy Code) whatsoever, whether for tort, contract, violations of federal or state securities laws and Avoidance Actions, including any derivative Claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity asserted or that could possibly have been asserted, or would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in, or under, in whole or in part, the Debtor, the Chapter 11 Case, the Old Notes, the Old Notes Indenture, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Releasing Party, the restructuring of Claims and Interests prior to or during the Chapter 11 Case, the negotiation, formulation, solicitation, or preparation of the Disclosure Statement, the Plan, the Plan Supplement, or related agreements, instruments or other documents, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided, however, that the foregoing provisions of this Section 8.4 shall have no effect on the liability of any of the Released Parties for gross negligence, willful misconduct, fraud, or criminal conduct as determined by a Final Order entered by a court of competent jurisdiction; provided further that nothing in this Section 8.4 shall release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed to implement, or otherwise given effect under, the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in this <u>Section 8.4</u>, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) important to the Plan; (b) in exchange for the good and valuable consideration provided by the Debtor, the Reorganized Debtor, the Estate and the Released Parties; (c) a good faith settlement and compromise of the Claims released by this <u>Section 8.4</u>; (d) in the best interests of the Debtor and all Holders of Claims and Interests; (e) fair, equitable, and reasonable; (f) given and made after due notice and opportunity for hearing; and (g) a bar to any Entity granting a release under this <u>Section 8.4</u> from asserting any Claim or Cause of Action released by this <u>Section 8.4</u>.

8.5    <u>Exculpation</u>

No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim or any obligation, Cause of Action, or liability for any Exculpated Claim; <u>provided</u>, <u>however</u>, that the foregoing "exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted fraud, gross negligence, or willful misconduct; <u>provided</u>, <u>further</u>, that in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to, or in connection with, the Plan. The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of acceptances and rejections of the Plan and the making of distributions pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable, law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

8.6    <u>Injunction</u>

Except as otherwise provided herein or for obligations issued pursuant hereto, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to <u>Section 8.3</u> or <u>Section 8.4</u>, discharged pursuant to <u>Section 8.2</u>, or are subject to exculpation pursuant to <u>Section 8.5</u> are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtor, the Reorganized Debtor, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estate of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estate of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, exculpated, or settled pursuant to the Plan.

8.7    <u>Protection Against Discriminatory Treatment</u>

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against the Reorganized Debtor, or any Entity with which the Reorganized Debtor have been or are associated, solely because the Reorganized Debtor was a debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Case (or during

the Chapter 11 Case but before the Debtor were granted or denied a discharge), or have not paid a debt that is dischargeable in the Chapter 11 Case.

8.8    **Recoupment**

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtor or the Reorganized Debtor, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtor on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

8.9    **Release of Liens**

Except as other provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, and except with respect to the Liens securing Other Secured Claims or Secured Tax Claims (depending on the treatment of such Claims), all mortgages, deeds of trust, Liens, pledges, or other security interests relating to or arising from the Old Notes shall be fully released and discharged in connection with the execution of the New Notes Indenture and issuance of the New Notes as contemplated by Section 4.4 hereof, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall vest and revert to the Reorganized Debtor and its successors and assigns. In addition, the Trustee shall execute and deliver all documents to evidence the release of mortgages, deeds of trust, Liens, pledges, and other security interests related to the Old Notes and shall authorize the Reorganized Debtor to file UCC-3 termination statements or their equivalent (to the extent applicable) with respect thereto.

8.10    **Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent or (b) the relevant Holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

## ARTICLE IX
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

9.1    **Conditions Precedent to the Effective Date.**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Section 9.2 of the Plan:

(a)    the Confirmation Order shall have been entered and become a Final Order, and such Final Order shall not have been stayed, modified, or vacated on appeal;

(b)    no Governmental Unit shall have issued any ruling or order enjoining the consummation of the Plan in a way that cannot be reasonably remedied by the Debtor or the Reorganized Debtor;

(c)    all professional fees and expenses of retained Professionals that require the approval of the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Professional Fee Escrow Account pending the approval of such fees and expenses by the Bankruptcy Court;

(d)     all necessary consents, approvals and actions of, filings with and notices to any governmental or regulatory authority necessary to permit the Debtor to consummate the Plan shall have been duly obtained, made or given and shall be in full force and effect, and all terminations or expirations of waiting periods imposed by any governmental or regulatory authority necessary for the consummation of the Plan shall have occurred; and

(e)     this Plan and all documents and agreements necessary to implement the Plan, including the New Corporate Governance Documents and any other agreement or document related to the foregoing or entered into in connection therewith (including documents effectuating affiliate guaranties or asset pledges), shall have: (i) all conditions precedent to such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements; (ii) been tendered for delivery to the required parties and, to the extent required, filed with and approved by any applicable Governmental Units in accordance with applicable laws; and (iii) been effected or executed.

## 9.2     <u>Waiver of Conditions Precedent</u>

The Debtor may amend, modify, supplement or waive any of the conditions to the Effective Date set forth in <u>Section 9.1</u> other than Section 9.1(c), at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan.

## 9.3     <u>Effect of Non-Occurrence of Conditions to Consummation</u>

If prior to Consummation, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtor or any other Entity.

