UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | : | |
| In re: | : | Case No. 24-10837 (DSJ) |
| | : | |
| CREDIVALORES – CREDISERVICIOS S.A., | : | Chapter 11 |
| | : | |
| Debtor. | : | |
| | : | |
| | : | |

**OBJECTION OF THE UNITED STATES TRUSTEE TO APPROVAL OF THE
DISCLOSURE STATEMENT AND CONFIRMATION OF THE PLAN**

# TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................................... i

TABLE OF AUTHORITIES ...................................................................................... ii

I.     PRELIMINARY STATEMENT. ..................................................................... 1

II.    FACTUAL BACKGROUND ........................................................................... 3

    General Background ........................................................................................ 3

    The Prepackaged Plan Solicitation Process. ................................................. 5

    The Debts and Equity Interests "Deemed Unimpaired" Under the Plan But Subject
    to Releases and Exculpations................................................................. 6

    The Plan and Disclosure Statement. ............................................................. 7

III.   ARGUMENT ................................................................................................ 10

    A.  The Disclosure Statement Should Not Be Approved. ................................. 10

       1. A Creditor Cannot Reasonably Understand the Solicitation Materials . ................ 11

       2. The Debtor Has Not Adequately Explained the Voting and Tabulation
       Process in the Disclosure Statement .......................................................... 13

       3. The Debtor Has Not Adequately Explained Other Material Issues in the
       Disclosure Statement .................................................................................. 13

    B.  The Plan Should Not be Confirmed............................................................ 14

       1. The Plan Violates the Absolute Priority Rule and Does Not Meet the Best
       Interests Test .............................................................................................. 14

       2. The Plan Violates Established Law on Releases ..................................... 16

       3. The Exculpation Provision in the Plan is Overly Broad ........................ 21

    C.  The Scheduling Order's Compressed Timeline Does Not Give Creditors a Full
       and Fair Opportunity to Respond to the Plan ........................................... 22

    D.  The Plan Does Not Comport with 11 U. S. C. §1125(g).. ......................... 24

IV.   CONCLUSION. ............................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*In re Aegean Marine Petroleum Network, Inc.*
   599 B.R. 717, 723 (Bankr. S.D.N.Y. 2019) ........................................................ 19, 21, *passim*

*In re Adelphia Commc'ns Corp.*,
   352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006) .................................................... 10, 11

*In re Celsius Network LLC*,
   655 B.R. 301, 311 (Bankr. S.D.N.Y. 2023) ............................................................ 15

*Century Glove, Inc. v. First American Bank of New York*,
   860 F.2d 94 (3d Cir. 1988) ................................................................................... 10

*In re Chassix Holdings*,
   533 B.R. at 79 (Bankr. S.D.N.Y. 2015) ............................................................ 18, 20

*In re Copy Crafters Quickprint, Inc.*,
   92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988)........................................................... 11

*In re Crowthers McCall Pattern, Inc.*,
   120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990) ........................................................ 11

*In re DBSD N. Am., Inc.*,
   *419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009)* ........................................................ 16

*DePippo v. Kmart Corp.*,
   335 B.R. 290, 295 (S.D.N.Y. 2005) ..................................................................... 23

*In re Dreier LLP*,
   429 B.R. 112, 133 (Bankr. S.D.N.Y. 2010) ........................................................ 19

*In re Duratech Indus.*,
   241 B.R. 291, 298 (Bankr. E.D.N.Y. 1999) ........................................................ 11

*In re Emerge Energy Services, LP*,
   2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019) ................................................ 17

*In re Ferretti*,
   128 B.R. 16, 19 (Bankr. D.N.H. 1991) ................................................................ 11

ii

*In re Hal Luftig Co., Inc.*,
   655 B.R. 508, 529 (Bankr. S.D.N.Y. 2023) ........................................................................... 17

*In re Johns-Manville Corp.*,
   600 F.3d 135 (2d Cir. 2010) ................................................................................................... 19

*Kunica v. St. Jean Fin., Inc.*,
   233 B.R. 46, 54 (S.D.N.Y. 1999) ........................................................................................... 10

*In re Mallinckrodt PLC*,
   639 B.R. 837, 883 (Bank. D. Del. 2022) ............................................................................... 22

*In re McLean Indus., Inc.*
   87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) ............................................................................. 11

*In re Metromedia Fiber Network, Inc.*,
   *416 F.3d 136, 141 (2d Cir. 2005)* ......................................................................................... 16

*Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*,
   25 F.3d 1132, 1136 (2d Cir. 1994) ......................................................................................... 10

*In re Motors Liquidation Co.*,
   *477 B.R. 198, 220 (Bankr. S.D.N.Y. 2011)* ......................................................................... 16

*Mullane v. Central Hanover Bank & Trust Co.*,
   339 U.S. 306, 314 (1950) ........................................................................................................ 22

*In Patterson v. Mahwah Bergen*,
   636 B.R. 641, 688 (E.D. Va. 2022) ........................................................................................ 18

*In re Purdue Pharma L.P.*,
   69 F.4th 45, 79 (2d Cir. 2023) ........................................................................................ 20, 21

*In re Quigley Co.*,
   377 B.R. 110, 115 *(Bankr. S.D.N.Y. 2007)* ......................................................................... 10

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*,
   81 F.3d 355, 362 (3d Cir. 1996) ............................................................................................. 10

*Stern v. Marshall*,
   564 U.S. 462 (2011) ................................................................................................................ 17

*In re SunEdison*,
   *576 B.R. 453, 461-62 (S.D.N.Y. Bankr. 2017)* .................................................................. 16, 19

*Truck Insurance Exchange v. Kaiser Gypsum Co.*,
   No. 22-1079 (June 6, 2024) ............................................................................................ 23

*In re Washington Mut., Inc.*,
   442 B.R. 314, 350–51 (Bankr. D. Del. 2011). ............................................................... 22

## Statutes

11 U.S.C. § 1125 ............................................................................................................. 9, 20

11 U.S.C § 1125(a)(1) ......................................................................................................... 10

11 U.S.C § 1125(e) .............................................................................................................. 20

11 U.S.C § 1125(g) .............................................................................................................. 23

