DAVIS POLK & WARDWELL LLP

450 Lexington Avenue

New York, New York 10017

Tel.: (212) 450-4000

Timothy Graulich

James I. McClammy

Angela M. Libby

Stephen D. Piraino

Moshe Melcer

*Counsel to the Ad Hoc Group of Noteholders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **CREDIVALORES – CREDISERVICIOS S.A.,** | **Case No. 24-10837 (DSJ)** |
| **Debtor.** | |

**THE AD HOC GROUP'S (I) MEMORANDUM OF
LAW IN SUPPORT OF THE AD HOC GROUP'S MOTION
UNDER BANKRUPTCY RULE 3018 TO COUNT CERTAIN BALLOTS
AND (II) OMNIBUS OBJECTION TO (A) PLAN CONFIRMATION,
(B) APPROVAL OF THE DISCLOSURE STATEMENT, (C) APPROVAL
OF THE SOLICITATION PROCEDURES, AND (D) THE UCC MOTION**

# TABLE OF CONTENTS

PAGE

Preliminary Statement ...................................................................................................1

Background ........................................................................................................................8

I.      Timeline ...............................................................................................................8

II.     The Voting Report .............................................................................................11

Argument .........................................................................................................................12

I.      The UCC Motion Should Be Denied ...............................................................12

II.     The Debtor's Disclosure Statement and Solicitation Procedures Should Not Be Approved...........................................................................................................14

      A.     The Debtor's Disclosure Was Misleading and Inadequate and Should Not Be Approved...........................................................................................15

      B.     The Debtor's Solicitation Procedures Did Not Appropriately Capture the Votes of the Only Impaired Class of Creditors and Should Not Be Approved...................16

III.    The Voting Motion Should Be Granted.............................................................23

IV.   The Plan Does Not Meet the Bankruptcy Code's Confirmation Requirements and Cannot Be Confirmed................................................................................28

      A.     The Debtor Has Not Complied with the Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2))...............................................28

      B.     The Record Does Not Establish That the Plan Was Proposed in Good Faith (11 U.S.C. § 1129(a)(3)) .............................................................29

      C.     The Plan Does Not Satisfy the Voting Requirements of the Bankruptcy Code (11 U.S.C. §§ 1129(a)(8), (10))...............................................29

Reservation of Rights......................................................................................................30

# TABLE OF AUTHORITIES[1]

PAGE(S)

## CASES

*Adelphia Bus. Sols., Inc. v. Abnos*,
    482 F.3d 602 (2d Cir. 2007) ................................................. 26

*In re Adelphia Commc'ns Corp.*,
    359 B.R. 54 (Bankr. S.D.N.Y. 2006) .................................. 24

*In re Avianca Holdings S.A.*,
    632 B.R. 124 (Bankr. S.D.N.Y. 2021) ................................ 16

*In re Barney's, Inc.*,
    201 B.R. 703 (Bankr. S.D.N.Y. 1996) .................................. 8

*In re Chemtura Corp.*,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010) ................................ 29

*In re City of Colorado Springs Spring Creek Gen. Imp. Dist.*,
    177 B.R. 684 (Bankr. D. Colo. 1995) ............................. 15, 17

*In re Combustion Eng'g, Inc.*,
    391 F.3d 190 (3d Cir. 2004) .............................................. 24

*Czyzewski v. Jevic Holding Corp.*,
    580 U.S. 451 (2017)............................................................12

*In re Imerys Talc Am., Inc.*,
    No. 19-10289 (LSS), 2021 WL 4786093 (Bankr. D. Del. Oct. 13, 2021) ........................... 25

*In re Indianapolis Downs, LLC.*,
    486 B.R. 286 (Bankr. D. Del. 2013) ................................... 8

*In re Ionosphere Clubs, Inc.*,
    119 B.R. 440 (Bankr. S.D.N.Y. 1990) ................................ 27

*In re Kellogg Square P'ship*,
    160 B.R. 332 (Bankr. D. Minn. 1993) ................................ 25

*Law v. Siegel*,
    571 U.S. 415 (2014)............................................................12

*In re Malek*,
    35 B.R. 443 (Bankr. E.D. Mich. 1983) ............................... 16

---

[1] Unless otherwise stated, all emphasis is added, all internal citations and quotations are omitted, and all quotes are otherwise cleaned up.

*In re MCorp Fin., Inc.*,
   137 B.R. 237 (Bankr. S.D. Tex. 1992) ................................................................. 25

*In re MPM Silicones, LLC*,
   No. 14-22503 (RDD), 2014 WL 4637175 (Bankr. S.D.N.Y. Sept. 17, 2014) ..................... 25

*In re Paul*,
   101 B.R. 228 (Bankr. S.D. Cal. 1989) ................................................................. 26

*In re Pioneer Fin. Corp.*,
   246 B.R. 626 (Bankr. D. Nev. 2000) ................................................................. 24

*In re Sabine Oil & Gas Corp.*,
   555 B.R. 180 (Bankr. S.D.N.Y. 2016) ........................................................... 28–29

*In re Signature Apparel Grp. LLC*,
   577 B.R. 54, 89 (Bankr. S.D.N.Y. 2017) ............................................................. 12

*In re Southland Corp.*,
   124 B.R. 211 (Bankr. N.D. Tex. 1991) ........................................................... 16–17

*Truck Ins. Exch. v. Kaiser Gypsum Co., Inc.*,
   144 S. Ct. 1414 (2024) ................................................................................... 12

*In re Westwood Plaza Apartments*,
   147 B.R. 692 (Bankr. E.D. Tex. 1992) ................................................................. 26

*In re Windmill Durango Off., LLC*,
   481 B.R. 51 (B.A.P. 9th Cir. 2012) ................................................................... 25

<u>STATUTES & RULES</u>

11 U.S.C. § 105(a) ................................................................................... 25–26

11 U.S.C. § 341(a) ......................................................................................... 8

11 U.S.C. 341(e) .......................................................................................... 13

11 U.S.C. § 1102(a)(1) ................................................................................ 8, 12

11 U.S.C. § 1123(a)(4) .................................................................................. 15

11 U.S.C. § 1125 ..................................................................................... 28–29

11 U.S.C. § 1126 ................................................................................... *passim*

11 U.S.C. § 1129(a)(2) ............................................................................. 28–29

11 U.S.C. § 1129(a)(3) ................................................................................. 29

11 U.S.C. § 1129(a)(7) ................................................................................. 16

11 U.S.C. § 1129(a)(8) ........................................................ 29

11 U.S.C. § 1129(a)(10) ..................................................... 2, 30

11 U.S.C. § 1129(b) ........................................................... 29

Fed. R. Bankr. P. 3017(d) ................................................... 14

Fed. R. Bankr. P. 3017(e) ................................................... 15

Fed. R. Bankr. P. 3018 ................................................. *passim*

<u>OTHER AUTHORITIES</u>

2 Collier on Bankruptcy ¶ 105.02 (16th ed. 2024) ........................27

3 Collier on Bankruptcy ¶ 341.05A (16th ed. 2024) ....................13

7 Collier on Bankruptcy ¶ 1102.02 (16th ed. 2024) ....................13

9 Collier on Bankruptcy ¶ 3018.01 (16th ed. 2024) ....................25

The Ad Hoc Group[2] hereby files this memorandum of law (together with the Declarations, this "**Brief**") (a) in support of *The Ad Hoc Group's Motion Under Bankruptcy Rule 3018 to Count Certain Ballots* filed contemporaneously herewith (the "**Motion**") and (b) in opposition to (i) confirmation of the Plan, (ii) approval of the Disclosure Statement, (iii) approval of the Solicitation Procedures, and (iv) the relief sought in the *Debtor's Motion for an Order Under 11 U.S.C. § 341(E) Dispensing with or Delaying the Formation of an Official Committee of Unsecured Creditors, or for Compliance with Fed. R. Bankr. P. 2007(B)* [ECF No. 13] (the "**UCC Motion**"). This Brief is supported by the declarations of Timothy Graulich (the "**Graulich Declaration**"), Ian McCall (the "**First Geneva Declaration**"), and Anibal Valdes (the "**Moneda Declaration**" and, together with the Graulich Declaration and First Geneva Declaration, the "**Declarations**"), each filed substantially contemporaneously herewith and incorporated herein by reference. The Ad Hoc Group respectfully represents as follows:

## **Preliminary Statement**

1. The Debtor insists that this is a prepackaged bankruptcy case (a "prepack") because it solicited votes prepetition and, based on the less than 43% of noteholders who voted (as tabulated by the Debtor), it purports to have sufficient votes to confirm a chapter 11 plan. However, the Debtor's prepetition solicitation process must first be approved by this Court. For the reasons set forth herein, the Ad Hoc Group respectfully submits that the Debtor's solicitation procedures should not be approved and, as a result, the Debtor's plan should not be confirmed. Instead, a

---

[2] As used herein, "**Ad Hoc Group**" refers to the group of noteholders identified in the *Verified Statement of Davis Polk & Wardwell LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019* [ECF No. 55], as the membership thereof may change from time to time. All other capitalized terms used but not immediately defined herein shall have the meanings ascribed to them elsewhere herein, in the *Debtor's Motion for Entry of an Order (I) Scheduling a Combined Hearing to Consider the Adequacy of the Disclosure Statement and Confirmation of the Plan; (II) Approving the Form and Manner of Notice of the Combined Hearing; (III) Approving the Solicitation Procedures; (IV) Directing That a Meeting of Creditors Not Be Convened; and (V) Granting Related Relief* [ECF No. 19] (the "**Scheduling Motion**"), in the Declarations, in the Plan, or in the Disclosure Statement, as applicable.

statutory committee of unsecured creditors (a "**Creditors' Committee**") should be appointed to negotiate a chapter 11 plan that then gets voted on as part of a court-supervised chapter 11 process.

