Paul J. Keenan Jr. (admitted *pro hac vice*)
Reginald Sainvil (admitted *pro hac vice*)
Benjamin Davis (admitted *pro hac vice*)
Dionna Shear (admitted *pro hac vice*)
Baker & McKenzie LLP
1111 Brickell Avenue, 10th Floor
Miami, FL 33130
Telephone: 305-789-8900
Facsimile: 305-789-8953
Email: paul.keenan@bakermckenzie.com
        reginald.sainvil@bakermckenzie.com
        benjamin.davis@bakermckenzie.com
        dionna.shear@bakermckenzie.com

Blaire Cahn
Baker & McKenzie LLP
452 Fifth Avenue
New York, NY 10018
Telephone: 212-626-4100
Facsimile: 212-310-1600
Email: blaire.cahn@bakermckenzie.com

*Proposed Counsel for the Debtor
and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CREDIVALORES – CREDISERVICIOS S.A. | Case No. 24-10837 (DSJ) |
| Debtor. | |

_____/

**DEBTOR'S (I) REPLY TO THE AD HOC GROUP'S OMNIBUS OBJECTION
TO PLAN CONFIRMATION, APPROVAL OF THE DISCLOSURE STATEMENT,
APPROVAL OF THE SOLICITATION PROCEDURES, AND THE UCC MOTION,
(II) OBJECTION TO THE AD HOC GROUP'S MOTION UNDER BANKRUPTCY
RULE 3018 TO COUNT CERTAIN BALLOTS, AND (III) REPLY TO THE
OBJECTION OF THE UNITED STATES TRUSTEE TO APPROVAL OF THE
<u>DISCLOSURE STATEMENT AND CONFIRMATION OF THE PLAN</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................2

MEMORANDUM OF LAW ...............................................................................................5

   I.   THE PLAN SATISFIES ALL REQUIREMENTS FOR CONFIRMATION. ....................5

      A.  The SEC Regulations (Applicable Non-Bankruptcy Law) Were Followed. ...........5

      B.  The Bankruptcy Code and Rules Were Followed....................................................7

      C.  The SDNY Prepack Guidelines Were Followed. ..................................................10

      D.  The Solicitation Procedures Adhered to the Well-Established Practice of How
          Prepack Solicitations Are Conducted in the New York Capital Markets. .............11

          i.   There Exist Well-Established Solicitation Procedures for Prepackaged
              Chapter 11 Bankruptcies Involving Bonds and Bondholders..........................15

          ii.  The Debtor Followed the Standard Solicitation Procedures for Prepackaged
              Chapter 11 Bankruptcies Involving Bonds and Bondholders and the Ad Hoc
              Group's Objection to the Solicitation Procedures Should be Overruled. ........18

          iii.  The Vote Tabulation in this Chapter 11 Case Was Proper. ............................20

          iv.  The 3018 Motion Should be Denied. ..............................................................25

   II.  THIS CHAPTER 11 CASE IS NOT AN "OUTLIER" ....................................................30

   III.  THE PLAN MEETS ALL § 1129 REQUIREMENTS....................................................34

   IV.  THE UCC MOTION SHOULD BE GRANTED. ..........................................................35

CONCLUSION....................................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re City of Colorado Springs Spring Creek Gen. Imp. Dist. (Colorado Springs)*,
177 B.R. 684 (Bankr. D. Colo. 1995) ..............................................................20, 21

*In re Garcia Avila*,
296 B.R. 95 (Bankr. S.D.N.Y. 2003) ......................................................................10

*In re Genco Shipping & Trading Ltd*,
513 B.R. 233 (Bank. S.D.N.Y, 2014) .....................................................................10

*In re Genesis Health Ventures, Inc.*,
266 B.R. 591 (Bank. Del. 2001) .............................................................................10

*In re Klaynberg*,
2023 Bankr. LEXIS 2055 (Bank. S.D.N.Y. Aug. 21, 2023) ...................................10

*In re Mallinckrodt PLC*,
639 B.R. 837 (Bank. Del. 2022) .............................................................................10

*In re Maxcom USATelecom, Inc.*,
No. 19-23489 (RDD) (Bankr. S.D.N.Y. 2019) ...........................................14, 33, 34

*In re MPM Silicones, LLC*,
No. 14-22503-RDD, 2014 WL 4637175 (Bankr. S.D.N.Y. Sept. 17, 2014)...........27

*In re Southland Corp.*,
124 B.R. 211 (Bankr. N.D. Tex. 1991)............................................................ *passim*

**Statutes**

11 U.S.C. § 1125...................................................................................................7, 8, 9

11 U.S.C. § 1126..............................................................................................5, 27, 31

11 U.S.C. § 1129............................................................................................... *passim*

Bankruptcy Code Chapter 11 .......................................................................... *passim*

Exchange Act 10b-5..................................................................................................6, 7

Exchange Act 14e-1 .................................................................................................6, 7

Regulation S of the Securities Exchange Act of 1934 ..................................................6

UCC ...........................................................................................................................1, 35

**Other Authorities**

Absalon Capital A/S, *About Us*, https://absalon-capital.com/about-us/ (last visited
June 25, 2024) ......................................................................................................15

Capital SICAV P.L.C., *Fund*, https://www.a3ecapital.com/fund (last visited June
25, 2024) ..............................................................................................................15

Fed. R. Bankr. P. 3020(e) ...............................................................................................5

Fed. R. Bankr. 3018(b) ...........................................................................22, 23, 27, 28

Fed. Bankr R. 3017 .......................................................................................................12

Fed. Bankr R. 3018 .............................................................................................. *passim*

Fed. Bankr R. 3019 ..................................................................................................1, 29

Julius Baer, *About Us*, https://www.juliusbaer.com/en/about-us/ (last visited June
25, 2024) ..............................................................................................................14

Moneda, *About Us*, https://www.moneda.cl/en/about-us (last visited June 25, 2024) .................14

Moneda, *History*, https://www.moneda.cl/private/historia#ancla (last visited June
25, 2024) ..............................................................................................................14

Vontobel, https://www.vontobel.com/en-us/about-vontobel/ (last visited June 25,
2024) ....................................................................................................................14

Vontobel, https://www.vontobel.com/en-us/about-
vontobel/media/communications/vontobel-delivered-solid-full-year-2023-
results/ (last visited June 25, 2024) .....................................................................14

The above-captioned debtor and debtor-in-possession (the "**Debtor**") in the above-captioned chapter 11 case (the "**Chapter 11 Case**") hereby files this Omnibus Reply ("**Reply**") to the Ad Hoc Group's[1] *Omnibus Objection to Plan Confirmation, Approval of the Disclosure Statement, Approval of the Solicitation Procedures, and the UCC Motion* [Doc. No. 89] (the "**Ad Hoc Group Objection**" or "**AHG Obj.**"), Objection to the Ad Hoc Group's *Motion Under Bankruptcy Rule 3018 to Count Certain Ballots* [Doc. No. 87] (including the Memorandum of Law in Support [Doc. No. 89] and the declarations submitted in support thereof [Doc. Nos. 90, 91, 92], "**3018 Motion**"), and Reply to the *Objection of the United States Trustee to Approval of the Disclosure Statement and Confirmation of the Plan* [Doc. No. 86] ("**UST Objection**")[2]. Reference is made to those declarations submitted contemporaneously herewith, including: the *Declaration of Jaime Francisco Buriticá Leal in Support of Confirmation* [Doc. No. *TBD*] ("**Leal Confirmation Declaration**"); the *Declaration of Jane Sullivan* [Doc. No. *TBD*] ("**Sullivan Declaration**"); and the *Declaration of Jim Harper* [Doc. No. *TBD*] ("**Harper Declaration**"). In support of this Reply, in opposition to the 3018 Motion, and in support of approval of the *Disclosure Statement with Respect to the Prepackaged Chapter 11 Plan of Credivalores – Crediservicios S.A.* [Doc. No. 18] (including all exhibits thereto and as the same may be amended, modified or supplemented, the "**Disclosure Statement**"), and confirmation of the *Prepackaged Chapter 11 Plan of Credivalores – Crediservicios S.A.* [Doc. No. 18], as amended [Doc. No. *TBD*] (including all exhibits thereto and as the same may be amended, modified or supplemented from time to time, the "**Plan**"),[3] the Debtor respectfully represents as follows:

---

[1] As used herein, the "Ad Hoc Group" refers to the group of noteholders identified in the *Verified Statement of Davis Polk & Wardwell LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019* [Doc No. 55] ("**2019 Statement**").

[2] Prior to this submission, the Debtor commenced discussions with the U.S. Trustee regarding its Objection. Based on those discussions, the Debtor has agreed to (and did) amend the Plan in order to address many of the points raised in said Objection, particularly as it relates to releases and exculpations. See Amended Plan [Doc. No. [●]].

[3] Unless provided otherwise, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or the *Amended Memorandum of Law in Support of an Order (I) Approving the Disclosure Statement and (II) Confirming the Prepackaged Chapter 11 Plan of Credivalores – Crediservicios S.A., and (III) Granting Related Relief* [Doc No. 82] (the "**Confirmation Brief**").

## PRELIMINARY STATEMENT

1.     When examined in earnest, the Ad Hoc Group's Objection asks this Bankruptcy Court to deviate from the guiding principles established by the Bankruptcy Code, the Rules, the SDNY Prepack Guidelines, and the well-established customs and practices employed in tender offers and plan solicitations conducted in the United States and in New York capital markets in particular, in favor of new precedents that would impose novel and additional requirements that have the practical effect of upending and disrupting future prepackaged cases in this District and elsewhere. For this primary reason, as explained in more detail below, the Objection should be overruled and the Plan confirmed.

