

EXHIBIT A

Paul J. Keenan Jr. (*pro hac vice pending*)
Reginald Sainvil (*pro hac vice pending*)
Baker & McKenzie LLP
1111 Brickell Avenue, 10th Floor
Miami, FL 33130
Telephone: 305-789-8900
Facsimile: 305-789-8953
Email: paul.keenan@bakermckenzie.com
        reginald.sainvil@bakermckenzie.com

Blaire Cahn
Baker & McKenzie LLP
452 Fifth Avenue
New York, NY 10018
Telephone: 212-626-4100
Facsimile: 212-310-1600
Email: blaire.cahn@bakermckenzie.com

*Proposed Counsel for the Debtor*
*and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CREDIVALORES – CREDISERVICIOS S.A. | Case No. 24-10837 (DSJ) |
| Debtor. | |

_____/

**DECLARATION OF JAIME FRANCISCO BURITICÁ LEAL**
**IN SUPPORT OF (I) THE CHAPTER 11 PETITION AND FIRST**
**DAY PLEADINGS AND (II) PURSUANT TO LOCAL RULE 1007-2**

I, Jaime Francisco Buriticá Leal, hereby declare, under penalty of perjury, as follows:

1.      I am the *Gerente General*, or Chief Executive Officer, at Credivalores – Crediservicios S.A., a company organized under the laws of Colombia ("**Credivalores**"), the above-captioned debtor and debtor in possession (the "**Debtor**," or the "**Company**"). I have served the Debtor in this role since October of 2023. Based on my service in these roles, I am generally familiar with the Debtor's day-to-day operations, business and financial affairs, and books and

1

records, and the circumstances leading to the commencement of the Debtor's above-captioned Chapter 11 case (the "**Chapter 11 Case**").

2.      I have had an extensive career in the financial sector, with expertise in investment banking, portfolio management in local and international markets, debt restructuring, and foreign trade.  Prior to joining the Debtor, I was the Treasury Director for Bancóldex.  I hold a professional degree in public accounting from Universidad Santo Tomás, with an MBA from Universidad de Los Andes and postgraduate studies in finance and economics from the same institution.

3.      On May 16, 2024 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in this Court seeking approval of its Prepackaged Chapter 11 Plan (as may be amended or modified, the "**Plan**") so as to permit the restructuring of the Debtor's notes issued under that certain Indenture, dated February 7, 2020, between the Debtor and the Bank of New York Mellon (the "**Old Notes**"), on the terms set forth in the Plan.

4.      On the Petition Date, the Debtor also filed a number of motions and applications (collectively, the "**First Day Motions**") in order to move towards approval and confirmation of the Plan in a manner that will allow the Debtor to operate in Chapter 11 with minimum disruption or loss of value. I am familiar with the contents of each of the First Day Motions (including the exhibits thereto), and believe that the relief sought in each of the First Day Motions is necessary to ensure a successful restructuring of the Old Notes as set forth in the Plan.

5.      I submit this declaration (the "**Declaration**") in accordance with Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**") and 28 U.S.C. § 1746 (the "**First Day Declaration**"). Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based on my personal knowledge, information supplied to me by

others at the Debtor and the Debtor's professionals, were learned from my review of relevant documents, or are my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtor. If called upon to testify, I would testify competently to the facts set forth herein.

6.      To familiarize the Bankruptcy Court with the Debtor, its business, the circumstances leading to the commencement of the Chapter 11 Case, and the relief the Debtor is seeking in those certain motions and applications filed contemporaneously herewith, I have organized this Declaration as follows:

(a)      Part I of this Declaration describes the background and business of the Debtor;

(b)      Part II describes the Debtor's prepetition capital structure and indebtedness;

(c)      Part III describes circumstances leading to the commencement of the Chapter 11 Case and the efforts of the Debtor to restructure the Old Notes;

(d)      Part IV sets forth the relevant facts in support of each of the First Day Motions; and

(e)      Part V contains statements and schedules providing additional information about the Debtor, as required by Local Rule 1007-2.

## PART I

## BACKGROUND AND BUSINESS OF THE DEBTOR

**A.      Corporate History and Organizational Structure**

7.      Crediservicios S.A. was formed in 2003 for the primary purpose of providing payroll deduction loans. Credivalores S.A. was also formed in 2003 and its primary business activities were factoring transactions and the financing of goods, services, and insurance premiums. Both companies provided their services locally in Cali, Colombia. As a result of a merger in 2008, Credivalores S.A. was fully absorbed into Crediservicios S.A. and the resulting entity changed its name to Credivalores – Crediservicios S.A.S.

3

8.      Over time, the Debtor grew into other geographic regions throughout Colombia, including Bogotá. In 2010, the Debtor was capitalized by two private equity funds, ACON Colombia Consumer Finance Holdings, S.L. and HSBC Capital (now Graycliff Partners), in order to strengthen its capital structure and leverage its high growth potential. In May 2014, the Debtor received a new capital injection from Gramercy, a U.S. investment manager, and as a result Gramercy became a new shareholder of the Debtor. In March 2015, Gramercy completed a new capital injection, which strengthened the Debtor's equity, promoted strong growth and improved its capitalization ratios.

9.      In June 2019, the Debtor completed a legal corporate transformation from a simplified stock corporation (*sociedad por acciones simplificadas or S.A.S*) to become a stock corporation (*sociedad anónima or S.A.*) under Colombian law and changed its name to Credivalores – Crediservicios S.A, the Debtor's current legal name.

**B.     The Debtor's Business Model**

10.     The Debtor is the largest non-bank financial institution in Colombia engaged primarily in consumer lending, focusing its offerings on a variety of flexible, specialized, and tailored credit and financing alternatives, which includes payroll deduction loans (*Tucrédito*), and insurance premium financing (*Credipóliza*), to the less-privileged segments of the Colombian population that is not served by traditional banks in small and mid-sized cities.

11.     The Debtor's main product is payroll loans, which are consumer loans whose monthly repayments/installments are deducted directly from the client's paycheck by its employer, who in turn transfers it directly to the Debtor.  The Debtor contracts directly with employers in Colombia to offer such loans to the employer's employees (each individual "**Client**" and the "**Clients**," collectively). Payroll loans are an integral financing and credit option for Colombian residents, representing approximately 35% of total consumer loans in the Colombian financial

system. Given the aforementioned collection mechanism, payroll loans typically have lower default ratios than other consumer loans. Moreover, the payroll loans are secured by an irrevocable order or authorization from the Clients to their respective employers (or to the entity that pays their salary or other financial benefits arising from their employment).

12.     In addition to the Payroll Loan Business, the Debtor also offers three (3) other services, two (2) legacy services that are being wound down and/or sold, and one (1) representing only a small portion of the Debtor's overall business operations.

13.     One such legacy portion of the Debtor's business operations is tailored to the provision of credit cards for Clients (the "**Credit Card Business**").  The Credit Card Business segment was initially launched as a revolving personal line of credit to finance the acquisition of specific goods, such as home appliances, or to finance home improvement projects.  Eventually, this segment evolved into a Debtor-branded credit card. The credit card was offered to Clients in major retailers in Colombia and could be used at any retail merchant that accepts Visa. Collections made in connection with the Credit Card Business are done through the Client's utility bill, as well as through direct billing to the Client and through independent collections companies located in Colombia. The Debtor is currently in the process of selling and closing the Credit Card Business and no longer originates any new business from the Credit Card Business.  Notwithstanding the anticipated sale and closure of the Credit Card Business, the Debtor continues to operate this segment of its operations.

14.     In another legacy service, the Debtor also provided financing for insurance premiums (the "**Insurance Premium Financing Business**").  The Insurance Premium Financing Business represented only a small part of the Debtor's total business operations and was ultimately closed in 2021.  Any income that the Insurance Premium Financing Business presently generates

5

is related solely to previously-existing clients. In other words, the Debtor is collecting on any remaining accounts, but does not originate any new business from this segment of its operations.

15.     Finally, the Debtor also offers the mandatory insurance required for the loans generated by the Payroll Loan Business, as well as other optional insurance products such as health and accident insurance ("**Optional Insurance Services**") through its alliances with insurers.  For every client that signs up for insurance services through the Debtor, the Debtor receives a fee of approximately 23.5–27% of the insurance premiums.

## PART II

## THE DEBTOR'S PREPETITION CAPITAL STRUCTURE AND INDEBTEDNESS

**A.     Outstanding Debt Obligations**

16.     The Debtor's largest financial indebtedness is the amount that it owes under the Old Notes. As of the Petition Date, the amount outstanding on the Old Notes was US$210,800,000, plus estimated accrued interest through February 7, 2024 of US$9,354,250.

17.     The Debtor issued the Old Notes under an Indenture, dated February 7, 2020, between the Debtor and the Bank of New York Mellon, a New York banking corporation incorporated under the laws of New York, as trustee, registrar, paying agent, and transfer agent. The Indenture provided for the issuance of 8.875% Senior Notes due February 7, 2025, in an aggregate principal amount not to exceed $300,000,000. The Old Notes arising under the Indenture are general unsecured obligations of the Debtor.

18.     Interest payments under the Old Notes are made semi-annually on February 7th and August 7th (or, if a non-Business Day, the next succeeding Business Day).

6

19.     The equity interest of the Debtor is as follows: Lacrot Inversiones 2014 SLU, 41.9%; Crediholding S.A.S., 20.6%; Davalia Gestión de Activos S.L, 20.0%; Acon Consumer Finance Holdings II S L, 12.0%; Acon Consumer Finance Holdings S de RL, 2.5%; with the remaining 3.0% held in treasury shares.

**B.     The Debtor's Secured Claims[1]**

20.     The Debtor has a series of secured claims, arising in the ordinary course of business, that are classified as unimpaired and will be paid in full as such obligations come due.  All such claims are collateralized with receivables from either the Debtor's payroll loans or credit cards. These secured claims total approximately US$94.7 million.[2] The Plan provides for payment in full in cash for all such claims in the ordinary course, as payments from loan portfolios are received or as loan portfolios are sold (in contexts described further below).

**C.     General Unsecured Claims**

21.     In the ordinary course, the Debtor routinely transacts business with a number of third-party contractors and vendors, many of which are based outside of the United States. These transactions give rise to general unsecured claims against the Debtor.  The Debtor estimates that from the Petition Date until the proposed date to consider approval of the Plan, the aggregate total amount of unsecured claims, such as leases, customer refunds, financials debt, trade claims, among others, in Class C—which the Debtor will have an obligation to pay as such obligations come due pursuant to the terms or course of dealing of the Debtor and such creditors—are approximately $2.8 million.  The Plan provides for reinstatement or payment in full in cash in the ordinary course of business for all such claims.

---

[1] The Plan provides that claims in Classes B (secured claims) and C (general unsecured claims) are unimpaired.
[2] Amounts reflect outstanding balance (principal and interest) as of April 30, 2024.

7

**C.      The Debtor's Current Financial Condition**

22.      A difficult credit environment, currency volatility, and certain operational challenges, including servicing prepetition debt, has led to tightening liquidity for the Debtor. These challenges caused the Debtor to choose to hold back the $9.4 million interest payment under the Old Notes on February 7, 2024 for the purposes of maintaining liquidity to fund ongoing operations. The consequent ratings downgrade of the Debtor's prepetition secured debt caused further tightening in the Debtor's trade terms, which has exacerbated the Debtor's ongoing liquidity issues. Given recent performance, business plan projections, and the lack of free cash flow needed to make critical investments in its business, the Debtor has determined that deleveraging its capital structure is a necessity. Accordingly, the Debtor has filed this Chapter 11 Case to implement the Plan and a comprehensive balance sheet restructuring of its Old Notes. The restructuring will enable the Debtor to deleverage its balance sheet by approximately $55 million—approximately 25.0% of its funded debt obligations—strengthening its capital structure, and positioning its businesses for stability and long-term financial sustainability and success after emergence from bankruptcy.

**PART III**

**CIRCUMSTANCES LEADING TO COMMENCEMENT OF THESE CHAPTER 11 CASE**

23.      The Debtor has historically funded costs and expenditures through a combination of cash generated from operations, equity issuances, and borrowing funded indebtedness. Although the Debtor's business remains strong, a difficult credit environment and certain operational challenges, including the servicing prepetition debt, has led to tightening liquidity for the Debtor.   Currency volatility, in particular with respect to the Colombian Peso, has also presented a headwind for the Debtor, as a substantial portion of the Debtor's debt is denominated

8

in U.S. dollars, while the Debtor's revenue is generated solely in Colombian Pesos. As a result of these forces, the Debtor recently experienced difficulty in raising sufficient cash to meet its obligations as they become due and has faced pressure with respect to its coupon and principal payments on its borrowings.

24.     Chief among the Debtor's debt obligations in this respect are the Old Notes. Despite the Debtor's overall financial strength, the Debtor has had difficulty raising the necessary funds to repay the Old Notes for the aforementioned reasons and recently held back the coupon payment due on February 7, 2024 on the Old Notes in order to maintain liquidity to continue funding ongoing operations.  Prior to holding back the coupon payment in February 2024, the Debtor announced its intention to restructure the Old Notes and replace them with new Senior Secured Step-up Notes maturing in 2029 with staggered coupons, and commenced negotiations with the holders of the Old Notes.  Additionally, the Debtor negotiated the terms of, and executed, three (3) forbearance agreements: one dated March 1, 2024 with Clover Zermatt O LLC, Clover Private Credit Opportunities Origination II LP, and Gramercy Colombia Consumer Lending Holdings LLC as lenders; one dated March 7, 2024 with GCS Colombia Finance LLC, GDA Luma Special Opportunities Fund, L.P., and Acon Colombia Finance II, LLC, as lenders; and one dated April 1, 2024 with Bancolombia S.A., Banco de Bogotá, S.A., Banco de Occidente S.A., and Banco de Santander de Negocios Colombia S.A. as lenders (collectively, the "**Lenders**").  In the forbearance agreements, the Lenders acknowledged the Debtor's efforts to restructure the debt owed under the Old Notes, its negotiations with the noteholders of the Old Notes, and agreed to forbear their rights to declare default events under certain credit agreements, thereby providing the Debtor with

9

sufficient time to consider and implement a prepackaged restructuring of its obligations under the Old Notes to optimize its balance sheet and ensure agility and resilience moving forward.

25.     The Plan (defined below), which has the support of the majority of the holders of the Debtor's funded indebtedness, contemplates restructuring the Old Notes, the issuance of the New Notes (defined below), and the unimpaired treatment of all other claims and interests.  By restructuring the Old Notes, the Debtor will strengthen its capital structure, improve and extend its debt maturity profile and liquidity, thereby fortifying its financial position and long-term financial sustainability and operations such that it can continue offering flexible credit and financing alternatives to its more than 700,000 clients, many of whom belong to the less-privileged and financially-underserved members of Colombia's population.

