# EXHIBIT 1
## DOCUMENT REQUESTS/FRBP 2004 TOPICS

## DEFINITIONS

"Acquiom" means Acquiom Agency Services LLC.

"Credit Agreement" means the Credit Agreement dated as of October 25, 2022 by and among Finanza Inversiones S.A.S. as borrower, the Debtor as guarantor, the Lenders and Acquiom as administrative agent, and all amendments thereto, including those dated as of February 3, 2023 and March 15, 2023.

"Debtor" means Credivalores - Crediservicios S.A.

"Lenders" means all lenders under the Credit Agreement, including GCS Colombia Finance LLC, GDA Luma Special Opportunities Fund, L.P. and ACON Colombia Finance II, LLC.

"Forbearance Agreement" means the annexed Amended & Restated Forbearance and Waiver Agreement dated as of March 7, 2024.

## INSTRUCTIONS

In accordance with Local Rule 2004-1, the uniform definitions and rules of construction from Local Civil Rule 26.3 apply to these requests.

Unless otherwise specifically stated, the temporal scope of these requests is September 1, 2022 through July 31, 2025, whether the documents were prepared in this period or refer to this period.

## REQUESTS/TOPICS

1.      All documents concerning the Credit Agreement, including all documents reflecting the terms of Acquiom's engagement as administrative agent.

2.      All documents concerning the Forbearance Agreement, including all documents concerning the addition of consent and exit fees under § 5.1 to outstanding loan balances owed to the respective Lenders, the payment of professional fees under § 5.2 and cash payments made under § 5.5(c).

3.      All communications with any of the Debtor, Finanza Inversiones S.A.S. or any of the Lenders, or any of their managers, general partners, directors, officers, employees, agents, attorneys or other representatives, in relation to the Credit Agreement, Forbearance Agreement or any payments made to or by Acquiom or obligations incurred thereunder.

4.      All documents concerning each payment made to Acquiom in relation to the Credit Agreement or the Forbearance Agreement, including documents sufficient to identify the bank or financial institution from which payment was made, the title of the account from which payment was made and full account number, the payment date and the payment amount.

5.      All documents concerning each payment that Acquiom made to or on behalf of any of the Lenders in relation to the Credit Agreement or the Forbearance Agreement, including documents sufficient to identify the bank or financial institution to which payment was made, the title of the account to which payment was made and full account number, the payment date and the payment amount.

This AMENDED & RESTATED FORBEARANCE AND WAIVER AGREEMENT (as may be amended, supplemented or otherwise modified, this "Agreement"), dated as of March 7, 2024, is by and among Finanza Inversiones S.A.S. (the "Borrower"), each of the Lenders party hereto (the "Lenders"), Credivalores-Crediservicios S.A. (the "Guarantor") and Acquiom Agency Services LLC, as administrative agent (the "Administrative Agent").

W I T N E S S E T H :

WHEREAS, the Borrower, the Guarantor, the Lenders and the Administrative Agent are parties to the Credit Agreement dated as of October 25, 2022, as amended on February 3, 2023 and as further amended on March 15, 2023 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement").

WHEREAS, pursuant to the Credit Agreement, the Lenders have made certain loans and other extensions of credit to the Borrower.

WHEREAS, each of the Loan Parties hereby acknowledges and agrees that as of the date hereof certain Defaults and Events of Default identified on Schedule I hereto have occurred under the Credit Agreement and that after the date hereof certain Defaults and Events of Default identified on Schedule I hereto may occur under the Credit Agreement (such Defaults and Events of Default, solely as they exist for the reasons described on Schedule I, the "Specified Events of Default").

WHEREAS, as a result of the occurrence of certain Specified Events of Default under the Credit Agreement, the Administrative Agent and the Lenders are entitled to exercise at any time their rights and remedies and to commence enforcement, litigation and collection actions under the Credit Agreement, the other Loan Documents and applicable law, including without limitation, to terminate the Commitments, to set off funds and to declare to be immediately due and payable the principal amount of the Loans now outstanding, all accrued interest (including Default interest), fees, and other similar amounts thereon and the other obligations of the Loan Parties accrued under the Credit Agreement and the other Loan Documents (such rights, remedies and actions, collectively, "Enforcement Actions"), in each case in accordance with the Loan Documents and applicable law.

WHEREAS, the Borrower and the Guarantor have requested that the Administrative Agent and the Lenders agree to (i) forbear from taking any Enforcement Actions to afford the Borrower and the Guarantor an opportunity to pursue a potential financial restructuring, including an exchange offer (the "Exchange Offer") by the Guarantor of its existing 8.875% Senior Notes due 2025 (the "Old Notes") for new Senior Secured Step-Up Notes due 2029 to be secured by certain assets of the Guarantor (the "New Notes") and (ii) waive compliance with the lien covenant in Section 7.01(b) of the Credit Agreement.

WHEREAS, the Lenders hereto have agreed to the Borrower and the Guarantor's request for a forbearance and waiver, subject to the terms and provisions set forth in this Agreement.

WHEREAS, the Borrower, the Guarantor, the Lenders and the Administrative Agent are parties to an existing Forbearance Agreement dated as of January 15, 2024 (the "Existing Forbearance Agreement").

WHEREAS, the Borrower, the Guarantor, the Lenders and the Administrative Agent now desire to amend and restate the Existing Forbearance Agreement in its entirety as set forth herein.