# ARTICLE X
# MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

## 10.1     <u>Modification of Plan</u>

Effective as of the date hereof: (a) the Debtor, in accordance with the Bankruptcy Code and the Bankruptcy Rules, may amend or modify the Plan before the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtor or the Reorganized Debtor, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan, subject to the limitations set forth herein.

## 10.2     <u>Revocation or Withdrawal of Plan</u>

The Debtor reserves the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans. If the Debtor revokes or withdraws the Plan, or if Confirmation or the Effective Date does not occur, then: (a) the Plan will be null and void in all respects; (b) any allowance of a Claim or any other settlement or compromise embodied in the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (c) nothing contained in the Plan shall (1) constitute a waiver or release of any Claims, Interests, or Causes of Action, (2) prejudice in any manner the rights of the Debtor or any other Entity, or (3) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor or any other Entity.

# ARTICLE XI
# RETENTION OF JURISDICTION

## 11.1    Jurisdiction

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under and/or related to the Chapter 11 Case and the Plan to the fullest extent permitted by applicable law, including jurisdiction to:

(a)    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Claim or Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

(b)    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

(c)    ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(d)    adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

(e)    enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan or the Confirmation Order, including contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement or the Disclosure Statement;

(f)    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

(g)    hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Case, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Section 6.5(a); (b) with respect to the releases, injunctions, and other provisions contained in ARTICLE VIII, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan or the Confirmation Order, or any Entity's rights arising from or obligations incurred in connection with the Plan or the Confirmation Order, including those arising under agreements, documents, or instruments executed in connection with the Plan; (d) related to section 1141 of the Bankruptcy Code; or (e) with respect to any Claims arising under or in connection with the Old Notes asserted by any current or former Holder of Old Notes against the Reorganized Debtor;

(h)    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(i)    consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(j)     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, or the Confirmation Order;

(k)     hear and determine matters concerning U.S. state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(l)     enter an order or Final Decree concluding or closing the Chapter 11 Case;

(m)     adjudicate any and all disputes arising from or relating to distributions under the Plan;

(n)     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in connection with and under the Plan, including under Article VIII;

(o)     enforce all orders previously entered by the Bankruptcy Court; and

(p)     hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII
## MISCELLANEOUS PROVISIONS

### 12.1   **Immediate Binding Effect**

Notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the documents and instruments contained in the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtor, the Reorganized Debtor, and any and all Holders of Claims and Interests (irrespective of whether such Holders of Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases.  The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rule 3020(e), 6004(g), and 7062.

### 12.2   **Additional Documents**

On or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtor or the Reorganized Debtor, as applicable, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 12.3   **Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

### 12.4   **Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

## 12.5    Service of Documents

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtor shall be served on:

| | |
|---|---|
| **Reorganized Debtor:** | **Credivalores – Crediservicios S.A**. <br> Carrera 7 #76-35, 7th Floor, Bogotá, Colombia |
| **Counsel to Reorganizaed Debtor:** | **Baker & McKenzie LLP** <br> 452 5th Avenue <br> New York, New York 10018 <br> Telephone: (212) 626-4100 <br> Attn: Michael Fitzgerald, Esq. <br><br> -and- <br><br> 1111 Brickell Avenue, 10th Floor <br> Miami, Florida 33131 <br> Telephone: (305) 789-8900 <br> Attn: Paul J. Keenan Jr. , Esq. |

## 12.6    Term of Injunctions or Stays

**Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

## 12.7    Entire Agreement

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

## 12.8    Plan Supplement Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtor's counsel at the address above or by downloading such exhibits and documents from the Bankruptcy Court's website at www.nysb.uscourts.gov. Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

## 12.9    Non-Severability

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and

provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Reorganized Debtor; and (c) nonseverable and mutually dependent.

## 12.10 **Closing Chapter 11 Case**

The Reorganized Debtor shall promptly file, after the full administration of the Chapter 11 Case, with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

*[The remainder of this page is intentionally left blank.]*

Dated: March 7, 2024

Respectfully Submitted,

**CREDIVALORES – CREDISERVICIOS S.A.,**

_____

The Exchange Agent and Information Agent for the Exchange Offer and the Consent Solicitation is:

**Epiq Corporate Restructuring LLC**

777 Third Avenue, 12th Floor
New York, New York 10017
Attention: Solicitation Group
Telephone: (646) 362-6336
Email: tabulation@epiqglobal.com,
with reference to "Credivalores" in the subject line.

The Dealer Manager for the Exchange Offer and for the Consent Solicitation is:

**BCP Securities, Inc.**
289 Greenwich Avenue
Greenwich, CT 06830
United States



**Credivalores – Crediservicios S.A.**

**Offer to Exchange any and all of its outstanding 8.875% Senior Notes due 2025 for its Senior Secured Step-up Notes**

**Solicitation of Consents to Proposed Amendments to Related Indenture**

**Disclosure Statement for Solicitation of Votes on a Prepackaged Plan of Reorganization**

**OFFERING MEMORANDUM AND CONSENT SOLICITATION STATEMENT**

**March 7, 2024**

*Dealer Manager*
**BCP Securities, Inc.**