11 U.S.C. § 1129(b)(2) ........................................................................................................ 13

11 U.S.C. § 1129(a)(7) ........................................................................................................ 13

11 U.S.C. § 1129(a)(7)(A)(ii) ............................................................................................. 13

## Other Authorities

New York Rules of Professional Conduct, *i.e.*, N.Y. Comp. Codes R. & Res. Tit. 22 § 1200.8
Rule 1.8(h)(1) ...................................................................................................................... 21

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

_____
                              :

In re:                       :     Case No. 24-10837 (DSJ)
                              :

CREDIVALORES – CREDISERVICIOS  :     Chapter 11
S.A.,                        :
                              :

          Debtor.        :
                              :
_____ :

**OBJECTION OF THE UNITED STATES TRUSTEE TO APPROVAL OF THE
DISCLOSURE STATEMENT AND CONFIRMATION OF THE PLAN**

TO:    **THE HONORABLE DAVID S. JONES,
       UNITED STATES BANKRUPTCY JUDGE:**

       William K. Harrington, the United States Trustee for Region 2 (the "**United States
Trustee**"), respectfully submits this objection (the "**Objection**") in the case of Credivalores –
Crediservicios S.A. (the "**Debtor**") to the Disclosure Statement[1] and confirmation of the Plan and
related Scheduling Order entered by this Court on May 20, 2024, in which the Court set a hearing
for June 27, 2024 (the "**Scheduling Order**"). ECF No. 32. In support thereof, the United States
Trustee respectfully states as follows:

**PRELIMINARY STATEMENT**

       In contrast to a traditional Chapter 11 case, a prepackaged case, such as this, involves the
solicitation of votes for a plan prior to the commencement of a bankruptcy case. After the voting

---

[1] All capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Solicitation and
Disclosure Statement Relating to the Prepackaged Plan of Reorganization* of the Debtor (the "**Disclosure
Statement**"). ECF No. 18. As noted below, the "Disclosure Statement" and the "Offering and Consent Solicitation
Statement" are one and the same document. When the Debtor is referring to approval of the Disclosure Statement,
the Debtor is seeking approval of the Offering and Consent Solicitation Statement. There is no separate document
entitled a "Disclosure Statement."

process concludes, the debtor files its Chapter 11 petition and asks the Court to approve its disclosure statement and plan of reorganization on a fast track.

Here, prior to the filing of the Chapter 11 petition, the Debtor solicited its creditors with a document it refers to as an "Offering Memorandum and Consent Solicitation Statement." The Offering Memorandum contains several partial summaries of the Plan (beginning at pages 31 of 519 and 109 of 519). The full Plan can be found at the end of the Disclosure Statement. ECF No. 18 (starting at page 480 of 519). As discussed in detail below, the Offering Memorandum lacks sufficient information for a creditor to make a reasoned decision as to whether to vote to accept the Plan. For example, the Offering Memorandum fails to address *Stern v. Marshall* and does not contain adequate information about (i) the Plan's third-party release, see Article VII.8.3 of the Plan (the "**Third-Party Release**"), including the impact of such release upon creditors who are not even given an opportunity to vote for the plan and (ii) the extremely broad exculpation provisions of the Plan. Furthermore, the Ballots that were provided to creditors with the Offering Memorandum were awkward and difficult to navigate.

Even if the Court should determine that the Offering Memorandum did contain sufficient information and that the ballots were clear and understandable, the Plan is patently unconfirmable because the Plan (i) violates the absolute priority rule, (ii) does not comport with the best interests test, (iii) contains impermissibly broad exculpation provisions, (iv) imposes third-party releases upon parties without their consent, (v) fails to include a procedure for seeking district court approval of aspects of the Plan for which this court can only make recommendations, and (vi) does not comport with section 1125(g) of the Bankruptcy Code.

Finally, the accelerated procedures of this prepackaged chapter 11 bankruptcy case have failed to give creditors a full and fair opportunity to respond to the Plan. Creditors that are deemed

unimpaired but who are forced to accept the Debtor and Third-Party Release are receiving no notice of the confirmation process, and the balloting process confused a sizable number of creditors who inevitably submitted ballots that could not be counted. There also appears to be some interest by some creditors in serving on an official committee of unsecured creditors, yet there has been little or no time for the United States Trustee to consider whether a committee should be formed.

In sum, the Disclosure Statement and accompanying documents fall far short of the level of disclosure required under the Bankruptcy Code. In addition, the Plan that they support is not confirmable. Accordingly, the Offering Memorandum which combines a traditional disclosure statement and plan into one document should not be approved, and the Plan should not be confirmed.

## FACTUAL BACKGROUND

### General Background

1.      On May 16, 2024 (the "**Petition Date**"), the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code (the "**Petition**"). ECF No. 1.

2.      The Debtor is authorized to continue to operate its business and manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      According to the Debtor, the Debtor is the largest non-bank financial institution in Colombia engaged primarily in consumer lending, focused on offering credit and financing alternatives. The Debtor's main product, payroll loans, are consumer loans and monthly installments are deducted directly from the client's paycheck by its employer, who in turn transfers these funds directly to the Debtor. *Declaration of Jaime Francisco Buriticá Leal in Support of (I) the Chapter 11 Petition and First Day Pleadings and (II) Pursuant to Local Rule 1007-2* (the "**Local Rule 1007 Statement**") at ¶¶ 10-11. ECF No. 4.

4. The Debtor is a stock corporation (*sociedad anónima*) organized under Colombian Law. *Id.* at ¶ 9. However, according to the Debtor, the Debtor is not under the supervision of the Colombian Superintendence of Finance (Superintendencia Financiera de Colombia) since it is not considered to be a financial institution in accordance with Colombian legislation, and it is not allowed to carry out brokering of instruments registered with the Colombian National Registry of Securities and Issuers. Offering Memorandum at p. 313 of 519.

5. The Debtor's securities are privately placed, and the Debtor asserts that its securities are exempt from registration under the U.S. Securities Act of 1933. Offering Memorandum at p. 8 of 519.