2.      The Ad Hoc Group's principal concern is that this is a traditional chapter 11 case masquerading as a prepack. First, the Debtor has not provided any evidence that it negotiated the Exchange Offer or Plan with any organized group of non-Insider noteholders. There is no negotiated plan support agreement as there would typically be in a prepack, and the record is conspicuously silent about which non-Insider impaired creditors, if any, the Debtor actually negotiated with. The Debtor has repeatedly refused to engage in negotiations with the Ad Hoc Group regarding the terms of the Plan. Perhaps most tellingly, to date, not a single supporting noteholder has made an appearance in this Chapter 11 Case to voice its support for the Debtor's proposed Plan.

3.      Less than 43%[3] (by amount) of the only impaired class even voted, an anomaly— and perhaps a record low turnout rate—for an alleged prepack. This highlights the absence of broad-based noteholder support for this Plan. The purpose of a prepack is to allow a debtor to negotiate a transaction with its creditors (almost always in accordance with a plan support agreement) prior to a chapter 11 filing and, in circumstances where the debtor has achieved a highly consensual plan, minimize the time and cost spent in chapter 11. Here the Debtor seeks the benefit of an expedited prepack process without the burden of actually negotiating to obtain the customary overwhelming creditor consent. The Ad Hoc Group is deeply concerned that if the

---

[3] This figure, as well as the figures relating to this Chapter 11 Case in the tables below, *exclude* the Mistabulated Votes which the Debtor, in the view of the Ad Hoc Group, inappropriately disqualified (the Ad Hoc Group holds Old Notes in an aggregate quantum equal to almost half of all votes tabulated by the Debtor). If one were to give franchise to the Mistabulated Votes and retabulate the votes, the participation figure would still be only $115,881,700, or 54.97% of the outstanding principal amount of Old Notes. Indeed, had the Debtor not improperly disenfranchised certain members of the Ad Hoc Group, the Plan would be facially unconfirmable due to lack of creditor support, for the reasons set forth herein. *See* 11 U.S.C. § 1129(a)(10).

Debtor's Plan is approved, the result will not only be a gross abuse of the prepack process in this case, but the opening of the floodgates for future abusive behavior by debtors that seek to utilize chapter 11 to impair creditors without subjecting themselves to the many creditor protections that are foundational to the chapter 11 process.

4.     To demonstrate just how severe an outlier this case is as compared to true prepack cases, the Ad Hoc Group would draw the Court's attention to the below table,[4] which shows the voting figures from the five cross-border prepacks that proposed counsel to the Debtor cited at the first-day hearing, *see* May 20, 2024 Hr'g Tr. [ECF No. 77] at 13:14–14:18, compared to the instant case. The difference is striking.

| Case | Claims Entitled to Vote | Voting Claims (% of Claims Entitled to Vote) | Accepting Claims (% of Voting Claims) | Plan Support Agreement |
|---|---|---|---|---|
| Credivalores | $210,800,000 | 42.82% | 81.25% | No |
| Latin America Power | $408,730,000 | 88.46% | 100% | Yes |
| Posadas | $199,900,000 | 100% | 100% | Yes |
| Automotores Gildemeister | $566,690,000 | 85.69% | 99.61% | Yes |
| Maxcom | $103,400,000 | 60.34% | 66.73% | No |
| Inversiones Alsacia | $464,000,000 | 82.67% | 100% | Yes |

5.     In fact, there is only one case cited by the Debtor that somewhat resembles the facts here. That case is *Maxcom*, where the debtors solicited votes on a "stapled" prepackaged chapter 11 plan that had been proposed by the debtors without any support or input from the noteholders they proposed to impair. After extending the voting deadline multiple times (due to insufficient

---

[4]  *In re Inversiones Latin America Power Ltda.*, No. 23-11891 (JPM) (Bankr. S.D.N.Y. Dec. 29, 2023) [ECF No. 67]; *In re Grupo Posadas S.A.B. de C.V.*, No. 21-11831 (SHL) (Bankr. S.D.N.Y. Oct. 26, 2021) [ECF No. 9]; *In re Automotores Gildemeister SpA*, No. 21-10685 (LGB) (Bankr. S.D.N.Y. May 26, 2021) [ECF No. 142]; *In re Maxcom USA Telecom, Inc. ("Maxcom")*, No. 19-23489 (RDD) (Bankr. S.D.N.Y. Sep. 11, 2019) [ECF No. 44]; *In re Inversiones Alsacia S.A.*, No. 14-12896 (MG) (Bankr. S.D.N.Y. Oct. 16, 2014) [ECF No. 18].

support), the debtors commenced their prepackaged chapter 11 cases with the 60.34% of turnout and 66.73% of support levels shown in the table above. An ad hoc group of noteholders holding over 35% of the notes objected to confirmation on multiple grounds, including lack of the company's and the dealer manager's good faith in soliciting votes on the plan, and sought designation of certain non-ad hoc group acceptances on such grounds. The *Maxcom* debtors ultimately negotiated with the ad hoc group and made significant economic improvements to the plan, leading to a consensual confirmation.

6. The lack of relative creditor support is even more striking by expanding the comparison pool. The below table[5] compares this Chapter 11 Case to each preceding prepackaged

---

[5] *In re ConvergeOne Holdings, Inc.*, No. 24-90194 (CML) (Bankr. S.D. Tex. May 14, 2024) [ECF No. 325]; *In re Gamida Cell Inc.*, No. 24-110003 (JKS) (Bankr. D. Del. May 13, 2024) [ECF No. 9]; *In re KidKraft, Inc. ("KidKraft")*, No. 24-80045-11 (MVL) (Bankr. N.D. Tex. May 10, 2024) [ECF No. 30]; *In re Airspan Networks Holdings Inc.*, No. 24-10621(TMH) (Bankr. D. Del. May 10, 2024) [ECF No. 121]; *In re CURO Grp. Holdings Corp.*, No. 24-90165 (MI) (Bankr. S.D. Tex. May 10, 2024) [ECF No. 327]; *In re View, Inc.*, No. 24-10692 (CTG) (Bankr. D. Del. May 8, 2024) [ECF No. 158]; *In re Appgate, Inc.*, No. 24-10956 (CTG) (Bankr. D. Del. May 6, 2024) [ECF No. 24]; *In re JOANN Inc.*, No. 24-10418 (CTG) (Bankr. D. Del. Apr. 16, 2024) [ECF No. 254]; *In re Charge Enter., Inc.*, No. 24-10349 (TMH) (Bankr. D. Del. Mar. 3, 2024) [ECF No. 13]; *In re Audacy Inc.*, No. 24-90004 (CML) (Bankr. S.D. Tex. Feb. 16, 2024) [ECF No. 270]; *In re PARTS iD, Inc.*, No. 23-12098 (LSS) (Bankr. D. Del. Jan. 26, 2024) [ECF No. 137]; *In re Pennsylvania Real Est. Inv. Tr.*, No. 23-11974 (KBO) (Bankr. D. Del. Jan. 12, 2024) [ECF No. 151]; *In re Strategic Materials, Inc.*, No. 23-90907 (CML) (Bankr. S.D. Tex. Dec. 4, 2023) [ECF No. 10]; *In re Air Methods Corp.*, No. 23-90886 (MI) (Bankr. S.D. Tex. Nov. 30, 2023) [ECF No. 282]; *In re Akumin Inc.*, No. 23-90827 (CML) (Bankr. S.D. Tex. Nov. 27, 2023) [ECF No. 234]; *In re OSG Holdings, Inc.*, No. 23-90799 (CML) (Bankr. S.D. Tex. Nov. 18, 2023) [ECF No. 153]; *In re RevitaLid Pharm. Corp. ("RevitaLid")*, No. 23-11704 (BLS) (Bankr. D. Del. Nov. 16, 2023) [ECF No. 111]; *In re Capstone Green Energy Corp.*, No. 23-11634 (LSS) (Bankr. D. Del. Nov. 2, 2023) [ECF No. 90]; *In re Sunlight Fin. Holdings Inc.*, No. 23-11794 (MFW) (Bankr. D. Del. Nov. 1, 2023) [ECF No. 42]; *In re Mallinckrodt plc*, No. 23-11258 (JTD) (Bankr. D. Del. Sep. 20, 2023) [ECF No. 296]; *In re Novation Companies, Inc.*, No. 23-11153 (JTD) (Bankr. D. Del. Aug. 28, 2023) [ECF No. 74]; *In re AeroCision Parent, LLC*, No. 23-11032 (KBO) (Bankr. D. Del. Aug. 21, 2023) [ECF No. 83]; *In re Venator Materials plc*, No. 23-90301 (CML) (Bankr. S.D. Tex. July 14, 2023) [ECF No. 299]; *In re Diebold Holding Co., LLC.*, No. 23-90602 (MI) (Bankr. S.D. Tex. July 5, 2023) [ECF No. 216]; *In re Lannett Co., Inc.*, No. 23-10559 (JKS) (Bankr. D. Del. June 7, 2023) [ECF No. 234]; *In re PacificCo Inc.*, No. 23-10620 (KB) (Bankr. D. Del. Apr. 18, 2023) [ECF No. 102]; *In re Quotient Ltd.*, No. 23-90003 (MI) (Bankr. S.D. Tex. Feb. 13, 2023) [ECF NO. 92]; *In re Rockley Photonics Holdings Ltd. ("Rockley")*, No. 23-10081 (LGB) (Bankr. S.D.N.Y. Jan. 23, 2023) [ECF No. 14]; *In re Nautical Sol., L.L.C.*, No. 23-90002 (CML) (Bankr. S.D. Tex. Jan. 9, 2023) [ECF No. 24]; *In re GTT Commc'n, Inc.*, No. 21-11880 (MEW) (Bankr. S.D.N.Y. Oct. 31, 2021) [ECF No. 19]; *In re Lumileds Holding B.V.*, No. 22-11155 (LGB) (Bankr. S.D.N.Y. Oct. 7, 2022) [ECF No. 161]; *In re Vewd Software USA, LLC ("Vewd")*, No. 21-12065 (MEW) (Bankr. S.D.N.Y. Dec. 16, 2021) [ECF No. 24].