2.     The "fulcrum" of the Ad Hoc Group's Objection is that certain votes submitted by their members were "mistabulated." *See* AHG Obj., ¶ 18. Notwithstanding the misleading adjectives used to describe the votes in question, *see infra*, the Ad Hoc Group has admitted one key and now undisputed fact: none of the votes identified by the Ad Hoc Group were submitted in compliance with the Debtor's Solicitation Procedures, and well-established vote tabulation procedures, protocols, and rules that are commonplace in in chapter 11 cases throughout this District and elsewhere. Rather, the "difficulties" identified by the Ad Hoc Group in support of their contention that the Debtor's Solicitation Procedures were not "adequate" all relate to the relationships between the Ad Hoc Group's members and their own respective Nominees, not with the Debtor or its Solicitation Procedures. *See, e.g.*, AHG Obj., ¶¶ 28, 31–32. Exactly *none* of these "difficulties" is evidence of some form of confusion caused by the Debtor's Solicitation Procedures or a flaw in those Procedures. In short, missing from each of the Ad Hoc Group's assertions is any proof that the solicitation process run by the Debtor and its highly-experienced solicitation agent, Jane Sullivan of Epiq Corporate Restructurings, LLC, failed to comply with the requirements under the

Bankruptcy Code, the Bankruptcy Rules, the SDNY Prepack Guidelines, applicable non-bankruptcy law, and those standard practices commonly employed in solicitations of holders of public securities.

3.     Consistent with the subtle attempt to impose new requirements and establish new precedents that is the latent theme of the Ad Hoc Group's Objection, the remaining arguments concerning allegedly low voter "turnout" and the challenges to the Disclosure Statement likewise seek to write novel confirmation requirements into the Code and Rules. Much ink is spilled by the Ad Hoc Group in an attempt to portray this Chapter 11 Case as an "outlier" as it relates to voter "turnout." *See, e.g.*, AHG Obj., ¶¶ 1–8. Their labor is wasted: there is no minimum threshold "participation" rate in the Code. If Congress believed that a low voter turnout was indicative of a problem with the solicitation procedures, it could have established such a requirement. It did not, presumably due to the innumerable reasons that may dictate voter participation in a given chapter 11 case. Instead, Congress established other requirements to preserve the sanctity of the chapter 11 process. Those requirements include, more generally, that the offering memorandum be "adequate," that the voting period be sufficient, and that the proposed chapter 11 plan meet all of the technical requirements of section 1129 of the Bankruptcy Code. When the Code's requirements are met, the bankruptcy court must confirm. The Debtor has complied with all such requirements.

4.     Even if there was such a requirement in the Code or elsewhere, a more scrutinizing analysis of the cases identified by the Ad Hoc Group for purposes of "comparison" confirms that the Ad Hoc Group is only able to reach their conclusion that this case is an "severe [] outlier" by omitting relevant facts and manipulating data to reach their desired result. When a truer, more accurate comparator analysis is presented—as the Debtor has prepared here by poring over the disclosure statements and solicitation materials in the cited cases—it becomes clear that this Chapter 11 Case is not unlike other cases previously confirmed by the Bankruptcy Court and other

bankruptcy courts in this District and throughout the United States, in terms of the Solicitation Procedures utilized and the voter "turnout." The argument should be cast off as a red herring.

5.     The same is true for the Ad Hoc Group's thin challenges to the Disclosure Statement. AHG Obj., ¶ 26. None of the alleged "inadequacies" raised by the Ad Hoc Group in relation to the Disclosure Statement—a detailed, 500-page document—concern specific requirements imposed by the Bankruptcy Code or Rules, as evidenced by the fact that the argument is devoid of citation to the Code, the Rules, or any authority to support the contentions reflected therein.

6.     The Ad Hoc Group's final Hail Mary is their 3018 Motion, in which they ask this Bankruptcy Court to compel the Debtor to tabulate votes they simultaneously admit were submitted improperly and not in line with the Debtor's commonplace Solicitation Procedures and the express instructions *written on the ballots the Ad Hoc Group's members submitted them on*. But, on its face, Rule 3018 of the Federal Rules of Bankruptcy Procedure does not apply. The Ad Hoc Group all but admits this—the Rule applies when a holder wishes "to change or withdraw an acceptance or rejection," yet the Ad Hoc Group does not wish to "change or withdraw" the votes at issue. Rule 3018 is simply not a mechanism designed to create a second opportunity to vote correctly, and the relief sought in the 3018 Motion would otherwise serve to undermine the customary solicitation and vote tabulation procedures utilized in this Chapter 11 Case and others. For this reason, as explained more fully below, the 3018 Motion should be denied.

7.     The Debtor has satisfied all of the requirements set forth in the Bankruptcy Code and Rules, and the SDNY Prepack Guidelines for confirmation of the Plan. Confirmation is required.

## MEMORANDUM OF LAW

## I.     THE PLAN SATISFIES ALL REQUIREMENTS FOR CONFIRMATION.

8.     The polestars in any prepackaged plan confirmation under chapter 11 of the Bankruptcy Code proceeding before the Southern District of New York Bankruptcy Court are fourfold: (1) the rules established by applicable nonbankruptcy law (as made applicable under section 1126(b) of the Bankruptcy Code); (2) the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"); (3) the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**") and the *Amended Procedural Guidelines for Prepackaged Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of New York, effective February 1, 2024* (the "**SDNY Prepack Guidelines**" or "**Guidelines**"); and (4) the well-established customs and practices employed in tender offers and plan solicitations conducted in the United States, and in the New York capital markets in particular. These rules, and the requirement that debtors adhere to them, provide certainty, finality, and uniformity in an otherwise complex and costly arena. Thus, the rules make the legal calculus simple and straightforward for the Bankruptcy Court—if a plan of reorganization under chapter 11 comports with the requirements established by these sources, then the Bankruptcy Court must confirm the plan. The Debtor's Plan comports with all such requirements and, therefore, must be confirmed.

### A.     The SEC Regulations (Applicable Non-Bankruptcy Law) Were Followed.

9.     Starting first with applicable nonbankruptcy law, section 1126(b) of the Bankruptcy Code, requires the prepetition solicitation of votes on the Plan to either be "in compliance with any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation," or, if such laws and regulations do not apply, the solicited holders must receive "adequate information" (as defined in section 1125(a) of the Code).

10.     Of the Ad Hoc Group's thirty-page Objection, one sentence is dedicated to this issue. *See* AHG Obj., ¶ 58. The Ad Hoc Group's bald assertion that the Debtor "has not established that its prepetition solicitation complied with applicable nonbankruptcy law or that no non-bankruptcy law applied" is not only insufficient to call into question the Debtor's compliance with the Code, but is incorrect. The Debtor addressed this issue in its Confirmation Brief, noting that the Debtor's prepetition solicitation was exempt from the registration requirements provided by section 4(a)(2) and Regulation S of the Securities Exchange Act of 1934 (the "**Exchange Act**"). *Id.* at ¶¶ 27–30.

11.     In addition, the Debtor complied with, Rule 14e-1 of the Exchange Act requires that any tender offer, including offers such as an exchange offer and consent solicitation, be held open for 20 business days. The Debtor launched its Exchange Offer and consent solicitation on March 7, 2024 via delivery of an Offering Memorandum and Consent Solicitation Statement (the "**Exchange Memorandum**") to the holders of the Old Notes. The Exchange Memorandum provided that the Exchange Offer would expire at 5:00 p.m. NYC Time on April 3, 2024. Debtor held the Exchange Offer for the Old Notes open from March 7, 2024 through April 3, 2024, or 20 business days.

12.     In addition, the anti-fraud provisions of Rule 10b-5 of the Exchange Act require that disclosure provided to investors not contain any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. In compliance with the requirements of Rule 10b-5 of the Exchange Act, the Exchange Memorandum delivered by the Debtor to investors contained adequate information in compliance with the Securities and Exchange Commission standards under Rule 10b-5. In a Dealer Manager Agreement dated March 7, 2024, the Debtor provided a representation to BCP Securities, Inc. ("**BCP**"), the dealer manager retained by the Debtor in connection with the Exchange Offer, stating that the Exchange Memorandum does not contain any

untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made. Beyond the anti-fraud requirements of Rule 10b-5, the Exchange Memorandum contains significantly more detailed information than what would be provided to investors in a standard disclosure statement for bankruptcy plan, substantially similar to what would be contained in a Form F-1 Registration Statement for the securities, including audited financial statements of the Debtor. Accordingly, the Debtor's solicitation likewise complied with this requirement under the Exchange Act.[4]

**B.      The Bankruptcy Code and Rules Were Followed.**

13.      The Ad Hoc Group objects on the basis that the Plan fails to comply with sections 1129(a)(2), 1129(a)(3), and 1129(a)(8) and (a)(10) of the Bankruptcy Code's confirmation requirements. *See* Obj. ¶¶ 57–61. The Ad Hoc Group is mistaken.

14.      As to section 1129(a)(2), the Ad Hoc Group raises two (rather threadbare) objections: first, that the Disclosure Statement fails to comply with section 1125 of the Bankruptcy Code; and, second, that the Debtor's prepetition solicitation did not comply with applicable non-bankruptcy law. Obj. ¶ 58. As to the latter, the Debtor has shown it to be incorrect. *See supra*, ¶¶ 9–14. As to the former, the Disclosure Statement contained "adequate information" as required by section 1125 of the Code. The Confirmation Brief goes into great detail on this issue and thoroughly explains how the detailed Disclosure Statement a whopping 515 pages—provides "adequate information" under the Code. *See* Confirmation Brief, ¶¶ 31–37.

15.      Further, the Disclosure Statement was not inadequate for a purported failure to disclose highly-specific details relating to the prepetition negotiations, as the Ad Hoc Group now

---

[4] Further, the Debtor confirms that it is not considered to be a financial institution in accordance with Colombian legislation but clarifies that it is monitored by the Colombian Superintendence of Finance (*Superintendencia Financiera de Colombia*). However, the Colombian Superintendence of Finance does exercise some supervision over the Debtor as a result of the Debtor being an issuer of securities in the local Colombian market with local bonds outstanding.

contends. *See* AHG Obj., ¶ 26. A disclosure statement must contain "adequate information," which, among other things, "means information … in sufficient detail … that would enable [] s hypothetical investor of the relevant class to make an informed judgment about the plan[.]" 11 U.S.C. § 1125(a)(1) and (b). More importantly, "in determining whether a disclosure statement provides adequate information, the court shall consider … the benefit of additional information to creditors[.]" *Id.* § 1125(a)(1).