A.     **The Exchange Offer**

26.     Because the Debtor, after considering the financial and operational aspects of the Debtor's business and after consultation with the Debtor's professionals and advisors, has deemed it necessary to obtain relief from its debt burden in order to remain competitive—namely, relief from the debt burden imposed under the Old Notes—it began discussion with several holders of its Old Notes regarding a restructuring of the Old Notes.  This restructuring would have the primary effect of extending the maturity of the Old Notes and thereby reducing the Debtor's overall debt and interest burden in the near term, ensuring its financial strength into the future.

27.     Accordingly, on March 7, 2024, the Debtor launched an exchange offer and solicited votes from all holders of the Old Notes to exchange the Old Notes (the "**Exchange Offer**") for newly-issued Senior Secured Step-up Notes due 2029 (the "**New Notes**") and on its Prepackaged Chapter 11 Plan (as may be amended, the "**Plan**") that would effectuate the financial

restructuring, *i.e.*, the exchange of the Old Notes for the New Notes, on essentially the same terms as the Exchange Offer.

28. As set forth above, the outstanding principal amount of the Old Notes is US$210,800,000. The maximum aggregate principal amount of the Senior Secured Step-Up Notes would be estimated to be US$165,120,000.

29. To assist it in connection with the Exchange Offer, consent solicitation, and the Plan Solicitation (defined below), the Debtor retained the services of Epiq Corporate Restructuring LLC (exchange agent and information agent) ("**Epiq**") and BCP Securities, Inc. (dealer manager) ("**BCP**").

**B. Plan Solicitation**

30. Concurrently with the Exchange Offer, the Debtor solicited votes from all holders of the Old Notes to approve the Plan (the "**Plan Solicitation**") that would effectuate the financial restructuring, *i.e.*, the exchange of the Old Notes for the New Notes and certain cash consideration, on essentially the same terms as the Exchange Offer.

**C. The Plan is Accepted**

31. The deadline for voting on the Plan expired at 5:00 p.m. (New York City time) on April 3, 2024 (the "**Voting Deadline**").

32. As of the Voting Deadline, the requisite number of eligible holders of the Old Notes tendered their votes and the Debtor determined to file and prosecute the Plan consistent with the Exchange Offer. As set forth in the certification of Epic, 128 ballots were submitted by holders of the Old Notes (the only creditors eligible to vote on the Plan). Of those that voted, 81.25% of the

holders of the Old Notes in number, holding 96.09% of principal amount of the Old Notes of the holders that voted, voted to accept the Plan.

33.     Contemporaneously with the filing of this First Day Declaration, the Debtor filed the Offering Memorandum and Consent Solicitation Statement Relating to the Joint Prepackaged Chapter 11 Plan of the Debtor (as modified, amended, or supplemented from time to time, the "**Disclosure Statement**") and the Joint Prepackaged Plan (again, the "**Plan**"), and a motion seeking approval of the adequacy of the Disclosure Statement, approval of the Solicitation Package and confirmation of the Plan (the "**Scheduling Motion**," and the proposed order in respect thereof, the "**Scheduling Order**").

**PART IV**

**FIRST DAY MOTIONS AND APPLICATIONS**

34.     The Debtor has filed or will file a number of Motions  (the "**First Day Motions**") seeking various forms of relief designed to facilitate approval of the Plan on an expeditious basis and a successful restructuring of the Debtor.[3]

35.     I have reviewed each of the First Day Motions, including the exhibits thereto. I believe that the Debtor has satisfied the applicable standards for the relief requested, and that the Court's grant of the requested relief is in the best interests of the Debtor, its estate, as well as that of creditors and other parties in interest. Each of the First Day Motions is summarized below.

36.     **Utilities Motion.**   The Debtor seeks entry of interim and final orders: (i) authorizing it to continue paying amounts owed to its foreign utility providers (including those that do not consent to the jurisdiction of this Court) in the normal course of business, (ii) approving the Debtor's proposed adequate assurance and adequate assurance procedures for consenting

---

[3] Unless otherwise defined herein, capitalized terms in this Part IV shall have the meaning ascribed to them in the respective First Day Motion.

foreign utility providers; (iii) prohibiting consenting foreign utility providers from altering, refusing, or discontinuing utility services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtor's proposed adequate assurance; and (iv) granting related relief.

37.     In the ordinary course of business, the Debtor regularly incurs utility expenses for utility services provided by foreign utility providers. Uninterrupted utility services are essential to the Debtor's business operations.  Should any foreign utility provider refuse or discontinue service, even for a brief period, the Debtor's ability to preserve and maximize the value of its estate could be severely and irreparably harmed. I believe that any interruption of the utility services would disrupt the Debtor's ability to operate and maintain its business and would thereby negatively affect the Debtor's customer relationships, revenues, and profits. Such a result could seriously jeopardize the value of the Debtor's businesses and, ultimately, creditor recoveries.

38.     **Cash Management Motion.**  The Debtor seeks entry of an interim and final orders: (A) authorizing, but not directing, (i) the continued use of existing cash management system(s), (ii) maintenance of bank accounts, and (iii) continued use of existing business forms and checks; (B) authorizing, but not directing, continued performance under related party transactions and historical practices; and (C) waiving the requirements of section 345(B) of the Bankruptcy Code; and (D) providing any additional relief required in order to effectuate the foregoing.

39.     To facilitate the efficient operation of their business, in the ordinary course of its business, the Debtor utilizes an integrated, centralized cash management system to collect, transfer, and disburse funds generated by its operations, including the Bank Accounts, the Flow of Funds, the Related Party Transactions, and all other cash management and funds-processing activities and arrangements utilized by the Debtor (together, the "**Cash Management System**").

The Cash Management System facilitates the Debtor's cash forecasting and reporting, monitoring of the collection and disbursement of funds, maintenance of current and accurate accounting records for all cash transactions, and administration of approximately forty three (43) bank accounts held by the Debtor or held by other parties where the debtor is the trustee (each, a "**Bank Account**" and collectively, the "**Bank Accounts**")  maintained by the Debtor prior to the Petition Date in the ordinary course of business at various financial institutions (hereinafter, the "**Banks**"). Of the forty three (43) Bank Accounts, fifteen (15) are under the Debtor's name, while the remaining twenty eight (28) are trust accounts.

40.    The Debtor's main operating Bank Accounts, although not within the UST Authorized Depository List, are accounts held at highly-rated, global financial institutions that are widely recognized as well-capitalized and financially stable. Of the 43 Bank Accounts, 41 are held at financially stable institutions that are insured by either the Federal Deposit Insurance Corporation ("**FDIC**") (up to an applicable limit per Debtor per institution) or its Colombian equivalent, the deposit insurance agencies Fondo de Garantias de Instituciones Financieras ("**FOGAFIN**"). Of the remaining two (2) Bank Accounts, one is held by the Debtor at Alianza Fiduciaria and is periodically used as a savings account to earn higher interest, and the other is a trust account with Fiduprevisora S.A. ("**Fiduprevisora**").

41.    The Cash Management System facilitates the Debtor's various operations.  With respect to the Payroll Loan Business, funds generally flow through the Cash Management System as follows.  The Debtor first signs an agreement with the employer to offer payroll loans to the employer's employees (each individual "**Client**" and the "**Clients**," collectively).  The Client then applies for credit and, if approved, the Client then issues an irrevocable payment instruction to their employer for deductions to be made from their monthly paycheck/pension receipt.  In order

14

to be approved, the Client must have a life insurance policy, either facilitated through the Debtor or their own. The insurance policy offered through the Debtor is with Cardif Colombia Seguros Generales S.A. If the Client utilizes their own life insurance policy, such policy must meet the same conditions as the policy offered through the Debtor. (These conditions include naming the Debtor as first beneficiary, requiring the pay-out amount to be for, at a minimum, the full balance of the loan, including principal, interest and fees, as well as other conditions.)  Once these steps are taken and conditions are met, the Client receives the funds from the Debtor.

42.     Once the funds are disbursed to the Client, the Debtor sends a file to the Client's employer with the total amounts due under each Client's loan, which includes any repayments to the principal, interest, fees, and any insurance premiums (if applicable). The employer then deducts the amounts due from the payroll and remits the deducted amounts to the Debtor. If the Client obtained the insurance through the Debtor, the Debtor then remits the portion corresponding to the insurance premiums to Cardif Colombia Seguros Generales S.A. A flowchart detailing the basics of this loan transaction, as relevant to the Cash Management System, is set forth below:



43.     At present, no new loans are being originated from the Credit Card Business nor the Payroll Loan Business at this time.  However, the Debtor is working with potential local and international investors to obtain more capital in order to begin originating new payroll loans.

44.     Generally, collections from the loans are remitted to the Debtor through trust accounts. Financing through trusts is a very commonly used structure in Colombia across public and public/private initiatives, including in the financial sector and with private companies. Indeed, the Debtor, like many of its competitors, has been raising funds through trusts since its inception. The trusts utilized are irrevocable trusts that are contractual in nature and are not separate legal entities from the grantor.

45.     For example, a trust is established by a grantor (*e.g.*, here, the Debtor) and agreed to by a trustee (a "*fiduciario*") who is bound to undertake a specific purpose for the benefit of a beneficiary (*e.g.*, here, the Debtor's financing institution(s)).  Fiduciaries must be financial services companies regulated by the local Colombian regulator responsible for overseeing financial regulation, the Superintendencia Financiera de Colombia ("SFC"). Under this structure, the Debtor becomes the grantor and constitutes the trust with either cash or a loan portfolio. The promissory notes that comprise the loan portfolio are endorsed to the trust, which in turn borrows funds from financial institutions, using the portfolio as collateral. The Debtor guarantees the obligations of the trusts and continues managing the loan portfolio throughout the life of the loans. Additionally, the Debtor is entitled to excess funds or assets owned by the trusts after the agreed collateral level has been met.

46.     The Debtor utilizes two master trusts for collection of funds: one for payroll loans, and another for credit cards.  In the case of payroll loans, all employers wire transfer the amounts deducted via payroll from Clients to a specific trust (*i.e.*, collection trust), and the Debtor in turn wire transfers the funds that correspond to the security of the financial obligation to each trust before taking the excess into the Debtor's own accounts to pay ongoing operational expenses and

16

other financial obligations.  In the case of credit cards issued by the Debtor, the transaction is substantially the same.

47.     The Debtor maintains seven (7) main types of accounts: (i) four (4) loan originating accounts; (ii) fifteen (15) collection accounts; (iii) one (1) consolidating account; (iv) nine (9) loan trust accounts; (v) one (1) excess funds account; (vi) four (4) disbursement account; and (vii) five (5) reserve accounts.

48.     Collections are continuously received on almost a daily basis.  At the end of each month, the Debtor prepares the various reports to determine all of the amounts that were collected and to which portfolio they belong. Within the first week after each month's end, the transfers to the various accounts are made

49.     In the ordinary course of business, the Debtor incurs and pays, honors, or allows to be deducted from the appropriate Bank Accounts certain service charges and other related fees, costs, and expenses charged by the Banks.  In particular, the Banks charge the Debtor service charges, transaction fees, taxes and other fees in connection with the maintenance of the Cash Management System ("**Bank Fees**"). Gravamen a los Movimientos Financieros ("**GMF**") is a financial transactions tax applied to most movements of money within Colombian bank accounts, such as deposits, withdrawals, and transfers among others. Currently, the rate is four Colombian pesos for every thousand Colombian pesos transacted, or 0.4% of the transaction amount. At present, the Debtor pays the Banks an aggregate of approximately US$104,493 in connection with the Bank Fees per month, which are generally due and paid on a daily basis for GMF, and on a monthly basis for all other Bank Fees.  The Bank Fees related to the accounts in the Debtor's name are approximately US$27,932, while the remaining US$76,561 relate to the trust accounts. As of the Petition Date, the Debtor does not believe that it has any outstanding or unpaid Bank Fees. Out

of an abundance of caution, and to ensure continued access to the Bank Accounts and related banking services, the Debtor seeks authority to pay any pre-petition Bank Fees that may have been incurred and to continue to pay the Bank Fees in accordance with past practices.

50.     As described in the Cash Management Motion, the Debtor does not have any intercompany transfers or transactions, but presently transacts with three (3) related entities with certain identified parties in which the Debtor's shareholders have a substantial ownership interest in the ordinary course of its business (the "**Related Party Transactions**"):

a)     In June 2016 the Debtor entered into an agreement with Asesorias Financieras de Credito S.A.S ("**Asficredito**")[4] to provide the following services: (i) selection, hiring and training of personnel for contact service center, credit origination, commercial management and Client onboarding; (ii) documentation management, digitization and custody of all types of documents; (iii) provision of contact center services (inbound and outbound) for data updates, service evaluation, classification and stratification of databases, sale of financial services, collection of portfolio and reception and transmission of telephone calls to carry out the above activities; (iv) provision of BPO (Business Process Outsourcing) services; (v) provision of courier services including collection, protection, surveillance, transfer, custody, filing, transportation and delivery of items and documents with commercial value; and (vi) execution of operational processes for Portfolio Payments and delivery of checks to third party Clients, among others.

b)     The Debtor is also borrower on several loans originated between 2022 and 2023 with Finanza Inversiones S.A.S ("**Finanza Inversiones**")[5] totaling approximately

---

[4] 14.5% of the Debtor's shareholders have approximately 23% ownership in Asficredito.
[5] 77.0% of the Debtor's shareholders have 100% ownership of Finanza Inversiones.

US$42.6 million (including capitalized interest at SOFR + 12.26% for four of the loans and 20% fixed for one loan). The Debtor utilized these loans to inject funds into the business to continue, and grow, the current operations. The Debtor also has an outstanding receivable loan from Finanza Inversiones for US$23.6 million from December 2022, with a net payable balance of US$19.0 million as of the Petition Date. These loans have a maturity date of November 2024 with accrued interest since the second half of 2023, resulting in outstanding interest of US$4.4 million.

c)   In November 2023, the Debtor sold to Ban100 S.A. ("**Ban100**")[6] some of its payroll loan portfolio and Credit Card Business. The payroll loan portfolio transfer has not been fully completed as the Debtor still receives some of the collections related to the portfolio sold to Ban100. Upon receipt of such collections, the Debtor transfers those funds to Ban100. The Debtor will continue to receive such collections—and, by extension, continue to transfer said collections to Ban100—until the employers update their records, at which point the employers will submit these collections directly to Ban100 on a monthly basis. The Debtor continues to sell some of its payroll loan portfolio to Ban100 (or any other interested party as may arise). The sales agreement with Ban100 also includes recourse against the Debtor for any overdue loans, which may result in the Debtor having to repurchase some of these loans back.

51.   These Related Party Transactions allow the Debtor, among other things, to meet the needs of their customers efficiently in a cost-effective manner through the centralization of key administrative functions, as well as ensure liquidity and cash flow.

---

[6] Finanza Inversiones owns approximately 94.5% of Ban100.

52.     I believe the Debtor's Cash Management System, as summarized above and more fully detailed in the Cash Management Motion, constitutes a customary and essential business practice that was created and implemented by the management of the Debtor in the exercise of its business judgment, and is a practical and essential mechanism that allows the Debtor to continue operations.