WHEREAS, the agreements of the Borrower and the Guarantor set forth in this Agreement (including the consent fee and the exit fee set forth at Section 5.1 and the payments and amortization set forth at Section 5.5(c)) are integral to the Lenders' willingness to enter into this Agreement.

NOW, THEREFORE, in consideration of the premises herein contained and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

SECTION 1.     DEFINITIONS.  Unless otherwise defined herein, capitalized terms are used herein as defined in the Credit Agreement.

SECTION 2.     ACKNOWLEDGEMENTS.

2.1     Amount of Obligations.  The Loan Parties acknowledge that the unpaid amount of principal, of accrued and unpaid interest (including Default interest) and fees, and commissions is outstanding and that such debt is valid, owed absolutely and not subject to any offsets, credit, defaces or adjustments of any kind.  Each Loan Party acknowledges and agrees that (i) as of March 4, 2024, the Obligations include, without limitation, the amounts set forth on Schedule II attached hereto on account of the outstanding unpaid amount of principal of, accrued and unpaid interest (including Default interest) on, and fees and commissions related to, the Loans and (ii) such Loan Party is indebted to the Lenders and the Administrative Agent for such Obligations and all other Obligations without defense, counterclaim or offset of any kind, and such Loan Party ratifies and reaffirms the validity, enforceability and binding nature of all such Obligations.

2.2     Events of Default.  Each Loan Party acknowledges and agrees that (a)(i) Specified Events of Default exist, are expected to occur, and will continue to exist, after the Forbearance Effective Date (as defined below) and (ii) no other Default or Event of Default has occurred and continues to exist as of the Forbearance Effective Date and (b) absent the agreement of the Lenders to forbear from taking Enforcement Actions as provided in this Agreement, the occurrence of the Specified Events of Default entitles the Administrative Agent and the Lenders to at any time take one or more Enforcement Actions.

2.3     Collateral.  Each Loan Party ratifies and reaffirms the validity and enforceability (without defense, counterclaim or offset of any kind) of the Liens and security interests granted to secure the Obligations by such Loan Party to the Collateral Agent, for the benefit of the Lenders, pursuant to the Collateral Documents to which such Loan Party is a party. Each Loan Party acknowledges and agrees that all such Liens and security interests granted by such Loan Party are not impaired by this Agreement and shall continue to secure the Obligations notwithstanding the occurrence of the Forbearance Effective Date. Each Loan Party hereby represents and warrants to the Administrative Agent and the Lenders that, pursuant to the Collateral Documents to which such Loan Party is a party, the Obligations are secured by a first priority (in the case of the agreements listed in Schedule 6.18, a second priority) and perfected Lien on, and security interest in, the Collateral, subject only to Permitted Liens.

SECTION 3.     FORBEARANCE.

3.1     Forbearance Period.

(a)     Subject to the terms and conditions of this Agreement (including the provision at the end of this clause (a)), the Administrative Agent and the Lenders shall forbear from taking any Enforcement Actions as a result of the occurrence of the Specified Events of Default during the period from and including the Forbearance Effective Date until the earliest to occur of any

of the following events (each such event, a "Forbearance Termination Event"; the date of such occurrence, the "Forbearance Termination Date"; and such period, the "Forbearance Period"):

(i) 11:59 p.m. (New York City time) on May 31, 2024, which may be extended from time to time by written agreement of the Lenders (email being sufficient);

(ii) the occurrence of a Default or Event of Default that is not a Specified Event of Default (including, for the avoidance of doubt, failure to pay any amount when due, including the payments described in Section 5.5(c) below);

(iii) by or on behalf of any other creditor of any Loan Party the commencement against any Loan Party, the Administrative Agent or any Lender of any material litigation or other exercise of any material rights or remedies (for the avoidance of doubt, it being understood that delivery of a notice of event of default or reservation of rights shall not alone constitute a Forbearance Termination Event under this clause (iii));

(iv) any representation or warranty made by any Loan Party in this Agreement proving to have been untrue, inaccurate or incomplete on or as of the date made or deemed made; and

(v) failure of any Loan Party to perform, as and when required, any of their respective covenants or other obligations set forth in this Agreement (it being understood that time is of the essence for each such covenant and obligation), including without limitation, any provision of Section 5 below.

provided, that the Loan Parties agree and acknowledge that this Agreement shall not constitute a forbearance of the rights, remedies and actions contained in Section 8.02 of the Credit Agreement and that the Administrative Agent and the Lenders retain all such rights, remedies and actions during the Forbearance Period, including the right to declare the Commitments and/or the Loans outstanding, and accrued interest, fees, and all other amounts owed, to be due and payable in whole; provided further, that the Administrative Agent shall not take any Enforcement Actions with respect to any Obligations accelerated during the Forbearance Period.