6. The Debtor seeks approval of a prepackaged chapter 11 plan (the "**Plan**") to effectuate a restructuring of the Debtor's indebtedness of notes issued under that certain Indenture, dated February 7, 2020, between the Debtor and the Bank of New York Mellon (the "**Old Notes**"). The Debtor's Plan can be found at the end of the Disclosure Statement. ECF No. 18 (starting at page 480 of 519).

7. On the Petition Date, the Debtor also filed motions and applications seeking, among other things, the payment of certain prepetition expenses to minimize disruption of the Debtor's business. The Debtor also filed a *Motion Dispensing with or Delaying the Formation of an Official Committee of Unsecured Creditors or for Compliance with Fed. R. Bankr. P. 2007(b)* (ECF No. 13) (the "**Committee Motion**") and a Cash Management Motion that seeks a waiver of the requirements of Section 345(b). ECF No. 6.

8. On May 20, 2024, the Court entered the Scheduling Order, setting various deadlines, including a hearing date for a joint Disclosure Statement and confirmation hearing. The Court also approved the mailing of a summary of the Plan. ECF No. 6. The Scheduling Order

provides that "[t]he Debtor is not required to mail a copy of the Plan or Disclosure Statement to holders of Claims or Interests that are unimpaired and conclusively presumed to accept the Plan." Scheduling Order at ¶ 10.

9.      No committee of unsecured creditors has been appointed to date.[2]

**The Prepackaged Plan Solicitation Process**

10.      As of the Petition Date, the amount outstanding on the Old Notes was $210,800,000, plus estimated accrued interest through February 7, 2024 of $9,354,250. Local Rule 1007 Statement at ¶ 16.

11.      Per the Debtor, a difficult credit environment, currency volatility, and operational challenges led to tightening liquidity. The Debtor chose to hold back a $9.4 million interest payment under the Old Notes on February 7, 2024 to fund ongoing operations. *Id*. at ¶22.

12.      The consequent ratings downgrade of the Debtor's prepetition secured debt caused further tightening in the Debtor's trade terms, which, according to the Debtor, exacerbated the Debtor's liquidity issues. *Id*.

13.      Therefore, on March 7, 2024, the Debtor launched an exchange offer and solicited votes from holders of Old Notes to exchange Old Notes for New Notes, to be effectuated as part of the prepackaged Plan. *Id*. at ¶ 27. Under the Plan, the Debtor intends to deleverage its balance sheet by about $55 million—approximately 25.0% of its funded debt obligations. *Id*. at ¶ 22.

14.      The Scheduling Order does not define the "Plan" or the "Disclosure Statement" even while using these capitalized terms. However, as stated, the Plan is attached to the "Offering and Consent Solicitation Statement." ECF No. 18 (starting at page 480 of 519). The Plan contains definitions, and "Disclosure Statement" is defined as "that certain Offering Memorandum and

---

[2] The Committee Motion is adjourned to the Confirmation Hearing. The United States Trustee has solicited creditors and has received responses from creditors who are interested in serving on a Committee.

Consent Solicitation Statement dated as of March 7, 2024, as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto, to be approved by the Bankruptcy Court." Section 1.1.29.

15. The Voting Deadline for holders of Old Notes, the only class entitled to vote, was April 3, 2024. *Id*. at ¶ 31.

16. According to the Debtor's solicitation agent, 128 ballots were submitted and included in the tabulation and, of these votes, 81.25% of holders in number holding 96.09% in amount (of voting claims) voted to accept the Plan. Declaration of Jane Sullivan, ECF No. 23 at ¶ 32 (the "**Sullivan Declaration**"). An additional twenty-three ballots were submitted but excluded from the final tabulation. *Id*. at 8.

17. The Debtor has not disclosed how many ballots were sent to its creditors, specifically, whether it was in fact able to locate all the Old Noteholders.

**The Debts and Equity Interests "Deemed Unimpaired"**
**Under the Plan But Subject to Releases and Exculpations**

18. The Debtor has a series of secured claims arising in the ordinary course of business that are classified in the Plan as unimpaired. These claims, which total approximately $94.7 million, are collateralized with receivables from either the Debtor's payroll loans or credit cards. The Plan provides for payment in full in cash for all such claims in the ordinary course as they come due from the receipt or sale of the Debtor's loan portfolios. Local Rule 1007 Statement at ¶ 20; Plan at 3.2. The Debtor has labeled these claims as unimpaired.

19. The Debtor also routinely transacts in the ordinary course with third-party contractors and vendors, many of which are based outside of the United States. These transactions give rise to general unsecured claims against the Debtor. The Debtor estimates that the aggregate total amount of unsecured claims, including leases, customer refunds, financials debt, and trade claims, among

others, which will come due before the proposed Confirmation Hearing, is approximately $2.8 million. The Plan provides for reinstatement or payment in full in cash in the ordinary course of business for these claims. *Id.* at ¶ 21; Plan at 3.2. The Debtor has labeled these claims as unimpaired.

20.     The Plan provides for all equity interests in the Debtor to be automatically reinstated as of the effective date. Plan at 4.16.

**The Plan and Disclosure Statement**

21.     As stated, the Plan is found at the end of the Offering Memorandum and Consent Solicitation Statement. ECF No. 18. The following sections of the Plan are particularly relevant to the Objection: Section 1.1.38 (Exculpated Claim definition); Section 1.1.39 (Exculpated Party definition); Section 1.1.73 (Released Party definition); Section 1.1.74 (Releasing Party definition); Section 8.4 (Third-Party Release); and Section 8.5 (Exculpation).

22.     The Plan defines an Exculpated Claim in Section 1.1.38 as:

any Claim related to any act or omission in connection with, relating to, or arising out of the Debtor's in-court or out-of-court efforts to negotiate, enter into or implement the Chapter 11 Case, the formulation, preparation, solicitation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with or pursuant to the Disclosure Statement or the Plan, the filing of the Chapter 11 Case, the pursuit of Confirmation, the administration and implementation of the Plan, or the distribution of property under the Plan.

23.     The Plan defines an Exculpated Party in Section 1.1.39 as:

each of the following in its capacity as such: (a) the Debtor; (b) the Reorganized Debtor; (c) the Trustee; (d) the Holders of Interests; and (e) with respect to each of the foregoing Entities in clauses (a) through (d) such Entity's predecessors, successors and assigns and current and former Affiliates, subsidiaries, officers, directors, members, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals.