chapter 11 case (a) commenced in this district after January 1, 2021 and (b) commenced in all U.S.

jurisdictions after January 1, 2023.

| Case | Claims Entitled to Vote | Voting Claims (% of Claims Entitled to Vote) | Accepting Claims (% of Voting Claims) | Plan Support Agreement |
|---|---|---|---|---|
| Credivalores | $210,800,000 | 42.82% | 81.25% | No |
| ConvergeOne | $1,674,000,000 | 93.71% | 90.6% | Yes |
| Gamida Cell | $79,429,066 | 100% | 100% | Yes |
| KidKraft | $146,944,000 | 100% | 100% | Yes |
| Airspan | $205,140,000 | 97.35% | 100% | Yes |
| CURO | $1,295,800,000 | 77.28% | 100% | Yes |
| View, Inc. | $274,366,000 | 89.95% | 100% | Yes |
| Appgate | $113,315,647 | 93.25% | 100% | Yes |
| JOANN | $1,273,874,863 | 93.72% | 100% | Yes |
| Charge Enterprises | $51,000,000 | 100% | 100% | Yes |
| Audacy | $1,852,541,670 | 87.14% | 100% | Yes |
| PARTS iD | $46,182,359 | 89.32% | 99.14% | Yes |
| PREIT | $726,984,655 | 100% | 100% | Yes |
| Strategic Materials | $376,534,077 | 92.2% | 100% | Yes |
| Air Methods | $1,790,817,833 | 95.98% | 100% | Yes |
| Akumin | $1,395,500,000 | 93.33% | 100% | Yes |
| OSG | $626,752,784 | 87.91% | 100% | Yes |
| RevitaLid | $80,082,689 | 100% | 100% | No[6] |
| Capstone | $56,953,058 | 100% | 100% | Yes |
| Sunlight Financial | $118,639,341 | 100% | 100% | Yes |
| Mallinckrodt | $3,512,098,138 | 85.91% | 98.2% | Yes |
| Novation | $97,804,338 | 64% | 100% | Yes |
| AeroCision | $129,714,625 | 100% | 100% | Yes |
| Venator | $972,933,407 | 87.5% | 99.67% | Yes |
| Diebold | $2,161,715,827 | 80.37% | 96.89% | Yes |
| Lannett | $589,100,000 | 94.26% | 100% | Yes |
| PacificCo | $334,465,702 | 98.46% | 99.91% | Yes |
| Quotient | $256,579,463 | 101.33% (sic) | 100% | Yes |
| Rockley | $119,958,988 | 100% | 100% | No |
| Nautical Solutions | $662,574,820 | 100% | 73.56% | Yes |
| GTT | $2,015,257,369 | 88.96% | 100% | Yes |
| Lumileds | $1,689,182,617 | 92.4% | 100% | Yes |

---

[6]  In *RevitaLid* and *Rockley*, while the debtors did not disclose the existence of an RSA, the plans were negotiated with and had the support of the impaired creditors.  For example, and in stark contrast to the Debtor's Plan, the plans in both *RevitaLid* and *Rockley* gave the supporting creditors customary consent rights over modifying the plan and waiving conditions precedent to effectiveness.  *RevitaLid*, No. 23-11704 (BLS) (Bankr. D. Del. Oct. 12, 2023) [ECF No. 15]; *Rockley*, No. 23-10081 (LGB) (Bankr. S.D.N.Y. Mar. 10, 2023) [ECF No. 133].

| Case | Claims Entitled to Vote | Voting Claims (% of Claims Entitled to Vote) | Accepting Claims (% of Voting Claims) | Plan Support Agreement |
|---|---|---|---|---|
| Vewd Software | $117,962,539 | 100% | 100% | Yes |

7.     The Ad Hoc Group does not believe that the facts of this case support approval of any prepetition solicitation process.  However, if the Court is inclined to consider the Debtor's proposed prepetition solicitation process, it should not ignore that at least $27,609,000 of Old Notes—an amount equal to over 30% of all votes tabulated by the Debtor and over 60% of the Old Notes held by Ad Hoc Group members as of the proposed Voting Record Date—were improperly disqualified or mistabulated.  These are votes of beneficial holders (i.e., the parties from whom the Debtor is required to solicit votes) that the Debtor *timely* received (albeit, in some cases, directly from the beneficial holders themselves) and if properly reflected as rejecting votes would cause the Plan to fail.

8.     What has become extremely clear both before and during this Chapter 11 Case is that this Debtor adamantly refuses to subject this Plan to a test of whether noteholders truly support it.  The Debtor is controlled by prepetition equity (whose interests are riding through), and its board of directors—a majority of whom are appointed by (and are employed by) shareholders, *see* ECF No. 78, Ex. A—approved the commencement of the Chapter 11 Case, apparently without the benefit of a separate committee of independent fiduciaries tasked with protecting the interests of the Company and all other stakeholders. The Debtor is resisting the appointment of a Creditor's Committee, has refused to negotiate the terms of the Plan with the Ad Hoc Group, and has refused to resolicit votes in chapter 11.  This is not a surprise, as it is highly unlikely that the Debtor would obtain the requisite support of the impaired noteholders if it subjected its Plan to a true vote, as required by the Bankruptcy Code.

9.      Under this Plan, noteholders are being asked to take a 25% discount and accept an interest rate lower than that of the Old Notes,[7] along with a four-year maturity extension and the loss of a $9.3 million cash interest payment, all while leaving *pari passu* debt (including trade debt and debt held by Insiders) and equity unimpaired.  First Day Decl., ¶¶ 22, 25, 50.  While the New Notes will purportedly be secured, the Plan and Disclosure Statement fail to adequately describe the Collateral, provide a valuation thereof, or disclose the rights that holders of New Notes will have with respect thereto (e.g., information rights, rights vis-à-vis other secured creditors).  In addition to the inadequate disclosures in the Disclosure Statement, the Plan was solicited without financial projections to demonstrate the Plan's feasibility or a Liquidation Analysis to establish compliance with the Best Interests Test.[8]  The New Notes also are based on an exchange rate of $4,000 COP to $1.00 USD, Disclosure Statement, p. 20, but this rate has fluctuated wildly since the commencement of Plan Solicitation ($3,915.76 to $1.00 USD on March 7, 2024, to $4,148 to $1.00 USD as of yesterday).  The Debtor has not disclosed how the peso's depreciation may affect its operations or the Plan.

10.      To protect the interests of *all* noteholders, a Creditors' Committee must be appointed in this Chapter 11 Case, to ensure that impaired creditors are appropriately represented before their economic and statutory rights are impaired.  Here, the Debtor should be compelled to do post-petition what it failed to do prepetition—actually engage, at arm's length and in good faith,

---

[7] The Old Notes' interest rate is 8.875%.  The New Notes, if issued, will have an initial interest rate of 4.00%, which will step up to 5.00% in February 2025, and a final step up to 11.00% in August 2026.  Disclosure Statement, p. 20.  This yields an average interest rate of 8.50%.

[8] While the Plan Supplement, filed on June 14, 2024 [ECF No. 78], contained a Liquidation Analysis, that does not rectify the inadequacy of the Debtor's disclosures made at the time of solicitation, as further set forth herein.  Even worse, the Plan Supplement did not contain the Projections, notwithstanding the Disclosure Statement's commitment to the contrary.  *See* Disclosure Statement, p. 121 (informing impaired creditors that the Plan Supplement will contain financial Projections establishing the Debtor's viability and the Plan's feasibility, and that "[the Debtors], together with [its] advisors, prepared the Projections in good faith").  To this day, the record before the Court is devoid of evidence establishing the Plan's feasibility.  *See* 11 U.S.C. § 1129(a)(11).

with the very creditors it proposes to impair regarding the terms of a value-maximizing chapter 11 plan that benefits all non-Insider parties in interest. After all, the distribution of a chapter 11 plan is akin to a debtor's "invitation to negotiate." *In re Barney's, Inc.*, 201 B.R. 703, 708 (Bankr. S.D.N.Y. 1996); *see also In re Indianapolis Downs, LLC.*, 486 B.R. 286, 297 (Bankr. D. Del. 2013) ("[T]he Court observes that the filing of a Chapter 11 petition is an invitation to negotiate."). The best way to do this is through the appointment of a Creditors' Committee with fiduciary duties to such creditors.