16.     The Ad Hoc Group raises a series of passing adequacy challenges to the Disclosure Statement, none of which are supported by any authority to support their claim that the identified (but not actual) deficiencies require a finding that the Disclosure Statement should not be approved. *See* AHG Obj., ¶ 26. The contentions are addressed in turn:

    a.     *Negotiation of the plan.* The Ad Hoc Group contends the Disclosure Statement should have provided additional details concerning how the Plan was formulated, who it was negotiated with, and the reasons voter participation was less than anticipated. The Ad Hoc Group cites no authority, however, for this contention and fails to explain how these additional details would affect the ability to make an informed judgment on the Plan or what benefit these additional details would provide to creditors.

       Moreover, these additional details would provide no benefit to at least one holder in Class A. The members of the ad hoc group of bondholders that negotiated the terms of the Exchange Offer, which contemplated a potential prepackaged case, included Vontobel, Vega Asset Management, Carlos Franky, Procapital, and GDA (the "**Prepetition Ad Hoc Group**"). *See* Harper Decl., ¶ 7. Vontobel, of course, is the largest member of the Ad Hoc Group. *See* 2019 Statement [Doc No. 55].

       This fact also largely explains the reason voter participation was less than anticipated. After negotiating the terms of the Plan with the Debtor, Vontobel turned coat at the last minute and voted against the Plan. *See* Harper Decl., ¶ 9. While it certainly had the right to do so, the Debtor cannot be faulted for not anticipating Vontobel would not support the terms of the deal it largely negotiated.

    b.     *Insider voting.* The Ad Hoc Group's contention that additional details concerning the composition of the Prepetition Ad Hoc Group would confer benefit to creditors is equally misplaced. While it is true GDA is an insider and member of the Prepetition Ad Hoc Group, its vote on the Plan was properly excluded as an insider vote, and GDA did not and would not receive any consideration other than what the Plan provides for every Class A holder. *See* Harper Decl., ¶ 10. Of course, GDA

participated in the negotiation of the Exchange Offer because all noteholders can participate in an Exchange Offer, regardless of any insider status.

c. *Liquidation analysis, and financial projections.* Nothing in the plain language of section 1125 requires that the disclosure statement itself contain a liquidation analysis or financial projections. The Debtor's Disclosure Statement does state that the treatment of the Plan would provide Class A holders "a recovery that is not less than" what would be received in the Debtor's "hypothetical liquidation under chapter 7" and further that a liquidation analysis would be provided with the Plan Supplement. Disclosure Statement at 121–122. These statements were validated by the liquidation analysis and financial projections prepared by FTI Consulting ("**FTI**") and filed June 14, 2024. These documents confirm what was disclosed in the Disclosure Statement: that a chapter 7 liquidation would result in Class A holders receiving substantially less (25%) than their proposed treatment under the Plan (75%). *See* Plan Supplement [Doc. No. 78.]

d. *Exchange rates.* Exchange rate risk is both adequately disclosed in the Disclosure Statement and adequately addressed under the Plan. The Disclosure Statement is replete with references to and descriptions of exchange rate matters, and the Ad Hoc Group does not seriously contend the contrary. Rather, the Ad Hoc Group argues the Plan is not feasible because of post-solicitation exchange rate fluctuations. This argument ignores the exchange rate hedging program—which is also disclosed in the Disclosure Statement—approved by this Court as one of the "first day" motions in its Order Granting the Hedging Practices Motion and approving the continuation of the Debtor's already existing exchange rate hedging program.

e. *Collateral.* The collateral package for the New Notes is described in the Disclosure Statement. *See* Disclosure Statement at 20. The fact that numerous sophisticated financial institutions found the description adequate to vote acceptances in favor of the Plan speaks volumes for the adequacy of such disclosure.

17.     The Ad Hoc Group's objection that the Plan does not satisfy the voting requirements of sections 1129(a)(8) and (10) of the Code rises and falls on their (incorrect) assertion that the only impaired claim in this Chapter 11 Case, the Old Notes Claims (Class A) voted to reject the Plan. *See* Obj. ¶¶ 60–61. As discussed *infra*, however, the Ad Hoc Group's request to force the Debtor to count improperly submitted votes or, worse still, resolicit the Plan, should be rejected.

18.     The other requirements set forth by the Code are also met.[5] The requirements for confirmation of a chapter 11 plan depend on whether the plan is classified as a consensual or non-

---

[5] In its Objection, the U.S. Trustee has asserted that the Plan violates the "absolute priority rule." UST Obj., at 14–15.

consensual plan. A plan is consensual when every impaired class votes to accept the plan. 11 U.S.C.S. § 1129(a)(8); *In re Genco Shipping & Trading Ltd*, 513 B.R. 233, 241 (Bank. S.D.N.Y, 2014). A class of creditors is considered to have accepted a plan when at least two-thirds in amount and more than one-half in number of allowed claims of such class accept the plan, measured out of those claims that vote. *In re Klaynberg*, 2023 Bankr. LEXIS 2055 at *39 (Bank. S.D.N.Y. Aug. 21, 2023). Accordingly, consensual plans need only comply with the requirements under section 1129(a). *In re Garcia Avila*, 296 B.R. 95, 111 (Bankr. S.D.N.Y. 2003). Only, non-consensual plans, *i.e.*, those that have not been accepted by all impaired creditors, must meet the requirements under section 1129(b), including the absolute priority rule. *In re Mallinckrodt PLC*, 639 B.R. 837, 855 (Bank. Del. 2022); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 599 (Bank. Del. 2001) (limiting Section 1129(b) requirements to class that rejected the chapter 11 plan); *In re Klaynberg*, 2023 Bankr. LEXIS 2055 at *45–48. Here, the Plan is consensual because the only claims that are impaired under the Plan are the Old Notes, and the requisite amount of voters in that Class approved the Plan. Thus, the Debtor is not required to comply with the requirements under section 1129(b), let alone the absolute priority rule. *In re Garcia Avila*, 296 B.R. at 111 (holding that section 1129(b) only applies to non-consensual plans); *In re Genesis Health Ventures, Inc.*, 266 B.R. at 599; *In re Klaynberg*, 2023 Bankr. LEXIS 2055 at *45–48.

19.     Accordingly, the Plan satisfies all of the requirements of section 1129 of the Code.

**C.     The SDNY Prepack Guidelines Were Followed.**

20.     The SDNY Prepack Guidelines were the product of much thought and extensive collaboration between the Bankruptcy Court's bench and the commercial bar to ensure that the Southern District of New York is current and consistent with practices in prepackaged cases throughout the United States. As noted at the first day hearing on May 20, 2024, the Debtor studied

the new Guidelines closely to ensure that the Solicitation Procedures, Plan, and Chapter 11 Case conformed to the requirements set forth in the Guidelines—and they do.

21.     Most notably, the Debtor's Solicitation Procedures followed the recommendations reflected in the Guidelines relating to voting periods. The Guidelines provide that in solicitations involving Publicly Traded Securities (as the term is defined by the Guidelines), a twenty-one (21) calendar[6] day voting period will be deemed reasonable. *See* Guidelines, Part IX.A(1). The Debtor, however, established a considerably longer voting period (the "**Voting Period**"), one that lasted twenty-seven (27) calendar days, from March 7, 2024, through April 3, 2024, at 5:00 pm (New York City time), during which Holders of Old Notes could vote to accept or reject the Plan.

22.     The ballots utilized by the Debtor's solicitation agent likewise comported with the Guidelines and were formulated after scrutinizing the SDNY Prepack Guidelines and in consultation with its highly-experienced solicitation agent, Epiq. *See* Guidelines, Part IX.C(1)–(3).

23.     Indeed, neither the Ad Hoc Group nor any other party has objected to confirmation of the Plan on the basis that the Debtor did not comply with the Guidelines. Nonetheless, it is worth reaffirming that the Plan conforms to the requirements established therein.

**D.     The Solicitation Procedures Adhered to the Well-Established Practice of How Prepack Solicitations Are Conducted in the New York Capital Markets.**

24.     While Rules 3017(d)–(e) and 3018 provide, *inter alia*, the basic requirements for solicitation procedures relating to the dissemination and distribution of plans, disclosure statements, and ballots, as well as the form of acceptance or rejection by creditors or other securityholders, the Rules (and the Code) have otherwise left it to practitioners, debtors, and the courts to develop the

---

[6] To be clear, the SDNY Prepack Guidelines note only "days," and do not specify whether this refers to calendar days or business days. *See* Guidelines, Part IX.A(1). The Debtor submits that in the absence of a reference to "business days," the default should be calendar days and that Bankruptcy Court intended to refer to calendar days in establishing the presumptively reasonable voting periods.

specifics of how solicitations are to be executed to conform to the general requirements of the Rules. With the increased use of prepackaged chapter 11 bankruptcies over the last several decades, practitioners, debtors, and their solicitation agents have indeed developed a robust set of protocols and procedures that conform to the general requirements of the Rules. *See* Sullivan Decl., ¶¶ 5–14. At this point, these solicitation and tabulation procedures—particularly as it relates to chapter 11 cases involving bonds and bondholders—are commonplace and fairly consistent across cases, varying only slightly to wed the specific facts of the given case to the procedures used therein. *See id.* at ¶¶ 14, 28–45. The Debtor's Solicitation Procedures were no different. *Id.* at ¶¶ 46–48. The Solicitation Procedures are consistent with well-established and customary procedures for the solicitation of plans and the tabulation of ballots that have been used and approved in countless other prepackaged chapter 11 cases involving bonds and bondholders. *Id.* The Ad Hoc Group's contention that the Solicitation Procedures were inadequate is without merit.

25. The Ad Hoc Group asserts that the Debtor's Solicitation Procedures "did not adequately capture the votes of [the beneficial holders of the Old Notes]." AHG Obj. ¶ 28. At its core, their chief complaint is that the Solicitation Procedures required the Ad Hoc Group's members to vote their positions through their respective custodians or Nominees.[7] *Id.* at ¶¶ 30–31.