53.     **Taxes and Fees Motion.**  The Debtor will seek entry of an order authorizing, but not directing, the Debtor, in its sole discretion to pay prepetition Taxes and Fees that arise in the ordinary course of the Debtor's business, owed to the Taxing and Regulatory Authorities, provided that the aggregate amount of such payments shall not exceed $750,000. Of this amount, the Debtor is requesting authority to pay approximately $700,000 on an interim basis prior to the final hearing on the relief requested in the Taxes and Fees Motion. In addition, in this Motion, the Debtor also seeks authorization to honor (a) all checks that remain uncashed prior to the Petition Date or that are otherwise returned by a Taxing or Regulatory Authority, as well as (b) those Taxes and Fees subsequently determined upon audit to be owed for periods prior to the Petition Date.

54.     In connection with the normal operations of its business, the Debtor withholds and incurs an assortment of income, VAT, city, municipal, withholding, and other taxes (collectively, the "**Taxes**") to various Colombian federal, municipal and local government entities, service providers or tax administrators (collectively, the "**Taxing and Regulatory Authorities**") and pay various regulatory fees (the "**Regulatory Fees**" and together with the Taxes, the "**Taxes and Fees**").

55.     It is my understanding that the Debtor's failure to pay the Taxes and Fees could adversely affect the Debtor's business operations because the Taxing and Regulatory Authorities could suspend the Debtor's operations, file liens, issue penalties, or seek to lift the automatic stay.

20

In addition, certain Taxing and Regulatory Authorities may take precipitous action against the Debtor's directors and officers for unpaid Taxes, which undoubtedly would distract those key personnel from their day-to-day duties as well as in connection with the restructuring. For these reasons, as described more fully in the Taxes Motion, I believe that the payment of prepetition Taxes and Fees will help the Debtor avoid serious disruption to its operations that would result from the failure to pay such Taxes and Fees.

56. **Unimpaired Claims Motion.** In the Unimpaired Claims Motion, the Debtor requests entry of an order authorizing, but not directing, the Debtor to pay the prepetition claims of creditors that are treated as unimpaired claims under the Plan as the payment obligation on those claims arise in the ordinary course of the Debtor's business. The Plan seeks to restructure just one type of claims—those arising under the Old Notes. Importantly, the Plan has classified the Debtor's other secured claims ("**Class B**") and general unsecured claims ("**Class C**") as unimpaired (collectively, the "**Unimpaired Claims**"), with the Debtor seeking to satisfy each of those claims as they come due in the ordinary course of the Debtor's business.

57. The Debtor's Class B claims relate primarily to secured claims of various financial institutions, collateralized with either receivables from payroll loans or receivables from credit cards. These secured claims total approximately $94.7 million.[78]

58. The Debtor's Class C claims consist of the Debtor's obligations to its vendors, other trade creditors that provide goods or services related to (and for the benefit of) the Debtor's operations, such as leases, customer refunds, trade claims, and other unsecured financial debt. The Debtor estimates that from the Petition Date until the proposed date to consider approval of the

---

[7] As noted in Schedule 2 to this Declaration, Citibank Colombia S.A holds a security interest in a portion of the Debtor's payroll loan portfolio. In the Debtor's ordinary course of business, proceeds related to the sale of such interest to Ban100 (or any other interested party), must be used to repay Citibank Colombia S.A.
[8] Amount reflect outstanding balance (principal and interest) as of April 30, 2024.

Plan, the aggregate total amount of unsecured claims, such as leases, customer refunds, financial debt, trade claims, among others, in Class C, which the Debtor will have an obligation to pay as such obligations come due pursuant to the terms or course of dealing of the Debtor and such creditors are approximately $2.8 million.  The Debtor believes that most of those claims (a) may be entitled to statutory priority under section 503(b)(9) of the Bankruptcy Code, (b) may give rise to shippers, suppliers, or other liens against the Debtor's property if unpaid, (c) are held by vendors who are critical to the Debtor's business and who the Debtor believes must be paid to avoid any disruption to the Debtor's business, and/or (d) are foreign trade vendors who operate in Colombia and have few or no contacts with the United States. Such foreign vendors may not be willing to transact with the Debtor if it owes outstanding debts and they may seek to withhold goods or services, which would interfere with ordinary course operations of the Debtor's business.

59.     I believe that given the importance of maintaining its relationships with creditors who hold Unimpaired Claims, and that such claims will remain unimpaired under the Plan, it is necessary to avoid the risk of key vendors and service providers withholding essential services or refusing to sell goods to the Debtor.

60.     **Schedules Extension/Waiver Motion.**  In this Motion, the Debtor seeks interim and final orders: (i) extending the time by which the Debtor must file its schedules of assets and liabilities and statements of financial  affairs (collectively, the "**Schedules and Statements**") to sixty (60) days after the current deadline imposed by Bankruptcy Rule 1007 and (ii) waiving the requirement that the Debtor file the Schedules and Statements on the date of confirmation of the Plan if confirmation occurs on or before the 60 day deadline.

61.     This is a prepackaged chapter 11 plan, and the Debtor anticipates consummation of the plan during the next sixty (60) days. Given this compressed time frame, I believe that the

22

Debtor's resources must be focused on finalizing the documentation necessary to implement the transactions contemplated by the Plan rather than working to finalize Schedules and Statements. Therefore, I am of the understanding that the deadline to file the Schedules and Statements should be extended and the requirement waived if the Plan is confirmed.

62.   **Insurance Motion.**   The Debtor requests that the Court authorize the Debtor to maintain existing insurance policies, pay all policy premiums arising thereunder, whether prepetition or postpetition, and renew or enter into new policies as needed. The Debtor also requests that the Court authorize the Debtor to continue paying premiums collected from borrowers of the Debtor (the "**Borrowers**") to the appropriate insurance company.

63.   The Debtor historically maintains numerous insurance policies with various insurance companies (collectively, the "**Insurance Companies**") providing coverage for, *inter alia*, officers and directors liability, general civil liability, cyber risk management, the Debtor's assets (real estate and otherwise), and coverage derived from the risk in the management of financial entities (collectively, the "**Operations Insurance Policies**").  In addition, the Borrowers are required by Colombian law to purchase a life insurance policy when acquiring a financial service, but the Debtor also offers to its Borrowers other optional upgrades or policies such as personal injuries coverage. Therefore, the Borrowers must maintain life insurance coverage with a death benefit in favor of the Borrower, whether the Borrower has a drawable loan or a credit card. The insurance coverage must be equal or greater to the principal amount of the loan acquired, *i.e.* principal, interest, interest on arrears, and collection expenses. To meet the  requirement of life insurance policies required by Colombian law, Borrowers have two options. They may either (i) accredit their own insurance policy or (ii) buy an insurance policy offered by the Debtor (the "**Borrower's Life Insurance Policies**" and together with the "**Operating Insurance Policies**",

23

the "**Policies**"). Borrowers are the named insured, but the Debtor is the beneficiary thereof. The monthly insurance premiums are deducted from the Borrower's payments for both mandatory and optional insurance coverage and are remitted by the Debtor to the Insurer within 60 days after collection.

64.     I believe that the continuation of the Policies, the renewal of and entry into new insurance policies in the ordinary course, and remitting payments from the Debtor's Borrowers to the Borrower's Life Insurance Policies is essential to the preservation of the value of the Debtor's properties and assets. In many cases, coverage provided by the Policies is required by the regulations, laws, and contracts governing the Debtor's commercial activities, including the requirement of the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") that a debtor maintain adequate coverage. While other alternatives exist, such alternatives likely require considerable additional cash expenditures that could thwart the Debtor's efforts to preserve and maximize the value of its estate. Accordingly, and as set forth further in the Insurance Motion, the Debtor submits that it is necessary and appropriate to permit the Debtor to honor its obligations under its current Policies.

65.     **Scheduling and Solicitation Procedures Motion.** The Debtor seeks entry of an order (i) scheduling a combined hearing (the "**Confirmation Hearing**") to consider the adequacy of the Offering Memorandum and Consent Solicitation Statement (as modified, amended, or supplemented from time to time, the "**Disclosure Statement**") and confirmation of the Plan; (ii) approving the form and manner of notice of the Confirmation Hearing; (iii) approving the solicitation procedures used in connection with the Debtor's prepetition solicitation of the Plan described herein and further discussed in the Disclosure Statement (collectively, the "**Solicitation**

24

**Procedures**"); (iv) directing that a meeting of creditors not be convened; and (v) granting certain related relief, all as described more fully in the Scheduling and Solicitation Procedures Motion.

66. As set forth in the Motion, the Debtor proposes the following schedule of dates relevant to the Solicitation Procedures and the Confirmation Hearing.

| Proposed Solicitation and Confirmation Schedule | |
|---|---|
| Voting Record Date | March 7, 2024 |
| Distribution of Solicitation Package | March 7, 2024 |
| Voting Deadline | April 3, 2024 |
| Petition Date | May 16, 2024 |
| Distribution of Confirmation Hearing Notice | May 23, 2024 |
| Plan Supplement Deadline | June 7, 2024 |
| Objection Deadline | June 14, 2024, at 4:30 pm (prevailing Eastern Time) |
| Reply Deadlines | June 21,2024, at 4:30 pm (prevailing Eastern Time) |
| Confirmation Hearing | June 25, 2024 |

67. The Debtor believes that this timeline is reasonable, particularly given the fact that the holders of the Old Notes will have known the terms of the Plan for approximately fourteen (14) weeks by the time objections are due, and were aware that, if the Exchange Offer were not consummated, the Debtor would promptly seek relief under the Bankruptcy Code.

68. Based on my conversations with the Debtor's advisors, I respectfully submit that the relief sought in this Motion is appropriate under the circumstances presented here.

69. **Unsecured Creditors Committee Motion.** The Debtor seeks an entry of an order, pursuant to 11 U.S.C. § 341(e), dispensing with or delaying the formation of an official committee of unsecured creditors, or for compliance with Fed. R. Bankr. P. 2007(B). The basis for this Motion is that there are no unsecured creditors, and no such plan or solicitation need for the same, and therefore, I understand that a meeting of creditors would serve no meaningful purpose in this Chapter 11 Case. In addition, as further detailed in the Motion, there is little complexity in these proceedings because the Plan relates to only one set of debt instruments, and thus, I understand

25

that any requirement of a meeting of creditors would unduly prolong the resolutions process and cause the Debtor to incur unnecessary expenses without significant benefits to the interested parties in this Chapter 11 Case.

70. **Salaries and Wages Motion.** Here, the Debtor seeks interim and final orders: (i) authorizing it to pay prepetition amounts owed on account of Employee Related Obligations, (including Employee Compensation, Payroll Withholding Obligations, Social Fund Obligations, Employee Benefit Programs, and Termination Obligations, as further defined in the underlying Motion), (ii) authorizing it to maintain and continue paying these Employee Related Obligations post-petition in the ordinary course of business; and (iii) granting related relief.

71. The Debtor's ability to successfully operate depends on the services and dedication of the 112 men and women that make up the Debtor's workforce. These Employees have worked tirelessly to sustain the Debtor's operations and prepare them for this Chapter 11 Case. I believe it is critical that the Debtor retains its Employees to continue its operations. Thus, it is essential to assure the Employees that the Debtor will honor the prepetition Employee Related Obligations, and continue to honor those obligations post-petition in the ordinary course of business. A failure to promptly do so may create concern and discontent among the Employees and could hinder the Debtor's operations and the administration of its estate. I believe that loss of even a few key personnel in the initial days of this Chapter 11 Case could immediately and irreparably harm the Debtor's ability to maintain operations and maximize the value of its assets, all to the detriment of the Debtor and its estate.

72. **Automatic Stay Motion.** The Debtor seeks an entry of an order (1) enforcing the protections of 11 U.S.C. §§ 362, 365, 525, and 541; (2) approving the form and manner of notice; (3) granting related relief. As further detailed in the Motion, this "automatic stay" constitutes a

26

fundamental protection that, together with other provision of the Bankruptcy Code, would provide Debtor with a "breathing spell" that is essential to a successful reorganization.

73.     **Compensation of Professionals Motion.**  In this motion, the Debtor seeks an entry of an order establishing procedures for interim compensation and reimbursement of expenses for retained professionals.  As further detailed in the Motion, the Debtor seeks the Court's approval of procedures for the monthly allowance and payment of compensation and reimbursement of expenses for attorneys and other professionals whose retention are approved by the Court pursuant to sections 327, or 1103 of the Bankruptcy Code and who will be required to file applications for allowance of compensation and reimbursement of expenses pursuant to sections 328, 330, and 331 of the Bankruptcy Code, on terms that satisfy the requirements of Bankruptcy Rule 2016(a) and Local Bankruptcy Rule 2016-1.  I believe that the retention of these professionals is essential to the success of the Chapter 11 Case and, by extension, the long-term success of the Debtor.

74.     **Application to Retain Attorneys.**  The Debtor has determined that it is necessary to engage counsel with knowledge and experience in the areas of bankruptcy, reorganization, tax, corporate governance and other matters. Such counsel will enable the Debtor to carry out their duties in the Chapter 11 Case and to assist in the restructuring of the Old Notes.  The Debtor, therefore, seeks to retain and employ Baker & McKenzie LLP ("**Baker McKenzie**") as their restructuring attorneys in all phases of the Chapter 11 Case.

75.     I understand that Baker McKenzie is a law firm, which employs approximately 4,800 attorneys and maintains offices for the practice of law in New York, New York, as well as offices located throughout the world, including but not limited to: Washington, D.C.; Miami, Florida; Bogotá, Colombia; Mexico City, Mexico; London, United Kingdom; Paris, France; Rome, Italy; Milan, Italy; Frankfurt, Germany; Berlin, Germany; Hong Kong; Beijing, China; Buenos

Aires, Argentina; São Paulo, Brazil; Abu Dhabi, United Arab Emirates; Seoul, South Korea; Bangkok, Thailand; Tokyo, Japan; and Sydney, Australia. I also have been informed that Paul Keenan, Esq., of Baker McKenzie, the lead partner who will be engaged in the Chapter 11 Case, is a member in good standing of, among others, the Bar of the State of Florida, and is presently seeking *pro hac vice* admission to the United States District Court for the Southern District of New York, and is sponsored in such admission by Blaire Cahn, Esq., of Baker McKenzie, who is a member in good standing of the Bar of the State of New York and the United States District Court for the Southern District of New York.

76.     Over the course of its representation of the Debtor, Baker McKenzie has become familiar with the Debtor's business and affairs, including the transactions contemplated by the Plan, as well as the legal issues that may arise in these proceedings. Baker McKenzie's present representation of the Debtors regarding the restructuring contemplated in this Chapter 11 Case began on or around October 2023. I have been informed that Baker McKenzie does not hold or represent any interest adverse to the Debtor or its estate, and that Baker McKenzie is a "disinterested person" as that phrase is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code.