(b) Notwithstanding anything to the contrary contained herein, (i) the Specified Events of Default constitute actionable Events of Default for the purpose of triggering all limitations, restrictions or prohibitions on certain actions that may be taken or omitted or otherwise acquiesced to by or on behalf of any Loan Party pursuant to the Credit Agreement or any other Loan Document, including, without limitation, any and all limitations, restrictions or prohibitions with respect to any distribution, advance or other payment directly or indirectly from or for the benefit of any Loan Party to any other Loan Party, any direct or indirect owner of an equity interest in any Loan Party or any Affiliate of any of the foregoing and any actions or inactions taken or omitted or otherwise acquiesced to, by or on behalf of any Loan Party in violation of such provisions, in each case while any Default or Event of Default (including the Specified Events of Default) exists, will constitute additional Events of Default under the Credit Agreement and the other Loan Documents under this Agreement, and (ii) all fees and interest

(including Default interest) shall continue to accrue and be payable on the Obligations at the Default Rate (as such Default Rate is amended pursuant to the terms hereof) pursuant to Section 2.06 of the Credit Agreement. Each of the Loan Parties hereby acknowledges and agrees that as a result of the Specified Events of Default the Lenders have no obligation to make any Loan.

(c)     Notwithstanding anything to the contrary (including, without limitation, the definition of Interest Period), the Lenders direct that (i) all Loans have been and shall continue to be Term Benchmark Loans and (ii) the Adjusted Term SOFR rate has been and shall continue to be calculated after the Maturity Date as it was calculated prior to the Maturity Date, including with respect to the determination of Interest Periods.

3.2     <u>Limitation on Forbearance</u>.  Each Loan Party acknowledges and agrees that, notwithstanding the agreement of the Administrative Agent and the Lenders to forbear from taking any Enforcement Actions during the Forbearance Period in respect of the Specified Events of Default, (i) such forbearance shall not constitute a waiver of the occurrence or the continuance of any Event of Default (including the Specified Events of Default), and each such Event of Default which has occurred, or which is expected to occur, and is otherwise still continuing shall continue to exist during and after the Forbearance Effective Date and (ii) nothing contained in this Agreement shall be construed to limit or affect the right of the Administrative Agent and the Lenders to bring or maintain during the Forbearance Period any action to enforce or interpret any term or provision of this Agreement, or to file or record instruments of public record (or take other action) to perfect or further protect the Liens and security interests granted by the Loan Parties to the Administrative Agent.

3.3     <u>Enforcement Actions After Forbearance Period</u>.  Each Loan Party acknowledges and agrees that, on the Forbearance Termination Date, the Forbearance Period shall automatically terminate and the agreement of the Lenders and the Administrative Agent to forbear from taking any Enforcement Actions in respect of the Specified Events of Default shall immediately and automatically cease and be of no further force or effect, and the Administrative Agent and the Lenders shall be entitled to immediately take any or all Enforcement Actions under (and in accordance with) the Credit Agreement, the other Loan Documents and applicable law, all without further notice or demand, in respect of the Specified Events of Default or any other Event of Default then existing. Following the occurrence of the Forbearance Termination Date, the Administrative Agent and the Lenders shall have no obligation whatsoever to extend the maturity of the Credit Agreement, waive any Events of Default, defer any payments, or further forbear from exercising their rights and remedies.

SECTION 4.     <u>Waiver</u>

4.1     <u>Waiver of Lien Covenant</u>.  In the event that the Guarantor proceeds with the Exchange Offer and issues the New Notes during the Forbearance Period, the Administrative Agent and the Lenders hereby agree to exceptionally waive compliance with the requirement set forth in Section 7.01(b) of the Credit Agreement that the Guarantor shall not create or permit to exist any Lien on any of its property, revenues or other assets, solely in order to permit the Guarantor to secure the New Notes with a first-priority lien on the Guarantor's loan portfolio and a second priority lien on a Special Purpose Finance Trust (*patrimonio autónomo*), which Collateral is listed on Schedule III hereto (as may be modified or replaced from time to time with cash or assets in the loan portfolio having (x) comparable creditworthiness to the average creditworthiness of the Collateral listed in Schedule III and (y) a value that is equivalent to or lower than the value of the Collateral being replaced).

CRED-0023511

SECTION 5.    AGREEMENTS.   To induce the Administrative Agent and the Lenders to enter into this Agreement, the Borrower agrees as follows:

5.1    Consent Fee and Exit Fee.   In consideration of the forbearance by each of the Lenders under this Agreement, each of the Loan Parties hereby agrees to pay to the Lenders, which fees shall be earned on the date hereof, and payable on the date hereof in kind, pro rata in accordance with their Commitments, in the form of additional principal, pro-rata across all the Loans now outstanding, (a) a consent fee in an aggregate principal amount equal to U.S.$2,012,203.19 and (b) an exit fee in an aggregate principal amount equal to U.S.$2,012,203.19.

5.2    Payment of Fees and Expenses.   Each of the Loan Parties hereby agrees to pay the reasonable and documented fees, charges and disbursements of Simpson Thacher & Bartlett LLP, Milbank LLP, Cuatrecasas, Gomez Pinzon Abogados S.A.S., Paredes López & Asociados and counsel to the Administrative Agent, the Lenders or their respective counsel.

5.3    Cooperation.   The Loan Parties and their advisors shall reasonably cooperate in good faith with the Administrative Agent, the Lenders and their respective advisors regarding a potential restructuring of the Loan Parties' financial obligations and shall provide updates and reasonably detailed information regarding such potential restructuring and sale process (including copies of letters of intent, memorandum of understanding or draft term sheets subject to confidentiality restrictions existing as of the date hereof) and information regarding the operations, business affairs and financial condition of any Loan Party as reasonably requested by the Administrative Agent, the Lenders or their respective advisors (including any Monitoring Agent (as defined below)); provided, however, that the Loan Parties and their advisors will not be required to disclose, or permit the inspection or discussion of, any document, information or other matter (i) that in their good faith judgment constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which in their good faith judgment disclosure is prohibited by any Governmental Requirement or any binding agreement or (iii) that in their good faith judgment is subject to attorney client or similar privilege or constitutes attorney work product; provided that if the Loan Parties are restricted from sharing documents or information as a result of existing confidentiality agreements, the Loan Parties shall use good faith efforts to (x) amend such restrictions or (y) get the consent of the applicable parties, in each case, to share such documents or information with the Administrative Agent, the Lenders and their respective advisors.