24.     The Plan defines a Released Party in Section 1.1.73 as:

each of the following: (a) the Debtor; (b) the Trustee; (c) the Holders of Interests; and (d) with respect to each of the foregoing Entities in clauses (a) through (c), such Entity's

successors and assigns, and current and former Affiliates, subsidiaries, officers, directors, members, stockholders, partners, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, solely in their respective capacities as such.

25.    The Plan defines a Releasing Party in Section 1.1.74 as:

each of the following: (a) the Holders of Impaired Claims or Interests that (i) affirmatively vote to accept the Plan or (ii) abstain from voting on the Plan; (b) to the fullest extent permissible under applicable law, the Holders of Unimpaired Claims or Interests; (c) the Trustee; and (d) with respect to each of the foregoing Entities in clauses (a) through (c), such Entity's successors and assigns, and current and former Affiliates, subsidiaries, officers, directors, members, stockholders, partners, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, solely in their respective capacities as such.

26.    Section 8.4 of the Plan, the Third-Party Release, reads:

**As of the Effective Date, to the extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtor, the Reorganized Debtor, the Estate, the Released Parties and each such Entity's successors and assigns, current and former affiliates, subsidiaries, officers, directors, members, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, solely in their respective capacities as such, and only if such Persons occupied any such positions at any time on or after the Petition Date, from any and all Claims, Interests, obligations, rights, liabilities, actions, causes of action, choses in action, suits, debts, demands, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including all claims and actions against any Entities under the Bankruptcy Code) whatsoever, whether for tort, contract, violations of federal or state securities laws and Avoidance Actions, including any derivative Claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity asserted or that could possibly have been asserted, or would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in, or under, in whole or in part, the Debtor, the Chapter 11 Case, the Old Notes, the Old Notes Indenture, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Releasing Party, the restructuring of Claims and Interests prior to or during the Chapter 11 Case, the negotiation, formulation, solicitation, or preparation of the Disclosure Statement, the Plan, the Plan Supplement, or related agreements, instruments or other documents, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided, however, that the foregoing provisions of this**

**Section 8.4 shall have no effect on the liability of any of the Released Parties for gross negligence, willful misconduct, fraud, or criminal conduct as determined by a Final Order entered by a court of competent jurisdiction; provided further that nothing in this Section 8.4 shall release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed to implement, or otherwise given effect under, the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in this Section 8.4, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) important to the Plan; (b) in exchange for the good and valuable consideration provided by the Debtor, the Reorganized Debtor, the Estate and the Released Parties; (c) a good faith settlement and compromise of the Claims released by this Section 8.4; (d) in the best interests of the Debtor and all Holders of Claims and Interests; (e) fair, equitable, and reasonable; (f) given and made after due notice and opportunity for hearing; and (g) a bar to any Entity granting a release under this Section 8.4 from asserting any Claim or Cause of Action released by this Section 8.4.**

27. Section 8.5 of the Plan, the Exculpation provision, reads:

**No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim or any obligation, Cause of Action, or liability for any Exculpated Claim; provided, however, that the foregoing "exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted fraud, gross negligence, or willful misconduct; provided, further, that in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to, or in connection with, the Plan. The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of acceptances and rejections of the Plan and the making of distributions pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable, law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

## ARGUMENT

### A.    The Disclosure Statement Should Not Be Approved

The disclosure statement requirement of Section 1125 is "crucial to the effective functioning of the federal bankruptcy system[;] . . . the importance of full and honest disclosure

cannot be overstated." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362

(3d Cir. 1996) (citing *Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor*

*Freight, Inc.*), 848 F.2d 414, 417-18 (3d Cir. 1988)).

Section 1125 of the Bankruptcy Code provides that a disclosure statement must contain

"adequate information" describing a confirmable plan. 11 U.S.C. § 1125; *see also In re Quigley*

*Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007). The Bankruptcy Code defines "adequate

information" as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in
> light of the nature and history of the debtor and the condition of the debtor's books
> and records, including a discussion of the potential material Federal tax
> consequences of the plan to the debtor, any successor to the debtor, and a
> hypothetical investor typical of the holders of claims or interests in the case, that
> would enable such a hypothetical investor of the relevant class to make an informed
> judgment about the plan, but adequate information need not include such
> information about any other possible or proposed plan and in determining whether
> a disclosure statement provides adequate information, the court shall consider the
> complexity of the case, the benefit of additional information to creditors and other
> parties in interest, and the cost of providing additional information.

11 U.S.C. § 1125(a)(1); *see also Momentum Mfg. Corp. v. Employee Creditors Comm. (In re*

*Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994); *In re Adelphia Commc'ns Corp.*, 352

B.R. 592, 596 (Bankr. S.D.N.Y. 2006); *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y.

1999).

The "adequate information" requirement is designed to give creditors enough information

so that they can make an informed decision of whether to approve or reject a plan. *See Century*

*Glove, Inc. v. First American Bank of New York*, 860 F.2d 94, 100 (3d Cir. 1988); *In re Duratech*

*Indus.*, 241 B.R. 291, 298 (Bankr. E.D.N.Y. 1999), *aff'd* at 241 B.R. 283 (E.D.N.Y. 1999). To be

approved, a disclosure statement must include sufficient information to apprise creditors of the

risks and financial consequences of the proposed plan. *See In re McLean Indus., Inc.,* 87 B.R. 830,

834 (Bankr. S.D.N.Y. 1987) ("substantial financial information with respect to the ramifications of any proposed plan will have to be provided to, and digested by, the creditors and other parties in interest in order to arrive at an informed decision concerning the acceptance or rejection of a proposed plan").  Although the adequacy of the disclosure statement is determined on a case-by-case basis, the disclosure statement must "contain simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [restructuring] alternatives . . . ."  *In re Copy Crafters Quickprint, Inc.,* 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).