11. The U.S. Trustee has indicated that it has received sufficient support to form a Creditors' Committee. *See* June 13, 2024 Hr'g Tr. [ECF No. 81] at 6:14–15, and the facts here clearly dictate the appropriateness of compliance with the Bankruptcy Code's requirement for the U.S. Trustee to appoint a Creditors' Committee. 11 U.S.C. § 1102(a)(1) ("[A]s soon as practicable after the order for relief under chapter 11 of this title, the United States trustee *shall* appoint a committee of creditors holding unsecured claims . . . ."); *see also* 11 U.S.C. § 341(a) ("Within a reasonable time after the order for relief in a case under this title, the United States trustee *shall* convene and preside at a meeting of creditors."). There is simply no basis in this case to deviate from the express language of the Bankruptcy Code, and a Creditors' Committee should be appointed.

## Background

### I. Timeline

12. On February 7, 2024, the Debtor missed—and still has not paid—a scheduled interest payment on the Old Notes in the amount of $9,354,250. That same day, the Debtor disclosed through a press release its intention to launch the Exchange Offer for the Old Notes.[9] In

---

[9] https://www.credivalores.com/sites/default/files/2024-02/Version%20Ingles_0.pdf.

this press release, the Debtor framed the terms of the Exchange Offer as the result of "agreements [reached] with its main noteholders." The Debtor claimed to have "the full support of the Ad Hoc Committee of Noteholders,"[10] and that "[t]his development . . . underscores the collaborative spirit between the company and its investors."

13. On March 7, 2024, the Debtor launched the Exchange Offer and commenced solicitation on the Plan. ECF No. 19 ¶ 9. The Debtor issued a press release disclosing the launch of the Exchange Offer the next day.[11] In this press release, too, the Debtor disclosed agreements with an undisclosed "Ad-Hoc Committee" and that the Exchange Offer, as of February 7, "had the support of *a majority* of the holders of the [Old Notes]." Holders of Old Notes were sent a third disclosure (dated March 7, 2024), which appears to not have been otherwise published, that alluded to the Plan and a potential chapter 11 case, and again disclosed "significant" noteholder support:

> Credivalores has had discussions with several holders of Old Notes who assisted in developing the proposal and who believe the transaction is fair and reasonable in light of the current market environment and given Credivalores's circumstances and consider this exchange offer a favorable outcome. Holders of a significant percentage of the aggregate principal amount of our Old Notes have already indicated that they will vote in favor of the transaction.

Graulich Decl., Ex. A. Holders of Old Notes were also sent a Notice of Commencement, which disclosed the Debtor's intent to file for chapter 11 on or about April 5, 2024 (assuming it received the requisite support), with the Confirmation Hearing to occur on or about May 15, 2024. Graulich

---

[10] For the avoidance of doubt, this "committee" is not the Ad Hoc Group and the Ad Hoc Group has no knowledge of the identity of members of this alleged committee. The undersigned counsel understands that one Ad Hoc Group member did receive proposals from the Debtor containing terms similar to those of the Plan in early 2024. While such holder was in contact with the Debtor's Dealer Manager, the "negotiations" were essentially unilateral, as this holder's input with respect to the economics of the Exchange Offer and Plan were not accepted. Ultimately, this holder informed the Debtor's Dealer Manager in mid-February that it did not support the Debtor's proposed transaction, and such holder ultimately voted to reject the Plan.

[11] https://www.credivalores.com.co/sites/default/files/2024-03/Press%20release%20ENG_Bonds%20exchange%202024_2_Credivalores%2008032024.pdf.

Decl., Ex. B.  The Disclosure Statement that was included in the Solicitation Packages again disclosed that "[c]ertain noteholders holding over 40% the aggregate principal amount of the Old Notes outstanding have already indicated that they will vote in favor of the Exchange Offer." Disclosure Statement, p. 12.

14.     In the weeks leading up to the April 3, 2024 Voting Deadline, several Ad Hoc Group members encountered difficulties and irregularities when trying to vote on the Plan in accordance with the Debtor's proposed Solicitation Procedures.  *See infra* ¶ 31.  The Easter holidays fell during the week preceding the proposed Voting Deadline, which only exacerbated these difficulties.[12]

15.     On April 5, the Debtor announced that the out-of-court Exchange Offer failed, but the "previously announced" chapter 11 Plan was "overwhelmingly approved," and therefore the Company would file the Plan with the Court "as soon as practicable."[13]  That same day, the Debtor's board of directors approved the commencement of the Chapter 11 Case.  ECF No. 1.

16.     Almost six weeks later,[14] the Debtor filed a voluntary petition for relief under the Bankruptcy Code on May 16, 2024.  Graulich Decl., Ex. B.  The Debtor filed the UCC Motion on the Petition Date.  Prior to the first-day hearing, the Debtor granted the U.S. Trustee's request to adjourn consideration of the UCC Motion.  ECF No. 45.  The Debtor also granted the Ad Hoc Group's request to adjourn consideration of the Solicitation Procedures until the Confirmation

---

[12] Many Ad Hoc Group members (and perhaps more importantly, their custodians) are based in Europe, where Easter holidays formally began as early as March 28 and ended as late as April 1.

[13] https://www.credivalores.com.co/sites/default/files/2024-04/Credivalores%20-%20Press%20Release.pdf.  While this press release is dated April 4, it was released on April 5.

[14] No explanation has been given for this delay, nor is it known whether the Debtor's board reconsidered commencing the Chapter 11 Case for any changes in circumstances that may have occurred since its April 5 meeting and the Petition Date.

Hearing, to allow the Ad Hoc Group to work with the Debtor and U.S. Trustee to audit the Voting Report.  *See* ECF No. 28.  However, the Debtor did not engage in discussions on the economics of the Plan.

## II.    The Voting Report

17.    The board resolutions approving the commencement of the Chapter 11 Case stated that "approximately 81.25% of the *total outstanding* principal amount of Old [Notes] voted in favor of accepting the Plan."[15]  ECF No. 1; *see also* First Day Decl., ¶ 25 ("The Plan (defined below), which has the support of the majority of the holders of the Debtor's funded indebtedness . . . .").  Similarly, the Debtor sent a "cover letter" to hundreds of stakeholders after the Petition Date in which it disclosed an agreement with "the majority of our US noteholders."  ECF No. 31, Ex. A.  The Solicitation Agent's Voting Report clearly contradicts these assertions.  According to the Voting Report, the following votes were tabulated:

|  | Number Accepting | Number Rejecting | Amount Accepting | Amount Rejecting |
|---|---|---|---|---|
| Claims | 123 | 5 | $73,351,079.65 | $16,921,620.35 |
| % of Voting Claims | 96.09% | 3.91% | 81.25% | 18.75% |

Voting Report, Ex. A.

18.    According to the Debtor, only 42.82% of the Old Notes—the only debt to be impaired under the proposed Plan—had their votes on the Plan tabulated at all (and only 34.8% of all outstanding Old Notes voted in favor), in stark contrast to the "overwhelming support" the Debtor has been trumpeting to the market since February.  And, the Debtor would only have acceptances from two-thirds in amount of voting Old Notes by improperly disqualifying votes on

---

[15]  This quote is from the board resolutions as amended on April 15, 2024.  The original resolutions, dated April 5, 2024, stated that "more than US [$]98,467,079.65 in amount and 124 in number of holders who cast ballots, constituting approximately 96.12% of the Old [Notes] that actually voted on the Plan (and approximately 47% of the total outstanding principal amount of Old [Notes]), voted in favor of accepting the Plan."  ECF No. 1.

account of over $25.6 million of Old Notes. *See* Voting Report, Ex. B. These Mistabulated Votes are the fulcrum: if the Typo Votes, Beneficial Holder Votes, and Misrepresented Votes are tabulated properly, as explained below, the Plan fails.

**Argument**

**I.    The UCC Motion Should Be Denied**

19.    Under the facts of this case, the U.S. Trustee must appoint a Creditors' Committee to represent the interests of all noteholders whose claims are to be impaired by the Plan and, once appointed, a Creditors' Committee can fully and properly investigate whether the proposed Plan complies with the Bankruptcy Code and is otherwise in the best interests of the estate.