26. As discussed *infra*, the requirement that a beneficial owner vote their position through their Nominee is a commonplace requirement in chapter 11 solicitations that exists to preserve the custodial chain and ensure the voted position is actually entitled to vote. *See* Sullivan Decl., ¶¶ 28–45. Thus, the Ad Hoc Group concedes their members voted improperly, but nonetheless asks this Bankruptcy Court to establish a novel and dangerous precedent that would

---

[7] The term "Nominee" is not defined, but is nonetheless understood to refer to how the term is defined in the ballots used in the Solicitation Procedures, *i.e.*, the brokers, banks, common representatives or other nominees, or the agents of brokers, banks, common representatives or other nominees (each "**Nominee**" and collectively, the "**Nominees**").

require debtors to directly solicit votes from bondholders (rather than through Nominees, as has long-been the custom and practice for various reasons described further herein), and impose a lavish dedication to a beneficial holder's "intent" irrespective of whether the holder voted their position in compliance with the instructions expressly communicated to them (instructions created to, among other things, preserve the custodial chain and ensure the voted position is actually entitled to vote). In short, and as set forth in greater detail below, the Ad Hoc Group implicitly asks the Bankruptcy Court to deviate from the well-established norms in the New York capital markets (and elsewhere) and establish dramatic new precedents that would have the real-world effect of upending all future prepackaged cases in this District and elsewhere.

27.     The Ad Hoc Group's Objection lays bare that the "difficulties" its members faced when trying to vote their claims were issues between the Ad Hoc Group's members and their respective Nominees, AHG Obj., ¶ 31—no one from the Debtor's side, be it the Debtor, the Solicitation Agent, or counsel, have any involvement in the relationship between beneficial owners and their respective Nominees. That the Ad Hoc Group's Nominees failed the Ad Hoc Group insofar as they did not follow their instructions is outside of the Debtor's control. More to the point, as set forth below and in the Sullivan Declaration, exactly *none* of the "difficulties" the Ad Hoc Group may have had with their Nominees is evidence of a flaw in the Solicitation Procedures.

28.     It also bears mention that the Ad Hoc Group is comprised of sophisticated market participants. For example, the largest member of the Ad Hoc Group by aggregate principal amount of Old Notes, Vontobel Holding AG ("**Vontobel**")—who was intimately involved in the negotiation of the Exchange Offer and Plan, *see* Harper Decl., ¶ 7—is an international investment management firm, providing investment, advisory and solutional capabilities to private and institutional clients.[8]

---

[8] *See generally* Vontobel, https://www.vontobel.com/en-us/about-vontobel/ (last visited June 25, 2024).

Per its website, Vontobel is an active investor in emerging market bonds and has over 2,000 employees across 26 worldwide locations and is considered among the top-tier Swiss banks, holding around $300 billion of client assets.[9] Vontobel has undoubtedly been involved in a number of chapter 11 restructurings, including those involving Latin American entities.

29.     The second largest member of the Ad Hoc Group, Moneda S.A. Administradora General de Fondos ("**Moneda**") is equally experienced. Moneda is an asset management leader in Latin America with more than 25 years of experience investing and managing assets in Latin America, with expertise in distressed debt.[10] Moneda currently has more than $8.9 billion of assets under management.[11] Moneda has played a role in many chapter 11 restructurings; indeed, Moneda was a lead player in the chapter 11 prepack in *In re Maxcom USATelecom, Inc.* ("*Maxcom*"), No. 19-23489 (RDD) (Bankr. S.D.N.Y. 2019). The other members of the Ad Hoc Group are no different. Julius Baer – Private Banking ("**Julius Baer**") has more than 130 years of experience in wealth management, is present in over 60 locations worldwide (including Latin America), has over $500 billion of assets under management, and an expertise in emerging market bonds.[12] Indeed, Julius Baer, like Vontobel and Moneda, have been involved in a significant number of chapter 11 cases, including those involving non-bank financial institution restructurings involving Latin American entities. The same is generally true for A3E Capital SICAV P.L.C. ("**A3E**"), Absalon Capital A/S ("**Absalon**"), and First Geneva Capital Partners ("**First Geneva**"), all three of which have decades of experience in emerging market bonds and other instruments, and general asset management.[13,14]

---

[9]  *See id.*; *see also* Vontobel, https://www.vontobel.com/en-us/about-vontobel/media/communications/vontobel-delivered-solid-full-year-2023-results/ (last visited June 25, 2024).

[10] *See generally* Moneda, *History*, https://www.moneda.cl/private/historia#ancla (last visited June 25, 2024).

[11] *See* Moneda, *About Us*, https://www.moneda.cl/en/about-us (last visited June 25, 2024).

[12] *See* Julius Baer, *About Us*, https://www.juliusbaer.com/en/about-us/ (last visited June 25, 2024).

[13] *See* A3E Capital SICAV P.L.C., *Fund*, https://www.a3ecapital.com/fund (last visited June 25, 2024); Absalon Capital A/S, *About Us*, https://absalon-capital.com/about-us/ (last visited June 25, 2024).

[14] All of this notwithstanding the fact that the Ad Hoc Group sought to portray themselves as "a bunch of folks who have never experienced the U.S. Chapter 11 process before," and further described the process as "pretty new and

30.      Jane Sullivan ("**Ms. Sullivan**") is an Executive Vice President of Epiq Corporate Restructuring, LLC ("**Epiq**" or the "**Solicitation Agent**").[15] For over 30 years, Ms. Sullivan has specialized in bankruptcy balloting assignments. *See* Sullivan Decl., ¶¶ 4–23. Notably, Ms. Sullivan was personally involved and played a key role in the creation and development of the solicitation and voting procedures, protocols, and rules that are now commonplace in in chapter 11 cases throughout this District and elsewhere. *See id*.

31.      The history of how the present day solicitation and balloting procedures came to be is an interesting one that Ms. Sullivan had a front-row seat with, having worked on the cases from which they first came to being and through which they were refined into the procedures practitioners across the United States utilize today. *See id*. Many of these solicitation and balloting procedures find their roots in the difficulties and failures experienced in *Southland*. In *Southland*, the bankruptcy court required a resolicitation directly to beneficial owners, rather than through their custodians and/or record holders, given what the court determined to be lax rules and procedures for the verification of record holders' authority to vote on the plan. *See In re Southland Corp.*, 124 B.R. 211, 221 (Bankr. N.D. Tex. 1991); *see also* Sullivan Decl., ¶¶ 7–9.

32.      Given the obstacles to the direct solicitation of beneficial owners, including financial institutions' confidentiality requirements regarding their clients' identities and learning from the verification issues presented in *Southland*, practitioners sought to develop more robust means to solicit votes from beneficial holders. *Sullivan Decl.,* ¶¶ 10–14. Enter the ballot and master ballot

---

foreign to them because a lot of these holders are European and they're not regular players in this space." *See* June 13, 2024 Hearing Trans., at 17:13–17. To suggest that the multi-billion dollar funds that comprise the Ad Hoc Group and are staffed with highly educated financial professionals and who regularly trade in distressed debt are somehow unsophisticated is specious.

[15] Ms. Sullivan's *Declaration* was filed contemporaneously with this Reply, and is incorporated by reference herein.

system, which was developed to preserve the chain of authority from the beneficial owner that ultimately owned the securities to the bank or broker holding the securities through the depository system. *Id.* Over time, specific voting procedures and instructions were drafted regarding the solicitation procedures for securities by using the standard protocol of soliciting votes through the Nominees via the ballot and master ballot process. *Id.* at ¶¶ 7–14, 27–45. Again, Ms. Sullivan was personally involved in the development of these procedures, which are now customary in chapter 11 cases, and were in fact employed in this Chapter 11 Case. *Id.* at ¶¶ 7–14.

33. These now-routine rules and procedures are fairly uniform throughout prepackaged chapter 11 cases and include, but are not limited to: how master ballots and beneficial holder ballots are distributed to beneficial holders; how beneficial holders must vote in order for their vote to be counted; and rules for the exclusion of votes. *Id.* at ¶¶ 27–45. Uniformity in this regard helps provide clarity and finality in the bankruptcy process. *Id.* at ¶ 28–30. Importantly, such rules and procedures are critical to the integrity of the solicitation process in order to, among other things, avoid the issues along the custodial chain *à la Southland. See id.*

34. Given the importance of compliance with the solicitation procedures and voting rules, in every instance, the rules relating to how beneficial holders must vote for their votes to be counted and information as to what votes will not be counted are expressly set forth in the ballots distributed to beneficial holders (by way of their respective Nominees). *Id.* at ¶¶ 27–45. In every chapter 11 case involving bondholders, solicitation materials are distributed to the Nominees acting on behalf of beneficial owners with explicit instructions on how to further distribute the solicitation materials to beneficial holders. *Id.* at ¶ 36–37, 40–43. In turn, the beneficial holder ballots likewise contain explicit instructions, including as to how the beneficial owner must vote (as it relates to the physical act of voting) in order for their vote to be counted. *Id.* As relevant here, the instructions

used in nearly every chapter 11 case involving bondholders will include instructions that the beneficial owner must communicate their vote to their Nominee (unless such ballot is "pre-validated") in order for the solicitation agent to verify the custodial chain. *See id.*

35. In every chapter 11 case involving securities, the solicitation agent turns to The Depository Trust Company ("**DTC**"), the central securities depository of the United States and technical "holder" of all securities held in "street name" through a brokerage firm or bank, to determine which Nominees hold positions in the security at issue as of a particular "record date." *Id.* at ¶¶ 38–39. Indeed, it is impossible for a debtor or its solicitation agent (absent a court order compelling a Nominee to disclose such information) to identify the beneficial owners of bonds. *Id.* at ¶¶ 32–39. The only information available to debtors and its solicitation agent is the identity of the Nominees, who themselves are situated to verify who the bondholders are. *Id.* at ¶ 32. The ballot and master ballot system solves this issue while preserving the chain of authority to ensure that the beneficial owner is a claimholder and entitled to vote on the plan. *See id.* at ¶ 10.

36. Whether the Nominee holds a position in a particular security as of the record date is communicated to the solicitation agent through a Security Position Report ("**SPR**") issued by DTC. *Id.* at ¶ 39. If a Nominee is not listed on the SPR, then the solicitation agent has no way of verifying whether the Nominee actually holds the position it may be attempting to vote on behalf of the beneficial holder and, therefore, the voting agent is required—per the standard rules and practice in chapter 11 bondholder cases—to exclude the vote. *See id.* at ¶ 42.