77.     The Debtor believes, and I agree, that Baker McKenzie is both well-qualified and uniquely able to represent the Debtor in the Chapter 11 Case in an efficient and timely manner. Accordingly, I respectfully submit that the Baker McKenzie Application should be approved

78.     **Hedging Practices Motion.**  In this motion, the Debtor seeks entry of interim and final orders authorizing, but not directing, the Debtor to (a) continue entering into, terminating, and/or performing under the Hedging Agreements in the ordinary course of business, (b) perform

28

such ancillary transactions as may be necessary to implement or terminate such Hedging Agreements, including providing credit support, and (c) granting related relief.

79.     As is customary for companies with debts denominated in other currencies, in the ordinary course of business, the Debtor has historically entered into foreign currency purchase contracts and options to manage risks associated with transactions denominated in foreign currencies (the "**Foreign Currency Hedging Agreements**" or "**Hedging Agreements**") and the activities related thereto (the "**Hedging Practices**"). In order to execute derivative trades, the Debtor enters into an International Swap and Derivatives Association, Inc. Master Agreement ("**ISDA**") with Morgan Stanley & Co ("**Morgan Stanley**"). The ISDA is a standard contract that governs all Hedging Agreements entered into between the Debtor and the respective derivative counterparty (each "**Hedging Counterparty**" or the "**Hedging Counterparties**").

80.     The Hedging Practices operate to reduce the Debtor's exposure to risks related to currency exchange rate fluctuations, providing the Debtor with cash-flow predictability to help manage its business. Through the Hedging Practices, the Debtor is able to hedge against adverse foreign exchange fluctuations, thereby protecting the economic value of its operations by preventing substantial declines in cash flows. While hedging does not eliminate risk, hedging can generally be used as an effective management tool for mitigating it. The Debtor's internal policy states that as long as the functional currency of the business is the Colombian Peso, management must implement a total hedging strategy (principal and interest) for foreign currency denominated assets and liabilities in a timely manner after acquiring those rights and obligations.

81.     As of the Petition Date, the Debtor had approximately twenty-four (24) foreign exchange call options (Hedging Agreements) with an approximate mark to market value as of May 8, 2024 of US$314,387. Foreign currency options hedge against changes in currency exchange

rates. Essentially, these options provide the right, but not the obligation, to exchange a specific amount of one currency for another at a predetermined rate (strike price) on or before a specified date (the expiry date). This flexibility allows the Debtor to mitigate its risk against foreign exchange currency fluctuations. The Debtor has implemented a call spread strategy which involves buying a call option with a lower strike price and selling another call option with a higher strike price. Both options have the same expiration date. The aim of this strategy is to reduce the net cost of entering the trade, as the premium received from selling the higher-strike call helps offset the cost of the lower-strike call.

82.     I believe that, an as set forth more fully in the Hedging Practices Motion, the Debtor maintaining the prepetition Hedging Practices on a postpetition basis is essential for the Debtor to minimize its exposure to foreign currency exchange rate fluctuations so as to maintain predictable cash flows and uninterrupted operations.

**PART V**
**LOCAL RULE 1007-2 DISCLOSURES**

83.     Pursuant to Local Rule 1007-2(a)(1), a statement regarding the nature of the Debtor's business and the circumstances leading to the filing of the Chapter 11 case is set forth in Parts I through III above.

84.     The Chapter 11 case was not originally commenced under Chapter 7 or Chapter 13 of the Bankruptcy Code. Accordingly, Local Rule 1007-2(a)(2) is inapplicable.

85.     In accordance with Local Rule 1007-2(a)(4), **Schedule 1** lists the twenty (20) largest unsecured claims, excluding the claims of insiders, held against the Debtor as of the Petition Date. Schedule 1 includes a list of the names and addresses of each such creditor, and the names, addresses and telephone numbers of persons familiar with the Debtor's accounts. Where available, the amount of the claim is also included. In each case, the claim amount listed on Schedule 1

30

represents the Debtor's best estimate of the amount of the claim, and is therefore subject to verification. The Debtor reserves any and all rights (i) as to whether any claim is contingent, unliquidated, disputed or subject to setoff, (ii) challenge the priority, nature, amount and status of any claim or debt and (iii) to assert any remedies, defenses, counterclaims and offsets with respect to each of the foregoing.

86.    Pursuant to Local Rule 1007-2(a)(5), **Schedule 2** lists the name and address of the holders of secured claims against the Debtor as of the Petition Date. Any amount listed on Schedule 2 represents the Debtor's best estimate, and is therefore subject to verification. The Debtor reserves all rights as to the validity, enforceability and priority of each claim and lien pending approval of the Plan and reserves any and all rights to assert remedies, defenses, counterclaims and offsets with respect to such claim.

87.    Pursuant to Local Rule 1007-2(a)(6), **Schedule 3** provides a summary of the Debtor's total assets and liabilities as of March 31, 2024.

88.    Pursuant to Local Rule 1007-2(a)(7), the Debtor confirms that there is no publicly traded equity issued by the Debtor.

89.    Pursuant to Local Rule 1007-2(a)(8), the Debtor confirms that none of the Debtor's property is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity, giving the name, address and telephone number of such entity. The Debtor represents that there are no proceedings related to any of the above pending in any court.

90.    Pursuant to Local Rule 1007-2(a)(9), **Schedule 4** lists the property or premises owned, leased or held under another arrangement from which the Debtor operates.

31

91.     Pursuant to Local Rule 1007-2(a)(10), **Schedule 5** lists the locations of the Debtor's substantial assets, the location of its books and records, and the nature, location and value of any assets held by the Debtor outside the territorial limits of the United States.

92.     Pursuant to Local Rule 1007-2(a)(11), I hereby confirm that to the best of my knowledge, as of the Petition Date, there were no pending actions or proceedings against the Debtor, where a judgment against the Debtor or seizure of the Debtor's properties may be imminent as of the Petition Date.

93.     Pursuant to Local Rule 1007-2(a)(12), **Schedule 6** lists the Debtor's existing senior management, including their tenure with the Debtor and a brief summary of their relevant responsibilities and experience.

94.     Pursuant to Local Rule 1007-2(b)(1), the Debtor estimates that the weekly payroll for employees, exclusive of officers, directors, stockholders and partners, during the 30-day period following the Petition Date will be $79,000.

95.     Pursuant to Local Rule 1007-2(b)(2), the Debtor estimates that the amount to be paid to the Debtor's officers for the 30-day period following the Petition Date will be $24,000.

96.     Pursuant to Local Rule 1007-2(b)(3), **Schedule 7** provides the estimated consolidated cash receipts, disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid for the 30 days following the Petition Date, other than professional fees.

97.     Venue of the Chapter 11 cases in this district is proper because the Debtor maintains property in the United States, in particular, the Debtor satisfies the requirement of Section 109(a) of the Bankruptcy Code because (i) the Old Notes are governed by New York law, and (ii) Debtor

32

has a US$100,000 on retainer in the trust account of Baker & McKenzie LLP, in a JPMorgan

Chase account in New York.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the

United States of America that the foregoing is true and correct.

Dated: May 16, 2024
New York, New York


/s/ Jaime Francisco Buritica Leal
*Gerente General* (Chief Executive Officer)
Credivalores – Crediservicios S.A.,

**SCHEDULE 1**

Twenty Largest Unsecured Claims

Pursuant to Local Rule 1007-2(a)(4), the following is a list of the twenty (20) largest unsecured claims, excluding the claims of insiders, held against the Debtor as of the Petition Date. This Schedule includes a list of the names and addresses of each such creditor, and the names, addresses and telephone numbers of persons familiar with the Debtor's accounts. Where available, the amount of the claim is also included. In each case, the claim amount listed on this Schedule represents the Debtor's best estimate of the amount of the claim, and is therefore subject to verification. The Debtor reserves any and all rights (i) as to whether any claim is contingent, unliquidated, disputed or subject to setoff, (ii) challenge the priority, nature, amount and status of any claim or debt and (iii) to assert any remedies, defenses, counterclaims and offsets with respect to each of the foregoing.

| | Name of Creditor | Complete Mailing Address, and Employee, Agent, or Department of Creditor Familiar with Claim | Nature of Claim | Whether Claim is Contingent, Unliquidated, Disputed, Partially Secured or Subject to Setoff | Amount of Claim (USD)[9] |
|---|---|---|---|---|---|
| 1. | THE BANK OF NEW YORK MELLON 240 GREENWICH STREET, FLOOR 7 EAST NEW YORK, NEW YORK 10286 | CONTACT: CREDIVALORES – CREDISERVICIOS TRUSTEE - JOANNE ADAMIS PHONE: (212) 815-4259 FAX: (212) 815 5875 / (212) 815 5877 JOANNE.ADAMIS@BNYMELLON.COM | TRUSTEE OF UNSECURED BONDS 2025 | N/A | $220,154,250.00 |
| 2. | FINANZA INVERSIONES S.A.S CARRERA 10 65-98 BOGOTA, CUNDINAMARCA N/A COLOMBIA | CONTACT: MARIA CRISTINA ROJAS PHONE: +57-601-4926792 FAX: N/A NOTIFICACIONES@FINANZAINVERSIONES.COM | SHAREHOLDERS LOANS (RELATED PARTIES) | | $42,600,551.78 |
| 3. | DEUTSCHE BANK WINCHESTER HOUSE GREAT WINCHESTER STREET 1 LONDON, N/A EC2N 2DB UNITED KINGDOM | CONTACT: DEBT AND AGENCY SERVICES PHONE: +44-207-547-5796 FAX: +44-0207-547-5782 TSS-GDS.ROW@DB.COM | AGENT OF UNSECURED NOTES 2028 | | $32,865,666.30 |
| 4. | FONDO NACIONAL DE GARANTIAS | CONTACT: MAYRA PEREZ PHONE: +57-601-3239000 EXT 4061 FAX: N/A | UNSECURED DEBT | | $25,471,061.42 |

[9] Total Prepetition Debt balance converted from COP to USD using the FX Rate from Colombia's Central Bank as of May 16, 2024 @ 3,825.42 USD/COP.

| | Name of Creditor | Complete Mailing Address, and Employee, Agent, or Department of Creditor Familiar with Claim | Nature of Claim | Whether Claim is Contingent, Unliquidated, Disputed, Partially Secured or Subject to Setoff | Amount of Claim (USD)[9] |
|---|---|---|---|---|---|
| | CALLE 26 13-97 PISO25 BOGOTA, CUNDINAMARCA N/A COLOMBIA | GARANTIABONOS@FNG.GOV.CO | | | |
| 5. | BAN100 S.A CR 7 76 35 P 9 BOGOTA, CUNDINAMARCA N/A COLOMBIA | CONTACT: RICARDO VALDES PHONE: +57-4926792 EXT. 2216 FAX: N/A RVALDES@BAN100.COM.CO | COMMISSIONS & SALE OF BUSINESS SEGMENT (RELATED PARTIES) | | $8,753,563.97 |
| 6. | BANCO DE OCCIDENTE CRA 7 NO. 71 - 52 TORRE A PISO 1 BOGOTA, CUNDINAMARCA N/A COLOMBIA | CONTACT: LEONARDO JIMENEZ PHONE: +57-601-7462060 EXT 15242 FAX: N/A LJIMENEZ@BANCODEOCCIDENTE.COM.CO | UNSECURED WORKING CAPITAL FACILITY | | $2,315,273.48 |
| 7. | BANCOLOMBIA AVENIDA 8 NORTE NO. 12 N - 43 PISO 5 CALI, VALLE DEL CAUCA N/A COLOMBIA | CONTACT: MARIA CRISTINA CADAVID VALENCIA PHONE: +57-602- 4853243 FAX: N/A MCCADAVI@BANCOLOMBIA.COM.CO | OPERATIONAL LEASES & UNSECURED WORKING CAPITAL FACILITIES | | $2,189,218.37 |
| 8. | DIRECCION DE IMPUESTOS Y INCOME TAXES ADUANAS NACIONALES (DIAN) CR 7 34 69 BOGOTA, CUNDINAMARCA N/A COLOMBIA | CONTACT: N/A PHONE: +57-601-3325100 FAX: N/A DIRECCIONGENERAL@DIAN.GOV.CO | INCOME TAXES | | $988,255.34 |
| 9. | BANCO DE BOGOTA CARRERA 3 NO. 8 - 13 PISO 8 CALI, VALLE DEL CAUCA N/A COLOMBIA | CONTACT: CARLOS DAVILA PHONE: +57-602- 8900760 EXT. 55241 FAX: N/A CDAVIL1@BANCODEBOGOTA.COM.CO | UNSECURED WORKING CAPITAL FACILITY | | $644,842.84 |
| 10. | METLIFE COLOMBIA SEGUROS DE VIDA S.A CR 7 99 53 P 17 BOGOTA, BOGOTA N/A COLOMBIA | CONTACT: GUILLERMO RODRIGUEZ PHONE: +57-601-6388240 FAX: N/A GUILLERMO.A.RODRIGUEZ@METLIFE.COM.CO | INSURANCE | | $599,721.46 |

| | Name of Creditor | Complete Mailing Address, and Employee, Agent, or Department of Creditor Familiar with Claim | Nature of Claim | Whether Claim is Contingent, Unliquidated, Disputed, Partially Secured or Subject to Setoff | Amount of Claim (USD)[9] |
|---|---|---|---|---|---|
| 11. | AMERICAS BUSINESS PROCESS SERVICES SA AV EL DORADO 85 D 55 LC 149 BOGOTA, CUNDINAMARCA N/A COLOMBIA | CONTACT: OLGA LUCIA GARZON ABRIL PHONE: +57-601-4251700 FAX: N/A OLGA.GARZON@AMERICASB PS.COM; CRISTIAN.HERNANDEZH@A MERICASBPS.COM | PROFESSIONAL SERVICES | | $236,369.50 |
| 12. | SECRETARIA DE HACIENDA BOGOTA CR 30 25 90 BOGOTA, CUNDINAMARCA N/A COLOMBIA | CONTACT: N/A PHONE: +57-601-3385000 FAX: N/A RADICACIONHACIENDABOGO TA@SHD.GOV.CO | INCOME TAXES | | $156,520.80 |
| 13. | CUATRECASAS, GONCALVES PEREIRA S.A.S CR 11 79 35 OF 701 BOGOTA, CUNDINAMARCA N/A COLOMBIA | CONTACT: MANUEL FERNANDO QUINCHE GONZALEZ PHONE: +57-606-7953030 FAX: N/A MANUEL.QUINCHE@CUATRE CASAS.COM | PROFESSIONAL SERVICES | | $143,535.48 |
| 14. | DELIMA MARSH CL 67N 6N 85 CALI, VALLE DEL CAUCA N/A COLOMBIA | CONTACT: YASNI GIOVANNETTI PHONE: +57-602-3985000 FAX: N/A YASNI.GIOVANNETTI@MARS H.COM; ALEXANDER.BOTELLO@MAR SH.COM; ANDRES.C.POVEDA@MARSH. COM | INSURANCE | | $107,921.30 |
| 15. | FINLECO B P O SAS CR 27B 68 96 BOGOTA, CUNDINAMARCA N/A COLOMBIA | CONTACT: SERGIO ERNESTO REYES OROZCO PHONE: +57-601-7449772 – +57-3208498435 FAX: N/A ERNESTO.REYES@FINLECOBP O.COM; SERGIO.REYES@FINLECOBPO .COM; CONTABILIDAD@FINLECOBP O.COM; COMERCIAL@FINLECOBPO.C OM; SERGIO.REYES@FINLECOBPO .COM | PROFESSIONAL SERVICES | | $104,209.67 |
| 16. | ECONTACT COL SAS CR 28 48 59 | CONTACT: EVARISTO CANETE DEL RIO PHONE: +57-3164544541 FAX: N/A | COLLECTION AND TECHNICAL SERVICES | | $62,490.74 |