5.4    Reporting; Notices and Pending Information.   In addition to the requirements set forth in the Credit Agreement, the Loan Parties shall provide the following reporting and notices to the Administrative Agent, each Lender and the Monitoring Agent:

(a)    (i) on Friday of each calendar week, commencing on the date hereof, an updated Cash Flow Projection (as defined below) for the 13-week period commencing on the immediately succeeding Monday, in a form consistent with the initial Cash Flow Projections, and (ii) so long as this Agreement remains in effect, on Friday of each calendar week, commencing on the date hereof, a reconciliation report and a variance report with respect to the most recently delivered Cash Flow Projection, which shall (x) compare the actual cash receipts and disbursements projected in the most recently delivered Cash Flow Projection for such period, (y) indicate the percentage variance, if any, of actual results of aggregate cash receipts and aggregate cash disbursements versus projections therefor for such period, together with an explanation for such variance, and (z) be in a form reasonably satisfactory to the Administrative Agent and its financial advisor;

(b)     with each delivery of the Cash Flow Projection described in paragraph (a) above, the Borrower shall deliver a certificate of the Monitoring Agent confirming that such Cash Flow Projection and comparison have been reviewed by the Monitoring Agent;

(c)     the Borrower shall provide, and shall direct the Monitoring Agent to provide, as soon as reasonably practicable information (including without limitation, details for any reporting) regarding the operations, business affairs and financial condition of any Loan Party, as reasonably requested by the Administrative Agent or any Lender;

(d)     the Borrower shall provide to the Administrative Agent prompt written notice of, or the threat in writing to the Borrower or any other Loan Party of, any action, suit, proceeding, exercise of remedies or notice of acceleration commenced against the Borrower, any other Loan Party or any of its or their officers or directors;

(e)     the Borrower shall provide written notice promptly upon receipt by the Borrower or any of its Subsidiaries of a material demand by any regulatory entity, creditor, guarantor, vendor, operator, surety provider or supplier to post additional collateral or provide additional credit support with respect to such entities' services, goods or obligations;

(f)     Each Loan Party shall provide by not later than the date hereof the documents and information included in Schedule I; and

(g)     Each Loan Party agrees that any failure to perform timely, and otherwise comply with, any of its obligations set forth in this Section 5.4 shall constitute an immediate Event of Default.

5.5     Other Agreements.

(a)     The Borrower shall not, and shall not permit any of its Subsidiaries to, make any Restricted Payments;

(b)     Each Loan Party hereby agrees that if any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Loan Party herein, under this Agreement or in any other Loan Document, or in any information or document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made, then such event shall constitute an Event of Default and, in any such event, all amounts owed under the Credit Agreement or any Loan Document will automatically become due and payable.

(c)     Without prejudice to the obligations of the Loan Parties to pay, repay or prepay any Obligation (including, for the avoidance of doubt, the principal amount of Loans outstanding) in the amounts and at the times required under the Credit Agreement or any other Loan Document, the Borrower hereby agrees to repay (and the Guarantor agrees to guarantee the repayment payment of) the Loans in the following aggregate principal amount:

(i) $8,400,000 on the date that is the earlier of (x) April 15, 2024, and (y) two (2) Business Days prior to the date on which the Exchange Offer is consummated;

(ii) $100,000 on April 30, 2024;

(iii) $200,000 on May 31, 2024;

(iv) $300,000 on June 30, 2024;

(v) $400,000 on July 31, 2024;

(vi) $500,000 on August 31, 2024;

(vii) $600,000 on September 30, 2024;

(viii) $700,000 on October 31, 2024;

(ix) $800,000 on November 30, 2024;

(x) $900,000 on December 31, 2024;

(xi) $1,000,000 on January 31, 2025; and

(xii) the lesser of (x) $1,060,000, and (y) the principal amount of Loans then outstanding, on February 28, 2025 and on the last Business Day of each month thereafter until all Loans have been paid in full.

The amounts paid in accordance with this clause (c) shall be applied pro rata across all Loans and, notwithstanding anything to the contrary in the Credit Agreement, such amounts shall be applied to repay principal and not interest or any other amounts due under the Credit Agreement.

Each Loan Party agrees that any failure to perform timely, and otherwise comply with, any of its payment obligations set forth in this clause (c) and clause (d) below shall constitute an immediate Event of Default.

(d)     The Borrower shall pay on or prior to the earliest of (x) two (2) Business Days before the date on which the Exchange Offer is consummated, (y) the date on which the legal fees incurred in connection with the Exchange Offer are paid (and concurrently with such payment) and (z) April 15, 2024, which date may be extended from time to time by written agreement of the Lenders (email being sufficient), all reasonable fees and accrued expenses of the Lenders, including, without limitation, the reasonable fees and expenses of Simpson Thacher & Bartlett LLP, Gomez Pinzon Abogados S.A.S., Cuatrecasas, Gonçalves Pereira, S.A.S., Milbank LLP and Paredes López & Asociados as described under Schedule IV hereof.