Section 1125 of the Bankruptcy Code is biased towards more disclosure rather than less.  *See In re Crowthers McCall Pattern, Inc*., 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990).  The "adequate information" requirement establishes a floor, not a ceiling, for disclosures that must be made to creditors.  *Adelphia*, 352 B.R. at 596 (citing *Century Glove,* 860 F.2d at 100).  Once the "adequate disclosure" floor is satisfied, additional information can go into a disclosure statement if the additional information is accurate and its inclusion is not misleading.  *Adelphia*, 352 B.R. at 596.  The disclosure statement must inform the average creditor what it will receive and when and what contingencies might intervene.  *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

    1.  <u>A Creditor Cannot Reasonably Understand the Solicitation Materials</u>

In the Ballots, voting creditors—holders of Old Notes—must acknowledge receipt of "applicable solicitation materials," which is not defined.  The Ballot also uses capitalized terms when referring to the Disclosure Statement and Plan but does not actually define these terms.  Therefore, holders of Old Notes are being asked to approve a complex set of documents without knowing which documents from the many they have received they are being asked to approve.

In addition, the Exchange Offer is conditioned upon, among other things, the valid tender, without subsequent withdrawal, of at least 95% (including any Old Notes which are owned by us

*or our affiliates*) in aggregate principal amount of the outstanding Old Notes . . .” *See* Disclosure Statement at p. 5 (emphasis added).  The Debtor does not describe whether the creditors voting on the Plan are holders of Debtor debt or affiliate debt, or some combination.  The Note Holders should be able to vote only to the extent they own Debtor and not affiliate debts.

Only months after holders of Old Notes were required to submit their votes on the Plan (and only one business day before the deadline for parties in interest to object to confirmation), the Debtor finally filed a liquidation analysis.  The liquidation analysis is a necessary component of the solicitation materials, among other reasons, so that creditors can decide if the Plan is the best path forward for the Debtor.  Prior to the Petition Date, when the voting took place, a creditor would not have found a liquidation analysis among the documents sent to it for approval.

Significant portions of the Disclosure Statement and Ballots are not written in “plain English” so that creditors can easily understand the Plan’s provisions and how to exercise their rights.  For example, the Ballots contain five pages of single-spaced text explaining how the Third-Party Release works in lengthy and complex legal terminology (even to trained lawyers, a labyrinth), and then include a box for creditors to elect to opt in to the Third-Party Release on a separate page.

The fact that 128 Ballots were counted and 23 were not – *i.e.,* 15.23% of the Ballots returned to the Debtor were rejected from tabulation – evidences clear confusion among the creditor body as to the proper way to return Ballots.  *See* Sullivan Declaration at ¶ 32.  It is impossible to know exactly how widespread this confusion may have been, since we do not know how many ballots were sent out; yet $90,644,519 worth of votes were disallowed for duplication or other reasons.  *See* Sullivan Declaration, Ex. B.  In addition, even excluding duplicates and insider votes, $48,310,519 worth of Old Notes Claims, nearly 25% of the total outstanding

indebtedness under the Old Notes, submitted votes that were not counted. As of the Petition Date, the amount outstanding on the Old Notes was $210,800,000, plus estimated accrued interest through February 7, 2024 of $9,354,250. Local Rule 1007 Statement at ¶ 16. It appears that a large percentage of the Old Notes did not return a Ballot at all.

2. The Debtor Has Not Adequately Explained the Voting and Tabulation Process in the Disclosure Statement

The Debtor has failed to explain its voting and tabulation processes, and specifically whether its creditors were able to have a full and fair opportunity to participate in the Plan process. Key information missing from the Disclosure Statement includes (a) how many Ballots were sent to creditors and how many creditors were reached, and (b) whether the Ballots were sent in Spanish.

No interested parties other than the Debtor were given the chance to weigh in on the adequacy of the Disclosure Statement or propose amendments to the Debtor before the solicitation materials were sent out, so votes have already been solicited based on an inadequate Disclosure Statement. The Debtor has not provided any business justification as to the need to confirm this Plan on such a short timeline. Rather than plough forward at a breakneck pace, the Debtor should re-solicit for its Plan in a more fulsome manner that gives creditors an opportunity to truly understand the Plan and to exercise their rights.

3. The Debtor Has Not Adequately Explained Other Material Issues in the Disclosure Statement

The Debtor has also failed to advise creditors numerous material components of its restructuring, including:

- How holders of Old Notes, who are senior in priority to equity interests, will receive at least as much value from the Plan as they would under a chapter 7 liquidation;

- Why the Third-Party Release is justified.[3]
- The basis for the inclusion of non-consensual third-party releases without an opportunity to opt-in, as explained below;
- Why the Debtor believes this Court has the authority and jurisdiction to order the release of creditors' claims against non-estate assets;
- How the Plan follows Second Circuit precedent on third-party releases;
- How the Third-party Release meets the *Purdue* factors;
- How the exculpation provision in the Plan will pass muster by the court; and
- How the Plan satisfies Section 1125(g).

The significance of each of these items, and their impact on the Plan's confirmability, are discussed in detail below.

**B.** **The Plan Should Not be Confirmed**

1.   The Plan Violates the Absolute Priority Rule and Does Not Meet the Best Interests Test

Under the "Absolute Priority Rule," embodied in Section 1129(b)(2) of the Bankruptcy Code, a Chapter 11 plan cannot be confirmed unless each class of creditors are unimpaired or have voted to accept the plan, claims of a higher priority are paid in full in order for lower priority claims to receive any recovery, and all creditors are be paid in full in order for equity interest holders to retain any interest in the debtor, or receive any distribution under the plan.

The Debtor intends to allow equity interests to retain their interest upon confirmation of the Plan.  *See* Disclosure Statement at 31 ("Specifically, under the Plan, we intend to have all other claims against us ride through the Chapter 11 Case and Plan unaffected and/or satisfied in the ordinary course of business. In addition, under the Plan, all of our equity interests will be left unaltered.").  At the very least the Debtor is acknowledging that the Old Notes are impaired.