20.    Creditors' Committees serve a fundamental purpose in chapter 11 cases, because their members have fiduciary duties to all unsecured creditors. *See In re Signature Apparel Grp. LLC*, 577 B.R. 54, 89 (Bankr. S.D.N.Y. 2017). They are tasked with honestly and independently representing the interests of unsecured creditors, especially those with the resources to appear in a chapter 11 case. *Id.* For this reason, the Bankruptcy Code explicitly *requires* the U.S. Trustee to appoint Creditors' Committees in chapter 11 cases. 11 U.S.C. § 1102(a)(1) ("[T]he U.S. Trustee *shall* appoint" a Creditors' Committee). A statute's plain meaning controls, and the Bankruptcy Code clearly requires the U.S. Trustee to appoint a Creditors' Committee. *See, e.g.*, *Truck Ins. Exch. v. Kaiser Gypsum Co., Inc.*, 144 S. Ct. 1414 (2024) (interpreting the Bankruptcy Code based on the statute's "plain meaning"); *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017) (holding that courts must follow the plain meaning of the Bankruptcy Code); *Law v. Siegel*, 571 U.S. 415 (2014) (holding that it is not for the courts to alter the balance of the Code); *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235 (1989) (holding that where the Code's language is clear, the sole function of the courts is to enforce it according to its terms); *United Sav. Ass'n of Tex. v. Timbers*

12

*of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988) (holding that legislative history and potential inconsistencies in the Code are not sufficient to overcome the plain meaning of the text).

21.     Of course, this does not mean that there needs to be a Creditors' Committee appointed in every case, especially in consensual prepackaged chapter 11 cases where a Creditors' Committee may be duplicative of the negotiations that have previously occurred.  The U.S. Trustee may also abstain from appointing Creditors' Committees where it would not be practical to appoint one, such as where no impaired creditors are willing to serve on it.  *See* 7 Collier on Bankruptcy ¶ 1102.02 (16th 2024).  These are the types of cases that underlie the recently amended Guidelines governing prepackaged chapter 11 cases in this district which allow debtors, under the right facts and in a true prepackaged chapter 11 case, to file a first-day motion *requesting* the relief sought in the UCC Motion.  Guidelines, Part VI.C.5.  And of course, "[t]he Guidelines are advisory only," they do not purport to override the Bankruptcy Code (nor could they), and "the Court retains the power to depart from [the Guidelines]."  *Id.*, Part I.

22.     While the Guideline allows the debtor to seek an order that the U.S. Trustee not convene a meeting of creditors, *id.*, Part VI.C.5, a court may only grant such relief if the debtor demonstrates that cause exists to dispense with such a meeting.  11 U.S.C. § 341(e).  A debtor should not be able to meet its burden of demonstrating cause if the "plan formulation and solicitation [were] flawed" or where "factual issues or irregularities should be explored."  3 Collier on Bankruptcy ¶ 341.05A (16th 2024).  Based upon the facts of this case, the Debtor cannot demonstrate sufficient cause to dispense with a meeting of creditors (relief contemplated by the Bankruptcy Code) and, by extension, dispensing with the appointment of a Creditors' Committee (relief not explicitly contemplated by the Bankruptcy Code).

23.     Fundamentally, the Bankruptcy Code provides debtors with two choices.  As is their right, they can choose to forgo building broad-based support for a restructuring transaction prepetition and instead negotiate with their impaired creditors in bankruptcy.  In such a bankruptcy case, unsecured creditors are entitled to and receive the protections afforded by the Bankruptcy Code, including the right to be represented by an independent Creditors' Committee. Alternatively, debtors can work diligently and in good faith to build broad-based support prior to the petition date, and then come to the bankruptcy court for approval, which would likely be a *fait accompli* given the consensus obtained.  In such a prepackaged bankruptcy, the impaired creditors are essentially co-plan proponents and do not require the protection of a Creditors' Committee.

24.     Here, the Debtor took neither approach.  It failed to achieve a consensual, broadly supported Plan prepetition.  Over 65% of all the claims to be impaired by the Plan either voted to reject the Plan, abstained from voting, or were disqualified.  This is not a prepackaged bankruptcy, and disenfranchised and ignored impaired noteholders have expressed significant interest in serving on a Creditors' Committee.  *See* June 13, 2024 Hr'g Tr. [ECF No. 81] at 6:14–15.  The Debtor's attempts to short-cut the post-petition path by rushing confirmation and strip away the statutory rights afforded to impaired creditors should not be countenanced.

## II.     The Debtor's Disclosure Statement and Solicitation Procedures Should Not Be Approved.

25.     Bankruptcy Rule 3017(d) identifies the materials that must be provided to holders of claims or interests for purposes of soliciting votes and providing adequate notice of the hearing on confirmation of a plan; these include the disclosure statement, the plan, notice of the voting and objection deadlines, and a ballot.  *See* Fed. R. Bankr. P. 3017(d).  Bankruptcy Rule 3018(e) mandates that the Court "consider the procedures for transmitting the documents and information required by [Bankruptcy Rule 3017(d)] to beneficial holders of stock, bonds, debentures, notes,

and other securities, determine the adequacy of the procedures, and enter any orders the court deems appropriate." Fed. R. Bankr. P. 3017(e). In a prepackaged bankruptcy case, "[a]s a 'Monday morning quarterback,' the Court must review the proposed disclosure statement and the completed solicitation process to verify that substantially all of the creditors received adequate notice of the plan and disclosure statement and had an opportunity to vote upon and object to the plan." *In re City of Colorado Springs Spring Creek Gen. Imp. Dist. ("Colorado Springs")*, 177 B.R. 684, 691 (Bankr. D. Colo. 1995).

A. <u>The Debtor's Disclosure Was Misleading and Inadequate and Should Not Be Approved</u>

26. The Debtor's prepetition disclosures (including the Disclosure Statement) were inadequate. Specifically, the Ad Hoc Group submits that:

- The Disclosure Statement does not disclose how the Plan was formulated or identify who it was formulated with.

- The Ad Hoc Group believes that a single noteholder holds between $40–$50 million of Old Notes, and that such holder supports the Plan. The existence of this holder, the role it played in formulating and soliciting votes on the Plan (if any), and what it is receiving in exchange for its support (if anything)[16] are not disclosed.

- The Disclosure Statement discloses that holders of over 40% of the outstanding Old Notes intended to vote in favor of the Plan, but this support never materialized, since less than 35% of the outstanding Old Notes voted in favor of the Plan.

- On numerous occasions prior to and concurrent with the commencement of Plan Solicitation, the Debtor disclosed that the transactions contemplated by the Plan and Exchange Offer had the support of a significant constituency of impaired creditors, the so-called "Ad Hoc Committee of Noteholders," without ever identifying such holders. *See supra* ¶¶ 12–13. The Ad Hoc Group is the only "committee" to identify themselves in this Chapter 11 Case pursuant to Bankruptcy Rule 2019.

---

[16] If this holder is receiving consideration (economic or otherwise) different than the other holders of Old Notes, the Plan may violate section 1123(a)(4) of the Bankruptcy Code.

- The Disclosure Statement did not include a Liquidation Analysis (to demonstrate that the Plan complies with section 1129(a)(7) of the Bankruptcy Code) or financial Projections (to demonstrate the Plan's feasibility).[17]

- The economics of the Plan depend heavily on the exchange rate between the U.S. dollar and the Colombian peso. This rate has changed materially and adversely since Plan Solicitation, and there is no evidence to support that the transactions contemplated by the Plan are still feasible given the current rate.

- The New Notes proposed by the Plan will be secured by various of the Debtor's loan portfolios, but the Disclosure Statement is devoid of information with respect to the Collateral (e.g., priority of the liens, whether the Debtor has received third-party consents to perfect such liens, underlying data with respect to the loans which will serve as Collateral, how Collateral will be replenished).

27.     The Ad Hoc Group submits that the Debtor's disclosures (including the Disclosure Statement) were inadequate at best and misleading at worst, and should not be approved.

B.     <u>The Debtor's Solicitation Procedures Did Not Appropriately Capture the Votes of the Only Impaired Class of Creditors and Should Not Be Approved</u>

28.     This Chapter 11 case is simple in that there is only one class of impaired creditors—namely the beneficial holders of the Old Notes—whose votes matter. Unfortunately, the Debtor's prepetition solicitation process simply did not adequately capture the votes of that impaired class.

29.     Securities such as notes circulate amongst financial institutions that regularly trade such securities. Clearinghouses, such as DTC, "serve as agents to facilitate the transfer of securities for the accounts of their institutional participants; when the securities are traded by and among those participants, the transfers are handled as book entries, eliminating the need for cancelling and reissuing the certificates representing the securities themselves." *In re Southland Corp.*, 124 B.R. 211, 221 (Bankr. N.D. Tex. 1991). However, the notes held by such

---

[17] While the Debtor filed such documents on June 14, 2024 [ECF No. 78], these materials are not just a *confirmation* requirement but are also a *disclosure* requirement. *In re Malek*, 35 B.R. 443 (Bankr. E.D. Mich. 1983) ("The Debtor is required, at a minimum, to provide a disclosure statement containing [a] liquidation analysis [and] the projection of operations subsequent to confirmation so that the Court may determine the feasibility of the plan."); *see also In re Avianca Holdings S.A.*, 632 B.R. 124 (Bankr. S.D.N.Y. 2021) (approving a disclosure statement only after the debtor amended it to include a liquidation analysis and financial projections). The absence of these materials in the Solicitation Packages prevents approval of the Debtor's disclosures.

clearinghouses are often beneficially held, not for the clearinghouse itself, but for other market participants, who themselves are Nominees holding securities for the benefit of their own customers even further down the custodial chain. *Id.* "The person or entity ultimately entitled to the benefits of ownership of the security, whether the participant or a participant's customer, is known as the 'beneficial owner' of the security." *Id.*

30.     A debtor must solicit votes from beneficial owners, irrespective of whether they hold their claims through Nominees who may be the actual record holders. *See infra* ¶ 47.  Indeed, in *In re Southland Corp.*, the bankruptcy court held that beneficial holders' due process rights were violated when their nominees provided a window to vote on a prepackaged chapter 11 plan of just eight *business* days, and withheld approval of proposed solicitation procedures on such grounds. 124 B.R. at 227 (also concluding that the chaos caused by complex ballots and confusing solicitation procedures was grounds to withhold approval of a prepetition solicitation process). Similarly, low voter turnout can be grounds for not sanctioning a prepetition solicitation process. *Colorado Springs*, 177 B.R. at 692 (requiring a chapter 9 debtor to resolicit votes when there was a "potentially significant number of non-voting noteholders" and there were general ambiguities in the tabulation report).