37. Ms. Sullivan, who has handled *hundreds* of bankruptcy balloting solicitations, confirms that these solicitation procedures and tabulation rules are nearly uniform in every prepackaged or traditional chapter 11 case. *Id.* at ¶ 45.

ii. The Debtor Followed the Standard Solicitation Procedures for Prepackaged Chapter 11 Bankruptcies Involving Bonds and Bondholders and the Ad Hoc Group's Objection to the Solicitation Procedures Should be Overruled.

38. Ms. Sullivan confirms the Debtor's Solicitation Procedures did not deviate from the standard solicitation procedures used in chapter 11 cases for the last several decades. *See* Sullivan Decl., at ¶¶ 46–48. In this instance—like in every other chapter 11 case ballots were sent to (a) the DTC, and (b) the Nominees. *See Certificate of Service of Solicitation Materials* ("**Young Decl.**") [Doc. No. 113], ¶ 3.

39. In this instance—like in every other chapter 11 case—Holders were repeatedly cautioned that they must comply with proper voting procedures in order for their votes to be counted and that improperly submitted votes "shall not be counted." The Beneficial Holder Ballot expressly cautioned Holders in the ballot's "Voting Instructions" that they must properly vote through their Nominees and follow the instructions for their vote to count:

> If your Beneficial Holder Ballot is not received by your Nominee in sufficient time to be included on a timely submitted Master Ballot, it will not be counted unless the Debtor determines otherwise. In all cases, Beneficial Holders should allow sufficient time to assure timely delivery of your Beneficial Holder Ballot to your Nominee. ***Beneficial Holder Ballots must be returned in accordance with the instructions received.***

Beneficial Holder Ballot, Exhibit 4 to the Young Decl., at 11 ¶ 6 (emphasis added). The "Voting Instructions" also expressly advised that duplicate and inconsistent votes will not be counted:

> You may receive more than one Beneficial Holder Ballot if you hold Old Notes Claims through multiple Nominees. You must vote all of your Old Notes Claims to accept or reject the Plan in the same manner. ***Accordingly, if you submit more than one vote and the votes are not consistent, such votes shall not be counted.***

*Id.* at 11 ¶ 10 (emphasis added). The cautions continued, advising Holders that their Beneficial Holder Ballots "***will not be counted***" under the following relevant circumstances:

a. any vote cast by an entity that does not hold Old Notes Claims

as of the Voting Record Date;

b.   any vote sent to any party other than the Nominee (*e.g.*, the Debtor, any official committee, or the Court) or, in the case of a pre-validated Beneficial Holder Ballot, the Claims Agent;

\*   \*   \*

d.   any inconsistent or duplicate votes that are simultaneously cast with respect to the same Old Notes Claim; [and]

e.   any vote (or group of votes from a single creditor) that partially rejects and partially accepts the Plan will not be counted[.]

*Id.* at 12 ¶ 12 (emphasis added). The Master Ballots contained warnings similar to those in the Beneficial Holder Ballots, advising that deviation from the voting instructions would result in their vote not being counted. *See* Young Decl., Exhibit 3, at 14 ¶¶ 6, 8, and 14 ¶¶ 13–14.

40.    In fact, there is no objection that challenges whether the Debtor's Solicitation Procedures complied with the well-established rules, procedures, and practices used in chapter 11 cases. Conceding that each and every vote they now seek to have tabulated was not voted in compliance with these established voting procedures they were explicitly advised of, the Ad Hoc Group instead asks this Court to turn back time to the chaos of the pre-*Southland* world and mandate that the Debtor directly solicit votes from the beneficial owners. *See* AHG Obj., ¶ 30.

41.    Citing no controlling authority, the Ad Hoc Group makes the sweeping assertion that "[a] debtor must solicit votes from beneficial owners, irrespective of whether they hold their claims through Nominees who may be the actual record holders." AHG Obj., ¶ 30. For the reasons stated, this is an impossible task. *See* Sullivan Decl., ¶ 32. Perhaps most critically, establishing a precedent that a debtor must solicit votes directly from beneficial holders would write prepack bankruptcies out of existence—because a court order is required to compel Nominees' disclosure of the beneficial owners, such a requirement would effectively preclude a debtor from soliciting votes at all before the chapter 11 case was filed. The Ad Hoc Group's request to establish this dangerous precedent

should be rejected as it is impractical (if not impossible), deviates from decades' long solicitation practices, writes a new requirement in the Code and Rules, and would upend the chapter 11 process in the context of chapter 11 cases involving bondholders. *See id.* at ¶¶ 7–14, 27–45.

42.     Neither *Southland* nor *In re City of Colorado Springs Spring Creek Gen. Imp. Dist. (Colorado Springs)*, 177 B.R. 684, 691 (Bankr. D. Colo. 1995) are controlling or instructive. First, *Southland* predates the solicitation procedures that are now commonplace in chapter 11 cases; indeed, the issues with the custodial chain in *Southland* are what prompted the creation of the modern methods of soliciting ballots in chapter 11 cases. *See* Sullivan Decl., ¶¶ 7–10 (describing the *Southland* case as "infamous" for this reason). It was these then-existing issues in the then-informal custodial chain that compelled the *Southland* bankruptcy court to conclude that a direct solicitation was required to provide beneficial owners the opportunity to vote on the plan. *See Southland*, 124 B.R. at 221–222, 227. These issues have been resolved through the implementation of the more modern ballot and master ballot system developed post-*Southland* that is consistently approved by bankruptcy courts and was utilized in this Chapter 11 Case. *See generally* Sullivan Decl. *Colorado Springs*, from 1995, is equally antiquated. In *Colorado Springs*, the court determined that there existed "substantial uncertainty as to whether all beneficial bondholders received the [solicitation materials]," notwithstanding that 97% in amount of the impaired voting class cast votes. *Colorado Springs*, 177 B.R. at 688, 692. There is no indication that the beneficial bondholders in this case did not receive the Debtor's solicitation materials. To the contrary, the Ad Hoc Group admits they *did* receive the Debtor's solicitation materials, but did not comply with the voting procedures. Both *Southland* and *Colorado Springs* are out-of-date and inapplicable—neither should be leaned on to create the bad precedent the Ad Hoc Group seeks through its Objection.

iii.     <u>The Vote Tabulation in this Chapter 11 Case Was Proper.</u>

43.     The Ad Hoc Group identifies three categories of votes that it claims were "improperly disqualified" from the final tabulation of votes in this Chapter 11 Case: the "Typo Votes," the "Beneficial Holder Votes," and the "Misrepresented Votes."[16] Despite their attempt to claim these votes were "improperly disqualified," the Ad Hoc Group nonetheless all but expressly concedes that such votes were not submitted in accord with the Voting Instructions and Solicitation Procedures. *See* AHG Obj., ¶¶ 34–40 (describing the various noncompliant ways in which the Excluded Votes were submitted and admitting that the Ad Hoc Group "is not suggesting that the Debtor intentionally miscounted votes"). The Debtor addresses each in turn.

44.     The Beneficial Holder Ballots identified as BR001.019 and BR001.020 (the "**Unrecorded Holder Votes**")[17] were not, as the Ad Hoc Group now claims, "submitted in accordance with the Debtor's proposed Solicitation Procedures." AHG Obj., ¶ 34. To the contrary, the Solicitation Procedures—as in every chapter 11 case, *see* Sullivan Decl., ¶¶ 38–39—require that an entity must hold Old Notes Claims as of the Voting Record Date. *See* Young Decl., Ex. 3, at 12 ¶ 12(a). As in every chapter 11 case, the Solicitation Agent verified Nominees' positions by retrieving the SPR from DTC reflecting those Nominees who held Old Notes Claims as of the Voting Record Date. Sullivan Decl., ¶ 39. If an entity is not listed on the Old Notes SPR, it cannot vote. *See id.* at ¶¶ 39, 42, 53–55; *see also* Fed. R. Bankr. 3018(b); Young Decl., Ex. 4, at 15 ¶ 14(a)

---

[16] The Ad Hoc Group refers to these votes collectively as the "Mistabulated Votes." AHG Obj., ¶ 40. The Debtor declines to do so. To call the votes in question "mistabulated" or "improperly disqualified" is inaccurate for the reasons stated herein. Accordingly, the Debtor refers to the "Mistabulated Votes" instead as the "**Excluded Votes**."

[17] The Ad Hoc Group refers to the ballots identified as BR001.019 and BR001.020 in Exhibit B to the *Declaration of Jane Sullivan of Eqiq Corporate Restructuring, LLC Regarding Solicitation of Votes and Tabulation of Ballots* [Doc. No. 23] (the "**Sullivan Solicitation Declaration**") as the "Typo Votes" contending that they were excluded due to a "typo in the custodial chain [that] caused the incorrect four-digit DTC participant identification number to be inadvertently included." AHG Obj., ¶ 35. The Ad Hoc Group cites to several declarations as support for this contention but has otherwise not established where in said "chain" a "typo" occurred and what the correct DTC participant number for this position would be. *See id.*; Graulich Decl. [Doc. No. 90]; Moneda Decl. [Doc. No. 92]. As far as the Debtor can discern, there was no "typo," and accordingly declines to adopt that nomenclature. Instead, the Debtor refers to these votes as the **Unrecorded Holder Votes**, which more accurately reflects why they were not tabulated—because this DTC participant number was not included in the Old Notes SPR. *See infra.*

(noting that votes cast through a Nominee will be applied "*as evidenced by the record and depository listings*" (emphasis added)). The Ad Hoc Group admits that the DTC participant number identified on the Unrecorded Holder Votes *was not* included on the Master Ballot submitted. AHG Obj., ¶ 34. Consequently, these votes were properly excluded. Sullivan Decl., ¶¶ 53–57.