| | Name of Creditor | Complete Mailing Address, and Employee, Agent, or Department of Creditor Familiar with Claim | Nature of Claim | Whether Claim is Contingent, Unliquidated, Disputed, Partially Secured or Subject to Setoff | Amount of Claim (USD)[9] |
|---|---|---|---|---|---|
| | MANIZALES, CALDAS N/A COLOMBIA | JHOYOS@EMERGIACC.COM; AAGUDELO@EMERGIACC.COM | | | |
| 17. | CENTRAL DE COBRANZAS SAS CR 43 95 20 BRR EL TABOR BARRANQUILLA, ATLANTICO N/A COLOMBIA | CONTACT: MONICA PATRICIA VELEZ ANGULO PHONE: (57) 3205654955 +57-605- 3091735 FAX: N/A JHERRERA@CENTRALDECOBRANZASLTDA.COM; VELEZMONICA@CENTRALDECOBRANZASLTDA.COM | PROFESSIONAL SERVICES | | $61,164.69 |
| 18. | AMERICAN SMART SYSTEM & NETWORKS LTDA CR 49 A 91 31 BBR LA CASTELLANA BOGOTA, CUNDINAMARCA N/A COLOMBIA | CONTACT: JOSE FERNANDO RODRIGUEZ CABRERA PHONE: +57-601- 5801800 EXT 1020 FAX: N/A EARIAS@ASNETLA.COM; YTORRES@ASNETLA.COM; ASNET@ASNETLA.COM; GTORRES@ASNETLA.COM; YTORRES@ASNETLA.COM; FRODRIGUEZ@ASNETLA.COM | TECHNICAL SERVICES & MAINTENANCE | | $59,476.12 |
| 19. | CREDIBANCO SA AK 68 75 A 50 METROPOLIS BOGOTA, CUNDINAMARCA N/A COLOMBIA | CONTACT: ANDRES MAURICIO GOMEZ DURAN PHONE: +57 (1) 3766440 FAX: N/A REPRESENTANTELEGALCREDIBANCO@CREDIBANCO.COM; ANDRESM.GOMEZ@CREDIBANCO.COM; CARLOS.DELUQUE@CREDIBANCO.COM | TECHNICAL SERVICES & MAINTENANCE | | $59,293.52 |
| 20. | GRUPO CONSULTOR RA SAS CL 29 BIS 6 58 OF 402 BOGOTA, CUNDINAMARCA N/A COLOMBIA | CONTACT: SANDRA ROSA ACUNA PAEZ PHONE: (57) 3208770066 FAX: N/A SANDRARAP72@HOTMAIL.COM | PROFESSIONAL SERVICES | | $51,337.33 |

**SCHEDULE 2**

List of Holders of Secured Claims

Pursuant to Local Rule 1007-2(a)(5), the following lists the name and address of the holders of secured claims against the Debtor as of the Petition Date. Any amount listed on Schedule 2 represents the Debtor's best estimate, and is therefore subject to verification. The Debtor reserves all rights as to the validity, enforceability and priority of each claim and lien pending approval of the Plan and reserves any and all rights to assert remedies, defenses, counterclaims and offsets with respect to such claim.

| Creditor Name and Address | Amount of Claim (USD)[10] | Collateral Description | Gross Accounting Book Value of Collateral (USD) |
|---|---|---|---|
| Citibank Colombia S.A | 26,881,984 | Secured Bank Debt collateralized with receivables from payroll loans | 45,878,493 |
| Bancolombia S.A. | 26,200,709 | Secured Bank Debt collateralized with receivables from payroll loans | 36,532,068 |
| UBS Gramercy Facility | 17,547,383 | Secured Bank Debt collateralized with receivables from credit cards | 84,650,702 |
| Systemgroup S.A.S. | 8,510,350 | Secured Bank Debt collateralized with receivables from payroll loans and credit cards | 100,476,618 |
| Banco De Occidente | 7,568,282 | Secured Bank Debt collateralized with receivables from payroll loans | 10,552,505 |

---

[10] Amounts reflect outstanding balance (principal and interest) as of April 30, 2024.

38

**SCHEDULE 3**

Summary of the Debtor's Assets and Liabilities

Pursuant to Local Rule 1007-2(a)(6), the following are estimates of the Debtor's assets and liabilities (book value) as of *March 31, 2024*. The information contained herein shall not constitute an admission of liability by, nor is it binding on the Debtor.

| Assets and Liabilities | Amount (USD) |
|---|---|
| Total Assets | $ 487,956,371 |
| Total Liabilities | $ 432,840,883 |

**SCHEDULE 4**

Schedule of Owned and Leased Property

Pursuant to Local Rule 1007-2(a)(9), the following lists the property or premises owned, leased or held under another arrangement from which the Debtor operates as of the Petition Date.

|     | **Name of Property** | **Type of Leasing** |
| --- | --- | --- |
| 1.  | Office in Armenia | Commercial Building - Offices |
| 2.  | Edificio BCSC | Commercial Building – Offices |
| 3.  | Office in Bogota | Commercial Building – Offices |
| 4.  | Oficina 701 | Commercial Building – Offices |
| 5.  | Edificio Gran Colombiano | Commercial Building – Offices |
| 6.  | Edificio Caja Agraria | Commercial Building – Offices |
| 7.  | Office in Cucuta | Commercial Building – Offices |
| 8.  | Office in Ibague | Commercial Building – Offices |
| 9.  | Office in Manizales | Commercial Building – Offices |
| 10. | Centro Empresarial Olaya Herrera | Commercial Building – Offices |
| 11. | Office in Santa Marta | Commercial Building – Offices |
| 12. | Office in Sincelejo | Commercial Building – Offices |
| 13. | Edificio Santa Fe | Commercial Building - Offices |

40

**SCHEDULE 5**

Location of the Debtor's Substantial Assets, Books and Records, and Nature and
Location of Assets Outside of the United States

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtor's substantial assets, the location of its books and records, and the nature, location and value of any assets held by the Debtor outside the territorial limits of the United States as of the Petition Date.

| Debtor's Assets | Location |
| --- | --- |
| Debtor's Books and Records | Carrera 7 No, 76 - 35 Bogotá, Colombia |
| Debtor's Substantial Assets | Carrera 7 No, 76 - 35 Bogotá, Colombia |

41

# SCHEDULE 6

## Debtor's Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who constitute the Debtor's existing senior management, including their tenure with the Debtor and a brief summary of their relevant responsibilities and experience.

| Name | Title | Responsibility | Tenure |
|---|---|---|---|
| Jaime Francisco Buriticá Leal | President and Chief Executive Officer | Spearheads the organization's overall strategic direction and operational activities, guiding executive decision-making, fostering a culture of innovation, and driving sustainable growth and profitability. Leads by example, ensuring alignment with corporate values, and representing the organization to stakeholders, partners, and the public. | 7 months |
| Liliana Arango Salazar | Vice-president and Legal Counsel | Provides strategic legal advice and guidance to senior management, overseeing legal matters, contracts, and regulatory compliance to safeguard the organization's interests and ensure adherence to applicable laws and regulations | 14 years and 11 months |
| Julieth Stefanny Cadena Palencia | Compliance Officer | Ensures adherence to regulatory standards and company policies, conducting audits and implementing procedures to mitigate risks. | 3 months |
| Hernán Dario Ramírez Torres | Internal Auditor | Conducts thorough assessments of organizational processes, identifying inefficiencies and ensuring compliance with internal policies and external regulations | 4 years and 11 months |
| Maria Paola Carvajal Galeano | Treasury Manager | Oversees the organization's financial liquidity, managing cash flow, investments, and financial risk to optimize financial stability and support strategic objectives. | 5 months |
| Eliana Andrea Erazo Restrepo | Administrative Manager | Coordinates administrative functions, including office operations, personnel management, and resource allocation to facilitate smooth business operations | 18 years and 7 months |
| Zulma Consuelo Moreno | Product (Payroll Loans) Manager | Coordinates market analysis, strategy development, roadmap planning, and cross-functional collaboration to deliver innovative solutions. This role involves | 4 years and 11 months |

| Name | Title | Responsibility | Tenure |
|---|---|---|---|
| | | defining product requirements, overseeing agile development, leading product launches, and monitoring performance metrics for continuous improvement. | |
| Juan Carlos Restrepo Acuña | Distributor Manager | Develops and maintains relationships with distribution partners, manages sales channels, and implements strategies to maximize product distribution and revenue | 20 years and 7 months |
| Jennifer Paola Machado Sanchez | Collections Director | Leads the collections department, developing strategies to recover outstanding debts while maintaining positive customer relationships and compliance with regulations. | 5 years |
| Juan Carlos Estupiñan Sandoval | Director of Financial Planning | Guides financial planning initiatives, analyzing data, and developing strategies to achieve organizational financial goals and optimize resource allocation. | 8 years and 10 months |
| Carmen Elena Caro Cardenas | Accounting Director | Oversees accounting operations, including financial reporting, budgeting, and auditing, ensuring accuracy and compliance with accounting standards and regulations | 6 years |

43

# SCHEDULE 7

Schedule of 30 Day Estimated Cash Receipts and Disbursements

Pursuant to Local Rule 1007-2(b)(3), the following provides the estimated consolidated cash receipts, disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid for the 30 days following the Petition Date, other than professional fees.

| Type | Amount (Estimated) |
|---|---|
| Cash Receipts | US 11.6 million |
| Cash Disbursements | (US 18.1 million) |
| Net Cash Gain (Loss)[1] | (US 6.5 million) |
| Unpaid Obligations[2] | (US 427.5 million) |
| Uncollected Receivables[3] | US 422.9 million |

[1].   Although the estimated amount results in a net cash loss, the disbursements include payments to be made from collections received prior to the Petition Date which are part of the opening cash balance of US$13.6 million.

[2].   Unpaid Obligations consider obligations with financial lenders and suppliers outstanding as of March 31, 2024.

[3].   Uncollected Receivables consider accounts receivable and loan portfolio as of March 31, 2024.



EXHIBIT B

Page 1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 24-10837-dsj

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of:

CREDIVALORES - CREDISERVICIOS, S.A.,

          Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                    United States Bankruptcy Court

                    One Bowling Green

                    New York, NY 10004-1408


                    Thursday, September 5, 2024

                    11:03 a.m.








   B E F O R E :

HON. DAVID S. JONES

U.S. BANKRUPTCY JUDGE


ECRO:     UNKNOWN

**HEARING re Status Conference.**

**Transcribed by:  Rita Weltsch**

Page 3

APPEARANCES:


BAKER MCKENZIE LLP

Attorneys for the Debtor

1111 Brickell Avenue, Suite 1000

Miami, FL 33131


BY:  PAUL KEENAN (TELEPHONICALLY)


DAVIS POLK & WARDWELL LLP

Attorneys for the Ad Hoc Group of Noteholders

450 Lexington Avenue

New York, NY 10017


BY:  TIMOTHY E. GRAULICH (TELEPHONICALLY)


UNITED STATES DEPARTMENT OF JUSTICE

Attorneys for the Office of the United States Trustee

Alexander Hamilton Customs House

One Bowling Green - Room 534

New York, NY 10004


BY:  ANDREW D. VELEZ-RIVERA (TELEPHONICALLY)

UNITED STATES DEPARTMENT OF JUSTICE

    Attorney for the Internal Revenue Service

    86 Chambers Street

    New York, NY 10007


BY:  ALYSSA O'GALLAGHER (TELEPHONICALLY)

Page 5

P R O C E E D I N G S

THE COURT:  All right.  The next and final case on the calendar is Credivalores, Number 24-10837, down for a status conference.  Let me go ahead and take appearances on that.  Who's here for Debtors, please?

MR. KEENAN:  Good morning, Your Honor.  This is Paul Keenan, from Baker McKenzie, on behalf of the Debtors.

THE COURT:  Hi.  Nice to -- yep.  Go ahead.  Are you with a team?

MR. KEENAN:  No one else from Baker McKenzie. Your Honor, but Susana Hidvegi, who is an attorney licensed to practice in the country of Colombia.  She is on today. She won't be speaking, I don't believe, but --

THE COURT:  Okay.

MR. KEENAN:  -- I just wanted to introduce her.

THE COURT:  Great.  Nice to see you and welcome. Okay.  And let's see, I think we have someone -- Mr. --I apologize.  I forget how to pronounce your name, but Graulich --

MR. GRAULICH:  Yes --

THE COURT:  -- for the Ad Hoc Group?

MR. GRAULICH:  You got it perfectly correct, Your Honor, and better than I've been able to be with my camera today, so my apologies.  But if you could remember my name, you could also remember what I look like.  So I apologize,

Page 6

though.  I'm on my firm laptop in a different law office today, stepped out of meetings and --

THE COURT:  Got it.

MR. GRAULICH:  -- I need to get it taken a look at by my IT folks.

THE COURT:  No problem.  I can see your name beautifully, and I can hear you very well, so that's fine. And yes, I do remember what you look like as well from a nice, lengthy time we spent together in the Courtroom.

Okay.  I'll keep canvassing.  Mr. Velez Rivera for the U.S. Trustee?

MR. VELEZ-RIVERA:  Good morning, Your Honor.  Andy Velez-Rivera, from the U.S. Trustee's office.

THE COURT:  Okay.  Ms. O'Gallagher?

MS. O'GALLAGHER:  Good morning, Your Honor. Alyssa O'Gallagher, from the U.S. Attorney's Office, on behalf of the IRS.

THE COURT:  Great.  Nice to see you.  Anyone else actively participating today?  Okay.  I'll just disclose to all of you I actually know Ms. O'Gallagher in a friendly and personal manner outside of work.  We were also -- I think we didn't quite overlap at the U.S. Attorney's Office, but that won't affect my discharge of my duties here today.  I just like to make it known.

Okay.  So let's hear the update of unspecified

Page 7

developments that prompted this conference.

MR. KEENAN:  Yes, Your Honor.  And first of all, thank you very much for taking this request for a status conference on such short notice.  There was developments late last week in Columbia, which we thought it was important to inform the Court.  We were able to inform Davis Polk yesterday and we were able to have email exchanges with the U.S. Trustee, and I'll be able to provide their office with more details later today if they would like.

First of all, Your Honor, you may recall that we had a contested confirmation hearing, and Your Honor entered an order confirming the plan.  I believe it was on July 2nd, so nearly two months ago.