(e)     The Borrower, the Administrative Agent and the Lenders hereby agree that effective as of the date hereof, the Credit Agreement is hereby amended as follows:

(i)     the definition of "Applicable Rate" shall be amended by replacing the reference to "10%" with "15%"; and

(ii)     the definition of "Default Rate" shall be amended by replacing the references to "2%" with "5%" and the amended Default Rate shall apply to any applicable amounts from and after the date hereof.

(f)     In connection with Clause XIV of the Colombian Share Pledge Agreement, the Borrower acknowledges and agrees to immediately initiate the valuation proceeding of the

shares of BCF. The results of such valuation shall be deemed valid and binding upon all the parties under the Colombian Share Pledge Agreement absent manifest error.

(g)     Within five (5) Business Days after the date hereof, the Borrower along with other parties to the Colombian Share Pledge Agreement shall execute Amendment no. 3 to the Colombian Share Pledge Agreement (*Otrosí No. 3 al Contrato de Garantía Mobiliaria sobre Acciones*), substantially in the form of Schedule V hereof.

5.6     <u>Amendment of the FI SHA</u>.  Prior to the date that is the earlier of (x) two (2) Business Days prior to the date on which the Exchange Offer is consummated and (y) March 31, 2024, the Borrower shall cause that certain Stockholders' Agreement dated as of May 5, 2014, by and among the Borrower, ACON Consumer Finance Holdings S. de R.L., Lacrot Inversiones 2014, S.L.U. ("Lacrot") and the initial stockholders of the Borrower listed on Schedule I thereto, to be amended to reflect the following (the FI SHA, as so amended, the "<u>Amended FI SHA</u>"):

(a)     the existence, number and rights of the Class B Privileged Shares (*Acciones Privilegiadas Clase B*) of the Borrower (the "<u>Class B Privileged Shares</u>") as set forth in the minutes (*acta*) of the General Shareholders' Meeting (*Asamblea General de Accionistas*) of the Borrower dated on or about the date hereof (the "<u>FI Shareholders' Meeting Minutes</u>"), including the additional number of Class B Privileged Shares to be issued and the additional rights of the Class B Privileged Shares to be made effective after obtaining the approval of the *Superintendencia Financiera de Colombia* referred to therein (the "<u>SFC Approval</u>");

(b)     rights of the holders of Class B Privileged Shares that are at least as favorable as the rights that the holders of Series D Privileged Stock (*Acciones Privilegiadas Clase D*) of the Guarantor have pursuant to the bylaws (*estatutos*) of the Guarantor and that certain Stockholders' Agreement, dated as of May 5, 2014 (as amended by that certain Amendment No. 1 dated as of July 7, 2017, by that certain Amendment No. 2 dated as of May 26, 2023, and by that certain Amendment No. 3 dated as of June 30, 2023, the "<u>Credivalores SHA</u>"), by and among the Guarantor, Crediholding S.A., ACON Colombia Consumer Finance Holdings, S.L., Acon Consumer Finance Holdings II, S.L.U., Lacrot and DAVALIA Gestión de Activos S.L. ("<u>Davalia</u>"); <u>provided</u>, that the Amended FI SHA shall reflect that: (i) (A) prior to receiving the SFC Approval, GDA Luma Special Opportunities Fund, L.P. ("<u>GDA Luma Special Opportunities Fund</u>") and/or any of its Affiliates will own that certain number of Class B Privileged Shares giving the holder thereof certain rights and (B) after receiving the SFC Approval, GDA Luma Special Opportunities Fund and/or any of its Affiliates will own that greater number of Class B Privileged Shares giving the holder thereof certain additional rights, in each case of (A) and (B), as set forth in the FI Shareholders' Meeting Minutes; and (ii) (A) prior to receiving the SFC Approval, Lacrot and/or any of its Affiliates will own that certain number of Class B Privileged Shares giving the holder thereof certain rights and (B) after receiving the SFC Approval, Lacrot and/or any of its Affiliates will own that greater number of Class B Privileged Shares giving the holder thereof certain additional rights, in each case of (A) and (B), as set forth in the FI Shareholders' Meeting Minutes;

(c)     rights granted to GDA Luma Special Opportunities Fund and/or any of its Affiliates and Lacrot and/or any of its Affiliates that are at least as favorable as the rights granted to Davalia and Lacrot, respectively, pursuant to the Credivalores SHA;

(d)     any and all governance, consent or approval thresholds under the FI SHA that refer to holdings of Class B Privileged Shares of at least 15%, 10% or any other number greater than 9% by GDA Luma Special Opportunities Fund and/or any of its Affiliates

or by Lacrot and/or any of its Affiliates shall be deemed to refer instead to holdings of at least 9%; and

        (e)      any additional rights of the holders of Class B Privileged Shares that GDA Luma Special Opportunities Fund and/or any of its Affiliates and Lacrot and/or any of its Affiliates may deem desirable or necessary in connection with amending the FI SHA.

        Each Loan Party agrees that if the Borrower fails to amend the FI SHA prior to the date that is the earlier of (x) two (2) Business Days prior to the date on which the Exchange Offer is consummated and (y) March 31, 2024, in accordance with this Section 5.6, then such failure shall constitute an immediate Event of Default.

        5.7      <u>Transaction Fees</u>.