---

[3] In fact, this Court's own guidelines for prepackaged plans of reorganization suggest that, because a 'Rapid Prepackaged Chapter 11 Case' only impairs accepting class(es) of creditors, such cases "[do] not provide for [. . .] (b) releases of claims by parties in interest against non-Debtor parties, unless, in each instance, the Debtor establishes that the foregoing is on a consensual basis, including, without limitation, that the affected party is a co-proponent of the plan or of a settlement embodied in the plan".  General Order M-621, *Amended Procedural Guidelines for Prepackaged Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of New York,* amending General Order M-454 (Glenn, C.J.), Feb. 1, 2024.  While the Debtor's timeline is longer than the fourteen-day timeline in a 'Rapid Prepackaged Chapter 11 Case', this Plan is analogous in that it also purports to impair only accepting classes of creditors.

Under the circumstances, the Plan violates the Absolute Priority Rule because equity holders are retaining their interests while holders of the Old Notes are receiving less than their full interest.[4]

Moreover, Section 1129(a)(7), colloquially referred to as the Best Interest Test, protects dissenting creditors in a class that has voted to accept a plan by providing that such creditors will "receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." 11 U.S.C. § 1129(a)(7)(A)(ii). In other words, such creditor is entitled to *at least* the amount they would receive in liquidation. *In re Celsius Network LLC*, 655 B.R. 301, 311 (Bankr. S.D.N.Y. 2023).

The Debtor must demonstrate that the Best Interest Test has been satisfied if *any* member of an accepting class voted to reject the Plan. As some holders of Old Notes voted not to accept the plan, the Debtor must meet this burden. *See* Local Rule 1007 Declaration at ¶ 32. Assuming the Debtor is accurately reporting the results of the balloting, and this Court finds that holders of Old Notes were not confused by the Ballots, the fact remains that some Old Note holders rejected the Plan. Therefore, it is the Debtor's burden to establish that holders of Old Notes, who are senior in priority to equity interests, will receive at least as much value from the Plan as they would under a chapter 7 liquidation. The Debtor did not provide that information. While the Debtor did include a liquidation analysis in the Plan Supplement filed less than a week ago, this information is not helpful to creditors after the Voting Deadline has passed.

---

[4] The Debtor is not proposing a cramdown.

2.     The Plan Violates Established Law on Releases

The Plan, if confirmed, will provide a myriad of third parties with broad releases that will deprive the Debtor's creditors of property rights without their consent. The Third-Party Release in the Plan is a material term and should have been addressed fully so that interested creditors could determine (i) exactly what releases will be imposed upon them and (ii) the likelihood of the Debtor's success in confirming a Plan with or without such broad third-party releases. Without adequate information about the releases, a creditor could not reasonably determine whether the inclusion of such releases is a worthwhile compromise.

Specifically, even assuming the Debtor persuades the Court that it has constitutional authority to enter a final judgement that compels impaired creditors to provide non-consensual third-party releases, the imposition of third-party releases is proper only in rare and unique circumstances. *See In re SunEdison*, 576 B.R. 453, 461-62 (S.D.N.Y. Bankr. 2017) (*citing Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.*), 416 F.3d 136, 141 (2d Cir. 2005). In *Metromedia*, the Second Circuit articulated at least two reasons for its reluctance to approve these releases:

> First, the only explicit authorization in the Code for non-debtor releases is 11 U.S.C. § 524(g), which authorizes releases in asbestos cases when specified conditions are satisfied, including the creation of a trust to satisfy future claims, [and] …Second, a non-debtor release is a device that lends itself to abuse. By it, a non-debtor can shield itself from liability to third parties. In form, it is a release; in effect it may operate as a bankruptcy discharge without a filing and without the safeguards of the Code. The potential for abuse is heightened when releases afford blanket immunity.

*Id.* at 142. *See also In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (footnotes omitted); *In re Motors Liquidation Co.*, 477 B.R. 198, 220 (Bankr. S.D.N.Y. 2011) ("Although (since the Code is silent on the matter) third-party releases aren't 'inconsistent with the applicable provisions of this title,' the Second Circuit has ruled that they're permissible only in rare cases,

with appropriate consent or under circumstances that can be regarded as unique, some of which the Circuit listed. But where those circumstances haven't been shown, third-party releases can't be found to be appropriate").

a. *The Non-Consensual Third-Party Releases Are Non-Core and Subject to De Novo Review, Rendering the Plan Unconfirmable within the Time Frame Proposed by the Debtor*

As an initial matter, approval of non-consensual third-party releases is a non-core proceeding under *Stern v. Marshall*, 564 U.S. 462 (2011), and the bankruptcy court therefore lacks constitutional authority to finally approve these non-consensual releases. *See, e.g., In re Hal Luftig Co., Inc.,* 655 B.R. 508, 529 (Bankr. S.D.N.Y. 2023) (finding that the bankruptcy court lacked constitutional authority to approve a non-consensual third-party release and so submitting proposed findings of fact and conclusions of law to the District Court for that court's *de novo* review and issuance of final judgment), *proposed findings of fact and conclusions of law rejected on other grounds*, 657 B.R. 704 (S.D.N.Y. 2024).

In this case, the impaired class has a right to 'opt-out' but the "Deemed" unimpaired classes are not entitled to vote, yet are nonetheless bound by the Third-Party Releases. The Disclosure Statement provides that Releasing Parties include, "to the extent permitted by applicable law, each of the following: (a) the Holders of Impaired Claims or Interests that . . . (ii) abstain from voting on the Plan; (b) to the fullest extent permissible under applicable law, the Holders of Unimpaired Claims or Interests;" *See* Disclosure Statement at 114. Those abstaining from the vote and the Unimpaired Claims or Interests are non-consensual participants in the third-party releases.

There are many reasons that creditors do not act, and because creditors have no duty to vote on a plan, return a ballot, or object to a plan, a creditor's failure to do so cannot have legal consequences for the inactive creditor with respect to the Third-Party Release. *See, generally, In re Emerge Energy Services, LP*, 2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019) (applying

contract principles, the bankruptcy court determined that failure to return a ballot could not be deemed consent to the release); *Patterson v. Mahwah Bergen*, 636 B.R. 641, 688 (E.D. Va. 2022) (District Court held that neither contract law nor class action law supported debtors' argument that failure to vote or to opt out could be deemed consent to a release and that construing either as consent violates due process as well.)