31.     As set forth herein, several beneficial holders encountered numerous—and, in some cases, insurmountable—difficulties when trying to vote their claims through their Nominees in accordance with the proposed Solicitation Procedures.  For example, upon information and belief:

- Multiple holders may not have been given the ability by their Nominees to vote on the Plan (or to opt out of the Plan releases), but only to participate in the Exchange Offer.

- At least one Nominee gave its holder options that did not conform with the Ballots. *See* First Geneva Decl., Ex. A.

- At least one Nominee told its downstream custodian(s) and beneficial holder(s) that a voting deadline passed as early as March 21, 2024.  *See id.*

- At least three holders timely instructed their custodians to vote against the Plan, but the Debtor apparently received Ballots from the Nominees reflecting affirmative votes on account of such beneficial holders. *See, e.g.*, *id.*

- At least one custodian may have given its beneficial holders a mere seven *calendar* days to vote on the Plan, a period that included Holy Week and the Easter holidays, bank holidays in Europe.

32. Additionally, based solely on the work that the Ad Hoc Group has undertaken with respect to the votes of its own members, it appears that there are numerous instances where the intent of the beneficial holder was not ultimately reflected in the Debtor's tabulation. It is the Ad Hoc Group's understanding that the Debtor does not even disagree that this is the case. Rather, the Debtor argues that the clearly demonstrated intent of the beneficial holders should be disregarded as such votes failed certain technical requirements under the Debtor's Solicitation Procedures—procedures that, of course, have not been approved by the Court.

33. Specifically, the Ad Hoc Group has identified three categories of votes that were improperly disqualified. There may well be similar issues with respect to votes cast by noteholders outside of the Ad Hoc Group. As outlined in more detail below, even if only the votes that the Ad Hoc Group has identified are properly tabulated as rejecting votes, the Debtor's Plan simply does not have the two-thirds in amount of Old Notes required for confirmation under the Bankruptcy Code.

|  | **Voting Report** | **Proper Tabulation** |
|---|---|---|
| Mistabulated Votes | n/a | $27,609,000 |
| Total voting Old Notes | $90,272,000 | $115,881,700[18] |
| Total accepting Old Notes | $73,351,079.65 | $71,351,079.65 |
| Total rejecting Old Notes | $16,921,620.35 | $44,530,620.35 |
| Accepting / rejecting | 81.25% / 18.75% | 61.57% / 38.43% |

---

[18] $115,881,700 is 54.97% of all outstanding Old Notes, which would be extremely low voter turnout for a prepackaged bankruptcy, perhaps historically so. *See supra* ¶¶ 4, 6.

(i)     Typo Votes[19]

34.     The first category of improperly disqualified votes comprises Ballots BR001.019 and BR001.020 (the "**Typo Votes**"), equaling $10,832,000 in total, which come from a single Master Ballot submitted on behalf of Moneda, a member of the Ad Hoc Group.  Graulich Decl., Exhibit H.  As set forth in the Voting Report, the Typo Votes were rejections of the Plan (in accordance with Moneda's intent), were submitted prior to the proposed Voting Deadline, and were submitted in accordance with the Debtor's proposed Solicitation Procedures.  However, the Typo Votes were disqualified because, through no fault of Moneda's, the underlying Master Ballot listed the four-digit DTC participant identification number[20] of a Nominee who did not appear on DTC's position report for the Old Notes as of the proposed Voting Record Date.  *Id.*

35.     Moneda held its position on the proposed Voting Record Date; indeed, it held most of its position since August 2023, seven months prior to the proposed Voting Record Date. Moneda Decl., Ex. A.  Moneda instructed its proxy to reject the Plan, and while the proxy ensured that a rejection was timely submitted on Moneda's behalf in accordance with the Debtor's proposed Solicitation Procedures, unbeknownst to Moneda until it saw the Voting Report, a simple typo in the custodial chain caused the incorrect four-digit DTC participant identification number to be inadvertently included on the Master Ballot submitted for Moneda.  Graulich Decl., Ex. H. The Ad Hoc Group has not determined where in the custodial chain this typographic error occurred.   The Typo Votes otherwise complied  with  the  Debtor's proposed  Solicitation Procedures.  Simply stated, Moneda—a beneficial holder of the Debtor's notes long before the

---

[19]  For ease of reference, certain votes are identified herein by using the ballot number ascribed to such votes in the first column of Exhibit B to the Voting Report.

[20]  Each DTC Nominee has its own unique four-digit identification number used by DTC.  *See* https://www.dtcc.com/client-center/dtc-directories.

Record Date—has been disenfranchised by an error in the custodial chain (*i.e.,* someone—not Moneda—simply put the wrong DTC participant number on the Master Ballot). Shortly after the commencement of this Chapter 11 Case, the Ad Hoc Group provided the Debtor's proposed counsel with evidence that Moneda is a beneficial holder as of the Voting Record Date. To date, the Debtor has failed to correct the Voting Report. There is simply no basis for this error to remain uncorrected in the face of the indisputable proof that Moneda was, in fact, the beneficial holder on the Voting Record Date. Moneda Decl., Ex. A.

*(ii)    Beneficial Holder Votes*

36.     The second category of improperly rejected votes arise from votes cast by funds and/or accounts, or subsidiaries of such funds and/or accounts, managed, advised, or controlled by A3E Capital SICAV p.l.c. ("**A3E**"), Absalon Capital A/S and Formuepleje A/S (together, "**Absalon**"), Bank Julius Baer ("**Julius Baer**"), and Vontobel Holding AG ("**Vontobel**"), each of whom experienced at least certain of the voting difficulties and impediments described in paragraph 31 hereof.

37.     Accordingly, each emailed timely Ballots (the "**Beneficial Holder Votes**") directly to the Solicitation Agent, the Debtor's proposed counsel, Baker & McKenzie LLP, and the Debtor's Dealer Manager, BCP Securities, Inc. Graulich Decl. Ex. D–G. These emailed ballots gave the Debtor and its advisors actual notice that noteholders experienced difficulties when trying to vote their Old Notes through their respective Nominee. Importantly, the Beneficial Holder Votes clearly indicated that the holder was voting to reject the Plan and opting out of the releases. Each of these emails included completed Beneficial Ballots, using the exact same form included in the Solicitation Packages.

38.     These Beneficial Holder Votes were pursuant to the following ballot numbers in the following amounts:

|  | **Ballot No.** | **Old Notes** |
|---|---|---|
| A3E | BB001 | $1,500,000 |
| Absalon | BB007 and BB008 | $4,000,000 |
| Julius Baer | BB004 | $3,500,000 |
| Vontobel | BB002 | $5,777,000 |
|  | **Total:** | **$14,777,000** |

Graulich Decl., Ex. D–G.  The Solicitation Agent disqualified these Beneficial Holder Votes due to purported "improper delivery."

### (iii)    Misrepresented Votes

39.    The third category of improperly rejected votes are on account of Master Ballot MB002, which included 21 votes for $16,184,000 of Old Notes and purports to vote all such Old Notes to accept the Plan.[21]  Graulich Decl., Ex. C.  Three members of the Ad Hoc Group are included on Master Ballot MB002: First Geneva, Julius Baer, and Vontobel.  Upon information and belief, each of these institutions instructed their Nominees to vote against the Plan, and yet Master Ballot MB002 reflects that the Solicitation Agent received affirmative votes.

40.    The case of First Geneva is instructive.  Unlike several other noteholders, First Geneva did not encounter any difficulties in submitting its vote through its DTC custodian, so did not directly send a Beneficial Holder Vote.  First Geneva instructed its custodian to vote its $2 million of Old Notes to reject the Plan.  First Geneva Decl., Ex. A.  Yet, Master Ballot 002 purports to accept the Plan on First Geneva's behalf.  To be clear, the Ad Hoc Group is not suggesting that the Debtor intentionally miscounted votes; but it is stating that beneficial holders' true (and provable) intention must trump any administrative process.  Votes of beneficial holders against the Plan that were mistakenly communicated to the Debtor as acceptances are referred to herein as the

---

[21]  The Solicitation Agent disqualified two of these votes (MB002.11 and MB002.12, totaling $200,000 each) for being duplicative of a tabulated vote. The Ad Hoc Group believes that, except as set forth herein, none of its members' Old Notes appear on Master Ballot MB002 and accordingly cannot conclude whether any of the other beneficial holders listed thereon also voted to reject the Plan.