45.     The Ad Hoc Group's contention that the Unrecorded Holder Votes must now be included in the tabulation on the basis that it has "demonstrated that Moneda was the beneficial holder on the Voting Record Date" is incorrect. AHG Obj., ¶ 35. First, Moneda has not "demonstrated that [it] was the beneficial holder on the Voting Record Date" and certainly has not submitted "indisputable proof." Reference is made to the Moneda Declaration [Doc. No. 92], which attaches a "Position and P&L Report" from JP Morgan purportedly detailing an account held by Moneda as of March 7, 2024. While on its face this document appears to support the Ad Hoc Group's contention that it has "demonstrated" Moneda's position, for the reasons noted by Ms. Sullivan, this document is insufficient to authenticate Moneda's position on the Voting Record Date. Sullivan Decl., ¶ 58. Second, the more far-reaching problem with the contention that this after-the-fact "demonstration" must take priority over the DTC's SPR as of the Voting Record Date is that it undermines the certainty and finality that the voting rules and procedures set forth in the Solicitation Procedures provide. *See generally Id*. Indeed, as discussed *infra*, there is no mechanism under the Rules for this forced retabulation of improperly submitted votes. *See infra*.

46.     Third, the Ad Hoc Group's belief that this purported "proof" trumps the Solicitation Procedures is wrong for the additional reason that it violates the Rules. While the Ad Hoc Group seeks to have the Unrecorded Holder Votes tabulated pursuant to Rule 3018(a), *see infra*, the Court should instead look to Rule 3018(b), which provides in its pertinent part:

> *(b) Acceptances or Rejections Obtained Before Petition.* An equity
> security holder or creditor whose claim is based on a security of

> record who accepted or rejected the plan before the commencement of the case ***shall not be deemed to have accepted or rejected the plan*** pursuant to §1126(b) of the Code ***unless the equity security holder or creditor was the holder of record of the security on the date specified in the solicitation of such acceptance or rejection for the purposes of such solicitation.***

Fed. R. Bankr. 3018(b) (emphasis added). Stated in the inverse, if a holder is not the "holder of record" as of the date specified in the solicitation package, then the holder's vote does not count. *See id.* Under long-established practice, a holder is determined to be a holder of record through the DTC's participant list as of a given voting record date, not by some informal statement by the alleged holder itself. *See* Sullivan Decl., ¶¶ 38–39. As noted, this is the means utilized to authenticate a holder's position used throughout the chapter 11 process. *Id.* Thus, it is not merely the custom and practice of chapter 11 solicitations that the Ad Hoc Group's position violates, but also the Rules.

47.     Moving to the "Beneficial Holder Votes,"[18] such votes were also not "improperly rejected." AHG Obj., ¶ 36. Rather, these votes were very clearly improperly submitted "directly to the Solicitation Agent," as the Ad Hoc Group admits.[19] *Id.* at ¶ 37. As noted, the Beneficial Holder Ballots clearly caution holders that communicating the Beneficial Holder Ballot "to any party other than the Nominee" will result in the vote "not be[ing] counted."[20] Young Decl., Ex. 4, at 12 ¶ 12(b). This rule, like all other rules employed in the soliciting process, exists for a purpose: only the Nominee can verify whether a beneficial owner actually holds a votable position. Sullivan Decl., ¶ 42. Neither the Solicitation Agent nor the Debtor have any way of verifying this information

---

[18] The "Beneficial Holder Votes" refers to the ballots identified as BB001, BB002, BB004, BB007, and BB008 in the Sullivan Solicitation Declaration [Doc. No. 23].

[19] The Ad Hoc Group fails to identify the actual issues that led to the direct (and improper) submission of these ballots, making only the vague statement that they "experienced at least certain of the voting difficulties" identified elsewhere in the Objection. Other than those "difficulties" identified by First Geneva, the Debtor is left wondering what "difficulties" each of the other members of the Ad Hoc Group specifically faced.

[20] Only in the case of a "pre-validated" Beneficial Holder Ballot can the Beneficial Holder Ballot be sent directly to the Solicitation Agent. *See* Young Decl., Ex. 4, at 12 ¶ 12(b). A "pre-validated" Beneficial Holder Ballot is one in which the Nominee certifies or "validates" that the beneficial owner executing the Beneficial Holder Ballot actually holds the position indicated in the Beneficial Holder Ballot. Sullivan Decl., ¶ 41.

themselves and, thus, an email communicating what purports to be a beneficial owners' vote is functionally useless for purposes of tabulating *valid* votes. *See id.* at ¶¶ 59–61. That the beneficial owners of these votes have come forward in a (flawed) attempt to verify their positions and intended votes further seeks to undermine the certainty and finality of the solicitation process that is necessary for chapter 11 bankruptcies, and in particular, prepackaged chapter 11 bankruptcies, to proceed efficiently through the chapter 11 process. *See id.* at ¶¶ 7–14, 27–45.

48.     In fact, two of these positions—the Vontobel position ($5,770,000) and the Julius Baer position ($3,500,000)—were voted *twice*. Prior to the Voting Deadline, the Solicitation Agent received a properly-executed Master Ballot from Citibank NA, as Nominee for various beneficial holders (the "**Citibank Master Ballot**").[21] Sullivan Decl., ¶¶ 62–67. The Citibank Master Ballot voted to accept the Plan, and the aforementioned positions for Vontobel and Julius Baer. *Id.* at ¶ 63. Because this vote was reflected on a properly-submitted Master Ballot, the Solicitation Agent *could have* included such acceptances in the final tabulation. *Id.* at ¶ 66. The Solicitation Agent did not do so in an exercise of reasoned discretion and fairness towards Vontobel and Julius Baer in light of their apparent (but unverifiable) intention to vote to reject the Plan. *Id.*

49.     The Citibank Master Ballot and the two votes for Vontobel and Julius Baer reflected therein are included in the votes identified by the Ad Hoc Group as the "Misrepresented Votes." *See* AHG Obj., ¶¶ 39–40. Citing no support, the Ad Hoc Group contends "it is insufficient" to have the Citibank Master Ballot cancel out the "Beneficial Holder Votes." *Id.* at ¶ 41. The Ad Hoc Group is incorrect once again. The distinction between the Citibank Master Ballot and the Beneficial Holder Votes is obvious and admitted: the former was validly submitted in compliance with the well-

---

[21] The Citibank Master Ballot is referred to as "MB002" in the Ad Hoc Group's Objection. The Ad Hoc Group believes, but even now cannot confirm whether Vontobel and Julius Baer "instructed their Nominees to vote against the Plan." See AHG Obj., ¶¶ 39–40 (making such an assertion on "information and belief" and including only a declaration from First Geneva establishing the instructions First Geneva provided to its Nominee).

established Solicitation Procedures that are themselves consistent with solicitation procedures used throughout bondholder chapter 11 cases; and the latter was submitted incorrectly, not in compliance with the Solicitation Procedures, and in a manner contrary to the clear and unambiguous Voting Instructions reflected on the Beneficial Holder Ballots. Thus, the Solicitation Agent was not free to exercise its discretion and accept the incorrectly submitted Beneficial Holder Votes purportedly reflected in BB002 and BB004 precisely because such votes were communicated incorrectly and unverifiable for that very reason. *See supra*; Sullivan Decl., ¶ 66.

50.     There is no genuine dispute that the vote tabulation in this Chapter 11 Case, conducted pursuant to and consistent with the Solicitation Procedures and long-standing, well-established rules for tabulating votes in prepackaged and traditional chapter 11 cases personally developed and administered here by the Debtor's highly sophisticated Solicitation Agent, were appropriate. The Ad Hoc Group's inability to vote in line with these established and commonplace procedures, many of which were spelled out in the ballots they sought to improperly submit, is not indicative of a larger problem with the Debtor's Solicitation Procedures. If such were the case, the "difficulties" identified by the Ad Hoc Group would not be indicative of a flaw in *the Debtor's* Solicitation Procedures, but with the solicitation procedures now utilized in nearly all prepackaged and traditional chapter 11 cases *writ large*. This Bankruptcy Court should decline the Ad Hoc Group's invitation to create the dangerous precedent that would result in the upending of these established procedures if their positions in this respect are accepted.

iv.     The 3018 Motion Should be Denied.

51.     The 3018 Motion should be denied for the primary reason that Rule 3018(a) does not apply to the present circumstances and does not provide the Ad Hoc Group (or any holder in a chapter 11 case) with a mechanism to correct improperly submitted votes. The relief sought—that

a series of improperly submitted (the Beneficial Holder Votes) and unauthenticated (the Unrecorded Holder Votes) rejecting votes, some of which were *properly* voted to *accept* the Plan (the Vontobel and Julius Baer votes included among the Unrecorded Holder Votes) be tabulated—is outside the confines of the Rule. The face of the Rule makes this clear: it applies where a holder wishes "to change or withdraw an acceptance or rejection." As the Ad Hoc Group admits, this is not what they are asking of this Bankruptcy Court. *See* AHG Obj., ¶ 48 n.24 (admitting that the Ad Hoc Group is <u>not</u> requesting "to change or withdraw an acceptance or rejection"), ¶ 53 (same). Thus, the Ad Hoc Group is seeking to expand the Rule beyond its plain language and purpose. Perhaps most tellingly, none of the Ad Hoc Group's cited authority supports this novel application of Rule 3018 as a mechanism to supersede and undermine the customary solicitation and vote tabulation procedures utilized in this Chapter 11 Case and others. *See generally supra*.

52.    Even if the Rule did apply under the present circumstances, and it does not, the Ad Hoc Group has not established the requisite "cause." "[T]he test for cause very much depends on the context," and often looks to the motivation of the movant and whether the requested releif seeks "to enhance the objector's leverage in opposing confirmation." *See In re MPM Silicones, LLC*, No. 14-22503-RDD, 2014 WL 4637175, at *2 (Bankr. S.D.N.Y. Sept. 17, 2014). Although the Ad Hoc Group asserts that the motivation in forcing the acceptance of their otherwise improperly submitted votes is merely to reflect their "intent," the Debtor disputes this: the motivation could easily be to prevent confirmation of what is otherwise a properly-solicited, properly-tabulated, and consensual Plan. In fact, the Ad Hoc Group does not shy away from this reality, recognizing that, if granted (as to all the votes)[22] it will serve to disrupt this prepackaged Chapter 11 Case and prevent confirmation of the Plan. *See* AHG Obj., ¶ 54 ("granting the 3018 Motion will prevent confirmation of the Plan").