Also, as the Court may recall, the plan contemplated the issuance of new notes, which of course would require a new indenture drafting of new notes.  There is a requirement to run those by the SEC.  Of course, they have to be negotiated with Indenture Trustee's counsel.  And so, we expected that it would take about six to eight weeks to go effective on the plan, because it was centered around the issuance of new notes.  And we're at about that eight-week mark.

The development that we wanted to inform the Court of is that, you know, we will not be going effective, at least not anytime soon.  And one of the principal reasons is

Page 8

that a Law 1116 proceeding was commenced in Colombia just last Friday.  Your Honor, fortunately, myself and also Susana Hidvegi, of course, have a lot of experience working in Colombia on various cross-border matters where they touch both Colombia and the U.S.

And I certainly won't, you know, give the Court a lengthy dissertation on Law 1116 proceedings, except to say that it's the rough equivalent of a Chapter 11 in Colombia. And to be clear, this was voluntarily commenced by Credivalores in Colombia, although, you know, I'll say under significant pressure to do so, which I'll explain in a moment.

I think the one salient feature I might mention of the Law 1116 process in Colombia is that unlike the United States, where a company files a petition and the bankruptcy case commences immediately, under Law 1116 -- and this is a common feature, I think, throughout Latin America -- a company -- when a company files a voluntary petition, the regulatory body then takes two to four months to review the petition and determine whether or not the case -- the petition should be admitted and the case should proceed.

So, at this moment, you could think of ourselves as sort of being in a bit of a gap period in the sense that a petition was filed by the company last Friday, but the case is not technically in motion yet.

Page 9

What that means, then, Your Honor, is that we're in this unfortunate position of being in what I'd call two concurrent plenary proceedings over the same Debtor.  And what I mean by that is that, you know, for the same Debtor, Credivalores, we have a pending Chapter 11 case, albeit with a confirmed plan and a, you know, pending petition for a Law 1116 proceeding in Columbia.

THE COURT:  I'm sorry, but both commenced by Credivalores, right, by the same entity?

MR. KEENAN:  Correct.  Correct.  Correct.  And so, if you will, there are two courts, so to speak, that purport to have jurisdiction in two different countries over the same entity.  And that's a different situation than what we typically strive for, which is where you have, you know, a -- you know, for example, you know, we have experience with a Chapter 11 in the U.S. over a company, and that you might file a version of Chapter 15 in Colombia.  So you have an ancillary proceeding in Colombia.  And just to clarify, Columbia has adopted the UNCITRAL Model Law cross-border insolvency, which is our Chapter 15.

THE COURT:  Right.

MR. KEENAN:  But to be clear, this is not a Chapter 15 proceeding in Colombia, right?  This is like a Chapter 11 proceeding in Colombia, so to speak.

THE COURT:  Hmm.

Page 10

MR. KEENAN:  And which makes it more complicated, right?  Because typically, you know, you have one plenary proceeding, I call it, and one ancillary proceeding that follows the plenary proceeding.  Here we have two plenary proceedings over the same -- over the same Debtor.

We only -- quite frankly, as Debtor's counsel, we only learned this when it was filed.  And there were some events leading up to this filing that we learned of just on Monday.  And I'll relay some of those events to the Court.

So it appears that in late July, at least two insurance companies who are creditors of the Debtor commenced a form of civil litigation in Colombia for unpaid debts that led to embargoes on the company's bank accounts in Colombia.

Embargoes are a common litigation tool for plaintiffs in Latin America, and the best way to describe it is that you could think of it as a prejudgment attachment of bank accounts, you know, at the commencement of civil litigation.  And as the Court's certainly aware, it's very difficult to get prejudgment relief at the beginning of a civil litigation case.  The bar is very high.  It's not nearly as high in Latin America.  And so these embargoes by creditors at the outset of civil litigation are not uncommon.

Unfortunately, since, you know, it's over bank

Page 11

accounts in this case, that obviously constrains the company's liquidity.  And it's my understanding that those embargoes, plus other issues are -- caused two things.  One is it's caused the company to miss an interest payment on its local bonds.

So, in this case, Your Honor, you'll recall, of course, that we have, I believe it was $210 million in dollar denominated bonds governed by New York law.  And those are the bonds that were being exchanged through the prepackaged plan.  But the company also had local bonds.  And the approximate amount -- denominated in the Colombian pesos, but in the approximate amount of about $24 million U.S.

There was an interest payment due on those local bonds and those local bonds were going to ride through like all the other claims under the plan.  Those local bonds had an interest payment that was due on October 26th that the company did not make.

And so, the liquidity issues that the company is facing has caused it to miss the interest payment on its local bonds.  It's also caused it to be unable to fund the administrative expenses that would need to be funded under the confirmed Chapter 11 plan to make it go effective, and also to make the bond payment under the new notes that would, you know, be due almost immediately.  It was actually

Page 12

due a week ago, I believe.  So --

THE COURT:  And you -- I think you may have misstated a date.  I think you may have just referenced October of 26th, but --

MR. KEENAN:  And August 26th, Your Honor.

THE COURT:  Yeah, okay.

MR. KEENAN:  So, that was the due date for the interest payment under the local bonds.

And so, you know, to be frank, we're in a tough spot.  This is uncharted territory.  I've been involved in, you know, a Chapter 11 case where we sought recognition under the Model Law in Colombia.  I've done the reverse where we had a Colombian proceeding and obtained Chapter 15 protection here.  And in both those cases, we worked closely with the Superintendent of Corporations in Colombia to make that happen.

Here, to my knowledge, this is the first time that there's ever been two concurrent plenary proceedings, as I call it, over the same Debtor in the U.S. and Colombia.

THE COURT:  Right.

MR. KEENAN:  Fortunately -- I'm going to sing Susana's praises here for a moment, Ms. Hidvegi.  Ms. Hidvegi is probably one of the, you know, the preeminent practitioners of insolvency law in Colombia.  I've known her probably for almost 15 years at this point.  She started off

Page 13

as an Associate Brigard when Colombia enacted their restructuring law in 2006.  And she quickly became the country's expert on a Law 1116, so much so that she wound up serving, I believe it was, a three or four term as the Chief Bankruptcy Judge in Columbia.  And she has now returned to private practice.

We're fortunate that the company has hired her.  And we're going to be working closely in the coming weeks to figure out what her options are.  Don't know what the options are, quite frankly.  Don't know -- we're just at the beginning stages here.  But we thought that since the company is now the subject of another bankruptcy proceeding in another country that it was incumbent upon us to inform the Court and, of course, to inform all the other parties.

THE COURT:  Okay.  So I am disinclined to say much of anything, other than to absorb this information.  I don't want to complicate things further.  This is -- you said this was a first for you.  It's a first for me of having two principal cases in two jurisdictions concurrently.  I think one that occurs to me, I appreciate your -- first off, I should say I appreciate your calling this to attention promptly, because there's potential broader interest.

I think it would be appropriate for the Debtor to file some form of notice --

MR. KEENAN:  Notice?

Page 14

THE COURT:  Yeah, of the commencement of Law 1116, I guess if it's fair to call it, restructuring or insolvency proceedings in Colombia concerning the same Debtor that's the Debtor in the case here.  I think that would be good for maximizing notice to parties in interest.  And I'd encourage you to just -- well, not -- I'd direct you to order the transcript, as I'm sure you would anyway, so that that'll be docketed in due course.  I think that's embargoed -- public access to that is embargoed for a time.  But it'll then be memorialized and made part of the record.

I'm -- I guess as part -- can -- are you in a position to say anything about likelihood of effective date timing?  Or it's just -- it sounds to me like you have too much uncertainty about that right now to speak to that.

MR. KEENAN:  It's -- I think I can say unequivocally I don't see an effective date anytime soon, meaning in the coming days or weeks.  And so, you know, I think that --

THE COURT:  Okay.  Maybe I should -- what if I set a conference date and your notice can include that a conference date has been -- a further conference date has been set for date X and Debtors do not anticipate achieving effectiveness of their plan before then, something like that?

MR. KEENAN:  Yes, Your Honor.

Page 15

THE COURT: Okay. I'm making this up, so if I say something that doesn't make sense, please tell me. I mean, that is, by making it up I mean I am coming up with things that I think are appropriate, sensible measures, but I'm open for better ideas because it's new, a new situation to me, both because I hadn't learned of it before this conference started and because I've never been in this situation.

I'm going to let everybody else speak. And let me ask one thing -- and I know Mr. Graulich wants to speak too. I assume that the -- I'll just call it the treatment of the preexisting notes that was the centerpiece of the plan and the modification of parties rights, will not go into force until and unless you achieve your effective date. Is that right? In other words, is Mr. Graulich's clientele, that is the Ad Hoc Group or the dissenting noteholders, at risk of their rights being modified pursuant to the plan that I approved prior to -- before further things happen or not?

MR. KEENAN: So, Your Honor, I think what we can stipulate here today is what you suggested earlier, which is that perhaps we set a conference, a further status conference, for two weeks from now. I'm hoping that we'll have some more clarity on something before then. And certainly the Debtors can commit to not going effective on

Page 16

the plan before then, or without further --

THE COURT:  Okay.

MR. KEENAN:  -- notice to the parties.

THE COURT:  And I would make it, like, three business days thereafter or something so that there's not a --

MR. KEENAN:  Sure.

THE COURT:  -- you know, a fire drill at that time.  Okay.  So that makes sense.  And I think we can get you a date in something like two weeks.  I'm responsive to the parties' views of how far out we want go.  If you want two weeks, that's fine with me.

Mr. Graulich, you were getting ready to speak and I jumped in.  Anything -- what do you want to add, if anything?

MR. GRAULICH:  Yeah.  No, just -- thank you, Your Honor, and for the record, Timothy Graulich, of Davis Polk, on behalf of the Ad Hoc Group.  Just a couple of observations.  One, with respect to the effectiveness of the plan, you know, the plan has -- you know, the plan and disclosure statement that was sent out to clients, to creditors -- and not to rehash any of the objections that we had previously -- stated specifically that the first bond payment was to be made on August 7th, i.e., you know, almost a month ago.  Presumably that would have meant that the

Page 17

bonds should have been issued and the case gone effective

back then.

You know, given the fact -- and what's unusual

about this is that, you know, we weren't involved in

negotiating any of this, but I'm also assuming that the bond

indenture and the (indiscernible) -- like, I'm sure every

subsequent event that has happened right now is probably a

breach of those agreements.  So I'm not so sure that there's

a world in which the bonds could -- that the plan could be -

- just go effective at this point.  But we'll see.  You

know, again, I -- we're all sort of dealing with this in

real time.

But I do want to raise my hand to say that I think

very significant new events have occurred here that it's not

obvious to me that we're able to go effective at this point.

Maybe if things get resolved in the next two weeks in

Colombia, maybe that's -- you know, maybe people come to the

conclusion that no harm, no foul, it's close enough.  But,

you know, I think there's already material potentially, you

know, breaches of what the arrangement was supposed to be,

even under the plan that's been confirmed.

THE COURT:  Okay.

MR. GRAULICH:  The other observation is that I

think this is the first time -- I'll throw in my hat as well

-- that of two plenary cases where they have not yet been

Page 18

coordinated and they sort of weren't -- although both

commenced by the Debtors, I take Mr. Keenan's point that,

you know, one was sort of commenced as the plan A and the

other one may have been, you know, the subsequent Colombian

proceedings may have been commenced -- I don't want to say

under duress -- but based upon newly developing facts on the

ground locally.

But, you know, the history of Chapter 15 probably

goes back to the Maxwell case, which I think was two plenary

cases, one in the UK, one in the U.S.  So there are ways

and, you know, the Southern District does have court-to-

court communication protocols.

You know, I'm sure Mr. Keenan is already thinking

about how best to, you know, coordinate this proceeding with

that proceeding.  And frankly, we would have, as the

bondholders and as creditors, have I think common ground

with the Debtors to make sure that they're -- that these --

this sort of unanticipated new filing doesn't, you know,

cause undue harm to creditors.

So there probably is some, you know, coordination

that could be done.  But you know, I think what Your Honor

has requested or has suggested about there being a

conference, you know, if it's in two weeks, that's great.

But I'm not so sure that unless this gets resolved

immediately that we're -- you know, and this may not be

Page 19

something that even the creditors would be happy about --

but I am, just myself, questioning whether or not the --

that too much has changed from what was in the disclosure

statement and the plan for there to be a world where we're

back in the, you know, a pre-pack, you know, plan going

effective in two weeks, for example.

THE COURT:  Yeah, I hear you, Mr. Graulich.  I

thank you for those thoughts.  I think that the best

contribution I can make is to not say too much, because

that'll -- it isn't fully -- it wouldn't be fully informed

and I think it's pretty clear that Mr. Keenan and his team

are reacting kind of in real time to -- and trying to get

their arms around how to proceed, as well as maybe some

additional facts.

My concern in the meantime, my objective in the

meantime, is to allow that process to occur in a way that

doesn't further complicate matters or prejudice anybody's

rights, and in particular, my thoughts go really to all

noteholders, both the dissenters and then, honestly, even

the folks supporting the prior plan.  So I want to make sure

they have both notice and an opportunity to have their

rights addressed if they want to raise anything.

Otherwise -- you know, but otherwise I think we

just have to allow a little time.  I'm sure the Debtors'

team will be communicating with all stakeholders and trying

Page 20

to sort things out, and I want to allow enough breathing room for that to occur, so long as that's not going to result in somebody being prejudiced.  Those are sort of my thoughts.  Does that work for you, Mr. Graulich?

MR. GRAULICH:  It does.  It does.  And I think, again, while Mr. Keenan and I, who have known each other for quite a while, had a good conversation yesterday, I think we are aligned in trying to make sure that there is a -- the best possible outcome here for creditors.  So, that all is sensible to me.

THE COURT:  Okay, great.  I'm told I have calendar availability on the 17th of September and then the 24th, if any -- if you want to pick either of those on the spot, or else you can talk to whoever you need to talk to offline and then just communicate with my deputy which you prefer.  Okay?

I'm going to ask the other participants in a minute if they want to add anything or ask questions, but Mr. Keenan, so far, so good, based on what you've heard --

MR. KEENAN:  Yes --

THE COURT:  -- from Mr. Graulich?

MR. KEENAN:  Yes, Your Honor.

THE COURT:  Okay.  Any further thoughts from the U.S. Trustee's Office?

MR. VELEZ-RIVERA:  Good morning, Your Honor.  Andy

Page 21

Velez-Rivera, for the U.S. Trustee.  No, I have nothing to add today.  We're absorbing the information in the same manner you are.

THE COURT:  Okay.

MR. VELEZ-RIVERA:  Thank you.

THE COURT:  Yep, thanks.  And I'm open for applications at any time from anybody who wants to make it. Ms. O'Gallagher, how about for the U.S. Attorney's Office?

MS. O'GALLAGHER:  Nothing to add, Your Honor. Thank you very much.