        (a)      Within eighteen (18) months from the date on which any amounts owed to GDA Luma Special Opportunities Fund and/or any of its Affiliates are capitalized or otherwise cancelled (or required to be capitalized or otherwise cancelled) in exchange for the issuance of Class B Privileged Shares pursuant to the FI Shareholders' Meeting Minutes, the Borrower shall pay to GDA Luma Special Opportunities Fund and/or one of its Affiliates (as designated in writing by GDA Luma Special Opportunities Fund and/or any of its Affiliates) an amount of cash (by wire transfer of immediately available funds to an account designated in writing by GDA Luma Special Opportunities Fund and/or any of its Affiliates, as applicable) equal to the amount so capitalized or otherwise cancelled (each such amount, a "<u>GDA Transaction Fee</u>"); <u>provided</u>, for the avoidance of doubt, that, as set forth in the FI Shareholders' Meeting Minutes, such capitalization or other cancellation of amounts owed to GDA Luma Special Opportunities Fund and/or any of its Affiliates will occur more than once and, accordingly, the Borrower will be required to make payments under this Section 5.7(a) more than once.

        (b)      Within eighteen (18) months from the date on which any amounts owed to Lacrot and/or any of its Affiliates are capitalized or otherwise cancelled (or required to be capitalized or otherwise cancelled) in exchange for the issuance of Class B Privileged Shares pursuant to the FI Shareholders' Meeting Minutes, the Borrower shall pay to Lacrot and/or one of its Affiliates (as designated in writing by Lacrot and/or any of its Affiliates, as applicable) an amount of cash (by wire transfer of immediately available funds to an account designated in writing by Lacrot and/or any of its Affiliates) equal to the amount so capitalized or otherwise cancelled (each such amount, a "<u>Lacrot Transaction Fee</u>", and, together with the GDA Transaction Fee, the "<u>Transaction Fees</u>"); <u>provided</u>, for the avoidance of doubt, that, as set forth in the FI Shareholders' Meeting Minutes, such capitalization or other cancellation of amounts owed to Lacrot and/or any of its Affiliates will occur more than once and, accordingly, the Borrower will be required to make payments under this Section 5.7(b) more than once.

        (c)      Each Loan Party agrees that the Transaction Fees and the obligations of the Borrower under Section 5.7(a) and Section 5.7(b) shall be deemed to be Obligations under the Credit Agreement. For the avoidance of doubt, payment of the Transaction Fees pursuant to this Section 5.7 shall not constitute or be deemed to constitute payment of, and shall not reduce or be deemed to reduce, any amounts payable by the Borrower under the Credit Agreement or any other provision of this Agreement.

(d)     Payment of the Transaction Fees shall be made free and clear of, and not be subject to, any and all present and future withholding, levies, imposts, deductions, charges or other applicable taxes or to any deduction, counterclaim or set-off for, or be otherwise affected by, any claim or dispute relating to, any other matter; <u>provided</u>, that to the extent that payment of any Transaction Fee will be subject to deductions or withholdings of any nature, the sum payable by the Borrower shall be increased as necessary so that after making all such required deductions or withholdings, the corresponding party receives an amount equal to the sum it would have received had no such deductions or withholdings been made. Any Transaction Fees payable by the Borrower hereunder are in addition to and not creditable against any other fee payable to the Lenders.

5.8     <u>Survival</u>. For the avoidance of doubt, the obligations in this Section 5 shall survive the Forbearance Termination Date and the obligations in Section 5.6 and Section 5.7 shall survive the termination of the Credit Agreement and this Agreement.

SECTION 6.     <u>CONDITIONS PRECEDENT</u>.

6.1     <u>Forbearance Effective Date</u>. This Agreement shall become effective on the first date on which all of the following conditions have been satisfied or waived by the Administrative Agent and the Required Lenders (the "<u>Forbearance Effective Date</u>"):

(a)     <u>Execution and Delivery</u>. The Administrative Agent shall have received counterparts of this Agreement duly executed by (a) the Borrower and the Guarantors and (b) each Lender.

(b)     <u>Cash Flow Projection</u>. The Administrative Agent shall have received a cash flow projection of the Borrower and its Subsidiaries on a consolidated, line-item and weekly basis, which shall include projected cash receipts and disbursements, for the 13-week period commencing on Monday, March 4, 2024, in a form reasonably satisfactory to the Administrative Agent (a "<u>Cash Flow Projection</u>").

(c)     <u>No Default</u>. Upon giving effect to this Agreement, there shall be no Default or Event of Default (other than the Specified Events of Default).

(d)     <u>Representations and Warranties</u>. As of the Forbearance Effective Date, the representations and warranties contained in this Agreement, the Credit Agreement and in each other Loan Document (other than with respect to Specified Events of Default) shall be true and correct in all material respects (or in any respect to the extent such representation or warranty is qualified by materiality) on and as of the Forbearance Effective Date as if made on and as of the Forbearance Effective Date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects (or in any respect to the extent such representation or warranty is qualified by materiality) on and as of such earlier date.

(e)     <u>Retention of a Monitoring Agent</u>. The Borrower shall have countersigned an engagement letter of one monitoring agent (the "<u>Monitoring Agent</u>") for the Administrative Agent, the Lenders, or their respective counsel, on terms and conditions acceptable to the Administrative Agent in its reasonable discretion, pursuant to which, among other things, the Loan Parties agree to pay all reasonable and documented fees, charges and disbursements of any such monitoring agent.