Judge Wiles has noted that courts should be wary of approving procedures that impose releases on parties that have not affirmatively manifested their consent. *In re Chassix Holdings,* 533 B.R. at 79 (Bankr. S.D.N.Y. 2015). Further, the Court reasoned that "many creditors may simply have assumed that a package that related to the Debtors' bankruptcy case must have related only to their dealings with the Debtors and would not affect their claims against other parties." *Id.* at 80-81. Thus, to charge "all inactive creditors with full knowledge of the scope and implications of the proposed third party releases, and implying a 'consent' to the third party releases based on the creditors' inaction, is simply not realistic or fair, and would stretch the meaning of 'consent' beyond the breaking point." *Id*.

Whether this Court has constitutional authority to bestow such broad releases in a final confirmation order is a material issue and an issue that should have been addressed by the Debtor in the Disclosure Statement, so that interested creditors can determine (i) exactly what releases are being imposed and on which creditors and (ii) the likelihood of Debtor's success of confirming a plan with such broad releases. Accordingly, the bankruptcy court's decision would only constitute findings of fact and conclusions of law for the district court's *de novo* review before the Plan could be confirmed. Because the Debtor presumably requires a speedy decision on Plan confirmation, the delay associated with seeking District Court approval renders the current Plan patently unconfirmable.

b.      *The Scope of the Third-Party Release is Impermissibly Broad*

Before turning to the non-consensual third party releases aspect of this Objection, the Third-Party Release is inappropriate because certain of the Released Parties are non-debtors and their assets are thus not property of the bankruptcy estate.  The Debtor has not explained why it believes this Court has the authority and jurisdiction to order the release of creditors' claims against non-estate assets.  *In re Johns-Manville Corp.*, 517 F.3d 52, 66 (2d Cir. 2008), *vacated & remanded on other grounds*, 557 U.S. 137 (2009), *aff'g in part & rev'g in part*, 600 F.3d 135 (2d Cir. 2010) ("a bankruptcy court only has jurisdiction to enjoin third-party non-debtor claims that directly affect the *res* of the bankruptcy estate."); *see also In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 723 (Bankr. S.D.N.Y. 2019) ("third-party claims that are the subject of the proposed releases in this case are not claims against the estate or against property of the estate.  A bankruptcy court has no *in rem* jurisdiction over such third-party claims."); *SunEdison,* 576 B.R. at 464 (including third-party releases in a plan requires a debtor to "demonstrate how the outcome of the claims to be released might have a conceivable effect on the Debtors' estates . . ."); *In re Dreier LLP*, 429 B.R. 112, 133 (Bankr. S.D.N.Y. 2010) (because the court lacks jurisdiction to enjoin claims that do not affect property of the estate or the administration of the estate, third-party releases must be limited to claims that are derivative of the debtors).

The Third-Party Release is also impermissibly broad in that it includes a release of claims pursuant to federal or state securities laws.  This Court lacks jurisdiction to rewrite securities laws or to bind the current or future actions of an executive branch agency tasked with enforcing the same.

*The Debtor Failed to Demonstrate that the Proposed Release Satisfies Relevant Factors Propounded by the Second Circuit*

The Plan cannot be approved based on Second Circuit precedent on third-party releases to voting creditors. A release of claims held by non-debtors against other non-debtors is "a dramatic measure to be used cautiously" and "is only proper in rare cases." *Metromedia*, 416 F.3d at 142-43 (internal citation omitted). "The plain admonition of the Second Circuit Court of Appeals is that third-party releases are frequently a subject of abuse and that they are appropriate only in narrow and unusual circumstances." *In re Chassix Holdings, Inc., et al.,* 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015) (citing *Metromedia*, 461 F.3d at 143).

According to *Purdue Pharma,* given the potential for abuse, third-party releases must be imposed against a backdrop of equity, and courts should exercise particular care when evaluating a non-consensual release. *In re Purdue Pharma L.P.*, 69 F.4th 45, 79 (2d Cir. 2023).[5] In evaluating such releases, courts *must* consider the following seven factors:

First, is there an identity of interest between the debtor and the released third parties?

Second, are the claims against the debtor and non-debtor factually and legally intertwined?

Third, is the scope of the release appropriate?

Fourth, is the release essential to the reorganization?

Fifth, has the non-debtor contributed substantial assets to the reorganization?

Sixth, did the impacted creditors overwhelmingly vote in support of the plan? and

Seventh, does the plan provide fair payment of enjoined claims?

*Id.* at 78-79.

The Second Circuit requires "consideration of each factor" but also cautions that "there may even be cases in which all factors are present, but the inclusion of third-party releases in a

---

[5] The matter was argued before the Supreme Court of the United States on December 4, 2023.

plan of reorganization should not be approved." *Id*. at 79. It also requires the bankruptcy court to "support each of these factors with specific and detailed findings." *Id*. Satisfaction of the *Purdue* Factors—which the Debtor did not even mention, let alone analyze—is essential to determine the confirmability of the Plan under *Purdue*. But also, the Plan failed to set forth the great legal uncertainty relating to third party releases, given the pending Supreme Court decision on the matter.

### 3. The Exculpation Provision in the Plan is Overly Broad

The exculpation provision in the Plan is also overly broad and far beyond the scope of 11 U.S.C. § 1125(e). Plan, Section 8.5. The exculpation provision should be limited (and is not here), with respect to "claims against exculpated parties based on the negotiation, execution, and implementation of agreements and transactions that were approved by the Court." *In re Aegean Marine Petroleum Network, Inc*. 599 B.R. 717, 721 (Bankr. S.D.N.Y. 2019). Accordingly, unless the Debtor revises the exculpation provision so that it is consistent with 11 U.S.C. § 1125, the United States Trustee objects to the exculpation provision.