"**Misrepresented Votes**" (and, together with the Typo Votes and Beneficial Holder Votes, the "**Mistabulated Votes**").[22]

41.     Importantly, the Debtor has known that the votes of at least Julius Baer and Vontobel are from beneficial holders, as that is clear from the Voting Report itself.  As stated above, Master Ballot MB002 somehow reflects votes in favor of the Plan, notwithstanding those holders' instructions to the contrary.  Consistent with their intention to vote against the Plan, Julius Baer and Vontobel caused their Beneficial Holder Votes to be timely delivered to the Debtor.  According to the Voting Report, the Solicitation Agent disqualified Julius Baer's and Vontobel's Beneficial Holder Votes, due to purported "improper delivery," and their respective portions of Master Ballot MB002, due to the inconsistency with the Beneficial Holder Votes.  So, the Debtor and Solicitation Agent knew of both Julius Baer and Vontobel and of their true intent, since they used the rejecting Beneficial Holder Votes to cancel out the purported acceptances included in Master Ballot 002 on grounds of inconsistency.  But it is insufficient that Beneficial Holder Vote simply cancel out the erroneous Master Ballot; they must be affirmatively counted.  Correctly counting just the ballots of Julius Baer, Vontobel, and Moneda would cause the Plan to fail, even without regard to all the other Mistabulated Votes.

42.     The Debtor's continued rejection of the Mistabulated Votes demonstrates the insufficiency of the Debtor's proposed Solicitation Procedures and the need for the Debtor to resolicit votes in this Chapter 11 Case, with ample notice to creditors and oversight from the Court

---

[22]  While both Julius Baer and Vontobel experienced difficulties when voting through their custodians, and therefore submitted Beneficial Holder Votes, the custodians ultimately accepted their rejection votes.  These votes ended up on Master Ballot MB002 *notwithstanding that Julius Baer and Vontobel instructed their custodians to reject the Plan*, just the same as First Geneva.  According to the Voting Report, the Solicitation Agent disqualified Julius Baer's and Vontobel's Beneficial Holder Votes, due to purported "improper delivery," and their respective portions of Master Ballot MB002, due to the inconsistency with the Beneficial Holder Votes.  So, the Debtor and Solicitation Agent knew Julius Baer's and Vontobel's true intent, since they used the rejecting Beneficial Holder Votes to cancel out the purported acceptances included in Master Ballot 002 on grounds of inconsistency.

and hopefully a Creditors' Committee, to ensure that the intent of the beneficial holders of the Old Notes who are being impaired under the Plan is properly reflected.

*(iv)*     *Third-Party Releases*

43.     Finally, the Debtor's improper disenfranchisement of the holders who submitted the Mistabulated Votes cannot force such holders to grant the third-party releases. The Debtor contends that the Plan's third-party release provisions are consensual. ECF No. 82 ¶¶ 77–79. The Ballots imply that a noteholder must opt in to be a Releasing Party under the Plan. However, the Plan's definition of "Releasing Party" includes accepting noteholders and abstaining noteholders, indicating that, by default, the Plan forces the impaired noteholders to grant the releases unless they expressly opt out. *See* Plan, Art. 1.1.74.

44.     As set forth herein, First Geneva's Misrepresented Votes are currently tabulated as acceptances (notwithstanding that the Nominee opted out of the third-party releases on behalf of all the noteholders on whose behalf it submitted Master Ballot 002). Presumably, then, the Debtor purports to force First Geneva to grant the third-party releases. Furthermore, while abstaining noteholders are deemed by the Plan to grant the third-party releases, it is unclear whether the Plan proposes to treat disqualified votes, such as the Mistabulated Votes, as being tantamount to abstentions. Out of an abundance of caution, the Ad Hoc Group submits that each holder who submitted a Mistabulated Vote expressly informed the Debtor that it was opting out of being a Releasing Party, and therefore such holders are not Releasing Parties.

## III.     The Voting Motion Should Be Granted

45.     To the extent that the Court is inclined to consider the Debtor's Solicitation Procedures, then the Ad Hoc Group respectfully moves that the Typo Votes and Misrepresented Votes should be deemed tabulated as rejections, in accordance with the beneficial holders' intent.

46.     The members of the Ad Hoc Group clearly made their intentions known to the Debtor in the week preceding the proposed Voting Deadline and over six weeks before the commencement of this Chapter 11 Case.  For the reasons set forth herein, the Ad Hoc Group filed the Voting Motion to respectfully request that the Court (a) correct the Typo Votes, (b) allow the Beneficial Holder Votes, and (c) change Master Ballot 002 to accurately reflect First Geneva's intent when it properly submitted the Misrepresented Votes.

47.     The Mistabulated Votes must be retabulated in accordance with the intent of the respective beneficial holders.  *In re Pioneer Fin. Corp.*, 246 B.R. 626 (Bankr. D. Nev. 2000).  "The ability to vote on a reorganization plan is one of the most sacred entitlements that a creditor has in a chapter 11 case [and] should not be denied except for highly egregious conduct [of the creditor]." *In re Adelphia Commc'ns Corp.*, 359 B.R. 54, 56 (Bankr. S.D.N.Y. 2006).  "By providing impaired creditors the right to vote on confirmation, the Bankruptcy Code ensures the terms of the reorganization are monitored by those who have a financial stake in its outcome."  *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 243–44 (3d Cir. 2004), *as amended* (Feb. 23, 2005) (explaining why the Bankruptcy Code, which "provides a framework for the consensual and cooperative reorganization of an insolvent debtor," requires a chapter 11 plan to garner "some indicia of support" from affected creditors).  Given how crucial the voice of impaired creditors is to the bankruptcy process, a "party seeking to have a ballot disallowed has a heavy burden of proof." *In re Adelphia Commc'ns Corp.*, 359 B.R. at 61.[23]

---

[23]  The context in which the bankruptcy court in *In re Adelphia Commc'ns Corp.* set such a high bar for vote disqualification was one of designation under section 1126(e) of the Bankruptcy Code, where a party sought to change a creditor's vote in a manner that would not reflect the intent of such creditor (perhaps for good reason, e.g., due to the creditor's bad faith).  Here, as explained herein, the Voting Motion is seeking to ensure that Mistabulated Votes are tabulated in a manner that *reflects* the intent of their respective impaired creditors.

48.     "For cause shown, the court after notice and hearing may permit a creditor or equity security holder to change or withdraw an acceptance or rejection."  Fed. R. Bankr. P. 3018(a).[24] "[T]he Bankruptcy Code does not provide any guidance as to what constitutes cause under Rule 3018(a)."  *In re Windmill Durango Off., LLC*, 481 B.R. 51, 64 (B.A.P. 9th Cir. 2012).  Nonetheless, "[t]he test for determining whether cause has been shown for purposes of Bankruptcy Rule 3018(a) should often not be a difficult one to meet."  *In re MPM Silicones, LLC ("MPM Silicones")*, No. 14-22503 (RDD), 2014 WL 4637175, at *2 (Bankr. S.D.N.Y. Sept. 17, 2014).  "As long as the reason for the vote change is not tainted, the change should usually be permitted.  The court must ensure only that the change is not improperly motivated."  *Id.*; *In re Kellogg Square P'ship*, 160 B.R. 332, 334 (Bankr. D. Minn. 1993) (same); *In re Imerys Talc Am., Inc.*, No. 19-10289 (LSS), 2021 WL 4786093, at *7 (Bankr. D. Del. Oct. 13, 2021) (same).

49.     As Judge Drain noted in *MPM Silicones*, courts across the country have found that "cause" exists, and held that "the vote should be changed in order to allow the voting entity to intelligently express its will," in instances of "human error."  *MPM Silicones*, at *2 (quoting 9 Collier on Bankruptcy ¶ 3018.01[4]); *see also In re MCorp Fin., Inc.*, 137 B.R. 237 (Bankr. S.D. Tex. 1992); *In re Kellogg Square P'ship*, 160 B.R. at 334.  "Examples of reasons for a change of vote might include a breakdown in communications at the voting entity; misreading the terms of the plan; or execution of the first ballot by one without authority."  *Id.*

50.     Bankruptcy Rule 3018(c) governs the form of acceptance or rejection of a bankruptcy plan.  "An acceptance or rejection shall be in writing, identify the plan or plans

---

[24] For the avoidance of doubt, the relief being requested in the Voting Motion is not so much "to change or withdraw an acceptance or rejection."  Fed. R. Bankr. P. 3018(a).  It is a much simpler request: to retabulate the Typo Votes and Misrepresented Votes in a manner that accurately reflects the beneficial holders' will.  To the extent the Court, as a technical matter, believes that it would be more appropriate to grant such relief under section 105(a) of the Bankruptcy Code (*see infra* ¶ 52) or otherwise, the Ad Hoc Group concurs.

accepted or rejected, be signed by the creditor or equity security holder or an authorized agent, and

conform to the appropriate Official Form." Fed. R. Bankr. P. 3018(c); *see also In re Paul*, 101

B.R. 228 (Bankr. S.D. Cal. 1989) (allowing late ballots even though they were delivered directly

to the debtor's counsel instead of being filed with the court as was required); *In re Westwood Plaza*

*Apartments*, 147 B.R. 692, 698 (Bankr. E.D. Tex. 1992) (holding that even though a creditor did

not submit a ballot, its confirmation objection could be tabulated as a rejection under Bankruptcy

Rule 3018(c) because "the Debtor knew the amount of [the creditor]'s claim, that [the creditor]

was the creditor voting, and that [the creditor] was dissatisfied with the terms of the plan"), *aff'd*

*in part, rev'd in part on other grounds sub nom. In re Westwood Plaza Apartments, Ltd.*, 192 B.R.