---

[22] The Bankruptcy Court must force retabulation of all, or nearly all, of the Excluded Votes for the Ad Hoc Group to defeat confirmation of the Plan. *See* 11 U.S.C. § 1126.

53.     Further, cause must be demonstrated as to each of the votes the Ad Hoc Group seeks to have tabulated. Accordingly, each category of vote merits further scrutiny under the lens of Rule 3018 and the claimed "human error" provided by the Ad Hoc Group as the basis for their Motion.

54.     As to the Beneficial Holder Votes, the Ad Hoc Group contends that these votes satisfy Rule 3018(c) because they were in writing, identify the plan accepted or rejected, were signed by the holder, and were on the appropriate Official Form. AHG Obj., ¶¶ 50–51. Of course, that is not the sole requirement for the system to work. In practice, the general requirements of Rule 3018(c) must be satisfied, but so too must those requirements—exhibited in the Solicitation Procedures in this case and countless others—that allow solicitation agents to authenticate the positions reflected in the ballots submitted. *Supra*. This includes submitting a beneficial holder ballot (unless pre-validated) to the Nominee for authentication of the holder's position. *See id.*; Sullivan Decl., ¶¶ 40–41. Absent compliance with this long-customary and now-commonplace process a debtor cannot confirm that the requirements of Rule 3018(b) are satisfied, *i.e.*, that "the equity security holder or creditor was ***the holder of record*** of the security" on the particular voting record date. Fed. R. Bankr. 3018(b) (emphasis added).

55.     It is worth further breaking down the votes included in the Ad Hoc Group's Beneficial Holder Votes into two smaller categories: (a) the votes submitted for Vontobel and Julius Baer, and (b) those submitted for A3E ($1,500,000) and Absalon ($4,000,000). As to the latter, those votes for A3E and Absalon, such votes *have never been authenticated in any way by a DTC participant*. Sullivan Decl., ¶ 69. Nor has the Ad Hoc Group introduced any evidence to establish that they were entitled to vote the identified amounts as of the Voting Record Date. All that the Ad Hoc Group submits as to these two votes are those emails sent directly to the Solicitation Agent containing their Beneficial Holder Ballots (which themselves explicitly note that the method in

which they are attempting to vote "will <u>not</u> be counted"). *See* Graulich Decl. [Doc. No. 90], Ex. D & E. For the same reason this is insufficient to authenticate their claimed positions prior to the Voting Date, it is insufficient now. *See* Sullivan Decl., ¶¶ 61, 69. The Court should reject the Ad Hoc Group's attempt to force inclusion of these two votes for this additional reason.[23]

56.    The Unrecorded Holder Votes and Misrepresented Votes face equally as many issues, as discussed at length *supra*. The Ad Hoc Group describes the issue as a "clerical error somewhere in the chain of voting" as to both groups. AHG Obj., ¶ 53. But, these too need to be broken down. To recall, the Unrecorded Holder Votes purportedly belonging to Moneda ($8,382,000.00 and $2,450,000.00) were not listed on the Old Notes SPR and, therefore, the position was never verified by DTC, as required. Sullivan Decl., ¶¶ 53–54, 57. These are simply invalid rejecting votes and, thus, improperly sought to be subject to the procedure for *changing* votes set out in Rule 3018(a). Further, the Ad Hoc Group's present claim that "there is no question that Moneda [] w[as] noteholders on the proposed Voting Record Date," AHG Obj., ¶ 53, is incorrect as their representations in a brief and the JP Morgan report attached to their declaration does not establish that they held these positions as of the Voting Record Date. Sullivan Decl., ¶ 58 (noting that this brokerage statement would not be "acceptable proof of ownership," and quoting the language directly from the statement saying as much. The Misrepresented Vote of First Geneva ($2,000,000) is perhaps the only vote that could conceivably fit within the confines of Rule 3019(a), insofar as First Geneva seeks to change an acceptance to a rejection. *See* AHG Obj., ¶ 46 (requesting to change the vote for First Geneva reflected in the Citibank Master Ballot). However, yet again the request has the practical effect of derailing established procedures.

---

[23] The only reason the Vontobel and Julius Baer votes were able to be identified in some fashion was because they were voted on a properly submitted Master Ballot that explicitly identified them by name and amount. Sullivan Decl., ¶ 63.

57.     Again, the solicitation procedures used in chapter 11 cases, those same procedures used here, exist for a reason, and the clarity and finality that these procedures provide for is only undermined by requests like those presented under the guise of Rule 3018 here. Rule 3018 was not intended to create a second opportunity to vote when a holder fails to comply with otherwise unobjectionable and routine solicitation procedures, nor was it created as a mechanism to correct an improper, invalid, or untimely vote. If read to apply to instances where a voter votes incorrectly, then the solicitation practices used in this Chapter 11 Case, the purpose of which has been described in great detail herein, would be substantially undermined.

58.     In sum, the Court should not accept the Ad Hoc Group's invitation to deviate from the norm and upend established, clearly communicated, and routine voting procedures designed to create finality and certainty in the chapter 11 process and avoid scenarios such as those seen in *Southland*. The Ad Hoc Group wrongly criticizes the Debtor for attempting to open the proverbial floodgates "for future abusive behavior," when it is the Ad Hoc Group who seeks to do precisely that by vitiating such well-established solicitation and voting rules. Forcing tabulation of the Excluded Votes would create a novel precedent in this District that disgruntled bondholders (here, a minority group) can force a recount of votes after the established (and presumptively reasonable) voting deadline based on their own failure to comply with established, routine, and uncontroversial voting procedures. The Court should decline to create such new and exceptional precedent.

59.     The various faults in the relationships between the members of the Ad Hoc Group and their respective Nominees reflect issues outside of the Debtor's control and in no way demonstrate "the insufficiency of the Debtor's proposed Solicitation Procedures." *See* AHG Obj., ¶ 42. Derogation of the otherwise proper Solicitation Procedures (in this case and in future cases) and

the disruption of the chapter 11 process is not the solution to these disgruntled bondholders' desire to avoid pursuing claims against their respective Nominees.

## II.     THIS CHAPTER 11 CASE IS NOT AN "OUTLIER."

60.     This Chapter 11 Case is not a "severe [] outlier," as the Ad Hoc Group would have this Bankruptcy Court believe. *See* AHG Obj., ¶¶ 3–7. The Ad Hoc Group is only able to reach that conclusion through a series of false and flawed comparisons.

61.     As a threshold point, the Ad Hoc Group's argument that the level of voter "turnout" is somehow indicative of a flaw in the Solicitation Procedures is a red herring. Neither the Code nor the Rules (nor the SDNY Prepack Guidelines) set a participation "floor" for voting. When drafting the Bankruptcy Code, Congress could have required a threshold level of voter participation in amount[24] in order for a chapter 11 plan to confirmed. It did not. Presumably, if there was reason to suspect that low voter participation was, in and of itself, indicative of an issue that required a more searching inquiry, Congress could have written that into the Code. Again, it did not. Rather, Congress concluded, more generally, that if (a) the offering memorandum is adequate, (b) the voting period was sufficient, and (c) the plan meets all the technical requirements of section 1129, then the Bankruptcy Court must confirm the Plan. Those facts exist here. *Supra*; Confirmation Brief. In fact, Congress included only one numerosity threshold when drafting the Code—the one under section 1126, which requires that two-thirds in amount and one-half in number *who vote*, vote to accept the plan. 11 U.S.C. § 1126. That requirement was likewise satisfied here, and confirmation of the Plan is appropriate. *See supra*; Confirmation Brief.

62.     Put simply, the Ad Hoc Group subtly asks the Bankruptcy Court to rewrite the Code to include confirmation requirements that would prove favorable to them in this case, but that do

---

[24] For the reasons noted *supra*, requiring a voter threshold *in number* would be an impossible task, as there is no way for the debtors or solicitation agents in bondholder cases to identify all such bondholders.

not otherwise exist. For this preliminary reason alone, the Court should disregard the Ad Hoc Group's objection to the Plan on the basis that there was allegedly low voter "turnout."

63.     The Ad Hoc Group's attempt to draw comparisons between the participation rate in this case and others to paint this case as a "severe [] outlier" is not only legally flawed, *supra*, but equally flawed on the facts. Many of the cases cited are distinguishable and do not serve as proper comparisons to this Chapter 11 Case. A more honest chart of factually analogous comparators confirms that this case is neither unique nor an "outlier," and that confirmation of the Plan would be consistent with those confirmed in other cases in this District and throughout the United States.

64.     Of the thirty-two (32) cases that the Ad Hoc Group includes in the table in Paragraph 6 of their Objection, eighteen (18) do not involve voter participation from bondholders.

| Case | Claims Entitled to Vote | Voting Claims (% of Claims Entitled to Vote) | Accepting Claims (% of Voting Claims) | Impaired Bondholders? |
|---|---|---|---|---|
| Capstone | $56,953,058 | 100% | 100% | No |
| Sunlight Financial | $118,639,341 | 100% | 100% | No |
| KidKraft | $146,944,000 | 100% | 100% | No |
| Charge Enterprises | $51,000,000 | 100% | 100% | No |
| Novation | $97,804,338 | 64% | 100% | No |
| RevitaLid | $80,082,689 | 100% | 100% | No |
| Vewd Software | $117,962,539 | 100% | 100% | No |
| Airspan | $205,140,000 | 97.35% | 100% | No |
| PREIT | $726,984,655 | 100% | 100% | No |
| Nautical Solutions | $662,574,820 | 100% | 73.56% | No |
| AeroCision | $129,714,625 | 100% | 100% | No |
| PacificCo | $334,465,702 | 98.46% | 99.91% | No |
| Strategic Materials | $376,534,077 | 92.20% | 100% | No |
| OSG | $626,752,784 | 87.91% | 100% | No |
| PARTS iD | $46,182,359 | 89.32% | 99.14% | No |
| JOANN | $1,273,874,863 | 93.72% | 100% | No |
| ConvergeOne | $1,674,000,000 | 93.71% | 90.60% | No |
| Lumileds | $1,689,182,617 | 92.40% | 100% | No |

The solicitation of bondholders is notably distinct from the solicitation of beneficial owners in other contexts. For example, the above listed prepackaged bankruptcy cases involve many creditors that are banks or other types of lenders, whose identity is known to the debtor. In such cases, the solicitation and vote tabulation procedures are distinct from those here insofar as they are tailored

to the fact that creditors are readily identifiable by the debtor and the solicitation agent. *See* Sullivan Decl., ¶ 49. In contrast, and as noted herein, in bankruptcies involving bondholders, neither the debtor nor the solicitation agent is able to ascertain who the beneficial owners of the outstanding bonds are. *See supra*. This distinction is further demonstrated and confirmed by the fact that more than half of these non-bond cases involved less than 35 individual creditors participating, at least eight (8) involved less than ten (10) individual creditors participating, and three involved a single creditor participating. [25] Thus, the Ad Hoc Group is making an apples to oranges comparison and the voter participation rates in these eighteen (18) cases cited by the Ad Hoc Group have no bearing on what the level of voter participation should look like in this case.