THE COURT:  Okay.  So, let's -- so let me just recap, I think, where we are.  First, I thank you for the update.  There's a second plenary proceeding unexpectedly now occurring in Colombia.  Debtors are going to file a notice of that.  Debtors have committed that no steps will be taken of having the plan go effective, and I've generally urged that no steps be taken that will prejudice peoples' -- parties in interest rights, pending a further conference.

And that further conference will occur on either September 17th or September 24th.  I'll just presumptively put it at 10:00 a.m. as part of a calendar, but if you need a separate or a different time, that would be fine.  And you can consult among yourselves and figure out which of those two dates makes more sense, and then just communicate to them to Ms. Calderon what it is, and get a notice of

Page 22

conference on file making known to the world that date.

And then also, in the meantime, Debtors will file some version of the notice document that Mr. Keenan and I discussed earlier.  Okay?  Does that cover -- I think that's the total set of takeaways.  Do I have that right, Mr. Keenan?

MR. KEENAN:  Yes, Your Honor.

THE COURT:  Okay.  So, thank you for alerting me to this situation and I will just say good luck navigating.  It sounds challenging, but you're a skilled group and we'll see where you get.  Okay?

MR. KEENAN:  Thank you.

THE COURT:  All right.  Thank you, all.

MR. KEENAN:  Thank you, Your Honor.

MAN:  Take care, Judge.

MR. GRAULICH:  Thank you, Your Honor.

(Whereupon these proceedings were concluded at 11:29 a.m.)

**Page 23**

C E R T I F I C A T I O N

I, Sonya Ledanski Hyde, certified that the foregoing transcript is a true and accurate record of the proceedings.

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  September 12, 2024



EXHIBIT C

UNITED STATES BANKRUPTCY COURT

Southern   DISTRICT OF   New York

In Re. Credivalores - Crediservicios S.A.     §     Case No.  24-10837

§

§

_____     §

Debtor(s)

☐ Jointly Administered

# Monthly Operating Report

Chapter 11

Reporting Period Ended: 04/30/2025     Petition Date: 05/16/2024

Months Pending: 12     Industry Classification:  5  2  2  2

Reporting Method:     Accrual Basis ⦿     Cash Basis ◯

Debtor's Full-Time Employees (current):     112

Debtor's Full-Time Employees (as of date of order for relief):     109

**Supporting  Documentation**  (check all that are attached):

(For jointly administered debtors, any required schedules must be provided on a non-consolidated basis for each debtor)

☒   Statement of cash receipts and disbursements
☒   Balance sheet containing the summary and detail of the assets, liabilities and equity (net worth) or deficit
☒   Statement of operations (profit or loss statement)
☐   Accounts receivable aging
☐   Postpetition liabilities aging
☐   Statement of capital assets
☐   Schedule of payments to professionals
☐   Schedule of payments to insiders
☐   All bank statements and bank reconciliations for the reporting period
☐   Description of the assets sold or transferred and the terms of the sale or transfer

/S/ Liliana Arnago Salazar     Liliana Arnago Salazar

Signature of Responsible Party     Printed Name of Responsible Party

05/21/2025

Date

Carrera 7 No, 76 - 35 Bogotá, Colombia

Address

STATEMENT: This Periodic Report is associated with an open bankruptcy case; therefore, Paperwork Reduction Act exemption 5 C.F.R. § 1320.4(a)(2) applies.

UST Form 11-MOR (12/01/2021)     1

Debtor's Name  Credivalores - Crediservicios S.A.                                    Case No.  24-10837

| Part 1: Cash Receipts and Disbursements | Current Month | Cumulative |
|---|---|---|
| a.   Cash balance beginning of month | $6,444,059 | |
| b.   Total receipts (net of transfers between accounts) | $2,524,687 | $58,104,136 |
| c.   Total disbursements (net of transfers between accounts) | $2,353,661 | $61,940,931 |
| d.   Cash balance end of month (a+b-c) | $6,615,084 | |
| e.   Disbursements made by third party for the benefit of the estate | $0 | $0 |
| f.   Total disbursements for quarterly fee calculation (c+e) | $2,353,661 | $61,940,931 |

| Part 2:  Asset and Liability Status (Not generally applicable to Individual Debtors. See Instructions.) | Current Month |
|---|---|
| a.   Accounts receivable (total net of allowance) | $55,110,163 |
| b.   Accounts receivable over 90 days outstanding (net of allowance) | $44,385,588 |
| c.   Inventory    (Book ⦿    Market ◯    Other ◯    (attach explanation)) | $0 |
| d    Total current assets | $262,101,707 |
| e.   Total assets | $350,915,528 |
| f.   Postpetition payables (excluding taxes) | $6,351,761 |
| g.   Postpetition payables past due (excluding taxes) | $0 |
| h.   Postpetition taxes payable | $80,332 |
| i.   Postpetition taxes past due | $0 |
| j.   Total postpetition debt (f+h) | $6,432,093 |
| k.   Prepetition secured debt | $53,091,663 |
| l.   Prepetition priority debt | $0 |
| m.   Prepetition unsecured debt | $359,254,149 |
| n.   Total liabilities (debt) (j+k+l+m) | $418,777,906 |
| o.   Ending equity/net worth (e-n) | $-67,862,378 |

| Part 3:  Assets Sold or Transferred | Current Month | Cumulative |
|---|---|---|
| a.   Total cash sales price for assets sold/transferred outside the ordinary course of business | $0 | $0 |
| b.   Total payments to third parties incident to assets being sold/transferred outside the ordinary course of business | $0 | $0 |
| c.   Net cash proceeds from assets sold/transferred outside the ordinary course of business (a-b) | $0 | $0 |

| Part 4:  Income Statement (Statement of Operations) (Not generally applicable to Individual Debtors. See Instructions.) | Current Month | Cumulative |
|---|---|---|
| a.   Gross income/sales (net of returns and allowances) | $1,568,023 | |
| b.   Cost of goods sold (inclusive of depreciation, if applicable) | $3,356,691 | |
| c.   Gross profit (a-b) | $-1,788,667 | |
| d.   Selling expenses | $0 | |
| e.   General and administrative expenses | $-512,091 | |
| f.   Other expenses | $-10,330,746 | |
| g.   Depreciation and/or amortization (not included in 4b) | $-14,052 | |
| h.   Interest | $20,411 | |
| i.   Taxes (local, state, and federal) | $3,282,538 | |
| j.   Reorganization items | $0 | |
| k.   Profit (loss) | $-9,342,608 | $-111,168,555 |

UST Form 11-MOR (12/01/2021)                    2

Debtor's Name  Credivalores - Crediservicios S.A.                                                     Case No.  24-10837

| **Part 5:** | **Professional Fees and Expenses** | | | | | |
|---|---|---|---|---|---|---|
| | | | Approved Current Month | Approved Cumulative | Paid Current Month | Paid Cumulative |
| a. | Debtor's professional fees & expenses (bankruptcy) *Aggregate Total* | | $0 | $79,326 | $79,326 | $79,326 |
| | *Itemized Breakdown by Firm* | | | | | |
| | Firm Name | Role | | | | |
| i | Epiq Corporate Restructuring, L | Other | $0 | $79,326 | $79,326 | $79,326 |
| ii | | | | | | |
| iii | | | | | | |
| iv | | | | | | |
| v | | | | | | |
| vi | | | | | | |
| vii | | | | | | |
| viii | | | | | | |
| ix | | | | | | |
| x | | | | | | |
| xi | | | | | | |
| xii | | | | | | |
| xiii | | | | | | |
| xiv | | | | | | |
| xv | | | | | | |
| xvi | | | | | | |
| xvii | | | | | | |
| xviii | | | | | | |
| xix | | | | | | |
| xx | | | | | | |
| xxi | | | | | | |
| xxii | | | | | | |
| xxiii | | | | | | |
| xxiv | | | | | | |
| xxv | | | | | | |
| xxvi | | | | | | |
| xxvii | | | | | | |
| xxviii | | | | | | |
| xxix | | | | | | |
| xxx | | | | | | |
| xxxi | | | | | | |
| xxxii | | | | | | |
| xxxiii | | | | | | |
| xxxiv | | | | | | |
| xxxv | | | | | | |
| xxxvi | | | | | | |

UST Form 11-MOR (12/01/2021)                                                3

Debtor's Name Credivalores - Crediservicios S.A.     Case No. 24-10837

| | | | | | |
|---|---|---|---|---|---|
| xxxvii | | | | | |
| xxxvii | | | | | |
| xxxix | | | | | |
| xl | | | | | |
| xli | | | | | |
| xlii | | | | | |
| xliii | | | | | |
| xliv | | | | | |
| xlv | | | | | |
| xlvi | | | | | |
| xlvii | | | | | |
| xlviii | | | | | |
| xlix | | | | | |
| l | | | | | |
| li | | | | | |
| lii | | | | | |
| liii | | | | | |
| liv | | | | | |
| lv | | | | | |
| lvi | | | | | |
| lvii | | | | | |
| lviii | | | | | |
| lix | | | | | |
| lx | | | | | |
| lxi | | | | | |
| lxii | | | | | |
| lxiii | | | | | |
| lxiv | | | | | |
| lxv | | | | | |
| lxvi | | | | | |
| lxvii | | | | | |
| lxviii | | | | | |
| lxix | | | | | |
| lxx | | | | | |
| lxxi | | | | | |
| lxxii | | | | | |
| lxxiii | | | | | |
| lxxiv | | | | | |
| lxxv | | | | | |
| lxxvi | | | | | |
| lxxvii | | | | | |
| lxxvii | | | | | |

UST Form 11-MOR (12/01/2021)     4

Debtor's Name  Credivalores - Crediservicios S.A.                                    Case No.  24-10837

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | lxxix | | | | | | |
| | lxxx | | | | | | |
| | lxxxi | | | | | | |
| | lxxxii | | | | | | |
| | lxxxii | | | | | | |
| | lxxxiv | | | | | | |
| | lxxxv | | | | | | |
| | lxxxvi | | | | | | |
| | lxxxvi | | | | | | |
| | lxxxvi | | | | | | |
| | lxxxix | | | | | | |
| | xc | | | | | | |
| | xci | | | | | | |
| | xcii | | | | | | |
| | xciii | | | | | | |
| | xciv | | | | | | |
| | xcv | | | | | | |
| | xcvi | | | | | | |
| | xcvii | | | | | | |
| | xcviii | | | | | | |
| | xcix | | | | | | |
| | c | | | | | | |
| | ci | | | | | | |

| | | | Approved Current Month | Approved Cumulative | Paid Current Month | Paid Cumulative |
|---|---|---|---|---|---|---|
| b. | Debtor's professional fees & expenses (nonbankruptcy)  *Aggregate Total* | | | | | |
| | *Itemized Breakdown by Firm* | | | | | |
| | Firm Name | Role | | | | |
| | i | | | | | |
| | ii | | | | | |
| | iii | | | | | |
| | iv | | | | | |
| | v | | | | | |
| | vi | | | | | |
| | vii | | | | | |
| | viii | | | | | |
| | ix | | | | | |
| | x | | | | | |
| | xi | | | | | |
| | xii | | | | | |
| | xiii | | | | | |
| | xiv | | | | | |

UST Form 11-MOR (12/01/2021)                                    5

Debtor's Name  Credivalores - Crediservicios S.A.                                    Case No.  24-10837

| | | | | | | |
|---|---|---|---|---|---|---|
| xv | | | | | | |
| xvi | | | | | | |
| xvii | | | | | | |
| xviii | | | | | | |
| xix | | | | | | |
| xx | | | | | | |
| xxi | | | | | | |
| xxii | | | | | | |
| xxiii | | | | | | |
| xxiv | | | | | | |
| xxv | | | | | | |
| xxvi | | | | | | |
| xxvii | | | | | | |
| xxviii | | | | | | |
| xxix | | | | | | |
| xxx | | | | | | |
| xxxi | | | | | | |
| xxxii | | | | | | |
| xxxiii | | | | | | |
| xxxiv | | | | | | |
| xxxv | | | | | | |
| xxxvi | | | | | | |
| xxxvii | | | | | | |
| xxxvii | | | | | | |
| xxxix | | | | | | |
| xl | | | | | | |
| xli | | | | | | |
| xlii | | | | | | |
| xliii | | | | | | |
| xliv | | | | | | |
| xlv | | | | | | |
| xlvi | | | | | | |
| xlvii | | | | | | |
| xlviii | | | | | | |
| xlix | | | | | | |
| l | | | | | | |
| li | | | | | | |
| lii | | | | | | |
| liii | | | | | | |
| liv | | | | | | |
| lv | | | | | | |
| lvi | | | | | | |

Debtor's Name  Credivalores - Crediservicios S.A.                                        Case No.  24-10837

| | | | | | |
|---|---|---|---|---|---|
| lvii | | | | | |
| lviii | | | | | |
| lix | | | | | |
| lx | | | | | |
| lxi | | | | | |
| lxii | | | | | |
| lxiii | | | | | |
| lxiv | | | | | |
| lxv | | | | | |
| lxvi | | | | | |
| lxvii | | | | | |
| lxviii | | | | | |
| lxix | | | | | |
| lxx | | | | | |
| lxxi | | | | | |
| lxxii | | | | | |
| lxxiii | | | | | |
| lxxiv | | | | | |
| lxxv | | | | | |
| lxxvi | | | | | |
| lxxvii | | | | | |
| lxxvii | | | | | |
| lxxix | | | | | |
| lxxx | | | | | |
| lxxxi | | | | | |
| lxxxii | | | | | |
| lxxxii | | | | | |
| lxxxiv | | | | | |
| lxxxv | | | | | |
| lxxxvi | | | | | |
| lxxxvi | | | | | |
| lxxxvi | | | | | |
| lxxxix | | | | | |
| xc | | | | | |
| xci | | | | | |
| xcii | | | | | |
| xciii | | | | | |
| xciv | | | | | |
| xcv | | | | | |
| xcvi | | | | | |
| xcvii | | | | | |
| xcviii | | | | | |

Debtor's Name  Credivalores - Crediservicios S.A.                                     Case No.  24-10837

| | | | | | | |
|---|---|---|---|---|---|---|
| xcix | | | | | | |
| c | | | | | | |
| c. | All professional fees and expenses (debtor & committees) | | | | | |

| **Part 6:  Postpetition Taxes** | **Current Month** | **Cumulative** |
|---|---|---|
| a.   Postpetition income taxes accrued (local, state, and federal) | $0 | $0 |
| b.   Postpetition income taxes paid (local, state, and federal) | $0 | $0 |
| c.   Postpetition employer payroll taxes accrued | $4,164 | $216,638 |
| d.   Postpetition employer payroll taxes paid | $14,938 | $241,526 |
| e.   Postpetition property taxes paid | $0 | $0 |
| f.   Postpetition other taxes accrued (local, state, and federal) | $76,168 | $1,562,708 |
| g.   Postpetition other taxes paid (local, state, and federal) | $90,064 | $1,692,414 |