(f)    <u>Fees and Expenses</u>. The Borrower shall have paid all reasonable fees and accrued expenses of the Administrative Agent, including, without limitation, the reasonable fees and expenses of Simpson Thacher & Bartlett LLP solely in its capacity as counsel to the Administrative Agent, as set forth in Schedule IV hereof.

SECTION 7.    <u>REPRESENTATIONS AND WARRANTIES</u>. In order to induce the Administrative Agent and the Lenders party hereto to enter into this Agreement, the Loan Parties hereby represent and warrant to the Administrative Agent and the Lenders that:

(a)    each Loan Party is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, and has all requisite power and authority to execute, deliver and perform this Agreement;

(b)    the representations and warranties of each Loan Party contained in the Credit Agreement and the other Loan Documents are true and correct in all material respects on and as of the Forbearance Effective Date (except with respect to the Specified Events of Default) as if made on and as of the Forbearance Effective Date;

(c)    each Loan Party has granted to the Collateral Agent Liens on and security interests in all of such Loan Party's assets to the extent required by the Loan Documents;

(d)    the execution, delivery, and performance by each Loan Party of this Agreement, (i) have been duly authorized by all necessary corporate or limited liability company and, if required, stockholder or member action on the part of such Loan Party, (ii) does not and will not violate any applicable law or regulation applicable to such Loan Party or the charter, limited liability company agreement, by-laws or other organizational documents of such Loan Party or any order of any Governmental Authority and (iii) does not require any consent or approval of, registration or filing with (other than any disclosure filing), or any other action by, any Governmental Authority, except as have been made or obtained or made and are in full force; and

(e)    this Agreement constitutes the legal, valid and binding obligation of each Loan Party, enforceable against such Loan Party in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 8.    <u>CONTINUING EFFECT</u>. The Credit Agreement shall continue to be and shall remain in full force and effect in accordance with its terms. This Agreement shall not constitute an amendment, waiver or modification of any provision of the Credit Agreement and shall not be construed as an amendment, waiver or modification of any action on the part of the Borrower or the other Loan Parties that would require an amendment, waiver or consent of the Administrative Agent or the Lenders, in each case except as set forth herein, including Section 5 hereof. This Agreement is a Loan Document.

SECTION 9.    <u>CONSENT OF GUARANTOR</u>. The Guarantor hereby consents to this Agreement, and to the amendments and modifications to the Credit Agreement pursuant hereto.

SECTION 10.    <u>RELEASE</u>. Each of the Loan Parties (on behalf of itself and its Affiliates) and its successors-in-title, legal representatives and assignees and, to the extent the same is claimed by right of, through or under any of the Loan Parties, for its past, present and future employees, agents, representatives, officers, directors, shareholders, and trustees (each, a "<u>Releasing Party</u>" and collectively,

the "Releasing Parties"), does hereby release and discharge, and shall be deemed to have forever released and discharged, the Administrative Agent and each other Lender, and the Administrative Agent's and each other Lender's respective successors-in-title, legal representatives and assignees, past, present and future officers, directors, affiliates, shareholders, trustees, agents, employees, consultants, experts, advisors, attorneys and other professionals and all other persons and entities to whom any of the foregoing would be liable if such persons or entities were found to be liable to any Releasing Party, or any of them (collectively hereinafter the "Lender Parties"), from any and all manner of action and actions, cause and causes of action, claims, charges, demands, counterclaims, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, damages, judgments, expenses, executions, liens, claims of liens, claims of costs, penalties, attorneys' fees, or any other compensation, recovery or relief on account of any liability, obligation, demand or cause of action of whatever nature, whether in law, equity or otherwise (including, without limitation, any so called "lender liability" claims, interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses and incidental, consequential and punitive damages payable to third parties, or any claims arising under 11 U.S.C. §§ 541-550 or any claims for avoidance or recovery under any other federal, state or foreign law equivalent), whether known or unknown, fixed or contingent, joint and/or several, secured or unsecured, due or not due, primary or secondary, liquidated or unliquidated, contractual or tortious, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Lender Parties in their capacities as such under any of the Loan Documents or Collateral Documents, whether held in a personal or representative capacity, solely to the extent based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including (but not after) the date hereof in any way, directly or indirectly arising out of, connected with or relating to any of this Agreement, the Loan Documents or Collateral Documents and the transactions contemplated hereby or thereby, or any other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing (each, a "Claim" and collectively, the "Claims"). Each Releasing Party further stipulates and agrees with respect to all Claims, that it hereby waives, to the fullest extent permitted by applicable law, any and all provisions, rights, and benefits conferred by any applicable U.S. federal or state law, or any principle of common law, that would otherwise limit a release or discharge of any unknown Claims pursuant to this Section 10.

SECTION 11.  GOVERNING LAW.  THIS AGREEMENT, AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO, SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

SECTION 12.  WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

SECTION 13.  SUCCESSORS AND ASSIGNS.  This Agreement shall be binding upon and inure to the benefit of the Borrower, the Guarantor, the Administrative Agent, and the Lenders, and each of their respective successors and assigns, and shall not inure to the benefit of any third parties. The execution and delivery of this Agreement by any Lender prior to the Forbearance Effective Date shall be binding upon its successors and assigns and shall be effective as to any Loans or Commitments assigned to it after such execution and delivery.