First, the exculpation provision is inappropriate because the list of exculpated parties is overly broad. The list of exculpated parties includes persons who cannot be classified as estate fiduciaries – specifically, the definition of "Exculpated Party" includes (a) the Debtor; (b) the Reorganized Debtor; (c) the Trustee; (d) the Holders of Interests; and (e) [these entities'] predecessors, successors and assigns and current and former Affiliates, subsidiaries, officers, directors, members, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals." Plan, Section 1.1.39. A proper exculpation operates to shield court-supervised fiduciaries from liability. *Aegean Marine*, 599 B.R. at 721. "The exculpation clause must be limited to the fiduciaries who have

served during the chapter 11 proceeding: estate professionals, the Committees and their members, and the Debtor's directors and officers." *In re Washington Mut., Inc.*, 442 B.R. 314, 350–51 (Bankr. D. Del. 2011). Exculpation provisions are based "to some extent . . . on the theory that court-supervised fiduciaries are entitled to qualified immunity for their actions." *Aegean*, 599 B.R. at 720. "If this Court has approved a transaction as being in the best interests of the estate and has authorized the transaction to proceed, then the parties to those transactions should not be subject to claims that effectively seek to undermine or second-guess this Court's determinations." *Id*. at 721. Parties who had nothing to do with the bankruptcy process should not be entitled to benefit from such exculpations.

Second, the exculpation provision contains no temporal limitation on the actions that are being exculpated and therefore could be interpreted to provide prospective exculpation that extends past the Effective Date. Plan, Section 8.5. Exculpation clauses should not extend past the effective date of a plan, to avoid exculpating actions that have not yet occurred and are as yet unknown. *See In re Mallinckrodt PLC*, 639 B.R. 837, 883 (Bank. D. Del. 2022) (exculpation "only extends to conduct that occurs between the Petition Date and the effective date").

Third, in addition to excepting acts that constitute fraud, gross negligence, or willful misconduct, the exculpation provision should also carve out claims for bad faith, breach of fiduciary duty, and legal malpractice, release of which is prohibited under section of the New York Rules of Professional Conduct, *i.e.*, N.Y. Comp. Codes R. & Res. Tit. 22 § 1200.8 Rule 1.8(h)(1).

## C. The Scheduling Order's Compressed Timeline Did Not Give Creditors a Full and Fair Opportunity to Respond to the Plan

Not only are the proponents of a chapter 11 plan required to provide adequate disclosure to voting creditors and other parties-in-interest, but they are also required to give those parties a full and fair opportunity to respond to the plan. *See Mullane v. Central Hanover Bank & Trust*

*Co.*, 339 U.S. 306, 314 (1950) (requiring that notice be "reasonably calculated, under all the circumstances, to apprise interest parties of the pendency of the action and afford them an opportunity to present their objections"); *DePippo v. Kmart Corp.*, 335 B.R. 290, 295 (S.D.N.Y. 2005) (confirmed chapter 11 plan binds creditors, but only so long as they have received notice sufficient to satisfy due process).

In fact, the Supreme Court recently reaffirmed the importance of allowing a broad contingent of stakeholders to participate in the bankruptcy process, ruling that an insurer fits the definition of a party in interest:

> that anyone holding a direct financial stake in the outcome of the case should have an opportunity (either directly or through an appropriate representative) to participate in the adjudication of any issue that may ultimately shape the disposition of his or her interest." 7 Collier on Bankruptcy ¶1109.01 (16th ed. 2023). This understanding aligns with this Court's observation that Congress uses the phrase "'party in interest'" in bankruptcy provisions when it intends the provision to apply "broadly." Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A., 530 U. S. 1, 7 (2000) (quoting 11 U. S. C. §502(a)).

*Truck Insurance Exchange v. Kaiser Gypsum Co.*, No. 22-1079 (June 6, 2024).

Here, however, the Debtor seeks to drastically limit the disclosure it is providing of creditors' rights, specifically by failing to provide any notice to creditors who are not entitled to vote, including holders of secured claims arising in the ordinary course of business and certain of the Debtor's third-party contractors and vendors who hold unsecured claims. The Scheduling Order does not require notice of the Plan and Disclosure Statement on any party (only requiring a summary) and provides for no notice whatsoever for the classes that the Debtor deems to be unimpaired. By virtue of these creditors' inability to opt out of granting releases to the Debtors

and third parties, these creditors cannot be classified as unimpaired, and need notice and an opportunity to participate in this process.

### D. The Plan Does Not Comport with 11 U. S. C. §1125(g)

Further, the Debtor seeks a ruling by this Court that it is not subject to certain securities laws. Section 1125(g) provides that for a prepackaged plan, "acceptance or rejection of the plan may be solicited from a holder of a claim or interest if such solicitation complies with applicable nonbankruptcy law and if such holder was solicited before the commencement of this case in a manner complying with applicable nonbankruptcy law." 11 U. S. C. §1125(g). The Debtor has not explained how the solicitation process complied with applicable nonbankruptcy law. According to the Debtor, the Debtor is not under the supervision of the Colombian Superintendence of Finance (Superintendencia Financiera de Colombia) since it is not considered to be a financial institution in accordance with Colombian legislation, and it is not allowed to carry out brokering of instruments registered with the Colombian National Registry of Securities and Issuers. Offering Memorandum at p. 313 of 519. The Debtor's securities are privately placed, and the Debtor believes its securities are exempt from registration under the U.S. Securities Act of 1933. Offering Memorandum at p. 8 of 519. Other than these bald statements, the Debtor has not demonstrated that its prepetition solicitation process complies with securities and other relevant regulatory law as required under 11 U.S.C. § 1125(g).

A committee of unsecured creditors could be especially important in forwarding the process and the United States Trustee may appoint a committee pursuant to 11 U.S.C. § 1102(a)(1) if this Court delays or denies confirmation. At the very least, non-voting creditors who will be

opting in to a release without their consent should be given notice and an opportunity to participate in the Plan process.

## CONCLUSION

In sum, the Disclosure Statement did not contain adequate information about material issues and the Plan contains provisions that render it patently unconfirmable.

WHEREFORE, for all the foregoing reasons, the United States Trustee respectfully requests that the Court (i) sustain this Objection and decline to approve the Disclosure Statement (ii) decline to approve the Plan, and (iii) grant such other relief as is just and appropriate.

Dated:  New York, New York
       June 18, 2024

Respectfully submitted,

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE
Region 2

By:    */s/Greg M. Zipes*
       Greg M. Zipes
       Rachael E. Siegel
       Trial Attorneys
       Office of the United States Trustee
       Alexander Hamilton Custom House
       One Bowling Green, Rm. 534
       New York, New York 10004
       Tel.: (212) 510-0500