693 (E.D. Tex. 1996).

51.     The Beneficial Holder Votes satisfy Bankruptcy Rule 3018(c)'s requirements: the

noteholders at issue used the same written Beneficial Ballot as everyone else, such Beneficial

Ballot is based on the Official Form, and the email accompanying the Beneficial Ballot identified

the Plan as the plan being voted on.  Indeed, in certain instances, the Debtor has already identified

and matched the holder who submitted the Beneficial Holder Ballot to the beneficial holder on the

erroneous master ballot.  The only thing that was different is that they presented these Ballots

directly and not through their custodians (a process that has led to the myriad of mistakes in this

case, as set forth at length above).

52.     Additionally, "[s]ection 105(a) [of the Bankruptcy Code] grants broad equitable

power to the bankruptcy courts to carry out the provisions of the Bankruptcy Code so long as that

power is exercised within the confines of the Bankruptcy Code."  *Adelphia Bus. Sols., Inc. v.*

*Abnos*, 482 F.3d 602, 609 (2d Cir. 2007) (citing 11 U.S.C. § 105(a)).  Bankruptcy courts rely on

section 105(a) of the Bankruptcy Code in numerous situations where the integrity of the courts and

the bankruptcy process in general must be preserved, including to preserve the Bankruptcy Code's crucial voting-related provisions. *See* 2 Collier on Bankruptcy ¶ 105.02 (16th 2024) (citing, among other cases, *In re Ionosphere Clubs, Inc.*, 119 B.R. 440 (Bankr. S.D.N.Y. 1990)).

53. Here, with respect to the Typo Votes and Misrepresented Votes, the Ad Hoc Group is not seeking to "change or withdraw" any acceptance or rejection, but simply to allow rejections that were mistabulated due to simple clerical error somewhere in the chain of voting to be correctly. There is no question that human error caused these votes to either be disqualified, and there is also no question that Moneda and First Geneva[25] were noteholders on the proposed Voting Record Date. Both Moneda and First Geneva opposed the Plan and timely voted to reject, but the Master Ballots submitted for them had the wrong DTC participant identification number or the wrong vote, respectively. This error occurred presumably on account of "a breakdown in communications at the voting entity." *Id.* Accordingly, there is cause to remedy the Typo Votes and Master Ballot 002 so that they can be tabulated in accordance with Moneda's and First Geneva's clear and unambiguous intent.

54. The Debtor and its professionals knew well before the proposed Voting Deadline that numerous noteholders opposed the transactions contemplated by the Plan, but the Debtor decided to proceed with the Plan and this Chapter 11 Case anyway. Various noteholders informed the Debtor and its professionals in the days prior to the proposed Voting Deadline that they were experiencing difficulties when trying to exercise their sacred voting rights in accordance with the proposed Solicitation Procedures, but the Debtor did not demonstrate any curiosity. While

---

[25] As the Plan proponent, the Debtor has the burden of proving that the Nominee who submitted Master Ballot 002 was an "authorized agent" of First Geneva to vote its Old Notes to *accept* the Plan. *See* Fed. R. Bankr. P. 3018(c) (requiring ballots to be signed by the creditor or its authorized agent); June 13, 2024 Hr'g Tr. [ECF No. 81] at 27:15–17 ("The Debtor is the proponent and has the burden of establishing all the things one has to establish.").

granting the Voting Motion will prevent confirmation of the Plan, the Debtor need not languish in chapter 11—it can and should seek to expeditiously engage with creditors on an acceptable plan. There is no evidence that a small delay will harm the Debtor. Indeed, the Debtor already significantly delayed this Chapter 11 Case by waiting six weeks from its originally intended petition date before filing its bankruptcy petitions. Graulich Decl., Ex. B.

55.     Accordingly, the Voting Motion—which merely seeks to enforce, but not expand, sacred rights already afforded to creditors under the Bankruptcy Code—should be granted.

## IV.     The Plan Does Not Meet the Bankruptcy Code's Confirmation Requirements and Cannot Be Confirmed

56.     If the Voting Motion is granted, the Plan cannot be confirmed because there is no impaired accepting class. So, if the Court grants the Voting Motion, it need not consider confirmation of the Plan, the adequacy of the Disclosure Statement, or the appropriateness of the proposed Solicitation Procedures, because the Plan then fails on its face. Nevertheless, out of an abundance of caution, the Ad Hoc Group objects to confirmation of the Plan.

57.     "Section 1129(a) of the [Bankruptcy] Code establishes the requirements for confirmation of a chapter 11 plan of reorganization and a debtor must satisfy the provisions of section 1129 by a preponderance of the evidence." *In re Sabine Oil & Gas Corp. ("Sabine")*, 555 B.R. 180, 310 (Bankr. S.D.N.Y. 2016). The Debtor has failed, or will not be able, to establish that certain of these requirements have been met.

### A.     The Debtor Has Not Complied with the Applicable Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(2))

58.     Section 1129(a)(2) of the Bankruptcy Code obligates a plan proponent to "comply with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(2). "The case law and legislative history to section 1129(a)(2) reflect that this provision is intended to encompass the disclosure and solicitation requirements set forth in section 1125 of the [Bankruptcy] Code and the

plan acceptance requirements set forth in section 1126 of the [Bankruptcy] Code. *Sabine*, 555 B.R. at 311. As set forth herein, the Ad Hoc Group submits that the Debtor's disclosures (including the Disclosure Statement) do not comply with section 1125 of the Bankruptcy Code. Similarly, the Debtor has not established that its prepetition solicitation complied with applicable non-bankruptcy law or that no non-bankruptcy law applied. 11 U.S.C. § 1126(b); Guidelines, Part III.A(1)(i). Accordingly, the Plan does not satisfy section 1129(a)(2) of the Bankruptcy Code and cannot be confirmed.

      B.    <u>The Record Does Not Establish That the Plan Was Proposed in Good Faith (11 U.S.C. § 1129(a)(3))</u>

59.    Section 1129(a)(3) provides that a court "shall confirm a plan only if . . . [t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Courts look to the totality of the circumstances when determining whether a plan was proposed in good faith, with more of an emphasis on plan formulation than the terms of the plan itself. *In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010). In its confirmation brief, the Debtor asserts that the Plan complies with section 1129(a)(3). ECF No. 82 ¶ 99 ("[T]he Plan is the product of months of good faith, arm's length discussions with certain holders of the Old Notes over the terms of the New Notes, as well as the other consideration provided under the Plan to holders of Old Notes."). However, the record does not presently contain evidence to support this assertion. *See supra* ¶ 58.

      C.    <u>The Plan Does Not Satisfy the Voting Requirements of the Bankruptcy Code (11 U.S.C. §§ 1129(a)(8), (10))</u>

60.    Subject to the exceptions contained in section 1129(b) of the Bankruptcy Code, section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or equity interests must either accept the plan or be unimpaired under the plan. 11 U.S.C. § 1129(a)(8). A class of claims accepts a plan if the holders of at least two-thirds of the dollar amount and more than one-

half of the number of claims that actually vote on the plan (excluding designated votes) vote to accept the plan.  *See* 11 U.S.C. § 1126(c).  Section 1129(a)(10) of the Bankruptcy Code requires that, if any class of claims is impaired under the plan, at least one impaired class of claims must accept the plan, excluding acceptance by any insider.  11 U.S.C. § 1129(a)(10).

61.     The only Class entitled to vote on the Plan—indeed, the only Impaired Class—is Class A, which is entirely comprises the Old Notes.  As set forth herein, the Impaired Class voted to reject the Plan, so the Plan cannot be confirmed.  And, even if the Debtor was able to disqualify the Mistabulated Votes, the Debtor has not established that the tabulated acceptances do not include the votes of any Insiders.

## Reservation of Rights

62.     The Ad Hoc Group reserves the right to further object to the relief that the Debtor is requesting to be heard at the hearing tentatively scheduled for June 27, 2024, should the Debtor, after the date hereof, (a) proffer evidence in support of such relief following the date hereof, (b) file the proposed form of Confirmation Order, (c) modify or supplement the Plan (including the Plan Supplement documents), the Disclosure Statement, or the proposed order for any of the relief being sought at such hearing, or (d) seek additional or different relief than presently contemplated.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court (a) enter the Proposed Order granting the relief requested in the Voting Motion and (b) deny (i) confirmation of the Plan, (ii) approval of the Disclosure Statement, (iii) approval of the Solicitation Procedures, and (iv) the UCC Motion.

Dated:  June 19, 2024
        New York, New York

DAVIS POLK & WARDWELL LLP

By:  */s/ Timothy Graulich*
_____

450 Lexington Avenue
New York, New York 10017
Tel.: (212) 450-4000
Timothy Graulich
James I. McClammy
Angela M. Libby
Stephen D. Piraino
Moshe Melcer

*Counsel to the Ad Hoc Group of Noteholders*