65.    A closer look at the remainder of the cases[26] that the Ad Hoc Group references on Paragraphs 4 and 6 of their Objection—*i.e,*, those that involve bonds and bondholders like the case *sub judice*—confirms that the participation rate that occurred here is not the "severe outlier" the Ad Hoc Group contends it is, but is in fact in line with what is seen in other bondholder prepack cases:

| Case | Claims Entitled to Vote | Voting Claims (% of Claims Entitled to Vote) | Total # Impaired Claims Included in Vote | Voting Period |
|---|---|---|---|---|
| Gamida Cell | $79,429,066 | 100% | 5 | 28 days |
| Appgate | $113,315,647 | 93.25% | 10 | 2 days |
| Rockley | $119,958,988 | 100% | 17 | 3 days |
| View, Inc. | $274,366,000 | 89.95% | 31 Overall<br>*17 Bondholders* | 30 days |
| Quotient | $256,579,463 | 101.33% (*sic*)[27] | 53 Overall<br>*38 Bondholders* | 28 days |
| Latin America Power | $408,730,000 | 88.46% | 60 | 29 days |
| GTT | $2,015,257,369 | 88.96%<br>*Bondholder Participation:* 74.35% | 400 Overall<br>*67 Bondholders* | 21 days |
| Inversiones Alsacia | $464,000,000 | 82.67% | 82 | 25 days |
| Maxcom | $103,400,00 | 60.34% | 118 | 58 days |

---

[25] These cases are: Capstone (1); Sunlight Financial (1); KidKraft (1); Charge Enterprises (2); Novation (2); RevitaLid (6); Vewd Software (7); Airspan (9); PREIT (25); Nautical Solutions (30); and AeroCision (34).

[26] The Court can take judicial notice of the disclosure statements, declarations, and other materials filed in these cases, and the Debtor is happy to provide copies of such documents for the Court upon request.

[27] The 101.33% participation rate in *Quotient* is erroneous as the total amount of voters that participated in Class 4 exceeded the aggregate amount of Class 4 claims reflected in the disclosure statement.

| | | | | |
|---|---|---|---|---|
| Posadas | $392,605,000*[28] | 50.92% | 120 | 30 days |
| Lannett | $589,100,000 | 94.26% | 123 | 14 days |
| Air Methods | $1,790,817,833 | 95.98%<br>*Bondholder Participation: 89.48%* | 539 Overall<br>*123 Bondholders* | 34 days |
| CURO | $1,295,800,000 | 77.28%<br>*Bondholder Participation: 81.3%* | 237 Overall<br>*196 Bondholders* | 44 days |
| Akumin | $1,395,500,000 | 93.33%<br>*Bondholder Participation: 91.47%* | 248 Overall<br>*244 Bondholders* | 25 days |
| Venator | $972,933,407 | 87.50% | 400 | 32 days |
| Audacy | $1,852,541,670 | 87.14% | 439 | 34 days |
| Diebold | $2,161,715,827 | 80.37% | 662 | 29 days |
| Mallinckrodt | $3,512,098,138 | 85.91% | Hundreds | 120 days |

66.     As reflected above, the voter "participation" rates in comparable bondholder prepackaged chapter 11 cases (those with over 60 holders) that have been confirmed varies considerably, from 94.26% in some cases, to as low as 50.92% in others (*e.g.*, *Posadas*, *Maxcom*). Those handful of cases with consistently high bondholder participation (*e.g.*, *Gamida Cell*, *Appgate*, *Rockley*, and *Quotient*), involved far fewer bondholders, only a handful in some cases (*e.g.*, *Gamida Cell*). Certainly where there are fewer bondholders—*e.g.*, those cases with less than 60 holders that participated in the vote, not even half of the 128 holders that participated in this case—a higher participation rate is easier to achieve. Regardless, as evident from the chart above, and the applicable rules, there is simply no "sweet spot" or specific percentage of participation that is (or could be deemed) required for prepackaged chapter 11 cases.

67.     Notably, with respect to bondholder prepacks that share facts similar to this Chapter 11 Case, courts in this District have confirmed plans with even less participation than the Debtor received. For example, Judge Drain in *Maxcom*, another prepack with a single class of impaired bondholders where 118 voters holders participated in the vote, only 60.34% of the outstanding bondholders voted on the plan and the bankruptcy court confirmed the plan. Likewise in *Posadas*,

---

[28] The Ad Hoc Group erroneously state that the aggregate amount owed to all impaired bondholders in *Posadas* was $1,999,900,000. That amount only reflects the total dollar amount of impaired bondholders that were included on the vote. The disclosure statement in *Posadas* confirms that the aggregate dollar amount of impaired bondholders was only $392,605,000, which, as reflected in the chart above, resulted in a significantly lower participation rate.

which involved a single class of impaired bondholders where 120 holders participated in the vote, only 50.92% of the outstanding bondholders voted on the plan and the court confirmed the plan.

68.     The proper comparison comes into even greater focus when you consider the actual "participation" rate in this Chapter 11 Case. The following ballots were voted properly and in compliance with the Solicitation Procedures, and indicated votes to accept the Plan, but were correctly excluded from the tabulation for the reasons identified in Exhibit B to the Sullivan Solicitation Declaration, this Reply, and the Sullivan Declaration:

| Ballot | Participant Name | Amount |
|---|---|---|
| Citibank Master Ballot (MB002) | Vontobel | $5,777,000.00 |
| Citibank Master Ballot (MB002) | Julius Baer | $3,500,000.00 |
| BR001.018 | UBS Financial Services LLC | $25,116,000.00 |

While these positions were properly excluded from the vote tabulation, including them would yield a more accurate picture of how many properly cast votes (in amount) there were. When these votes to accept the Plan are included in the "turnout" calculation, the participation rate rises to nearly 60% (*i.e.*, 59.14%). (Even by including only the insider vote of $25,116,000.00, the participation rate rises to 54.74%.) With this adjustment, the "turnout" rate in this case is squarely in good company, and even higher than the other bondholder prepacks that courts have approved. It bears repeating, nonetheless, that the participation rate (or voter "turnout") is irrelevant. The Code imposes no such requirement to confirm a plan. The Ad Hoc Group is attempting to unfairly tilt the board in their favor by subtly asking this Bankruptcy Court to adopt this implicit and novel precedent.

## III.     THE PLAN MEETS ALL § 1129 REQUIREMENTS.

69.     As noted *supra*, the Ad Hoc Group's Objection as it relates to sections 1129(a)(2), (3), (8), and (10), should be overruled. The Debtor's Disclosure Statement satisfies all requirements of the Code, there is no genuine challenge that the Plan was not proposed "in good faith," and the voting requirements of the Code are satisfied because the Excluded Votes were properly excluded,

and the 3018 Motion should be denied. *See supra.* Furthermore, the Plan meets the low burden that is the "best interests test"[29] insofar as the liquidation analysis confirms that a chapter 7 liquidation would result in Class A holders receiving substantially less (25%) than their proposed treatment under the Plan (75%). *See* Plan Supplement [Doc. No. 78.]

## IV.  THE UCC MOTION SHOULD BE GRANTED.

70.     The sole basis presented for the denial of the UCC Motion is that the Plan cannot be confirmed because it has not met the requisite thresholds for approval. *See* AHG Obj., ¶¶ 19–24. Of course, the only way to reach that conclusion is if *all* of the improper Excluded Votes are compelled to be included in the vote tabulation. *See id.* For the reasons stated *supra*, the Excluded Votes were properly excluded, and the 3018 Motion should be denied. Thus, the UCC Motion should be granted.

## CONCLUSION

71.     For all of the reasons set forth herein, and as will be further demonstrated at the Confirmation Hearing, the Debtor respectfully requests that the Bankruptcy Court: (I) overrule the Ad Hoc Group's Objection; (II) deny the 3018 Motion; (III) overrule the U.S. Trustee's Objection; (IV) approve the Debtor's (a) Disclosure Statement, (b) the Solicitation Procedures, and (c) the form of Ballots; (V) confirm the Plan as fully satisfying all applicable requirements of the Code by entering the Proposed Confirmation Order; and (VI) grant such further relief as is just and proper.

*[Remainder of Page Intentionally Left Blank]*

---

[29] *See* UST Obj., at 15.

Dated: June 25, 2024 **BAKER & McKENZIE LLP**

By: _/s/ Paul J. Keenan_
    Paul J. Keenan Jr. (admitted _pro hac vice_)
    Reginald Sainvil (admitted _pro hac vice_)
    Benjamin Davis (admitted _pro hac vice_)
    Dionna Shear (admitted _pro hac vice_)
    1111 Brickell Avenue, 10th Floor
    Miami, FL 33131
    Telephone: 305-789-8900
    Facsimile: 305-789-8953
    Email: paul.keenan@bakermckenzie.com
           reginald.sainvil@bakermckenzie.com
           benjamin.davis@bakermckenzie.com
           dionna.shear@bakermckenzie.com

    _– and –_

    Blaire Cahn
    452 Fifth Avenue
    New York, NY 10018
    Telephone: 212-626-4100
    Facsimile: 212-310-1600
    Email: blaire.cahn@bakermckenzie.com

    _Proposed Counsel for the Debtor and Debtor-in-Possession_