**Part 7: Questionnaire - During this reporting period:**

a.   Were any payments made on prepetition debt?  (if yes, see Instructions)   Yes ⦿   No ◯

b.   Were any payments made outside the ordinary course of business without court approval?  (if yes, see Instructions)   Yes ◯   No ⦿

c.   Were any payments made to or on behalf of insiders?   Yes ⦿   No ◯

d.   Are you current on postpetition tax return filings?   Yes ⦿   No ◯

e.   Are you current on postpetition estimated tax payments?   Yes ⦿   No ◯

f.   Were all trust fund taxes remitted on a current basis?   Yes ⦿   No ◯

g.   Was there any postpetition borrowing, other than trade credit? (if yes, see Instructions)   Yes ◯   No ⦿

h.   Were all payments made to or on behalf of professionals approved by the court?   Yes ◯   No ◯   N/A ⦿

i.   Do you have:        Worker's compensation insurance?   Yes ⦿   No ◯

                            If yes, are your premiums current?   Yes ⦿   No ◯   N/A ◯   (if no, see Instructions)

                    Casualty/property insurance?   Yes ⦿   No ◯

                            If yes, are your premiums current?   Yes ⦿   No ◯   N/A ◯   (if no, see Instructions)

                    General liability insurance?   Yes ⦿   No ◯

                            If yes, are your premiums current?   Yes ⦿   No ◯   N/A ◯   (if no, see Instructions)

j.   Has a plan of reorganization been filed with the court?   Yes ⦿   No ◯

k.   Has a disclosure statement been filed with the court?   Yes ⦿   No ◯

l.   Are you current with quarterly U.S. Trustee fees as set forth under 28 U.S.C. § 1930?   Yes ⦿   No ◯

UST Form 11-MOR (12/01/2021)                                      8

Debtor's Name  Credivalores - Crediservicios S.A.                                    Case No.  24-10837

**Part 8: Individual Chapter 11 Debtors (Only)**

| | | |
|---|---|---:|
| a. | Gross income (receipts) from salary and wages | $0 |
| b. | Gross income (receipts) from self-employment | $0 |
| c. | Gross income from all other sources | $0 |
| d. | Total income in the reporting period (a+b+c) | $0 |
| e. | Payroll deductions | $0 |
| f. | Self-employment related expenses | $0 |
| g. | Living expenses | $0 |
| h. | All other expenses | $0 |
| i. | Total expenses in the reporting period (e+f+g+h) | $0 |
| j. | Difference between total income and total expenses (d-i) | $0 |
| k. | List the total amount of all postpetition debts that are past due | $0 |

l. Are you required to pay any Domestic Support Obligations as defined by 11 U.S.C § 101(14A)?    Yes ○  No ●

m. If yes, have you made all Domestic Support Obligation payments?    Yes ○  No ○  N/A ●

### Privacy Act Statement

28 U.S.C. § 589b authorizes the collection of this information, and provision of this information is mandatory under 11 U.S.C. §§ 704, 1106, and 1107.  The United States Trustee will use this information to calculate statutory fee assessments under 28 U.S.C. § 1930(a)(6).  The United States Trustee will also use this information to evaluate a chapter 11 debtor's progress through the bankruptcy system, including the likelihood of a plan of reorganization being confirmed and whether the case is being prosecuted in good faith.  This information may be disclosed to a bankruptcy trustee or examiner when the information is needed to perform the trustee's or examiner's duties or to the appropriate federal, state, local, regulatory, tribal, or foreign law enforcement agency when the information indicates a violation or potential violation of law.  Other disclosures may be made for routine purposes. For a discussion of the types of routine disclosures that may be made, you may consult the Executive Office for United States Trustee's systems of records notice, UST-001, "Bankruptcy Case Files and Associated Records." *See* 71 Fed. Reg. 59,818 et seq. (Oct. 11, 2006).  A copy of the notice may be obtained at the following link: http://www.justice.gov/ust/eo/rules_regulations/index.htm.  Failure to provide this information could result in the dismissal or conversion of your bankruptcy case or other action by the United States Trustee.  11 U.S.C. § 1112(b)(4)(F).

**I declare under penalty of perjury that the foregoing Monthly Operating Report and its supporting documentation are true and correct and that I have been authorized to sign this report on behalf of the estate.**

/s/ Liliana Arango Salazar                                    Liliana Arango Salazar

Signature of Responsible Party                                Printed Name of Responsible Party

Legal director and General Secretary                          05/21/2025

Title                                                          Date

Debtor's Name Credivalores - Crediservicios S.A.          Case No. 24-10837



PageOnePartOne



PageOnePartTwo



PageTwoPartOne



PageTwoPartTwo

Debtor's Name  Credivalores - Crediservicios S.A.                                                    Case No.  24-10837

Bankruptcy1to50

Bankruptcy51to100

NonBankruptcy1to50

NonBankruptcy51to100

UST Form 11-MOR (12/01/2021)                                11

Debtor's Name  Credivalores - Crediservicios S.A.                                         Case No.  24-10837



PageThree



PageFour

**CREDIVALORES CREDISERVICIOS S.A.**

**Case No. 24-10837**

Notes to the Monthly Operating Report

Notes to UST Form 11-MOR, Part 7 Questionnaire:

Part 7(a): During the reporting period, as authorized, pursuant to the relief granted via the various first day orders, the debtor, paid approximately US$1.5 million of prepetition debt through approximately 17 transactions. To the extent requested by the Office of the Unites States Trustee, the debtor can provide a schedule identifying transaction dates, name of recipients, and amounts paid for its respective transactions. The transactions are also reflected in the bank statements, which were shared with the Office of the United States Trustee.

Part 7(c): During the reporting period, as authorized, pursuant to the final order and associated granted relief authorizing the debtor to pay prepetition employee obligations, the debtor paid approximately US $3,074 to insiders related to their salaries and benefits.

## GLOBAL NOTES AND STATEMENTS OF LIMITATIONS
## AND DISCLAIMERS REGARDING THE DEBTOR'S MONTHLY OPERATING REPORT

On May 16, 2024 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in this Court seeking approval of its Prepackaged Chapter 11 Plan (as may be amended or modified, the "Plan") so as to permit the restructuring of the Debtor's notes issued under that certain Indenture, dated February 7, 2020, between the Debtor and the Bank of New York Mellon (the "Old Notes"), on the terms set forth in the Plan.

On the Petition Date, the Debtor also filed a number of motions and applications (collectively, the "First Day Motions") in order to move towards approval and confirmation of the Plan in a manner that will allow the Debtor to operate in Chapter 11 with minimum disruption or loss of value.

On July 3, 2024 the Plan was approved and confirmed by honorable Judge David S. Jones of the U.S. Bankruptcy Court of the Southern District of New York.

This Monthly Operating Report ("MOR") was prepared on a standalone basis for the Company as it does not own any direct or indirect subsidiaries. The MOR is unaudited, is limited in scope, covers a limited time period, and has been prepared solely for the purpose of complying with the monthly reporting requirements for Chapter 11 debtors as required by the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") and the Bankruptcy Court.

This MOR does not include all of the information and footnotes required by generally accepted accounting principles ("GAAP") or international financial reporting standards ("IFRS") for complete financial statements. Therefore, there can be no assurance that the consolidated financial information presented herein is complete and readers are strongly cautioned not to place undue reliance on this MOR.

The information contained herein is a preliminary draft based on the Company's books and records as of the date of this MOR and is subject to material change as the Company continues with its normal quarter end procedures in respect to its quarterly financial statements, which could include adjustments as a result of the limited audit review being performed by its external auditors.

This MOR should be read in conjunction with the financial statements and accompanying notes in the Company's annual and quarterly reports. Due to the nature of the information contained in this MOR, monthly cash flow and results may not entirely align with the Company's next quarterly consolidated report.

Unless otherwise noted, this MOR reflects the carrying values of the assets as recorded on the Debtor's books and records as of the end of the month and is not based upon an estimate of their current market value. The Debtor reserves its right to amend or adjust the value of each asset set forth herein.

The Debtor's financial records are maintained in Colombian Pesos. Amounts presented in the MOR are in U.S. dollars and were converted using the following exchange rates:

(i)     Amounts in Balance Sheet were converted at 4,222.25 Colombian Pesos per U.S. dollar in line with the official exchange rate from Colombia's Central Bank as of April 30th, 2025; and

(ii)    Amounts in Income Statement and Cash Flows were converted at 4,278.23 Colombian Pesos per U.S. dollar in line with the average of the official exchange rates from Colombia's Central Bank for the period April 1st, 2025 to April 30th, 2025.

The Debtor hereby reserves all of its rights to dispute the validity, status, enforceability, or executory nature of any claim amount, representation or other statement in this MOR and reserves the right to amend or supplement this MOR, if necessary.

**CREDIVALORES CREDISERVICIOS S.A.**
**Case No. 24-10837**
**Cash Receipts and Disbursements April 1ˢᵗ to April 30ᵗʰ**

| Credivalores - Statement of Receipts and Disbursements | |
|---|---|
| **USD** | **Apr-25** |
| | |
| Receipts | |
| Credit Card | 460,066 |
| Small loans | 25,811 |
| Payroll loans | 2,047,784 |
| Interest | 34,669 |
| **Total Receipts** | **2,568,329** |
| | |
| Disbursements | |
| Payroll and wages | (189,794) |
| Leases | 0 |
| Administrative | (113,148) |
| Utilities | 0 |
| Operating costs | (1,176,549) |
| Taxes | (56,101) |
| Financial Obligations | (818,069) |
| Professional Fees & UST Fees | 0 |
| **Total Disbursements** | **(2,353,661)** |
| | |
| **Net cash flow** | **214,668** |
| Opening cash balance | 6,444,059 |
| FX | (43,642) |
| **Ending Cash Balance** | **6,615,084** |

| Credivalores - Cash Reconciliation | |
|---|---|
| **USD** | |
| Bank balance | 6,615,084 |
| (+) transfers in transit | 8,117 |
| Total Balance | 6,623,201 |
| Book balance | 6,623,201 |
| Variance | - |

**CREDIVALORES CREDISERVICIOS S.A.**

**Case No. 24-10837**

Balance Sheet as of April 30th

| Unaudited Balance Sheet | |
|---|---|
| **USD** | **Apr-25** |
| Cash and Cash Equivalents | 6,623,201 |
| Investments in Associates | 145,051 |
| **Total Cash and Cash Equivalents** | **6,768,252** |
| Loan Portfolio | 362,356,782 |
| Impairment | (162,188,869) |
| **Loan Portfolio. Net** | **200,167,913** |
| Derivative Instruments | 55,379 |
| Accounts Receivable, net | 55,110,163 |
| Tax Assets, net | 10,990,173 |
| Deferred taxes, net | 77,466,623 |
| PP&E | 5,868 |
| Intangible Assets, net | 126,135 |
| Investments in Associates | 0 |
| Other Assets | 225,021 |
| **Total Assets** | **350,915,528** |
| **Liabilities** | |
| Unsecured Notes | 259,631,647 |
| Unsecured Bank Debt | 139,978,913 |
| **Financial Liabilities** | **399,610,560** |
| Leases | 0 |
| Employees Benefits | 308,197 |
| Provisions | 278,680 |
| Accounts Payable | 13,534,080 |
| Current Taxes | 311,960 |
| Deferred Taxes | 0 |
| Other Liabilities | 4,734,428 |
| **Total Liabilities** | **418,777,906** |
| **Stockholders' Equity** | |
| Common Stock | 53,365,735 |
| Other Equity Accounts | 57,832,946 |
| Retained Earnings | (155,928,792) |
| Earnings from the Period | (23,132,266) |
| **Total Stockholders' Equity** | **(67,862,378)** |
| **Total Liabilities and Stockholders' Equity** | **350,915,528** |

**CREDIVALORES CREDISERVICIOS S.A.**

**Case No. 24-10837**

Post Petition Income Statement April 1st to April 30th

| Unaudited Income Statement | |
|---|---|
| **USD** | **Apr-25** |
| Interest Income | 1,460,015 |
| Commissions and Other Revenues | 108,008 |
| **Interest Income and Commissions** | **1,568,023** |
| Interest Expense | (1,222,358) |
| Portfolio Sale (Loss) | - |
| Currency Exchange Gains (Loss) | (2,134,333) |
| **Net Interest Income (Cost)** | **(1,788,667)** |
| Provision for Loan Losses | (8,446,682) |
| Other Receivables Provisions | (1,884,064) |
| **Gross Profit (Loss)** | **(12,119,414)** |
| Employees Benefits Expenses | (165,833) |
| Depreciation and Amortization | (14,052) |
| Other Expenses | (346,258) |
| **Operating Income (Loss)** | **(12,645,557)** |
| Financial Income | 20,411 |
| **Earnings Before Taxes** | **(12,625,147)** |
| Income Taxes | 3,282,538 |
| **Net Income (Loss)** | **(9,342,608)** |

EXHIBIT D

# Account Reconciliation

Field Office: 02 01 New York, NY

| | | | | | |
|---|---|---|---|---|---|
| **Case #:** 081-24-10837 | **CPC:** 07-03-24 | **OCS:** | **Billed($):** | | **478,963.18** |
| **Debtor:** CREDIVALORES - CREDISERVICIOS | **CDC:** | **CTO:** | Fees($): | | 476,698.00 |
| **Opened:** 05-16-24 | **Closed:** | **CNV:** | **CBC:** | Interest($): | 2,265.18 |
| | | **TIN:** | **Payments($):** | | **-338,853.34** |
| | | | Principal($): | | -337,421.63 |
| | | | Interest($): | | -1,431.71 |
| | | | **Balance($):** | | **140,109.84** |

| Quarterly Fees and Disbursements | | | Payments | | | |
|---|---|---|---|---|---|---|
| **Quarter** | **Disbursements ($)** | **Fee ($)** | **Batch/Trans ID** | **Date** | **Type Code** | **Payment($)** |
| 2-2024 | 12,064,268 | 96,514 | 91-048 | 08-14-24 | PMTUC | -96,514.00 |
| 3-2024 | 28,375,326 | 227,003 | 90-004 | 12-23-24 | PMTLBINT | -137.50 |
| 4-2024 | 12,183,129 | 97,465 | 90-004 | 12-23-24 | PMTUC | -226,865.50 |
| 1-2025 | 6,964,545 | 55,716 | 90-001 | 02-13-25 | PMTUC | -14,042.13 |
| | | | 90-001 | 02-13-25 | PMTLBINT | -1,294.21 |

## Interest

| Transaction Date | Assessment Period | Days | Interest Rate | Amount ($) |
|---|---|---|---|---|
| 05-07-25 | 04-01-25 through 04-30-25 | 30 | 4% | 274.72 |
| 04-03-25 | 03-01-25 through 03-31-25 | 31 | 4% | 283.88 |
| 03-07-25 | 02-01-25 through 02-28-25 | 28 | 4% | 274.87 |
| 02-07-25 | 01-01-25 through 01-31-25 | 31 | 4% | 0.47 |
| 01-06-25 | 11-01-24 through 12-31-24 | 61 | 4% | 1,293.74 |
| 11-07-24 | 08-01-24 through 10-31-24 | 92 | 4% | 137.50 |