SECTION 14.  NO THIRD PARTY BENEFICIARIES.  This Agreement is made and entered into for the sole protection and benefit of the parties hereto and no other person or entity shall have any right of action hereon, right to claim any right or benefit from the terms contained herein, or be deemed a third party beneficiary hereunder.

SECTION 15. <u>REVIEW AND CONSTRUCTION OF DOCUMENTS</u>. Each party hereto hereby acknowledges, and represents and warrants to the other parties hereto, that:

      (a)     it has had the opportunity to consult with legal counsel of its own choice and has been afforded an opportunity to review this Agreement with legal counsel;

      (b)     it has carefully reviewed this Agreement and fully understands all terms and provisions of this Agreement;

      (c)     it has freely, voluntarily, knowingly, and intelligently entered into this Agreement of its own free will and volition;

      (d)     none of the Administrative Agent or the Lenders have a fiduciary relationship with any of the Loan Parties and the Loan Parties do not have a fiduciary relationship with the Administrative Agent or Lenders, and the relationship between the Administrative Agent and the Lenders, on the one hand, and the Loan Parties, on the other hand, is solely that of creditor and debtor; and

      (e)     no joint venture exists among the Loan Parties, the Administrative Agent and/or the Lenders.

SECTION 16.  <u>Notices</u>. All notices and requests in connection with this Agreement or the Credit Agreement (notwithstanding Section 11.02 thereof) to the Borrower or the Administrative Agent or the Collateral Agent shall be sufficiently given or made if given or made in writing via hand delivery, overnight courier, U.S. Mail (postage prepaid) or email, and addressed as follows:

| | |
|---|---|
| If to the Loan Parties: | Finanza Inversiones S.A.S.<br>Address: Carrera 10 #65-98, Bogotá, Colombia<br>Phone: + (571) 315 380 7014<br>Email: notificaciones@finanzainversiones.com<br>Attention: María Cristina Rojas |
| | Credivalores-Crediservicios S.A.<br>Address: Carrera 7 # 76-35, Piso 7, Bogotá, Colombia<br>Phone: + (571) 313 7500 Ext 1319<br>Email: jburitica@credivalores.com<br>Attention: Jaime Buriticá Leal |
| If to the Administrative Agent: | Acquiom Agency Services LLC<br>950 17th Street<br>Suite 1400<br>Denver, Colorado 80202<br>Telephone: (512) 639-3871<br>Email: bcesari@srsacquiom.com<br>Attention: Beth Cesari / Senior Director |

If to the Collateral Agent:    Credicorp Capital Fiduciaria S.A.
                               Address: Calle 34 # 6-65, Bogotá, Colombia
                               Phone: + (571) 307 8047 Ext 3005
                               Email: spalomino@credicorpcapital.com
                               Attention: Silvia Ruth Palomino

SECTION 17. ENTIRE AGREEMENT; AMENDMENT. THIS AGREEMENT EMBODIES THE FINAL, ENTIRE AGREEMENT AMONG THE PARTIES HERETO REGARDING THE ADMINISTRATIVE AGENT'S AND THE LENDERS' FORBEARANCE WITH RESPECT TO THEIR RIGHTS AND REMEDIES WHICH MAY ARISE AS A RESULT OF THE SPECIFIED EVENTS OF DEFAULT AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSION OF THE PARTIES HERETO. THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES HERETO. The provisions of this Agreement may be amended or waived only by an instrument in writing signed by the Borrower, the Administrative Agent and the Required Lenders under the Credit Agreement.

SECTION 18. SEVERABILITY. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

SECTION 19. COUNTERPARTS. This Agreement may be executed by the parties hereto in any number of separate counterparts and all of said counterparts taken together shall be deemed to constitute one and the same instrument. An executed signature page of this Agreement may be delivered by facsimile transmission or electronic PDF of the relevant signature page hereof.

SECTION 20. FURTHER ASSURANCES. The Loan Parties agree to execute, acknowledge, deliver, file and record such further certificates, instruments and documents, and to do all other acts and things, as may be reasonably requested by the Administrative Agent and necessary or advisable to carry out the intents and purposes of this Agreement.

SECTION 21. HEADINGS. Section headings used in this Agreement are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their duly authorized officers as of the date first written above.

FINANZA INVERSIONES S.A.S.,
as Borrower

By ⟨signature⟩

Name: María Cristina Rojas
Title: Legal Representative

CRED-0023522

GCS COLOMBIA FINANCE LLC, as Lender

By _____
Title:   Gustavo Ferraro
       Authorized Signatory


By _____
Title:   Joshua O'Melia
       Authorized Signatory

CRED-0023523

GDA LUMA SPECIAL OPPORTUNITIES FUND, L.P., as Lender

By: GDA Luma Special Opportunities GP, LLC, its general partner

By: _____

Title: Gabriel de Alba, Managing Member

CRED-0023524

ACON COLOMBIA FINANCE II, LLC, as Lender

By _____
Title:    Authorized signatory

CRED-0023525

CREDIVALORES-CREDISERVICIOS S.A., as Guarantor

By _____
Name: Liliana Arango Salaza
Title: Legal Representative

CRED-0023526

ACQUIOM AGENCY SERVICES LLC,
as Administrative Agent

By _Beth Cesari_____

Name: Beth Cesari
Title: Senior Director

CRED-0023527